### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Allied Systems Holdings, Inc., et al.,[1] | ) Case No. 12-11564 (CSS) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |
| | ) |
| The Official Committee of Unsecured Creditors Of | ) |
| Allied Systems Holdings, Inc. and its affiliated | ) |
| debtors, | ) |
| | ) |
| Plaintiff(s), | ) Adversary Proceeding No. 13-50530- |
| | ) (CSS) |
| -against- | ) |
| | ) |
| Yucaipa American Alliance Fund, I, LP, Yucaipa | ) |
| American Alliance (Parallel) Fund I, L.P., Yucaipa | ) |
| American Alliance Fund, II, LP, Yucaipa American | ) |
| Alliance (Parallel) Fund II, L.P., Mark J. Gendregske, | ) |
| Jos Opdeweegh, James Frank, Derex Walker, Jeff | ) |
| Pelletier, Ira Tochner, and Joseph Tomczak, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ANSWER AND AFFIRMATIVE DEFENSE OF DEFENDANTS YUCAIPA AMERICAN ALLIANCE FUND, I, LP, YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND, II, LP, AND YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P. TO PLAINTIFF'S COMPLAINT

---

[1] The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd,. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).

Defendants Yucaipa American Alliance Fund, I, LP, Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund, II, LP and Yucaipa American Alliance (Parallel) Fund II, L.P. (collectively, the "Defendants") by and through their undersigned counsel, answer the Complaint for (I) Equitable Subordination, (II) Recharacterization, (III) Breach of Contract, (IV) Specific Performance, (V) Breaches of Fiduciary Duty, (VI) Aiding and Abetting Breaches of Fiduciary Duties, (VII) Avoidance and Recovery of Avoidable Transfers, and (VIII) Disallowance of Certain Claims filed by Plaintiff The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. dated February 1, 2013 as follows:

## ANSWER TO COMPLAINT

1.      The Defendants deny the allegations in Paragraph 1 of the Complaint.

2.      In response to the allegations in Paragraph 2 of the Complaint, the Defendants admit that Yucaipa converted all of its debt claims into approximately 67% of the equity in Allied Systems Holdings ("Allied"), as reorganized.  Except as expressly so alleged, the Defendants deny the allegations contained in Paragraph 2 of the Complaint.

3.      The Defendants are informed and believe that the allegations contained in Paragraph 3 of the Complaint are correct.

4.      The Defendants deny the allegations contained in Paragraph 4 of the Complaint.

5.      The Defendants deny the allegations contained in Paragraph 5 of the Complaint.

6.      The Defendants deny the allegations contained in Paragraph 6 of the Complaint.

7.      In response to the allegations set forth in Paragraph 7 of the Complaint, the Defendants admit that they did not purchase any First Lien Debt pursuant to the Third Amendment.  Except as expressly so alleged, the Defendants deny the allegations contained in Paragraph 7 of the Complaint.

8.      In response to the allegations set forth in Paragraph 8 of the Complaint, the Defendants admit that, in February 2009 they pursued a tender offer to acquire a certain amount of First Lien Debt.  Except as expressly so alleged, the Defendants deny the allegations contained in Paragraph 8 of the Complaint.

9.      The Defendants deny the allegations contained in Paragraph 9 of the Complaint.

10.      The Defendants deny the allegations contained in Paragraph 10 of the Complaint.

11.      The Defendants deny the allegations contained in Paragraph 11 of the Complaint.

12.      The Defendants deny the allegations contained in Paragraph 12 of the Complaint.

13.      The Defendants deny the allegations contained in Paragraph 13 of the Complaint.

14.      The Defendants deny the allegations contained in Paragraph 14 of the Complaint.

15.      The Defendants deny the allegations contained in Paragraph 15 of the Complaint.

16.      The Defendants deny the allegations contained in Paragraph 16 of the Complaint.

17.      The Defendants deny the allegations contained in Paragraph 17 of the Complaint.

18.      The allegations contained in Paragraph 18 of the Complaint simply summarize the claims asserted and, therefore, the Defendants respectfully refer the Court to the allegations contained in the Complaint. Except as expressly so alleged, the Defendants deny the remaining allegations contained in Paragraph 18 of the Complaint.

19.      The allegations in Paragraph 19 of the Complaint set forth legal conclusions to which no response is required.

20.      The allegations in Paragraph 20 of the Complaint set forth legal conclusions to which no response is required.

21.      The allegations in Paragraph 21 of the Complaint set forth legal conclusions to which no response is required.

22.     The allegations in Paragraph 22 of the Complaint set forth legal conclusions to which no response is required.

23.     The allegations in Paragraph 23 of the Complaint set forth legal conclusions to which no response is required.

24.     In response to the allegations set forth in Paragraph 24 of the Complaint, the Defendants respectfully refer the Court to the Plaintiff's motion seeking standing and authority to bring the Committee's claims against the Defendants, which speaks for itself.

25.     The Defendants admit, upon information and belief, the allegations contained in Paragraph 25 of the Complaint.

26.     The Defendants admit the allegations contained in Paragraph 26 of the Complaint.

27.     The Defendants admit, upon information and belief, the allegations contained in Paragraph 27 of the Complaint.

28.     In response to the allegations contained in Paragraph 28 of the Complaint the Defendants admit, upon information and belief, the residency of the named defendant and further admit that he was a director of Allied and affiliated with these Defendants while serving in that capacity.

29.     In response to the allegations contained in Paragraph 29 of the Complaint the Defendants admit, upon information and belief, the residency of the named defendant and further admit that he was a director of Allied and affiliated with these Defendants while serving in that capacity.

30.     In response to the allegations contained in Paragraph 30 of the Complaint the Defendants admit, upon information and belief, the residency of the named defendant and further admit that he was a director of Allied and affiliated with these Defendants while serving in that capacity.

31.     In response to the allegations contained in Paragraph 31 of the Complaint the Defendants admit, upon information and belief, the residency of the named defendant and further admit that he was a director of Allied and affiliated with these Defendants while serving in that capacity.

32.     In response to the allegations contained in Paragraph 32 of the Complaint the Defendants admit, upon information and belief, the residency of the named defendant and further admit that he was a director of Allied and affiliated with these Defendants while serving in that capacity.

33.     In response to the allegations contained in Paragraph 33 of the Complaint the Defendants admit, upon information and belief, the residency of the named defendant and further admit that he was an interim officer of Allied and affiliated with these Defendants while serving in that capacity.

34.     The Defendants admit the allegations contained in Paragraph 34 of the Complaint.

35.     The Defendants deny the allegations contained in Paragraph 35 of the Complaint.

36.     In response to the allegations contained in Paragraph 36 of the Complaint, the Defendants respectfully refer the Court to Allied's bankruptcy proceedings in the United States Bankruptcy Court for the Northern District of Georgia (the "Prior Allied Bankruptcy Cases"), which speak for themselves.

37.     The Defendants deny the allegations contained in Paragraph 37 of the Complaint.

38.     In response to the allegations set forth in Paragraph 38 of the Complaint, the Defendants respectfully refer the Court to the minutes of the February 20, 2007 meeting of the Board, which speak for themselves.

39.     In response to the allegations set forth in Paragraph 39 of the Complaint, the Defendants respectfully refer the Court to the minutes of the February 12, 2007 meeting of the Board, which speak for themselves.

40.     The Defendants deny the allegations contained in Paragraph 40 of the Complaint.

41.     In response to the allegations set forth in Paragraph 41 of the Complaint, the Defendants respectfully refer the Court to the minutes of the March 16, 2007 meeting of the Board, which speak for themselves.

42.     The Defendants deny the allegations contained in Paragraph 42 of the Complaint.

43.     In response to the allegations set forth in Paragraph 43 of the Complaint, the Defendants respectfully refer the Court to the Second Amended Joint Plan of Reorganization of Allied Holdings, Inc. And Affiliated Debtors Proposed By The Debtors, Yucaipa, And The Teams National Automobile Transportation Industry Negotiating Committee (the "2007 Reorganization Plan") and Allied's Form 8-K, dated May 24, 2007, which speak for themselves.

44.     In response to the allegations set forth in Paragraph 44 of the Complaint, the Defendants respectfully refer the Court to the 2007 Reorganization Plan, which speaks for itself.

45.     The Defendants admit that, pursuant to the 2007 Reorganization Plan, Yucaipa became the majority shareholder of Allied.  Except as expressly so alleged, the Defendants deny the allegations contained in Paragraph 45 of the Complaint.

46.     In response to the allegations set forth in Paragraph 46 of the Complaint, the Defendants respectfully refer the Court to the 2007 Reorganization Plan, which speaks for itself.

47.     In response to the allegations contained in Paragraph 47 of the Complaint, the Defendants respectfully refer the Court to the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit Agreement and Guaranty Agreement, dated May 15, 2007 ("First Lien Credit Agreement") and the Second Lien Secured Super-Priority Debtor in

Possession and Exit Credit Agreement and Guaranty Agreement, dated May 15, 2007 ("Second Lien Credit Agreement"), which speak for themselves.

48.     In response to the allegations contained in Paragraph 48 of the Complaint, the Defendants respectfully refer the Court to First Lien Credit Agreement, which speaks for itself.

49.     In response to the allegations contained in Paragraph 49 of the Complaint, the Defendants respectfully refer the Court to First Lien Credit Agreement, which speaks for itself.

50.     In response to the allegations contained in Paragraph 50 of the Complaint, the Defendants respectfully refer the Court to Second Lien Credit Agreement, which speaks for itself.

51.     In response to the allegations contained in Paragraph 52 of the Complaint, the Defendants respectfully refer the Court to Second Lien Credit Agreement, which speaks for itself.

52.     In response to the allegations set forth in Paragraph 52 of the Complaint, the Defendants understand that Allied may have been in default at certain periods of time, but that no lenders ever exercised remedies against Allied as a result thereof and that lenders, including the Petitioning Creditors, specifically directed the Administrative Agent not to do so.

53.     In response to the allegations contained in Paragraph 53 of the Complaint, the Defendants respectfully refer the Court to the First and Second Lien Credit Agreements, which speak for themselves.

54.     In response to the allegations set forth in Paragraph 54 of the Complaint, the Defendants respectfully refer the Court to First Lien Credit Agreement, which speaks for itself.

55.     In response to the allegations set forth in Paragraph 55 of the Complaint, the Defendants respectfully refer the Court to First Lien Credit Agreement, which speaks for itself.

56.    In response to the allegations set forth in Paragraph 56 of the Complaint, the Defendants respectfully refer the Court to First Lien Credit Agreement, which speaks for itself.

57.    In response to the allegations set forth in Paragraph 57 of the Complaint, the Defendants respectfully refer the Court to Third and Fourth Amendments of the First Lien Credit Agreement (respectively, the "Third Amendment" and "Fourth Amendment"), which speaks for themselves.

58.    In response to the allegations set forth in Paragraph 58 of the Complaint, the Defendants respectfully refer the Court to Third Amendment to the Second Lien Credit Agreement, which speaks for itself.

59.    The Defendants deny the allegations in Paragraph 59 of the Complaint.

60.    In response to the allegations set forth in Paragraph 60 of the Complaint, the Defendants acquired a portion of the Second Lien Debt at a discount to par and exchanged a portion of the acquired debt for preferred stock in Allied.  Except as expressly so alleged, the Defendants deny the allegations contained in Paragraph 60 of the Complaint.

61.    In response to the allegations contained in first two sentences of Paragraph 61 of the Complaint, the Defendants respectfully refer the Court to the Second Lien Credit Agreement, which speaks for itself.  The Defendants deny the remaining allegations contained in Paragraph 61 of the Complaint.

62.    The Defendants deny the allegations in Paragraph 62 of the Complaint.

63.    The Defendants deny the allegations in Paragraph 63 of the Complaint.

64.    The Defendants deny the allegations in Paragraph 64 of the Complaint.

65.    In response to the allegations contained in Paragraph 65 of the Complaint, the Defendants respectfully refer the Court to the Third Amendment, which speaks for itself.

66.     In response to the allegations in Paragraph 66 of the Complaint, the Defendants respectfully refer the Court to the Third Amendment, which speaks for itself.

67.     In response to the allegations contained in Paragraph 67 of the Complaint, the Defendants acknowledge they never intended to acquire First Lien Debt subject to the restrictions contained in the Third Amendment.  The Defendants further respectfully refer the Court to Yucaipa's filings in these bankruptcy proceedings, which speak for themselves. Except as expressly so alleged, the Defendants deny the allegations contained in Paragraph 67 of the Complaint.

68.     The Defendants deny the allegations in Paragraph 68 of the Complaint.

69.     The Defendants are informed and believe that the allegations contained in the first sentence of Paragraph 69 of the Complaint are true.  The Defendants deny the remaining allegations contained in Paragraph 69 of the Complaint.

70.     The Defendants deny the allegations in Paragraph 70 of the Complaint.

71.     In response to the allegations contained in Paragraph 71 of the Complaint, the Defendants are informed and believe that the Special Committee relied on advice from Goldman Sachs and the law firm of Troutman Sanders LLP.  Except as expressly so alleged, the Defendants deny the allegations in Paragraph 71 of the Complaint.

72.     In response to the allegations contained in Paragraph 72 of the Complaint, the Defendants respectfully refer the Court to the minutes of the Special Committee meetings referenced therein, which speak for themselves.

73.     In response to the allegations contained in Paragraph 73 of the Complaint, the Defendants respectfully refer the Court to the minutes of the April 17, 2008 Special Committee meeting, which speak for themselves.

74.    In response to the allegations contained in Paragraph 74 of the Complaint, the Defendants acknowledge they were unwilling to acquire First Lien Debt subject to the restrictions contained in the Third Amendment.  Except as expressly so alleged, the Defendants deny the allegations in Paragraph 74 of the Complaint.

75.    The Defendants deny the allegations in Paragraph 75 of the Complaint.

76.    In response to the allegations contained in the second, third, and fourth sentences of Paragraph 76 of the Complaint, the Defendants respectfully refer the Court to the documents which the Plaintiff purportedly quotes, which speak for themselves.  The Defendants deny the allegations contained in the first sentence of Paragraph 76 of the Complaint.

77.    The Defendants deny the allegations in Paragraph 77 of the Complaint.

78.    The Defendants deny the allegations contained in the first sentence of Paragraph 78 of the Complaint.  In response to the remaining allegations set forth in Paragraph 78 of the Complaint, the Defendants respectfully refer the Court to the minutes of the December 10, 2008 Board meeting, which speak for themselves.

79.    The Defendants deny the allegations in Paragraph 79 of the Complaint.

80.    The Defendants deny the allegations contained in the first sentence of Paragraph 80 of the Complaint.  In response to the remaining allegations contained in Paragraph 80 of the Complaint, the Defendants refer the Court to the minutes of the February 3, 2009 Special Committee meeting, which speak for themselves.

81.    The Defendants deny the allegations in Paragraph 81 of the Complaint.

82.    In response to the allegations contained in Paragraph 82 of the Complaint, the Defendants respectfully refer the Court to the February 2, 2009 email referenced therein, which speaks for itself.

83.     In response to the allegations contained in Paragraph 83 of the Complaint, the Defendants respectfully refer the Court to the February 3, 2009 email referenced therein, which speaks for itself.

84.     In response to the allegations contained in Paragraph 84 of the Complaint, the Defendants admit that, in February 2009, Yucaipa tendered for a certain amount of First Lien Debt and that the tender offer materials speak for themselves.  Except as expressly so alleged, the Defendants deny the allegations in Paragraph 84 of the Complaint.

85.     In response to the allegations contained in Paragraph 85 of the Complaint, the Defendants admit that the tender offer was unsuccessful because the majority of the First Lien Debt was acquired by ComVest Investment Partners III, L.P. ("ComVest").  Except as expressly so alleged, the Defendants deny the allegations in Paragraph 85 of the Complaint.

86.     The Defendants deny the allegations in Paragraph 86 of the Complaint.

87.     In response to the allegations contained in Paragraph 87 of the Complaint, the Defendants respectfully refer the Court to the minutes of the March 6, 2009 Board meeting, which speak for themselves.

88.     In response to the allegations contained in Paragraph 88 of the Complaint, the Defendants respectfully refer the Court to the minutes of the March 6, 2009 Board meeting, which speak for themselves.

89.     In response to the allegations contained in Paragraph 89 of the Complaint, the Defendants respectfully refer the Court to the minutes of the March 6, 2009 Board meeting, which speak for themselves.

90.     The Defendants deny the allegations contained in Paragraph 90 of the Complaint.

91.     The Defendants deny the allegations contained in Paragraph 91 of the Complaint.

92.     The Defendants deny the allegations contained in Paragraph 92 of the Complaint.

93.     The Defendants deny the allegations contained in Paragraph 93 of the Complaint.

94.     In response to the allegations contained in Paragraph 94 of the Complaint, the

Defendants acknowledge that Allied may have been in default at certain periods of time, but

understand that no lenders exercised remedies against Allied as a result thereof and that lenders,

including Petitioning Creditors, specifically directed the Administrative Agent not to do so.

Except as expressly so alleged, the Defendants deny the allegations contained in Paragraph 94 of

the Complaint.

95.     The Defendants deny the allegations contained in Paragraph 95 of the Complaint.

96.     The Defendants deny the allegations contained in Paragraph 96 of the Complaint.

97.     The Defendants deny the allegations contained in Paragraph 97 of the Complaint.

98.     The Defendants deny the allegations contained in Paragraph 98 of the Complaint.

99.     In response to the allegations contained in Paragraph 99 of the Complaint, the

Defendants respectfully refer the Court to the minutes of the August 3, 2009 Board meeting,

which speak for themselves.

100.     In response to the allegations contained in Paragraph 100 of the Complaint, the

Defendants respectfully refer the Court to the minutes of the August 3, 2009 Board meeting,

which speak for themselves.

101.     In response to the allegations contained in Paragraph 101 of the Complaint, the

Defendants respectfully refer the Court to the minutes of the August 3, 2009 Board meeting,

which speak for themselves.

102.     In response to the allegations contained in Paragraph 102 of the Complaint, the

Defendants respectfully refer the Court to the minutes of the August 3, 2009 Board meeting,

which speak for themselves.

103.    In response to the allegations contained in Paragraph 103 of the Complaint, the

Defendants acknowledge that Allied may have been in default at certain periods of time, but

understand that no lenders exercised remedies against Allied as a result thereof and that lenders,

including Petitioning Creditors, specifically directed the Administrative Agent not to do so.

Except as expressly so alleged, the Defendants deny the allegations contained in Paragraph 103

of the Complaint.

104.    In response to the allegations contained in Paragraph 104 of the Complaint, the

Defendants acknowledge that in 2009 they engaged in discussions with ComVest. Except as

expressly so alleged, the Defendants deny the allegations contained in Paragraph 104 of the

Complaint.

105.    In response to the allegations contained in Paragraph 105 of the Complaint, the

Defendants acknowledge that in 2009 they engaged in discussions with ComVest, that Mr.

Ornstein assisted in these negotiations and that on or about August 3, 2009 a proposal was made

to acquire the Allied First Lien Debt held by ComVest.

106.    In response to the allegations contained in Paragraph 106 of the Complaint, the

Defendants acknowledge that on or about August 3, 2009 an agreement in principle was reached

to acquire the Allied First Lien Debt held by ComVest.

107.    In response to the allegations contained in Paragraph 107 of the Complaint, the

Defendants acknowledge that on or about August 3, 2009 an agreement in principle was reached

to acquire the Allied First Lien Debt held by ComVest. Except as expressly so alleged, the

Defendants deny the allegations contained in Paragraph 107 of the Complaint.

108.    In response to the allegations contained in Paragraph 108 of the Complaint, the

Defendants acknowledge that the Allied Board approved of the Fourth Amendment to the First

Lien Credit Agreement on or about August 19, 2009 upon recommendation by the Special

Committee.   Except as expressly so alleged, the Defendants deny the allegations contained in Paragraph 108 of the Complaint.

109.   In response to the allegations set forth in Paragraph 109 of the Complaint, the Defendants state that the Fourth Amendment as well as the Loan Purchase Agreement and Assignment and Assumption Agreement between Yucaipa and ComVest speak for themselves.

110.   In response to the allegations set forth in Paragraph 110 of the Complaint, the Defendants respectfully refer the Court to the Fourth Amendment, which speaks for itself.

111.   In response to the allegations set forth in Paragraph 111 of the Complaint, the Defendants states that the Loan Purchase Agreement and Assignment and Assumption Agreement speaks for itself.

112.   In response to the allegations set forth in first sentence of Paragraph 112 of the Complaint, the Defendants state that the Loan Purchase Agreement speaks for itself.  Except as expressly so alleged, the Defendants deny the allegations in Paragraph 112 of the Complaint.

113.   In response to the allegations set forth in Paragraph 113 of the Complaint, the Defendants believe that Yucaipa is the Requisite Lender under the First Lien Credit Agreement. Except as expressly so alleged, the Defendants deny the allegations contained in Paragraph 113 of the Complaint.

114.   The Defendants deny the allegations contained in Paragraph 114 of the Complaint.

115.   The Defendants deny the allegations contained in Paragraph 115 of the Complaint.

116.   The Defendants deny the allegations contained in Paragraph 116 of the Complaint.

117.    The Defendants deny the allegations contained in Paragraph 117 of the Complaint.

118.    In response to the allegations set forth in Paragraph 118 of the Complaint, the Defendants acknowledge that its status as Requisite Lender is in dispute.

119.    In response to the allegations set forth in Paragraph 119 of the Complaint, the Defendants acknowledge that its status as Requisite Lender is in dispute, and that CIT, as Administrative Agent under the First Lien Credit Agreement, initially worked with Yucaipa but ceased doing so after receiving a threatening letter from the Petitioning Creditors.

120.    In response to the allegations contained in Paragraph 120 of the Complaint, the Defendants admit that, on November 21, 2009, Yucaipa and Allied Holdings filed suit in Georgia seeking a declaration that the Fourth Amendment was valid and enforceable and that Yucaipa is the Requisite Lender (the "Georgia Action"), and respectfully refer to the Court to the pleadings filed in the Georgia Action, which speak for themselves.  Except as expressly so alleged, the Defendants deny the allegations contained in Paragraph 120 of the Complaint.

121.    In response to the allegations contained in Paragraph 121 of the Complaint, the Defendants respectfully refer to the Court to the settlement agreement reached in the Georgia Action, which speaks for itself.

122.    In response to the allegations contained in Paragraph 122 of the Complaint, the Defendants respectfully refer the Court to the proceedings in *BDCM Opportunity Fund II, LP et al. v. Yucaipa American Alliance Fund I L.P. et al.*, Index No. 650150/2012 ("the New York Action"), which speak for themselves.

123.    In response to the allegations contained in Paragraph 123 of the Complaint, the Defendants respectfully refer the Court to the May 30, 2012 proceedings in the New York Action, which speak for themselves.

124.    In response to the allegations contained in Paragraph 124 of the Complaint, the Defendants respectfully refer the Court to the November 19, 2012 proceedings in the New York Action, which speak for themselves, and further note that no final ruling has been issued by the Court in the New York Action which has any claim or issue preclusion effect in this Court.

125.    The Defendants deny the allegations contained in Paragraph 125 of the Complaint.

126.    The Defendants deny the allegations contained in Paragraph 126 of the Complaint.

127.    In response to the allegations set forth in Paragraph 127 of the Complaint, the Defendants respectfully refer the Court to the filing in these bankruptcy proceedings, which speak for themselves.

128.    The Defendants deny the allegations contained in Paragraph 128 of the Complaint.

## CLAIMS FOR RELIEF

### First Claim for Relief

#### Equitable Subordination Pursuant to 11 U.S.C. § 510(c) against Yucaipa

129.    The Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 128.

130.    The Defendants deny the allegations contained in Paragraph 130 of the Complaint.

131.    The allegations in Paragraph 131 of the Complaint set forth legal conclusions to which no response is required.

132.    The Defendants deny the allegations contained in Paragraph 132 of the Complaint.

133.    The Defendants deny the allegations contained in Paragraph 133 of the Complaint.

134.    The Defendants deny the allegations contained in Paragraph 134 of the Complaint.

135.    The Defendants deny the allegations contained in Paragraph 135 of the Complaint.

## Second Claim for Relief

### Recharacterization Pursuant to 11 U.S.C. § 105(a) of Yucaipa's Purported Debt Holdings Under the First and Second Lien Facilities against Yucaipa

136.    The Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 135.

137.    The Defendants deny the allegations contained in Paragraph 137 of the Complaint.

138.    The Defendants deny the allegations contained in Paragraph 138 of the Complaint.

139.    The Defendants deny the allegations contained in Paragraph 139 of the Complaint.

## Third Claim for Relief

### Breach of Third Amendment to the First Lien Credit Agreement against Yucaipa

140.    The Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 139.

141.    The allegations in Paragraph 141 of the Complaint set forth legal conclusions to which no response is required.

142.    The Defendants deny the allegations contained in Paragraph 142 of the Complaint.

143.    The Defendants admit the allegations contained in Paragraph 143 of the Complaint.

144.    The Defendants deny the allegations contained in Paragraph 144 of the Complaint.

145.    The Defendants deny the allegations contained in Paragraph 145 of the Complaint.

146.    The Defendants deny the allegations contained in Paragraph 146 of the Complaint.

### Fourth Claim for Relief

**Specific Performance of Third Amendment
to the First Lien Credit Agreement against Yucaipa**

147.    The Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 146.

148.    The Defendants deny the allegations contained in Paragraph 148 of the Complaint.

149.    The Defendants deny the allegations contained in Paragraph 149 of the Complaint.

150.    The Defendants deny the allegations contained in Paragraph 150 of the Complaint.

151.    The Defendants deny the allegations contained in Paragraph 151 of the Complaint.

152.    The Defendants deny the allegations contained in Paragraph 152 of the Complaint.

153.     The Defendants deny the allegations contained in Paragraph 153 of the Complaint.

## Fifth Claim for Relief
### Breach of Fiduciary Duty against Yucaipa

154.     The Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 153.

155.     The allegations in Paragraph 155 of the Complaint set forth legal conclusions to which no response is required.

156.     The Defendants deny the allegations contained in Paragraph 156 of the Complaint.

157.     The Defendants deny the allegations contained in Paragraph 157 of the Complaint.

158.     The Defendants deny the allegations contained in Paragraph 158 of the Complaint.

## Sixth Claim for Relief
### Breach of Fiduciary Duty against the Allied Directors

159.     The Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 158.

160.     This claim for relief is not asserted against these defendants so no response to Paragraph 160 is required.

161.     This claim for relief is not asserted against these defendants so no response to Paragraph 161 is required.

162.     This claim for relief is not asserted against these defendants so no response to Paragraph 162 is required.

163.    This claim for relief is not asserted against these defendants so no response to Paragraph 163 is required.

164.    This claim for relief is not asserted against these defendants so no response to Paragraph 164 is required.

165.    This claim for relief is not asserted against these defendants so no response to Paragraph 165 is required.

166.    This claim for relief is not asserted against these defendants so no response to Paragraph 166 is required.

167.    This claim for relief is not asserted against these defendants so no response to Paragraph 167 is required.

### Seventh Claim for Relief
### Aiding and Abetting Breach of Fiduciary Duty against All Defendants

168.    The Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 167.

169.    The Defendants deny the allegations contained in Paragraph 169 of the Complaint.

170.    The Defendants deny the allegations contained in Paragraph 170 of the Complaint.

171.    The Defendants deny the allegations contained in Paragraph 171 of the Complaint.

172.    The Defendants deny the allegations contained in Paragraph 172 of the Complaint.

173.    The Defendants deny the allegations contained in Paragraph 173 of the Complaint.

### Eighth Claim for Relief

### Avoidance and Recovery of Intentional and Constructive Fraudulent Transfers against Yucaipa Pursuant to 11 U.S.C. §§ 548(a) and 550

174.    The Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 173.

175.    The Defendants deny the allegations contained in Paragraph 175 of the Complaint.

176.    The Defendants deny the allegations contained in Paragraph 176 of the Complaint].

177.    The Defendants deny the allegations contained in Paragraph 177 of the Complaint.

178.    The Defendants deny the allegations contained in Paragraph 178 of the Complaint.

179.    The Defendants deny the allegations contained in Paragraph 179 of the Complaint.

180.    The Defendants deny the allegations contained in Paragraph 180 of the Complaint.

181.    The Defendants deny the allegations contained in Paragraph 181 of the Complaint.

182.    The Defendants deny the allegations contained in Paragraph 182 of the Complaint.

183.    The Defendants deny the allegations contained in Paragraph 183 of the Complaint.

184.    The Defendants deny the allegations contained in Paragraph 184 of the Complaint.

185.    The Defendants deny the allegations contained in Paragraph 185 of the Complaint.

186.    The Defendants deny the allegations contained in Paragraph 186 of the Complaint.

187.    The Defendants deny the allegations contained in Paragraph 187 of the Complaint.

188.    The Defendants deny the allegations contained in Paragraph 188 of the Complaint.

189.    The Defendants deny the allegations contained in Paragraph 189 of the Complaint.

190.    The Defendants deny the allegations contained in Paragraph 190 of the Complaint.

## Ninth Claim for Relief

**Avoidance and Recovery of Intentional and Constructive Fraudulent Transfers and Conveyances against Yucaipa Pursuant to 11 U.S.C. §§ 544(b) and 550**

191.    The Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 190 of the Complaint.

192.    The Defendants deny the allegations contained in Paragraph 192 of the Complaint.

193.    The Defendants deny the allegations contained in Paragraph 193 of the Complaint.

194.    The Defendants deny the allegations contained in Paragraph 194 of the Complaint.

195.    The Defendants deny the allegations contained in Paragraph 195 of the Complaint.

## Tenth Claim for Relief

### Preferential Transfers against Yucaipa Pursuant to 11 U.S.C. §§ 547 and 550

196.    The Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 195 of the Complaint.

197.    The allegations in Paragraph 197 of the Complaint set forth legal conclusions to which no response is required.

198.    The Defendants deny the allegations contained in Paragraph 198 of the Complaint.

199.    The Defendants deny the allegations contained in Paragraph 199 of the Complaint.

200.    The Defendants deny the allegations contained in Paragraph 200 of the Complaint.

## Eleventh Claim for Relief

### Disallowance of Claim against Yucaipa

201.    The Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 200 of the Complaint.

202.    The Defendants deny the allegations contained in Paragraph 202 of the Complaint.

203.    The Defendants deny the allegations contained in Paragraph 203 of the Complaint.

**AFFIRMATIVE DEFENSES**

Defendants Yucaipa American Alliance Fund I, LP; and Yucaipa American Alliance (Parallel) Fund I, LP; Yucaipa American Alliance Fund II, LP; and Yucaipa American Alliance (Parallel) Fund II, LP;   (collectively, the "Defendants"), by and through their counsel, hereby assert the following affirmative defenses to the claims for relief alleged against them in the Complaint filed by The Official Committee of Unsecured Creditors (the "Plaintiff") dated February 1, 2013, as follows:

## BACKGROUND IN SUPPORT OF MANY OF THE DEFENDANTS' AFFIRMATIVE DEFENSES

A.    **Overview**

204.    This is a case about the duplicity and unjust enrichment of BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., and Spectrum Investment Partners, L.P. (the "Petitioning Creditors") and the Plaintiff's effort to benefit the Petitioning Creditors, other first lien lenders and the Committee's constituency based on this improper conduct. The Plaintiff and the Petitioning Creditors[2] – two of the most aggressive distressed hedge funds – ask to be rewarded with a windfall as a result of the Petitioning Creditors' double-dealing, self-serving scheme. From the inception of their relationship with Yucaipa, the Petitioning Creditors have acted in a deceitful manner and in violation of their agreement with Yucaipa to work together to maximize the overall value of Allied Holdings for the benefit of all parties in interest. Typifying their underhanded dealings and bad faith, the Petitioning Creditors "double-crossed" Yucaipa and now the Plaintiff seeks to profit from this wrongdoing at Yucaipa's expense, all to the detriment of the Estate.

---

[2] On information and belief, at all relevant times, Spectrum and Black Diamond have acted in concert with one another, and each reference to Black Diamond hereinafter refers to Black Diamond and Spectrum acting in concert.

205. The Petitioning Creditors reached an agreement with Yucaipa in August 2009, when Stephen H. Deckoff, founder and Managing Principal of the parent company of Black Diamond, personally met with defendant Ronald Burkle and other senior Yucaipa representatives and agreed to work together to maximize Allied Holdings' value for the benefit of all interested parties. In reliance on this agreement, and in reliance upon Petitioning Creditors' endorsement of Yucaipa's plan to become Requisite Lender under the Fourth Amendment to the Credit Agreement, Yucaipa negotiated to purchase the Requisite Lender position from ComVest Investment Partners III, L.P. ("ComVest"), which closed in August 2009.

206. Petitioning Creditors knew for at least seven months prior to the ComVest transaction that Yucaipa intended to spend tens of millions of dollars to acquire a majority of the first lien debt pursuant to an amendment that reversed the restrictions on ownership in the Third Amendment. In February 2009, Petitioning Creditors were sent Yucaipa's tender offer materials, which included a proposed fourth amendment to the First Lien Credit Agreement. At no time did Petitioning Creditors inform Yucaipa that they believed such an amendment would be invalid. Indeed, Mr. Deckoff and others representing Petitioning Creditors supported Yucaipa's acquisition of the Requisite Lender position. In fact, Petitioning Creditors sought to work with Yucaipa having known since February 2009 that Yucaipa was intent on purchasing a majority of the debt from ComVest. Yucaipa and Black Diamond spoke frequently during the spring and summer of 2009 about Yucaipa's negotiations with ComVest.

207. During the summer of 2009, Mr. Deckoff requested a meeting with Mr. Burkle and flew to Los Angeles on August 18, 2009 for the sole purpose of meeting to coordinate the strategy going forward. At that meeting, Mr. Deckoff proposed a plan for Yucaipa to use its control over Allied Holdings to file for bankruptcy with a DIP loan made by Yucaipa and Black Diamond after which they would do a "low value" plan of reorganization that would give Allied

Holdings to them as DIP lenders. Mr. Burkle was unwilling to participate in Mr. Deckoff's proposal, and instead suggested a different approach. Mr. Burkle proposed that Yucaipa buy ComVest's Requisite Lender position and then work to sell Allied Holdings in a way that maximized the value of the Estate. Mr. Deckoff did not want to invest additional capital to effectuate Mr. Burkle's plan, but given Black Diamond's existing holdings in the first lien debt, Mr. Deckoff agreed to work together with Yucaipa and support Yucaipa's plan to acquire the Requisite Lender position. During this meeting and during several subsequent phone calls between Mr. Ehrlich and Mr. Walker prior to the Fourth Amendment's enactment and Yucaipa's purchase, Mr. Deckoff and Mr. Ehrlich developed various strategies to work with Yucaipa as Requisite Lender under the Fourth Amendment, and never objected in any way to Yucaipa's plans no suggested in any way that Yucaipa could not be the Requisite Lender. Yucaipa and Mr. Deckoff agreed to work together for the purpose of maximizing the recovery for the Estate, including through a sale to Michael Riggs who, with ComVest, had already tried to buy Allied Holdings in the spring of 2009.

208.    In reliance on Petitioning Creditors' stated support for Yucaipa's transaction with ComVest and the First Lien's passage of the related Fourth Amendment to the Credit Agreement, Yucaipa closed on the acquisition of ComVest's debt holdings in Allied Holdings and became Requisite Lender. On August 22, 2009, Yucaipa confirmed to Black Diamond that it had followed through on the purchase from ComVest. Black Diamond once again confirmed its support for the then completed transaction when Derex Walker of Yucaipa emailed that "[We] did in fact take an assignment of the ComVest debt" and Richard Ehrlich of Black Diamond replied "OK. Let me know a good time to [talk]."

209.    Then, unbeknownst to Yucaipa, only one month after Yucaipa's acquisition of the Requisite Lender position and only one day after Mr. Deckoff spoke by telephone with Mr.

Burkle to further plan the strategy for maximizing the value of the Estate, Petitioning Creditors

chose to double-cross Yucaipa and thereby enhance their leverage in the credit. On September

18, 2009, they surreptitiously sent a letter to their agent, The CIT Group/Business Credit, Inc.

("CIT"), questioning the validity Yucaipa's Requisite Lender status. Petitioning Creditors did

not send this letter to Yucaipa or otherwise disclose to Yucaipa any concerns regarding the

validity of the Fourth Amendment or Yucaipa's Requisite Lender status. To the contrary,

Petitioning Creditors continued to work with Yucaipa by proposing and discussing transactions

that necessarily relied upon Yucaipa acting as the Requisite Lender.

     210.    Yucaipa did not learn that the Petitioning Creditors had precipitated the "Georgia

Action" until CIT filed its Counterclaim in that Action, dated December 21, 2009. Thereafter,

although they had instigated the Georgia Action, the Petitioning Creditors continued to socialize

with Yucaipa's principals and negotiate potential business strategies that depended on Yucaipa's

exercise of its Requisite Lender powers. For example, Mr. Deckoff had dinner with Mr. Burkle

on February 23, 2010, at which they discussed Yucaipa's plans as Requisite Lender to increase

Allied Holdings' value. Mr. Deckoff expressed support for Yucaipa's plans. Mr. Deckoff and

Mr. Burkle met again in New York on January 31, 2011, at which they again discussed

Yucaipa's plans as Requisite Lender. Mr. Deckoff expressed appreciation for the meeting and

support for Yucaipa's plans. Then, in March through May, 2011, Black Diamond attempted to

broker a transaction whereby Allied Holdings would be sold as a whole or as part of an asset sale

to a third party. Black Diamond proposed to finance this transaction whereby the Lenders in

Allied Holdings were to receive a discount to par in connection with the sale of their collateral to

a third party. During this period, Mr. Ehrlich sent Yucaipa numerous proposals, all of which

relied on Yucaipa's ability to vote the majority of Allied Holdings' debt and exercise its

Requisite Lender powers. During the aforementioned discussions, Black Diamond never

suggested it had any objection to or issue with Yucaipa being Requisite Lender or the Fourth

Amendment's validity. Indeed, Black Diamond's plan recognized and depended on Yucaipa's

Requisite Lender status to fulfill its own business objectives. Black Diamond's actions stand in

direct contrast to the positions it has taken in the New York Action and these bankruptcy

proceedings. During this time, Petitioning Creditors professed to have the same goal as Yucaipa

– the maximization of the value of the enterprise for its creditors. At that time, Petitioning

Creditors acknowledged that Yucaipa was acting toward that goal and not – as Petitioning

Creditors now falsely claim – in Yucaipa's self- interest. Thus, while Yucaipa was working

toward what it believed to be that shared goal, Petitioning Creditors were scheming to challenge

Yucaipa's Requisite Lender status. Their duplicitous conduct should not be rewarded.

**B. Factual Background**

211.    Certain affiliates of the Debtors had previously filed for bankruptcy on July 31,

2005 in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta

Division (Case No. 05-12515-CRM) (the "Prior Allied Bankruptcy Case"). As part of the Prior

Allied Bankruptcy Case, Yucaipa held approximately $99 million of unsecured note claims

issued by those debtors. At the time Yucaipa appeared in the Prior Allied Bankruptcy Case, that

case was at an impasse and those Allied Debtors faced liquidation. Yucaipa's involvement in the

Prior Allied Bankruptcy Case was encouraged by the International Brotherhood of Teamsters

(the "IBT"), which represents most of the Debtors' employees and which was concerned about

the viability of the business. Yucaipa made additional loans during the Prior Allied Bankruptcy

Case to enable the Debtors in that case to purchase much needed equipment and obtained an

unprecedented 17.5% wage concession (totaling up to $105 million) from the IBT to fund future

capital expenditures. Yucaipa's involvement also led to dramatic reductions in the interest rate

and fees paid by the Debtors in the Prior Allied Bankruptcy Case under their debtor-in-

possession financing facility.  In addition, Yucaipa co-sponsored a plan of reorganization that enabled Allied Holdings to survive and preserve thousands of jobs.  Through that plan of reorganization, Allied Holdings emerged from the Prior Allied Bankruptcy Case with a de-levered capital structure and enhanced prospects for competing successfully in the car haul industry.  Upon the effective date of the plan of reorganization, Yucaipa converted all of its debt claims into approximately 67% of Allied Holdings, as reorganized.  Yucaipa also designated three members of the reorganized Allied Holdings' board of directors; the other two members of the board were independent and not designated by Yucaipa (including one independent individual designated by the official committee of unsecured creditors' in the Prior Allied Bankruptcy Case).  The non-Yucaipa designated members of the Allied Holdings board of directors make up a special committee (the "Special Committee"), which was formed to independently consider and negotiate on behalf of the Debtors certain matters involving Yucaipa.

212.    In order to finance its exit from the Prior Allied Bankruptcy Case, Allied Holdings, as borrower, and certain of its affiliates and subsidiaries, as guarantors, entered into the First Lien Credit Agreement.  The First Lien Credit Agreement was an exit facility from the Prior Allied Bankruptcy Case and provided a facility for term loans, revolving loans and lenders deposits to support letters of credit issued to beneficiaries for the benefit of Allied Holdings and certain of its affiliates.  Simultaneously, Allied Holdings also entered into that certain Second Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007 (the "Second Lien Credit Agreement").

C.    The Amendments to the First Lien Credit Agreement

213.    Yucaipa was not a Lender under the original First Lien Credit Agreement ("CA"), which contained certain provisions that restricted Lenders from selling debt they held under the First Lien Credit Agreement to Yucaipa.  (*See, e.g.*, CA § 1.1, pp. 17 (referring to Yucaipa as

"Sponsor"); CA § 10.6(c), p. 44 (excluding Yucaipa, as Sponsor, from becoming an "Eligible Assignee" to whom Lenders were contractually permitted to sell or assign their first lien debt.)

214.    The First Lien Credit Agreement was amended over time. The first and second amendments are not relevant to the matters before the Court. In April 2008, CIT, as Administrative Agent to all Lenders under the First Lien Credit Agreement, coordinated passage of the Third Amendment. The Third Amendment – approved by Allied Holdings' Special Committee, executed by Allied Holdings, and approved by a majority of the first lien Lenders – authorized the first lien Lenders to sell up to $50,000,000 in principal amount of term loans under the First Lien Credit Agreement to Yucaipa and its affiliates, provided that (a) fifty percent of such acquired term loans would be converted into capital of Allied Holdings and (b) Yucaipa's voting rights under the First Lien Credit Agreement would be restricted pursuant to the Third Amendment. (*See* 3A §§ 2.7(e)(iii), (iv).)

215.    Yucaipa was not a signatory to the Third Amendment and did not become bound by the First Lien Credit Agreement as amended by the Third Amendment. Although the Lenders were permitted to sell Yucaipa first lien term loans under the Third Amendment, Yucaipa never purchased any such term loans under the Third Amendment.

216.    Instead, at or around the time the Third Amendment was executed, an amendment to the Second Lien Credit Agreement that was similar to the amendment to the First Lien Credit Agreement was executed, except it did not have limits on the amount of second lien debt that Yucaipa could purchase or limits on Yucaipa's voting rights. At that time, Yucaipa acquired two-thirds of the debt under the Second Lien Credit Agreement.

217.    Approximately 15 months later, on August 21, 2009, Allied Holdings and ComVest, as the majority or Requisite Lender under the First Lien Credit Agreement, executed the Fourth Amendment. (*See* 4A.) The Special Committee – consisting of the Allied Holdings'

independent board members – reviewed and voted to approve the Fourth Amendment. Allied Holdings was represented by independent outside counsel in connection with the Third Amendment and Fourth Amendment, and Yucaipa (along with the first lien Lenders) was provided with written legal opinions from Allied Holdings' counsel in connection therewith.

218.    Various sections of the Fourth Amendment amended or deleted certain of the restrictions and conditions that sections of the Third Amendment placed on first lien debt that Yucaipa could acquire. The Fourth Amendment permitted Yucaipa to acquire and accept assignment of Allied Holdings' first lien debt (including terms loans and amounts deposited to support letters of credit issued for the benefit of Allied Holdings) and to become Requisite Lender under the First Lien Credit Agreement. (*See, e.g.*, 4A §§ 2.1(b), 2.4(e).)

## D. Yucaipa Reasonably Relied On The Validity Of The Fourth Amendment In Acquiring Claims Under The First Lien Credit Agreement To Its Detriment

219.    In reasonable reliance on the validity of the Fourth Amendment, on August 21, 2009 – again, approximately 15 months after the Third Amendment became effective – Yucaipa acquired the first lien debt then held by ComVest, which constituted more than fifty percent of all of Allied Holdings' first lien debt, making Yucaipa Requisite Lender under the terms of the First Lien Credit Agreement. The actual holdings Yucaipa acquired consisted of $114,712,088.66 of Term Loans and $30,400,458.40 of LC Commitments (*i.e.* deposits to support letters of credit), totaling $145,112,547.06 of the $265,000,000 maximum first lien loans authorized by the First Lien Credit Agreement. As noted, the Special Committee approved the Fourth Amendment, and Allied Holdings was represented by independent outside counsel in connection with the Fourth Amendment.

220.    Yucaipa would not have purchased any portion of Allied Holdings' first lien debt, much less ComVest's entire position, if it understood that any portion of the Fourth Amendment was invalid or if Black Diamond had expressed any intention to challenge this transaction.

Yucaipa also received and reasonably relied upon the legal opinion of Allied Holdings' counsel that the Fourth Amendment was enforceable against Allied Holdings, as well as the actions of Black Diamond's most senior principals.

221.    The other Lenders under the First Lien Credit Agreement were aware of Yucaipa's intent to purchase ComVest's holdings following the Fourth Amendment, yet never raised a timely objection to that purchase. As discussed in paragraphs 2 through 8, *supra*, the Petitioning Creditors' engaged in a pattern of duplicitous conduct in connection with the passage of the Fourth Amendment and Yucaipa's acquisition of the Requisite Lender position. Yucaipa reasonably relied to its detriment on these and other facts and actions.

222.    Despite the Petitioning Creditors' repeated acts and statements affirming and ratifying the validity of the Fourth Amendment and Yucaipa's Requisite Lender status, and as described in further detail below, the Petitioning Creditors caused CIT, the Administrative Agent for all Lenders under the First Lien Credit Agreement, to litigate the validity of the Fourth Amendment and Yucaipa's Requisite Lender status in Georgia State Court for approximately two years. CIT, Allied Holdings and Yucaipa settled that action on December 5, 2011 and CIT dismissed with prejudice all claims it brought in its representative capacity as agent on December 7, 2011.

223.    On or about December 9, 2011, Yucaipa directed CIT as Administrative Agent pursuant to the settlement agreement executed by CIT, Yucaipa and Allied Holdings in the Georgia Action (the "Settlement Agreement") to terminate the LC Commitments. This direction demonstrated that all of the first lien lenders – including Petitioning Creditors - had accepted and ratified Yucaipa's Requisite Lender status and very clearly shows Yucaipa was working for the equal benefit of all creditors. This termination resulted in $16,928,474.40 of deposits that had been made to support the letters of credit being released to the Lenders under the First Lien

Credit Agreement. Each of the Lenders that then had an LC Commitment outstanding received its pro rata portion of the funds that were released. None of the Petitioning Creditors or other Lenders complained about this termination, Yucaipa's authority in regard thereto, or Yucaipa's acquisition of first lien debt from ComVest under the Fourth Amendment, and each accepted its pro rata share of the released funds.

224.    Then, in January 2012 – nearly two and a half years after the execution of the Fourth Amendment and a month after the Administrative Agent dismissed with prejudice all claims it litigated in its representative capacity in Georgia – the Petitioning Creditors filed suit against Yucaipa in New York State Court (the "New York Action"). The Petitioning Creditors' sole claim in the New York Action seeks, *inter alia*, a judicial declaration that the Fourth Amendment is null and void and that, consequently, Yucaipa is not the Requisite Lender under the First Lien Credit Agreement.

225.    On November 19, 2012, more than three years after execution of the Fourth Amendment, the Court in the New York Action held a hearing on the Petitioning Creditors' motion for summary judgment. The Court in the New York Action indicated at oral argument that it would approve the Petitioning Creditors' motion for summary judgment. That Court has not yet issued a written order (which is required for an order to be effective under applicable state law), and Yucaipa intends to take an appeal of any written order. Moreover, as illustrated by the issues raised below, the impact of the New York State Court's anticipated ruling on the parties' rights and the Debtors' chapter 11 cases is far from clear, but must be resolved efficiently in order for the Debtors to preserve value for creditors and exit from chapter 11 protection as a going concern.

226.    Though the New York Court has not yet issued an order nor entered a judgment thereon, the Petitioning Creditors have notified the Debtors that the Petitioning Creditors now

deem themselves "Requisite Lender" under the First Lien Credit Agreement. The Petitioning

Creditors also executed that certain Appointment Agreement dated as of December 3, 2012 (the

"Purported Appointment Agreement"), by and among the Petitioning Creditors and American

Money Management Corporation, purporting to appoint affiliates of the Petitioning Creditors,

Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance LLC, as

successor administrative and collateral agents pursuant to the First Lien Credit Agreement. As

noted, Yucaipa intends to appeal the New York State Court's decision once judgment is entered,

and disputes the foregoing creditors' right to act as "Requisite Lender" or to appoint successor

agents under the First Lien Credit Agreement.

227.    As a result of the foregoing, and assuming the broadest possible written order

affirming the Petitioning Creditors' motion for summary judgment in the New York Action, the

conduct of the Petitioning Creditors should be rejected and the Plaintiff's efforts to rely on such

conduct to acquire a windfall for the Petitioning Creditors, other first lien Lenders and the Estate,

because:

a.    Yucaipa reasonably and detrimentally relied on the conduct of the

Petitioning Creditors and the effectiveness of the Fourth Amendment. Yucaipa never would

have acquired first lien debt holdings. In fact, prior to the Fourth Amendment, Yucaipa chose

not to acquire any first lien debt holdings at all, and the first lien Lenders were not permitted to

sell to Yucaipa the amount of first lien debt holdings that Yucaipa ultimately acquired.

Moreover, Yucaipa was not – and still is not – a signatory to the Third Amendment and never

intended to purchase any debt claims that would make it bound by the Third Amendment's

provisions; in fact, although Yucaipa was permitted to do so, Yucaipa decided not to purchase

any first lien holdings that would be subject to the limitations of the Third Amendment;

b.  if Yucaipa is somehow bound by the Third Amendment, the Petitioning Creditors, the other first lien Lenders and the Estate would reap a windfall and be unjustly enriched if Yucaipa were forced to convert any of its debt to capital or be prevented from voting its debt. Yucaipa never executed the Third Amendment, did not act pursuant to or under the Third Amendment, and would be inequitably harmed if it were now retroactively bound by its terms. Moreover, the Debtors and other Lenders, including the Petitioning Creditors, are now estopped from enforcing the Third Amendment against Yucaipa because, among other reasons, they were aware of, and made no effort to oppose, the passage of the Fourth Amendment or Yucaipa's acquisition of first lien debt pursuant thereto. Accordingly, it would be inequitable to enforce retroactively the Third Amendment's provisions on the indisputably valid first lien debt that Yucaipa acquired in reasonable reliance on the Fourth Amendment;

c.  depending on the rationale of the written summary judgment order in the New York Action, there may be grounds to invalidate and/or sever certain additional provisions in the First Lien Credit Agreement and the applicable amendments restricting Yucaipa's rights; and

d.  Yucaipa contends that even if the Third Amendment is somehow applicable, (i) the other Lenders under the Third Amendment will have only a breach of contract claim for potential damages against ComVest for purported breach of the Third Amendment in connection with ComVest's sale of its debt position under the First Lien Credit Agreement to Yucaipa and (ii) such breach of contract claim, if any, should be the exclusive remedy for such Lenders.

228.  As evidenced by the Purported Appointment Agreement, the Petitioning Creditors have demanded that the Debtors recognize the Petitioning Creditors as "Requisite Lender" after giving effect to the Third Amendment and have sought to install their affiliates as successor

Administrative Agent and Collateral Agent. Such recognition and installation of their agents could lead the Petitioning Creditors to claim a right to credit bid (or to block a credit bid) of the first lien debt and exercise other remedies to the detriment of Yucaipa. Yucaipa disputes the Petitioning Creditors' status as Requisite Lender and right to appoint any agents under the terms of the First Lien Credit Agreement.

229.    Additionally, the ability of the Petitioning Creditors, along with other Lenders, to claim Requisite Lender status would also unjustly enrich such Lenders, and for this reason, they should now be estopped from asserting and acting upon such asserted status. The Petitioning Creditors acquired a minority position in the first lien debt and should not be allowed to dramatically increase their voting rights and distributions years after the fact by depriving Yucaipa of the benefit of its bargain pursuant to the Fourth Amendment –which the Petitioning Creditors endorsed and acquiesced to – and on which Yucaipa reasonably relied. Yucaipa's only acquisition of the first lien debt was of a majority of such indebtedness, in reasonable reliance upon the Fourth Amendment that enabled Yucaipa to act as Requisite Lender. Again, Yucaipa would not have purchased any of the first lien debt had it known that it could be subject to the decisions of other Lenders, and the other Lenders should now be estopped from taking any actions that would purport to credit bid or otherwise impact Yucaipa's first lien debt holdings.

230.    The resolution of these disputes is central to the parties' respective rights to credit bid or otherwise participate in a sale process. Further, without an expedited resolution of these issues by this Court, the Debtors will be hamstrung by piecemeal litigation over the various parties' rights, including the amount of Yucaipa's claims, which Lender can cause a credit bid under the First Lien Credit Agreement and contribute claims as consideration in a section 363 sale, and how the Debtors' assets should be distributed to creditors. Accordingly, Yucaipa

respectfully requests that this Court determine these issues so as to facilitate the Debtors'

expeditious exit from these chapter 11 cases.

## STATEMENT OF ADDITIONAL FACTS RELEVANT TO THE DEFENDANTS' AFFIRMATIVE DEFENSES

**A.    First Lien Credit Agreement**

231.    Allied Holdings, as borrower, and certain of its affiliates and subsidiaries, as

guarantors, entered into the First Lien Credit Agreement on May 15, 2007.

232.    The First Lien Credit Agreement provides that a Lender or group of Lenders

thereunder collectively holding more than 50% of the sum of the aggregate of all of the

outstanding first lien loans constitutes the "Requisite Lender" or "Requisite Lenders" with

certain powers, among other powers, to direct the Administrative and Collateral Agents under

the First Lien Credit Agreement to take certain actions on behalf of all the Lenders.

233.    Section 10.5(a) of the First Lien Credit Agreement states:

Subject to the additional requirements of sections 10.5(b) and 10.5(c), no amendment, modification, termination or waiver of any provision of the credit documents, or consent to any departure by any credit party therefrom, shall in any event be effective without the written concurrence of the requisite lenders . . . .

234.    Sections 10.5(b) and 10.5(c) of the first lien credit agreement prohibit certain

amendments, modifications, terminations or waivers without other parties' consent.    Those

sections state in full:

(b)    Affected Lenders' Consent.    Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)    extend the scheduled final maturity of any Loan or Note;

(ii)    waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii)    extend the stated expiration date of any Letter of Credit beyond the LC Commitment Termination Date;

(iv)    extend the date on which any LC Deposit is required to be made by, or returned to, any LC Lender.

(v)    reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.10) or any fee or any premium payable hereunder;

(vi)    extend the time for payment of any such interest or fees;

(vii)    reduce the principal amount of any Loan or any reimbursement obligation in respect of any Letter of Credit;

(viii)    amend, modify, terminate or waive any provision of Section 2.13(b)(iii), this Section 10.5(b), Section 10.5(c) or any other provision of this Agreement that expressly provides that the consent of all Lenders is required;

(ix)    amend the definition of **"Requisite Lenders"** or **"Pro Rata Share"**; provided, with the consent of Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of **"Requisite Lenders"** or **"Pro Rata Share"** on substantially the same basis as the Term Loan Commitments, the Term Loans, the LC Commitments, the LC Deposits, the Revolving Commitments and the Revolving Loans are included on the Closing Date;

(x)    release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents; or

(xi)    consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document.

(c)    Other Consents. No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall:

(i)    increase any Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; provided, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Commitment of any Lender;

(ii)    amend, modify, terminate or waive any provision hereof relating to the Swing Line Sublimit or the Swing Line Loans without the consent of Swing Line Lender;

(iii)    alter the required application of any repayments or prepayments as between Classes pursuant to Section 2.15 without the consent of Lenders holding more than 50% of the aggregate Term Loan Exposure of all Lenders, LC Exposure of all Lenders or Revolving Exposure of all Lenders, as applicable, of each Class which is being allocated a lesser repayment or prepayment as a result thereof; provided, Requisite Lenders may waive, in whole or in part, any prepayment so long as the application, as between Classes, of any portion of such prepayment which is still required to be made is not altered;

(iv)    amend, modify, terminate or waive any provision of Section 2.4 or this Section 10.5(c)(iv) without the written consent of Administrative Agent (including any Person acting as Administrative Agent under Section 2.4 pursuant to the last sentence of Section 9.7);

(v)    amend, modify, terminate or waive any provision of Section 2.16(h) without the written consent of one or more Lenders having or holding Revolving Exposure and representing more than 50% of the sum of the aggregate Revolving Exposure of all Lenders;

(vi)    amend, modify or waive this Agreement or the Pledge and Security Agreement so as to alter the ratable treatment of Obligations arising under the Credit Documents and Obligations arising under Hedge Agreements or the definition of "**Lender Counterparty**," "**Hedge Agreement**," "**Obligations**," or "**Secured Obligations**" in each case in a manner adverse to any Lender Counterparty with Obligations then outstanding without the written consent of any such Lender Counterparty;

(vii)    amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent;

(viii)    amend, modify, terminate or waive any provision of Section 2.24, 4.25, 6.15, or 6.21, without the written consent of each Lender;

(ix)    amend, modify, terminate or waive any provision of Section 3.4 that provides for the satisfaction of Administrative Agent with any conditions set forth therein, without the written consent of Administrative Agent; or

(x)    amend, modify, terminate or waive any provision of the Intercreditor Agreement without the consent of Lenders holding more than 50% of the aggregate Revolving Exposure of all Lenders if any such amendment, modification, termination or waiver would have, as among all Classes, a disproportionately adverse effect on the rights under this Agreement or any other Credit Document of Lenders holding Revolving Exposure.

235.    The first lien credit agreement contains a severability provision:

In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(CA § 10.11.) The First Lien Credit Agreement also contains a clause which states that the

parties' various respective obligations thereunder are independent covenants and not conditions,

stating: "All covenants hereunder shall be given independent effect . . . ." (*See* CA § 10.7.)

236.    Yucaipa was not a lender under the original first lien credit agreement.

**B.    The Third Amendment**

237.    In early 2008, a number of Lenders were concerned about the state of the automotive industry and were looking for strategies to exit their positions in the Allied Holdings debt.  Some of these Lenders expressed interest in potentially selling their debt positions to Yucaipa but recognized that doing so would potentially constitute a default under the First Lien Credit Agreement without an amendment to its terms.  To facilitate such potential sales, the Lenders held discussions with Allied Holdings about potentially amending the First Lien Credit Agreement to allow Yucaipa to be an "Eligible Assignee" under that document's terms.

238.    In April 2008, CIT, as Administrative Agent, coordinated passage of the Third Amendment.  The Third Amendment was enacted with Requisite Lender consent, not unanimous consent.  (*See* 3A § 4(a).)  Yucaipa was not a signatory to the Third Amendment.

239.    Sections 2.1(c) and 2.7(e) of the Third Amendment permitted Lenders to sell or assign to Yucaipa Allied Holdings' first lien debt by amending the term "Eligible Assignee" in the First Lien Credit Agreement.  (3A § 2.1(c); *see also* 3A § 2.7(e) (each "Lender hereby acknowledges that [Yucaipa] may be a Lender (provided [Yucaipa] otherwise satisfies the criteria of the definition of the term of 'Eligible Assignee')").)  It is undisputed that unanimous consent was not required to amend the term "Eligible Assignee" in the Third Amendment.  (*See* 3A § 4(a).)

240.    The Third Amendment contained several amendments to the First Lien Credit Agreement's terms, including several restrictions and conditions on any first lien debt that Yucaipa might acquire.  First, Section 2.7(e) purported to require Yucaipa to make a capital

contribution of at least 50% of any Term Loans it acquired.  (3A § 2.7(e).)[3]  Second, Section 2.7

and Section 2.7(e) at (j)(i) purported to cap the amount of first lien debt that Lenders could

assign to Yucaipa to the lesser of (A) "25% of the aggregate principal amount of the Term Loan

Exposure held or beneficially owned by all Lenders (including [Yucaipa]) or (B) after giving

_____

[3]    3A § 2.7(e) states in relevant part:

> Each Lender that is a Restricted Sponsor Affiliate [Yucaipa], upon succeeding to
> an interest in the Term Loans: … (iii) agrees further that no later than ten days
> after the date of such assignment or transfer of such Term Loans …, such
> Restricted Sponsor Affiliate shall make a capital contribution to Borrowers of no
> less than 50% of the aggregate principal amount of such Term Loans in
> accordance with Section 10.6(k).

Section 10.6(k) (as defined at 3A § 2.7(f)), in turn, states:

> (k) Contribution of Term Loans to Borrowers; Cancellation of Debt.
>
>      (i)    The Restricted Sponsor Affiliates, from time to time, intend to
> make capital contributions of their Term Loans to Borrowers.
>
>      (ii)    Notwithstanding anything to the contrary herein, a Restricted
> Sponsor Affiliate may at any time make a capital contribution of its Term Loans
> to Borrowers in exchange for Equity Interests of Holdings (other than
> Disqualified Equity Interests) upon no less than five Business Days' prior written
> notice to Administrative Agent and Lenders. Such Restricted Sponsor Affiliate
> and Borrowers shall promptly provide all information and data reasonably
> requested by Administrative Agent in connection with such capital contribution.
>
>      (iii)    Immediately upon a Borrower's acquisition of Term Loans from a
> Restricted Sponsor Affiliate, (x) *such Term Loans* and all rights and obligations as
> a Lender related thereto *shall for all purposes (including under this Agreement,
> the other Credit Documents and otherwise) be deemed to be irrevocably prepaid,
> terminated, extinguished, cancelled and of no further force and effect* and such
> Borrower shall neither obtain nor have any rights as a Lender hereunder or under
> the other Credit Documents by virtue of such capital contribution and (y) such
> Borrower shall deliver to Administrative Agent a written acknowledgement and
> agreement executed by an Authorized Officer and in form and substance
> reasonably acceptable to Administrative Agent acknowledging the irrevocable
> prepayment, termination, extinguishment and cancellation of such Term Loans
> and confirming that such Borrower has no rights as a Lender under the Credit
> Documents or otherwise. . . .

(3A § 2.7(f) (italicized emphasis added).)

effect to such assignment or transfer, the aggregate amount of Term Loans acquired by

[Yucaipa] since the Closing Date would exceed $50 million (notwithstanding whether all or any

portion of such acquired Term Loans have been contributed to Borrowers or otherwise disposed

of by [Yucaipa])." (3A § 2.7(c); *see also* 3A § 2.7(e) at (j)(i).)  Third, sections of the Third

Amendment purported to limit the voting rights associated with any Term Loans Yucaipa might

acquire.  For example, Section 2.1(e) changed the term "Term Loan Exposure" ("TLE") by

adding language that would disregard any Term Loans Yucaipa might acquire from any

provisions "relating to the voting rights of Lenders" under the First Lien Credit Agreement.  (3A

§ 2.1(e).)  Specifically, that section modified the TLE language contained in the original First

Lien Credit Agreement by adding the emphasized clause below:

> "Term Loan Exposure" means, with respect to any Lender, as of any date of
> determination, the outstanding principal amount of the Term Loans of such
> Lender plus during the Term Loan Commitment Period, the unfunded Term Loan
> Commitment of such Lender; provided, at any time prior to the making of the
> initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such
> Lender's Term Loan Commitment; *provided further that with respect to any
> provisions of this Agreement relating to the voting rights of Lenders (including
> the right of Lenders to consent or take any other action with respect to any
> amendment, modification, termination or waiver of any provision of this
> Agreement or the other Credit Documents, or consent to any departure by any
> Credit Party therefrom), the aggregate outstanding principal amount of the Term
> Loans of all Restricted Sponsor Affiliates[4] shall be disregarded for purposes of
> this definition of "Term Loan Exposure".*

(*Id.* (emphasis added); *see also* 3A § 2.7(a) (any voting rights Yucaipa might acquire would

purportedly be assigned to the other Lenders, whose own voting rights would "be automatically

ratably increased" by such assignment).)

241.    The Third Amendment also contains a severability clause, which states:

> In case any provision in or obligation hereunder shall be invalid, illegal or
> unenforceable in any jurisdiction, the validity, legality and enforceability of the
> remaining provisions or obligations, or of such provision or obligation in any
> other jurisdiction, shall not in any way be affected or impaired thereby.

---

[4] Yucaipa was defined to be a Restricted Sponsor Affiliate in the Third Amendment.

(3A § 7.2.)

242.    Yucaipa did not make any first lien purchases while the Third Amendment was in effect prior to the enactment of the Fourth Amendment, which is discussed below.  Yucaipa never would have acquired any first lien debt while the Third Amendment's restrictions and conditions limiting Yucaipa's potential ownership rights existed.

**C.    Lenders Seek To Sell To Yucaipa and Remove Third Amendment Restrictions**

243.    In December 2008, with the automotive industry in serious decline, Lenders holding a majority of Allied Holdings' first lien debt sought to exit their positions but faced an extremely limited market of buyers for such debt.  Such Lenders sought to sell their positions to Yucaipa pursuant to the Third Amendment, but Yucaipa made clear to those Lenders that it would buy the Lenders' positions only if certain Third Amendment terms related to Yucaipa's potential acquisitions were amended and Yucaipa could serve as the Requisite Lender on its own.

244.    On February 4, 2009, Yucaipa submitted a written tender offer (the "Tender Offer") by email to all Lenders, including Petitioning Creditors, (the "February 4 Email").  The Tender Offer package included Allied Holdings' proposed fourth amendment to the Credit Agreement (the "Proposed Fourth Amendment") that would have amended the Third Amendment's terms to eliminate any limits on the amount of Term Loans and LC Deposits Yucaipa could purchase, permitted Yucaipa to acquire a majority of Allied Holdings' first-lien debt, and permitted Yucaipa to become the Requisite Lender, among other changes.  The February 4 Email shows that the Tender Offer documents, including the Proposed Fourth Amendment, were sent to Richard Ehrlich of Black Diamond and Jeffrey Schaffer and Jeff Buller of Spectrum, among other representatives for all Lenders.  Although some of the Proposed Fourth Amendment's terms varied from the Fourth Amendment that ComVest enacted on

August 21, 2009, the two documents were materially similar, and their definitions of "Term Loan Exposure" were identical.

245.    On February 11, 2009, Yucaipa offered to extend the deadline for responses to the Tender Offer in an email that was sent to all Lenders, including Richard Ehrlich of Black Diamond and Jeffrey Schaffer and Jeff Buller of Spectrum, among others.

246.    No Lender took any steps to demonstrate opposition to any aspect of Yucaipa's Tender Offer or the Proposed Fourth Amendment. Petitioning Creditors never informed Yucaipa that the changes in the Proposed Fourth Amendment would violate the letter or the spirit of the First Lien Credit Agreement, and never stated that such changes could be made only with their consent. Yucaipa specifically relied – to its detriment -- on the Lenders' lack of any objection to the Proposed Fourth Amendment when it later acquired a majority of Allied Holdings' first lien debt in reliance on the validity of the Fourth Amendment that ComVest and Allied Holdings enacted on August 21, 2009.

247.    At approximately the same time in February 2009, ComVest acquired the majority of Allied Holdings' first lien debt, including a majority of both the First Lien Term Loans and LC Commitments from Allied Holdings' then-existing Lenders. Shortly thereafter, Yucaipa entered into direct negotiations with ComVest to acquire its Requisite Lender position. These negotiations played out over several months and involved different proposals, but every one of them contemplated ComVest enacting certain amendments to the Third Amendment's terms, Yucaipa acquiring ComVest's majority position in Allied Holdings' first lien debt and becoming the Requisite Lender.

248.    During the time Yucaipa and ComVest were negotiating over Yucaipa's purchase of Allied Holdings' first lien debt held by ComVest, Mr. Ehrlich called Yucaipa several times to inquire about the status of the negotiations. As discussed in paragraphs 2 through 8, *supra*, the

Petitioning Creditors' engaged in a pattern of duplicitous conduct in connection with the passage of the Fourth Amendment and Yucaipa's acquisition of the Requisite Lender position. In fact, Yucaipa told Mr. Ehrlich, and he was fully aware throughout the summer of 2009, that Yucaipa intended to acquire ComVest's majority position in Allied Holdings' first lien debt and become the Requisite Lender. During Mr. Ehrlich's calls with Yucaipa and during Mr. Deckoff's meeting with Yucaipa, discussed *supra*, Black Diamond never expressed any opposition to any aspect of Yucaipa's plan to become Requisite Lender. Instead, Black Diamond encouraged Yucaipa to move forward with that plan. Yucaipa relied on Black Diamond's affirmative endorsement of (and lack of objection to) Yucaipa becoming Requisite Lender, as Yucaipa would not have purchased ComVest's holdings if Black Diamond had objected.

## D.     The Fourth Amendment

249.    On August 21, 2009, Allied Holdings and ComVest, as the Requisite Lender under the First Lien Credit Agreement, executed the Fourth Amendment. Allied Holdings' Special Committee – consisting of the Allied Holdings board members who were independent of Yucaipa –reviewed and voted to approve the Fourth Amendment after being advised by outside counsel. Yucaipa (along with the first lien Lenders) also was provided with a written legal opinion from Allied Holdings' counsel in connection with the Fourth Amendment's enactment.

250.    Various sections of the Fourth Amendment amended or deleted certain restrictions and conditions that sections of the Third Amendment placed on first lien debt that Yucaipa might acquire, as described above. The Fourth Amendment permitted Yucaipa to acquire and accept assignment of Allied Holdings' first lien debt and become Requisite Lender under the First Lien Credit Agreement. (*See, e.g.,* 4A §§ 2.1(b), 2.4(e).)

251.    Among its changes, Section 2.1(b) of the Fourth Amendment modified the language of "Term Loan Exposure" by deleting the language added by the Third Amendment.

That section thereby restored the "Term Loan Exposure" language to its condition as it existed in the First Lien Credit Agreement prior to the Third Amendment's enactment:

> "Term Loan Exposure" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; provided, at any time prior to the making of the initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment.

(4A § 2.1(b) (emphasis in original); compare id. and CA § 1.1 ("Term Loan Exposure" language) with 3A § 2.1(e).)

252.    The Fourth Amendment also contains a severability clause with wording identical to the severability clause contained in the Third Amendment.  (4A § 6.2; see 3A § 7.2.)

253.    In reliance on the validity of the Fourth Amendment, Yucaipa acquired all of ComVest's majority holdings of Allied Holdings' first lien debt on August 21, 2009. These holdings consisted of $114,712,088.66 of Term Loans and $30,400,458.40 of LC Commitments, totaling $145,112,547.06 of the $265,000,000 maximum first lien loans authorized by the First Lien Credit Agreement.

254.    Certain Lenders, including Black Diamond, knew in mid-August 2009 that Yucaipa was planning to acquire ComVest's Requisite Lender position, and did not express any objection whatsoever to Yucaipa.  As noted above, Black Diamond and Yucaipa held an in-person meeting in Los Angeles on August 18, 2009 to discuss, among other things, Yucaipa's plan to acquire ComVest's Requisite Lender position.  Yucaipa's acquisition of ComVest's position was discussed further during an August 19, 2009 conference call involving Black Diamond, Yucaipa and Yucaipa's counsel.  During these communications, Black Diamond never objected in any way to Yucaipa's proposed acquisition, never expressed that it would not consent to Yucaipa becoming Requisite Lender, and never stated a belief that unanimous Lender consent was required for Yucaipa to acquire ComVest's position.  To the contrary, Black Diamond

encouraged Yucaipa's proposed plan, a fact on which Yucaipa relied in executing the plan.

255.    On August 22, 2009, immediately after Yucaipa purchased its first lien debt position pursuant to the Fourth Amendment, Mr. Walker advised Black Diamond, through Mr. Ehrlich, by email that Yucaipa "did in fact take an assignment of the ComVest debt." Mr. Ehrlich responded, "OK. Let me know a good time [to talk]." Even after the Fourth Amendment was passed and Yucaipa acquired ComVest's majority position – permitting Yucaipa to become Requisite Lender – Black Diamond continued to discuss with Yucaipa the joint plan to sell Allied Holdings and did not object to Yucaipa.

256.    Mr. Walker of Yucaipa also contacted Jeff Schaffer of Spectrum on August 22, 2009, to inform him that Yucaipa had taken an assignment of ComVest's first lien loans. Mr. Schaffer responded to Mr. Walker's email on September 8, 2009, stating "I am back in the office this week. Please call me at your convenience so we can discuss next steps. Thanks, Jeff." Yucaipa also offered to meet in person with Mr. Schaffer later in September 2009, but he was not available. Even though Yucaipa attempted to open a line of communication with Mr. Schaffer, he never objected in any way to Yucaipa's acquisition, never expressed that the Fourth Amendment was invalid or that unanimous Lender consent was required for Yucaipa to acquire ComVest's position, and never questioned Yucaipa's Requisite Lender status to Yucaipa before his and Black Diamond's counsel sent a letter to the Lenders' Agent, CIT, on September 18, 2009, as discussed below.

257.    Yucaipa also contacted the Administrative Agent for all first lien Lenders, CIT, on or about August 22, 2009, to inform CIT that Yucaipa had taken an assignment of ComVest's first lien loans. Yucaipa had a series of phone calls with CIT representatives over the weeks that followed concerning Yucaipa's requests as Requisite Lender for CIT as Administrative Agent to resolve certain outstanding administrative issues. During those multiple calls, CIT never

objected in any way to Yucaipa's acquisition, never asserted that the Fourth Amendment was invalid or that CIT's or all Lenders' consent was required for Yucaipa to acquire ComVest's position, and never questioned Yucaipa's Requisite Lender status. In fact, CIT entered all of Yucaipa's loans on the Register in compliance with its duties as Administrative Agent under First Lien Credit Agreement Section 10.6(b) shortly after the Fourth Amendment was executed. As a result, all Lenders are bound by the Credit Agreement to "deem and treat the Persons listed as Lenders in the Register [including Yucaipa] as the holders and owners of the corresponding Commitments, LC Deposits and Loans listed therein for all purposes hereof [of the Credit Agreement]." (CA § 10.6(b).)

258.    Yucaipa would not have purchased any portion of Allied Holdings' first lien debt, much less ComVest's stake, if it understood that any portion of the Fourth Amendment were invalid or if any Lender had contended that Yucaipa could not acquire a majority of Allied Holdings' first lien debt, or that the Fourth Amendment was invalid, without unanimous Lender consent. Yucaipa specifically and detrimentally relied on the Lenders' lack of any objection to its plan to acquire a majority of Allied Holdings' first lien debt by going forward with that transaction under the auspices of the Fourth Amendment.

**E.    The Georgia Litigation**

259.    Approximately a month after Yucaipa acquired ComVest's majority position –
with Petitioning Creditors' full knowledge and without any objection from the Petitioning
Creditors – the Petitioning Creditors changed course and expressly instructed CIT, as
Administrative Agent for all Lenders, to challenge the validity of the Fourth Amendment by
letter dated September 18, 2009. In that letter, the Petitioning Creditors instructed CIT "that the
Agent should refuse to acknowledge the purported direction delivered by [Yucaipa as Requisite
Lender]" based on their "doubts about the validity of the assignment of the Loans to [Yucaipa]

and their entitlement to act as Requisite Lenders under the [First Lien] Credit Agreement."

260.    CIT, as Administrative Agent for all Lenders, pressed Petitioning Creditors' dispute with Yucaipa. In response to that pressure, on November 21, 2009, Yucaipa and Allied Holdings filed suit in Georgia seeking a declaration that the Fourth Amendment was valid and enforceable and that Yucaipa is the Requisite Lender (the "Georgia Complaint"). In the Georgia Complaint, Yucaipa and Allied Holdings expressly asserted certain claims against CIT in its capacity as Administrative Agent.

261.    CIT brought a counterclaim in both its representative capacity as Administrative Agent and in its individual capacity as a Lender (the "CIT Counterclaim"). (The litigation related to the Georgia Complaint and the CIT Counterclaim is referred to herein as the "Georgia Action"). The CIT Counterclaim included a declaratory judgment claim, which CIT asserted in its representative capacity as Administrative Agent for all Lenders, that the Fourth Amendment was ineffective and that Yucaipa was not the Requisite Lender.

262.    The Petitioning Creditors participated in the Georgia Action: they produced documents in response to subpoenas, made themselves available for deposition, and communicated with both CIT, their Agent, and Yucaipa about the proceedings.

263.    While the Georgia Action was pending, as discussed *supra*, the Petitioning Creditors continued to engage in a pattern of duplicitous conduct, socializing with Yucaipa's principals and negotiating potential business strategies that depended on Yucaipa's exercise of its Requisite Lender powers. On December 5, 2011, after more than two years of litigation, CIT, Yucaipa and Allied Holdings executed the Settlement Agreement in the Georgia Action. Among other things, the Settlement Agreement expressly stated that the parties "will dismiss their respective claims in the Action with prejudice upon the execution of this Agreement." CIT entered the Settlement Agreement in both its representative capacity as Administrative Agent

and in its individual capacity as a Lender.  Among other things, CIT bound itself in the Settlement Agreement to various obligations as Administrative Agent and Collateral Agent under the First Lien Credit Agreement's first lien facility.

264.    On December 7, 2011, the parties to the Georgia Action filed mutual dismissals with prejudice of all of their claims (the "Dismissals with Prejudice").  In the Dismissals with Prejudice, "Defendant and Counterclaim-Plaintiff The CIT Group/Business Credit Inc." expressly stated that it was dismissing "all claims it asserted in its Verified Answer and Counterclaims," including the claim CIT asserted in its role as Administrative Agent for all Lenders to invalidate the Fourth Amendment and declare that Yucaipa was not the Requisite Lender.

265.    Prior to the settlement of the Georgia Action, the Petitioning Creditors were fully aware that settlement negotiations were ongoing between Yucaipa, Allied Holdings and CIT from approximately May 2011 until December 2011.  In fact, Mr. Ehrlich called Mr. Walker of Yucaipa repeatedly for updates on the status of the settlement discussions during those months. Mr. Walker understood Mr. Ehrlich's calls were to gauge Yucaipa's settlement posture, and he understood that Mr. Ehrlich also was talking with his agent, CIT, throughout the settlement process.  During these calls, Mr. Ehrlich never complained about CIT's handling of the Georgia Action never expressed that a settlement of the Georgia Action would not resolve the claims CIT brought in its representative capacity, never said that his or other Lenders' consent would be required to finalize the settlement, and never suggested that Yucaipa could not be the Requisite Lender.

266.    All Lenders became aware of the settlement on December 5, 2011 at the latest, when CIT posted it to IntraLinks, but no Lender objected to the settlement between December 5, 2011 and the entry of the Dismissals with Prejudice on December 7, 2011.

267.    Yucaipa intended for CIT to execute the Settlement Agreement and the
Dismissals with Prejudice in both its representative capacity and in its individual capacity as a
Lender, and Yucaipa understood that CIT did, in fact, act in both capacities in executing both
documents.

268.    Yucaipa understood that CIT served as the Petitioning Creditors' agent in the
Georgia Action, and that CIT was litigating on its own behalf and on behalf of all Lenders,
including the Petitioning Creditors, throughout the Georgia Action.  In connection with the
action described below between the Petitioning Creditors and Yucaipa, the Petitioning Creditors
repeatedly and expressly admitted that CIT acted as their agent during the Georgia Action,
including in a statement made under oath in an affidavit filed by one of the Petitioning Creditor's
principals, Richard Ehrlich.

F.    **The New York Litigation**

269.    On January 18, 2012, the Petitioning Creditors filed the New York Action against
Yucaipa in the Supreme Court of the State of New York, Index No. 650150/2012.  The
Petitioning Creditors' sole claim in the New York Action seeks, *inter alia*, a judicial declaration
that the Fourth Amendment is null and void and that, consequently, Yucaipa is not the Requisite
Lender under the First Lien Credit Agreement.

270.    On August 27, 2012, before any discovery had been taken in the New York
Action, the Petitioning Creditors filed a motion for summary judgment on their declaratory
judgment claim, arguing that the Fourth Amendment's change to the term "Term Loan
Exposure" had the effect of changing the definition of Requisite Lender without all "affected"
Lenders' consent in violation of First Lien Credit Agreement § 10.5(b)(ix).

271.    The New York Court heard oral argument on the Petitioning Creditors' motion for
summary judgment on November 19, 2012.  Although the New York Court has not yet issued its

written order, at oral argument the Court expressed the intention to grant the Petitioning

Creditors' motion for summary judgment.

272.    Yucaipa disagrees with the New York Court's anticipated order and intends to

take an appeal from it.  Yucaipa continues to contend that the Fourth Amendment's change to the

definition of "Term Loan Exposure" did not effect a change to the definition of "Requisite

Lender" and did not do so in a way that "affected" Petitioning Creditors.  Yucaipa also contends,

even assuming, *arguendo*, that the Fourth Amendment provision's change to TLE was not

passed with the required level of consent, that the New York Court should, consistent with the

Fourth Amendment's severability clause, sever the purportedly offending "Term Loan

Exposure" language from the remaining provisions of the Fourth Amendment, and should not

invalidate the Fourth Amendment in its entirety.  Accordingly, the remainder of the Fourth

Amendment's provisions should remain fully effective.

G.    **Validity of Third Amendment's Restrictions and Conditions on Yucaipa's Acquisitions of First Lien Debt**

1.    **Enforcement of the Third Amendment's Restrictions Against Yucaipa Would Effectuate an Unjust Enrichment at Yucaipa's Expense**

273.    It would be manifestly inequitable, and result in an impermissible windfall

unjustly enriching the other Lenders, if Yucaipa were to be held to the terms of the Third

Amendment to which it never intended to be bound.  As illustrated by the fact that Yucaipa

decided not to purchase debt under the Third Amendment, Yucaipa would not have purchased

any portion of Allied Holdings' first lien debt, much less a majority of this debt, if it understood

that it would be bound by the Third Amendment, or if it understood that any portion of the

Fourth Amendment was invalid.

274.    If the contribution provisions of the Third Amendment were enforced against

Yucaipa – which were expressly removed by the Fourth Amendment on which Yucaipa

reasonably relied to its detriment – a significant amount of the otherwise indisputably valid first lien loans purchased by Yucaipa would be converted to capital, resulting in a windfall enhanced recovery to the other Lenders that they would have had absolutely no right to receive if the indebtedness purchased by Yucaipa was in the hands of any other entity.

275.    Moreover, despite the Petitioning Creditors' knowledge of the Fourth Amendment and Yucaipa's purchase of loans pursuant thereto before and at the time the Fourth Amendment was executed, the Petitioning Creditors sat on their hands and did not contest Yucaipa's acquisition of this debt or the Fourth Amendment.  Yucaipa respectfully submits that to enforce retroactively the Third Amendment against Yucaipa would deprive Yucaipa of its legitimate expectations in purchasing the first lien debt it acquired pursuant to the Fourth Amendment and would result in an unjust enrichment of the other Lenders at Yucaipa's expense, a result that should not be permitted under equity and in good conscience.  Thus, Petitioning Creditors, other Lenders, and all other interested parties should now be estopped from enforcing the Third Amendment's contribution and voting restrictions against Yucaipa so as to preclude the unjust enrichment of the other first lien Lenders at Yucaipa's expense.

### 2.   Under the New York State Court's Interpretation of the Fourth Amendment, the Third Amendment's Restrictions and Conditions Should Be Severed and Invalidated

276.    Assuming, *arguendo*, that the New York Court disregards the severability clause of the Fourth Amendment and completely invalidates the Fourth Amendment for the reasons urged by Petitioning Creditors, it would be patently unfair to treat Yucaipa's acquisition of Allied Holdings' first lien debt as if the Third Amendment applied to it.  First, as described above, Yucaipa never would have acquired first lien debt if it knew that the Fourth Amendment were invalid and that the Third Amendment would apply.  Yucaipa understood that the Fourth Amendment was valid based on its approval by ComVest, as Requisite Lender, and Allied

Holdings, through the Special Committee.

277.    Second, Yucaipa specifically and detrimentally relied on the fact that Black Diamond, among other Lenders, never objected to either the Fourth Amendment or Yucaipa's acquisition before it occurred on August 21, 2009 – despite Black Diamond's full, prior knowledge of Yucaipa's plan to acquire ComVest's majority position and that the Fourth Amendment would permit such act.  Third, Yucaipa understood that CIT settled and dismissed its claims in the Georgia Action in both its individual capacity and in its representative capacity as Administrative Agent on behalf of all Lenders.  In settling that action, Yucaipa specifically and detrimentally relied on the fact that no Lender ever objected to CIT's prosecution and settlement of the Georgia Action on behalf of the first lien Lenders.

278.    Moreover, the application of the Third Amendment's contribution provisions – which Yucaipa understood to be null and void at the time it acquired its first lien debt – also would unfairly result in a financial windfall to Petitioning Creditors and all other Lenders.  These provisions would unfairly require Yucaipa, without its consent, to contribute some portion of its first lien debt to Allied Holdings, increasing the pro rata recovery of all other first lien Lenders.

279.    Assuming, *arguendo*, that the New York Court disregards the severability clause of the Fourth Amendment and completely invalidates the Fourth Amendment for the reasons urged by Petitioning Creditors, then, based on the reasoning that led that Court to invalidate certain provisions of the Fourth Amendment, several provisions of the Third Amendment would also be invalid under the terms of First Lien Credit Agreement §§ 10.5(b) and (c) and therefore would need to be severed pursuant to the severability clauses in the First Lien Credit Agreement and the Third Amendment.  For instance:

      a.    <u>Contribution Provisions</u>.  Assuming, *arguendo*, the Fourth Amendment is invalid because it passed without the required level of Lender consent, then the Third

Amendment's contribution provisions (*see* 3A § 2.7(e) at (j)(iii)) violated several

subsections of Sections 10.5(b) and (c) as they too were not passed with affected

Lender consent because:

- The Third Amendment's contribution provisions violated Section 10.5(b)(vii) because their enforcement would "reduce the principal amount of any Loan", affecting all Lenders by a reduction in the principal amount of the first lien Term Loans.

- The Third Amendment's contribution provisions also violated Section 10.5(b)(ix) because a contribution of 50% of Yucaipa's Term Loans would have decreased the amount of Term Loans then outstanding, thereby increasing *all* Lenders' pro rata rights and affecting a change to the definition of "Pro Rata Share."

- Assuming, *arguendo*, that the Fourth Amendment's provision regarding Term Loan Exposure violated Section 10.5(b)(ix) because it affected a change to the Term Loan Exposure calculation, then the Third Amendment's contribution provisions also violated Section 10.5(b)(ix) by affecting a change to the Term Loan Exposure calculation by decreasing the amount of outstanding Term Loans.

   b.       Term Loan Exposure. Assuming, *arguendo*, that the Fourth Amendment's

provisions that changed the definition of Term Loan Exposure violated First Lien

Credit Agreement Section 10.5(b)(ix), then the Third Amendment's provisions

that changed the definition of Term Loan Exposure also violated that section. The

Third Amendment's Section 2.1(e) added in the very language to the definition of

Term Loan Exposure that the Fourth Amendment's Section 2.1(b) deleted. If

deleting this language in the Fourth Amendment required Petitioning Creditors'

consent, then so too did the Third Amendment's addition of such language. The

effect of such severance would be to return the "Term Loan Exposure" definition

to its state in the First Lien Credit Agreement – which is identical to its definition

under the Fourth Amendment.

   c.       Voting Rights. Similarly, the Third Amendment's section that purportedly

eliminated Yucaipa's voting rights also violated First Lien Credit Agreement

Section 10.5(b)(ix), among others, by increasing each Lender's voting rights on a

pro rata basis, thereby affecting a change to the definition of "Pro Rata Share"

without each Lender's consent.

    d.   <u>Indebtedness Permitted to be Acquired</u>.  Assuming, *arguendo*, that a change to the

identity of the Requisite Lender changes the definition of Requisite Lender in

violation of Section 10.5(b)(ix), then the Third Amendment's purported cap on

the amount of Term Loans Yucaipa could acquire also violated Section

10.5(b)(ix), among other sections.

**H.**    **Petitioning Creditors Seek To Act As Requisite Lender, Administrative Agent and Collateral Agent Even Before A Ruling In The New York Action**

280.    As of the date of this Answer, the New York Court had not yet written a decision

ruling on Petitioning Creditors' motion for summary judgment.

281.    Notwithstanding the New York Court's comments from the bench, until the New

York Court reduces its decision to a writing entered on the docket in the New York State Court,

the Fourth Amendment remains valid and Yucaipa remains the Requisite Lender.

282.    Nevertheless, on November 26, 2012, the Petitioning Creditors wrote to counsel

for the Debtors stating that, "in accordance with the valid and enforceable terms of the Credit

Agreement as determined by Justice Ramos [the New York Court], the Petitioning Creditors

together with American Money Management Corporation . . . now constitute Requisite Lenders."

In that letter, the Petitioning Creditors also stated their "intention" to appoint themselves as "co-

Administrative Agents."

283.    On December 3, 2012, the Petitioning Creditors and American Money

Management Corporation sent to the Debtor an "Appointing Agreement," purporting to appoint

Petitioning Creditors or their affiliates as co-Administrative Agents and as Collateral Agent.

284.    On information and belief, the Petitioning Creditors will soon seek to act in furtherance of their own self-interests and to Yucaipa's detriment in their self-appointed roles as Requisite Lenders and Agents, including, without limitation, by changing entries on the Register in an effort to unilaterally contribute Yucaipa's debt to equity, seeking to enforce remedies against Debtors and commencing a credit bid or Section 363 sale process.

## THE AFFIRMATIVE DEFENSES

### First Affirmative Defense as to All Claims for Relief[5]
### (Failure to State a Claim)

285.    The Complaint fails to state facts sufficient to constitute a claim for relief against the Defendants, and each of them.

### Second Affirmative Defense as to All Claims for Relief
### (No Standing)

286.    The claims for relief, and each of them, belong to the estate of the Debtors and not to the Plaintiff.  Unless and until this Court, on motion of the Plaintiff, grants the Plaintiff standing to pursue the claims for relief alleged in the Complaint, the Plaintiff lacks standing to pursue those claims.

### Third Affirmative Defense as to the First through the Fifth and Seventh Claims for Relief
### (Validity of the Fourth Amendment)

287.    The Defendants incorporate herein by this reference as though fully set forth herein the allegations contained in Paragraphs 204 through 284 above.

288.    The Plaintiff's claims for relief are based in whole or in part of the invalidity of

---

[5] These Defendants are not parties to Sixth Claim for relief for alleged breach of fiduciary duties by certain of the Debtors' directors.

the Fourth Amendment to the First Lien Credit Agreement. Because the Fourth Amendment was validly entered into and is binding on the Debtors and the lenders subject to the First Lien Credit Agreement, the Plaintiff's First through the Fifth and Seventh claims for relief are barred.

## Fourth Affirmative Defense as to the First through the Fifth and Seventh Claims for Relief

### (Justification)

289.     The Defendants incorporate herein by this reference as though fully set forth herein the allegations contained in Paragraphs 204 through 284 above.

290.     Accordingly, Plaintiff's First through the Fifth and Seventh claims for relief are barred because the Defendants' conduct was justified, proper, authorized and/or a lawful exercise of its contractual rights and duties.

## Fifth Affirmative Defense as to the First through the Fifth and Seventh Claims for Relief

### (Estoppel)

291.     The Defendants incorporate herein by this reference as though fully set forth herein the allegations contained in Paragraphs 204 through 284 above.

292.     Accordingly, the Plaintiff is estopped from pursuing the First through the Fifth and Seventh claims for relief by the actions and conduct of the Petitioning Creditors.

## Sixth Affirmative Defense as to the First through the Fifth and Seventh Claims for Relief

### (Waiver)

293.     The Defendants incorporate herein by this reference as though fully set forth herein the allegations contained in Paragraphs 204 through 284 above.

294.     Accordingly, the Plaintiff is barred by the doctrine of waiver from pursuing the First through the Fifth and Seventh claims for relief by the actions and conduct of the Petitioning

Creditors.

## Seventh Affirmative Defense as to the First through the Fifth and Seventh Claims for Relief

### (Unclean Hands and *In Pari Delicto*)

295.    The Defendants incorporate herein by this reference as though fully set forth herein the allegations contained in Paragraphs 204 through 284 above.

296.    Accordingly, the Plaintiff is barred by the doctrines of unclean hands and *in pari delicto* from pursuing the First through the Fifth and Seventh claims for relief by the actions and conduct of the Petitioning Creditors.

## Eighth Affirmative Defense as to the First through the Fifth and Seventh Claims for Relief

### (Unjust Enrichment)

297.    The Defendants incorporate herein by this reference as though fully set forth herein the allegations contained in Paragraphs 204 through 284 above.

298.    Accordingly, the Plaintiff is barred by the doctrine of unjust enrichment from pursuing the First through the Fifth and Seventh claims for relief by the actions and conduct of the Petitioning Creditors.

## Ninth Affirmative Defense as to the First through the Fifth and Seventh Claims for Relief

### (Consent)

299.    The Defendants incorporate herein by this reference as though fully set forth herein the allegations contained in Paragraphs 204 through 284 above.

300.    Plaintiff is bound by the actions and conduct of the Petitioning Creditors which expressly and/or impliedly consented to each and every act complained of in the Complaint and,

accordingly, they are barred by the doctrine of consent from pursuing the First through the Fifth and Seventh claims for relief.

## Tenth Affirmative Defense as to the Third, Fourth, Fifth and Seventh Claims for Relief
### (Statute of Limitations)

301.    The Defendants incorporate herein by this reference as though fully set forth herein the allegations contained in Paragraphs 204 through 284 above.

302.    To the extent that Delaware law supplies the applicable statute of limitations for contract-based claims, Plaintiff's Third and Fourth claims for relief are barred by the applicable statute limitations.

## Eleventh Affirmative Defense as to the Third and Fourth Claims for Relief
### (Laches)

303.    The Defendants incorporate herein by this reference as though fully set forth herein the allegations contained in Paragraphs 204 through 284 above.

304.    Plaintiff is bound by the actions and conduct of the Petitioning Creditors which were aware since at least August 2009 that the Defendants were relying on the validity of the Fourth Amendment to the First Lien Credit Agreement and the transactions contemplated thereby but failed to take action in a timely manner to assert the claims they now seek to assert. Accordingly, the Plaintiff's Third and Fourth claims for relief are barred by the doctrine of laches.

## Twelfth Affirmative Defense to the Third and Fourth Claims for Relief
### (Duty to Mitigate)

305.    Plaintiff is bound by the actions and conduct of the Petitioning Creditors. Thus, if Plaintiff suffered any damages or losses, which Defendants deny, then Plaintiff failed to take

reasonable and necessary steps in order to mitigate, lessen, reduce and minimize those damages and losses.

### Thirteenth Affirmative Defense to the Fifth and Seventh Claims for Relief
### (No Legal Duty Owed)

306.    The Defendants owed no legal duty to the Plaintiff or the Debtors and, accordingly, Plaintiff's' Fifth and Seventh claims for relief are barred.

### Fourteenth Affirmative Defense to the Eighth, Ninth and Eleventh Claims for Relief
### (Failure to Plead Fraud With Particularity)

307.    Plaintiff has failed to plead actual fraud with particularity as required and, accordingly, Plaintiff is barred from pursuing the Eighth, Ninth and Eleventh claims for relief.

### Fifteenth Affirmative Defense to the Eighth, Ninth and Eleventh Claims for Relief
### (Good Faith and Reasonably Equivalent Value)

308.    For each of the payments which Plaintiff seeks to avoid, the Debtor made such payments in good faith and received reasonably equivalent value and, accordingly, Plaintiff is barred from pursuing the Eighth, Ninth and Eleventh claims for relief.

### Sixteenth Affirmative Defense to the Eighth, Ninth, Tenth and Eleventh Claims for Relief
### (Statute of Limitations)

309.    Many of the payments which Plaintiff seeks to avoid were made by the Debtor for the benefit of the Defendants outside of the applicable statute of limitations and, accordingly, the Eighth, Ninth, Tenth and Eleventh claims for relief are barred in whole or in part.

### Seventeenth Affirmative Defense to the Tenth and Eleventh Claims for Relief
### (Payments Made in the Ordinary Course)

310.    The payments which Plaintiff seeks to avoid were paid by the Debtor in the ordinary course of its business and on ordinary business terms and, accordingly, the Tenth and

Eleventh claims for relief are barred in whole or in part.

### Reservation of Right to Assert Additional Defenses

311.    The Defendant expressly reserves their right to amend, modify and/or supplement

its Answer to the Complaint and to allege additional affirmative defenses and claims for relief as

may be warranted based on its investigation and discovery in this matter.

### PRAYER

WHEREFORE, Defendants prays for judgment as follows:

1.    That Plaintiffs takes nothing by reason of their Complaint;

2.    That judgment is rendered in favor of Defendants;

3.    That Defendants are awarded their costs of suit; and

4.    For such other and further relief as this Court may deem just and proper.

Dated: February 11, 2013          Respectfully submitted,
       Wilmington, Delaware

                                  YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                  /s/  Donald J. Bowman, Jr.
                                  John T. Dorsey, Esquire (No. 2988)
                                  Michael R. Nestor (No. 3526)
                                  Donald J. Bowman, Jr. (No. 4383)
                                  Rodney Square
                                  1000 North King Street
                                  Wilmington, DE  19801
                                  Telephone: (302) 571-6600
                                  mnestor@ycst.com

                                  - and -

                                  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
                                  David E. Ross
                                  David E. Spalten
                                  Adam K. Grant
                                  1633 Broadway
                                  New York, New York 10019 Phone:
                                  (212) 506-1700
                                  DRoss@kasowitz.com

                                  - and -

01:13280772.1                          62

LATHAM & WATKINS, LLP
Russell F. Sauer, Jr.
Robert A. Klyman
355 S. Grand Ave.
Los Angeles, CA 90071
Phone: (213) 485-1234
russ.sauer@lw.com

*Attorneys for Defendants Yucaipa American Alliance Fund, I, LP, Yucaipa American Alliance (Parallel) Fund I, LP, Yucaipa American Alliance Fund, II, LP and Yucaipa American Alliance (Parallel) Fund II,*