**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) CHAPTER 11 |
| ALLIED SYSTEMS HOLDINGS, INC. *et al.* | ) |
| | ) Case No. 12–11564 (CSS) |
| Debtors. | ) |
| | ) (Jointly Administered) |

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ALLIED SYSTEMS HOLDINGS, INC. AND ITS AFFILIATED DEBTORS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Pro. No. 13-50530 (CSS) |
| | ) |
| YUCAIPA AMERICAN ALLIANCE FUND I, LP, *et al.*, | ) |
| | ) **Re: D.I. 76, 81** |
| Defendants. | ) |

**OPENING BRIEF IN SUPPORT OF MOTION OF DEFENDANT MARK J. GENDREGSKE TO DISMISS THE CLAIMS ASSERTED AGAINST HIM IN THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' AMENDED COMPLAINT FOR (I) EQUITABLE SUBORDINATION, (II) RECHARACTERIZATION, (III) BREACH OF CONTRACT, (IV) SPECIFIC PERFORMANCE, (V) BREACHES OF FIDUCIARY DUTIES, (VI) AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES, (VII) AVOIDANCE AND RECOVERY OF AVOIDABLE TRANSFERS, AND (VIII) DISALLOWANCE OF CERTAIN CLAIMS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
William M. Alleman, Jr. (No. 5449)
1201 North Market Street
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

ARNOLD & PORTER LLP
Justin S. Antonipillai
Ian S. Hoffman
555 Twelfth Street, N.W.
Washington, DC 20004
Telephone: (202) 942–5000
Facsimile: (202) 942–5999

*Attorneys for Mark J. Gendregske*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 7

STANDARD OF REVIEW ..................................................................................................... 12

ARGUMENT .......................................................................................................................... 13

I.    ALLIED'S CHARTER EXCULPATES MR. GENDREGSKE FROM THE COMMITTEE'S DUTY OF CARE CLAIM. ...................................................... 13

II.   THE STATUTE OF LIMITATIONS BARS MOST OF THE COMMITTEE'S CLAIMS AGAINST MR. GENDREGSKE. ........................................................... 16

III.  THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF THE DUTY OF LOYALTY BY MR. GENDREGSKE.. .......................................... 18

    A.   Any Duty of Loyalty Claim Fails Because the Amended Complaint Fails to Plausibly Allege that Allied Was Actually Insolvent. ................................................. 20

    B.   The Amended Complaint Pleads No Facts Whatsoever Supporting a Theory That Mr. Gendregske Lacked Independence.. ................................................. 24

    C.   The Amended Complaint Pleads No Plausible Or Viable Claims That Mr. Gendregske Lacked Good Faith. ................................................................. 27

IV.  THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY BY MR. GENDREGSKE. ................... 34

V.   ALTERNATIVELY, THE AMENDED COMPLAINT FAILS TO PLEAD PLAUSIBLE CLAIMS (1) FOR BREACH OF THE DUTY OF LOYALTY BASED ON CONDUCT THAT PREDATES JUNE 11, 2009 AND (2) FOR BREACH OF THE DUTY OF CARE. ................................................................................................................. 35

    A.   The Amended Complaint Does Not State Plausible Claims For Breach of the Duty of Loyalty Based on Conduct Prior to June 11, 2009. ......................................... 35

    B.   The Amended Complaint Does Not State Any Plausible Claims For Breach Of The Duty Of Care. .............................................................................. 37

CONCLUSION. ..................................................................................................................... 39

STATEMENT UNDER RULE 7012-1. ................................................................................. 40

- i -

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Andreae v. Andreae,*
18 Del. J. Corp. L. 197, 208 (Del. Ch. 1992).........................................................................26

*Aronson v. Lewis,*
473 A.2d 805 (Del. 1984) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d
244 (Del. 2000) ...............................................................................................................19, 26

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)............................................................................................... passim

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)...............................................................................................12, 18

*Benihana of Tokyo, Inc. v. Benihana, Inc.,*
891 A.2d 150 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) ..............................................39

*Cede & Co. v. Technicolor, Inc.,*
634 A.2d 345 (Del. 1993), *modified* 636 A.2d 956 (Del. Ch, 1994) ......................................19

*Citron v. Fairchild Camera & Instrument Corp.,*
569 A.2d 53 (Del. 1989) .....................................................................................................29, 30

*Continuing Creditors' Comm. of Star Telecomms, Inc. v. Edgecomb,*
385 F. Supp. 2d 449 (D. Del. 2004)........................................................................ 14, 15, 24

*Crescent/Mach I Partners, LP v. Turner,*
846 A.2d 963 (Del. Ch. 2000)...............................................................................................37

*Globis Partners, L.P. v. Plumtree Software, Inc.,*
No. 1577-VCP, 2007 WL 4292024 (Del. Ch. Nov. 30, 2007) .................................................14

*Hokanson v. Petty,*
No. 3438-VCS, 2008 WL 5169633 (Del. Ch. Dec. 10, 2008)..................................................14

*In re Alloy, Inc.,*
C.A. No. 5626-VCP, 2011 WL 4863716 (Del. Ch. Oct. 13, 2011).........................................30

*In re Autobacs Strauss, Inc.,*
473 B.R. 525 (Bankr. D. Del. 2012) (Sontchi, J.) ........................................................ 21, 22, 23

*In re BH S & B Holdings LLC,*
420 B.R. 112 (Bankr. S.D.N.Y. 2009) ..............................................................................25, 26

*In re Bridgeport Holdings, Inc.*,
    388 B.R. 548 (Bankr. D. Del. 2008) ...............................................................16

*In re Caremerica, Inc.*,
    409 B.R. 759 (Bankr. E.D.N.C. 2009) ...........................................................21

*In re Direct Response Media, Inc.*,
    466 B.R. 626 (Bankr. D. Del. 2012) ..........................................................16, 17

*In re Emerging Commc'ns, Inc. S'holders Litig.*,
    No. Civ.A. 16415, 2004 WL 1305745 (Del. Ch. May 3, 2004) ....................31

*In re Fedders N. Am., Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) ...............................................................24

*In re Fruehauf Trailer Corp.*,
    250 B.R. 168 (D. Del. 2000) ...........................................................................16

*In re IT Group Inc.*,
    No. 02-10118, Civ.A. 04-1268 2005 WL 3050611 (D. Del. 2005)................14, 15

*In re Life Fund 5.1 LLC*,
    09 Bankr. No. 09 B 32672, Ad. No. 10 A 42, 2010 WL 2650024, at *7 (Bankr. N.D.
    Ill. June 30, 2010)............................................................................................21

*In re Nat'l Auto Credit, Inc. S'holders Litig.*,
    No Civ. A. 19028, 2003 WL 139768 (Del. Ch. Jan. 10, 2003) .............................37

*In re Rothenberg*,
    173 B.R. 4 (Bankr. D.D.C. 1994) ...................................................................16

*In re Tower Air, Inc.*,
    416 F.3d 229 (3d Cir. 2005).............................................................................18

*In re Trinsum Grp., Inc.*,
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) ...........................................................22

*In re Trinsum Grp., Inc.*,
    466 B.R. 596 (Bankr. S.D.N.Y. 2012) .................................................. passim

*In re Tyson Foods, Inc. Consol. S'holders Litig.*,
    919 A.2d 563 (Del. Ch. 2007)..........................................................................31

*In re USDigital, Inc.*,
    443 B.R. 22 (Bankr. D. Del. 2011) (Sontchi, J.).................................... passim

*In re Verestar, Inc.*,
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...........................................................14

*In re Walt Disney Co. Derivative Litig.,*
  907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)..................................25, 31, 32

*In re Wheelabrator Techs., Inc. S'holders Litig.,*
  No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992)........................................................... 13

*In re Yelverton,*
  09-00414, 2010 WL 1688403 (Bankr. D.D.C. Apr. 22, 2010) .................................................21

*Lyondell Chem. Co. v. Ryan,*
  970 A.2d 235 (Del. 2009) ............................................................................................. passim

*Malpiede v. Townson,*
  780 A.2d at 1075 (Del. Supr. 2001).........................................................................13, 14, 34

*Mann v. GTCR Golder Rauner, L.L.C.,*
  483 F. Supp. 2d 884 (D. Ariz. 2007) .....................................................................................34

*MCG Capital Corp. v. Maginn,*
  No. 4521-CC, 2010 WL 1782271 (Del. Ch. May 5, 2010) ...............................................30, 39

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,*
  930 A.2d 92 (Del. 2007) .......................................................................................................21

*Oberly v. Kirby,*
  592 A.2d 445 (Del. 1991) ......................................................................................................39

*Official Comm. of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins,*
  No. CIV.A. 20228-NC, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004).................30, 32, 33, 34

*Parnes v. Bally Entm't Corp.,*
  722 A.2d 1243 (Del. 1999) ....................................................................................................19

*S. Muoio & Co. LLC v. Hallmark Entm't Investments Co.,*
  No. CIV.A. 4729-CC, 2011 WL 863007 (Del. Ch. Mar. 9, 2011), *aff'd*, 35 A.3d 419
  (Del. 2011) ............................................................................................................................26

*Smith v. Van Gorkom,*
  488 A.2d 858 (Del. 1985), *overruled on other grounds by Gantler v. Stephens*, 965
  A.2d 695 (Del. 2008) ............................................................................................................37

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,*
  906 A.2d 168 (Del. Ch. 2006)................................................................................................19

*Unocal Corp. v. Mesa Petroleum Co.,*
  493 A.2d 946 (Del. 1985) ......................................................................................................19

*Wallace v. Wood*,
    752 A.2d 1175 (Del. Ch. 1999)........................................................................34

*Zimmerman v. Crothall*,
    C.A. 6001-VCP, 2012 WL 707238 (Del. Ch. Mar. 5, 2012)....................................31

## STATUTES

11 U.S.C. § 108(a) ...........................................................................................3, 16, 17, 18

Chapter 11 of the Bankruptcy Code........................................................................11

Section 102(b)(7) of the Delaware General Corporation Law........................................ 13, 14, 15

## OTHER AUTHORITIES

Amended Certificates of Incorporation (May 29, 2007), *available at*
    http://www.sec.gov/Archives/edgar/data/909950/000095014407005266/g07653exv1
    w1.htm ............................................................................................................13

Duff & Phelps Website, *available at*
    www.duffandphelps.com/Expertise/our_team/pages/bio.aspx?list=People&itemid=23 ..........8

Defendant Mark J. Gendregske respectfully submits this memorandum in support of his Motion to Dismiss (the "Motion") the Amended Complaint ("Amended Complaint" or "Am. Compl.") filed by the Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. and its affiliated debtors (the "Committee" or "Plaintiff").

## <u>INTRODUCTION</u>

As this Court is aware, Allied Systems Holding, Inc. ("Allied") is a privately held company that is a leading provider of long-haul car-hauling services for the automobile industry. Am. Compl. ¶ 38. Allied had the misfortune of emerging from a prior bankruptcy proceeding around May 2007, just before the U.S. economy began its spiral toward the "Great Recession," from which the country is still emerging.

Mr. Gendregske is currently Chief Executive Officer and a Director of Allied Systems Holding, Inc. *Id*. ¶ 31. He was hired after Allied emerged from its last bankruptcy. Mr. Gendregske is not alleged to have had any connection whatsoever to Allied or Yucaipa,[1] or any of the other parties to this case, prior to being hired by Allied.

In March 2008, Allied formed a Special Committee of the Board to consider certain proposed amendments to Allied's senior secured first priority credit facility (the "First Lien Facility"). *Id.* ¶ 73. As one of two members of Allied's Board who had not been formally appointed to the Board by Yucaipa, Mr. Gendregske was appointed to a Special Committee (the "Special Committee), along with Brian Cullen, who is also independent and is a leader of the restructuring practice with the firm of Duff & Phelps.

---

[1]    Yucaipa refers to Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P. and Yucaipa American Alliance (Parallel) Fund II, L.P. *See* Am. Compl. ¶ 2.

- 1 -

There is no doubt that Allied struggled after emergence from bankruptcy, as did virtually every company that touched the U.S. auto industry.  In that context, between March 2008 and August 2009, the Special Committee met myriad times to discuss, among other things, amendments to Allied's First Lien Facility.  *Id.* ¶¶ 73, 76, 77, 83, 84. As the Amended Complaint makes clear, Allied's in-house counsel, and outside counsel, regularly attended the Special Committee meetings.  *Id.* ¶ 73.  In addition, the Directors received advice from Allied's financial advisors.  *See id.* ¶¶ 16, 75, 184.  Based upon those meetings, the Special Committee, and ultimately the full Board of Allied, approved the Third Amendment (in April 2008) and Fourth Amendment (in August 2009) to the First Lien Facility.  It is these two amendments, the deliberations that led to these amendments, and some related decisions by Allied and its Board, that are the bases for the claims against Mr. Gendregske.

However, Mr. Gendregske really should not be a party to this case, and for the reasons set forth below, this Court should dismiss the claims against him.

### *Duty of Care Claims Are Barred by Allied's Exculpatory Clause.*

***First***, the Amended Complaint lists claims of breach of the duty of care and the duty of loyalty against Mr. Gendregske.  However, Allied's charter includes a clear exculpatory clause that bars any claims for breach of the duty of care.  This Court and others universally uphold these provisions.  This is not a close call under controlling case law, and this Court should accordingly dismiss all claims for breach of the duty of care against Mr. Gendregske.  That leaves only claims for breach of the duty of loyalty, which also fail for reasons discussed below.

- 2 -

***The Statute of Limitations Bars Most of the Other Duty of Loyalty Claims***

**Second**, with respect to the remaining claims for breach of the duty of loyalty,

virtually all of the claims enumerated in the Amended Complaint are time-barred.   There

is a three-year statute of limitations on the breach of fiduciary duty claims.  Ordinarily,

this limitations period would leave each of the claims time-barred because all of the

alleged acts underlying the claims occurred more than three years before the Committee's

complaint was filed on February 1, 2013.  However, to the extent the Committee will

seek to rely on 11 U.S.C. § 108(a) to extend the statute of limitations, Section 108(a), at

best, would only extend statutes of limitation that had not expired on the date of the

Order for Relief—which was entered on June 11, 2012.  That means, at best, the

Committee can only bring duty of loyalty claims for conduct that occurred after June 11,

2009, and virtually all of the acts of which the Committee complains occurred before that

date.  This Court should thus dismiss these claims against Mr. Gendregske, leaving, at

most, only claims for breach of the duty of loyalty that occurred after June 11, 2009.

***Any Claims For Breach of Fiduciary Duty Against Mr. Gendregske Fail.***

This Court should dismiss the remaining claims against Mr. Gendregske for many

reasons.

First, each and every each theory of breach of fiduciary duty (or aiding and

abetting the same) against Mr. Gendregske depends on the creditors of Allied being the

beneficiaries of the directors' duties owed to Allied.  For example, there is no allegation

in the Amended Complaint that the Fourth Amendment to the First Lien Facility

discriminated against or adversely affected any of Allied's shareholders or even Allied

itself.  Rather, the breach of duty of loyalty claim arising from the Fourth Amendment

appears to be based on the notion that the Fourth Amendment adversely affected and discriminated against the *other lenders* in the First Lien Facility. As this Court has repeatedly held, only after a company is actually insolvent do the director's fiduciary duties owed to the company inure to the benefit of the creditors.

Thus, to state any viable claims on these theories, the Committee would have had to allege well-pled facts supporting a plausible inference that Allied was actually insolvent at the relevant times—not just in the zone of insolvency or struggling, but insolvent in fact.  The Amended Complaint does not do this.  Indeed, the Amended Complaint contains **no** well-pled allegations supporting an inference that Allied was actually insolvent at the time of the Fourth Amendment; on the contrary, the Amended Complaint alleges that Allied was able to pay interest on its First Lien Facility at that time (Am. Compl. ¶¶ 105-6), suggesting it was not insolvent.  This undermines the lynchpin of each of the claims against Mr. Gendregske.

In addition, based on the language of the Amended Complaint, there can be only two implausible and unsupported theories on which the Committee could be pursuing breach of the duty of loyalty claims that arose after June 11, 2009 against Mr. Gendregske: either: (a) that Mr. Gendregske was somehow self-interested or lacked independence ("Lacking Loyalty Theory"), or (2) that Mr. Gendregske somehow **intentionally** disregarded his duties as a director ("Lacking Good Faith Theory").  The Amended Complaint does not come close to alleging plausible claims against Mr. Gendregske on either of these theories.

We need not dwell long on the Lacking Loyalty Theory because there is not one single well-pled allegation in the Amended Complaint suggesting that Mr. Gendregske

- 4 -

was self-interested or lacked independence.  Indeed, it is not really clear whether the Amended Complaint is even pursuing such a theory against Mr. Gendregske.  There is no allegation that he had any prior connection with Yucaipa, the Petitioning Creditors, or any other plaintiff here; no allegation that Mr. Gendregske had any financial interest in any of the transactions at issue; and no allegation that Mr. Gendregske was in any way on "both sides" of these transactions.  Nor could anyone make such allegations.  The only basis for this theory would be that Mr. Gendregske was appointed as director by board members who had been appointed by Yucaipa, the majority shareholder; however, Delaware courts have flatly rejected that as a basis for imputing bias or interestedness.  This Court should clearly dismiss any claims based on the Lacking Loyalty Theory against Mr. Gendregske.

Finally, there is no plausible claim whatsoever pled in the Amended Complaint against Mr. Gendregske on the Lacking Good Faith Theory.  First, the Lacking Good Faith theory implied in the Amended Complaint appears to be a duty of care argument, which is barred by the exculpatory clause in Allied's charter.  *See infra* at 13.  However, even if these claim fell under the duty of loyalty, that theory requires extraordinary facts, to say the least.  To survive a motion to dismiss, the Committee must allege well-pled facts supporting a plausible inference of an "extreme set of facts . . . premised on the notion that disinterested directors were ***intentionally disregarding their duties***."  *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (emphasis added).  The only challenged actions that Mr. Gendregske (and the Special Committee) is alleged to have taken after June 11, 2009 are the following:

- 5 -

- In "Summer 2009" – The Special Committee deliberating what became the Fourth Amendment, with the help of Allied's in-house and outside counsel and financial advisors, but without hiring special-committee-only counsel or advisors (*id.* ¶¶ 93, 112, 184)

- "Spring / Summer 2009" – The Special Committee allegedly failing to pursue discussions with the Requisite Lender concerning potential voluntary restructuring options (*id.* ¶¶ 97-101)

- August 2009 – The Special Committee allegedly approving the decision to forego the quarterly interest payment to Allied's First Lien lenders (*id.* ¶¶ 106, 121); to reimburse collateral accounts that secured the First Lien Facility's letter of credit facility (*id.* ¶ 121)

- August 2009 – The Special Committee allegedly approving "the payment of millions of dollars in purported fees paid to or on behalf of Yucaipa," related to the negotiation of the Fourth Amendment (*id.* ¶ 185)

- August 2009 – The Special Committee allegedly acting with "gross[] negligence of [his] obligation to seek information about Yucaipa's intentions once . . . it acquired a majority stake in the outstanding secured debt of the Company."  (*Id.* ¶ 186)

None of this comes close to even suggesting that Mr. Gendregske ***intentionally disregarded*** his duties.  Even in the light most favorable to the Committee, the Amended Complaint is filled with allegations demonstrating that Mr. Gendregske more than satisfied the duty of good faith with respect to each of these issues.  Among other things, the Special Committee, including Mr. Gendregske, is alleged (1) to have met many, many times to deliberate over the Fourth Amendment; (2) have received the advice of in-house counsel; (3) have received the advice of outside counsel; and (4) have received the advice of financial advisors prior to approving the Fourth Amendment.  Further, the Special Committee had ***two members***, including Mr. Cullen, an independent director and financial restructuring expert who participated in every single Special Committee meeting and who—significantly—is not alleged to have breached any fiduciary duties whatsoever.  Indeed, the Special Committee decisions at issue were always unanimous.

Am. Compl. ¶¶ 77, 92, 106.  Moreover, to the extent the Committee is attempting to allege that the Special Committee's deliberations were inadequate, such claims would be aimed at supporting a claim for breach of the duty of care, not loyalty, and such claims would be barred by the exculpatory provision.  On any or all of these bases, this Court should dismiss these claims.

A few other points bear emphasis here.  This Court has surely seen that this bankruptcy case has been overtaken by a dispute between two factions of creditors who hold positions in the First Lien Facility—with the first faction represented by Yucaipa and the second represented by the so-called "Petitioning Creditors."  This case really has nothing to do with Mr. Gendregske, and this Court should not permit him to be dragged into this case personally merely as a result of this broader dispute.  Second, Mr. Gendregske is a person who has clearly worked very hard and continues to work very hard on behalf of Allied and the estate consistent with his duties.  There is a significant burden on individuals like Mr. Gendregske in defending cases like this, which was the entire reason for development of the business judgment rule and its corollaries.  There is simply no basis to keep Mr. Gendregske in this case, and we urge the Court to dismiss the claims against him.

## STATEMENT OF FACTS[2]

In May 2007, Allied emerged from its first bankruptcy with Yucaipa as the majority and controlling shareholder.  Am. Compl. ¶¶ 46, 49.  Allied exited bankruptcy with exit financing consisting of the First Lien Facility and a second lien facility (the

---

[2] This Statement of Facts is derived from the Amended Complaint, and Mr. Gendregske takes the facts as alleged only for purposes of this Motion to Dismiss.

"Second Lien Facility"). *Id.* ¶ 51.  Under the terms of Allied 2007 Reorganizational Plan, Yucaipa, through its representation on the Allied Board, was permitted to select Allied's new CEO, who would also serve as one of the five Allied directors, but only if that selection was "reasonably acceptable to TNATINC [*i.e.*, the Teamsters] and the Creditors' Committee." *Id.* ¶ 47.  Pursuant to this procedure, the Allied Board selected Mr. Gendregske as Allied's CEO.  *Id.* ¶¶ 31, 73.

As a part of the bankruptcy exit plan, Yucaipa was also permitted to name three of the five members of the Board of Directors (the "Board") of Allied.  *Id.* ¶ 46.  The fifth member of the board, Brian Cullen ("Cullen"), was "chosen by the Creditor's Committee" and was "reasonably acceptable to Yucaipa."  *Id.* ¶ 47.  Mr. Cullen had served as the financial advisor to the Creditors' Committee in the first Allied bankruptcy. *Id.* ¶ 48.  Mr. Cullen is currently a Managing Director of the Restructuring Advisory practice at Duff & Phelps, a leading global financial advisory and investment banking firm.[3]  Significantly, Mr. Gendregske is being sued for (unanimous) decisions by the Special Committee of Allied, but Mr. Cullen, the other member of that Special Committee, is not named as a defendant in this suit and is not alleged to have breached *any* fiduciary duties whatsoever.

After exit from bankruptcy, Allied's financial performance suffered, caused in large part by the collapse of the economy from 2007 to 2010.  In that context, on March 31, 2008, Allied's Board of Directors established the independent Special Committee to, among other things, review all transactions involving Yucaipa, Allied's largest

---

[3]    *See* Duff & Phelps Website,
www.duffandphelps.com/Expertise/our_team/pages/bio.aspx?list=People&itemid=23.

shareholder.  Am. Compl. ¶¶ 72-74.  The Special Committee consisted of Mr.

Gendregske and Mr. Cullen, the two independent directors not formally appointed by

Yucaipa.  *Id*. ¶ 73.  The Special Committee's decisions at issue were unanimous.  *Id*.

¶¶ 77, 92, 106.

    Third Amendment.  In early 2008, Allied began negotiating what became known

as the Third Amendment to the First Lien Credit Agreement, under which Yucaipa could

acquire a portion of First Lien Debt.  *See* ¶ 69.  The Special Committee deliberated about

the Third Amendment over the course of at least four Special Committee meetings.  *Id*.

¶¶ 73, 76-77.  Critically, Allied's in-house and outside counsel regularly attended the

Special Committee meetings.  *Id*. ¶ 73  At a meeting on April 1, 2008, the Special

Committee, discussed the details of the proposed transaction, and two weeks later, the

Special Committee met again to receive an update on ongoing negotiations between

counsel for the Company and counsel for Yucaipa.  *Id*.  Three days later, on April 17,

2008, the Special Committee met again, received an update from Allied's negotiators and

from Yucaipa, and agreed to return a term sheet with a counterproposal.  *Id*. ¶ 77.

Subsequently, the parties reached an agreement upon the terms of the Third

Amendment,[4] which amended the First Lien Credit Agreement such that Yucaipa could

---

[4]    Although barred by the statute of limitations, the Committee's claim against
Mr. Gendregske for breach of fiduciary duties in connection with the Third Amendment
is baffling as it appears inconsistent with the other allegations and broader theory of the
case.  According to the Amended Complaint, the Third Amendment was designed to be
*good* for Allied; it was drafted to ensure that Yucaipa would make capital contributions
based on its acquisition of debt, and also contained restrictions that would apply to
Yucaipa and limit its role.  *See* Am. Compl. ¶¶ 7, 69, 71, 154.  Indeed, in these same
proceedings, the Committee asserts three claims against Yucaipa specifically seeking to
*enforce* the Third Amendment.  *See id*. ¶¶ 151-173.  Thus, in addition to each of the other
deficiencies relating to the claims against Mr. Gendregske related to the Third
Amendment, such claims also fail for simple failure to plausibly allege any harm to
Allied as a result of such alleged breaches.

acquire debt under the First Lien Facility.  *Id.* ¶ 68.  The clear purpose of this transaction was to de-lever Allied and afford some liquidity.

> Amendment to Second Lien Credit Agreement.  On or around May 6, 2008, the Second Lien Credit Agreement was amended to permit Yucaipa to become the Requisite Lender under the Second Lien Facility.  *Id.* ¶ 64-65.  According to the Amended Complaint, Yucaipa, not Allied controlled the surrounding negotiations.  *Id.* ¶ 65.

> Fourth Amendment.  The Special Committee also played an active role in deliberating over what would become known as the Fourth Amendment to the First Lien Credit Agreement, which gave Yucaipa the ability to purchase a majority of the First Lien Debt.  These discussions began at least as early as December 2008 (*id.* ¶ 82), stretched through at least six Board and Special Committee meetings (*id.* ¶¶ 82-84, 91, 93, 103, 112), and culminated in the Board's approval of the Fourth Amendment on August 19, 2009.  *Id.* ¶ 112.

> In particular, on March 6, 2009, the Board—including Mr. Gendregske—met to discuss Yucaipa's proposed transaction with ComVest, the Requisite Lender under the First Lien Credit Agreement, that would "eventually lead to the Fourth Amendment" to that agreement.  *Id.* ¶¶ 91-93.  During that meeting, Defendant Derex Walker, the chairman of the Board, presented a description of the proposed transaction (*id.* ¶ 91), and also "stated that ComVest's intention, absent an agreement on the proposed transaction, would be to 'push the Company into bankruptcy and force a 363 sale in which it would likely credit bid its loans in order to obtain an order to purchase the Company.'"  *Id.* ¶ 92.  The Board "went on to discuss the ramifications of the proposed transaction, including the impact of the proposed transaction on minority shareholders, and other lenders," (*id.*),

and whether the Board should obtain a fairness opinion. *Id*. ¶ 93. The Board then directed the Special Committee to meet to discuss the transaction, which it did. *Id*. After a separate Special Committee meeting, the Special Committee recommended that the Board approve the proposed transaction that "would ultimately lead to the Fourth Amendment." *Id*. The Special Committee received the advice of counsel and financial advisors throughout this process. *Id*. ¶¶ 16, 73, 75, 184.

The Fourth Amendment was approved by Allied's Board on August 19, 2009, at the recommendation of the Special Committee. *Id*. ¶ 112. According to the Amended Complaint, between the board meeting in March 2009 and the final approval in August 2009, neither Allied's Special Committee, nor the full Board, played any significant role in the negotiations of the terms of the Fourth Amendment. *Id*.

<u>Bankruptcy Proceedings</u>. On May 17, 2012, two creditors of Allied— BDCM Opportunity Fund II, LP; Black Diamond CLO 2005-1 Ltd., and Spectrum Investment Partners, L.P. ("Black Diamond & Spectrum")—filed involuntary bankruptcy proceedings on behalf of the Company in this court. D.I. 1 (12-11564). The Company thereafter consented to the bankruptcy proceedings and filed a voluntary petition under Chapter 11 of the Bankruptcy Code, and the Order for Relief was entered on June 11, 2012. D.I. 88 (12-11564).

The Committee filed its complaint against Yucaipa and Allied's Board, including Mr. Gendregske, on February 1, 2013, alleging among other claims, breach of fiduciary duties and aiding and abetting the same. D.I. 1 (13-50530). The Committee filed the Amended Complaint on March 14, 2013. D.I. 76 (13-50530).

## STANDARD OF REVIEW

The Court should grant a motion to dismiss where—as here—a complaint fails to state a claim as a matter of law.  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court held that if a plaintiff seeks to rely on an inference from facts to state his claim, the inference must be at least plausible; otherwise, the court should dismiss. *Id.* at 556–58.  To meet this standard, a plaintiff must state "more than labels and conclusions" and more than "a formulaic recitation of the elements" of a claim.  *Id.* at 555-56.  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court reaffirmed its *Twombly* holding and set forth a two-step process for courts to apply under these circumstances.  First, because a plaintiff may not rely on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" to meet the pleading requirements, a court should identify "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id*. at 678-79 (citation omitted).  In other words, a court considering a motion to dismiss should ignore all conclusory allegations.  Second, a court should examine the veracity of any "well-pleaded factual allegations" and "determine whether they *plausibly* give rise to an entitlement to relief."  *Id.* at 679 (emphasis added).  Where factual allegations are "merely consistent with" liability, they "stop[] short of the line between [inadequate] possibility and [required] plausibility of 'entitlement to relief.'"  *Id*. at 696 (internal quotations omitted).  Thus under the second step of the *Iqbal*  analysis, where the allegations in a complaint are consistent with the elements of a claim but are more likely explained by an alternative rationale, the claims are rendered implausible and must be dismissed.

# ARGUMENT

## I.    ALLIED'S CHARTER EXCULPATES MR. GENDREGSKE FROM THE COMMITTEE'S DUTY OF CARE CLAIM.

At the outset, any breach of the duty of care claims against Mr. Gendregske are barred by

Allied's certificate of incorporation.  Section 102(b)(7) of the Delaware General Corporation Law

provides that a Delaware company's certificate of incorporation may contain:

> A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 [unlawful dividends or stock purchases] of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

Del. Code Ann. tit. 8, § 102(b)(7).

Allied's Amended Certificate of Incorporation[5] contains such a provision, modeled on

the language of Section 102(b)(7).  That Certificate provides that:

> A director of [Allied] shall not be liable to the [Allied] or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended.

---

[5]    *See* Amended Certificates of Incorporation (May 29, 2007), *available at* http://www.sec.gov/Archives/edgar/data/909950/000095014407005266/g07653exv1w 1.htm

The Court may take judicial notice of an exculpatory provision in a company's charter on a motion to dismiss. *See, e.g.*, *Malpiede v. Townson*, 780 A.2d 1075, 1091-92 (Del. 2001) (exculpatory provision in charter can be raised on a motion to dismiss, a motion for judgment on the pleadings, or in a motion for summary judgment); *In re Wheelabrator Techs., Inc. S'holders Litig.*, No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) (taking judicial notice of the corporation's certificate of incorporation and dismissing duty of care claim).

This Court and others consistently have upheld and enforced exculpatory provisions such as Allied's, recognizing that they "insulate directors from duty of care violations." *In re USDigital, Inc.*, 443 B.R. 22, 43 (Bankr. D. Del. 2011) (Sontchi, J.). Indeed, because of their utility and prevalence, "[l]itigation involving the duty of care is uncommon since the adoption of section 102(b)(7) . . . ." *Id.* Such provisions are enforceable even in the presence of allegations of gross negligence. *See Continuing Creditors' Comm. of Star Telecomms, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 464 (D. Del. 2004)). Exculpatory clauses are also enforceable where, as here, they are asserted "against a bankruptcy estate representative asserting a debtor's claims on behalf of creditors." *In re Verestar, Inc.*, 343 B.R. 444, 473 (Bankr. S.D.N.Y. 2006) (applying Delaware law).

For example, in *In re USDigital, Inc.*, the Trustee alleged that certain director defendants breached their fiduciary duties of care, loyalty, and good faith owed to the debtor and its creditors, based on the directors' alleged failure to supervise and monitor the financial affairs of the debtor. 443 B.R. at 40. The director-defendants moved to dismiss the duty of care claims on the basis of an exculpatory provision and this Court granted the motion, holding that the "exculpatory provision in USDigital's bylaws releases the Director Defendants from claims alleging breach of the duty of care." *Id.* at 44.[6]

---

[6]    *See also Edgecomb*, 385 F. Supp. 2d at 464 (dismissing duty of care claims in light of an exculpatory provision, observing that "a claim that a corporate manager [or director] acted with gross negligence is the same as a claim that she breached her fiduciary duty of care"); *Malpiede*, 780 A.2d at 1092-93 (affirming dismissal of plaintiffs' duty of care claim based on exculpatory provision); *Hokanson v. Petty,* No. 3438-VCS, 2008 WL 5169633, at *5 (Del. Ch. Dec. 10, 2008) (same); *Globis Partners, L.P. v. Plumtree Software, Inc.,* No. 1577-VCP, 2007 WL 4292024, at *14-15 (Del. Ch. Nov. 30, 2007) (same); *In re IT Group Inc.*, No. 02-10118, Civ.A. 04-1268 2005 WL 3050611, at *10-11 (D. Del. 2005) (same).

- 14 -

Indeed, Delaware courts have enforced an exculpatory clause under circumstances very similar to those set forth in the Amended Complaint.  In *In re IT Group Inc.*, No. 02-10118, Civ.A. 04-1268-KAJ, 2005 WL 3050611, *7 (D. Del. Nov. 15, 2005), plaintiff—representing the interests of creditors—asserted claims against certain directors for breach of the duty of loyalty and care based on the theory that the company was insolvent and thus owed duties to the company and its creditors.  Despite holding that the plaintiff had sufficiently stated a duty of loyalty claim (*id*. at *8-9), the court dismissed the duty of care claim based on the existence of an exculpatory clause, stating that "[o]nce the § 102(b)(7) provision is raised against duty of care claims, that is 'the end of the case.' Thus, while the duty of loyalty claims may be unaffected, the directors are protected by § 102(b)(7) against liability for breaching the duty of care."  *Id*. at *11 (quoting *Malpiede*, 780 A.2d at 1095).

Here, the Committee's claim for breach of the duty of care against Mr. Gendregske (Am. Compl. ¶¶ 179-186) is barred by the exculpatory provision in Allied's Amended Certificate of Incorporation.  This provision is materially identical to the provisions in *In re USDigital* and *In re IT Group* and is based directly on the express language of Section 102(b)(7).  *See In re USDigital*, 443 B.R. at 44; *In re IT Group*, 2005 WL 3050611, at *11  Here, as in those cases, Delaware law requires that this Court enforce the exculpatory provision by dismissing the duty of care claim.  "[T]hat is the end of the case" for that claim (*In re IT Group*, 2005 WL 3050611, at *11)—leaving only the duty of loyalty claims, to which we turn next.[7]

---

[7]     The exculpatory provision is enforceable notwithstanding the Committee's passing, conclusory allegation that Mr. Gendregske acted with "gross negligence."  Am. Compl. ¶ 186; *see Edgecomb*, 385 F. Supp. 2d at 464

## II.    THE STATUTE OF LIMITATIONS BARS MOST OF THE COMMITTEE'S CLAIMS AGAINST MR. GENDREGSKE.

"Delaware has a three year statute of limitations to assert claims for breaches of fiduciary duties." *In re Direct Response Media, Inc.*, 466 B.R. 626, 647 (Bankr. D. Del. 2012) (citing Del. Code Ann. tit. 10, § 8106).  Likewise, Delaware has a three-year statute of limitations for aiding and abetting breach of fiduciary duty.  *See In re Fruehauf Trailer Corp.*, 250 B.R. 168, 184 (D. Del. 2000).  "The general rule in Delaware is that 'the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action.'"  *In re Direct Response Media, Inc.*, 466 B.R. at 647 (quoting *Whittington v. Dragon Group, L.L.C.*, No. 2291-VCP, 2008 WL 4419075, at *5 (Del. Ch. June 06, 2008)).  "Where a plaintiff brings a claim based upon multiple allegedly wrongful acts, a court considers each act in turn in applying the statute of limitations."  *In re Bridgeport Holdings, Inc.,* 388 B.R. 548, 562 (Bankr. D. Del. 2008).

Furthermore, 11 U.S.C. § 108(a) extends the time period for filing a claim by two years from the order for relief *only* for those claims whose statutes of limitations had not expired by the date of the Order of Relief,[8] which in this case was entered on June 11, 2012.  *See In re Fruehauf Trailer Corp.*, 250 B.R. at 185.  This bars all claims based on conduct by Mr. Gendregske prior to June 11, 2009 (three years before).

For example, in *In re Direct Response Media*, the Trustee asserted claims for breach of fiduciary duties against certain director defendants based on alleged actions that took place in February 2006, September 2006, November 2007 and early 2009.  466 B.R.

---

[8]    "[S]ection 108(a)(2) does not apply to suspend the running of the statute of limitations during the pendency of the involuntary case." *In re Rothenberg*, 173 B.R. 4, 11 (Bankr. D.D.C. 1994).  Accordingly, the relevant date is June 11, 2012—the order for relief date—not May 17, 2012, the involuntary petition date.

at 647.  The bankruptcy filing occurred in January 2010, and the Trustee's complaint was filed in March 2010.  *Id*.  The court concluded that certain of the alleged breaches were barred by the statute of limitations and others were not.  *Id*.

Here, in light of Section 108(a), the critical question for application of the statute of limitations is whether the Committee's breach of fiduciary duty and aiding and abetting claims expired by June 11, 2012—the date of the Order for Relief and the date the case was converted to a voluntary petition.  Accordingly, if the claims accrued before June 11, 2009, they expired before June 11, 2012, and the claims are time-barred.

Considering each alleged act in turn, it is clear that the Committee's claims against Mr. Gendregske in connection with the Third Amendment are time barred.  The Amended Complaint alleges that the Third Amendment was considered and executed in March and April 2008.  Am. Compl. ¶¶ 74-77.  Under Delaware's three-year statute of limitations, if the claims accrued in March and April 2008, they expired in March and April 2011—over a year before the voluntary petition and order for relief.  Accordingly, Section 108(a) does not extend the limitations period for these claims.

In the same way, the alleged breach of fiduciary duty in connection with the amendment to the Second Lien Credit Agreement is likewise barred because those claims accrued—if at all—in May 2008 (Am. Compl. ¶¶ 64-65) and thus became time-barred in May 2011.  Likewise, the claims for aiding and abetting Yucaipa's alleged breach of fiduciary duties (id. ¶¶ 175, 191) are barred in the same fashion—to the extent any of

Yucaipa's breaching actions, allegedly aided by Mr. Gendregske, occurred before June

11, 2009, they are time-barred and not aided by Section 108(a).[9]

With respect to the Fourth Amendment, the allegations in the Amended

Complaint that arguably occurred after June 11, 2009 are set forth *supra* at 6.  Much of

this occurred before June 11, 2009, and each claim based thereon is time-barred.

Moreover, the Amended Complaint alleges that that the Special Committee "approved of

the proposed transaction and what would ultimately lead to the Fourth Amendment" in

March 2009, which would mean that the Committee cannot challenge some of the

conduct relating to the Fourth Amendment.  However, because the Fourth Amendment

was not finally approved until August 2009, some portion of that duty of loyalty claim

may not be untimely as a result of Section 108(a).

In any event, virtually all of the fiduciary duty claims against Mr. Gendregske are

clearly time barred, and this Court should dismiss them.  This leaves, at best, only breach

of duty of loyalty claims that arose after June 11, 2009.

## III.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF THE DUTY OF LOYALTY BY MR. GENDREGSKE.

A straightforward application of *Twombly* and *Iqbal* requires dismissal of the

Amended Complaint.  Most of the allegations in the Amended Complaint are conclusory,

and *Iqbal* requires that this Court ignore them when considering this motion to dismiss.

The remaining allegations do not state plausible claims.

With respect to Mr. Gendregske, the claims must overcome the business judgment

rule—"a near-Herculean task."  *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005).

---

[9]     The Amended Complaint alleges that the Board did not finally approve the Fourth
Amendment until August 19, 2009.  *Id*. ¶ 112.

The presumption under this rule is "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 193 (Del. Ch. 2006). Courts thus defer to, and do not apply an objective reasonableness test to examine the wisdom of a board decision. *See Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del. 1993) (concluding that the business judgment rule "protect[s] corporate officers and directors and the decisions they make, and our courts will not second-guess these business judgments"), *modified* 636 A.2d 956 (Del. Ch, 1994). Indeed, "a Court will not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.'" *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del. 1985) (quoting *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del. 1971)).[10]

As discussed below, to the extent the Amended Complaint is stating breach of the duty of loyalty claims based on conduct that occurred after June 11, 2009, those claims fail because (1) each claim depends on Allied being actually insolvent at the time, and the Amended Complaint does not plead any facts supporting a plausible inference of actual insolvency; (2) the Amended Complaint does not plead any facts supporting an inference on the Lacking Loyalty Theory; and (3) the Amended Complaint does not and cannot plead any facts supporting the Lacking Good Faith Theory.

---

[10] *See also Parnes v. Bally Entm't Corp.,* 722 A.2d 1243, 1246 (Del. 1999) ("The presumptive validity of a business judgment is rebutted in those rare cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'") (quoting *In re J.P. Stevens & Co. S'holders Litig.,* 542 A.2d 770, 780-81 (Del. Ch. 1988)).

### A.    Any Duty of Loyalty Claim Fails Because the Amended Complaint Fails to Plausibly Allege that Allied Was Actually Insolvent.

The Amended Complaint's remaining breach of the duty of loyalty claims fail because there are no well pled facts suggesting a plausible inference that Allied was actually insolvent between June 11, 2009 and the time of the Fourth Amendment in August 2009.  The key here is that the Amended Complaint does not allege that the Special Committee, by deliberating over and ultimately approving the Fourth Amendment, breached any duty owed *to Allied or its shareholders*; rather, each of the theories in the Amended Complaint are based on the notion that Mr. Gendregske (as one of two members of the Special Committee) breached his duties because approval of the Fourth Amendment was allegedly unfair or discriminatory *to the First Lien creditors.* *See* Am. Compl. ¶¶ 1, 82, 120, 175, 177, 179-87.  Indeed, the opening paragraph of the Amended Complaint explains that "[t]his is a case about" the defendants' alleged interference with "the legitimate rights and expectations of the Debtors' secured and unsecured creditors."  *Id*. ¶ 1.

However, "[t]he general rule is that directors and officers do *not* owe a fiduciary duty to creditors beyond the relevant contractual terms" because "[c]reditors are presumed to be able to protect themselves through the contractual agreements governing their relationships with firms."  *In re USDigital, Inc.*, 443 B.R. at 41-42 (emphasis added) (citations omitted).  "[W]hen a corporation . . . become[s] insolvent, however, fiduciary duties inure to the benefit of creditors."  *Id*. at 42.  The corporation's actual insolvency—not occupation of the "zone of insolvency"—is what triggers the fiduciary

duties to the company[11] that inure to the benefit of the creditors.  Indeed, as the Delaware Supreme Court has explained:  "When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders."  *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007).  Thus, "the actual point of insolvency becomes integral to assessing the director's duty to creditors."  *In re USDigital*, 443 B.R. at 42.

Without well-pled allegations supporting a plausible inference that Allied was actually insolvent, controlling law requires dismissal of all remaining claims.  *See In re Autobacs Strauss, Inc.*, 473 B.R. 525 (Bankr. D. Del. 2012) (Sontchi, J.).  In fact, Courts regularly dismiss claims like these when the Plaintiff fails to plausibly plead actual insolvency.  *See, e.g.*, *In re Caremerica, Inc.*, 409 B.R. 759, 767 (Bankr. E.D.N.C. 2009) (granting defendant's motion to dismiss fraudulent transfers claims where the complaint alleged only that transferor was "insolvent on the date of each fraudulent transfer or became insolvent as a result of the fraudulent transfers" without further support); *In re Yelverton*, 09-00414, 2010 WL 1688403, at *3 (Bankr. D.D.C. Apr. 22, 2010) (granting motion to dismiss fraudulent transfer claims where bankruptcy petitioner simply stated that "at the time of the foreclosure, the Debtor was insolvent"); *In re Life Fund 5.1 LLC*, 09 Bankr. No. 09 B 32672, Ad. No. 10 A 42, 2010 WL 2650024, at *7 (Bankr. N.D. Ill. June 30, 2010) (granting motion to dismiss constructive fraud claims where insolvency was alleged in conclusory fashion)

---

[11] Even if a company is insolvent, the creditors do not have the authority to bring direct claims for breach of fiduciary duty.  *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007).

For example, *In re Trinsum Grp., Inc.*, 460 B.R. 379 (Bankr. S.D.N.Y. 2011), a bankruptcy court dismissed claims that required allegations of insolvency.  There, plaintiff filed a conveyance claim and included allegations about net income figures and net cash flow figures for 2003 to 2008 and alleged that revenue declined by approximately 43 percent every year between 2002 and 2004, and debt levels rose 75 percent between 2002 and 2004.  *Id.* at 392-93.  The court nonetheless held that the percentage figures of the decrease in revenue and the rise in debt levels did not rule out the possibility that the debtors had a cash reserve such that they were not rendered insolvent.  *Id*. at 393.  The court thus dismissed the claims.  *Id.*

Similarly, in *In re Autobacs Strauss*, a bankruptcy court dismissed claims similar to those here.  There, as here, the plaintiffs alleged breach of fiduciary duties for the benefit of creditors.  473 B.R. at 552 (describing insolvency as the "keystone" of the complaint).  The director defendants moved to dismiss on the ground that the complaint failed to allege insolvency sufficiently, and that the only insolvency allegations were "broad and general."  *Id*. at 554, 560.  This Court criticized the failure to include any "adjusted balance sheet analysis" or "actual discounted cash flow analysis let alone one from each date of transfer or obligation."  *Id*. at 554-55.  The Court observed that "[w]hen it's all said and done, Plaintiffs rely on the old 'where there is smoke there is fire' theory of pleading."  *Id*. at 555.  Nevertheless, because the plaintiffs included some detailed factual allegations—alleging the existence and amount of specific assets and

liabilities—this Court concluded that "[t]hese allegations are sufficient to survive a motion to dismiss—*barely*." *Id*. (emphasis added).[12]

Here, the Committee's Amended Complaint utterly fails to plausibly allege insolvency—the key factual lynchpin for each of the claims. The Amended Complaint barely mentions insolvency and does so only in the most broad and conclusory—and sometimes contradictory—fashion. For example, the Committee alleges that, "as early as 2008, Allied was nearing insolvency, if not already insolvent." Am. Compl. ¶ 4. This is a conclusory allegation that is to be ignored on a motion to dismiss. The Amended Complaint later alleges—with no supporting factual allegations—that "the Allied Directors owed Allied and, as of at least early 2008, *when Allied became insolvent*, owed its creditors fiduciary duties of loyalty and care." Am. Compl. ¶ 180 (emphasis added). These two allegations are not consistent, but in any event, are conclusory.[13]

Moreover, the Committee's Amended Complaint alleges specific facts that *undermine* an assertion of actual insolvency. In particular, the Amended Complaint alleges that, at least as of August 3, 2009, "Allied had *sufficient funds* available to make its [First Lien interest] payment and to stay current on its payment obligations under the First Lien Facility." *Id*. ¶ 105 (emphasis added); *see also id*. ¶ 106 (alleging "the fact that Allied had sufficient liquidity to pay debt service under the First Lien Facility"). In addition, the Amended Complaint alleges that Scott Macaulay, an Allied financial officer advised the

---

[12]    The Court also observed that "Plaintiffs have won the right to take discovery but if they expect to prevail on this point they have much work left to do." *In re Autobacs Strauss*, 473 B.R. at 555.

[13]    A few additional mentions of insolvency are sprinkled throughout the Amended Complaint, but those too are conclusory and missing any supporting factual allegations. *See, e.g.*, Am. Compl. ¶ 121, 177, 207.

Board that Allied had as much as $16.5 million of cash on hand, of which $5.5 million was immediately available even after paying an insurance premium and the First Lien interest payment.  *Id*.  Certainly, these allegations would have given the Special Committee comfort that Allied was not actually insolvent at the time.

Without well-pled allegations supporting a plausible inference that Allied was actually insolvent, each of the remaining claims against Mr. Gendregske fails as a matter of law because the creditors were not beneficiaries of any of the duties owed to Allied. Thus, the Committee has failed to state a claim for breach of fiduciary duty, or aiding and abetting a breach of fiduciary duty.

> **B.    The Amended Complaint Pleads No Facts Whatsoever Supporting A Theory That Mr. Gendregske Lacked Independence.**

As noted above, the only possible claims remaining after application of the exculpatory clause and the statute of limitations are claims for the breach of duty of loyalty that arose after June 11, 2009.  With respect to the duty of loyalty, as discussed *supra* at 4, there are only two theories that are even suggested by the Amended Complaint: the Lacking Loyalty Theory and the Lacking Good Faith Theory.  In addition to the insufficient allegations of insolvency, the Amended Complaint states no plausible claims within the relevant window of time on either of these Theories, and this Court should accordingly dismiss the claims against Mr. Gendregske.

Under the Lacking Loyalty Theory, the Committee would have to plead non-conclusory allegations that a director was either self-interested or lacked independence to consider objectively whether the relevant decisions and transactions were in the best interest of the company.  *Edgecomb*, 385 F. Supp. 2d at 460; *In re Fedders N. Am., Inc.*,

- 24 -

405 B.R. 527, 540 (Bankr. D. Del. 2009).  "A claim for breach of fiduciary duty of

loyalty requires an intentional act," *In re BH S & B Holdings LLC*, 420 B.R. 112, 151

(Bankr. S.D.N.Y. 2009), and "some form of self-dealing or misuse of corporate office for

personal gain."  *Id.* at 150 (citations omitted).  "The classic example that implicates the

duty of loyalty is when a fiduciary either appears on both sides of a transaction or

receives a personal benefit not shared by all shareholders."  *In re Walt Disney Co.*

*Derivative Litig.,* 907 A.2d 693, 751 (Del. Ch. 2005) (citations omitted), *aff'd*, 906 A.2d

27 (Del. 2006).  "In alleging that a director breached his duty of loyalty, the element of

the director's scienter must be pled with particularity."  *In re Trinsum Grp., Inc.*, 466

B.R. 596, 611 (Bankr. S.D.N.Y. 2012).

Under *Iqbal*, the Court begins its analysis on a motion to dismiss by identifying

and striking from the Complaint all conclusory allegations.  Here, in its Eighth Claim for

Relief, the Committee makes a single, conclusory allegation that the Special Committee

"was neither special nor independent."  Compl. ¶ 184.  *Iqbal* requires that this Court

ignore this conclusory allegation for purposes of the motion to dismiss.

Next, turning to the second step of *Iqbal*, there are no allegations that Mr.

Gendregske personally benefitted from any of the transactions described in the Amended

Complaint, or that he appeared on both sides of any transaction.  There are no allegations

of self-dealing or misuse of corporate office for Mr. Gendregske's own personal gain.

There are no allegations of scienter—*i.e.*, whether and how Mr. Gendregske intentionally

acted to benefit himself to the detriment of Allied.  Further, there are no allegations

tending to show that Mr. Gendregske was loyal to Yucaipa, rather than Allied.  There are

no allegations that he had any relationship with Yucaipa prior to May 2007, when he was

- 25 -

hired as Allied's CEO, and there are no allegations that he is or ever has been financially

beholden to Yucaipa in any way.  Moreover, the Committee's Amended Complaint

admits that Mr. Gendregske was not "formally appointed by Yucaipa," but instead was

selected as a CEO who was "reasonably acceptable" to both the Teamsters union and

Creditors' Committee appointed in connection with Allied's first bankruptcy.  *See* Am.

Compl. ¶¶ 31, 73.

One reading of the Amended Complaint is that it is suggesting that

Mr. Gendregske was not independent because he was hired by the Board of Allied (after

the approvals by third parties described above), whose members had been appointed by

Yucaipa.  However, this very argument "has consistently been rejected by the Delaware

courts."  *Andreae v. Andreae*, 18 Del. J. Corp. L. 197, 208 (Del. Ch. 1992).  It is well

established that "[t]he mere nomination of a director by a majority stockholder . . . is

insufficient to demonstrate lack of independence."  *S. Muoio & Co. LLC v. Hallmark*

*Entm't Investments Co.*, No. CIV.A. 4729-CC, 2011 WL 863007, *10 (Del. Ch. Mar. 9,

2011), *aff'd*, 35 A.3d 419 (Del. 2011).  As the Delaware Supreme Court has recognized:

> it is not enough to charge that a director was nominated by or
> elected at the behest of those controlling the outcome of a
> corporate election.  That is the usual way a person becomes a
> corporate director.  It is the care, attention and sense of individual
> responsibility to the performance of one's duties, not the method of
> election, that generally touches on independence.

*Aronson*, 473 A.2d at 816.

In sum, this theory is barred by controlling law and the allegations in the

Amended Complaint.  *See, e.g.*, *BH S & B Holdings*, 420 B.R. at 151 (dismissing breach

of duty of loyalty claim where "there [were] no allegations of specific facts that raise a

plausible inference that [defendants] either sat on both sides of a transaction or received a benefit not shared by the other . . . members").

### C. The Amended Complaint Pleads No Plausible Or Viable Claims That Mr. Gendregske Lacked Good Faith.

Under Delaware law, a breach of the duty of good faith is a "subsidiary element" of the "fundamental duty of loyalty."  *In re USDigital, Inc.*, 443 B.R. at 41 (citations omitted).  A failure to act in good faith may be established when a director (1) "intentionally acts with a purpose other than that of advancing the best interests of the corporation[,]" (2) "acts with the intent to violate applicable positive law[,]" or (3) "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  *Id.* (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 67).

With respect to the last category—lack of good faith based on alleged *inaction*— the Committee faces a heavy pleading burden because "[an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties."  *Lyondell Chem. Co*, 970 A.2d at 243 (citation omitted); *see also In re Trinsum Grp.*, 466 B.R. at 612 (standard of liability for breach of fiduciary duty based on inaction is "extremely high") (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d at 750).  A director's failure to take all required steps under the circumstances is simply a breach of the duty of care—not loyalty.  *Lyondell,* 970 A.2d at 243.  Indeed, "[i]t is only where a director 'knowingly and completely failed to undertake his responsibility' that a breach of duty of loyalty is implicated."  *In re Trinsum Grp.*, 466 B.R. at 611 (quoting *Lyondell,* 970 A.2d at 243–

- 27 -

44).  Further, "there must be *particularized allegations of fact* that show that the directors

acted with scienter, *i.e.*, there was an *intentional* dereliction of duty or a conscious

disregard for their responsibilities, amounting to bad faith."  *In re Trinsum Grp.*, 466 B.R.

at 611 (all but first emphasis added) (internal quotation marks and citation omitted).

        At the outset, although the language in the Amended Complaint that appears to

relate to good faith mentions the duty of loyalty, it actually is a claim based on the duty

of care.  *See* Am. Compl. ¶ 181 ("The Allied Directors breached their fiduciary duty of

loyalty by . . . intentionally disregarding the responsibilities . . . .") *see also id.* ¶¶ 182-4.

In other words, the substance of the acts that the Directors are alleged not to have done

are actually covered by the duty of care, not loyalty.  However, clearly aware that the

duty of care claims are barred by the exculpatory clause, the Amended Complaint

attempts to artfully plead around the bar on duty of care claims by calling them duty of

loyalty claims.  The Amended Complaint cannot transform one kind of claim into another

through labeling, and this Court should dismiss all of these "good faith" claims as a result

of the exculpatory clause.  *See supra* at 13.

        For example, in *Lyondell*, a shareholder-plaintiff sued certain directors for breach

of the duty of care *and* good faith based on the directors' role in a merger transaction.

970 A.2d at 239-40.  The plaintiff alleged that the directors "took no action to prepare for

a possible acquisition proposal," that the transaction "was negotiated and finalized in less

than one week, during which time the directors met for a total of only seven hours to

consider the matter," and that the directors "did not seriously press [the counter-party] for

a better price, nor did they conduct even a limited market check."  *Id.* at 241.  The trial

court held that, although the plaintiff may have been able to prevail at trial on a claim for

the breach of duty of *care*, the existence of an exculpatory provision barred such a claim.

Nevertheless, based on the same facts, the trial court denied summary judgment for

plaintiff's claim for breach of the duty of *good faith*.  *Id*. at 240-41.  The Delaware

Supreme Court reversed, holding that none of the facts alleged could establish breach of

the duty of good faith.  *Id*. at 244.  Critically, the court distinguished between duty of care

claims and duty of good faith claims as follows:

> [T]he directors' failure to take any specific steps during the sale
> process could not have demonstrated a conscious disregard of their
> duties.  More importantly, ***there is a vast difference between an
> inadequate or flawed effort to carry out fiduciary duties and a
> conscious disregard for those duties***.  Directors' decisions must be
> reasonable, not perfect. . . . ***[I]f the directors failed to do all that
> they should have under the circumstances, they breached their
> duty of care.***  Only if they knowingly and completely failed to
> undertake their responsibilities would they breach their duty of
> loyalty.  The trial court approached the record from the wrong
> perspective.

*Id*. at 243-44 (emphasis added).  In the end, because the directors "met several times to

consider" the issues, "were generally aware of the their company and . . . [the] market,"

and "solicited and followed the advice of their financial and legal advisors," the court

held that there was no breach of the duty of good faith.  *Id*. at 244.

Here, the Amended Complaint allegations are, at best, aimed at establishing a

breach of the duty of care, not loyalty.  For example, the Amended Complaint generally

alleges that "the Special Committee *process* was entirely flawed and deficient."  Am.

Compl. ¶ 16 (emphasis added).  But under Delaware law, it is the "due care

examination"—not the good faith examination—that is "focused on a board's decision

making process."  *Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 66 (Del.

1989).  Additionally, the Committee alleges that Mr. Gendregske "consciously and

intentionally failed to consider potential transactions that could have potentially greatly

benefited Allied if such transactions held even the potential of harming Yucaipa's equity

interests in the Company."  Am. Compl. ¶ 183.  But, an alleged failure to consider

alternatives goes to an alleged duty of care, not good faith, violation.  As the Delaware

Chancery Court has recognized, "[p]laintiffs' criticism of the Special Committee for not

evaluating fully alternative transactions does not implicate director self-interest or lack of

independence.  Even if supported by well-pleaded facts, such a criticism would state at

best a claim for breach of the duty of care."  *In re Alloy, Inc.*, C.A. No. 5626-VCP, 2011

WL 4863716, at *8 (Del. Ch. Oct. 13, 2011) (citation omitted); *see also Citron*, 569 A.2d

at 66 (the due care analysis "look[s] for evidence as to whether a board has acted in a

deliberate and knowledgeable way in identifying and exploring alternatives").

Accordingly, the Committee's purported claim for breach of the duty of good faith should

be dismissed as an improper attempt to plead around the exculpatory provision.[14]

In addition, the Committee's allegations simply do not meet the rigorous pleading

standard for establishing breach of the duty of good faith.  As indicated by the discussion

of *Lyondell* above, courts consistently dismiss breach of the duty of loyalty claims based

on this "conscious disregard" theory "as long as the Board exercised *some* business

judgment."  *Official Comm. of Unsecured Creditors of Integrated Health Services, Inc. v.*

---

[14]    Likewise, to the extent the Committee attempts to rely on the Special Committee's
use of Allied's counsel and financial advisors to support its claim for breach of the duty
of good faith, such reliance would be misplaced, as these allegations go to the issue of
whether the Special Committee exercised due care, not whether it was disloyal.  *See, e.g.*,
*MCG Capital Corp. v. Maginn*, No. 4521-CC, 2010 WL 1782271, at *19 (Del. Ch. May
5, 2010) (observing that use of company counsel is, "at most, a breach of the duty of
care").  *Cf. In re Alloy, Inc.*, C.A. 5626-VCP, 2011 WL 4863716, at *11 (Del. Ch. Oct.
13, 2011) (special committee's use of company's financial advisors not a breach of the
duty of good faith).  Thus, these claims are barred by the exculpatory clause.

*Elkins*, No. CIV.A. 20228-NC, 2004 WL 1949290, at *14 (Del. Ch. Aug. 24, 2004).[15]

For example, in *In re Walt Disney Co. Derivative Litig.*, 907 A.2d at 768-71, the

Delaware Chancery Court refused to find any intentional disregard of duties or failure to

act on the part of two members of the Disney compensation committee who, after only 25

to 30 minutes of discussion, voted to approve a CEO employment agreement worth at

least $23 million for the next five years. At that meeting, the Committee did not review

or discuss the full text of the agreement nor did they listen to a presentation by Disney's

outside expert on executive compensation. *Id.* at 769. Noting that many aspects of the

Board's hiring decision "reflect the absence of ideal corporate governance[,]" the court

said "standards used to measure the conduct of fiduciaries under Delaware law are not the

same standards used in determining good corporate governance." *Id.* at 772. The Court

said there was "no question . . . that the actions [of the two directors] may appear casual

or uninformed," but they did not "bury their heads in the sand knowing a decision had to

be made." *Id.* at 771.

     Here, after disregarding the conclusory allegations that Mr. Gendregske

"consciously and intentionally disregard[ed] [his] responsibilities," (Am. Compl. ¶ 181;

*see also id.* ¶¶ 181-4), and "simply went along for the ride" and "sat idly by" as Yucaipa

---

[15]    *See, e.g., Zimmerman v. Crothall*, C.A. 6001-VCP, 2012 WL 707238, at *10 (Del.
Ch. Mar. 5, 2012) (dismissing bad faith claims) ("Because I already have found that the
Director Defendants' actions in approving the transactions were not grossly negligent or
reckless, I also necessarily find that their actions did not constitute an intentional
dereliction of a known duty."); *In re Tyson Foods, Inc. Consol. S'holders Litig.*, 919
A.2d 563, 595-96 (Del. Ch. 2007) (dismissing claim for breach of duty of good faith
based on sheer volume of transactions challenged); *In re Emerging Commc'ns, Inc.
S'holders Litig.*, No. Civ.A. 16415, 2004 WL 1305745 at *41-43 (Del. Ch. May 3, 2004)
(dismissing claim for breach of duty of good faith despite allegations that a member of
the Special Committee breached duty of care by communicating with other Committee
members through the secretary of the minority stockholders' negotiating adversary).

negotiated the Third and Fourth Amendments (*id*. ¶¶ 67, 72, 112), all that remains to be considered under the second step of the *Iqbal* analysis are a few factual allegations that do not demonstrate breach of the duty of good faith.  These are listed *supra* at 6.

These allegations are insufficient to plausibly allege a claim for breach of the duty of good faith, particularly in light of the other facts alleged in the Amended Complaint. The well-pleaded facts in the Amended Complaint show that, at a minimum, the Special Committee "exercised *some* business judgment," and engaged in far more than "a short conversation" concerning the issues underlying the alleged breaches of fiduciary duty. *See Elkins*, 2004 WL 1949290, at *12, *14.  For example, the allegations in the Amended Complaint state that the Special Committee, with the advice of in-house and outside counsel and advisors, discussed issues related to the Fourth Amendment over the course of at least nine months (December 2008 to August 2009), stretching over at least three board meetings and three special committee meetings.  In each of those meetings, the Special Committee obtained the advice of Allied's in-house counsel and outside counsel. In each of those meetings, the Special Committee benefited from the deliberation and advice of Mr. Cullen—the lone director not named as a defendant in this suit—who is an expert in his own right in financial restructuring, a leader in the Restructuring Advisory practice at Duff & Phelps.  Significantly, Mr. Cullen is not alleged to have breached *any* fiduciary duties, and the Special Committee's decisions were always unanimous.  Am. Compl. ¶¶ 77, 92, 106.  Even viewing the allegations in the light most favorable to the Committee, Mr. Gendregske was clearly engaged substantively in the issues under consideration—he did not "bury [his] head[] in the sand knowing a decision had to be made."  *In re Walt Disney Derivative Litig.*, 907 A.2d at 771.  Instead, these allegations

- 32 -

indicate that Mr. Gendregske and the Special Committee conscientiously approached their roles and were actively engaged in their responsibilities. This is far from the type of "intentional dereliction of duty" required to sustain a claim for breach of the duty of good faith. *See In re Trinsum Grp.*, 466 B.R. at 611 (internal quotation and citation omitted).

Moreover, the Amended Complaint itself suggests equally plausible inferences from these same allegations. For example, the Special Committee approved of the decision to forego the August 2009 quarterly interest payment only after meeting with the Board to specifically discuss Allied's liquidity, during which Allied's chief financial officer gave a detailed presentation of the company's financial health. Am. Compl. ¶¶ 103-5. At the same time, the Board was informed that "it was critical that the Company have adequate liquidity to provide a sufficient runway for negotiations" and that the Requisite Lender would not exercise any rights if the Company failed to make the interest payment. Am. Comp. ¶ 104. These allegations raise a plausible inference that the Special Committee was actively engaged and reasonably informed on the issues, in contrast to a "total lack of deliberation." *Elkins*, 2004 WL 1949290, at *12 n.58.

Similarly, the decision to pay legal fees in connection with the transactions amending the credit agreements was clearly the subject of deliberations by the Special Committee with the advice of counsel. Under the second prong of *Iqbal* there is an equally plausible reason for the payment of fees, aside from an alleged breach of duty— namely, that there are many credit transactions in which a company pays another party's legal fees as part of a negotiated deal. Nothing about the legal fees issues raises any plausible claims.

Put simply, the Committee has failed to allege the "extreme set of facts" necessary to state a claim for breach of the duty of loyalty based on the "conscious disregard" theory of liability. *See Lyondell,* 970 A.2d at 243. The facts alleged come nowhere close to showing that there was a "total lack of deliberation" or that that the Special Committee acted with "knowing and deliberate indifference to the Board's duties . . . ." *Elkins*, 2004 WL 1949290, at *12.

## IV. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY BY MR. GENDREGSKE.

The Court should also dismiss all claims that Mr. Gendregske is liable for aiding and abetting an unspecified breach of an unnamed other defendant's fiduciary duties. Under Delaware law, a claim for aiding and abetting a breach of fiduciary duty must plead (1) the existence of a fiduciary duty, (2) a breach of that duty, (3) knowing participation in the breach by a non-fiduciary and (4) damages. *Malpiede,* 780 A.2d at 1096; *Mann v. GTCR Golder Rauner, L.L.C.*, 483 F. Supp. 2d 884, 916 (D. Ariz. 2007) (applying Delaware law). A person who owes a fiduciary duty cannot be liable for aiding and abetting a breach of that duty by another, because any such act constitutes a primary breach instead. *Mann*, 483 at 916; *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999). In *Mann*, for example, the court dismissed an aiding and abetting claim against one defendant because the plaintiff alleged in some detail the existence of that defendant's fiduciary duty. 483 F. Supp. 2d at 917. Here, the Amended Complaint has alleged that Mr. Gendregske owed fiduciary duties to Allied. Am. Compl. ¶ 160. As in *Mann*, therefore, the Committee cannot state a claim against Mr. Gendregske for aiding

- 34 -

and abetting a breach of his own fiduciary duties.  In addition, these claims fail for the same reasons discussed above.

## V.    ALTERNATIVELY, THE AMENDED COMPLAINT FAILS TO PLEAD PLAUSIBLE CLAIMS (1) FOR BREACH OF THE DUTY OF LOYALTY BASED ON CONDUCT THAT PREDATES JUNE 11, 2009 AND (2) FOR BREACH OF THE DUTY OF CARE.

As explained above, it is clear that the only claims that could survive the exculpatory clause and the statute of limitations would be claims for breach of the duty of loyalty based on conduct that occurred after June 11, 2009.  Nevertheless, if the Court disagrees, it should still dismiss because the Amended Complaint does not state any plausible claims.

### A.    The Amended Complaint Does Not State Plausible Claims For Breach of the Duty of Loyalty Based on Conduct Prior To June 11, 2009.

The Committee asserts breach of fiduciary duty claims against Mr. Gendregske based on certain conduct that predates June 11, 2009—in particular, his role in the deliberations about the Third Agreement to the First Lien Credit Agreement, as well as the amendment to the Second Lien Credit Agreement, and some of the deliberations leading to the Fourth Amendment.  *See* Am. Compl. ¶ 64-65, 73, 76-77, 182, 184. For the same reasons that support dismissal of the duty of loyalty claims that post-date June 11, 2009, these claims should be dismissed.

It is not clear, at the outset, if the Amended Complaint is even challenging the decision to approve the Third Amendment, or why it would be doing so.  Indeed, the Amended Complaint contains several other claims seeking to uphold and enforce the terms of the Third Amendment.  In addition, there are no allegations that Mr. Gendregske lacked independence with respect to any of the pre-June 11, 2009 conduct or that he was

interested—financially or otherwise—in the transactions. *See supra* 24-27. Moreover, there are no well-pled allegations sufficient to demonstrate that Mr. Gendregske "consciously disregarded" his responsibilities, or intentionally abdicated his duties in any way with respect to the pre-June 11, 2009 conduct. *See supra* 30-34. There are no allegations supporting any plausible inference that Allied was actually insolvent at the time.

On the contrary, the Amended Complaint's allegations show the Special Committee deliberated about the Third Amendment over the course of at least four Special Committee meetings in or around April 2008, which were regularly attended by Allied's in-house and outside counsel. *Id.* ¶¶ 73, 76-77. Further, the Amended Complaint alleges that the Special Committee regularly consulted with Allied's advisors. *Id.* ¶¶ 16, 73, 75, 184. Indeed, Mr. Gendregske is alleged to have approached *all* issues in constant consultation with Mr. Cullen, the only other Special Committee member, who is himself a financial expert and former financial advisor to the creditors' committee in Allied's first bankruptcy. Mr. Cullen is not alleged to have breached a single fiduciary duty and the Special Committee's decisions were always unanimous. *Id.* ¶¶ 77, 92, 106. Simply put, the allegations with respect to the pre-June 11, 2009 conduct are wholly insufficient to demonstrate that "there was an *intentional* dereliction" sufficient to state a claim for breach of the duty of good faith. *In re Trinsum Grp.*, 466 B.R. at 611 (emphasis added).

For all of the same reasons set forth above, any claims for breach of the duty of loyalty based on conduct that occurred before June 11, 2009, also fail.

**B.     The Amended Complaint Does Not State Any Plausible Claims For Breach Of The Duty Of Care.**

In addition to being barred by the exculpatory provision, the Amended Complaint fails to state a plausible claim for breach of the duty of care.  Establishing that Mr. Gendregske failed to act with due care requires well-pled allegations that he was both uninformed and "grossly negligent."  *Crescent/Mach I Partners, LP v. Turner*, 846 A.2d 963, 984-86 (Del. Ch. 2000) (dismissing claims where plaintiffs did not show that directors acted in uninformed fashion); *In re Nat'l Auto Credit, Inc. S'holders Litig.*, No Civ. A. 19028, 2003 WL 139768, at *6, *12 (Del. Ch. Jan. 10, 2003) (dismissing where allegations stating that directors "arrived at these decisions uninformed and, therefore, violated the duty of care" set forth "nothing but conclusory descriptions of any deficiency in the Board's decision-making process").

Given courts' general deference to directors' business judgment, plaintiffs face a high bar when pleading a duty of care claim.  *See Smith v. Van Gorkom,* 488 A.2d 858 (Del. 1985), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695 (Del. 2008).  As noted above, the first step in the *Iqbal* analysis requires that the Court identify and effectively strike from the complaint all conclusory allegations.  Here, with no supporting factual allegations whatsoever, the Amended Complaint alleges in wholly conclusory fashion that:

- "The Allied Directors violated their duties of care through their gross negligence of their obligation to seek information about Yucaipa's intentions once and if it acquired a majority stake in the outstanding secured debt of the Company."  Am. Compl. ¶ 186.

- The Allied Directors "approvals of the amendments to the secured debt facilities that enabled Yucaipa to seize complete control . . . were breaches

of the Allied Directors fiduciary duties of loyalty and care."  Am. Compl.
¶ 186.

These are wholly conclusory allegations against all the directors collectively, and *Iqbal*
requires that this Court disregard these allegations.

Beyond these conclusory assertions, the Amended Complaint fails to state a
plausible claim for breach of the duty of care.  The Amended Complaint itself
demonstrates that Mr. Gendregske met frequently with the Board and as a member of the
Special Committee to discuss the various issues underlying this suit, including the
amendments to the credit agreements; was substantively engaged with the issues;
consulted with both in-house and outside counsel about the issues; and consulted with
independent director Brian Cullen, the only other member of the Special Committee and
the managing director of restructuring at a financial advisory and investment banking
firm.  These facts establish diligence, not gross negligence.

In addition, the Amended Complaint includes the following:

- The Special Committee decided not to get a fairness opinion for a
  contemplated transaction (which never occurred) where Yucaipa would
  only acquire a minority amount of the First Lien Debt.  Am. Compl. ¶ 83

- The Special Committee used the in-house and outside counsel of Allied
  and Allied's financial advisor, rather that retain separate advisors and
  counsel.  Am. Compl. ¶¶ 75, 184.

- The Special Committee "failed to engage in deliberations separate and
  apart from deliberations with the Yucaipa directors, but instead would
  merely meet and deliberate after presentations by and deliberations with
  the conflicted Yucaipa directors and the ordinary advisors to the
  Company, whose retention was subject to the whims of Yucaipa and its
  control over Allied."  Am. Compl. ¶ 184.

Even accepting these allegations as true for the purposes of this Motion, they are
insufficient under Delaware law to state a plausible claim for breach of the duty of care.

First, Delaware case law clearly establishes that fairness opinions are not necessary, as a matter of law, to support an informed business decision. "Although Delaware law requires that corporate directors evaluate the propriety of a given transaction on the basis of a full complement of information, *it does not require that they seek a formal fairness opinion*. In some situations, a formal opinion may be helpful; in others, it will not significantly amplify the information already available to directors." *Oberly v. Kirby*, 592 A.2d 445, 472 (Del. 1991) (emphasis added) (citing *Van Gorkom,* 488 A.2d at 881).

Second, the mere fact that the Special Committee utilized Allied's counsel and financial advisors does not indicate that the Special Committee members themselves failed to undertake properly their duty of care. *MCG Capital Corp.,* 2010 WL 1782271, at *19 n.119.

Third, there are plainly no minimum requirements of time or space to determine the independence of Special Committee deliberations. The fact that the Special Committee met immediately after presentations to and deliberations with the full Board of Directors suggests only that the Special Committee wanted to be fully informed before making any decisions. *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005) (finding no breach of the duty of care where independent directors met several times to discuss the specific issues relating to the transaction and consider alternatives before voting on the transaction), *aff'd*, 906 A.2d 114 (Del. 2006). Thus, this Court should dismiss any remaining claims.

## <u>CONCLUSION</u>

This Court should dismiss with prejudice the claims against Mr. Gendregske.

- 39 -

## <u>STATEMENT UNDER RULE 7012-1</u>

Mr. Gendregske does not consent to the entry of final orders or judgments by the

Court if it is determined that the Court, absent consent of the parties, cannot enter final

orders or judgments consistent with Article III of the United States Constitution.


Respectfully submitted,


*/s/ William M. Alleman, Jr.* _

MORRIS, NICHOLS, ARSHT &            *Of Counsel:*
TUNNELL LLP
Derek C. Abbott (No. 3376)            ARNOLD & PORTER LLP
William M. Alleman, Jr. (No.          Justin S. Antonipillai
5449)                                 Ian S. Hoffman
1201 North Market Street             555 Twelfth Street, N.W.
Wilmington, Delaware 19801            Washington, DC 20004
Telephone: (302) 658-9200             Telephone: (202) 942–5000
Facsimile: (302) 658-3989             Facsimile: (202) 942–5999

*Attorneys for Mark J. Gendregske*

Dated: March 21, 2013