## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | |
| ALLIED SYSTEMS HOLDINGS, INC., *et al.*,[†] | Chapter 11<br>No. 12-11564 (CSS)<br>(Jointly Administered) |
| Debtors. | |
| ALLIED SYSTEMS HOLDINGS, INC., | |
| Plaintiff, | |
| v. | |
| AMMC VIII, LIMITED, AVENUE CAPITAL GROUP, BDCM OPPORTUNITY FUND II, LP, BENNETT MANAGEMENT, BLACK DIAMOND CLO 2005-1 LTD., DEL MAR DISTRESSED OPPORTUNITIES MASTER FUND, MJX ASSET MANAGEMENT, LLC, PAR-FOUR INVESTMENT MANAGEMENT, SPECTRUM INVESTMENT PARTNERS LP, TEAK HILL CREDIT CAPITAL INVESTMENTS, LLC, THE CIT GROUP BUSINESS CREDIT, INC., THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, YUCAIPA AMERICAN ALLIANCE FUND II, L.P., and YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., | Adversary Proceeding No. 12-50947 (CSS) |
| Defendants. | |

---

[†] The Debtors in these cases, along with their federal tax identification numbers (business numbers where applicable), are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ALLIED SYSTEMS HOLDINGS,
INC., and its affiliated debtors,

        Plaintiff,

BLACK DIAMOND OPPORTUNITY FUND II, LP,
BLACK DIAMOND CLO 2005-1 LTD., and
SPECTRUM INVESTMENT PARTNERS, L.P.,

        Intervenors,

        v.

YUCAIPA AMERICAN ALLIANCE FUND I, L.P.,
YUCAIPA AMERICAN ALLIANCE (PARALLEL)
FUND I, L.P., YUCAIPA AMERICAN ALLIANCE
FUND II, L.P., YUCAIPA AMERICAN ALLIANCE
(PARALLEL) FUND II, L.P., MARK
GENDREGSKE, JOS OPDEWEEGH, JAMES
FRANK, DEREX WALKER, JEFF PELLETIER,
IRA TOCHNER, and JOSEPH TOMCZAK,

        Defendants.

Adversary Proceeding
No. 13-50530 (CSS)

## YUCAIPA'S MEMORANDUM OF LAW IN OPPOSITION TO THE PETITIONING CREDITORS' MOTION FOR SUMMARY JUDGMENT REGARDING THE DETERMINATION OF REQUISITE LENDERS UNDER THE FIRST LIEN CREDIT AGREEMENT

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
  Michael R. Nestor (No. 3526)
  Edmon L. Morton (No. 3856)
  Donald J. Bowman, Jr. (No. 4383)
  Michael S. Neiburg (No. 5275)
  Laurel D. Roglen (No. 5759)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: +1.302.571.6600

LATHAM & WATKINS LLP
  Russell F. Sauer, Jr.
  Robert A. Klyman
  Wayne S. Flick
  Kimberly A. Posin
355 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1.213.485.1234

*Attorneys for Yucaipa*

Dated: July 23, 2013

## <u>TABLE OF CONTENTS</u>

Page

I.     INTRODUCTION ...............................................................................1

II.    COUNTERSTATEMENT OF FACTS .................................................2

    A.    Yucaipa Rescues Allied Out Of Chapter 11 Bankruptcy In 2007 ..............2

    B.    The Credit Agreements Allow Allied To Emerge From Bankruptcy ..........3

    C.    The Third Amendments Are Passed With Requisite Lender Consent ....................................................................................................4

    D.    Allied Is Faced With Unreasonable Lender Demands.................................6

    E.    Allied's Lenders Ask Yucaipa To Acquire Their Debt ..............................8

    F.    Yucaipa Makes A Tender Offer.................................................................9

    G.    Yucaipa Becomes Requisite Lender With The Petitioning Creditors' Encouragement .......................................................................10

    H.    The Fourth Amendment Is Passed With Requisite Lender Consent.........11

    I.    The Georgia Action Is Litigated And Settled By CIT ..............................13

    J.    The New York Action Is Filed And Decided Without Discovery.............14

    K.    The Lenders' Current First Lien Debt Holdings .......................................15

III.    ARGUMENT ..................................................................................16

    A.    The Motion Is Procedurally Defective.....................................................16

        1.    The Motion does not address any claim in the Committee Adversary Proceeding.................................................................17

        2.    The Petitioning Creditors are time-barred from asserting any relevant claim in the Committee Adversary Proceeding.........18

        3.    The New York order regarding the validity of the Fourth Amendment has no preclusive effect against Allied, requiring denial of the Motion in the Allied Adversary Proceeding.........................................................................19

i

B.    The Petitioning Creditors Are Not Requisite Lenders ..............................21

    1.    The Petitioning Creditors are not Requisite Lenders even if Yucaipa's holdings are excluded from the determination .............21

    2.    Yucaipa is Requisite Lender because it holds a majority of Allied's first lien debt ..................................................................22

    3.    Yucaipa is Requisite Lender under the First Lien Credit Agreement because its holdings must be included in the Requisite Lender calculation.........................................................24

    4.    Yucaipa is Requisite Lender even if the Third Amendment were valid because Yucaipa's holdings must be included in the Requisite Lender calculation....................................................27

C.    The Petitioning Creditors Also Have Failed To Establish The Legal Predicates To Their Claim To Requisite Lender Status .................29

    1.    The New York order does not preclude Yucaipa from being Requisite Lender under the Third Amendment ...........................29

    2.    The Third Amendment is invalid...................................................32

        a.    The law of the case doctrine does not apply .....................32

        b.    In any event, the Petitioning Creditors have failed to establish that the Third Amendment is valid on the merits.................................................................................35

D.    The Motion Should Be Denied Or Deferred Because Necessary Discovery Has Been Obstructed ...........................................................38

IV.    CONCLUSION................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alhusen v. Caristo Constr. Co.,*
  103 N.E.2d 891 (N.Y. 1952) ................................................................... 24

*Almeida Oil Co. v. Singer Holding Corp.,*
  51 A.D.3d 604 (N.Y. App. Div. 2008) .................................................... 24

*Anderson v. Comm'r,*
  698 F.3d 160 (3d Cir. 2012) .................................................................... 33

*Bank Brussels Lambert v. Credit Lyonnais,*
  No. 93-6876, 2000 WL 1876915 (S.D.N.Y. Dec. 22, 2000)..................... 24

*Blackwell Pub., Inc. v. Excel Research Grp., LLC,*
  No. 07-12731, 2008 WL 506329 (E.D. Mich. Feb. 22, 2008) .................. 39

*Boliaux v. Manheim Auto. Fin. Servs.,*
  No. 10-5467, 2010 WL 4529732 (N.D. Ill. Nov. 2, 2010)....................... 33

*Buechel v. Bain,*
  766 N.E.2d 914 (N.Y. 2001) .................................................................... 20

*Carley v. Wheeled Coach,*
  991 F.2d 1117 (3d Cir. 1993) .................................................................. 19

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................ 17

*Christianson v. Colt Indus. Operating Corp.,*
  486 U.S. 800 (1988) ................................................................................ 33

*City of New York v. Welsbach Elec. Corp.,*
  878 N.E.2d 966 (N.Y. 2007) .............................................................. 30, 32

*Cnty. of Suffolk v. Amerada Hess Corp.,*
  517 F. Supp. 2d 662 (S.D.N.Y. 2007) ..................................................... 17

*Delgrosso v. Spang & Co.,*
  903 F.2d 234 (3d Cir. 1990) .................................................................... 19

*Doe v. Abington Friends Sch.,*
  480 F.3d 252 (3d Cir. 2007) .................................................................... 38

*Empire Discount Corp. v. Bouley Co.,*
    160 N.Y.S.2d 395 (N.Y. Sup. Ct. 1957)....................................................... 25, 29

*Green v. Santa Fe Indus., Inc.,*
    514 N.E.2d 105 (N.Y. 1987) ............................................................................ 20

*IDT Corp. v. Morgan Stanley Dean Witter & Co.,*
    45 A.D.3d 419 (N.Y. App. Div. 2007) ........................................................... 32

*In re 785 Partners LLC,*
    No. 11-13702, 2012 WL 401497 (Bankr. S.D.N.Y. Feb. 7, 2012) ........ 25, 26

*In re GWLS Holdings, Inc.,*
    No. 08-12430, 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009)................. 22

*In re Metaldyne Corp.,*
    409 B.R. 671 (Bankr. S.D.N.Y. 2009) .......................................................... 22

*In re Moody,*
    825 F.2d 81 (5th Cir. 1987) ............................................................................ 33

*In re W.R. Grace & Co.,*
    475 B.R. 34 (D. Del. 2012)............................................................................. 22

*In re White Beauty View, Inc.,*
    841 F.2d 524 (3d Cir. 1988) ........................................................................... 33

*Juan C. v. Cortines,*
    679 N.E.2d 1061 (N.Y. 1997) ....................................................................... 20

*Kraemer v. McGowan,*
    89 A.D.2d 763 (N.Y. App. Div. 1982) .......................................................... 32

*Landau, P.C. v. LaRossa, Mitchell & Ross,*
    892 N.E.2d 380 (N.Y. 2008) ......................................................................... 30

*Macfarlan v. Ivy Hill SNF, LLC,*
    675 F.3d 266 (3d Cir. 2012) ........................................................................... 19

*Macklowe v. 42nd St. Dev. Corp.,*
    170 A.D.2d 388 (N.Y. App. Div. 1991) ........................................................ 24

*Magaziner v. Montemuro,*
    468 F.2d 782 (3d Cir. 1972) ........................................................................... 18

*Martin v. Port Auth. Transit*,
   115 F. App'x 556 (3d Cir. 2004) ................................................................. 33

*Matter of Howard v. Stature Elec., Inc.*,
   986 N.E.2d 911 (N.Y. 2013) ...................................................................... 30

*McKenzie v. BellSouth Telecomms., Inc.*,
   219 F.3d 508 (6th Cir. 2000) ..................................................................... 34

*Metro. Life Ins. Co. v. Bancorp Servs., LLC*,
   527 F.3d 1330 (Fed. Cir. 2008) ................................................................. 38

*Miller v. Beneficial Mgmt. Corp.*,
   977 F.2d 834 (3d Cir. 1992) ...................................................................... 38

*Nat'l Union Fire Ins. Co. v. Hartford Ins. Co.*,
   248 A.D.2d 78 (N.Y. App. Div. 1998) ....................................................... 20

*PenneCom B.V. v. Merrill Lynch & Co.*,
   372 F.3d 488 (2d Cir. 2004) ...................................................................... 30

*Perez-Ruiz v. Crespo-Guillen*,
   25 F.3d 40 (1st Cir. 1994) ......................................................................... 33

*Pravin Bankers Assocs. v. Banco Popular del Peru*,
   109 F.3d 850 (2d Cir. 1997) ...................................................................... 24

*Purchase Partners, LLC v. Carver Fed. Sav. Bank*,
   No. 09-9687, 2012 WL 6641633 (S.D.N.Y. Dec. 13, 2012) ................... 25, 28

*Rasmussen v. City of New York*,
   766 F. Supp. 2d 399 (E.D.N.Y. 2011) ....................................................... 17

*RePass v. Vreeland*,
   357 F.2d 801 (3d Cir. 1966) ...................................................................... 17

*Rimbert v. Eli Lilly & Co.*,
   647 F.3d 1247 (10th Cir. 2011) ................................................................. 33

*Rosen v. Trans World Airlines, Inc.*,
   No. 94-0682, 1997 WL 107640 (S.D.N.Y. Mar. 11, 1997) ....................... 39

*Shanus v. Auctions*,
   No. 11-2839, 2013 WL 393950 (D.N.J. Jan. 30, 2013) ............................ 19

*Sullivan v. Int'l Fid. Ins. Co.*,
    96 A.D.2d 555 (N.Y. App. Div. 1983) ....................................................... 25, 27, 28, 29

*U.S. v. Warren*,
    338 F.3d 258 (3d Cir. 2003) ...................................................................... 31

*U.S. v. Webber*,
    396 F.2d 381 (3d Cir. 1968) ...................................................................... 20

*UA Theatre Circuit v. Twp. of Warrington*,
    316 F.3d 392 (3d Cir. 2003) ...................................................................... 34

*Waste Conversion v. Sims*,
    868 F. Supp. 643 (D.N.J. 1994) ................................................................ 34

*Wideman v. Shallowford Cmty. Hosp., Inc.*,
    826 F.2d 1030 (11th Cir. 1987) ................................................................. 38

## RULES

Fed. R. Bankr. P. 7056 ..................................................................................... 16

Fed. R. Civ. P. 56 ............................................................................................ 16, 17

Fed. R. Civ. P. 56(a) ....................................................................................... 17, 18

Fed. R. Civ. P. 56(d) ....................................................................................... 38, 39

## I.    **INTRODUCTION**

The Petitioning Creditors' Motion for Summary Judgment Regarding the Determination of Requisite Lenders under the First Lien Credit Agreement (the "Motion")[1] must be denied for both procedural and substantive reasons.

Procedurally, the Motion is improper. The Petitioning Creditors filed their Motion in the two remaining adversary proceedings in the Allied bankruptcy case.[2] In the Committee Adversary Proceeding, the Motion is not aimed at resolving any claim that has been or could be alleged. At best, the Motion seeks an improper advisory opinion. In the Allied Adversary Proceeding, the Motion is premised on applying collateral estoppel based on a prior New York action against *Allied*, but Allied had no role in that litigation. Collateral estoppel, therefore, is of no help to Petitioning Creditors in establishing the foundation of their Motion. For these reasons alone, the Motion must be denied.

In addition, on the merits, the Petitioning Creditors are not and cannot be Requisite Lenders under any plausible scenario. Even under the most favorable of circumstances, the Petitioning Creditors do not hold a majority of Allied's first lien debt. Instead, Yucaipa indisputably holds a majority of Allied's first lien debt – and that debt must be counted in any Requisite Lender calculation under the plain terms of the governing credit agreement. Even if, as the Petitioning Creditors assert, the August 2009 assignment of debt to Yucaipa was contractually prohibited, controlling principles of New York law make clear that the assignment is nevertheless valid and must be included in any Requisite Lender calculation. At the very least, there are disputed issues of material fact, which preclude summary judgment.

---

[1]  Yucaipa adopts the definitions contained in the Motion, unless otherwise indicated.

[2]  The Petitioning Creditors filed identical summary judgment motions in: (i) *The Official Comm. of Unsecured Creditors of Allied Systems Holdings, Inc. v. Yucaipa American Alliance Fund I, L.P.*, No. 13-50530 (the "Committee Adversary Proceeding") (D.I. 254); and (ii) *Allied Systems Holdings, Inc. v. AMMC VIII, Ltd.*, No. 12-50947 (the "Allied Adversary Proceeding") (D.I. 247).

Finally, the Petitioning Creditors' unwillingness to provide discovery necessary fully to contest the Motion also warrants denial of the Motion (or, at least, a deferral until discovery is provided). In all events, on multiple grounds, the Motion fails.

## II.    COUNTERSTATEMENT OF FACTS

Throughout these proceedings, the Petitioning Creditors have maligned Yucaipa's actions and motives, and misrepresented the facts relating to Yucaipa's investment in and ongoing commitment to Allied. Consistent with that approach, the Motion spins a story that deviates materially from the record and the truth. Yucaipa presents below a summary of facts grounded in both.

### A.    Yucaipa Rescues Allied Out Of Chapter 11 Bankruptcy In 2007

Predecessors of the Debtors (the "Prior Debtors") filed for bankruptcy protection in 2005. (Derex Walker Declaration ("Walker Dec.") ¶ 3.) During the prior bankruptcy, Yucaipa held about $99 million of unsecured notes issued by the Prior Debtors. (*Id.*) Yucaipa also made additional loans during the prior bankruptcy to enable the Prior Debtors to purchase equipment, and obtained an unprecedented 17.5% in Teamsters wage concessions to fund future capital expenditures based on its longstanding reputation of partnering successfully with organized labor. (*Id.*) In addition, Yucaipa co-sponsored a reorganization plan with the Prior Debtors and the Teamsters (the "Plan") that enabled the Prior Debtors to reorganize, to survive and to preserve thousands of jobs. (*Id.*) The reorganized Prior Debtors are the "Current Debtors" here.

The Current Debtors emerged from the prior bankruptcy in 2007 with a de-levered capital structure and enhanced prospects for competing successfully in the car haul industry. (Walker Dec. ¶ 4.) Pursuant to the Plan, Yucaipa converted all of its debt claims into roughly 67% of Allied's equity. Also pursuant to the Plan, Allied's board

2

consisted of five members:  a new CEO, a member chosen by the Prior Debtors'

Creditors Committee, and three members selected by Yucaipa.  (*Id.*)[3]

**B.    The Credit Agreements Allow Allied To Emerge From Bankruptcy**

To finance Allied's exit from the prior bankruptcy, the Current Debtors entered

into a two-tiered exit financing, including (i) a First Lien Credit Agreement that provided

a $265 million facility in the form of term loans, revolving loans and lenders deposits to

support letters of credit, and (ii) a $50 million Second Lien Credit Agreement.  (Walker

Dec. ¶ 6.)  The CIT Group/Business Credit, Inc. ("CIT") was Administrative Agent for

the lenders under the First Lien Credit Agreement.

As defined in the First Lien Credit Agreement, the "Requisite Lenders" are:

[O]ne or more Lenders having or holding Term Loan Exposure, LC
Exposure and/or Revolving Exposure and representing more than 50% of
the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the
aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving
Exposure of all Lenders.

(Justin A. Mendelsohn Affirmation ("Mendelsohn Aff."), Ex. 8 § 1.1.)  Determining

Requisite Lender status is purely a mathematical calculation; the numerator is the amount

of first lien debt held by the lender (or lenders) claiming to be Requisite Lender, and the

denominator is the total amount of first lien debt (*i.e.*, the sum of (i)-(iii) above).

Yucaipa, as a "Restricted Sponsor Affiliate," was originally excluded from the

definition of "Eligible Assignee" and, therefore, lenders were prohibited from assigning

debt to Yucaipa.  (Movants' Memorandum ("Mem.") at 5.)  Yucaipa was not a party to

the First Lien Credit Agreement, so it was not prohibited from *acquiring* debt if an

---

[3]  In March 2008, based on the recommendation of Allied's regular outside counsel and now
counsel to the Current Debtors, Troutman Sanders, Allied's new CEO, Mark Gendregske, and the
Creditors Committee appointee, Brian Cullen (a restructuring expert) established a special
committee (the "Special Committee"), which was formed independently to consider and to
negotiate on behalf of Allied certain matters involving Yucaipa.  (Walker Dec. ¶ 5.) ███████

3

existing Lender was willing to sell or to assign it to Yucaipa. Indeed, the Petitioning

Creditors acknowledged that they could not stop Yucaipa from acquiring a majority of

the first lien debt if other lenders were prepared to sell to Yucaipa – even after the third

amendment to the First Lien Credit Agreement (the "Third Amendment") was passed.

(Russell F. Sauer, Jr. Declaration ("Sauer Dec.") ¶ 4, Ex. 11 (emphasis

added).) *Importantly, the First Lien Credit Agreement nowhere provides that a*

*prohibited assignment to Yucaipa (or to anyone else) is "void."*

C.    **The Third Amendments Are Passed With Requisite Lender Consent**

Shortly after Allied exited from bankruptcy in 2007, the global economy plunged

into a recession, which, among other things, devastated the U.S. automotive market.

(Walker Dec. ¶ 7.) Thus, Allied's financial condition began to deteriorate soon after the

exit. As a consequence, beginning in early 2008, a number of Allied's lenders panicked

and began looking for strategies to exit their positions in the Allied debt. Yucaipa

considered the opportunity to acquire both first and second lien debt at a discount – not

just as an investment opportunity, but also as a means to benefit Allied if, after acquiring

the debt, Yucaipa contributed some of it to the capital of Allied, thereby de-levering the

balance sheet and positively affecting Allied's cash flow. (*Id.*) From the perspective of

the Special Committee and the company's board of directors, Allied needed to improve

its balance sheet to maintain customer confidence and to avoid a "going concern" opinion

from its auditors, which would have caused a default under both credit agreements and

would likely have led to a "free fall" into bankruptcy. (*Id.* ¶ 8.)

Recognizing that Yucaipa's acquisition of Allied debt would benefit the company

and its many constituencies, the Special Committee supported the idea. (Walker Dec.

4

¶ 8.)  To facilitate potential sales, Allied, its lenders and Yucaipa began negotiating amendments to both the First and Second Lien Credit Agreements to allow Yucaipa to become an "Eligible Assignee." (*Id.* ¶ 9.)  As discussions about the Third Amendment progressed, however, the lenders imposed increasingly restrictive terms on the first lien debt that Yucaipa could acquire.  (*Id.*)  Although Yucaipa was willing to live with certain restrictions on the amount of first lien debt it could acquire ███████ and the voting rights associated with that debt (*see* Mendelsohn Aff., Ex. 11), the other restrictions the first lien lenders sought to impose became so onerous that Yucaipa lost its appetite to acquire first lien debt.  (Walker Dec. ¶ 9.)

At the same time, the Special Committee and Yucaipa also were pursuing an amendment to the Second Lien Credit Agreement that would allow Yucaipa to buy second lien debt and to contribute some of it to the capital of the company.  (Walker Dec. ¶ 10.)  Although not as attractive to Yucaipa because of its junior position, Yucaipa's acquisition and contribution of second lien debt was *more attractive* to Allied because of the higher interest rate it carried and because of its positive impact on company cash flow.  (*Id.*)  The proposed third amendment to the Second Lien Credit Agreement contained none of the restrictions on second lien debt that the first lien lenders sought to impose.  Among other things, there were no limits on the amount of second lien debt Yucaipa could acquire or on Yucaipa's ability to become Requisite Lender, no restrictions on the voting rights of such debt and no requirement that any portion of it be contributed to company capital.  (*Id.*)

Although not required, it was always Yucaipa's plan to contribute a portion of any Allied second lien debt to company capital – but such a contribution was barred by the First Lien Credit Agreement.  (*See id.* ¶ 11; Mendelsohn Aff., Ex. 8 § 6.22.)  So Yucaipa pursued the Third Amendment, even after it was clear that Yucaipa would not acquire

first lien debt, to allow Yucaipa to help de-lever the company and to reduce its quarterly interest expense by acquiring and contributing second lien debt. (Walker Dec. ¶ 11.)

The Third Amendments to both the First and Second Lien Credit Agreements passed with *majority*, or Requisite Lender, consent. (*Id.* ¶ 12.) Unanimous lender consent was neither sought nor obtained for either amendment. Notably, the Petitioning Creditors did not support or approve the Third Amendments. (Sauer Dec. ¶¶ 5-7, Exs. 12-15.)



*Critically, like the original First Lien Credit Agreement itself, the Third Amendment does **not** provide that any assignment by lenders to Yucaipa of more or different types of first lien debt than permitted by the amendment is "void."* In any event, Yucaipa was not a party to the Third Amendment, was not obligated to purchase first lien debt and did not do so because of the restrictions and conditions limiting Yucaipa's potential ownership rights. (Walker Dec. ¶ 12.)[4]

### D.    Allied Is Faced With Unreasonable Lender Demands

By mid-2008, the economy and the auto industry continued their precipitous decline. In August 2008, Allied notified its lenders that it was in covenant default under the First Lien Credit Agreement and wished to discuss an out-of-court restructuring through an amendment to the credit agreement. (Walker Dec. ¶ 13.) Allied was

---

[4] Yucaipa did make additional substantial investments in Allied. For example, Yucaipa purchased ▮▮▮▮▮▮ in outstanding second lien debt, and then voluntarily contributed ▮▮▮ of this debt to Allied capital in return for preferred stock. (Walker Dec. ¶ 12.) This voluntary contribution helped de-lever Allied's balance sheet, reduce its principal and interest payments on the debt and avoid a going concern opinion from its auditors. (*Id.*)

concerned that a new Chapter 11 filing so soon after it emerged from bankruptcy would result in a loss of business from which the company would never recover. (*Id.*) The Allied board and Yucaipa were confident that – given Allied's industry leadership position, the fact that other car haulers were going out of business and a belief that the auto industry would eventually recover – Allied could succeed if given the time to do so. (*Id.*) Indeed, Allied purchased a large fleet of tractor-trailers from a competitor, which was liquidating through a forced bankruptcy, to put itself in a position to capture new business when the auto industry eventually improved. (*Id.*)

　　　While suggesting that they were willing to consider a restructuring of the first lien debt, the lenders insisted, as a purported initial step, that Allied enter into a "Forbearance Agreement" under which the first lien lenders would temporarily refrain from exercising remedies in return for various concessions.[5] (Walker Dec. ¶ 14.)  As a condition to the Forbearance Agreement, the lenders also required that Yucaipa execute a "Sponsor Side Letter." (*Id.*)  This letter required that during the forbearance period Yucaipa forego payments on the second lien debt and not acquire any of Allied's first lien debt – even under the onerous Third Amendment, which because of the capital contribution provision, would have further improved Allied's balance sheet. (*Id.*)  Although Yucaipa had no obligation to execute the Sponsor Side Letter, it did so, and then extended its term, solely for Allied's benefit and with no consideration for itself. (*Id.*)

　　　During the forbearance period, Allied, Yucaipa and the lender group discussed restructuring Allied's first lien debt.  While Allied and Yucaipa were prepared to amend the First Lien Credit Agreement to the significant benefit of the lenders, the lenders'

---

[5]

demands of both Allied and Yucaipa were unreasonable, particularly given the cash crunch Allied was facing. (Walker Dec. ¶ 15.) These demands made no sense to a company struggling to preserve cash flow in the face of an economy and industry in a downward spiral. (*Id.* ¶ 16.) Thus, no agreement was reached, no additional amendment to the credit agreement was executed and the forbearance period expired. (*Id.*)

### E.    Allied's Lenders Ask Yucaipa To Acquire Their Debt

In December 2008, with no restructured credit agreement in place, first lien lenders holding *substantially more than 50%* of the Allied debt negotiated to sell their Requisite Lender position to Yucaipa. (Walker Dec. ¶ 17.) Many of these lenders were the very same ones who had approved the Third Amendment and its restrictions on sales of first lien debt to Yucaipa. (*Id.*) Not even they believed the Third Amendment barred Yucaipa's acquisition of their combined Requisite Lender position or that unanimous lender consent was required to vitiate the Third Amendment. ■■■■■■■■■■■■

In fact, an agreement in principle was reached between Yucaipa and the majority of the first lien lenders to acquire their first lien debt for 28 cents on the dollar and, as far as Yucaipa knew, the deal was done on December 24, 2008, subject only to the execution of final documents. (Walker Dec. ¶ 18.) The documentation would have included a fourth amendment to the First Lien Credit Agreement eliminating the restrictions on sales of debt to Yucaipa that were added by the Third Amendment, and relaxing some of the financial covenants – again for the purpose of giving Allied breathing room to survive the economic downturn and a chance to prosper when the economy and automotive industry began to recover. None of the selling lenders, *including Spectrum,* even suggested that this amendment required unanimous lender consent. (*Id.* ¶ 19.)

8

Shortly before finalizing Yucaipa's acquisition of a majority of the first lien debt, third party IEP Carhaul ("IEP") made a bid to acquire a majority of Allied's first lien debt for 30 cents on the dollar. (Sauer Dec. ¶ 16, Ex. 27.)



### F.    Yucaipa Makes A Tender Offer

In February 2009, unaware of the lenders' discussions with IEP and perplexed by the silence from lenders who were once anxious to sell, Yucaipa decided to try to acquire a majority of the Allied first lien debt through a tender offer to all first lien lenders (the "Tender Offer"). The Tender Offer included and was conditioned upon passage of a proposed fourth amendment to the First Lien Credit Agreement by a majority of the first lien lenders (the "Proposed Fourth Amendment") – the exact manner in which the Third Amendment was enacted. (Walker Dec. ¶¶ 21, 23.)

The Tender Offer documents, including the Proposed Fourth Amendment, were sent to all first lien lenders, including the Petitioning Creditors. (*Id.* ¶ 23; Sauer Dec. ¶ 19, Ex. 30.) No lender notified Yucaipa that the changes contained in the Proposed Fourth Amendment concerning Yucaipa's acquisition of first lien debt or its ability to act as Requisite Lender might violate the First Lien Credit Agreement, or that such changes required unanimous lender consent. (Walker Dec. ¶ 23.)

The Tender Offer was *not* rejected by the lenders.  Rather, by early February 2009, IEP had begun to firm up the financing for its acquisition bid and a majority of lenders had signed an exclusivity agreement with IEP's financial partner, ComVest Investment Partners ("ComVest"), to negotiate for the sale of their Allied debt exclusively with ComVest for a specified period.[6]  (Walker Dec. ¶ 24.)  By late February 2009, ComVest had completed the purchase of approximately ▇▇▇ of the Allied first lien debt and, accordingly, became Requisite Lender.  (*Id.* ¶ 26.)



### G.    Yucaipa Becomes Requisite Lender With The Petitioning Creditors' Encouragement

ComVest subsequently began negotiations to sell its Requisite Lender position to Yucaipa.  (Walker Dec. ¶ 27.)  Yucaipa eventually agreed to acquire ComVest's position.

---

[6]


During the Spring and Summer 2009, all of the lenders, including the Petitioning Creditors, were well aware of the negotiations between Yucaipa and ComVest, and of Yucaipa's intention to spend tens of millions of dollars to acquire ComVest's Requisite Lender position under an amendment that reversed the restrictions on its ownership imposed by the Third Amendment. (*See, e.g., id.* ¶ 29.) The Petitioning Creditors specifically acknowledged more than three months before Yucaipa purchased the ComVest position that such a purchase would be accompanied by an amendment to the First Lien Credit Agreement allowing Yucaipa to acquire the debt without restriction. (Sauer Dec. ¶ 26, Ex. 43.) In the weeks prior to Yucaipa's purchase from ComVest, Yucaipa had several calls and an August 18 meeting with Black Diamond principals in which Yucaipa's plan to acquire ComVest's Requisite Lender position was specifically discussed (the "August 18 Meeting"). (*Id.* ¶ 27, Exs. 44-45; Walker Dec. ¶ 29.) At no time did the Petitioning Creditors or any other lender object to Yucaipa's proposed acquisition or inform Yucaipa (or ComVest) that they believed a Yucaipa purchase of ComVest's Requisite Lender position would be invalid or require unanimous lender consent. (Walker Dec. ¶ 31.) Black Diamond not only failed to object to the Yucaipa plan, but its principals *actively encouraged and endorsed* Yucaipa's efforts.[7] (*Id.* ¶ 30.)

### H.    The Fourth Amendment Is Passed With Requisite Lender Consent

On August 21, 2009, Allied and ComVest, as the Requisite Lender under the First Lien Credit Agreement, executed a fourth amendment to the First Lien Credit Agreement (the "Fourth Amendment"). The Fourth Amendment amended or deleted the restrictions

---

[7]   Three days before the closing, Black Diamond proposed that Yucaipa use its soon-to-be acquired control over Allied to file for bankruptcy with a DIP loan from Yucaipa and Black Diamond, after which they would do a "low value" reorganization plan that would give Allied to them as DIP lenders – to the detriment of all of Allied's other stakeholders. Yucaipa was unwilling to participate in this scheme. (Walker Dec. ¶ 30.) Two days before the closing, on a conference call, Yucaipa reiterated its plan to acquire the ComVest position, and Black Diamond reaffirmed its support. (*Id.*)

and conditions imposed by the Third Amendment, and permitted Yucaipa to acquire and to accept assignment of Allied's first lien debt and to become Requisite Lender.  Allied's Special Committee reviewed and voted to approve the Fourth Amendment.  (Walker Dec. ¶ 22.) ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

In reliance on the validity of the Fourth Amendment, Yucaipa acquired all of ComVest's majority holdings of Allied's first lien debt on August 21, 2009.  (Walker Dec. ¶ 33.)  These holdings consisted of ███████████ of Term Loans and ████████████ of LC Commitments, totaling ███████████████ of the $265,000,000 of first lien debt authorized by the First Lien Credit Agreement.  (*Id.*)

Following the execution of the Fourth Amendment, Yucaipa notified all of the lenders of its acquisition of Allied's first lien debt, the passage of the Fourth Amendment and its status as Requisite Lender.  (*Id.* ¶ 34.)  Yucaipa also sought to engage with the Petitioning Creditors, who held the next most significant amounts of first lien debt, to discuss a going-forward plan for Allied.[8]  (*Id.*, Exs. 5-7.)



---

[8]  Yucaipa informed CIT that Yucaipa had taken an assignment of ComVest's first lien loans. CIT entered all of Yucaipa's loans on the Register in compliance with its duties as Administrative Agent.  All lenders are bound by the Credit Agreement to "deem and treat the Persons listed as Lenders in the Register [including Yucaipa] as the holders and owners of the corresponding Commitments, LC Deposits and Loans listed therein for all purposes hereof [of the Credit Agreement]."  (Mendelsohn Aff., Ex. 8 § 10.6(b).)

████████████████████████████████████████████████████████
████████████████████████████████████████████████

I.      **The Georgia Action Is Litigated And Settled By CIT**

One month after Yucaipa acquired the Requisite Lender position and only one day after Black Diamond's Stephen Deckoff spoke by phone with Yucaipa founder Ronald Burkle to plan further strategy for maximizing the value of Allied as they had agreed at the August 18 Meeting (Walker Dec. ¶ 36), the Petitioning Creditors chose to double-cross Yucaipa. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████ CIT, as Administrative Agent, pressed the Petitioning Creditors' dispute with Yucaipa. In response, on November 21, 2009, Yucaipa and Allied filed suit in Georgia against CIT in its capacity as Administrative Agent, seeking a declaration that the Fourth Amendment was valid (the "Georgia Action"). (*Id.* ¶ 34; Mendelsohn Aff., Ex. 6.)  CIT, in turn, asserted counterclaims in its individual and representative capacity as Administrative Agent. (Sauer Dec. ¶ 35; Mendelsohn Aff., Ex. 19.)[9]

CIT litigated the Georgia Action as Administrative Agent for the other lenders. CIT has admitted in this Court that it asserted the Georgia Counterclaim – including the declaratory judgment claim – in *both* its representative capacity as Administrative Agent and in its individual capacity as a lender. (Sauer Dec. ¶ 36, Ex. 49; Mendelsohn Aff., Ex. 19 ¶¶ 34-42, 78.) CIT explained its role in the Georgia Action by stating that it was "simply attempting to fulfill its role as Administrative Agent in good faith." (Mendelsohn Aff., Ex. 19 ¶ 35.) The Petitioning Creditors also admitted that CIT was pursuing the Georgia Action on their behalf: "CIT, which was the agent which was handling the defense of this [Georgia] case, in effect, for us . . . ." (Sauer Dec., Ex. 57 at 2:13-15; *see also id.* at Ex. 56 ¶ 12 ("CIT was defending the Georgia action, and thereby

---

[9]  The Petitioning Creditors participated in the Georgia Action and communicated with both CIT and Yucaipa about the action. (*See, e.g.*, Walker Dec. ¶ 41; Sauer Dec. ¶ 37, Exs. 52-55.)

complying with its fiduciary duties as Agent to [Respondents]."). )



On December 5, 2011, after more than two years of litigation, CIT, Yucaipa and Allied executed a settlement agreement in the Georgia Action,

After dismissal of the Georgia Action, Yucaipa directed CIT as Administrative Agent to terminate certain commitments under the First Lien Credit Agreement. (Walker Dec. ¶ 45.) This resulted in ▓▓▓▓▓▓▓ of deposits being released to the first lien lenders. (*Id.*) Neither the Petitioning Creditors nor any other lender questioned Yucaipa's authority, as Requisite Lender, to direct this release of funds. (*Id.*)

**J.    The New York Action Is Filed And Decided Without Discovery**

Approximately five weeks after the Georgia Action was dismissed, the Petitioning Creditors sued Yucaipa in New York state court (the "New York Action"). The Petitioning Creditors' sole claim in the New York Action was for a judicial declaration that the Fourth Amendment is null and void, and that, consequently, Yucaipa was not the Requisite Lender. The New York Action did not involve the Third Amendment. Yucaipa moved to dismiss the New York Action on *res judicata* grounds, because CIT's

14

dismissal of the Georgia Action was tantamount to a final judgment binding its principals, the Petitioning Creditors.  In denying the motion, the New York court stated that Yucaipa "may be able to establish [*res judicata*] as a defense in this case," and that although it was denying Yucaipa's motion to permit discovery on the disputed agency issue, it was "not saying [Yucaipa] do[es]n't have a defense here."  (Sauer Dec. ¶ 43, Ex. 64.)  At the end of the hearing, the court announced that it would set a preliminary conference to discuss discovery.  (*Id.*, Ex. 65.)  But before any discovery was taken, the Petitioning Creditors sought summary judgment on their declaratory relief claim, arguing that the Fourth Amendment's change to the definition of "Term Loan Exposure" had the effect of changing the definition of Requisite Lender without all "affected" lenders' consent, in violation of First Lien Credit Agreement.  At the November 19, 2012 hearing, without explaining why discovery should not be permitted, the court indicated an intention to grant the motion, and did so by written order on March 29, 2013.[10]

### K.    The Lenders' Current First Lien Debt Holdings

Amidst these events, Allied's lenders shuffled and reassigned Allied's first lien debt.  The current holdings under Allied's First Lien Credit Agreement total

█████████[11] – consisting of:  (i) ████████ of Term Loan Exposure; (ii) ██████ of letter of credit exposure ("LC Exposure"); and (iii) roughly ██████ of revolving exposure – held, in relevant part, as follows:

---

[10]  While arguing in the New York Action that Yucaipa acted improperly by acquiring a majority of the first lien debt not subject to the restrictions of the Third Amendment without unanimous lender consent, a few doors down in the same New York courthouse, Black Diamond – as a defendant in an indistinguishable case – asserted positions nearly identical to those of Yucaipa, but directly contrary to the positions Black Diamond itself asserted before the New York court and this Court.  (Sauer Dec. ¶¶ 48-54, Exs. 70-73 (filings in *Commerzbank Ag v. Black Diamond Cap. Holdings, LLC*, No. 065273 (N.Y. Sup. Ct.)).)

[11] ████████████████████████████████████████

- **Yucaipa** holds ███████ in first lien debt, which is composed of ███████ in Term Loan Exposure and ███████ in LC Exposure;
- **The Petitioning Creditors** hold ███████ in first lien debt. Of that, Black Diamond holds ███████ and Spectrum holds ███████; and
- **AMMC VIII, Limited** ("<u>AMMC</u>"), f/k/a American Money Management Corp., holds ███████ in first lien debt. (Walker Dec. ¶¶ 55-58, Ex. 10.)

The Petitioning Creditors contend that their combined holdings are roughly $56 million, based on affiant testimony from their managers. (Mem. 29 & n.23.) This amount includes AMMC's holdings ███████, which AMMC purportedly agreed to assign to Black Diamond in June 2012. (Walker Dec. ¶ 58.) Under the First Lien Credit Agreement, however, no assignment or transfer of any first lien debt is effective "unless and until recorded in the Register" by the Administrative Agent. (Mendelsohn Aff., Ex. 8 § 10.6(b).) ███████████████████████████████████ To date, the AMMC assignment has not been entered. (*Id.* ¶ 58.) The Petitioning Creditors' holdings, excluding the AMMC assignment, are ███████. (*Id.* ¶ 57, Ex. 10.)

## III.    ARGUMENT

### A.    <u>The Motion Is Procedurally Defective</u>

The Petitioning Creditors' Motion, filed in two separate adversary proceedings, fails to satisfy basic procedural prerequisites for either. In the Committee Adversary Proceeding, the Motion fails to identify any "claim" on which summary judgment (or, more accurately, partial summary judgment) is sought, as required by Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056. In the Allied Adversary Proceeding, the Motion is improperly premised on establishing collateral estoppel against claims by Allied, a party with no relationship to the prior New York Action. For these reasons alone, the Motion must be denied in both adversary cases.

1.    **The Motion does not address any claim in the Committee Adversary Proceeding**

In the Committee Adversary Proceeding, the Motion fails at the threshold. Despite purportedly moving for summary judgment pursuant to Rule 56, the Petitioning Creditors identify no "claim or defense" on which summary judgment is sought. Thus, there is no identifiable basis on which the Court could grant the Motion in the Committee Adversary Proceeding, even if it had substantive merit (which, plainly, it does not).

Summary judgment procedures are designed to "isolate and dispose of factually unsupported *claims.*" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) (emphasis added). Accordingly, Rule 56(a) requires that a party moving for summary judgment "identify[ ] each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). A "claim" is a party's cause of action or theory for relief. *See RePass v. Vreeland*, 357 F.2d 801, 805-06 (3d Cir. 1966); *Cnty. of Suffolk v. Amerada Hess Corp.*, 517 F. Supp. 2d 662, 664-65 (S.D.N.Y. 2007). The phrase "part of [a] claim" was added by amendment in 2010 to permit parties to move for partial summary judgment on discrete elements of a cause of action such as damages or liability. *See* Fed. R. Civ. P. 56 advisory committee's note; *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 404 (E.D.N.Y. 2011) ("the reference to 'part' is best understood as relating to either the entirety of liability, or damages, or at least a discrete element of damages"). The plain meaning of the rule has always required that a summary judgment motion be capable of disposing of at least "part of [a] claim," as opposed to being used for indiscriminate issue-narrowing. *See* Fed. R. Civ. P. 56(a).

The Motion fails this basic requirement. The Petitioning Creditors may not obtain summary judgment in a vacuum. They filed the Motion in the Committee Adversary Proceeding, which was initiated by the Creditors' Committee complaint filed on February 1, 2013. (D.I. 1.) The Petitioning Creditors intervened through an amended complaint,

filed on March 14, 2013, alleging causes of action for (i) equitable subordination; (ii) recharacterization; (iii) specific performance; (iv) breach of contract; (v) breach of fiduciary duty; (vi) aiding and abetting breach of fiduciary duty; (vii) avoidance of transfers; and (viii) disallowance of claims.  (D.I. 76 at 2, 40-59.)  The contract claims (*i.e.*, specific performance and breach of contract) relate solely to provisions that allegedly require Yucaipa to make capital contributions to Allied and to divest itself of certain debt.  (*Id.* at 44-48.)  None of these claims (or any of the others) requires or even relies upon a determination of Requisite Lender.  Because the Requisite Lender issue has absolutely no bearing on any "claim" or "part of [any] claim" in the Committee's amended complaint, relief is unavailable to the Petitioning Creditors under Rule 56(a).[12]

The Petitioning Creditors' invitation for the Court to issue an improper advisory opinion should be rejected.  *See Magaziner v. Montemuro*, 468 F.2d 782, 784 (3d Cir. 1972).  The Motion, filed in the Committee Adversary Proceeding, must be denied.

### 2. The Petitioning Creditors are time-barred from asserting any relevant claim in the Committee Adversary Proceeding

The Petitioning Creditors' fundamental Rule 56(a) problem in the Committee Adversary Proceeding cannot be remedied.  The only claim to which the Motion could arguably relate is a contract claim seeking specific performance or a declaration regarding Requisite Lender status under the Third Amendment to the First Lien Credit Agreement.  Not only is no such claim asserted in the Committee Adversary Proceeding, but the Petitioning Creditors would be time-barred from asserting one in any event.

---

[12] On June 19, 2013, the Court instructed that issues concerning the determination of "[w]ho, if anyone, is 'Requisite Lender'" under the First Lien Credit Agreement "may be addressed . . . in conjunction with the hearing on the proposed sale contemplated by the sales procedure motion." (No. 13-50530, D.I. 247.)  The Motion seeks improperly to bypass the evidentiary hearing.  The Court certainly did not sanction a summary judgment motion that ignores the requirements of Rule 56.  At the least, the Motion should be deferred pending the hearing or, as appropriate, until necessary discovery regarding this issue has been completed. (*See infra* Sect. III(D).)

As the Petitioning Creditors argued successfully in pursuing their Motion to Dismiss Yucaipa's Cross-Claims in the Allied Adversary Proceeding, Delaware's three-year statute of limitations applies to any contract claim concerning the Third Amendment. (Sauer Dec. ¶¶ 55-57, Ex. 50; Mendelsohn Aff., Ex. 3 at 107:5-108:17; No. 12-50947, D.I. 74, 117.) The Petitioning Creditors also argued previously that, because the Fourth Amendment was *void ab initio*, any claim under the Third Amendment accrued, at the latest, in August 2009, when Yucaipa purchased its first lien debt from ComVest (subject to the Third Amendment). (*Id.*) Judicial estoppel would bar the Petitioning Creditors from asserting any contrary position now. *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 272 (3d Cir. 2012).[13]

The Petitioning Creditors have not asserted – and are foreclosed from asserting – any claim that could possibly relate to the relief sought in the Motion.

> **3. The New York order regarding the validity of the Fourth Amendment has no preclusive effect against Allied, requiring denial of the Motion in the Allied Adversary Proceeding**

The Motion also fails procedurally in the Allied Adversary Proceeding. The Motion is premised entirely on the alleged invalidity of the Fourth Amendment to the First Lien Credit Agreement (under which Yucaipa is Requisite Lender), which the Petitioning Creditors seek to establish based solely on the purportedly preclusive effect of a prior summary judgment order in the New York Action. (Mem. 17-20.) In the Allied

---

[13] Courts routinely apply the doctrine of judicial estoppel in such circumstances. *See, e.g.*, *Delgrosso v. Spang & Co.*, 903 F.2d 234, 241 (3d Cir. 1990); *Carley v. Wheeled Coach*, 991 F.2d 1117, 1133-34 (3d Cir. 1993) (Becker, J., concurring and dissenting) (judicial estoppel would apply against litigant arguing application of Florida law after previously arguing otherwise); *Shanus v. Auctions*, No. 11-2839, 2013 WL 393950, at *3 (D.N.J. Jan. 30, 2013) (applying judicial estoppel against litigant arguing against own prior position that New York statute of limitations applied "simply because their interests have now changed").

Adversary Proceeding, however, the Petitioning Creditors are attempting to apply the New York order through collateral estoppel against claims *alleged by Allied.* Allied was not a party to, and had no involvement in, the New York Action.

New York law applies in determining the preclusive effect of the New York order. (Mem. 19-20.) Under New York law, collateral estoppel may be asserted only against a "party or those in privity" to the prior litigation. *Buechel v. Bain,* 766 N.E.2d 914, 919 (N.Y. 2001). Allied was neither a party, nor in privity with any party in the New York Action. (Mendelsohn Aff., Ex. 4.) In particular, Allied had no control or involvement in any part of the New York Action that could allow for a finding of privity. *See Buechel,* 766 N.E.2d at 920; *Juan C. v. Cortines,* 679 N.E.2d 1061, 1065 (N.Y. 1997) (privity requires considering any "participation amounting to a sharing in control of the litigation"). Any dispute regarding privity presents a "question of fact," which precludes entry of summary judgment. *U.S. v. Webber,* 396 F.2d 381, 386 (3d Cir. 1968).

Yucaipa's inclusion as a defendant in the Allied Adversary Proceeding does not allow the application of estoppel against *Allied. See Green v. Santa Fe Indus., Inc.,* 514 N.E.2d 105, 108 (N.Y. 1987) (reversing summary judgment because collateral estoppel could not be applied against two co-plaintiffs because only one was a party in the prior action and the other was not in privity); *Nat'l Union Fire Ins. Co. v. Hartford Ins. Co.,* 248 A.D.2d 78, 83 (N.Y. App. Div. 1998). Allied – not Yucaipa – filed the Allied Adversary Proceeding. (D.I. 1.) Allied – not Yucaipa – is prosecuting a claim for declaratory relief, seeking a determination regarding the identity of the Requisite Lender. In particular, Allied – not Yucaipa – is seeking relief from the Court regarding whether Allied must abide by the Petitioning Creditors' aggressive demands. (*Id.* at 3 ("The Petitioning Creditors recently have escalated this dispute, demanding in a communication to Allied . . . that the Debtors pursue a strategy in line with the Petitioning Creditors'

priorities.").) The Petitioning Creditors are asking the Court to apply collateral estoppel against Allied, and to force Allied to recognize them as Requisite Lenders. Because Allied had no role in the New York Action, however, collateral estoppel simply cannot apply. As a result, the Motion fails in the Allied Adversary Proceeding as well.

**B.      The Petitioning Creditors Are Not Requisite Lenders**

On the merits of the procedurally improper Motion, there is no viable scenario in which the Petitioning Creditors are Requisite Lenders. They have not established that they hold a majority of Allied's first lien debt under the First Lien Credit Agreement or the Third Amendment (because they do not). This flaw is fatal to the Motion.

**1.      The Petitioning Creditors are not Requisite Lenders even if Yucaipa's holdings are excluded from the determination**

Even if this Court were to exclude entirely Yucaipa's holdings for purposes of determining the Requisite Lender, the Petitioning Creditors fall short of Requisite Lender status. Under this scenario, the total amount of first lien debt holdings would be ███████. (Mem. 29.) Black Diamond holds ███████ and Spectrum holds ███████. (Walker Dec. ¶ 57, Ex. 10.) Their combined holdings ███████) approximate ███████ of first lien debt, below the majority needed to be Requisite Lenders.

The Petitioning Creditors erroneously and disingenuously contend that their combined holdings are roughly $56 million,[14] but this amount improperly includes AMMC's ███████ in first lien debt, which it supposedly agreed to assign to the Petitioning Creditors in June 2012. (Walker Dec. ¶ 58.) Under Section 10.6 of the First Lien Credit Agreement, however, no assignment or transfer of any first lien debt is effective "unless and until recorded in the Register" by the Administrative Agent.

---

[14] The *only* evidence the Petitioning Creditors offer in support of their (inflated) share of Allied first lien debt comes from declarations from their managers, Richard Ehrlich and Jeffrey Schaffer. (Mem. 29 & n.23.) As stated below, the Petitioning Creditors' continuing refusal to allow depositions of these affiants, or even an examination of the documents on which they rely, is an independent basis upon which to deny the Motion. (*See infra* Sect. III(D).)

(Mendelsohn Aff., Ex. 8 § 10.6(b).)  When there is no Administrative Agent, a successor Administrative Agent may be appointed by the Requisite Lender.  (*Id.* § 9.7.)  In the absence of a successor Administrative Agent, only the Requisite Lender may register any assignments or transfers of first lien debt.  (*Id.*) ████████████████████

████████████  In an effort to circumnavigate this roadblock, the Petitioning Creditors apparently designated *themselves* as Requisite Lenders and then purported to appoint a Black Diamond affiliate as "agent" to "approve" the transfers.  (Richard Ehrlich Affidavit ("<u>Ehrlich Aff.</u>") ¶ 3, Ex. 1; Jeffrey Schaffer Affidavit ("<u>Schaffer Aff.</u>") ¶ 3, Ex. 1.)

The AMMC assignments to the Petitioning Creditors are not effective because they have not been properly approved or registered, there is no Administrative Agent to enter it and the issue of Requisite Lender has not been judicially determined.  (Walker Dec. ¶¶ 58-60.)  The procedures governing the roles and responsibilities of an Administrative Agent must be strictly enforced according to the unambiguous language in the governing contract. *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 203 (D. Del. 2012); *In re Metaldyne Corp.*, 409 B.R. 671, 676 (Bankr. S.D.N.Y. 2009); *In re GWLS Holdings, Inc.*, No. 08-12430, 2009 WL 453110, at *5 (Bankr. D. Del. Feb. 23, 2009).

AMMC's holdings, therefore, may not be included in calculating the Petitioning Creditors' first lien debt holdings.  Excluding AMMC's ██████, the Petitioning Creditors have ██████████, which is insufficient to make them Requisite Lenders (even under the scenario most favorable to the Petitioning Creditors).

> **2.      Yucaipa is Requisite Lender because it holds a majority of Allied's first lien debt**

The Petitioning Creditors argue that, even if the Third Amendment is invalid, Yucaipa "still cannot be the Requisite Lender." (Mem. 27.)  Putting aside that this would not help the Petitioning Creditors demonstrate *their* status as Requisite Lenders, the

argument fails as a matter of law.  If the Third Amendment is invalid, then the First Lien

Credit Agreement, as amended only by the (immaterial) First and Second Amendments,

governs the Requisite Lender determination.  Requisite Lenders are defined as:

> [O]ne or more Lenders *having or holding* Term Loan Exposure, LC
> Exposure and/or Revolving Exposure and representing more than 50% of
> the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the
> aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving
> Exposure of all Lenders.

(Mendelsohn Aff., Ex. 8 § 1.1 (emphasis added).)  The Petitioning Creditors contend that

Yucaipa is contractually barred from being an "Eligible Assignee" and thus "there is no

conceivable path to Yucaipa acquiring any Obligations or becoming a Lender, let alone

. . . Requisite Lender." (Mem. 28.)  But the Petitioning Creditors' focus on Yucaipa's

"path" to acquiring debt ignores the unquestionable reality that Yucaipa, *in fact*, acquired

and currently *holds* approximately ███████████████████████ of first

lien debt and, therefore, *is* the Requisite Lender as a matter of law.

The Petitioning Creditors evidently misunderstand the definition of Requisite

Lenders.  They contend that Yucaipa cannot be the Requisite Lender because there are

numerous restrictions on Yucaipa's rights as debt holders.  (Mem. 25-27 & n.20.)  For

example, they argue that the Third Amendment's disregard of Yucaipa's Term Loan

Exposure for purposes of determining Yucaipa's *voting rights* necessarily means that

Yucaipa's Term Loan holdings also must be disregarded for purposes of determining the

Requisite Lender.  (Mem. 30-31.)  Not so.  Indeed, the Petitioning Creditors point to no

provision in the First Lien Credit Agreement, as amended or not, that defines Requisite

Lenders by the aggregate of one or more Lenders' voting rights or by the extent of the

rights enjoyed by the Requisite Lenders.  There is no such provision.  "Requisite

Lenders" is defined solely by reference to "having or holding" debt, and not by reference

to the rights that flow from being Requisite Lenders.

The parties to the First Lien Credit Agreement and Third Amendment were free to include language regarding the effect of Yucaipa's acquisition of debt as it relates to the Requisite Lender determination, just as they included language in the Third Amendment that Yucaipa's Term Loan holdings were to be "disregarded" for purposes of determining Yucaipa's voting rights. (Mendelsohn Aff., Ex. 2 § 2.1(e).) But they included no such language. Based on the plain meaning of the First Lien Credit Agreement, Yucaipa holds a majority of Allied's first lien debt and is, thus, the Requisite Lender.

   3.      **Yucaipa is Requisite Lender under the First Lien Credit
           Agreement because its holdings must be included in the
           Requisite Lender calculation**

Under controlling New York law, which governs the First Lien Credit Agreement (Mem. 17), an assignment made in contravention of a contractual provision is valid unless the contract also contains clear, definite and appropriate language declaring such an assignment void or invalid. *See Alhusen v. Caristo Constr. Co.*, 103 N.E.2d 891, 893 (N.Y. 1952) (assignment is invalid only if the contract contains "clear, definite and appropriate language . . . that any attempted assignment of either the contract or any rights created thereunder shall be 'void'"); *Almeida Oil Co. v. Singer Holding Corp.*, 51 A.D.3d 604, 606 (N.Y. App. Div. 2008) (accord); *Macklowe v. 42nd St. Dev. Corp.*, 170 A.D.2d 388, 389-90 (N.Y. App. Div. 1991) (accord); *Bank Brussels Lambert v. Credit Lyonnais*, No. 93-6876, 2000 WL 1876915, at *2 (S.D.N.Y. Dec. 22, 2000) (accord); *Pravin Bankers Assocs. v. Banco Popular del Peru*, 109 F.3d 850, 856 (2d Cir. 1997) ("[T]o reveal the intent necessary to preclude the power to assign, or cause an assignment violative of contractual provisions to be wholly void, [a contractual] clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way.").

24

Absent language explicitly voiding or invalidating a contractually prohibited
assignment, an assignment of rights in violation of the agreement gives rise only to a
breach of contract claim for damages against the *assignor*, and nothing more. The
assignment of rights itself, however, remains valid. *See Sullivan v. Int'l Fid. Ins. Co.*, 96
A.D.2d 555, 556 (N.Y. App. Div. 1983) (where contract language does not provide that a
prohibited assignment "shall be void," "an assignment made in violation of such
covenant gives rise only to a claim for damages against the assignor for violation of the
covenant"); *Empire Discount Corp. v. Bouley Co.*, 160 N.Y.S.2d 395, 397 (N.Y. Sup. Ct.
1957) (accord); *Purchase Partners, LLC v. Carver Fed. Sav. Bank*, No. 09-9687, 2012
WL 6641633, at *22 (S.D.N.Y. Dec. 13, 2012) (because "contractual provisions
prohibiting assignments are treated as personal covenants," an assignment "made in
violation of a personal covenant prohibiting assignments is enforceable, although it does
give rise to a damages action against the assignor").[15]

As explained previously,[16] Judge Bernstein's decision in *In re 785 Partners LLC*,
No. 11-13702, 2012 WL 401497 (Bankr. S.D.N.Y. Feb. 7, 2012), is directly on point.
There, the debtor objected to the claim of First Manhattan, which held the debtor's
secured note by virtue of an assignment. *Id.* at *1. Pursuant to the terms of a certain loan
agreement, the original lender was permitted only to assign all or a part of "its rights and
obligations" to an "Eligible Lender." *Id.* at *1-2. The debtor argued that First Manhattan
was not an "Eligible Lender" under the loan agreement and, therefore, that the
assignment along with the claim associated with the impermissibly assigned debt were

[15] Whether ComVest's August 2009 assignment of Allied first lien debt to Yucaipa was a breach
of the Third Amendment by ComVest is of no significance whatsoever to the Motion.

[16] The Petitioning Creditors only address this argument – which Yucaipa has made consistently
throughout this litigation (*see, e.g.*, Mendelsohn Aff., Ex. 17 ¶ 40) – in a footnote. (Mem. 24
n.19.) Without a single citation to New York law, the Motion calls Yucaipa's position "absurd."
(*Id.*) To the contrary, Yucaipa's position is based squarely upon *settled New York law*.

both invalid. *Id.* at *2. Judge Bernstein found it unnecessary to determine whether First

Manhattan was an "Eligible Lender" because even if it were not, the loan assignment was

nevertheless valid as a matter of New York law. *Id.* at *3 ("Even if First Manhattan did

not meet the definition of an Eligible Lender, the assignment . . . was valid, and First

Manhattan is a secured creditor and party in interest."). Judge Bernstein explained:

> [T]he assignment is valid under New York law. "[T]o reveal the intent
> necessary to preclude the power to assign, or cause an assignment
> violative of contractual provisions to be wholly void, [a contractual]
> clause must contain express provisions that any assignment shall be void
> or invalid if not made in a certain specified way." ***Absent clear voiding
> language, such an assignment gives the obligor no more than a claim
> for breach of contract against the assignor/obligee, but does not
> invalidate the assignment.*** Here, the Building Loan Agreement states that
> a Lender may assign its rights to an Eligible Lender. It does not state that
> an assignment to an in-Eligible Lender is void or invalid. Accordingly,
> the assignment is valid. *Id.* (emphasis added, citations omitted).

The Petitioning Creditors have made the same argument here that was rejected in

*785 Partners*: that Yucaipa is not an "Eligible Assignee" under the First Lien Credit

Agreement, and that the assignment is, therefore, invalid. (Mem. 24 n.19.) Just as it did

in *785 Partners*, that argument fails here because neither Section 10.6 of the First Lien

Credit Agreement, which governs assignments, nor any other provision contains any

"clear and definite" language (or any language at all) providing that an assignment to an

entity not within the definition of "Eligible Assignee" is void. Therefore, Yucaipa's

entire acquisition of ███████████ of first lien debt from ComVest was valid under the

First Lien Credit Agreement. Yucaipa currently holds ███████████ of first lien debt,

which must be counted in the Requisite Lender determination.

As the Petitioning Creditors acknowledge, the Obligations under the First Lien

Credit Agreement total ███████████. (Mem. 28.) Because Yucaipa's holdings

███████████ are more than 50% of the total holdings ███, Yucaipa is Requisite

Lender under the First Lien Credit Agreement.  But even if this Court were to find that Yucaipa cannot be Requisite Lender under the credit agreement, Yucaipa's valid holdings must nevertheless be counted in calculating the total holdings for purposes of making the Requisite Lender determination (that is, they must be included in the denominator). Given that the Petitioning Creditors hold only approximately ███████ of more than ████████████████, the Petitioning Creditors fall far short of the percentage required to be Requisite Lenders.  In any event, the Motion fails.

### 4. Yucaipa is Requisite Lender even if the Third Amendment were valid because Yucaipa's holdings must be included in the Requisite Lender calculation

Nor are the Petitioning Creditors the Requisite Lenders under the Third Amendment, if it were valid.  Again, Requisite Lender is defined by reference to *holding* debt, even if the holder may not vote that debt.  The Petitioning Creditors assert that Yucaipa's LC Exposure should not count in determining the Requisite Lender because Yucaipa was prohibited from *acquiring* LC Exposure under the Third Amendment. (Mem. 29-31.)  This argument also fails under controlling New York law.

As explained above, an assignment made in contravention of a contractual provision is valid unless the contract contains "clear, definite and appropriate language" declaring such an assignment void or invalid.  *See, e.g.*, *Sullivan*, 96 A.D.2d at 556. Section 2.1(c) of the Third Amendment, which prohibited Yucaipa from acquiring LC Exposure, contains no such language, and instead simply states that "no Restricted Sponsor Affiliate [Yucaipa] may be an Eligible Assignee with respect to a sale, assignment or transfer of Commitments, Revolving Loans or LC Deposits." (Mendelsohn Aff., Ex. 2 § 2.1(c).)

New York courts have repeatedly held that provisions stating an entity "may not" receive an assignment or similar rights are mere personal covenants, and do not render an

assignment void or invalid. *See Sullivan*, 96 A.D.2d at 555-56 (prohibited assignment was valid where clause at issue stated that "*[neither] party may assign* this agreement, or any right or interest hereunder without the prior written consent of the other party," and assignor failed to obtain such consent) (emphasis added); *Purchase Partners*, 2012 WL 6641633, at *20-22 (assignment in violation of provision that "*neither [third-party defendant] nor its legal representatives nor it successors . . . may assign or transfer* all or part of its Interest without the prior written consent of the Lender" was held to be valid) (emphasis added). Yucaipa's acquisition of ████████ in LC Exposure from ComVest was, therefore, valid as a matter of law. Yucaipa currently holds ████████ of such LC Exposure, which counts for purposes of the Requisite Lender determination.

Yucaipa's ████████ in valid LC Exposure alone precludes the Petitioning Creditors from Requisite Lender status whether the Court uses the true amount of the Petitioning Creditors' holdings (approximately ████████) or the improperly inflated amount asserted in the Motion (approximately ████████, which incorrectly includes the AMMC holding). The aggregate amount of Term Loan Exposure, LC Exposure and Revolving Exposure of all Lenders, excluding Yucaipa, is ████████. (Mem. 29.) When Yucaipa's LC Exposure is added, the total is ████████. The Petitioning Creditors' holdings amount to only ████████ if the Court uses ████████ as the numerator, and only ████████ if the Court uses ████████ . In no event, however, do the Petitioning Creditors' holdings equal the majority needed to be Requisite Lender – even if Yucaipa's Term Loan Exposure is excluded from the calculation.

In any event, Yucaipa's acquisition of approximately ████████ in term loans from ComVest also must be counted in determining the Requisite Lender. While First Lien Lenders under the Third Amendment were permitted to assign to Yucaipa only up to

25% of the available "Term Loan Exposure," or ███████████ in Term Loan Exposure then available under the First Lien Credit Agreement, the Third Amendment did *not* declare assignments to Yucaipa in excess of that amount void or invalid. (*See* Mendelsohn Aff., Ex. 2 § 2.7(e).) The full assignment of ██████ was therefore valid as a matter of law. *See Sullivan*, 96 A.D.2d at 556; *Empire*, 160 N.Y.S.2d at 397. When this ██████ is combined with Yucaipa's ██████ in LC Exposure, the total Obligations under Allied's First Lien Credit Agreement, as amended by the Third Amendment, totals ████████. (Mem. 28.) Yucaipa holds ██████████ ████████ of that total and, therefore, is the Requisite Lender.[17]

But even if Yucaipa were not the Requisite Lender, the Petitioning Creditors hold only about ████████ of the total holdings – less than ████, and nowhere near the amount needed to achieve Requisite Lender status. As a matter of law, therefore, the Petitioning Creditors are not – and cannot be – Requisite Lenders under any scenario.

### C. The Petitioning Creditors Also Have Failed To Establish The Legal Predicates To Their Claim To Requisite Lender Status

#### 1. The New York order does not preclude Yucaipa from being Requisite Lender under the Third Amendment

Because they cannot do so on the merits, the Petitioning Creditors attempt to bar Yucaipa's claim to Requisite Lender status based on collateral estoppel. (Mem. 17-20.) The argument fails. The New York order decided only the narrow question whether Yucaipa was Requisite Lender under the Fourth Amendment. To be clear, the New York court did *not* decide any issue with respect to the Third Amendment, including whether Yucaipa is or could be the Requisite Lender under it. The Petitioning Creditors are attempting to apply collateral estoppel to establish issues that were not previously raised or decided. This they may not do.

---

[17] ████████████████████████████████████████

Collateral estoppel applies only if "the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the [opposing party] had a full and fair opportunity to litigate the issue in the earlier action." *City of New York v. Welsbach Elec. Corp.*, 878 N.E.2d 966, 968 (N.Y. 2007). The party seeking the benefit of collateral estoppel – here, the Petitioning Creditors – bears "the burden of demonstrating the identity of the issues in the present litigation and the prior determination." *Matter of Howard v. Stature Elec., Inc.*, 986 N.E.2d 911, 914 (N.Y. 2013). Even if this burden is satisfied, collateral estoppel is an "equitable doctrine – not a matter of absolute right." *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004). New York courts caution that in "properly seeking to deny a litigant 'two days in court', courts must be careful not to deprive him of one." *Landau, P.C. v. LaRossa, Mitchell & Ross*, 892 N.E.2d 380, 384 (N.Y. 2008). In an attempt to deny Yucaipa its day in this Court, the Petitioning Creditors urge a construction of the New York order that its language cannot bear.

The sole issue decided in the New York Action was the validity of the Fourth Amendment to the Credit Agreement. Indeed, the Petitioning Creditors repeatedly and explicitly represented as much to the New York court:

- "The *only issue* before the Court therefore is whether, under the plain terms of the Credit Agreement, the Purported Fourth Amendment had 'the effect' of amending the Requisite Lender definition within the meaning of section 10.5(b), thereby requiring consent of all affected Lenders, which was not obtained." (Sauer Dec. ¶ 44, Ex. 67 at 15 (emphasis added).)

- "[T]his case presents a pure question of contract construction relating to the effectiveness of the amendment – fourth amendment to the credit agreement." (Mendelsohn Aff., Ex. 16 at 2-3.)

- "The issue before this Court, Your Honor, is whether under the plain terms of the credit agreement whether the purported fourth amendment had, quote, the effect of, unquote, amending the

30

definition of 'Requisite lender' . . . thereby requiring the consent of all affected lenders." (*Id.* at 3.)

Ignoring their numerous prior representations and judicial admissions, the Petitioning Creditors now rest their argument on out-of-context statements by the New York court that "Yucaipa is not the Requisite Lender." (Mem. 18.) This argument is disingenuous. The New York court's comment regarding Yucaipa's eligibility to be Requisite Lender was based solely on the purported invalidity of the *Fourth* Amendment. Any fair reading of the New York order makes this context clear:

> As a result of the Purported Fourth Amendment . . . Yucaipa contends that it is the Requisite Lender . . . [Plaintiffs] move . . . for summary judgment declaring that the Purported Fourth Amendment to the Credit Agreement is not, and never was, effective, and that, *as a result*, Defendants are not, and may not act as, Requisite Lenders under the Credit Agreement.

(Mendelsohn Aff., Ex. 1 at 8 (emphasis added).) The very first sentence of the Petitioning Creditors' summary judgment motion in New York demonstrates that this narrow issue was the only one presented to the New York court: "[The Petitioning Creditors] respectfully submit this memorandum of law in support of their motion . . . for summary judgment declaring that the purported Fourth Amendment to the Credit Agreement is not, and never was, effective, and that, *as a result*, Defendants are not, and may not act as, Requisite Lenders under the Credit Agreement." (Sauer Dec., Ex. 66 at 1 (emphasis added); *accord id.* at 14 ("As a result of the Purported Fourth Amendment . . . Yucaipa now purports to be the Requisite Lender[.]").) Any argument to the contrary is based on pure dicta, which had no bearing on the narrow issue regarding the Fourth Amendment presented and decided in the New York Action. *See U.S. v. Warren*, 338 F.3d 258, 265 (3d Cir. 2003) ("Gratuitous statements in an opinion that do not implicate the adjudicative facts of the case's specific holding do not have the bite of precedent.").

The New York court made no findings or rulings regarding the Requisite Lender under the *Third* Amendment. If it had, then there would be no need for the mental

31

gymnastics undertaken in the Motion regarding, *e.g.*, (i) the effectiveness of the Third Amendment (Mem. 20-25); (ii) Yucaipa's right to vote its debt under the Third Amendment (Mem. 25-27); (iii) the effect of the First Lien Credit Agreement if the Third Amendment is found to be invalid (Mem. 27-28); and (iv) the effect of the Third Amendment on Yucaipa's LC Exposure (Mem. 29-31). These issues concerning the Third Amendment were simply not considered by the New York court and, therefore, may not be deemed established here in shortcut fashion through the improper application of collateral estoppel. The Petitioning Creditors' attempt to parlay a narrow New York order into an absolute and inequitable legal bar in this case fails as a matter of law.[18]

### 2.    The Third Amendment is invalid

#### a.    The law of the case doctrine does not apply

The Petitioning Creditors assert (without a single citation) that Yucaipa is precluded – based on the "law of the case" doctrine – from disputing the applicability of the restrictions in the Third Amendment to Yucaipa's first lien debt. (Mem. 20-22.) But this Court did not previously decide this issue through a final order, which is a necessary prerequisite for the law of the case doctrine to apply.

---

[18] Even if the New York court had decided Yucaipa's eligibility for Requisite Lender status under the Third Amendment (it did not), the order would not warrant application of collateral estoppel here. In the New York Action, the Petitioning Creditors moved for summary judgment without allowing Yucaipa a "full and fair opportunity" for necessary discovery. *Welsbach*, 878 N.E.2d at 968. This precludes any application of collateral estoppel. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 45 A.D.3d 419 (N.Y. App. Div. 2007) (rejecting collateral estoppel because "plaintiff never had an opportunity to conduct discovery") (reversed on other grounds); *Kraemer v. McGowan*, 89 A.D.2d 763 (N.Y. App. Div. 1982) ("defendants lacked the opportunity fully and fairly to litigate such issues" because they "did not have the right to subpoena witnesses or documents"). The Petitioning Creditors argue that "Yucaipa had a full and fair opportunity to argue the issue" (Mem. 20), but fail to mention that *the New York order was issued prior to any discovery taking place.* As recounted above, Yucaipa was denied discovery in the New York Action with respect to the binding effect of the dismissal of the Georgia Action on the Petitioning Creditors. *See supra* Sects. II(I)-(J). At best, there is a factual dispute regarding whether Yucaipa had a full opportunity to litigate the New York Action.

Under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case," *e.g.*, on remand from appeal. *Anderson v. Comm'r*, 698 F.3d 160, 166 (3d Cir. 2012). The doctrine is strictly a discretionary principle. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). Moreover, the law of the case doctrine does not apply to any interlocutory order. *See Martin v. Port Auth. Transit*, 115 F. App'x 556, 560 (3d Cir. 2004) ("Martin's reliance on the law of the case doctrine is not only misplaced, it approaches frivolity. . . . Interlocutory orders . . . do not constitute the law of the case."); *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1252 (10th Cir. 2011); *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994).

The Court's order granting the Petitioning Creditors' Motion to Dismiss Yucaipa's Cross-Claim (leaving the claims in the affirmative complaint to be litigated) was unquestionably interlocutory. *See In re White Beauty View, Inc.*, 841 F.2d 524, 526 (3d Cir. 1988) (summary judgment order in adversary proceeding not final because additional claims remained to be litigated); *In re Moody*, 825 F.2d 81, 85-86 (5th Cir. 1987) ("Finality for appeal purposes does not occur until the court has settled all the issues pending between the parties in that [adversary] proceeding."); *Boliaux v. Manheim Auto. Fin. Servs.*, No. 10-5467, 2010 WL 4529732, at *1 (N.D. Ill. Nov. 2, 2010) (dismissal of counterclaims "unquestionably did not resolve [affirmative] claims and thus did not end the litigation"). The Court's order did not dispose of the entire Allied Adversary Proceeding; indeed, the Petitioning Creditors filed their present Motion in connection with that very same, and continuing, case. Because the prior order was not final, it is not law of the case, and the Petitioning Creditors' preclusion argument fails.

Furthermore, courts apply the law of the case doctrine only when their prior decisions in an ongoing case "expressly resolved an issue or necessarily resolved it by

33

implication." *UA Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 397-98 (3d Cir. 2003). The Court has not decided any issue regarding the enforceability of provisions of the Third Amendment on which the Petitioning Creditors rely, either in connection with Yucaipa's Cross-Claim or otherwise. As the Petitioning Creditors admit, "the Court's decision [on Petitioning Creditors' Motion to Dismiss] turned substantially on the covenant not to sue contained in the Third Amendment . . . and the statute of limitations." (Mem. 22.) Indeed, those were the only two legal determinations the Court made with respect to the motion to dismiss. (Sauer Dec. ¶ 57; Mendelsohn Aff., Ex. 3 at 107-09.) At most, the Court's order addressed the validity of the covenant not to sue in the Third Amendment. Contrary to the Petitioning Creditors' contentions (*see* Mem. 22), however, that decision did not implicate whether the rest of the Third Amendment is valid.[19] The Third Amendment contains a severability clause, which makes necessary an independent evaluation of each purportedly invalid clause. (Mendelsohn Aff., Ex. 2 § 7.2; *see also id.*, Ex. 8 § 10.11 (same for First Lien Credit Agreement).) A decision regarding the validity of the covenant not to sue simply does not equate to a decision regarding the validity of the rest of the Third Amendment.[20]

Because there has been no final order concerning the validity of the Third Amendment, there is no basis for any preclusive effect for purposes of the Motion.

---

[19] The validity of the remainder of the Third Amendment was not litigated. As of this Court's decision granting the motion to dismiss, the New York court had not entered an order invalidating the Fourth Amendment. Accordingly, Yucaipa's argument in response to the motion to dismiss was that the Fourth Amendment remained valid "because there has been no final determination that it is void or unenforceable." (D.I. 101 at 18.)

[20] Even if the Court had previously addressed relevant Third Amendment issues at the motion to dismiss stage (it did not), the law of the case doctrine would not apply because that decision was made under a different legal standard (*i.e.*, on a motion to dismiss versus a motion for summary judgment). *See McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000) ("our holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment"); *Waste Conversion v. Sims*, 868 F. Supp. 643, 649 (D.N.J. 1994) (doctrine does not apply when same issue was decided under a different legal standard).

b.    **In any event, the Petitioning Creditors have failed to establish that the Third Amendment is valid on the merits**

Absent their flawed "law of the case" theory, the Petitioning Creditors concede that the effectiveness of the Third Amendment depends on whether Allied's lenders were "affected" by its enactment. (Mem. 22-25.) The record plainly demonstrates that Allied's lenders, including the Petitioning Creditors, were affected by the enactment of the Third Amendment. At best, the issue is factual and disputed. In any event, the Motion does not establish the validity of the Third Amendment.[21]

The issue centers on Section 10.5(b) of the First Lien Credit Agreement, which governs the requisite consents necessary to amend the credit agreement:

> Without the written consent of each Lender (other than a Defaulting Lender) that would be *affected* thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would . . . amend the definition of "Requisite Lenders" . . . .

(Mendelsohn Aff., Ex. 8 § 10.5(b) (emphasis added).) The definition of "Requisite Lenders," in turn, incorporates the term "Term Loan Exposure." (*Id.*, Ex. 8 at 41.)

Indisputably, both the Third *and* Fourth Amendments changed the definition of Term Loan Exposure, which was originally defined in the First Lien Credit Agreement. (Mendelsohn Aff., Ex. 8 at 45.) The Third Amendment changed the definition by appending additional language (noted in italics below):

> "Term Loan Exposure" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; provided, at any time prior to the making of the initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment; *provided further that with respect to any provisions of this Agreement relating to the voting rights of Lenders (including the right of Lenders to consent or take any other action with respect to any amendment,*

---

[21]  Accordingly, the Motion fails under the First Lien Credit Agreement. *See supra* Sect. III(B). Even if the Third Amendment were valid, the Motion fails. *See supra* Sect. III(B)(4).

> *modification, termination or waiver of any provision of this Agreement or*
> *the other Credit Documents, or consent to any departure by any Credit*
> *Party therefrom), the aggregate outstanding principal amount of the Term*
> *Loans of all restricted Sponsor Affiliates shall be disregarded for*
> *purposes of this definition of "Term Loan Exposure."*

(*Id.*, Ex. 2 § 2.1(e) (italics added).)  The Fourth Amendment simply deleted the (italicized) part of the definition that the Third Amendment added – and restored the definition to the original text.  (*Id.*, Ex. 18 § 2.1(b).)

The New York court invalidated the Fourth Amendment based solely on its determination that this change to Term Loan Exposure amended the definition of Requisite Lenders, affected all lenders, and thus required unanimous lender consent. (Mendelsohn Aff., Ex. 1 at 12-13.)

The Petitioning Creditors cannot and do not dispute any of these facts.  Instead, they go on at length in an effort to solve an inexorable problem with their case:  If the Fourth Amendment was invalid because it changed the definition of Term Loan Exposure without unanimous lender consent, then the Third Amendment, which also changed the definition of Term Loan Exposure without unanimous lender consent, must likewise be invalid.  The only reasonable interpretation of these contracts is to find either that the Third and Fourth Amendments are both valid, or that neither is valid.  (*See, e.g.*, D.I. 1 ¶¶ 35-36 (Allied recognizes that "Third and Fourth Amendments both were valid or neither were [*sic*] valid").)  The Petitioning Creditors, however, attempt to have it both ways.  They argue that the Fourth Amendment's change to Term Loan Exposure affected all lenders because it allowed Yucaipa to become Requisite Lender for the first time; in contrast, they contend that the change in the definition of Term Loan Exposure in the Third Amendment did not affect "any of the Lenders," despite its effects, because it did

not allow Yucaipa to become Requisite Lender.[22] (Mem. 23-25.)  This attempt to distinguish the amendments is specious.

The Petitioning Creditors ignore the fundamental change the Third Amendment made to the relationship between Yucaipa and Allied's other lenders.  At the most basic level, the Third Amendment opened the door for Yucaipa to become Requisite Lender. The Petitioning Creditors argue that, "prior to the passage of the Third Amendment in April [ ] 2008 Yucaipa was expressly prohibited from acquiring *any* Obligations, let alone the majority that is required to become Requisite Lender." (Mem. 27.)  Even if this were true, *after* the Third Amendment, Yucaipa was explicitly permitted to acquire and to hold Allied's first lien debt.  (Mem. 7; Mendelsohn Aff., Ex. 2 at 6 ("Restricted Sponsor Affiliate [Yucaipa] . . . may be a Lender").)  *Even with the restrictions imposed by the Third Amendment, the Third Amendment allowed Yucaipa, by joining with other Lenders, to become Requisite Lender.*  (Mendelsohn Aff., Ex. 8 at 41 ("'Requisite Lenders' means one or more Lenders having or holding . . . more than 50% of the sum of [Allied's first lien debt].").)  The Fourth Amendment only increased Yucaipa's ability to act as Requisite Lender by building on the foothold created by the Third Amendment. There is simply no rational basis for the assertion that the Third Amendment did not affect other lenders (at least as much as did the Fourth Amendment).[23]

---

[22] As explained above, *see supra* Sect. III(B)(4), this premise fails as a matter of law:  Yucaipa is Requisite Lender, even under the Third Amendment.

[23] While it suits their purpose now for the Petitioning Creditors to argue that mere Requisite Lender consent, as opposed to unanimous consent, was required to enact the Third Amendment because the non-consenting lenders were not "affected" within the meaning of Section 10.5(b) of the First Lien Credit Agreement (Mem. 24-25), that is not how they saw it then.

The Petitioning Creditors have failed to demonstrate the effectiveness of the Third Amendment as a matter of law. The Third Amendment fails for the same reason the Fourth Amendment purportedly failed – it was not enacted with full lender consent. Contrary to the Petitioning Creditors' argument, if the Fourth Amendment "affected" all lenders, then so did the Third Amendment, and their consent was required to make the Third Amendment valid. At a minimum, there exists a factual dispute regarding whether other lenders were "affected" by the Third Amendment, and the Motion must be denied.

**D.      The Motion Should Be Denied Or Deferred Because Necessary Discovery Has Been Obstructed**

The Motion also should be denied, or at least deferred, because of the Petitioning Creditors' refusal to provide discovery necessary for Yucaipa fully to respond to the Motion. The accompanying Sauer Declaration establishes each prerequisite under Federal Rule of Civil Procedure 56(d) to deny, or to defer any ruling on, the Motion until the Petitioning Creditors provide directly relevant and necessary discovery.

Rule 56(d) provides: "If a nonmovant shows by . . . declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it." Fed. R. Civ. P. 56(d). An opposition to a motion for summary judgment based on Rule 56(d) should be granted "as a matter of course." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007).

The failure to allow a party to depose an affiant on an assertion made in support of a summary judgment motion is the quintessential situation in which Rule 56(d) requires denial or deferral of the motion. *See Miller v. Beneficial Mgmt. Corp.*, 977 F.2d 834, 846 (3d Cir. 1992); *Metro. Life Ins. Co. v. Bancorp Servs., LLC*, 527 F.3d 1330, 1338 (Fed. Cir. 2008); *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1037 n.11 (11th Cir. 1987) ("[T]he proceedings in the district court took a bizarre turn when the court accepted the affidavits [ ] in support of the defendants' motion for summary

judgment, yet refused to permit the plaintiffs to depose those same individuals. This is not a proper practice."); *Blackwell Pub., Inc. v. Excel Research Grp., LLC*, No. 07-12731, 2008 WL 506329, at *1 (E.D. Mich. Feb. 22, 2008) ("[I]t is axiomatic that when a party files an affidavit [in support of summary judgment] . . . the opposing party has the right to depose the affiant [ ] on the assertions made."); *Rosen v. Trans World Airlines, Inc.*, No. 94-0682, 1997 WL 107640, at *1 (S.D.N.Y. Mar. 11, 1997).

The requirements of Rule 56(d) are satisfied here. As the Sauer Declaration states, the Petitioning Creditors rejected Yucaipa's demands for discovery, including depositions of affiants providing key testimony in connection with this Motion. (Sauer Dec. ¶¶ 59-61.) In particular, on June 21, 2013, counsel discussed the Petitioning Creditors' contemplated summary judgment motion. (*Id.* ¶¶ 59-60.) Yucaipa identified five depositions it needed in order to respond, including those of the Petitioning Creditors' agents, Richard Ehrlich and Jeff Schaffer. (*Id.*, Ex. 77.) The Petitioning Creditors refused to permit the discovery. (*Id.* ¶¶ 60-61.) After Yucaipa indicated its intention to oppose any summary judgment motion on Rule 56(d) grounds, the Petitioning Creditors agreed to "reconsider" whether they would allow the discovery, but then ignored the request. (*Id.*) The Petitioning Creditors have yet to permit the requested depositions.

As stated above, *see supra* Sect. III(B)(1), the *only* evidence the Petitioning Creditors offer to support their (inflated and disputed) share of Allied first lien debt are the Ehrlich and Schaffer Affidavits. (Mem. 29 & n.23.) And, in his affidavit regarding Black Diamond's share of first lien debt (including amounts that AMMC purportedly assigned to Black Diamond), Ehrlich appears to rely on a 100-page redacted document produced for the first time in connection with the Motion. (Ehrlich Aff. ¶ 3, Ex. 1.) Yucaipa is entitled to depose both Ehrlich and Schaffer to explore the (mistaken) basis

for their affidavits, and to examine the *un*redacted document on which they purport to rely to establish Petitioning Creditors' claim to Requisite Lender status.

The Petitioning Creditors' refusal to provide this foundational discovery violates the Court's scheduling order, in which the Court ordered the parties to "meet and confer in good faith regarding any deposition discovery they may deem necessary" in connection with the Requisite Lender issue. (No. 12-50947, D.I. 242; No. 13-50530, D.I. 247.) They are seeking to expedite resolution of disputed, material factual issues while denying Yucaipa discovery to which it is plainly entitled. The Court should thus deny the Motion, or defer hearing it until the Petitioning Creditors provide discovery necessary to permit Yucaipa the opportunity fully to respond.

## IV.    CONCLUSION

For the foregoing reasons, Yucaipa respectfully requests the Court deny (or, at a minimum, defer) the Petitioning Creditors' Motion for Summary Judgment.

Dated:  July 23, 2013

LATHAM & WATKINS LLP
  Russell F. Sauer, Jr.
  Robert A. Klyman
  Wayne S. Flick
  Kimberly A. Posin
355 South Grand Avenue
Los Angeles, CA 90071

*Attorneys for Yucaipa*

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Michael S. Neiburg*
  Michael R. Nestor (No. 3526)
  Edmon L. Morton (No. 3856)
  Donald J. Bowman, Jr. (No. 4383)
  Michael S. Neiburg (No. 5275)
  Laurel D. Roglen (No. 5759)
Rodney Square
1000 North King Street
Wilmington, DE 19801