# Exhibit 108

# Deposition Exhibit 385

# EXHIBIT A-1

DOC ID - 23524326.1



LITIGATION TRUST AGREEMENT

## TABLE OF CONTENTS

ARTICLE 1 ESTABLISHMENT OF THE LITIGATION TRUST..........................2

    1.1    Establishment of Litigation Trust and Appointment of Litigation Trustee ............2
    1.2    Transfer of Assets and Rights to the Litigation Trust.................................2
    1.3    Title to Preserved Causes of Action................................................3
    1.4    Nature and Purpose of the Litigation Trust.......................................3
    1.5    Relationship to, and Incorporation of, the Plan and Confirmation
          Order ......................................................................................4
    1.6    Funding of the Litigation Trust....................................................4
    1.7    Appointment as Representative ....................................................5

ARTICLE 2 LITIGATION TRUST INTERESTS ...........................................5

    2.1    Allocation of Litigation Trust Interests ..........................................5
    2.2    Interests Beneficial Only............................................................5
    2.3    Evidence of Beneficial Interests ...................................................5
    2.4    Exemption from Registration ......................................................6
    2.5    Transfer and Exchange.............................................................6
    2.6    Access to the Trust Register by the Litigation Trust Beneficiaries..............7
    2.7    Issuance of Certificates Upon Transfer .........................................7
    2.8    Mutilated, Defaced, Lost, Stolen or Destroyed Certificates.........................7
    2.9    Change of Address..................................................................8
    2.10   Tax Identification Numbers.......................................................8

ARTICLE 3 THE LITIGATION TRUSTEE.................................................9

    3.1    Role of the Litigation Trustee .....................................................9
    3.2    Authority of the Litigation Trustee ................................................9
    3.3    Limitation of the Litigation Trustee's Authority ..............................12
    3.4    Payment of Litigation Trust Expenses..........................................12
    3.5    Reimbursement of Reorganized Debtors........................................13
    3.6    Distributions..........................................................................13
    3.7    Tenure, Removal, and Replacement of the Litigation Trustee ...............14
    3.8    Books and Records ................................................................15
    3.9    Inquiries into the Litigation Trustee's Authority ..............................16
    3.10   Compliance with Laws............................................................16
    3.11   Litigation Trustee Compensation and Reimbursement........................16
    3.12   Reliance by the Litigation Trustee ..............................................17
    3.13   Standard of Care; Exculpation ...................................................17

ARTICLE 4 LITIGATION OVERSIGHT COMMITTEE..................................17

    4.1    Litigation Oversight Committee ..................................................17
    4.2    Authority of the Litigation Oversight Committee..............................18
    4.3    Regular Meetings of the Litigation Oversight Committee .....................18
    4.4    Special Meetings of the Litigation Oversight Committee .....................18
    4.5    Manner of Acting..................................................................18
    4.6    Litigation Oversight Committee's Action Without a Meeting ...................20

| | | |
|---|---|---|
| 4.7 | Tenure, Removal, and Replacement of the Members of the Litigation Oversight Committee | 20 |
| 4.8 | Compensation and Reimbursement of Expenses of the Litigation Oversight Committee | 21 |
| 4.9 | No Further Liability | 21 |

**ARTICLE 5 TAX MATTERS** ...........................................................................................22

| | | |
|---|---|---|
| 5.1 | Treatment of Litigation Trust Assets Transfer | 22 |
| 5.2 | Income Tax Status | 22 |
| 5.3 | Valuation of Litigation Trust Assets as of Effective Date | 22 |
| 5.4 | Tax Returns | 23 |
| 5.5 | Expedited Determination of Taxes | 23 |
| 5.6 | Withholding of Taxes; Litigation Trust Taxes | 23 |

**ARTICLE 6 DISTRIBUTIONS** ......................................................................................24

| | | |
|---|---|---|
| 6.1 | Annual Distribution; Withholding | 24 |
| 6.2 | Manner of Payment or Distribution | 24 |
| 6.3 | Delivery of Litigation Trust Distributions | 24 |
| 6.4 | Cash Distributions | 24 |

**ARTICLE 7 INDEMNIFICATION** ................................................................................25

| | | |
|---|---|---|
| 7.1 | Indemnification of the Litigation Trustee and the Litigation Oversight Committee | 25 |

**ARTICLE 8 REPORTS TO LITIGATION TRUST BENEFICIARIES** .........................26

| | | |
|---|---|---|
| 8.1 | Reports | 26 |

**ARTICLE 9 TERM; TERMINATION OF THE LITIGATION TRUST** .........................26

| | | |
|---|---|---|
| 9.1 | Term; Termination of the Litigation Trust | 26 |
| 9.2 | Continuance of the Litigation Trustee for Winding Up | 27 |

**ARTICLE 10 AMENDMENT AND WAIVER** ................................................................27

**ARTICLE 11 MISCELLANEOUS PROVISIONS** .........................................................28

| | | |
|---|---|---|
| 11.1 | Intention of Parties to Establish a Liquidating Trust, | 28 |
| 11.2 | Reimbursement of Trust Costs, | 28 |
| 11.3 | Laws as to Construction, | 28 |
| 11.4 | Jurisdiction, | 29 |
| 11.5 | Severability, | 29 |
| 11.6 | Notices, | 29 |
| 11.7 | Fiscal Year | 30 |
| 11.8 | Headings | 30 |
| 11.9 | Counterparts, | 30 |
| 11.10 | Confidentiality | 31 |
| 11.11 | Entire Agreement | 31 |
| 11.12 | Rules of Interpretation | 31 |
| 11.13 | Effectiveness | 32 |
| 11.14 | No Waiver | 32 |

# LITIGATION TRUST AGREEMENT

This Litigation Trust Agreement (this "Litigation Trust Agreement"), dated as of _____ __, 2015, by (a) the individual identified on Exhibit A attached hereto, as the trustee for the liquidating trust established pursuant to this Litigation Trust Agreement (such person and each successor trustee, the "Litigation Trustee"), (b) ASHINC Corporation, on behalf of itself and the other Debtors and Reorganized Debtors, and (c) Black Diamond Commercial Finance L.L.C. and Spectrum Commercial Finance LLC, each in its capacity as Co-Administrative Agent for the First Lien Lenders (the "First Lien Agents"), is executed pursuant to the Confirmation Order to facilitate the implementation of the Debtors' First Amended Joint Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents dated August 28, 2015 (as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof, the "Plan") that provides for the establishment of the Litigation Trust created hereby. Each of the Debtors (or, after the Effective Date, the Reorganized Debtors), the Litigation Trustee and the First Lien Agents are sometimes referred to individually as a "Party" and collectively as the "Parties," Capitalized terms used in this Litigation Trust Agreement and not otherwise defined shall have the meanings assigned to such terms in the Plan.

## RECITALS

WHEREAS, on May 17, 2012, involuntary petitions under Chapter 11 of the Bankruptcy Code were filed against Allied Holdings and Allied Systems in the Bankruptcy Court. On June __, 2012, Allied Systems and Allied Holdings consented to the entry of orders for relief, and the remaining Debtors filed voluntary petitions for relief under Chapter 11;

WHEREAS, on September __, 2015, the Bankruptcy Court entered the Confirmation Order;

WHEREAS, the date of this Litigation Trust Agreement is the Effective Date;

WHEREAS, the Litigation Trust is established for the sole purpose of administering the Litigation Trust Assets and making all distributions on account of the Litigation Trust Interests as provided for under the Plan;

WHEREAS, the Litigation Trust shall be established for the benefit of the Litigation Trust Beneficiaries;

WHEREAS, the Litigation Trustee was duly appointed as a representative of each of the Estates pursuant to section 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code;

DOC ID - 23336003.5

WHEREAS, the Litigation Trust has no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust;

WHEREAS, the Litigation Trust is intended to qualify as a liquidating trust within the meaning of United States Treasury Regulation section 301.7701-4(d), and this Litigation Trust Agreement, the Litigation Trust, the Confirmation Order, the Plan and the Disclosure Documents are intended to comply with the advance ruling guidelines contained in Rev. Proc. 94-45, 1994-2 C.B. 684; and

WHEREAS, this Litigation Trust Agreement is the "Litigation Trust Agreement" contemplated under the Plan and executed in order to facilitate the implementation of the Plan;

NOW, THEREFORE, pursuant to the Plan and Confirmation Order, in consideration of the premises and the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

## ARTICLE 1

## ESTABLISHMENT OF THE LITIGATION TRUST

1.1    Establishment of Litigation Trust and Appointment of Litigation Trustee.

(a)    A trust, which shall be known as the "ASHINC Litigation Trust," is hereby established on behalf of the Litigation Trust Beneficiaries.

(b)    The Litigation Trustee is hereby appointed as trustee of the Litigation Trust effective as of the Effective Date and agrees to accept and hold the Litigation Trust Assets in trust for the Litigation Trust Beneficiaries subject to the terms of the Plan, the Confirmation Order, and this Litigation Trust Agreement. The Litigation Trustee and each successor Litigation Trustee serving from time to time hereunder shall have all the rights, powers and duties set forth herein.

(c)    Subject to the terms of this Litigation Trust Agreement, any action by the Litigation Trustee and/or the Litigation Oversight Committee that affects the interests of more than one Litigation Trust Beneficiary shall be binding and conclusive on all Litigation Trust Beneficiaries even if such Litigation Trust Beneficiaries have different or conflicting interests.

(d)    The Litigation Trustee and the members of the Litigation Oversight Committee may serve without bond.

1.2    Transfer of Assets and Rights to the Litigation Trust.

(a)    As of the Effective Date, and pursuant to and subject in all respects to the terms of the Confirmation Order in accordance with section 1141 of the

Bankruptcy Code, the Debtors, in their respective capacities as debtors-in-possession on behalf of the Estates, have transferred, assigned, and delivered to the Litigation Trust, without recourse, all of their respective rights, title, and interests in and to the Estate Claims free and clear of Claims and Interests (other than Claims in the nature of setoff or recoupment), encumbrances or interests of any kind in such property of any other Person.

(b)     As of the Effective Date, and pursuant to and subject in all respects to the terms of the Confirmation Order, the First Lien Agents have transferred, assigned and delivered to the Litigation Trust, without recourse, all of their respective rights, title and interests in and to the Lender Direct Claims free and clear of all Claims and Interests (other than Claims in the nature of setoff or recoupment), encumbrances or interests of any kind in such property of any other Person.

(c)     On the Effective Date, the Reorganized Debtors and the Litigation Trustee shall enter into a Confidentiality and Common Interest Agreement providing for reasonable access to, at the Litigation Trust's own expense, copies of the Debtors' and Reorganized Debtors' records and information relating to the Litigation Trust Assets, including electronic records or documents.

(d)     All of the proceeds received by the Litigation Trust from the pursuit of any of the Litigation Claims (collectively, the "Litigation Trust Proceeds") shall be added to the Litigation Trust Assets and held as a part thereof (and title thereto shall be vested in the Litigation Trust).

(e)     At any time and from time to time on and after the Effective Date, the Reorganized Debtors and the First Lien Agents agree (i) at the reasonable request of the Litigation Trustee to execute and/or deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), and (ii) to take, or cause to be taken, all such further actions as the Litigation Trustee may reasonably request, in each case in order to evidence or effectuate the transfer of the Estate Claims and Lender Direct Claims to the Litigation Trust.

1.3     Title to Preserved Causes of Action.

The transfer of the Litigation Claims to the Litigation Trust is made by the Estates and the First Lien Agents for the sole benefit of the Litigation Trust Beneficiaries. Upon the transfer of the Litigation Claims and the Litigation Trust Assets to the Litigation Trust, the Litigation Trust shall succeed to all of the Estates' and First Lien Agents' rights, title and interests in and to the Litigation Claims and no other Person has any interest, legal, beneficial, or otherwise, in the Litigation Trust or the Litigation Claims as of their transfer and assignment to the Litigation Trust.

1.4     Nature and Purpose of the Litigation Trust.

(a)     The Litigation Trust is organized and established as a trust solely for the purposes set forth in Sections 5.10 and 5.11 of the Plan pursuant to which the

3

Litigation Trustee, subject to the terms and conditions contained herein and in the Plan, is to (i) administer the Litigation Trust Assets and make all distributions on account of Litigation Trust Interests to the Litigation Trust Beneficiaries as provided for herein and under the Plan, and (ii) oversee and direct the expeditious but orderly liquidation of the Litigation Trust Assets. The Litigation Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation section 301.7701-4(d). The primary purpose of the Litigation Trust is to liquidate the Litigation Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to preserve or enhance the liquidation value of the Litigation Trust Assets, and consistent with the liquidating purpose of the Litigation Trust.

(b)    This Litigation Trust Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust. The Litigation Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Trustee, the Litigation Oversight Committee (or any of its members), the Debtors or Reorganized Debtors, or the Litigation Trust Beneficiaries, or any of them, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers. The relationship of the Litigation Trust Beneficiaries to the Litigation Trustee and the Litigation Oversight Committee shall be solely that of beneficiaries of a trust and shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Litigation Trust Agreement.

1.5    Relationship to, and Incorporation of, the Plan and Confirmation Order.

This Litigation Trust Agreement is to aid in the implementation of the Plan and the Confirmation Order, and therefore this Litigation Trust Agreement incorporates the provisions of the Plan and the Confirmation Order by this reference. To that end, the Litigation Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan and to seek any orders from the Bankruptcy Court in furtherance of implementation of the Plan, in each case solely to the extent such actions or orders are in furtherance of this Litigation Trust Agreement, but in each case subject in all respects to and solely to the extent not inconsistent with the terms of the Plan. To the extent that there is conflict between the provisions of this Litigation Trust Agreement, the provisions of the Plan, and/or the Confirmation Order, each such document shall have controlling effect in the following rank order: (1) the Confirmation Order; (2) the Plan; and (3) this Litigation Trust Agreement.

1.6    Funding of the Litigation Trust.

On the Effective Date, the Investors, as investors, and the Litigation Trust, as issuer, shall become parties to the Investor Funding Agreement. The Investor Funding Agreement shall provide for investments in the aggregate amount of up to $15 million. Except as expressly provided in the Investor Funding Agreement, none of the

Debtors or the Reorganized Debtors shall have any liability for any cost or expense of the Litigation Trust. Any failure or inability of the Litigation Trust to obtain funding will not affect the enforceability of the Litigation Trust.

### 1.7    Appointment as Representative.

Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Plan appointed the Litigation Trustee as the duly appointed representative of each of the Estates solely with respect to the Litigation Trust Assets and, as such, the Litigation Trustee is deemed to be acting in the capacity of a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, or creditors' committee or any similar official who has been appointed to take control of, supervise, manage or liquidate the Debtors solely with respect to prosecution of the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries. To the extent that any Estate Claim cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provisions of the Bankruptcy Code, such Estate Claim shall be deemed to have been retained by the applicable Estate and the Litigation Trustee shall be deemed to have been designated as a representative of the applicable Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Estate Claim on behalf of such Estate subject to the terms of this Litigation Trust Agreement, the Plan and the Confirmation Order. Notwithstanding the foregoing, all Litigation Trust Proceeds shall be paid over to the Litigation Trust and shall be applied in accordance with the Plan and the Litigation Proceeds Waterfall.

## ARTICLE 2

## LITIGATION TRUST INTERESTS

### 2.1    Allocation of Litigation Trust Interests.

The allocation and distribution of the Litigation Trust Interests shall be accomplished as set forth in the Plan.

### 2.2    Interests Beneficial Only.

The ownership of a Litigation Trust Interest shall not entitle any Litigation Trust Beneficiary to any title in or to the Litigation Trust Assets (which title shall be vested in the Litigation Trust) or to any right to call for a partition or division of the Litigation Trust Assets or to require an accounting.

### 2.3    Evidence of Beneficial Interests.

(a)    The Litigation Trust Interests may be represented either by book entries on the books and records of the Litigation Trust or by certificates, in either definitive or global form, as shall be determined by the Litigation Trustee upon consultation with and subject to the approval of the Litigation Oversight Committee. In the event certificates are created, the Litigation Trustee shall cause to be placed on such

certificate such legends as it deems are required or appropriate under tax laws or regulations in connection with tax withholding pursuant to <u>Section 6.1</u> herein, under securities laws or regulations in connection with registration or reporting requirements, if any, or otherwise. Any Person to whom a certificate is issued or transferred, by virtue of the acceptance thereof, shall assent to and be bound by the terms and conditions of this Litigation Trust Agreement, the Plan and the Confirmation Order. In the event certificates are issued, the form of such certificates shall be determined by the Litigation Trustee subject to approval of the Litigation Oversight Committee.

(b)    In the event certificates are issued, only whole numbers of certificates shall be issued. When any distribution of Litigation Trust Interests would otherwise result in the issuance of a number of certificates that is not a whole number, the actual distribution of such certificates shall be rounded to the next higher or lower whole number of certificates as follows: (i) fractions equal to or greater than $^1/2$ shall be rounded to the next higher whole number; and (ii) fractions less than $^1/2$ shall be rounded to the next lower number. No consideration shall be provided in lieu of fractional certificates that are rounded down.

2.4    <u>Exemption from Registration</u>.

The Parties hereto intend that the rights of the Litigation Trust Beneficiaries arising under this Litigation Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such rights constitute securities, the Parties hereto intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan.

2.5    <u>Transfer and Exchange</u>.

(a)    No transfer, assignment, pledge, hypothecation or other disposition of a Litigation Trust Interest may be effected until (i) the Litigation Trustee and the Litigation Oversight Committee have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary to assure that any such disposition shall not cause the Litigation Trust to be subject to entity-level taxation for U.S. federal income tax purposes, and (ii) either (x) the Litigation Trustee and the Litigation Oversight Committee have received such legal advice or other information that they, in their sole and absolute discretion, deem necessary or appropriate to assure that any such disposition shall not require the Litigation Trust to comply with the registration and reporting requirements of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), the Trust Indenture Act of 1939, as amended (the "TIA"), or the Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>"), or (y) the Litigation Trustee and the Litigation Oversight Committee have determined, in their sole and absolute discretion, to register and/or make periodic reports in order to enable such disposition to be made. In the event that any such disposition is allowed, the Litigation Oversight Committee and the Litigation Trustee may add such restrictions upon transfer and other terms to this Litigation Trust

Agreement as are deemed necessary or appropriate by the Litigation Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws. Notwithstanding the foregoing, any Litigation Trust Beneficiary may transfer its Litigation Trust Interest to a wholly-owned subsidiary treated as a corporation for U.S. federal income tax purposes, which shall thereafter be the relevant Litigation Trust Beneficiary.

(b)     The Litigation Trustee shall appoint a registrar, which may be the Litigation Trustee (the "Registrar"), for the purpose of recording ownership of the Litigation Trust Interests as herein provided. The Registrar, if other than the Litigation Trustee, shall be an institution acceptable to the Litigation Oversight Committee. For its services hereunder, the Registrar, unless it is the Litigation Trustee, shall be entitled to receive reasonable compensation from the Litigation Trust as a cost of administering the Litigation Trust.

(c)     The Litigation Trustee shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time, a registry of the Litigation Trust Beneficiaries (the "Trust Register"), which shall be maintained pursuant to such reasonable regulations as the Litigation Trustee and the Registrar may prescribe.

2.6     Access to the Trust Register by the Litigation Trust Beneficiaries.

Each Litigation Trust Beneficiary and its duly authorized representatives shall have the right, upon reasonable prior written notice to the Registrar and the Litigation Trustee, and in accordance with the reasonable regulations prescribed by the Registrar and the Litigation Trustee, to inspect and, at the sole expense of the Litigation Trust Beneficiary seeking the same, make copies of the Trust Register reflecting such Litigation Trust Beneficiary's interest in the Litigation Trust, in each case for a purpose reasonably related to such Litigation Trust Beneficiary's interest in the Litigation Trust.

2.7     Issuance of Certificates Upon Transfer.

In the event certificates representing Litigation Trust Interests are created, subject to the conditions of Section 2.5(a) herein, whenever any certificate shall be presented for transfer or exchange, the Litigation Trustee shall cause the Registrar to issue, authenticate and deliver in exchange therefor, a certificate of the same class for the Litigation Trust Interest(s) that the Person presenting such certificates shall be entitled to receive.

2.8     Mutilated, Defaced, Lost, Stolen or Destroyed Certificates.

In the event certificates representing Litigation Trust Interests are created, if a Litigation Trust Beneficiary claims that its certificate (the "Original Certificate") has been mutilated, defaced, lost, stolen or destroyed, the Litigation Trustee shall issue, and the Registrar shall authenticate, a replacement certificate of the same class if such Litigation Trust Beneficiary submits a notarized affidavit certifying that (i) it is the true, lawful, present and sole owner of the Original Certificate; (ii) it has diligently searched

all of its financial and other records and the Original Certificate is nowhere to be found; (iii) the Original Certificate and any rights or interests therein were not endorsed, and have not been pledged, sold, delivered, transferred or assigned under any agreement, hypothecated or pledged for any loan or other obligation, or disposed of in any manner by the Litigation Trust Beneficiary or on its behalf; (iv) no other Person or other entity has any right, title, claim, equity or interest in, to, or respecting the Original Certificate; and (v) in the event of the recovery of the Original Certificate at any time after the issuance of a new certificate in exchange thereof, the Litigation Trust Beneficiary will cause the recovered Original Certificate to be returned to the Litigation Trustee, or the Litigation Trustee's successor, for cancellation. In addition, such Litigation Trust Beneficiary will indemnify the Litigation Trustee or the Registrar and, if required by the Litigation Trustee and/or the Registrar, provide a bond or other security sufficient in the reasonable judgment of the Litigation Trustee or the Registrar, with respect to any loss which either of them may suffer if the Original Certificate is replaced, including a loss resulting from the assertion by any Person of the right to payment under the Original Certificate. Such Litigation Trust Beneficiary shall pay reasonable charges established by the Litigation Trustee and the Registrar for the purpose of reimbursing the Litigation Trust and the Registrar for the expenses incident thereto, including any tax or other governmental charges. The Litigation Trustee shall incur no liability to anyone by reason of anything done or omitted to be done by it in good faith under the provisions of this <u>Section 2.8</u>. All Litigation Trust Interests shall be held and owned upon the express condition that the provisions of this <u>Section 2.8</u> are exclusive in respect of the replacement or payment of mutilated, defaced, lost, stolen or destroyed certificates and shall, to the extent permitted by law, preclude any and all other rights or remedies respecting such replacement or the payment in respect thereto. Any duplicate certificate issued pursuant to this <u>Section 2.8</u> shall constitute original interests in the Litigation Trust and shall be entitled in the manner provided herein to equal and proportionate benefits with all other Litigation Trust Interests issued hereunder in any monies or property at the time held by the Litigation Trustee for the benefit of the Litigation Trust Beneficiaries. The Litigation Trustee and the Registrar shall not treat the Original Certificate as outstanding following issuance of a duplicate certificate.

2.9    <u>Change of Address</u>.

A Litigation Trust Beneficiary may, after the Effective Date, select an alternative distribution address or provide wire transfer instructions for any distribution by providing notice to the Registrar including such address or instructions. Such notification will be effective only upon receipt by the Registrar. Absent receipt of such notice by the Registrar, the Litigation Trustee shall not recognize any such change of distribution address.

2.10    <u>Tax Identification Numbers</u>.

The Litigation Trustee may require any direct payee of distributions on account of Litigation Trust Interests to furnish to the Litigation Trustee its social security number or employer or taxpayer identification number as assigned by the Internal Revenue Service and complete any related documentation (including a Form

W-8 or Form W-9) and the Litigation Trustee may condition any distribution to any such payee upon the receipt of such information and the receipt of such other documents as the Litigation Trustee reasonably requests.

ARTICLE 3

THE LITIGATION TRUSTEE

3.1     Role of the Litigation Trustee.

In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, the Litigation Trustee, subject to the terms and conditions contained herein, in the Plan and in the Confirmation Order, shall (i) hold the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries, and (ii) make distributions of Litigation Trust Proceeds in accordance with the Plan and the Litigation Proceeds Waterfall. Subject to the provisions of this Litigation Trust Agreement, the Litigation Trustee in consultation with, and subject to the management and direction of, the Litigation Oversight Committee shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets. In all circumstances, the Litigation Trustee shall act in the best interests of all the Litigation Trust Beneficiaries of the Litigation Trust and in furtherance of the purpose of the Litigation Trust. The Litigation Trustee shall be subject to and bound by the terms of the Confidentiality and Common Interest Agreement.

3.2     Authority of the Litigation Trustee.

In connection with the administration of the Litigation Trust, in addition to any and all of the powers enumerated elsewhere herein, the Litigation Trustee is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Litigation Trust Agreement and the provisions of the Plan solely relating to the Litigation Trust, within the bounds of the Plan and applicable law. The Litigation Trustee, upon direction of the Litigation Oversight Committee except as set forth herein, shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions and not unduly prolong the duration of the Litigation Trust. The liquidation of the Litigation Trust Assets may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal of any or all Litigation Claims, or otherwise.

The Litigation Trustee, subject to the approval of the Litigation Oversight Committee except as set forth herein, shall have the right to pursue, not pursue, release, abandon, and/or settle any and all Litigation Claims (but including any counterclaims asserted against the Litigation Trust) as the Litigation Trustee determines is in the best interests of the Litigation Trust Beneficiaries. To the extent that any action has been taken to prosecute or otherwise resolve any Litigation Claims prior to the Effective Date by the Debtors and/or the Committee, on the Effective Date the Litigation Trustee shall be substituted for the Debtors and/or the Committee in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable to the

litigation by Rule 7025 of the Federal Rules of Bankruptcy Procedure and the caption with respect to such pending litigation shall be changed to the following: "_____, as Litigation Trustee for the ASHINC Litigation Trust, et al. v. [Defendant]". Subject to any limitations contained herein (including Article 4 herein) or in the Plan, the Litigation Trustee shall have the following powers and authorities:

   (a) hold legal title to any and all rights of the Holders of the Litigation Trust Interests in or arising from the Litigation Trust Assets, including collecting and receiving any and all money and other property belonging to the Litigation Trust and, subject to the approval of the Litigation Oversight Committee, the right to vote any claim or interest relating to the Litigation Trust Assets in a case under the Bankruptcy Code and receive any distribution with respect thereto;

   (b) make distributions of Litigation Trust Proceeds in accordance with the provisions of the Plan and the Litigation Proceeds Waterfall;

   (c) exercise and perform the rights, powers, and duties held by each Estate with respect to the Litigation Trust Assets, including the authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy trustee, receiver, liquidator, conservator, rehabilitator, creditors' committee or any similar official who has been appointed to take control of, supervise, manage or liquidate the Debtors, to provide for the prosecution, settlement, adjustment, retention, and enforcement of the Litigation Trust Assets;

   (d) in consultation with and subject to the approval of the Litigation Oversight Committee, protect and enforce the rights to the Litigation Trust Assets by any method deemed appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

   (e) in consultation with and subject to the approval of the Litigation Oversight Committee, obtain reasonable insurance coverage with respect to the liabilities and obligations of the Litigation Trustee and the Litigation Oversight Committee under this Litigation Trust Agreement (in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy or otherwise);

   (f) upon the prior written consent of the Litigation Oversight Committee, without further order of the Bankruptcy Court, employ various professionals, including counsel, tax advisors, consultants, and financial advisors, as the Litigation Trustee deems necessary to aid it in fulfilling its obligations under this Litigation Trust Agreement and the Plan, and on whatever fee arrangement the Litigation Trustee deems appropriate, including contingency fee arrangements. Professionals engaged by the Litigation Trustee shall not be required to file applications in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. All such compensation and reimbursement shall be paid by the Litigation Trust with Litigation Trust Proceeds or the proceeds of the Litigation Funding Investments;

(g)    upon the prior written consent of the Litigation Oversight Committee, request Investments from the Investors under the Investor Funding Agreement;

(h)    in consultation with and subject to the approval of the Litigation Oversight Committee, retain and approve compensation arrangements of an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Litigation Trust as may be required by this Litigation Trust Agreement and applicable laws and as may be reasonable and appropriate in the Litigation Trustee's discretion and to prepare and file any tax returns, informational returns, or periodic or current reports as required by applicable laws, for the Litigation Trust as may be required. Subject to the foregoing, the Litigation Trustee may commit the Litigation Trust to and shall pay such independent public accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, and all such compensation and reimbursement shall be paid from the Litigation Trust with Litigation Trust Proceeds or the proceeds of the Investments;

(i)    subject to the Confidentiality and Common Interest Agreement to the extent applicable, in consultation with and subject to the approval of the Litigation Oversight Committee, assert, enforce, release, or waive any privilege or any defense on behalf of the Litigation Trust, the Litigation Trust Assets, or the Litigation Trust Beneficiaries, as applicable;

(j)    upon the written consent of the Litigation Oversight Committee, the Litigation Trustee may invest all assets transferred to the Litigation Trust (other than Litigation Claims), the proceeds of the Investments, all Litigation Trust Proceeds, and all income earned by the Litigation Trust (pending periodic distributions in accordance with the provisions of the Plan and the Litigation Proceeds Waterfall) in short term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills, and withdraw funds of the Litigation Trust, make distributions, incur obligations for reasonable and necessary expenses in liquidating and converting the Litigation Trust Assets to Cash, and pay taxes and other obligations owed by the Litigation Trust from funds held by the Litigation Trustee; provided, however, that such actions are consistent with the Litigation Trust's status as a liquidating trust within the meaning of United States Treasury Regulation section 301.77014(d) and in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684;

(k)    request any appropriate tax determination with respect to the Litigation Trust, including a determination pursuant to section 505 of the Bankruptcy Code;

(l)    subject to applicable securities laws, if any, establish and maintain a website, to the extent the Litigation Trustee deems necessary, for the purpose of providing notice of Litigation Trust activities in lieu of sending written notice to Holders of Litigation Trust Interests, subject to providing notice of the establishment of such website to Holders;

(m)    take or refrain from taking any and all actions the Litigation Trustee reasonably deems necessary for the continuation, protection, and maximization of the Litigation Trust Assets consistent with the purposes hereof, take all steps and execute all instruments and documents necessary to effectuate the Litigation Trust, and take all actions necessary to comply with the Confirmation Order, the Plan and this Litigation Trust Agreement and the obligations thereunder and hereunder;

(n)    upon the written consent of the Litigation Oversight Committee, liquidate any remaining Litigation Trust Assets, and provide for the distributions therefrom in accordance with the provisions of the Plan, this Litigation Trust Agreement and the Litigation Proceeds Waterfall;

(o)    upon the written consent of the Litigation Oversight Committee, exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust;

(p)    upon the written consent of the Litigation Oversight Committee, evaluate and determine strategy with respect to the Litigation Trust Assets, and hold, pursue, prosecute, adjust, arbitrate, compromise, release, settle or abandon the Litigation Trust Assets on behalf of the Litigation Trust; and

(q)    in consultation with and subject to the approval of the Litigation Oversight Committee, perform all duties and functions of the Plan Administrator as set forth in the Plan.

3.3    Limitation of the Litigation Trustee's Authority.

(a)    Notwithstanding anything herein to the contrary, the Litigation Trustee shall not (i) be authorized to engage in any trade or business, (ii) take any actions inconsistent with the orderly liquidation of the Litigation Trust Assets as are required or contemplated by applicable law, the Confirmation Order, the Plan and this Litigation Trust Agreement, (iii) be authorized to engage in any investments or activities inconsistent with the treatment of the Litigation Trust as a liquidating trust within the meaning of United States Treasury Regulation section 301.7701-4(d) and in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684, (iv) take any action in contravention of this Litigation Trust Agreement, or (v) take any action that would jeopardize treatment of the Litigation Trust as a grantor trust for U.S. federal income tax purposes under sections 671-677 of the Internal Revenue Code of 1986, as amended (the "IRC"), or any successor provisions thereof.

(b)    The Litigation Trustee, acting on behalf of the Litigation Trust, shall agree to comply with, and shall not take any actions inconsistent with or seek to modify or seek relief from, any provision of the Plan or the Confirmation Order.

3.4    Payment of Litigation Trust Expenses.

(a)    The Litigation Trustee may incur any reasonable and necessary fees and expenses in pursuing the Litigation Trust Assets, administering the Litigation Trust, managing the Litigation Trust Assets and making distributions on account of Litigation Trust Interests. All fees, expenses, and costs of the Litigation Trust shall be paid by, and solely be the obligation of, the Litigation Trust.

(b)    The Litigation Trustee shall maintain an expense fund (the "Expense Fund") as a reserve to pay fees and expenses anticipated to be incurred in the future for the purposes set forth in Sections 3.4(a) and 3.5 herein and expend the assets of the Expense Fund to pay such fees and expenses as and when they become due. The Expense Fund shall be funded from time to time with proceeds from the Investments.

(c)    Notwithstanding any other provision of this Litigation Trust Agreement to the contrary, the Litigation Trustee shall not be required to take any action or enter into or maintain any claim, demand, action or proceeding relating to the Litigation Trust unless it shall have funds in the Expense Fund reasonably expected to be sufficient for that purpose.

3.5    Reimbursement of Reorganized Debtors.

The Litigation Trust shall reimburse the Reorganized Debtors and the Committee for all reasonable and documented out-of-pocket expenses incurred (including for reasonable legal fees, travel accommodations, electronic discovery and other forensic investigation and analysis and courier and mail service) solely in performing their obligations under this Litigation Trust Agreement, the Plan and the Confidentiality and Common Interest Agreement. The Litigation Trust shall provide reimbursement for all such reasonable out-of-pocket expenses incurred within thirty (30) days of receipt of an appropriately detailed written invoice. Reimbursement of the Committee under this Section 3.5 and Section 5.18(d) of the Plan shall be in accordance with the budget contemplated thereby. For the avoidance of doubt, nothing in this Litigation Trust Agreement or the Confidentiality and Common Interest Agreement shall be interpreted as imposing on the Litigation Trustee any obligation to reimburse any Person other than the Reorganized Debtors or the Committee for any legal fees or expenses incurred in connection with this Litigation Trust Agreement or the Confidentiality and Common Interest Agreement, or the production of documents or information generally.

3.6    Distributions.

(a)    Upon the written consent of the Litigation Oversight Committee, the Litigation Trustee shall distribute the Litigation Trust Proceeds in accordance with the provisions of the Plan and the Litigation Proceeds Waterfall.

(b)    The Litigation Trust may withhold from amounts distributable to any Person any and all amounts, determined in the Litigation Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement (including tax withholding relating to wage claims). Any Litigation Trust

Assets which are not distributable in accordance with this <u>Section 3.6(b)</u> as of the termination of Litigation Trust shall be distributed in accordance with the Litigation Proceeds Waterfall.

(c)     The Litigation Trustee may retain a distribution agent for the effective administration and distribution of amounts payable to the Litigation Trust Beneficiaries and all costs and expenses of such distribution agent shall be paid from the Expense Fund.

3.7     <u>Tenure, Removal, and Replacement of the Litigation Trustee</u>.

(a)     The Litigation Trustee will serve until resignation and the appointment of a successor pursuant to subsection (b) below, removal pursuant to subsection (c) below, Disability (as defined below), or death (if applicable).

(b)     The Litigation Trustee may resign by giving not less than thirty (30) days' prior written notice to the Litigation Oversight Committee and the Litigation Trust Beneficiaries and filing such notice with the Bankruptcy Court. Such resignation will become effective on the later to occur of (i) the day specified in such notice, and (ii) the appointment of a successor Litigation Trustee as provided herein and the acceptance by such successor Litigation Trustee of such appointment.

(c)     The Litigation Trustee or any successor Litigation Trustee appointed pursuant to the Plan and this Litigation Trust Agreement may be removed as Litigation Trustee with or without Cause (as defined below) by the Litigation Oversight Committee.

(d)     In the event that the Litigation Trustee is removed, resigns, or otherwise ceases to serve as Litigation Trustee, the Litigation Oversight Committee shall appoint a successor Litigation Trustee. The Litigation Oversight Committee shall give prompt written notice to the Reorganized Debtors of the death, resignation or removal of the Litigation Trustee and the appointment of any successor Litigation Trustee.

(e)     Immediately upon the appointment of any successor Litigation Trustee, all rights, powers, duties, authority, and privileges of the predecessor Litigation Trustee hereunder will be vested in and undertaken by the successor Litigation Trustee without any further act; and the successor Litigation Trustee will not be liable personally for any act or omission of the predecessor Litigation Trustee. Any successor Litigation Trustee appointed hereunder shall execute an instrument accepting such appointment and assuming all of the obligations of the predecessor Litigation Trustee hereunder, and such successor shall be subject to the same qualifications and shall have the same rights, powers, duties, and discretion, and otherwise be in the same position, as the originally named Litigation Trustee. References herein to the Litigation Trustee shall be deemed to refer to any successor Litigation Trustee acting hereunder.

(f)     Upon the appointment of a successor Litigation Trustee, the predecessor Litigation Trustee (or the duly appointed legal representative of a deceased

Litigation Trustee or a Litigation Trustee suffering a Disability) shall, if applicable, when requested in writing by the successor Litigation Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Litigation Trustee upon the trust herein expressed, without recourse to the predecessor Litigation Trustee, all the estates, properties, rights, powers and trusts of such predecessor Litigation Trustee, and shall duly assign, transfer, and deliver to such successor Litigation Trustee all property and money held hereunder, and all other assets and documents relating to the Litigation Trust, the Litigation Trust Assets, or the Litigation Trust Interests then in such predecessor Litigation Trustee's possession and held hereunder.

(g)     During any period in which there is a vacancy in the position of Litigation Trustee, the Litigation Oversight Committee shall appoint one of its members to serve as interim Litigation Trustee (the "Interim Trustee"). The Interim Trustee shall be subject to all the terms and conditions applicable to a Litigation Trustee hereunder. Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a member of the Litigation Oversight Committee merely by such Person's appointment as Interim Trustee.

(h)     The Litigation Trustee shall, during the period that the Litigation Trustee serves as Litigation Trustee under this Litigation Trust Agreement and following the termination of this Litigation Trust Agreement or following its removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Litigation Trust Assets relates or of which the Litigation Trustee has become aware in the Litigation Trustee's capacity as Litigation Trustee, except as otherwise required by law.

(i)     For purposes of this Section 3.7 and Section 4.7 herein, the following terms shall have the following meanings:

(i)     "Cause" means fraud, self-dealing, intentional misrepresentation, gross negligence, or willful misconduct.

(ii)     "Disability" of the Litigation Trustee or a member of the Litigation Oversight Committee shall have occurred if, as a result of such Person's incapacity due to physical or mental illness as determined by a physician selected by the Litigation Trustee or the member of the Litigation Oversight Committee, as applicable, and reasonably acceptable to the Litigation Oversight Committee, the Litigation Trustee or the member of the Litigation Oversight Committee shall have been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

3.8     Books and Records.

The Litigation Trustee shall maintain in respect of the Litigation Trust and the Holders of Litigation Trust Interests good and sufficient books and records relating

to the Litigation Trust Assets and income of the Litigation Trust and the payment of, expenses of, liabilities of, and claims against or assumed by, the Litigation Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Litigation Trust and the requirements of Article 8 herein. Nothing in this Litigation Trust Agreement requires the Litigation Trustee to file any accounting or seek approval of any court with respect to the administration of the Litigation Trust, or as a condition for managing any payment or distribution out of the Litigation Trust Assets. The books and records of the Litigation Trust shall be available for inspection by any member of the Litigation Oversight Committee upon reasonable notice.

3.9    Inquiries into the Litigation Trustee's Authority.

Except as otherwise set forth in this Litigation Trust Agreement or in the Plan, no Person dealing with the Litigation Trust shall be obligated to inquire into the authority of the Litigation Trustee in connection with the protection, conservation or disposition of the Litigation Trust Assets.

3.10    Compliance with Laws.

(a)    The Litigation Trustee shall ensure that any and all distributions of Litigation Trust Proceeds shall be in compliance with applicable laws, including applicable federal and state securities laws.

(b)    If the Litigation Trustee determines, with the advice of counsel, that the Litigation Trust is required to comply with registration and reporting requirements of the Exchange Act, the TIA, or the Investment Company Act, then the Litigation Trustee shall, after consultation with the Litigation Oversight Committee, take commercially reasonable efforts to comply with such registration and reporting requirements, if any, and file periodic reports with the U.S. Securities and Exchange Commission to the extent required by law.

3.11    Litigation Trustee Compensation and Reimbursement.

The Litigation Trustee shall receive compensation from the Litigation Trust as follows:

(a)    The Litigation Trustee shall receive the compensation set, from time to time, by the Litigation Oversight Committee. The Litigation Oversight Committee, without application to or approval by the Bankruptcy Court, may reasonably modify the Litigation Trustee's compensation and other terms regarding the retention of the Litigation Trustee.

(b)    In addition, the Litigation Trust will reimburse the Litigation Trustee (out of the Litigation Trust Proceeds or the proceeds of the Litigation Funding Investment) for all reasonable and documented out-of-pocket expenses incurred by the Litigation Trustee in connection with the performance of the Litigation Trustee's duties hereunder and under the Plan.

(c)    The fees and expenses payable to the Litigation Trustee shall be paid to the Litigation Trustee upon approval of such fees by the Litigation Oversight Committee without necessity for review or approval by the Bankruptcy Court or any other Person. All such compensation and reimbursement shall be paid from the Litigation Trust with the Litigation Trust Proceeds or the proceeds of the Investments. The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute between the Litigation Trustee and the Litigation Oversight Committee regarding the fees, compensation, and expenses of the Litigation Trustee.

3.12    Reliance by the Litigation Trustee.

Except as otherwise provided herein:

(a)    The Litigation Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Litigation Trustee to be genuine and to have been signed or presented by the proper party or parties.

(b)    Persons dealing with the Litigation Trustee shall look only to the Litigation Trust Assets to satisfy any liability incurred by the Litigation Trustee to such Person in carrying out the terms of this Litigation Trust Agreement, and neither the Litigation Trustee nor any member of the Litigation Oversight Committee nor the Reorganized Debtors shall have any personal obligation to satisfy any such liability.

3.13    Standard of Care; Exculpation.

Neither the Litigation Trustee nor any of the Litigation Trustee's duly designated agents or representatives or professionals shall be liable for any act or omission taken or omitted to be taken by the Litigation Trustee except in the event that there is a Final Order of a court of competent jurisdiction determining that the Litigation Trustee committed fraud, self-dealing, intentional misrepresentation, gross negligence, or willful misconduct. The Litigation Trustee may, in connection with the performance of the Litigation Trustee's functions, and in the Litigation Trustee's sole and absolute discretion, consult with the Litigation Trustee's attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons. Notwithstanding such authority, the Litigation Trustee shall be under no obligation to consult with the Litigation Trustee's attorneys, accountants, financial advisors or agents, and the Litigation Trustee's good faith determination not to do so shall not result in the imposition of liability on the Litigation Trustee, unless such determination is based on gross negligence, recklessness, willful misconduct, or knowing violation of law.

ARTICLE 4

LITIGATION OVERSIGHT COMMITTEE

4.1    Litigation Oversight Committee.

The Litigation Oversight Committee, which shall have no more than three members consisting of (i) two members selected by the First Lien Requisite Lender and (ii) a member selected by the Committee, is hereby established as of the Effective Date pursuant to Section 5.12 of the Plan to advise, assist, supervise and direct the Litigation Trustee in the administration of the Litigation Trust pursuant to this Litigation Trust Agreement. The initial members of the Litigation Oversight Committee shall be the Persons set forth on Exhibit B, attached hereto. Members of the Litigation Oversight Committee shall have the right to direct and remove the Litigation Trustee, and shall have such other rights to operate and manage the Litigation Trust as are not inconsistent with the Confirmation Order, the Plan and the terms of this Litigation Trust Agreement. No other Litigation Trust Beneficiary shall have any consultation or approval rights whatsoever in respect of management and operation of the Litigation Trust.

4.2     Authority of the Litigation Oversight Committee.

The Litigation Oversight Committee shall have the authority and responsibility to advise, assist, supervise and direct the Litigation Trustee in the administration of the Litigation Trust and shall have the authority to remove the Litigation Trustee in accordance with Section 3.7(c) herein. The Litigation Trustee shall consult with and provide information to the Litigation Oversight Committee in accordance with and pursuant to the terms of this Litigation Trust Agreement and the Plan. The Litigation Oversight Committee shall have the authority to select and engage such professional advisors, including any professional previously retained by the Litigation Trust, the First Lien Agents, the Committee, or the Debtors, as the Litigation Oversight Committee deems necessary and desirable to assist the Litigation Oversight Committee in fulfilling its obligations under this Litigation Trust Agreement and the Plan, and the Litigation Trust shall pay the reasonable and documented fees of such advisors (including on an hourly, contingency, or modified contingency basis) and reimburse such advisors for their reasonable and documented out-of-pocket costs and expenses consistent with the terms of this Litigation Trust Agreement.

4.3     Regular Meetings of the Litigation Oversight Committee.

Meetings of the Litigation Oversight Committee are to be held with such frequency and at such place as the Litigation Trustee and the members of the Litigation Oversight Committee may determine in their reasonable discretion, but in no event shall such meetings be held less frequently than quarterly.

4.4     Special Meetings of the Litigation Oversight Committee.

Special meetings of the Litigation Oversight Committee may be held whenever and wherever called for by the Litigation Trustee or any member of the Litigation Oversight Committee, subject to reasonable notice.

4.5     Manner of Acting.

(a)     A majority of the total number of members of the Litigation Oversight Committee then in office shall constitute a quorum for the transaction of

business at any meeting of the Litigation Oversight Committee. The affirmative vote of a majority of the members of the Litigation Oversight Committee present and entitled to vote at a meeting at which a quorum is present shall be the act of the Litigation Oversight Committee except as otherwise required by law or as provided in this Litigation Trust Agreement or the Plan. Notwithstanding the foregoing, the affirmative vote of each member of the Litigation Oversight Committee appointed by the First Lien Requisite Lender shall be required with respect to (i) the removal the Litigation Trustee, (ii) the replacement of the Litigation Trustee, (iii) any request to draw funds under the Litigation Investment Agreement, (iv) the incurrence of additional indebtedness or issuance of additional investments to fund the prosecution of the Litigation Claims in excess of the Investments, (v) retain counsel or other professionals to assist in the prosecution of the Litigation Claims, (vi) settle all or any portion of the Litigation Claims, or (vii) the compensation arrangements for the Litigation Trustee. Any or all of the members of the Litigation Oversight Committee may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any member of the Litigation Oversight Committee participating in a meeting by this means is deemed to be present in person at the meeting. Voting (including on negative notice) may, if approved by the majority of the members at a meeting, be conducted by electronic mail or individual communications by the Litigation Trustee and each member of the Litigation Oversight Committee.

(b)     Any member of the Litigation Oversight Committee who is present and entitled to vote at a meeting of the Litigation Oversight Committee when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Litigation Oversight Committee, unless: (i) such member of the Litigation Oversight Committee objects at the beginning of the meeting (or promptly upon his or her arrival) to holding it or transacting business at the meeting; or (ii) his or her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he or she delivers written notice (including by electronic or facsimile transmission) of his or her dissent or abstention to the Litigation Oversight Committee before its adjournment. The right of dissent or abstention is not available to any member of the Litigation Oversight Committee who votes in favor of the action taken.

(c)     Prior to the taking of a vote on any matter or issue or the taking of any action with respect to any matter or issue, each member of the Litigation Oversight Committee shall report to the Litigation Oversight Committee any conflict of interest such member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including disclosing any and all financial or other pecuniary interests that such member might have with respect to or in connection with such matter or issue, other than solely as a Litigation Trust Beneficiary). A member who has or who may have a conflict of interest shall be deemed to be a "conflicted member" who shall not be entitled to vote or take part in any action with respect to such matter or issue (however such member shall be counted for purposes of determining the existence of a quorum); the vote or action with respect to

such matter or issue shall be undertaken only by members of the Litigation Oversight Committee who are not "conflicted members." Notwithstanding anything to the contrary set forth herein, no member of the Litigation Oversight Committee shall be deemed to be a "conflicted member" solely as a result of (i) such member's affiliation with a Person that is a Litigation Trust Beneficiary or an Investor, or (ii) such member is, or is affiliated with any Person that is, adverse to any Person that is a defendant in any of the Litigation Claims in any other action or proceeding.

      4.6    Litigation Oversight Committee's Action Without a Meeting.

      Any action required or permitted to be taken by the Litigation Oversight Committee at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Litigation Oversight Committee as evidenced by one or more written consents describing the action taken, signed by all members of the Litigation Oversight Committee and recorded in the minutes or other transcript of proceedings of the Litigation Oversight Committee.

      4.7    Tenure, Removal, and Replacement of the Members of the Litigation Oversight Committee.

      The authority of the members of the Litigation Oversight Committee will be effective as of the Effective Date and will remain and continue in full force and effect until the Litigation Trust is terminated in accordance with Section 9.1 herein. The service of the members of the Litigation Oversight Committee will be subject to the following:

      (a)    The members of the Litigation Oversight Committee will serve until Disability, death, resignation pursuant to subsection (b) below, or removal pursuant to subsection (c) below;

      (b)    A member of the Litigation Oversight Committee may resign at any time by providing a written notice of resignation to the remaining members of the Litigation Oversight Committee. Such resignation will be effective upon the date received by the Litigation Oversight Committee or such later date specified in the written notice;

      (c)    A member of the Litigation Oversight Committee may be removed by the majority vote of the other members of the Litigation Oversight Committee, a written resolution of which shall be delivered to the removed Litigation Oversight Committee member; provided, however, that such removal may only be made for Cause;

      (d)    In the event of a vacancy on the Litigation Oversight Committee (whether by removal, Disability, death or resignation), a new member shall be appointed to fill such position by the Person(s) who initially designated the member whose seat has become vacant.

(e)    Immediately upon the appointment of any successor member of the Litigation Oversight Committee, all rights, powers, duties, authority, and privileges of the predecessor member of the Litigation Oversight Committee hereunder will be vested in and undertaken by the successor member of the Litigation Oversight Committee without any further act; and the successor member of the Litigation Oversight Committee will not be liable personally for any act or omission of the predecessor member of the Litigation Oversight Committee; and

(f)    Every successor member of the Litigation Oversight Committee appointed hereunder shall execute, acknowledge and deliver to the Litigation Trustee and other members an instrument accepting the appointment under this Litigation Trust Agreement and agreeing to be bound thereto, and thereupon the successor member of the Litigation Oversight Committee without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring member.

4.8    Compensation and Reimbursement of Expenses of the Litigation Oversight Committee.

(a)    The Litigation Trust will reimburse the members of the Litigation Oversight Committee for all reasonable and documented out-of-pocket expenses (other than the fees and disbursements of legal counsel retained by the members, which will be reimbursed as provided in Section 4.8(b)(ii) below) incurred by such members in connection with the performance of their respective services hereunder, without duplication, upon demand for payment thereof.

(b)    All fees and expenses of the members of the Litigation Oversight Committee shall be paid solely from Litigation Trust Proceeds or the proceeds of the Investments.

4.9    No Further Liability.

(a)    Each of the Litigation Trustee and the members of the Litigation Oversight Committee shall have no liability for any actions or omissions in accordance with this Litigation Trust Agreement unless arising out of their gross negligence or willful misconduct. In performing its duties under this Litigation Trust Agreement, the Litigation Trustee or the members of the Litigation Oversight Committee (as applicable) shall have no liability for any action taken by the Litigation Trustee and the members of the Litigation Oversight Committee in accordance with the advice of counsel, accountants, appraisers and other professionals retained by the members of the Litigation Oversight Committee or the Litigation Trust. Without limiting the generality of the foregoing, the Litigation Trustee and the members of the Litigation Oversight Committee may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by the Litigation Trustee or the members of the Litigation Oversight Committee (as applicable) to be genuine, and shall have no liability for actions taken in reliance thereon. None of the provisions of this Litigation Trust Agreement shall require the Litigation Trustee or the members of the Litigation Oversight Committee to expend or risk their own funds or otherwise incur personal

financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. Each of the Litigation Trustee and the members of the Litigation Oversight Committee may rely without inquiry upon writings delivered to it under the Plan which the Litigation Trustee or the members of the Litigation Oversight Committee (as applicable) reasonably believes to be genuine and to have been given by a proper Person. Notwithstanding the foregoing, nothing in this Section 4.9 shall relieve the Litigation Trustee or the members of the Litigation Oversight Committee from any liability for any actions or omissions arising out of their gross negligence or willful misconduct. Any action taken or omitted to be taken in the case of the Litigation Trustee or the members of the Litigation Oversight Committee with the express approval of the Bankruptcy Court and, in the case of the Litigation Trustee, with the express approval of the members of the Litigation Oversight Committee will conclusively be deemed not to constitute gross negligence or willful misconduct.

(b)     Neither the Litigation Trustee, the members of the Litigation Oversight Committee nor their professionals will be liable for punitive, exemplary, consequential, special or other damages for a breach of this Litigation Trust Agreement under any circumstances.

ARTICLE 5

TAX MATTERS

5.1     Treatment of Litigation Trust Assets Transfer.

Notwithstanding Section 1.2(a) herein, all parties shall treat, for U.S. federal income tax purposes, the transfer of each of the Litigation Trust Assets to the Litigation Trust, including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred), as a transfer of the Litigation Trust Assets to the Litigation Trust Beneficiaries, followed by a transfer of such Litigation Trust Assets by the Litigation Trust Beneficiaries to the Litigation Trust in exchange for beneficial interests in the Litigation Trust.

5.2     Income Tax Status.

For U.S. federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable), the Litigation Trust shall be treated as a grantor trust pursuant to IRC sections 671-677, or any successor provisions thereof. To the extent consistent with Revenue Procedure 94-45 and not otherwise inconsistent with this Litigation Trust Agreement, this Litigation Trust Agreement shall be construed so as to satisfy the requirements for liquidating trust status. For all purposes of this Litigation Trust Agreement, (i) the Litigation Trust Beneficiaries will be treated as the grantors, deemed owners and beneficiaries of the Litigation Trust, and (ii) any items of income, gain, loss, deduction and credit of the Litigation Trust shall be allocated for U.S. federal income tax purposes to the Litigation Trust Beneficiaries. The Litigation Trust shall at all times be administered so as to constitute a domestic trust for U.S. federal income tax purposes.

5.3     Valuation of Litigation Trust Assets as of Effective Date.

Promptly after the Effective Date, the Valuation Expert shall determine and file with the Bankruptcy Court the final fair market value as of the Effective Date of all Litigation Trust Assets transferred to the Litigation Trust, giving due regard to the initial estimated valuation of the Litigation Trust Assets determined in accordance with the Plan. Subject to any lawful objection thereto, the Litigation Trust Beneficiaries, the Litigation Trust and the Litigation Trustee will each be required to use such Valuation Expert's final valuation consistently and solely for all U.S. federal income tax purposes, including for determining tax basis and gain or loss. For the avoidance of doubt, the Valuation Expert's final valuation shall not be binding on the Litigation Trust Beneficiaries, the Litigation Trust or the Litigation Trustee for any purpose other than U.S. federal income tax purposes, and the valuation shall not impair or prejudice any rights, claims, powers, duties, authority, and privileges of the Litigation Trust Beneficiaries, the Litigation Trust or the Litigation Trustee except with respect to U.S. federal income tax purposes. The Litigation Trustee also shall file (or cause to be filed) any other statements, returns or disclosure relating to the Litigation Trust that are required by any governmental unit.

5.4     Tax Returns.

The Litigation Trustee shall file U.S. federal income tax returns for the Litigation Trust as a grantor trust in accordance with United States Treasury Regulation section 1.671-4 and report, but not pay tax on, the Litigation Trust's tax items of income, gain, loss, deduction and credit ("LT Tax Items"), The Holders of Litigation Trust Interests shall report such LT Tax Items on their U.S. federal income tax returns and pay any resulting U.S. federal income tax liability. In addition, the Litigation Trust shall file in a timely manner such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes shown as due thereon. Within a reasonable time following the end of the taxable year, the Litigation Trust shall send to each Litigation Trust Beneficiary a separate statement setting forth the Litigation Trust Beneficiary's share of LT Tax Items and will instruct each such Litigation Trust Beneficiary to report such items on its applicable income tax return. The Litigation Trust may provide each Litigation Trust Beneficiary with a copy of the Form 1041 for the Litigation Trust (without attaching any other Litigation Trust Beneficiary's Schedule K-1 or other applicable information form) along with such Litigation Trust Beneficiary's Schedule K-1 or other applicable information form in order to satisfy the foregoing requirement.

5.5     Expedited Determination of Taxes.

The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust under applicable law for all returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

5.6     Withholding of Taxes; Litigation Trust Taxes.

The Litigation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Litigation Trust to the Litigation Trust Beneficiaries shall be subject to any such withholding and reporting requirements. To the extent that the operation of the Litigation Trust or the liquidation of the Litigation Trust Assets creates a tax liability imposed on the Litigation Trust, the Litigation Trust shall timely pay such tax liability and any such payment shall be considered a

cost and expense of the operation of the Litigation Trust. All Litigation Trust Beneficiaries shall be required to provide any information necessary to comply with all withholding and reporting requirements.

## ARTICLE 6

## DISTRIBUTIONS

6.1    <u>Distributions</u>.

The Litigation Trustee shall distribute all Litigation Trust Proceeds in accordance with the Plan and the Litigation Proceeds Waterfall at such time or times as the Litigation Trustee, after consultation with the Litigation Oversight Committee, may determine, <u>provided, however,</u> that the Litigation Trust shall promptly distribute all Litigation Trust Proceeds recovered from and after the entry of a Final Order resolving all of the Litigation Claims.

6.2    <u>Manner of Payment or Distribution</u>.

(a)    All distributions made by the Litigation Trustee to Holders of Litigation Trust Interests shall be payable by the Litigation Trustee directly to the Holders of Litigation Trust Interests of record as of the twentieth (20th) day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such date for the distribution shall be the following Business Day.

(b)    All Litigation Trust Proceeds shall be distributed in accordance with the Plan and the Litigation Proceeds Waterfall.

6.3    <u>Delivery of Litigation Trust Distributions</u>.

All distributions under this Litigation Trust Agreement to any Holder of Litigation Trust Interests, shall be made at the address of such Holder as set forth in the Trust Register or at such other address or in such other manner as such Holder of Litigation Trust Interests shall have specified for payment purposes in a written notice to the Litigation Trustee and the Registrar at least twenty (20) days prior to such distribution date. If any distribution to any Litigation Trust Beneficiary is returned as undeliverable, and after reasonable efforts the Litigation Trustee has not been able to determine the current address of the Litigation Trust Beneficiary, such undeliverable or unclaimed distribution shall be deemed unclaimed property 120 days after the date of such distribution and shall be reallocated to the remaining Litigation Trust Beneficiaries and shall be distributed in accordance with the Plan and the Litigation Proceeds Waterfall. Such undeliverable or unclaimed distributions shall not be subject to (i) any claims by such Litigation Trust Beneficiary, or (ii) the unclaimed property or escheat laws of any state or governmental unit.

6.4    <u>Cash Distributions</u>.

No Cash distributions shall be required to be made to any Litigation Trust Beneficiary in an amount less than $100.00. Any funds so withheld and not distributed

shall be held in reserve and distributed in subsequent distributions. Notwithstanding the foregoing, all Cash shall be distributed in the final distribution of the Litigation Trust Proceeds.

ARTICLE 7

INDEMNIFICATION

7.1    Indemnification of the Litigation Trustee and the Litigation Oversight Committee.

(a)    To the fullest extent permitted by law, the Litigation Trust, to the extent of its assets legally available for that purpose, will indemnify and hold harmless the Litigation Trustee and the Litigation Oversight Committee and each of their respective directors, members, shareholders, partners, officers, agents, professionals or employees (collectively, the "Litigation Trust Indemnified Parties" and each a "Litigation Trust Indemnified Party") from and against any and all loss, cost, damage, expense (including fees and expenses of attorneys and other advisors and any court costs incurred by any Litigation Trust Indemnified Party) or liability by reason of anything any Litigation Trust Indemnified Party did, does or refrains from doing for the business or affairs of the Litigation Trust, except to the extent that it is finally judicially determined by a court of competent jurisdiction that the loss, cost, damage, expense or liability resulted from the Litigation Trust Indemnified Party's gross negligence or willful misconduct.

(b)    Notwithstanding any provision herein to the contrary, the Litigation Trust Indemnified Parties shall be entitled to obtain advances from the Litigation Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts and omissions, actual or alleged, of a Litigation Trust Indemnified Party in its capacity as such, provided, however, that the Litigation Trust Indemnified Parties receiving such advances shall repay the amounts so advanced to the Litigation Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Litigation Trust Indemnified Parties were not entitled to any indemnity under the provisions of this Section 7.1, The foregoing indemnity in respect of any Litigation Trust Indemnified Party shall survive the termination, resignation or removal of such Litigation Trust Indemnified Party from the capacity for which they are indemnified. Termination or modification of the Trust Agreement shall not affect any indemnification rights or obligations then existing.

(c)    The rights to indemnification under this Section 7.1 are not exclusive of other rights which any Litigation Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution. Nothing in this Section 7.1 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under this Litigation Trust Agreement or any other agreement or instrument to which that Person is a party.

## ARTICLE 8

## REPORTS TO LITIGATION TRUST BENEFICIARIES

8.1     <u>Reports</u>.

(a)     The Litigation Trustee shall file quarterly reports with the Bankruptcy Court (and serve the same upon counsel for the Reorganized Debtors), and provide annual reports to the Litigation Trust Beneficiaries, with respect to (i) the prosecution and resolution of the Litigation Trust Assets, and (ii) expenditures, receipts, and distributions of the Litigation Trust. The Litigation Trustee shall cause to be prepared, as applicable, either at such times as may be required by the Exchange Act, if applicable, or, not less than annually, financial statements of the Litigation Trust, to be delivered to the Litigation Trust Beneficiaries together with annual income tax reporting of the Litigation Trust. To the extent required by law, the financial statements prepared as of the end of the fiscal year shall be audited by nationally recognized independent accountants in accordance with U.S. generally accepted accounting principles. The materiality and scope of audit determinations shall be established between the Litigation Trustee (in consultation with the Litigation Oversight Committee) and the appointed auditors with a view toward safeguarding the value of the Litigation Trust Assets, but nothing relating to the mutually agreed scope of work shall result in any limitation of audit scope that would cause the auditors to qualify their opinion as to scope of work with respect to such financial statements.

(b)     Within ten (10) Business Days after the end of the relevant report preparation period the Litigation Trustee shall cause any information reported pursuant to <u>Section 8.1(a)</u> herein to be provided to such Litigation Trust Beneficiaries and to be filed with the Bankruptcy Court.

(c)     Any report required to be distributed by the Litigation Trustee under <u>Section 8.1(a)</u> hereof shall also be distributed to the Persons listed in <u>Section 11.6</u> hereof concurrently with its distribution to the Litigation Trust Beneficiaries under <u>Section 8.1(a)</u> hereof. The Litigation Trustee may post any report required to be provided under this <u>Section 8.1</u> on a web site maintained by the Litigation Trustee in lieu of actual notice to the Litigation Trust Beneficiaries (unless otherwise required by law) subject to providing notice to the Persons listed in <u>Section 11.6</u> herein.

## ARTICLE 9

## TERM; TERMINATION OF THE LITIGATION TRUST

9.1     <u>Term; Termination of the Litigation Trust</u>.

(a)     The Litigation Trust will be dissolved no later than five (5) years from the Effective Date; <u>provided, however</u>, that the Bankruptcy Court, upon motion by a party in interest, on notice with an opportunity for a hearing, may extend the term of the Litigation Trust for a finite period if (i) such extension is necessary to the purpose of

the Litigation Trust, (ii) the Litigation Trustee receives an opinion of counsel or a ruling from the Internal Revenue Service stating that such extension would not adversely affect the status of the Litigation Trust as a liquidating trust for U.S. federal income tax purposes, and (iii) such extension is obtained within the six (6) month period prior to the Litigation Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable.

(b)    Upon dissolution of the Litigation Trust, any remaining Cash on hand, including any Cash in the Expense Fund, and other assets, with the exception of any Litigation Claims, will be distributed to the Litigation Trust Beneficiaries in accordance with the Plan, this Litigation Trust Agreement and the Litigation Proceeds Waterfall.

(c)    If for any reason the Litigation Trust shall terminate and be deemed wound up prior to the entry of a Final Order resolving the Litigation Claims (by way of judgment, settlement or otherwise) and receipt by the Litigation Trust of all amounts to which the Litigation Trust may be entitled, notwithstanding anything to the contrary set forth herein, the distribution of any proceeds recovered at any time on account of the Litigation Claims shall be made in accordance with the Litigation Proceeds Waterfall.

9.2    Continuance of the Litigation Trustee for Winding Up.

After the termination of the Litigation Trust and for the purpose of liquidating and winding up the affairs of the Litigation Trust, the Litigation Trustee shall continue to act as such until the Litigation Trustee's duties have been fully performed. Prior to the final distribution of all of the remaining Litigation Trust Assets and upon approval of the Litigation Oversight Committee, the Litigation Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Litigation Trustee's own costs and expenses in accordance with Section 3.11 herein until such time as the winding up of the Litigation Trust is completed. Upon termination of the Litigation Trust, subject to the terms and conditions contained in the Confidentiality and Common Interest Agreement, the Litigation Trustee shall retain for a period of two (2) years, as a cost of administering the Litigation Trust, the books, records, Litigation Trust Beneficiary lists, the Trust Register, and certificates and other documents and files that have been delivered to or created by the Litigation Trustee. Subject to the terms and conditions contained in the Confidentiality and Common Interest Agreement, at the Litigation Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the completion and winding up of the affairs of the Litigation Trust. Except as otherwise specifically provided herein, upon the termination of the Litigation Trust, the Litigation Trustee shall have no further duties or obligations hereunder.

ARTICLE 10

AMENDMENT AND WAIVER

Any substantive provision of this Litigation Trust Agreement, except for this <u>Article 10</u> and <u>Section 1.5</u> herein, may be amended or waived in writing by the Litigation Trustee, upon notice and approval by the Litigation Oversight Committee and approval of the Bankruptcy Court and provision of reasonable notice to the Reorganized Debtors; <u>provided</u>, <u>however,</u> that any modification that may adversely affect distributions to Litigation Trust Beneficiaries shall require the consent of the Investors. Notwithstanding the foregoing, any amendment or waiver which materially and adversely affects the Reorganized Debtors shall require their consent. Technical amendments to this Litigation Trust Agreement may be made, as necessary to clarify this Litigation Trust Agreement or enable the Litigation Trustee to effectuate the terms of this Litigation Trust Agreement, by the Litigation Trustee with approval by a majority of the Litigation Oversight Committee; <u>provided, however</u>, that all amendments of this Litigation Trust Agreement shall be consistent with the Plan and the purpose and intention of the Litigation Trust to liquidate in an expeditious but orderly manner the Litigation Trust Assets in accordance with United States Treasury Regulation section 301.7701-4(d) and <u>Section 1.4</u> herein.

ARTICLE 11

MISCELLANEOUS PROVISIONS

11.1    <u>Intention of Parties to Establish a Liquidating Trust,</u>

The Litigation Trust is intended to be classified as a liquidating trust for U.S. federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Litigation Trust Agreement may be amended in accordance with <u>Article 10</u> herein to comply with such U.S. federal income tax laws, which amendments may apply retroactively.

11.2    <u>Reimbursement of Trust Costs,</u>

If the Litigation Trustee, the Litigation Oversight Committee, the Litigation Trust, or any Debtor or Reorganized Debtor, as the case may be, is the prevailing party in a dispute regarding the provisions of this Litigation Trust Agreement or the enforcement thereof, the Litigation Trustee, the Litigation Oversight Committee, the Litigation Trust or any Debtor or Reorganized Debtor, as the case may be, shall be entitled to collect any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action. To the extent that the Litigation Trust has advanced such amounts, the Litigation Trust may recover such amounts from the non-prevailing party.

11.3    <u>Laws as to Construction,</u>

Except to the extent the Bankruptcy Code or Federal Rules of Bankruptcy Procedure are applicable, this Litigation Trust Agreement shall be governed by, and

construed and enforced in accordance with, the federal laws of the United States and, to the extent there is no applicable federal law, the domestic laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof.

11.4    Jurisdiction.

The Bankruptcy Court shall have the exclusive jurisdiction with respect to any action relating to or arising from the Litigation Trust.

11.5    Severability.

If any provision of this Litigation Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Litigation Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Litigation Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

11.6    Notices.

(a)    All notices, requests or other communications to the Parties hereto shall be in writing and shall be sufficiently given only if: (i) delivered in person; (ii) sent by electronic or facsimile communication (as evidenced by an electronic mail return receipt or confirmed fax transmission report, respectively); (iii) sent by registered or certified mail, return receipt requested; or (iv) sent by commercial delivery service or courier. Until a change of address is communicated, as provided below, all notices, requests and other communications shall be sent to the parties at the following addresses or facsimile numbers:

(i)    If to the Litigation Trustee, to:

_____
_____
_____
_____
Tel: _____
Email: _____

With a copy to:

_____
_____
_____
Attn:_____
Tel: _____
Email: _____

(ii)    If to the Litigation Oversight Committee, to the last known address(es) and facsimile number(s) provided by the Litigation Oversight Committee to the Litigation Trustee.

(iii)    If to the Reorganized Debtors, to:

_____
_____
Attn:_____
Tel: _____
Email: _____

With a copy to:

_____
_____
Attn:_____
Tel: _____
Email: _____

(iv)    If to a Litigation Trust Beneficiary: to the name and address set forth on the Trust Register, provided that general notices to all Litigation Trust Beneficiaries may be made by posting such notice to a website identified in advance for communication with Litigation Trust Beneficiaries.

(b)    All notices shall be effective and shall be deemed delivered: (i) if by personal delivery, delivery service or courier, on the date of delivery; (ii) if by electronic mail or facsimile communication, on the date of receipt or confirmed transmission of the communication; and (iii) if by mail, on the date of receipt. Any Party from time to time may change its address, facsimile number or other information for the purpose of notices to that Party by giving notice specifying such change to the other Party hereto.

11.7    Fiscal Year.

The fiscal year of the Litigation Trust will begin on the first day of January and end on the last day of December of each year.

11.8    Headings.

The section headings contained in this Litigation Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Litigation Trust Agreement or of any term or provision hereof.

11.9    Counterparts,

This Litigation Trust Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all together shall constitute one agreement.

11.10  <u>Confidentiality</u>.

The Litigation Trustee and each successor Litigation Trustee and each member of the Litigation Oversight Committee and each successor member of the Litigation Oversight Committee (each a "<u>Covered Person</u>") shall, during the period that they serve in such capacity under this Litigation Trust Agreement and following either the termination of this Litigation Trust Agreement or such individual's removal, incapacity, or resignation hereunder, hold strictly confidential any material, non-public information of or pertaining to any Person to which any of the Litigation Trust Assets relates or of which it has become aware in its capacity (the "<u>Information</u>"), except to the extent disclosure is required by applicable law, order, regulation or legal process. In the event that any Covered Person is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigation, demand or similar legal process) to disclose any Information, such Covered Person shall notify the Litigation Oversight Committee and the Reorganized Debtors reasonably promptly (unless prohibited by law) so that the Litigation Oversight Committee and/or the Reorganized Debtors may seek an appropriate protective order or other appropriate remedy or, in its discretion, waive compliance with the terms of this <u>Section 11.10</u>, subject to the Confidentiality and Common Interest Agreement, (and if the Litigation Oversight Committee or Reorganized Debtors seeks such an order, the relevant Covered Person will provide cooperation as the Litigation Oversight Committee and/or Reorganized Debtors shall reasonably request). In the event that no such protective order or other remedy is obtained, or that the Litigation Oversight Committee and the Reorganized Debtors waives compliance with the terms of this <u>Section 11.10</u>, subject to the LT Confidentiality and Common Interest Agreement, and that any Covered Person is nonetheless legally compelled to disclose the Information, the Covered Person will furnish only that portion of the Information, which the Covered Person, advised by counsel, is legally required and will give the Litigation Oversight Committee and the Reorganized Debtors written notice (unless prohibited by law) of the Information to be disclosed as far in advance as practicable and exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Information.

11.11  <u>Entire Agreement</u>.

This Litigation Trust Agreement (including the Recitals), the Confirmation Order, and the Plan constitute the entire agreement by and among the Parties hereto and there are no representations, warranties, covenants or obligations except as set forth herein or therein. This Litigation Trust Agreement, the Plan and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations, discussions, written or oral, of the Parties hereto, relating to any transaction contemplated hereunder. Except as otherwise specifically provided herein, in the Plan or in the Confirmation Order, nothing in this Litigation Trust Agreement is intended or shall be construed to confer upon or to give any Person other than the Parties hereto and their respective heirs, administrators, executors, successors, or assigns any right to remedies under or by reason of this Litigation Trust Agreement.

11.12  <u>Rules of Interpretation</u>.

For purposes of this Litigation Trust Agreement, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Litigation Trust Agreement as a whole and not to any particular section, subsection or clause contained in this Litigation Trust Agreement; (c) the rules of construction set forth in 11 U.S.C. § 102 will apply; and (d) the term "including" shall be construed to mean "including, but not limited to," "including, without limitation," or words of similar import.

11.13    Effectiveness.

This Litigation Trust Agreement shall become effective on the Effective Date.

11.14    No Waiver.

The Reorganized Debtors and the Litigation Trustee agree that no failure or delay by either party in exercising any right, power or privilege hereunder will operate as a waiver thereof, and that no single or partial exercise thereof will preclude any other or further exercise thereof or the exercise of any right, power and privilege hereunder.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties hereto have either executed and acknowledged this Litigation Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

ASHINC CORPORATION (for itself and on behalf of the other Debtors, as Debtors and Debtors in Possession

By: _____
Title:

BLACK DIAMOND COMMERCIAL FINANCE L.L.C. (as Co-Administrative Agent)

By: _____
Title:

SPECTRUM COMMERCIAL FINANCE LLC (as Co-Administrative Agent)

By: _____
Title:

_____, AS LITIGATION TRUSTEE

_____, as

LITIGATION TRUSTEE

DOC ID - 23336003.5

SIGNATURE PAGE – LITIGATION TRUST AGREEMENT

## EXHIBIT A
## THE LITIGATION TRUSTEE

**EXHIBIT B**

**INITIAL MEMBERS OF THE LITIGATION OVERSIGHT COMMITTEE**

Jeffrey Buller
Brad Berliner
Samuel Goldfarb

# Exhibits 109 - 123

# Filed Under Seal

# Exhibit 124

# D.I. 1, Case No. 12-11564

B 5 (Official Form 5) (12/07)

| UNITED STATES BANKRUPTCY COURT<br>District of Delaware | INVOLUNTARY<br>PETITION |
|---|---|

| IN RE (Name of Debtor – If Individual: Last, First, Middle)<br><br>Allied Systems Holdings, Inc. | ALL OTHER NAMES used by debtor in the last 8 years<br>(Include married, maiden, and trade names.)<br><br>Allied Holdings, Inc. |
|---|---|

| Last four digits of Social-Security or other Individual's Tax-I.D. No /Complete EIN<br>(If more than one, state all.):<br>58-0360550 | |
|---|---|

| STREET ADDRESS OF DEBTOR (No. and street, city, state, and zip code)<br><br>2711 Centerville Road, Suite 400<br>Wilmington, Delaware 19808 | MAILING ADDRESS OF DEBTOR (If different from street address)<br><br>2302 Parklake Drive, Building 15<br>Suite 600, Atlanta, GA 30345 |
|---|---|
| COUNTY OF RESIDENCE OR PRINCIPAL PLACE OF BUSINESS<br>New Castle              ZIP CODE<br>                                19808 | ZIP CODE<br>30345 |

LOCATION OF PRINCIPAL ASSETS OF BUSINESS DEBTOR (If different from previously listed addresses)

CHAPTER OF BANKRUPTCY CODE UNDER WHICH PETITION IS FILED

☐ Chapter 7    ☑ Chapter 11

**INFORMATION REGARDING DEBTOR (Check applicable boxes)**

| Nature of Debts<br>(Check one box.)<br><br>Petitioners believe:<br><br>☐ Debts are primarily consumer debts<br>☑ Debts are primarily business debts | Type of Debtor<br>(Form of Organization)<br><br>☐ Individual (Includes Joint Debtor)<br>☑ Corporation (Includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities,<br>   check this box and state type of entity below.) | Nature of Business<br>(Check one box.)<br><br>☐ Health Care Business<br>☐ Single Asset Real Estate as defined in<br>   11 U.S.C. § 101(51)(B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☑ Other |
|---|---|---|

| VENUE | FILING FEE (Check one box) |
|---|---|
| ☑ Debtor has been domiciled or has had a residence, principal<br>place of business, or principal assets in the District for 180<br>days immediately preceding the date of this petition or for<br>a longer part of such 180 days than in any other District.<br><br>☐ A bankruptcy case concerning debtor's affiliate, general<br>partner or partnership is pending in this District. | ☑ Full Filing Fee attached<br><br>☐ Petitioner is a child support creditor or its representative, and the form<br>   specified in § 304(g) of the Bankruptcy Reform Act of 1994 is attached.<br>   [If a child support creditor or its representative is a petitioner, and if the<br>   petitioner files the form specified in § 304(g) of the Bankruptcy Reform Act of<br>   1994, no fee is required.] |

**PENDING BANKRUPTCY CASE FILED BY OR AGAINST ANY PARTNER<br>OR AFFILIATE OF THIS DEBTOR (Report information for any additional cases on attached sheets.)**

| Name of Debtor | Case Number | Date |
|---|---|---|
| Relationship | District | Judge |

| ALLEGATIONS<br>(Check applicable boxes) | COURT USE ONLY |
|---|---|
| 1.  ☑ Petitioner (s) are eligible to file this petition pursuant to 11 U.S.C. § 303 (b).<br>2.  ☑ The debtor is a person against whom an order for relief may be entered under title 11 of the United<br>     States Code.<br>3.a. ☑ The debtor is generally not paying such debtor's debts as they become due, unless such debts are<br>     the subject of a bona fide dispute as to liability or amount;<br>                            or<br>  b. ☐ Within 120 days preceding the filing of this petition, a custodian, other than a trustee receiver, or<br>     agent appointed or authorized to take charge of less than substantially all of the property of the<br>     debtor for the purpose of enforcing a lien against such property, was appointed or took possession. | |

B 5 (Official Form 5) (12/07) – Page 2

Name of Debtor  Allied Systems Holdings, Inc.

Case No. _____

| TRANSFER OF CLAIM |
| --- |
| ☑ Check this box if there has been a transfer of any claim against the debtor by or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a). |

**REQUEST FOR RELIEF**

Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached.

Petitioner(s) declare under penalty of perjury that the foregoing is true and correct according to the best of their knowledge, information, and belief.

x _____
Signature of Petitioner or Representative (State title)
BDCM Opportunity Fund II, LP

Name of Petitioner                    Date Signed
                                      Stephen H. Deckoff, Managing Principal
Name & Mailing        BDCM Opportunity Fund II, LP
Address of Individual  By: BDCM Opportunity Fund II, Adviser, L.L.C.
Signing in Representative    One Sound Shore Drive
Capacity                     Suite 200
                             Greenwich, CT 06830

x _____  5/17/12
Signature of Attorney          Date
Landis Rath & Cobb LLP By Kerri K. Mumford (DE 4186)
Name of Attorney Firm (If any)
919 Market St., Suite 1800 Wilmington, DE 19801
Address
(302) 467-4400
Telephone No.

x _____
Signature of Petitioner or Representative (State title)
Black Diamond CLO 2005-1 Ltd.

Name of Petitioner                    Date Signed
                                      Stephen H. Deckoff, Managing Principal
Name & Mailing        Black Diamond CLO 2005-1 Ltd.
Address of Individual  By: Black Diamond CLO 2005-1 Adviser, L.L.C.
Signing in Representative    One Sound Shore Drive
Capacity                     Suite 200
                             Greenwich, CT 06830

x _____  5/17/12
Signature of Attorney          Date
Landis Rath & Cobb LLP
Name of Attorney Firm (If any)
919 Market St., Suite 1800 Wilmington, DE 19801
Address
(302) 467-4400
Telephone No.

x _____
Signature of Petitioner or Representative (State title)
Spectrum Investment Partners LP

Name of Petitioner                    Date Signed
                                      Jeffrey A. Schaffer, Managing Member
Name & Mailing        Spectrum Investment Partners LP
Address of Individual  By: Spectrum Group Management LLC
Signing in Representative    1250 Broadway, 19th Floor
Capacity                     New York, NY 10001

x _____
Signature of Attorney          Date
Landis Rath & Cobb LLP
Name of Attorney Firm (If any)
919 Market St., Suite 1800 Wilmington, DE 19801
Address
(302) 467-4400
Telephone No.

| PETITIONING CREDITORS | | |
| --- | --- | --- |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| BDCM Opportunity Fund II, LP | Bus. debt - loan default | At Least $26.8 million |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Black Diamond CLO 2005-1 Ltd. | Bus. debt - loan default | At Least $4.5 million |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Spectrum Investment Partners LP | Bus. debt - loan default | At Least $21.5 million |
| Note: If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims  At Least $52.8 million |

___0___ continuation sheets attached

B 5 (Official Form 5) (12/07) – Page 2      Name of Debtor __Allied Systems Holdings, Inc.__

Case No. _____

| TRANSFER OF CLAIM |
|---|
| ☑ Check this box if there has been a transfer of any claim against the debtor by or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a). |

| REQUEST FOR RELIEF |
|---|
| Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached. |

Petitioner(s) declare under penalty of perjury that the foregoing is true and correct according to the best of their knowledge, information, and belief.

| | |
|---|---|
| x_____<br>Signature of Petitioner or Representative (State title)<br>**BDCM  Opportunity Fund II, LP** | x_____ Date<br>Signature of Attorney<br>**Landis Rath & Cobb LLP By Kerri K. Mumford (DE 4186)** |
| Name of Petitioner          Date Signed<br>     Stephen H. Deckoff, Managing Principal<br>Name & Mailing    BDCM Opportunity Fund II, LP<br>Address of Individual   By: BDCM Opportunity Fund II, Adviser, L.L.C.<br>Signing in Representative     One Sound Shore Drive<br>Capacity             Suite 200<br>              Greenwich, CT 06830 | Name of Attorney Firm (If any)<br>    919 Market St., Sutie 1800 Wilmington, DE 19801<br>Address<br>    (302) 467-4400<br><br>Telephone No. |
| x_____<br>Signature of Petitioner or Representative (State title)<br>**Black Diamond CLO 2005-1 Ltd.** | x_____ Date<br>Signature of Attorney<br>**Landis Rath & Cobb LLP** |
| Name of Petitioner          Date Signed<br>     Stephen H. Deckoff, Managing Principal<br>Name & Mailing    Black Diamond CLO 2005-1 Ltd.<br>Address of Individual   By: Black Diamond CLO 2005-1 Adviser, L.L.C.<br>Signing in Representative     One Sound Shore Drive<br>Capacity             Suite 200<br>              Greenwich, CT 06830 | Name of Attorney Firm (If any)<br>    919 Market St., Sutie 1800 Wilmington, DE 19801<br>Address<br>    (302) 467-4400<br><br>Telephone No. |
| x_____<br>Signature of Petitioner or Representative (State title)<br>**Spectrum Investment Partners LP** | x_____ Date<br>Signature of Attorney<br>**Landis Rath & Cobb LLP** |
| Name of Petitioner          Date Signed<br>     Jeffrey A. Schaffer, Managing Member<br>Name & Mailing    Spectrum Investment Partners LP<br>Address of Individual   By: Spectrum Group Management LLC<br>Signing in Representative<br>Capacity          1250 Broadway, 19th Floor<br>            New York, NY 10001 | Name of Attorney Firm (If any)<br>    919 Market St., Sutie 1800 Wilmington, DE 19801<br>Address<br>    (302) 467-4400<br><br>Telephone No. |

| PETITIONING CREDITORS | | |
|---|---|---|
| Name and Address of Petitioner<br>BDCM Opportunity Fund II, LP | Nature of Claim<br>Bus. debt - loan default | Amount of Claim<br>At Least $26.8 million |
| Name and Address of Petitioner<br>Black Diamond CLO 2005-1 Ltd. | Nature of Claim<br>Bus. debt - loan default | Amount of Claim<br>At Least $4.5 million |
| Name and Address of Petitioner<br>Spectrum Investment Partners LP | Nature of Claim<br>Bus. debt - loan default | Amount of Claim<br>At Least $21.5 million |
| Note:    If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims.<br>At Least $52.8 million |

         0    continuation sheets attached

# Exhibit 125

# D.I. 1, Case No. 05-12515

**(Official Form 1) (12/03)**

| FORM B1 | **United States Bankruptcy Court**<br>**Northern District of Georgia** | **Voluntary Petition** |
|---|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Allied Holdings, Inc.** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names):<br>**AKA Allied Holdings** | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. No. / Complete EIN or other Tax I.D. No.<br>(if more than one, state all):  **58-0360550** | Last four digits of Soc. Sec. No. / Complete EIN or other Tax I.D. No.<br>(if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>**160 Clairemont Avenue**<br>**Decatur, GA 30030-2557** | Street Address of Joint Debtor (No. & Street, City, State & Zip Code): |
| County of Residence or of the<br>Principal Place of Business:  **Dekalb** | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>**160 Clairemont**<br>**Decatur, GA 30030-2557** | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor **Same as street address**<br>(if different from street address above): | |

**Information Regarding the Debtor (Check the Applicable Boxes)**

**Venue** (Check any applicable box)
- ■ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| **Type of Debtor** (Check all boxes that apply) | | **Chapter or Section of Bankruptcy Code Under Which**<br>**the Petition is Filed** (Check one box) | |
|---|---|---|---|
| ☐ Individual(s) | ☐ Railroad | ☐ Chapter 7  ■ Chapter 11  ☐ Chapter 13 | |
| ■ Corporation | ☐ Stockbroker | ☐ Chapter 9  ☐ Chapter 12 | |
| ☐ Partnership | ☐ Commodity Broker | ☐ Sec. 304 - Case ancillary to foreign proceeding | |
| ☐ Other_____ | ☐ Clearing Bank | | |

| **Nature of Debts** (Check one box) | | **Filing Fee** (Check one box) |
|---|---|---|
| ☐ Consumer/Non-Business | ■ Business | ■ Full Filing Fee attached |

**Chapter 11 Small Business** (Check all boxes that apply)
- ☐ Debtor is a small business as defined in 11 U.S.C. § 101
- ☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e) (Optional)

☐ Filing Fee to be paid in installments (Applicable to individuals only.) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3.
**\*\*\* Jeffrey W. Kelley 412296 \*\*\***

**Statistical/Administrative Information** (Estimates only)
- ■ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

| Estimated Number of Creditors | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ■ | ☐ |

| Estimated Assets | $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ■ |

| Estimated Debts | $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ■ |

# Voluntary Petition
*(This page must be completed and filed in every case)*

Name of Debtor(s):
**Allied Holdings, Inc.**

| Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet) | | |
|---|---|---|
| Location Where Filed:  **- None -** | Case Number: | Date Filed: |

| Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor (If more than one, attach additional sheet) | | |
|---|---|---|
| Name of Debtor: **- None -** | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Debtor

X _____
Signature of Joint Debtor

_____
Telephone Number (If not represented by attorney)

_____
Date

### Signature of Attorney

X _____
Signature of Attorney for Debtor(s)

**Jeffrey W. Kelley 412296**
Printed Name of Attorney for Debtor(s)

**Troutman Sanders LLP**
Firm Name

**Bank of America Plaza, Suite 5200
600 Peachtree Street, NE
Atlanta, GE 30308-2216**
Address

**404-885-3000**
Telephone Number

7/31/05
Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

**Thomas H. King**
Printed Name of Authorized Individual

**Executive Vice President and Chief Financial Officer**
Title of Authorized Individual

7 31 2005
Date

### Exhibit A
(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

■ Exhibit A is attached and made a part of this petition.

### Exhibit B
(To be completed if debtor is an individual whose debts are primarily consumer debts)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X _____
Signature of Attorney for Debtor(s)          Date

### Exhibit C

Does the debtor own or have possession of any property that poses a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.

■ No

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed Name of Bankruptcy Petition Preparer

_____
Social Security Number (Required by 11 U.S.C. § 110(c).)

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.

## United States Bankruptcy Court
### Northern District of Georgia

In re  **Allied Holdings, Inc.**                                                   Case No. _____

                                                          Debtor

                                                                   Chapter_____11_____

## Exhibit "A" to Voluntary Petition

1.  If any of debtor's securities are registered under Section 12 of the Securities Exchange Act of 1934, the SEC file number is __**0-22276**_____.

2.  The following financial data is the latest available information and refers to debtor's condition on __**March 2005**_____.

    a. Total assets                                  $_____**132,226,000.00**_____

    b. Total debts (including debts listed in 2.c.,below)   $_____**179,895,000.00**_____

                                                                      Approximate
                                                                      number of
                                                                      holders

    c. Debt securities held by more than 500 holders.

    secured / /    unsecured / /    subordinated / /   $  **150,000,000.00**   **unknown**

    secured / /    unsecured / /    subordinated / /   $_____0.00   _____0

    secured / /    unsecured / /    subordinated / /   $_____0.00   _____0

    secured / /    unsecured / /    subordinated / /   $_____0.00   _____0

    secured / /    unsecured / /    subordinated / /   $_____0.00   _____0

    d. Number of shares of preferred stock          _____0      _____0

    e. Number of shares of common stock             _____8,940,167    _____1,434

    Comments, if any:

3.  Brief description of debtor's business:
    **Allied Holdings, Inc. serves as the parent for the Allied and Axis entities, which provide short-haul services for original equipment manufacturers and provide logistical services.**

4.  List the name of any person who directly or indirectly owns, controls, or holds, with power to vote, 5% or more of the voting securities of debtor:
    **\*\*see attachment\*\***

Copyright (c) 1996-2005   Best Case Solutions, Inc. - Evanston, IL - (800) 492-8037                                          Best Case Bankruptcy

In re  Allied Holdings, Inc.

Debtor(s)

Case No. _____

## Exhibit "A" to Voluntary Petition
### Attachment 1

# Common Stock Ownership Over 5%

| Beneficial Owner | # of shares owned (1) | % of shares outstanding |
|---|---|---|
| Robert J. Rutland | 1,123,894 | 12.6 |
| Guy W. Rutland, III | 850,718 | 9.5 |
| Guy W. Rutland, IV | 651,936 | 7.3 |
| Beck, Mack & Oliver LLC | 1,018,050 **(2)** | 11.4 |
| Alan W. Weber | 1,069,900 **(2)** | 12.0 |
| J.B. Capital Partners, L.P | 1,020,800 **(2)** | 11.4 |
| Dimensional Fund Advisors, Inc. | 466,635 **(2)** | 5.2 |
| Robert E. Robotti, Robbotti & Company, LLC, Robotti & Company Advisors, LLC and The Ravenswood Management Company, LLC and the Ravenswood Investment Company, L.P. | 732,597 **(2)** | 8.2 |

(1)     Number of shares of common stock beneficially owned as of March 2005.

(2)     Based solely on the most recent schedule 13D/136 filed with the Securities and Exchange Commission.

# ALLIED HOLDINGS, INC.

## Proposed Resolutions to be Adopted by the Board of Directors

**WHEREAS,** after due consideration and analysis, the Board of Directors has determined that it is desirable and in the best interests of the Corporation, its creditors, shareholders, employees and other interested parties, that the Corporation and certain of its subsidiaries commence Chapter 11 cases by filing voluntary petitions for relief under the provisions of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code");

**NOW, THEREFORE, BE IT RESOLVED,** that, in the judgment of the Board of Directors, it is desirable and in the best interests of the Corporation, its creditors, shareholders, employees and other interested parties, that the Corporation commence a Chapter 11 case by filing a voluntary petition for relief under the Bankruptcy Code; and

**RESOLVED,** that each of Hugh E. Sawyer, President and Chief Executive Officer of the Corporation, Thomas H. King, Executive Vice President and Chief Financial Officer of the Corporation, and Thomas M. Duffy, Executive Vice President, General Counsel and Secretary of the Corporation (each, an "Authorized Officer" and together, the "Authorized Officers"), be and hereby is authorized and empowered on behalf of, and in the name of, the Corporation to execute and verify or certify, or cause to be executed and verified or certified, a voluntary petition under Chapter 11 of the Bankruptcy Code and to cause the same to be filed in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"), at such time as said Authorized Officer executing the same shall determine and in such form and forms as such Authorized Officer may approve, and that the execution, verification or certification of such petitions under Chapter 11 of the Bankruptcy Code and such filings by the Authorized Officers in connection with, and in furtherance of, the foregoing resolution, be and the same hereby is specifically authorized; and

**RESOLVED,** that Thomas H. King is hereby designated and appointed as agent for service of process for the Corporation in connection with the petition and filing thereof with the Bankruptcy Court, and that the naming of Thomas H. King in the petition to serve in such capacity is hereby authorized and approved; and

**RESOLVED,** that each of the Authorized Officers, and such other officers of the Corporation as the Authorized Officers shall from time to time designate, be and hereby are authorized, empowered and directed on behalf of, and in the name of, the Corporation to execute and file any and all petitions, schedules, motions, lists, applications, pleadings and other papers, to take any and all such other and further actions which the Authorized Officers, other designated officers or the Corporation's legal counsel may deem necessary, appropriate, proper or desirable to file the voluntary petition for relief under the Bankruptcy Code, including, but not limited to, motions to obtain the use of cash collateral and to incur debtor-in-possession financing, and to take and perform any and all further acts and deeds which they may deem necessary, appropriate, proper or desirable in connection with the Chapter 11 case, with a view to the successful

prosecution of such case, and that the execution, filing and the taking of all actions by the Authorized Officers or other designated officers in connection with, and in furtherance of, the foregoing resolution, be and the same hereby is specifically authorized; and

**RESOLVED**, that the debtor-in-possession financing contemplated by that certain Commitment Letter and Term Sheet dated July 12, 2005 from General Electric Capital Corporation, Morgan Stanley Senior Funding, Inc. and Marathon Structured Finance Fund, L.P. previously distributed to the Board of Directors (the "Commitment Letter"), together with any changes thereto as the Authorized Officers deem appropriate, it hereby specifically approved and authorized; and

**RESOLVED**, that the law firm of Troutman Sanders LLP, with an office currently located at 600 Peachtree Street, Atlanta, Georgia 30308 be, and it hereby is, employed as attorneys for the Corporation under a general retainer in connection with the prosecution of the Corporation's case under the Bankruptcy Code; and

**RESOLVED**, that each of the Authorized Officers, and such other officers of the Corporation as the Authorized Officers shall from time to time designate, be and hereby are authorized, empowered and directed on behalf of, and in the name of, the Corporation to retain and employ other attorneys, investment bankers, accountants, restructuring professionals, financial advisors, public relations advisors and other professionals to advise and assist in the Corporation's Chapter 11 case on such terms as such Authorized Officer or other designated officer of the Corporation shall deem necessary, appropriate, proper or desirable; and

**RESOLVED**, that in connection with the commencement of the Chapter 11 case by the Corporation, the Authorized Officers, and such other officers of the Corporation as the Authorized Officers shall from time to time designate, be and hereby are, authorized, empowered and directed on behalf of, and in the name of, the Corporation, to negotiate, execute and deliver, or cause to be negotiated, executed and delivered, a debtor-in-possession loan facility (including, in connection therewith, such notes, security agreements and other agreements or instruments as such officers consider necessary or appropriate) on the terms and conditions set forth in the Commitment Letter or on such other terms and conditions as such Authorized Officer or other designated officer executing the same may consider necessary, appropriate, proper or desirable, such determination to be conclusively evidenced by such execution or the taking of such action, and are hereby authorized, empowered and directed to consummate the transactions contemplated by such agreements or instruments on behalf of the Corporation and any affiliates, and that the execution, delivery and performance by the Authorized Officers or other designated officers in connection with, and in furtherance of, the foregoing resolution, be and the same hereby is specifically authorized; and

**RESOLVED**, that each of the Authorized Officers, and such other officers of the Corporation as the Authorized Officers shall from time to time designate, and any employees or agents (including counsel) designated by or directed by any such officers, be and hereby are authorized, empowered and directed to cause the Corporation and such of its affiliates as

management deems appropriate to take such actions and to enter into, execute, deliver, certify, file and/or record, and perform, such agreements, instruments, motions, affidavits, orders, requests, receipts, guaranties, pledges, financing statements, applications for approvals or ruling of governmental or regulatory authorities, certificates and other documents, and to take such other actions, as in the judgment of such officer, shall be or become necessary, appropriate, proper or desirable to prosecute to a successful completion the Chapter 11 case, to effectuate the restructuring of the debt, other obligations, organizational form and structure and ownership of the Corporation consistent with the foregoing resolutions and to carry out and put into effect the purposes of the foregoing resolutions and the transactions contemplated by these resolutions, their authority thereunto to be evidenced by the taking of such actions, and that the execution, delivery, certification, filing, recording, performance and the taking of all such actions by the Authorized Officers or other designated officers in connection with, and in furtherance of, the foregoing resolutions, be and the same hereby is specifically authorized; and

**RESOLVED,** that the Corporation be, and hereby is, authorized to pay all fees and expenses incurred by it for its account in connection with the transactions approved in any or all of the foregoing resolutions, and all transactions related thereto, and each of the Authorized Officers, and such other officers of the Corporation as the Authorized Officers or other designated officer shall from time to time designate, are hereby authorized, empowered and directed to make said payments as such Authorized Officer or other designated officer may deem necessary, appropriate, advisable or desirable, such payment by any such officer to constitute conclusive evidence of such officer's determination and approval of the necessity, appropriateness, advisability or desirability thereof; and

**RESOLVED,** that any and all past actions heretofore taken by any of the officers or directors of the Corporation in the name of and on behalf of the Corporation in furtherance of any or all of the preceding resolutions be, and the same hereby are, ratified, approved and adopted in their entirety.

# Exhibit 126

# D.I. 2563, Case No. 05-12515

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **ALLIED HOLDINGS, INC.**, *et al.*[1] | **Case Nos. 05-12515 through 05-12526 and 05-12528 through 05-12537** |
| **Debtors.** | **(Jointly Administered)** |
| | **Judge Mullins** |

## JOINT PLAN OF REORGANIZATION OF ALLIED HOLDINGS, INC. AND AFFILIATED DEBTORS PROPOSED BY THE DEBTORS, YUCAIPA AND THE TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTATION INDUSTRY NEGOTIATING COMMITTEE

Dated March 2, 2007

LATHAM & WATKINS LLP
Robert A. Klyman
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

and

PARKER, HUDSON, RAINER & DOBBS LLP
Rufus T. Dorsey
1500 Marquis Two Tower
285 Peachtree Center Ave., N.E.
Atlanta, Georgia 30303
Telephone: (404) 420-5550
Facsimile: (404) 522-8409

Counsel for Yucaipa American Alliance Fund I, LP and
Yucaipa American Alliance (Parallel) Fund I, LP

TROUTMAN SANDERS LLP
Jeffrey W. Kelley
Bank of America Plaza
600 Peachtree Street, N.E. – Suite 5200
Atlanta, Georgia 30308-2216
Telephone: (404) 885-3000
Facsimile: (404) 885-3900

Counsel for the Debtors

PREVIANT, GOLDBERG, UELMEN, GRATZ,
MILLER & BRUEGGEMAN, S.C.
Frederick Perillo
1555 N. River Center Dr., Suite 202
Milwaukee, WI 53212
Telephone: (414) 223-0434
Facsimile: (414) 271-6308

Counsel for the Teamsters National Automobile
Transportation Industry Negotiating Committee

---

[1] The Debtors in the jointly administered cases are: Allied Holdings, Inc., Case No. 05-12515; Allied Automotive Group, Inc., Case No. 05-12516; Allied Systems, Ltd. (L.P.), Case No. 05-12517; Allied Systems (Canada) Company, Case No. 05-12518; QAT, Inc., Case No. 05-12519; RMX LLC, Case No. 05-12520; Transport Support LLC, Case No. 05-12521; F.J. Boutell Driveaway LLC, Case No. 05-12522; Allied Freight Broker LLC, Case No. 05-12523; GACS Incorporated, Case No. 05-12524; Commercial Carriers, Inc., Case No. 05-12525; Axis Group, Inc., Case No. 05-12526; Axis Netherlands, LLC, Case No. 05-12528; Axis Areta, LLC, Case No. 05-12529; Logistic Technology, LLC, Case No. 05-12530; Logistic Systems, LLC, Case No. 05-12531; CT Services, Inc., Case No. 05-12532; Cordin Transport LLC, Case No. 05-12533; Terminal Services LLC, Case No. 05-12534; Axis Canada Company, Case No. 05-12535; Ace Operations, LLC, Case No. 05-12536; and AH Industries Inc., Case No. 05-12537.

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS AND GENERAL PROVISIONS........................................................2

    **1.1**    Definitions.................................................................................2
    **1.2**    Time.........................................................................................22
    **1.3**    Rules of Interpretation ...........................................................22

ARTICLE II. CLASSIFICATION OF CLAIMS AND INTERESTS; IMPAIRMENT .............22

    **2.1**    Summary..................................................................................22
    **2.2**    Deemed Acceptance of Plan ...................................................24
    **2.3**    Deemed Rejection of Plan ......................................................24
    **2.4**    Classes Entitled to Vote on Plan ...........................................24
    **2.5**    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code....................24
    **2.6**    Prepetition Lender Claims ......................................................24

ARTICLE III. TREATMENT OF CLAIMS AND INTERESTS ..........................................24

    **3.1**    Class 1 et seq. -- Other Secured Claims..................................25
    **3.2**    Class 2 -- Priority Non-Tax Claims. .......................................25
    **3.3**    Class 3 -- Workers' Compensation Claims. .............................26
    **3.4**    Class 4A -- General Unsecured Claims. ..................................27
    **3.5**    Class 4B -- Insured Claims. .....................................................27
    **3.6**    Class 4C -- Other Insured Claims. ..........................................28
    **3.7**    Class 5 -- Intercompany Claims. .............................................28
    **3.8**    Class 6---Subordinated General Unsecured Claims. ...............29
    **3.9**    Class 7A – Old Allied Holdings Common Stock ....................29
    **3.10**    Class 7B – Old Other Debtors Common Stock. ......................29
    **3.11**    Class 7C -- Old Allied Holdings Stock Rights. .......................30
    **3.12**    Special Provision Governing Unimpaired Claims ..................30

ARTICLE IV. TREATMENT OF UNCLASSIFIED CLAIMS.............................................30

    **4.1**    Summary..................................................................................30
    **4.2**    Unclassified Claims (Applicable to All Debtors). ..................30

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES...............................................................................................33

    **5.1**    Assumption and Cure of Executory Contracts and Unexpired Leases.................33
    **5.2**    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases .........34
    **5.3**    Collective Bargaining Agreement...........................................35
    **5.4**    Employment Agreements and Other Benefits. ........................35

ARTICLE VI. MEANS FOR IMPLEMENTATION OF PLAN ..................................................36

ii

| | | |
|---|---|---|
| **6.1** | Continued Corporate Existence and Vesting of Assets in Reorganized Debtors. | 36 |
| **6.2** | Substantive Consolidation of Claims against Debtors for Plan Purposes Only. | 37 |
| **6.3** | Exit Financing | 37 |
| **6.4** | Sources of Cash for Distribution | 38 |
| **6.5** | Reinstatement of Interests of Allied Holdings in its Affiliates | 38 |
| **6.6** | Corporate and Limited Liability Company Action | 38 |
| **6.7** | Effectuating Documents; Further Transactions | 38 |
| **6.8** | Exemption from Certain Transfer Taxes and Recording Fees | 38 |
| **6.9** | Further Authorization. | 39 |
| **6.10** | Canadian Operations Sale | 39 |
| **6.11** | Retained Actions. | 39 |
| **6.12** | Other Documents and Actions | 40 |
| **6.13** | Corporate Action. | 40 |
| **6.14** | Retiree Benefits. | 40 |
| **6.15** | Employee Claims | 41 |
| **6.16** | Good Faith | 41 |
| **6.17** | Executory Contracts and Unexpired Leases Entered Into, and Other Obligations Incurred After, the Petition Date | 41 |
| **6.18** | Security Interests and Liens | 41 |

**ARTICLE VII. PROVISIONS REGARDING CORPORATE GOVERNANCE OF REORGANIZED DEBTORS** ... 41

| | | |
|---|---|---|
| **7.1** | Amended Governing Documents and Amended By-Laws | 41 |
| **7.2** | Directors and Officers of Reorganized Debtors. | 42 |
| **7.3** | New Employment, Retirement, Indemnification and Other Related Agreements and Incentive Compensation Programs | 42 |
| **7.4** | Effectuating Documents and Further Transactions. | 42 |
| **7.5** | Authorization and Issuance of New Common Stock | 43 |
| **7.6** | Reserve | 43 |
| **7.7** | Listing of New Allied Holdings Common Stock | 43 |

**ARTICLE VIII. VOTING AND DISTRIBUTIONS** ... 43

| | | |
|---|---|---|
| **8.1** | Voting of Claims | 43 |
| **8.2** | Nonconsensual Confirmation | 43 |
| **8.3** | Acceptance by Class of Creditors | 43 |
| **8.4** | Distributions for Claims Allowed as of the Effective Date | 44 |
| **8.5** | Disbursing Agent | 44 |
| **8.6** | Distributions of Cash | 44 |
| **8.7** | No Interest on Claims or Interests | 44 |
| **8.8** | Delivery of Distributions | 45 |
| **8.9** | Distributions to Holders as of the Record Date | 45 |
| **8.10** | De Minimis Distributions | 46 |
| **8.11** | Fractional Securities, Fractional Dollars | 46 |

**8.12**   Compliance with Tax Requirements.............................................................46
**8.13**   No Duplicate Distributions .......................................................................47
**8.14**   Distributions in U.S. Dollars....................................................................47

ARTICLE IX. PROCEDURES FOR TREATING AND RESOLVING DISPUTED
CLAIMS .................................................................................................................47

**9.1**   Objections to Claims.................................................................................47
**9.2**   Authority to Prosecute Objections ...........................................................47
**9.3**   No Distributions Pending Allowance .......................................................49
**9.4**   Estimation of Claims.................................................................................49
**9.5**   Distributions After Allowance ..................................................................49
**9.6**   Intentionally Omitted. ..............................................................................49
**9.7**   Claims Covered by Insurance Policy........................................................49

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND THE
EFFECTIVE DATE OF THE PLAN ......................................................................50

**10.1**   Conditions to Confirmation ......................................................................50
**10.2**   Conditions to the Effective Date...............................................................51
**10.3**   Waiver of Conditions................................................................................52
**10.4**   Non-Waivable Conditions to the Effective Date .......................................53
**10.5**   Effect of Failure of Conditions ................................................................53
**10.6**   Order Denying Confirmation ....................................................................53

ARTICLE XI. EFFECT OF PLAN ON CLAIMS AND INTERESTS.........................54

**11.1**   Revesting of Assets...................................................................................54
**11.2**   Discharge of Claims and Termination of Interests ..................................54
**11.3**   Cancellation of Claims and Interests .......................................................54
**11.4**   Release by Debtors of Certain Parties .....................................................55
**11.5**   [Release by the Debtors of the DIP Lenders.............................................57
**11.6**   Release by Holders of Claims and Interests. ...........................................57
**11.7**   Releases Reasonable; Bankruptcy Court's Exclusive Jurisdiction Related
Thereto. ....................................................................................................58
**11.8**   Setoffs ......................................................................................................58
**11.9**   Exculpation and Limitation of Liability ...................................................58
**11.10**   Injunction ................................................................................................59
**11.11**   Effect of Confirmation..............................................................................59

ARTICLE XII. RETENTION AND SCOPE OF JURISDICTION OF THE
BANKRUPTCY COURT .......................................................................................60

**12.1**   Retention of Jurisdiction ..........................................................................60
**12.2**   Alternative Jurisdiction ............................................................................62
**12.3**   Final Decree ............................................................................................62

ARTICLE XIII. MISCELLANEOUS PROVISIONS .................................................62

iv

| | | |
|---|---|---|
| **13.1** | Modification of the Plan | 62 |
| **13.2** | Revocation of the Plan | 63 |
| **13.3** | Exemption From SEC Registration | 63 |
| **13.4** | Exemption from Securities Laws | 63 |
| **13.5** | Initial Offer and Sale Exempt from Registration | 63 |
| **13.6** | Applicable Law | 63 |
| **13.7** | Plan Supplement | 64 |
| **13.8** | Filing or Execution of Additional Documents | 64 |
| **13.9** | Withholding and Reporting Requirements | 64 |
| **13.10** | Waiver of Rule 62(a) of the Federal Rules of Civil Procedure | 64 |
| **13.11** | Allocation of Plan Distributions between Principal and Interest | 64 |
| **13.12** | Dissolution of Creditors' Committee | 64 |
| **13.13** | Preparation of Estates' Returns and Resolution of Tax Claims | 65 |
| **13.14** | Headings | 65 |
| **13.15** | Confirmation of Plans for Separate Debtors | 65 |
| **13.16** | No Admissions; Objection to Claims | 65 |
| **13.17** | Survival of Settlements | 65 |
| **13.18** | No Waiver | 65 |
| **13.19** | No Bar to Suits | 66 |
| **13.20** | Successors and Assigns | 66 |
| **13.21** | Severability of Plan Provisions | 66 |
| **13.22** | Post-Effective Date Effect of Evidences of Claims or Interests | 66 |
| **13.23** | Conflicts | 66 |
| **13.24** | Exhibits/Schedules | 66 |
| **13.25** | No Injunctive Relief | 67 |
| **13.26** | Rounding | 67 |
| **13.27** | Saturday, Sunday or Legal Holiday | 67 |
| **13.28** | Entire Agreement | 67 |
| **13.29** | Service of Certain Plan Exhibits and Disclosure Statement Exhibits | 67 |
| **13.30** | Service of Documents | 67 |

## INTRODUCTION

Allied Holdings, Inc. and the Affiliated Debtors (collectively, the "Debtors"),Yucaipa American Alliance Fund I, LP and Yucaipa Alliance (Parallel) Fund I, LP (collectively, "Yucaipa") and The Teamsters National Automobile Transportation Industry Negotiating Committee ("TNATINC") hereby propose this Joint Plan of Reorganization (defined hereinafter as the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors. Yucaipa and TNATINC are the proponents of this Plan within the meaning of Section 1129 of the Bankruptcy Code.

The Creditors' Committee has endorsed the Plan, subject to, among other things, review and approval of the Plan Supplement and other Plan documentation, as well as negotiation of certain related matters, including, without limitation, documentation of the issuance and Distribution of the New Common Stock, including anti-dilution provisions in respect thereof, appropriate post-Effective Date protections for the rights of minority shareholders, any proposed sale of assets, terms of any funding and exit financing, and other review and approval rights in connection with the Confirmation process.

Reference is made to the Plan Proponents' Disclosure Statement dated as of March 2, 2007 for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections and properties, and for a summary of the Plan and certain related matters. There also are other agreements and documents, which are or will be filed with the Bankruptcy Court, that are referenced in the Plan and/or the Disclosure Statement and that will be available for review. All referenced documents are or will be accessible on the website http://administar.net/allied/indexmain.htm under the link for "Disclosure Statement and Plan". Capitalized terms not defined in this

Introduction shall have the meanings ascribed to them in Article I hereof or as otherwise specified in the first paragraph of Section 1.1 below.

Under the Plan, the Debtors will be reorganized through, among other things, the consummation of the following transactions:  (i) payment in Cash of the DIP Facility Claims, (ii) payment in Cash, Reinstatement, return of collateral or other treatment of Other Secured Claims agreed between the holder of each such Claim and Yucaipa, (iii) distribution of New Common Stock on a Pro Rata basis to the holders of Allowed General Unsecured Claims, (iv) cancellation of the existing Interests in the Debtors, (v) assumption of Assumed Contracts, and (vi) the funding of the Exit Financing.

Under Section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from holders of claims and/or interests until such time as the Disclosure Statement has been approved by the Bankruptcy Court.  The Plan Proponents urge all holders of Claims entitled to vote on the Plan to read the Plan, the Disclosure Statement and the exhibits attached hereto and thereto in their entirety before voting to accept or reject the Plan.   To the extent, if any, that the Disclosure Statement is inconsistent with the Plan, the Plan will govern.  No solicitation materials other than the Disclosure Statement and any schedules and exhibits attached thereto or referenced therein, or otherwise enclosed with the Disclosure Statement served by the Plan Proponents on interested parties, have been authorized by the Plan Proponents or the Bankruptcy Court for use in soliciting acceptances of the Plan.

## ARTICLE I.
## DEFINITIONS AND GENERAL PROVISIONS

**1.1**      Definitions.  As used in the Plan, capitalized terms have the meanings set forth below.  Any capitalized term that is not otherwise defined herein, but that is used in

2

the Bankruptcy Code, the Bankruptcy Rules or the local rules of the Bankruptcy Court, will have the meaning given to that term in the Bankruptcy Code, the Bankruptcy Rules or the local rules of the Bankruptcy Court, as applicable.

(1)     "Ace Operations" means Ace Operations, LLC, a Georgia limited liability company.

(2)     "Administrative Expense Claim" means a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and/or entitled to priority pursuant to Sections 507(a)(1) or 507(b) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, (b) Professional Compensation, (c) any payment to be made under this Plan to cure a default on an executory contract or unexpired lease that is assumed pursuant to Section 365 of the Bankruptcy Code, (d) Allowed Claims entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court and, (e)  Indenture Trustee Fees and Expenses and (f) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code.

(3)     "Administrative Expense Claim Bar Date" means the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

(4)     "Affiliates" has the meaning given such term by Section 101(2) of the Bankruptcy Code.

(5)     "Allied Automotive" means Allied Automotive Group, Inc., a Georgia corporation.

(6)     "Allied Canada" means Allied Systems (Canada) Company, a Nova Scotia unlimited.

(7)     "Allied Freight Broker" means Allied Freight Broker LLC, a Delaware limited liability company.

(8)     "Allied Holdings" means Allied Holdings, Inc., a Georgia corporation.

(9)     "Allied Systems" means Allied Systems, LTD. (L.P.)

(10)     "Allowed" when used herein together with the term Claim, means a Claim or any portion thereof that (i) has been allowed by a Final Order of the Bankruptcy Court; (ii) is listed in any of the Debtors' respective Schedules (less any amounts paid on account of such Claim after the Petition Date), as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, and for which no contrary proof of Claim has been timely Filed, other than a Claim that is listed in any of the Debtors' Schedules at zero or as disputed, contingent, or unliquidated; (iii) is evidenced by a proof of Claim that has been Filed with the Bankruptcy Court or the

CH\917779.13

Claims Agent on or before the Bar Date (or Administrative Expense Claim Bar Date if an Administrative Expense Claim) or deemed to be timely filed pursuant to any Final Order of the Bankruptcy Court or under applicable law, and as to which (A) no objection to its allowance has been timely Filed, or (B) any objection to its allowance has been settled or withdrawn, or has been overruled by a Final Order; or (iv) is Allowed pursuant to the terms of this Plan, including Indenture Trustee Fees and Expenses (regardless of whether such Claim has been listed by the Debtors in their Schedules and regardless of whether a proof of Claim has been filed in respect thereof); provided, however, that Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims for the purposes of distribution under this Plan.  An Allowed Interest shall have a correlative meaning.

(11)    "Amended By-Laws" means the amended by-laws of the Reorganized Debtors prepared pursuant to Section 7.1 of this Plan, which shall be in substantially the forms contained in the Plan Supplement.

(12)    "Amended Governing Documents" means the amended and restated articles of incorporation, partnership agreement or limited liability company operating agreement, as the case may be, of each of the Reorganized Debtors prepared pursuant to Section 7.1 of this Plan, which shall be in substantially the forms contained in the Plan Supplement.

(13)    "Assets" means, collectively, all of the legal and equitable interests of the Debtors in the property, as defined by Section 541 of the Bankruptcy Code of the Estates of the Debtors (including, without limitation, all of the assets, property, interests (including equity interests) and effects, real and personal, tangible and intangible, including all Avoidance Actions), wherever situated as such properties exist on the Effective Date or thereafter.

(14)    "Avoidance Action" means any claim or cause of action of an Estate arising out of or maintainable pursuant to Sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

(15)    "Axis Areta" means Axis Areta, LLC, a Georgia limited liability company.

(16)    "Axis Canada" means Axis Canada Company, a Nova Scotia unlimited liability company.

(17)    "Axis Group" means Axis Group, Inc., a Georgia corporation.

(18)    "Axis Netherlands" means Axis Netherlands, LLC, a Georgia limited liability company.

CH\917779.13

(19)    "Ballot" means each of the ballot forms that are distributed with the Disclosure Statement to Holders of Claims included in Classes that are Impaired under this Plan and are entitled to vote to accept or reject this Plan.

(20)    "Bankruptcy Code" means title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, if such amendments are made applicable to the Chapter 11 Cases.

(21)    "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division or, in the event such court ceases to exercise jurisdiction over any Chapter 11 Case, the District Court or such court or adjunct thereof that exercises jurisdiction over such Chapter 11 Case in lieu of the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division.

(22)    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as in effect on the Petition Date and as thereafter amended, if such amendments are made applicable to the Chapter 11 Cases, the Federal Rules of Civil Procedure, as applicable, to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applied to the Chapter 11 Cases or proceedings therein, as the case may be.

(23)    "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including the Bar Date Order and the Confirmation Order.

(24)    "Bar Date Order" means that certain Order Establishing a Bar Date for Filing Proofs of Claim and Approving the Manner and Notice Thereof entered by the Bankruptcy Court on November 16, 2005 [Docket No. 731].

(25)    "Business Day" means any day on which commercial banks are open for business, and not authorized to close, in the City of New York, New York, except any Saturday, Sunday or any day designated as a legal holiday in Bankruptcy Rule 9006(a).

(26)    "Canadian Operations Sale" shall have the meaning set forth in Section 6.10 hereof.

(27)    "Cash" means legal tender of the United States of America and equivalents thereof.

(28)    "Causes of Action" means all claims, actions, Avoidance Actions, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims (including, but not limited to, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code) of any of the Debtors, the Debtors-in-Possession,

and/or the Estates (including, but not limited to, those actions set forth in the Plan Supplement) that are or may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date against any entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

(29)    "Chapter 11 Case" means, with respect to each Debtor, the Chapter 11 Case initiated by such Debtor's filing on the Petition Date of a voluntary petition for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered in the Bankruptcy Court as Bankruptcy Case No. 05-12515-CRM pursuant to the Order Directing Joint Administration of Cases entered by the Bankruptcy Court on August 1, 2005.

(30)    "Claim" means a claim against one of the Debtors (or all or some of them) whether or not asserted or Allowed, as defined in Section 101(5) of the Bankruptcy Code.

(31)    "Claims Agent" means JPMorgan Trust Company, National Association, 8475 Western Way, Suite 110, Jacksonville, FL 32256.

(32)    "Claims Objection Deadline" means the later of the first Business Day which is (i) one hundred twenty (120) days after the Effective Date, or (ii) such other time as may be ordered by the Bankruptcy Court, as such dates may be from time to time extended by the Bankruptcy Court without further notice to parties in interest.

(33)    "Class" means a category of Claims or Interests designated pursuant to the Plan.

(34)    "Commercial Carriers" means Commercial Carriers, Inc., a Michigan corporation.

(35)    "Confirmation" means the entry of the Confirmation Order on the docket of the Bankruptcy Court, within the meaning of Bankruptcy Rules 5003 and 9021.

(36)    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

(37)    "Confirmation Hearing" means the hearing before the Bankruptcy Court held to consider confirmation of this Plan and related matters under Section 1128 of the Bankruptcy Code, as such hearing may be continued.

(38)    "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan.

(39)    "Contract/Lease Schedule" shall have the meaning ascribed to it in Section 5.1 of the Plan.

6

(40)    "Cordin Transport" means Cordin Transport LLC, a Delaware limited liability company.

(41)    "Creditors' Committee" means the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code as its composition may be changed from time to time by addition, resignation and/or removal of its members.

(42)    "CT Services" means CT Services, Inc., a Michigan corporation.

(43)    "Cure Amount" means the amount required to satisfy any Debtor's obligations under Section 365(b) of the Bankruptcy Code with respect to such Debtor's assumption of any executory contract or unexpired lease.

(44)    "Debtor" means, individually, Allied Holdings, Allied Automotive, Allied Systems, Allied (Canada), QAT, RMX, Transport Support, F.J. Boutell, Allied Freight Broker, GACS Incorporated, Commercial Carriers, Axis Group, Axis Netherlands, Axis Areta, Logistic Technology, Logistic Systems, CT Services, Cordin Transport, Terminal Services, Axis Canada, Ace Operations, and AH Industries, each of which is a Debtor in its Chapter 11 Case.

(45)    "Debtor-in-Possession" means the Debtors in their capacities as debtors in debtors in possession in the Chapter 11 Cases pursuant to sections 1107(a) and 1108 of the Bankruptcy Code

(46)    "Deficiency Amount" means the amount, if any, by which the Allowed amount of a Secured Claim exceeds the value of the collateral securing such Claim or the amount by which a Claim subject to setoff exceeds the amount of any setoff.

(47)    "Deficiency Claim" means any Claim against a Debtor representing a Deficiency Amount.

(48)    "Designated Notice" means notice and an opportunity for a hearing as defined in Section 102(1) of the Bankruptcy Code, with notice limited to the Debtors, the Plan Proponents, the Creditors' Committee (if still in existence at such time), the United States Trustee, and other parties in interest who, after entry of the Confirmation Order, file a request for such notice with the Clerk of the Bankruptcy Court and serve a copy of same on counsel for the Debtors.  Until and including the earlier of (a) the Effective Date and (b) thirty (30) days after the Confirmation Date, Designated Notice means notice pursuant to that certain Order Establishing Notice Procedures entered by the Bankruptcy Court on August 2, 2005 in the Chapter 11 Case [Docket No. 46].

(49)    "DIP Credit Documents" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of August 1, 2005, as amended, supplemented or otherwise modified from time to time, and all documents executed in connection therewith by and between the Debtors as borrowers and General Electric as Administrative Agent, Collateral Agent, Revolver Agent and co-Syndication Agent, Morgan Stanley Senior Funding, Inc., as Term Loan A Agent, Term Loan B

7

Agent, Term Loan C Agent, co-Syndication Agent, co-Bookrunner and co-Term Loan B Lead Arranger and the other Lenders signatory thereto from time to time.

(50) "DIP Lender Claim" means all Secured Claims arising under or pursuant to the DIP Credit Documents.

(51) "DIP Lenders" means the Secured Parties as defined by the DIP Loan Facility.

(52) "DIP Liens" means the Liens of the DIP Lenders on the Assets as previously granted pursuant to the Final DIP Order, subject to the limitations set forth therein.

(53) "DIP Loan Facility" means that certain debtor-in-possession senior, secured credit facility entered into pursuant to the DIP Credit Documents.

(54) "DIP Loan Facility Borrowers" means Allied Holdings and Allied Systems.

(55) "DIP Loan Facility Guarantors" means Ace Operations, AH Industries, Allied Automotive, Allied Canada, Allied Freight Broker, Axis Areta, Axis Canada, Axis Group, Axis Netherlands, Commercial Carriers, Cordin Transport, CT Services, FJ Boutell, GACS, Logistic Systems, Logistic Technology, QAT, RMX, Terminal Services, and Transport Support.

(56) "Disbursing Agent" means any entity (including any Reorganized Debtor and any Third Party Disbursing Agent), in its capacity as a disbursing agent pursuant to Section 8.5.

(57) "Disclosure Statement" means the written disclosure statement that relates to this Plan, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time in accordance with applicable law.

(58) "Disclosure Statement Hearing" means the hearing held pursuant to Bankruptcy Code Section 1125(b) and Bankruptcy Rule 3017(a), including any continuances thereof, at which the Bankruptcy Court considers the adequacy of the Disclosure Statement.

(59) "Disputed Claim" means (a) if no proof of Claim has been Filed by the applicable Bar Date, a Claim that is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but as to which an objection has been Filed on or before the Claims Objection Deadline, and such objection has not been withdrawn or denied by a Final Order; (b) if no proof of Claim has been Filed by the applicable Bar Date, a Claim that is listed on a Debtor's Schedules as disputed, contingent or unliquidated; or (c) if a proof of Claim or request for payment of an Administrative Expense Claim has been Filed by the Bar Date (or the Administrative Expense Claim Bar Date, as the case may be) or has otherwise been deemed timely filed under applicable

law:  (i) a Claim for which no corresponding Claim is listed on a Debtor's Schedules; (ii) a Claim for which a corresponding Claim is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of Claim varies from the nature and amount of such Claim as it is listed on the Schedules; (iii) a Claim for which a corresponding Claim is listed on a Debtor's Schedules as disputed, contingent or unliquidated; or (iv) a Claim for which an objection has been Filed by a Debtor or Reorganized Debtor or, prior to the Confirmation Date, any other party in interest, by the Claims Objection Deadline, and such objection has not been withdrawn or denied by a Final Order.

(60)    "Distribution" means any distribution by the Debtors or Reorganized Debtors to a Holder of an Allowed Claim or Interest.

(61)    "Distribution Record Date" means the date selected in the Confirmation Order or any other Final Order of the Bankruptcy Court for determining which holders of Claims are eligible to receive distributions hereunder, and shall be the close of business on the Confirmation Date (or such other date established by Bankruptcy Court order).

(62)    "District Court" means the United States District Court for the Northern District of Georgia, Atlanta Division.

(63)    "Effective Date" means the date specified by Yucaipa (after consultation with the Debtors and the Creditors' Committee) in a notice filed by the Debtors or Yucaipa with the Bankruptcy Court as the date on which this Plan shall take effect, which date shall be not more than five (5) Business Days after the date on which the conditions to the Effective Date provided for in this Plan have been satisfied or waived.

(64)    "Employee Wage Order" means that certain Order Authorizing Payment of Prepetition Wages, Certain Employee Benefits and Related Expenses entered on August 2, 2005 by the Bankruptcy Court.

(65)    "Entity" means an entity as defined in Section 101(15) of the Bankruptcy Code.

(66)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

(67)    "Estate" means, with regard to each Debtor, the estate that was created by the commencement by a Debtor of a Chapter 11 Case pursuant to Section 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers, and privileges of such Debtor and any and all Assets and interests in property, whether real, personal or mixed, rights, causes of action, avoidance powers or extensions of time that such Debtor or such estate shall have had as of the commencement of the Chapter 11 Case, or which such Estate acquired after the commencement of the Chapter 11 Case, whether by virtue of Sections 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code, or otherwise.

Case 13-50530-CSS Doc 721-3 Filed 05/06/20 Page 69 of 564

(68)     "Estates" means, collectively, the Estates created for the Debtors in the Chapter 11 Cases.

(69)     "Exit Financing" means the debt or equity financing to be provided on the Effective Date to the Reorganized Debtors to (a) fund the Debtors' Cash payment obligations under the Plan and (b) provide the Reorganized Debtors' anticipated working capital needs on and after the Effective Date.

(70)     "Exit Financing Lenders" means the lenders to be identified by the Debtors in the Plan Supplement that will provide the financing contemplated by the Exit Financing.

(71)     "File" or "Filed" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

(72)     "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

(73)     "Final DIP Order" means the Final Order (i) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (ii) Granting Liens and Super-Priority Claims, (iii) Granting Adequate Protection to Prepetition Agents and Prepetition Secured Lenders, and (iv) Authorizing Use of Cash Collateral, Prohibiting Setoffs, and Providing Adequate Protection to the Bank of Nova Scotia entered by the Bankruptcy Court on August 24, 2005 [Docket No. 210].

(74)     "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing will have been denied or resulted in no modification of such order, provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

(75)     "FJ Boutell" means F.J. Boutell Driveaway, LLC, a Delaware limited liability company.

(76)     "GACS" means GACS Incorporated, a Georgia corporation.

(77)     "General Unsecured Claim" means a Claim against any Debtor other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a DIP Facility Claim, Prepetition Loan Facility Claim, an Insured Claim (to the

10

extent paid by insurance), an Other Secured Claim, a Workers' Compensation Claim, a Subordinated General Unsecured Claim, an Intercompany Claim or a claim arising out of Old Common Stock or Old Allied Holdings Stock Rights. General Unsecured Claims shall include any Deficiency Claims of a holder of a Secured Claim.

(78)    "Holder" means a holder of a Claim or Interest, as applicable.

(79)    "IBT" means the International Brotherhood of Teamsters.

(80)    "Impaired" means with respect to any Class of Claims or Interests, a Claim or Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

(81)    "Indenture Trustee" means Wells Fargo Bank, National Association, as trustee, or any successor trustee, under the Prepetition Notes Indenture.

(82)    "Indenture Trustee Charging Lien" means any Lien or other priority in payment or right available to the Indenture Trustee pursuant to the Prepetition Notes Indenture or otherwise available to the Indenture Trustee under applicable law, for the payment of Indenture Trustee Fees and Expenses.

(83)    "Indenture Trustee Fees and Expenses" means the reasonable fees and expenses of the Indenture Trustee (including reasonable attorneys fees) allowable under the Prepetition Notes Indenture.

(84)    "Initial Board" shall have the meaning set forth in Section 7.2 of the Plan.

(85)    "Insured Claim" means any Tort Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date that is covered under an insurance policy, including the Debtors' self-insured retention, other than a workers' compensation insurance policy, applicable to the Debtors or their businesses.

(86)    "Intercompany Claim" means any Claim that is or could be asserted by any Debtor(s) or its/their Estate(s) against any other Debtor(s) or its/their Estate(s).

(87)    "Interest" means any equity security of any Debtor (as defined in Section 101(16) of the Bankruptcy Code).

(88)    "KERP" means that certain key employee retention program approved by the Bankruptcy Court on December 19, 2005 [Docket No. 829] and implemented by supplemental order entered by the Bankruptcy Court on January 6, 2006 [Docket No. 905].

(89)    "Lien" has the meaning set forth in Section 101(37) of the Bankruptcy Code.

CH\917779.13

(90)    "Logistic Systems" means Logistic Systems, LLC, a Georgia limited liability company.

(91)    "Logistic Technology" means Logistic Technology, LLC, a Georgia limited liability company.

(92)    "Material Adverse Effect" means any material adverse change in the assets, liabilities, operations, business, property or prospects of the Debtors' or Reorganized Debtors' businesses, in each case taken as a whole.

(93)    "New Ace Operations Common Stock" means the membership interests in Reorganized Ace Operations, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(94)    "New AH Industries Common Stock" means the shares of common stock of Reorganized AH Industries, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(95)    "New Allied Automotive Common Stock" means the shares of common stock of Reorganized Allied Automotive, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(96)    "New Allied Canada Common Stock" means the shares of common stock of Reorganized Allied Canada, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(97)    "New Allied Freight Broker Common Stock" means the membership interests in Reorganized Allied Freight Broker, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(98)    "New Allied Holdings Common Stock" means the shares of common stock of Reorganized Allied Holdings, par value $0.01 per share, authorized hereunder on the Effective Date for Distribution to Holders of Allowed Claims in Classes 4A, 4B and 4C pursuant to the Plan and any additional shares authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(99)    "New Allied Systems Common Stock" means the partnership interests of Reorganized Allied Systems, authorized hereunder on the Effective Date and any partnership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(100)    "New Axis Areta Common Stock" means the membership interests in Reorganized Axis Areta, authorized hereunder on the Effective Date and any

12

additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(101)   "New Axis Canada Common Stock" means the shares of common stock of Reorganized Axis Canada, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(102)   "New Axis Group Common Stock" means the shares of common stock of Reorganized Axis Group, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(103)   "New Axis Netherlands Common Stock" means the membership interests in Reorganized Axis Netherlands, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(104)   "New Commercial Carriers Common Stock" means the shares of common stock of Reorganized Commercial Carriers, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(105)   "New Common Stock" means, collectively, as applicable the shares of common stock, membership interests and partnership interests of each of the Reorganized Debtors as of the Effective Date.

(106)   "New Cordin Transport Common Stock" means the membership interests in Reorganized Cordin Transport, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(107)   "New CT Services Common Stock" means the shares of common stock of Reorganized CT Services, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(108)   "New FJ Boutell Common Stock" means the membership interests in Reorganized FJ Boutell, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(109)   "New GACS Common Stock" means the shares of common stock of Reorganized GACS, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Amended Governing Documents.

CH\917779.13

(110)   "New Logistic Systems Common Stock" means the membership interests in Reorganized Logistic Systems, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(111)   "New Logistic Technology Common Stock" means the membership interests in Reorganized Logistic Technology, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(112)   "New QAT Common Stock" means the shares of common stock of Reorganized QAT, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(113)   "New RMX Common Stock" means the membership interests in Reorganized RMX, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(114)   "New Terminal Services Common Stock" means the membership interests in Reorganized Terminal Services, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(115)   "New Transport Support Common Stock" means the membership interests in Reorganized Transport Support, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(116)   "Old Ace Operations Common Stock" means the membership interests in  Ace Operations that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Ace Operations in existence immediately prior to the Effective Date. .

(117)   "Old AH Industries Common Stock" means all authorized and issued shares of common stock of AH Industries that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old AH Industries Inc. Common Stock in existence immediately prior to the Effective Date.

(118)   "Old Allied Automotive Common Stock" means all authorized and issued shares of common stock of Allied Automotive that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old Allied Automotive Common Stock in existence immediately prior to the Effective Date.

14

(119)   "Old Allied Canada Common Stock" means all authorized and issued shares of common stock of Allied Canada that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old Allied Canada Common Stock in existence immediately prior to the Effective Date.

(120)   "Old Allied Freight Broker Common Stock" means all membership interests in Allied Freight Broker that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests of Allied Freight Broker in existence immediately prior to the Effective Date.

(121)   "Old Allied Holdings Common Stock" means all authorized and issued shares of common stock of Allied Holdings that are outstanding immediately prior to the Effective Date.

(122)   "Old Allied Holdings Stock Rights" means, collectively, all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed) contractual, legal or otherwise, to purchase or acquire Old Common Stock.

(123)   "Old Allied Systems Common Stock" means all authorized and issued partnership interests of Allied Systems that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any partnership interests of Old Allied Systems in existence immediately prior to the Effective Date.

(124)   "Old Axis Areta Common Stock" means all membership interests in Axis Areta that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Axis Areta in existence immediately prior to the Effective Date.

(125)   "Old Axis Canada Common Stock" means all authorized and issued shares of common stock of Axis Canada that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old Axis Canada Common Stock in existence immediately prior to the Effective Date.

(126)   "Old Axis Group Common Stock" means all authorized and issued shares of common stock of Axis Group that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old Axis Group Common Stock in existence immediately prior to the Effective Date.

(127)   "Old Axis Netherlands Common Stock" means all membership interests in Axis Netherlands that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interest in Axis Netherlands in existence immediately prior to the Effective Date.

(128)   "Old Commercial Carriers Common Stock" means all authorized and issued shares of common stock of  Commercial Carriers that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire

any common shares of Old Commercial Carriers Common Stock in existence immediately prior to the Effective Date.

(129)   "Old Common Stock" means, collectively, Old Allied Holdings Common Stock and Old Other Debtors Common Stock.

(130)   "Old Corbin Common Stock" means the membership interests in Cordin Transport  that are outstanding prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Corbin in existence immediately prior to the Effective Date.

(131)   "Old CT Services Common Stock" means all authorized and issued shares of common stock of CT Services that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old CT Services Common Stock in existence immediately prior to the Effective Date.

(132)   "Old FJ Boutell Common Stock" means all membership interests in FJ Boutell that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in FJ Boutell in existence immediately prior to the Effective Date.

(133)   "Old GACS Common Stock" means all authorized and issued shares of common stock of GACS that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old GACS Common Stock in existence immediately prior to the Effective Date.

(134)   "Old Logistic Systems Common Stock" means all membership interests in Logistic Systems that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Logistic Systems in existence immediately prior to the Effective Date.

(135)   "Old Logistic Technology Common Stock" means all membership interests in Logistic Technology that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Logistic Technology in existence immediately prior to the Effective Date.

(136)   "Old Other Debtors Common Stock" means, collectively, the authorized and issued shares of common stock, partnership interests, membership interests or other equity interests, as applicable, of or in the Other Debtors and any right, contractual or otherwise, to acquire any common shares of such common stock, or any such partnership interests or membership interests or other equity interests in existence immediately prior to the Effective Date.

(137)   "Old QAT Common Stock" means all authorized and issued shares of common stock of QAT that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old QAT Common Stock in existence immediately prior to the Effective Date.

(138) "Old RMX Common Stock" means all membership interests in RMX that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in RMX in existence immediately prior to the Effective Date.

(139) "Old Terminal Services Common Stock" means all membership interests in Terminal Services that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Terminal Services in existence immediately prior to the Effective Date.

(140) "Old Transport Support Common Stock" means all authorized and issued membership interests in Transport Support that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Transport Support in existence immediately prior to the Effective Date.

(141) "Ordinary Course Professionals Order" means that certain Order Authorizing Employment of Professionals in the Ordinary Course of Business entered by the Bankruptcy Court on August 2, 2005 [Docket No. 55].

(142) "Other Debtors" means all Debtors except for Allied Holdings.

(143) "Other Insured Claim" means any Tort Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date and asserted against GACS and/or Commercial Carriers, Inc.

(144) "Other Secured Claim" means a Secured Claim other than a Prepetition Lender Claim or a DIP Lender Claim.

(145) "Person" shall have the meaning ascribed in Section 101(41) of the Bankruptcy Code.

(146) "Petition Date" means July 31, 2005, the date on which each of the Debtors Filed its respective petition for relief in the Bankruptcy Court for the Northern District of Georgia, Newnan Division, commencing its Chapter 11 Case.

(147) "Plan" means this joint plan of reorganization as the same may hereafter be amended or modified. If the Plan is withdrawn as the Plan for a particular Debtor, the defined term "Plan" shall not include the plan of reorganization or liquidation for such Debtor in its Chapter 11 Case except where the context otherwise requires.

(148) "Plan Documents" means, collectively, the Disclosure Statement, this Plan, all exhibits, schedules and annexes to each, all of the documents included in the Plan Supplement, and all other agreements contemplated by the Plan.

(149) "Plan Objection Deadline" means [_____, 2007] the deadline established by the Bankruptcy Court for filing and serving objections to the Confirmation of the Plan.

17

(150)   "Plan Proponents" means, collectively, the Debtors, Yucaipa and TNATINC.

(151)   "Plan Supplement" means the compilation of documents and forms of documents, schedules and exhibits, including those specified in Section 13.7 of the Plan, as it may thereafter be altered, amended, modified or supplemented in accordance with the terms hereof.

(152)   "Postpetition Tax Claims" means Administrative Expense Claims and other Claims by a governmental unit for taxes against any of the Debtors (and for interest and/or penalties related to such taxes) for any tax year or period, which Claims first arise from and including the Petition Date through and including the Effective Date.

(153)   "Prepetition Lender Claim" means any Claim (including without limitation, principal, interest, fees, costs and expenses) under or pursuant to the Prepetition Loan Facility.

(154)   "Prepetition Loan Facility" means that certain senior, secured credit facility in the principal amount of approximately $180 million provided by a group of lenders, with Ableco Finance, LLC as collateral agent and Wells Fargo Foothill, Inc., formerly known as Foothill Capital Corporation, as administrative agent.

(155)   "Prepetition Notes" means the 8 5/8% Senior Notes in the aggregate principal face amount of $150,000,000 issued by Allied Holdings pursuant to the Prepetition Notes Indenture.

(156)   "Prepetition Notes Claim" means any Claim for principal and interest under or pursuant to the Prepetition Notes or the Prepetition Notes Indenture, including without limitation Claims against guarantors of the Prepetition Notes, which Claims shall constitute Allowed Claims under the Plan in an amount of not less than $154,317,286.61.

(157)   "Prepetition Notes Indenture" means that certain indenture dated as of September 30, 1997, by and between Allied Holdings and The First National Bank of Chicago, as trustee, as such indenture may have been amended, supplemented, or otherwise modified from time to time, and all related agreements and documents.

(158)   "Priority Non-Tax Claim" means a Claim entitled to priority under the provisions of Sections 507(a)(3) through 507(a)(7) of the Bankruptcy Code other than an Administrative Expense Claim, a Postpetition Tax Claim or a Priority Tax Claim.

(159)   "Priority Tax Claim" means a Claim against the Debtors that is of a kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

(160)   "Professional" means any professional employed in the Chapter 11 Cases pursuant to Sections 327 or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Section 503(b)(4) of the Bankruptcy Code.

CH\917779.13

(161)   "Professional Compensation" means (i) any amounts that the Bankruptcy Court allows pursuant to Section 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code as compensation earned, and reimbursement of expenses incurred, by professionals employed by the Debtors and the Creditors' Committee and (ii) any amounts the Bankruptcy Court allows pursuant to Sections 503(b) of the Bankruptcy Code in connection with the making of a substantial contribution to the Chapter 11 Cases.

(162)   "Pro Rata" means, with respect to any distribution on account of an Allowed Claim, a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim or Allowed Interest in a Class or Classes to the amount of such Allowed Claim or Allowed Interest is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims or Allowed Interests in such Class or Classes to the amount of all Allowed Claims or Allowed Interests in such Class or Classes.

(163)   "QAT" means QAT, Inc., a Florida corporation.

(164)   "Qualified Pension Plans" means, collectively, all of the Debtors' defined benefit plans, including:  the Allied Defined Benefit Pension Plan, the Allied Systems, Ltd., UAW Local 95 Unit 2 Retirement Income Plan, the Allied Systems, Ltd. Office Workers UAW Local 95 Pension Plan and Trust, and the Registered Pension Plan for Employees of Allied Systems (Canada) Company.

(165)   "Record Date" means the date established in the Confirmation Order or any other Final Order of the Bankruptcy Court for determining the identity of Holders of Allowed Claims or Interests entitled to Distributions under this Plan.  If no Record Date is established in the Confirmation Order or any other order of the Bankruptcy Court, then the Record Date shall be the Confirmation Date.

(166)   "Record Holder" means the Holder of a Claim or Interest as of the Record Date.

(167)   "Reinstated" or "Reinstatement" means (x) with respect to a Claim, (i) the Debtors shall cure any default with respect to such Claim that occurred before or after the relevant Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, (ii) the maturity of such Claim shall be Reinstated as such maturity existed before any such default, (iii) the holder of such Claim shall be compensated for any damages incurred as a result of any reasonable reliance by the holder on any right to accelerate its Claim, and (iv) the legal, equitable and contractual rights of such holder will not otherwise be altered, and (y) with respect to an Interest, the legal, equitable and contractual rights of the holder of such Interest will not be altered.

(168)   "Reorganized Debtor" or "Reorganized Debtors" means, on and after the Effective Date, the Debtors as reorganized pursuant to the Plan, as the case may be and, in each case, to the extent applicable.  When referring to a specific Debtor as reorganized pursuant to the Plan, the Plan shall use the term "Reorganized [name of

19

Debtor].'' Reorganized Allied Holdings will be the ultimate corporate parent of the Reorganized Debtors.

(169) "Retained Actions" means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtors' Estate may hold against any Person, including, without limitation, (i) claims and Causes of Action brought prior to the Effective Date, (ii) claims and Causes of Action against any Persons for failure to pay for products or services provided or rendered by any of the Debtors, (iii) claims and Causes of Action relating to strict enforcement of any of the Debtors' intellectual property rights, including patents, copyrights and trademarks, (iv) claims and Causes of Action seeking the recovery of any of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of any of the Debtors' or the Reorganized Debtors' businesses, including, without limitation, claim overpayments and tax refunds, and (v) all Causes of Action that are Avoidance Actions.

(170) "RMX" means RMX LLC, a Delaware limited liability company.

(171) "Scheduled Claims" means Claims set forth on the Schedules.

(172) "Schedules" means, with respect to any Debtor, the Schedules of Assets and Liabilities such Debtor filed in its Chapter 11 Case, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009.

(173) "Secured Claim" means:  (a) Claims that are secured by a Lien on property in which an Estate has an interest, which liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, all as determined pursuant to Section 506(a) of the Bankruptcy Code; and (b) Claims which are Allowed under the Plan as a Secured Claim.

(174) "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended.

(175) "Securities and Exchange Commission" means the United States Securities and Exchange Commission.

(176) "Securities Claim" means any Claim described in Section 510(b) of the Bankruptcy Code against any Debtor arising from recission of a purchase or sale of a security of any Debtor, for damages arising from the purchase or sale of such security, or for reimbursement, indemnity or contribution Allowed under Section 502 of the Bankruptcy Code on account of such Claim, or for any Claim arising out of the ownership of an equity security.

(177) "Subordinated General Unsecured Claims" means (i) any Claim, or portion thereof, which is subordinated to the payment of all other General Unsecured Claims (other than Claims which are themselves Subordinated General Unsecured

CH\917779.13

Claims) pursuant to Section 510 of the Bankruptcy Code (including, without limitation, Securities Claims), any other applicable law, any order of the Bankruptcy Court or any applicable agreement, or (ii) any Claim for any fine, penalty, or forfeiture, or for multiple, exemplary or punitive damages, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Holder of such Claim.

(178)   "Terminal Services" means Terminal Services LLC, a Delaware limited liability company.

(179)   "TNATINC" means the Teamsters National Automobile Transportation Industry Negotiating Committee.

(180)   "Tort Claim" means any Claim (including punitive damage claims to the extent permitted by the Bankruptcy Court and not otherwise subordinated under applicable law), which arose prior to the Petition Date, that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment, including any products liability or tort claim asserted against GACS or Commercial Carriers, Inc.

(181)   "Transport Support" means Transport Support LLC, a Delaware limited liability company.

(182)   "Unimpaired" means, with respect to a Class of Claims or Interests, any Class that is unimpaired within the meaning of Section 1124 of the Bankruptcy Code.

(183)   "Voting Agent" means JPMorgan Trust Company, National Association, 8475 Western Way, Suite 110, Jacksonville, FL 32256 in its capacity as notice, claims and balloting agent for the Debtors.

(184)   "Voting Deadline" means _____, 2007 at 4:00 p.m. (Eastern Time), the date and time by which all Ballots must be received by the Voting Agent.

(185)   "Voting Instructions" means the instructions for voting on the Plan that are attached to the Ballots.

(186)   "Voting Record Date" means the date established by the Bankruptcy Court for determining the identity of Holders of Allowed Claims or Interests entitled to vote on this Plan.

(187)   "Workers' Compensation Claim" means a Claim by any former or current employee of the Debtors arising from or related to their employment with the Debtors for which the Debtors are required by state statute to maintain workers' compensation insurance coverage through a program of either third party insurance, self-insurance, or state-sponsored insurance.

21

(188)  "Workers' Compensation Order" means that certain Order Authorizing Continued Maintenance and Payment of Obligations with Respect to Debtors' Insurance Programs entered by the Bankruptcy Court on August 2, 2005 [Docket No. 56].

(189)  "Yucaipa" has the meaning set forth in the Introduction hereof.

1.2     Time.  Whenever the time for the occurrence or happening of an event as set forth in this Plan falls on a day which is a Saturday, Sunday, or legal holiday under the laws of the United States of America or the State of Georgia, then the time for the next occurrence or happening of said event shall be extended to the next day following which is not a Saturday, Sunday, or legal holiday.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.3     Rules of Interpretation.  For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan or Confirmation Order; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors, assigns and affiliates; (e) unless otherwise specified in a particular reference, all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan or Plan Supplement; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) unless otherwise specified, the words "acceptable to Yucaipa" shall in each instance mean "acceptable to Yucaipa in its sole and absolute discretion;" (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (i) all Exhibits to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan; (j) all documents set forth in the Plan Supplement are incorporated into the Plan and shall be deemed to be included in the Plan; and (k) the rules of construction set forth in Section 102 of the Bankruptcy Code will apply.

## ARTICLE II.
## CLASSIFICATION OF CLAIMS AND INTERESTS; IMPAIRMENT

2.1     Summary  The following summary is for the convenience of all interested parties and is superseded for all purposes by the classification, description and treatment of Claims and Interests in Articles III and IV of the Plan.  The categories of Claims and Interests set forth below classify all Claims against and Interests in the Debtors for all purposes of this Plan.  A Claim or Interest shall be deemed classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such

CH\917779.13

Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. The treatment with respect to each Class of Claims and Interests provided for in this Article III shall be in full and complete satisfaction, release and discharge of such Claims and Interests.

For the purposes of classification, voting, and treatment under this Plan, Claims against the Debtors, respectively, are classified in a single Class regardless of whether such Claims are assertable against one or more of the Debtors. The Plan Proponents do not believe that such classification or treatment adversely impacts upon the rights of any Holder of an Allowed Claim. The Plan Proponents do not intend, by so classifying Claims, to effect a substantive consolidation of any of the Debtors or their respective Estates. Rather, the separate corporate existence of each of the Debtors is preserved under this Plan in accordance with Section 6.1 of this Plan.

The classification of Claims under this Plan is as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 et seq. | Other Secured Claims | Unimpaired with respect to Sections (i) and (v) of the paragraph titled "Treatment" under Section 3.1(2); Impaired with respect to Sections (ii), (iii),(iv) and (vi) of such paragraph | No if Unimpaired; Yes if Impaired |
| 2 | Priority Non-Tax Claims | Unimpaired | No |
| 3 | Workers' Compensation Claims | Unimpaired | No |
| 4A | General Unsecured Claims | Impaired | Yes |
| 4B | Insured Claims | Impaired | Yes |
| 4C | Other Insured Claims | Impaired | Yes |
| 5 | Intercompany Claims | Impaired | No |
| 6 | Subordinated General Unsecured Claims | Impaired | No |
| 7A | Old Allied Holdings Common | Impaired | No |

23

| | | Stock | | |
|---|---|---|---|---|
| 7B | | Old Other Debtors Common Stock | Impaired | No |
| 7C | | Old Allied Holdings Stock Rights | Impaired | No |

**2.2** **Deemed Acceptance of Plan.** Certain subclasses of Class 1 described in Section 3.1(3) hereof, and Classes 2 and 3 are Unimpaired under this Plan. Accordingly, pursuant to Section 1126(f) of the Bankruptcy Code, Certain subclasses of Class 1, and Classes 2 and 3 are deemed to accept this Plan and are not entitled to vote to accept or reject this Plan.

**2.3** **Deemed Rejection of Plan.** Classes 5, 6 and 7A through 7C are Impaired under this Plan, and because such classes shall receive no distribution under the Plan, they are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Consequently, holders of Claims in Classes 5, 6 and 7A through 7C may not vote on the Plan.

**2.4** **Classes Entitled to Vote on Plan.** Certain subclasses of Class 1 described in Section 3.1(3) hereof, and Classes 4A, 4B and 4C are Impaired and are entitled to vote on the Plan.

**2.5** **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.** In the event at least one Impaired Class of Claims votes to accept the Plan (and at least one Impaired Class either votes to reject the Plan or is deemed to have rejected the Plan), the Plan Proponents shall request the Bankruptcy Court to confirm the Plan under Section 1129(b) of the Bankruptcy Code.

**2.6** **Prepetition Lender Claims.** During the Chapter 11 Case, the Holders of Prepetition Lender Claims received in full and final satisfaction of their Claims in Cash equal to one hundred percent (100%) of their Claims and, as a result, Prepetition Lender Claims are not classified or otherwise provided for in this Plan and the Holders of Prepetition Lender Claims are not entitled to vote to accept or reject this Plan.

## ARTICLE III.
## TREATMENT OF CLAIMS AND INTERESTS

The timing and procedures for all Distributions specified in this Section are governed by Article VIII of the Plan. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A

CH\917779.13

Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

      **3.1**     Class 1 et seq. -- Other Secured Claims.

      (1)     Classification: Class 1 consists of the Allowed Other Secured Claims against each Debtor. This Class will be divided into subclasses designated by letters of the alphabet (Class 1A, Class 1B and so on), so that each holder of any Secured Claim against each Debtor is in a Class by itself, except to the extent that there are Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified classes of Secured Claims. A list of all Class 1 Claims and the proposed treatment thereof will be filed with the Bankruptcy Court ten days before the Voting Deadline. Such list may be amended, modified or supplemented by Yucaipa (after consultation with the Debtors and the Creditors' Committee) (a) on or before three days before the Voting Deadline for any Secured Claims and (b) thereafter on or before three days before the Confirmation Hearing to add Secured Claims that will be treated in a manner that results in Holders of such Claims not having the right to vote to accept or reject the Plan.

      (2)     Treatment: The Plan Proponents expect that the Claims of the members certain subclasses of Class 1 shall be Unimpaired under Sections (i) and (v) of this paragraph and the Claims of the members of certain subclasses of Class 1 shall be Impaired under Sections (ii), (iii), (iv) and (vi) of this paragraph. Each Holder of an Allowed Secured Claim in Class 1 shall, in the discretion of Yucaipa (after consultation with the Debtors and the Creditors' Committee), receive, in full satisfaction, settlement, release and discharge of, and in exchange for, its Allowed Class 1 Claim, any one or a combination of any of the following: (i) Cash in an amount equal to such Allowed Class 1 Claim; (ii) deferred Cash payments totaling at least the Allowed amount of such Allowed Class 1 Claim, of a value, as of the Effective Date, of at least the value of such Holder's interest in the Debtors' property securing the Allowed Class 1 Claim; (iii) the property of the Debtors securing such holder's Allowed Class 1 Claim; (iv) Cash payments or Liens amounting to the indubitable equivalent of the value of such holder's interest in the Debtors' property securing the Allowed Class 1 Claim; (v) Reinstatement of such Allowed Class 1 Claim; or (vi) such other treatment as Yucaipa (after consultation with the Debtors and the Creditors' Committee) and such holder shall have agreed upon in writing.

      (3)     Voting: Allowed Claims in Class 1 that are paid in full in Cash or Reinstated on the Effective Date or as soon as practicable thereafter are Unimpaired under the Plan and the holders of such Allowed Claims in Class 1 are conclusively deemed to have accepted this Plan pursuant to Section 1126(f) of the Bankruptcy Code. Allowed Claims in Class 1 that receive any alternative treatment are Impaired and therefore entitled to vote to accept or reject the Plan.

      **3.2**     Class 2 -- Priority Non-Tax Claims.

        (1)     Classification: Class 2 consists of all Allowed Priority Non-Tax Claims against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than Allowed Administrative Expense Claims and Allowed Priority Tax Claims.

        (2)     Treatment: The legal, equitable and contractual rights of the Holders of Allowed Class 2 Priority Non-Tax Claims are unaltered by this Plan. Unless the Holder of such Claim and Yucaipa agree to a different treatment (after consultation with the Debtors and the Creditors' Committee), each Holder of an Allowed Class 2 Priority Non-Tax Claim shall receive, in full and final satisfaction of such Allowed Class 2 Priority Non-Tax Claim, one of the following alternative treatments:

        (a)     to the extent then due and owing on the Effective Date, such Claim will be paid in full in Cash by the Debtors or the Reorganized Debtors on the Effective Date;

or

        (b)     to the extent not due and owing on the Effective Date, such Claim will be paid in full in Cash by the Debtors or the Reorganized Debtors when and as such Claim becomes due and owing in the ordinary course of business;

or

        (c)     such Claim will be otherwise treated in a manner so that such Claim shall be rendered Unimpaired pursuant to Section 1124 of the Bankruptcy Code.

The proposed treatment of each Class 2 Priority Non-Tax Claim shall be selected by Yucaipa (after consultation with the Debtors and the Creditors' Committee) and shall be disclosed within ten days before the Voting Deadline.

        (3)     Voting: Class 2 is an Unimpaired Class, and the Holders of Class 2 Priority Non-Tax Claims are conclusively deemed to have accepted this Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject this Plan.

    **3.3**    Class 3 -- Workers' Compensation Claims.

        (1)     Classification: Class 3 consists of all Allowed Workers' Compensation Claims.

        (2)     Treatment: The Debtors will continue all of their workers' compensation programs that were in effect on the Petition Date such that Allowed Workers' Compensation Claims are unaltered by this Plan. Any Holder of a Workers' Compensation Claim may proceed with such Claim before the appropriate state workers' compensation board subject to the right of the Debtors or Reorganized Debtors, as applicable, to defend any such Claim. To the extent any such Claim is determined to be valid by the appropriate state workers' compensation board, or other court having

26

jurisdiction over such Claim, such Claim shall be paid in full in Cash from proceeds of the applicable insurance (or self-insurance) program that is maintained by the Debtors pursuant to their existing workers' compensation programs.

(3)     Voting.  Class 3 is an Unimpaired Class, and the Holders of Class 3 Workers' Compensation Claims are conclusively deemed to have accepted this Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 3 are not entitled to vote to accept or reject this Plan.

**3.4**     Class 4A -- General Unsecured Claims.

(1)     Classification:  Class 4A consists of all Allowed General Unsecured Claims.

(2)     Treatment:  Each Holder of a Class 4A General Unsecured Claim will receive a Pro Rata share of the New Allied Holdings Common Stock

(3)     Voting:  Class 4A is an Impaired Class and pursuant to Section 1126 of the Bankruptcy Code each Holder of an Allowed Class 4A General Unsecured Claim is entitled to vote to accept or reject this Plan.

**3.5**     Class 4B -- Insured Claims.

(1)     Class 4B consists of all Allowed Insured Claims.

(2)     Treatment:  Each Holder of an Allowed Class 4B shall receive a Pro Rata Share of the New Allied Holdings Common Stock; provided, however, that the maximum allowed amount of an Allowed Insured Claim shall be limited to an amount equal to the applicable self-insured retention or deductible under the relevant insurance policy plus the amount by which the Insured Claim exceeds the total coverage available from the relevant insurance policies of the Debtors.  Nothing in this Section shall constitute a waiver of any litigation rights the Debtors may hold against any Person, including the Debtors' insurance carriers; and nothing in this Section is intended to, shall or shall be deemed to preclude any Holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any distribution such Holder may receive under the Plan; provided, however, that the Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

(3)     The Plan shall not expand the scope of, or alter in any way, the rights and obligations of the Debtors' insurers under their policies, and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable policy.  The Plan shall not operate as a waiver of any other Claims the Debtors' insurers have asserted or may assert in any proof of Claim or the Debtors' rights and defenses to such proofs of Claim.

(4)     Voting:  Class 4B is an Impaired Class and pursuant to Section 1126 of the Bankruptcy Code each Holder of an Allowed Class 4B Insured Claim is entitled to vote to accept or reject this Plan.

**3.6**     Class 4C -- Other Insured Claims.

(1)     Classification:  Class 4C consists of all Other Insured Claims.

(2)     Treatment:  Distributions under the Plan to each Holder of an Other Insured Claim shall receive a Pro Rata Share of the New Allied Holdings Common Stock; provided, however, that the maximum allowed amount of an Allowed Other Insured Claim shall be limited to an amount equal to the applicable self-insured retention or deductible under the relevant insurance policy plus the amount by which the Allowed Other Insured Claim exceeds the total coverage available from the relevant insurance policies of the Debtors.  Nothing in this Section shall constitute a waiver of any litigation rights the Debtors may hold against any Person, including the Debtors' insurance carriers; and nothing in this Section is intended to, shall or shall be deemed to preclude any Holder of an Allowed Other Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any distribution such Holder may receive under the Plan; provided, however, that the Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

(3)     The Plan shall not expand the scope of, or alter in any way, the rights and obligations of the Debtors' insurers under their policies, and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable policy.  The Plan shall not operate as a waiver of any other Claims the Debtors' insurers have asserted or may assert in any Proof of Claim or the Debtors' rights and defenses to such Proofs of Claim.

(4)     Voting:  Class 4C is an Impaired Class and pursuant to Section 1126 of the Bankruptcy Code each Holder of an Allowed Class 4C Other Insured Claim is entitled to vote to accept or reject this Plan.

**3.7**     Class 5 -- Intercompany Claims.

(1)     Classification:  Class 5 consists of all Allowed Intercompany Claims.

(2)     Treatment:  No holder of an Allowed Intercompany Claim will receive or retain any property of the Debtors under the Plan on account of such Claim; provided, however, that Intercompany Claims may be capitalized, satisfied, or preserved either directly or indirectly or in whole or part.  Any Intercompany Claim, or portion thereof, that is not so capitalized, satisfied, or preserved will be cancelled as of the Effective Date.

28

(3)    Voting: Class 5 is an Impaired Class. Pursuant to Section 1126(g) of the Bankruptcy Code, Holders of Class 5 Intercompany Claims are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

**3.8**    Class 6---Subordinated General Unsecured Claims.

(1)    Classification: Class 6 Claims consist of Allowed Subordinated General Unsecured Claims against the Debtors.

(2)    Treatment: On the Effective Date, all Class 6 Claims shall be cancelled and holders of Class 6 Claims shall receive nothing on account of such Allowed Subordinated General Unsecured Claims.

(3)    Voting: Class 6 is Impaired. Pursuant to Section 1126(g) of the Bankruptcy Code, the holders of Allowed Claims in Class 6 are conclusively presumed to have rejected the Plan and, therefore, are not entitled to vote.

**3.9**    Class 7A – Old Allied Holdings Common Stock

(1)    Classification: Class 7A consists of all Interests in Old Allied Holdings Common Stock.

(2)    Treatment: Holders of Old Allied Holdings Common Stock will not receive any distribution of property under the Plan on account of their interest in Old Allied Holdings Common Stock and, on the Effective Date, all Interests in Old Allied Holdings Common Stock will be cancelled.

(3)    Voting: Class 7A is an Impaired Class. Pursuant to Section 1126(g) of the Bankruptcy Code, Holders of Old Allied Holdings Common Stock are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

**3.10**    Class 7B – Old Other Debtors Common Stock.

(1)    Classification: Class 7B consists of all Allowed Old Other Debtors Common Stock.

(2)    Treatment: Holders of Old Other Debtors Common Stock will not receive any distribution of property under the Plan on account of their interest in Old Other Debtors Common Stock and, on the Effective Date, all Interests in Old Other Debtors Common Stock will be cancelled.[2]

---

[2] The foregoing may be modified by the Plan Proponents or the Reorganized Debtors at any time, after consultation with the Creditors' Committee.

(3)    Voting:  Class 7B is an Impaired Class.  Pursuant to Section 1126(g) of the Bankruptcy Code, Holders of Old Other Debtors Common Stock are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

**3.11**    Class 7C -- Old Allied Holdings Stock Rights.

(1)    Classification:  Class 7C consists of all Allowed Old Allied Holdings Stock Rights.

(2)    Treatment:  Holders of Allowed Old Allied Holdings Stock Rights will not receive any distribution of property under the Plan on account of their interest in Old Common Stock and, on the Effective Date, all Interests in Old Allied Holdings Stock Rights will be cancelled.

(3)    Voting:  Class 7C is an Impaired Class.  Pursuant to Section 1126(g) of the Bankruptcy Code, Holders of Old Allied Holdings Stock Rights are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

**3.12**    Special Provision Governing Unimpaired Claims.  Except as otherwise provided in this Plan, nothing under this Plan is intended to or shall affect the Debtors' or Reorganized Debtors' rights and defenses in respect of any Claim that is Unimpaired under this Plan, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupment against such Unimpaired Claims.

**ARTICLE IV.**
**TREATMENT OF UNCLASSIFIED CLAIMS**

**4.1**    Summary.  Pursuant to Section 1123(a)(l) of the Bankruptcy Code, Administrative Expense Claims (including Claims for Professional Compensation), Claims of the DIP Lenders and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under this Plan.  Holders of such Claims are not entitled to vote on this Plan.  All such Claims are instead treated separately in accordance with this Article IV and in accordance with the requirements set forth in Section 1129(a)(9)(A) of the Bankruptcy Code.

**4.2**    Unclassified Claims (Applicable to All Debtors).

(a)    Administrative Expense Claims.

(i)    General.

Subject to (x) the bar date provisions set forth in Section 4.2(a)(iii) hereof and (y) additional requirements for Professionals and certain other entities set forth below, the Reorganized Debtors shall pay to each holder of an Allowed Administrative Expense

30

Claim, on account of its Administrative Expense Claim and in full satisfaction thereof, Cash equal to the Allowed amount of such Administrative Expense Claim on the later of (A) sixty (60) days after such Claim becomes Allowed or (B) the Effective Date (or as soon as practicable thereafter) unless the Holder, the Reorganized Debtors and Yucaipa agree in writing to other treatment of such Claim.  Payment on an Administrative Expense Claim that arose in the ordinary course of the Debtors' business will not be made until such payment would have become due in the ordinary course of the Debtors' business or under the terms of the legal obligation giving rise to the Claim in the absence of the Chapter 11 Cases.

(ii)   Payment Of Statutory Fees.

On or before the Effective Date, all fees then payable pursuant to 28 U.S.C. § 1930 shall be paid in full in Cash.

(iii)   Bar Date for Administrative Expense Claims.

(1)   General Provisions.

Except for Administrative Expense Claims of Professionals for Professional Compensation, which are addressed in Section 4.2(a)(iii)(2) below, and except as otherwise provided below for (A) non-tax liabilities incurred in the ordinary course of business by each Debtor and (B) Postpetition Tax Claims and (C) Yucaipa's Claim for substantial contribution and (D) Indenture Trustee Fees and Expenses, requests for payment of Administrative Expense Claims must be Filed and served on counsel for the Reorganized Debtors and counsel for Yucaipa no later than (x) the Administrative Expense Claim Bar Date, or (y) such later date, if any, as the Bankruptcy Court shall order upon application made prior to the end of the Administrative Expense Claim Bar Date.  Holders of Administrative Expense Claims (including, without limitation, the holders of any Claims for federal, state or local taxes) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against any of the Debtors or the Reorganized Debtors or any of their respective properties.

(2)   Professionals.

(A)   Persons requesting Professional Compensation pursuant to any of Sections 327, 328, 330, 331, 363, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Confirmation Date shall File and serve on the Debtors, Reorganized Debtors, as the case may be, Yucaipa, the Creditors' Committee (if still then in existence) and any other party entitled to receive a copy of such application pursuant to rule or order of the Bankruptcy Court, an application for final allowance of compensation and reimbursement of expenses on or before sixty (60) days after the Effective Date.  Any claims by or on behalf of Yucaipa that would be covered by this section will instead be treated as part of Yucaipa's claim for substantial contribution under Section 4.2(a)(iii)(5).

(B)   Objections to applications of professionals or other Persons for Professional Compensation must be Filed and served on the Debtors, counsel for the Debtors or

31

Reorganized Debtors, as the case may be, counsel for Yucaipa, the Creditors' Committee (if still then in existence) and the professionals (or other Persons) to whose application the objections are addressed on or before the later of (i) thirty (30) days after such application is Filed with the Bankruptcy Court, (ii) ninety (90) days after the Effective Date, or (iii) such later date as the Bankruptcy Court shall order upon application or upon agreement between the Reorganized Debtors and the affected professional (or other Person).

(3)     Ordinary Course Liabilities.

Holders of Administrative Expense Claims based on liabilities incurred after the Petition Date in the ordinary course of the Debtors' business (other than Claims of governmental units for taxes or Claims and/or penalties related to such taxes) shall not be required to File any request for payment of such Claims. Such Administrative Expense Claims shall be assumed and paid by the Reorganized Debtors, as appropriate, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Expense Claim, without any further action by the holders of such Claims; provided that, notwithstanding the foregoing, the Reorganized Debtors reserve the right to dispute through any means permitted at law, equity and/or contract any Administrative Expense Claims based on liabilities incurred after the Petition Date in the ordinary course of the Debtors' business that the Reorganized Debtors believe are incorrect, invalid or otherwise objectionable.

(4)     Postpetition Tax Claims.

All requests for payment of Postpetition Tax Claims, for which no bar date has otherwise been previously established, must be Filed on or before the later of (i) sixty (60) days following the Effective Date; and (ii) one hundred and twenty (120) days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any Holder of any Postpetition Tax Claim that is required to File a request for payment of such taxes and that does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Postpetition Tax Claim against any of the Debtors or Reorganized Debtors, or any of their respective properties, whether any such Postpetition Tax Claim is deemed to arise prior to, on, or subsequent to, the Effective Date.

(5)     Yucaipa Claim for Substantial Contribution.

Yucaipa shall hold an Allowed Claim for substantial contribution under Section 503(b)(3) of the Bankruptcy Code for its fees and expenses incurred in connection with Yucaipa's participation in the Debtors' Chapter 11 Cases, if the Debtors successfully reorganize (including, without limitation, professional fees and the fees associated with retention of a new CEO for the Reorganized Debtors). Among other things, Yucaipa played a key role in negotiating and drafting the terms of the Plan and a new labor deal with TNATINC, and played a key role in obtaining Exit Financing. No motion for allowance shall be required for the Debtors or the Reorganized Debtors, as

applicable, to pay Yucaipa's Allowed Claim for substantial contribution on the Effective Date of the Plan in the amount of such fees and expenses.

(6)    Indenture Trustee Fees and Expenses.

No motion for allowance shall be required for the Debtors or the Reorganized Debtors, as applicable, to pay the Indenture Trustee Fees and Expenses, which shall be paid by the Reorganized Debtors on the Effective Date.

(b)    Treatment of Priority Tax Claims.

Each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date either (a) will be paid the full unpaid amount of such Allowed Priority Tax Claim in Cash on the Effective Date, or upon such other terms as may be agreed upon by such Holder, Yucaipa or the Reorganized Debtors, (b) will receive deferred Cash payments, over a period ending not later than 6 years from the date of assessment, totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at a fixed rate of 4% per annum from the Effective Date, or such lesser rate agreed to by a particular taxing authority, or (c) otherwise will be paid as provided for in an order of the Bankruptcy Court. The proposed treatment for each Holder of an Allowed Priority Tax Claim due and payable on the Effective Date shall be selected by Yucaipa and shall be disclosed in the Plan Supplement.  The amount of any Priority Tax Claim that is not an Allowed Claim or that is not otherwise due and payable on or prior to the Effective Date, and the rights of the Holder of such Claim, if any, to payment in respect thereof shall (i) be determined in the manner in which the amount of such Claim and the rights of the Holder of such Claim would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced, (ii) survive after the Effective Date as if the Chapter 11 Cases had not been commenced, and (iii) not be discharged pursuant to Section 1141 of the Bankruptcy Code.  In accordance with Section 1124 of the Bankruptcy Code, this Plan leaves unaltered the legal, equitable, and contractual rights of each Holder of a Priority Tax Claim.

(c)    Treatment of Claims Under the DIP Loan Facility.

As further discussed in Section 10.4 hereof, on the Effective Date, all outstanding Allowed amounts under the DIP Loan Facility shall be paid, in full, in Cash by the Reorganized Debtors.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1**    Assumption and Cure of Executory Contracts and Unexpired Leases.  On the Effective Date, in addition to all executory contracts and unexpired leases that have been previously assumed by the Debtors by order of the Bankruptcy Court, all executory contracts and unexpired leases of the Reorganized Debtors identified on an Exhibit to this

33

Plan in form and substance reasonably acceptable to Yucaipa, as may be amended prior to the Confirmation Date (the "Contract/Lease Schedule"), are hereby deemed assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code.  On or before [April ____,] 2007, Yucaipa (after consultation with the Debtors and the Creditors' Committee) will File the Contract/Lease Schedule; provided however that Yucaipa reserves the right to amend the Contract/Lease Schedule at any time up to ten (10) days before the Confirmation Hearing to add a contract or lease and up to three (3) days before the Confirmation Hearing to delete a contract or lease.  The Debtors and the Plan Proponents, as applicable, will provide notice of any amendments to the Contract/Lease Schedule to the parties to the executory contracts and unexpired leases affected thereby and the Creditors' Committee.  All executory contracts or unexpired leases of the Reorganized Debtors not set forth on the Contract/Lease Schedule (or not previously assumed by the Debtors by order of the Bankruptcy Court or subject of a Filed motion to assume) that were not previously rejected will be deemed rejected as of the Effective Date pursuant to Sections 365 and 1123 of the Bankruptcy Code.

Any Holder of any Claim arising from the rejection of an executory contract or unexpired lease must File a proof of Claim within the earlier of (a) thirty (30) days following entry of an order by the Bankruptcy Court authorizing rejection of the applicable contract or lease and (b) thirty (30) days after the Confirmation Date.  Entry of the Confirmation Order by the Bankruptcy Court shall, subject to the occurrence of the Effective Date, constitute approval of such rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed and/or assigned pursuant to this Article V (or pursuant to other Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the applicable Reorganized Debtor(s) in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.  To the extent applicable, all executory contracts or unexpired leases of Reorganized Debtors assumed pursuant to this Section 5.1 shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant executory contract or unexpired lease, and any required consent under any such contract or lease shall be deemed satisfied by the confirmation of the Plan.

**5.2**     Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.  Any monetary cure amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) as due in the ordinary course of business or (iii) on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.  In the event of a dispute regarding: (1) the amount of any cure payments, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assigned, or (3) any other matter pertaining to assumption, the cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.  Yucaipa will list cure

34

amounts for executory contracts and unexpired leases on the Contract/Lease Schedule. **As more fully set forth in the order approving the Disclosure Statement, the failure of any non-Debtor party to an executory contract or unexpired lease to file and serve an objection to the cure amount listed on the Contract/Lease Schedule for such executory contract or unexpired lease by [_____,] 2007 at 4:00 pm, Eastern Standard Time, shall be deemed consent to such cure amount.**

      **5.3**    Collective Bargaining Agreement.  The Collective Bargaining Agreement between the IBT and the Debtors shall be amended and assumed by the Reorganized Debtors on the terms and conditions set forth in Exhibit G to the Disclosure Statement. The Debtors and the Reorganized Debtors shall not be obligated to pay any cure amounts associated with the assumption of such contract.

      **5.4**    Employment Agreements and Other Benefits.

      (1)    <u>Employment Agreements</u>.  Except as otherwise provided in this Plan or as modified by the KERP, to the extent the Debtors had employment agreements with certain of their employees as of the Petition Date, Yucaipa will disclose in the Contract/Lease Schedule whether they intend to assume or reject such contracts. Notwithstanding anything to the contrary in this Plan, the Reorganized Debtors shall maintain all of their existing rights, including, but not limited to, any rights that they may have to amend, modify, or terminate, the employment agreements assumed pursuant to this Article, subject to the existing contractual rights, if any, of the directors, officers or employees affected thereby.

      (2)    <u>Compliance with the KERP</u>.  The Debtors will comply with the KERP and the Debtors or Reorganized Debtors will perform any and all remaining obligations thereunder, including the payment of performance bonuses, emergence bonuses and severance amounts contemplated thereby.

      (3)    <u>Qualified Pension Plans</u>.  Upon the occurrence of the Effective Date, the Reorganized Debtors intend to continue the Qualified Pension Plans, as frozen, and shall meet the minimum funding standards under ERISA and the Internal Revenue Code, shall pay all Pension Benefit Guaranty Corporation insurance premiums, if applicable, and shall otherwise administer and operate the Qualified Pension Plans in accordance with their terms and ERISA in such manner as is necessary to maintain those benefits that had accrued prior to the date that accrual of benefits under the Qualified Pension Plans was frozen. Nothing in this Plan shall be deemed to release, discharge, or relieve the Debtors, Reorganized Debtors, any member of the Debtors' controlled groups (as defined in 29 U.S.C. § 1301(a)(14)), or any other party, in any capacity, from any current or future liability with respect to the Qualified Pension Plans, and the Pension Benefit Guaranty Corporation and the Qualified Pension Plans shall not be enjoined or precluded from enforcing such liability as a result of this Plan's provisions or consummation. Notwithstanding anything to the contrary in this Plan, the Reorganized Debtors shall maintain all of their existing rights, including, but not limited to, any rights that they may have to amend, modify, or terminate the Qualified Pension Plans.

(4)    <u>Compensation and Benefit Programs</u>.  All employment and severance agreements and policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees, officers and directors including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements and plans, incentive plans, deferred compensation plans and life, accidental death and dismemberment insurance plans, shall be treated as executory contracts under the Plan, and on the Effective Date will be deemed assumed pursuant to the provisions of Sections 365 and 1123 of the Bankruptcy Code; and the Debtors' and Reorganized Debtors' obligations under such programs to such Persons shall survive confirmation of the Plan, except for: (a) executory contracts or employee benefit plans specifically rejected pursuant to the Plan by being listed as contracts to be rejected on the Contract/Lease Schedule or otherwise (to the extent that any such rejection does not violate the Bankruptcy Code including, but not limited to, Sections 1114 and 1129(a)(13) thereof); (b) all employee equity or equity-based incentive plans; (c) such executory contracts or employee benefit plans as have previously been rejected, are the subject of pending rejection procedures or a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract; and (d) except as modified pursuant to the terms of the amended IBT Collective Bargaining Agreement as described in Section 5.3 hereof; provided however, that the Reorganized Debtors' obligations, if any, to pay all "retiree benefits" as defined in Section 1114(a) of the Bankruptcy Code shall continue to the extent that any such retiree benefits have been modified in accordance with Section 1114 of the Bankruptcy Code. Notwithstanding the foregoing, the assumption of the indemnification provisions and insurance described in this Section shall only apply to directors, officers and employees who remain in their respective capacity as directors, officers and employees as of the Effective Date.

(5)    <u>Workers' Compensation Programs</u>.  As of the Effective Date, the Reorganized Debtors shall continue to honor their post-petition obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  Nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, claims, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; provided however, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for in the applicable laws.

## ARTICLE VI.
## MEANS FOR IMPLEMENTATION OF PLAN

**6.1**    Continued Corporate Existence and Vesting of Assets in Reorganized Debtors.

(1)    Subject to the additional provisions of this Plan, after the Effective Date, each of the Reorganized Debtors shall continue to exist in accordance with the law

CH\917779.13

in the jurisdiction in which it is incorporated or organized and pursuant to its certificate of incorporation and bylaws or other applicable organizational document in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other applicable organizational document are amended under the Plan and as provided in the Amended Governing Documents and Amended By-Laws.  On and after the Effective Date, all property of the Estates, including all Claims, rights and causes of action and any property acquired by any Debtor or Reorganized Debtor under or in connection with the Plan, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests. On and after the Effective Date, each of the Reorganized Debtors may operate its business, may use, acquire and dispose of property, may retain, compensate and pay any professionals or advisors, and compromise or settle any Claims or Interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.

(2)    There are certain Affiliates of the Debtors that are not Debtors in the Chapter 11 Cases. The continued existence, operation and ownership of such non-Debtor Affiliates is a material component of the Debtors' businesses, and all of the Interests and other property interests in such non-Debtor Affiliates (other than non-Debtor Affiliates owned by certain other non-Debtor Affiliates) shall vest in the applicable Reorganized Debtor or its successor on the Effective Date free and clear of all Claims, Liens, charges, other encumbrances and interests.

**6.2**    Substantive Consolidation of Claims against Debtors for Plan Purposes Only.  The Plan is premised on the substantive consolidation of all of the Debtors with respect to the treatment of all Claims and Interests except for the Other Secured Claims in Class 1, as provided below.  The Plan does not contemplate substantive consolidation of the Debtors with respect to the Class 1 Claims, which shall be deemed to apply separately with respect to the Plan proposed by each Debtor.  This Plan shall serve as a request by the Plan Proponents, in lieu of a separate motion, to the Bankruptcy Court, that it grant substantive consolidation with respect to the treatment of all Claims and Interests other than Class 1 Claims as follows:  on the Effective Date, (a) all Intercompany Claims will be eliminated (except as set forth in Section 3.7 hereof); (b) all Assets and liabilities of the Debtors will be merged or treated as though they were merged (except to the extent they secure any Allowed Other Secured Claim); (c) all guarantees of the Debtors of the obligations of any other Debtor and any joint or several liability of any of the Debtors shall be eliminated; and (d) each and every Claim or Interest (except for Other Secured Claims) against any Debtor shall be deemed Filed against the consolidated Debtors and all Claims (except for Other Secured Claims) Filed against more than one Debtor for the same liability shall be deemed one Claim against any obligation of the consolidated Debtors.

**6.3**    Exit Financing.  On the Effective Date, the Reorganized Debtors shall obtain the Exit Financing from the Exit Financing Lenders. Term sheets relating to the Exit Financing shall be contained in the Plan Supplement. The Reorganized Debtors are authorized to enter into, execute and deliver the Exit Financing.  In addition, from and after the Effective Date, the Reorganized Debtors shall have the right and authority

without further order of the Bankruptcy Court to raise additional capital and obtain additional financing that the boards of directors of the applicable Reorganized Debtors deem appropriate.

      6.4     Sources of Cash for Distribution.  All Cash necessary for the Reorganized Debtors to make payments required by this Plan shall be obtained from existing Cash balances, the operations of the Debtors or Reorganized Debtors and the Exit Financing. Cash payments to be made pursuant to the Plan shall be made by the Reorganized Debtors, provided however, that the Debtors and the Reorganized Debtors shall be entitled to transfer funds between and among themselves as may be necessary or appropriate to enable any of the Reorganized Debtors to satisfy their obligations under the Plan.

      6.5     Reinstatement of Interests of Allied Holdings in its Affiliates.  Each Reorganized Debtor shall, without the need for any further corporate act or other action under any applicable law, regulation, order or rule, issue authorized New Common Stock to the Reorganized Debtor that was that Debtor's corporate parent prior to the Effective Date, so that each Reorganized Debtor will retain its 100% ownership of its pre-Petition subsidiary.  The foregoing may be modified by the Plan Proponents or the Reorganized Debtors at any time, after consultation with the Creditors' Committee.

      6.6     Corporate and Limited Liability Company Action.  Each of the matters provided for under this Plan involving the corporate or limited liability company structure of any Debtor or Reorganized Debtor or any corporate or limited liability company action to be taken by or required of any Debtor or Reorganized Debtor, including, without limitation, the adoption of the Amended Governing Documents and Amended By-Laws of each of the Reorganized Debtors as provided for in Section 7.1 of this Plan, the initial selection of directors and officers for the Reorganized Debtors, the Distribution of Cash pursuant to the Plan, the issuance and sale of New Common Stock, the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing, and other matters involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of any of the Debtors or the Reorganized Debtors.

      6.7     Effectuating Documents; Further Transactions.  Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan or to otherwise comply with applicable law.

      6.8     Exemption from Certain Transfer Taxes and Recording Fees.  Pursuant to Section 1146 of the Bankruptcy Code, any transfers from a Debtor to a Reorganized

Debtor or to any other Person or Entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

      **6.9**    Further Authorization.  The Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

      **6.10**    Canadian Operations Sale.  After the Effective Date, the  Reorganized Debtors will consider selling, subject to the discretion of Yucaipa, all of their assets utilized in connection with their operations in Canada (the "Canadian Operations Sale").  If the Reorganized Debtors engage in a sale process with respect to the Canadian Operations Sale, it is contemplated that PTS/Leaseway Motorcar Transport Company would act as a stalking horse bidder for such a sale.  In order for a Canadian Operations Sale to be effectuated , the value of the consideration received by the Reorganized Debtors must equal or exceed the imputed value of the Canadian operations, as derived from the implied EBITDA  multiples used in the valuation of the Reorganized Debtors set forth in Exhibit E to the Disclosure Statement.

      **6.11**    Retained Actions. Except as set forth in this Section 6.11, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, to the extent set forth below, and their respective successors, any assigns hereunder and future assigns will retain and may exclusively enforce any Retained Actions subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan (and consented to by Yucaipa in its sole discretion), and the Confirmation Order's approval of the Plan shall be deemed a res judicata determination of such rights to retain and exclusively enforce such Causes of Action, and none of such Retained Actions is deemed waived, released or determined by virtue of the entry of the Confirmation Order or the occurrence of the Effective Date, notwithstanding that the specific Claims and Retained Actions are not identified or described.  Absent such express waiver or release by the Debtors, the Reorganized Debtors, or their respective successors or assigns (with the consent of Yucaipa) may pursue Retained Actions, as appropriate, in accordance with the best interests of the Reorganized Debtors (or their successors or future assigns).  All Retained Actions may be asserted or prosecuted before or after solicitation of votes on the Plan and before or after the Effective Date.

      Absent an express waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors  from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Retained

Actions and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Actions upon or after Confirmation, the Effective Date or the consummation of the Plan. By example only, and without limiting the foregoing, the utilization or assertion of a Retained Action, or the initiation of any proceeding with respect thereto against a Person, by the Reorganized Debtors or any successor to or assign of them, shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of (a) the solicitation of a vote on the Plan from such Person or such Person 's predecessor in interest; (b) the Claim, Interest or Administrative Expense Claim of such Person or such Person's predecessor in interest having been listed in a Debtor's Schedules, List of Holders of Interests, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim or, Interest of the Person or such Person's predecessor in interest; or (d) Confirmation of the Plan.

Notwithstanding any allowance of a Claim, the Reorganized Debtors reserve the right to seek, among other things, to have such Claim disallowed if the Reorganized Debtor, at the appropriate time, determines that it has a defense under Section 502(d) of the Bankruptcy Code, e.g., the Reorganized Debtor holds an Avoidance Action against the Holder of such Claim and such Holder after demand refuses to pay the amount due in respect thereto.

**6.12** Other Documents and Actions. The Debtors, the Debtors in Possession and the Reorganized Debtors shall File or execute such documents and take such other actions as are necessary to effectuate the transactions provided for in the Plan.

**6.13** Corporate Action. The authorization and issuance of the New Common Stock, the adoption of the Amended Governing Documents and Amended By-Laws and the selection of the Persons who will serve as the initial directors and officers of the Reorganized Debtors as of the Effective Date, and other matters under the Plan involving the corporate structure of each Debtor or Reorganized Debtor or corporate action by each Debtor or Reorganized Debtor, shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the stockholders, directors, members, partners or other applicable entity of each Debtor or Reorganized Debtor. Without limiting the foregoing, upon entry of the Confirmation Order by the clerk of the Bankruptcy Court, the filing by each Reorganized Debtor of its respective Amended Governing Documents and Amended By-Laws shall be authorized and approved in all respects.

**6.14** Retiree Benefits. On and after the Effective Date, to the extent required by Section 1129(a)(13) of the Bankruptcy Code, and except as may be provided to the contrary in a separate order of the Bankruptcy Court or under contracts negotiated with the applicable labor groups governing such benefits, each Reorganized Debtor shall continue to pay all retiree benefits (if any) of any worker who retired as of the Effective Date, to the extent such benefits were maintained or established prior to the Effective Date.

CH\917779.13

**6.15**     Employee Claims.  Except as provided in the Employee Wage Order, each Debtor's employees shall have a Priority Claim for unpaid wages, benefits and other entitlements to the extent permitted by Section 507(a)(3) of the Bankruptcy Code, which, if allowed, will be either (i) paid in full, or (ii) Reinstated.  To the extent that any employee's Claim exceeds the amount prescribed by Section 507(a)(3) of the Bankruptcy Code, the employee shall receive a General Unsecured Claim for the excess amount. Notwithstanding the foregoing, any employee who continues to be an employee in good standing with the Reorganized Debtors after the Effective Date shall be entitled to take (in the form of vacation days and not in Cash) all unused and unpaid vacation time accrued prior to the Petition Date on such terms as will be prescribed by the Reorganized Debtors; provided, however, that notwithstanding the foregoing, if any employee is no longer employed by the Reorganized Debtors for any reason after the Effective Date, the Reorganized Debtors shall have no obligations to make any payments on account of any unused and unpaid vacation time accrued prior to the Petition Date to such employee.

**6.16**     Good Faith.  Confirmation of the Plan shall constitute a finding that: (i) this Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code, and (ii) all Persons' solicitations of acceptances or rejections of this Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**6.17**     Executory Contracts and Unexpired Leases Entered Into, and Other Obligations Incurred After, the Petition Date.  Executory contracts and unexpired leases (a) assumed by the Debtors after the Petition Date or (b) entered into, and other obligations incurred, after the Petition Date by the Debtors shall be performed by the Debtors or Reorganized Debtors in the ordinary course of their businesses.  Accordingly, such executory contracts, unexpired leases and other obligations shall survive and remain unaffected by the entry of the Confirmation Order or the occurrence of the Effective Date under, and the effectiveness of, the Plan.

**6.18**     Security Interests and Liens.  All security interests and Liens granted or to be granted to any party in connection with the Plan or any document or agreement contemplated by the Plan or entered into in connection with the Plan or otherwise granted or to be granted, including without limitation, the guarantees, mortgages, security agreements and pledge agreements described in the Exit Financing term sheets included in the Plan Supplement, shall be governed in all respects, including without limitation, perfection and priority, by applicable non-bankruptcy law, notwithstanding anything to the contrary in the Plan or the Confirmation Order.

## ARTICLE VII.
## PROVISIONS REGARDING CORPORATE GOVERNANCE OF REORGANIZED DEBTORS

**7.1**     Amended Governing Documents and Amended By-Laws.  The Amended Governing Documents and Amended By-Laws of each of the Reorganized Debtors shall be adopted as may be required in order to be consistent with the provisions of this Plan and the Bankruptcy Code.  The Amended Governing Documents of Reorganized Allied

Holdings shall, among other things (a) authorize the issuance of common stock in amounts not less than the amounts necessary to permit the Distributions thereof required or contemplated by the Plan and (b) provide, pursuant to Section 1123(a)(6) of the Bankruptcy Code, for (i) a provision prohibiting the issuance of non voting equity securities and (ii) to the extent necessary, a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.  Forms of the Amended Governing Documents and Amended By-Laws of the Debtors will be contained in the Plan Supplement.

7.2    **Directors and Officers of Reorganized Debtors.**  The Initial Board shall have five members, including a new CEO (who shall be selected by Yucaipa and shall be reasonably acceptable to TNATINC and the Creditors' Committee), one member chosen by the Creditors' Committee (who shall be reasonably acceptable to Yucaipa), and three other members selected by Yucaipa.  Pursuant to the terms of the amended Collective Bargaining Agreement, TNATINC shall have certain observer rights with respect to the Initial Board.  The proposed identity of the members of the Initial Board and the new CEO shall be disclosed on or prior to the date of the hearing on the approval of the Disclosure Statement with respect to the Plan, or as soon thereafter as practicable.  The remaining members of senior management will continue to serve until the Effective Date pursuant to their respective existing terms of compensation and thereafter subject to terms and conditions mutually acceptable to the Initial Board and the applicable member of management.  The Initial Board of Allied Holdings shall choose the members of the Boards of Directors of each of the other Reorganized Debtors on the Effective Date or as soon as practicable thereafter.  Each of the Persons on the Initial Boards of Directors and each of the initial officers of the respective Reorganized Debtors shall serve in accordance with the Amended Governing Documents and Amended By-Laws of each of the respective Reorganized Debtors, as the same may be amended from time to time.

7.3    **New Employment, Retirement, Indemnification and Other Related Agreements and Incentive Compensation Programs.**  As of the Effective Date, the Reorganized Debtors will have authority to:  (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with their active directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees.

7.4    **Effectuating Documents and Further Transactions.**  Each of the Debtors or Reorganized Debtors, as appropriate, is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

CH\917779.13

7.5     Authorization and Issuance of New Common Stock.  On the Effective Date, the Reorganized Debtors are authorized to issue the New Common Stock in accordance with the provisions of the Plan.  The issuance of New Common Stock and the Distributions thereof will be exempt from registration under applicable securities laws pursuant to Section 1145(a) of the Bankruptcy Code.

7.6     Reserve.  Reorganized Allied Holdings shall be authorized, without further act or action by the Initial Board and without further act or action under applicable law, regulation, order, or rule to reserve from the authorized shares of New Common Stock, that number of shares of New Common Stock required for issuance to the Holders of Allowed Claims as and when required under the Plan.  The Initial Board may reduce the number of shares of New Common Stock so reserved at any time as it deems appropriate to the extent it determines in good faith that such reserve is in excess of the number of shares needed to satisfy the foregoing requirements.

7.7     Listing of New Allied Holdings Common Stock.  In the event the Initial Board determines in its discretion to register the New Allied Holdings Common Stock with the Securities and Exchange Commission, or if Reorganized Allied Holdings is required under applicable securities laws to register the New Allied Holdings Common Stock with the Securities and Exchange Commission, Reorganized Allied Holdings shall use commercially reasonable efforts to list the New Allied Holdings Common Stock on a national securities exchange or for quotation on a national automated interdealer quotation system within one year of the Effective Date unless the Initial Board determines otherwise, with such efforts to commence as soon as reasonably practicable after the Effective Date. Reorganized Allied Holdings shall have no liability if it is unable to list the New Allied Holdings Common Stock as described above. Persons receiving Distributions of New Allied Holdings Common Stock, by accepting such Distributions, shall have agreed to cooperate with Reorganized Allied Holdings's reasonable requests to assist Reorganized Allied Holdings in its efforts to list the New Allied Holdings Common Stock on a securities exchange or quotation system to the extent necessary.

## ARTICLE VIII.
## VOTING AND DISTRIBUTIONS

8.1     Voting of Claims.  Each Holder of an Allowed Claim in an Impaired Class, not otherwise deemed to have rejected the Plan in accordance with Section 1126(g) of the Bankruptcy Code, shall be entitled to vote separately to accept or reject the Plan.

8.2     Nonconsensual Confirmation.  The Plan Proponents request Confirmation under Section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept the Plan pursuant to Section 1126 of the Bankruptcy Code. The Plan Proponents reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

8.3     Acceptance by Class of Creditors.  An Impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (⅔) in

43

dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

    **8.4**    Distributions for Claims Allowed as of the Effective Date.  Except as otherwise provided in this Article VIII and as to DIP Facility Claims, Distributions of Cash to be made on the Effective Date to Holders of Claims that are allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (i) 90 days after the Effective Date and (ii) 90 days after such later date when the applicable conditions of Section 5.2 (regarding cure payments for executory contracts and unexpired leases being assumed) and Section 8.8 (regarding undeliverable Distributions) are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Section 9.5 and Section 9.6 of the Plan.

    **8.5**    Disbursing Agent.  The Reorganized Debtors, or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion, will make all Distributions of Cash, New Common Stock, and other instruments or documents required under the Plan. Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other Entities to assist in or make the Distributions required by the Plan.  Each Third Party Disbursing Agent including for these purposes, the Indenture Trustee, providing services related to Distributions pursuant to the Plan will receive from the Reorganized Debtors reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services without Bankruptcy Court approval.  These payments will be made on terms agreed to with the Reorganized Debtors and will not be deducted from Distributions to be made pursuant to the Plan to Holders of Allowed Claims receiving Distributions from a Third Party Disbursing Agent.  The Indenture Trustee shall receive an Administrative Claim in an amount equal to the Indenture Trustee Fees and Expenses. To the extent such Administrative Claim is not paid to the Indenture Trustee (or escrowed pending the resolution of any dispute), the Indenture Trustee shall retain its charging lien on Distributions to Holders of Prepetition Notes Claims to the fullest extent permitted under the Prepetition Notes Indenture.

    **8.6**    Distributions of Cash.  Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the applicable Reorganized Debtor or by wire transfer from a domestic bank; provided that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the applicable Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan on behalf of DIP Facility Claims will be made to the administrative agent under such facility on the Effective Date by wire transfer of immediately available funds.

    **8.7**    No Interest on Claims or Interests.  Unless otherwise specifically provided for or contemplated elsewhere in the Plan or Confirmation Order, or required by applicable bankruptcy law to render a Claim Unimpaired or otherwise, postpetition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be

entitled to interest accruing on or after the Petition Date on any Claim, other than Other Secured Claims to the extent required by the applicable documents giving rise to such Claims; provided, however, that to the extent a holder of a Other Secured Claim has a Deficiency Claim on account of such Other Secured Claim, interest shall not accrue on or after the Petition Date on the Other Secured Claim or the Deficiency Claim.

**8.8**    Delivery of Distributions.  The Distribution to a Holder of an Allowed Claim shall be made by the Reorganized Debtors (a) at the address set forth on the proof of Claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to the Reorganized Debtors after the date of any related proof of Claim, (c) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Reorganized Debtors has not received a written notice of a change of address, (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records, or (e) in the case of Prepetition Notes Claims, to the Indenture Trustee for ultimate distribution to the Record Holders of such Prepetition Notes Claims.   The Indenture Trustee shall be directed to effect any Distribution under the Plan through the most efficient method available in the Indenture Trustee's discretion, including without limitation through the book entry transfer facilities of the Depository Trust Company pursuant to the procedures used for effecting distributions thereunder on the date of any such distribution.  If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Reorganized Debtors are notified of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  All Cash Distributions returned to the Reorganized Debtors and not claimed within six (6) months of return shall be irrevocably retained by the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary. All Distributions of New Common Stock returned to the Debtors and not claimed within six (6) months of return shall irrevocably revert to Reorganized Allied Holdings and shall be retained and held as set forth in the Amended Governing Documents. Upon such reversion, the claim of any Holder or their successors with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

**8.9**    Distributions to Holders as of the Record Date.  All Distributions on Allowed Claims shall be made to the Record Holders of such Claims. As of the close of business on the Record Date, the Claims register maintained by the Claims Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim. The Reorganized Debtors and any Disbursing Agent shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. The Reorganized Debtors shall instead be entitled to recognize and deal for all purposes under this Plan with the Record Holders as of the Record Date.  As of the close of business on the Confirmation Date, the transfer ledgers for the Prepetition Notes shall be deemed closed and the Indenture Trustee may take whatever action is necessary to close the transfer ledgers and there shall be no further transfers or changes in the holder of record of such securities in such transfer ledgers.  The Disbursing Agent and the Indenture Trustee shall have no obligation to recognize the transfer of, or sale of any participation in, any Prepetition Notes Claim that occurs after close of business on the Confirmation Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of

CH\917779.13

Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Confirmation Date.

**8.10**  **Indenture Trustee as Claim Holder.**  Consistent with Bankruptcy Rule 3003(c), the Debtors or Reorganized Debtors shall recognize the Proofs of Claim filed by the Indenture Trustee, in the amounts as Allowed herein, in respect of the Prepetition Notes Claims.  Accordingly, any Claim, proof of which is filed by the registered or beneficial holder of a Prepetition Notes Claim, may be disallowed as duplicative of the Claims of the Indenture Trustee without need for any further action or Bankruptcy Court order.

**8.11**  **De Minimis Distributions.**  Neither the Reorganized Debtors nor the Indenture Trustee shall have an obligation to make a Distribution if the amount to be distributed to the specific Holder of the Allowed Claim has a value less than fifty dollars ($50.00).  Any Holder of an Allowed Claim on account of which the amount of Cash to be distributed is less than fifty ($50.00) dollars will have its claim for such distribution discharged and will be forever barred from asserting any such claim against the Reorganized Debtors or their respective property. Any Cash not distributed pursuant to this Section 8.10 will be the property of Reorganized Allied Holdings, free of any restrictions thereon, and any such Cash held by a Third Party Disbursing Agent will be returned to Reorganized Allied Holdings.

**8.12**  **Fractional Securities, Fractional Dollars.**  Any other provision of this Plan notwithstanding, payments of fractions of shares of New Common Stock will not be made and shall be deemed to be zero. Any other provision of this Plan notwithstanding, the Reorganized Debtors shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

**8.13**  **Procedures for Distributions to Holders of Prepetition Notes Claims.**  Unless waived by the Reorganized Debtors, as a condition to receiving payments or other distributions, Distributions to Holders of Prepetition Notes Claims shall only be made to such Holders after the surrender by each such Holder of the Prepetition Notes, and/or similar or related documents representing such Claims, or in the event that such certificate or similar document is lost, stolen, mutilated or destroyed, upon the holder's compliance with the requirements set forth in this Plan.  Any Holder that fails to: (i) surrender such instrument or (ii) execute and deliver an affidavit of loss and/or indemnity, reasonably satisfactory to the Reorganized Debtors and furnish a bond in form, substance and amount reasonably satisfactory to the Reorganized Debtors within one (1) year of the Effective Date, shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution under the Plan in respect of such Claims.

**8.14**  **Compliance with Tax Requirements.** The Debtors or the Reorganized Debtors, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting

CH\917779.13

requirements. The Debtors or the Reorganized Debtors shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

(2)     Notwithstanding any other provision of the Plan, each Entity receiving a distribution of Cash or New Common Stock pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding and other tax obligations.

**8.15**     No Duplicate Distributions.  To the extent more than one Debtor is liable for any Claim, such Claim shall be considered a single Claim and entitled only to the payment provided therefor under the applicable provisions of the Plan.

**8.16**     Distributions in U.S. Dollars.   Except as otherwise specified herein, Cash payments made pursuant to the Plan shall be in U.S. currency by checks drawn on a domestic bank selected by the applicable Debtor or Reorganized Debtor or, at the option of the applicable Debtor or Reorganized Debtor, by wire transfer from a domestic bank. If an Allowed Claim is filed in a currency other than U.S. dollars, distributions will be made to the holder of such Allowed Claim utilizing the exchange rate on or about the time of distribution.

## ARTICLE IX.
## PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS

**9.1**     Objections to Claims.  All objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Deadline, and (a) if Filed prior to the Effective Date, such objections shall be served on the parties on the then applicable service list in the Chapter 11 Cases; and (b) if Filed after the Effective Date, such objections shall be served on the Reorganized Debtors, the United States Trustee and Yucaipa.  If an objection has not been Filed to a proof of Claim or a scheduled Claim by the Claims Objection Deadline, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. An objection is deemed to have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Deadline. Each such Tort Claim shall remain a Disputed Claim until it becomes an Allowed Claim in accordance with Sections 9.5 or 9.6.

**9.2**     Authority to Prosecute Objections.  After the Effective Date, except as provided in the following paragraph or otherwise in the Plan, only the Reorganized Debtors shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, provided, however, that the Reorganized Debtors shall not be entitled to object to Claims (i) that have been Allowed by a Final Order entered by the Bankruptcy Court prior to the Effective Date or (ii) that are Allowed by the express terms of this Plan. After the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; provided that (a) the Reorganized Debtors shall promptly File with the Bankruptcy Court a written

notice of any settlement or compromise of a Claim that results in an Allowed Claim in excess of $500,000 and (b) the United States Trustee and Yucaipa shall be authorized to contest the proposed settlement or compromise by Filing a written objection with the Bankruptcy Court and serving such objection on the Reorganized Debtors within 20 days of the service of the settlement notice. If no such objection is Filed, the applicable settlement or compromise shall be deemed final without further action of the Bankruptcy Court.

Except as set forth herein, notwithstanding that the Reorganized Debtors shall have the right to File objections to Claims and Interests, litigate and settle objections to Disputed Claims and Disputed Interests on behalf of the Debtors and their Estates, nothing contained herein shall be deemed to obligate the Reorganized Debtors to take any such actions, all of which shall be determined by the Reorganized Debtors in their sole and absolute discretion.

THE PLAN PROPONENTS HAVE NOT FULLY REVIEWED THE CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES OR DETERMINED WHETHER OBJECTIONS TO CLAIMS AND INTERESTS EXIST. THIS INVESTIGATION IS ONGOING AND WILL OCCUR, IN LARGE PART, AFTER THE CONFIRMATION DATE. AS A RESULT, CREDITORS AND OTHER PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THAT THE EXISTENCE OF ANY PARTICULAR OBJECTION TO A DISPUTED CLAIM OR DISPUTED INTEREST MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THIS PLAN, AN OBJECTION TO A CLAIM OR INTEREST MAY BE BROUGHT AGAINST ANY CREDITOR, INTEREST HOLDER OR PARTY-IN-INTEREST AT ANY TIME, SUBJECT TO THE CLAIMS OBJECTION DEADLINE. IN ADDITION TO THE FOREGOING, THE DEBTORS AND REORGANIZED DEBTORS RETAIN AND HEREBY RESERVE THE RIGHT TO OBJECT TO

(i) ANY CLAIMS OR INTERESTS FILED AFTER THE BAR DATE; AND

(ii) ANY CLAIMS FILED TO SET FORTH DAMAGES ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OR OTHER AGREEMENT WITH THE DEBTORS.

IN ADDITION, THE DEBTORS AND REORGANIZED DEBTORS RESERVE THE RIGHT TO BRING ANY RETAINED ACTION AGAINST ANY THIRD PARTY ARISING FROM OR RELATING TO ANY EVENT, ACTION OR OMISSION OCCURRING ON OR PRIOR TO THE EFFECTIVE DATE. THE PLAN PROPONENTS HAVE NOT FULLY REVIEWED ALL SUCH CAUSES OF ACTION (INCLUDING WITHOUT LIMITATION ANY AVOIDANCE ACTION OR RETAINED ACTION). AS A RESULT, CREDITORS AND OTHER PARTIES- IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THAT THE EXISTENCE OF ANY PARTICULAR LITIGATION OR AFFIRMATIVE CLAIM MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THIS PLAN, SUCH LITIGATION OR AFFIRMATIVE CLAIM MAY BE BROUGHT AGAINST ANY CREDITOR, INTEREST HOLDER OR PARTY-IN-INTEREST AT ANY TIME.

9.3     No Distributions Pending Allowance.  Except as otherwise provided herein, no Distributions will be made with respect to any portion of a Claim unless and until (i) the Claims Objection Deadline has passed and no objection to such Claim has been filed, or (ii) any objection to such Claim has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.

9.4     Estimation of Claims.  Yucaipa, the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee (to the extent still in existence at such time) may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502 of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (and after the Effective Date, the Reorganized Debtors) may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

9.5     Distributions After Allowance.  As soon as practicable after (i) the occurrence of the applicable Claims Objection Deadline, if no objection to such Claim has been timely filed, or (ii) the Disputed Claim becomes an Allowed Claim, the Reorganized Debtors, with respect to all Distributions will distribute to the Holder thereof all Distributions to which such Holder is then entitled under this Plan. In the event that the New Common Stock being held for Distribution with respect to a Claim is greater than the Distribution that is made to a Holder once the Claim becomes entitled to a Distribution, the excess remaining New Common Stock will revert to and be irrevocably retained by the Reorganized Debtors; the voting of such retained shares will be governed by the Amended Organization Documents for the applicable Reorganized Debtor. All Distributions made under this Article of this Plan will be made together with any dividends, payments, or other Distributions made on account of, as well as any obligations arising from, the distributed property as if such Claim had been an Allowed Claim on the dates Distributions were previously made to Allowed Holders included in the applicable Class.

9.6     Intentionally Omitted.

9.7     Claims Covered by Insurance Policy.  If any Holder (other than a Holder of a Workers' Compensation Claim, which Claim shall be treated in accordance with Section 3.4 of this Plan) has asserted a Claim that is covered as to liability, in whole or in part, by an insurance policy that is assumed or otherwise remains in effect pursuant to the

49

terms of this Plan, such Holder will have an Allowed Claim entitled to a distribution under this Plan only to the extent of any deductible or self- insured retention under the applicable insurance policy that was unpaid or otherwise unexhausted as of the Petition Date. Notwithstanding the foregoing, the Holder shall be entitled to pursue recovery of any amount in excess of such unpaid deductible or self-insured retention from the applicable insurance carrier, and, in connection therewith, notwithstanding the discharge of the balance of such Claim provided pursuant to this Plan, such Holder may continue to pursue the balance of such Claim against the Debtors solely for the purposes of liquidating such Claim and obtaining payment of the balance of such liquidated Claim from any otherwise applicable policy of insurance. Except as otherwise provided in the applicable insurance policy, the applicable insurance carrier may, at its expense, employ counsel, direct the defense, and determine whether and on what terms to settle any Claim for the purposes of determining the amount of insurance proceeds that will be paid on account of such Claim. If after liquidation of a Claim pursuant to this Article, it is determined that there are insufficient insurance proceeds available to satisfy the amount of such Claim that is in excess of any unpaid deductible or self-insured retention, then the Holder of such Claim shall have an Allowed Claim in the amount of such insufficiency.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND THE EFFECTIVE DATE OF THE PLAN

**10.1**    Conditions to Confirmation.  The following are conditions precedent to Confirmation of this Plan that must be (i) satisfied or (ii) waived in accordance with Section 10.3 below:

(1)    The Bankruptcy Court shall have approved the Disclosure Statement with respect to this Plan in form and substance that is acceptable to Yucaipa, and reasonably acceptable to the Debtors and the Creditors' Committee.

(2)    The Confirmation Order shall be in form and substance satisfactory to Yucaipa, and reasonably acceptable to the Debtors and the Creditors' Committee, shall have been signed by the Bankruptcy Court and shall have been entered on the docket of the Chapter 11 Cases.

(3)    The Plan shall be in form and substance satisfactory to Yucaipa, and reasonably acceptable to the Debtors and the Creditors' Committee.

(4)    The Plan Supplement and the Exhibits hereto (as confirmed or approved by the Confirmation Order) shall be in form and substance satisfactory to Yucaipa (after consultation with the Debtors and the Creditors' Committee).

(5)    The Debtors shall have obtained a written commitment for the Exit Financing in form and substance satisfactory to Yucaipa (after consultation with the Debtors and the Creditors' Committee).

(6)    The Debtors and TNATINC shall have entered into agreements and/or the Bankruptcy Court shall have entered orders, each in form and substance

satisfactory to Yucaipa and TNATINC in their respective sole discretion (which shall not have been vacated or stayed), providing individually or in combination for approval of modified collective bargaining agreements in form and substance satisfactory to each of the Plan Proponents.

     **10.2**    Conditions to the Effective Date.  The following are conditions precedent to the Effective Date that must be (i) satisfied or (ii) waived in accordance with Section 10.3 below:

        (1)    All conditions to Confirmation of this Plan set forth in Section 10.1 shall remain satisfied.

        (2)    Each order of the Bankruptcy Court referred to in Section 10.1 shall have become a Final Order.

        (3)    The Confirmation Order and supporting findings of fact and conclusions of law shall be entered by the Bankruptcy Court in form and substance reasonably acceptable to each of the Plan Proponents and the Creditors' Committee and shall have become a Final Order.

        (4)    All documents and agreements to be executed on the Effective Date or otherwise necessary to implement this Plan (including documents relating to the Exit Financing) shall be in form and substance that is acceptable to Yucaipa (after consultation with the Creditors' Committee) and reasonably acceptable to the Debtors, except as otherwise specifically provided herein.

        (5)    The closing and initial funding shall have occurred under the Exit Financing and all conditions precedent to the consummation thereof (other than the occurrence of the Effective Date of the Plan) shall have been waived or satisfied in accordance with the terms thereof.

        (6)    The Debtors and the Plan Proponents shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement this Plan and that is required by law, regulation, or order (collectively, the "Authorizations"), and such Authorizations shall not have been revoked.

        (7)    The New Common Stock shall have been issued in accordance with the Plan.

        (8)    All other actions, documents and agreements necessary to implement the Plan as of the Effective Date shall have been delivered and all conditions precedent thereto shall have been satisfied or waived.

        (9)    All corporate and other proceedings to be taken by the Debtors in connection with the Plan and Plan Supplement and the consummation of the transactions contemplated thereby and by the Plan and all documents incident thereto shall have been completed in form and substance reasonably satisfactory to Yucaipa (after consultation

with the Debtors and the Creditors' Committee), and Yucaipa shall have received all such counterpart originals or certified or other copies of the Plan and documents contemplated by the Plan and such other documents as they may reasonably request.

(10)    No event, condition or circumstance shall have occurred or arisen from the date the Plan is filed through the Effective Date which has had or could reasonably be expected to have or give rise to a Material Adverse Effect.

(11)    Subsequent to the Confirmation Date, there shall be no threatened or pending suit, action, investigation, inquiry or other proceeding by or before any court of competent jurisdiction (excluding the Chapter 11 Cases or any other proceeding disclosed by the Debtors to Yucaipa in writing prior to the hearing on the approval of the Disclosure Statement) which is likely to have a Material Adverse Effect.

(12)    The Effective Date shall have occurred prior to six months after the Confirmation Date.

(13)    The Initial Board shall have been elected or appointed as of the Effective Date, and the directors' and officers' liability insurance shall be available to the members of the Initial Board on terms reasonably satisfactory to Yucaipa and the Creditors' Committee.

(14)    The members of the IBT shall have approved or ratified modified collective bargaining agreements in form and substance satisfactory to the Debtors, Yucaipa (after consultation with the Creditors' Committee) and TNATINC.

(15)    All waiting periods imposed by applicable law (including, without limitation, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable) in connection with the consummation of the Plan and transactions contemplated thereby shall have expired or been terminated without any action having been taken by any court of competent jurisdiction restraining, preventing or imposing materially adverse conditions upon such transactions, and the Debtors and Yucaipa shall have received all material regulatory approvals required for the consummation of the Plan and the transactions contemplated thereby and for the Reorganized Debtors to continue to carry on their businesses without material change, each of which approvals shall have become final.

(16)    All other actions and documents necessary to implement the treatment of Claims and Interests set forth in this Plan shall have been effected or executed or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

**10.3**    Waiver of Conditions.  The conditions to Confirmation of the Plan set forth in Section 10.1 or the Effective Date set forth in Section 10.2 may be waived, in whole or in part, by Yucaipa without any notice to any other parties in interest or the Bankruptcy Court and without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan; provided, however, that Yucaipa may not waive the conditions set forth in Sections 10.1(6) or 10.2(14) without the prior express written consent of TNATINC; provided further that

52

Yucaipa will not waive a condition that expressly is subject to consultation with the Debtors or the Creditors' Committee without first consulting with the Debtors or the Creditors' Committee.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Plan Proponents in their respective sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Plan Proponents). The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.  Notwithstanding anything in the Plan to the contrary, if any condition, pleading, document or order is required to be acceptable to Yucaipa and reasonably acceptable to the Debtors and/or the Creditors' Committee, and it is acceptable to Yucaipa, but the Debtors and/or the Creditors' Committee, in the exercise of their respective fiduciary duties, find it unacceptable, the sole remedy of the Debtors and/or the Creditors' Committee, as applicable, shall be an entitlement to withdraw their respective support for the Plan.  Thereafter, and notwithstanding any such withdrawal, Yucaipa may proceed unabated with Confirmation and consummation of the Plan.

**10.4**    Non-Waivable Conditions to the Effective Date.  The payment in full in Cash of all amounts owed to the DIP Lenders under the DIP Loan Facility shall be a condition precedent to the occurrence of the Effective Date in accordance with Section 4.2(c) that may not be waived in whole or in part by the Plan Proponents without the written consent of the DIP Lenders or an order of the Bankruptcy Court after notice and hearing, provided, however, that to the extent there is a dispute as to amounts owed under the DIP Loan Facility, the Reorganized Debtors shall pay the undisputed portion and place the remainder in a non-interest bearing escrow pending resolution of such dispute by a Final Order.

**10.5**    Effect of Failure of Conditions.  In the event that all of the conditions to the Effective Date are not satisfied or waived within six months following entry of the Confirmation Order:  (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged (except to the extent of any payments made after entry of the Confirmation Order but prior to the Effective Date) and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors.

**10.6**    Order Denying Confirmation. If an order denying confirmation of the Plan is entered by the Bankruptcy Court, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors, (b) prejudice in any manner the rights of the holder of any Claim against, or Interest in, the Debtors, (c) prejudice in any manner any right, remedy or Claim of the Debtors, or (d) be deemed an admission against interest by the Debtors, Yucaipa, TNATINC or the Creditors' Committee.

## ARTICLE XI.
## EFFECT OF PLAN ON CLAIMS AND INTERESTS

**11.1**     Revesting of Assets. Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in each of the Debtors that owned such property or interest in property as of the Petition Date, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security holders, except as specifically provided in this Plan. As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

**11.2**     Discharge of Claims and Termination of Interests.

Except as otherwise provided in the Plan or the Confirmation Order: (i) on the Effective Date, each Reorganized Debtor shall be deemed discharged and released from all Claims and Interests, including, but not limited to, demands, liabilities, Claims and Interests that arose before the Effective Date and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (A) a proof of Claim or proof of Interest based on such debt or Interest is Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code, (B) a Claim or Interest based on such debt or Interest is Allowed pursuant to Section 502 of the Bankruptcy Code, (C) the holder of a Claim or Interest based on such debt or Interest has accepted the Plan or (D) such Claim is listed in the Schedules; and (ii) all Persons shall be precluded from asserting against each Reorganized Debtor, its successors, or its assets or properties any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. Except as otherwise provided in the Plan or the Confirmation Order, upon the occurrence of the Effective Date, the Confirmation Order shall act as a discharge of any and all Claims against and all debts and liabilities of the Reorganized Debtors, as provided in Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment against each Reorganized Debtor at any time obtained to the extent that it relates to a discharged Claim or terminated Interest.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests against the property of any Estate shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns.

**11.3**     Cancellation of Claims and Interests.

54

Except with respect to Reinstated Claims, and except for purposes of evidencing a right to distributions under the Plan or otherwise provided hereunder, on the Effective Date, all agreements and other documents evidencing the Claims or rights of any holder of a Claim against the Debtors, including all notes, guarantees, mortgages, and all Interests and any options or warrants to purchase Interests, obligating the Debtors to issue, transfer or sell Interests or any other capital stock of the Debtors, shall be canceled. As of the Effective Date, all Old Common Stock shall be canceled. Notwithstanding the foregoing, on and after the Effective Date, the Prepetition Notes Indenture shall continue in effect solely for the purposes of allowing the Indenture Trustee to enforce the indemnity provisions of the Prepetition Note Indenture, to make the Distributions to be made on account of Prepetition Notes Claims under this Plan and, to the extent necessary, enforce the Indenture Trustee Charging Lien, after which point the Prepetition Notes Indenture shall be cancelled and discharged.

**11.4**    Release by Debtors of Certain Parties.

(A)  **EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN, PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, AS OF THE EFFECTIVE DATE, ON THE EFFECTIVE DATE, THE DEBTORS AND REORGANIZED DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION, WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES (OTHER THAN THE RIGHTS OF THE DEBTORS OR REORGANIZED DEBTORS TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, REORGANIZED DEBTORS, THE PARTIES RELEASED PURSUANT TO THIS SECTION 11.4, THE CHAPTER 11 CASES, THE PLAN OR THE DISCLOSURE STATEMENT, AND THAT COULD HAVE BEEN ASSERTED BY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES OR THE REORGANIZED DEBTORS, WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR IN ANY REPRESENTATIVE OR ANY OTHER CAPACITY, AGAINST (I) THE CURRENT DIRECTORS, OFFICERS AND EMPLOYEES OF THE DEBTORS (OTHER THAN FOR MONEY BORROWED FROM OR OWED TO THE DEBTORS BY ANY SUCH DIRECTORS, OFFICERS OR EMPLOYEES AS SET FORTH IN THE DEBTORS' BOOKS AND RECORDS) AND THE DEBTORS' FORMER OR CURRENT ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH PERSON;  (II)  THE CREDITORS' COMMITTEE AND ITS CURRENT AND**

**FORMER MEMBERS (SOLELY IN SUCH CAPACITY) THE INDENTURE TRUSTEE, ITS AND THEIR RESPECTIVE ADVISORS (INCLUDING ANY FORMER OR CURRENT ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH PERSONS); AND (III) YUCAIPA AND TNATINC AND EACH OF THEIR RESPECTIVE AFFILIATES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, MEMBERS, MANAGERS AND ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH PERSONS) EXCEPT CLAIMS ARISING IN THE ORDINARY COURSE OF THE DEBTORS' BUSINESS WITH RESPECT TO EMPLOYEE MATTERS, INCLUDING WITHOUT LIMITATION ORDINARY COURSE UNION GRIEVANCES WHICH SHALL BE RESOLVED AS SET FORTH IN COLLECTIVE BARGAINING AGREEMENT BETWEEN THE DEBTORS AND THE IBT (THOSE ENTITIES IN SUBSECTIONS (I) THROUGH (III) OF THE PRECEDING SENTENCE SHALL BE REFERRED TO AS THE "DEBTOR RELEASEES"). NOTWITHSTANDING THE FOREGOING, NOTHING IN THE PLAN SHALL RELEASE ANY DEBTOR RELEASEE OTHER THAN THE PLAN PROPONENTS FROM ANY CLAIMS ASSERTED BY THE DEBTORS THAT ARE THE SUBJECT OF A PENDING LITIGATION, ADVERSARY PROCEEDING OR OTHER CONTESTED MATTER OR JUDGMENT AS OF THE EFFECTIVE DATE.**

**(B)    ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASES SET FORTH HEREIN, WHICH INCLUDE BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASES; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS (C) FAIR, EQUITABLE AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OTHER PERSON ACTING ON BEHALF OF THEM ASSERTING ANY CLAIM RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE DEBTOR RELEASEES OR THEIR RESPECTIVE PROPERTY. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION,  THE RELEASE OF THE DEBTORS' OFFICERS, DIRECTORS AND EMPLOYEES  SET FORTH ABOVE SHALL BE OF NO FORCE AND EFFECT IN FAVOR OF ANY OFFICER, DIRECTOR OR EMPLOYEE WHO ASSERTS ANY PRE-EFFECTIVE DATE CLAIM AGAINST**

56

THE DEBTORS OR REORGANIZED DEBTORS [FOR INDEMNIFICATION][3], DAMAGES OR ANY OTHER CAUSES OF ACTION OTHER THAN FOR UNPAID COMPENSATION, WAGES OR BENEFITS THAT AROSE IN THE ORDINARY COURSE OF BUSINESS OR PURSUANT TO THE KERP APPROVED BY THE BANKRUPTCY COURT BY FINAL ORDER.

**11.5**    Release by the Debtors of the DIP Lenders. **PURSUANT TO SECTION 1123(b)(3) OF THE BANKRUPTCY CODE, AS OF THE EFFECTIVE DATE OF THIS PLAN, EACH OF THE DEBTORS AND EACH OTHER CREDIT PARTY (AS DEFINED BY THE DIP LOAN FACILITY), IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION FOR AND ON BEHALF OF THEIR RESPECTIVE ESTATES, SHALL RELEASE AND DISCHARGE AND BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED EACH AND EVERY DIP LENDER, AND EACH OF THEIR RESPECTIVE PRESENT OR FORMER MEMBERS, PARTNERS, OFFICERS, DIRECTORS, EMPLOYEES, ADVISORS, ATTORNEYS, REPRESENTATIVES, FINANCIAL ADVISORS, INVESTMENT BANKERS OR AGENTS AND ANY OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "RELEASED LENDERS") FOR AND FROM ANY AND ALL CLAIMS, OBLIGATIONS, LIABILITIES, LOSSES, EXPENSES OR CAUSES OF ACTION OF ANY KIND OR NATURE WHATSOEVER EXISTING AS OF THE EFFECTIVE DATE OF THIS PLAN AND HOWSOEVER ARISING, INCLUDING BUT NOT LIMITED TO IN ANY MANNER ARISING FROM, BASED ON OR RELATING TO, IN WHOLE OR IN PART, THE DIP CREDIT DOCUMENTS OR THE DIP LOAN FACILITY, THE PREPETITION LOAN FACILITY, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED LENDER, OR ANY ACT OR OMISSION RELATED TO THE CHAPTER 11 CASES OR THIS PLAN. THE REORGANIZED DEBTORS SHALL BE BOUND, TO THE SAME EXTENT THE DEBTORS ARE BOUND, BY ALL OF THE RELEASES SET FORTH HEREIN.**

**11.6**    Release by Holders of Claims and Interests.

**(1)  EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN, ON THE EFFECTIVE DATE, (a) EACH PERSON THAT VOTES TO ACCEPT THIS PLAN OR IS PRESUMED TO HAVE VOTED FOR THIS PLAN PURSUANT TO SECTION 1126(f) OF THE BANKRUPTCY CODE; (b) EACH PERSON WHO OBTAINS A RELEASE UNDER THE PLAN; AND (c) TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AS SUCH LAW MAY BE EXTENDED OR INTERPRETED SUBSEQUENT TO THE**

---

[3] The text in brackets remains subject to additional discussion among the Plan Proponents and may be modified or deleted prior to Confirmation.

CH\917779.13

**EFFECTIVE DATE, EACH ENTITY (OTHER THAN A DEBTOR), THAT HAS HELD, HOLDS OR MAY HOLD A CLAIM OR INTEREST (EACH, A "RELEASE OBLIGOR"), IN CONSIDERATION FOR THE OBLIGATIONS OF YUCAIPA, THE DEBTORS AND THE REORGANIZED DEBTORS UNDER THIS PLAN AND THE CASH, NEW COMMON STOCK, AND OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS TO BE DELIVERED IN CONNECTION WITH THIS PLAN, SHALL HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED EACH PARTY RELEASED IN SECTIONS 11.4 AND 11.5 HEREOF FROM ANY CLAIM OR RETAINED ACTION EXISTING AS OF THE EFFECTIVE DATE ARISING FROM, BASED ON OR RELATING TO, IN WHOLE OR IN PART, THE SUBJECT MATTER OF, OR THE TRANSACTION OR EVENT GIVING RISE TO, THE CLAIM OF SUCH RELEASE OBLIGOR, AND ANY ACT, OMISSION, OCCURRENCE OR EVENT IN ANY MANNER RELATED TO SUCH SUBJECT MATTER, TRANSACTION OR OBLIGATION; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THIS SECTION 11.6 SHALL NOT RELEASE ANY RELEASED PARTY FROM ANY RETAINED ACTION HELD BY A GOVERNMENTAL ENTITY EXISTING AS OF THE EFFECTIVE DATE BASED ON (i) ANY CRIMINAL LAWS OF THE UNITED STATES OR ANY DOMESTIC STATE, CITY OR MUNICIPALITY OR (ii) SECTIONS 1104-1109 AND 1342(d) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED.**

**11.7** Releases Reasonable; Bankruptcy Court's Exclusive Jurisdiction Related Thereto. The Plan Proponents believe the releases set forth in the Plan are reasonable and appropriate given the extraordinary facts and circumstances of these cases. The releases and injunctions provided in Sections 11.4, 11.5 and 11.6 of the Plan are supported by the consideration provided hereunder. Any action brought against any party receiving a release hereunder for any matter or thing related to the Chapter 11 Cases or the Plan must be brought in Bankruptcy Court.

**11.8** Setoffs. The Debtors may, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

**11.9** Exculpation and Limitation of Liability. The Plan Proponents, the Creditors' Committee, the present and former members of the Creditors' Committee in their capacities as such, the Indenture Trustee, in its capacity as such, and the Released Lenders, and any of such parties' respective current and/or post-Petition Date and pre-Effective Date affiliates, members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, cause of action, or liability to one another or to any Holder of any Claim or Interest, or any other party-in-interest, or any of their respective agents, employees,

58

representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation and filing of this Plan, the provision of post-petition financing, the filing of the Chapter 11 Cases, the settlement of claims or renegotiation of executory contracts and leases, the pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan (collectively, the "Exculpated Claims"). No Holder of any Claim or Interest, or other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Plan Proponents, the Creditors' Committee, the present and former members of the Creditors' Committee in their capacities as such, the Indenture Trustee, in its capacity as such, and the Released Lenders, and any of such parties' respective current and/or post-Petition Date and pre-Effective Date affiliates, members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns with respect to the Exculpated Claims.

**11.10** Injunction. The Confirmation Order will permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including but not limited to the Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Sections 11.4, 11.5 and 11.6 of the Plan.

**11.11** Effect of Confirmation.

(1) Binding Effect. On the Confirmation Date, the provisions of this Plan shall be binding on the Debtors, the Estates, all Holders of Claims against or Interests in the Debtors, and all other parties-in-interest whether or not such Holders are Impaired and whether or not such Holders have accepted this Plan.

(2) Effect of Confirmation on Automatic Stay. Except as provided otherwise in this Plan, from and after the Effective Date, the automatic stay of Section 362(a) of the Bankruptcy Code shall terminate.

(3) Filing of Reports. The Reorganized Debtors shall file all reports and pay all fees required by the Bankruptcy Code, Bankruptcy Rules, U.S. Trustee guidelines, and the rules and orders of the Bankruptcy Court.

(4) Post-Confirmation Date Retention of Professionals. Upon the Confirmation Date, any requirement that professionals comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered

CH\917779.13

after such date will terminate, and the Reorganized Debtors may employ and pay professionals in the ordinary course of business.

## ARTICLE XII.
## RETENTION AND SCOPE OF JURISDICTION OF THE BANKRUPTCY COURT

**12.1** Retention of Jurisdiction. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will have or retain jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction for the following purposes:

(1) To allow, disallow, determine, liquidate, classify, subordinate, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim, the resolution of any objections to the allowance, classification or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to Reinstate or render Unimpaired a Claim or Interest pursuant to the Plan, as well as the approval of the Indenture Trustee Fees and Expenses, to the extent of any dispute between the Indenture Trustee and the Plan Proponents;

(2) To establish a date or dates by which objections to Claims must be filed to the extent not established herein;

(3) To establish the amount of any reserve required to be withheld from any distribution under this Plan on account of any disputed, contingent or unliquidated claim.

(4) To resolve all matters related to the rejection, and assumption and/or assignment of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom including any Cure Amount Claims;

(5) To hear and rule upon all Retained Actions, Avoidance Actions and other Causes of Action commenced and/or pursued by the Debtors and/or the Reorganized Debtors;

(6) To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny applications involving the Debtors that may be pending on the Effective Date or brought thereafter;

(7) To hear and rule upon all applications for Professional Compensation;

(8) To modify the Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code, modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document

CH\917779.13

entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate or carry out the intent and purpose the Plan; provided, however, that without the consent of TNATINC and Yucaipa, there shall be no modification of the Collective Bargaining Agreement between the Debtors and the IBT, as assumed and assigned pursuant to the terms of the Plan.

(9)     To enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, as well as to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(10)     To issue injunctions, enforce the injunctions contained in the Plan and the Confirmation order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(11)     To enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

(12)     To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including the Distribution of funds from the Estates and the payment of claims;

(13)     To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(14)     To determine any suit or proceeding brought by the Debtors and/or the Reorganized Debtors to recover property under any provisions of the Bankruptcy Code;

(15)     To determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes; and to determine and declare any tax effects under this Plan;

(16)     To determine any matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract,

CH\917779.13

instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(17) To determine any other matters as may be authorized by or under the provisions of the Bankruptcy Code; and

(18) To enter a Final Decree closing the Chapter 11 Cases.

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction. If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including without limitation the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**12.2** Alternative Jurisdiction. In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then the District Court shall hear and determine such matter. If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.

**12.3** Final Decree. The Bankruptcy Court may, upon application of the Reorganized Debtors at any time after 120 days after the Confirmation Date, enter a final decree in these cases, notwithstanding the fact that additional funds may eventually be distributed to parties in interest. In such event, the Bankruptcy Court may enter an Order closing these cases pursuant to Section 350 of the Bankruptcy Code, provided, however, that: (a) the Reorganized Debtors shall continue to have the rights, powers, and duties set forth in this Plan; (b) any provision of this Plan requiring the absence of an objection shall no longer be required, except as otherwise ordered by the Bankruptcy Court; and (c) the Bankruptcy Court may from time to time reopen the Chapter 11 Cases if appropriate for any of the following purposes: (1) administering Assets; (2) entertaining any adversary proceedings, contested matters or applications the Debtors have brought or bring with regard to the liquidation of Assets and the prosecution of Causes of Action; (3) enforcing or interpreting this Plan or supervising its implementation; or (4) for other cause.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

**13.1** Modification of the Plan. Yucaipa, after consultation with the Debtors and the Creditors' Committee, reserves the right in accordance with Section 1127 of the Bankruptcy Code to modify, alter or amend this Plan at any time before its substantial consummation; provided, however, that any such modification, alteration or amendment does not negatively impact the amended terms of the Collective Bargaining Agreement with the IBT, as described in Exhibit G to the Disclosure Statement. Subject to the limitations contained herein, Yucaipa may modify, alter or amend this Plan in accordance with this paragraph, before or after confirmation, without notice or hearing, or after such

CH\917779.13

notice and hearing as the Bankruptcy Court deems appropriate, if the Bankruptcy Court finds that the modification, alteration or amendment does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto. In the event of any modification, alteration or amendment on or before confirmation, any votes to accept or reject this Plan shall be deemed to be votes to accept or reject this Plan as modified, unless the Bankruptcy Court finds that the modification, alteration or amendment materially and adversely affects the rights of parties in interest which have cast said votes.

13.2    Revocation of the Plan.  The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Plan Proponents revoke or withdraw the Plan, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors; (b) constitute an admission of any fact or legal conclusion by the Plan Proponents or any other Entity; or (c) prejudice in any manner the rights of the Plan Proponents or any other party, including the Creditors' Committee, in any related or further proceedings.

13.3    Exemption From SEC Registration.  The issuance of New Common Stock shall be made pursuant to Section 1145 of the Bankruptcy Code and shall be exempt from registration. Except with respect to securities held by any entity that is an "underwriter" as that term is defined in section 1145(b) of the Bankruptcy Code, the securities to be issued in reliance upon the exemption set forth in section 1145 of the Bankruptcy Code shall be freely tradeable.

13.4    Exemption from Securities Laws.  The entry of the Confirmation Order shall be (1) a final determination of the Bankruptcy Court that the New Common Stock authorized, issued or distributed pursuant to this Plan, is entitled to all of the benefits and exemptions provided by Section 1145 of the Bankruptcy Code, (2) a final determination of the Bankruptcy Court that the New Common Stock is entitled to the exemptions from federal and state securities registration available under Section 4(2) of the Securities Act of 1933, as amended, Rule 701 and/or Regulation D of the Securities and Exchange Commission, and similar provisions of state securities law, and (3) deemed to incorporate the provisions of this Article XIII as mixed findings of fact and conclusions of law.

13.5    Initial Offer and Sale Exempt from Registration.  Section 5 of the Securities Act and any State or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer or, underwriter or, or broker or dealer in, a security, do not apply to the offer or sale of any New Common Stock in accordance with the Plan.

13.6    Applicable Law.  Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with

63

the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflict of laws thereof.

**13.7**    Plan Supplement.  The Plan Supplement will contain forms of the (a) Amended By-Laws, (b) Amended Governing Documents, (c) proposed Confirmation Order and (d) terms of the Exit Financing.  The Plan Supplement shall be in form and substance satisfactory to each of the Plan Proponents and shall be filed with the Bankruptcy Court ten days prior to the Confirmation Hearing.  Notwithstanding the foregoing, subject to any express limitations set forth herein, the Plan Proponents may amend the Plan Supplement and any attachments thereto, through and including the Confirmation Date, so long as such amendments are satisfactory in form and substance to the Plan Proponents and the Creditors' Committee (except with respect to those documents where the Plan grants the Creditors' Committee only the right of consultation).

**13.8**    Filing or Execution of Additional Documents.  On or before the Effective Date, the Plan Proponents shall File or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**13.9**    Withholding and Reporting Requirements.  In connection with the Plan and all instruments issued in connection therewith and distributions thereon, to the extent applicable and except as provided in the Plan, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions thereunder shall be subject to any such withholding and reporting requirements.

**13.10**    Waiver of Rule 62(a) of the Federal Rules of Civil Procedure.  The Plan Proponents may request that the Confirmation Order include (a) a finding that Rule 62(a) of the Federal Rules of Civil Procedure shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after the entry of the Confirmation Order.

**13.11**    Allocation of Plan Distributions between Principal and Interest.  To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

**13.12**    Dissolution of Creditors' Committee.  On the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released and discharged from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code.  The Professionals retained by the Creditor's Committee and the members thereof will not be

entitled to assert any claim for any services rendered or expenses incurred after the Effective Date, except for reasonable services rendered and expenses incurred in connection with the consummation of the Plan and any applications for allowance of compensation and reimbursement of expenses of Creditors' Committee members or professionals pending on the Effective Date or Filed and served after the Effective Date pursuant to Section 4.2.

**13.13** Preparation of Estates' Returns and Resolution of Tax Claims. The Debtors or Reorganized Debtors shall file all tax returns and other filings with governmental authorities and may file determination requests under Section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority. The Reorganized Debtors are hereby authorized to request an expedited determination under Section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

**13.14** Headings. The headings of the Articles and the Sections of this Plan have been used for convenience only and shall not limit or otherwise affect the meaning thereof.

**13.15** Confirmation of Plans for Separate Debtors. In the event the Plan Proponents are unable to confirm this Plan with respect to all Debtors, the Plan Proponents reserve the right, unilaterally and unconditionally, to proceed with this Plan with respect to any Debtor for which the confirmation requirements of the Bankruptcy Code are met.

**13.16** No Admissions; Objection to Claims. Notwithstanding anything herein or in the Disclosure Statement to the contrary, nothing contained herein or in the Disclosure Statement shall be deemed to be an admission by any Plan Proponent with respect to any matter set forth herein including, without limitation, liability on any Claim or Interest or the propriety of the classification of any Claim or Interest. The Plan Proponents are not bound by any statements herein or in the Disclosure Statement as judicial admissions.

**13.17** Survival of Settlements. Except as specifically set forth in the Plan, all Bankruptcy Court-approved settlements shall survive consummation of the Plan.

**13.18** No Waiver. Neither the failure of a Debtor to list a Claim in the Debtor's Schedules, the failure of a Debtor to object to any Claim or Interest for purposes of voting, the failure of a Reorganized Debtor to object to a Claim, Administrative Expense Claim or Interest prior to the Confirmation Date or the Effective Date, the failure of a Debtor to assert a Retained Action prior to the Confirmation Date or the Effective Date, the absence of a proof of Claim having been filed with respect to a Claim, Administrative Expense Claim, Interest or Retained Action other than a legally effective express waiver or release shall be deemed a waiver or release of the right of a Debtor or its successors, before or after solicitation of votes on the Plan or before or after the Confirmation Date or the Effective Date to (a) object to or examine such Claim, Administrative Expense Claim

or Interest, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Retained Action.

**13.19** No Bar to Suits. Neither this Plan nor confirmation hereof shall operate to bar or estop the Debtors or Reorganized Debtors from commencing any Retained Action, or any other legal action against any Holder of a Claim or Interest or any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal Entity, whether such Retained Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Retained Action, or any other legal action was disclosed in any Disclosure Statement filed by the Debtors in connection with this Plan or whether or not any payment was made or is made on account of any Claim.

**13.20** Successors and Assigns. The rights, benefits and obligations of any Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**13.21** Severability of Plan Provisions. If prior to Confirmation any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Plan Proponents, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**13.22** Post-Effective Date Effect of Evidences of Claims or Interests. Notes, bonds, stock certificates and other evidences of Claims against or Interests in the Debtors, and all instruments of the Debtors (in either case, other than those executed and delivered as contemplated hereby in connection with the consummation of the Plan), shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Plan.

**13.23** Conflicts. In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, the terms of this Plan shall govern.

**13.24** Exhibits/Schedules. All exhibits and schedules to this Plan and the Disclosure Statement, including, without limitation, the Plan Supplement, and all attachments thereto, are incorporated into and are a part of this Plan as if set forth in full herein.

13.25    No Injunctive Relief.  Except as otherwise provided in the Plan or Confirmation Order, no Holder of a Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable, or other prospective relief with respect to such Claim or Interest.

13.26    Rounding.  All amounts set forth herein, including, without limitation, with respect to shares, dollar amounts and percentages, shall be subject to rounding and other immaterial changes.

13.27    Saturday, Sunday or Legal Holiday.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.28    Entire Agreement.  This Plan (together with the Exhibits and schedules hereto and the Plan Supplement) sets forth the entire agreement and undertaking relating to the subject matter hereof and supersedes all prior discussions and documents.  The Debtors' Estates shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein.

13.29    Service of Certain Plan Exhibits and Disclosure Statement Exhibits.  Because the Exhibits to the Plan are voluminous, the Exhibits are not being served with copies of the Plan and Disclosure Statement.  Any party in interest may view the Plan Exhibits at the following website: www.administar.net/allied.  Copies are also available upon request to Debtors' or the Plan Proponents' respective counsel.  Please direct such requests to: [telephone number] or [email address].

13.30    Service of Documents.  Any pleading, notice or other document required by the Plan or Confirmation Order to be served on or delivered to the Debtors, the Reorganized Debtors, Yucaipa, TNATINC, the Creditors' Committee or the DIP Lenders must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

| The Debtors | The Creditors' Committee |
|---|---|
| Ezra H. Cohen, Esq. | Jonathan B. Alter, Esq. |
| Jeffrey W. Kelley, Esq. | William F. Govier, Esq. |
| Harris B. Winsberg, Esq. | Richard H. Agins, Esq. |
| Troutman Sanders LLP | Bingham McCutchen LLP |
| 600 Peachtree Street, N.E. - Suite 5200 | One State Street |
| Atlanta, Georgia 30308 | Hartford, CT 06105 |
| Facsimile No.: (404) 885-3900 | Facsimile No.: (860) 240-2818 |

| The DIP Lenders | The United States Trustee |
|---|---|
| Jesse H. Austin, III, Esq. | R. Jeneane Treace, Esq. |
| Paul, Hastings, Janofsky & Walker LLP | Office of the United States Trustee |
| 600 Peachtree Street, N.E. | 75 Spring Street, S.W., Suite 362 |
| Suite 2400 | Atlanta, Georgia 30303 |
| Atlanta, GA 30308-2222 | Facsimile No.: (404) 331-4464 |
| Facsimile No.: (404) 685-5208 | |

| Yucaipa and the Reorganized Debtors | TNATINC |
|---|---|
| Robert A. Klyman, Esq. | Frederick Perillo, Esq. |
| Latham & Watkins LLP | Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C. |
| 633 West Fifth Street, Suite 4000 | 1555 N. River Center Dr., Suite 202 |
| Los Angeles, CA 90071 | Milwaukee, WI 53212 |
| Facsimile No.: (213) 891-8763 | Facsimile No.: (414) 271-6308 |

68

Dated this 2nd day of March, 2007.

Allied Holdings, Inc., as agent and attorney-in fact for each of the Debtors

By: /s/ _____
Name:  Thomas H. King
Title:  Executive Vice President and Chief
        Financial Officer

Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP

By: /s/ _____
Name:  Robert P. Bermingham
Title:  Vice President

Teamsters National Automobile Transportation Industry Negotiating Committee

By: /s/ _____
Name:  Fred Zuckerman
Title:  Co-Chair of TNATINC

69

# Exhibit 127

# D.I. 2802, Case No. 05-12515

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **ALLIED HOLDINGS, INC.,** *et al.* | **Case Nos. 05-12515 through 05-12526 and 05-12528 through 05-12537 (Jointly Administered as Case No. 05-12515)** |
| **Debtors.** | **Judge Mullins** |

---

## DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN OF REORGANIZATION OF ALLIED HOLDINGS, INC. AND AFFILIATED DEBTORS PROPOSED BY THE DEBTORS, YUCAIPA AND THE TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTATION INDUSTRY NEGOTIATING COMMITTEE

### Dated April 5, 2007

---

LATHAM & WATKINS LLP
Robert A. Klyman
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763

PARKER, HUDSON, RAINER & DOBBS LLP
Rufus T. Dorsey
1500 Marquis Two Tower
285 Peachtree Center Ave., N.E.
Atlanta, Georgia 30303
Telephone (404) 420-5550
Facsimile:  (404) 522-8409

Counsel for Yucaipa American Alliance Fund I, LP
and Yucaipa American Alliance (Parallel) Fund I,
LP

TROUTMAN SANDERS LLP
Jeffrey W. Kelley
Bank of America Plaza
600 Peachtree Street, NE, Suite 5200
Atlanta, Georgia 30308-2216
Telephone:  (404) 885-3000
Facsimile:  (404) 885-3900

Counsel for the Debtors

PREVIANT, GOLDBERG, UELMEN, GRATZ,
MILLER & BRUEGGEMAN, S.C.
Frederick Perillo
1555 N. RiverCenter Dr., Suite 202
Milwaukee, WI  53212
Telephone:  (414) 223-0434
Facsimile:  (414) 271-6308

Counsel for the Teamsters National Automobile
Transportation Industry Negotiating Committee

## TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION ...................................................................................3
    A.    Overview ..............................................................................................3
    B.    Purpose of the Plan ............................................................................4
    C.    Summary of the Plan .........................................................................5
    D.    Yucaipa ...............................................................................................5
    E.    Debtors' Principal Assets and Indebtedness .....................................6
    F.    Treatment of Claims and Interests ....................................................6
    G.    Voting and Confirmation Procedures ..............................................13
         1.    Who May Vote ....................................................................13
         2.    Certain Risk Factors to Be Considered Prior to Voting ...........14
         3.    Voting Instructions and Voting Deadline ............................14
         4.    Voting Procedures; Voting Procedures for Securities Intermediaries .......15
         5.    Who to Contact for More Information ................................16
         6.    Acceptance or Rejection of the Plan ...................................17
         7.    Time and Place of the Confirmation Hearing .....................17
         8.    Objections to the Plan ........................................................17
ARTICLE II. GENERAL INFORMATION REGARDING THE DEBTORS ............................18
    A.    Formation and History of the Debtors ............................................18
    B.    The Debtors' Business Operations...................................................19
    C.    Employees ........................................................................................22
    D.    Competitive Factors Affecting the Debtors' Businesses .................22
    E.    Regulatory Factors Affecting the Debtors' Businesses ...................23
         1.    Trade Regulation ................................................................23
         2.    Environmental Regulation ..................................................24
    F.    Pre-Petition Capital Structure of the Debtors .................................24
         1.    The Prepetition Loan Facility .............................................24
         2.    The Prepetition Notes .........................................................25
    G.    Insurance .........................................................................................25
         1.    Auto Liability Actions and Related Insurance ...................25
         2.    The Debtors' Automobile Liability Insurance Program ...........26
         3.    Haul Insurance Limited .......................................................27
         4.    Insurance Generally ...........................................................27
ARTICLE III. THE CHAPTER 11 CASES ...............................................................28
    A.    Events Leading to the Filing of the Chapter 11 Cases ...................28
         1.    Decreasing Revenues ..........................................................29
         2.    Increasing Expenses ...........................................................30
    B.    Corporate Governance of the Debtors During the Chapter 11 Cases ...................30
         1.    Boards of Directors .............................................................30
          2.    Senior Management ............................................................33
    C.    Significant Developments in the Chapter 11 Cases .........................34
         1.    "First Day" Orders and Retention of Professionals ...........34
         2.    Appointment of the Official Committee of Unsecured Creditors ..............35
         3.    Debtor-In-Possession Financing .........................................35

| | 4. | Equipment Purchase Agreement and Equipment Financing Facility | 37 |
| | 5. | Dissemination of Information About the Chapter 11 Cases | 40 |
| | 6. | Rejection/Assumption of Executory Contracts and Unexpired Leases | 40 |
| | 7. | Sales of Assets | 41 |
| | 8. | Severance and Key Employee Retention | 42 |
| | 9. | Post-Petition Financial Performance | 44 |
| | 10. | Claims Bar Date and Claims Summary | 44 |
| | 11. | Labor Issues | 45 |
| ARTICLE IV. | SUMMARY OF THE PLAN | | 46 |
| A. | Overview of Chapter 11 | | 46 |
| B. | Classification of Claims and Interests | | 48 |
| | 1. | Introduction | 48 |
| | 2. | Classification | 48 |
| C. | Treatment of Unclassified Claims. | | 56 |
| | 1. | Summary | 56 |
| | 2. | Administrative Expense Claims | 56 |
| | 3. | Priority Tax Claims | 58 |
| | 4. | DIP Lender Claims | 59 |
| | 5. | Equipment Financing Facility Claims | 59 |
| D. | Means for Implementation of the Plan | | 59 |
| | 1. | Sources of Funding for Distributions Under the Plan | 59 |
| | 2. | Pooling of Claims/Limited Substantive Consolidation | 59 |
| | 3. | Corporate Structure and Governance of the Reorganized Debtors | 62 |
| | 4. | Exemption from Certain Transfer Taxes and Recording Fees | 67 |
| | 5. | Retained Actions | 68 |
| E. | Provisions Regarding Distributions | | 69 |
| | 1. | Distributions for Claims Allowed as of the Effective Date | 69 |
| | 2. | Disbursing Agent | 69 |
| | 3. | Distributions of Cash | 69 |
| | 4. | No Interest on Claims or Interests | 70 |
| | 5. | Delivery of Distributions | 70 |
| | 6. | Distributions to Holders as of the Record Date | 70 |
| | 7. | De Minimis Distributions | 71 |
| | 8. | Fractional Securities; Fractional Dollars | 72 |
| | 9. | Procedures for Distributions to Holders of Prepetition Note Claims. | 72 |
| | 10. | Distributions of Cash to Holders of Allowed Class 4D Claims | 72 |
| | 11. | Withholding Taxes | 72 |
| | 12. | No Duplicate Distributions | 73 |
| | 13. | Distributions in U.S. Dollars | 73 |
| F. | Treatment of Executory Contracts and Unexpired Leases | | 73 |
| | 1. | Assumption and Cure of Executory Contracts and Unexpired Leases. | 73 |
| | 2. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 73 |
| | 3. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 74 |
| | 4. | Collective Bargaining Agreement | 74 |
| | 5. | Employment Agreements and Other Benefits | 74 |
| G. | Procedures for Treating and Resolving Disputed Claims | | 78 |
| | 1. | Objections to Claims | 78 |

|   |   |   |   |
|---|---|---|---|
| | 2. | No Distributions Pending Allowance | 79 |
| | 3. | Estimation of Claims | 79 |
| | 4. | Distributions After Allowance | 80 |
| | 5. | Claims Covered by Insurance Policy | 80 |
| H. | | Conditions Precedent to Confirmation and the Effective Date of the Plan | 81 |
| | 1. | Conditions to Confirmation | 81 |
| | 2. | Conditions to the Effective Date | 81 |
| | 3. | Waiver of Conditions | 83 |
| | 4. | Intentionally Omitted. | 84 |
| | 5. | Effect of Failure of Conditions | 84 |
| I. | | Effect of the Plan | 84 |
| | 1. | Revesting of the Debtors' Assets | 84 |
| | 2. | Discharge of Claims and Termination of Interests | 84 |
| | 3. | Release by Debtors of Certain Parties | 85 |
| | 4. | Release by Holders of Claims and Interests. | 88 |
| | 5. | Setoffs | 89 |
| | 6. | Exculpation and Limitation of Liability | 89 |
| | 7. | Injunction | 90 |
| | 8. | Binding Effect | 90 |
| | 9. | Effect of Confirmation on Automatic Stay | 90 |
| | 10. | Filing of Reports | 90 |
| | 11. | Post-Confirmation Date Retention of Professionals | 90 |
| J. | | Retention of Jurisdiction After Confirmation and Effective Date | 90 |
| | 1. | Retention of Jurisdiction | 90 |
| | 2. | Alternative Jurisdiction | 93 |
| | 3. | Final Decree | 93 |
| K. | | Miscellaneous Provisions of the Plan | 93 |
| | 1. | Modification of Plan | 93 |
| | 2. | Allocation of Plan Distributions between Principal and Interest | 93 |
| | 3. | Dissolution of Creditors' Committee | 94 |
| | 4. | Preparation of Estates' Returns and Resolution of Tax Claims | 94 |
| | 5. | Revocation of Plan | 94 |
| | 6. | Confirmation of Plans for Separate Debtors | 94 |
| | 7. | No Admissions; Objection to Claims | 94 |
| | 8. | No Bar to Suits. | 95 |
| | 9. | Section 1145 Exemption | 95 |
| | 10. | Exemption from Securities Laws | 95 |
| | 11. | Initial Offer and Sale Exempt from Registration | 95 |
| | 12. | Applicable Law | 95 |
| | 13. | Plan Supplement | 96 |
| | 14. | Waiver of Rule 62(a) of the Federal Rules of Civil Procedure | 96 |
| | 15. | Headings | 96 |
| | 16. | Survival of Settlements | 96 |
| | 17. | No Waiver | 96 |
| | 18. | Successors and Assigns. | 97 |
| | 19. | Severability of Plan Provisions | 97 |
| | 20. | Post-Effective Date Effect of Evidences of Claims or Interests | 97 |

21.     Conflicts..................................................................................97
22.     Service of Documents ............................................................97
ARTICLE V. REQUIREMENTS FOR CONFIRMATION OF THE PLAN ..............................98
A.      General Information..................................................................................98
B.      Solicitation of Acceptances......................................................................99
C.      Acceptances Necessary to Confirm the Plan ...........................................99
D.      Confirmation of Plan Pursuant to Section 1129(b).................................99
E.      Considerations Relevant to Acceptance of the Plan ................................99
ARTICLE VI. FEASIBILITY OF THE PLAN AND BEST INTERESTS TEST.....................100
A.      Feasibility of the Plan ............................................................................100
B.      Best Interest of Creditors Test ...............................................................100
C.      Application of Best Interests of Creditors Test to the Liquidation Analysis and
        Valuation of the Reorganized Debtors...................................................101
        1.      Yucaipa's Reorganized Value Analysis................................101
        2.      The Debtors' Reorganized Value Analysis............................103
        3.      Liquidation Analysis ............................................................104
ARTICLE VII. CERTAIN RISK FACTORS TO CONSIDER ...........................................105
A.      Certain Bankruptcy Law Considerations...............................................105
B.      Financial Information; Disclaimer..........................................................107
C.      Factors Affecting The Value Of The Securities To Be Issued Under The Plan ..108
D.      Risk Factors Associated With the Business............................................108
E.      Factors Affecting the Reorganized Debtors............................................110
        1.      General Factors ....................................................................110
        2.      Litigation Risks ...................................................................111
F.      Disclaimer Regarding Issuance Of New Allied Common Stock.......................115
ARTICLE VIII. CERTAIN SECURITIES LAW MATTERS ...............................................115
A.      Issuance of New Common Stock ...........................................................115
B.      Subsequent Transfers of New Allied Holdings Common Stock .........................116
ARTICLE IX. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES118
A.      Introduction............................................................................................118
B.      United States Federal Income Tax Consequences to the Debtors .....................119
        1.      Cancellation of Indebtedness Income ...................................119
        2.      Utilization of Net Operating Losses and Other Tax Attributes — Section
                382...........................................................................................119
C.      United States Federal Income Tax Consequences to Holders of Claims............120
        1.      Holders of Secured Claims ..................................................121
        2.      Holders of Priority Claims ...................................................122
        3.      Allocation of Plan Distributions Between Principal and Interest ...........122
        4.      Market Discount....................................................................122
        5.      Holders of Claims Receiving Distributions of New Allied Holdings
                Common Stock.......................................................................123
        6.      Holders of Interests ..............................................................124
        7.      Information Reporting and Backup Withholding ...................124
ARTICLE X. RECOMMENDATION .................................................................................126
EXHIBITS TO DISCLOSURE STATEMENT....................................................................127

4

## DISCLAIMER

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT (DEFINED BELOW) AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, SUCH DOCUMENTS.  FURTHERMORE, ALTHOUGH THE PLAN PROPONENTS HAVE MADE EVERY EFFORT TO BE ACCURATE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT OR OTHER REVIEW BY AN ACCOUNTING FIRM. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN, THIS DISCLOSURE STATEMENT, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, OR THE FINANCIAL INFORMATION INCORPORATED HEREIN OR THEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN, UNLESS SO SPECIFIED.  ALTHOUGH THE PLAN PROPONENTS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERY UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OCCUR.

THIS DISCLOSURE STATEMENT CONTAINS CERTAIN PROJECTED FINANCIAL INFORMATION RELATING TO THE REORGANIZED DEBTORS, AS WELL AS CERTAIN OTHER STATEMENTS THAT CONSTITUTE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE FEDERAL PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH PROJECTIONS AND STATEMENTS ARE BASED ON CERTAIN ESTIMATES AND ASSUMPTIONS MADE

BY, AND ON INFORMATION AVAILABLE TO, THE DEBTORS. WHEN USED IN THIS DOCUMENT, THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "EXPECT," "INTEND," "PLAN," "PROJECT," "FORECAST," "MAY," "PREDICT," "TARGET," "POTENTIAL," "PROPOSED," "CONTEMPLATED," "WILL," "SHOULD," "COULD," "WOULD" AND SIMILAR EXPRESSIONS, AS THEY RELATE TO THE DEBTORS, THE REORGANIZED DEBTORS AND THEIR MANAGEMENT, ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. THE DEBTORS INTEND FOR SUCH FORWARD-LOOKING STATEMENTS TO BE COVERED BY THE SAFE HARBOR PROVISIONS FOR FORWARD-LOOKING STATEMENTS CONTAINED IN THE FEDERAL PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995, AND THE DEBTORS SET FORTH THIS STATEMENT AND THE RISK FACTORS CONTAINED HEREIN TO COMPLY WITH SUCH SAFE HARBOR PROVISIONS. SUCH PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS REFLECT THE CURRENT VIEWS OF THE PLAN PROPONENTS AND ARE SUBJECT TO CERTAIN RISKS, UNCERTAINTIES AND ASSUMPTIONS. MANY FACTORS COULD CAUSE THE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS OF THE DEBTORS AND THE REORGANIZED DEBTORS TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS THAT MAY BE EXPRESSED OR IMPLIED BY SUCH PROJECTED FINANCIAL INFORMATION AND FORWARD-LOOKING STATEMENTS, INCLUDING, BUT NOT LIMITED TO, THE RISKS DISCUSSED IN THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" AND RISKS, UNCERTAINTIES AND OTHER FACTORS DISCUSSED FROM TIME TO TIME IN FILINGS MADE BY CERTAIN OF THE DEBTORS WITH THE SEC AND OTHER REGULATORY AUTHORITIES. SHOULD ONE OR MORE OF THESE RISKS OR UNCERTAINTIES MATERIALIZE, OR SHOULD ASSUMPTIONS UNDERLYING THE PROJECTED FINANCIAL INFORMATION OR OTHER FORWARD-LOOKING STATEMENTS PROVE INCORRECT, ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE DESCRIBED HEREIN AS ANTICIPATED, BELIEVED, ESTIMATED OR EXPECTED. THE PLAN PROPONENTS DO NOT INTEND, AND DO NOT ASSUME ANY DUTY OR OBLIGATION, TO UPDATE OR REVISE THESE FORWARD-LOOKING STATEMENTS, WHETHER AS THE RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS OTHERWISE REQUIRED BY LAW.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

IN ACCORDANCE WITH THE BANKRUPTCY CODE, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC

PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THE PLAN PROPONENTS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF INFORMING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. EXCEPT AS PROVIDED IN THE PRECEDING SENTENCE, AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION OR WAIVER BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS. THIS DISCLOSURE STATEMENT SHALL NOT BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER, AND SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR THE REORGANIZED DEBTORS OR ANY OTHER PARTY-IN-INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES LAW OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

## ARTICLE I.
## INTRODUCTION

### A.    Overview

The Debtors (defined below), Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (collectively, "Yucaipa") and The Teamsters National Automobile Transportation Industry Negotiating Committee ("TNATINC" and, collectively with Yucaipa and the Debtors, the "Plan Proponents") hereby submit this Disclosure Statement pursuant to Section 1125(b) of Title 11, United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and Rule 3017 of the Federal Rules of Bankruptcy Procedure, in connection with the Second Amended Joint Plan of Reorganization of Allied Holdings, Inc. ("Allied Holdings"), Allied Automotive Group, Inc. ("AAG"), Allied Systems, Ltd. (L.P.), Allied Systems (Canada) Company, QAT, Inc., RMX LLC, Transport Support LLC, F.J. Boutell Driveaway LLC, Allied Freight Broker LLC, GACS Incorporated ("GACS"), Commercial Carriers, Inc. ("CCI"), Axis Group, Inc., Axis Netherlands, LLC, Axis Areta, LLC, Logistic Technology, LLC, Logistic Systems, LLC, CT Services, Inc., Cordin Transport LLC, Terminal Services LLC, Axis Canada Company, Ace Operations, LLC, and AH Industries Inc., debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") filed by the Plan Proponents on April 6, 2007 (the "Plan"). A copy of the Plan is attached hereto as Exhibit A. All capitalized terms used but not defined in the Disclosure Statement shall have the respective meanings ascribed to such terms in the Plan, unless otherwise noted. In the event of any inconsistency between the Disclosure Statement and the Plan, the terms of the Plan shall govern and such inconsistency shall be resolved in favor of the Plan.

The Debtors' Board of Directors reserves the right, in the exercise of their fiduciary duties to the Estates, to cause the Debtors to withdraw their support of the Plan.  In the event the Debtors withdraw their support of the Plan, the remaining Plan Proponents may proceed to attempt to achieve confirmation of the Plan without delay.  **Due to tax, operational and other business considerations, Yucaipa reserves the right to structure the Plan as an asset sale so long as the treatment to holders of Allowed Claims and Interests does not change negatively and materially.**

The purpose of this Disclosure Statement is to enable you, as a Holder whose Claim is Impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

By order dated April 6, 2007 (the "Disclosure Statement Approval Order"), the United States Bankruptcy Court for the Northern District of Georgia (such court or, in the event that such court ceases to exercise jurisdiction over any Chapter 11 Case in lieu of another court,  such other court, shall be referred to as the "Bankruptcy Court") has found that this Disclosure Statement provides adequate information to enable Holders of Claims that are Impaired under the Plan to make an informed judgment in exercising their right to vote for acceptance or rejection of the Plan.

## B.    Purpose of the Plan

The Plan provides for an equitable distribution to Holders of Allowed Claims of the Debtors, preserves the value of the Debtors' businesses as going concerns, and preserves the jobs of the Debtors' employees.  Moreover, the Plan Proponents believe that Holders of Allowed Claims will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation.

The Plan is supported by the Debtors, Yucaipa and TNATINC (which represents the interests of approximately 3300 union members employed by the Debtors). Additionally, the Creditors' Committee provisionally supports the Plan subject to certain approval rights set forth below and in the Plan, as well as subject to the Disclaimer contained in Article VII hereof (which all creditors are strongly urged to read carefully) concerning the ongoing negotiations between the Creditors' Committee and Yucaipa regarding certain corporate governance, minority shareholder protection terms and other matters.  The linchpin to the reorganization of the Debtors and the Plan is an amendment to the Collective Bargaining Agreement between TNATINC and the Debtors.  The Plan incorporates that amendment.  TNATINC asserts that no better labor deal for the Debtors and their creditors will be obtainable than the one provided by that amendment.  As described further below, a deal was reached to avoid the possibility of a strike and potentially the ultimate liquidation of the Debtors.  The Plan Proponents believe that the Plan will lead to reorganization, the satisfaction of hundreds of millions of claims and the preservation of thousands of jobs.  The Ad Hoc Equity Committee disagrees with this conclusion, however, it should be noted that the Ad Hoc Equity Committee has never approached TNANTIC or had any direct negotiations with TNANTIC.

## C.     Summary of the Plan

Under the Plan, the Debtors will be reorganized through, among other things, the consummation of the following transactions:  (i) the conversion of the DIP Facility into the Exit Financing Facility, (ii) payment in Cash, Reinstatement, return of collateral or other treatment of Other Secured Claims agreed between the Holder of each such Claim and Yucaipa, (iii) distribution of New Common Stock on a Pro Rata basis to the Holders of Allowed General Unsecured Claims, (iv) cancellation of the existing Interests in the Debtors, (v) assumption of Assumed Contracts and (vi) the potential conversion of the Equipment Financing Facility into New Allied Holdings Common Stock.  A chart reflecting the post-Effective Date corporate organization structure of the Reorganized Debtors is attached to the Disclosure Statement as Exhibit F.

The Plan contemplates the reorganization and ongoing business operations of the Debtors, and the resolution of the outstanding Claims against and Interests in the Debtors pursuant to Sections 1129(a) and 1123 of the Bankruptcy Code.  The Plan classifies all Claims against and Interests in the Debtors into twelve (12) separate Classes (Class 1A et seq. through Class 7C). Holders of Allowed Other Secured Claims will be paid in full, receive their collateral back, receive payments over time or receive some other treatment that provides them with the "indubitable equivalent" of their claims.  Holders of Allowed Administrative Expense Claims and Holders of Allowed Priority Non-Tax Claims will generally receive a one-time Cash payment equal to the Allowed Claim amounts of such Claims in satisfaction of such Claims. Each Holder of an Allowed Priority Tax Claim will receive the Treatment set forth in Section 4.2(b) of the Plan.  Holders of Allowed General Unsecured Claims will receive a Pro Rata Distribution of New Allied Holdings Common Stock.  As set forth in greater detail below, certain Holders of Allowed General Unsecured Claims, Insured Claims and Other Insured Claims will receive Cash instead of New Allied Holdings Common Stock on account of their Allowed Claim.  Holders of equity interests will receive nothing under the Plan.

## D.     Yucaipa

The Yucaipa Companies, LLC is a private equity firm.  Founded by Ron Burkle in 1986, Yucaipa focuses on making control investments in underperforming and labor-intensive industries.  Yucaipa has sponsored transactions aggregating more than $30 billion primarily in the areas of distribution, logistics, transportation, consumer goods, food, retail and light manufacturing.    Its past and current investments include TDS Logistics, Performance Transportation Services ("PTS"), Cadence Innovation, AmeriCold Logistics, Source  Interlink, Pathmark Stores, Ralphs, Food 4 Less, Fred Meyer, and Golden State Foods.

Yucaipa is committed to making worker-friendly investments and working constructively with organized labor at its portfolio companies.  The firm has owned over 30 companies with more than 200,000 unionized employees and manages funds for numerous public and Taft Hartley pension funds.  In 2005, Yucaipa raised the largest ever worker-friendly investment fund, the Yucaipa American Alliance Fund ("YAAF").   Investment discretion rests solely with Yucaipa.

As a result of its Claims, the potential conversion of the Equipment Financing Facility and Yucaipa's funding of the Cash Out Option, Yucaipa is expected to receive a Distribution of New Allied Holdings Common Stock which could amount, in the aggregate to more than 50% of all New Allied Holdings Common Stock to be distributed pursuant to the Plan. At this time, the Plan Proponents are not aware of any other Holder which will receive Distributions of New Allied Holdings Common Stock totaling more than 10% of all New Allied Holdings Common Stock to be distributed pursuant to the Plan.

**E.    Debtors' Principal Assets and Indebtedness**

The principal assets of Allied Holdings include the stock of AAG and each of its direct and indirect subsidiaries, Axis Group, Inc. and each of its direct and indirect subsidiaries, AH Industries Inc, and Haul Insurance Limited (not one of the Debtors). The principal assets of AAG include its automobile hauling businesses and the stock of its direct and indirect subsidiaries. The principal assets of Axis Group, Inc. include its vehicle distribution and transportation support services and related businesses and the stock of its direct and indirect subsidiaries. The principal assets of AH Industries Inc. are intercompany receivables. The operations of the Debtors are described more fully in Article III hereof. A pre-Effective Date corporate chart of the Debtors is set forth in Exhibit F hereto.

The principal indebtedness of the Debtors includes the following: (1) DIP Lender Claims, (2) Claims under the Equipment Financing Facility, (3) Other Secured Claims, and (4) General Unsecured Claims, including Prepetition Notes Claims.

**F.    Treatment of Claims and Interests**

A brief summary of the Classes, the treatment of each Class, and the voting rights of each Class is set forth in the table below. A complete description of the treatment of each Class is set forth in Article III of the Plan and Article IV of this Disclosure Statement. Parties should refer to those sections for a complete description of the proposed treatment for each Class. **NOTE TO HOLDERS OF GENERAL UNSECURED CLAIMS, INSURED CLAIMS AND OTHER INSURED CLAIMS:** As summarized in the table below and as more fully set forth in Article III of the Plan and Article IV of this Disclosure Statement, you will receive a Pro Rata share of the New Allied Holdings Common Stock on account of your Allowed Claim. However, you can receive Cash instead of New Allied Holdings Common Stock on account of your Allowed Claim if you elect the Cash Option. As set forth in Section IV.B.2.(g) below, to exercise the Cash Option, you must check the "Take Stock Instead of Cash Option" box on your Ballot regardless of whether you vote for or against the Plan. If your Allowed Claim is greater than $20,000, you will also need to agree to reduce your claim to $20,000 in order to elect the Cash Option. Accordingly, the Cash Option does not provide payment in full to eligible creditors electing the Cash Option and eligible creditors should study the terms of the Cash Option carefully. The Cash Option election is irrevocable.

| Class | Description | Estimated Aggregate Allowed Amount | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|---|
| 1 | Other Secured Claims | $0.00 | Each Holder shall receive any one or a combination of any of the following: (i) Cash in an amount equal to such Allowed Class 1 Claim; (ii) deferred Cash payments totaling at least the Allowed amount of such Allowed Class 1 Claim, of a value, as of the Effective Date, of at least the value of such Holder's interest in the Debtors' property securing the Allowed Class 1 Claim; (iii) the property of the Debtors securing such Holder's Allowed Class 1 Claim; (iv) Cash payments or Liens amounting to the indubitable equivalent of the value of such Holder's interest in the Debtors' property securing the Allowed Class 1 Claim; (v) Reinstatement of such Allowed Class 1 Claim; or (vi)(after the consultation with the Debtors and the Creditors' Committee) such other treatment as Yucaipa and such Holder shall have agreed upon in writing. | Unimpaired with respect to subsections (i) and (v) of the paragraph titled "Treatment" under Section 3.1(2) of the Plan; Impaired with respect to subsections (ii), (iii), (iv) and (vi) of such paragraph | Unimpaired Other Secured Claims deemed to accept Plan and not entitled to vote; Impaired Other Secured Claims entitled to vote | N.A. |
| 2 | Priority Non-Tax Claims | $0.00 | To the extent that such Claim is due and owing on the Effective Date, such Claim will be paid in full in Cash on the Effective Date; to the extent that such Claim is not due and owing on the Effective Date, such Claim will be paid in full in Cash when | Unimpaired | Deemed to accept Plan; not entitled to vote | N.A. |

| Class | Description | Estimated Aggregate Allowed Amount | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|---|
| | | | such Claim becomes due and owing in the ordinary course of business; such a Claim may also be treated in any other manner that would render such Claim unimpaired pursuant to Bankruptcy Code Section 1124 | | | |
| 3 | Workers' Compensation Claims | N/A | Such Claims are unaltered by the Plan | Unimpaired | Deemed to accept Plan; not entitled to vote | 100% |
| 4A | General Unsecured Claims (other than General Unsecured Claims classified in Class 4D) | $196.9 million | A Holder shall receive a Pro Rata share of the New Allied Holdings Common Stock other than the shares issued pursuant to Section 4.2(d) of the Plan based on the ratio of the amount of such Holder's Allowed Class 4A Claim to the aggregate amount of all Allowed Class 4A, Class 4B and Class 4C Claims plus the Stub Amount of Allowed Class 4D Claims | Impaired | Entitled to vote | Up to 50%[1] |
| 4B | Insured Claims (other than Insured Claims classified in Class 4D) | $14.5 million | A Holder of such a Claim shall receive the same treatment as the Holder of a Class 4A Claim, provided, however, that the Allowed Amount of such a Claim shall be limited to the sum of the applicable self-insured retention or deductible under the relevant insurance policy and the amount, if any, that such Claim exceeds the total coverage available from the | Impaired | Entitled to vote | Up to 50%[2] |

---

[1] This estimate is based on FTI's valuation of the Debtors' enterprise at up to $303 million before any dilution for, among other things, issuance of New Allied Common Stock issued pursuant to the Equipment Financing and management options.  Under the Miller Buckfire valuation the enterprise valuation is from $350 million to $425 million, with a mid-point of $388 million. Under the Miller Buckfire valuation, the estimated percentage recovery would be commensurately higher.

| Class | Description | Estimated Aggregate Allowed Amount | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|---|
| | | | relevant insurance policies | | | |
| 4C | Other Insured Claims (other than Other Insured Claims classified in Class 4D) | $3.0 million | A Holder of such a Claim shall receive the same treatment as the Holder of a Class 4A Claim, provided, however, that the Allowed Amount of such a Claim shall be limited to the sum of the applicable self-insured retention or deductible under the relevant insurance policy and the amount, if any, that such Claim exceeds the total coverage available from the relevant insurance policies | Impaired | Entitled to vote | Up to 50% [3] |
| 4D | General Unsecured Claims, Insured Claims and Other Insured Claims Whose Holders Elect the Cash Option | TBD | Each Holder of such a Claim shall receive a Cash distribution equal to: (a) if the aggregate amount of Allowed Class 4D Claims is equal to or less than $8 million, 25% of such Holder's Allowed Class 4D Claim, (b) if the aggregate amount of Allowed Class 4D Claims is greater than $8 million and equal to or less than $16 million, a Pro Rata share of $2 million (i.e., between approximately 12.5% and 25% of such Holder's Allowed Class 4D Claim), (c) if the aggregate | Impaired | Entitled to Vote | Up to 25% |

[2] This estimate is based on FTI's valuation of the Debtors' enterprise at up to $303 million before any dilution for, among other things, issuance of New Allied Common Stock issued pursuant to the Equipment Financing and management options. Under the Miller Buckfire valuation the enterprise valuation is from $350 million to $425 million, with a mid-point of $388 million. Under the Miller Buckfire valuation, the estimated percentage recovery would be commensurately higher.

[3] This estimate is based on FTI's valuation of the Debtors' enterprise at up to $303 million before any dilution for, among other things, issuance of New Allied Common Stock issued pursuant to the Equipment Financing and management options. Under the Miller Buckfire valuation the enterprise valuation is from $350 million to $425 million, with a mid-point of $388 million. Under the Miller Buckfire valuation, the estimated percentage recovery would be commensurately higher.

| Class | Description | Estimated Aggregate Allowed Amount | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|-------|-------------|-----------------------------------|-----------------|--------------|--------------------|-----------------------------|
| | | | amount of Allowed Class 4D Claims is greater than $16 million and equal to or less than $20 million, 12.5% of such Holder's Allowed Class 4D Claim, and (d) if the aggregate amount of Allowed Class 4D Claims is in excess of $20 million, at Yucaipa's option, either (i) 12.5% of such Holder's Allowed Class 4D Claim or (ii) 12.5% of the product of such Holder's Allowed Class 4D Claim multiplied by a fraction, the numerator of which is $20 million and the denominator of which is the aggregate amount of Allowed Class 4D Claims. In addition if the aggregate amount of Allowed Class 4D Claims exceeds $20 million and Yucaipa elects the option descried in clause (d)(ii) of the preceding sentence, each Holder of an Allowed Class 4D Claim shall also receive a Pro Rata Share of the New Allied Holdings Common Stock other than the shares issued pursuant to Section 4.2(d) of the Plan based on the ratio of (a) the amount of such Holder's Allowed Class 4D Claim multiplied by a fraction, the numerator of which is the difference between the aggregate amount of Allowed Class 4D | | | |

| Class | Description | Estimated Aggregate Allowed Amount | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|-------|-------------|-----------------------------------|-----------------|--------------|---------------------|-------------------------------|
|  |  |  | Claims minus $20 million (the "Stub Amount") and the denominator of which is the aggregate amount of Allowed Class 4D Claims to (b) the aggregate amount of all Allowed Class 4A, Class 4B and Class 4C Claims plus the Stub Amount of Allowed Class 4D Claims. In exchange for making the Cash Out Contribution, Yucaipa shall receive the New Allied Holdings Common Stock that each Holder of an Allowed Class 4D Claim would have received if its Allowed Claim were classified in Class 4A, 4B, or 4C (without giving effect to any Voluntary Reduction). |  |  |  |
| 5 | Intercompany Claims | N/A | No holder of an Allowed Intercompany Claim will receive or retain any property of the Debtors under the Plan on account of such Claim; provided, however, that Intercompany Claims may be capitalized, satisfied, or preserved either directly or indirectly or in whole or part. Any Intercompany Claim, or portion thereof, that is not so capitalized, satisfied, or preserved will be cancelled as of the Effective Date | Impaired | Deemed to reject Plan; not entitled to vote | 0% |
| 6 | Subordinated General Unsecured Claims | N.A. | Subordinated General Unsecured Claims shall be canceled and Holder of Subordinated General Unsecured Claims | Impaired | Deemed to reject Plan; not entitled to vote | N.A. |

11

| Class | Description | Estimated Aggregate Allowed Amount | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|-------|-------------|-----------------------------------|-----------------|--------------|---------------------|-------------------------------|
| | | | shall not receive any Distributions on account of such Claims | | | |
| 7A | Old Allied Holdings Common Stock | N/A | The Old Allied Holdings Common Stock shall be cancelled and the Holders shall receive no Distributions on account thereof | Impaired | Deemed to reject Plan; not entitled to vote | 0% |
| 7B | Old Other Debtors Common Stock | N/A | The Old Other Debtors Common Stock shall be cancelled and the Holders shall receive no Distributions on account thereof unless Yucaipa determines for business, tax or operational reasons that the stock should remain outstanding after consultation with the Creditors' Committee and the Debtors | Impaired | Deemed to reject Plan; not entitled to vote | 0% |
| 7C | Old Allied Holdings Stock Rights | N/A | The Old Allied Holdings Stock Rights shall be cancelled and the Holders shall receive no Distributions on account thereof | Impaired | Deemed to reject Plan; not entitled to vote | 0% |

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, the Plan. Similarly, Claims of the DIP Lenders under the DIP Loan Facility (i.e., that certain that certain Secured, Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated as of March 30, 2007, as amended, supplemented or otherwise modified from time to time, and all documents executed in connection therewith by and among Allied Holdings, Inc. and Allied Systems, LTD. (L.P.) as borrowers, certain subsidiaries of Allied Holdings, Inc. and Allied Systems, LTD. (L.P.) as guarantors, Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other Lenders signatory thereto from time to time) and Claims of Yucaipa's Lender affiliate under the Equipment Financing Facility are not classified for purposes of voting on, or receiving Distributions under, the Plan. Holders of such Claims are not entitled to vote on the Plan. All such Claims are instead treated separately in accordance with Article IV of the Plan. A more complete description

of the treatment of Administrative Expense Claims and Priority Tax Claims is provided in Article IV of the Plan and Article IV, Section C of this Disclosure Statement.

During the Chapter 11 Cases, the Holders of Prepetition Lender Claims with respect to the Prepetition Loan Facility (i.e., that certain senior, secured credit facility of approximately $180 million provided prior to the Petition Date by a group of lenders with Ableco Finance, LLC as collateral agent and Wells Fargo Foothill, Inc., formerly known as Foothill Capital Corporation, as administrative agent) received, in full and final satisfaction of their Claims, Cash equal in amount to one hundred percent (100%) of their Claims and, as a result, Prepetition Lender Claims are not classified for purposes of voting on or receiving Distributions under the plan. Thus, Holders of Prepetition Lender Claims are not entitled to vote to accept or reject the Plan.

## G.    Voting and Confirmation Procedures

Accompanying this Disclosure Statement are copies of the following documents: (1) the Plan, which is annexed to this Disclosure Statement as <u>Exhibit A</u>; (2) a Notice to Voting Classes; and (3) a Ballot to be executed by Holders of certain Allowed Claims in Class 1 and all Allowed Claims in Classes 4A, 4B, 4C and 4D to accept or reject the Plan.

This Disclosure Statement, the form of Ballot, and the related materials delivered together herewith (collectively, the "Solicitation Package"), are being furnished to Holders of certain Claims in Class 1 and all Claims in Classes 4A, 4B, 4C and 4D for the purpose of soliciting votes on the Plan.

If you did not receive a Ballot in your Solicitation Package, and believe that you should have received a Ballot, please contact the Claims Agent and Voting Agent, JP Morgan Trust Company, N.A., P.O. Box 56636, Jacksonville, FL 32241-6636; or by telephone at (866) 890-0607 (or local 904-807-3066) or counsel to the Debtors, Troutman Sanders LLP, 5200 Bank of America Plaza, 600 Peachtree Street, N.E., Atlanta, Georgia 30308, attn:  Thomas R. Walker, Esq., facsimile no. (404) 885-3900.

### 1.    Who May Vote

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan of reorganization under Section 1126(g) of the Bankruptcy Code are entitled to vote to accept or reject the Plan.  Any class that is unimpaired within the meaning set forth in Section 1124 of the Bankruptcy Code ("Unimpaired") is not entitled to vote to accept or reject a plan of reorganization and is conclusively presumed to have accepted the Plan. As set forth in Section 1124 of the Bankruptcy Code, a class is "impaired" if legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered. For purposes of the Plan only, Holders of certain Allowed Claims in Class 1 and all Allowed Claims in Classes 4A, 4B, 4C and 4D are Impaired and are entitled to vote on the Plan.

A Claim must be "Allowed" for purposes of voting in order for such creditor to have the right to vote.  Generally, for voting purposes a Claim is deemed "Allowed" absent an objection to the Claim if (i) a Proof of Claim was timely filed, or (ii) if no Proof of Claim was filed, the

Claim is identified in the Debtors' Schedules as other than "disputed," "contingent," or "unliquidated," and an amount of the Claim is specified in the Schedules, in which case the Claim will be deemed Allowed for the specified amount. In either case, when an objection to a Claim is filed, the Holder of such Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection, or deems the Claim to be Allowed for voting purposes.

**Each Holder of an Allowed Claim in an Impaired Class which Claim is not (i) a Tort Claim, (ii) contingent or (iii) Filed in an unliquidated or undetermined amount shall be entitled to vote separately to accept or reject the Plan unless (a) such Holder's Claim is otherwise deemed to have rejected the Plan in accordance with Section 1126(g) of the Bankruptcy Code, or (b) otherwise permitted to vote by order of the Bankruptcy Court.**

If you did not receive a Ballot and believe that you are entitled to vote on the Plan, you must either (a) obtain a Ballot pursuant to the instructions set forth above and timely submit such Ballot by the Voting Deadline, or (b) file a Motion pursuant to Federal Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes by April 23, 2007, or you will not be entitled to vote to accept or reject the Plan.

THE REORGANIZED DEBTORS AND YUCAIPA IN ALL EVENTS RESERVE THE RIGHT THROUGH THE CLAIM RECONCILIATION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM FOR DISTRIBUTION PURPOSES UNDER THE PLAN, EVEN IF THE HOLDER OF SUCH CLAIM VOTED TO ACCEPT OR REJECT THE PLAN.

### 2.    Certain Risk Factors to Be Considered Prior to Voting

**HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY CONSIDER THE RISKS SET FORTH IN ARTICLE VII HEREIN PRIOR TO ACCEPTING OR REJECTING THE PLAN.**

### 3.    Voting Instructions and Voting Deadline

All votes to accept or reject the Plan must be cast by using the Ballot enclosed with this Disclosure Statement.  No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed April 4, 2007 as the date (the "Voting Record Date") for the determination of the Holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.  Accordingly, each Holder of an Allowed Claim in an Impaired Class of Claims as of the Voting Record Date, otherwise entitled to vote on the Plan pursuant to Article III of the Plan, shall be entitled to vote separately to accept or reject the Plan.  After carefully reviewing the Plan and this Disclosure Statement, including the annexed exhibits, please indicate your acceptance or rejection of the Plan on the Ballot and return such Ballot in the enclosed envelope by no later than 4:00p.m. Eastern Standard Time on May 1, 2007 to:

|  |  |
|---|---|
| By mail: | By hand delivery or courier: |
| Allied Holdings, Inc. | Allied Holdings, Inc. |
| c/o JP Morgan Trust Company, N.A. | c/o JP Morgan Trust Company, N.A. |

c/o Administar Services Group          c/o Administar Services Group
P.O. Box 56636                          8475 Western Way, Suite 110
Jacksonville, FL 32241-6636             Jacksonville, FL 32256

**BALLOTS MUST BE COMPLETED AND RECEIVED NO LATER THAN 4:00 P.M. (EASTERN TIME) ON MAY 1, 2007 (THE "VOTING DEADLINE").   ANY BALLOT THAT IS NOT EXECUTED BY A DULY AUTHORIZED PERSON SHALL NOT BE COUNTED.   ANY BALLOT THAT IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM BUT THAT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE.   ANY BALLOT THAT IS RECEIVED BY TELECOPIER, FACSIMILE OR OTHER ELECTRONIC COMMUNICATIONS SHALL NOT BE COUNTED IN THE VOTING TO ACCEPT OR REJECT THE PLAN, UNLESS THAT BALLOT IS ACCEPTED IN THE PLAN PROPONENTS' DISCRETION.   IF A HOLDER OF A CLAIM SHOULD CAST MORE THAN ONE BALLOT VOTING THE SAME CLAIM PRIOR TO THE VOTING DEADLINE, ONLY THE LAST TIMELY BALLOT RECEIVED BY THE BALLOTING AGENT WILL BE COUNTED.   IF A HOLDER OF A CLAIM SHOULD CAST SIMULTANEOUS DUPLICATIVE BALLOTS VOTED INCONSISTENTLY, SUCH BALLOT SHALL COUNT AS ONE VOTE ACCEPTING THE PLAN.**

**NOTE TO HOLDERS OF GENERAL UNSECURED CLAIMS, INSURED CLAIMS AND OTHER INSURED CLAIMS:**  Any Holder of a Class 4A General Unsecured Claim, Class 4B Insured Claim or Class 4C Other Insured Claim that is Allowed in an amount equal to or less than $20,000 shall be classified in Class 4D and receive the Cash Option unless the Holder of such Claims checks the "Take Stock Instead of Cash Option" box on the Ballot. Any Holder of a General Unsecured Claim, Insured Claim or Other Insured Claim that is Allowed in an amount greater than $20,000, but who is willing to reduce irrevocably the Allowed amount of its Claim to $20,000 in order to exercise the Cash Option (a "Voluntary Reduction"), shall be entitled to exercise the Cash Option, and thus be classified in Class 4D, by checking the "Reduce Claim to $20,000 and Exercise Cash Option" box on its Ballot.  **Each Holder's election as to the Class in which it wants to be classified shall be irrevocable from and after the submission of its Ballot.**

### 4.      Voting Procedures; Voting Procedures for Securities Intermediaries

The Plan Proponents have proposed that the Bankruptcy Court approve certain procedures regarding temporary allowance of claims for voting purposes only.  Specifically, the Plan Proponents have requested that if an objection to a Claim or Interest is pending on the Voting Record Date or such Claim or Interest is a Disputed Claim or Interest, such Claim or Interest holder shall receive a copy of the Confirmation Hearing "Notice and a Notice of Non-Voting Status With Respect To Disputed Claims" ("Disputed Claim Notice") in lieu of a Ballot. The Disputed Claim Notice shall inform such person or entity that its Claim or Interest has been objected to, and that the holder of such Claim or Interest cannot vote absent any of the following taking place prior to the Voting Deadline (i) an order is entered by the Bankruptcy Court temporarily allowing such Disputed Claim or Disputed Interest for voting purposes pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (ii) a stipulation or other agreement is

executed between the holder of the Disputed Claim or Disputed Interest and the Plan Proponents resolving such objection and allow the holder of the Disputed Claim or Disputed Interest to vote its claim or interest in an agreed upon amount; or (iii) the pending objection to the Disputed Claim or Disputed Interest is voluntarily withdrawn by the Plan Proponents (each, a "Resolution Event"). No later than two (2) business days after a Resolution Event, the Voting Agent shall distribute a Ballot and a pre-addressed, postage pre-paid envelope to the relevant holder of the Disputed Claim or Disputed Interest, which must be returned to the Voting Agent by no later than the Voting Deadline, unless such deadline is extended by the Plan Proponents to facilitate a reasonable opportunity for such creditor to vote for or against the Plan after the occurrence of a Resolution Event.

If an objection to a Claim or Interest is filed by the Plan Proponents after the Voting Record Date but before 15 days prior to the Confirmation Hearing, the Ballot of such Claim or Interest holder will not be counted absent a Resolution Event taking place on or before the Confirmation Hearing.

Nothing in the Solicitation Procedures shall affect the Plan Proponents' right to object to any proof of claim on any other ground or for any other purpose.

The Debtors' security intermediaries, which hold the Debtors' debt securities for the account of beneficial owners, are authorized by the Bankruptcy Court to obtain the votes of the beneficial owners as follows: the securities intermediary may either (i) forward the solicitation package to each beneficial owner of the applicable debt security for voting and include a postage-prepaid, return envelope provided by and addressed to the security intermediary so that the beneficial owner may return the completed beneficial owner Ballot for inclusion in the appropriate master ballot or (ii) prevalidate a Ballot by (a) signing it and by indicating on the Ballot the record holder of the debt securities voted, the principal amount and the appropriate account number and (b) forwarding the solicitation package along with the prevalidated Ballot to the beneficial owner of the debt security for voting, so that the beneficial owner may return the completed Ballot directly to the Balloting Agent in the return envelope provided in the solicitation package. The Ballots of security intermediaries must be completed and returned to the Balloting Agent at the address set forth above by the Voting Deadline.

## 5.    Who to Contact for More Information

If you have any questions about the procedure for voting your Claim or the packet of materials you received, please contact the Claims Agent at the address indicated above or by telephone at (866) 890-0607 (or local 904-807-3636). If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please call Troutman Sanders LLP at (404) 885-2506.

Allied Holdings files annual, quarterly and current reports, proxy statements and/or other information with the SEC. Should you want more information regarding the Debtors, please refer to the annual, quarterly and current reports and proxy statements, as applicable, filed with the SEC regarding those entities. Specifically, you are encouraged to read the following documents, which are incorporated herein by reference:

- Annual Reports on Form 10-K for the year ended December 31, 2005;

- Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30 and September 30, 2006; and

- Other Reports on Form 8-K.

You may read and copy any document Allied Holdings files with the SEC at the SEC's public reference room located at:  450 Fifth Street, N.W., Washington, D.C.  20549.  Please call the SEC at 1-800-SEC-0330 for further information on the public reference room and its copy charges.  SEC filings for Allied Holdings are also available to the public on the SEC's website at *www.sec.gov*.

### 6.    Acceptance or Rejection of the Plan

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in that class that cast ballots for acceptance or rejection of the plan.  Assuming that at least one Impaired Class votes to accept the Plan, the Plan Proponents will seek to confirm the Plan under Section 1129(b) of the Bankruptcy Code, which permits the confirmation of a plan notwithstanding the non-acceptance by one or more Impaired classes of Claims or Interests.  Under Section 1129(b) of the Bankruptcy Code, a plan may be confirmed if (a) the plan has been accepted by at least one Impaired class of Claims and (b) the Bankruptcy Court determines that the plan does not discriminate unfairly and is "fair and equitable" with respect to the non-accepting classes.  A more detailed discussion of these requirements is provided in Article V of this Disclosure Statement.

### 7.    Time and Place of the Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Pursuant to Section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to commence on May 9, 2007 at 9:30 a.m. (Eastern time), before the Honorable C. Ray Mullins, of the United States Bankruptcy Court for the Northern District of Georgia, in Courtroom 1203, United States Courthouse, 75 Spring Street, S.W., Atlanta, Georgia.  A notice setting forth the time and date of the Confirmation Hearing has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of such adjourned hearing date by the Bankruptcy Court in open court at such hearing.

### 8.    Objections to the Plan

Any objection to confirmation of the Plan must be in writing; must comply with the Bankruptcy Code, Bankruptcy Rules, and the Local Rules of the Bankruptcy Court; and must be filed with the United States Bankruptcy Court for the Northern District of Georgia, Atlanta

Division, 75 Spring Street, S.W., Atlanta, Georgia 30303, and served upon the following parties, so as to be received no later than May 1, 2007 at 4:00 p.m. (Eastern time): (a) Robert Klyman, Esq., Latham & Watkins LLP, 633 West Fifth Street, Suite 4000, Los Angeles, California 90071-2007 (counsel for Yucaipa), (b) Frederick Perillo, Esq., Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C., 1555 N. River Center Dr., Suite 202, Milwaukee, WI 53212 (counsel for the TNATINC), (c) Jeffrey Kelley, Esq., Troutman Sanders LLP, 5200 Bank of America Plaza, 600 Peachtree Street, N.E., Atlanta, Georgia 30308-2216 (counsel for Debtors); (d) R. Jeneane Treace, Office of the United States Trustee, 75 Spring Street, S.W., Atlanta, Georgia 30303; and (e) Jonathan B. Alter, Esq., Bingham McCutchen LLP, One State Street, Hartford, Connecticut 06103  (counsel for the Official Committee of Unsecured Creditors (the "Creditors' Committee")).

FOR THE REASONS SET FORTH BELOW, THE PLAN PROPONENTS URGE YOU TO RETURN YOUR BALLOT "ACCEPTING" THE PLAN.

## ARTICLE II.
## GENERAL INFORMATION REGARDING THE DEBTORS

FOR MORE DETAILED INFORMATION ABOUT THE DEBTORS, PLEASE ALSO REVIEW THE SEC FILINGS REFERENCED ABOVE IN I(F)(4) ABOVE

**A.      Formation and History of the Debtors**

Allied was founded as "Motor Convoy" in 1934.  Following industry deregulation in the early 1980s, Allied expanded geographically through acquisitions.  In 1986, Motor Convoy and Auto Convoy, a carhaul company based in Dallas, Texas, formed a joint venture, which allowed the companies to enter new markets in Texas, Missouri, Louisiana, and Kentucky.  The two firms merged in 1988 to create Allied Systems.  In 1993, the new company went public as Allied Holdings, Inc., a company incorporated under the laws of the state of Georgia.

In 1994, Allied obtained approximately 90% of the Canadian motor carrier market when it acquired Auto Haulaway.  In 1997, Allied became the major auto transporter in North America by acquiring certain subsidiaries of Ryder System, Inc. known as "Ryder Automotive Group" (such acquisition being referred to as the "Ryder Acquisition"), a move that expanded Allied's operations in the western section of the U.S. and substantially increased the volume of Allied's business with certain customers, particularly General Motors.

In an effort to expand internationally, in 1988, through its subsidiary Axis Group, Inc. ("Axis"), Allied formed a Brazilian joint venture to provide logistics services to the auto transport market in the Mercosur region of South America.  A year later, Allied set up an Axis related business unit in Mexico.  Allied sold its interest in the Brazilian joint venture in 2001.  In 1999, a joint venture with AutoLogic Holdings (a logistics firm serving the car industry in Belgium, France, the Netherlands, and the UK) was created to manage Ford's distribution of vehicles in the United Kingdom.  Allied sold its interest in this joint venture in 2001.

In 2000, Axis purchased CT Group, Inc., a provider of vehicle inspection services to the pre-owned and off-lease vehicle market. In 2001, Axis established a deal with Toyota Motor Sales to provide vehicle tracking of more than 1.5 million units per year.

Since 2000, Allied has made no significant acquisitions. Instead, Allied has focused on the restructuring and streamlining of operations, including closing terminals deemed to be non-performing, exiting unprofitable business and focusing on cost reduction initiatives. Positive developments in these areas were, however, hampered by Allied's historically high debt level and an aging fleet, as well as by certain automotive industry dynamics including but not limited to the rising costs of fuel, the decline in new vehicle production by certain major customers, the increase in non-union competition and increasing labor costs. These challenges culminated in the Debtors' Chapter 11 filings on July 31, 2005 (the "Petition Date").

Today, Allied's corporate headquarters office is located at 160 Clairemont Avenue, Decatur, Georgia 30030. Allied services span the finished vehicle continuum, and include vehicle transportation, car-hauling, intramodal transport, inspection, accessorization, yard management, title storage and dealer preparatory services. Through direct and indirect subsidiaries, Allied is the leading company in North America specializing in the delivery of new and used vehicles.

Allied Holdings is the ultimate parent company of all Allied affiliates. Allied Holdings has four direct subsidiaries, three of which are Debtors, and one which is not. AAG (collectively, with all of its direct and indirect subsidiaries, the "Automotive Group") is a direct subsidiary of Allied Holdings which is a Debtor; it provides the "short-haul" vehicle delivery services that are Allied's main business operations (comprising approximately 97% of Allied's 2005 revenues (which exceeded $890 million). Axis (collectively, with all of its direct and indirect subsidiaries, the "Axis Group") is another of Allied Holdings' direct subsidiaries that is a Debtor. The Axis Group provides support services with respect to vehicle distribution and transportation services. The third direct subsidiary which is a Debtor, AH Industries Inc., is not currently providing delivery services or support services. The direct subsidiary that is not a Debtor is Haul Insurance Limited (Cayman) ("Haul"). Haul is a captive insurance company which, pursuant to the provisions of the Bankruptcy Code, was not eligible to be a debtor in a bankruptcy case.

## B. The Debtors' Business Operations

On the Petition Date, the Automotive Group owned approximately 3,400 "Rigs," leased 453 additional Rigs, and utilized approximately 590 owner-operator Rigs. Using these Rigs, the Automotive Group serves and supports all the major domestic and foreign automobile manufacturers, operating primarily in the "short-haul" segment, a segment of the automotive transportation industry with average hauled distances of less than 200 miles. Though there is limited public information available about the Allied's competitors, most of whom are privately-owned companies, Allied believes that Allied Automotive Group is by far the largest motor carrier in North America, based on the number of vehicles it delivers annually versus total vehicles produced as well as revenues generated from vehicle deliveries. The Automotive Group's largest customers are General Motors, Ford, DaimlerChrysler, Toyota and Honda. During 2005 and 2006, these customers accounted for approximately 88% of the Automotive

19

Group's revenues.  Other North American customers include the major foreign manufacturers, namely Mazda, Nissan, Isuzu, Volkswagen, Hyundai, and KIA.

The Axis Group complements the services provided by the Automotive Group, providing vehicle distribution and transportation support services to both the pre-owned and new vehicle markets as well as to other segments of the automotive industry.  Other services provided by the Axis Group to the automotive industry include automobile inspections, auction and yard management services, vehicle tracking, vehicle accessorization, title storage and dealer preparatory services.

The Automotive Group operates a total of approximately 75 terminals while Axis Group operates approximately 40.  The Debtors' day-to-day operations are directed from these terminals.  The Automotive Group's terminals rely upon one customer service center in Decatur, Georgia to design optimal loads for each Rig.  The Axis Group's carrier management services rely upon a separate customer dispatch center in Decatur, Georgia to coordinate pickup and delivery of customer vehicles.  Terminal staffing varies based on a number of factors including complexity, size, delivery profile and number of customers served but may include a terminal manager, an assistant terminal manager, an operations manager, a shop manager, a quality or safety manager (these two positions are sometimes combined), yard supervisors, mechanics, dispatchers, an office supervisor and administrative associates.  Allied's corporate office (in Decatur, Georgia) provides some centralized management services for the Automotive Group and the Axis Group, including logistics and load planning, information technology, sales and marketing, purchasing, finance and accounting, human resources, legal services, planning, insurance and risk management.

The Automotive Group has one-year or multi-year contracts in place with substantially all of its customers.  However, most of these contracts can be terminated by either party upon a specified period of notice.  These contracts establish rates for the transportation of vehicles and are generally based upon a fixed rate per vehicle transported, a variable rate for each mile that a vehicle is transported plus an administrative processing fee.  Certain contracts provide for rate variation per vehicle depending on the size and weight of the vehicle.  During 2005 and 2006, substantially all of the Automotive Group's customers paid a fuel surcharge that allowed the Automotive Group to recover at least a portion of the fuel price increases that occurred during that time frame.  Except in cases where the Automotive Group was able to obtain the customer's agreement, these contracts do not permit the recovery of increases in fuel taxes or labor costs.

The Automotive Group has developed and maintained long-term relationships with its significant customers and has historically been successful in negotiating the renewal of contracts with these customers.  According to the Debtors, current customer contracts include the following:

- a contract with DaimlerChrysler, which was renewed in December 2005, expires on September 30, 2007, and grants the Automotive Group primary carrier rights for 24 locations in the U.S. and 13 in Canada.  The contract may be terminated by location on 150 days notice by either party.  This contract, as renewed, provided for increases in underlying base rates which went into effect as of October 1, 2005 and again on October 1, 2006.  This renewed agreement has been approved by the Bankruptcy Court;

- a contract with General Motors which expires in December 2008 grants the Automotive Group primary carrier rights for 36 locations in the U.S. and Canada. This contract was renewed in December 2005 with a rate increase which went into effect January 1, 2006 and an increase which will go into effect on January 1, 2007. General Motors does not have the right to resource business at a location under the terms of the contract unless the Automotive Group fails to comply with service or quality standards at such location. Should an event of non-compliance occur, the Automotive Group has 30 days in which to cure. If the Automotive Group does not cure, General Motors may give 60 days notice of termination with respect to the applicable location. This renewed agreement has been approved by the Bankruptcy Court;

- an agreement in principle with Toyota regarding a contract which will expire on March 31, 2007. This agreement in principle provides that the contract may be terminated by either party by giving 60 days notice and provided for an increase in base rates which went into effect on February 1, 2006 at locations which generated approximately 68% of the revenues for 2005 associated with the Toyota account. In addition, during the first quarter of 2006, Allied ceased performing vehicle delivery services at locations that generated approximately 32% of the 2005 revenues associated with the Toyota account. This agreement in principle remains subject to the execution of a definitive agreement and approval of the agreement by the Bankruptcy Court;

- an agreement in principle with Ford Motor Company through Autogistics, which Allied understands to be the entity overseeing Ford's vehicle delivery network. This agreement in principle grants the Automotive Group primary carrier rights for 22 locations in the U.S. and Canada. The agreement in principle provides for Allied to retain all of its business in North America for Ford for a two-year term expiring December 31, 2007, required Allied to reduce its rates at one location served for Ford effective December 2005, and allows Allied to increase rates on all business served to Ford, effective January 1, 2007. The agreement in principle contemplates that each party to the contract will have the right to terminate the agreement by location on 75 days notice. This agreement in principle remains subject to the execution of a definitive agreement and approval of the agreement by the Bankruptcy Court; and

- a contract with American Honda Motor Company for vehicles delivered in the United States which extends the Automotive Group's current contract with Honda in the United States through March 31, 2009. Pursuant to the terms of the agreement which was renewed in March 2006, Allied will continue performing vehicle delivery services at all of the locations in the United States that it currently serves for Honda. The contract renewal included an increase in the underlying rates paid by Honda to Allied for vehicle delivery services which went into effect on April 1, 2006, and for increases which will go into effect on April 1, 2007 and on April 1, 2008. Honda's current fuel surcharge program with Allied will remain in place during the term of the agreement. The assumption of this agreement has been approved by the Bankruptcy Court.

Under written contracts, the Automotive Group has served Ford since 1934, DaimlerChrysler since 1979 and General Motors since 1997. The Plan Proponents anticipate that the Automotive Group will be able to continue these relationships with its customers without interruption of service but can provide no assurance that the Automotive Group will be able to successfully renew these contracts on terms satisfactory to us on or prior to their expiration dates or without a loss of market share or that the Automotive Group will be able to continue to serve these customers without service interruption.

## C.    Employees

As of February 1, 2007, the Debtors had approximately 5,500 active employees, of which approximately 3,300 are represented by TNATINC.

## D.    Competitive Factors Affecting the Debtors' Businesses

In 1997, after the Ryder Acquisition, the Automotive Group became the largest transporter of new vehicles in the U.S. and Canada. However, between 1997 and 2000, the Automotive Group lost market share primarily as a result of customers' decisions to remove certain business from its portfolio. Between 2001 and 2006, the Automotive Group lost market share primarily as a result of decisions to close certain unprofitable terminals, return certain unprofitable business to its customers and certain pricing actions. In addition, during 2002, Allied decided to terminate its services to substantially all Nissan customers located in the U.S.

The Automotive Group continues to be the largest motor carrier in North America specializing in the transportation of new automobiles, SUVs and light trucks via its specialized Rigs for all the major domestic and foreign automotive manufacturers. However, the Automotive Group was losing market share prior to and during these Chapter 11 Cases. The Automotive Group is attempting to reduce its market share losses on the basis of superior customer relationships and value propositions, by differentiating itself from its competitors on the basis of reliability through its experienced and reliable drivers, effective management, productive and service-driven operations, extensive and flexible distribution network, and management of risk, particularly with respect to cargo claims, worker injuries and traffic accidents. The Automotive Group also hopes to differentiate its service based on its extensive capacity, the flexibility of its distribution network and reliability of execution.

One of the Automotive Group's major competitors is Performance Transportation Services, Inc. ("PTS"), which is the parent company for E & L Transport Company, Hadley Auto Transport and Leaseway Auto Carrier. PTS is the second largest unionized automobile-hauling company in North America. PTS and each of these three subsidiaries filed a voluntary petition for protection under Chapter 11 of the U.S. Bankruptcy Code in January 2006. PTS emerged from Chapter 11 on January 26, 2007. **Yucaipa owns the majority of the equity interests in PTS and has appointed designees to the PTS board of directors**.

After the Effective Date, the Reorganized Debtors will consider selling, subject to the discretion of Yucaipa, all of their assets utilized in connection with their operations in Canada (the "Canadian Operations Sale"). If the Reorganized Debtors engage in a sale process with respect to the Canadian Operations Sale, it is contemplated that PTS would act as a stalking

horse bidder for such a sale.  In order for a Canadian Operations Sale to be effectuated, the value of the consideration received by the Reorganized Debtors must equal or exceed the imputed value of the Canadian operations, as derived from the implied EBITDA multiples used in the valuation of the Reorganized Debtors set forth in <u>Exhibit E</u> to the Disclosure Statement.  In the event the Debtors' Canadian Operations are sold, a significant portion of EBITDA may be lost. The board of directors of Reorganized Allied Holdings will evaluate the impact of such a sale on the ongoing operations of Reorganized Allied Holdings and any other relevant issues when deciding whether to pursue any such sale.

Allied Automotive Group's other primary competitors include:

- Jack Cooper Transport Co., Inc. ("Jack Cooper");

- Cassens Transport Company ("Cassens");

- Active Transportation ("Active");

- The Waggoners Trucking ("Waggoners");

- Fleet Car-lease, Inc. ("Fleet"); and

- United Road Services, Inc. ("United Road").

The Rig capacity represented by the non-union sector is substantial and a growing material challenge to the union companies.  The labor force of E & L Transport Company, Hadley Auto Transport, Leaseway Auto Carrier, Jack Cooper, Cassens and Active are unionized while those of Waggoners, Fleet and United Road are non-unionized.  TNATINC believes that Allied's unionized competitors have the same labor, wage and benefit costs as Allied.  These companies provide services similar to those that the Automotive Group provides and some, particularly those that are non-unionized, may be able to provide these services at lower prices or in a more flexible manner.

**E.    Regulatory Factors Affecting the Debtors' Businesses**

**1.    Trade Regulation**

Certain of Allied's subsidiaries domiciled in the U.S. are regulated by the U.S. Department of Transportation ("DOT") along with various state agencies.  Allied's Canadian subsidiary is regulated by the National Transportation Agency of Canada along with various provincial transport boards.  Regulations by these agencies include restrictions on truck and trailer length, height, width, maximum weight capacity and other specifications.

In addition, Allied's interstate motor carrier operations are subject to safety requirements prescribed by the DOT.  These regulations were amended effective January 1, 2004 to require shorter hours of service for drivers of commercial motor vehicles.  Because some of Allied's business consists of relatively short hauls, not all of Allied's drivers were affected by the new regulations.  Allied estimates that approximately 60% of its drivers were affected by the new

regulations, which served to decrease their flexibility and hours of service. The reduced flexibility and hours of service had no material impact on Allied's operating costs due to Allied's relatively short length of haul. Other regulations include safety regulations by the DOT in the design of Rigs as well as environmental laws and regulations enforced by federal, state, provincial, and local agencies.

### 2.    Environmental Regulation

Environmental laws and regulations affect the regulatory environment in which the Automotive Group's terminals operate. Areas regulated include the treatment, storage and disposal of waste, and the storage and handling of lubricants. To ensure compliance with environmental laws and regulations, the Automotive Group maintains regular ongoing testing programs for underground storage tanks located at its terminals.

Future regulatory and legislative changes within the motor carrier transportation industry can affect the economics of the automobile-hauling industry by requiring changes in operating policies or by influencing the demand for, and the cost of providing services to shippers. While the Plan Proponents believe Allied is in compliance, in all material respects, with the various regulations, any failure to so comply, as well as any changes in the regulation of the industry through legislative, judicial, administrative or other action, could materially and adversely affect Allied.

### F.    Pre-Petition Capital Structure of the Debtors

As of the Petition Date, the Debtors owed approximately $330 million in funded debt. This debt was comprised of approximately $180 million of obligations under the Debtors' prepetition senior secured credit facility (the "Prepetition Loan Facility") and $150 million of borrowings evidenced by unsecured notes (the "Prepetition Notes") issued pursuant to the terms of the Prepetition Notes Indenture.

### 1.    The Prepetition Loan Facility

The Prepetition Loan Facility was provided by a group of lenders (collectively, the "Prepetition Lenders") with Ableco Finance, LLC (operated by Cerberus Partners LP) as collateral agent ('Prepetition Collateral Agent") and Wells Fargo Foothill, Inc., formerly known as Foothill Capital Corporation, as administrative agent ("Prepetition Administrative Agent," and together with the Prepetition Collateral Agent, the "Prepetition Agents"). The Prepetition Loan Facility was comprised of the following two (2) facilities: (i) a revolving credit facility pursuant to which certain Prepetition Lenders committed to advance loans and provide letters of credit in an aggregate principal amount of up to $90 million (the "Prepetition Revolver"), and (ii) three (3) term loans (Terms A, B & C) pursuant to which certain Prepetition Lenders advanced loans in an aggregate principal amount of $145 million (individually, a "Prepetition Term Loan" and, collectively, the "Prepetition Term Loans"). The Prepetition Revolver provided for advances and for the issuance of letters of credit and the availability under the Prepetition Revolver was calculated by a borrowing base, which was comprised of a percentage of the net amount of eligible accounts receivable and a percentage of the orderly liquidation value of the Rigs, with reserves and contractual limits. The Prepetition Loan Facility was secured by substantially all of

the Debtors' assets, including accounts receivable, Rigs, real estate and a pledge of stock of certain subsidiaries (the "Prepetition Collateral"). Excluded from the Prepetition Collateral was restricted cash, cash equivalents and investments.

Immediately prior to the Petition Date, the outstanding advances and the face amount of the letters of credit issued by the Prepetition Lenders under the Prepetition Loan Facility totaled approximately $180 million. Outstanding advances under the Prepetition Revolver were about $24,000,000 and the face amount of the outstanding letters of credit issued by the Prepetition Lenders under the Prepetition Revolver totaled about $43,000,000, for a total of about $67,000,000. Also, as of the Petition Date, the principal amount outstanding under the Prepetition Term Loans totaled approximately $113,600,000.

Each of the interest rates for the Prepetition Revolver and the Prepetition Term Loans varied based on several different factors. For example, at management's discretion, the interest rate for the Prepetition Revolver could be set at the Prime Rate plus 1.5% or LIBOR plus 4.5%. As of March 31, 2005, the interest rate on the Prepetition Revolver was 7.25%. Also on that date, the interest rates for the Term A and Term B Prepetition Term Loans were 11.5% and 14.25%, respectively. As of May 14, 2005, the interest rate on the Term C Prepetition Term Loan was 14.50%.

### 2.      The Prepetition Notes

On September 30, 1997, Allied Holdings borrowed the principal amount of $150 million by issuing, through a private placement, the Prepetition Notes in that principal amount, bearing interest at 8 5/8%. The Prepetition Notes are the subject of a trust indenture (the "Indenture") and are now registered with the Securities and Exchange Commission. The net proceeds from the Prepetition Notes were used principally to fund the Ryder Acquisition. The Prepetition Notes are payable in semi-annual installments of interest only and mature on October 1, 2007. The obligations under the Prepetition Notes are general unsecured obligations of Allied Holdings and are guaranteed by all but three of Allied Holdings' direct and indirect subsidiaries. The three non-guarantor subsidiaries, Haul Insurance Limited, Areta SRL and Axis Logistica, are not Debtors. Wells Fargo National Bank Association, in its capacity as trustee for the Indenture, was appointed by the United States Trustee to be a member of the Creditors' Committee. Yucaipa, one of the Plan Proponents, owns approximately $98.8 million of the Prepetition Notes.

### G.      Insurance

### 1.      Auto Liability Actions and Related Insurance

The Debtors are parties in multiple personal injury actions that were brought against the Debtors on account of the alleged negligence of the drivers of the Debtors' vehicle carrier tractor-trailer units. In conducting their operations, the Debtors are required to maintain a certain amount of financial responsibility to cover any damages awarded against the Debtors on account of such actions.

2.      **The Debtors' Automobile Liability Insurance Program**

Federal Regulations promulgated by the Federal Motor Carrier Safety Administration (FMCSA) require that motor carriers provide the public with certain minimum amounts of financial responsibility. 49 CFR 387.1, et seq. The regulations provide three options for providing this financial responsibility -- through a surety bond, through an authorization to self insure, or through a policy of liability insurance containing a MCS-90 endorsement. 49 CFR 387.7.  The Debtors have elected to satisfy the requirement by purchasing coverage with an MCS-90 endorsement.  This endorsement is included in each of the Debtors' primary automobile liability policies and provides evidence of financial responsibility up to the FMCSA required limits of $750,000.

Under their insurance program for the period of March 1, 2003 through December 31, 2005, the Debtors maintained primary automobile liability insurance through the ACE Group of Companies ("ACE").  The Debtors' primary automobile liability program with ACE is complex and generally included several policies per year: a business automobile liability policy and one or more indemnity policies.

For the 2003 insurance year, the Debtors' automobile liability policy with ACE provided a $2 million limit of liability per accident and a $2 million deductible per accident.  For the 2004 insurance year, the Debtors' primary automobile liability policy provided a $1 million limit of liability per accident and a $1 million deductible per accident.  For the 2005 insurance year, the Debtors' primary automobile liability policy provided a $5 million limit of liability per accident and a $5 million deductible per accident.

ACE and the Debtors entered into contractual indemnity policies that functioned to buy-down the deductibles to a level of $1 million or less per accident in the U.S. with no annual aggregate limit, subject to reinsurance.  In addition, the Debtors are subject to an annual $7 million inner-aggregate deductible for claims that exceed $1 million, but are less than $5 million per occurrence.  The Debtors' potential liabilities for the deductibles are unfunded. Haul Insurance Limited (described below) reinsures the deductibles of $1 million or less per incident.

In Canada, the Debtors retain liability up to CDN $500,000 for each claim for personal injury and property damage and have a CDN $500,000 inner-aggregate deductible for losses from CDN $500,000 to CDN $1 million.  These retentions and deductibles were effective January 1, 2004 and remain in effect for the insurance year commencing January 1, 2005.

Prior to March 1, 2003, for automobile liability claims in the U.S., the Debtors maintained primary coverage thru Kemper Insurance Company and retained the first $500,000 of every claim with no aggregate deductible and retained their losses from $500,000 to $1 million subject to a $1.5 million inner-aggregate deductible.  The Debtors also had a $1 million inner-aggregate deductible for losses from $1 million to $2 million, with an additional $4 million aggregate deductible for losses from $2 million to $5 million.

Under self-funded deductibles described above, in personal injury actions brought against the Debtors or their drivers, the Debtors are liable for the first $500,000 or $1 million of defense costs and judgments rendered against the Debtors before insurance would provide any coverage.

The Debtors may have liability exposure above the first $500,000 or $1 million until such time as they exhaust the applicable inner-aggregate deductible.

The Debtors posted irrevocable letters of credit in the sum of approximately $3.5 million for the benefit of ACE and Kemper as security for their potential obligations under the automobile liability insurance policies. The Debtors maintain approximately $90 million in restricted cash that serves to collateralize these letters of credit.

Automobile liability claims in excess of the Debtors' primary automobile liability policy limits are covered by excess insurance to the extent of such coverage.

### 3.    Haul Insurance Limited

Haul Insurance Limited ("Haul"), a wholly owned captive insurance subsidiary of Allied Holdings, provides reinsurance coverage to certain of the Debtors' licensed insurance carriers for certain types of losses within their insurance program, primarily insured workers' compensation, automobile and general liability risks. Haul's only business is reinsurance of Allied. Specifically, Haul has contractual obligations with the Debtors' insurance companies in which Haul agrees to indemnify the insurance companies for a share of the insurance claims paid by the insurance companies for the specified set of policies.

Haul posted irrevocable letters of credit in the sum of approximately $62.7 million for the benefit of the Debtors' various insurance companies as security for its potential reinsurance obligations. The letters of credit posted by Haul, as well as restricted cash held by Haul, serve to collateralize the Debtors' self-insured obligations under their workers compensation program as well as their retained liabilities under their general commercial liability and automobile liability programs.

In the Debtors' automobile liability insurance programs, the deductibles in the Debtors' insurance policies (described above) are modified by contractual indemnity policies issued by the insurance companies whereby the Debtors essentially buy-down their deductibles. The first $500,000 or $1 million of the indemnified sums are reinsured by Haul. The Debtors' insurance companies have recourse against the letters of credit and the cash collateral held by Haul to support the reinsured obligations. Haul is not eligible to be a debtor in the Bankruptcy Cases under Section 109 of the Bankruptcy Code.

### 4.    Insurance Generally

Notwithstanding anything to the contrary in the Plan, nothing in the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to or have the effect of impairing the legal, equitable or contractual rights of any of (i) the Debtors' insurers, or (ii) any of the Holders of any Claims with respect to such Holders' rights, if any, to recover under applicable insurance policies providing coverage for such Claims (including, without limitation, any amounts recoverable within any policy deductible and provided that any recovery under any insurance policy is not in duplication of any Distribution such Holder may receive under this Plan). The rights, obligations and liabilities of insurers and the Debtors shall be determined under the subject insurance policies and related agreements. All insurance policies and related agreements entered into or issued prior to the

Effective Date shall continue after the Effective Date unaltered by the Plan or the Confirmation Order. The terms, conditions, limitations, exclusions and coverages, and the Debtors' rights, obligations and liabilities under their insurance policies and related agreements shall remain unmodified, including any duty of the Debtors to defend, at their own expense, against claims asserted under their insurance policies; provided, however, that the rights, obligations and liabilities of the Debtors, whether now existing or hereafter arising, shall be the rights, obligations and liabilities of the Reorganized Debtors and shall be fully enforceable by and against the Reorganized Debtors.

Nothing in the Plan, including the injunction and release provisions of Sections 11.4 and 11.6 of the Plan, or in the Confirmation Order shall preclude the Debtors or any insurer from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any insurance policy or any insurance settlement agreement, including the rights of the insurers to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable insurance policy.

## ARTICLE III.
## THE CHAPTER 11 CASES

### A.    Events Leading to the Filing of the Chapter 11 Cases

The factors that contributed to the Debtors' need for bankruptcy relief fell into three broad categories: (a) decreasing revenues, (b) increasing expenses, and (c) the consequent difficulty of servicing debt and maintaining adequate liquidity. Some of the specific factors were:

(a)    significant reduction in original equipment manufacture ("OEM") production by automobile manufacturers in North America over the three-year period prior to the Petition Date, particularly at the Big Three;

(b)    escalating labor costs for both United States and Canadian employees;

(c)    substantial debt burden and debt-service expense;

(d)    continued excess Rig capacity in the automotive delivery market, leading to increased pricing competition;

(e)    increases in diesel fuel costs not fully offset by the Allied's fuel surcharge programs;

(f)    the inability to maintain compliance with covenants in the Prepetition Loan Facility;

(g)    the inability to achieve the liquidity required by Allied;

(h)    significant recurring capital expenditures and maintenance costs associated with the fleet of Rigs; and

28

(i)      an increase in collateral required to support workers' compensation claims.

As a result of decreasing revenue and increasing expenses, the Debtors suffered net losses in the years just prior to the filing of the Chapter 11 Cases.  For example, in the year ending December 31, 2003, the Debtors suffered a net loss of approximately $8.6 million.  In the year ending December 31, 2004, the Debtors' net loss increased to approximately $53.9 million.

## 1.      Decreasing Revenues

The automobile transportation industry in which the Debtors operate is dependant upon the volume of new automobiles, SUVs and light trucks manufactured in North America and those manufactured outside of North America but sold in North America.  The automotive industry is highly cyclical, and the demand for new automobiles, SUVs and light trucks is directly affected by such external factors as general economic conditions, unemployment, consumer confidence, governmental policy and the availability of affordable new car financing.  When these and other factors cause a significant decline in OEM production, distribution or sales in North America, they have a material adverse effect on the Debtors' revenues.

Since 2002, there has been significant reduction in OEM production levels in North America.  In 2002, the aggregate industry OEM production in North America was approximately 16.4 million units.  In 2003, OEM production in North America decreased to 15.8 million units (a 6.5% decrease from 2002).  In 2004, while OEM production in North America remained static at approximately 15.8 million units, North American OEM production by the Big Three (which account for 73% of Allied's revenues from delivery services) decreased by approximately 400,000 units from the prior year (from 11.6 million units in 2003 to 11.2 million units in 2004, a decrease of approximately 3.5%).

The continuing decrease in North American OEM production since 2002 (and, particularly, the significant decrease in North American OEM production by the Big Three) had a material adverse effect on the Debtors' revenues.  In the fiscal year ending December 31, 2002, the Debtors' revenues were approximately $898.06 million.   In 2003, revenues fell to approximately $865.46 million (a decrease of approximately $32.6 million).  In 2004, while the Debtors' revenues increased to approximately $895.2 million, they still fell short of the 2002 figures.  In addition, approximately $19 million of the Debtors' 2004 revenues were attributable to amounts paid by customers to the Debtors to offset, at least partially, the rising cost of diesel fuel during 2004.

Excess Rig capacity in the vehicle haulaway market is another factor which caused a significant reduction in the Debtors' revenues.  There had been (and continues to be) an increase in competition by independent owner-operators, railroads and other rival companies in the short-haul segment of the automotive industry.  In addition, an increase in the number and volume of business carried by non-union motor carriers has caused additional pricing competition.  This has occurred during a period of time when the Debtors' customers, particularly the Big Three, are seeking vendor cost reduction.  The resulting lower prices for automotive transport, together with increasing financial pressures at the Big Three and the reduction in units available for transport, because of lower OEM production, had a significant negative impact on the Debtors' revenues.

### 2. Increasing Expenses

While there were multiple areas where the Debtors' expenses had been rising, increases in fuel expenses, labor expenses, maintenance and repair expenses, debt service expenses, insurance expenses and the need for ongoing significant increases for capital expenses had the most significant negative impact.

It is common knowledge that fuel prices have increased significantly in the past few years. Since fuel is a major expense in the transportation of automotive vehicles, the increasing cost of fuel had a material adverse affect upon the Debtors. The Debtors sought to reduce fuel expenses by negotiating fuel surcharges with all of its customers. Certain of these fuel surcharges typically are adjusted at the beginning of each quarter based upon the fuel prices from the previous quarter. Thus, as to such surcharges, there is a one-quarter lag between the time fuel prices change and the time that the fuel surcharge is adjusted. This lag-time, coupled with fuel prices that continued to increase and fuel surcharges with certain customers that did not fully mitigate increases in fuel prices, caused the Debtors' expenses to materially increase.

The Debtors' expenses also significantly increased as a result of escalating labor costs in the United States and Canada. These continually increasing costs, at a time when the Debtors' gross revenues tied to OEM production levels were not improving, put an enormous amount of financial pressure on the Debtors, exposing them to significant risk of losing market share as agreements with customers were to be renewed and attempts to increase pricing in the current customer and competitive environment.

In addition, the servicing of the Debtors' funded debt of approximately $330 million required the dedication of a significant portion of the Debtors' revenues. The servicing of this funded debt had become more costly for the Debtors. For example, for the year ending December 31, 2003, the Debtors' interest expense was approximately $29,138,000. In 2004, the Debtors' interest expense increased by more than $2 million to approximately $31,355,000.

In addition, the Debtors experienced significant recurring capital expenditures, which were expected to materially increase. In 2004, the Debtors spent approximately $18.7 million for the purchase and remanufacture of Rigs and the purchase of replacement engines for the Rigs.

### B. Corporate Governance of the Debtors During the Chapter 11 Cases

### 1. Boards of Directors

Allied Holdings' Bylaws provide for the division of its Board of Directors into three classes, each class serving for a period of three years. Members of the three classes are as follows: (i) Guy W. Rutland, III, Robert R. Woodson and J. Leland Strange; (ii) Guy W. Rutland, IV, Berner F. Wilson, Jr. and Thomas E. Boland; and (iii) David G. Bannister, Robert J. Rutland, William P. Benton and Hugh E. Sawyer. The following table sets forth the most recent information concerning Allied Holdings' directors:

| Name | Expiration of Term |
|---|---|
| David G. Bannister | 2006 annual shareholder meeting[4] |
| William P. Benton | 2006 annual shareholder meeting |
| Thomas E. Boland | 2007 annual shareholder meeting |
| Guy W. Rutland, III | 2008 annual shareholder meeting |
| Guy W. Rutland, IV | 2007 annual shareholder meeting |
| Robert J. Rutland | 2006 annual shareholder meeting |
| Hugh E. Sawyer | 2006 annual shareholder meeting |
| J. Leland Strange | 2008 annual shareholder meeting |
| Berner F. Wilson, Jr. | 2007 annual shareholder meeting |
| Robert R. Woodson | 2008 annual shareholder meeting |

**David G. Bannister** became a director of Allied Holdings in 1993. Mr. Bannister is Senior Vice President of Strategy and Development of FTI Consulting, Inc. and has held that position since June 2005. From 1998 to 2003, Mr. Bannister was a General Partner of Grotech Capital Group, a private equity and venture capital firm. Prior to joining Grotech Capital Group in May 1998, Mr. Bannister was a Managing Director at Deutsche Bank Alex Brown Incorporated. Mr. Bannister also serves on the Board of Directors of Landstar Systems, Inc.

**William P. Benton** became a director of Allied Holdings in February 1998. Mr. Benton retired from Ford Motor Company as its Vice President of Marketing worldwide after a 37-year career with that company. During this time Mr. Benton held the following major positions: VP/General Manager of Lincoln/ Mercury Division; VP/ General Manager Ford Division; 4 years in Europe as Group VP Ford of Europe; and a member of the company's Product Planning Committee, responsible for all products of the company worldwide. Most recently Mr. Benton was vice chairman of Wells Rich Greene, an advertising agency in New York, from September 1986 to January 1997, and Executive Director of Ogilvy & Mather Worldwide, an advertising agency in New York from January 1997 to January 2002. Mr. Benton has been a director of Speedway Motor Sports, Inc. since February 1995, and a director of Sonic Automotive, Inc. since December 1997.

**Thomas E. Boland** retired as Chairman of the Board of Wachovia Corporation of Georgia and Wachovia Bank of Georgia, N.A., in April, 1994. Mr. Boland joined Wachovia (formerly The First National Bank of Atlanta) in 1954 and was a senior executive in various capacities until his retirement. Mr. Boland has been Special Counsel to the President of Mercer University of Macon and Atlanta since October 1995. Mr. Boland currently serves on the boards of directors of Citizens Bancshares, Inc. and its subsidiary Citizens Trust Bank in Atlanta and Neighbors Bancshares, Inc. and its subsidiary Neighbors Bank, Alpharetta, Georgia. Mr. Boland is past chairman of the board of directors of Minbanc Capital Corporation of Washington, D.C. and formerly served on the boards of directors of InfiCorp Holdings, Inc., of Atlanta, and VISA International and VISA U.S.A. of San Mateo, California.

---

[4] The 2006 shareholder meeting is scheduled to occur on May 17, 2007.

**Guy W. Rutland, III** was elected Chairman Emeritus in December 1995 and served as Chairman of the Board of Allied Holdings from 1986 to December 1995. Prior to October 1993, Mr. Rutland was Chairman or Vice Chairman of each of Allied Holdings' subsidiaries.

**Guy W. Rutland, IV** has been Senior Vice President of Performance Management and Chaplaincy of Allied Holdings since July 2001, and was Executive Vice President and Chief Operating Officer of Allied Automotive Group, Inc. from February 2001 to July 2001. Mr. Rutland was Senior Vice President — Operations of AAG. from November 1997 to February 2001. Mr. Rutland was Vice President — Reengineering Core Team of AAG, from November 1996 to November 1997. From January 1996 to November 1996, Mr. Rutland was Assistant Vice President of the Central and Southeast Region of Operations for Allied Systems, Ltd. From March 1995 to January 1996, Mr. Rutland was Assistant Vice President of the Central Division of Operations for Allied Systems, Ltd. From June 1994 to March 1995, Mr. Rutland was Assistant Vice President of the Eastern Division of Operations for Allied Systems, Ltd. From 1993 to June 1994, Mr. Rutland was assigned to special projects with an assignment in Industrial Relations/ Labor Department and from 1988 to 1993, Mr. Rutland was Director of Performance Management for Allied Systems, Ltd.

**Robert J. Rutland** has been Chairman of the Board of Directors of Allied Holdings since 1995, and served as Chairman and Chief Executive Officer of Allied Holdings from February 2001 to June 2001 and from December 1995 to December 1999. Mr. Rutland was the President and Chief Executive Officer of Allied Holdings from 1986 to December 1995. Prior to October 1993, Mr. Rutland was Chief Executive Officer of each of Allied Holdings' subsidiaries. Mr. Rutland is a member of the board of directors of Fidelity National Bank, a national banking association.

**Hugh E. Sawyer** has been President and Chief Executive Officer of Allied Holdings since June 2001. Mr. Sawyer served as President and Chief Executive Officer of Aegis Communications Group, Inc. from April 2000 to June 2001. Mr. Sawyer served as President of AAG from January 2000 to April 2000. Mr. Sawyer was President and Chief Executive Officer of National Linen Service, a subsidiary of National Service Industries, Inc., from 1996 to 2000, President of The Cunningham Group from 1995 to 1996 and President of Wells Fargo Armored Service Corp., a subsidiary of Borg-Warner Corp., from 1988 to 1995. Mr. Sawyer previously served as a member of the board of directors of Spiegel, Inc.

**J. Leland Strange** is Chairman of the board of directors, Chief Executive Officer and President of Intelligent Systems Corporation and has been with that company since its merger with Quadram Corporation in 1982. Mr. Strange is Chairman of the Georgia Tech Research Corp. He serves on the advisory board of the Georgia Institute of Technology's College of Management.

**Berner F. Wilson, Jr.** retired as Vice President and Vice-Chairman of Allied Holdings in June 1999. Mr. Wilson was Secretary of Allied Holdings from December 1995 to June 1998. Prior to October 1993, Mr. Wilson was an officer or Vice Chairman of several of Allied Holdings' subsidiaries. Mr. Wilson joined Allied in 1974 and held various finance, administration, and operations positions prior to his retirement in 1999. Mr. Wilson currently serves on the board of directors of Mountain Heritage Bank in Clayton, Georgia.

**Robert R. Woodson** retired as a member of the board of directors of John H. Harland Company in April 1999 and served as its Chairman from October 1995 to April 1997. Mr. Woodson was also the President and Chief Executive Officer of John H. Harland Company prior to October 1995. Mr. Woodson also served as a director of Haverty Furniture Companies, Inc. through May 2002.

In late 2006, a shareholder who is also a member of the Ad Hoc Equity Committee requested that Allied Holdings schedule an annual shareholders meeting for the purpose of electing directors. In January 2007, Allied Holdings scheduled such a meeting to take place on May 17, 2007. In deciding upon that date, Allied Holdings determined that it could not hold the meeting any sooner due to an SEC regulation that requires Allied Holdings to disseminate audited financial statements for the year 2006 at least 20 days prior to such a meeting. Allied Holdings estimated that the audited statements will not be available until late April 2007. The Ad Hoc Equity Committee believes that the meeting should be held sooner and has requested that the Court require an earlier meeting. The Court has taken this issue under advisement. Allied Holdings reserves the right to cancel or postpone the May 17, 2007 meeting.

## 2. Senior Management

The following table sets forth certain information regarding Allied Holdings' executive officers:

| Name | Age | Title |
|------|-----|-------|
| Robert J. Rutland .......................................... | 64 | Chairman and Director |
| Hugh E. Sawyer ........................................... | 52 | President, Chief Executive Officer, and Director |
| Guy W. Rutland, IV ..................................... | 42 | Senior Vice President and Director |
| Thomas M. Duffy........................................ | 46 | Executive Vice President, General Counsel and Secretary |
| Thomas H. King........................................... | 51 | Executive Vice President and Chief Financial Officer |

The biographies of Robert J. Rutland, Hugh E. Sawyer and Guy W. Rutland, IV are provided above. The biographies of Thomas M. Duffy and Thomas H. King are provided below.

Mr. Duffy has been Executive Vice President, General Counsel and Secretary of Allied Holdings since February 2004, was Senior Vice President, General Counsel and Secretary between November 2000 and February 2004, and was Vice President, General Counsel and Secretary from June 1998 to November 2000. Between May 1997 and June 1998, Mr. Duffy was a partner with the law firm of Troutman Sanders LLP. Prior to May 1997, Mr. Duffy was a partner with the law firm of Peterson Dillard Young Asselin & Powell LLP.

Mr. King was appointed Executive Vice President and Chief Financial Officer of Allied Holdings on January 25, 2005, prior to which he served Allied as a full-time accounting consultant. Prior to August 2004 when he joined Allied as a full-time accounting consultant, Mr. King was with Tatum Partners, a consulting group, which he joined in 2000 that provides clients with a full range of chief financial officer services. While at Tatum Partners, Mr. King served as

interim CFO and financial vice-president for a number of public and private companies. Prior to joining Tatum Partners, Mr. King served as Chief Financial Officer of John Galt Holdings, Ltd. & Affiliates. Mr. King is a certified public accountant and has worked at the accounting firms of Deloitte and Touche LLP and PricewaterhouseCoopers.

## C.   Significant Developments in the Chapter 11 Cases

### 1.   "First Day" Orders and Retention of Professionals

On the Petition Date, the Debtors filed "first day" motions and applications with the Bankruptcy Court seeking relief to aid in the efficient administration of the Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in-possession status. These motions and applications were granted at the "first day" hearing held on August 1, 2005.

The Debtors' motion for interim approval[5] to enter into the DIP Loan Facility was among those motions granted. As described below, the DIP Loan Facility provided the Debtors sufficient financing to continue their business operations and pay off the balance of the Prepetition Loan Facility in full.

Also at the first-day hearing, the Debtors' received Bankruptcy Court permission to retain a panel of professionals to assist the Debtors in their reorganizations. Pursuant to the Bankruptcy Court's first-day orders and subsequent retention orders, the following professionals were retained: Troutman Sanders LLP, as counsel to the Debtors; Miller Buckfire & Co., LLC, as the Debtors' financial advisor and investment banker; JP Morgan Trust Company, National Association, as claims, noticing and balloting/voting agent for the Chapter 11 Cases; Mercer Human Resource Consulting, Inc., as the Debtors' human resources consultants; Kekst and Company, Incorporated, as the Debtors' corporate communications consultants; Ogletree, Deakins, Nash, Smoak & Stewart P.C., as the Debtors' special labor law counsel; Lamberth, Cifelli, Stokes & Stout, PA, as the Debtors' conflicts counsel; and Hays Financial Consulting, LLC, as the Debtors' administrative compliance consultants. Subsequently, the Bankruptcy Court entered orders approving the retention of KPMG LLP as the Debtors' auditors and accounting advisors, Deloitte Tax LLP as the Debtors' tax services provider, and Gowling LaFleur Henderson LLP as the Debtors' Canadian counsel.

Finally, the Debtors sought and obtained several first-day orders from the Bankruptcy Court intended to enable the Debtors to operate in the normal course of business during the Chapter 11 process. Among other things, these orders authorized the Debtors to:

- procedurally consolidate and jointly administer their Chapter 11 cases;

- operate their consolidated cash management system during the Chapter 11 cases in substantially the same manner as it was operated prior to the commencement of the Chapter 11 cases;

- pay certain prepetition employee salaries, wages, and benefits;

---

[5] The Bankruptcy Court entered a final order approving the DIP Loan Facility on August 24, 2006.

- reimburse employees' prepetition business expenses;

- pay prepetition sales, payroll, and use taxes owed by the Debtors;

- pay prepetition obligations to customers and certain customs brokers, common carriers and warehousemen;

- maintain and pay obligations with respect to insurance programs, including obligations arising from the financing of insurance premiums;

- pay prepetition claims of certain critical vendors and service providers; and

- pay post-petition utility service invoices.

### 2.     Appointment of the Official Committee of Unsecured Creditors

On August 5, 2005, the United States Trustee appointed the Creditors' Committee pursuant to Section 1102(a) of the Bankruptcy Code. The members of the Creditors' Committee that were appointed were: Wells Fargo Bank National Association, as Indenture Trustee, International Brotherhood of Teamsters, Cummins South, Inc., Exotic Auto Transport, LLC, D. E. Shaw Laminar Portfolios, LLC, Eton Park Capital Management, L.P. as representative and Manager of Eton Park Funds and Stanfield Capital Partners, LLC. Stanfield Capital Partners, LLC and Eton Park Capital Management, L.P. each subsequently resigned from the Creditors' Committee. By orders entered on September 2, 2005, the Creditors' Committee was authorized to retain Bingham McCutchen LLP as counsel to the Creditors' Committee, Nelson Mullins Riley & Scarborough, LLP as co-counsel to the Creditors' Committee, Chanin Capital Partners LLC as financial advisors to the Creditors' Committee and Fasken Martineau Dumoulin LLP as Canadian counsel for the Creditors' Committee. Fasken Martineau Dumoulin LLP was subsequently replaced by Lang Michener LLP as counsel for the Creditors' Committee.

### 3.     Debtor-In-Possession Financing

As part of the "first day" hearing in the Chapter 11 Case the Debtors sought authorization to enter into the DIP Loan Facility which would provide financing of $230 million consisting of a revolving loan for up to $130 million which included a $75 million subfacility for letters of credit (the "DIP Revolving Loan"), a $20 million term loan ("DIP Term Loan A") and an $80 million term loan ("DIP Term Loan B"). On August 1, 2005, the Bankruptcy Court entered an order (the "Interim DIP Order") that authorized the Debtors to enter into the DIP Loan Facility on an interim basis and authorized the Debtors to utilize approximately $18,845,135 to payoff, in full, all amounts owed to the Prepetition Lenders under the Prepetition Loan Facility. On August 24, 2005, the Bankruptcy Court entered a final order approving the DIP Loan Facility. At the time of the approval of the DIP Loan Facility, the lenders under the DIP Loan Facility were General Electric Capital Corporation ("GE Capital"), Morgan Stanley Senior Funding, Inc. ("Morgan Stanley"), Marathon Structured Finance Fund, L.P. ("Marathon") and other lenders.

Pursuant to the Interim DIP Order, borrowings under the DIP Loan Facility were used to refinance in full the Prepetition Lender Claims. Upon satisfaction of all obligations of the Debtors under the Prepetition Loan Facility, the Prepetition Lenders released all the liens in their

favor which attached to any property of the Debtors. The DIP Loan Facility was originally secured by first priority liens on substantially all of the Debtors' assets subject to a carve-out of $1.5 million for payment of professional expenses. The DIP Loan Facility contained financial covenants requiring the Debtors to maintain minimum levels of earnings before certain corporate items, interest, taxes, depreciation, and amortization ("Operating EBITDA"), as defined.

Paragraph 19(b) of the Final DIP Order provided that, without further order of the Bankruptcy Court, the Debtors, the DIP Lenders and the DIP Facility Lenders (as defined in the Final DIP Order) could agree to modify or amend the DIP Loan Facility to shorten the maturity of the extensions of credit thereunder, or decrease the rate of interest or the letter of credit fees payable thereunder, provided, however, that notice of any material modification or amendment to the DIP Loan Facility was to be provided to the Creditors' Committee and the U.S. Trustee, each of which was to have five (5) days from the date of such notice within which to object in writing. Further, in the event that any such objection was timely filed, the modification or amendment to the DIP Loan Facility would only be permitted pursuant to order of the Bankruptcy Court.

Pursuant to the authority set forth in Paragraph 19(b) of the Final DIP Order, the Debtors amended the DIP Loan Facility as follows: (i) on August 30, 2005, the Debtors filed a Notice of the First Amendment to the DIP Loan Facility (the "First Amendment"), and no objection was received; (ii) on November 1, 2005, the Debtors filed a Notice of Second Amendment to the DIP Loan Facility (the "Second Amendment"), and no objection was received; (iii) on November 21, 2005, the Debtors filed a notice of Third Amendment to the DIP Loan Facility (the "Third Amendment"), and no objection was received; (iv) on April 19, 2006, the Debtors filed a notice of Fourth Amendment to the DIP Loan Facility (the "Fourth Amendment", together with the First Amendment, the Second Amendment and the Third Amendment, the "Other Amendments"). The Creditors' Committee filed an objection to the Fourth Amendment. A hearing on such objection was held on May 15, 2006. On May 19, 2006, the Bankruptcy Court entered an order approving the Fourth Amendment.

After the approval of the Fourth Amendment, the Debtors continued to have additional financing needs with respect to their respective business operations. Accordingly, on June 16, 2006, the Debtors filed a motion for authority to enter into a Fifth Amendment to the DIP Loan Facility (the "Fifth Amendment") which would provide an additional funds for the Debtors' business operations through a $30 million term loan ("DIP Term Loan C") to be provided by Morgan Stanley in whole or in part if Morgan Stanley were to arrange for other participating lenders. On June 30, 2006, the Bankruptcy Court entered an interim order approving the Fifth Amendment. On July 13, 2006, the Bankruptcy Court entered a final order approving the Fifth Amendment which provided the Debtors with an additional $30 million in financing. Finally, on January 10, 2007, the Debtors filed their motion seeking approval of a sixth amendment to the DIP Loan Facility (the "Sixth Amendment") which extends the maturity date of the revolving loan portion of the DIP Loan Facility from February 7, 2007 to March 30, 2007. The remaining portions of the DIP Loan Facility will mature on June 30, 2007. Pursuant to the foregoing amendments, the Debtors cannot prepay such remaining portions of the DIP Loan Facility without incurring a fee of one-percent of the outstanding balance. On January 26, 2007, the Bankruptcy Court entered an order approving the Sixth Amendment. It is anticipated that

maturity date of the revolving loan portion of the DIP Loan Facility will be extended or the DIP Loan Facility will be timely refinanced.

On March 16, 2007, the Debtors executed a commitment letter (the "Commitment Letter") with Goldman Sachs Credit Partners L.P. ("Goldman") whereby Goldman agreed to refinance the DIP Loan Facility and provide the Debtors with an option to convert the debtor-in-possession financing into exit financing (the "Replacement Facilities"). Pursuant to the Commitment Letter, the Replacement Facilities consist of a $230 million senior secured term loan facility (the "Term Facility"), a $50 million senior secured synthetic letter of credit facility (the "Synthetic L/C Facility"), and a $35 million senior secured revolving credit facility (the "Revolving Facility"). In general, the Replacement Facilities will be used to (a) refinance the existing DIP Loan Facility, (b) pay administrative and other related claims, (c) pay fees and expenses associated with the financing and the Debtors' exit from bankruptcy and (d) provide for working capital and other general corporate purposes. At a hearing on March 26, 2007, the Bankruptcy Court entered an interim order approving the Replacement Facilities. A final hearing regarding the Replacement Facilities will be held on April 11, 2007.

### 4.    Equipment Purchase Agreement and Equipment Financing Facility

On April 4, 2007, the Bankruptcy Court entered an interim order authorizing Allied Systems to enter into the Equipment Purchase Agreement and the Equipment Financing Facility. The Bankruptcy Court has scheduled a hearing to consider final approval of the Equipment Financing Facility on April 23, 2007. Under the Equipment Purchase Agreement, it is anticipated that Allied Systems will purchase from Yucaipa Transport approximately 150 used rigs that Yucaipa Transport anticipates purchasing at one or more auctions with assistance from Allied. Allied Systems will pay for such equipment purchases and finance related taxes, fees and expenses through the issuance to Yucaipa Transport of secured promissory notes pursuant to the Equipment Financing Facility.

Yucaipa Transport is not obligated to purchase any equipment at any auction or to sell it to Allied Systems, but if Yucaipa Transport elects to sell any equipment to Allied Systems, then Allied Systems will be obligated to purchase such equipment. The equipment will be sold to Allied Systems on an "AS IS" and "WHERE IS" basis without representations or warranties and Allied Holdings and Allied Systems will be responsible for, and provide indemnities with respect to, any liabilities relating to the equipment or its use. Allied Systems will be responsible for the titling, registration and licensing of the equipment and any related taxes or fees. Allied Systems will also perform the initial repair and retrofit of such equipment. Such taxes and fees and the labor costs and out-of-pocket expenses incurred in connection with the initial repair and retrofit of such equipment may be financed through the issuance of additional secured promissory notes under the Equipment Financing Facility, provided that the maximum amount of such financed labor costs and out-of-pocket expenses may not exceed $30,000 per item or $450,000 for all equipment in the aggregate, without the approval of Yucaipa Transport.

The Equipment Financing Facility will provide a commitment for debtor in possession financing comprised of one or more secured promissory notes, in an aggregate principal amount not to exceed $15 million, with interest on the drawn amounts to bear interest at a rate equal to three-month LIBOR plus 4%, with all accrued interest to be added to principal on the first day of

each calendar quarter (on a pro rata basis if the Effective Date occurs before the end of a calendar quarter) and thereafter accrue interest at the same rate as the principal amount.

Pursuant to the Equipment Financing Facility, Yucaipa Transport will have a first priority lien on the equipment purchased with the proceeds of the Equipment Financing Facility and will be treated as an superpriority Administrative Expense Claim to the extent that the value of the collateral is less than the amount owing under the Equipment Financing Facility. The Equipment Financing Facility will contain a number of covenants regarding, among other things, the maintenance of insurance with respect to the purchased equipment, Allied Systems' risk of loss with respect to the equipment, restrictions on transfers and the incurrence of liens on collateral and maintenance of Yucaipa Transport's lien on the collateral.

Certain events will constitute a default under the Equipment Financing Facility. Such events of default include, among others, (i) breaches of representations and warranties or covenants in the Equipment Financing Facility or the Equipment Purchase Agreement, (ii) a default under any indebtedness in a principal amount of $7,500,000 or more, (iii) the conversion of the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code, (iv) judgment or attachment liens in excess of $7,500,000, (v) the failure to obtain final approval of the Equipment Financing Facility by the Bankruptcy Court on or before a specified date, (vi) certain change of control transactions involving Debtors and (vi) the approval of any plan of reorganization other than the Plan. Upon an event of default, Yucaipa Transport will have a number of remedies, including, among others, the right to accelerate the obligations under the Equipment Financing Facility and the right to sell the collateral to satisfy the obligations under the Equipment Financing Facility.

In the event that an event of default has occurred or a plan of reorganization other than the Plan is filed and the treatment of Yucaipa Transport in the plan is not approved by Yucaipa Transport, then Yucaipa Transport will have the right to repurchase all or a portion (at its election) of the equipment for a purchase price equal to the purchase price Allied Systems paid for such equipment pursuant to the Equipment Purchase Agreement, plus the amount financed for the initial repair and retrofit costs of such equipment. The purchase price for any equipment repurchased by Yucaipa Transport will be paid to Allied Systems by the delivery for cancellation of promissory notes (or portions thereof) issued under the Equipment Financing Facility.

Upon the Effective Date, the principal and interest due and owing under the Equipment Financing Facility (including, without limitation, any interest which has been added to principal pursuant to the Equipment Financing Facility) and all other obligations owing under the Equipment Financing Facility shall be converted to New Allied Holdings Common Stock, at the option of the either the Debtors or Yucaipa Transport, in each case in its sole and absolute discretion, which option must be exercised by giving the Debtors or Yucaipa Transport, as applicable, written notice on the earlier of (a) within ten (10) days after the entry by the Bankruptcy Court of the Confirmation Order and (b) by May 31, 2007, if the entry by the Bankruptcy Court of the Confirmation Order occurs between May 22 and May 31, 2007. If the conversion right is exercised, then the obligations under the Equipment Financing Facility shall be exchanged into a percentage of the New Allied Holdings Common Stock after giving effect to consummation of the Plan, with the percentage of shares to be issued to Yucaipa Transport to be calculated as follows: 100 percent multiplied by a fraction, (i) the numerator of which equals the

total amount of the obligations under the Equipment Financing Facility as of the Effective Date and (ii) the denominator of which equals (a) Two Hundred Eighty-Five Million Dollars ($285,000,000) minus (b) the principal amount of all net debt of the Reorganized Debtors (other than the Equipment Financing Facility) net of cash on hand outstanding on the Effective Date after giving effect to consummation of the Plan.

Eligible Participants (as defined below) have the right to acquire a participation in the Equipment Financing Facility under the terms, and subject to the conditions, set forth in a loan participation agreement (the "Participation Agreement") with Yucaipa Transport. A copy of the Participation Agreement may be obtained by written request to Colleen Rico, Latham & Watkins LLP, 633 West Fifth Street, Suite 4000, Los Angeles, California 90071 (Facsimile No. (213) 891-8763) or by e-mail at colleen.rico@lw.com.

As used herein, an "Eligible Participant" means a creditor of one or more of the Debtors who (A) is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended, (B) has an Allowed Class 4A Claim in a fixed and liquidated amount (an "Eligible Claim") that satisfies each of the following requirements: (i) such claim is the subject of a timely filed proof of claim in these chapter 11 cases or is listed on the Schedules of Assets and Liabilities of one or more of the Debtors as filed in these Chapter 11 Cases (collectively, the "Schedules"), (ii) such claim does not purport to be secured or entitled to any administrative or priority treatment and is not scheduled in the Schedules as a secured or priority claim, (iii) such claim has not been objected to, is otherwise not Disputed and is not scheduled in the Schedules as contingent, unliquidated or disputed, (iv) such claim is in an amount of not less than $500,000 and (C) held its Eligible Claim as of March 30, 2007 (an Eligible Claim is not assignable or otherwise transferable without prior written consent of Yucaipa Transport, which consent may be provided or withheld in Yucaipa Transport's sole discretion). Yucaipa Transport, following consultation with the Creditors' Committee, shall determine in its sole and absolute discretion whether a creditor is an Eligible Participant, including, without limitation, whether such creditor holds an Eligible Claim. Any decision by Yucaipa Transport shall, absent a showing of bad faith, be absolute and shall not be subject to appeal or challenge in any court including this Court.

Each Eligible Participant is entitled to participate in the Equipment Financing in an amount that is based on a fraction, the numerator of which is the amount of such Eligible Participant's Eligible Claim and the denominator of which is $196,900,000. In addition, the participation is for no more than fifty percent (50%) in the aggregate of the Equipment Financing; Yucaipa intends to provide at least fifty percent of the Equipment Financing. In other words, and by way of example, an Eligible Participant with Eligible Claims totaling $19.69 million can provide no more than ten percent of the Equipment Financing in the aggregate.

**PLEASE TAKE FURTHER NOTICE THAT THERE ARE SIGNIFICANT RISKS IN ACQUIRING A PARTICIPATION IN THE EQUIPMENT FINANCING. THOSE RISKS INCLUDE, WITHOUT LIMITATION, SERIOUS RISKS OF REPAYMENT AND THE FACT THAT ANY NEW ALLIED HOLDINGS COMMON STOCK ISSUED UPON THE CONVERSION OF EQUIPMENT FINANCING WILL BE SUBJECT TO A STOCKHOLDERS' AGREEMENT AND OTHER LIMITATIONS ON TRANSFERABILITY AND VOTING RIGHTS. IN ADDITION, ELIGIBLE**

**PARTICIPANTS WILL HAVE NO VOTE ON WHETHER THE EQUIPMENT FINANCING IS CONVERTED INTO NEW ALLIED HOLDINGS COMMON STOCK AND NO ABILITY TO WAIVE OR EXERCISE ANY RIGHTS UNDER THE EQUIPMENT FINANCING, EXCEPT AS EXPRESSLY PROVIDED UNDER THE PARTICIPATION AGREEMENT. FURTHER, IF THE EQUIPMENT FINANCING IS NOT CONVERTED FOR ANY REASON, THEN IT SHALL BE AT YUCAIPA'S OPTION IN YUCAIPA'S SOLE DISCRETION AS TO WHETHER THE ELIGIBLE PARTICIPANTS SHALL BE REPAID OR CONTINUE TO HAVE A PARTICIPATORY INTEREST IN THE EQUIPMENT. YOU ARE ENCOURAGED TO READ THE RISK FACTORS SET FORTH IN ARTICLE VII OF THE DISCLOSURE STATEMENT AND TO CONSULT COUNSEL BEFORE MAKING ANY INVESTMENT HEREUNDER.**

In order to participate in the Equipment Financing, an Eligible Participant must execute and deliver a Participation Agreement so that it is received no later than April 16, 2007 at 5:00 p.m., Pacific time (the "Participation Deadline"), by Colleen Rico, Latham & Watkins LLP, 633 West Fifth Street, Suite 4000, Los Angeles, California 90071 (Facsimile: (213) 891-8763).

### 5. Dissemination of Information About the Chapter 11 Cases

The Debtors have been actively engaged in providing information about the Debtors' businesses and proceedings in these Chapter 11 Cases to various parties-in-interest. The Debtors provided extensive information about the Debtors' financial, corporate, and operational status to creditors at the initial meeting of creditors held pursuant to Section 341 of the Bankruptcy Code. The Debtors also have provided regular updates to the Creditors' Committee through its counsel. Finally, the Debtors prepared and filed regular monthly operating reports with detailed financial information.

### 6. Rejection/Assumption of Executory Contracts and Unexpired Leases

As part of the review of their ongoing businesses, the Debtors have assessed their executory contracts and unexpired leases to identify those contracts that were no longer beneficial and those that remain valuable to the Debtors' business operations.

Pursuant to that review, the Debtors sought and received Bankruptcy Court approval to reject seven non-residential real property leases and one sublease. For a variety of reasons, the rejected leases and sublease were no longer advantageous to the Debtors' businesses. For example, one lease was rejected because the Debtors were able to secure new property with more favorable lease terms, including lower rent. Other leases were rejected because changes to the Debtors' customer base rendered the leased premises unusable. The non-residential real property leases rejected include leases between one of the Debtors and the following parties: Timberland Four Limited Partnership; Richview Construction Company Limited; 171862 Canada Inc.; Cornett Holdings, Ltd.; Hart Industrial Park, LLC; Norfolk and Western Railway Company; D&D Land Investments; and Volkswagen of America.

In addition to these leases, the Debtors also rejected non-beneficial executory contracts, including various severance agreements and agreements between one of the Debtors and the following parties: Volkswagen of America (hauling agreement; port services and vehicle

processing agreement); Auto-Trans Management Services (consulting agreement); 782777 Ontario Limited (purchase and sale agreement); CB Richard Ellis (listing agreement); Consolidated Rail Corporation (access agreement); Software Engineering of America, Inc. (software maintenance agreement); and USI of Georgia, Inc. (third party claims administration agreement).

Also pursuant to their review of executory contracts and leases, the Debtors sought and received Bankruptcy Court approval to assume equipment leases, customer contracts, and real property leases that are favorable to the Debtors' businesses.  In some cases, the contract or lease was amended and then assumed as amended.  Specifically, the Debtors have assumed two real property leases: a lease between Allied Systems, Ltd. and Norfolk Southern Railway Company; and the Debtors' lease for their corporate headquarters located in Decatur, Georgia. The headquarters lease was assumed in June 2006 and expires by its own terms on December 31, 2007.  The Debtors have also amended and assumed equipment leases between Allied Systems, Ltd. and the following parties: Banc of America Leasing & Capital, LLC; Chase Equipment Leasing, Inc.; and SunTrust Leasing Corporation.  Finally, the Debtors have assumed and amended two customer contracts: an agreement between AAG and General Motors Corporation; and an agreement between Allied Systems, Ltd. and American Honda Motor Co., Inc.

Yucaipa is reviewing the Debtors' executory contracts and unexpired leases. The proposed treatment for executory contracts and leases that are not assumed or rejected prior to confirmation of the Plan is discussed in Section VIII of the Disclosure Statement.

### 7.    Sales of Assets

#### (a)    Real Property and Improvements in Georgetown, Kentucky

On June 26, 2006, the Debtors obtained entry of an Order allowing them to sell 9.43 acres of land located in Georgetown, Kentucky, together with all improvements and fixtures located thereon and all appurtenances, easements and rights related thereto to Jack Cooper Transport Company, Inc. for the purchase price of $625,000.  The property sold had been used by Allied as an office and truck maintenance facility.  However, shifts in business resulted in Allied no longer conducting business operations in that geographic area.

#### (b)    Sale of Debtor Kar-Tainer International LLC as going concern and subsequent dismissal of its bankruptcy case

At the time of the Petition Date, Kar-Tainer International LLC (one of the original twenty-three Debtors) and Kar-Tainer International (Pty) LTD (a non-Debtor which was wholly owned by non-Debtor Kar-Tainer Bermuda which is a wholly owned subsidiary of the Axis Group) served as the containerized vehicle shipping arm of Axis Group.  In addition to the transportation of completely built up vehicles, the two companies (together, "Kar-Tainer") had developed a special market niche in semi-knocked down vehicle transportation.  Kar-Tainer designed and manufactured particular technology designed to meet its business objectives, including ramps, frames and cassettes and had patented its containerized loading systems. Certain of the intellectual property associated with Kar-Tainer's business was owned by Allied Holdings (the "AHI/Kar-Tainer IP").

On October 4, 2006, the Debtors filed a motion seeking approval of the sale of the Debtors' ownership interests in Kar-Tainer (the "Securities") and the AHI/Kar-Tainer IP to Richard Cox for the purchase price of $2 million. On October 27, 2005, the Bankruptcy Court entered an order approving the sale of the Securities. As a result of the sale of the Securities, there was no need for Kar-Tainer International LLC to remain in bankruptcy. Accordingly, on December 20, 2005, the Bankruptcy Court entered an order dismissing the Kar-Tainer International LLC bankruptcy case (Case No. 05-12527).

### (c)    Sale of Real Property Located in Windsor, Ontario

During the course of the Chapter 11 Cases, the Debtors identified 15.11 acres of undeveloped land located in Windsor, Ontario (the "Windsor Property") as a non-essential asset. The Debtors solicited bids for the sale of the Windsor Property and retained a real estate broker, Cushman & Wakefield LePage, Inc. to assist the sale effort. Ultimately, a purchase and sale agreement was presented to the Bankruptcy Court for approval, subject to higher and better offers. The Debtors received several overbids and determined that an auction was necessary. On November 1, 2006, an auction was held for the sale of the Windsor Property. All parties which presented an overbid and satisfied the preconditions for bidding were invited to attend the auction. The Debtors sought and obtained authority to consummate the sale of the Windsor Property to the prevailing bidder at auction, 1659579 Ontario Ltd at a purchase price of $4.3 million. The sale of the Windsor Property closed on December 8, 2006.

### 8.    Severance and Key Employee Retention

To ensure the retention of employees critical to the Debtors' continued operations, the Debtors filed a motion on September 27, 2005 to obtain authority to implement a key employee retention program (as amended, the "KERP") which provides for severance, retention bonuses and emergence bonuses for certain employees of the Debtors determined by the Board of Directors of Allied Holdings to be eligible to participate in the KERP (such employees shall be referred to as "Eligible Employees"). On January 6, 2006, the Bankruptcy Court entered an order approving the KERP as amended pursuant to the Bankruptcy Court's direction.

The KERP, as approved by the Court, divides Eligible Employees into five "tiers" – Tier 1a (comprised of one Eligible Employee, Allied Holdings' President and Chief Executive Officer), Tier 1b (comprised of two Eligible Employees, (a) Allied Holdings' Executive Vice President of Finance and Chief Financial Officer and (b) Allied Holdings' Executive Vice President, General Counsel and Secretary), Tier 2 (comprised of nine Eligible Employees in senior management positions), Tier 3 (comprised of nineteen Eligible Employees in high level management positions) and Tier 4 (comprised of 49 Eligible Employees in management positions). For each Eligible Employee, the severance, retention bonus and emergency bonuses is calculated as a certain percentage of the particular Eligible Employee's "Annual Base Salary" which is the annualized rate of all regular cash compensation excluding bonus payments and other items of extraordinary compensation, but including any regular cash compensation which is contributed to an Allied benefit plan pursuant to a salary deferral or reduction agreement (such as a 401(k) contribution). The particular percentage utilized for such calculation depends upon the particular tier of the Eligible Employee.

42

The following tables provide summaries of the severance and retention and bonus programs under the KERP:

**Severance**

| Tier | Percentage of Annual Base Salary | Date Eligible |
|------|----------------------------------|---------------|
| 1a | not more than 150% | After date upon which Eligible Employee incurs an Involuntary Termination of employment without Cause or Voluntary Termination or Voluntary Termination for Good Reason (with all capitalized terms have the meaning subscribed to them in the KERP) |
| 1b | not more than 150% | After date upon which Eligible Employee incurs an Involuntary Termination of employment without Cause or Voluntary Termination or Voluntary Termination for Good Reason |
| 2 | not more than 100% | After date upon which Eligible Employee incurs an Involuntary Termination of employment without Cause or Voluntary Termination or Voluntary Termination for Good Reason |
| 3 | not more than 50% | After date upon which Eligible Employee incurs an Involuntary Termination of employment without Cause or Voluntary Termination or Voluntary Termination for Good Reason |
| 4 | not more than 25% | After date upon which Eligible Employee incurs an Involuntary Termination of employment without Cause or Voluntary Termination or Voluntary Termination for Good Reason |

**Retention and Emergence Bonuses**

| Tier | Percentage of Annual Base Salary | Date Eligible |
|------|----------------------------------|---------------|
| 1a | Was to be 75%; however, the only Eligible Employee has waived his right to this bonus. | N.A. |

| Tier | Percentage of Annual Base Salary | Date Eligible |
|------|----------------------------------|---------------|
| 1b | 75% | 30% of such amount on the day the Plan was filed; 35% on the Confirmation Date; and 35% on the Effective Date of the Plan |
| 2 | 50.4% to 70% | 30% of such amount on the day the Plan was filed; 35% on the Confirmation Date; and 35% on the Effective Date of the Plan |
| 3 | 35% to 50% | 25% on February 28, 2006; 25% on earlier of April 30, 2006 or the date the Plan was filed; 25% at the Confirmation Date; and 25% on the Effective Date of the Plan |
| 4 | 20% to 25% | 25% on February 28, 2006; 25% on earlier of April 30, 2006 or the date the Plan was filed; 25% at the Confirmation Date; and 25% on the Effective Date of the Plan |

In addition, the KERP provided the Debtors the authority to distribute up to $150,000 in discretionary bonuses to employees that were not Eligible Employees, provided, however, that no single employee could receive more than $30,000 in such discretionary bonuses.

### 9.     Post-Petition Financial Performance

The Debtors' financial performance since the Petition Date is summarized in monthly operating reports that the Debtors have filed with the Bankruptcy Court. The monthly operating reports are available from the Bankruptcy Court's website (https://ecf.ganb.uscourts.gov/).

### 10.     Claims Bar Date and Claims Summary

On November 16, 2005, the Bankruptcy Court entered an order (the "Bar Date Order") fixing February 17, 2006 as the deadline by which all creditors must file proofs of claim in the Chapter 11 Cases. The Bar Date Order also approved the form and manner of notice of the Bar Date. By December 1, 2005, notice of the Bar Date Order was sent to all known Holders of Claims against the Debtors, all counterparties to executory contracts or unexpired leases with the Debtors, and other parties in interest as required by the Bar Date Order. Notice of the Bar Date Order was also published in *The Wall Street Journal* (National Edition) on January 16, 2006, *USA Today* (National Edition) on January 16, 2006, and *The Fulton County Daily Report* on January 17, 2006.

The Debtors estimate that they have approximately $200 million of claims subject to compromise. This debt is comprised of approximately $154 million of public debt and the rest of the debt relates primarily to vendor pre-petition balances. This amount includes Claims that have been characterized by the purported Holders of the Claims as Claims that are Priority

44

Claims, Secured Claims and Unsecured Claims. As of the date of this Disclosure Statement, the Debtors conducted only a preliminary review of these Claims to determine whether they are properly classified, duplicative, or invalid for any other reason. Based on their preliminary review, with regard to the Impaired Classes, the Debtors currently estimate that the aggregate Allowed amount of (i) Other Secured Claims will be zero, (ii) General Unsecured Claims will be approximately $200 million, (iii) Insured Claims will be approximately $14.5 million, and (iv) Other Insured Claims will be approximately $3.0 million. Because the Debtors have not yet conducted an in-depth analysis of the Claims to determine which claims may be invalid, the Plan Proponents opted for a conservative approach in determining the estimates provided in this Disclosure Statement. Therefore, the Debtors believe that the estimates provided herein represent the upper range of the amounts of Claims in the various Classes. Nevertheless, because the actual, final amounts of Allowed Claims will not be known until all Claims objections are resolved, it is possible that the actual allowed amount of General Unsecured Claims will be greater than that estimated by the Debtors in this Disclosure Statement.

### 11. Labor Issues

Since the commencement of these chapter 11 cases, the Debtors have worked with the TNATINC to modify the existing collective bargaining agreements on mutually agreeable terms. By the spring of 2006, no significant progress had been made with respect to such negotiations. Also, at that time, the Debtors were facing a liquidity crisis. Thus, on April 13, 2006, the Debtors filed an emergency motion pursuant to Section 1113(e) of the Bankruptcy Code (the "Interim Relief Motion") for immediate interim wage relief from the United States Teamsters. The Interim Relief Motion sought a 10% wage reduction for union employees for the period from May 1, 2006 through and including June 30, 2006. Hearings on the Interim Relief Motion were held on April 26 and April 27, 2006. The Bankruptcy Court approved the Interim Relief Motion in an oral ruling on May 1, 2006 which was later memorialized in a written order entered on May 2, 2006. On February 9, 2007, the United States District Court for the Northern District of Georgia denied TNATINC's motion for leave to appeal the Bankruptcy Court's approval of the Interim Relief Motion. Under the terms of the stipulation between TNATINC and Yucaipa, TNATINC shall waive its right to appeal the Bankruptcy Court's approval of the Interim Relief Motion and waive any right to claim an administrative expense claim as a result of the Bankruptcy Court's approval of the Interim Relief Motion.

On February 2, 2007, because they had still been unable to consensually resolve their labor issues with the TNATINC, the Debtors filed a motion to reject their collective bargaining agreements pursuant to section 1113 of the Bankruptcy Code (the "1113 Motion"). The United States Teamsters are in possession of a 100% strike vote by every single Allied member in the United States in the event the Bankruptcy Court grants the 1113 Motion. The CEO of the Debtors has stated that if the Teamsters strike, the Debtors will liquidate.

Shortly after becoming the Debtors' largest unsecured creditor with approximately $100 million in claims in May 2006, Yucaipa met with management to discuss the status of the chapter 11 cases, including the discussions that had taken place between the Debtors and TNATINC. Subsequent to the meeting, the Debtors requested Yucaipa's assistance in facilitating a resolution of the outstanding issues relating to the collective bargaining agreement.

After numerous discussions with the Debtors and TNATINC, Yucaipa and the TNATINC have been able to resolve the labor issues with which the Debtors are faced. As a consequence, the Debtors and TNATINC stipulated to take the 1113 Motion "off calendar" and continue indefinitely the commencement of the hearing on the 1113 Motion. The terms of the amendments to the collective bargaining agreement between the Debtors and the IBT are set forth in Exhibit G hereto. To the extent there are any conflicts between the treatment of the potential sale of the Canadian operations in the Plan and the treatment of the potential sale of the Canadian operations in the amendments to the collective bargaining agreement as set forth in Exhibit G, the terms of the Plan shall control and shall supersede the terms of the amendments to the collective bargaining agreement.

## ARTICLE IV.
## SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO INCLUDED IN THE PLAN SUPPLEMENT AND DEFINITIONS TO THE PLAN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING DISTRIBUTIONS UNDER THE PLAN AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER DOCUMENT REFERRED TO THEREIN, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

## A.      Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its holders of claims and equity interests. Chapter 11 also strives to promote equality of treatment of similarly

situated holders of claims and similarly situated holders of equity interests with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all the legal and equitable interests of a debtor as of the petition date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against, and equity interests in, a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any holder of claims against or equity interests in the debtor, whether or not such holders of claims or equity interests (1) is impaired under or has accepted the plan or (2) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therewith the obligations specified under the confirmed plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the debtor's holders of claims and equity interests. Pursuant to Section 1122 of the Bankruptcy Code, each class of claims against and equity interests in a debtor must contain claims or interests, whichever is applicable, that are substantially similar to the other claims or interests in such class. Further, a chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or equity interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are Unimpaired and, because of such favorable treatment, are deemed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or equity interests in such classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes with claims or interests which are receiving a distribution under the plan but which are not Unimpaired will be solicited to vote to accept or reject the plan.

In compliance with the requirements of Section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each class. Further, the Plan Proponents believe that the Plan is in compliance with the requirements of Section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Plan Proponents intend, to the extent permitted by the Bankruptcy Court and the Plan (and after consultation with the Creditors' Committee), to make such reasonable modifications to the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class

47

under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

**B.      Classification of Claims and Interests**

**1.      Introduction**

The categories of Claims and Interests set forth below classify all Claims against and Interests in the Debtors for all purposes of the Plan. A Claim or Interest shall be deemed classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. The treatment with respect to each Class of Claims and Interests provided for in the Plan shall be in full and complete satisfaction, release and discharge of such Claims and Interests.

**2.      Classification**

For purposes of classification, voting, and treatment under the Plan, Claims against all Debtors are classified in a single class regardless of whether such Claims are assertable against one or more of the Debtors.  The Plan Proponents do not believe that such classification or treatment adversely impacts upon the rights of any Holder of a Claim. The Plan Proponents do not intend, by so classifying Claims, to effect a substantive consolidation of any of the Debtors or their respective Estates for any purpose other than classification, voting and treatment under the Plan.  Rather, the separate corporate existence of each of the Debtors is preserved under the Plan in accordance with Section 6.1 of the Plan.

Except as otherwise provided in the Plan, nothing under the Plan is intended to or shall affect the Debtors' or Reorganized Debtors' rights and defenses in respect of any Claim that is "unimpaired" under the Plan, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupment against such Unimpaired Claims.

For purposes of classification and treatment under the Plan, Interests are treated in a two Classes, one for Interests held by persons or entities in Allied Holdings and the other for Interests held by a Debtor in another Debtor.

The classification of Claims under the Plan is as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 et seq. | Other Secured Claims | Unimpaired with respect to Sections (i) and (v) of the paragraph titled "Treatment" under Section 3.1(2) of the | No if Unimpaired; Yes if Impaired |

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
|  |  | Plan; Impaired with respect to Sections (ii), (iii), (iv) and (vi) of such paragraph |  |
| 2 | Priority Non-Tax Claims | Unimpaired | No |
| 3 | Workers' Compensation Claims | Unimpaired | No |
| 4A | General Unsecured Claims (other than those classified in Class 4D) | Impaired | Yes |
| 4B | Insured Claims (other than those classified in Class 4D) | Impaired | Yes |
| 4C | Other Insured Claims (other than those classified in Class 4D) | Impaired | Yes |
| 4D | Claims of Cash Out Holders Cash Option | Impaired | Yes |
| 5 | Intercompany Claims | Impaired | No |
| 6 | Subordinated General Unsecured Claims | Impaired | No |

The classification of Interests under the Plan are as follows:

| 7A | Old Allied Holdings Common Stock | Impaired | No |
|---|---|---|---|
| 7B | Old Other Debtors Common Stock | Impaired | No |
| 7C | Old Allied Holdings Stock Rights | Impaired | No |

The Classes of Claims and Interests, as well as their treatment and an analysis of whether they are impaired or unimpaired, are described in more detail as follows:

(a)   **Class 1 -- Other Secured Claims.**  Class 1 consists of Allowed Other Secured Claims against each Debtor.  This Class will be divided into subclasses designated by letters of the alphabet (Class 1A, Class 1B and so on), so that each Holder of any Secured Claim against each Debtor is in a Class by itself, except to the extent that there are Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified classes of Secured Claims.  The Plan Proponents currently estimate that the total amount of Other Secured Claims that will be Allowed under the Plan is zero.  The Plan Proponents expect that the Claims of the members certain subclasses of Class 1 shall be Unimpaired under clauses (i) and (v) of this paragraph and the Claims of the members of certain subclasses of Class 1 shall be Impaired under clauses (ii), (iii), (iv) and (vi) of this paragraph.  Each Holder of an Allowed Secured Claim in Class 1 shall, in the discretion of Yucaipa (after consultation with the Debtors and the Creditors' Committee), receive, in full satisfaction, settlement, release and discharge of, and in exchange for, its Allowed Class 1 Claim, any one or a combination of any of the following: (i) Cash in an amount equal to such Allowed Class 1 Claim; (ii) deferred Cash payments totaling at least the Allowed amount of such Allowed Class 1 Claim, of a value, as of the Effective Date, of at least the value of such Holder's interest in the Debtors' property securing the Allowed Class 1 Claim; (iii) the property of the Debtors

49

securing such Holder's Allowed Class 1 Claim; (iv) Cash payments or Liens amounting to the indubitable equivalent of the value of such Holder's interest in the Debtors' property securing the Allowed Class 1 Claim; (v) Reinstatement of such Allowed Class 1 Claim; or (vi) (after consultation with the Creditors' Committee and the Debtors) such other treatment as Yucaipa and such Holder shall have agreed upon in writing.

A list of all Class 1 Claims and the proposed treatment thereof will be filed with the Bankruptcy Court ten (10) days before the Voting Deadline.    Such list may be amended, modified or supplemented by Yucaipa (after consultation with the Debtors and the Creditors' Committee) as more fully described in the Plan.

> Voting:  Each Impaired Allowed Class 1 Claim shall be entitled to vote on confirmation of the Plan.  Each Unimpaired Allowed Class 1 Claim is conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

**(b)    Class 2 – Priority Non-Tax Claims**.  Class 2 consists of all Claims entitled to priority under Section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim. The legal, equitable and contractual rights of the Holders of Class 2 Priority Non-Tax Claims are unaltered by the Plan. Unless the Holder of such Claim and Yucaipa agree to a different treatment (after consultation with the Creditors' Committee and the Debtors), each Holder of an Allowed Class 2 Priority Non-Tax Claim shall receive, in full and final satisfaction of such Allowed Class 2 Priority Non-Tax Claim, one of the following alternative treatments:

> (i)    to the extent then due and owing on the Effective Date, such Claim will be paid in full in Cash by the Debtors or the Reorganized Debtors on the Effective Date; or

> (ii)    to the extent not due and owing on the Effective Date, such Claim will be paid in full in Cash by the Debtors or the Reorganized Debtors when and as such Claim becomes due and owing in the ordinary course of business; or

> (iii)    such Claim will be otherwise treated in a manner so that such Claims shall be rendered Unimpaired pursuant to Section 1124 of the Bankruptcy Code.

The proposed treatment of each Class 2 Priority Non-Tax Claim shall be selected by Yucaipa (after consultation with the Debtors and the Creditors' Committee) and shall be disclosed within ten (10) days before the Voting Deadline.

> Voting:  Class 2 is an Unimpaired Class, and the Holders of Class 2 Priority Non-Tax Claims are conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

(c)    **Class 3 – Workers' Compensation Claims.**    Class 3 Workers' Compensation Claims consist of all claims by employees of the Debtors arising from or related to their employment with the Debtors for which the Debtors are required by state statute to maintain workers' compensation insurance coverage through a program of third party insurance, self-insurance, or state-sponsored insurance.    Under the Plan, the Reorganized Debtors will continue all of the Debtors' workers' compensation policies and related agreements that were in effect on or at any time prior to the Effective Date such that Workers' Compensation Claims are unaltered by the Plan.    Any Holder of a Workers' Compensation Claim may proceed with such Claim before the appropriate state workers' compensation board or other appropriate authority subject to the right of the Debtors/Reorganized Debtors and the insurers, as applicable pursuant to any policy and related agreements to, among other things, defend, contest or litigate any such Claim or the existence, primacy and/or scope of available coverage under any alleged applicable policy or program. To the extent any such Claim is determined to be valid by the appropriate state workers' compensation board or other authority having jurisdiction over such Claim, such Claim shall be paid from proceeds of the applicable workers' compensation insurance policies to the extent of any coverage thereunder.    Nothing in the Plan is intended to, shall or shall be deemed: (i) to preclude any Holder of a Workers' Compensation Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such Holder may receive under this Plan; or (ii) to modify or limit the rights of the insurers to contest and/or litigate the existence, primacy and/or scope of available coverage under the alleged applicable policy.

> Voting:  Class 3 is an Unimpaired Class, and the Holders of Class 3 Workers' Compensation Claims are conclusively deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 3 are not entitled to vote to accept or reject the Plan.

(d)    **Class 4A – General Unsecured Claims.**    The Debtors estimate that the total amount of Allowed General Unsecured Claims that will be Allowed under the Plan is approximately $200 million. Each Holder of a Class 4A General Unsecured Claim will receive a Pro Rata share of the New Allied Holdings Common Stock (subject to dilution by the shares issued pursuant to Section 4.2(d) of the Plan and the Equipment Financing Facility) based on the ratio of the amount of such Holder's Allowed Class 4A Claim to the aggregate amount of all Allowed Class 4A, Class 4B and Class 4C Claims plus the Stub Amount of Allowed Class 4D Claims. The Committee supports the Plan subject to the assessment of certain matters referenced in Article VII.F

> Voting:  Class 4A is an Impaired Class and pursuant to Section 1126 of the Bankruptcy Code each Holder of an Allowed Class 4A General Unsecured Claim is entitled to vote to accept or reject the Plan.

(e)    **Class 4B –Insured Claims.**    Class 4B consists of all Tort Claims (other than Tort Claims whose Holders have elected the Cash Option) arising from an incident or occurrence alleged to have occurred prior to the Effective Date.    Under the Plan, a "Tort Claim"

means any Claim (including punitive damage claims to the extent permitted by the Bankruptcy Court and not otherwise subordinated under the Plan or applicable law), which arose prior to the Petition Date, that has not been settled, compromised or otherwise resolved that: (i) arises out of allegations of personal injury, wrongful death, property damage or similar legal theories of recovery; or (ii) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment. Each Holder of an Allowed Class 4B Claim shall receive a Pro Rata Share of the New Allied Holdings Common Stock (subject to dilution by the shares issued pursuant to Section 4.2(d) of the Plan and the Equipment Financing Facility) based on the ratio of the amount of such Holder's Allowed Class 4D Claim to the aggregate amount of all Allowed Class 4A, Class 4B and Class 4C Claims plus the Stub Amount of Allowed Class 4D Claims; provided, however, that the Allowed Amount of such a Claim shall be limited to the sum of the applicable self-insured retention or deductible under the relevant insurance policy and the amount, if any, that such Claim exceeds the total coverage available from the relevant insurance policies. The total dollar amount of Tort Claims asserted against the Debtors is approximately $400 million. This amount represents the sum of the Claims asserted by Holders in Classes 4B and 4C including duplicative amounts where a single claimant filed proofs of claim against multiple Debtors for the same alleged injury. Nothing in the Plan is intended to, shall or shall be deemed: (i) to preclude any Holder of an Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such Holder may receive under this Plan; or (ii) to modify or limit the rights of the insurers to contest and/or litigate the existence, primacy and/or scope of available coverage under the alleged applicable policy.

> <u>Voting:</u>   Class 4B is an Impaired Class and pursuant to Section 1126 of the Bankruptcy Code each Holder of an Allowed Class 4B Insured Claim is entitled to vote to accept or reject the Plan.

**(f)**      **Class 4C – Other Insured Claims.**   Class 4C consists of all Tort Claims (other than Tort Claims whose Holders have elected the Cash Option) arising from an incident or occurrence alleged to have occurred prior to the Effective Date and asserted against GACS and/or Commercial Carriers. There are approximately 21 pending Other Insured Claims arising out of the manufacture of specially designed trailers manufactured under the name "Delevan." The Other Insured Claims are brought generally by drivers alleged to be injured in the course of loading or unloading these trailers. These trailers were manufactured by Delevan Industries, Inc., which was formerly a subsidiary of CCI. The Debtors acquired CCI and GACS in the Ryder Acquisition. The Debtors maintained limited insurance for certain Other Insured Claims for the period of October 1, 1997 through October 1, 2003. The insurance policies were issued by Haul. For each policy year, the policy with Haul provided a $1 million retained liability per occurrence with an additional layer of coverage subject to a $1 million limit of liability per occurrence and a $5 million policy aggregate limit for the period October 1, 1997 to October 1, 2002 and a $2,000,000 Annual Aggregate for the period October 1, 2002 to October 1, 2003. Neither GACS, CCI nor any other Debtor maintained insurance for Other Insured Claims after October 1, 2003. Each Holder of an Allowed Other Insured Claim shall receive a Pro Rata Share of the New Allied Holdings Common Stock (subject to dilution by the shares issued pursuant to

Section 4.2(d) of the Plan and the Equipment Financing Facility) based on the ratio of the amount of such Holder's Allowed Class 4C Claim to the aggregate amount of all Allowed Class 4A, Class 4B and Class 4C Claims plus the Stub Amount of Allowed Class 4D Claims; provided, however, that the maximum allowed amount of an Allowed Other Insured Claim shall be limited to an amount equal to the applicable self-insured retention or deductible under the relevant insurance policy plus the amount by which the Allowed Other Insured Claim exceeds the total coverage available from the relevant insurance policies of the Debtors.  The Plan Proponents estimate that Allowed Class 4C Claims will aggregate $3.0 million.  The total dollar amount of Tort Claims asserted against the Debtors is approximately $400 million.  Nothing in the Plan is intended to, shall or shall be deemed: (i) to preclude any Holder of an Other Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such Holder may receive under this Plan; or (ii) to modify or limit the rights of the insurers to contest and/or litigate the existence, primacy and/or scope of available coverage under the alleged applicable policy.

> Voting:  Class 4C is an Impaired Class and pursuant to Section 1126 of the Bankruptcy Code each Holder of an Allowed Class 4C Other Insured Claim is entitled to vote to accept or reject the Plan.

**(g)     Class 4D – Claims of Cash Out Electing Holders**.   Class 4D consists of the Claims of all Cash Out Holders.

The Debtors estimate that the General Unsecured Claims, Insured Claims and Other Insured Claims Allowed in an amount equal to or less than $20,000 total approximately $6.7 million in the aggregate.

Yucaipa has agreed to fund the Cash Out Contribution in the amount of at least $2 million.  By way of example:

Yucaipa will contribute $2 million to pay each Holder of an Allowed Class 4D Claim up to 25 cents on the dollar (assuming Allowed Class 4D Claims total in the aggregate $8 million).

The aggregate amount of Allowed Class 4D Claims is greater than $8 million and equal to or less than $16 million, a Pro Rata share of $2 million (i.e., between approximately 12.5% and 25% of such Holder's Allowed Class 4D Claim).  For example, if the Allowed Class 4D Claims total in the aggregate $10 million, each Holder of Allowed Class 4D Claim will receive a Pro Rata share of the $2 million Cash Out Contribution, for a Pro Rata payment of 20 cents on the dollar.

As the total Allowed Class 4D Claims increase in dollar amount, the Pro Rata recovery of the Cash Contribution will reduce correspondingly; however, so long as the total Allowed Class 4D Claims do not exceed $20 million, Yucaipa will increase the Cash Out Contribution, as appropriate, to provide a floor distribution of at least 12.5 cents on the dollar (e.g., if $20 million of claims opt in, then Yucaipa would put in enough cash to ensure that every creditor gets at least 12.5 cents on the dollar (or a total of $2.5 million to satisfy $20 million of claims)).

If the total Allowed Class 4D Claims exceed $20 million, at Yucaipa's option, Yucaipa can put in additional funds to increase the Cash Out Contribution and provide such Holders a Pro Rata 12.5 cent recovery. If no additional funds are contributed, creditors who opt in will get a distribution on a Pro Rata basis as follows: cash up to 12.5 cents on the dollar and New Allied Holdings Common Stock for the remainder. By way of example, if Allowed Class 4D Claims total $30 million, Yucaipa would contribute $2.5 million in cash to be spread pro rata over $20 million of claims, and the remaining $10 million in claims would get a pro rata distribution of New Allied Holdings Common Stock. Any portion of the Cash Out Distribution remaining after all required distributions have been made to Holders of Allowed Class 4D Claims will be returned to Yucaipa.

**Holders of General Unsecured Claims, Insured Claims and Other Insured Claims who receive the Cash Option shall be deemed to have assigned their General Unsecured Claims, Insured Claims and/or Other Insured Claims (without giving effect to any Voluntary Reductions) to Yucaipa, and such Allowed Claims shall be combined with Yucaipa's other Allowed General Unsecured Claims for purposes of determining the Pro Rata share of the New Allied Holdings Common Stock to be distributed to Yucaipa. NOTE: The election of a creditor in its Ballot regarding whether to take the Cash Option or to make a Voluntary Reduction is irrevocable.**

> Voting: Class 4D is an Impaired Class and pursuant to Section 1126 of the Bankruptcy Code each Holder of an Allowed Class 4D Unsecured Claim is entitled to vote to accept or reject the Plan.

**(h)** **Class 5 -- Intercompany Claims**. Class 5 consists of all Claims by a Debtor against another Debtor. Under the Plan, on and as of the Effective Date, no Holder of an Allowed Intercompany Claim will receive or retain any property of the Debtors under the Plan on account of such Claim; provided, however, that Intercompany Claims may be capitalized, satisfied, or preserved either directly or indirectly or in whole or part. Any Intercompany Claim, or portion thereof, that is not so capitalized, satisfied, or preserved will be cancelled as of the Effective Date.

> Voting: Class 5 is an Impaired Class, and the Holders of Class 5 Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 5 are not entitled to vote to accept or reject the Plan.

**(i)** **Class 6 – Subordinated General Unsecured Claims.** Class 6 – Subordinated General Unsecured Claims. Class 6 consists of (i) any Claim, or portion thereof, which is subordinated to the payment of all other General Unsecured Claims (other than Claims which are themselves Subordinated General Unsecured Claims) pursuant to Section 510 of the Bankruptcy Code, any other applicable law, any order of the Bankruptcy Court or any applicable agreement, or (ii) any Claim for any fine, penalty, or forfeiture, or for multiple, exemplary or punitive damages, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Holder of such Claim and to the extent that there is not insurance coverage under applicable insurance policies for such Claim. Under

the Plan, on and as of the Effective Date, such Claims shall be cancelled and the Holders thereof will receive no distribution on account thereof under the Plan.

>Voting: Class 6 is an Impaired Class, and the Holders of Class 6 Claims are conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 6 are not entitled to vote to accept or reject the Plan.

(j) **Class 7A – Old Allied Holdings Common Stock**.  Class 7A consists of all Allowed Interests in Old Allied Holdings Common Stock.  Under the Plan, on and as of the Effective Date, the Interests in Old Allied Holdings Common Stock will be cancelled and the Holders thereof will receive no distribution on account thereof under the Plan.

>Voting: Class 7A is an Impaired Class, and the Holders of Class 7A Interests are conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Therefore the Holders of Class 7A Interests are not entitled to vote to accept or reject the Plan.

(k) **Class 7B – Old Other Debtors Common Stock.**  Class 7B consists of all Allowed Interests in Old Other Debtors Common Stock.  Under the Plan, Holders of Old Other Debtors Common Stock will not receive any distribution of property under the Plan on account of their interest in Old Other Debtors Common Stock and, on the Effective Date, all Interests in Old Other Debtors Common Stock will be cancelled.[6]

>Voting: Class 7B is an Impaired Class, and the Holders of Class 7B Interests are conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Therefore the Holders of Class 7B Interests are not entitled to vote to accept or reject the Plan.[7]

(l) **Class 7C – Old Allied Holdings Stock Rights**.  Class 7C consists of all Old Allied Holdings Stock Rights.  Holders of Allowed Old Allied Holdings Stock Rights will not receive any distribution of property under the Plan on account of their interest in Old Common Stock and, on the Effective Date, all Interests in Old Allied Holdings Stock Rights will be cancelled.

>Voting: Class 7C is an Impaired Class, and the Holders of Class 7C Interests are conclusively deemed to have rejected the Plan

---

[6]  The foregoing may be modified by the Plan Proponents or the Reorganized Debtors at any time, after consultation with the Creditors' Committee.

[7]  If Yucaipa determines for business, tax or operational reasons that the Old Other Debtors Common Stock should remain outstanding, the foregoing may be modified by Yucaipa at any time, after consultation with the Debtors and the Creditors' Committee.

pursuant to Section 1126(g) of the Bankruptcy Code. Therefore the Holders of Class 7C Interests are not entitled to vote to accept or reject the Plan.

## C.    Treatment of Unclassified Claims.

### 1.    Summary

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, the Plan. Similarly, Claims of the DIP Lenders under the DIP Loan Facility are not classified for purposes of voting on, or receiving Distributions under, the Plan. Holders of such DIP Lender Claims are not entitled to vote on the Plan. All such DIP Lender Claims are instead treated separately in accordance with Article IV of the Plan and in accordance with the requirements set forth in Section 1129(a)(9)(A) of the Bankruptcy Code. In addition, during the Chapter 11 Cases, the Holders of Prepetition Lender Claims previously received, in full and final satisfaction of their Claims, Cash equal in amount to one hundred percent (100%) of their Claims and, as a result, Prepetition Lenders' Claims are not classified or otherwise provided for in the Plan and the Holders of Prepetition Lenders' Claims are not entitled to vote to accept or reject the Plan.

### 2.    Administrative Expense Claims

Administrative Expense Claims are claims for payment of administrative expenses of a kind specified in Section 503(b) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(1) of the Bankruptcy Code, including, without limitation, post-petition wages, post-petition salaries, commissions for services rendered after the Petition Date, Professional Compensation and all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code. The Debtors currently estimate that the amount of Administrative Expense Claims will total in excess of approximately $2 million. Such estimate includes only unpaid ordinary course expenses incurred after the Petition Date and Cure Amounts (amounts necessary to cure defaults under executory contracts or unexpired leases to be assumed pursuant to Section 5.1 of the Plan, but excludes, among other items, Postpetition Tax Claims, Claims for Professional Compensation, Yucaipa's Claim for substantial contribution and the Indenture Trustee Fees and Expenses, which amounts remain undetermined and which will be material individually and in the aggregate. Subject to (x) the bar date provisions set forth below and (y) additional requirements for professionals and certain other entities set forth below, the Reorganized Debtors shall pay to each holder of an Allowed Administrative Expense Claim, on account of its Administrative Expense Claim and in full satisfaction thereof, Cash equal to the Allowed amount of such Administrative Expense Claim on the later of (A) sixty (60) days after such Claim becomes Allowed or (B) the Effective Date (or as soon as practicable thereafter) unless the Holder, the Reorganized Debtors and Yucaipa agree in writing to other treatment of such Claim. Payment on an Administrative Expense Claim that arose in the ordinary course of the Debtors' Business will not be made until such payment would have become due in the ordinary course of the Debtors' business or under the terms of the legal obligation giving rise to the Claim in the absence of the Chapter 11 Cases.

(a)    **Bar Date for Filing Administrative Expense Claims**

Except for Administrative Expense Claims of Professionals for Professional Compensation, which are addressed below, and except as otherwise provided below for (A) non-tax liabilities incurred in the ordinary course of business by each Debtor and (B) Postpetition Tax Claims and (C) Yucaipa's Claim for substantial contribution and (D) the Indenture Trustee Fees and Expenses, requests for payment of Administrative Expense Claims must be Filed and served on counsel for the Reorganized Debtors and counsel for Yucaipa no later than (x) 30 days after the Effective Date of the Plan (the "Administrative Expense Claim Bar Date") or (y) such later date, if any, as the Bankruptcy Court shall order upon application made prior to the end of the Administrative Expense Claim Bar Date. Holders of Administrative Expense Claims that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against any of the Debtors or the Reorganized Debtors or any of their respective properties.

(b)    **Final Application for Professional Compensation**

Except as provided in IV.C.2(e) below, Persons requesting Professional Compensation pursuant to any of Sections 327, 328, 330, 331, 363, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Confirmation Date shall File and serve on the Debtors, Reorganized Debtors, as the case may be, Yucaipa, the Creditors' Committee (if still then in existence) and any other party entitled to receive a copy of such application pursuant to rule or order of the Bankruptcy Court, an application for final allowance of compensation and reimbursement of expenses on or before sixty (60) days after the Effective Date. The provisions of this paragraph shall not apply to any professional providing services pursuant to and subject to the limits contained in the Order Authorizing Employment of Professionals Utilized in the Ordinary Course of Business entered in the Chapter 11 Cases on or about August 2, 2005.

(c)    **Ordinary Course Liabilities**

Holders of Administrative Expense Claims based on liabilities incurred after the Petition Date in the ordinary course of the Debtors' business (other than Claims of governmental units for taxes or Claims and/or penalties related to such taxes) shall not be required to File any request for payment of such Claims. Such Administrative Expense Claims shall be assumed and paid by the Reorganized Debtors, as appropriate, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Expense Claim, without any further action by the Holders of such Claims; provided that, notwithstanding the foregoing, the Reorganized Debtors reserve the right to dispute through any means permitted at law, equity and/or contract any Administrative Expense Claims based on liabilities incurred after the Petition Date in the ordinary course of the Debtors' business that the Reorganized Debtors believe are incorrect, invalid or otherwise objectionable.

(d)    **Postpetition Tax Claims**

All requests for payment of Postpetition Tax Claims, for which no bar date has otherwise been previously established, must be Filed on or before the later of (i) sixty (60) days following the Effective Date; and (ii) one hundred and twenty (120) days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any

57

Holder of any Postpetition Tax Claim that is required to File a request for payment of such taxes and that does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Postpetition Tax Claim against any of the Debtors or Reorganized Debtors, or any of their respective properties, whether any such Postpetition Tax Claim is deemed to arise prior to, on, or subsequent to, the Effective Date.

### (e) Yucaipa Claim for Substantial Contribution

Yucaipa shall hold an Allowed Claim for substantial contribution under Section 503(b)(3) of the Bankruptcy Code for its fees and expenses incurred in connection with Yucaipa's participation in the Debtors' Chapter 11 Cases, if the Debtors successfully reorganize (including, without limitation, professional fees and the fees associated with retention of a new CEO for the Reorganized Debtors). Among other things, Yucaipa played a key role in negotiating and drafting the terms of the Plan and the new labor deal with TNATINC and played a key role in obtaining Exit Financing. No motion for allowance shall be required for the Debtors or Reorganized Debtors, as applicable, to pay Yucaipa's Allowed Claim for substantial contribution on the Effective Date of the Plan in the amount of such fees and expenses. Yucaipa will provide a good faith estimate of its Allowed Claim for substantial contribution at or prior to the Confirmation Hearing.

### (f) Indenture Trustee Fees and Expenses

No motion for allowance shall be required for the Debtors or the Reorganized Debtors, as applicable, to pay the Indenture Trustee Fees and Expenses, which shall be paid by the Reorganized Debtors on the Effective Date.

### 3. Priority Tax Claims

Priority Tax Claims include Unsecured Claims of governmental units for unpaid taxes entitled to priority under Section 507(a)(8) of the Bankruptcy Code. The Debtors currently estimate that the amount of Priority Tax Claims will be no more than $398,000. Each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date either (a) will be paid the full unpaid amount of such Allowed Priority Tax Claim in Cash on the Effective Date, or upon such other terms as may be agreed upon by such Holder, Yucaipa or the Reorganized Debtors, (b) will receive deferred Cash payments, over a period ending not later than 6 years after the date of assessment, totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at a fixed rate of 4% per annum from the Effective Date, or such lesser rate agreed to by a particular taxing authority, or (c) otherwise will be paid as provided for in an order of the Bankruptcy Court. The proposed treatment for each Holder of an Allowed Priority Tax Claim due and payable on the Effective Date shall be selected by Yucaipa and shall be disclosed in the Plan Supplement. The amount of any Priority Tax Claim that is not an Allowed Claim or that is not otherwise due and payable on or prior to the Effective Date, and the rights of the Holder of such Claim, if any, to payment in respect thereof shall (i) be determined in the manner in which the amount of such Claim and the rights of the Holder of such Claim would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced, (ii) survive after the Effective Date as if the Chapter 11 Cases had not been commenced, and (iii) not be discharged pursuant to Section 1141 of the Bankruptcy

Code. In accordance with Section 1124 of the Bankruptcy Code, the Plan leaves unaltered the legal, equitable, and contractual rights of each Holder of a Priority Tax Claim.

### 4.        DIP Lender Claims

On the Effective Date, as set forth in the DIP Credit Documents, all outstanding Allowed Claims under the DIP Loan Facility shall be either (a) paid, in full, in Cash by the Reorganized Debtors or (b) converted into the Exit Financing Facility on the terms and subject to the conditions set forth in the DIP Credit Documents.

### 5.        Equipment Financing Facility Claims

Claims under the Equipment Financing Facility will be treated as set forth in Section III.C.4 above.

### D.        Means for Implementation of the Plan

### 1.        Sources of Funding for Distributions Under the Plan

On the Effective Date, the Reorganized Debtors shall obtain the Exit Financing from the Exit Financing Lenders.  The terms of the Exit Financing will be contained in the Plan Supplement.  Except for the Cash Out Distribution which will be funded by Yucaipa, all Cash necessary for the Reorganized Debtors to make payments required by the Plan shall be obtained from existing Cash balances, the operations of the Debtors or Reorganized Debtors and the Exit Financing.  Except as otherwise set forth in Article VIII of the Plan, Cash payments to be made pursuant to the Plan shall be made by the Reorganized Debtors, provided, however, that the Debtors and Reorganized Debtors shall be entitled to transfer funds between and among themselves as may be necessary or appropriate to enable any of the Reorganized Debtors to satisfy their obligations under the Plan.  Additionally, in the projections attached as Exhibit C hereto, the Reorganized Debtors expect to spend $70 million in capital expenditures per year for at least the next four years.  The Reorganized Debtors expect to fund such capital expenditures from cash flow generated from operations and from the Exit Facility and the Equipment Financing Facility.

### 2.        Pooling of Claims/Limited Substantive Consolidation

Generally, substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan.  The effect of consolidation is the pooling of the assets of, and claims against, the consolidated debtors; satisfying liabilities from a common fund; and combining the creditors of the debtors for purposes of receiving distributions under a reorganization plan. Here, for the limited purposes of for voting and treatment under the Plan, the Debtors seek to substantively consolidate their estates to facilitate distributions to creditors.

As set forth in Section 2.1 of the Plan, the Plan is premised on the substantive consolidation of all of the Debtors with respect to the treatment of all Claims and Interests except for the Other Secured Claims in Class 1, as provided below.  The Plan does not contemplate substantive consolidation of the Debtors with respect to the Class 1 Claims, which shall be

deemed to apply separately with respect to the Plan proposed by each Debtor. The Plan shall serve as a request by the Plan Proponents, in lieu of a separate motion, to the Bankruptcy Court, that it grant substantive consolidation with respect to the treatment of all Claims and Interests other than Class 1 Claims as follows:  on the Effective Date, (a) all Intercompany Claims will be eliminated (except as set forth in Section 3.7 in the Plan); (b) all Assets and liabilities of the Debtors will be merged or treated as though they were merged (except to the extent they secure any Allowed Other Secured Claim); (c) all guarantees of the Debtors of the obligations of any other Debtor and any joint or several liability of any of the Debtors shall be eliminated; and (d) each and every Claim or Interest (except for Other Secured Claims) against any Debtor shall be deemed Filed against the consolidated Debtors and all Claims (except for Other Secured Claims) Filed against more than one Debtor for the same liability shall be deemed one Claim against any obligation of the consolidated Debtors. The limited substantive consolidation under the Plan should not affect a Holder of a Tort Claim's rights, if any, to seek coverage under multiple policies of insurance.

The authority of a Bankruptcy Court to order substantive consolidation is found by most courts to be derived from their general equitable powers under Section 105(a) of the Bankruptcy Code, which provides that the court may issue orders necessary to carry out the provisions of the Bankruptcy Code. In addition, courts have found that statutory authority exists for the approval of substantive consolidation as a part of the plan of reorganization under the terms of Section 1123(a)(5)(C) of the Bankruptcy Code. There has been a modern trend towards allowing substantive consolidation, as the judiciary recognized the widespread use of interrelated corporate structures operating under a parent entity's umbrella for business and tax purposes. In re Murray Indus., 119 Bankr. 820, 830 (Bankr. M.D. Fla. 1990); see also In re Vecco Construction Indus., 4 Bankr. 407, 409 (Bankr. E.D. Va. 1980). However, there are no statutorily prescribed standards setting forth the parameters for when substantive consolidation is appropriate. Instead, judicially developed standards control whether substantive consolidation should be granted in any given case

The United States Court of Appeals for the Eleventh Circuit developed a standard for authorizing substantive consolidation pursuant to which the proponent of substantive consolidation must show that (i) there is a substantial identity between the entities to be consolidated and (ii) consolidation is necessary to avoid some harm or to realize some benefit. Eastgroup Properties v. Southern Motel Assoc., LTD., 935 F.2d 245, 249 (11th Cir. 1991). See also Reider v. F.D.I.C. (In re Reider), 31 F.3d 1102, 1107-1108 (11th Cir. 1994). Once this prima facie case for consolidation is made, the burden shifts to an objecting creditor to show that (i) it has relied on the separate credit of one of the entities to be consolidated and (ii) it will be prejudiced by substantive consolidation. Eastgroup, 935 F.2d at 249. If the objecting creditor makes this showing, then the court may order consolidation if it determines that the demonstrated benefits of consolidation "heavily" outweigh the harm. Id.

Thus, the propriety of substantive consolidation must be evaluated on a case-by-case basis based upon the particular facts and circumstances of the estates in question. The extensive list of elements and factors frequently cited and relied upon by courts in determining the propriety of substantive consolidation may be viewed as variants on two critical factors, namely, (i) whether creditors dealt with the entities as a single economic unit and did not rely on their

separate identity in extending credit or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.

Allied Holdings is a publicly owned corporation that has no parent corporations.  It has four direct and wholly owned subsidiaries: (1) AAG (collectively, with its direct and indirect subsidiaries, the "Automotive Group"); (2) Axis Group, Inc. (collectively, with its direct and indirect subsidiaries, the "Axis Group"); (3) AH Industries, Inc.; and (4) Haul (collectively, the "Subsidiaries").  All of the companies in the Automotive Group are Debtors.  All of the U.S. and Canadian companies in the Axis Group are Debtors.  The remaining Axis Group companies, comprised of certain foreign companies and certain entities in which Axis Group, Inc. holds only a minority interest, are not Debtors.  Haul is not a Debtor.  There are twenty two (22) separate Debtors.

Throughout their existence, the numerous Automotive Group Debtors have functioned as a single entity in several important ways.  Similarly, the Axis Group Debtors have historically functioned as a single entity in many ways.  While the Debtors' businesses have been operated through several different legal entities for various business planning reasons, they are part of one, integrated enterprise, the value of which cannot realistically be apportioned to any one entity.

The Debtors are commonly owned and are managed by a "corporate" office located in Decatur, Georgia.  Allied Holdings' management provides services to all Debtor entities, including accounting and bookkeeping, treasury, legal, tax, information systems, administrative, real estate management and similar "back office" corporate services.  All of the Debtors are part of centralized cash management system, which included consolidated bank accounts.  The cash management system allows the Debtors to collect funds received by all Debtors through a series of transactions and to disburse the funds through disbursement accounts to pay for operating expenses related to all Debtors.  The Debtors have consolidated financial statements and consolidated Federal tax returns.  At year end, only the consolidated financial statement and that of non-debtor Haul are audited.  All of the Debtors are borrowers or guarantors of the debtor-in-possession financing facility and the pre-petition unsecured notes.  In addition, it is company policy that the individual Subsidiaries are not permitted to borrow money independently.

There is substantial identity among the Debtors, some of which have similar names and are known as the largest transporter of new and used vehicles in North America.  The Debtors' extremely strong and high-profile presence in the car-hauling industry also contributed to their substantial identity, despite their observance of corporate formalities.  Further, although the Debtors keep separate books and records, the time and expense of separately classifying and treating claims against each Debtor would be significant.

In the Chapter 11 Cases, all of the Debtors are jointly and severally liable for the DIP Loan Facility and the Prepetition Notes.  Absent the proposed limited substantive consolidation, any recoveries available to general unsecured creditors likely would be further diluted on account of secured guarantees provided by Debtor subsidiaries which are structurally senior to the claims of substantially all trade and other general unsecured claims.  For these reasons, there is no prejudice to any creditor in substantively consolidating the estates and treating each creditor as holding a single claim against a common pool of value.  Accordingly, limited substantive consolidation as set forth herein is warranted.

Based upon the proposed substantive consolidation of the Debtors' estates, creditors each effectively have one claim for purposes of distributing the value allocated to them in the Plan. This structure avoids complications that arise in connection with calculating and making distributions on account of their individual, separate claims against each Debtor entity. The actual assets of the Debtors, however, will not be consolidated together, and the separate legal identity of each Debtor will be maintained.

### 3.    Corporate Structure and Governance of the Reorganized Debtors

#### (a)    Continued Corporate Existence

After the Effective Date, each of the Reorganized Debtors shall continue to exist in accordance with the law in the jurisdiction in which it is incorporated or organized and pursuant to its certificate of incorporation and bylaws or other applicable organizational document in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other applicable organizational document are amended or replaced under the Plan and as provided in the Reorganized Governing Documents and Reorganized By-Laws. Old Allied Holdings may be reorganized and reincorporated as a Delaware corporation pursuant to the Plan, on or after the Effective Date and shall operate under its Reorganized Governing Documents and Reorganized By-laws. On and after the Effective Date, all property of the Estates, including all Claims, rights and causes of action and any property acquired by any Debtor or Reorganized Debtor under or in connection with the Plan, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests. On and after the Effective Date, each of the Reorganized Debtors may operate its business, may use, acquire and dispose of property, may retain, compensate and pay any professionals or advisors, and compromise or settle any Claims or Interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Notwithstanding the foregoing, due to tax, operational and other business considerations, Yucaipa reserves the right to structure the Plan as an asset sale so long as the treatment to holders of Allowed Claims and Interests does not change negatively and materially.

Each Reorganized Debtor may, without the need for any further corporate act or other action under any applicable law, regulation, order or rule, issue authorized New Common Stock to the Reorganized Debtor that was that Debtor's corporate parent prior to the Effective Date, so that each Reorganized Debtor will retain its 100% ownership of its pre-Petition subsidiary. The foregoing may be modified by Yucaipa, after consultation with the Debtors and the Creditors' Committee.

There are certain Affiliates of the Debtors that are not Debtors in the Chapter 11 Cases. The continued existence, operation and ownership of such non-Debtor Affiliates is a material component of the Debtors' businesses and, all of the Interests and other property interests in such non-Debtor Affiliates (other than non-Debtor Affiliates owned by certain other non-Debtor Affiliates) shall vest in the applicable Reorganized Debtor as its successor on the Effective Date free and clear of all Claims, Liens, charges, other encumbrances and interests.

**(b)    Reorganized Governing Documents and By-Laws**

The Reorganized Governing Documents (defined in the Plan as the new or amended and restated articles, partnership agreement or limited liability company operating agreement, as the case may be, of each of the Reorganized Debtors prepared pursuant to Article 7.1 of the Plan) and Reorganized By-Laws (defined in the Plan as the new or amended by-laws of the Reorganized Debtors prepared pursuant to Article 7.1 of the Plan) of each Reorganized Debtor shall be adopted as may be required in order that they are consistent with the provisions of the Plan and the Bankruptcy Code. In addition, the Reorganized Governing Documents for each of the Reorganized Debtors, shall, among other things, (a) authorize the issuance of common stock in amounts not less than the amounts necessary to permit the distributions thereof required or contemplated by the Plan, and (b) provide, pursuant to Section 1123(a)(6) of the Bankruptcy Code, for (i) a provision prohibiting the issuance of non-voting equity securities, and (ii) to the extent necessary, a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.    The Reorganized Governing Documents of Reorganized Allied Holdings may, among other things, provide for the waiver, to the extent permitted by law, of any interest or expectancy of Reorganized Allied Holdings in, or in being offered the opportunity to participate in, specified business opportunities or specified classes or categories of business opportunities that are presented to the corporation or one or more of its directors, officers or stockholders.    Forms of the Reorganized Governing Documents and Reorganized By-Laws of the Reorganized Debtors will be contained in the Plan Supplement.

**(c)    Authority to Take Actions**

Each of the matters provided for under the Plan involving the corporate, partnership or limited liability company structure of any Debtor or Reorganized Debtor or any corporate or limited liability company action to be taken by or required of any Debtor or Reorganized Debtor, including without limitation the adoption of the Reorganized Governing Documents and Reorganized By-Laws of each of the Reorganized Debtors as provided for in Section 7.1 of the Plan, the reincorporation of Allied Holdings into a Delaware corporation, entrance into the Stockholders' Agreement, Registration Rights Agreement and Management Services Agreement, the initial selection of directors and officers for the Reorganized Debtors, the Distribution of Cash pursuant to the Plan, the issuance and sale of New Common Stock, the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing, and other matters involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of any of the Debtors or the Reorganized Debtors.

Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to

effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.

The Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

**(d)** **Directors and Officers of Reorganized Debtors**

The Initial Board shall have five members, including a new CEO (who shall be selected by Yucaipa and shall be reasonably acceptable to TNATINC and the Creditors' Committee), one member chosen by the Creditors' Committee (who shall be reasonably acceptable to Yucaipa), and three other members selected by Yucaipa. Pursuant to the terms of the amended Collective Bargaining Agreement, TNATINC shall have certain observer rights with respect to the Initial Board. The current CEO's employment with the Debtors shall terminate prior to the Effective Date. Yucaipa has selected Derex Walker, Ira Tochner and Jos Opdeweegh to serve on the Initial Board. The proposed identity of the other members of the Initial Board and the new CEO shall be disclosed on or prior to the date of the hearing on the approval of the Disclosure Statement with respect to the Plan, or as soon thereafter as practicable. The remaining members of senior management who will continue to serve until the Effective Date shall do so pursuant to their respective existing terms of compensation and thereafter subject to terms and conditions mutually acceptable to the Initial Board and the applicable member of management. The Initial Board of Allied Holdings shall choose the members of the Boards of Directors of each of the other Reorganized Debtors on the Effective Date or as soon as practicable thereafter. Each of the Persons on the Initial Boards of Directors and each of the initial officers of the respective Reorganized Debtors shall serve in accordance with the Reorganized Governing Documents and Reorganized By-Laws of each of the respective Reorganized Debtors, as the same may be amended from time to time.

**(e)** **New Employment, Retirement, Indemnification and Other Related Agreements and Incentive Plans**

As of the Effective Date, the Reorganized Debtors will have authority to: (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with their active directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees, subject to the relevant Reorganized Governing Documents.

**(f)** **Stockholders' Agreement**

All creditors receiving New Allied Holdings Common Stock under the Plan, by acceptance of such newly issued shares, will be bound by the terms of the Stockholders' Agreement to the maximum extent permitted by applicable law, including the Bankruptcy Code. The Stockholders' Agreement may provide for, among other things, (i) nomination and observation rights regarding the board of directors of Reorganized Allied Holdings consistent (for two years) with the board composition described in the section of this Disclosure Statement

titled "Directors and Officers of Reorganized Debtors", (ii) approval rights of Yucaipa and possibly others regarding certain significant transactions involving Reorganized Allied Holdings, (iii) pre-emptive rights in favor of Yucaipa and possibly others in connection with certain issuances of securities, (iv) "drag along" and/or "tag along" rights triggered upon certain sales or dispositions of the capital stock of Reorganized Allied Holdings, pursuant to which holders may be required to sell all their shares of New Allied Holdings Common Stock and/or entitled to sell all or a portion of their New Allied Holdings Common Stock, (v) certain additional restrictions on transfer of New Allied Holdings Common Stock, including among others, rights of first refusal or other rights to purchase in favor of Reorganized Allied Holdings, Yucaipa or possibly others in connection with any proposed sale or transfer of New Allied Holdings Common Stock, and (vi) other terms, conditions and restrictions of the type included in stockholders' agreements. The form of the Stockholders' Agreement will be set forth in the Plan Supplement. The entering into and effectuation of the Stockholders' Agreement on the Effective Date, will be authorized by the Plan without the need for any further action by holders of New Allied Holdings Common Stock, and shall be effective on the date thereof.

If there are fewer than 300 Initial Holders of New Allied Holdings Common Stock on the Effective Date, it is expected that Reorganized Allied Holdings will not remain a "public" company subject to the reporting requirements of the Exchange Act. In such event, the Stockholders' Agreement would include transfer and trading restrictions intended to limit the number of record holders of New Allied Holdings Common Stock to no more than 290 per class of securities (as such concept is understood for purposes of Section 12 of the Exchange Act) such that Reorganized Allied Holdings would not be subject to reporting requirements under the Exchange Act. If there are more than 300 Initial Holders of New Allied Holdings Common Stock on the Effective Date, Reorganized Allied Holdings would remain, for some period of time, a "public" company subject to the reporting requirements of the Exchange Act. In the event Reorganized Allied Holdings emerges from these Chapter 11 Cases as a public company, certain of the terms of the Stockholders' Agreement described above may not be applicable.

The foregoing may be modified by Yucaipa at any time after consultation with the Debtors and the Creditors' Committee. Certain of the terms described above may instead or also be included in the Reorganized Governing Documents or Reorganized By-Laws.

### (g)    Registration Rights Agreement

On the Effective Date, Reorganized Allied Holdings will be authorized to enter into a Registration Rights Agreement with Yucaipa and potentially other holders of the New Allied Holdings Common Stock. The Registration Rights Agreement is expected to provide (i) certain rights to require Reorganized Allied Holdings to register a public offering, (ii) certain rights to demand that Reorganized Allied Holdings file, prepare and cause to become effective registration statement and (iii) piggyback registration rights. The Registration Rights Agreement may also provide other holders of New Allied Holdings Common Stock with certain registration rights. The form of the Registration Rights Agreement will be set forth in the Plan Supplement. The entering into and effectuation by Reorganized Allied Holdings of the Registration Rights Agreement on the Effective Date, will be authorized by the Plan without the need for any further corporate action and without any further action by holders of Claims or equity interests, and shall be effective on the date thereof.

The foregoing may be modified by Yucaipa at any time after consultation with the Debtors and the Creditors' Committee.

### (h)   Management Services Agreement

On the Effective Date, Reorganized Allied Holdings will be authorized to enter into a Management Services Agreement with an affiliate of Yucaipa, with a term of five years, such term being automatically extended by 12 additional calendar months on an annual basis unless prior notice of nonrenewal is provided by Reorganized Allied Holdings. The Management Services Agreement will provide that Yucaipa affiliate may perform certain monitoring and management services, including helping the company evaluate its strategic and financing alternatives, improve labor relations, attract and retain senior management, negotiate future collective bargaining agreements, set strategic priorities, pursue revenue growth opportunities, and develop strategies for upgrading the fleet. In return for such services the Yucaipa affiliate will be entitled to an annual fee of $1,500,000 and reimbursement of out-of-pockets costs. The Management Services Agreement will be filed as part of the Plan Supplement.

### (i)   Old Allied Holdings Common Stock, Old Other Debtors Common Stock and Old Allied Holdings Stock Rights

On the Effective Date, all Old Allied Holdings Common Stock will be cancelled. On the Effective Date, all Old Other Debtors Common Stock and Old Allied Holdings Stock Rights will be cancelled unless, after consultation with the Debtors and the Creditors' Committee, Yucaipa determines for business, tax or operational reasons that such stock should remain outstanding.

### (j)   Effectuating Documents and Further Transactions

Each of the Debtors or Reorganized Debtors, as appropriate, is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

### (k)   Authorization and Issuance of New Common Stock

On the Effective Date, the Reorganized Debtors are authorized to issue the New Common Stock in accordance with the provisions of the Plan. The issuance of New Common Stock and the Distributions thereof will be exempt from registration under applicable securities laws pursuant to Section 1145(a) of the Bankruptcy Code.

### (l)   Reserve of New Allied Holdings Common Stock

Reorganized Allied Holdings shall be authorized, without further act or action by the Initial Board and without further act or action under applicable law, regulation, order, or rule to reserve from the authorized shares of New Allied Holdings Common Stock, that number of shares of New Allied Holdings Common Stock required for issuance to the Holders of Allowed Claims as and when required under the Plan. The Initial Board may reduce the number of shares of New Allied Holdings Common Stock so reserved at any time as it deems appropriate to the

extent it determines in good faith that such reserve is in excess of the number of shares needed to satisfy the foregoing requirements.

### (m)     Listing of New Allied Holdings Common Stock

In the event the Initial Board determines in its discretion to register the New Allied Holdings Common Stock with the Securities and Exchange Commission, or if Reorganized Allied Holdings is required under applicable securities laws to register the New Allied Holdings Common Stock with the Securities and Exchange Commission, Reorganized Allied Holdings shall use commercially reasonable efforts to list the New Allied Holdings Common Stock on a national securities exchange or for quotation on a national automated interdealer quotation system within one year of the Effective Date unless the Initial Board determines otherwise. Reorganized Allied Holdings shall have no liability if it is unable to, or determines not to, list the New Allied Holdings Common Stock as described above.  In the event the New Allied Holdings Common Stock is listed on a national securities exchange, action may be taken to modify the composition of the board of directors, including potentially the number of directors, so that Reorganized Allied Holdings would be in compliance with certain independence requirements mandated by the Sarbanes-Oxley Act of 2002, and all documents incident thereto shall have been completed in form and substance acceptable to Yucaipa.  Persons receiving Distributions of New Allied Holdings Common Stock, by accepting such Distributions, shall have agreed to cooperate with Reorganized Allied Holdings' reasonable requests to assist Reorganized Allied Holdings in its efforts to list the New Allied Holdings Common Stock on a securities exchange or quotation system to the extent necessary.

### (n)     Possible Privatization of Reorganized Allied Holdings Following Emergence

If there are more than 300 Initial Holders of New Allied Holdings Common Stock on the Effective Date, Reorganized Allied Holdings would as of the Effective Date remain a "public" company subject to the reporting requirements of the Exchange Act.  However, it is possible that after the Effective Date, Reorganized Allied Holdings, Yucaipa and/or other holders of New Allied Holdings Common Stock could take actions to reduce the number of stockholders to below 300, or otherwise engage in or approve a transaction or transactions which would reduce the number of stockholders to below 300 and cause Reorganized Allied Holdings to become a private company not subject to the reporting requirements of the Exchange Act and without securities registered with the Securities and Exchange Commission.

### 4.     Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to Section 1146 of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or Entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to

67

accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 5.    Retained Actions

Except as set forth in Section 6.11 of the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, to the extent set forth below, and their respective successors, any assigns and future assigns will retain and may exclusively enforce any Causes of Action subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan (and consented to by Yucaipa in its sole discretion), and the Confirmation Order's approval of the Plan shall be deemed a res judicata determination of such rights to retain and exclusively enforce such Causes of Action, and none of such Causes of Action is deemed waived, released or determined by virtue of the entry of the Confirmation Order or the occurrence of the Effective Date, notwithstanding that the specific Claims and Causes of Action are not identified or described. Absent such express waiver or release by the Debtors, the Reorganized Debtors, or their respective successors or assigns (with the consent of Yucaipa) may pursue Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors (or their successors or future assigns).  All Causes of Action may be asserted or prosecuted before or after solicitation of votes on the Plan and before or after the Effective Date.

Absent an express waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors  from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Causes of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after Confirmation, the Effective Date or the consummation of the Plan. By example only, and without limiting the foregoing, the utilization or assertion of a Cause of Action, or the initiation of any proceeding with respect thereto against a Person, by the Reorganized Debtors or any successor to or assign of them, including the Liquidating Trustee, shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of (a) the solicitation of a vote on the Plan from such Person or such Person 's predecessor in interest; (b) the Claim, Interest or Administrative Expense Claim of such Person or such Person's predecessor in interest having been listed in a Debtor's Schedules, List of Holders of Interests, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim or, Interest of the Person or such Person's predecessor in interest; or (d) Confirmation of the Plan.

Notwithstanding any allowance of a Claim, the Reorganized Debtors reserve the right to seek, among other things, to have such Claim disallowed if the Reorganized Debtor, at the appropriate time, determines that it has a defense under 11 U.S.C. § 502(d), e.g., the Reorganized Debtor holds an Avoidance Action against the Holder of such Claim and such Holder after demand refuses to pay the amount due in respect thereto.

Although the Plan Proponents have not yet completed their investigation of all Causes of Action, at this time, the Debtors are unaware of any significant fraudulent conveyance actions

and the maximum amount the Debtors believe they could recover from Avoidance Actions is less than $13,628,611.84.

## E. Provisions Regarding Distributions

### 1. Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in Article VIII of the Plan and as to DIP Facility Claims, Distributions of Cash to be made on the Effective Date to Holders of Claims that are Allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (i) 90 days after the Effective Date and/or, as applicable (ii) 90 days after such later date when the applicable conditions of Section 5.2 of the Plan (regarding cure payments for Executory Contracts and Unexpired Leases being assumed) and Section 8.8 of the Plan (regarding undeliverable Distributions) are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Section 9.5 of the Plan.

### 2. Disbursing Agent

Except as otherwise provided in Article VIII of the Plan, the Reorganized Debtors, or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion, will make all Distributions of Cash, New Allied Holdings Common Stock, and other instruments or documents required under the Plan. Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other Entities to assist in or make the Distributions required by the Plan. Each Third Party Disbursing Agent including for these purposes, the Indenture Trustee, providing services related to Distributions pursuant to the Plan will receive from the Reorganized Debtors reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services without the need for Bankruptcy Court approval. These payments will be made on terms agreed to with the Reorganized Debtors and will not be deducted from the Distributions to be made pursuant to the Plan to Holders of Allowed Claims receiving Distributions from a Third Party Disbursing Agent. The Indenture Trustee shall receive an Administrative Claim in an amount equal to the Indenture Trustee Fees and Expenses. To the extent such Administrative Claim is not paid to the Indenture Trustee (or escrowed pending the resolution of any dispute), the Indenture Trustee shall retain its charging lien on Distributions to Holders of Prepetition Notes Claims to the fullest extent permitted under the Prepetition Notes Indenture.

### 3. Distributions of Cash

Except as otherwise provided in the Plan, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the Reorganized Debtors or, at the option of the Reorganized Debtors or by wire transfer from a domestic bank; provided that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan on behalf of the DIP Facility Claims will be made to the administrative agent for the DIP Loan Facility on the Effective Date by wire transfer of immediately available funds.

4.     **No Interest on Claims or Interests**

Unless otherwise specifically provided for or contemplated in the Plan or Confirmation Order, or required by applicable bankruptcy law to render a Claim Unimpaired or otherwise, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim, other than Other Secured Claims to the extent required by the applicable documents giving rise to such Claims; provided, however, that to the extent a Holder of a Other Secured Claim has a Deficiency Claim on account of such Other Secured Claim, interest shall not accrue on or after the Petition Date on the Other Secured Claim or the Deficiency Claim.

5.     **Delivery of Distributions**

The Distribution to a Holder of an Allowed Claim shall be made by the Reorganized Debtors (a) at the address set forth on the Proof of Claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to the Debtors or Reorganized Debtors after the date of any related Proof of Claim, (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Debtors or Reorganized Debtors have not received a written notice of a change of address, (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtors' books and records, or (e) in the case of Prepetition Notes Claims to the Indenture Trustee for ultimate distribution to the Record Holders of such Prepetition Notes Claims. The Indenture Trustee shall be directed to effect any Distribution under the Plan through the most efficient method available in the Indenture Trustee's discretion, including, without limitation, through the book entry transfer facilities of the Depository Trust Company pursuant to the procedures used for effecting distributions thereunder on the date of any such distribution. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Reorganized Debtors are notified of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest. All Cash Distributions returned to the Reorganized Debtors and not claimed within six (6) months of return shall be irrevocably retained by the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary. All Distributions of New Allied Holdings Common Stock returned to the Debtors and not claimed within six (6) months of return shall irrevocably revert to Reorganized Allied Holdings and shall be retained and held as set forth in the Reorganized Governing Documents. Upon such reversion, the claim of any Holder or their successors with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

6.     **Distributions to Holders as of the Record Date**

All Distributions on Allowed Claims shall be made to the Record Holders of such Claims. As of the close of business on the Record Date, the Claims register maintained by the Claims Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim. The Reorganized Debtors and any Disbursing Agent shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. The Reorganized Debtors shall instead be entitled to recognize and deal for all purposes under the Plan with the Record Holders as of the Record Date. As of the close of business on the Confirmation Date, the transfer ledgers for the

Prepetition Notes shall be deemed closed and the Indenture Trustee may take whatever action is necessary to close the transfer ledgers and there shall be no further transfers or changes in the holder of record of such securities in such transfer ledgers. The Disbursing Agent and the Indenture Trustee shall have no obligation to recognize the transfer of, or sale of any participation in, any Prepetition Notes Claim that occurs after close of business on the Confirmation Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Confirmation Date.

Notwithstanding Bankruptcy Rule 3001(d) and (e) or any other applicable provisions of the Bankruptcy Code, the Bankruptcy Rules or other applicable law, from and after the Record Date, Holders of Class 4A, Class 4B and Class 4C Claims, and those Class 4D Claims who receive New Allied Holdings Common Stock under the Plan (if any), will not be permitted to transfer, sell, assign, hypothecate or pledge their claims except that they may be assigned or transferred by will, intestate succession, or operation of law. Any purported transfer, sale, assignment, hypothecation or pledge that is made in derogation of the previous sentence will not be recognized by the Debtors or the Reorganized Debtors and will be null and void for all purposes. Holders of Allowed Class 4A, Class 4B, Class 4C and Class 4D who receive New Allied Holdings Common Stock will not be permitted to transfer, sale, assign, hypothecate or pledge such shares except (i) transfers and assignments by will, intestate succession or operation of law, (ii) transfers, assignment and sales permitted by the Stockholders' Agreement, or (iii) to the extent permitted by the Stockholders' Agreement, transfers effectuated through a national securities exchange if the stock is listed on such an exchange pursuant to section 7.10 of the Plan. Notwithstanding the foregoing, pursuant to the terms of the Plan, Holders of General Unsecured Claims, Insured Claims and Other Insured Claims who receive the Cash Option shall be permitted to assign and deemed to have assigned their General Unsecured Claims, Insured Claims and/or Other Insured Claims (without giving effect to any Voluntary Reductions) to Yucaipa or Yucaipa's designees.

Consistent with Bankruptcy Rule 3003(c), the Debtors or Reorganized Debtors shall recognize the Proofs of Claim filed by the Indenture Trustee, in the amounts as Allowed herein, in respect of the Prepetition Notes Claims. Accordingly, any Claim, proof of which is filed by the registered or beneficial holder of a Prepetition Notes Claim, may be disallowed as duplicative of the Claims of the Indenture Trustee without need for any further action or Bankruptcy Court order.

### 7.        **De Minimis Distributions**

Pursuant to Section 8.10 of the Plan, neither the Reorganized Debtors nor the Indenture Trustee shall have an obligation to make a Distribution if the amount to be distributed to the specific Holder of the Allowed Claim has a value less than $50.00. Any Holder of an Allowed Claim on account of which the amount of Cash to be distributed is less than fifty dollars ($50.00) will have its claim for such Distribution discharged and will be forever barred from asserting any such Claim against the Reorganized Debtors or their respective property. Any Cash not distributed pursuant to Section 8.10 of the Plan will be the property of Reorganized Allied Holdings, free of any restrictions thereon, and any such Cash held by a Third Party Disbursing Agent will be returned to Reorganized Allied Holdings.

8. **Fractional Securities; Fractional Dollars**

Any other provision of the Plan notwithstanding, payments of fractions of shares of New Allied Holdings Common Stock will not be made and shall be deemed to be zero. Any other provision of the Plan notwithstanding, the Reorganized Debtors shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

9. **Procedures for Distributions to Holders of Prepetition Note Claims.**

Unless waived by the Reorganized Debtors, as a condition to receiving payments or other distributions, Distributions to Holders of Prepetition Notes Claims shall only be made to such Holders after the surrender by each such Holder of the Prepetition Notes, and/or similar or related documents representing such Claims, or in the event that such certificate or similar document is lost, stolen, mutilated or destroyed, upon the holder's compliance with the requirements set forth in the Plan. Any Holder that fails to: (i) surrender such instrument or (ii) execute and deliver an affidavit of loss and/or indemnity, reasonably satisfactory to the Reorganized Debtors and furnish a bond in form, substance and amount reasonably satisfactory to the Reorganized Debtors within one (1) year of the Effective Date, shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution under the Plan in respect of such Claims.

10. **Distributions of Cash to Holders of Allowed Class 4D Claims.**

The Reorganized Debtors, or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion, will make all Distributions of Cash from the Cash Out Distribution to Holders of Allowed Class 4D Claims only after all Class 4D Claims have been Allowed or disallowed by agreement or Final Order. Any amount of the Cash Out Distribution remaining after making such Distributions shall be returned to Yucaipa.

11. **Withholding Taxes**

(a) **Responsibilities of the Debtors**

The Debtors or the Reorganized Debtors, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding and reporting requirements. The Debtors or the Reorganized Debtors, as applicable, shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

(b) **Responsibilities of Entities Receiving Distributions**

Notwithstanding any other provision of the Plan, each Entity receiving a Distribution of Cash or New Allied Holdings Common Stock pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any

governmental unit on account of such Distribution, including income, withholding and other tax obligations.

### 12. No Duplicate Distributions

To the extent more than one Debtor is liable for any Claim, such Claim shall be considered a single Claim and entitled only to the payment provided therefor under the applicable provisions of the Plan.

### 13. Distributions in U.S. Dollars

Except as otherwise specified herein, Cash payments made pursuant to the Plan shall be in U.S. currency by checks drawn on a domestic bank selected by the applicable Debtor or Reorganized Debtor or, at the option of the applicable Debtor or Reorganized Debtor, by wire transfer from a domestic bank. If an Allowed Claim is filed in a currency other than U.S. dollars, Distributions will be made to the Holder of such Allowed Claim utilizing the exchange rate on or about the time of Distribution.

## F. Treatment of Executory Contracts and Unexpired Leases

### 1. Assumption and Cure of Executory Contracts and Unexpired Leases.

On the Effective Date, in addition to all executory contracts and unexpired leases that have been previously assumed by the Debtors by order of the Bankruptcy Court, all executory contracts and unexpired leases of the Reorganized Debtors identified on an exhibit to the Plan in form and substance reasonably acceptable to Yucaipa, as may be amended prior to the Confirmation Date (the "Contract/Lease Schedule"), are hereby deemed assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code. On or before the day that is five days before the Voting Deadline, Yucaipa (after consultation with the Debtors and the Creditors' Committee) will File the Contract/Lease Schedule; provided however that Yucaipa reserves the right to amend the Contract/Lease Schedule at any time up to three (3) days before the Confirmation Hearing. The Debtors and Plan Proponents, as applicable, will provide notice of any amendments to the Contract/Lease Schedule to the parties to the executory contracts and unexpired leases affected thereby and to the Creditors' Committee. All executory contracts or unexpired leases of the Reorganized Debtors not set forth on the Contract/Lease Schedule (or not previously assumed by the Debtors by order of the Bankruptcy Court or subject of a Filed motion to assume) that were not previously rejected will be deemed rejected as of the Effective Date pursuant to Sections 365 and 1123 of the Bankruptcy Code.

### 2. Claims Based on Rejection of Executory Contracts and Unexpired Leases

Any Holder of any Claim arising from the rejection of an executory contract or unexpired lease must File a Proof of Claim within the earlier of (a) thirty (30) days following entry of an order by the Bankruptcy Court authorizing rejection of the applicable contract or lease and (b) thirty (30) days after the Confirmation Date. Entry of the Confirmation Order by the Bankruptcy Court shall, subject to the occurrence of the Effective Date, constitute approval of such rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed and/or assigned pursuant to Article V of the Plan (or pursuant to other

Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the applicable Reorganized Debtor(s) in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law.  To the extent applicable, all executory contracts or unexpired leases of Reorganized Debtors assumed pursuant to Section 5.1 of the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant executory contract or unexpired lease, and any required consent under any such contract or lease shall be deemed satisfied by the confirmation of the Plan.

### 3.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary cure amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) as due in the ordinary course of business or (iii) on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree. In the event of a dispute regarding: (1) the amount of any cure payments, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assigned, or (3) any other matter pertaining to assumption, the cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.  Yucaipa will list cure amounts for executory contracts and unexpired leases on the Contract/Lease Schedule.  **The failure of any non-Debtor party to an executory contract or unexpired lease to file and serve an objection to the cure amount listed on the Contract/Lease Schedule for such executory contract or unexpired lease by May 7, 2007 at 4:00 pm, Eastern Standard Time, shall be deemed consent to such cure amount.**

### 4.      Collective Bargaining Agreement

The Collective Bargaining Agreement between the IBT and the Debtors shall be amended and assumed by the Reorganized Debtors on the terms and conditions set forth in <u>Exhibit G</u> to the Disclosure Statement.  The Debtors and the Reorganized Debtors shall not be obligated to pay any cure amounts associated with the assumption of such contract.

### 5.      Employment Agreements and Other Benefits

### (a)      Employment Agreements

Except as otherwise provided in the Plan or modified by the KERP, to the extent the Debtors had employment agreements with certain of their employees as of the Petition Date, Yucaipa will disclose in the Contract/Lease Schedule whether they intend to assume or reject such contracts. Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors shall maintain all of their existing rights, including, but not limited to, any rights that they may have to amend, modify, or terminate, the employment agreements assumed pursuant to the Plan,

subject to the existing contractual rights, if any, of the directors, officers or employees affected thereby.

**(b)    Benefits Provided to Executives and Certain Key Employees**

The Debtors are directed in the Plan to comply with the KERP and the Debtors or Reorganized Debtors will perform any and all remaining obligations thereunder, including the payment of performance bonuses, emergence bonuses (not voluntarily forgone) and severance amounts contemplated thereby.

**(c)    Qualified Pension Plans**

Upon the occurrence of the Effective Date, the Reorganized Debtors intend to continue the Qualified Pension Plans, as frozen, and shall meet the minimum funding standards under ERISA and the Internal Revenue Code, shall pay all Pension Benefit Guaranty Corporation insurance premiums, if applicable, and shall otherwise administer and operate the Qualified Pension Plans in accordance with their terms and ERISA in such manner as is necessary to maintain those benefits that had accrued prior to the date that accrual of benefits under the Qualified Pension Plans was frozen. Nothing in the Plan shall be deemed to release, discharge, or relieve the Debtors, Reorganized Debtors, any member of the Debtors' controlled groups (as defined in 29 U.S.C. § 1301(a)(14)), or any other party, in any capacity, from any current or future liability with respect to the Qualified Pension Plans, and the Pension Benefit Guaranty Corporation and the Qualified Pension Plans shall not be enjoined or precluded from enforcing such liability as a result of the Plan's provisions or consummation.  Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors shall maintain all of their existing rights, including, but not limited to, any rights that they may have to amend, modify, or terminate the Qualified Pension Plans.

**(d)    Compensation and Benefit Programs**

All employment and severance agreements and policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees, officers and directors including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements and plans, incentive plans, deferred compensation plans and life, accidental death and dismemberment insurance plans, shall be treated as executory contracts under the Plan, and on the Effective Date will be deemed assumed pursuant to the provisions of Sections 365 and 1123 of the Bankruptcy Code; and the Debtors' and Reorganized Debtors' obligations under such programs to such Persons shall survive confirmation of the Plan, except for: (a) executory contracts or employee benefit plans specifically rejected pursuant to the Plan by being listed as contracts to be rejected on the Contract/Lease Schedule or otherwise (to the extent that any such rejection does not violate the Bankruptcy Code including, but not limited to, Sections 1114 and 1129(a)(13) thereof); (b) all employee equity or equity-based incentive plans; (c) such executory contracts or employee benefit plans as have previously been rejected, are the subject of pending rejection procedures or a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract; and (d) except as modified pursuant to the terms of the amended IBT Collective Bargaining Agreement as described in Section 5.3 of the Plan; provided however, that the Reorganized

Debtors' obligations, if any, to pay all "retiree benefits" as defined in Section 1114(a) of the Bankruptcy Code shall continue to the extent that any such retiree benefits have been modified in accordance with Section 1114 of the Bankruptcy Code. [Notwithstanding the foregoing, the assumption of the indemnification provisions and insurance described in this Section shall only apply to directors, officers and employees who remain in their respective capacity as directors, officers and employees as of the Effective Date.][8]

### (e)     Workers' Compensation Programs

As of the Effective Date, the Reorganized Debtors shall continue to honor all of the obligations of the Debtors to insurers, including those incurred on or prior to the Effective Date, under: (i) all applicable workers' compensation laws; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. Notwithstanding anything to the contrary in the Plan or Disclosure Statement, nothing in the Plan or the Confirmation Order shall (i) limit, diminish, or otherwise alter or impair the Debtors', Reorganized Debtors' and/or insurers' defenses, claims, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and/or plans; or (ii) preclude or limit, in any way, the rights of the Debtors, Reorganized Debtors and/or insurers to contest and/or litigate with any party the existence, primacy and/or scope of available coverage under any alleged applicable policy; provided further, that nothing herein shall be deemed to impose any obligations on the Debtors, Reorganized Debtors or insurers beyond what is provided for in the applicable laws, policies and/or related insurance agreements.

### (f)     Retiree Medical Benefits

On and after the Effective Date, to the extent required by Section 1129(a)(13) of the Bankruptcy Code, and except as may be provided to the contrary in a separate order of the Bankruptcy Court or under contracts negotiated with the applicable labor groups governing such benefits, each Reorganized Debtor shall continue to pay all retiree benefits (if any) of any worker who retired as of the Effective Date, to the extent such benefits were maintained or established prior to the Effective Date.

### (g)     Insurance Policies.

(1)     Notwithstanding anything to the contrary in the Plan, nothing in the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to or have the effect of impairing the legal, equitable or contractual rights of any of (i) the Debtors' insurers, or (ii) any of the Holders of any Claims with respect to such Holders' rights, if any, to recover under applicable insurance policies providing coverage for such Claims (including, without limitation, any amounts recoverable within any policy deductible and provided that any recovery under any insurance policy is not in duplication of any Distribution such Holder may receive

---

[8]   The assumption of the indemnification provisions and insurance set forth in this bracketed sentence remains subject to further discussions among the Plan Proponents.  Accordingly, this sentence maybe modified or deleted prior to the Confirmation Hearing.

under this Plan).  The rights, obligations and liabilities of insurers and the Debtors shall be determined under the subject insurance policies and related agreements.  All insurance policies and related agreements entered into or issued prior to the Effective Date shall continue after the Effective Date unaltered by the Plan or the Confirmation Order.  The terms, conditions, limitations, exclusions and coverages, and the Debtors' rights, obligations and liabilities under their insurance policies and related agreements shall remain unmodified, including any duty of the Debtors to defend, at their own expense, against claims asserted under their insurance policies; provided, however, that the rights, obligations and liabilities of the Debtors, whether now existing or hereafter arising, shall be the rights, obligations and liabilities of the Reorganized Debtors and shall be fully enforceable by and against the Reorganized Debtors.

(2)     Nothing in the Plan, including the injunction and release provisions of Sections 11.4 and 11.6 of the Plan, or in the Confirmation Order shall preclude the Debtors or any insurer from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any insurance policy or any insurance settlement agreement, including the rights of the insurers to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable insurance policy.

(3)     All of the Debtors' rights, obligations and liabilities arising under any insurance policies and any agreements, documents and instruments relating thereto shall be deemed transferred to and fully enforceable by and against the Reorganized Debtors on the Effective Date.

(h)     **ACE Insurance Program**.  Notwithstanding anything to the contrary contained in the Plan or Confirmation Order  (including, without limitation any other provision that purports to be preemptory or supervening, or grants an injunction or release (as set forth in Sections 11.4 and 11.6 of the Plan or otherwise)),  all insurance policies and related insurance agreements, including but not limited to, those providing coverage for workers' compensation, general liability and automobile liability, entered into between ACE American Insurance Company (together with its affiliates, the "ACE Companies") and the Debtors or issued by the ACE Companies to the Debtors prior to the Effective Date (collectively, the "ACE Insurance Program"), and the Debtors' and the ACE Companies' rights, obligations and liabilities thereunder, shall continue after the Effective Date unaltered by the Plan or the Confirmation Order, except that the rights, obligations and liabilities of the Debtors, whether now existing or hereafter arising, shall be the rights, obligations and liabilities of the Reorganized Debtors and shall be fully enforceable by and against the Reorganized Debtors under the ACE Insurance Program.  Except as provided in the immediately preceding sentence, nothing in the Plan or Confirmation Order shall vary, amend, modify or alter in any way the terms, conditions, coverages, limitations, exclusions, or dates of coverage provided under the ACE Insurance Program.  Without limiting the foregoing, the respective rights, claims, defenses, duties, liabilities and obligations of the Debtors, the Reorganized Debtors and the ACE Companies under the ACE Insurance Program shall remain in effect, including, without limitation, the rights of the ACE Companies to contest and/or litigate the existence, primacy and/or scope of available coverage under the alleged applicable policy.  The claims of the ACE Companies against the Debtors shall be payable by the Debtors (and after the Effective Date, by the Reorganized

Debtors), in the ordinary course of their businesses, without any requirement for the ACE Companies to file a proof or proofs of claim or administrative expense claim.

## G.    Procedures for Treating and Resolving Disputed Claims

### 1.    Objections to Claims

All objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Deadline, and (a) if Filed prior to the Effective Date, such objections shall be served on the parties on the then applicable service list in the Chapter 11 Cases; and (b) if Filed after the Effective Date, such objections shall be served on the Reorganized Debtors, the United States Trustee and Yucaipa.  If an objection has not been Filed to a Proof of Claim or a scheduled Claim by the Claims Objection Deadline, the Claim to which the Proof of Claim or scheduled Claim relates shall be treated as an Allowed Claim if such Claim has not been allowed earlier. An objection is deemed to have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Deadline. Each such Tort Claim shall remain a Disputed Claim until it becomes an Allowed Claim in accordance with Sections 9.5 of the Plan.

After the Effective Date, except as provided in Paragraph 2 of Section IX of the Plan, only the Reorganized Debtors shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, provided, however, that the Reorganized Debtors shall not be entitled to object to Claims (i) that have been Allowed by a Final Order entered by the Bankruptcy Court prior to the Effective Date or (ii) that are Allowed by the express terms of the Plan. After the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; provided that (a) the Reorganized Debtors shall promptly File with the Bankruptcy Court a written notice of any settlement or compromise of a Claim that results in an Allowed Claim in excess of $500,000 and (b) the United States Trustee and Yucaipa shall be authorized to contest the proposed settlement or compromise by Filing a written objection with the Bankruptcy Court and serving such objection on the Reorganized Debtors within 20 days of the service of the settlement notice. If no such objection is Filed, the applicable settlement or compromise shall be deemed final without further action of the Bankruptcy Court.

Except as set forth in the Plan, notwithstanding that the Reorganized Debtors shall have the right to File objections to Claims and Interests, litigate and settle objections to Disputed Claims and Disputed Interests on behalf of the Debtors and their Estates, nothing contained herein shall be deemed to obligate the Reorganized Debtors to take any such actions, all of which shall be determined by the Reorganized Debtors in their sole and absolute discretion.

**THE PLAN PROPONENTS HAVE NOT FULLY REVIEWED THE CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES OR DETERMINED WHETHER OBJECTIONS TO CLAIMS AND INTERESTS EXIST.  THIS INVESTIGATION IS ONGOING AND WILL OCCUR, IN LARGE PART, AFTER THE CONFIRMATION DATE.  AS A RESULT, CREDITORS AND OTHER PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THAT THE EXISTENCE OF ANY**

**PARTICULAR OBJECTION TO A DISPUTED CLAIM OR DISPUTED INTEREST MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THE PLAN, AN OBJECTION TO A CLAIM OR INTEREST MAY BE BROUGHT AGAINST ANY CREDITOR, INTEREST HOLDER OR PARTY-IN-INTEREST AT ANY TIME, SUBJECT TO THE CLAIMS OBJECTION DEADLINE.  IN ADDITION TO THE FOREGOING, THE DEBTORS AND REORGANIZED DEBTORS RETAIN AND HEREBY RESERVE THE RIGHT TO OBJECT TO**

**(i)    ANY CLAIMS OR INTERESTS FILED AFTER THE BAR DATE; AND**

**(ii)    ANY CLAIMS FILED TO SET FORTH DAMAGES ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OR OTHER AGREEMENT WITH THE DEBTORS.**

**IN ADDITION, THE DEBTORS AND REORGANIZED DEBTORS RESERVE THE RIGHT TO BRING ANY CAUSE OF ACTION AGAINST ANY THIRD PARTY ARISING FROM OR RELATING TO ANY EVENT, ACTION OR OMISSION OCCURRING ON OR PRIOR TO THE EFFECTIVE DATE.  THE PLAN PROPONENTS HAVE NOT FULLY REVIEWED ALL SUCH CAUSES OF ACTION (INCLUDING WITHOUT LIMITATION ANY AVOIDANCE ACTION OR CAUSE OF ACTION).  AS A RESULT, CREDITORS AND OTHER PARTIES- IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THAT THE EXISTENCE OF ANY PARTICULAR LITIGATION OR AFFIRMATIVE CLAIM MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THE PLAN, SUCH LITIGATION OR AFFIRMATIVE CLAIM MAY BE BROUGHT AGAINST ANY CREDITOR, INTEREST HOLDER OR PARTY-IN-INTEREST AT ANY TIME.**

### 2.    No Distributions Pending Allowance

Except as otherwise provided in the Plan, no Distributions will be made with respect to any portion of a Claim unless and until (i) the Claims Objection Deadline has passed and no objection to such Claim has been filed, or (ii) any objection to such Claim has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.

### 3.    Estimation of Claims

Yucaipa, the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee (to the extent still in existence at such time) may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502 of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (and after the

Effective Date, the Reorganized Debtors) may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

### 4.    Distributions After Allowance

As soon as practicable after (i) the occurrence of the applicable Claims Objection Deadline, if no objection to such Claim has been timely filed, or (ii) the Disputed Claim becomes an Allowed Claim, the Reorganized Debtors, with respect to all Distributions will distribute to the Holder thereof all Distributions to which such Holder is then entitled under the Plan. In the event that the New Common Stock being held for Distribution with respect to a Claim is greater than the Distribution that is made to a Holder once the Claim becomes entitled to a Distribution, the excess remaining New Common Stock will revert to and be irrevocably retained by the Reorganized Debtors; the voting of such retained shares will be governed by the Reorganized Governing Documents for the applicable Reorganized Debtor. All Distributions made under this Article of the Plan will be made together with any dividends, payments, or other Distributions made on account of, as well as any obligations arising from, the distributed property as if such Claim had been an Allowed Claim on the dates Distributions were previously made to Allowed Holders included in the applicable Class.

### 5.    Claims Covered by Insurance Policy

To the extent a Claim (other than a Workers' Compensation Claim which shall be treated in accordance with Section 3.3 of the Plan) is asserted for liability that is covered, in whole or in part, by any insurance policy or related agreement of the Debtors ("Insured Claim"), the Holder of such Claim may continue to pursue the Claim against the Reorganized Debtors solely for the purpose of liquidating such Claim; provided, however, that in accordance with the terms of the applicable insurance policies, related agreements and the Plan, the Reorganized Debtors (on behalf of the Debtors) or the insurer, as applicable, may employ counsel, direct the defense, and determine whether and on what terms to settle any such Claim.  Once the Claim is determined to be valid by agreement or court order, then the Claim shall be an Allowed Insured Claim in the amount set forth in such order or agreement.  Subject to applicable policy terms, conditions, endorsements and applicable non-bankruptcy law, the Holder of such Allowed Insured Claim will be entitled to: (i) a Distribution under the Plan only to the extent of: (a) any unpaid or unexhausted deductible or self-insured retention under the applicable insurance policies or related agreements; and (b) any amount in excess of the limit of coverage provided by any applicable insurance policy or related agreement; and (ii) a recovery under the applicable insurance policy of the amount of such Allowed Insured Claim that is in excess of the deductible or self-insured retention but subject to the limit of coverage provided by such applicable insurance policy or related agreement.

**H.      Conditions Precedent to Confirmation and the Effective Date of the Plan**

**1.      Conditions to Confirmation**

The following are conditions precedent to the occurrence of the Confirmation of the Plan, each of which may be (i) satisfied or (ii) waived in accordance with Section 10.3 of the Plan:

(a)      The Bankruptcy Court shall have approved the Disclosure Statement with respect to the Plan in form and substance that is acceptable to Yucaipa, the Debtors and the Creditors' Committee.

(b)      The Confirmation Order shall be in form and substance satisfactory to Yucaipa, the Debtors and the Creditors' Committee, shall have been signed by the Bankruptcy Court and shall have been entered on the docket of the Chapter 11 Cases.

(c)      The Plan shall be in a form and substance satisfactory to Yucaipa, and reasonably acceptable to the Debtors and the Creditors' Committee.

(d)      The Plan Supplement and the Exhibits hereto (as confirmed or approved by the Confirmation Order) shall be in form and substance satisfactory to Yucaipa (after consultation with the Debtors and the Creditors' Committee).

(e)      The Debtors and the TNATINC shall have entered into agreements and/or the Bankruptcy Court shall have entered orders, each in form and substance satisfactory to Yucaipa and TNATINC in their respective sole discretion (which shall not have been vacated or stayed), providing individually or in combination for approval of modified collective bargaining agreements in form and substance satisfactory to each of the Plan Proponents.

(f)      The Debtors shall have obtained a written commitment for Exit Financing in form and substance satisfactory to Yucaipa (after consultation with the Debtors and the Creditors' Committee).

**2.      Conditions to the Effective Date**

The following are conditions precedent to the Effective Date that must be (i) satisfied or (ii) waived in accordance with Section 10.3 of the Plan:

(a)      All conditions to Confirmation of the Plan set forth in Section 10.1 of the Plan shall remain satisfied.

(b)      Each order of the Bankruptcy Court referred to in Section 10.1 of the Plan shall have become a Final Order.

(c)      The Confirmation Order and supporting findings of fact and conclusions of law shall be entered by the Bankruptcy Court in form and substance reasonably acceptable to each of the Plan Proponents and the Creditors' Committee and shall have become a Final Order.

(d)      All documents and agreements to be executed on the Effective Date or otherwise necessary to implement the Plan (including documents relating to the Exit Financing) shall be in form and substance that is acceptable to Yucaipa and reasonably acceptable to the Debtors (after consultation with the Creditors' Committee), except as otherwise specifically provided in the Plan.

(e)      The closing and initial funding shall have occurred under the Exit Financing and all conditions precedent to the consummation thereof (other than the occurrence of the Effective Date of the Plan) shall have been waived or satisfied in accordance with the terms thereof.

(f)      The Debtors and the Plan Proponents shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement the Plan and that is required by law, regulation, or order (the "Authorizations") and such Authorizations shall not have been revoked.

(g)      The New Common Stock shall have been issued in accordance with the Plan.

(h)      All other actions, documents and agreements necessary to implement the Plan as of the Effective Date shall have been delivered and all conditions precedent thereto shall have been satisfied or waived.

(i)      All corporate and other proceedings to be taken by the Debtors in connection with the Plan and Plan Supplement and the consummation of the transactions contemplated thereby and by the Plan and all documents incident thereto shall have been completed in form and substance reasonably satisfactory to Yucaipa (after consultation with the Debtors and the Creditors' Committee), and Yucaipa shall have received all such counterpart originals or certified or other copies of the Plan and documents contemplated by the Plan and such other documents as they may reasonably request.

(j)      No event, condition or circumstance shall have occurred or arisen from the date the Plan is filed through the Effective Date which has had or could reasonably be expected to have or give rise to a Material Adverse Effect.

(k)      Subsequent to the Confirmation Date, there shall be no threatened or pending suit, action, investigation, inquiry or other proceeding by or before any court of competent jurisdiction (excluding the Chapter 11 Cases or any other proceeding disclosed by the Debtors to Yucaipa in writing prior to the hearing on the approval of this Disclosure Statement which is likely to have a Material Adverse Effect.

(l)      The Effective Date shall have occurred prior to six months after the Confirmation Date.

(m)      The Initial Board shall have been elected or appointed as of the Effective Date, and the directors' and officers' liability insurance shall be available to the members of the Initial Board on terms reasonably satisfactory to Yucaipa and the Creditors' Committee.

(n)    The members of the IBT shall have approved or ratified modified collective bargaining agreements in form and substance satisfactory to the Debtors, Yucaipa (after consultation with the Creditors' Committee) and TNATINC.

(o)    All waiting periods imposed by applicable law (including, without limitation, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable) in connection with the consummation of the Plan and transactions contemplated thereby shall have expired or been terminated without any action having been taken by any court of competent jurisdiction restraining, preventing or imposing materially adverse conditions upon such transactions, and the Debtors and Yucaipa shall have received all material regulatory approvals required for the consummation of the Plan and the transactions contemplated thereby and for the Reorganized Debtors to continue to carry on their businesses without material change, each of which approvals shall have become final.

(p)    All other actions and documents necessary to implement the treatment of Claims and Interests set forth in the Plan shall have been effected or executed or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

(q)    A Final Order acceptable to Yucaipa approving the Equipment Purchase Agreement and Equipment Financing Facility shall have been entered by the Bankruptcy Court and the transactions contemplated thereby have occurred or will occur in substance acceptable to Yucaipa.

## 3.    Waiver of Conditions

The conditions to Confirmation of the Plan set forth in Section 10.1 or the Effective Date set forth in Section 10.2 may be waived, in whole or in part, by Yucaipa without any notice to any other parties in interest or the Bankruptcy Court and without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan; provided, however, that Yucaipa may not waive the conditions set forth in Sections 10.1(6) or 10.2(14) of the Plan without the prior express written consent of TNATINC; provided further that Yucaipa will not waive a condition that expressly is subject to consultation with the Debtors or the Creditors' Committee without first consulting with the Debtors or the Creditors' Committee.  Neither the Debtors, TNATINC nor the Creditors' Committee have the authority to waive any condition to Confirmation Date or the Effective Date absent the express prior written consent of Yucaipa.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Plan Proponents in their respective sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Plan Proponents).  The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.  Notwithstanding anything in the Plan to the contrary, if any condition, pleading, document or order is required to be acceptable to Yucaipa and reasonably acceptable to the Debtors and/or the Creditors' Committee, and it is acceptable to Yucaipa, but the Debtors and/or the Creditors' Committee, in the exercise of their respective fiduciary duties, find it unacceptable, the sole remedy of the Debtors and/or the Creditors' Committee, as applicable, shall be an entitlement to

withdraw their respective support for the Plan. Thereafter, and notwithstanding any such withdrawal, Yucaipa may proceed without delay with Confirmation and consummation of the Plan.

### 4.    Intentionally Omitted.

### 5.    Effect of Failure of Conditions

In the event that all of the conditions to the Effective Date are not satisfied or waived within six months following entry of the Confirmation Order: (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged (except to the extent of any payments made after entry of the Confirmation Order but prior to the Effective Date) and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors.

## I.    Effect of the Plan

### 1.    Revesting of the Debtors' Assets

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estates (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in each of the Debtors that owned such property or interest in property as of the Petition Date, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security Holders, except as specifically provided in the Plan. As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order.

### 2.    Discharge of Claims and Termination of Interests

Except as otherwise provided in the Plan or the Confirmation Order: (i) on the Effective Date, each Reorganized Debtor shall be deemed discharged and released from all Claims and Interests, including, but not limited to, demands, liabilities, Claims and Interests that arose before the Effective Date and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (A) a Proof of Claim or proof of Interest based on such debt or Interest is Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code, (B) a Claim or Interest based on such debt or Interest is Allowed pursuant to Section 502 of the Bankruptcy Code, (C) the Holder of a Claim or Interest based on such debt or Interest has accepted the Plan or (D) such Claim is listed in the Schedules; and (ii) all Persons shall be precluded from asserting against each Reorganized Debtor, its successors, or its assets or properties any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. Except as otherwise provided in the Plan or the

Confirmation Order, upon the occurrence of the Effective Date, the Confirmation Order shall act as a discharge of any and all Claims against and all debts and liabilities of the Reorganized Debtors, as provided in Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment against each Reorganized Debtor at any time obtained to the extent that it relates to a discharged Claim or Terminated Interest.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests against the property of any Estate shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns.

Except with respect to Reinstated Claims, and except for purposes of evidencing a right to distributions under the Plan or otherwise provided hereunder, on the Effective Date, all agreements and other documents evidencing the Claims or rights of any Holder of a Claim against the Debtors, including all notes, guarantees, mortgages, and all Interests and any options or warrants to purchase Interests, obligating the Debtors to issue, transfer or sell Interests or any other capital stock of the Debtors, shall be canceled.  As of the Effective Date, all Old Common Stock shall be canceled.  Notwithstanding the foregoing, on and after the Effective Date, the Prepetition Notes Indenture shall continue in effect solely for the purposes of allowing the Indenture Trustee to enforce the indemnity provisions of the Prepetition Notes Indenture, to make the Distributions to be made on account of Prepetition Notes Claims under the Plan and, to the extent necessary, enforce the Indenture Trustee Charging Lien, after which point the Prepetition Notes Indenture shall be cancelled and discharged.

### 3.      Release by Debtors of Certain Parties

#### (a)      General Release

**EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, AS OF THE EFFECTIVE DATE, ON THE EFFECTIVE DATE, THE DEBTORS AND REORGANIZED DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION, WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES (OTHER THAN THE RIGHTS OF THE DEBTORS OR REORGANIZED DEBTORS TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, REORGANIZED DEBTORS, THE PARTIES RELEASED PURSUANT**

TO THIS SECTION 11.4, THE CHAPTER 11 CASES, THE PLAN OR THE DISCLOSURE STATEMENT, AND THAT COULD HAVE BEEN ASSERTED BY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES OR THE REORGANIZED DEBTORS, WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR IN ANY REPRESENTATIVE OR ANY OTHER CAPACITY, AGAINST (I) THE CURRENT DIRECTORS, OFFICERS AND EMPLOYEES OF THE DEBTORS (OTHER THAN FOR MONEY BORROWED FROM OR OWED TO THE DEBTORS BY ANY SUCH DIRECTORS, OFFICERS OR EMPLOYEES AS SET FORTH IN THE DEBTORS' BOOKS AND RECORDS) AND THE DEBTORS' FORMER OR CURRENT ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH PERSONS;   (II) THE CREDITORS' COMMITTEE AND ITS CURRENT AND FORMER MEMBERS (SOLELY IN SUCH CAPACITY) AND ITS RESPECTIVE ADVISORS (INCLUDING ANY FORMER OR CURRENT ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH PERSONS); AND (III) THE PLAN PROPONENTS AND EACH OF THE THEIR RESPECTIVE AFFILIATES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, MEMBERS, MANAGERS AND ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH PERSONS) (THOSE ENTITIES IN SUBSECTIONS (I) THROUGH (III) OF THE PRECEDING SENTENCE SHALL BE REFERRED TO AS THE "DEBTOR RELEASEES"). NOTWITHSTANDING THE FOREGOING, NOTHING IN THE PLAN SHALL RELEASE ANY DEBTOR RELEASEE OTHER THAN THE PLAN PROPONENTS FROM ANY CLAIMS ASSERTED BY THE DEBTORS THAT ARE THE SUBJECT OF A PENDING LITIGATION, ADVERSARY PROCEEDING OR OTHER CONTESTED MATTER OR JUDGMENT AS OF THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASES SET FORTH HEREIN, WHICH INCLUDE BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASES; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS (C) FAIR, EQUITABLE AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OTHER PERSON ACTING ON BEHALF OF THEM ASSERTING ANY CLAIM RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE DEBTOR RELEASEES OR THEIR RESPECTIVE PROPERTY.   NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION,   THE RELEASE OF THE DEBTORS' OFFICERS, DIRECTORS AND EMPLOYEES  SET FORTH ABOVE SHALL BE OF NO FORCE AND EFFECT IN FAVOR OF ANY OFFICER, DIRECTOR OR EMPLOYEE WHO ASSERTS ANY PRE-

**EFFECTIVE DATE CLAIM AGAINST THE DEBTORS OR REORGANIZED DEBTORS FOR [INDEMNIFICATION] [9], DAMAGES OR ANY OTHER CAUSES OF ACTION OTHER THAN FOR UNPAID COMPENSATION, WAGES OR BENEFITS THAT AROSE IN THE ORDINARY COURSE OF BUSINESS OR PURSUANT TO THE KERP APPROVED BY THE BANKRUPTCY COURT BY FINAL ORDER.**

The Plan Proponents do not believe that any valid potential actions exist against the Released Parties with regard to the foregoing released claims. The Creditors' Committee and the Debtors have not pursued, or informed the Plan Proponents of, any valid potential actions against the Released Parties arising from such transactions or any other transactions. Additionally, the Plan Proponents believe that litigation over the validity of any theoretically potential claims against the Released Parties based upon the foregoing released claims would require a significant expenditure of the Debtors' time and resources and could unnecessarily impair the Debtors' businesses and the administration of the Chapter 11 Cases. The Ad Hoc Equity Committee, however, alleges that there may be potentially valuable claims against non-debtor third parties, including, without limitation, Yucaipa, which could be brought on behalf of the Debtors' estates. The Debtors have reviewed such allegations and found them to be without merit. In addition, the Ad Hoc Equity Committee has not sought authority of the Bankruptcy Court to assert such allegations. Certain parties have objected to the releases contained in the Plan. The propriety of the releases will be considered by the Court at the Confirmation Hearing. There is no guaranty any such releases will be approved.

(b)    **Release by the Debtors of the DIP Lenders and Original DIP Lenders**

**PURSUANT TO SECTION 1123(b)(3) OF THE BANKRUPTCY CODE, AS OF THE EFFECTIVE DATE OF THE PLAN, EACH OF THE DEBTORS AND EACH OTHER CREDIT PARTY (AS DEFINED BY THE DIP LOAN FACILITY), IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION FOR AND ON BEHALF OF THEIR RESPECTIVE ESTATES, SHALL RELEASE AND DISCHARGE AND BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED EACH AND EVERY ORIGINAL DIP LENDER, DIP LENDER, AND EACH OF THEIR RESPECTIVE PRESENT OR FORMER MEMBERS, PARTNERS, OFFICERS, DIRECTORS, EMPLOYEES, ADVISORS, ATTORNEYS, REPRESENTATIVES, FINANCIAL ADVISORS, INVESTMENT BANKERS OR AGENTS AND ANY OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "RELEASED LENDERS") FOR AND FROM ANY AND ALL CLAIMS, OBLIGATIONS, LIABILITIES, LOSSES, EXPENSES OR CAUSES OF ACTION OF ANY KIND OR NATURE WHATSOEVER EXISTING AS OF THE EFFECTIVE DATE OF THE PLAN AND HOWSOEVER ARISING, INCLUDING BUT NOT LIMITED TO IN ANY MANNER ARISING FROM, BASED ON OR RELATING TO, IN WHOLE OR IN PART, THE ORIGINAL DIP CREDIT DOCUMENTS, THE DIP CREDIT DOCUMENTS, THE ORIGINAL DIP LOAN FACILITY OR THE DIP LOAN FACILITY, THE PREPETITION LOAN FACILITY, THE SUBJECT MATTER OF, OR**

---

[9] The text in brackets remains subject to additional discussion among the Plan Proponents and may be modified or deleted prior to Confirmation.

THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED LENDER, OR ANY ACT OR OMISSION RELATED TO THE CHAPTER 11 CASES OR THE PLAN. THE REORGANIZED DEBTORS SHALL BE BOUND, TO THE SAME EXTENT THE DEBTORS ARE BOUND, BY ALL OF THE RELEASES SET FORTH HEREIN.

    4.    **Release by Holders of Claims and Interests.**

    The Plan contains the following language regarding releases of claims by Holders of Claims and Interests:

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, ON THE EFFECTIVE DATE, (a) EACH PERSON THAT VOTES TO ACCEPT THE PLAN OR IS PRESUMED TO HAVE VOTED FOR THE PLAN PURSUANT TO SECTION 1126(f) OF THE BANKRUPTCY CODE; (b) EACH PERSON WHO OBTAINS A RELEASE UNDER THE PLAN; AND (c) TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AS SUCH LAW MAY BE EXTENDED OR INTERPRETED SUBSEQUENT TO THE EFFECTIVE DATE, EACH ENTITY (OTHER THAN A DEBTOR), THAT HAS HELD, HOLDS OR MAY HOLD A CLAIM OR INTEREST (EACH, A "RELEASE OBLIGOR"), IN CONSIDERATION FOR THE OBLIGATIONS OF YUCAIPA, THE DEBTORS AND THE REORGANIZED DEBTORS UNDER THE PLAN AND THE CASH, NEW COMMON STOCK, AND OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS TO BE DELIVERED IN CONNECTION WITH THE PLAN, SHALL HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED EACH PARTY RELEASED IN SECTIONS 11.4 AND 11.5 HEREOF FROM ANY CLAIM OR RETAINED ACTION EXISTING AS OF THE EFFECTIVE DATE ARISING FROM, BASED ON OR RELATING TO, IN WHOLE OR IN PART, THE SUBJECT MATTER OF, OR THE TRANSACTION OR EVENT GIVING RISE TO, THE CLAIM OF SUCH RELEASE OBLIGOR, AND ANY ACT, OMISSION, OCCURRENCE OR EVENT IN ANY MANNER RELATED TO SUCH SUBJECT MATTER, TRANSACTION OR OBLIGATION; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT NOTHING IN THE PLAN WILL RESTRICT ANY GOVERNMENTAL OR REGULATORY AGENCY FROM PURSUING ANY REGULATORY OR POLICE ENFORCEMENT ACTION AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THEIR CURRENT OR FORMER OFFICERS, DIRECTORS OR EMPLOYEES, AND THEIR RESPECTIVE AGENTS, ADVISORS, ATTORNEYS AND REPRESENTATIVES ACTING IN ANY CAPACITY, OTHER THAN ANY ACTION OR PROCEEDING OF ANY TYPE TO RECOVER MONETARY CLAIMS, DAMAGES, OR PENALTIES AGAINST THE DEBTORS FOR AN ACT OR OMISSION OCCURRING PRIOR TO CONFIRMATION.

    The Plan Proponents believe the releases set forth in the Plan are reasonable and appropriate given the extraordinary facts and circumstances of these cases. Specifically, Yucaipa played a key role in negotiating and drafting the terms of the Plan and the new labor deal with TNATINC and played a key role in obtaining Replacement Facility and the Exit Financing. The

Creditors' Committee was actively involved in the Plan process and played a key role in negotiating the Disclosure Statement and the Plan. TNATINC granted substantial labor concessions that are essential to the Debtors' successful reorganization. The releases and injunctions provided in Sections 11.4, 11.5 and 11.6 of the Plan are supported by the consideration provided hereunder. Any action brought against any party receiving a release hereunder for any matter or thing related to the Chapter 11 Cases or the Plan must be brought in Bankruptcy Court.

**5.      Setoffs**

The Debtors may, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Holder; but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

**6.      Exculpation and Limitation of Liability**

The Plan Proponents, the Creditors' Committee, the present and former members of the Committee in their capacities as such, the Indenture Trustee, in its capacity as such, and the Released Lenders, and any of such parties' respective current and/or post-Petition Date and pre-Effective Date affiliates, members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, cause of action, or liability to one another or to any Holder of any Claim or Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation and filing of the Plan, the provision of post-petition financing, the filing of the Chapter 11 Cases, the settlement of claims or renegotiation of executory contracts and leases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan (collectively, the "Exculpated Claims"). No Holder of any Claim or Interest, or other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Plan Proponents, the Creditors' Committee, the present and former members of the Creditors' Committee in their capacities as such, the Indenture Trustee, in its capacity as such, and the Released Lenders, and any of such parties' respective current and/or post-Petition Date and pre-Effective Date affiliates, members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns with respect to the Exculpated Claims.

### 7.     Injunction

The Confirmation Order will permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including but not limited to the Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Sections 11.4, 11.5 and 11.6 of the Plan; provided, however, that nothing in the Plan will restrict any governmental or regulatory agency from pursuing any regulatory or police enforcement action against the Debtors, the Reorganized Debtors, their current or former officers, directors or employees, and their respective agents, advisors, attorneys and representatives acting in any capacity, other than any action or proceeding of any type to recover monetary claims, damages or penalties against the Debtors for an act or omission occurring prior to confirmation.

### 8.     Binding Effect

On the Confirmation Date, the provisions of the Plan shall be binding on the Debtors, the Estates, all Holders of Claims against or Interests in the Debtors, and all other parties-in-interest whether or not such Holders are Impaired and whether or not such Holders have accepted the Plan.

### 9.     Effect of Confirmation on Automatic Stay

Except as provided otherwise in the Plan, from and after the Effective Date of the Plan, the automatic stay of Bankruptcy Code Section 362(a) shall terminate.

### 10.    Filing of Reports

To the extent not Filed by the Debtors, the Reorganized Debtors shall file all reports and pay all fees required by the Bankruptcy Code, Bankruptcy Rules, U.S. Trustee guidelines, and the rules and orders of the Bankruptcy Court.

### 11.    Post-Confirmation Date Retention of Professionals

Upon the Effective Date, any requirement that professionals comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors may employ and pay professionals in the ordinary course of business.

## J.    Retention of Jurisdiction After Confirmation and Effective Date

### 1.     Retention of Jurisdiction

The Plan provides that notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will have or retain jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, for the following purposes:

(a)     To allow, disallow, determine, liquidate, classify, subordinate, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including, the resolution of any request for payment of any Administrative Expense Claim, the resolution of any objections to the allowance, classification or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to Reinstate or render Unimpaired a Claim or Interest pursuant to the Plan, as well as the approval of the Indenture Trustee Fees and Expenses, to the extent of any dispute between the Indenture Trustee and the Plan Proponents;

(b)     To establish a date or dates by which objections to Claims must be Filed to the extent not established in the Plan;

(c)     To establish the amount of any reserve required to be withheld from any distribution under the Plan on account of any disputed, contingent or unliquidated claim.

(d)     To resolve all matters related to the rejection, and assumption and/or assignment of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom including any Cure Amount Claims;

(e)     To hear and rule upon all Retained Actions, Avoidance Actions and other Causes of Action commenced and/or pursued by the Debtors and/or the Reorganized Debtors;

(f)     To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny applications involving the Debtors that may be pending on the Effective Date or brought thereafter;

(g)     To hear and rule upon all applications for Professional Compensation;

(h)     To modify the Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code, modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate or carry out the intent and purpose the Plan; provided, however, that without the consent of TNATINC and Yucaipa, there shall be no modification of the Collective Bargaining Agreement between the Debtors and the IBT, as assumed and assigned pursuant to the terms of the Plan;

(i)     To enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, as well as to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(j)    To issue injunctions, enforce the injunctions contained in the Plan and the Confirmation order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(k)    To enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

(l)    To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of the Plan, including the Distribution of funds from the Estates and the payment of claims;

(m)    To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(n)    To determine any suit or proceeding brought by the Debtors and/or the Reorganized Debtors to recover property under any provisions of the Bankruptcy Code;

(o)    To determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes; and to determine and declare any tax effects under the Plan;

(p)    To determine any matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(q)    To determine any other matters as may be authorized by or under the provisions of the Bankruptcy Code; and

(r)    To enter a Final Decree closing the Chapter 11 Cases; and

(s)    To retain jurisdiction to hear and decide Claims, subject to the exception for personal injury tort and wrongful death claims set forth in 28 U.S.C. § 157(b)(5), which expressly retains the jury trial rights, if any, of the holders of personal injury tort and wrongful death claims.

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction. If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including without limitation the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### 2. Alternative Jurisdiction

In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then the District Court shall hear and determine such matter. If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.

### 3. Final Decree

The Bankruptcy Court may, upon application of the Reorganized Debtors after any time one hundred twenty (120) days after the Confirmation Date, enter a final decree in the Chapter 11 Cases, notwithstanding the fact that additional funds may eventually be distributed to parties in interest. In such event, the Bankruptcy Court may enter an Order closing the Chapter 11 Cases pursuant to Section 350 of the Bankruptcy Code, provided, however, that: (a) the Reorganized Debtors shall continue to have the rights, powers, and duties set forth in the Plan; (b) any provision of the Plan requiring the absence of an objection shall no longer be required, except as otherwise ordered by the Bankruptcy Court; and (c) the Bankruptcy Court may from time to time reopen the Chapter 11 Cases if appropriate for any of the following purposes: (1) administering Assets; (2) entertaining any adversary proceedings, contested matters or applications the Debtors have brought or bring with regard to the liquidation of Assets and the prosecution of Causes of Action; (3) enforcing or interpreting the Plan or supervising its implementation; or (4) for other cause.

## K. Miscellaneous Provisions of the Plan

### 1. Modification of Plan

Yucaipa, after consultation with the Debtors and the Creditors' Committee (to the extent the Creditors' Committee has not been dissolved), reserves the right in accordance with Section 1127 of the Bankruptcy Code to modify, alter or amend the Plan at any time before its substantial consummation; provided, however, that any such modification, alteration or amendment does not negatively impact the amended terms of the Collective Bargaining Agreement with the IBT, as described in Exhibit G hereof. Subject to the limitations contained herein, Yucaipa may modify, alter or amend the Plan in accordance with this paragraph, before or after confirmation, without notice or hearing, or after such notice and hearing as the Bankruptcy Court deems appropriate, if the Bankruptcy Court finds that the modification, alteration or amendment does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto. In the event of any modification, alteration or amendment on or before confirmation, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the Bankruptcy Court finds that the modification, alteration or amendment materially and adversely affects the rights of parties in interest which have cast said votes.

### 2. Allocation of Plan Distributions between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to

the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

### 3.    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released and discharged from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code. The Professionals retained by the Creditor's Committee and the members thereof will not be entitled to assert any claim for any services rendered or expenses incurred after the Effective Date, except for reasonable services rendered and expenses incurred in connection with the consummation of the Plan and any applications for allowance of compensation and reimbursement of expenses of Creditors' Committee members or professionals pending on the Effective Date or Filed and served after the Effective Date pursuant to Section 4.2 of the Plan.

### 4.    Preparation of Estates' Returns and Resolution of Tax Claims

The Debtors or Reorganized Debtors shall file all tax returns and other filings with governmental authorities and may file determination requests under Section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority. The Reorganized Debtors are hereby authorized to request an expedited determination under Section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

### 5.    Revocation of Plan

The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors; (b) constitute an admission of any fact or legal conclusion by the Plan Proponents or any other Entity; or (c) prejudice in any manner the rights of the Plan Proponents or any other party, Person or Entity, including the Creditors' Committee, in any related or further proceedings.

### 6.    Confirmation of Plans for Separate Debtors

In the event the Plan Proponents are unable to confirm the Plan with respect to all Plan Proponents, the Debtors reserve the right, unilaterally and unconditionally, to proceed with the Plan with respect to any Debtor for which the confirmation requirements of the Bankruptcy Code are met.

### 7.    No Admissions; Objection to Claims

Notwithstanding anything in the Plan or in this Disclosure Statement to the contrary, nothing contained in the Plan or herein shall be deemed to be an admission by any Plan Proponent with respect to any matter set forth herein including, without limitation, liability on

any Claim or Interest or the propriety of the classification of any Claim or Interest.  The Plan Proponents are not bound by any statements herein or in the Plan as judicial admissions.

### 8.  No Bar to Suits

Neither the Plan nor Confirmation thereof shall operate to bar or estop the Debtors or Reorganized Debtors from commencing any Retained Action, or any other legal action against any Holder of a Claim or Interest or any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal Entity, whether such Retained Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Retained Action, or any other legal action was disclosed in any Disclosure Statement filed by the Debtors in connection with the Plan or whether or not any payment was made or is made on account of any Claim.

### 9.  Section 1145 Exemption

The issuance of New Common Stock shall be made pursuant to Section 1145 of the Bankruptcy Code and shall be exempt from registration. Except with respect to securities held by any entity that is an "underwriter" as that term is defined in section 1145(b) of the Bankruptcy Code, the securities to be issued in reliance upon the exemption set forth in section 1145 of the Bankruptcy Code shall be freely tradeable subject to any restrictions in the Stockholders' Agreement.

### 10.  Exemption from Securities Laws

The entry of the Confirmation Order shall be (1) a final determination of the Bankruptcy Court that the New Common Stock authorized, issued or distributed pursuant to the Plan, is entitled to all of the benefits and exemptions provided by Section 1145 of the Bankruptcy Code, (2) a final determination of the Bankruptcy Court that the New Common Stock is entitled to the exemptions from federal and state securities registration available under Section 4(2) of the Securities Act of 1933, as amended, Rule 701 and/or Regulation D of the Securities and Exchange Commission, and similar provisions of state securities law, and (3) deemed to incorporate the provisions of Article XIII of the Plan as mixed findings of fact and conclusions of law.  Notwithstanding anything in this section to the contrary, the tradeability of New Allied Holdings Common Stock may be restricted under the terms of any Stockholders' Agreement.

### 11.  Initial Offer and Sale Exempt from Registration

Section 5 of the Securities Act and any State or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer or underwriter or broker or dealer in, a security, do not apply to the offer or sale of any New Common Stock in accordance with the Plan.

### 12.  Applicable Law

Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the

rights and obligations arising under the Plan and any agreements, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflict of laws thereof.

### 13.    Plan Supplement

The Plan Supplement will contain forms of the (a) Reorganized By-Laws, (b) Reorganized Governing Documents, (c) Registration Rights Agreement, (d) Stockholders' Agreement, (e) Management Services Agreement and (f) proposed Confirmation Order. The Plan Supplement shall be in form and substance satisfactory to each of the Plan Proponents and shall be filed with the Bankruptcy Court no less than seven (7) days prior to the Voting Deadline or as otherwise expressly provided herein. Notwithstanding the foregoing, subject to any express limitations set forth herein, the Plan Proponents may amend the Plan Supplement and any attachments thereto, through and including the Confirmation Date, so long as such amendments are satisfactory in form and substance to the Plan Proponents and the Creditors' Committee (except with respect to those documents where the Plan grants the Creditors' Committee only the right of consultation).

### 14.    Waiver of Rule 62(a) of the Federal Rules of Civil Procedure

The Plan Proponents may request that the Confirmation Order include (a) a finding that Rule 62(a) of the Federal Rules of Civil Procedure shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after the entry of the Confirmation Order.

### 15.    Headings

The headings of the Articles and the Sections of the Plan and this Disclosure Statement have been used for convenience only and shall not limit or otherwise affect the meaning thereof.

### 16.    Survival of Settlements

Except as specifically set forth in the Plan, all Bankruptcy Court-approved settlements shall survive consummation of the Plan.

### 17.    No Waiver

Neither the failure of a Debtor to list a Claim in the Debtor's Schedules, the failure of a Debtor to object to any Claim or Interest for purposes of voting, the failure of a Reorganized Debtor to object to a Claim, Administrative Expense Claim or Interest prior to the Confirmation Date or the Effective Date, the failure of a Debtor to assert a Retained Action prior to the Confirmation Date or the Effective Date, the absence of a proof of Claim having been filed with respect to a Claim, Administrative Expense Claim, Interest or Retained Action other than a legally effective express waiver or release shall be deemed a waiver or release of the right of a Debtor or its successors, before or after solicitation of votes on the Plan or before or after the Confirmation Date or the Effective Date to (a) object to or examine such Claim, Administrative

Expense Claim or Interest, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Retained Action.

### 18.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

### 19.    Severability of Plan Provisions

If prior to Confirmation any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Plan Proponents, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 20.    Post-Effective Date Effect of Evidences of Claims or Interests

Notes, bonds, stock certificates and other evidences of Claims against or Interests in the Debtors, and all instruments of the Debtors (in either case, other than those executed and delivered as contemplated hereby in connection with the consummation of the Plan), shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Plan.

### 21.    Conflicts

In the event that provisions of this Disclosure Statement and provisions of the Plan conflict, the terms of the Plan will govern.

### 22.    Service of Documents

Any pleading, notice or other document required by the Plan or Confirmation Order to be served on or delivered to Yucaipa, the TNATINC, the Debtors, the Creditors' Committee or the DIP Lenders must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

| Yucaipa and the Reorganized Debtors | The TNATINC |
|---|---|
| Robert Klyman, Esq.<br>Latham & Watkins<br>633 West Fifth Street, Suite 4000<br>Los Angeles, CA 90071<br>Telephone:  (213) 485-1234<br>Facsimile:  (213) 891-8763 | Frederick Perillo, Esq.<br>Previant, Goldberg, Uelmen, Gratz, Miller &<br>Brueggeman, S.C.<br>1555 N. RiverCenter Dr., Suite 202<br>Milwaukee, WI  53212<br>Telephone:  (414) 223-0434<br>Facsimile:  (414) 271-6308 |
| **The Debtors** | **The Creditors' Committee** |
| Ezra H. Cohen, Esq.<br>Jeffrey W. Kelley, Esq.<br>Harris B. Winsberg, Esq.<br>Troutman Sanders LLP<br>600 Peachtree Street, N.E. - Suite 5200<br>Atlanta, GA 30308<br>Telephone:  (404) 885-3000<br>Facsimile No.: (404) 885-3900 | Jonathan B. Alter, Esq.<br>William F. Govier, Esq.<br>Richard H. Agins, Esq.<br>Bingham McCutchen LLP<br>One State Street<br>Hartford, CT 06105<br>Telephone:  (404) 240-2700<br>Facsimile No.:  (860) 240-2818 |
|  | **The DIP Lenders** |
|  | Peter J. Neckles, Esq.<br>D.J. Baker, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, NY 10036<br>Telephone: (212) 735-2466<br>Facsimile No.: (212) 735-2000 |

## ARTICLE V.
## REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### A.    General Information

All Holders of Holders of Impaired Claims in Class 1 and Impaired Claims in Classes 4A, 4B, 4C and 4D may cast their votes for or against the Plan.  As a condition to Confirmation of the Plan, the Bankruptcy Code requires that one Class of Impaired Claims votes to accept the Plan.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of Impaired Claims as acceptance by Holders of at least two-thirds of the dollar amount of the class and by more than one-half in number of Claims.  Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.  Voting is accomplished by completing, dating, signing and returning the ballot form (the "Ballot") by the Voting Deadline.  Ballots will be distributed to all Holders of Claims entitled to vote on the Plan and is part of the solicitation package accompanying this Disclosure Statement. The Ballot indicates (i) where the Ballot is to

be filed and (ii) the deadline by which creditors must return their Ballots.  See Article I, Section
F of this Disclosure Statement for a more detailed explanation of who will receive Ballots and
voting procedures.

**B.      Solicitation of Acceptances**

This Disclosure Statement has been approved by the Bankruptcy Court as containing
"adequate information" to permit Holders of Allowed Claims and Interests to make an informed
decision whether to accept or reject the Plan. Under the Bankruptcy Code, your acceptance of the
Plan may not be solicited and will be deemed not to have been solicited unless you receive a
copy of this Disclosure Statement prior to, or concurrently with, such solicitation.

**C.      Acceptances Necessary to Confirm the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things,
whether the Plan has been accepted by the requisite creditors of the Debtors.  Holders of
Impaired Claims in Class 1 (each of which will be classified in a separate subclass) and Classes
4A, 4B, 4C and 4D will be deemed to accept the Plan if at least two-thirds in amount and more
than one-half in number of the Claims in each Class vote to accept the Plan.  Classes 5, 6, 7A, 7B
and 7C are receiving no Distribution under the Plan and are deemed conclusively to reject the
Plan.  The Bankruptcy Court must determine that the Holders of Claims and Interests in these
Classes and any non-accepting members of the Voting Classes will receive property with a value,
as of the Effective Date of the Plan, that is not less than the amount that such Class member
would receive or retain if the Debtors were liquidated as of the Effective Date of the Plan under
Chapter 7 of the Bankruptcy Code.

**D.      Confirmation of Plan Pursuant to Section 1129(b)**

The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted
by all impaired classes.  To confirm the Plan without the requisite number of acceptances of each
Impaired Class, the Bankruptcy Court must find that at least one Impaired Class has accepted the
Plan without regard to the acceptances of insiders, and the Plan does not discriminate unfairly
against, and is otherwise fair and equitable, to any Impaired Class that does not accept the Plan.
Accordingly, if any Impaired Class votes to accept the Plan, the Plan Proponents will seek to
confirm the Plan under these "cramdown" provisions of Section 1129(b) of the Bankruptcy Code.

**E.      Considerations Relevant to Acceptance of the Plan**

The Plan Proponents' recommendation that all Holders of Claims or Interests entitled to
vote should vote to accept the Plan is premised upon the Plan Proponents' view that the Plan is
preferable to other alternatives for liquidation or reorganization of the Debtors' Estates.  It
appears unlikely to the Plan Proponents that an alternate plan of reorganization or liquidation can
be proposed that would provide for Distributions in an amount equal or greater than the amounts
proposed under the Plan.  If the Plan is not accepted, it is likely that the value to be distributed to
creditors will be further diminished.

## ARTICLE VI.
## FEASIBILITY OF THE PLAN AND BEST INTERESTS TEST

### A.    Feasibility of the Plan

The Bankruptcy Code requires that, for the Plan to be confirmed, the Plan Proponents must demonstrate that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. The Plan Proponents believe that the Debtors and/or Reorganized Debtors, as applicable, will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Plan Proponents have prepared Pro Forma Financial Projections for Fiscal Years 2007 through 2010 (the "Financial Projections"), as set forth in Exhibit C to this Disclosure Statement.  The Financial Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations, including the Exit Financing, all payments required to be made pursuant to the Plan, and to fund their restructured operations. Accordingly, the Plan Proponents believe that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code.  The Plan Proponents caution that they are making no representations can be made as to the accuracy of the Financial Projections or as to the Reorganized Debtors' ability to achieve the projected results.  Many of the assumptions upon which the Financial Projections are based are subject to uncertainties outside the Plan Proponents or Reorganized Debtors' control.  Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Financial Projections were prepared may be different than those assumed or may be unanticipated and may adversely affect the Plan Proponents Reorganized Debtors' financial results.  Therefore the actual results may vary from the Financial Projections, and the variations may be material and adverse.

**HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED TO REVIEW CAREFULLY THE RISK FACTORS INCLUDED IN ARTICLE VII OF THIS DISCLOSURE STATEMENT AS THEY MAY AFFECT THE FINANCIAL FEASIBILITY OF THE PLAN.**

### B.    Best Interest of Creditors Test

As described above, in certain circumstances, to be confirmed, the Plan must pass the "Best Interest Of Creditors Test" incorporated in Section 1129(a)(7) of the Bankruptcy Code. The test applies to Holders of Claims and Interests that are both (i) in Impaired Classes under the Plan, and (ii) do not vote to accept the Plan.  Section 1129(a)(7) of the Bankruptcy Code requires that such Holders receive or retain an amount under the Plan not less than the amount that such Holders would receive or retain if the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code.

In a typical Chapter 7 case, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code.  Secured creditors generally are paid first from the sales proceeds of properties securing their liens.  If any assets are remaining in the bankruptcy estates after the satisfaction of secured

creditors' claims from their collateral, Administrative Expense Claims generally are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, Holders of Interests receive the balance that remains, if any, after all creditors are paid.

## C. Application of Best Interests of Creditors Test to the Liquidation Analysis and Valuation of the Reorganized Debtors

The Plan Proponents believe that the Plan meets the "best interests" test of Section 1129(a)(7) of the Bankruptcy Code because members of each Impaired Class will receive a more valuable distribution under the Plan than they would in a liquidation in a hypothetical chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as going concerns rather than a forced liquidation will allow the realization of more value for the Debtors' assets. Moreover, creditors such as the Debtors' employees will retain their jobs and most likely make few if any other claims against the Estates. Lastly, in the event of liquidation, the aggregate amount of unsecured claims would increase significantly, and such claims would be subordinated to priority claims that would be created. For example, employees will file claims for wages and other benefits, some of which would be entitled to priority. The resulting increase in both general unsecured and priority claims would decrease percentage recoveries to unsecured creditors of the Debtors. Attached as Exhibit D to the Disclosure Statement is a hypothetical liquidation analysis (the "Liquidation Analysis") that shows the hypothetical distribution creditors would receive in the event the Plan is not confirmed and the Chapter 11 Cases are converted to Chapter 7 liquidations. Attached as Exhibit E to the Disclosure Statement is Yucaipa's analysis of the value of the Debtors' businesses if the Plan is confirmed ("Yucaipa's Reorganized Value Analysis"). Attached as Exhibit E-1 to the Disclosure Statement is the Debtors' analysis of the value of the Debtors' businesses if the Plan is confirmed ("Debtors' Reorganized Value Analysis") (together, with Yucaipa's Reorganized Value Analysis, the "Reorganized Value Analyses"). A comparison of the Liquidation Analysis with the Reorganized Value Analyses shows that the Plan satisfies the "best interests" test. The Debtors and Yucaipa agree that there is insufficient value to support a distribution to Holders of Interests on account of their equity Interests in the Debtors. The Debtors and Yucaipa may present separate valuation evidence and testimony at the Confirmation Hearing in the event the Plan Proponents fail to reach agreement as to which Reorganized Value Analysis to use at the Confirmation Hearing. The Ad Hoc Equity Committee does not agree with either of the Reorganized Value Analyses. The Ad Hoc Equity Committee believes there is value for Holders of Interests.

### 1. Yucaipa's Reorganized Value Analysis

Yucaipa hired FTI Consulting, Inc. ("FTI") to prepare Yucaipa's Reorganized Value Analysis. FTI is a prominent financial advisory services firm. FTI advises major corporations, financial institutions and law firms on their most critical issues, such as financial and operational improvement, major litigation, mergers and acquisitions, and regulatory challenges.

FTI used the following methodologies and assumptions in arriving at its indicated enterprise value range for Reorganized Allied:

Discounted Cash Flow Analysis:  FTI prepared a discounted cash flow analysis using Reorganized Allied's future consolidated, debt free, after-tax cash flows based on the company's projections for the years 2007 through 2011.  FTI estimated the present value of the interim cash flows using a risk-adjusted discount rate of 20%. FTI applied a multiple of EBITDA of 3.8 to the year 2011 EBITDA in order to estimate a terminal value and used a 20% risk adjusted discount rate to estimate the present value of the terminal value. Adding the present value of the interim cash flows to the present value of the terminal value resulted in an estimated enterprise value of Reorganized Allied of $160.1 million. The discounted cash flow analysis involves complex considerations and judgments concerning, among other things, relevant terminal value multiples and appropriate risk-adjusted discount rates.

Guideline Publicly Traded Companies Analysis:  FTI selected certain publicly held companies that it believed in its judgment to be comparable in certain respects to the business of the debtors.  FTI then calculated the implied enterprise value multiples of the selected companies using the selected companies' EBITDA and EBIT. The guideline companies had enterprise value to EBITDA multiples ranging from 4.22 to 10.96, with a mean of 7.25 and a median of 5.49. Based on the Debtors' negative comparison to the selected companies on key financial measures, FTI selected a below average EBITDA multiple of 3.8x to apply to normalized 2006 EBITDA for Reorganized Allied. This resulted in an estimated enterprise value of $107.5 million for the Company based on normalized 2006 EBITDA of $27.6 million.

Although the selected companies were used for comparison purposes, no selected company is either identical or directly comparable to the business of Reorganized Allied. Accordingly, FTI's comparison of the selected companies to the business of Reorganized Allied and analysis of the results of such comparisons was not purely mathematical, but instead necessarily involved complex considerations and judgments.

Comparable Transactions Analysis:   FTI reviewed certain recently completed transactions involving companies in lines of business FTI believed to be comparable in certain respects to Reorganized Allied.  FTI calculated implied enterprise value to EBITDA multiples based on the terms of the transactions and financial data of the target companies. The terms of the transactions for the target companies were based upon publicly available information.  FTI selected four transactions that were completed in 2006 for this purpose.   These selected transactions had a range of EBITDA multiples of 2.07 to 10.25, with a mean of 5.60 and median of 5.04.  FTI then compared certain financial data of the debtors to that of the target companies, and concluded that Reorganized Allied was below average.  As a result of this comparison, FTI selected an EBITDA multiple of 4.0, which resulted in an estimated value for Reorganized Allied in the amount of $112.6 million.

Although the selected transactions were used in FTI's analysis, no target company was either identical or directly comparable to Reorganized Allied.  Accordingly, FTI's comparison of the selected transactions and target company multiples to Reorganized Allied and analysis of the results of such comparisons was not purely mathematical, but instead necessarily involved complex considerations and judgments.

Future Wage and Price Adjustments: In order to take into consideration certain potential future improvements to the Debtors' core business, FTI prepared a sensitivity analysis regarding the value of Reorganized Allied under the assumption that such improvements will be realized to some degree. FTI based this analysis on the assumption that annualized labor cost savings resulting from an interim agreement with the IBT could be in the range of $31 million to $36 million, while price increases on customer contracts could reach $20 million to $25 million on an annual basis. Although FTI understands that customer pricing increases currently agreed to in principle are significantly below this $20 - $25 million range.) Combined, these changes could yield $51 million to $61 million of incremental EBITDA, although they are still subject to certain risks and would not be realized immediately. FTI therefore discounted these improvements to a fiscal year 2006 present value at a rate of 18%, resulting in additional 2006 EBITDA (on a pro forma basis) of $39.8 million to $47.6 million. Adding both the low end and the high end of this range to the debtor's normalized 2006 EBITDA of $27.6 million, resulted in a 2006 pro forma EBITDA range of $67.4 million to $75.2 million. FTI then multiplied the low end and the high end of this pro forma EBITDA range by the 3.8x multiple used in the guideline publicly traded company approach, yielding an enterprise value range of approximately $259 million to $289 million. Similarly, FTI multiplied the pro forma EBITDA range by the 4.0x multiple derived from the comparable transactions analysis to arrive at a value range of approximately $271 million to $303 million. Finally, FTI reduced the discount rate used in the discounted cash flow approach from 20% to 18% to reflect a higher probability that these improvements will be achieved. This resulted in an increased estimated enterprise value of $175 million for Reorganized Allied. As a result, assuming the company had already achieved the previously discussed labor and price concessions, the enterprise valuation of Reorganized Allied would be in the range of $175 million to $303 million.

## 2. The Debtors' Reorganized Value Analysis

The Debtors have been advised by Miller Buckfire, their financial advisor, with respect to the total enterprise value of Reorganized Allied Holdings on a going-concern basis. Miller Buckfire undertook this valuation analysis for the purpose of determining value available for Distribution to Holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such Holders thereunder.

Based in part on information provided by the Debtors, Miller Buckfire has concluded solely for purposes of the Plan that total enterprise value of Reorganized Allied Holdings is between approximately $350 million to $425 million, with a value of $388 million as the midpoint as of an assumed Effective Date of May 31, 2007. Based upon the total enterprise value of Reorganized Allied Holdings' business and an assumed total debt of approximately $206 million plus unrestricted cash on hand of $2 million, the range of equity values for Reorganized Allied Holdings would be approximately $146 million to $221 million. Equity value available for distribution to Holders of Allowed Claims will depend on additional factors including but not limited to the terms associated with the capital contribution used to acquire used rigs and whether holders of certain tort claims will receive recoveries in equity.

In performing its analysis, Miller Buckfire used discounted cash flow and comparable public companies trading multiples methodologies. These valuation techniques reflect the contemplated standalone plan of emergence with distributed equity ownership and the intrinsic

value of the cash flow financial projections in the Debtors' business plan.  Miller Buckfire's analysis is summarized on Exhibit E-1 hereto.

The Debtors' Reorganized Value Analysis addresses the estimated going concern enterprise value of the Debtors and the value of certain expected tax attributes, including NOLs, as appropriate.  It does not address other aspects of the proposed reorganization, the Plan or any other transactions, and it does not address the Debtors' underlying business decision to effect the reorganization set forth in the Plan.  The Debtors' Valuation Analysis does not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan.  Miller Buckfire has not been asked nor did Miller Buckfire express any view as to what the value of the Reorganized Allied Holdings' securities will be when issued pursuant to the Plan or the prices at which they may trade in the future.

The summary set forth herein does not purport to be a complete description of the analyses performed by Miller Buckfire.  The preparation of a valuation estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily suitable to summary description.  In performing the Debtors' Reorganized Value Analysis, Miller Buckfire and the Debtors made numerous assumptions with respect to industry performance, business and economic conditions and other matters.  The analysis performed by Miller Buckfire is not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by the Debtors' Reorganized Value Analysis.

### 3.        Liquidation Analysis

Central States Funds asserts that the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MEPPA"), 29 U.S.C. §§ 1001-1461, imposes withdrawal liability on an employer withdrawing from a multiemployer pension plan which is measured as the employer's proportionate share of the plan's unfunded vested benefits which is the difference between the present value of the vested benefits and the current value of the plan's assets. 29 U.S.C. §§ 1381, 1391; see, e.g., Connors v. Ryan's Coal Co., 923 F.2d 1461, 1462-63 (11th Cir. 1991) (discussing statutory framework and background). A complete withdrawal occurs when an employer permanently ceases to have an obligation to contribute under the plan, or permanently ceases all covered operations under the plan. 29 U.S.C. § 1383(a). Were Allied to liquidate, it would cease all covered operations under the various multiemployer pension plans in which Allied participates, and as a result Central States Funds would claim that a complete withdrawal from each of those plans would be triggered.  With respect to the Central States, Southeast and Southwest Areas Pension Fund, a complete withdrawal occurring in 2007 would result in a withdrawal liability claim by those funds in an amount in excess of $330 million.

As discussed in the Liquidation Analysis, the Debtors estimate that in a liquidation under chapter 7 of the Bankruptcy Code, there would be approximately $1.5 million to satisfy claims of general unsecured creditors, resulting in a distribution to general unsecured creditors of approximately 0%.  In contrast, according to Yucaipa's Reorganized Value Analysis, if the Plan is confirmed, the equity value of the Debtors will be between approximately $175 million and approximately $303 million, resulting in a distribution to general unsecured creditors of up to

approximately 50%. Thus, the Plan Proponents believe that the Plan satisfies the "best interests" test. According to the Debtors' Reorganized Value Analysis, if the Plan is confirmed, the equity value of the Debtors will be between approximately $350 million and approximately $425 million, resulting in a distribution to general unsecured creditors potentially greater than 50%.

The Plan Proponents have analyzed the potential market for sale the Debtors' businesses as going concerns. This analysis has not revealed any offers or potential offers to purchase the businesses as going concerns that would provide a better alternative to Holders of Claims and Interests than the reorganization of the Debtors' businesses as proposed by the Plan.

## ARTICLE VII.
## CERTAIN RISK FACTORS TO CONSIDER

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL IMPAIRED HOLDERS OF CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

The following provides a summary of various important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of Claims or Interests should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.

## A.      Certain Bankruptcy Law Considerations

*Parties-in-Interest May Object To Debtors' Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Plan Proponents believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponents created ten classes of Claims and Interests, each encompassing Claims or Interests that are substantially similar to the other Claims or Interests in each such class.

*A Delay in Plan Confirmation May Disrupt the Debtors' Operations and Have Potential Adverse Effects of Prolonged Confirmation Process*

A prolonged confirmation process could adversely affect the Debtors' relationships with their customers, suppliers, and employees, which, in turn, could adversely affect the Debtors/' competitive position, financial condition, and results of operations. Such developments could, in turn, adversely affect the price of the New Common Stock, and hence the value of assets available to satisfy Holders of Allowed Claims.

*Risk of Non-Confirmation of the Plan*

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for Confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for Confirmation or that such Modifications would not necessitate the resolicitation of votes.

*Risk of No Labor Deal*

TNATINC believes that in the absence of a labor deal there will be a substantial withdrawal liability claim and there will likely be a strike, in which it believes Allied has no plan to operate.

*The Plan Proponents May Not be Able to Secure Confirmation of the Plan*

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or interest Holder of Debtors might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and the value of distributions to non-accepting Holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such Holders would receive if Debtors were liquidated under Chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Plan Proponents believe that the Plan will not be followed by a need for further financial reorganization and that non-accepting Holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under Chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such Chapter 7 case. The Plan Proponents believe that Holders of Interests in Debtors would receive no distribution under either a liquidation pursuant to Chapter 7 or Chapter 11.

Confirmation of the Plan is also subject to certain conditions as described in Article IV, Section H hereof. If the Plan is not confirmed, it is unclear whether a restructuring of the Debtors could be implemented and what Distributions Holders of Claims or Interest ultimately would receive with respect to their Claims or Interests. If an alternative reorganization could not be agreed to, it is possible that Debtors would have to liquidate their assets, in which case it is likely that Holders of Claims and Interests would receive substantially less favorable treatment than they would receive under the Plan.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms of the Plan as necessary for Confirmation. Any such Modification could result in a less favorable treatment of any non accepting Class or Classes, as well as of any Classes junior to such non accepting Classes, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

*Risk of Post-Confirmation Default*

At the Confirmation Hearing, the Court will be required to make a judicial determination that the Plan is feasible, but that determination does not serve as any guarantee that there will not be any post-confirmation defaults. The Debtors believe that the cash flow generated from operations and post-Effective Date borrowing will be sufficient to meet the Reorganized Debtors' operating requirements, their obligations under the Exit Financing, and other post-confirmation obligations under the Plan.

*The Debtors and the Reorganized Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Plan Proponents reserve the right to object to the amount or classification of any Claim or Interest deemed Allowed under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim may not receive its specified share of the estimated distributions described in this Disclosure Statement.

*Risk of Non-Occurrence of the Effective Date*

Although the Plan Proponents believe that the Effective Date may occur as soon as ten (10) Business Days after the Confirmation Date, there can be no assurance as to such timing.

*Contingencies Not to Affect Votes of Impaired Classes to Accept the Plan*

The Distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Claims to be subordinated to other Claims. The occurrence of any and all such contingencies which could affect distributions available to Holders of Allowed Claims under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

**B.    Financial Information; Disclaimer**

Although the Plan Proponents have used their reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, much of the financial information contained in the Disclosure Statement came from parties other than the Plan Proponents, and some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation

of the Plan and this Disclosure Statement.  While the Plan Proponents believe that such financial information fairly reflects the financial condition of the Debtors, the Plan Proponents are unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

**C.      Factors Affecting The Value Of The Securities To Be Issued Under The Plan**

In addition to the risk factors set forth below, the following factors may affect the value of the securities to be issued under the Plan:

*The Reorganized Debtors May Not be Able to Achieve Projected Financial Results*

The Reorganized Debtors may not be able to meet their projected financial results or achieve the revenue or cash flow that they have assumed in projecting future business prospects. If the Reorganized Debtors do not achieve these projected revenue or cash flow levels, they may lack sufficient liquidity to continue operating as planned after the Effective Date.  The financial projections represent the Plan Proponents' view based on current known facts and hypothetical assumptions about the Reorganized Debtors' future operations.  However, the Projections set forth herein do not guarantee the Reorganized Debtors' future financial performance.

*The Reorganized Debtors May Not be Able to Meet Post-Reorganization Debt Obligations and Finance All Operating Expenses, Working Capital Needs and Capital Expenditures*

To the extent the Reorganized Debtors are unable to meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may be unable to service their debt obligations as they come due or to meet the Reorganized Debtors' operational needs. Such a failure may preclude the Reorganized Debtors from developing or enhancing their products and services, taking advantage of future opportunities, growing their business or responding to competitive pressures.

*Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors*

Holders of Claims should carefully review Article IX hereof, "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES," including the discussion under the heading "United States Federal Income Tax Consequences to the Debtors," and this Article VII Section E "CERTAIN RISK FACTORS TO CONSIDER –Factors Affecting the Reorganized Debtors" to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

**D.      Risk Factors Associated With the Business**

*The Debtors' Business is Affected by the U.S. Economy and the Varying Economic and Business Cycles of Their Customers*

The Debtors' business is vulnerable to the U.S. economy and the varying economic and business cycles of their customers.

*The General Economic and/or Business Conditions Affecting the Automotive Industry May Adversely Impact the Debtors*

The automotive industry in the United States as a whole is facing a downturn in economic and business conditions.  In particular, General Motors Corporation, DaimlerChrysler and Ford Motor Company, three of the Debtors' largest customers, are trying to return their North American automotive operations to profitability through a combination of strict cost control, capacity rationalization (plant closings) and the acceleration of new product/technology introductions.  Unless they can stem their ongoing market share declines, further production cuts will have a ripple effect throughout the automotive industry and impact the profitability of those businesses most dependent on these domestic manufacturers, including the Debtors and/or Reorganized Debtors.  Moreover, certain of the Debtors' customers have imposed market share caps, which may limit the Debtors' ability to increase the relative percentage of their business obtained from those customers.

*The Debtors Have Incurred Significant Losses In Recent Years*

There can be no assurance that the Reorganized Debtors will be, or of the extent to which they will be, profitable.

*The Debtors May Be Adversely Impacted by the Inability to Reduce Costs*

There is substantial, continuing pressure from the major OEMs to reduce costs, including the cost of products and services purchased from outside vendors.  In addition, the Debtors' business is capital intensive.  If the Debtors are unable to generate sufficient cost savings in the future to offset price reductions and any reduction in customer demand for vehicle-hauling services, the Debtors' profitability would be adversely affected.

*Competition*

Certain of the Debtors' principal competitors may be better able to withstand market conditions within the automobile industry.  The Debtors generally compete on the basis of, among other things:  (a) quality and breadth of service; (b) expertise; (c) reliability; and (d) price.  There can be no assurance that the Debtors will not encounter increased competition in the future, which could have a material adverse effect on their business, financial condition and results of operations.  In addition, certain of the Debtors' competitors may attempt to use these Chapter 11 Cases and rumors concerning the Debtors' financial condition to their advantage.  These discussions and rumors may adversely affect relations with the Debtors' customers, vendors and employees.

*Reliance on Key Personnel*

The Debtors' success and future prospects depend on the continued contributions of their senior management.  The Debtors current financial position makes it difficult for it to retain key employees.  There can be no assurances that the Debtors would be able to find qualified replacements for these individuals if their services were no longer available.  The loss of services

of additional members of the senior management team could have a material adverse effect on the Debtors' business, financial condition and results of operations.

*Loss of Key Customers*

If some of the Debtors' existing customers ceased doing business with the Debtors, or if the Debtors were unable to generate new customers, they could experience an adverse impact on their business, financial condition and results of operations. The Debtors cannot be certain that any given customer in any given year will continue to use the Debtors' services in subsequent years. There is significant risk in concentrating their sales with these customers, including but not limited to, potential customer insolvency, work stoppage, or other adverse circumstances.

Further, the Debtors are dependent on certain domestic and foreign OEMs as their largest customers. The loss of any one of these customers, or a significant reduction in demand for vehicles for which the Debtors provide vehicle-hauling services, would have a material adverse effect on the Debtors' existing and future revenues and net income.

## E. Factors Affecting the Reorganized Debtors

### 1. General Factors

*Capital Requirements*

The business of the Reorganized Debtors is expected to have certain capital expenditure needs. While the Debtors' projections assume that operations and post-Effective Date borrowings will generate sufficient funds to meet capital expenditure needs for the foreseeable future, the Reorganized Debtors' ability to gain access to additional capital, if needed, cannot be assured, particularly in view of competitive factors and industry conditions.

*Variances from Projections*

The fundamental premise of the Plan is the de-leveraging of the Debtors and the implementation and realization of the Debtors' business plan, as reflected in the projections contained in this Disclosure Statement. The Projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize. Such assumptions include, among other items, assumptions concerning the general economy, the ability to make necessary capital expenditures, the ability to maintain market strength, consumer preferences and the ability to increase gross margins and control future operating expenses. The Plan Proponents believe that the assumptions underlying the Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of the Reorganized Debtors. Therefore, the actual results achieved throughout the periods covered by the Projections necessarily will vary from the projected results and such variations may be material and adverse.

2.      **Litigation Risks**

From time to time, the Debtors are subject to claims or litigation incidental to their business.  As of the date of the Disclosure Statement, the Debtors are not currently involved in any legal proceedings that, individually or in the aggregate, are expected to have a material effect on their business, financial condition, results of operations or cash flows.

(a)      **Risk that the Information in this Disclosure Statement May be Inaccurate**

The statements contained in this Disclosure Statement are made by the Plan Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein.  The Plan Proponents may subsequently update the information in this Disclosure Statement, but they have no duty to update this Disclosure Statement unless ordered to do so by the Court.  Further, the pro forma and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited.  Finally, neither the SEC nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits thereto.

**THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.   ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD LOOKING STATEMENTS AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.**

The following disclosures are not intended to be all inclusive and should be read in connection with the other disclosures contained in this Disclosure Statement and the Exhibits hereto. You should consult your legal, financial, and tax advisors regarding the risks associated with the Plan and the distributions you may receive thereunder.

*Risks Relating to Future Business Performance*:    The Debtors' future business performance is subject to business, economic, legislative, and competitive risks and uncertainties. Such uncertainties and other factors include approval by the Bankruptcy Court of the Plan and potential objections of third parties.  Uncertainties also include, but are not limited to: (i) general

economic and political conditions and the cyclicality of the auto hauling industry; (ii) competitive conditions in the auto hauling industry; (iii) the Debtors' ability to implement cost reductions, efficiencies and other improvements in their businesses; (iv) the Debtors' ability to fund capital expenditure requirements needed to maintain competitive position; (v) the effect of U.S. governmental policies and regulations related to the Debtors' businesses; (vi) compliance with environmental, health and safety laws and regulations; (vii) changes in relationships with large customers; (viii) business-related difficulties of the Debtors' customers; and (ix) the effects of the Chapter 11 process on the Debtors' ability to attract and retain key management personnel.

*Assumptions Regarding Value of Debtors' Assets*:  It has been assumed in the preparation of the Plan that the value of the Debtors' assets described in the Reorganized Value Analysis generally approximates the fair value thereof, except for specific adjustments discussed in the notes thereto. For financial reporting purposes, the fair value of the assets of the Debtors (including deferred tax assets) must be determined as of the Effective Date.  Although such valuation is not presently expected to result in values that are materially different than the values assumed in the preparation of the Plan, there can be no assurance with respect thereto.

*Leverage, Liquidity, and Capital Requirements*:   In addition to Cash generated by operations, the Reorganized Debtors' principal source of liquidity following their emergence from bankruptcy will be the Exit Financing.   After the Effective Date of the Plan, the Reorganized Debtors will face liquidity requirements, including working capital requirements and repayment of the Reorganized Debtors' obligations under the Exit Financing. While the Debtors believe that they will have adequate liquidity to meet requirements following the Effective Date of the Plan, no assurances can be made in this regard. Furthermore, the ability of the Reorganized Debtors to gain access to additional capital if needed, whether through equity offerings or debt financing, cannot be assured. Any inability of the Reorganized Debtors to service their indebtedness, obtain additional financing, as needed, or comply with the financial covenants contained in the debt instruments issued pursuant to the Plan could have a material adverse effect on the Reorganized Debtors.

*Market for New Allied Holdings Common Stock*:  As described in more detail in Article VIII of this Disclosure Statement, the New Allied Holdings Common Stock to be issued under the Plan has not been registered under the Securities Act, any state securities laws or the laws of any other jurisdiction. Absent such registration, and subject to the provisions of any Stockholders' Agreement restricting the trade of New Allied Holdings Common Stock, the New Allied Holdings Common Stock may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of the Securities Act and other applicable securities laws.

The shares of New Allied Holdings Common Stock are a new issuance of securities with no established trading market. In the event the board of directors of Reorganized Allied Holdings determines in its discretion to register the New Allied Holdings Common Stock with the Securities and Exchange Commission, or if Reorganized Allied Holdings is required under applicable securities laws to register the New Allied Holdings Common Stock, Reorganized Allied Holdings has agreed to use its commercially reasonable efforts to list the New Allied Holdings Common Stock on a national securities exchange or for quotation on a national automated interdealer quotation system unless the Initial Board determines otherwise. However,

there can be no assurance that an active market for the New Allied Holdings Common Stock will develop and no assurance can be given as to the prices at which such securities might be traded. The Plan provides that Reorganized Allied Holdings will have no liability if it is unable to list the New Allied Holdings Common Stock as described herein.

The valuation of the Reorganized Debtors could be adversely impacted over time if the Reorganized Debtors' business plan does not meet expectations or if factors beyond the Reorganized Debtors' control materialize.

If there are fewer than 300 Initial Holders of New Allied Holdings Common Stock on the Effective Date, then Reorganized Allied Holdings does not intend to remain a "public" company and will no longer be subject to the reporting requirements of the Exchange Act. In that event, the New Allied Holdings Common Stock will not be listed for trading on any national securities exchange, automated quotation service or over-the-counter trading markets, and it is unlikely that an active trading market will develop or be sustained for the New Allied Holdings Common Stock. If no active trading market develops, stockholders may not be able to resell their shares of New Allied Holdings Common Stock at their fair market value or at all.

*Claims Estimation*: There can be no assurance that the estimated Claim amounts assumed for the purposes of preparing the Plan are correct. The actual amount of Allowed Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed Amount of Claims may vary from those estimated for the purpose of preparing the Plan. Depending on the outcome of claims objections, the estimated recovery percentages provided in this Disclosure Statement may be different than the actual recovery percentages that are realized under the Plan.

*Certain Risks of Nonconfirmation*: There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A rejecting Claim or Interest Holder might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court were to determine that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to nonaccepting Holders of Claims and Interests within a particular Class under the Plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The statutory requirements are explained in more detail in Article VI of this Disclosure Statement.

*Yucaipa May Own a Majority of the New Allied Holdings Common Stock*

Yucaipa and certain of its affiliates may receive greater than 50% of the New Allied Holdings Common Stock in return for the Prepetition Notes held by them and that percentage could increase substantially as a result of the conversion of the Equipment Financing Facility for New Allied Holdings Common Stock and if Yucaipa provides funding for the Cash Option. After the Effective Date, Yucaipa could further increase its percentage of ownership in Reorganized Allied Holdings.  Although the Stockholders' Agreement may govern certain rights among the holders of New Allied Holdings Common Stock, Yucaipa will exercise significant influence over the operations and business strategy of Reorganized Allied Holdings and will be able to control the outcome of votes on matters requiring stockholder and/or board approval, including the approval or disapproval of significant corporate transactions, such as mergers, sales or other business combinations, the issuance of securities or the incurrence or guaranty of material amounts of debt. Yucaipa will also nominate a majority of the members of the board of directors of Reorganized Allied Holdings.  As a result, the ability of the non-Yucaipa holders of New Allied Holdings Common Stock to influence the affairs of Reorganized Allied Holdings will be limited and it could adversely affect the price, value and liquidity of the New Allied Holdings Common Stock.

Stockholders' Agreement

The shares of New Allied Holdings Common Stock will be subject to the terms and restrictions of the Stockholders' Agreement which will contain certain terms and restrictions that may adversely affect the rights of holders of New Allied Holdings Common Stock and could adversely affect the price, value and liquidity of the New Allied Holdings Common Stock.  All creditors receiving New Allied Holdings Common Stock under the Plan, by acceptance of such newly issued shares, will be bound by the terms of the Stockholders' Agreement to the maximum extent permitted by applicable law, including the Bankruptcy Code. The Stockholders' Agreement may  provide for, among other things, (i) nomination and observation rights regarding the board of directors of Reorganized Allied Holdings consistent (for two years) with the board composition described in the section of this Disclosure Statement titled "Directors and Officers of Reorganized Debtors", (ii) approval rights of Yucaipa and possibly others regarding certain significant transactions involving Reorganized Allied Holdings, (iii) pre-emptive rights in favor of Yucaipa and possibly others in connection with certain issuances of securities, (iv) "drag along" and/or "tag along" rights triggered upon certain sales or dispositions of the capital stock of Reorganized Allied Holdings, pursuant to which holders may be required to sell all their shares of New Allied Holdings Common Stock and/or entitled to sell all or a portion of their New Allied Holdings Common Stock, (v) transfer and trading restrictions intended to limit the number of record holders of New Allied Holdings common stock to no more than 290 per class of securities, (vi) certain additional restrictions on transfer of New Allied Holdings Common Stock, including among others, rights of first refusal or other rights to purchase in favor of Reorganized Allied Holdings, Yucaipa or possibly others in connection with any proposed sale or transfer of New Allied Holdings Common Stock, and (vii) other terms, conditions and restrictions of the type included in stockholders' agreements.

114

F.      **Disclaimer Regarding Issuance of New Allied Common Stock**

**Creditors are strongly urged to take notice of the fact that, as of the date hereof, Yucaipa and/or the Plan Proponents have not reached agreement with the Creditors' Committee concerning the terms and conditions of the corporate organizational documents of Reorganized Allied Holdings, Stockholders' Agreement, Registration Rights Agreement and various other significant points of corporate governance for Reorganized Allied Holdings, which may affect the value of the recovery associated with the distribution of the New Allied Holdings Common Stock under the Plan. The parties have agreed to negotiate in good faith toward the end of reaching agreement on these matters but there is no assurance they will reach agreement which could result in various terms and risks being different from those currently described in the Disclosure Statement and/or various documents, such as the Stockholders' Agreement not being entered into. Notwithstanding the foregoing, Yucaipa has agreed that in the event agreement cannot be reached with the Creditors' Committee concerning the form of corporate governance documents directed at minority shareholder rights, minority shareholders will have, at a minimum, the rights and protections afforded to such stockholders in accordance with the law of the State of Delaware. Despite this concession, depending upon the outcome of the ongoing good faith negotiations, the New Allied Common Stock to be distributed under the Plan may be illiquid for an indeterminate period of time, and minority shareholders may have a limited or no voice in corporate matters. Such restrictions and limitations may have the effect of substantially diminishing any value attributable to the equity distribution under the Plan and Holders of Unsecured Claims should be guided accordingly. The Plan Proponents shall provide the Creditors' Committee with the form of any corporate governance documents within fifteen (15) days before the Voting Deadline to enable the Creditors' Committee to assess the rights and protections to be afforded to minority shareholders, and to file a position statement within 10 days before the Voting Deadline. Creditors are strongly recommended to consult the docket in these Chapter 11 Cases prior to the Voting Deadline to review and consider the position statement to be filed by the Creditors' Committee by April 21, 2007 since recoveries provided under the Plan to Unsecured Creditors may be materially and adversely impacted by the result of ongoing negotiations.**

<u>**ARTICLE VIII.**</u>
**CERTAIN SECURITIES LAW MATTERS**

A.      **Issuance of New Common Stock**

Section 1145(a)(l) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act of 1933 (the "Securities Act") and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claims or interests and partly for cash or property.  Except as noted below, the Plan

Proponents believe that the offer and sale of the New Allied Holdings Common Stock under the Plan to Holders satisfy the requirements of Section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

**B.      Subsequent Transfers of New Allied Holdings Common Stock**

The Stockholders' Agreement may include a number of provisions that restrict the transfer of New Allied Holdings Common Stock, including  (i) "drag along" and/or "tag along" rights triggered upon certain sales or dispositions of the capital stock of Reorganized Allied Holdings, pursuant to which holders may be required to sell all their shares of New Allied Holdings Common Stock and/or entitled to sell all or a portion of their New Allied Holdings Common Stock, (ii) transfer and trading restrictions intended to limit the number of record holders of New Allied Holdings common stock to no more than 290 per class of securities, (iii) certain additional restrictions on transfer of New Allied Holdings Common Stock, including among others, rights of first refusal or other rights to purchase in favor of Reorganized Allied Holdings, Yucaipa or possibly others in connection with any proposed sale or transfer of New Allied Holdings Common Stock, and (iv) other terms, conditions and restrictions of the type included in stockholders' agreements.

Apart from any provisions in the Stockholders' Agreement preventing transferability of the New Allied Holdings Common Stock, such stock may be freely transferred by most recipients following initial issuance under the Plan, and all resales and subsequent transactions in the New Allied Holdings Common Stock or other securities so issued are exempt from registration under federal and state securities laws, unless the Holder is an "underwriter" with respect to such securities. Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

1. persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

2. persons who offer to sell securities offered under a plan for the Holders of such securities;

3. persons who offer to buy such securities from the Holders of such securities, if the offer to buy is:

   a. with a view to distributing such securities; and

   b. under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

4. a person who is an "issuer" with respect to the securities as the term "issuer" is defined in Section 2(11) of the Securities Act.

Under Section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that Persons who receive New Allied Holdings Common Stock pursuant to the Plan are deemed to be "underwriters," resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  So long as there are 300 or more Initial Holders of New Allied Holdings Common Stock on the Effective Date and Reorganized Allied remains a "public" company subject to the reporting requirements of the Exchange Act, Persons deemed to be underwriters would, however, apart from any restrictions in the Stockholders' Agreement be permitted to sell such New Allied Holdings Common Stock or other securities without registration pursuant to the provisions of Rule 144 under the Securities Act.  These rules permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

If there are fewer than 300 Initial Holders of New Allied Holdings Common Stock on the Effective Date, Reorganized Allied Holdings does not intend to remain a "public" company subject to the reporting requirements of the Exchange Act. In that event, the provisions of Rule 144 under the Securities Act will not be available to persons that are deemed to be an "underwriter" with respect to the New Allied Holdings Common Stock. Such persons would not be permitted to resell the New Allied Holdings Common Stock unless the securities were registered under the Securities Act or another exemption from such registration requirements was available.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Allied Holdings Common Stock or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular Person receiving New Allied Holdings Common Stock or other securities under the Plan would be an "underwriter" with respect to such New Allied Holdings Common Stock.

Given the complex and subjective nature of the question of whether a particular Holder may be an underwriter, the Plan Proponents make no representation concerning the right of any person to trade in the New Allied Holdings Common Stock or other securities. The Plan Proponents recommend that potential recipients of the New Allied Holdings Common Stock consult their own counsel concerning whether they may freely trade New Allied Holdings Common Stock without compliance with the Securities Act or the Exchange Act.

On the Effective Date, Reorganized Allied Holdings will be authorized to enter into a Registration Rights Agreement with Yucaipa and potentially other holders of the New Allied Holdings Common Stock.  The Registration Rights Agreement is expected to provide (i) certain rights to require Reorganized Allied Holdings to register a public offering, (ii) certain rights to demand that Reorganized Allied Holdings file, prepare and cause to become effective registration statements, and (iii) piggyback registration rights.

## ARTICLE IX.
### MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

**THE PLAN PROPONENTS HAVE NOT SOUGHT OR OBTAINED ANY RULING FROM THE INTERNAL REVENUE SERVICE OR FROM ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN, NOR HAVE THE PLAN PROPONENTS SOUGHT OR OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO ANY SUCH TAX CONSEQUENCES. NO REPRESENTATIONS OR ASSURANCES ARE MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS SUMMARIZED HEREIN. CERTAIN TYPES OF CREDITORS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES. FURTHER, CREDITORS MAY BE SUBJECT TO STATE, LOCAL, OR FOREIGN TAX CONSEQUENCES THAT ARE NOT ADDRESSED HEREIN. BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES, EACH CREDITOR SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF ANY ASPECT OF THE PLAN WITH RESPECT TO SUCH CREDITOR.**

**A.    Introduction**

A summary description of material United States federal income tax consequences of the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the material United States federal income tax consequences of the Plan to the Debtors and to Holders who are entitled to vote to accept or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any Holder. No assurance can be given that the IRS would not assert, or that a court would not sustain, a position different from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees, and persons who

118

received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation). Furthermore, the following discussion does not address United States federal taxes other than income taxes.

Each Holder is strongly urged to consult its own tax advisor regarding the United States federal, state, and local and any foreign tax consequences of the transactions described herein and in the Plan.

## B.    United States Federal Income Tax Consequences to the Debtors

### 1.    Cancellation of Indebtedness Income

Upon implementation of the Plan, the amount of the Debtors' aggregate outstanding indebtedness will be substantially reduced. In general, the discharge of a debt obligation in exchange for an amount of cash and other property having a fair market value (or, in the case of a new debt instrument, an "issue price") less than the "adjusted issue price" of the debt obligation being discharged gives rise to cancellation of indebtedness ("COD") income to the debtor. However, under IRC Section 108, COD income is not taxable to the debtor if the debt discharge occurs in a Title 11 bankruptcy case. Rather, such COD income instead will reduce certain of the Debtors' tax attributes, generally in the following order: (a) net operating losses ("NOLs") for the taxable year of discharge and NOL carryforwards; (b) general business credit carryforwards; (c) minimum tax credit available as of the beginning of the taxable year immediately following the taxable year of discharge; (d) net capital loss for the taxable year of discharge and capital loss carryforwards; (e) the tax basis of the Debtors' depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); (f) passive activity loss and credit carryforwards and (g) foreign tax credit carry forwards. A debtor may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets (and, possibly, the depreciable assets of its subsidiaries), but in such case, the basis may be reduced below the Debtors' post-Effective Date liabilities. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income that accrues between the date of discharge and the end of the Debtors' tax year). Any excess COD income over the amount of available tax attributes is not subject to United States federal income tax.

Because some of the Debtors' outstanding indebtedness will be satisfied in exchange for New Allied Holdings Common Stock, the amount of COD income, and accordingly the amount of tax attributes required to be reduced, will depend in part on the fair market value of the New Allied Holdings Common Stock. This value cannot be known with certainty until after the Effective Date.  Depending on such valuation, it is possible that a substantial portion of the NOLs and other tax attributes of the Debtors could be eliminated under these rules.

### 2.    Utilization of Net Operating Losses and Other Tax Attributes — Section 382

Under IRC Section 382, whenever there is a more than fifty percent ownership change of a corporation during a three-year testing period, the ability of the corporation to utilize any NOL carryovers (to the extent not eliminated under the IRC Section 108 attribute reduction rules) and certain subsequently recognized built-in losses and deductions to offset future taxable income

may be subject to an annual limitation. The issuance of New Allied Holdings Common Stock pursuant to the Plan will constitute an ownership change for purposes of IRC Section 382.

Under IRC Section 382(l)(6) and the Treasury Regulations promulgated thereunder, the amount of the annual limitation to which the Debtors would be subject should generally be equal to the product of (i) the lesser of the value of the equity of the Reorganized Debtors immediately after the ownership change or the value of the Debtors' consolidated gross assets immediately before such change (with certain adjustments) and (ii) the "long-term tax-exempt rate" in effect for the month of the Effective Date as published by the United States Treasury Department (by way of illustration, that rate is 4.04% for ownership changes occurring in April 2007) (the "L6 Limitation").

In general, if the Debtors have a net unrealized built-in gain ("NUBIG") at the time of the ownership change (subject to a *de minimis* threshold), the amount of such built-in gain recognized during the five-year period following the ownership change will increase the amount of the taxable income that may be offset by pre-ownership change losses. If, on the other hand, the Debtors have a net unrealized built-in loss ("NUBIL") at the time of the ownership change (subject to a *de minimis* threshold), the amount of such built-in loss recognized during the five-year period following the ownership change will decrease the amount of income that may be offset by pre-ownership change losses. Whether the Debtors are in a NUBIG or NUBIL position will depend in part on the fair market value of the Debtors' assets immediately before the ownership change date. This value cannot be known with certainty until the Effective Date.

The IRC provides an exception to the L6 Limitation under IRC Section 382(l)(5), which applies in the case of certain reorganizations under the Bankruptcy Code if the reorganization of the Debtors results in an exchange by qualifying creditors and stockholders of their claims and interests for at least fifty percent of the Debtors' stock (in vote and value) (the "L5 Exception"). Stock transferred to a creditor will be taken into account for the purpose of the fifty percent test only to the extent that such stock is transferred in satisfaction of indebtedness and only if such indebtedness was held by the creditor for at least eighteen months before the Petition Date or arose in the ordinary course of the Debtors' trade or business and is held by the person who at all times held the beneficial interest in such indebtedness. The Plan Proponents have concluded that the Debtors likely will not qualify for the L5 Exception.

## C.  United States Federal Income Tax Consequences to Holders of Claims

The following discusses certain United States federal income tax consequences of the transactions contemplated by the Plan to Holders that are "United States Holders," as defined below. The United States federal income tax consequences of the transactions contemplated by the Plan to Holders of Claims (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (1) whether the Claim and the consideration received in respect thereof are "securities" for federal income tax purposes; (2) the manner in which a Holder acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or any prior year; (6) whether the Holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the Holder's method of tax accounting; and (8) whether the Claim

is an installment obligation for federal income tax purposes. Therefore, Holders should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan. This discussion assumes that the Holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year. Moreover, the Debtors intend to claim deductions to the extent they are permitted to deduct any amounts they pay in cash, stock or other property pursuant to the Plan.

For purposes of the following discussion, a "United States Holder" is a Holder that is (1) a citizen or individual resident of the United States, (2) a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust if: (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust or (ii) the trust was in existence on August 20, 1996 and properly elected to be treated as a United States person. If a partnership (or other entity treated as a partnership for United States federal income tax purposes) is a Holder of Claims, the tax treatment of a partner as a beneficial owner thereof will generally depend on the status of the partner and the activities of the partnership.

### 1.    Holders of Secured Claims

The Holders of Secured Claims may recognize income, gain or loss for United States federal income tax purposes with respect to the discharge of their Claims, depending on whether their Claims are reinstated or, if not reinstated, on the outcome of their negotiations with Yucaipa. A Holder whose Secured Claim is reinstated pursuant to the Plan will not recognize gain or loss unless either (i) such Holder is treated as having received interest, damages or other income in connection with the reinstatement or (ii) such reinstatement is considered a "significant modification" of the Claim. The Plan Proponents do not believe that the treatment of the Holders of Secured Claims will constitute a "significant modification" for federal income tax purposes.

A Holder who receives cash or other property in exchange for its Claim pursuant to the Plan will generally recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (1) the amount of cash or fair market value of other property, if any, received in exchange for its Claim and (2) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether the Holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim (as discussed further, below in Section C.3).

## 2.    Holders of Priority Non-Tax Claims

A Holder whose Priority Claim is paid in full or otherwise discharged on the Effective Date will recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the amount of cash received by such Holder in respect of its Claim and (ii) the Holder's adjusted tax basis in the Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether the Holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim (as discussed further, below in Section C.3). A Holder recognizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. In addition, the rules summarized below with respect to accrued interest and market discount may also apply with respect to the receipt of cash in discharge of a Holder's Priority Claim.

## 3.    Allocation of Plan Distributions Between Principal and Interest

The Plan provides that, to the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. The Debtors intend to take the position that any Distributions made under the Plan with respect to an Allowed Claim will be allocated first to the principal amount of the Claim, with the excess over the principal amount being allocated to accrued but unpaid interest. However, current United States federal income tax law is unclear on this point and no assurance can be given that the IRS will not challenge the Debtors' position. Holders are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

## 4.    Market Discount

The market discount provisions of the IRC may apply to Holders of certain Claims. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a Holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that Holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the Holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount. Gain recognized by a creditor with respect to a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the creditor's period of ownership, unless the creditor elected to include accrued market discount in taxable income currently. A Holder of a market discount bond that is required under the market discount rules of the IRC to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on disposition of such bond.

**5.    Holders of Claims Receiving Distributions of New Allied Holdings Common Stock**

*Generally* – A Holder of a Claim that receives a Distribution of New Allied Holdings Common Stock in exchange for its Claim pursuant to the Plan will generally recognize income, gain or loss for United States federal income tax purposes (unless such claim constitutes a "security," as described below) in an amount equal to the difference between (1) the fair market value on the Effective Date of the New Allied Holdings Common Stock received and (2) the Holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. A Holder recognizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. In addition, the rules summarized above with respect to accrued interest and market discount may also apply with respect to the receipt of New Allied Holdings Common Stock in discharge of a Holder's Claim. A Holder's aggregate tax basis in the New Allied Holdings Common Stock it receives pursuant to the Plan would generally be equal to the aggregate fair market value on the Effective Date of such stock. The holding period for the New Allied Holdings Common Stock would begin on the day after the Effective Date.

*Tax-Free Treatment for Holders of Unsecured Claims that are "Securities"* – Allied Holdings' cancellation of its common stock and the distribution of the New Allied Holdings Common Stock may qualify for treatment as a tax-free reorganization to the extent Holders of Claims hold Claims that constitute "securities" for U.S. federal income tax purposes. The term "security" is not defined in the IRC or Treasury Regulations promulgated thereunder and has not been clearly defined by judicial decision. The determination of whether an instrument constitutes a "security" is determined based on all the facts and circumstances but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of five years or less is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. In addition to maturity, other factors taken into account are the nature of the debt, the degree of participation and continuing interest in the business represented by the debt, the extent of proprietary interest compared with the similarity of the debt to a cash payment, and the purpose of the advance. The Prepetition Notes Claims have a term of six years, and therefore, although not free from doubt, because the prepetition notes have a term of six (6) years, the Debtors believe that such claims should be "securities" for these purposes. Holders of these claims should consult their own tax advisors to determine whether their exchange will qualify as a tax-free reorganization.

In the event that a Holder's receipt of New Allied Holdings Common Stock qualifies as a tax-free reorganization, then such Holders generally (i) will not recognize loss upon the exchange of such Claim, but (ii) will recognize gain, if any, only to the extent of consideration received other than New Allied Holdings Common Stock (other than in respect of any accrued but unpaid interest). Further, the Holder's aggregate tax basis in any New Allied Holdings Common Stock received in satisfaction of its Claim will equal the Holder's aggregate tax basis

in such Claim, increased by the amount of any gain recognized and decreased by any consideration received (other than New Allied Holdings Common Stock) that is not allocable to accrued but unpaid interest. In general, the Holder's holding period for New Allied Holdings Common Stock will include the Holder's holding period for the Claim exchanged therefore, except to the extent that the New Allied Holdings Common Stock was issued in respect of a Claim for accrued but unpaid interest.

The market discount provisions of the IRC provides that, under regulations to be prescribed by the Treasury Department, any accrued market discount that is not treated as ordinary income upon a tax-free exchange of market discount bonds carries over to the non-recognition property received in the exchange. Any accrued market discount incurred in respect of a Claim that constitutes a "security" for federal income tax purposes would carry over to any New Allied Holdings Common Stock received by the Holder pursuant to the Plan, such that any gain recognized by the Holder upon a subsequent disposition of the New Allied Holdings Common Stock also would be treated as ordinary income to the extent of any such accrued market discount not previously included in income.

To the extent certain Holders reach an agreement with the Debtors to have their Claims satisfied, settled, released, exchanged or otherwise discharged in a manner other than as discussed above, such Holders should consult their own tax advisors regarding the tax consequences to them of such treatment.

### 6. Holders of Interests

A Holder of an Interest that is cancelled under the Plan will be allowed a "worthless stock deduction" in an amount equal to the Holder's adjusted basis in such Interest. A "worthless stock deduction" is a deduction allowed to a Holder of a corporation's stock for the taxable year in which such stock becomes worthless (which year may differ from the year the Plan is confirmed). If the Holder held the Interest as a capital asset, the loss will be treated as a loss from the sale or exchange of such capital asset on the last day of the Holder's taxable year.

### 7. Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payer to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the IRC's backup withholding rules, a United States Holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the Holder is a United States person, that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's United States federal income tax liability,

and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

[space intentionally left blank]

## ARTICLE X.
## RECOMMENDATION

Based on the foregoing analysis of the Plan Proponents, the Debtors' remaining assets, and the Plan, the Plan Proponents believe that the best interests of all parties would be served through confirmation of the Plan. The Committee supports the Plan subject to the assessment of certain matters referenced in Article VII.F. **FOR THESE REASONS, THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO "ACCEPT" THE PLAN.**

Respectfully submitted, this 5th day of April, 2007.

/s/ Robert A. Klyman
(by JWK with express permission)
LATHAM & WATKINS LLP
Robert A. Klyman
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763


PARKER, HUDSON, RAINER & DOBBS LLP
Rufus T. Dorsey
1500 Marquis Two Tower
285 Peachtree Center Ave., N.E.
Atlanta, Georgia 30303
Telephone (404) 420-5550
Facsimile: (404) 522-8409

/s/ Jeffrey W. Kelley
TROUTMAN SANDERS LLP
Jeffrey W. Kelley
Bank of America Plaza
600 Peachtree Street, NE, Suite 5200
Atlanta, Georgia 30308-2216
Telephone: (404) 885-3000
Facsimile: (404) 885-3900

Counsel for the Debtors


/s/ Frederick Perillo
(by JWK with express permission)
PREVIANT, GOLDBERG, UELMEN, GRATZ, MILLER & BRUEGGEMAN, S.C.
Frederick Perillo
1555 N. RiverCenter Dr., Suite 202
Milwaukee, WI 53212
Telephone: (414) 223-0434
Facsimile: (414) 271-6308


Counsel for the Teamsters National Automobile Transportation Industry Negotiating Committee

## **EXHIBITS TO DISCLOSURE STATEMENT**

| | |
|---|---|
| Exhibit A | Second Amended Joint Plan of Reorganization |
| Exhibit B | Terms of Exit Financing (Intentionally Deleted.  See Docket Entry Nos. 2649, 2683 and 2704) |
| Exhibit C | Pro Forma Financial Projections |
| Exhibit D | Liquidation Analysis |
| Exhibit E | Yucaipa's Reorganized Value Analysis |
| Exhibit E-1 | Debtors' Reorganized Value Analysis |
| Exhibit F | Pre-Effective Date corporate organizational structure of the Debtors |
| Exhibit G | Terms of Labor Deal |

# EXHIBIT A

# SECOND AMENDED JOINT PLAN OF REORGANIZATION

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **ALLIED HOLDINGS, INC.,** *et al.*[1] | **Case Nos. 05-12515 through 05-12526 and 05-12528 through 05-12537 (Jointly Administered)** |
| **Debtors.** | **Judge Mullins** |

## SECOND AMENDED JOINT PLAN OF REORGANIZATION OF ALLIED HOLDINGS, INC. AND AFFILIATED DEBTORS PROPOSED BY THE DEBTORS, YUCAIPA AND THE TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTATION INDUSTRY NEGOTIATING COMMITTEE

Dated April 5, 2007

LATHAM & WATKINS LLP
Robert A. Klyman
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

and

PARKER, HUDSON, RAINER & DOBBS LLP
Rufus T. Dorsey
1500 Marquis Two Tower
285 Peachtree Center Ave., N.E.
Atlanta, Georgia 30303
Telephone: (404) 420-5550
Facsimile: (404) 522-8409

Counsel for Yucaipa American Alliance Fund I, LP and
Yucaipa American Alliance (Parallel) Fund I, LP

TROUTMAN SANDERS LLP
Jeffrey W. Kelley
Bank of America Plaza
600 Peachtree Street, N.E. – Suite 5200
Atlanta, Georgia 30308-2216
Telephone: (404) 885-3000
Facsimile: (404) 885-3900

Counsel for the Debtors

PREVIANT, GOLDBERG, UELMEN, GRATZ,
MILLER & BRUEGGEMAN, S.C.
Frederick Perillo
1555 N. River Center Dr., Suite 202
Milwaukee, WI 53212
Telephone: (414) 223-0434
Facsimile: (414) 271-6308

Counsel for the Teamsters National Automobile
Transportation Industry Negotiating Committee

---

[1] The Debtors in the jointly administered cases are: Allied Holdings, Inc., Case No. 05-12515; Allied Automotive Group, Inc., Case No. 05-12516; Allied Systems, Ltd. (L.P.), Case No. 05-12517; Allied Systems (Canada) Company, Case No. 05-12518; QAT, Inc., Case No. 05-12519; RMX LLC, Case No. 05-12520; Transport Support LLC, Case No. 05-12521; F.J. Boutell Driveaway LLC, Case No. 05-12522; Allied Freight Broker LLC, Case No. 05-12523; GACS Incorporated, Case No. 05-12524; Commercial Carriers, Inc., Case No. 05-12525; Axis Group, Inc., Case No. 05-12526; Axis Netherlands, LLC, Case No. 05-12528; Axis Areta, LLC, Case No. 05-12529; Logistic Technology, LLC, Case No. 05-12530; Logistic Systems, LLC, Case No. 05-12531; CT Services, Inc., Case No. 05-12532; Cordin Transport LLC, Case No. 05-12533; Terminal Services LLC, Case No. 05-12534; Axis Canada Company, Case No. 05-12535; Ace Operations, LLC, Case No. 05-12536; and AH Industries Inc., Case No. 05-12537.

## TABLE OF CONTENTS

ARTICLE I. DEFINITIONS AND GENERAL PROVISIONS ......................................... 3

    **1.1**    Definitions .................................................................................................... 3
    **1.2**    Time ............................................................................................................ 24
    **1.3**    Rules of Interpretation .............................................................................. 24

ARTICLE II. CLASSIFICATION OF CLAIMS AND INTERESTS; IMPAIRMENT .............. 25

    **2.1**    Summary ..................................................................................................... 25
    **2.2**    Deemed Acceptance of Plan ...................................................................... 26
    **2.3**    Deemed Rejection of Plan ......................................................................... 26
    **2.4**    Classes Entitled to Vote on Plan .............................................................. 26
    **2.5**    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ................... 26
    **2.6**    Prepetition Lender Claims ......................................................................... 27

ARTICLE III. TREATMENT OF CLAIMS AND INTERESTS ................................................. 27

    **3.1**    Class 1 et seq. -- Other Secured Claims .................................................... 27
    **3.2**    Class 2 -- Priority Non-Tax Claims. .......................................................... 28
    **3.3**    Class 3 -- Workers' Compensation Claims ................................................ 29
    **3.4**    Class 4A -- General Unsecured Claims. .................................................... 29
    **3.5**    Class 4B -- Insured Claims. ....................................................................... 30
    **3.6**    Class 4C -- Other Insured Claims. ............................................................ 30
    **3.7**    Class 4D –Unsecured Claims Receiving Cash Option. ............................. 31
    **3.8**    Class 5 -- Intercompany Claims. ............................................................... 32
    **3.9**    Class 6---Subordinated General Unsecured Claims. ................................. 32
    **3.10**    Class 7A – Old Allied Holdings Common Stock ...................................... 33
    **3.11**    Class 7B – Old Other Debtors Common Stock. ........................................ 33
    **3.12**    Class 7C -- Old Allied Holdings Stock Rights. ........................................ 33
    **3.13**    Special Provision Governing Unimpaired Claims .................................... 34

ARTICLE IV. TREATMENT OF UNCLASSIFIED CLAIMS ......................................... 34

    **4.1**    Summary ..................................................................................................... 34
    **4.2**    Unclassified Claims (Applicable to All Debtors). ..................................... 34

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ............................................................................................................ 38

    **5.1**    Assumption and Cure of Executory Contracts and Unexpired Leases ................ 38
    **5.2**    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases .......... 39
    **5.3**    Collective Bargaining Agreement. ............................................................. 39
    **5.4**    Employment Agreements and Other Benefits. ........................................... 40
    **5.5**    Insurance Policies. ..................................................................................... 41
    **5.6**    ACE Insurance Program. ........................................................................... 42

ARTICLE VI. MEANS FOR IMPLEMENTATION OF PLAN ....................................................43

    6.1    Continued Corporate Existence and Vesting of Assets in Reorganized
        Debtors.....................................................................................................................43
    6.2    Substantive Consolidation of Claims against Debtors for Plan Purposes
        Only..........................................................................................................................43
    6.3    Exit Financing Facility............................................................................................44
    6.4    Sources of Cash for Distribution.............................................................................44
    6.5    Reinstatement of Interests of Allied Holdings in its Affiliates...............................44
    6.6    Corporate and Limited Liability Company Action.................................................44
    6.7    Effectuating Documents; Further Transactions.......................................................45
    6.8    Exemption from Certain Transfer Taxes and Recording Fees.................................45
    6.9    Further Authorization...............................................................................................45
    6.10   Canadian Operations Sale........................................................................................45
    6.11   Retained Actions......................................................................................................45
    6.12   Other Documents and Actions .................................................................................46
    6.13   Corporate Action......................................................................................................46
    6.14   Retiree Benefits........................................................................................................47
    6.15   Employee Claims .....................................................................................................47
    6.16   Good Faith ...............................................................................................................47
    6.17   Executory Contracts and Unexpired Leases Entered Into, and Other
        Obligations Incurred After, the Petition Date ........................................................47
    6.18   Security Interests and Liens ....................................................................................47

ARTICLE VII. PROVISIONS REGARDING CORPORATE GOVERNANCE OF
    REORGANIZED DEBTORS ..................................................................................48

    7.1    Reorganized Governing Documents and Reorganized By-Laws ...........................48
    7.2    Directors and Officers of Reorganized Debtors......................................................48
    7.3    New Employment, Retirement, Indemnification and Other Related
        Agreements and Incentive Compensation Programs ..............................................49
    7.4    Stockholders' Agreement........................................................................................49
    7.5    Registration Rights Agreement...............................................................................49
    7.6    Management Services Agreement ...........................................................................50
    7.7    Effectuating Documents and Further Transactions.................................................50
    7.8    Authorization and Issuance of New Common Stock................................................50
    7.9    Reserve.....................................................................................................................50
    7.10   Listing of New Allied Holdings Common Stock.....................................................50
    7.11   Possible Privatization of Reorganized Allied Holdings Following
        Emergence................................................................................................................51
    7.12   Old Allied Holdings Common Stock, Old Other Debtors Common Stock
        and Old Allied Holdings Stock Rights....................................................................51

ARTICLE VIII. VOTING AND DISTRIBUTIONS.............................................................51

    8.1    Voting of Claims......................................................................................................51
    8.2    Nonconsensual Confirmation..................................................................................52

| | | |
|---|---|---|
| **8.3** | Acceptance by Class of Creditors | 52 |
| **8.4** | Distributions for Claims Allowed as of the Effective Date | 52 |
| **8.5** | Disbursing Agent | 52 |
| **8.6** | Distributions of Cash | 52 |
| **8.7** | No Interest on Claims or Interests | 53 |
| **8.8** | Delivery of Distributions | 53 |
| **8.9** | Distributions to Holders as of the Record Date | 53 |
| **8.10** | Indenture Trustee as Claim Holder. | 54 |
| **8.11** | De Minimis Distributions | 54 |
| **8.12** | Fractional Securities, Fractional Dollars. | 55 |
| **8.13** | Procedures for Distributions to Holders of Prepetition Notes Claims. | 55 |
| **8.14** | Distributions of Cash to Holders of Allowed Class 4D Claims | 55 |
| **8.15** | Compliance with Tax Requirements. | 55 |
| **8.16** | No Duplicate Distributions | 56 |
| **8.17** | Distributions in U.S. Dollars. | 56 |

ARTICLE IX. PROCEDURES FOR TREATING AND RESOLVING DISPUTED
CLAIMS ..............56

| | | |
|---|---|---|
| **9.1** | Objections to Claims | 56 |
| **9.2** | Authority to Prosecute Objections | 56 |
| **9.3** | No Distributions Pending Allowance | 57 |
| **9.4** | Estimation of Claims. | 57 |
| **9.5** | Distributions After Allowance | 58 |
| **9.6** | Intentionally Omitted. | 58 |
| **9.7** | Claims Covered by Insurance Policy. | 58 |

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND THE
EFFECTIVE DATE OF THE PLAN ..............59

| | | |
|---|---|---|
| **10.1** | Conditions to Confirmation | 59 |
| **10.2** | Conditions to the Effective Date | 59 |
| **10.3** | Waiver of Conditions | 61 |
| **10.4** | Intentionally Deleted. | 62 |
| **10.5** | Effect of Failure of Conditions | 62 |
| **10.6** | Order Denying Confirmation | 62 |

ARTICLE XI. EFFECT OF PLAN ON CLAIMS AND INTERESTS ..............62

| | | |
|---|---|---|
| **11.1** | Revesting of Assets | 62 |
| **11.2** | Discharge of Claims and Termination of Interests | 63 |
| **11.3** | Cancellation of Claims and Interests | 63 |
| **11.4** | Release by Debtors of Certain Parties | 64 |
| **11.5** | Release by the Debtors of the Original DIP Lenders and DIP Lenders | 65 |
| **11.6** | Release by Holders of Claims and Interests. | 66 |
| **11.7** | Releases Reasonable; Bankruptcy Court's Exclusive Jurisdiction Related Thereto. | 67 |

**11.8** Setoffs ...........................................................................................................67
**11.9** Exculpation and Limitation of Liability .................................................67
**11.10** Injunction ......................................................................................................68
**11.11** Effect of Confirmation.................................................................................68

ARTICLE XII. RETENTION AND SCOPE OF JURISDICTION OF THE
BANKRUPTCY COURT ..........................................................................................69

**12.1** Retention of Jurisdiction ...........................................................................69
**12.2** Alternative Jurisdiction .............................................................................71
**12.3** Final Decree ..................................................................................................71

ARTICLE XIII. MISCELLANEOUS PROVISIONS .................................................71

**13.1** Modification of the Plan .............................................................................71
**13.2** Revocation of the Plan ................................................................................72
**13.3** Exemption From SEC Registration ..........................................................72
**13.4** Exemption from Securities Laws ...............................................................72
**13.5** Initial Offer and Sale Exempt from Registration...................................72
**13.6** Applicable Law .............................................................................................72
**13.7** Plan Supplement ..........................................................................................73
**13.8** Filing or Execution of Additional Documents........................................73
**13.9** Withholding and Reporting Requirements .............................................73
**13.10** Waiver of Rule 62(a) of the Federal Rules of Civil Procedure............73
**13.11** Allocation of Plan Distributions between Principal and Interest........73
**13.12** Dissolution of Creditors' Committee .......................................................73
**13.13** Preparation of Estates' Returns and Resolution of Tax Claims............74
**13.14** Headings ........................................................................................................74
**13.15** Confirmation of Plans for Separate Debtors...........................................74
**13.16** No Admissions; Objection to Claims .......................................................74
**13.17** Survival of Settlements ...............................................................................74
**13.18** No Waiver ......................................................................................................74
**13.19** No Bar to Suits..............................................................................................75
**13.20** Successors and Assigns................................................................................75
**13.21** Severability of Plan Provisions .................................................................75
**13.22** Post-Effective Date Effect of Evidences of Claims or Interests ...........75
**13.23** Conflicts.........................................................................................................75
**13.24** Exhibits/Schedules.......................................................................................75
**13.25** No Injunctive Relief .....................................................................................76
**13.26** Rounding ........................................................................................................76
**13.27** Saturday, Sunday or Legal Holiday ..........................................................76
**13.28** Entire Agreement .........................................................................................76
**13.29** Service of Certain Plan Exhibits and Disclosure Statement Exhibits...................76
**13.30** Service of Documents ..................................................................................76

## INTRODUCTION

Allied Holdings, Inc. and the Affiliated Debtors (collectively, the "Debtors"),Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (collectively, "Yucaipa"), and The Teamsters National Automobile Transportation Industry Negotiating Committee ("TNATINC") hereby propose this Second Amended Joint Plan of Reorganization (defined hereinafter as the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors.  Yucaipa and TNATINC are the proponents of this Plan within the meaning of Section 1129 of the Bankruptcy Code.

The Creditors' Committee has endorsed the Plan, subject to, among other things, review and approval of the Plan Supplement and other Plan documentation, as well as negotiation of certain related matters, including, without limitation, documentation of the issuance and Distribution of the New Common Stock, including anti-dilution provisions in respect thereof, appropriate post-Effective Date protections for the rights of minority shareholders, any proposed sale of assets, terms of any funding and exit financing, and other review and approval rights in connection with the Confirmation process.

Reference is made to the Plan Proponents' Disclosure Statement dated as of April 5, 2007 for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections and properties, and for a summary of the Plan and certain related matters.  There also are other agreements and documents that are, or will be, filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement or both, and will be available for review.  All referenced documents are or will be accessible on the website http://administar.net/allied/indexmain.htm under the link for

"Disclosure Statement and Plan". Capitalized terms not defined in this Introduction shall have the meanings ascribed to them in Article I hereof or as otherwise specified in the first paragraph of Section 1.1 below.

Under the Plan, the Debtors will be reorganized through, among other things, the consummation of the following transactions: (i) the conversion of the DIP Facility into the Exit Financing Facility, (ii) payment in Cash, Reinstatement, return of collateral or other treatment of Other Secured Claims as agreed between the holder of each such Claim and Yucaipa, (iii) distribution of New Common Stock, on a Pro Rata basis, to the holders of Allowed General Unsecured Claims, (iv) cancellation of the existing Interests in the Debtors, (v) assumption of Assumed Contracts, and (vi) the potential conversion of the Equipment Financing Facility into New Allied Holdings Common Stock.

Under Section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from holders of claims or interests until the Disclosure Statement has been approved by the Bankruptcy Court. The Plan Proponents urge all Claimholders entitled to vote on the Plan to read in their entirety, the Plan, the Disclosure Statement, and the exhibits attached hereto and thereto before voting to accept or reject the Plan. To the extent, if any, that the Disclosure Statement is inconsistent with the Plan, the Plan will govern. No solicitation materials other than the Disclosure Statement and any schedules and exhibits attached thereto or referenced therein, or otherwise enclosed with the Disclosure Statement served by the Plan Proponents on interested parties, have been authorized by the Plan Proponents or the Bankruptcy Court for use in soliciting acceptances of the Plan.

# ARTICLE I.
## DEFINITIONS AND GENERAL PROVISIONS

**1.1**    Definitions.  As used in the Plan, capitalized terms have the meanings set forth below.  Any capitalized term that is not otherwise defined herein, but that is used in the Bankruptcy Code, the Bankruptcy Rules or the local rules of the Bankruptcy Court, shall have the meaning given to that term in the Bankruptcy Code, the Bankruptcy Rules or the local rules of the Bankruptcy Court, as applicable.

(1)    "Ace Operations" means Ace Operations, LLC, a Georgia limited liability company.

(2)    "Administrative Expense Claim" means a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 1114(e)(2) of the Bankruptcy Code and/or entitled to priority pursuant to Sections 507(a)(1) or 507(b) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, (b) Professional Compensation, (c) any payment to be made under this Plan to cure a default on an executory contract or unexpired lease that is assumed pursuant to Section 365 of the Bankruptcy Code, (d) Allowed Claims entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court, (e) Indenture Trustee Fees and Expenses and (f) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code.

(3)    "Administrative Expense Claim Bar Date" means the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

(4)    "Affiliates" has the meaning given such term by Section 101(2) of the Bankruptcy Code.

(5)    "Allied Automotive" means Allied Automotive Group, Inc., a Georgia corporation.

(6)    "Allied Canada" means Allied Systems (Canada) Company.

(7)    "Allied Freight Broker" means Allied Freight Broker LLC, a Delaware limited liability company.

(8)    "Allied Holdings" means Allied Holdings, Inc., a Georgia corporation.

(9)    "Allied Systems" means Allied Systems, Ltd. (L.P.).

(10)    "Allowed" when used herein together with the term Claim, means a Claim or any portion thereof that (i) has been allowed by a Final Order of the Bankruptcy Court; (ii) is listed in any of the Debtors' respective Schedules (less any amounts paid on account of such Claim after the Petition Date), as such Schedules may

3

be amended from time to time in accordance with Bankruptcy Rule 1009, and for which no contrary proof of Claim has been timely Filed, other than a Claim that is listed in any of the Debtors' Schedules at zero or as disputed, contingent, or unliquidated; (iii) is evidenced by a proof of Claim that has been Filed with the Bankruptcy Court or the Claims Agent on or before the Bar Date (or Administrative Expense Claim Bar Date if an Administrative Expense Claim) or deemed to be timely filed pursuant to any Final Order of the Bankruptcy Court or under applicable law, and as to which (A) no objection to its allowance has been timely Filed, or (B) any objection to its allowance has been settled or withdrawn, or has been overruled by a Final Order; (iv) is Allowed pursuant to the terms of this Plan, including Indenture Trustee Fees and Expenses (regardless of whether such Claim has been listed by the Debtors in their Schedules and regardless of whether a proof of Claim has been filed in respect thereof); or (v) is not otherwise a Disputed Claim; provided, however, that Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims for the purposes of distribution under this Plan.  An Allowed Interest shall have a correlative meaning.

(11)    "Assets" means, collectively, all of the legal and equitable interests of the Debtors in the property, as defined by Section 541 of the Bankruptcy Code of the Estates of the Debtors (including, without limitation, all of the assets, property, interests (including equity interests) and effects, real and personal, tangible and intangible, including all Avoidance Actions), wherever situated as such properties exist on the Effective Date or thereafter.

(12)    "Avoidance Action" means any claim or cause of action of an Estate arising out of or maintainable pursuant to Sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

(13)    "Axis Areta" means Axis Areta, LLC, a Georgia limited liability company.

(14)    "Axis Canada" means Axis Canada Company, a Nova Scotia unlimited liability company.

(15)    "Axis Group" means Axis Group, Inc., a Georgia corporation.

(16)    "Axis Netherlands" means Axis Netherlands, LLC, a Georgia limited liability company.

(17)    "Ballot" means each of the ballot forms that are distributed with the Disclosure Statement to Holders of Claims included in Classes that are Impaired under this Plan and entitled to vote to accept or reject this Plan.

(18)    "Bankruptcy Code" means title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, if such amendments are made applicable to the Chapter 11 Cases.

(19)   "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division or, in the event such court ceases to exercise jurisdiction over any Chapter 11 Case, the District Court or such court or adjunct thereof that exercises jurisdiction over such Chapter 11 Case in lieu of the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division.

(20)   "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as in effect on the Petition Date and as thereafter amended, if such amendments are made applicable to the Chapter 11 Cases, the Federal Rules of Civil Procedure, as applicable, to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applied to the Chapter 11 Cases or proceedings therein, as the case may be.

(21)   "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including the Bar Date Order and the Confirmation Order.

(22)   "Bar Date Order" means that certain Order Establishing a Bar Date for Filing Proofs of Claim and Approving the Manner and Notice Thereof entered by the Bankruptcy Court on November 16, 2005 [Docket No. 731].

(23)   "Business Day" means any day on which commercial banks are open for business, and not authorized to close, in the City of New York, New York, except any Saturday, Sunday or any day designated as a legal holiday in Bankruptcy Rule 9006(a).

(24)   "Canadian Operations Sale" shall have the meaning set forth in Section 6.10 hereof.

(25)   "Cash" means legal tender of the United States of America and equivalents thereof.

(26)   "Cash Option" means the irrevocable option that is available to Holders of General Unsecured Claims, Insured Claims and Other Insured Claims to be Cash Out Holders.

(27)   "Cash Out Contribution" means a contribution of up to $2.5 million of cash that Yucaipa is committed to make to effectuate the Cash Option plus any additional amount Yucaipa elects to make to effectuate the Cash Option if there are more than $20 million of Allowed Class 4D Claims.  In exchange for making the Cash Out Contribution, Yucaipa shall receive the New Allied Holdings Common Stock that each Holder of an Allowed Class 4D Claim would have received if its Allowed Claim were classified in Class 4A, Class 4B or Class 4C (without giving effect to any Voluntary Reductions).

(28)   "Cash Out Holder" means a Holder of an Allowed General Unsecured Claim, Insured Claim or Other Insured Claim who (a) holds an Allowed Claim that is equal to or less than $20,000 and does not irrevocably elect to be classified

in Class 4A, Class 4B or 4C or (b) holds an Allowed Claim in excess of $20,000 but irrevocably elects to a Voluntary Reduction of such Allowed Claim to $20,000 and to be classified in Class 4D.

(29)    "Causes of Action" means all claims, actions, Avoidance Actions, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims (including, but not limited to, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code) of any of the Debtors, the Debtors-in-Possession, and/or the Estates (including, but not limited to, those actions set forth in the Plan Supplement) that are or may be pending on the Effective Date or that may be instituted by the Reorganized Debtors after the Effective Date against any entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

(30)    "Chapter 11 Case" means, with respect to each Debtor, the Chapter 11 Case initiated by such Debtor's filing on the Petition Date of a voluntary petition for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered in the Bankruptcy Court as Bankruptcy Case No. 05-12515-CRM pursuant to the Order Directing Joint Administration of Cases entered by the Bankruptcy Court on August 1, 2005.

(31)    "Claim" means a claim against one of the Debtors (or all or some of them) whether or not asserted or Allowed, as defined in Section 101(5) of the Bankruptcy Code.

(32)    "Claims Agent" means JPMorgan Trust Company, National Association, 8475 Western Way, Suite 110, Jacksonville, FL 32256.

(33)    "Claims Objection Deadline" means the later of the first Business Day which is (i) one hundred twenty (120) days after the Effective Date, or (ii) such other time as may be ordered by the Bankruptcy Court, as such dates may be from time to time extended by the Bankruptcy Court without further notice to parties in interest.

(34)    "Class" means a category of Claims or Interests designated pursuant to the Plan.

(35)    "Commercial Carriers" means Commercial Carriers, Inc., a Michigan corporation.

(36)    "Confirmation" means the entry of the Confirmation Order on the docket of the Bankruptcy Court, within the meaning of Bankruptcy Rules 5003 and 9021.

(37)   "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

(38)   "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider confirmation of this Plan and related matters under Section 1128 of the Bankruptcy Code, as such hearing may be continued.

(39)   "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan.

(40)   "Contract/Lease Schedule" has the meaning ascribed to it in Section 5.1 of the Plan.

(41)   "Cordin Transport" means Cordin Transport LLC, a Delaware limited liability company.

(42)   "Creditors' Committee" means the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code as its composition may be changed from time to time by addition, resignation or removal of its members.

(43)   "CT Services" means CT Services, Inc., a Michigan corporation.

(44)   "Cure Amount" means the amount required to satisfy any Debtor's obligations under Section 365(b) of the Bankruptcy Code with respect to such Debtor's assumption of any executory contract or unexpired lease.

(45)   "Debtor" means, individually, Allied Holdings, Allied Automotive, Allied Systems, Allied (Canada), QAT, RMX, Transport Support, F.J. Boutell, Allied Freight Broker, GACS Incorporated, Commercial Carriers, Axis Group, Axis Netherlands, Axis Areta, Logistic Technology, Logistic Systems, CT Services, Cordin Transport, Terminal Services, Axis Canada, Ace Operations, and AH Industries, each of which is a Debtor in its Chapter 11 Case.

(46)   "Debtor-in-Possession" means the Debtors in their capacities as debtors in possession in the Chapter 11 Cases pursuant to sections 1107(a) and 1108 of the Bankruptcy Code

(47)   "Deficiency Amount" means the amount, if any, by which the Allowed amount of a Secured Claim exceeds the value of the collateral securing such Claim or the amount by which a Claim subject to setoff exceeds the amount of any setoff.

(48)   "Deficiency Claim" means any Claim against a Debtor representing a Deficiency Amount.

(49)   "Designated Notice" means notice and an opportunity for a hearing as defined in Section 102(1) of the Bankruptcy Code, with notice limited to the Debtors,

the Plan Proponents, the Creditors' Committee (if still in existence at such time), the United States Trustee, and other parties in interest who, after entry of the Confirmation Order, file a request for such notice with the Clerk of the Bankruptcy Court and serve a copy of same on counsel for the Debtors. Until and including the earlier of (a) the Effective Date and (b) thirty (30) days after the Confirmation Date, Designated Notice means notice pursuant to that certain Order Establishing Notice Procedures entered by the Bankruptcy Court on August 2, 2005 in the Chapter 11 Case [Docket No. 46].

(50)   "DIP Credit Documents" means that certain Secured, Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated as of March 30, 2007, as amended, supplemented or otherwise modified from time to time, and all documents executed in connection therewith by and among Allied Holdings, Inc. and Allied Systems, LTD. (L.P.) as borrowers, certain subsidiaries of Allied Holdings, Inc. and Allied Systems, LTD. (L.P.) as guarantors, Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other Lenders signatory thereto from time to time.

(51)   "DIP Lender Claim" means all Secured Claims arising under or pursuant to the DIP Credit Documents.

(52)   "DIP Lenders" means the Secured Parties as defined by the DIP Loan Facility.

(53)   "DIP Liens" means the Liens of the DIP Lenders on the Assets as previously granted pursuant to the Final DIP Order, subject to the limitations set forth therein.

(54)   "DIP Loan Facility" means that certain debtor-in-possession senior, secured credit facility entered into pursuant to the DIP Credit Documents.

(55)   "DIP Loan Facility Borrowers" means Allied Holdings and Allied Systems.

(56)   "DIP Loan Facility Guarantors" means Ace Operations, AH Industries, Allied Automotive, Allied Canada, Allied Freight Broker, Axis Areta, Axis Canada, Axis Group, Axis Netherlands, Commercial Carriers, Cordin Transport, CT Services, FJ Boutell, GACS, Logistic Systems, Logistic Technology, QAT, RMX, Terminal Services, and Transport Support.

(57)   "Disbursing Agent" means any entity (including any Reorganized Debtor and any Third Party Disbursing Agent), in its capacity as a disbursing agent pursuant to Section 8.5.

(58)   "Disclosure Statement" means the written disclosure statement that relates to this Plan, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time in accordance with applicable law.

(59)    "Disclosure Statement Hearing" means the hearing held pursuant to Bankruptcy Code Section 1125(b) and Bankruptcy Rule 3017(a), including any continuances thereof, at which the Bankruptcy Court considers the adequacy of the Disclosure Statement.

(60)    "Disputed Claim" means (a) if no proof of Claim has been Filed by the applicable Bar Date, a Claim that is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but as to which an objection has been Filed on or before the Claims Objection Deadline, and such objection has not been withdrawn or denied by a Final Order; (b) if no proof of Claim has been Filed by the applicable Bar Date, a Claim that is listed on a Debtor's Schedules as disputed, contingent or unliquidated; or (c) if a proof of Claim or request for payment of an Administrative Expense Claim has been Filed by the Bar Date (or the Administrative Expense Claim Bar Date, as the case may be) or has otherwise been deemed timely filed under applicable law:  (i) a Claim for which no corresponding Claim is listed on a Debtor's Schedules; (ii) a Claim for which a corresponding Claim is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of Claim varies from the nature and amount of such Claim as it is listed on the Schedules; (iii) a Claim for which a corresponding Claim is listed on a Debtor's Schedules as disputed, contingent or unliquidated; or (iv) a Claim for which an objection has been Filed by a Debtor or Reorganized Debtor or, prior to the Confirmation Date, any other party in interest, by the Claims Objection Deadline, and such objection has not been withdrawn or denied by a Final Order.

(61)    "Distribution" means any distribution by the Debtors or Reorganized Debtors to a Holder of an Allowed Claim or Interest.

(62)    "Distribution Record Date" means the date selected in the Confirmation Order or any other Final Order of the Bankruptcy Court for determining which holders of Claims are eligible to receive distributions hereunder, and shall be the close of business on the Confirmation Date (or such other date established by Bankruptcy Court order).

(63)    "District Court" means the United States District Court for the Northern District of Georgia, Atlanta Division.

(64)    "Effective Date" means the date specified by Yucaipa (after consultation with the Debtors and the Creditors' Committee) in a notice filed by the Debtors or Yucaipa with the Bankruptcy Court as the date on which this Plan shall take effect, which date shall be not more than five (5) Business Days after the date on which the conditions to the Effective Date provided for in this Plan have been satisfied or waived.

(65)    "Eligible Participant" means any Holder of a General Unsecured Claim, Insured Claim or Other Insured Claim (A) who is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended, (B) whose Claim satisfies all of the following requirements:  (i)  such Claim is

the subject of a timely filed proof of claim in the Chapter 11 Cases or is listed on the Schedules, (ii) such Claim does not purport to be secured or entitled to any priority treatment and is not scheduled in the Schedules as a secured or priority Claim, (iii) such Claim has not been objected to, is otherwise not disputed by the Debtors and is not scheduled in the Schedules as contingent, unliquidated or disputed, and (C) such Claim is in an amount of not less than $500,000 and held such held its Eligible Claim as of March 30, 2007 (an Eligible Claim is not assignable or otherwise transferable).   Yucaipa Transport shall have the right to (i) request information and representations from any Eligible Participant who intends to acquire a participation in the Equipment Financing Facility to ensure, in Yucaipa Transport's sole and absolute discretion, that such Eligible Participant is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended, and (ii) refuse to accept the executed participation agreement of and sell a participation in the Equipment Financing Facility to any Eligible Participant who fails to provide such information and representations within three (3) business days after Yucaipa Transport's request for such information and representations or who provides information and representations that Yucaipa Transport determines, in its sole and absolute discretion, are inadequate for Yucaipa Transport to determine definitively whether such Eligible Participant is an "accredited investor."   Yucaipa Transport, following consultation with the Creditors' Committee, shall determine in its sole and absolute discretion whether a creditor is an Eligible Participant, including, without limitation, whether such creditor holds an Eligible Claim.   Any decision by Yucaipa Transport shall, absent a showing of bad faith, be absolute and shall not be subject to appeal or challenge in any court including this Court.

(66)    "Employee Wage Order" means that certain Order Authorizing Payment of Prepetition Wages, Certain Employee Benefits and Related Expenses entered on August 2, 2005 by the Bankruptcy Court.

(67)    "Entity" means an entity as defined in Section 101(15) of the Bankruptcy Code.

(68)    "Equipment Financing Facility" means that certain post-Petition Date Loan and Security Agreement and Guaranty entered into among Allied Systems as borrower, the other Debtors, as guarantors, and Yucaipa Transport, as lender, to finance the purchase by Allied Systems of certain equipment from Yucaipa Transport Rigs from Yucaipa Transport, which facility has received interim approval of the Bankruptcy Court.

(69)    "Equipment Purchase Agreement" means that certain Purchase and Sale Agreement entered into among Yucaipa Transport , Allied Systems and Allied Holdings, pursuant to which Allied Holdings shall purchase certain equipment from Yucaipa Transport.

(70)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

(71)    "Estate" means, with regard to each Debtor, the estate that was created by the commencement by a Debtor of a Chapter 11 Case pursuant to Section 541

of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers, and privileges of such Debtor and any and all Assets and interests in property, whether real, personal or mixed, rights, causes of action, avoidance powers or extensions of time that such Debtor or such estate shall have had as of the commencement of the Chapter 11 Case, or which such Estate acquired after the commencement of the Chapter 11 Case, whether by virtue of Sections 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code, or otherwise.

(72)   "Estates" means, collectively, the Estates created for the Debtors in the Chapter 11 Cases.

(73)   "Exit Financing Facility" means the financing facility which is created from the conversion of the DIP Loan Facility on the terms and conditions set forth in the DIP Credit Documents to (a) fund the Debtors' Cash payment obligations under the Plan and (b) provide the Reorganized Debtors' anticipated working capital needs on and after the Effective Date.

(74)   "Exit Financing Lenders" means the lenders who are from time to time party to the Exit Financing Facility.

(75)   "File" or "Filed" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

(76)   "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

(77)   "Final DIP Order" means the Final Order expected to be entered on or about April 11, 2007 approving, on a final basis, the DIP Loan Facility approved on an interim basis pursuant to that certain Interim Order Under 11 U.S.C. §§ 105(a), 362, 363 and 364 and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing Debtors to (A) Obtain New Secured post-Petition Date Financing to Refinance Existing post-Petition Date Financing; (B) Convert New post-Petition Date Financing Into Exit Financing; and (C) Pay Related Fees and Expenses, and (II) Granting Related Relief.

(78)   "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing will have been denied or resulted in no modification of such order, provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy

Rules or applicable state court rules of civil procedure, may be Filed with respect to such order, shall not cause such order not to be a Final Order.

(79)    "FJ Boutell" means F.J. Boutell Driveaway, LLC, a Delaware limited liability company.

(80)    "GACS" means GACS Incorporated, a Georgia corporation.

(81)    "General Unsecured Claim" means a Claim against any Debtor other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a DIP Loan Facility Claim, Prepetition Loan Facility Claim, an Insured Claim (to the extent paid by insurance), an Other Secured Claim, a Workers' Compensation Claim, a Subordinated General Unsecured Claim, an Intercompany Claim or a claim arising out of Old Common Stock or Old Allied Holdings Stock Rights. General Unsecured Claims shall include any Deficiency Claims of a holder of a Secured Claim.

(82)    "Holder" means a holder of a Claim or Interest, as applicable.

(83)    "IBT" means the International Brotherhood of Teamsters.

(84)    "Impaired" means with respect to any Class of Claims or Interests, a Claim or Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

(85)    "Indenture Trustee" means Wells Fargo Bank, National Association, as trustee, or any successor trustee, under the Prepetition Notes Indenture.

(86)    "Indenture Trustee Charging Lien" means any Lien or other priority in payment or right available to the Indenture Trustee pursuant to the Prepetition Notes Indenture or otherwise available to the Indenture Trustee under applicable law, for the payment of Indenture Trustee Fees and Expenses.

(87)    "Indenture Trustee Fees and Expenses" means the reasonable fees and expenses of the Indenture Trustee (including reasonable attorneys fees) allowable under the Prepetition Notes Indenture.

(88)    "Initial Board" shall have the meaning set forth in Section 7.2 of the Plan.

(89)    "Insured Claim" means any Tort Claim that arises from an incident or occurrence alleged to have occurred prior to the Effective Date and that is covered under an insurance policy, including the Debtors' self-insured retention and deductible, other than a workers' compensation insurance policy, applicable to the Debtors or their businesses.

(90)    "Intercompany Claim" means any Claim that is or could be asserted by any Debtor(s) or its/their Estate(s) against any other Debtor(s) or its/their Estate(s).

(91)    "Interest" means any equity security of any Debtor (as defined in Section 101(16) of the Bankruptcy Code).

(92)    "KERP" means that certain key employee retention program approved by the Bankruptcy Court on December 19, 2005 [Docket No. 829] and implemented by supplemental order entered by the Bankruptcy Court on January 6, 2006 [Docket No. 905].

(93)    "Lien" has the meaning set forth in Section 101(37) of the Bankruptcy Code.

(94)    "Logistic Systems" means Logistic Systems, LLC, a Georgia limited liability company.

(95)    "Logistic Technology" means Logistic Technology, LLC, a Georgia limited liability company.

(96)    "Management Services Agreement" means that certain Monitoring and Management Services Agreement by and between Yucaipa American Funds, LLC, a Delaware limited liability company and Allied Holdings, Inc.

(97)    "Material Adverse Effect" means any material adverse change in the assets, liabilities, operations, business, property or prospects of the Debtors' or Reorganized Debtors' businesses, in each case taken as a whole.

(98)    "New Ace Operations Common Stock" means the membership interests in Reorganized Ace Operations, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Amended Governing Documents.

(99)    "New AH Industries Common Stock" means the shares of common stock of Reorganized AH Industries, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(100)    "New Allied Automotive Common Stock" means the shares of common stock of Reorganized Allied Automotive, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(101)    "New Allied Canada Common Stock" means the shares of common stock of Reorganized Allied Canada, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(102)    "New Allied Freight Broker Common Stock" means the membership interests in Reorganized Allied Freight Broker, authorized hereunder on the

Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(103)  "New Allied Holdings Common Stock" means the shares of common stock of Reorganized Allied Holdings, par value $0.01 per share, authorized hereunder on the Effective Date for Distribution to Holders of Allowed General Unsecured Claims, Insured Claims, Other Insured Claim and Equipment Financing Facility Claims pursuant to the Plan and any additional shares authorized for the purposes specified herein and as further described in the Reorganized Governing Documents

(104)  "New Allied Systems Common Stock" means the partnership interests of Reorganized Allied Systems, authorized hereunder on the Effective Date and any partnership interests authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(105)   "New Axis Areta Common Stock" means the membership interests in Reorganized Axis Areta, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(106)   "New Axis Canada Common Stock" means the shares of common stock of Reorganized Axis Canada, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(107)   "New Axis Group Common Stock" means the shares of common stock of Reorganized Axis Group, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(108)   "New Axis Netherlands Common Stock" means the membership interests in Reorganized Axis Netherlands, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(109)   "New Commercial Carriers Common Stock" means the shares of common stock of Reorganized Commercial Carriers, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(110)   "New Common Stock" means, collectively, as applicable the shares of common stock, membership interests and partnership interests of each of the Reorganized Debtors as of the Effective Date.

(111)   "New Cordin Transport Common Stock" means the membership interests in Reorganized Cordin Transport, authorized hereunder on the Effective Date

and any additional membership interests authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(112)  "New CT Services Common Stock" means the shares of common stock of Reorganized CT Services, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(113)  "New FJ Boutell Common Stock" means the membership interests in Reorganized FJ Boutell, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(114)  "New GACS Common Stock" means the shares of common stock of Reorganized GACS, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(115)  "New Logistic Systems Common Stock" means the membership interests in Reorganized Logistic Systems, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(116)  "New Logistic Technology Common Stock" means the membership interests in Reorganized Logistic Technology, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(117)  "New QAT Common Stock" means the shares of common stock of Reorganized QAT, par value $0.01 per share, authorized hereunder on the Effective Date and any additional shares authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(118)  "New RMX Common Stock" means the membership interests in Reorganized RMX, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(119)  "New Terminal Services Common Stock" means the membership interests in Reorganized Terminal Services, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(120)  "New Transport Support Common Stock" means the membership interests in Reorganized Transport Support, authorized hereunder on the Effective Date and any additional membership interests authorized for the purposes specified herein and as further described in the Reorganized Governing Documents.

(121)  "Old Ace Operations Common Stock" means the membership interests in Ace Operations that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Ace Operations in existence immediately prior to the Effective Date.

(122)  "Old AH Industries Common Stock" means all authorized and issued shares of common stock of AH Industries that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old AH Industries Inc. Common Stock in existence immediately prior to the Effective Date.

(123)  "Old Allied Automotive Common Stock" means all authorized and issued shares of common stock of Allied Automotive that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old Allied Automotive Common Stock in existence immediately prior to the Effective Date.

(124)  "Old Allied Canada Common Stock" means all authorized and issued shares of common stock of Allied Canada that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old Allied Canada Common Stock in existence immediately prior to the Effective Date.

(125)  "Old Allied Freight Broker Common Stock" means all membership interests in Allied Freight Broker that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests of Allied Freight Broker in existence immediately prior to the Effective Date.

(126)  "Old Allied Holdings Common Stock" means all authorized and issued shares of common stock of Allied Holdings that are outstanding immediately prior to the Effective Date.

(127)  "Old Allied Holdings Stock Rights" means, collectively, all options, warrants and rights (whether fixed or contingent, matured or unmatured, disputed or undisputed) contractual, legal or otherwise, to purchase or acquire Old Common Stock.

(128)  "Old Allied Systems Common Stock" means all authorized and issued partnership interests of Allied Systems that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any partnership interests of Old Allied Systems in existence immediately prior to the Effective Date.

(129)  "Old Axis Areta Common Stock" means all membership interests in Axis Areta that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Axis Areta in existence immediately prior to the Effective Date.

(130)  "Old Axis Canada Common Stock" means all authorized and issued shares of common stock of Axis Canada that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old Axis Canada Common Stock in existence immediately prior to the Effective Date.

(131)  "Old Axis Group Common Stock" means all authorized and issued shares of common stock of Axis Group that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old Axis Group Common Stock in existence immediately prior to the Effective Date.

(132)  "Old Axis Netherlands Common Stock" means all membership interests in Axis Netherlands that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interest in Axis Netherlands in existence immediately prior to the Effective Date.

(133)  "Old Commercial Carriers Common Stock" means all authorized and issued shares of common stock of  Commercial Carriers that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old Commercial Carriers Common Stock in existence immediately prior to the Effective Date.

(134)  "Old Common Stock" means, collectively, Old Allied Holdings Common Stock and Old Other Debtors Common Stock.

(135)  "Old Corbin Common Stock" means the membership interests in Cordin Transport  that are outstanding prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Corbin in existence immediately prior to the Effective Date.

(136)  "Old CT Services Common Stock" means all authorized and issued shares of common stock of CT Services that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old CT Services Common Stock in existence immediately prior to the Effective Date.

(137)  "Old FJ Boutell Common Stock" means all membership interests in FJ Boutell that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in FJ Boutell in existence immediately prior to the Effective Date.

(138)  "Old GACS Common Stock" means all authorized and issued shares of common stock of GACS that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old GACS Common Stock in existence immediately prior to the Effective Date.

(139)  "Old Logistic Systems Common Stock" means all membership interests in Logistic Systems that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Logistic Systems in existence immediately prior to the Effective Date.

(140) "Old Logistic Technology Common Stock" means all membership interests in Logistic Technology that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Logistic Technology in existence immediately prior to the Effective Date.

(141) "Old Other Debtors Common Stock" means, collectively, the authorized and issued shares of common stock, partnership interests, membership interests or other equity interests, as applicable, of or in the Other Debtors and any right, contractual or otherwise, to acquire any common shares of such common stock, or any such partnership interests or membership interests or other equity interests in existence immediately prior to the Effective Date.

(142) "Old QAT Common Stock" means all authorized and issued shares of common stock of QAT that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any common shares of Old QAT Common Stock in existence immediately prior to the Effective Date.

(143) "Old RMX Common Stock" means all membership interests in RMX that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in RMX in existence immediately prior to the Effective Date.

(144) "Old Terminal Services Common Stock" means all membership interests in Terminal Services that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Terminal Services in existence immediately prior to the Effective Date.

(145) "Old Transport Support Common Stock" means all authorized and issued membership interests in Transport Support that are outstanding immediately prior to the Effective Date and any right, contractual or otherwise, to acquire any membership interests in Transport Support in existence immediately prior to the Effective Date.

(146) "Ordinary Course Professionals Order" means that certain Order Authorizing Employment of Professionals in the Ordinary Course of Business entered by the Bankruptcy Court on August 2, 2005 [Docket No. 55].

(147) "Original DIP Credit Documents" means that certain that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of August 1, 2005, as amended, supplemented or otherwise modified from time to time, and all documents executed in connection therewith by and between the Debtors as borrowers and General Electric as Administrative Agent, Collateral Agent, Revolver Agent and co-Syndication Agent, Morgan Stanley Senior Funding, Inc., as Term Loan A Agent, Term Loan B Agent, Term Loan C Agent, co-Syndication Agent, co-Bookrunner and co-Term Loan B Lead Arranger and the other Lenders signatory thereto from time to time.

(148) "Original DIP Lender" means the Secured Parties as defined by the Original DIP Loan Facility.

(149) "Original DIP Loan Facility" means that certain debtor-in-possession senior, secured credit facility entered into pursuant to the Original DIP Credit Documents.

(150) "Other Debtors" means all Debtors except for Allied Holdings.

(151) "Other Insured Claim" means any Tort Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date and asserted against GACS or Commercial Carriers, Inc.

(152) "Other Secured Claim" means a Secured Claim other than a Prepetition Lender Claim or a DIP Lender Claim.

(153) "Person" shall have the meaning ascribed in Section 101(41) of the Bankruptcy Code.

(154) "Petition Date" means July 31, 2005, the date on which each of the Debtors Filed its respective petition for relief in the Bankruptcy Court for the Northern District of Georgia, Newnan Division, commencing its Chapter 11 Case.

(155) "Plan" means this joint plan of reorganization as the same may hereafter be amended or modified. If the Plan is withdrawn as the Plan for a particular Debtor, the defined term "Plan" shall not include the plan of reorganization or liquidation for such Debtor in its Chapter 11 Case except where the context otherwise requires.

(156) "Plan Documents" means, collectively, the Disclosure Statement, this Plan, all exhibits, schedules and annexes to each, all of the documents included in the Plan Supplement, and all other agreements contemplated by the Plan.

(157) "Plan Objection Deadline" means May 1, 2007 at 4:00 p.m. (Eastern Time), the deadline established by the Bankruptcy Court for filing and serving objections to the Confirmation of the Plan.

(158) "Plan Proponents" means, collectively, the Debtors, Yucaipa and TNATINC.

(159) "Plan Supplement" means the compilation of documents and forms of documents, schedules and exhibits, including those specified in Section 13.7 of the Plan, as it may thereafter be altered, amended, modified or supplemented in accordance with the terms hereof.

(160) "Postpetition Tax Claims" means Administrative Expense Claims and other Claims by a governmental unit for taxes against any of the Debtors (and for interest and/or penalties related to such taxes) for any tax year or period, which Claims first arise from and including the Petition Date through and including the Effective Date.

(161)  "Prepetition Lender Claim" means any Claim (including without limitation, principal, interest, fees, costs and expenses) under or pursuant to the Prepetition Loan Facility.

(162)  "Prepetition Loan Facility" means that certain senior, secured credit facility in the principal amount of approximately $180 million provided by a group of lenders, with Ableco Finance, LLC as collateral agent and Wells Fargo Foothill, Inc., formerly known as Foothill Capital Corporation, as administrative agent.

(163)  "Prepetition Notes" means the 8 5/8% Senior Notes in the aggregate original principal amount of $150,000,000 issued by Allied Holdings pursuant to the Prepetition Notes Indenture.

(164)  "Prepetition Notes Claim" means any Claim for principal and interest under or pursuant to the Prepetition Notes or the Prepetition Notes Indenture, including without limitation Claims against guarantors of the Prepetition Notes, which Claims shall constitute Allowed Claims under the Plan in an amount of not less than $154,317,286.61.

(165)  "Prepetition Notes Indenture" means that certain indenture dated as of September 30, 1997, by and between Allied Holdings and The First National Bank of Chicago, as trustee, as such indenture may have been amended, supplemented, or otherwise modified from time to time, and all related agreements and documents.

(166)  "Priority Non-Tax Claim" means a Claim entitled to priority under the provisions of Sections 507(a)(3) through 507(a)(7) of the Bankruptcy Code other than an Administrative Expense Claim, a Postpetition Tax Claim or a Priority Tax Claim.

(167)  "Priority Tax Claim" means a Claim against the Debtors that is of a kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

(168)  "Professional" means any professional employed in the Chapter 11 Cases pursuant to Sections 327 or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Section 503(b)(4) of the Bankruptcy Code.

(169)  "Professional Compensation" means (i) any amounts that the Bankruptcy Court allows pursuant to Section 327, 328, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code as compensation earned, and reimbursement of expenses incurred, by professionals employed by the Debtors and the Creditors' Committee and (ii) any amounts the Bankruptcy Court allows pursuant to Sections 503(b) of the Bankruptcy Code in connection with the making of a substantial contribution to the Chapter 11 Cases.

(170)  "Pro Rata" means, with respect to any distribution on account of an Allowed Claim, a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim or Allowed Interest in a Class or Classes to the amount of such Allowed Claim or Allowed Interest is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims or Allowed Interests in such

Class or Classes to the amount of all Allowed Claims or Allowed Interests in such Class or Classes.

(171)  "QAT" means QAT, Inc., a Florida corporation.

(172)  "Qualified Pension Plans" means, collectively, all of the Debtors' defined benefit plans, including:  the Allied Defined Benefit Pension Plan, the Allied Systems, Ltd., UAW Local 95 Unit 2 Retirement Income Plan, the Allied Systems, Ltd. Office Workers UAW Local 95 Pension Plan and Trust, and the Registered Pension Plan for Employees of Allied Systems (Canada) Company.

(173)  "Record Date" means the date established in the Confirmation Order or any other Final Order of the Bankruptcy Court for determining the identity of Holders of Allowed Claims or Interests entitled to Distributions under this Plan.  If no Record Date is established in the Confirmation Order or any other order of the Bankruptcy Court, then the Record Date shall be the Confirmation Date.

(174)  "Record Holder" means the Holder of a Claim or Interest as of the Record Date.

(175)  "Registration Rights Agreement" means that certain Registration Rights Agreement entered into by and among Reorganized Allied Holdings, Yucaipa and potentially other holders the New Allied Holdings Common Stock.

(176)  "Reinstated" or "Reinstatement" means (x) with respect to a Claim, (i) the Debtors shall cure any default that occurred before or after the relevant Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, (ii) the maturity of such Claim shall be Reinstated as such maturity existed before any such default, (iii) the Holder of such Claim shall be compensated for any damages incurred as a result of any reasonable reliance by the Holder on any right to accelerate its Claim, and (iv) the legal, equitable and contractual rights of such holder will not otherwise be altered, and (y) with respect to an Interest, the legal, equitable and contractual rights of the holder of such Interest will not be altered.

(177)  "Reorganized By-Laws" means the amended by-laws of the Reorganized Debtors prepared pursuant to Section 7.1 of this Plan, in substantially the form contained in the Plan Supplement.

(178)  "Reorganized Governing Documents" means the amended and restated articles of incorporation, partnership agreement or limited liability company operating agreement, as the case may be, of each of the Reorganized Debtors prepared pursuant to Section 7.1 of this Plan, in substantially the forms contained in the Plan Supplement.

(179)  "Reorganized Debtor" or "Reorganized Debtors" means, on and after the Effective Date, the Debtors as reorganized pursuant to the Plan, as the case may be and, in each case, to the extent applicable.  When referring to a specific Debtor as reorganized pursuant to the Plan, the Plan shall use the term "Reorganized [name of

Debtor].'' Reorganized Allied Holdings will be the ultimate corporate parent of the Reorganized Debtors.

(180) "Retained Actions" means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtors' Estate may hold against any Person, including, without limitation, (i) claims and Causes of Action brought prior to the Effective Date, (ii) claims and Causes of Action against any Persons for failure to pay for products or services provided or rendered by any of the Debtors, (iii) claims and Causes of Action relating to strict enforcement of any of the Debtors' intellectual property rights, including patents, copyrights and trademarks, (iv) claims and Causes of Action seeking the recovery of any of the Debtors' or Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of any of the Debtors' or the Reorganized Debtors' businesses, including, without limitation, claim overpayments and tax refunds, and (v) all Causes of Action that are Avoidance Actions.

(181) "RMX" means RMX LLC, a Delaware limited liability company.

(182) "Scheduled Claims" means Claims set forth on the Schedules.

(183) "Schedules" means, with respect to any Debtor, the Schedules of Assets and Liabilities such Debtor filed in its Chapter 11 Case, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009.

(184) "Secured Claim" means: (a) Claims that are secured by a Lien on property in which an Estate has an interest, which liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, all as determined pursuant to Section 506(a) of the Bankruptcy Code; and (b) Claims which are Allowed under the Plan as a Secured Claim.

(185) "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended.

(186) "Securities and Exchange Commission" means the United States Securities and Exchange Commission.

(187) "Securities Claim" means any Claim described in Section 510(b) of the Bankruptcy Code against any Debtor arising from rescission of a purchase or sale of a security of any Debtor, for damages arising from the purchase or sale of such security, or for reimbursement, indemnity or contribution Allowed under Section 502 of the Bankruptcy Code on account of such Claim, or for any Claim arising out of the ownership of an equity security.

(188) "Subordinated General Unsecured Claims" means Class 6 Claims which consist of (i) any Claim, or portion thereof, which is subordinated to the payment of all other General Unsecured Claims (other than Claims which are themselves

22

Subordinated General Unsecured Claims) pursuant to Section 510 of the Bankruptcy Code, any other applicable law, any order of the Bankruptcy Court or any applicable agreement, or (ii) any Claim for any fine, penalty, or forfeiture, or for multiple, exemplary or punitive damages, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Holder of such Claim and to the extent that there is not insurance coverage under applicable insurance policies for such Claim. Under the Plan, on and as of the Effective Date, such Claims shall be cancelled and the Holders thereof will receive no distribution on account thereof under the Plan.

(189)  "Stockholders' Agreement" means the stockholders' agreement, in substantially the form as may be contained in the Plan Supplement to this Plan.

(190)  "Stub Amount" has the meaning set forth in Section 3.7 hereof.

(191)  "Terminal Services" means Terminal Services LLC, a Delaware limited liability company.

(192)  "TNATINC" means the Teamsters National Automobile Transportation Industry Negotiating Committee.

(193)  "Tort Claim" means any Claim (including punitive damage claims to the extent permitted by the Bankruptcy Court and not otherwise subordinated under applicable law) that arose prior to the Petition Date, that has not been settled, compromised or otherwise resolved, that: (a) arises out of allegations of personal injury, wrongful death, property damage or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment, including any products liability or tort claim asserted against GACS or Commercial Carriers, Inc.

(194)  "Transport Support" means Transport Support LLC, a Delaware limited liability company.

(195)  "Unimpaired" means, with respect to a Class of Claims or Interests, any Class that is unimpaired within the meaning of Section 1124 of the Bankruptcy Code.

(196)  "Voluntary Reduction" shall have the meaning set forth in section 3.7 hereof.

(197)  "Voting Agent" means JPMorgan Trust Company, National Association, 8475 Western Way, Suite 110, Jacksonville, FL 32256 in its capacity as notice, claims and balloting agent for the Debtors.

(198)  "Voting Deadline" means May 1, 2007 at 4:00 p.m. (Eastern Time), the date and time by which all Ballots must be received by the Voting Agent.

(199)  "Voting Instructions" means the instructions for voting on the Plan that are attached to the Ballots.

(200)  "Voting Record Date" means the date established by the Bankruptcy Court for determining the identity of Holders of Allowed Claims or Interests entitled to vote on this Plan.

(201)  "Workers' Compensation Claim" means a Claim by any former or current employee of the Debtors arising from or related to their employment with the Debtors for which the Debtors are required by state statute to maintain workers' compensation insurance coverage through a program of either third party insurance, self-insurance, or state-sponsored insurance.

(202)  "Workers' Compensation Order" means that certain Order Authorizing Continued Maintenance and Payment of Obligations with Respect to Debtors' Insurance Programs entered by the Bankruptcy Court on August 2, 2005 [Docket No. 56].

(203)  "Yucaipa" has the meaning set forth in the Introduction hereof.

(204)  "Yucaipa Transport" means Yucaipa Transportation, LLC, a Delaware limited liability company.

**1.2**  Time.  Whenever the time for the occurrence or happening of an event as set forth in this Plan falls on a day which is a Saturday, Sunday, or legal holiday under the laws of the United States of America or the State of Georgia, then the time for the next occurrence or happening of said event shall be extended to the next day following which is not a Saturday, Sunday, or legal holiday.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**1.3**  Rules of Interpretation.  For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan or Confirmation Order; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors, assigns and affiliates; (e) unless otherwise specified in a particular reference, all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan or Plan Supplement; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) unless otherwise specified, the words "acceptable to Yucaipa" shall in each instance mean "acceptable to Yucaipa in its sole and absolute discretion;" (h) captions and headings to Articles and Sections are inserted for convenience of reference

only and are not intended to be a part of or to affect the interpretation of the Plan; (i) all Exhibits to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan; (j) all documents set forth in the Plan Supplement are incorporated into the Plan and shall be deemed to be included in the Plan; and (k) the rules of construction set forth in Section 102 of the Bankruptcy Code will apply.

## ARTICLE II.
## CLASSIFICATION OF CLAIMS AND INTERESTS; IMPAIRMENT

**2.1**      **Summary**  The following summary is for the convenience of all interested parties and is superseded for all purposes by the classification, description and treatment of Claims and Interests in Articles III and IV of the Plan.  The categories of Claims and Interests set forth below classify all Claims against and Interests in the Debtors for all purposes of this Plan.  A Claim or Interest shall be deemed classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  The treatment with respect to each Class of Claims and Interests provided for in this Article III shall be in full and complete satisfaction, release and discharge of such Claims and Interests.

For the purposes of classification, voting, and treatment under this Plan, Claims against the Debtors, respectively, are classified in a single Class regardless of whether such Claims are assertable against one or more of the Debtors.  The Plan Proponents do not believe that such classification or treatment adversely impacts upon the rights of any Holder of an Allowed Claim.  The Plan Proponents do not intend, by so classifying Claims, to effect a substantive consolidation of any of the Debtors or their respective Estates.  Rather, the separate corporate existence of each of the Debtors is preserved under this Plan in accordance with Section 6.1 of this Plan.

The classification of Claims under this Plan is as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 et seq. | Other Secured Claims | Unimpaired with respect to Sections (i) and (v) of the paragraph titled "Treatment" under Section 3.1(2); Impaired with respect to Sections (ii), (iii),(iv) and (vi) of such paragraph | No if Unimpaired; Yes if Impaired |

| 2 | Priority Non-Tax Claims | Unimpaired | No |
|---|---|---|---|
| 3 | Workers' Compensation Claims | Unimpaired | No |
| 4A | General Unsecured Claims | Impaired | Yes |
| 4B | Insured Claims | Impaired | Yes |
| 4C | Other Insured Claims | Impaired | Yes |
| 4D | Claims of Cash Out Holders | Impaired | Yes |
| 5 | Intercompany Claims | Impaired | No |
| 6 | Subordinated General Unsecured Claims | Impaired | No |
| 7A | Old Allied Holdings Common Stock | Impaired | No |
| 7B | Old Other Debtors Common Stock | Impaired | No |
| 7C | Old Allied Holdings Stock Rights | Impaired | No |

2.2     Deemed Acceptance of Plan.  Certain subclasses of Class 1 described in Section 3.1(3) hereof, and Classes 2 and 3 are Unimpaired under this Plan.  Accordingly, pursuant to Section 1126(f) of the Bankruptcy Code, certain subclasses of Class 1, and Classes 2 and 3 are deemed to accept this Plan and are not entitled to vote to accept or reject this Plan.

2.3     Deemed Rejection of Plan.  Classes 5, 6 and 7A through 7C are Impaired under this Plan, and because such classes shall receive no distribution under the Plan, they are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Consequently, holders of Claims in Classes 5, 6 and 7A through 7C may not vote on the Plan.

2.4     Classes Entitled to Vote on Plan.  Certain subclasses of Class 1 described in Section 3.1(3) hereof, and Classes 4A, 4B, 4C and 4D are Impaired and are entitled to vote on the Plan.

2.5     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.  In the event at least one Impaired Class of Claims votes to accept the Plan (and at least one Impaired Class either votes to reject the Plan or is deemed to have rejected the Plan), the Plan Proponents shall request the Bankruptcy Court to confirm the Plan under Section 1129(b) of the Bankruptcy Code.

**2.6** Prepetition Lender Claims. During the Chapter 11 Case, the Holders of Prepetition Lender Claims received in full and final satisfaction of their Claims in Cash equal to one hundred percent (100%) of their Claims and, as a result, Prepetition Lender Claims are not classified or otherwise provided for in this Plan and the Holders of Prepetition Lender Claims are not entitled to vote to accept or reject this Plan.

## ARTICLE III.
## TREATMENT OF CLAIMS AND INTERESTS

The timing and procedures for all Distributions specified in this Section are governed by Article VIII of the Plan. The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

**3.1** Class 1 et seq. -- Other Secured Claims.

(1) Classification: Class 1 consists of the Allowed Other Secured Claims against each Debtor. This Class will be divided into subclasses designated by letters of the alphabet (Class 1A, Class 1B and so on), so that each holder of any Secured Claim against each Debtor is in a Class by itself, except to the extent that there are Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified classes of Secured Claims. A list of all Class 1 Claims and the proposed treatment thereof will be filed with the Bankruptcy Court ten days before the Voting Deadline. Such list may be amended, modified or supplemented by Yucaipa (after consultation with the Debtors and the Creditors' Committee) (a) on or before three days before the Voting Deadline for any Secured Claims and (b) thereafter on or before three days before the Confirmation Hearing to add Secured Claims that will be treated in a manner that results in Holders of such Claims not having the right to vote to accept or reject the Plan.

(2) Treatment: The Plan Proponents expect that the Claims of the members certain subclasses of Class 1 shall be Unimpaired under Sections (i) and (v) of this paragraph and the Claims of the members of certain subclasses of Class 1 shall be Impaired under Sections (ii), (iii), (iv) and (vi) of this paragraph. Each Holder of an Allowed Secured Claim in Class 1 shall, in the discretion of Yucaipa (after consultation with the Debtors and the Creditors' Committee) receive, in full satisfaction, settlement, release and discharge of, and in exchange for, its Allowed Class 1 Claim, any one or a combination of any of the following: (i) Cash in an amount equal to such Allowed Class 1 Claim; (ii) deferred Cash payments totaling at least the Allowed amount of such Allowed Class 1 Claim, of a value, as of the Effective Date, of at least the value of such

Holder's interest in the Debtors' property securing the Allowed Class 1 Claim; (iii) the property of the Debtors securing such holder's Allowed Class 1 Claim; (iv) Cash payments or Liens amounting to the indubitable equivalent of the value of such holder's interest in the Debtors' property securing the Allowed Class 1 Claim; (v) Reinstatement of such Allowed Class 1 Claim; or (vi) such other treatment as Yucaipa (after consultation with the Debtors and the Creditors' Committee) and such holder shall have agreed upon in writing.

        (3)     Voting:  Allowed Claims in Class 1 that are paid in full in Cash or Reinstated on the Effective Date or as soon as practicable thereafter are Unimpaired under the Plan and the holders of such Allowed Claims in Class 1 are conclusively deemed to have accepted this Plan pursuant to Section 1126(f) of the Bankruptcy Code. Allowed Claims in Class 1 that receive any alternative treatment are Impaired and therefore entitled to vote to accept or reject the Plan.

     **3.2**     Class 2 -- Priority Non-Tax Claims.

        (1)     Classification:  Class 2 consists of all Allowed Priority Non-Tax Claims against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than Allowed Administrative Expense Claims and Allowed Priority Tax Claims.

        (2)     Treatment:  The legal, equitable and contractual rights of the Holders of Allowed Class 2 Priority Non-Tax Claims are unaltered by this Plan.  Unless the Holder of such Claim and Yucaipa agree to a different treatment (after consultation with the Debtors and the Creditors' Committee), each Holder of an Allowed Class 2 Priority Non-Tax Claim shall receive, in full and final satisfaction of such Allowed Class 2 Priority Non-Tax Claim, one of the following alternative treatments:

        (a)     to the extent then due and owing on the Effective Date, such Claim will be paid in full in Cash by the Debtors or the Reorganized Debtors on the Effective Date;

or

        (b)     to the extent not due and owing on the Effective Date, such Claim will be paid in full in Cash by the Debtors or the Reorganized Debtors when and as such Claim becomes due and owing in the ordinary course of business;

or

        (c)     such Claim will be otherwise treated in a manner so that such Claim shall be rendered Unimpaired pursuant to Section 1124 of the Bankruptcy Code.

     The proposed treatment of each Class 2 Priority Non-Tax Claim shall be selected by Yucaipa (after consultation with the Debtors and the Creditors' Committee) and shall be disclosed within ten days before the Voting Deadline.

(3)     Voting:  Class 2 is an Unimpaired Class, and the Holders of Class 2 Priority Non-Tax Claims are conclusively deemed to have accepted this Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject this Plan.

**3.3**     Class 3 -- Workers' Compensation Claims.

(1)     Classification:   Class 3 consists of all Allowed Workers' Compensation Claims.

(2)     Treatment:  The Debtors will continue all of the Debtors' workers' compensation policies and related agreements that were in effect on or at any time prior to the Effective Date such that Allowed Workers' Compensation Claims are unaltered by this Plan.  Any Holder of a Workers' Compensation Claim may proceed with such Claim before the appropriate state workers' compensation board or other appropriate authority subject to the right of the Debtors/Reorganized Debtors and the insurers, as applicable pursuant to any policy and related agreements to, among other things, defend, contest or litigate any such Claim or the existence, primacy and/or scope of available coverage under any alleged applicable policy or program. To the extent any such Claim is determined to be valid by the appropriate state workers' compensation board or other authority having jurisdiction over such Claim, such Claim shall be paid from proceeds of the applicable workers' compensation insurance policies to the extent of any coverage thereunder.

Nothing in the Plan is intended to, shall or shall be deemed: (i) to preclude any Holder of a Workers' Compensation Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such Holder may receive under this Plan; or (ii) to modify or limit the rights of the insurers to contest and/or litigate the existence, primacy and/or scope of available coverage under the alleged applicable policy.

(3)     Voting.  Class 3 is an Unimpaired Class, and the Holders of Class 3 Workers' Compensation Claims are conclusively deemed to have accepted this Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 3 are not entitled to vote to accept or reject this Plan.

**3.4**     Class 4A -- General Unsecured Claims.

(1)     Classification:   Class 4A consists of all Allowed General Unsecured Claims other than General Unsecured Claims classified in Class 4D.

(2)     Treatment:  Each Holder of a Class 4A General Unsecured Claim will receive a Pro Rata share of the New Allied Holdings Common Stock (subject to dilution by the shares issued pursuant to Section 4.2(d) of the Plan and the Equipment Financing Facility) based on the ratio of the amount of such Holder's Allowed Class 4A Claim to the aggregate amount of all Allowed Class 4A, Class 4B and Class 4C Claims plus the Stub Amount of Allowed Class 4D Claims.

(3)    Voting:    Class 4A is an Impaired Class and pursuant to Section 1126 of the Bankruptcy Code each Holder of an Allowed Class 4A General Unsecured Claim is entitled to vote to accept or reject this Plan.

**3.5**    Class 4B -- Insured Claims.

(1)    Class 4B consists of all Allowed Insured Claims other than Allowed Insured Claims classified in Class 4D.

(2)    Treatment:  Each Holder of an Allowed Class 4B Claim shall receive a Pro Rata Share of the New Allied Holdings Common Stock (subject to dilution by the shares issued pursuant to Section 4.2(d) of the Plan and the Equipment Financing Facility) based on the ratio of the amount of such Holder's Allowed Class 4D Claim to the aggregate amount of all Allowed Class 4A, Class 4B and Class 4C Claims plus the Stub Amount of Allowed Class 4D Claims; provided, however, that the maximum allowed amount of an Allowed Insured Claim shall be limited to an amount equal to the applicable self-insured retention or deductible under the relevant insurance policy plus the amount by which the Insured Claim exceeds the total coverage available from the relevant insurance policies of the Debtors.

(3)    Nothing in the Plan is intended to, shall or shall be deemed: (i) to preclude any Holder of an Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such Holder may receive under this Plan; or (ii) to modify or limit the rights of the insurers to contest and/or litigate the existence, primacy and/or scope of available coverage under the alleged applicable policy.

(4)    Voting:    Class 4B is an Impaired Class and pursuant to Section 1126 of the Bankruptcy Code each Holder of an Allowed Class 4B Insured Claim is entitled to vote to accept or reject this Plan.

**3.6**    Class 4C -- Other Insured Claims.

(1)    Classification:  Class 4C consists of all Allowed Other Insured Claims other than Other Insured Claims classified in Class 4D.

(2)    Treatment:  Distributions under the Plan to each Holder of an Allowed Other Insured Claim shall receive a Pro Rata Share of the New Allied Holdings Common Stock (subject to dilution by the shares issued pursuant to Section 4.2(d) of the Plan and the Equipment Financing Facility) based on the ratio of the amount of such Holder's Allowed Class 4C Claim to the aggregate amount of all Allowed Class 4A, Class 4B and Class 4C Claims plus the Stub Amount of Allowed Class 4D Claims; provided, however, that the maximum allowed amount of an Allowed Other Insured Claim shall be limited to an amount equal to the applicable self-insured retention or deductible under the relevant insurance policy plus the amount by which the Allowed Other Insured Claim exceeds the total coverage available from the relevant insurance policies of the Debtors.

30

(3)     Nothing in the Plan is intended to, shall or shall be deemed: (i) to preclude any Holder of an Other Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to (but not in duplication of) any Distribution such Holder may receive under this Plan; or (ii) to modify or limit the rights of the insurers to contest and/or litigate the existence, primacy and/or scope of available coverage under the alleged applicable policy.

(4)     Voting:  Class 4C is an Impaired Class and pursuant to Section 1126 of the Bankruptcy Code each Holder of an Allowed Class 4C Other Insured Claim is entitled to vote to accept or reject this Plan.

     **3.7**     Class 4D –Unsecured Claims Receiving Cash Option.

(1)     Classification:  Class 4D consists of the Claims of all Cash Out Holders.

(2)     Method for Exercising Cash Option:  Any Holder of a General Unsecured Claim, Insured Claim or Other Insured Claim that is Allowed in an amount equal to or less than $20,000 shall be classified in Class 4D and receive the Cash Option unless the Holder of such Claim checks the "Take Stock Instead of Cash Option" box on its Ballot, regardless of whether such Holder votes for or against this Plan.  Any Holder of a General Unsecured Claim, Insured Claim or Other Insured Claim that is Allowed in an amount greater than $20,000, but who is willing to reduce irrevocably the Allowed amount of its Claim to $20,000 in order to exercise the Cash Option (a "Voluntary Reduction"), shall be entitled to exercise the Cash Option, and thus be classified in Class 4D, by checking the "Reduce Claim to $20,000 and Exercise Cash Option" box on its Ballot.  Each Holder's election as to the Class in which it wants to be classified shall be irrevocable from and after the submission of its Ballot.

(3)     Treatment:  Each Holder of an Allowed Class 4D Claim will receive a Cash distribution equal to: (a) if the aggregate amount of Allowed Class 4D Claims is equal to or less than $8 million, 25% of such Holder's Allowed Class 4D Claim, (b) if the aggregate amount of Allowed Class 4D Claims is greater than $8 million and equal to or less than $16 million, a Pro Rata share of $2 million (i.e., between approximately 12.5% and 25% of such Holder's Allowed Class 4D Claim), (c) if the aggregate amount of Allowed Class 4D Claims is greater than $16 million and equal to or less than $20 million, 12.5% of such Holder's Allowed Class 4D Claim, and (d) if the aggregate amount of Allowed Class 4D Claims is in excess of $20 million, at Yucaipa's option, either (i) 12.5% of such Holder's Allowed Class 4D Claim or (ii) 12.5% of the product of such Holder's Allowed Class 4D Claim multiplied by a fraction, the numerator of which is $20 million and the denominator of which is the aggregate amount of Allowed Class 4D Claims.  In addition, if the aggregate amount of Allowed Class 4D Claims exceeds $20 million and Yucaipa elects the option descried in clause (d)(ii) of the preceding sentence, each Holder of an Allowed Class 4D Claim shall also receive a Pro Rata Share of the New Allied Holdings Common Stock (other than the shares issued pursuant to Section 4.2(d) of the Plan) based on the ratio of (a) the amount of such Holder's Allowed Class 4D Claim multiplied by a fraction, the numerator of which is the

difference between the aggregate amount of Allowed Class 4D Claims minus $20 million (the "Stub Amount") and the denominator of which is the aggregate amount of Allowed Class 4D Claims to (b) the aggregate amount of all Allowed Class 4A, Class 4B and Class 4C Claims plus the Stub Amount of Allowed Class 4D Claims. In exchange for making the Cash Out Contribution, Yucaipa shall receive the New Allied Holdings Common Stock that each Holder of an Allowed Class 4D Claim would have received if its Allowed Claim were classified in Class 4A, 4B, or 4C (without giving effect to any Voluntary Reduction).

(4)    Voting: Class 4D is an Impaired Class and pursuant to the Section 1126 of the Bankruptcy Code each Holder of an Allowed Class 4D Unsecured Claim is entitled to vote to accept or reject the Plan.

**3.8**    Class 5 -- Intercompany Claims.

(1)    Classification:  Class 5 consists of all Allowed Intercompany Claims.

(2)    Treatment:  No holder of an Allowed Intercompany Claim will receive or retain any property of the Debtors under the Plan on account of such Claim; provided, however, that Intercompany Claims may be capitalized, satisfied, or preserved either directly or indirectly or in whole or part. Any Intercompany Claim, or portion thereof, that is not so capitalized, satisfied, or preserved will be cancelled as of the Effective Date.

(3)    Voting: Class 5 is an Impaired Class. Pursuant to Section 1126(g) of the Bankruptcy Code, Holders of Class 5 Intercompany Claims are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

**3.9**    Class 6---Subordinated General Unsecured Claims.

(1)    Classification:  Class 6 Claims consist of Allowed Subordinated General Unsecured Claims against the Debtors.

(2)    Treatment:  On the Effective Date, all Class 6 Claims shall be cancelled and holders of Class 6 Claims shall receive nothing on account of such Allowed Subordinated General Unsecured Claims. If the Bankruptcy Court determines that a General Unsecured Claim classified in Class 6 should not be subordinated, such Claim shall be reclassified in Class 4A, 4B or 4C or otherwise as ordered by the Bankruptcy Court or pursuant to agreement of the Plan Proponents.

(3)    Voting:  Class 6 is Impaired. Pursuant to Section 1126(g) of the Bankruptcy Code, the holders of Allowed Claims in Class 6 are conclusively presumed to have rejected the Plan and, therefore, are not entitled to vote.

3.10    Class 7A – Old Allied Holdings Common Stock

(1)    Classification:  Class 7A consists of all Interests in Old Allied Holdings Common Stock.

(2)    Treatment:  Holders of Old Allied Holdings Common Stock will not receive any distribution of property under the Plan on account of their interest in Old Allied Holdings Common Stock and, on the Effective Date, all Interests in Old Allied Holdings Common Stock will be cancelled.

(3)    Voting:   Class 7A is an Impaired Class.   Pursuant to Section 1126(g) of the Bankruptcy Code, Holders of  Old Allied Holdings Common Stock are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

3.11    Class 7B – Old Other Debtors Common Stock.

(1)    Classification:  Class 7B consists of all Allowed Old Other Debtors Common Stock.

(2)    Treatment:  Holders of  Old Other Debtors Common Stock will not receive any distribution of property under the Plan on account of their interest in Old Other Debtors Common Stock and, on the Effective Date, all Interests in Old Other Debtors Common Stock will be cancelled.[2]

(3)    Voting:   Class 7B is an Impaired Class.   Pursuant to Section 1126(g) of the Bankruptcy Code, Holders of Old Other Debtors Common Stock are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

3.12    Class 7C -- Old Allied Holdings Stock Rights.

(1)    Classification:   Class 7C consists of all Allowed Old Allied Holdings Stock Rights.

(2)    Treatment:  Holders of Allowed Old Allied Holdings Stock Rights will not receive any distribution of property under the Plan on account of their interest in Old Common Stock and, on the Effective Date, all Interests in Old Allied Holdings Stock Rights will be cancelled.

---

[2] If the Plan Proponents determine for business, tax or operational reasons that the stock should remain outstanding, the foregoing may be modified by the Plan Proponents or the Reorganized Debtors at any time, after consultation with the Debtors and the Creditors' Committee.

(3)    Voting:    Class 7C is an Impaired Class.    Pursuant to Section 1126(g) of the Bankruptcy Code, Holders of Old Allied Holdings Stock Rights are conclusively deemed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

**3.13**    Special Provision Governing Unimpaired Claims.    Except as otherwise provided in this Plan, nothing under this Plan is intended to or shall affect the Debtors' or Reorganized Debtors' rights and defenses in respect of any Claim that is Unimpaired under this Plan, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupment against such Unimpaired Claims.

## ARTICLE IV.
## TREATMENT OF UNCLASSIFIED CLAIMS

**4.1**    Summary.    Pursuant to Section 1123(a)(l) of the Bankruptcy Code, Administrative Expense Claims (including Claims for Professional Compensation), Claims of the DIP Lenders, Claims of Yucaipa (as well as Yucaipa Transport or any Eligible Participant who acquires a participation in the Equipment Financing Facility) arising under the Equipment Financing Facility and Priority Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under this Plan.  Holders of such Claims are not entitled to vote on this Plan.  All such Claims are instead treated separately in accordance with this Article IV and in accordance with the requirements set forth in Section 1129(a)(9)(A) of the Bankruptcy Code.

**4.2**    Unclassified Claims (Applicable to All Debtors).

(a)    Administrative Expense Claims.

(i)    General.

Subject to (x) the bar date provisions set forth in Section 4.2(a)(iii) hereof and (y) additional requirements for Professionals and certain other entities set forth below, the Reorganized Debtors shall pay to each holder of an Allowed Administrative Expense Claim, on account of its Administrative Expense Claim and in full satisfaction thereof, Cash equal to the Allowed amount of such Administrative Expense Claim on the later of (A) sixty (60) days after such Claim becomes Allowed or (B) the Effective Date (or as soon as practicable thereafter) unless the Holder, the Reorganized Debtors and Yucaipa agree in writing to other treatment of such Claim.  Payment on an Administrative Expense Claim that arose in the ordinary course of the Debtors' business will not be made until such payment would have become due in the ordinary course of the Debtors' business or under the terms of the legal obligation giving rise to the Claim in the absence of the Chapter 11 Cases.

(ii)    Payment Of Statutory Fees.

On or before the Effective Date, all fees then payable pursuant to 28 U.S.C. § 1930 shall be paid in full in Cash.

34

(iii)    Bar Date for Administrative Expense Claims.

(1)    General Provisions.

Except for Administrative Expense Claims of Professionals for Professional Compensation, which are addressed in Section 4.2(a)(iii)(2) below, and except as otherwise provided below for (A) non-tax liabilities incurred in the ordinary course of business by each Debtor and (B) Postpetition Tax Claims and (C) Yucaipa's Claim for substantial contribution and (D) Indenture Trustee Fees and Expenses, requests for payment of Administrative Expense Claims must be Filed and served on counsel for the Reorganized Debtors and counsel for Yucaipa no later than (x) the Administrative Expense Claim Bar Date, or (y) such later date, if any, as the Bankruptcy Court shall order upon application made prior to the end of the Administrative Expense Claim Bar Date.  Holders of Administrative Expense Claims (including, without limitation, the holders of any Claims for federal, state or local taxes) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against any of the Debtors or the Reorganized Debtors or any of their respective properties.

(2)    Professionals.

(A)    Persons requesting Professional Compensation pursuant to any of Sections 327, 328, 330, 331, 363, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Confirmation Date shall File and serve on the Debtors, Reorganized Debtors, as the case may be, Yucaipa, the Creditors' Committee (if still then in existence) and any other party entitled to receive a copy of such application pursuant to rule or order of the Bankruptcy Court, an application for final allowance of compensation and reimbursement of expenses on or before sixty (60) days after the Effective Date.  Any claims by or on behalf of Yucaipa that would be covered by this section will instead be treated as part of Yucaipa's claim for substantial contribution under Section 4.2(a)(iii)(5).

(B)    Objections to applications of professionals or other Persons for Professional Compensation must be Filed and served on the Debtors, counsel for the Debtors or Reorganized Debtors, as the case may be, counsel for Yucaipa, the Creditors' Committee (if still then in existence) and the professionals (or other Persons) to whose application the objections are addressed on or before the later of (i) thirty (30) days after such application is Filed with the Bankruptcy Court, (ii) ninety (90) days after the Effective Date, or (iii) such later date as the Bankruptcy Court shall order upon application or upon agreement between the Reorganized Debtors and the affected professional (or other Person).

(3)    Ordinary Course Liabilities.

Holders of Administrative Expense Claims based on liabilities incurred after the Petition Date in the ordinary course of the Debtors' business (other than Claims of governmental units for taxes or Claims and/or penalties related to such taxes) shall not be required to File any request for payment of such Claims.  Such Administrative Expense

Claims shall be assumed and paid by the Reorganized Debtors, as appropriate, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Expense Claim, without any further action by the holders of such Claims; provided that, notwithstanding the foregoing, the Reorganized Debtors reserve the right to dispute through any means permitted at law, equity and/or contract any Administrative Expense Claims based on liabilities incurred after the Petition Date in the ordinary course of the Debtors' business that the Reorganized Debtors believe are incorrect, invalid or otherwise objectionable.

(4)     Postpetition Tax Claims.

All requests for payment of Postpetition Tax Claims, for which no bar date has otherwise been previously established, must be Filed on or before the later of (i) sixty (60) days following the Effective Date; and (ii) one hundred and twenty (120) days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any Holder of any Postpetition Tax Claim that is required to File a request for payment of such taxes and that does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Postpetition Tax Claim against any of the Debtors or Reorganized Debtors, or any of their respective properties, whether any such Postpetition Tax Claim is deemed to arise prior to, on, or subsequent to, the Effective Date.

(5)     Yucaipa Claim for Substantial Contribution.

Yucaipa shall hold an Allowed Claim for substantial contribution under Section 503(b)(3) of the Bankruptcy Code for its fees and expenses incurred in connection with Yucaipa's participation in the Debtors' Chapter 11 Cases, if the Debtors successfully reorganize (including, without limitation, professional fees and the fees associated with retention of a new CEO for the Reorganized Debtors). Among other things, Yucaipa played a key role in negotiating and drafting the terms of the Plan and a new labor deal with TNATINC, and played a key role in obtaining Exit Financing Facility. No motion for allowance shall be required for the Debtors or the Reorganized Debtors, as applicable, to pay Yucaipa's Allowed Claim for substantial contribution on the Effective Date of the Plan in the amount of such fees and expenses.

(6)     Indenture Trustee Fees and Expenses.

No motion for allowance shall be required for the Debtors or the Reorganized Debtors, as applicable, to pay the Indenture Trustee Fees and Expenses, which shall be paid by the Reorganized Debtors on the Effective Date.

(b)     Treatment of Priority Tax Claims.

Each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date either (a) will be paid the full unpaid amount of such Allowed Priority Tax Claim in Cash on the Effective Date, or upon such other terms as may be agreed upon by such Holder, Yucaipa or the Reorganized Debtors, (b) will receive deferred Cash payments, over a period ending not later than 6 years from the date of assessment,

totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at a fixed rate of 4% per annum from the Effective Date, or such lesser rate agreed to by a particular taxing authority, or (c) otherwise will be paid as provided for in an order of the Bankruptcy Court. The proposed treatment for each Holder of an Allowed Priority Tax Claim due and payable on the Effective Date shall be selected by Yucaipa and shall be disclosed in the Plan Supplement.  The amount of any Priority Tax Claim that is not an Allowed Claim or that is not otherwise due and payable on or prior to the Effective Date, and the rights of the Holder of such Claim, if any, to payment in respect thereof shall (i) be determined in the manner in which the amount of such Claim and the rights of the Holder of such Claim would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced, (ii) survive after the Effective Date as if the Chapter 11 Cases had not been commenced, and (iii) not be discharged pursuant to Section 1141 of the Bankruptcy Code.   In accordance with Section 1124 of the Bankruptcy Code, this Plan leaves unaltered the legal, equitable, and contractual rights of each Holder of a Priority Tax Claim.

(c)        Treatment of Claims Under the DIP Loan Facility.

On the Effective Date, as set forth in the DIP Credit Documents, all outstanding Allowed Claims under the DIP Loan Facility shall be either (a) paid, in full, in Cash by the Reorganized Debtors or (b) converted into the Exit Financing Facility on the terms and subject to the conditions set forth in the DIP Credit Documents.

(d)        Treatment of Claims Under the Equipment Financing Facility.

Pursuant to the Equipment Financing Facility, Yucaipa Transport will have a first priority lien on the equipment purchased from Yucaipa Transport pursuant to the Equipment Purchase Agreement with the proceeds of the Equipment Financing Facility and will be treated as an superpriority Administrative Expense Claim to the extent that the value of the collateral is less than the amount owing under the Equipment Financing Facility.

In the event that an event of default has occurred or a plan of reorganization other than the Plan is filed and the treatment of Yucaipa Transport in the plan is not approved by Yucaipa Transport, then Yucaipa Transport will have the right to repurchase all or a portion (at its election) of the equipment for a purchase price equal to purchase price Allied Systems paid for such equipment pursuant to the Equipment Purchase Agreement, plus the amount financed for the initial repair and retrofit costs of such equipment.  The purchase price for any equipment repurchased by Yucaipa Transport will be paid to Allied Systems by the delivery for cancellation of promissory notes (or portions thereof) issued under the Equipment Financing Facility.

The Equipment Financing Facility provides a commitment for debtor in possession financing comprised of one or more secured promissory notes, in an aggregate principal amount not to exceed $15 million, with interest on the drawn amounts to bear interest at a rate equal to three-month LIBOR plus 4%, with all accrued interest to be

added to principal on the first day of each calendar quarter and thereafter accrue interest at the same rate as the principal amount. In connection with the Bankruptcy Court's interim approval of the Equipment Financing Facility, Yucaipa Transport agreed to permit each Eligible Participant to acquire a participation in the Equipment Financing Facility based on a fraction, the numerator of which is the undisputed amount of such Eligible Participant's General Unsecured Claim, Insured Claim or Other Insured Claim and the denominator of which is $[196,900,000]. At the present time, the Plan Proponents do not know how many, if any, Eligible Participants will acquire a participation in the Equipment Financing Facility.

Upon the Effective Date, the principal and interest due and owing under the Equipment Financing Facility (including, without limitation, any interest which has been added to principal pursuant to the Equipment Financing Facility) and all other obligations owing under the Equipment Financing Facility shall be converted to New Allied Holdings Common Stock, at the option of the either the Debtors or Yucaipa Transport, in each case in its sole and absolute discretion, which option must be exercised by giving the Debtors or Yucaipa Transport, as applicable, written notice within ten (10) days after the entry by the Bankruptcy Court of the Confirmation Order. If the conversion right is exercised, then the obligations under the Equipment Financing Facility shall be exchanged into a percentage of the New Allied Holdings Common Stock after giving effect to consummation of the Plan, with the percentage of shares to be issued to Yucaipa Transport to be calculated as follows: 100 percent multiplied by a fraction, (i) the numerator of which equals the total amount of the obligations under the Equipment Financing Facility as of the Effective Date and (ii) the denominator of which equals (a) Two Hundred Eighty-Five Million Dollars ($285,000,000) minus (b) the net amount of all indebtedness of the Reorganized Debtors (other than the Equipment Financing Facility) net of Cash on hand outstanding on the Effective Date after giving effect to consummation of the Plan.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1** Assumption and Cure of Executory Contracts and Unexpired Leases. On the Effective Date, in addition to all executory contracts and unexpired leases that have been previously assumed by the Debtors by order of the Bankruptcy Court, all executory contracts and unexpired leases of the Reorganized Debtors identified on an Exhibit to this Plan in form and substance reasonably acceptable to Yucaipa, as may be amended prior to the Confirmation Date (the "Contract/Lease Schedule"), are hereby deemed assumed in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code. On or before the date that is the fifth day before the Voting Deadline, Yucaipa (after consultation with the Debtors and the Creditors' Committee) will File the Contract/Lease Schedule; provided however that Yucaipa reserves the right to amend the Contract/Lease Schedule at any time up to three (3) days before the Confirmation Hearing. The Debtors and the Plan Proponents, as applicable, will provide notice of any amendments to the Contract/Lease Schedule to the parties to the executory contracts and unexpired leases affected thereby and the Creditors' Committee. All executory contracts or unexpired leases of the Reorganized Debtors not set forth on the Contract/Lease

Schedule (or not previously assumed by the Debtors by order of the Bankruptcy Court or subject of a Filed motion to assume) that were not previously rejected will be deemed rejected as of the Effective Date pursuant to Sections 365 and 1123 of the Bankruptcy Code.

Any Holder of any Claim arising from the rejection of an executory contract or unexpired lease must File a proof of Claim within the earlier of (a) thirty (30) days following entry of an order by the Bankruptcy Court authorizing rejection of the applicable contract or lease and (b) thirty (30) days after the Confirmation Date. Entry of the Confirmation Order by the Bankruptcy Court shall, subject to the occurrence of the Effective Date, constitute approval of such rejections pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed and/or assigned pursuant to this Article V (or pursuant to other Bankruptcy Court order) shall remain in full force and effect and be fully enforceable by the applicable Reorganized Debtor(s) in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable law. To the extent applicable, all executory contracts or unexpired leases of Reorganized Debtors assumed pursuant to this Section 5.1 shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," however such term may be defined in the relevant executory contract or unexpired lease, and any required consent under any such contract or lease shall be deemed satisfied by the confirmation of the Plan.

**5.2** Cure of Defaults of Assumed Executory Contracts and Unexpired Leases. Any monetary cure amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, pursuant to Section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) as due in the ordinary course of business or (iii) on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree. In the event of a dispute regarding: (1) the amount of any cure payments, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assigned, or (3) any other matter pertaining to assumption, the cure payments required by Section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. Yucaipa will list cure amounts for executory contracts and unexpired leases on the Contract/Lease Schedule. **The failure of any non-Debtor party to an executory contract or unexpired lease to file and serve an objection to the cure amount listed on the Contract/Lease Schedule for such executory contract or unexpired lease by May 7, 2007 at 4:00 p.m. (Eastern Time), shall be deemed consent to such cure amount.**

**5.3** Collective Bargaining Agreement. The Collective Bargaining Agreement between the IBT and the Debtors shall be amended and assumed by the Reorganized Debtors on the terms and conditions set forth in Exhibit G to the Disclosure Statement. The Debtors and the Reorganized Debtors shall not be obligated to pay any cure amounts associated with the assumption of such contract.

**5.4** Employment Agreements and Other Benefits.

(1) <u>Employment Agreements</u>. Except as otherwise provided in this Plan or as modified by the KERP, to the extent the Debtors had employment agreements with certain of their employees as of the Petition Date, Yucaipa will disclose in the Contract/Lease Schedule whether they intend to assume or reject such contracts. Notwithstanding anything to the contrary in this Plan, the Reorganized Debtors shall maintain all of their existing rights, including, but not limited to, any rights that they may have to amend, modify, or terminate, the employment agreements assumed pursuant to this Article, subject to the existing contractual rights, if any, of the directors, officers or employees affected thereby.

(2) <u>Compliance with the KERP</u>. The Debtors will comply with the KERP and the Debtors or Reorganized Debtors will perform any and all remaining obligations thereunder, including the payment of performance bonuses, emergence bonuses and severance amounts contemplated thereby.

(3) <u>Qualified Pension Plans</u>. Upon the occurrence of the Effective Date, the Reorganized Debtors intend to continue the Qualified Pension Plans, as frozen, and shall meet the minimum funding standards under ERISA and the Internal Revenue Code, shall pay all Pension Benefit Guaranty Corporation insurance premiums, if applicable, and shall otherwise administer and operate the Qualified Pension Plans in accordance with their terms and ERISA in such manner as is necessary to maintain those benefits that had accrued prior to the date that accrual of benefits under the Qualified Pension Plans was frozen. Nothing in this Plan shall be deemed to release, discharge, or relieve the Debtors, Reorganized Debtors, any member of the Debtors' controlled groups (as defined in 29 U.S.C. § 1301(a)(14)), or any other party, in any capacity, from any current or future liability with respect to the Qualified Pension Plans, and the Pension Benefit Guaranty Corporation and the Qualified Pension Plans shall not be enjoined or precluded from enforcing such liability as a result of this Plan's provisions or consummation. Notwithstanding anything to the contrary in this Plan, the Reorganized Debtors shall maintain all of their existing rights, including, but not limited to, any rights that they may have to amend, modify, or terminate the Qualified Pension Plans.

(4) <u>Compensation and Benefit Programs</u>. All employment and severance agreements and policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their employees, officers and directors including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements and plans, incentive plans, deferred compensation plans and life, accidental death and dismemberment insurance plans, shall be treated as executory contracts under the Plan, and on the Effective Date will be deemed assumed pursuant to the provisions of Sections 365 and 1123 of the Bankruptcy Code; and the Debtors' and Reorganized Debtors' obligations under such programs to such Persons shall survive confirmation of the Plan, except for: (a) executory contracts or employee benefit plans specifically rejected pursuant to the Plan by being listed as contracts to be rejected on the Contract/Lease Schedule or otherwise (to the extent that any such rejection does not violate the Bankruptcy Code including, but not limited to, Sections

40

1114 and 1129(a)(13) thereof); (b) all employee equity or equity-based incentive plans; (c) such executory contracts or employee benefit plans as have previously been rejected, are the subject of pending rejection procedures or a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract; and (d) except as modified pursuant to the terms of the amended IBT Collective Bargaining Agreement as described in Section 5.3 hereof; provided however, that the Reorganized Debtors' obligations, if any, to pay all "retiree benefits" as defined in Section 1114(a) of the Bankruptcy Code shall continue to the extent that any such retiree benefits have been modified in accordance with Section 1114 of the Bankruptcy Code. Notwithstanding the foregoing, the assumption of the indemnification provisions and insurance described in this Section shall only apply to directors, officers and employees who remain in their respective capacity as directors, officers and employees as of the Effective Date.

   (5) <u>Workers' Compensation Programs</u>. As of the Effective Date, the Reorganized Debtors shall continue to honor all of the obligations of the Debtors to insurers, including those incurred on or prior to the Effective Date, under: (i) all applicable workers' compensation laws; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. Notwithstanding anything to the contrary in the Plan, nothing in the Plan or the Confirmation Order shall (i) limit, diminish, or otherwise alter or impair the Debtors', Reorganized Debtors' and/or insurers' defenses, claims, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and/or plans; or (ii) preclude or limit, in any way, the rights of the Debtors, Reorganized Debtors and/or insurers to contest and/or litigate with any party the existence, primacy and/or scope of available coverage under any alleged applicable policy; <u>provided further</u>, that nothing herein shall be deemed to impose any obligations on the Debtors, Reorganized Debtors or insurers beyond what is provided for in the applicable laws, policies and/or related insurance agreements.

  **5.5** Insurance Policies.

   (1) Notwithstanding anything to the contrary in the Plan, nothing in the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to or have the effect of impairing the legal, equitable or contractual rights of any of (i) the Debtors' insurers, or (ii) any of the Holders of any Claims with respect to such Holders' rights, if any, to recover under applicable insurance policies providing coverage for such Claims (including, without limitation, any amounts recoverable within any policy deductible and provided that any recovery under any insurance policy is not in duplication of any Distribution such Holder may receive under this Plan). The rights, obligations and liabilities of insurers and the Debtors shall be determined under the subject insurance policies and related agreements. All insurance policies and related agreements entered into or issued prior to the Effective Date shall continue after the Effective Date unaltered by the Plan or the Confirmation Order. The terms, conditions, limitations, exclusions and coverages, and the Debtors' rights, obligations and liabilities under their insurance policies and related

agreements shall remain unmodified, including any duty of the Debtors to defend, at their own expense, against claims asserted under their insurance policies; provided, however, that the rights, obligations and liabilities of the Debtors, whether now existing or hereafter arising, shall be the rights, obligations and liabilities of the Reorganized Debtors and shall be fully enforceable by and against the Reorganized Debtors.

(2)     Nothing in the Plan, including the injunction and release provisions of Sections 11.4 and 11.6 of the Plan, or in the Confirmation Order shall preclude the Debtors or any insurer from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any insurance policy or any insurance settlement agreement, including the rights of the insurers to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable insurance policy.

(3)     All of the Debtors' rights, obligations and liabilities arising under any insurance policies and any agreements, documents and instruments relating thereto shall be deemed transferred to and fully enforceable by and against the Reorganized Debtors on the Effective Date.

**5.6**     **ACE Insurance Program.**   Notwithstanding anything to the contrary contained in the Plan or Confirmation Order  (including, without limitation any other provision that purports to be preemptory or supervening, or grants an injunction or release (as set forth in Sections 11.4 and 11.6 of the Plan or otherwise)),  all insurance policies and related insurance agreements, including but not limited to, those providing coverage for workers' compensation, general liability and automobile liability, entered into between ACE American Insurance Company (together with its affiliates, the "ACE Companies") and the Debtors or issued by the ACE Companies to the Debtors prior to the Effective Date (collectively, the "ACE Insurance Program"), and the Debtors' and the ACE Companies' rights, obligations and liabilities thereunder, shall continue after the Effective Date unaltered by the Plan or the Confirmation Order, except that the rights, obligations and liabilities of the Debtors, whether now existing or hereafter arising, shall be the rights, obligations and liabilities of the Reorganized Debtors and shall be fully enforceable by and against the Reorganized Debtors under the ACE Insurance Program. Except as provided in the immediately preceding sentence, nothing in the Plan or Confirmation Order shall vary, amend, modify or alter in any way the terms, conditions, coverages, limitations, exclusions, or dates of coverage provided under the ACE Insurance Program.   Without limiting the foregoing, the respective rights, claims, defenses, duties, liabilities and obligations of the Debtors, the Reorganized Debtors and the ACE Companies under the ACE Insurance Program shall remain in effect, including, without limitation, the rights of the ACE Companies to contest and/or litigate the existence, primacy and/or scope of available coverage under the alleged applicable policy.  The claims of the ACE Companies against the Debtors shall be payable by the Debtors (and after the Effective Date, by the Reorganized Debtors), in the ordinary course of their businesses, without any requirement for the ACE Companies to file a proof or proofs of claim or administrative expense claim.

## ARTICLE VI.
## MEANS FOR IMPLEMENTATION OF PLAN

**6.1** Continued Corporate Existence and Vesting of Assets in Reorganized Debtors.

(1) Subject to the additional provisions of this Plan, after the Effective Date, each of the Reorganized Debtors shall continue to exist in accordance with the law in the jurisdiction in which it is incorporated or organized and pursuant to its certificate of incorporation and bylaws or other applicable organizational document in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other applicable organizational document are amended or replaced under the Plan and as provided in the Reorganized Governing Documents and Reorganized By-Laws. Old Allied Holdings may be reorganized and reincorporated as a Delaware corporation pursuant to the Plan, on or after the Effective Date and shall operate under its Reorganized Governing Documents and Reorganized By-laws. On and after the Effective Date, all property of the Estates, including all Claims, rights and causes of action and any property acquired by any Debtor or Reorganized Debtor under or in connection with the Plan, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests. On and after the Effective Date, each of the Reorganized Debtors may operate its business, may use, acquire and dispose of property, may retain, compensate and pay any professionals or advisors, and compromise or settle any Claims or Interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Notwithstanding the foregoing, Yucaipa reserves the right to structure the Plan as an asset sale (for business, tax or operational issues) so long as the treatment to holders of Allowed Claims and Interests does not change negatively and materially.

(2) There are certain Affiliates of the Debtors that are not Debtors in the Chapter 11 Cases. The continued existence, operation and ownership of such non-Debtor Affiliates is a material component of the Debtors' businesses, and all of the Interests and other property interests in such non-Debtor Affiliates (other than non-Debtor Affiliates owned by certain other non-Debtor Affiliates) shall vest in the applicable Reorganized Debtor or its successor on the Effective Date free and clear of all Claims, Liens, charges, other encumbrances and interests.

**6.2** Substantive Consolidation of Claims against Debtors for Plan Purposes Only. The Plan is premised on the substantive consolidation of all of the Debtors with respect to the treatment of all Claims and Interests except for the Other Secured Claims in Class 1, as provided below. The Plan does not contemplate substantive consolidation of the Debtors with respect to the Class 1 Claims, which shall be deemed to apply separately with respect to the Plan proposed by each Debtor. This Plan shall serve as a request by the Plan Proponents, in lieu of a separate motion, to the Bankruptcy Court, that it grant

substantive consolidation with respect to the treatment of all Claims and Interests other than Class 1 Claims as follows: on the Effective Date, (a) all Intercompany Claims will be eliminated (except as set forth in Section 3.7 hereof); (b) all Assets and liabilities of the Debtors will be merged or treated as though they were merged (except to the extent they secure any Allowed Other Secured Claim); (c) all guarantees of the Debtors of the obligations of any other Debtor and any joint or several liability of any of the Debtors shall be eliminated; and (d) each and every Claim or Interest (except for Other Secured Claims) against any Debtor shall be deemed Filed against the consolidated Debtors and all Claims (except for Other Secured Claims) Filed against more than one Debtor for the same liability shall be deemed one Claim against any obligation of the consolidated Debtors.

6.3     Exit Financing Facility.  On the Effective Date, the DIP Loan Facility shall be converted into the Exit Financing Facility on the terms and conditions set forth in the DIP Credit Documents.

6.4     Sources of Cash for Distribution.  Except for the Cash Out Distribution which will be funded by Yucaipa, all Cash necessary for the Reorganized Debtors to make payments required by this Plan shall be obtained from existing Cash balances, the operations of the Debtors or Reorganized Debtors, Yucaipa and/or the Exit Financing Facility.  Except as provided in Article VIII of the Plan, Cash payments to be made pursuant to the Plan shall be made by the Reorganized Debtors, provided however, that the Debtors and the Reorganized Debtors shall be entitled to transfer funds between and among themselves as may be necessary or appropriate to enable any of the Reorganized Debtors to satisfy their obligations under the Plan.

6.5     Reinstatement of Interests of Allied Holdings in its Affiliates.  Each Reorganized Debtor shall, without the need for any further corporate act or other action under any applicable law, regulation, order or rule, issue authorized New Common Stock to the Reorganized Debtor that was that Debtor's corporate parent prior to the Effective Date, so that each Reorganized Debtor will retain its 100% ownership of its pre-Petition subsidiary.  The foregoing may be modified by the Plan Proponents or the Debtors at any time, after consultation with the Creditors' Committee.

6.6     Corporate and Limited Liability Company Action.  Each of the matters provided for under this Plan involving the corporate or limited liability company structure of any Debtor or Reorganized Debtor or any corporate or limited liability company action to be taken by or required of any Debtor or Reorganized Debtor, including, without limitation, the adoption of the Reorganized Governing Documents and Reorganized By-Laws of each of the Reorganized Debtors as provided for in Section 7.1 of this Plan, the reincorporation of Allied Holdings into a Delaware corporation, entrance into the Stockholders' Agreement, Registration Rights Agreement and Management Services Agreement, the initial selection of directors and officers for the Reorganized Debtors, the Distribution of Cash pursuant to the Plan, the issuance and sale of New Common Stock, the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing, and other matters involving the corporate structure of any Debtor or Reorganized Debtor or

corporate action to be taken by or required of any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of any of the Debtors or the Reorganized Debtors.

**6.7** **Effectuating Documents; Further Transactions.** Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan or to otherwise comply with applicable law.

**6.8** **Exemption from Certain Transfer Taxes and Recording Fees.** Pursuant to Section 1146 of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or Entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.9** **Further Authorization.** The Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

**6.10** **Canadian Operations Sale.** After the Effective Date, the Reorganized Debtors will consider selling, subject to the discretion of Yucaipa, all of their assets utilized in connection with their operations in Canada (the "Canadian Operations Sale"). If the Reorganized Debtors engage in a sale process with respect to the Canadian Operations Sale, it is contemplated that PTS/Leaseway Motorcar Transport Company would act as a stalking horse bidder for such a sale. In order for a Canadian Operations Sale to be effectuated , the value of the consideration received by the Reorganized Debtors must equal or exceed the imputed value of the Canadian operations, as derived from the implied EBITDA  multiples used in the valuation of the Reorganized Debtors set forth in Exhibit E to the Disclosure Statement.

**6.11** **Retained Actions.** Except as set forth in this Section 6.11, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, to the extent set forth below, and their respective successors, any assigns hereunder and future assigns will retain and may exclusively enforce any Retained Actions subject only to any express waiver or release thereof in the Plan or in any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan (and consented to

by Yucaipa in its sole discretion), and the Confirmation Order's approval of the Plan shall be deemed a res judicata determination of such rights to retain and exclusively enforce such Causes of Action, and none of such Retained Actions is deemed waived, released or determined by virtue of the entry of the Confirmation Order or the occurrence of the Effective Date, notwithstanding that the specific Claims and Retained Actions are not identified or described. Absent such express waiver or release by the Debtors, the Reorganized Debtors, or their respective successors or assigns (with the consent of Yucaipa) may pursue Retained Actions, as appropriate, in accordance with the best interests of the Reorganized Debtors (or their successors or future assigns). All Retained Actions may be asserted or prosecuted before or after solicitation of votes on the Plan and before or after the Effective Date.

Absent an express waiver or release as referenced above, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Reorganized Debtors from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Retained Actions and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Actions upon or after Confirmation, the Effective Date or the consummation of the Plan. By example only, and without limiting the foregoing, the utilization or assertion of a Retained Action, or the initiation of any proceeding with respect thereto against a Person, by the Reorganized Debtors or any successor to or assign of them, shall not be barred (whether by estoppel, collateral estoppel, res judicata or otherwise) as a result of (a) the solicitation of a vote on the Plan from such Person or such Person 's predecessor in interest; (b) the Claim, Interest or Administrative Expense Claim of such Person or such Person's predecessor in interest having been listed in a Debtor's Schedules, List of Holders of Interests, or in the Plan, Disclosure Statement or any exhibit thereto; (c) prior objection to or allowance of a Claim or, Interest of the Person or such Person's predecessor in interest; or (d) Confirmation of the Plan.

Notwithstanding any allowance of a Claim, the Reorganized Debtors reserve the right to seek, among other things, to have such Claim disallowed if the Reorganized Debtor, at the appropriate time, determines that it has a defense under Section 502(d) of the Bankruptcy Code, e.g., the Reorganized Debtor holds an Avoidance Action against the Holder of such Claim and such Holder after demand refuses to pay the amount due in respect thereto.

**6.12**   Other Documents and Actions.  The Debtors, the Debtors in Possession and the Reorganized Debtors shall File or execute such documents and take such other actions as are necessary to effectuate the transactions provided for in the Plan.

**6.13**   Corporate Action.  The authorization and issuance of the New Common Stock, the adoption of the Reorganized Governing Documents and Reorganized By-Laws and the selection of the Persons who will serve as the initial directors and officers of the Reorganized Debtors as of the Effective Date, and other matters under the Plan involving the corporate structure of each Debtor or Reorganized Debtor or corporate action by each Debtor or Reorganized Debtor, shall be deemed to have occurred and be effective on and

after the Effective Date without any requirement of further action by the stockholders, directors, members, partners or other applicable entity of each Debtor or Reorganized Debtor. Without limiting the foregoing, upon entry of the Confirmation Order by the clerk of the Bankruptcy Court, the filing by each Reorganized Debtor of its respective Reorganized Governing Documents and Reorganized By-Laws shall be authorized and approved in all respects.

6.14    Retiree Benefits.  On and after the Effective Date, to the extent required by Section 1129(a)(13) of the Bankruptcy Code, and except as may be provided to the contrary in a separate order of the Bankruptcy Court or under contracts negotiated with the applicable labor groups governing such benefits, each Reorganized Debtor shall continue to pay all retiree benefits (if any) of any worker who retired as of the Effective Date, to the extent such benefits were maintained or established prior to the Effective Date.

6.15    Employee Claims.  Except as provided in the Employee Wage Order, each Debtor's employees shall have a Priority Claim for unpaid wages, benefits and other entitlements to the extent permitted by Section 507(a)(3) of the Bankruptcy Code, which, if allowed, will be either (i) paid in full, or (ii) Reinstated.  To the extent that any employee's Claim exceeds the amount prescribed by Section 507(a)(3) of the Bankruptcy Code, the employee shall receive a General Unsecured Claim for the excess amount. Notwithstanding the foregoing, any employee who continues to be an employee in good standing with the Reorganized Debtors after the Effective Date shall be entitled to take (in the form of vacation days and not in Cash) all unused and unpaid vacation time accrued prior to the Petition Date on such terms as will be prescribed by the Reorganized Debtors; provided, however, that notwithstanding the foregoing, if any employee is no longer employed by the Reorganized Debtors for any reason after the Effective Date, the Reorganized Debtors shall have no obligations to make any payments on account of any unused and unpaid vacation time accrued prior to the Petition Date to such employee.

6.16    Good Faith.  Confirmation of the Plan shall constitute a finding that: (i) this Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code, and (ii) all Persons' solicitations of acceptances or rejections of this Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

6.17    Executory Contracts and Unexpired Leases Entered Into, and Other Obligations Incurred After, the Petition Date.  Executory contracts and unexpired leases (a) assumed by the Debtors after the Petition Date or (b) entered into, and other obligations incurred, after the Petition Date by the Debtors shall be performed by the Debtors or Reorganized Debtors in the ordinary course of their businesses.  Accordingly, such executory contracts, unexpired leases and other obligations shall survive and remain unaffected by the entry of the Confirmation Order or the occurrence of the Effective Date under, and the effectiveness of, the Plan.

6.18    Security Interests and Liens.  All security interests and Liens granted or to be granted to any party in connection with the Plan or any document or agreement

contemplated by the Plan or entered into in connection with the Plan or otherwise granted or to be granted, including without limitation, the guarantees, mortgages, security agreements and pledge agreements described in the DIP Credit Documents, shall be governed in all respects, including without limitation, perfection and priority, by applicable non-bankruptcy law, notwithstanding anything to the contrary in the Plan or the Confirmation Order.

## ARTICLE VII.
## PROVISIONS REGARDING CORPORATE GOVERNANCE OF
## REORGANIZED DEBTORS

7.1    Reorganized Governing Documents and Reorganized By-Laws.    The Reorganized Governing Documents and Reorganized By-Laws of each of the Reorganized Debtors shall be adopted as may be required in order to be consistent with the provisions of this Plan and the Bankruptcy Code.    The Reorganized Governing Documents of Reorganized Allied Holdings shall, among other things (a) authorize the issuance of common stock in amounts not less than the amounts necessary to permit the Distributions thereof required or contemplated by the Plan and (b) provide, pursuant to Section 1123(a)(6) of the Bankruptcy Code, for (i) a provision prohibiting the issuance of non voting equity securities and (ii) to the extent necessary, a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.    The Reorganized Governing Documents of Reorganized Allied Holdings may, among other things, provide for the waiver, to the extent permitted by law, of any interest or expectancy of Reorganized Allied Holdings in, or in being offered the opportunity to participate in, specified business opportunities or specified classes or categories of business opportunities that are presented to the corporation or one or more of its directors, officers or stockholders.    Forms of the Reorganized Governing Documents and Reorganized By-Laws of the Debtors will be contained in the Plan Supplement.

7.2    Directors and Officers of Reorganized Debtors.    The Initial Board shall have five members, including a new CEO (who shall be selected by Yucaipa and shall be reasonably acceptable to TNATINC and the Creditors' Committee), one member chosen by the Creditors' Committee (who shall be reasonably acceptable to Yucaipa), and three other members selected by Yucaipa.    Pursuant to the terms of the amended Collective Bargaining Agreement, TNATINC shall have certain observer rights with respect to the Initial Board.    Yucaipa has selected Derex Walker, Ira Tochner and Jos Opdeweegh to serve on the Initial Board.    The proposed identity of the other members of the Initial Board and the new CEO shall be disclosed on or prior to the date of the hearing on the approval of the Disclosure Statement with respect to the Plan, or as soon thereafter as practicable.    The remaining members of senior management will continue to serve until the Effective Date pursuant to their respective existing terms of compensation and thereafter subject to terms and conditions mutually acceptable to the Initial Board and the applicable member of management.    The Initial Board of Allied Holdings shall choose

the members of the Boards of Directors of each of the other Reorganized Debtors on the Effective Date or as soon as practicable thereafter. Each of the Persons on the Initial Boards of Directors and each of the initial officers of the respective Reorganized Debtors shall serve in accordance with the Reorganized Governing Documents and Reorganized By-Laws of each of the respective Reorganized Debtors, as the same may be amended from time to time.

7.3     New Employment, Retirement, Indemnification and Other Related Agreements and Incentive Compensation Programs.  As of the Effective Date, the Reorganized Debtors will have authority to:  (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with their active directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees.

7.4     Stockholders' Agreement.  All creditors receiving New Allied Holdings Common Stock under the Plan, by acceptance of such newly issued shares, will be deemed to have entered into, and will be bound by the terms of, the Stockholders' Agreement.  The Stockholders' Agreement may  provide for, among other things, (i) nomination and observation rights regarding the board of directors of Reorganized Allied Holdings consistent (for two years) with the board composition described in Section 7.2 of this Plan , (ii) approval rights of Yucaipa and possibly others regarding certain significant transactions involving Reorganized Allied Holdings, (iii) pre-emptive rights in favor of Yucaipa and possibly others in connection with certain issuances of securities, (iv) "drag along" and/or "tag along" rights triggered upon certain sales or dispositions of the capital stock of Reorganized Allied Holdings, pursuant to which holders may be required to sell all their shares of New Allied Holdings Common Stock and/or entitled to sell all or a portion of their New Allied Holdings Common Stock, (v) certain additional restrictions on transfer of New Allied Holdings Common Stock, including among others, rights of first refusal or other rights to purchase in favor of Reorganized Allied Holdings, Yucaipa or possibly others in connection with any proposed sale or transfer of New Allied Holdings Common Stock, and (vi) other terms, conditions and restrictions of the type included in stockholders' agreements.  The form of Stockholders' Agreement will be set forth in the Plan Supplement.  The entering into and effectuation of the Stockholders' Agreement on the Effective Date is authorized by the Plan without the need for any further action by holders of New Allied Holdings Common Stock, and shall be effective on the date thereof.  The foregoing may be modified by Yucaipa at any time after consultation with the Debtors and the Creditors' Committee.  Certain of the terms described above may instead or also be included in the Reorganized Governing Documents or Reorganized By-Laws.

7.5     Registration Rights Agreement.  On the Effective Date, Reorganized Allied Holdings will be authorized to enter into a Registration Rights Agreement with Yucaipa and potentially other holders the New Allied Holdings Common Stock.  The Registration Rights Agreement is expected to provide (i) certain rights to require Reorganized Allied Holdings to register a public offering, (ii) certain rights to demand

that Reorganized Allied Holdings file, prepare and cause to become effective registration statement and (iii) piggyback registration rights.  The Registration Rights Agreement may also provide other holders of New Allied Holdings Common Stock with certain registration rights. The form of the Registration Rights Agreement will be set forth in the Plan Supplement.  The entering into and effectuation by Reorganized Allied Holdings of the Registration Rights Agreement on the Effective Date, will be authorized by the Plan without the need for any further corporate action and without any further action by holders of Claims or equity interests, and shall be effective on the date thereof.  The foregoing may be modified by Yucaipa at any time after consultation with the Debtors and the Creditors' Committee.

   **7.6**  Management Services Agreement **.**  On the Effective Date, Reorganized Allied Holdings will be authorized to enter into a  Management Services Agreement with an affiliate of Yucaipa, with a term of five years, such term being automatically extended by 12 additional calendar months on an annual basis unless prior notice of nonrenewal is provided by Reorganized Allied Holdings.  The Management Services Agreement will provide that Yucaipa affiliate may perform certain monitoring and management services, including  helping the company evaluate its strategic and financing alternatives, improve labor relations, attract and retain senior management, negotiate future collective bargaining agreements, set strategic priorities, pursue revenue growth opportunities, and develop strategies for upgrading the fleet. In return for such services the Yucaipa affiliate will be entitled to an annual fee of $1,500,000 and reimbursement of out-of-pockets costs. The Management Services Agreement will be filed as part of the Plan Supplement.

   **7.7**  Effectuating Documents and Further Transactions.  Each of the Debtors or Reorganized Debtors, as appropriate, is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

   **7.8**  Authorization and Issuance of New Common Stock.  On the Effective Date, the Reorganized Debtors are authorized to issue the New Common Stock in accordance with the provisions of the Plan.  The issuance of New Common Stock and the Distributions thereof will be exempt from registration under applicable securities laws pursuant to Section 1145(a) of the Bankruptcy Code.

   **7.9**  Reserve.  Reorganized Allied Holdings shall be authorized, without further act or action by the Initial Board and without further act or action under applicable law, regulation, order, or rule to reserve from the authorized shares of New Common Stock, that number of shares of New Common Stock required for issuance to the Holders of Allowed Claims as and when required under the Plan.  The Initial Board may reduce the number of shares of New Common Stock so reserved at any time as it deems appropriate to the extent it determines in good faith that such reserve is in excess of the number of shares needed to satisfy the foregoing requirements.

   **7.10**  Listing of New Allied Holdings Common Stock.  In the event the Initial Board determines in its discretion to register the New Allied Holdings Common Stock

with the Securities and Exchange Commission, or if Reorganized Allied Holdings is required under applicable securities laws to register the New Allied Holdings Common Stock with the Securities and Exchange Commission, Reorganized Allied Holdings shall use commercially reasonable efforts to list the New Allied Holdings Common Stock on a national securities exchange or for quotation on a national automated interdealer quotation system within one year of the Effective Date unless the Initial Board determines otherwise. Reorganized Allied Holdings shall have no liability if it is unable to, or determines not to, list the New Allied Holdings Common Stock as described above. In the event the New Allied Holdings Common Stock is listed on a national securities exchange, action may be taken to modify the composition of the board of directors, including potentially the number of directors, so that Reorganized Allied Holdings would be in compliance with certain independence requirements mandated by the Sarbanes-Oxley Act of 2002 and/or the applicable national securities exchange. Persons receiving Distributions of New Allied Holdings Common Stock, by accepting such Distributions, shall have agreed to cooperate with Reorganized Allied Holdings' reasonable requests to assist Reorganized Allied Holdings in its efforts to list the New Allied Holdings Common Stock on a securities exchange or quotation system to the extent necessary.

**7.11** Possible Privatization of Reorganized Allied Holdings Following Emergence. If there are more than 300 Initial Holders of New Allied Holdings Common Stock on the Effective Date, Reorganized Allied Holdings would as of the Effective Date remain a "public" company subject to the reporting requirements of the Exchange Act. However, it is possible that after the Effective Date, Reorganized Allied Holdings, Yucaipa and/or other holders of New Allied Holdings Common Stock could take actions to reduce the number of stockholders to below 300, or otherwise engage in or approve a transaction or transactions which would reduce the number of stockholders to below 300 and cause Reorganized Allied Holdings to become a private company not subject to the reporting requirements of the Exchange Act and without securities registered with the Securities and Exchange Commission.

**7.12** Old Allied Holdings Common Stock, Old Other Debtors Common Stock and Old Allied Holdings Stock Rights. On the Effective Date, all old Allied Holdings Common Stock will be cancelled. On the Effective Date, all Old Other Debtors Common Stock and Old Allied Holdings Stock Rights will be cancelled unless, after consultation with the Debtors and the Creditors' Committee, Yucaipa determines for business, tax or operational reasons that such stock should remain outstanding.

## ARTICLE VIII.
## VOTING AND DISTRIBUTIONS

**8.1** Voting of Claims. Each Holder of an Allowed Claim in an Impaired Class which Claim is not (i) a Tort Claim, (ii) contingent or (iii) Filed in an unliquidated or undetermined amount shall be entitled to vote separately to accept or reject the Plan unless such Holder's Claim is otherwise deemed to have rejected the Plan in accordance with Section 1126(g) of the Bankruptcy Code.

**8.2**      Nonconsensual Confirmation. The Plan Proponents request Confirmation under Section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept the Plan pursuant to Section 1126 of the Bankruptcy Code. The Plan Proponents reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

**8.3**      Acceptance by Class of Creditors. An Impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

**8.4**      Distributions for Claims Allowed as of the Effective Date. Except as otherwise provided in this Article VIII and as to DIP Loan Facility Claims, Distributions of Cash to be made on the Effective Date to Holders of Claims that are allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (i) 90 days after the Effective Date and (ii) 90 days after such later date when the applicable conditions of Section 5.2 (regarding cure payments for executory contracts and unexpired leases being assumed) and Section 8.8 (regarding undeliverable Distributions) are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Section 9.5 of the Plan.

**8.5**      Disbursing Agent. Except as otherwise provided in this Article VIII, the Reorganized Debtors, or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion, will make all Distributions of Cash, New Common Stock, and other instruments or documents required under the Plan. Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other Entities to assist in or make the Distributions required by the Plan. Each Third Party Disbursing Agent including for these purposes, the Indenture Trustee, providing services related to Distributions pursuant to the Plan will receive from the Reorganized Debtors reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services without Bankruptcy Court approval. These payments will be made on terms agreed to with the Reorganized Debtors and will not be deducted from Distributions to be made pursuant to the Plan to Holders of Allowed Claims receiving Distributions from a Third Party Disbursing Agent. The Indenture Trustee shall receive an Administrative Claim in an amount equal to the Indenture Trustee Fees and Expenses. To the extent such Administrative Claim is not paid to the Indenture Trustee (or escrowed pending the resolution of any dispute), the Indenture Trustee shall retain its charging lien on Distributions to Holders of Prepetition Notes Claims to the fullest extent permitted under the Prepetition Notes Indenture.

**8.6**      Distributions of Cash. Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the applicable Reorganized Debtor or by wire transfer from a domestic bank; provided that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the applicable Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**8.7**    No Interest on Claims or Interests.  Unless otherwise specifically provided for or contemplated elsewhere in the Plan or Confirmation Order, or required by applicable bankruptcy law to render a Claim Unimpaired or otherwise, postpetition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim, other than Other Secured Claims to the extent required by the applicable documents giving rise to such Claims; provided, however, that to the extent a holder of a Other Secured Claim has a Deficiency Claim on account of such Other Secured Claim, interest shall not accrue on or after the Petition Date on the Other Secured Claim or the Deficiency Claim.

**8.8**    Delivery of Distributions.  The Distribution to a Holder of an Allowed Claim shall be made by the Reorganized Debtors (a) at the address set forth on the proof of Claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to the Reorganized Debtors after the date of any related proof of Claim, (c) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Reorganized Debtors has not received a written notice of a change of address, (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records, or (e) in the case of Prepetition Notes Claims, to the Indenture Trustee for ultimate distribution to the Record Holders of such Prepetition Notes Claims.   The Indenture Trustee shall be directed to effect any Distribution under the Plan through the most efficient method available in the Indenture Trustee's discretion, including without limitation through the book entry transfer facilities of the Depository Trust Company pursuant to the procedures used for effecting distributions thereunder on the date of any such distribution.  If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Reorganized Debtors are notified of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest.  All Cash Distributions returned to the Reorganized Debtors and not claimed within six (6) months of return shall be irrevocably retained by the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary. All Distributions of New Common Stock returned to the Debtors and not claimed within six (6) months of return shall irrevocably revert to Reorganized Allied Holdings and shall be retained and held as set forth in the Reorganized Governing Documents. Upon such reversion, the claim of any Holder or their successors with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

**8.9**    Distributions to Holders as of the Record Date.   All Distributions on Allowed Claims shall be made to the Record Holders of such Claims. As of the close of business on the Record Date, the Claims register maintained by the Claims Agent shall be closed, and there shall be no further changes in the Record Holder of any Claim. The Reorganized Debtors and any Disbursing Agent shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. The Reorganized Debtors shall instead be entitled to recognize and deal for all purposes under this Plan with the Record Holders as of the Record Date.  As of the close of business on the Confirmation Date, the transfer ledgers for the Prepetition Notes shall be deemed closed and the Indenture Trustee may take whatever action is necessary to close the transfer ledgers and there shall be no further transfers or changes in the holder of record of such securities in such

transfer ledgers.  The Disbursing Agent and the Indenture Trustee shall have no obligation to recognize the transfer of, or sale of any participation in, any Prepetition Notes Claim that occurs after close of business on the Confirmation Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Confirmation Date.  PLEASE NOTE THAT IF YOU ACQUIRE A CLAIM FOLLOWING THE RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF THAT CLAIM FROM THE DEBTORS.   IN ADDITION, IF YOU SELL OR TRANSFER YOUR CLAIM BEFORE THE RECORD DATE, YOU WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF THAT CLAIM.

Notwithstanding Bankruptcy Rule 3001(d) and (e) or any other applicable provisions of the Bankruptcy Code, the Bankruptcy Rules or other applicable law, from and after the Record Date, Holders of Class 4A, Class 4B and Class 4C Claims, and those Class 4D Claims who receive New Allied Holdings Common Stock under the Plan (if any), will not be permitted to transfer, sell, assign, hypothecate or pledge their claims except that they may be assigned or transferred by will, intestate succession, or operation of law.  Any purported transfer, sale, assignment, hypothecation or pledge that is made in derogation of the previous sentence will not be recognized by the Debtors or the Reorganized Debtors and will be null and void for all purposes.  Holders of Allowed Class 4A, Class 4B, Class 4C and Class 4D who receive New Allied Holdings Common Stock will not be permitted to transfer, sale, assign, hypothecate or pledge such shares except (i) transfers and assignments by will, intestate succession or operation of law, (ii) transfers, assignment and sales permitted by the Stockholders' Agreement, or (iii) to the extent permitted by the Stockholders' Agreement, transfers effectuated through a national securities exchange if the stock is listed on such an exchange pursuant to section 7.10 of the Plan.  Notwithstanding the foregoing, pursuant to the terms of the Plan, Holders of General Unsecured Claims, Insured Claims and Other Insured Claims who receive the Cash Option shall be permitted to assign and deemed to have assigned their General Unsecured Claims, Insured Claims and/or Other Insured Claims (without giving effect to any Voluntary Reductions) to Yucaipa or Yucaipa's designees.

**8.10**    Indenture Trustee as Claim Holder.   Consistent with Bankruptcy Rule 3003(c), the Debtors or Reorganized Debtors shall recognize the Proofs of Claim filed by the Indenture Trustee, in the amounts as Allowed herein, in respect of the Prepetition Notes Claims.   Accordingly, any Claim, proof of which is filed by the registered or beneficial holder of a Prepetition Notes Claim, may be disallowed as duplicative of the Claims of the Indenture Trustee without need for any further action or Bankruptcy Court order.

**8.11**    De Minimis Distributions.   Neither the Reorganized Debtors nor the Indenture Trustee shall have an obligation to make a Distribution if the amount to be distributed to the specific Holder of the Allowed Claim has a value less than fifty dollars ($50.00).  Any Holder of an Allowed Claim on account of which the amount of Cash to be distributed is less than fifty ($50.00) dollars will have its claim for such distribution discharged and will be forever barred from asserting any such claim against the

Reorganized Debtors or their respective property. Any Cash not distributed pursuant to this Section 8.10 will be the property of Reorganized Allied Holdings, free of any restrictions thereon, and any such Cash held by a Third Party Disbursing Agent will be returned to Reorganized Allied Holdings.

8.12    Fractional Securities, Fractional Dollars.  Any other provision of this Plan notwithstanding, payments of fractions of shares of New Common Stock will not be made and shall be deemed to be zero. Any other provision of this Plan notwithstanding, the Reorganized Debtors shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

8.13    Procedures for Distributions to Holders of Prepetition Notes Claims. Unless waived by the Reorganized Debtors, as a condition to receiving payments or other distributions, Distributions to Holders of Prepetition Notes Claims shall only be made to such Holders after the surrender by each such Holder of the Prepetition Notes, and/or similar or related documents representing such Claims, or in the event that such certificate or similar document is lost, stolen, mutilated or destroyed, upon the holder's compliance with the requirements set forth in this Plan.  Any Holder that fails to: (i) surrender such instrument or (ii) execute and deliver an affidavit of loss and/or indemnity, reasonably satisfactory to the Reorganized Debtors and furnish a bond in form, substance and amount reasonably satisfactory to the Reorganized Debtors within one (1) year of the Effective Date, shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution under the Plan in respect of such Claims.

8.14    Distributions of Cash to Holders of Allowed Class 4D Claims.   The Reorganized Debtors, or such Third Party Disbursing Agents as the Reorganized Debtors may employ in their sole discretion, will make all Distributions of Cash from the Cash Out Distribution to Holders of Allowed Class 4D Claims only after all Class 4D Claims have been Allowed or disallowed by agreement or Final Order.  Any amount of the Cash Out Distribution remaining after making such Distributions shall be returned to Yucaipa.

8.15    Compliance with Tax Requirements.The Debtors or the Reorganized Debtors, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting requirements. The Debtors or the Reorganized Debtors shall be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

(2)    Notwithstanding any other provision of the Plan, each Entity receiving a distribution of Cash or New Common Stock pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such distribution, including income, withholding and other tax obligations.

**8.16** No Duplicate Distributions. To the extent more than one Debtor is liable for any Claim, such Claim shall be considered a single Claim and entitled only to the payment provided therefor under the applicable provisions of the Plan.

**8.17** Distributions in U.S. Dollars. Except as otherwise specified herein, Cash payments made pursuant to the Plan shall be in U.S. currency by checks drawn on a domestic bank selected by the applicable Debtor or Reorganized Debtor or, at the option of the applicable Debtor or Reorganized Debtor, by wire transfer from a domestic bank. If an Allowed Claim is filed in a currency other than U.S. dollars, distributions will be made to the holder of such Allowed Claim utilizing the exchange rate on or about the time of distribution.

# ARTICLE IX.
## PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS

**9.1** Objections to Claims. All objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Deadline, and (a) if Filed prior to the Effective Date, such objections shall be served on the parties on the then applicable service list in the Chapter 11 Cases; and (b) if Filed after the Effective Date, such objections shall be served on the Reorganized Debtors, the United States Trustee and Yucaipa. If an objection has not been Filed to a proof of Claim or a scheduled Claim by the Claims Objection Deadline, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. An objection is deemed to have been timely Filed as to all Tort Claims, thus making each such Claim a Disputed Claim as of the Claims Objection Deadline. Each such Tort Claim shall remain a Disputed Claim until it becomes an Allowed Claim in accordance with Section 9.5.

**9.2** Authority to Prosecute Objections. After the Effective Date, except as provided in the following paragraph or otherwise in the Plan, only the Reorganized Debtors shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, provided, however, that the Reorganized Debtors shall not be entitled to object to Claims (i) that have been Allowed by a Final Order entered by the Bankruptcy Court prior to the Effective Date or (ii) that are Allowed by the express terms of this Plan. After the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; provided that (a) the Reorganized Debtors shall promptly File with the Bankruptcy Court a written notice of any settlement or compromise of a Claim that results in an Allowed Claim in excess of $500,000 and (b) the United States Trustee and Yucaipa shall be authorized to contest the proposed settlement or compromise by Filing a written objection with the Bankruptcy Court and serving such objection on the Reorganized Debtors within 20 days of the service of the settlement notice. If no such objection is Filed, the applicable settlement or compromise shall be deemed final without further action of the Bankruptcy Court.

Except as set forth herein, notwithstanding that the Reorganized Debtors shall have the right to File objections to Claims and Interests, litigate and settle objections to

Disputed Claims and Disputed Interests on behalf of the Debtors and their Estates, nothing contained herein shall be deemed to obligate the Reorganized Debtors to take any such actions, all of which shall be determined by the Reorganized Debtors in their sole and absolute discretion.

THE PLAN PROPONENTS HAVE NOT FULLY REVIEWED THE CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES OR DETERMINED WHETHER OBJECTIONS TO CLAIMS AND INTERESTS EXIST.  THIS INVESTIGATION IS ONGOING AND WILL OCCUR, IN LARGE PART, AFTER THE CONFIRMATION DATE.  AS A RESULT, CREDITORS AND OTHER PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THAT THE EXISTENCE OF ANY PARTICULAR OBJECTION TO A DISPUTED CLAIM OR DISPUTED INTEREST MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THIS PLAN, AN OBJECTION TO A CLAIM OR INTEREST MAY BE BROUGHT AGAINST ANY CREDITOR, INTEREST HOLDER OR PARTY-IN-INTEREST AT ANY TIME, SUBJECT TO THE CLAIMS OBJECTION DEADLINE.  IN ADDITION TO THE FOREGOING, THE DEBTORS AND REORGANIZED DEBTORS RETAIN AND HEREBY RESERVE THE RIGHT TO OBJECT TO

(i) ANY CLAIMS OR INTERESTS FILED AFTER THE BAR DATE; AND

(ii) ANY CLAIMS FILED TO SET FORTH DAMAGES ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OR OTHER AGREEMENT WITH THE DEBTORS.

IN ADDITION, THE DEBTORS AND REORGANIZED DEBTORS RESERVE THE RIGHT TO BRING ANY RETAINED ACTION AGAINST ANY THIRD PARTY ARISING FROM OR RELATING TO ANY EVENT, ACTION OR OMISSION OCCURRING ON OR PRIOR TO THE EFFECTIVE DATE.   THE PLAN PROPONENTS HAVE NOT FULLY REVIEWED ALL SUCH CAUSES OF ACTION (INCLUDING WITHOUT LIMITATION ANY AVOIDANCE ACTION OR RETAINED ACTION).  AS A RESULT, CREDITORS AND OTHER PARTIES- IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THAT THE EXISTENCE OF ANY PARTICULAR LITIGATION OR AFFIRMATIVE CLAIM MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THIS PLAN, SUCH LITIGATION OR AFFIRMATIVE CLAIM MAY BE BROUGHT AGAINST ANY CREDITOR, INTEREST HOLDER OR PARTY-IN-INTEREST AT ANY TIME.

**9.3**    No Distributions Pending Allowance.  Except as otherwise provided herein, no Distributions will be made with respect to any portion of a Claim unless and until (i) the Claims Objection Deadline has passed and no objection to such Claim has been filed, or (ii) any objection to such Claim has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.

**9.4**    Estimation of Claims.  Yucaipa, the Debtors or the Reorganized Debtors, as the case may be, and the Creditors' Committee (to the extent still in existence at such time) may, at any time, request that the Bankruptcy Court estimate any contingent or

unliquidated Claim pursuant to Section 502 of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (and after the Effective Date, the Reorganized Debtors) may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

**9.5**    **Distributions After Allowance.**    As soon as practicable after (i) the occurrence of the applicable Claims Objection Deadline, if no objection to such Claim has been timely filed, or (ii) the Disputed Claim becomes an Allowed Claim, the Reorganized Debtors, with respect to all Distributions will distribute to the Holder thereof all Distributions to which such Holder is then entitled under this Plan. In the event that the New Common Stock being held for Distribution with respect to a Claim is greater than the Distribution that is made to a Holder once the Claim becomes entitled to a Distribution, the excess remaining New Common Stock will revert to and be irrevocably retained by the Reorganized Debtors; the voting of such retained shares will be governed by the Amended Organization Documents for the applicable Reorganized Debtor. All Distributions made under this Article of this Plan will be made together with any dividends, payments, or other Distributions made on account of, as well as any obligations arising from, the distributed property as if such Claim had been an Allowed Claim on the dates Distributions were previously made to Allowed Holders included in the applicable Class.

**9.6**    Intentionally Omitted.

**9.7**    **Claims Covered by Insurance Policy.**    To the extent a Claim (other than a Workers' Compensation Claim which shall be treated in accordance with Section 3.3 of the Plan) is asserted for liability that is covered, in whole or in part, by any insurance policy or related agreement of the Debtors ("Insured Claim"), the Holder of such Claim may continue to pursue the Claim against the Reorganized Debtors solely for the purpose of liquidating such Claim; provided, however, that in accordance with the terms of the applicable insurance policies, related agreements and the Plan, the Reorganized Debtors (on behalf of the Debtors) or the insurer, as applicable, may employ counsel, direct the defense, and determine whether and on what terms to settle any such Claim.    Once the Claim is determined to be valid by agreement or court order, then the Claim shall be an Allowed Insured Claim in the amount set forth in such order or agreement.    Subject to applicable policy terms, conditions, endorsements and applicable non-bankruptcy law, the Holder of such Allowed Insured Claim will be entitled to: (i) a Distribution under the Plan only to the extent of: (a) any unpaid or unexhausted deductible or self-insured retention under the applicable insurance policies or related agreements; and (b) any

amount in excess of the limit of coverage provided by any applicable insurance policy or related agreement; and (ii) a recovery under the applicable insurance policy of the amount of such Allowed Insured Claim that is in excess of the deductible or self-insured retention but subject to the limit of coverage provided by such applicable insurance policy or related agreement.

**ARTICLE X.**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND THE EFFECTIVE DATE OF THE PLAN**

**10.1**    Conditions to Confirmation.  The following are conditions precedent to Confirmation of this Plan that must be (i) satisfied or (ii) waived in accordance with Section 10.3 below:

(1)    The Bankruptcy Court shall have approved the Disclosure Statement with respect to this Plan in form and substance that is acceptable to Yucaipa, and reasonably acceptable to the Debtors and the Creditors' Committee.

(2)    The Confirmation Order shall be in form and substance satisfactory to Yucaipa, and reasonably acceptable to the Debtors and the Creditors' Committee, shall have been signed by the Bankruptcy Court and shall have been entered on the docket of the Chapter 11 Cases.

(3)    The Plan shall be in form and substance satisfactory to Yucaipa, and reasonably acceptable to the Debtors and the Creditors' Committee.

(4)    The Plan Supplement and the Exhibits hereto (as confirmed or approved by the Confirmation Order) shall be in form and substance satisfactory to Yucaipa (after consultation with the Debtors and the Creditors' Committee).

(5)    The Debtors shall have obtained a written commitment for Exit Financing in form and substance satisfactory to Yucaipa (after consultation with the Debtors and the Creditors' Committee).

(6)    The Debtors and TNATINC shall have entered into agreements and/or the Bankruptcy Court shall have entered orders, each in form and substance satisfactory to Yucaipa and TNATINC in their respective sole discretion (which shall not have been vacated or stayed), providing individually or in combination for approval of modified collective bargaining agreements in form and substance satisfactory to each of the Plan Proponents.

**10.2**    Conditions to the Effective Date.  The following are conditions precedent to the Effective Date that must be (i) satisfied or (ii) waived in accordance with Section 10.3 below:

(1)    All conditions to Confirmation of this Plan set forth in Section 10.1 shall remain satisfied.

59

(2)     Each order of the Bankruptcy Court referred to in Section 10.1 shall have become a Final Order.

(3)     The Confirmation Order and supporting findings of fact and conclusions of law shall be entered by the Bankruptcy Court in form and substance reasonably acceptable to each of the Plan Proponents and the Creditors' Committee and shall have become a Final Order.

(4)     All documents and agreements to be executed on the Effective Date or otherwise necessary to implement this Plan (including documents relating to the Exit Financing Facility) shall be in form and substance that is acceptable to Yucaipa (after consultation with the Creditors' Committee) and reasonably acceptable to the Debtors, except as otherwise specifically provided herein.

(5)     The closing and initial funding shall have occurred under the Exit Financing Facility and all conditions precedent to the consummation thereof (other than the occurrence of the Effective Date of the Plan) shall have been waived or satisfied in accordance with the terms thereof.

(6)     The Debtors and the Plan Proponents shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement this Plan and that is required by law, regulation, or order (collectively, the "Authorizations"), and such Authorizations shall not have been revoked.

(7)     The New Common Stock shall have been issued in accordance with the Plan.

(8)     All other actions, documents and agreements necessary to implement the Plan as of the Effective Date shall have been delivered and all conditions precedent thereto shall have been satisfied or waived.

(9)     All corporate and other proceedings to be taken by the Debtors in connection with the Plan and Plan Supplement and the consummation of the transactions contemplated thereby and by the Plan and all documents incident thereto shall have been completed in form and substance reasonably satisfactory to Yucaipa (after consultation with the Debtors and the Creditors' Committee), and Yucaipa shall have received all such counterpart originals or certified or other copies of the Plan and documents contemplated by the Plan and such other documents as they may reasonably request.

(10)     No event, condition or circumstance shall have occurred or arisen from the date the Plan is filed through the Effective Date which has had or could reasonably be expected to have or give rise to a Material Adverse Effect.

(11)     Subsequent to the Confirmation Date, there shall be no threatened or pending suit, action, investigation, inquiry or other proceeding by or before any court of competent jurisdiction (excluding the Chapter 11 Cases or any other proceeding

disclosed by the Debtors to Yucaipa in writing prior to the hearing on the approval of the Disclosure Statement) which is likely to have a Material Adverse Effect.

(12)    The Effective Date shall have occurred prior to six months after the Confirmation Date.

(13)    The Initial Board shall have been elected or appointed as of the Effective Date, and the directors' and officers' liability insurance shall be available to the members of the Initial Board on terms reasonably satisfactory to Yucaipa and the Creditors' Committee.

(14)    The members of the IBT shall have approved or ratified modified collective bargaining agreements in form and substance satisfactory to the Debtors, Yucaipa (after consultation with the Creditors' Committee) and TNATINC.

(15)    All waiting periods imposed by applicable law (including, without limitation, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable) in connection with the consummation of the Plan and transactions contemplated thereby shall have expired or been terminated without any action having been taken by any court of competent jurisdiction restraining, preventing or imposing materially adverse conditions upon such transactions, and the Debtors and Yucaipa shall have received all material regulatory approvals required for the consummation of the Plan and the transactions contemplated thereby and for the Reorganized Debtors to continue to carry on their businesses without material change, each of which approvals shall have become final.

(16)    All other actions and documents necessary to implement the treatment of Claims and Interests set forth in this Plan shall have been effected or executed or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

(17)    A Final Order acceptable to Yucaipa approving the Equipment Financing Facility and the Equipment Purchase Agreement shall have been entered by the Bankruptcy Court and the transactions contemplated thereby and all documents incident thereto shall have been completed in form and substance acceptable to Yucaipa.

**10.3**    Waiver of Conditions.  The conditions to Confirmation of the Plan set forth in Section 10.1 or the Effective Date set forth in Section 10.2 may be waived, in whole or in part, by Yucaipa without any notice to any other parties in interest or the Bankruptcy Court and without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan; provided, however, that Yucaipa may not waive the conditions set forth in Sections 10.1(6) or 10.2(14) without the prior express written consent of TNATINC; provided further that Yucaipa will not waive a condition that expressly is subject to consultation with the Debtors or the Creditors' Committee without first consulting with the Debtors or the Creditors' Committee.  Neither the Debtors, TNATINC nor the Creditors' Committee have the authority to waive any condition to the Confirmation Date or the Effective Date absent the express written consent of Yucaipa.  The failure to satisfy or waive any

condition to the Confirmation Date or the Effective Date may be asserted by the Plan Proponents in their respective sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Plan Proponents). The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time. Notwithstanding anything in the Plan to the contrary, if any condition, pleading, document or order is required to be acceptable to Yucaipa and reasonably acceptable to the Debtors and/or the Creditors' Committee, and it is acceptable to Yucaipa, but the Debtors and/or the Creditors' Committee, in the exercise of their respective fiduciary duties, find it unacceptable, the sole remedy of the Debtors and/or the Creditors' Committee, as applicable, shall be an entitlement to withdraw their respective support for the Plan. Thereafter, and notwithstanding any such withdrawal, Yucaipa may proceed unabated with Confirmation and consummation of the Plan.

**10.4** Intentionally Deleted.

**10.5** Effect of Failure of Conditions. In the event that all of the conditions to the Effective Date are not satisfied or waived within six months following entry of the Confirmation Order: (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged (except to the extent of any payments made after entry of the Confirmation Order but prior to the Effective Date) and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors.

**10.6** Order Denying Confirmation. If an order denying confirmation of the Plan is entered by the Bankruptcy Court, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors, (b) prejudice in any manner the rights of the holder of any Claim against, or Interest in, the Debtors, (c) prejudice in any manner any right, remedy or Claim of the Debtors, or (d) be deemed an admission against interest by the Debtors, Yucaipa, TNATINC or the Creditors' Committee.

## ARTICLE XI.
## EFFECT OF PLAN ON CLAIMS AND INTERESTS

**11.1** Revesting of Assets. Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in each of the Debtors that owned such property or interest in property as of the Petition Date, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security holders, except as specifically provided in

this Plan. As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

    **11.2**    Discharge of Claims and Termination of Interests.

Except as otherwise provided in the Plan or the Confirmation Order: (i) on the Effective Date, each Reorganized Debtor shall be deemed discharged and released from all Claims and Interests, including, but not limited to, demands, liabilities, Claims and Interests that arose before the Effective Date and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (A) a proof of Claim or proof of Interest based on such debt or Interest is Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code, (B) a Claim or Interest based on such debt or Interest is Allowed pursuant to Section 502 of the Bankruptcy Code, (C) the holder of a Claim or Interest based on such debt or Interest has accepted the Plan or (D) such Claim is listed in the Schedules; and (ii) all Persons shall be precluded from asserting against each Reorganized Debtor, its successors, or its assets or properties any other or further Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. Except as otherwise provided in the Plan or the Confirmation Order, upon the occurrence of the Effective Date, the Confirmation Order shall act as a discharge of any and all Claims against and all debts and liabilities of the Reorganized Debtors, as provided in Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment against each Reorganized Debtor at any time obtained to the extent that it relates to a discharged Claim or terminated Interest.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests against the property of any Estate shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns.

    **11.3**    Cancellation of Claims and Interests.

Except with respect to Reinstated Claims, and except for purposes of evidencing a right to distributions under the Plan or otherwise provided hereunder, on the Effective Date, all agreements and other documents evidencing the Claims or rights of any holder of a Claim against the Debtors, including all notes, guarantees, mortgages, and all Interests and any options or warrants to purchase Interests, obligating the Debtors to issue, transfer or sell Interests or any other capital stock of the Debtors, shall be canceled. As of the Effective Date, all Old Common Stock shall be canceled. Notwithstanding the foregoing, on and after the Effective Date, the Prepetition Notes Indenture shall continue in effect solely for the purposes of allowing the Indenture Trustee to enforce the

indemnity provisions of the Prepetition Note Indenture, to make the Distributions to be made on account of Prepetition Notes Claims under this Plan and, to the extent necessary, enforce the Indenture Trustee Charging Lien, after which point the Prepetition Notes Indenture shall be cancelled and discharged.

**11.4**     Release by Debtors of Certain Parties.

(A)  **EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN, PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, AS OF THE EFFECTIVE DATE, ON THE EFFECTIVE DATE, THE DEBTORS AND REORGANIZED DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION, WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES (OTHER THAN THE RIGHTS OF THE DEBTORS OR REORGANIZED DEBTORS TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, REORGANIZED DEBTORS, THE PARTIES RELEASED PURSUANT TO THIS SECTION 11.4, THE CHAPTER 11 CASES, THE PLAN OR THE DISCLOSURE STATEMENT, AND THAT COULD HAVE BEEN ASSERTED BY OR ON BEHALF OF THE DEBTORS OR THEIR ESTATES OR THE REORGANIZED DEBTORS, WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR IN ANY REPRESENTATIVE OR ANY OTHER CAPACITY, AGAINST (I) THE CURRENT DIRECTORS, OFFICERS AND EMPLOYEES OF THE DEBTORS (OTHER THAN FOR MONEY BORROWED FROM OR OWED TO THE DEBTORS BY ANY SUCH DIRECTORS, OFFICERS OR EMPLOYEES AS SET FORTH IN THE DEBTORS' BOOKS AND RECORDS) AND THE DEBTORS' FORMER OR CURRENT ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH PERSON;  (II) THE CREDITORS' COMMITTEE AND ITS CURRENT AND FORMER MEMBERS (SOLELY IN SUCH CAPACITY) THE INDENTURE TRUSTEE, ITS AND THEIR RESPECTIVE ADVISORS (INCLUDING ANY FORMER OR CURRENT ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER PROFESSIONALS RETAINED BY SUCH PERSONS); AND (III) YUCAIPA AND TNATINC AND EACH OF THEIR RESPECTIVE AFFILIATES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, MEMBERS, MANAGERS AND ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS, ACCOUNTANTS AND OTHER**

PROFESSIONALS RETAINED BY SUCH PERSONS) EXCEPT CLAIMS ARISING IN THE ORDINARY COURSE OF THE DEBTORS' BUSINESS WITH RESPECT TO EMPLOYEE MATTERS, INCLUDING WITHOUT LIMITATION ORDINARY COURSE UNION GRIEVANCES WHICH SHALL BE RESOLVED AS SET FORTH IN COLLECTIVE BARGAINING AGREEMENT BETWEEN THE DEBTORS AND THE IBT (THOSE ENTITIES IN SUBSECTIONS (I) THROUGH (III) OF THE PRECEDING SENTENCE SHALL BE REFERRED TO AS THE "DEBTOR RELEASEES"). NOTWITHSTANDING THE FOREGOING, NOTHING IN THE PLAN SHALL RELEASE ANY DEBTOR RELEASEE OTHER THAN THE PLAN PROPONENTS FROM ANY CLAIMS ASSERTED BY THE DEBTORS THAT ARE THE SUBJECT OF A PENDING LITIGATION, ADVERSARY PROCEEDING OR OTHER CONTESTED MATTER OR JUDGMENT AS OF THE EFFECTIVE DATE.

(B)   ENTRY   OF   THE   CONFIRMATION   ORDER   SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASES SET FORTH HEREIN, WHICH INCLUDE BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASES; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS (C) FAIR, EQUITABLE AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY OTHER PERSON ACTING ON BEHALF OF THEM ASSERTING ANY CLAIM RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE DEBTOR RELEASEES OR THEIR RESPECTIVE PROPERTY.   NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS  SECTION,    THE  RELEASE  OF  THE  DEBTORS'  OFFICERS, DIRECTORS AND EMPLOYEES  SET FORTH ABOVE SHALL BE OF NO FORCE AND EFFECT IN FAVOR OF ANY OFFICER, DIRECTOR OR EMPLOYEE WHO ASSERTS ANY PRE-EFFECTIVE DATE CLAIM AGAINST THE DEBTORS OR REORGANIZED DEBTORS FOR [INDEMNIFICATION][3], DAMAGES OR ANY OTHER CAUSES OF ACTION OTHER THAN FOR UNPAID COMPENSATION, WAGES OR BENEFITS THAT AROSE IN THE ORDINARY COURSE OF BUSINESS OR PURSUANT TO THE KERP APPROVED BY THE BANKRUPTCY COURT BY FINAL ORDER.

11.5    Release by the Debtors of the Original DIP Lenders and DIP Lenders. PURSUANT TO SECTION 1123(b)(3) OF THE BANKRUPTCY CODE, AS OF

---

[3] The text in brackets remains subject to additional discussion among the Plan Proponents and may be modified or deleted prior to Confirmation.

THE EFFECTIVE DATE OF THIS PLAN, EACH OF THE DEBTORS AND EACH OTHER CREDIT PARTY (AS DEFINED BY THE DIP LOAN FACILITY), IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION FOR AND ON BEHALF OF THEIR RESPECTIVE ESTATES, SHALL RELEASE AND DISCHARGE AND BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED EACH AND EVERY ORIGINAL DIP LENDER AND DIP LENDER, AND EACH OF THEIR RESPECTIVE PRESENT OR FORMER MEMBERS, PARTNERS, OFFICERS, DIRECTORS, EMPLOYEES, ADVISORS, ATTORNEYS, REPRESENTATIVES, FINANCIAL ADVISORS, INVESTMENT BANKERS OR AGENTS AND ANY OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "RELEASED LENDERS") FOR AND FROM ANY AND ALL CLAIMS, OBLIGATIONS, LIABILITIES, LOSSES, EXPENSES OR CAUSES OF ACTION OF ANY KIND OR NATURE WHATSOEVER EXISTING AS OF THE EFFECTIVE DATE OF THIS PLAN AND HOWSOEVER ARISING, INCLUDING BUT NOT LIMITED TO IN ANY MANNER ARISING FROM, BASED ON OR RELATING TO, IN WHOLE OR IN PART, THE ORIGINAL DIP CREDIT DOCUMENTS, THE ORIGINAL DIP LOAN FACILITY, THE DIP CREDIT DOCUMENTS OR THE DIP LOAN FACILITY, THE PREPETITION LOAN FACILITY, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED LENDER, OR ANY ACT OR OMISSION RELATED TO THE CHAPTER 11 CASES OR THIS PLAN. THE REORGANIZED DEBTORS SHALL BE BOUND, TO THE SAME EXTENT THE DEBTORS ARE BOUND, BY ALL OF THE RELEASES SET FORTH HEREIN.

**11.6**    Release by Holders of Claims and Interests.

(1)    **EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN, ON THE EFFECTIVE DATE, (a) EACH PERSON THAT VOTES TO ACCEPT THIS PLAN OR IS PRESUMED TO HAVE VOTED FOR THIS PLAN PURSUANT TO SECTION 1126(f) OF THE BANKRUPTCY CODE; (b) EACH PERSON WHO OBTAINS A RELEASE UNDER THE PLAN; AND (c) TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AS SUCH LAW MAY BE EXTENDED OR INTERPRETED SUBSEQUENT TO THE EFFECTIVE DATE, EACH ENTITY (OTHER THAN A DEBTOR), THAT HAS HELD, HOLDS OR MAY HOLD A CLAIM OR INTEREST (EACH, A "RELEASE OBLIGOR"), IN CONSIDERATION FOR THE OBLIGATIONS OF YUCAIPA, THE DEBTORS AND THE REORGANIZED DEBTORS UNDER THIS PLAN AND THE CASH, NEW COMMON STOCK, AND OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS TO BE DELIVERED IN CONNECTION WITH THIS PLAN, SHALL HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED EACH PARTY RELEASED IN SECTIONS 11.4 AND 11.5 HEREOF FROM ANY CLAIM OR RETAINED**

**ACTION EXISTING AS OF THE EFFECTIVE DATE ARISING FROM, BASED ON OR RELATING TO, IN WHOLE OR IN PART, THE SUBJECT MATTER OF, OR THE TRANSACTION OR EVENT GIVING RISE TO, THE CLAIM OF SUCH RELEASE OBLIGOR, AND ANY ACT, OMISSION, OCCURRENCE OR EVENT IN ANY MANNER RELATED TO SUCH SUBJECT MATTER, TRANSACTION OR OBLIGATION; PROVIDED, HOWEVER, THAT NOTHING IN THE PLAN WILL RESTRICT ANY GOVERNMENTAL OR REGULATORY AGENCY FROM PURSUING ANY REGULATORY OR POLICE ENFORCEMENT ACTION AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THEIR CURRENT OR FORMER OFFICERS, DIRECTORS OR EMPLOYEES, AND THEIR RESPECTIVE AGENTS, ADVISORS, ATTORNEYS AND REPRESENTATIVES ACTING IN ANY CAPACITY, OTHER THAN ANY ACTION OR PROCEEDING OF ANY TYPE TO RECOVER MONETARY CLAIMS, DAMAGES, OR PENALTIES AGAINST THE DEBTORS FOR AN ACT OR OMISSION OCCURRING PRIOR TO CONFIRMATION.**

**11.7**    Releases Reasonable; Bankruptcy Court's Exclusive Jurisdiction Related Thereto.  The Plan Proponents believe the releases set forth in the Plan are reasonable and appropriate given the extraordinary facts and circumstances of these cases.  The releases and injunctions provided in Sections 11.4, 11.5 and 11.6 of the Plan are supported by the consideration provided hereunder. Any action brought against any party receiving a release hereunder for any matter or thing related to the Chapter 11 Cases or the Plan must be brought in Bankruptcy Court.

**11.8**    Setoffs.  The Debtors may, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such Holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

**11.9**    Exculpation and Limitation of Liability.   The Plan Proponents, the Creditors' Committee, the present and former members of the Creditors' Committee in their capacities as such, the Indenture Trustee, in its capacity as such, and the Released Lenders, and any of such parties' respective current and/or post-Petition Date and pre-Effective Date affiliates, members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur, and are hereby released from, any claim, obligation, cause of action, or liability to one another or to any Holder of any Claim or Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation and filing of this Plan, the provision of post-petition financing, the filing of the Chapter 11 Cases, the settlement of claims or renegotiation of executory contracts and leases, the pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be

distributed under this Plan, except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan (collectively, the "Exculpated Claims"). No Holder of any Claim or Interest, or other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Plan Proponents, the Creditors' Committee, the present and former members of the Creditors' Committee in their capacities as such, the Indenture Trustee, in its capacity as such, and the Released Lenders, and any of such parties' respective current and/or post-Petition Date and pre-Effective Date affiliates, members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns with respect to the Exculpated Claims.

**11.10** Injunction.   The Confirmation Order will permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including but not limited to the Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Sections 11.4, 11.5 and 11.6 of the Plan; provided, however, that nothing in this Plan will restrict any governmental or regulatory agency from pursuing any regulatory or police enforcement action against the Debtors, the Reorganized Debtors, their current or former officers, directors or employees, and their respective agents, advisors, attorneys and representatives acting in any capacity, other than any action or proceeding of any type to recover monetary claims, damages or penalties against the Debtors for an act or omission occurring prior to confirmation.

**11.11** Effect of Confirmation.

(1) <u>Binding Effect</u>.  On the Confirmation Date, the provisions of this Plan shall be binding on the Debtors, the Estates, all Holders of Claims against or Interests in the Debtors, and all other parties-in-interest whether or not such Holders are Impaired and whether or not such Holders have accepted this Plan.

(2) <u>Effect of Confirmation on Automatic Stay</u>.  Except as provided otherwise in this Plan, from and after the Effective Date, the automatic stay of Section 362(a) of the Bankruptcy Code shall terminate.

(3) <u>Filing of Reports</u>.  The Reorganized Debtors shall file all reports and pay all fees required by the Bankruptcy Code, Bankruptcy Rules, U.S. Trustee guidelines, and the rules and orders of the Bankruptcy Court.

(4) <u>Post-Confirmation Date Retention of Professionals</u>.  Upon the Confirmation Date, any requirement that professionals comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors may employ and pay professionals in the ordinary course of business.

**ARTICLE XII.**
**RETENTION AND SCOPE OF JURISDICTION OF THE BANKRUPTCY COURT**

**12.1**    Retention of Jurisdiction.  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will have or retain jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction for the following purposes:

(1)    To allow, disallow, determine, liquidate, classify, subordinate, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including, the resolution of any request for payment of any Administrative Expense Claim, the resolution of any objections to the allowance, classification or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to Reinstate or render Unimpaired a Claim or Interest pursuant to the Plan, as well as the approval of the Indenture Trustee Fees and Expenses, to the extent of any dispute between the Indenture Trustee and the Plan Proponents;

(2)    To establish a date or dates by which objections to Claims must be filed to the extent not established herein;

(3)    To establish the amount of any reserve required to be withheld from any distribution under this Plan on account of any disputed, contingent or unliquidated claim.

(4)    To resolve all matters related to the rejection, and assumption and/or assignment of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom including any Cure Amount Claims;

(5)    To hear and rule upon all Retained Actions, Avoidance Actions and other Causes of Action commenced and/or pursued by the Debtors and/or the Reorganized Debtors;

(6)    To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny applications involving the Debtors that may be pending on the Effective Date or brought thereafter;

(7)    To hear and rule upon all applications for Professional Compensation;

(8)    To modify the Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code, modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order

or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate or carry out the intent and purpose the Plan; provided, however, that without the consent of TNATINC and Yucaipa, there shall be no modification of the Collective Bargaining Agreement between the Debtors and the IBT, as assumed and assigned pursuant to the terms of the Plan.

(9)    To enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, as well as to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(10)    To issue injunctions, enforce the injunctions contained in the Plan and the Confirmation order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(11)    To enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

(12)    To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including the Distribution of funds from the Estates and the payment of claims;

(13)    To resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(14)    To determine any suit or proceeding brought by the Debtors and/or the Reorganized Debtors to recover property under any provisions of the Bankruptcy Code;

(15)    To determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes; and to determine and declare any tax effects under this Plan;

(16)    To determine any matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(17)   To determine any other matters as may be authorized by or under the provisions of the Bankruptcy Code; and

(18)   To enter a Final Decree closing the Chapter 11 Cases.

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction.  If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including without limitation the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**12.2**   Alternative Jurisdiction.  In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then the District Court shall hear and determine such matter. If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.

**12.3**   Final Decree.  The Bankruptcy Court may, upon application of the Reorganized Debtors at any time after 120 days after the Confirmation Date, enter a final decree in these cases, notwithstanding the fact that additional funds may eventually be distributed to parties in interest. In such event, the Bankruptcy Court may enter an Order closing these cases pursuant to Section 350 of the Bankruptcy Code, provided, however, that: (a) the Reorganized Debtors shall continue to have the rights, powers, and duties set forth in this Plan; (b) any provision of this Plan requiring the absence of an objection shall no longer be required, except as otherwise ordered by the Bankruptcy Court; and (c) the Bankruptcy Court may from time to time reopen the Chapter 11 Cases if appropriate for any of the following purposes: (1) administering Assets; (2) entertaining any adversary proceedings, contested matters or applications the Debtors have brought or bring with regard to the liquidation of Assets and the prosecution of Causes of Action; (3) enforcing or interpreting this Plan or supervising its implementation; or (4) for other cause.

# ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

**13.1**   Modification of the Plan.  Yucaipa, after consultation with the Debtors and before the Effective Date, the Creditors' Committee, reserves the right in accordance with Section 1127 of the Bankruptcy Code to modify, alter or amend this Plan at any time before its substantial consummation; provided, however, that any such modification, alteration or amendment does not negatively impact the amended terms of the Collective Bargaining Agreement with the IBT, as described in Exhibit G to the Disclosure Statement.  Subject to the limitations contained herein, Yucaipa may modify, alter or amend this Plan in accordance with this paragraph, before or after confirmation, without notice or hearing, or after such notice and hearing as the Bankruptcy Court deems appropriate, if the Bankruptcy Court finds that the modification, alteration or amendment does not materially and adversely affect the rights of any parties in interest which have

71

not had notice and an opportunity to be heard with regard thereto. In the event of any modification, alteration or amendment on or before confirmation, any votes to accept or reject this Plan shall be deemed to be votes to accept or reject this Plan as modified, unless the Bankruptcy Court finds that the modification, alteration or amendment materially and adversely affects the rights of parties in interest which have cast said votes.

**13.2** Revocation of the Plan. The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation does not occur or if the Plan does not become effective, then the Plan shall be null and void, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors; (b) constitute an admission of any fact or legal conclusion by the Plan Proponents or any other Entity; or (c) prejudice in any manner the rights of the Plan Proponents or any other party, including the Creditors' Committee, in any related or further proceedings.

**13.3** Exemption From SEC Registration. The issuance of New Common Stock shall be made pursuant to Section 1145 of the Bankruptcy Code and shall be exempt from registration. Except with respect to securities held by any entity that is an "underwriter" as that term is defined in section 1145(b) of the Bankruptcy Code, the securities to be issued in reliance upon the exemption set forth in section 1145 of the Bankruptcy Code shall be freely tradeable subject to any restrictions in the Stockholders' Agreement.

**13.4** Exemption from Securities Laws. The entry of the Confirmation Order shall be (1) a final determination of the Bankruptcy Court that the New Common Stock authorized, issued or distributed pursuant to this Plan, is entitled to all of the benefits and exemptions provided by Section 1145 of the Bankruptcy Code, (2) a final determination of the Bankruptcy Court that the New Common Stock is entitled to the exemptions from federal and state securities registration available under Section 4(2) of the Securities Act of 1933, as amended, Rule 701 and/or Regulation D of the Securities and Exchange Commission, and similar provisions of state securities law, and (3) deemed to incorporate the provisions of this Article XIII as mixed findings of fact and conclusions of law. Notwithstanding anything in this section to the contrary, the tradeability of New Allied Holdings Common Stock may be restricted under the terms of any Stockholders' Agreement.

**13.5** Initial Offer and Sale Exempt from Registration. Section 5 of the Securities Act and any State or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer or underwriter or broker or dealer in, a security, do not apply to the offer or sale of any New Common Stock in accordance with the Plan.

**13.6** Applicable Law. Unless a rule of law or procedure is supplied by (i) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (ii) an express choice of law provision in any agreement, contract, instrument or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan

and any agreements, contracts, documents and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflict of laws thereof.

**13.7** **Plan Supplement.** The Plan Supplement will contain forms of the (a) Reorganized By-Laws, (b) Reorganized Governing Documents, (c) Registration Rights Agreement, (d) Stockholders' Agreement, (e) Management Services Agreement and (f) proposed Confirmation Order. The Plan Supplement shall be in form and substance satisfactory to each of the Plan Proponents and shall be filed with the Bankruptcy Court seven (7) days prior to the Voting Deadline. Notwithstanding the foregoing, subject to any express limitations set forth herein, the Plan Proponents may amend the Plan Supplement and any attachments thereto, through and including the Confirmation Date, so long as such amendments are satisfactory in form and substance to the Plan Proponents and the Creditors' Committee (except with respect to those documents where the Plan grants the Creditors' Committee only the right of consultation).

**13.8** **Filing or Execution of Additional Documents.** On or before the Effective Date, the Plan Proponents shall File or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**13.9** **Withholding and Reporting Requirements.** In connection with the Plan and all instruments issued in connection therewith and distributions thereon, to the extent applicable and except as provided in the Plan, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions thereunder shall be subject to any such withholding and reporting requirements.

**13.10** **Waiver of Rule 62(a) of the Federal Rules of Civil Procedure.** The Plan Proponents may request that the Confirmation Order include (a) a finding that Rule 62(a) of the Federal Rules of Civil Procedure shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after the entry of the Confirmation Order.

**13.11** **Allocation of Plan Distributions between Principal and Interest.** To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

**13.12** **Dissolution of Creditors' Committee.** On the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released and discharged from any further duties and

responsibilities in the Chapter 11 Cases and under the Bankruptcy Code. The Professionals retained by the Creditor's Committee and the members thereof will not be entitled to assert any claim for any services rendered or expenses incurred after the Effective Date, except for reasonable services rendered and expenses incurred in connection with the consummation of the Plan and any applications for allowance of compensation and reimbursement of expenses of Creditors' Committee members or professionals pending on the Effective Date or Filed and served after the Effective Date pursuant to Section 4.2.

13.13 Preparation of Estates' Returns and Resolution of Tax Claims. The Debtors or Reorganized Debtors shall file all tax returns and other filings with governmental authorities and may file determination requests under Section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority. The Reorganized Debtors are hereby authorized to request an expedited determination under Section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through and including the Effective Date.

13.14 Headings. The headings of the Articles and the Sections of this Plan have been used for convenience only and shall not limit or otherwise affect the meaning thereof.

13.15 Confirmation of Plans for Separate Debtors. In the event the Plan Proponents are unable to confirm this Plan with respect to all Debtors, the Plan Proponents reserve the right, unilaterally and unconditionally, to proceed with this Plan with respect to any Debtor for which the confirmation requirements of the Bankruptcy Code are met.

13.16 No Admissions; Objection to Claims. Notwithstanding anything herein or in the Disclosure Statement to the contrary, nothing contained herein or in the Disclosure Statement shall be deemed to be an admission by any Plan Proponent with respect to any matter set forth herein including, without limitation, liability on any Claim or Interest or the propriety of the classification of any Claim or Interest. The Plan Proponents are not bound by any statements herein or in the Disclosure Statement as judicial admissions.

13.17 Survival of Settlements. Except as specifically set forth in the Plan, all Bankruptcy Court-approved settlements shall survive consummation of the Plan.

13.18 No Waiver. Neither the failure of a Debtor to list a Claim in the Debtor's Schedules, the failure of a Debtor to object to any Claim or Interest for purposes of voting, the failure of a Reorganized Debtor to object to a Claim, Administrative Expense Claim or Interest prior to the Confirmation Date or the Effective Date, the failure of a Debtor to assert a Retained Action prior to the Confirmation Date or the Effective Date, the absence of a proof of Claim having been filed with respect to a Claim, Administrative Expense Claim, Interest or Retained Action other than a legally effective express waiver or release shall be deemed a waiver or release of the right of a Debtor or its successors, before or after solicitation of votes on the Plan or before or after the Confirmation Date or

the Effective Date to (a) object to or examine such Claim, Administrative Expense Claim or Interest, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Retained Action.

**13.19**  No Bar to Suits.  Neither this Plan nor confirmation hereof shall operate to bar or estop the Debtors or Reorganized Debtors from commencing any Retained Action, or any other legal action against any Holder of a Claim or Interest or any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal Entity, whether such Retained Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Retained Action, or any other legal action was disclosed in any Disclosure Statement filed by the Debtors in connection with this Plan or whether or not any payment was made or is made on account of any Claim.

**13.20**  Successors and Assigns.  The rights, benefits and obligations of any Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**13.21**  Severability of Plan Provisions.  If prior to Confirmation any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Plan Proponents, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**13.22**  Post-Effective Date Effect of Evidences of Claims or Interests.  Notes, bonds, stock certificates and other evidences of Claims against or Interests in the Debtors, and all instruments of the Debtors (in either case, other than those executed and delivered as contemplated hereby in connection with the consummation of the Plan), shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Plan.

**13.23**  Conflicts.  In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, the terms of this Plan shall govern.

**13.24**  Exhibits/Schedules.  All exhibits and schedules to this Plan and the Disclosure Statement, including, without limitation, the Plan Supplement, and all attachments thereto, are incorporated into and are a part of this Plan as if set forth in full herein.

13.25   No Injunctive Relief.   Except as otherwise provided in the Plan or Confirmation Order, no Holder of a Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable, or other prospective relief with respect to such Claim or Interest.

13.26   Rounding.   All amounts set forth herein, including, without limitation, with respect to shares, dollar amounts and percentages, shall be subject to rounding and other immaterial changes.

13.27   Saturday, Sunday or Legal Holiday.   If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13.28   Entire Agreement.   This Plan (together with the Exhibits and schedules hereto and the Plan Supplement) sets forth the entire agreement and undertaking relating to the subject matter hereof and supersedes all prior discussions and documents.   The Debtors' Estates shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein.

13.29   Service of Certain Exhibits.   Any party in interest may view the Plan, Disclosure Statement, and all Exhibits thereto at the following website: www.administar.net/allied.   Copies are also available upon request to Debtors' or the Plan Proponents' respective counsel.   Please direct such requests to: Harris B. Winsberg, Troutman Sanders LLP, Bank of America Plaza, 600 Peachtree Street, NE, Suite 5200, Atlanta, Georgia 30308, (404)885-3000, fax: (404) 885-3900.

13.30   Service of Documents.   Any pleading, notice or other document required by the Plan or Confirmation Order to be served on or delivered to the Debtors, the Reorganized Debtors, Yucaipa, TNATINC, the Creditors' Committee or the DIP Lenders must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

| **The Debtors** | **The Creditors' Committee** |
|---|---|
| Ezra H. Cohen, Esq. | Jonathan B. Alter, Esq. |
| Jeffrey W. Kelley, Esq. | William F. Govier, Esq. |
| Harris B. Winsberg, Esq. | Richard H. Agins, Esq. |
| Troutman Sanders LLP | Bingham McCutchen LLP |
| 600 Peachtree Street, N.E. - Suite 5200 | One State Street |
| Atlanta, Georgia 30308 | Hartford, CT 06105 |
| Facsimile No.: (404) 885-3900 | Facsimile No.: (860) 240-2818 |

| **The DIP Lenders** | **TNATINC** |
|---|---|
| Peter J. Neckles, Esq.<br>D.J. Baker, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>Four Times Square<br>New York, NY 10036<br>Facsimile No.: (212) 735-2000 | Frederick Perillo, Esq.<br>Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C.<br>1555 N. River Center Dr., Suite 202<br>Milwaukee, WI 53212<br>Facsimile No.: (414) 271-6308 |
| **Yucaipa and the Reorganized Debtors** | |
| Robert A. Klyman, Esq.<br>Latham & Watkins LLP<br>633 West Fifth Street, Suite 4000<br>Los Angeles, CA 90071<br>Facsimile No.: (213) 891-8763 | |

Dated this 6th day of April, 2007.

Allied Holdings, Inc., as agent and attorney-in fact for each of the Debtors

By: /s/ Thomas H. King_____
Name:  Thomas H. King
Title:  Executive Vice President and Chief
         Financial Officer

Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP

By: /s/   Robert P. Bermingham_____
Name:  Robert P. Bermingham
Title:  Vice President

Teamsters National Automobile Transportation Industry Negotiating Committee

By: /s/   Fred Zuckerman_____
Name:  Fred Zuckerman
Title:  Co-Chair of TNATINC

# EXHIBIT B

# TERMS OF EXIT FINANCING

# INTENTIONALLY DELETED

# SEE DOCKET ENTRY NOS. 2649, 2683 AND 2704

# EXHIBIT C

## *PRO FORMA* FINANCIAL PROJECTIONS

**ALLIED HOLDINGS INC., AND SUBSIDIARIES**
**PROJECTED CONSOLIDATED INCOME STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31,**

As of March 23, 2007

| | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| *$000s unless otherwise indicated)* | | | | |
| **NUMBER OF UNITS HAULED** | 6,929,309 | 7,081,146 | 6,893,857 | 6,806,398 |
| **TOTAL REVENUE** | $ 827,581 | $ 876,228 | $ 878,487 | $ 883,470 |
| **OPERATING EXPENSES** | | | | |
| Salaries & Wages | 401,478 | 399,616 | 401,440 | 406,281 |
| Operating Supplies & Expenses | 171,989 | 170,772 | 168,996 | 169,243 |
| Purchased Transportation | 108,482 | 109,861 | 112,085 | 113,317 |
| Rents | 7,608 | 7,265 | 9,207 | 10,125 |
| Insurance & Claims | 37,680 | 40,244 | 40,514 | 41,129 |
| Operating Taxes & Licenses | 26,883 | 27,828 | 27,651 | 27,803 |
| Depreciation & Amortization | 31,568 | 37,991 | 41,570 | 46,112 |
| Communications & Utilities | 6,119 | 6,270 | 6,486 | 6,669 |
| Other Operating Expenses | 7,111 | 7,398 | 7,700 | 7,931 |
| Total Operating Expenses | 798,919 | 807,247 | 815,649 | 828,610 |
| **OPERATING INCOME** | 28,662 | 68,981 | 62,838 | 54,860 |
| **OTHER (INCOME) EXPENSE** | | | | |
| Interest (Income) | (5,016) | (4,879) | (4,895) | (4,881) |
| Interest Expense | 25,100 | 26,736 | 25,786 | 25,432 |
| Restructuring Costs | 7,811 | - | - | - |
| Total Other (Income) Expense | 27,894 | 21,857 | 20,891 | 20,551 |
| **INCOME BEFORE INCOME TAXES** | 767 | 47,124 | 41,948 | 34,309 |
| **CASH INCOME TAXES** | $ 402 | $ 986 | $ 744 | $ 574 |
| **NET INCOME** | $ 365 | $ 46,138 | $ 41,204 | $ 33,734 |
| **ADJUSTED EBITDA** | $ 60,230 | $ 106,972 | $ 104,409 | $ 100,972 |

*Subject to the following  Notes & Selected Key Assumptions*

## NOTES & SELECTED KEY ASSUMPTIONS

Subject to disclaimers set forth in the Disclosure Statement.

Readers should refer to www.alliedholdings.com or www.sec.com for the Company's public disclosures and financial filings

Not prepared in accordance with generally accepted accounting standards and unaudited.

Does not include the eventual impact of *fresh start accounting*, which the Company expects to be required to adopt on emergence.

Allied Automotive Group comprises approximately 97% of the revenues of the Company and the assumptions described relate thereto.

Revenue is forecast based upon number of units expected to be hauled (units hauled) assuming that the Company will be successful in retaining its exisiting book of business and in maintaining its existing fuel surcharge, payment, and other significant business terms.

The Number of Units Hauled is derived from data provided by a third-party industry forecasting service.

The revenue reflected in the projections includes the Company's current view of the amount of improvements to customer pricing that it may obtain from certain of its customers, as well as pricing assumptions for certain periods beyond the scope of the current discussions with customers. However, at this time, the amount of pricing improvements where there is an agreement in principle between the Company and its customers is less than the amount included in the projections by approximately $ 3.9 million in 2007, $ 23.4 million in 2008, $ 37.5 million in 2009 and $ 43.9 million in 2010, all cumulative. The actual amount of improvement to customer pricing (which will be included in the revenue of the Company) remains subject to ongoing negotiations and there is no guarantee the Company will achieve either the amount set forth in the projections or the amounts which have been verbally agreed to at this stage. The Plan Proponents reserve the right to supplement these projections at or prior to the Confirmation Hearing to reflect any developments in customer negotiations that occur after the date hereof.

Labor costs forecast using the terms contained in Exhibit G to the Disclosure Statement.

The projections assume an Effective Date of June 1, 2007. The actual date of the Debtor's emergence from Chapter 11 will depend on various factors, including the date of the Confirmation Hearing and the satisfaction of various conditions to the Effective Date. In the event the Effective Date does not occur by June 1, 2007, the Company presently believes that its projections may be adversely impacted by increased labor costs for the Company's employees represented by the International Brotherhood of Teamsters in the United States, which will reduce annual EBITDA by $ 2.7 million in 2007, $ 4.8 million in 2008, $ 4.6 million in 2009 and $ 4.7 million in 2010.

Fleet repair, maintenance, and depreciation costs are forecast based upon the assumption that the Company will be successful in acquiring a substantial number of used rigs near the effective date of the Plan.

Assumes the Company makes investments of $70 million per year on capital expenditures, on average, during the first five (5) years after emergence.

Forecast included estimated cash taxes and assumes substantial realization of the Company's US net operating loss (deferred tax accounting is not used herein).  The ability to utilize net operating losses and the timing of such use will ultimately be determined by future events.

Case 12-50530-CSS    Doc 721-8   Filed 05/06/20   Page 350 of 564

# EXHIBIT D

## LIQUIDATION ANALYSIS

# EXHIBIT D

## ALLIED HOLDINGS, INC.

## LIQUIDATION ANALYSIS

### 1.  General

**The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of the Debtors. The analysis is based upon a number of significant assumptions which are described. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

The chapter 7 liquidation period is assumed to average six to twelve months following the appointment of a chapter 7 trustee.  Estimates were made of the cash proceeds which might be realized from the liquidation of the Debtors' assets. For certain assets, estimates of liquidation were made for each asset individually. For other assets, such as fixtures and equipment, liquidation values were assessed for general classes of assets by estimating the percentage recoveries which the Debtors might achieve through their disposition.

Underlying the liquidation analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies beyond the control of the Debtors or a chapter 7 trustee. Additionally, various liquidation decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the Debtors' assets will result in an accurate estimate of the proceeds which would be realized were the Debtors to undergo an actual liquidation. The actual amounts of claims against the estate could vary significantly from the Debtors' estimate, depending on the claims asserted during the pendency of the chapter 7 case. This liquidation analysis does not include liabilities that may arise as a result of litigation, certain new tax assessments or other potential claims. This analysis also does not include potential recoveries from avoidance actions. No value was assigned to additional proceeds which might result from the sale of certain items with intangible value. Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided herein.

The liquidation analysis set forth below was based on the estimated and unaudited book values of the Debtors' assets on 01/31/07. Management of the Debtors does not believe that more current historical information or projected information would vary significantly. However, this analysis is subject to any changes due to the Debtors' continued operation. The book values used were obtained from the Debtors' projected financial statements and accounting records. These values have not been subject to any review, compilation or audit by any independent accounting firm.

**2. Cash**

Consists of all cash in banks or operating accounts and is assumed to be fully recoverable.

**3. Accounts Receivable, net**

Net Accounts Receivable primarily consists of various customer and trade receivables related to vehicle-hauling, logistics and other support services for the automotive industry. Estimated proceeds realized from accounts receivable under a liquidation are based upon management's assessment of the Debtors' ability to collect those receivables taking into consideration the composition of accounts receivable and the impacts that any supply interruption to customers as a result of a chapter 7 would likely have on the recovery of those receivables.

**4. Inventories**

Inventories consist primarily of fuel, parts and supplies for servicing the Company's tractors and trailers and are recorded at the lower cost or market. New/unused parts and supplies are assumed to receive a minimal recovery. Based on management's estimates, the blended recovery for inventory is projected to be 15% to 53%.

**5. Prepaid Expenses**

Prepaid Expenses consist primarily of prepaid insurance, licenses and tax. Management has reviewed the individual components of this category and has estimated that Prepaid Expenses recoveries would be partially returned and has the blended recovery value of 22% to 44%.

**6. Fixed Assets, net**

Net Fixed Assets consist of land and improvements, buildings and improvements, rolling stock, machinery and equipment, office, furniture and fixtures and leasehold improvements. The liquidation recovery on the rolling stock was based on ranges representing an orderly (assuming a six- to twelve-month time period for such) and forced liquidation (at a 20% discount to the orderly liquidation value), reflecting management's best estimate as well as review of other materials available to the Company, including third party reports. The value of the rolling stock has been updated by management to reflect additional purchases or dispositions, depreciation and an estimated expense for marshalling costs. The liquidation recovery on real estate was based on ranges representing an orderly (assuming a six- to twelve-month time period period for such) and forced liquidation (at a 10% discount to the orderly liquidation value), reflecting management's best estimate as well as review of other materials available to the Company, including third party reports, less value for properties already sold and currently owed taxes associated with the properties.

**7. Intangible Assets, net**

Net Intangible Assets primarily represent deferred financing costs due related to previous restructurings and are estimated to have no liquidation recovery value.

**8. Other Assets, net**

Net Other Assets primarily consist of security deposits, prepayments to workers compensation, prepaid pension asset, prepaid rent, utility and maintenance, and are estimated to have a blended recovery value of 39% to 44%.

**9. Excess Insurance Collateral**

Consists of amounts of cash collateral and letters of credit in excess of related liabilities (booked reserves) for the Debtors' various insurance policies. This coverage includes the Haul Insurance Limited captive insurance entity and the policies collateralized under the SIP revolving credit facility (the Ryder policy, the AIG auto insurance policy and the self-insured states policies). The Trustee would sell the collateral with the liabilities and/or manage the liabilities over time, harvesting collateral when possible.

**10. Chapter 7 Trustee Fees**

Compensation for the chapter 7 trustee will be limited to fee guidelines in section 326 of the Bankruptcy Code. For purposes of this analysis, management has assumed trustee fees of 3% of the proceeds recovered from non-cash assets in the liquidation.

**11. Other Professional Fees**

During the liquidation period, it will be necessary for the Debtors' estate to engage the services of various professionals to assist in the estates liquidation including, but not necessarily limited to, counsel, accountants, financial advisors, real estate brokers and auctioneers.

**12. Debtor in Possession Credit Facility**

The DIP Credit Facility Claims are estimated to be approximately $201,077,000 as of 01/31/07, comprised of principal, accrued interest outstanding under the Debtors' DIP Credit Facility and letters of credit that would be called upon in a liquidation. The projected hypothetical recoveries for the DIP Credit Facility Claims are based on the repayment priority provisions of the loan. The DIP Credit Facility documents carve out $1,500,000 for post petition administrative expenses including professional fees.

**13. Post-Petition Chapter 11 Administrative Claims**

Administrative and priority claims may include, without limitation, post-Petition fees associated with the Company's retained advisors, accrued wages and benefits and payables owed to vendors providing goods and services during the Debtors' reorganization cases. The Administrative Claims associated with liquidation are estimated to be approximately $48,800,000. Neither Miller Buckfire nor management have attempted to estimate potential additional Administrative Claims that would likely arise as a result of the termination of the Debtors' employment contracts, the rejection of remaining executory contracts and leases, and the failure of the Debtors to perform under existing contracts with its customers. Such claims would likely result from a cessation of operations as contemplated herein. Based upon the Liquidation Analysis and its related assumptions, no proceeds would be available for distribution to holders of Administrative Claims beyond the $1,500,000 DIP carveout.

**14. General Unsecured Claims**

General Unsecured Claims include claims related to the 8.625% Senior Notes, unsecured trade vendors as well as other unsecured creditors.  This Liquidation Analysis makes no attempt to estimate potential additional General Unsecured Claims that would likely arise as a result of the termination of the Debtors' employment contracts, the rejection of remaining executory contracts and leases, and the failure of the Debtors to perform under existing contracts with its customers. Such claims would likely result from a cessation of operations as contemplated herein.  Based upon the Liquidation Analysis and its related assumptions, no proceeds would be available for distribution to holders of General Unsecured Claims.

**15. MEPPAA Withdrawal Claims**

The Debtors' withdrawal from multi-employer pension plans due to its ceasing operations may generate yet-to-be-determined liabilities.  Based upon the Liquidation Analysis and its related assumptions, no proceeds would be available for distribution to holders of MEPPAA withdrawal claims.

**ALLIED HOLDINGS, INC.**
**LIQUIDATION ANALYSIS**
**(USD in MMs)**

| Proceeds from Liquidation | Note References | Projected BV as of 1/31/07 (unaudited) | Midpoint Estimated Liquidation Value | % Estimated Recovery |
|---|---|---|---|---|
| **Liquidation of US Assets** | | | | |
| Cash and Equivalents | 2 | $6.2 | $6.2 | 100.0% |
| Accounts Receivable, Net | 3 | 39.1 | 34.7 | 88.7% |
| Inventories | 4 | 4.7 | 1.6 | 33.7% |
| Prepaid Expenses | 5 | 20.4 | 6.8 | 33.2% |
| Fixed Assets, net | 6 | 127.6 | 108.2 | 84.8% |
| Intangible Assets, net | 7 | 3.5 | | |
| Other Assets, net | 8 | 18.9 | 7.8 | 41.3% |
| Insurance Overcollateralization | 9 | 35.2 | 22.9 | 65.0% |
| Gross Proceeds | | $255.7 | $188.1 | 73.6% |
| | | | | |
| **Less:** | | | | |
| Chapter 7 Trustee Fees | 10 | | ($5.6) | |
| Other Professionals | 11 | | (3.9) | |
| Total | | | ($9.5) | |
| | | | | |
| **Total Proceeds Available for Distribution** | | | $178.6 | |
| | | | | |
| | | | | |
| **Allocation of Proceeds** | 12 | | | |
| **Less: DIP Credit Facility** | | | | |
| DIP Credit Facility Revolver | | $44.7 | $44.7 | 100.0% |
| DIP Credit Facility L/C Balance | | 40.0 | 40.0 | 100.0% |
| DIP Credit Facility Term A | | 20.0 | 20.0 | 100.0% |
| DIP Credit Facility Term B | | 85.7 | 67.3 | 78.5% |
| DIP Credit Facility Term C | | 10.6 | 5.1 | 48.2% |
| Total DIP Credit Facility Claims | | $201.1 | $177.1 | 88.1% |
| **Total Proceeds Remaining** | | | $1.5 | |
| | | | | |
| **Less: Post-Petition Chapter 11 Administrative Claims** | 13 | | | |
| Post-petition Accounts Payable - Trade | | $22.9 | $1.5 | 6.6% |
| Post-petition Rejection and Damage Claims | | N/A | - | - |
| Accrued Wages and Benefits | | 25.9 | - | - |
| Total Administrative Claims | | $48.8 | $1.5 | 3.1% |
| **Total Proceeds Remaining** | | | - | |
| | | | | |
| Less: Priority Tax Claims | | $2.4 | - | - |
| **Total Proceeds Remaining** | | | - | |
| | | | | |
| **Less: General Unsecured Claims** | 14 | | | |
| 8.625% Senior Notes | | $150.0 | - | - |
| Accounts Payable | | 24.9 | - | - |
| Other General Unsecured Claims | | 19.7 | - | - |
| Total General Unsecured Creditors | | $194.6 | - | - |
| **Total Proceeds Remaining** | | | - | |
| | | | | |
| Less: MEPPAA Withdrawal Claims | 15 | N/A | - | - |
| | | | | |
| **Total Proceeds Remaining** | | | - | |

# EXHIBIT E

# YUCAIPA'S REORGANIZED VALUE ANALYSIS

# VALUATION OF THE REORGANIZED DEBTORS

*Introduction*
In conjunction with formulating the Plan, the Plan Proponents have determined that it is appropriate to estimate a post-confirmation going concern value for the Reorganized Debtors (the "Estimated Reorganized Debtors' Enterprise Value"). Accordingly, the Plan Proponents (other than the Debtors) directed FTI Consulting, Inc. ("FTI") to prepare such a valuation. The valuation is being prepared solely by FTI at such direction. The Debtors have not adopted this valuation and reserve their right to file a supplement.

*Valuation*
FTI estimates the Estimated Reorganized Debtors' Enterprise Value to be between approximately $110 million to $160 million based on current circumstances. Because the Plan contemplates certain operational savings, a secondary analysis was undertaken to gauge the pro forma impact of certain labor and customer pricing concessions on the estimated Enterprise Value of the reorganized company, and resulted in a prospective value range of $175 million to $303 million. The values are based upon information available to, and analyses undertaken by, FTI as of March 8, 2007 (and as supplemented by information provided by the Debtors through March 26, 2006). This reorganization enterprise value (ascribed as of March 8, 2007) reflects, among other factors discussed below, current financial market conditions and the inherent uncertainty today as to the achievement of the financial projections, which are set forth below in "Financial Projections."

The foregoing valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, uncertainty of achieving the forecasts reflected in the financial projections, the amount of available cash, market conditions, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. The estimates of value represent hypothetical enterprise values of the Reorganized Debtors on a going concern basis, and do not purport to reflect or constitute liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.

In preparing the Estimated Reorganized Debtors' Enterprise Value, FTI: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, including the Financial Projections relating to their businesses and prospects; (c) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (d) reviewed the Financial Projections; (e) reviewed publicly available financial data and considered the market values of public companies deemed

generally comparable to the operating businesses of the Debtors; (f) reviewed publicly available financial data and considered the value of publicly available transactions that occurred in industries deemed comparable to the industry in which the Debtors operate their businesses; (g) considered certain economic and industry information relevant to the Debtors' operating businesses; (h) visited certain of the Debtors' facilities; and (i) conducted such other analyses as FTI deemed appropriate. Although FTI conducted a review and analysis of the Debtors' businesses, operating assets and liabilities and business plans, FTI relied on the accuracy and completeness of all: (i) financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and (ii) publicly available information. No independent evaluations or appraisals of the Debtors' assets were sought or were obtained in connection therewith.

In performing its analysis, FTI used discounted cash flow, comparable public companies trading multiples and comparable transaction multiples methodologies. These valuation techniques reflect both the market's current view of the Debtors' strategic initiatives and operations, as well as a longer-term focus on the intrinsic value of the Financial Projections associated with Debtor's current strategic initiatives. The valuation multiples used by FTI to arrive at the going concern value of the Debtors' business were based on the public market valuation of selected public companies and public transactions deemed generally comparable to the operating businesses and industry of the Debtors and general capital market conditions. In selecting such comparable companies and transactions, FTI considered factors such as the focus of the comparable companies' businesses, assets and capital structures as well as such companies' operating performance relative to the Debtors and the turnaround required for the Debtors to perform as projected.

An estimate of total enterprise value is not entirely mathematical, but rather it involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, management's projections set forth herein are not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, neither the Debtors, FTI, nor any other person assumes responsibility for their accuracy. Depending on the results of the Debtors' operations or changes in the financial markets, FTI's valuation analysis as of the Effective Date may differ from that disclosed herein.

# EXHIBIT E-1

# DEBTORS' REORGANIZED VALUE ANALYSIS

**Valuation of Reorganized AHI**

At the request of the Debtors, Miller Buckfire performed a valuation analysis of Reorganized AHI. Based on advice from Miller Buckfire, the Debtors estimate the total enterprise value of Reorganized AHI to be between approximately $350 million to $425 million, with a value of $388 million as the midpoint as of an assumed Effective Date of May 31, 2007. Based upon the total enterprise value of Reorganized AHI's business and an assumed total debt of approximately $206 million, unrestricted cash on hand of $2 million, the range of equity values for Reorganized AHI would be approximately $146 million to $221 million. The proportion of that equity value available to stakeholders will depend on a variety of factors including, but not limited to, capital contributions anticipated by the Financial Projections for the acquisition of used rigs and whether certain tort liabilities will be settled for post-reorganized equity. This analysis was based on the Debtors' Financial Projections, including improvements to customer pricing that it may obtain from ongoing discussions with certain customers, as well as current market conditions and statistics. The values are based upon information available to, and analyses undertaken by, Miller Buckfire as of March 29, 2007. The foregoing reorganization equity value (ascribed as of the date of this Disclosure Statement) reflects, among other factors discussed below, current financial market conditions and the inherent uncertainty as to the achievement of the Financial Projections.

The foregoing valuations are based on a number of assumptions, including a successful reorganization of the Debtors' finances in a timely manner, the achievement of the forecasts reflected in the Financial Projections, the availability of certain tax attributes, the outcome of certain expectations regarding market conditions, and the Plan becoming effective in accordance with its terms. The estimates of value represent hypothetical total enterprise values of Reorganized AHI as the continuing operator of its business and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business such as the Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.

In preparing a range of the estimated total enterprise value of Reorganized AHI and the going concern value of the Debtors' business, Miller Buckfire: (i) reviewed certain historical financial information of the Debtors; (ii) reviewed certain financial and operating data of the Debtors, including financial and operational Financial Projections developed by management relating to its business and prospects; (iii) met with certain members of senior management of the Debtors to discuss operations and future prospects; (iv) reviewed the Financial Projections as prepared by the Debtors; (v) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating business of the Debtors; (vi) considered certain economic and industry information relevant to the operating business; and (vii) conducted such other analyses as Miller Buckfire deemed appropriate. Although Miller Buckfire conducted a review and analysis of the Debtors' business, operating assets and liabilities and business plan, Miller Buckfire assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and publicly available information. In addition, Miller Buckfire did not independently verify the assumptions underlying the Financial Projections in connection with such valuation. No independent evaluations or appraisals of the Debtors' assets were sought or were obtained in connection therewith.

In performing its analysis, Miller Buckfire used discounted cash flow and comparable public companies trading multiples methodologies. These valuation techniques reflect both the market's current view of the Debtors' business plan and operations, as well as a longer-term focus on the intrinsic value of the cash flow Financial Projections in the Debtors' business plan. The valuation multiples and discount rates used by Miller Buckfire to arrive at the going concern value of the Debtors' business were based on the public market valuation of selected public companies deemed generally comparable to the operating businesses of the Debtors and general capital market conditions. In selecting such comparable companies, Miller Buckfire considered factors such as the focus, profitability, growth and risks of the comparable companies' businesses and capital structures as well as such companies' current and projected operating performance relative to the Debtors.

An estimate of total enterprise value is not entirely mathematical, but rather it involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, none of AHI, Miller Buckfire or any other person assumes responsibility for their accuracy. Depending on the results of the Debtors' operations or changes in the financial markets, Miller Buckfire's valuation analysis as of the Effective Date may differ from that disclosed herein.

In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Debtors' history in chapter 11, conditions affecting the Debtors' competitors or the industry generally in which the Debtors participate or by other factors not possible to predict. Accordingly, the total enterprise value estimated by Miller Buckfire does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets. The value ascribed in the analysis does not purport to be an estimate of the post reorganization market trading value. Such trading value may be materially different from the total enterprise value ranges associated with Miller Buckfire's valuation analysis. Indeed, there can be no assurance that a trading market will develop for the new securities issued pursuant to the reorganization.

Furthermore, in the event that the actual distributions to Holders of Claims differ from those assumed by the Debtors in their recovery analysis, the actual recoveries realized by Holders of Claims could be significantly higher or lower than estimated by the Debtors.

Case 05-12515-drn    Doc 2802    Filed 04/06/07    Entered 04/06/07 15:19:49    Desc Main
Document    Page 233 of 248

# EXHIBIT F

## PRE-EFFECTIVE DATE CORPORATE ORGANIZATIONAL STRUCTURE OF THE DEBTORS



Allied Holdings, Inc. and
Subsidiaries
as of 7/31/2006

# EXHIBIT G

## TERMS OF LABOR DEAL

**ALLIED HOLDINGS, INC.**
**TERM SHEET FOR PLAN OF REORGANIZATION**
**PROPOSED BY YUCAIPA AND THE TEAMSTERS NATIONAL AUTOMOBILE**
**TRANSPORTERS INDUSTRY NEGOTIATING COMMITTEE**

This term sheet is prepared for the purpose of facilitating discussion of a possible restructuring of Allied Holdings, Inc. ("Allied") and its affiliated debtors (collectively with Allied, the "Debtors") whose chapter 11 cases are pending before the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"). The term sheet sets forth certain major terms of a possible restructuring, but additional terms and conditions, material to the transaction, are not set forth herein. This term sheet is not, and should not be deemed, a solicitation for votes on a plan of reorganization containing the terms outlined herein. This term sheet is being provided in furtherance of settlement discussions, and is entitled to the protection from use or disclosure afforded by Federal Rule of Evidence 408 and any similar applicable rule of evidence. The plan of reorganization will contain the following classes of claims and treatment for creditors in those classes. Yucaipa reserves the right to modify the treatment of such classes as long as such modification does not conflict with the terms and conditions of Exhibit A hereto. Except as expressly set forth herein, all distributions will be made on the effective date of the plan of reorganization (the "Plan").

## I. UNCLASSIFIED CLAIMS

### A. Allowed Administrative Claims.

1. *General.* Except as set forth below, administrative claims shall be paid in full in cash on the later of (a) 60 days after such claims are allowed or (b) the effective date of the Plan.

2. *Statutory Claims.* All fees payable pursuant to 28 U.S.C. Section 1930 shall be paid in full in cash.

3. *Professional Claims.* Professionals shall file final fee applications within 60 days after the effective date. Promptly after allowance, professional fees shall be paid in full in cash.

4. *Ordinary Course Liabilities.* Ordinary course liabilities (other than tax claims) shall be paid in cash when due.

5. *Postpetition Tax Claims.* Postpetition tax claims shall be filed on the later of (a) 60 days after the effective date or (b) 120 days after the filing of a tax return with the applicable governmental unit, and shall be paid in full in cash promptly after allowed.

6. *Yucaipa Claims for Substantial Contribution.* The Plan shall constitute a motion for approval of payment of claims of Yucaipa for substantial contribution as a result of, among other things, the negotiation, drafting and consummation of the Plan and arrangement of

financing. Such claims shall be payable in cash on the effective date of the Plan. The amount of such allowed claims shall be equal to Yucaipa's fees and expenses (including fees of Yucaipa's professionals) incurred in connection with the foregoing.

B. <u>Priority Tax Claims</u>. Holders of Allowed priority tax claims shall either (a) be paid in full in cash on the effective date or (b) receive deferred cash payments over six (6) years plus interest at a fixed rate of 4%.

C. <u>DIP Loan Facility</u>. The DIP Loan Facility shall be paid in full in cash on the Effective Date.

II.  CLASSIFIED CLAIMS AND INTERESTS

A. <u>Class 1 et seq.; Allowed Other Secured Claims</u>. Each secured creditor shall be in a Class by itself. Each holder of an Allowed Class 1A, 1B, etc. Secured Claim shall receive either (1) reinstatement of its legal, equitable and contractual rights, (2) the collateral securing the claim, (3) other treatment rendering the claim unimpaired or (4) such other treatment rendering the claim impaired. Yucaipa will file a list of Allowed Other Secured Claims and proposed treatment of such claims on or before 5 days before the voting deadline on the Plan.

B. <u>Class 2, Allowed Priority Non-Tax Claims</u>. Each holder of a Class 2 claim shall receive either (1) reinstatement of its legal, equitable and contractual rights, (2) the collateral securing the claim or (3) other treatment rendering the claim unimpaired.

C. <u>Class 3, Allowed Worker Compensation Claims</u>. The Debtors' worker compensation programs that were in effect on the date of filing of the chapter 11 cases (the "Petition Date") shall remain in full force and effect and worker compensation claims shall be paid in full in cash from the proceeds of the applicable insurance (or self-insurance) program maintained by the Debtors.

D. <u>Class 4A, Allowed General Unsecured Claims</u>. Each holder of a Class 4A general unsecured claim will receive a pro-rata share of the stock of Reorganized Allied. Any deficiency claim of a Class 1 Other Secured Claim that is not reinstated shall be classified within Class 4A.

E. <u>Class 4B, Allowed Insured Claims</u>. Class 4B claims are tort claims excluding any worker compensation claims, products liability claims or tort claims asserted against GACS Incorporated ("GACS") and/or Commercial Carriers, Inc. ("CCI"). Each holder of a Class 4B claim will receive the same treatment as each holder of a Class 4A claim; provided, that the maximum allowed amount of any Class 4B claim shall be limited to an amount equal to the applicable self-insured retention or deductible under the relevant insurance policy plus the amount by which the Class 4B claim exceeds the total coverage available from the relevant insurance policies of the Debtors.

F. <u>Class 4C, Allowed Other Insured Claims</u>. Class 4C claims are tort claims against GACS and/or CCI. Each holder of a Class 4C claim will receive the same treatment as each

2

Case 12-50530-CSS    Doc 721-8    Filed 05/06/20    Page 367 of 564

holder of a Class 4A claim; provided, that the maximum allowed amount of any Class 4C claim shall be limited to an amount equal to the applicable self-insured retention or deductible under the relevant insurance policy plus the amount by which the Class 4C claim exceeds the total coverage available from the relevant insurance policies of the Debtors.

I.    Class 5. Allowed Intercompany Claims.  No Debtor shall receive any distribution on account of its claims against the other Debtors.

J.    Class 6A. Allowed Equity Interests in Allied.  Holders of equity interests in Allied (including without limitation stock, warrants and options) shall not receive any distribution on account of their equity interests and, on the effective date, such equity interests shall be canceled.

K.    Class 6B. Allowed Equity Interests in Affiliated Debtors.  Each Reorganized Debtor (other than Reorganized Allied) shall issue new equity to its corporate parent on the Effective Date of the Plan.

III.    MEANS FOR IMPLEMENTATION OF PLAN

A.    Substantive Consolidation of Claims for Plan Purposes Only.  The Debtors will be substantively consolidated for the limited purpose of distributions to holders of all claims and equity interests except for Other Secured Claims.  The Plan shall serve as a request that (1) all intercompany claims shall be eliminated, (2) all assets and liabilities of the Debtors shall be treated as though merged (except to the extent they secure an Other Secured Claim), (3) all guaranties of the Debtors of the obligations of any other Debtor and any joint and several liability of any of the Debtors shall be eliminated and (4) each claim and equity interest against any Debtor (except for Other Secured Claims) shall be deemed filed against the consolidated Debtors and each claim (except for Other Secured Claims) filed against more than one Debtor shall be deemed one claim against the consolidated Debtors.

B.    Sources of Cash for Distribution.  The cash necessary for the Reorganized Debtors to make payments under the Plan shall be obtained from existing cash balances, ongoing operations and the following additional sources:

1.    *Exit Financing.*  On the effective date of the Plan, the Debtors shall receive secured exit financing in an amount to be determined in the reasonable business judgment of Yucaipa (the "Exit Financing").

2.    *Sale of Canadian Operations.*  On the effective date of the Plan or as soon thereafter as possible, the Debtors shall sell their Canadian operations.  It is contemplated that PTS will be the stalking horse bidder, subject to an auction process (the "Canadian Sale").

C.    New Board of Directors and Management.  Reorganized Allied's Board of Directors shall be comprised of 5 members, one of whom shall be the new CEO of Reorganized Allied (selected by Yucaipa and reasonably acceptable to the TNATINC), one of whom shall be selected by the Official Creditors' Committee (subject to the reasonable approval of Yucaipa)

3

and three of whom shall be selected by Yucaipa. The proposed identity of such members and the new CEO shall be disclosed on or prior to the date of the hearing on the approval of the Disclosure Statement with respect to the Plan. The new CEO shall take office on or before the Effective Date. The remaining members of senior management will continue to serve until the Effective Date pursuant to their respective existing terms of compensation and thereafter subject to terms and conditions mutually acceptable to the Reorganized Allied Board of Directors and the applicable member of management. Reorganized Allied shall grant access to a designated representative of the Chairman of TNATINC to be an observer at any meeting of the Board of Directors relating to the financial performance of the business

## IV. DISCHARGE AND RELEASES

A. <u>Discharge</u>. On the effective date of the Plan, all claims against and equity interests in the Debtors shall be discharged and all persons and entities shall be precluded from asserting against any Debtor any claims based on any act or omission that occurred prior to the effective date of the Plan.

B. <u>Release by the Debtors</u>. On the effective date of the Plan, the Debtors and Reorganized Debtors shall release all claims, rights and causes of action against (1) the current directors, officers and employees of the Debtors (other than for money borrowed from or owed to the Debtors by any such directors, officers or employees as set forth in the Debtors' books and records), the Debtors' agents and advisors (including lawyers), (2) the creditors' committee and its advisors (including lawyers), (3) Yucaipa, its affiliates, and their respective officers, directors, employees, partners, members, managers and advisors (including lawyers), (4) TNATINC and its officers, directors, employees, partners, members, managers and advisors (including lawyers), and (5) the DIP Lenders and the agent for the DIP Lenders, including their respective (the "Released Parties").

C. <u>Release by Holders of Claims and Interests</u>. To the fullest extent permissible by law, on the effective date of the Plan, all holders of claims and equity interests, in consideration for the obligations of Yucaipa, the Debtors and the Reorganized Debtors under the Plan, the participation in the Plan process by the TNATINC and the cash, stock of Reorganized Allied and other documents delivered in connection with the Plan, shall be deemed to release each released party from all claims, rights and causes of action against the Released Parties.

## V. CONDITIONS TO CONFIRMATION

The conditions to confirmation of the Plan of each Debtor shall include, without limitation:

(1) The Bankruptcy Court shall have approved the disclosure statement with respect to the Plan in form and substance that is acceptable to Yucaipa in Yucaipa's sole discretion; the disclosure statement shall be deemed satisfactory to the TNATINC so long as the disclosure statement does not deviate in any material way from the terms set forth in this term sheet; provided, however, that the TNATINC has the right to consent in its discretion to any modification to Exhibit A hereto.

4

(2) The order confirming the Plan (the "Confirmation Order") shall be in form and substance satisfactory to Yucaipa in Yucaipa's sole discretion, shall have been signed by the Bankruptcy Court and shall have been entered on the docket of the Debtors' bankruptcy cases; provided, however, that the Confirmation Order shall be deemed satisfactory to the TNATINC so long as the Confirmation Order does not deviate in any material way from the terms set forth in this term sheet; provided, however, that the TNATINC has the right to consent in its discretion to any modification to Exhibit A hereto.

(3) The Plan, the exhibits thereto and any Plan supplement (as confirmed or approved by the Confirmation Order) shall be in form and substance satisfactory to Yucaipa. The Plan, the exhibits thereto and any Plan supplement (as confirmed or approved by the Confirmation Order) shall be deemed satisfactory to the TNATINC so long as they do not deviate in any material way from the terms set forth in this term sheet; provided, however, that the TNATINC has the right to consent in its discretion to any modification to Exhibit A hereto.

(4) The Debtors shall have obtained a written commitment for the Exit Financing in form and substance satisfactory to Yucaipa.

(5) The Debtors and TNATINC shall have executed agreements and/or the Bankruptcy Court shall have entered orders, each in form and substance satisfactory to Yucaipa and TNATINC in their respective sole discretion (which shall not have been vacated or stayed), providing individually or in combination for the following matters with respect to TNATINC: modified collective bargaining agreements in form and substance satisfactory to each of the Plan Proponents which shall contain the terms and conditions set forth on Exhibit A hereto.

## VI. CONDITIONS TO EFFECTIVENESS

The conditions precedent to the effective date of the Plan shall include, without limitation:

(1) All conditions to confirmation of the Plan shall remain satisfied.

(2) Each order of the Bankruptcy Court referred to in Section V above shall have become a Final Order.

(3) The Confirmation Order and supporting findings of fact and conclusions of law shall be entered by the Bankruptcy Court in form and substance reasonably acceptable to the Plan Proponents and shall have become a Final Order.

(4) All documents and agreements to be executed on the effective date or otherwise necessary to implement the Plan shall be in form and substance that is acceptable to Yucaipa.

(5) The closing and initial funding shall have occurred under the Exit Financing and all conditions precedent to the consummation thereof (other than the occurrence of the effective date of the Plan) shall have been waived or satisfied in accordance with the terms thereof.

(6) The Debtors and the Plan Proponents shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement the Plan and that is required by law, regulation, or order.

LA\1 684498.1                                                          02-07-2007

(7) The Canadian Sale shall have been consummated (this provision may be delayed or waived in Yucaipa's discretion if the consummation of such sale will delay the Effective Date of the Plan).

(8) The stock of each of the Reorganized Debtors shall have been issued in accordance with the Plan.

(9) All other actions, documents and agreements necessary to implement the Plan as of the effective date shall have been delivered and all conditions precedent thereto shall have been satisfied or waived.

(10) All corporate and other proceedings to be taken by the Debtors in connection with the Plan and/or plan supplement and the consummation of the transactions contemplated thereby and by the Plan and all documents incident thereto shall have been completed in form and substance reasonably satisfactory to Yucaipa; provided however that the foregoing proceedings and documents shall be deemed satisfactory to the TNATINC so long as they do not deviate in any material way from the terms set forth in this term sheet; provided further that the TNATINC has the right to consent in its discretion to any modification to Exhibit A hereto

(11) No event, condition or circumstance shall have occurred or arisen from the date the Plan is filed through the effective date which has had or could reasonably be expected to have or give rise to a material adverse effect.

(12) Subsequent to the date the Plan is filed, there shall be no threatened or pending suit, action, investigation, inquiry or other proceeding by or before any court of competent jurisdiction (excluding the bankruptcy cases prior to the date the Plan is filed) which is likely to have a material adverse effect.

(13) The effective date shall have occurred prior to the first business day that is three months following the confirmation date.

(14) The Board of Directors shall have been elected or appointed as of the effective date, and the directors' and officers' liability insurance shall be available to the members of the new board on terms reasonably satisfactory to Yucaipa.

(15) All waiting periods imposed by applicable law (including, without limitation, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable) in connection with the consummation of the Plan and transactions contemplated thereby shall have expired or been terminated without any action having been taken by any court of competent jurisdiction restraining, preventing or imposing materially adverse conditions upon such transactions, and the Debtors and Yucaipa shall have received all material regulatory approvals required for the consummation of the Plan and the transactions contemplated thereby and for the reorganized debtors to continue to carry on their businesses without material change, each of which approvals shall have become final.

(16) The TNATINC shall have ratified new or amended collective bargaining agreements consistent with this term sheet and Exhibit A hereto and Reorganized Allied shall have assumed such agreements. Reorganized Allied shall have no obligation to pay any cure amounts with

6

02-07-2007

respect to the assumption of such agreements, and no claim shall be asserted by TNATINC inconsistent with this term sheet and the amendments collective bargaining agreement pursuant to Exhibit A.

\* \* \* \* \*

By executing below, the undersigned each represent that they have authority to execute this agreement.

Executed this ____ day of February, 2007

Yucaipa American Alliance Fund I, L.P. and
Yucaipa American Alliance (Parallel) Fund I, L.P.

By: _____
Name: _____
Title: _____

Teamsters National Automotive Transporters
Industry Negotiating Committee

By: _____
Name: FRED ZUCKERMAN
Title: Co-CHAIRMAN TNATINC

02-07-2007

EXHIBIT A

TO THE TERM SHEET FOR THE PLAN OF REORGANIZATION IN IN RE ALLIED
HOLDINGS, INC. PROPOSED BY YUCAIPA AMERICAN ALLIANCE FUND I, L.P.,
YUCIAPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P. AND TEAMSTERS
NATIONAL AUTOMOBILE TRANSPORTERS INDUSTRY NEGOTIATING COMMITTEE

**1. Preliminary Conditions.**

**Entirety.** The terms of this Exhibit A are presented as an integrated document with that certain Term Sheet (the "Term Sheet") for the Plan of Reorganization (the "Plan") in In re: Allied Holdings, Inc. Proposed by Yucaipa American Alliance Fund I, L.P. ("YAAF"), Yucaipa American Alliance (Parallel) Fund I, L.P. ("Parallel" and, together with YAFF, "Yucaipa") and the International Brotherhood of Teamsters (the "IBT"). The Teamsters National Automobile Transporters Industry Negotiating Committee ("TNATINC" and, with Yucaipa, the "Parties") and Yucaipa are entering into and executing the Term Sheet as part of a proposal to restructure Allied Holdings Inc. and its debtor subsidiaries (collectively, "Allied"). Once the Term Sheet is executed by the Parties thereto, it cannot be modified unless agreed by the Parties in writing.

**No Impairment of the NMATA; Reaffirmation of Allied's Participation in the Master Bargaining Unit.** Allied Systems, Ltd., Transport Support, LLC and F.J. Boutell Driveaway Co., Inc. each are signatory to the National Master Automobile Transporters Agreement ("NMATA") in accordance with Article 2, Section 4 of the NMATA. Except where otherwise noted herein, all terms and conditions of the NMATA, Supplements and Local Riders shall continue to apply. Allied Systems, Ltd. and its corporate parents, siblings and subsidiaries shall remain a part of the national multi-employer collective bargaining unit of the NMATA on and after the Effective Date of the Plan (the "Effective Date"). Following the Effective Date, Allied shall be referred to herein as "Reorganized Allied." Reorganized Allied will re-join the National Automobile Transporters Labor Division (the "Division").

**Meaning of Allied.** For purposes of this addendum, "Allied" shall mean, collectively, Allied Systems, Ltd.; its corporate parent Allied Automotive Group; its ultimate corporate parent, Allied Holdings, Inc.; and all of their subsidiaries; and any other entities owned or controlled by any of these (including Axis Group, Inc.), subject to the provisions outlined in Item 5, "Work Preservation Agreement."

**Modification of the Term Sheet.** Each of the Parties has the unqualified right to modify the Term Sheet at any time prior to its execution by the Parties. No Party has an obligation to accept any modification made by the other Party.

**Necessity of Approval and Ratification.** Any agreement resulting from the acceptance of this addendum shall be tentative only and shall further be subject to ratification by the affected

Term Sheet 2

membership in accordance with the terms of Article XII of the Constitution of the IBT within forty-five (45) days of the filing of the proposed Plan with the Court (the "Ratification"). TNATINC will recommend the Ratification and use reasonable efforts to obtain the Ratification.

**Effectiveness.** No agreement resulting from the acceptance and ratification of this addendum shall be effective until the Effective Date of the Plan. The Plan must be acceptable to the IBT or any ratification will not become effective. The IBT shall be a co-proponent of any such plan. Such plan shall include a provision changing (no later than the Effective Date) Allied's current chief executive officer to a chief executive officer reasonably acceptable to the TNATINC (the "New CEO"). As used in this Exhibit A to the Term Sheet, "agreement" means an agreement resulting from the written execution and acceptance by the Parties and the Ratification.

**Non-Use.** In the event that the Effective Date does not occur, each of the Parties agrees not to use the Term Sheet, any discussion relating thereto, or the fact of failure of any condition thereto, for any purpose in any proceeding. Specifically but without limitation, each of the Parties agrees that in the event of a failure of the Ratification, each of the Parties agrees not to use the tentative agreement for any purpose, and that neither the Term Sheet or any other documentation of the tentative agreement or agreement, or any discussion of any of them will, will be offered into evidence for any purpose in any proceeding.

**May–June 2006 Involuntary Concessions.** Pending the Effective Date of the Plan, the IBT and TNATINC will suspend and stay the prosecution of any litigation and/or appeals concerning the involuntary concessions extracted from members of the bargaining unit in May and June 2006 pursuant to Bankruptcy Code Section 1113(e). On the Effective Date of the Plan, that litigation and/or appeals shall be dismissed with prejudice.

**Total Concession.** As used herein, "Total Concession" shall mean, with respect to the 15% wage concessions defined below as the "15% Wage Concessions," a sum of Thirty-Five Million Dollars and No Cents ($35,000,000.00) per year for three years commencing on the Effective Date of the Plan.

## 2. Equality of Sacrifice.

**No pay increases while Teamsters suffer reductions.** At any time during the three year concession period described herein, no person employed by Reorganized Allied, regardless whether in the NMATA bargaining unit, management, or the executive cadre, or whether such person is unrepresented, shall receive any wage increase during the term of this addendum, except to meet market conditions to retain non-bargaining unit employees or in connection with transfers or promotions of non-bargaining unit employees. Allied shall provide a written report at least once a month to TNATINC on any use of such exceptions. This provision does not apply to employees covered by any other collective bargaining agreement. Reorganized Allied will seek similar economic concessions from other bargaining units.

Notwithstanding the foregoing, Reorganized Allied shall pay all pension contributions and increases and pay all health and welfare benefit contributions and increases required by the 2003-2008 NMATA and in any renewal of the NMATA for the term beginning June 1, 2008.

Term Sheet 3

## 3. Wages.

(a) All future wage and COLA increases shall be eliminated during the term of this addendum.

(b) The wages of U.S. employees of Reorganized Allied covered by the NMATA (including, without limitation, owner-operators) shall be reduced by 15% across the board for each of the next three years, commencing on the Effective Date of the Plan; provided, however, that in the case of owner-operators, this reduction shall be based on an equivalent reduction in gross revenue. The reduction in wages and gross revenue set forth in this subparagraph 3(b) shall be referred to collectively as the "15% Wage Concessions."

(c) After taking into account the 15% Wage Concessions, no employee employed by Reorganized Allied shall be paid wages less than eighty-five (85%) of the full NMATA rate.

In the event that the 15% Wage Concessions total more than $35 million in any year of this addendum, then at the anniversary concluding that year, or as soon thereafter as practicable, the excess over $35 million shall be returned to the employees who suffered pay reductions described herein by calculating the excess over $35 million and returning to each such employee his proportional share thereof in accordance with his W-2 earnings for the relevant periods. The audit provisions in paragraph 6 below shall apply to the calculation of the excess and the proportional return to each employee.

## 4. EBITDA Bonus.
During the term of this addendum, employees who suffer a wage reduction under this addendum shall be eligible to receive a bonus on each anniversary of the Effective Date under the following circumstances. If EBITDA for the twelve-month period ending December 31 for each year in the term of the agreement exceeds the EBITDA set forth in the bankruptcy court approved disclosure statement plus the margin set forth in the agreed upon provisions of Schedule 1 hereto, then each such employee shall receive a pro rata share of the percentage indicated on Schedule 1 of any excess up to 100% of the concessions made under the term of this addendum. In the event of (i) any material asset sale of operations of Reorganized Allied or (ii) OEM pricing increases during the three year 15% Wage Concessions, then EBITDA as set forth in the approved bankruptcy court disclosure statement and the EBITDA margin (to the extent not otherwise reflected in the bankruptcy court disclosure statement) hereto shall be adjusted accordingly. The audit provisions set forth in paragraph 6 hereof shall apply to the calculation of the Bonus.

## 5. Work Preservation.
In consideration for the willingness of the U.S. Teamster work force to agree to the above addenda to the current NMATA, Reorganized Allied agrees to the Ultimate Parent Work Preservation Agreement in Schedule 2, with the following narrow exceptions. Within ninety (90) days of the Effective Date of this addendum, Reorganized Allied shall review all Carhaul Work assigned to or performed by Axis Group, Inc, a Controlled Affiliate, to be performed under the terms of the NMATA. In the event that an agreement is reached within such ninety (90) day period,

(a) Current employees of affiliates of Axis Group performing Carhaul Work shall be subject to the provisions of Article 2, Section 3, second and fourth paragraphs, of the NMATA.

Term Sheet 4

(b). Any Carhaul Work received from any shipper by Axis Group or its affiliates shall be assigned, by right of first refusal, to an Employer covered by the NMATA.

(c).    Reorganized Allied and TNATINC shall consider the New York environs port facility financed through concessions herein to be an accretion to the NMATA bargaining unit in accordance with Article 2, Section 3, fourth paragraph, of the NMATA. Carhaul Work dispatched from this facility shall be governed by the Ultimate Parent Work Preservation Agreement in Schedule 2.

If the parties cannot reach mutual agreement within ninety (90) days regarding subparagraphs "a" and "b" above, Reorganized Allied will have four (4) months to sell the referenced operations.

6.  **Access to Financial Records.**  Reorganized Allied shall grant access to a designated representative of the Chairman of TNATINC to be an observer at any meeting of the Board of Directors relating to the financial performance of the business. Reorganized Allied shall submit an annual financial report to TNATINC which includes at least an income statement, balance sheet and statement of cash flow with accompanying notes. TNATINC reserves the right on an annual basis to examine the books of Allied or utilize an independent auditor of its choice. In the event an independent auditing firm is utilized by TNATINC, Reorganized Allied shall pay such independent auditor for such annual audit up to a maximum of ten thousand dollars ($10,000) per annum. Reorganized Allied will not change accounting assumptions or practices, except as required to conform to governmental regulation, generally accepted accounting practices or for legitimate business reasons; and in no event will such assumptions or practices be changed to artificially inflate or deflate the operating performance of the company. As a condition of being provided such access, reports, statements and audit, TNATINC (and any accountant or auditor engaged on its behalf) shall agree to maintain the confidentiality of any Allied or Reorganized Allied financial statements and reports for the protection of Reorganized Allied, and to execute a reasonable confidentiality agreement if requested by Reorganized Allied in such form as the current protective order in this matter.

7.  **Elimination of Labor Cost As A Factor.**  In recognition of the unitary nature of the single national multi-employer collective bargaining unit of the NMATA and the seniority provisions permitting employees to follow their work in the event of acquisition of business by one NMATA carrier of business performed by a different NMATA carrier, the 15% Wage Concessions shall not apply in any instance where Reorganized Allied acquires business that is part of the book of business of a carrier signatory to the NMATA at the moment immediately preceding its acquisition by Reorganized Allied. In that instance, the full conditions of the NMATA, including work rules, shall apply to the work so transferred or acquired whether or not any employee follows the work to Reorganized Allied. Reorganized Allied shall only use the 15% Wage Concessions for its pricing bid to secure "new business" from non-NMATA bargaining unit carriers or secure work at new OEM shipping locations, not previously handled by or transferred from NMATA Employers, as defined under Article 22 of the NMATA.

8.  **Disputes.**  All provisions of this Exhibit A to the Term Sheet are subject to the applicable dispute resolution procedures provided in the NMATA.

Term Sheet 5

9. **Term.** The term of this addendum shall be for the period of three years, commencing with the effective date of the Plan of Reorganization. Upon the expiration of this addendum, the parties will meet to negotiate a transition to the full terms and conditions of the NMATA.

10. **Other Matters.**

Dedication to the Purchase of New Equipment. Reorganized Allied will spend no less than the Total Concessions described in this addendum on capital expenditures for the purchase of new automobile transportation equipment to be used by employees covered by the NMATA.

Term Sheet 6

| SCHEDULE 1 | |
|---|---|
| **MARGIN** | **APPLICABLE PERCENTAGE** |
| Above $0 million and up to and including $10 million | 5% |
| Above $10 million and up to and including $15 million | 12% |
| Above $15 million and up to and including $20 million | 17% |
| Above $20 million | 25% |

# Exhibit 128

# D.I. 3113, Case No. 05-12515

ENTERED ON DOCKET

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

MAY 18 2007

| | |
|---|---|
| In Re: | **Chapter 11** |
| **ALLIED HOLDINGS, INC.,** *et al.*, | **Case Nos. 05-12515 through 05-12526 and 05-12528 through 05-12537** |
| **Debtors.** | **Judge Mullins** |

## ORDER CONFIRMING SECOND AMENDED JOINT PLAN OF REORGANIZATION OF ALLIED HOLDINGS, INC. AND AFFILIATED DEBTORS PROPOSED BY THE DEBTORS, YUCAIPA AND THE TEAMSTERS NATIONAL AUTOMOBILE TRANSPORTATION INDUSTRY NEGOTIATING COMMITTEE

This matter is before the Court on the *Second Amended Joint Plan of Reorganization of Allied Holdings, Inc. and Affiliated Debtors Proposed by the Debtors, Yucaipa and the Teamsters National Automobile Transportation Industry Negotiating Committee* (the "Second Amended Plan").[1] The Court set May 9, 2007, at 9:30 a.m. Prevailing Eastern Time as the date and time for the commencement of a hearing pursuant to Rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure and sections 1126, 1128 and 1129 of the Bankruptcy Code to consider the Confirmation of the Plan (the "Confirmation Hearing").[2] The relevant procedural background leading up to the Confirmation Hearing includes the following:

1.     Allied Holdings, Inc. and its affiliated debtors and debtors-in-possession[3] (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on July 31, 2005 (the "Petition Date");

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, as modified or supplemented pursuant to Section LL of this Confirmation Order. The rules of interpretation set forth in Article II of the Plan shall apply to these Findings of Fact, Conclusions of Law and Order (this "Confirmation Order" or "Order"). If there is any direct conflict between the terms of the Plan and the Plan Supplement and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.

[2] The Federal Rules of Bankruptcy Procedure shall be referred to herein as the "Bankruptcy Rules".

2.    On March 2, 2007, the Debtors, the Teamsters National Automobile Transportation Industry Negotiating Committee ("TNATINC"), Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (collectively, "Yucaipa" and, together with the Debtors and TNATINC, the "Plan Proponents") filed the *Joint Plan of Reorganization of Allied Holdings, Inc. and Affiliated Debtors Proposed by the Debtors, Yucaipa and the Teamsters National Automobile Transportation Industry Negotiating Committee* [Docket No. 2563] along with the *Disclosure Statement for the Joint Plan of Reorganization of Allied Holdings, Inc. and Affiliated Debtors Proposed by the Debtors, Yucaipa and the Teamsters National Automobile Transportation Industry Negotiating Committee* [Docket No. 2562];

3.    On April 6, 2007, the Plan Proponents filed the Second Amended Plan (as modified since its filing, the "Plan") which was attached as Exhibit A to the *Disclosure Statement for the Second Amended Joint Plan of Reorganization of Allied Holdings, Inc. and Affiliated Debtors Proposed by the Debtors, Yucaipa and the Teamsters National Automobile Transportation Industry Negotiating Committee* [Docket No. 2802] (as amended, the "Disclosure Statement"), which Disclosure Statement was approved by the Court pursuant to that certain Order dated April 6, 2007 (the "Solicitation Procedures Order") [Docket No. 2800];

4.    On April 6, 2007, the Plan Proponents began preparing solicitation materials for distribution and completed distribution of such solicitation materials by April 11, 2007, consistent with the Solicitation Procedures Order.  In addition, the Plan Proponents caused notice of the Confirmation Hearing to be published in the *Wall Street Journal* (national edition), *Atlanta Journal-Constitution* and *Daily Report* on April 13, 2007 [Docket No. 3016];

---

[3] In addition to Allied Holdings, Inc., the following entities are debtors in these related cases: Allied Automotive Group, Inc., Allied Systems, Ltd. (L.P.), Allied Systems (Canada) Company, QAT, Inc., RMX LLC, Transport Support LLC, F.J. Boutell Driveaway LLC, Allied Freight Broker LLC, GACS Incorporated, Commercial Carriers, Inc., Axis Group, Inc., Axis Netherlands, LLC, Axis Areta, LLC, Logistic Technology, LLC, Logistic Systems, LLC, CT Services, Inc., Cordin Transport LLC, Terminal Services LLC, Axis Canada Company, Ace Operations, LLC, and AH Industries Inc.

2

5.      On April 20, 2007, the Plan Proponents filed a *Notice of Filing of List of Class 1 Claims and Treatment* [Docket No. 2922] and a Notice of Proposed Treatment of Class 2 Priority Non-Tax Claims [Docket 2923];

6.      On April 24, 2007, the Plan Proponents filed a *Plan Supplement* [Docket No. 2944];[4]

7.      Also on April 24, 2007, the Official Committee of Unsecured Creditors (the "Creditors' Committee") filed its *Notice of Filing of Statement of the Official Committee of Unsecured Creditors Recommending that the Unsecured Creditors Vote in Favor of the Joint Plan of Reorganization of Allied Holdings, Inc., et al.* [Docket No. 2945];

8.      On April 26, 2007, the Plan Proponents filed a *Notice of Filing of Executory Contract and Unexpired Lease Schedule for the Joint Plan of Reorganization For Allied Holdings, Inc. and Affiliated Debtors* [Docket No. 2951];

9.      On April 27, 2007, the Plan Proponents filed a *Notice of Filing of Amended List of Class 1 Claims and Treatment* [Docket No. 2955];

10.     On May 1, 2007, the Plan Proponents filed their *Notice of Modifications to Plan Proponents' Second Amended Joint Plan of Reorganization Dated as of April 5, 2007* [Docket No. 2959];

11.     On May 4, 2007, the Plan Proponents filed the following documents:

a.      *Notice of Filing of Amended Executory Contracts and Unexpired Leases Schedule* [Docket No. 3013];

b.      *Notice of Right of Unsecured Creditors to Participate in Cash Out Option* [Docket No. 3014]; and

---

[4]      As set forth in the Plan, all references to the Plan Supplement include all exhibits thereto.

c. *Affidavit of Jeffrey Pirrung Certifying the Ballots Accepting or Rejecting the Second Amended Joint Plan of Reorganization of Allied Holdings, Inc. and Affiliated Debtors Proposed by the Debtors, Yucaipa and the Teamsters National Automobile Transportation Industry Negotiating Committee Dated April 5, 2007* [Docket No. 3016];

12.     On May 7, 2007, the Plan Proponents filed their *Memorandum of Law (A) in Support of Confirmation of Second Amended Joint Plan of Reorganization; and (B) in Response to Objections Thereto* [Docket No. 3028]; and

13.     On May 8, 2007, the Plan Proponents filed the *Amendment to Affidavit of Jeffrey Pirrung Certifying the Ballots Accepting or Rejecting the Second Amended Joint Plan of Reorganization of Allied Holdings, Inc. and Affiliated Debtors Proposed by the Debtors, Yucaipa and the Teamsters National Automobile Transportation Industry Negotiating Committee Dated April 5, 2007* [Docket No. 3054].

This Court having reviewed the Plan and Disclosure Statement and all filed pleadings, exhibits, amendments, supplements, statements and comments regarding Confirmation; having considered the objections to Confirmation; having heard the statements of counsel in respect of Confirmation; having considered all testimony, documents and filings regarding Confirmation; having heard and considered the oral representations and the testimony and other evidence admitted at the Confirmation Hearing; and after due deliberation thereon and good cause appearing therefor, this Court hereby makes and issues the following Findings of Fact and Conclusions of Law:[5]

---

[5]     This Confirmation Order constitutes this Court's findings of fact and conclusions of law under FED. R. CIV. P. 52, as made applicable by BANKRUPTCY RULES 7052 and 9014. Any and all findings of fact shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law shall constitute conclusions of law even if they are stated as findings of fact.

**I.**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Exclusive Jurisdiction and Venue*

On the Petition Date, each Debtor commenced a chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code. Venue in the Northern District of Georgia was proper as of the Petition Date and continues to be proper pursuant to 28 U.S.C. §§ 157(b)(1) and (2) and 1334(a). Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L). This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(1) and (2) and 28 U.S.C. § 1334(a); and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

*Modifications to the Plan*

On April 6, 2007, the Plan Proponents filed the Plan. On April 24, 2007, the Plan Proponents filed a Notice of Plan Modifications. These modifications, and all other modifications filed with the Court, disclosed in open Court at or prior to the Confirmation Hearing and/or set forth in this Confirmation Order, are neither material nor adversely change the treatment of the Claim of any Creditor. All such modifications, including modifications made in this Confirmation Order, are consistent with all of the relevant provisions of the Bankruptcy Code, including, but not limited to, sections 1122, 1123, 1125 and 1127 of the Bankruptcy Code. The disclosure of any modifications to the Plan on the record at or prior to the Confirmation Hearing or contained in this Confirmation Order constitutes due and sufficient notice thereof under the circumstances of these cases. The Plan is properly before this Court and all votes cast with respect to the Plan prior to the modifications shall be binding and shall be

deemed to be cast with respect to the Plan, as and to the extent the Plan has been modified. The modifications to the Plan are hereby approved, pursuant to section 1127(a) of the Bankruptcy Code.

**Solicitation Procedures Order**

On April 6, 2007, the Court entered the Solicitation Procedures Order that, among other things: (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017; (b) fixed the time for voting to accept or reject the Plan; (c) fixed May 9, 2007, at 9:30 a.m. Prevailing Eastern Time as the date and time for the commencement of the Confirmation Hearing; (d) established the objection deadline and procedures for objecting to the Plan; (e) approved the form and method of notice of the Confirmation Hearing (the "Confirmation Hearing Notice"); and (f) established the record date and certain procedures for soliciting and tabulating votes with respect to the Plan.

**Service of Solicitation Materials**

By April 11, 2007, the Debtors' agents completed their service of the solicitation packages upon the parties entitled to vote on the Plan as described in the exhibits to the Solicitation Procedures Order. On or about April 13, 2007, the Debtors' agents published notice of the Confirmation Hearing and related deadlines in the *Wall Street Journal*, the *Atlanta Journal-Constitution* and *Daily Report*. As such, the Plan Proponents complied with the service requirements and procedures approved in the Solicitation Procedures Order, and no other or further notice is or shall be required.

**Voting Report**

On May 4, 2007, the Debtors filed with the Court an affidavit certifying the method and results of the Ballot tabulation for each of the Voting Classes to accept or reject the

Plan (as amended on May 8, 2007, the "Voting Affidavit") and a report certifying the results of the solicitation of acceptances and rejections of the Plan (the "Voting Report").

Based upon the Voting Affidavit, all procedures used to distribute solicitation materials to the applicable Holders of Claims and to tabulate the Ballots were fair and conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the local rules of the United States Bankruptcy Court for the Northern District of Georgia and all other applicable rules, laws and regulations.

As evidenced by the Voting Report and the Voting Affidavit, all Ballots were properly tabulated. Pursuant to sections 1124 and 1126 of the Bankruptcy Code, all Impaired Classes in which claimants have cast eligible ballots have voted to accept the Plan.

*Judicial Notice*

The Court takes judicial notice of the docket of the above-captioned chapter 11 cases (the "Chapter 11 Cases") maintained by the Clerk of the Court and/or its duly appointed agent (the "Docket").

Any resolutions to objections to Confirmation filed at or prior to the Confirmation Hearing or explained on the record at the Confirmation Hearing are hereby incorporated by reference. All objections to Confirmation not resolved as set forth in the preceding sentence or otherwise as set forth in this Order and that were not previously overruled at the Confirmation Hearing are hereby overruled.

*Solicitation*

Based upon the Voting Affidavit, votes for acceptance and rejection of the Plan were solicited in good faith and the solicitation and tabulation of such votes complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, the Solicitation Procedures Order, all other applicable provisions of the

Bankruptcy Code, the Bankruptcy Rules, the local rules of the United States Bankruptcy Court for the Northern District of Georgia and all other applicable rules, laws and regulations.

Each of the: (i) Debtors and their respective directors, officers, agents, affiliates, representatives, employees, attorneys and advisors; (ii) Yucaipa and its representatives, directors, officers, partners, affiliates, agents, employees, attorneys and advisors; and (iii) TNATINC and its representatives, members, attorneys, affiliates, agents, employees, attorneys and advisors, have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Solicitation Procedures Order.

### *Burden of Proof*

The Plan Proponents have met their burden of proving the elements of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard. The Court also finds that the Plan Proponents have satisfied the elements of section 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.

### *Bankruptcy Rule 3016(a)*

The Plan is dated and identifies the entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).

### *Compliance with the Requirements of Section 1129 of the Bankruptcy Code*

#### Section 1129(a)(1) – Compliance of the Plan with Applicable Provisions of the Bankruptcy Code

The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including, without limitation, sections 1122 and 1123. Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Interests, other than Administrative Expense Claims, Priority Tax Claims, Claims under the DIP Loan Facility and the Claims under the

8

Equipment Financing Facility.[6] As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

Pursuant to sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code, Section 2.1 of the Plan specifies all Claims that are not Impaired and specifies the treatment of all Claims and Interests that are Impaired. Pursuant to section 1123(a)(4) of the Bankruptcy Code, Section 2.1 of the Plan also provides the same treatment for each Claim or Interest within a particular Class.

Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate and proper means for the Plan's implementation. The Debtors will have, upon converting the DIP Loan Facility into the Exit Financing Facility and the funding of the Cash Out Contribution by Yucaipa and/or by others on the Effective Date of the Plan, sufficient Cash to make all payments required to be made on the Effective Date pursuant to the terms of the Plan. Moreover, Article VI and various other provisions of the Plan specifically provide adequate means for implementing the Plan, including, without limitation: (i) the continued existence of the Debtors; (ii) the vesting of assets in the Reorganized Debtors; (iii) the adoption and filing of Reorganized Governing Documents; (iv) the conversion of the DIP Loan Facility into the Exit Financing Facility; (v) the issuance of New Common Stock; and (vi) preservation of Rights of Actions.

The Reorganized Governing Documents, as contained in the Plan Supplement, satisfy the requirements set forth in sections 1123(a)(6), 1123(a)(7) and 1123(b) of the

---

[6]     The Administrative Expense Claims, the Priority Tax Claims, the Claims under the DIP Loan Facility and the Claims under the Equipment Financing Facility are not required to be classified pursuant to section 1123(a)(l) of the Bankruptcy Code.

Bankruptcy Code.   The Plan Supplement and any duly authorized amendments thereto are hereby approved.

### Section 1129(a)(2) – Plan Proponents' Compliance with Applicable Provisions of the Bankruptcy Code

The Plan Proponents have complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 and Bankruptcy Rules 3017, 3018 and 3019.  In particular, the Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.   Furthermore, the solicitation of acceptances or rejections of the Plan: (i) complied with the Solicitation Procedures Order; (ii) complied with all applicable laws, rules and regulations governing the adequacy of disclosure in connection with such solicitation; and (iii) solicited votes to accept the Plan only after disclosing "adequate information" to holders of Claims or Interests as section 1125(a) of the Bankruptcy Code defines that term.   Accordingly, the Plan Proponents and their respective directors, officers, employees, agents, affiliates and professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

### Section 1129(a)(3) – Proposal of Plan in Good Faith

The Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law.  In so determining, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation and development, including without limitation the testimony of Thomas King, Derex Walker and Hugh Sawyer.  The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and

capital resources to operate. As a result thereof, the requirements of section 1129(a)(3) of the

Bankruptcy Code have been satisfied.

### Section 1129(a)(4) – Bankruptcy Court Approval of Certain Payments as Reasonable

Pursuant to section 1129(a)(4) of the Bankruptcy Code, the payments to be made

by the Debtors for services or for costs in connection with the Chapter 11 Cases or the Plan, as

described in the Plan, or as disclosed in the Plan Supplement, are approved.

In addition, fees and expenses incurred by Professionals retained by the Debtors

or the Creditors' Committee shall be payable according to the Orders approving such firms'

retention, the Plan and this Confirmation Order. As a result of the foregoing, the requirements of

section 1129(a)(4) of the Bankruptcy Code have been satisfied.

### Section 1129(a)(5) – Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy

The Plan Proponents disclosed in the Plan and the Plan Supplement the identity of

the proposed directors and officers of the Reorganized Debtors following Confirmation of the

Plan, as required by section 1129(a)(5)(A) of the Bankruptcy Code, and have also disclosed the

nature of compensation for insiders who will be employed or retained by the Reorganized

Debtors, as required by section 1129(a)(5)(B). The Debtors (through the Debtors' general

counsel, chief financial officer or other designated officer) are authorized and directed to execute

an employment agreement with the person to be employed as chief executive officer of the

Reorganized Debtors, to be effective immediately. As a result of the foregoing, the requirements

of section 1129(a)(5) of the Bankruptcy Code have been satisfied.

### Section 1129(a)(6) – Approval of Rate Changes

The Debtors' current businesses do not involve the establishment of rates over which any regulatory commission has or will have jurisdiction after Confirmation. Thus, section 1129(a)(6) of the Bankruptcy Code does not apply in these Chapter 11 Cases.

### Section 1129(a)(7) – Best Interests of Creditors and Equity Interest Holders

The liquidation analysis annexed to the Disclosure Statement and the other evidence related thereto that was proffered or adduced at or prior to the Confirmation Hearing (i) are persuasive and credible; (ii) have not been controverted by other evidence; and (iii) establish that, with respect to each Impaired Class, each Holder of a Claim or Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date, and, therefore, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The methodology used and assumptions made in the liquidation analysis are reasonable.

With respect to each Impaired Class, each Holder of an Allowed Claim or Interest, as the case may be, in an Impaired Class has accepted the Plan or will receive under the Plan on account of its respective Allowed Claim or Interest, as the case may be, property of a value, as of the Effective Date, that is not less than the amount that each such Holder would have received if the Debtors were to have liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. As a result thereof, the requirements of section 1129(a)(7) of the Bankruptcy Code have been satisfied.

## Section 1129(a)(8) – Acceptance of the Plan by Each Impaired Class

As indicated in Section 3.01 of the Plan, the following Classes for each Debtor are Unimpaired and conclusively presumed to have accepted the Plan:

| Class Description | Class Designation |
|---|---|
| Certain Other Secured Claims | 1 et seq. |
| Priority Non-Tax Claims | 2 |
| Workers' Compensation Claims | 3 |

As indicated in the Voting Report, the following Impaired Classes voted in favor of the Plan:

| Class Description | Class Designation |
|---|---|
| General Unsecured Claims | 4A |
| Claims of Cash Out Holders | 4D |

The following Impaired Classes consist of Tort Claims, the Holders of which were ineligible to vote under the Plan, and, therefore, are deemed to have rejected the Plan:

| Class Description | Class Designation |
|---|---|
| Insured Claims | 4B |
| Other Insured Claims | 4C |

The Plan provides that Classes 5, 6, 7A, 7B and 7C will not receive any Distribution or retain any property in satisfaction of each Holder's Claims and/or Interests, and these Classes are therefore deemed to have rejected the Plan (collectively, with Classes 4B and 4C, the "Deemed to Reject Classes") pursuant to section 1126(g) of the Bankruptcy Code.

## Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code

The treatment of Administrative Expense Claims, Priority Tax Claims, Claims under the DIP Loan Facility and Claims under the Equipment Financing Facility under Article IV of the Plan, satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

13

## Section 1129(a)(10) – Acceptance By At Least One Impaired Class

As set forth in the Voting Report, two Impaired Classes (Classes 4A and 4D), have voted to accept the Plan. Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

## Section 1129(a)(11) – Feasibility of the Plan

The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. Based upon the evidence proffered or adduced at, or prior to, the Confirmation Hearing (including without limitation the testimony regarding projections offered by Thomas King), the Plan is feasible and Confirmation of the Plan is not likely to be followed by any of the Debtors, the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan either liquidating or requiring further financial reorganization. Furthermore, the Court finds that the Reorganized Debtors will have adequate capital to meet their ongoing obligations.

## Section 1129(a)(12) – Payment of Bankruptcy Fees

In accordance with section 1129(a)(12) of the Bankruptcy Code, Section 4.2(a)(ii) of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930(a). The Reorganizing Debtors have adequate means to pay all such fees.

## Section 1129(a)(13) – Retiree Benefits

During these Chapter 11 Cases, there has been no modification of retiree benefits either by virtue of agreement, pursuant to section 1114(e)(1) of the Bankruptcy Code, by court order or pursuant to section 1114(g) of the Bankruptcy Code. The Plan provides that if motions made before Confirmation result in modifications pursuant to those subsections, the Debtors will continue paying the retiree benefits at the level so established for the duration of the period that the Debtors have obligated themselves to provide such benefits. Thus, the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

## **Section 1129(b) – Confirmation of Plan Over Nonacceptance of Impaired Class**

Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan may be confirmed notwithstanding the fact that not all Impaired Classes have voted to accept the Plan – if all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met. All Classes of Impaired Claims other than Class 4B, Class 4C and the Deemed to Reject Classes have voted to accept the Plan.

There is no Class of Claims or Interests junior to the Holders of the Claims and Interests in Class 4B, Class 4C and the Deemed to Reject Classes. Moreover, no Holder of any Claim will receive more than payment in full on account of such Claim. As a result, Holders of Old Allied Holdings Common Stock are not entitled to any distribution of cash or property on account of such interest. Accordingly, the requirements of sections 1129(b)(2) of the Bankruptcy Code are satisfied with respect to Class 4B, Class 4C and the Deemed to Reject Classes, and the Plan is fair and equitable with respect to each such Class.

### *Principal Purpose of the Plan Is Not Avoidance of Taxes*

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e). No governmental entity has asserted any such avoidance in an objection filed with this Court.

### *Issuance and Distribution of the New Securities*

The Plan Proponents (and each of their respective affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan are deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distribution of the New Common Stock under the Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or

15

rejections of the Plan or such distributions made pursuant to the Plan. The issuance of the New
Common Stock is in exchange for Claims against or Interests in the Debtors, or principally in
such exchange and partly for cash or property, within the meaning of section 1145(a)(1) of the
Bankruptcy Code.

### *Exit Financing*

   The Plan contemplates that the Debtors will convert the DIP Loan Facility into
the Exit Financing Facility, which shall be used to: (i) make payments required to be made on or
following the Effective Date, and (ii) provide additional borrowing capacity to the Reorganized
Debtors following the Effective Date. Thus, the Exit Financing Facility is an essential element
of the Plan and is in the best interests of the Debtors, their estates, and their creditors and is
necessary to the consummation of the Plan.

### *Reincorporation Merger*

   On or after the Effective Date, Allied Holdings shall reincorporate as a Delaware
Corporation and operate under its Reorganized Governing Documents and Reorganized By-
Laws. The reincorporation of Allied Holdings as a Delaware corporation, is fair, appropriate and
in the best interests of the Debtors.

### *Executory Contracts and Unexpired Leases*

   The Collective Bargaining Agreement between the IBT and the Debtors shall be
amended and assumed by the Reorganized Debtors on the terms and conditions set forth in
Exhibit G to the Disclosure Statement. The Debtors and the Reorganized Debtors shall not be
obligated to pay any cure amounts associated with the assumption of such contract. To the
extent there are any conflicts between the treatment of the potential sale of the Canadian
operations in the Plan and the treatment of the potential sale of the Canadian operations in the
amendments to the Collective Bargaining Agreement as set forth in Exhibit G, the terms of the

Plan shall control and shall supersede the terms of the amendments to the Collective Bargaining Agreement.

All executory contracts and unexpired leases that: (i) have not expired by their own terms on or prior to the Effective Date; (ii) the Debtors have not assumed or rejected during the pendency of the Chapter 11 Cases; (iii) are not the subject of a motion pending as of the Effective Date to assume the same; or (iv) are not listed on the Contract/Lease Schedule (as may be amended from time to time) as executory contracts or unexpired leases to be assumed shall be deemed to be rejected.   These executory contracts and unexpired leases are referred to collectively as the "Rejected Contracts."   The rejection of the Rejected Contracts represents a valid and well–considered exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, and their creditors.

The Plan Proponents gave due and proper notice of the assumption of each contract and lease to be assumed by means of the Contract/Lease Schedule.  Those executory contracts and unexpired leases listed on the Contract/Lease Schedule as executory contracts or unexpired leases to be assumed (the "Assumed Contracts") shall be deemed assumed by the Debtors as of the Effective Date.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

All monetary amounts on the Contract/Lease Schedule representing the amounts owed by the Debtors pursuant to the respective Assumed Contracts (the "Cure Amounts") shall be cured, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash on the later of the Effective Date or as due in the ordinary course of business of the Debtors or Reorganized Debtors, as applicable, or on such other terms as the parties to each such

17

Assumed Contract may otherwise agree. The Debtors have provided adequate assurance of future performance with respect to the Assumed Contracts.

With the exception of a limited class of parties for whom the deadline was extended, the deadline for objections (the "Objections") to the Cure Amount by parties to the Assumed Contracts was May 7, 2007 (the "Objection Deadline"). The following parties filed timely Objections to the Cure Amounts: United HealthCare Insurance Company; United HealthCare Insurance Company of Ohio and CSX Transportation, Inc. (the "Objecting Parties"). The following parties executed stipulations or entered into other agreements with the Debtors for an extension of the Objection Deadline: Union Pacific Railroad Company, General Electric Capital Corporation, and GE CapitalModular (the "Deadline Extension Parties"). The Objecting Parties and Deadline Extension Parties shall have their respective Objections adjudicated by the Court.

The Court will order the Debtors to pay any valid Cure Amount following notice and a hearing.

The rights, remedies, defenses and reservations of each Debtor, Objecting Party and Deadline Extension Party are reserved, pursuant to the respective terms of their stipulations, where applicable, pending the (i) withdrawal of; (ii) settlement of; or (iii) ruling by the Bankruptcy Court on the applicable Objection. Also, with respect to Cure Amounts, Central States Southeast & Southwest Areas Pension Fund and Central States Southeast and Southwest Areas Health & Welfare Funds (collectively "Central States Funds") shall have the rights announced by the court at the Confirmation Hearing, with respect to establishing the Central States Funds' valid Cure Amounts, if any (the rights, remedies and defenses of each Debtor with respect thereto being expressly reserved).

18

Except as to the Cure Amounts of the Objecting Parties and the Deadline Extension Parties, the Cure Amounts set forth in the Contract/Lease Schedule are deemed satisfied[7], and each of the Cure Amounts for all parties other than the Objecting Parties and the Deadline Extension Parties shall be deemed the Cure Amount for the respective Assumed Contract except as otherwise specifically found by the Court.

The Debtors have through this Order supplemented the Contract/Lease Schedule to include the contract between Allied Holdings and Mini Modal Corporation, which contract has no Cure Amount. The Debtors have provided notice of the assumption and Cure Amount to Mini Modal Corporation and have extended the Objection Deadline for Mini Modal Corporation through June 4, 2007.

### *Approval of Settlements and Compromises*

Pursuant to Bankruptcy Rule 9019 and any applicable non–bankruptcy law, and as consideration for the Distributions and other benefits provided under the Plan, all settlements and compromises of Claims, Causes of Action and objections to Claims that are embodied in the Plan constitute good faith compromises and settlements of any Claims, Causes of Actions and objections to Claims, which compromises and settlements are hereby approved as fair, equitable, reasonable and appropriate in light of the relevant facts and circumstances underlying such compromises and settlements.

A number of stipulations resolving a variety of issues were filed at or about the time of the Confirmation Hearing or announced on the record during the during the Confirmation

---

[7] The Debtors and AT&T Corporation entered into and filed a stipulation governing the treatment of the executory contract between them. The Cure Amount with regard to that contract is also deemed satisfied subject to the terms set forth in such stipulation which terms are hereby approved.

Hearing.   These stipulations are approved.   The stipulations and their terms include the following:[8]

Teamsters Pension Trust Fund of Philadelphia & Vicinity and Central

Pennsylvania Teamsters Pension Fund

Certain Debtors (the "Debtor Parties") are parties to certain agreements (the "Agreements") which, among other things, require them to remit contributions to (i) the Teamsters Pension Trust Fund of Philadelphia & Vicinity and (ii) the Central Pennsylvania Teamsters Pension Fund (collectively, the "Funds"), which are multi-employer plans as that term is defined in 29 U.S.C. § 1301(a)(3).   Any proofs of claim filed in these Chapter 11 Cases by the Funds for contingent liability for a complete or partial withdrawal under 29 U.S.C. §§ 1383 and 1385, including, without limitation, claim numbers 374, 375, 1683 through 1704, 2101 through 2122 (the "Contingent Withdrawal Liability Claims") shall be deemed withdrawn on the Effective Date.   Thus, and notwithstanding anything to the contrary contained in the Plan or in this order confirming the Plan, this is without impairment of the right of the Funds to assert against the Debtors, the Reorganized Debtors or any third party withdrawal liability claims first arising after Confirmation.   Nothing herein impairs the Funds inclusion of pre- and post-confirmation contribution histories in calculating any withdrawal liability first arising hereafter or the right of any Debtor, Reorganized Debtor, or third party to contest any claims arising from such calculation.

New England Teamsters and Trucking Industry Pension Fund

Certain Debtors (the "Debtor Parties") are parties to certain agreements (the "Agreements") which, among other things, require them to remit contributions to the New England Teamsters and Trucking Industry Pension Fund (the "New England Pension Fund"),

---

[8] Defined terms in the descriptions of these stipulations shall only pertain to the description of the particular stipulation in which such defined term falls.

which is a multi-employer plan as that term is defined in 29 U.S.C. § 1301(a)(3). Any proofs of claim filed in these Chapter 11 Cases by the New England Pension Fund for contingent liability for a complete or partial withdrawal under 29 U.S.C. §§ 1383 and 1385, including, without limitation, claim numbers 1755 through 1777, 2734 through 2739, and 2741 through 2757 (the "Contingent Withdrawal Liability Claims") shall be deemed withdrawn on the Effective Date. Thus, and notwithstanding anything to the contrary contained in the Plan or in this order confirming the Plan, this order is without impairment of the right of New England Pension Fund to assert against the Debtors, the Reorganized Debtors, or any third party, withdrawal liability claims first arising after confirmation. Nothing herein impairs the New England Pension Fund's inclusion of pre- and post-confirmation contribution histories in calculating any withdrawal liability first arising hereafter or the right of any Debtor, Reorganized Debtor, or third party to contest any claims arising from such calculations.

### Substantive Consolidation

The proposed substantive consolidation of the Debtors for purposes of classification, voting and treatment of Classes under the Plan is necessary to, among other things, effectuate equitable distributions and reduce the administrative burden of tabulating separate votes with respect to each of the Debtors. Thus, the substantive consolidation of the Debtors for these purposes under the Plan reflects the economic reality of their respective businesses and operations and is fair and equitable for all creditors.

### Releases, Discharges and Exculpation

The releases and discharges of Claims and Causes of Action described in Article XI of the Plan, including, but not limited to, the releases by the Debtors, the releases by Holders of Claims and Interests and the exculpation provisions, constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in

21

exchange for adequate consideration and are in the best interest of Holders of Claims, are fair, necessary, equitable, and reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Each of the discharge, release and exculpation provisions set forth in the Plan and this Order is: (i) within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), 1334(b) and 1334(d); (ii) an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (iii) an integral element of the transactions incorporated into the Plan; (iv) conferring material benefit on, and is in the best interests of, the Debtors, their Estates and their creditors; (v) important to the overall objectives of the Plan to finally resolve all Claims among or against the parties–in–interest in the Chapter 11 Cases with respect to the Debtors; and (vi) consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

The agreements of each of the Debtor Releasees, as described in Section 11.4 of the Plan and the agreements of other releasees described in the Plan, constitute good and valuable consideration for, and justify the releases granted under, Article XI of the Plan. Such compromises and settlements are made in exchange for adequate consideration and are in the best interest of Holders of Claims, are fair, necessary, equitable, and reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Accordingly, such provisions are approved, *provided, however*, that, as announced at the Confirmation Hearing, the last sentence of Section 11.4(B) of the Plan shall be replaced with the following:

**NOTHWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION, EXCEPT WITH RESPECT TO ANY OFFICER, DIRECTOR OR EMPLOYEE WHO SERVED IN SUCH CAPACITY AT ANY TIME FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE, THE RELEASE OF THE DEBTORS' OFFICERS, DIRECTORS AND EMPLOYEES SET FORTH ABOVE SHALL BE OF NO FORCE AND EFFECT IN FAVOR OF ANY OFFICER, DIRECTOR OR EMPLOYEE WHO ASSERTS ANY PRE-EFFECTIVE DATE CLAIM AGAINST THE DEBTORS OR REORGANIZED DEBTORS FOR INDEMNIFICATION, DAMAGES (INCLUDING, INTER ALIA, DAMAGES ARISING FROM OR RELATED TO REJECTION OF AN EMPLOYMENT**

**AGREEMENT) OR ANY OTHER CAUSES OF ACTION OTHER THAN FOR UNPAID COMPENSATION, WAGES OR BENEFITS THAT AROSE IN THE ORDINARY COURSE OF BUSINESS OR PURSUANT TO THE KERP APPROVED BY THE BANKRUPTCY COURT OR BY FINAL ORDER.**

Central States Southeast & Southwest Areas Pension Fund and Central States Southeast and Southwest Areas Health & Welfare Funds (collectively "Central States Funds") objected to any release of entities other than the Debtors and the Reorganized Debtors ("Third Parties"), as provided in Article 11 of the Plan, from liability owing to the Central States Funds. This objection was resolved by excluding the Central States Funds from the release of any Third Parties under Sections 11.6 or 11.9 of the Plan.

Virtus Capital L.P. and Hawk Opportunity Fund L.P. (collectively "V&H Objectors") objected to the release of any Third Parties. This objection was resolved by excluding the V&H Objectors from the release of any Third Parties under Sections 11.6 or 11.9 of the Plan.

Guy W. Rutland, III, Guy Rutland, IV, and Robert J. Rutland (collectively "the Rutlands"), who were in the class released under Sections 11.4 and 11.9, objected to being required thereby to release Third Parties. This objection was resolved by an agreement on the record that the Rutlands will not receive any release under the Plan and shall not grant a release to any Third Parties under Sections 11.6 or 11.9 of the Plan.

The exculpation provision set forth in Section 11.9 of the Plan is appropriately limited to a qualified immunity for acts of negligence and does not relieve any party of liability for gross negligence or willful misconduct.

In approving the exculpations, limitations of liability and injunctions provided for in Article XI of the Plan, this Court has also considered: (i) the likelihood of success of claims asserted by the Debtors or other claimants against the likelihood of success of the defenses or counterclaims possessed by the Debtors, other claimants or other potential defendants; (ii) the

complexity, cost and delay of litigation that would result in the absence of these settlements, compromises, releases, waivers, discharges and injunctions; (iii) the acceptance of the Plan by an overwhelming majority of Holders of Claims; (iv) the consent, without objection, to the releases by those who voted in favor of the Plan; and (v) that the Plan, which gives effect to the other compromises, releases, waivers, discharges and injunctions set forth in the Plan, is the product of extensive arms' length negotiations among the Debtors, Yucaipa, TNATINC, the Creditors' Committee, the Original DIP Lenders and their agent, the DIP Lenders, the DIP Agents, the current and former officers, partners, directors, employees, agents, members, stockholders, advisors (including any attorneys, financial advisors, investment bankers, accountants and other professionals retained by such Persons) and professionals of each of the foregoing, and other parties-in-interest. Each Ballot contained a clear provision expressly notifying holders of Claims entitled to vote on the Plan that a vote for the Plan constitutes a vote in favor of the releases set forth in the Plan.

Each of the Plan Proponents significantly contributed to the Debtors' reorganization and has enhanced the recoveries of Creditors of these Estates. Other parties receiving releases, such as officers, directors, employees of the Debtors, and the parties to the Original DIP Loan Facility, the DIP Loan Facility and the Pre-petition Notes Indenture, may have indemnification claims against the Debtors or the Reorganized Debtors if the underlying claims are not released and enjoined as described in the Plan.

### *Good Faith Negotiation, Implementation and Consummation*

The Plan Proponents and the Creditors' Committee participated in negotiating in good faith and at arm's length the Plan and each of the settlements and agreements embodied therein. Each of the Plan Proponents and the Creditors' Committee participated in good faith in each of the actions taken to bring about, and in satisfying each of the conditions precedent to,

Confirmation and consummation. Yucaipa participated in good faith in negotiations with TNATINC to reach a consensual labor deal and avoid a potentially catastrophic strike by the IBT; the Debtors were apprised and approved of such negotiations; and once Yucaipa negotiated a term sheet reflecting certain wage concessions by the IBT, the Debtors' boards of directors or governing body acted in good faith in adopting that labor deal as an essential component of the Plan. At all relevant times, the undisputed evidence demonstrated that the Debtors remained in control of and were aware of negotiations between Yucaipa and TNATINC and the IBT involving labor concessions for the Reorganized Debtors. Yucaipa, TNATINC and the IBT did not improperly exercise control over or improperly collude or conspire in connection with any property rights of the Debtors in connection with the foregoing negotiations. The Debtors had a "fiduciary out" to abandon the Plan, but in good faith determined to continue as a Plan Proponent through the Confirmation Hearing. None of the Plan Proponents or the IBT intended as part of the foregoing negotiations to artificially suppress the Debtors' earnings or to achieve any other improper purpose; in fact, the foregoing negotiations were of critical importance in reaching a consensual resolution of labor disputes between the Debtors and the IBT, and therefore to the consummation of the Plan. Without the resolution of such labor disputes, if the Debtors had to reject the collective bargaining agreement between the Debtors and the IBT, the result very likely would have been the liquidation of the Debtors and the loss of approximately 5,000 jobs. The Plan Proponents and all parties-in-interest will be acting in good faith if they proceed to: (i) consummate the Plan and the agreements, settlements, transactions and transfers contemplated thereby and this Order and (ii) take the actions authorized and directed by this Order, notwithstanding an appeal of this Order, so long as no stay is issued. In so determining, the Court has examined, among other things, the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the record of the Chapter 11 Cases, the Plan, the Disclosure Statement,

and all other related affidavits, pleadings, exhibits, and statements (including without limitation the testimony of Thomas King, Derex Walker, James Doak and Hugh Sawyer) made before the Court regarding Plan Confirmation.

### Satisfaction of Conditions to Confirmation

Each of the conditions precedent to the entry of this Confirmation Order, as set forth in Section 10.1 of the Plan, has been satisfied or waived in accordance with the Plan. Specifically, this Court finds, based on the statements of the parties made before it and otherwise, the proposed Confirmation Order and supporting findings of facts/conclusions of law (i) are reasonably acceptable in form and substance to the Debtors; (ii) are reasonably acceptable in form and substance to Yucaipa; (iii) are reasonably acceptable in form and substance to the Creditors' Committee; and (iv) expressly authorize and direct the Debtors and applicable third parties to perform the actions that are conditions to the effectiveness of the Plan.

### Likelihood of Satisfaction of Conditions Precedent to Consummation

Based upon statements of the parties made before this Court and the statements, representations and other information set forth in all other related pleadings, exhibits and other relevant documents, each of the conditions precedent to the Effective Date, as set forth in Section 10.2 of the Plan, is reasonably likely to be satisfied.

### Yucaipa Contribution

Based on the uncontroverted testimony and the proffer of evidence made at the Confirmation Hearing, and the record of the Chapter 11 Cases, Yucaipa has made a substantial contribution to the successful reorganization of the Debtors. Yucaipa significantly enhanced recoveries to creditors of these Estates through, among other things, the following actions: (i) negotiating and drafting the terms of the Plan; (ii) drafting the Disclosure Statement; (iii) negotiating and drafting the Settlement Agreement with the ad hoc equity committee (thus,

26

minimizing the cost and expense of the confirmation process); (iv) negotiating the new labor deal with TNATINC which is the cornerstone of the Plan (and which will generate more than approximately $105 million in savings over the next three years); (v) negotiating and drafting the Reorganized Governing Documents and other documents and agreements necessary for consummation of the Plan; (vi) offering to provide Term Loan C Financing on favorable terms to the Debtors, which ultimately led to enhanced savings and covenant flexibility; (vii) playing a key role in obtaining and negotiating the DIP Financing Facility, Equipment Financing Facility, and Exit Financing Facilities; (viii) providing at least 40% of the Cash Out Contribution; (ix) agreeing to contribute rigs under the Equipment Financing Facility to the Debtors on below market terms; and (x) securing and paying for an executive search firm to help in the retention of a new chief executive officer for Reorganized Allied Holdings.

For the foregoing reasons, Yucaipa provided consideration for the releases in the Plan and good cause and valid reasons exist to allow Yucaipa's Claim for substantial contribution under section 503(b) of the Bankruptcy Code for its fees and expenses incurred in connection with these Chapter 11 Cases (the "Substantial Contribution Claim") as set forth in Section 4.2(a)(iii)(5) of the Plan, *provided, however*, that Yucaipa will provide to the Creditors' Committee and the Debtors invoices (redacted for privilege or work product) or where applicable, an estimate through the Effective Date documenting the amount of the Substantial Contribution Claim.

### *Objections*

All objections to the Plan that have not been withdrawn by the objecting party or compromised in a manner acceptable to the Plan Proponents and the objecting party are hereby overruled.

27

## II.

## ORDER

Based on all of the foregoing, the record in the Chapter 11 Cases, including the Findings and Conclusions provided herein and incorporated herein by reference and the findings and conclusions made by the Court in connection with Confirmation of the Plan (hereby incorporated by reference pursuant to Bankruptcy Rule 7052), for good cause and adequate notice appearing therefore, it is hereby ORDERED as follows:

### A.   Confirmation of the Plan

The Plan, substantially in the form as filed on April 6, 2007 [Docket No. 2802], and the Plan Supplement, in each case as modified from time to time and as further modified herein, are confirmed in each and every respect pursuant to section 1129 of the Bankruptcy Code. Based on the evidence admitted at the Confirmation hearing, the Court finds and concludes that the Holders of Old Allied Holdings Common Stock are not entitled to any distribution of cash or property on account of such interest. The terms of the Plan, the Plan Supplement, the Court's docket in these Chapter 11 Cases and all exhibits to this Confirmation Order are incorporated by reference into, and are an integral part of, this Confirmation Order. The terms of the Plan, the Plan Supplement, and all other relevant and necessary documents, shall be effective and binding upon all parties-in-interest upon the entry of the Confirmation Order. All objections to the Plan and all responses, statements or comments purporting to construe the Plan in an manner inconsistent with the Plan or purporting to reserve rights that are inconsistent with the Plan, to the extent not already withdrawn, waived or settled, are hereby overruled and declared not to effect a modification of the Plan. The failure to reference or discuss any particular provision of the Plan in this Order shall have no effect on this Court's approval and authorization of, or the validity, binding effect and enforceability of, such provision; and each provision of the Plan is

28

authorized and approved and shall have the same validity, binding effect and enforceability as every other provision of the Plan, whether or not mentioned in this Order.

**B.    Plan Modifications**

All modifications to the Plan since the solicitation, including, without limitation, the modifications set forth in the Notice of Plan Modifications approved by this Court on April 23, 2007, the modifications disclosed in open Court at or prior to the Confirmation Hearing and the modifications contained herein, are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation.

**C.    Plan Classification Controlling**

The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the Distributions to be made thereunder.  The classifications set forth on the Ballots tendered to or returned by the Debtors' Creditors in connection with voting on the Plan:  (i) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan; (ii) do not represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims under the Plan for Distribution purposes; (iii) may not be relied upon by any creditor as representing the actual classification of such Claims under the Plan for distribution purposes; and (iv) shall not bind the Debtors or the Reorganized Debtors.

**D.    Executory Contracts and Unexpired Leases**

The executory contract and unexpired lease provisions of Article V of the Plan shall be, and hereby are, approved.

Any contracts not included on the Contract/Lease Schedule are deemed rejected (the "Rejected Contracts") by the Debtors immediately prior to the Effective Date, and the entry of this Confirmation Order by the Bankruptcy Court constitutes approval of each such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

All proofs of Claim arising from the rejection of the Rejected Contracts (the "Rejection Claims") must be filed with the Voting Agent within thirty (30) days after the earlier of: (a) the date of entry of an order of the Bankruptcy Court approving any such rejection and (b) the Confirmation Date. Any Claims arising from the rejection of the Rejected Contracts for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors or the Reorganized Debtors, or their respective Estates and property.

The Debtors shall pay the Cure Amounts in Cash on (i) the Effective Date or as soon as practicable thereafter, (ii) such other terms as the parties to each such Assumed Contract may otherwise agree or (iii) as due in the ordinary course of business of the Debtors or Reorganized Debtors, as applicable. Payment of the Cure Amounts shall satisfy, in full, the Debtors' obligations pursuant to section 365(b)(1) of the Bankruptcy Code.

The Assumed Contracts are hereby deemed assumed by the Debtors as of immediately prior to the Effective Date. The entry of this Order constitutes approval of all such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Confirmation and consummation of the Plan (including, without limitation, the issuance of the New Common Stock) shall not constitute a "change in control" or any other default under any Assumed Contract.

As of the Effective Date, all Assumed Contracts shall be assigned and transferred to, and remain in full force and effect for the benefit of, the applicable Reorganized Debtors, notwithstanding any provision in any such Assumed Contract (including those described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease. The applicable Reorganized Debtors' remaining obligations arising from each such Assumed Contract shall therefore be limited solely to, from the Effective Date and thereafter, any future performance thereunder and obligations arising therefrom.

**E.    Exemption from Registration**

The issuance and distribution of all of the New Allied Holdings Common Stock as provided in the Plan (including, without limitation, the issuance of New Allied Holdings Common Stock upon the conversion of the amounts outstanding under the Equipment Financing Facility) will be duly authorized, validly issued and, as applicable, fully paid and nonassessable. The issuance of the New Allied Holdings Common Stock is in exchange for Claims against or Interests in the Debtors, or principally in such exchange and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code. In addition, under section 1145 of the Bankruptcy Code, to the extent, if any, that the above–listed items constitute "securities" the offering of such items is exempt and the issuance and distribution of such items will be exempt from Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. In addition, pursuant to and to the fullest extent permitted by section 1145 of the Bankruptcy Code, the resale of any securities issued under the Plan shall be exempt from Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance distribution or sale of such securities; provided, however, that any resale of the securities issued under the Plan shall be subject to the restrictions contained in the Reorganized Governing Documents of Reorganized Allied Holdings.

**F.    Matters Relating to Implementation of the Plan; Immediate Effectiveness; General Authorizations**

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), 7062, 8001, 8002 or otherwise, immediately upon the entry of this Confirmation Order, the terms of the Plan, the Plan Supplement and this Order shall be, and hereby are, immediately effective and enforceable and deemed binding upon any Person named or referred to in the Plan and the respective heir, executor, trustee, administrator, successor or assign of such Person.

The approvals and authorizations specifically set forth in this Confirmation Order are nonexclusive and are not intended to limit the authority of any Debtor or Reorganized Debtor or any officer thereof to take any and all actions necessary or appropriate to implement, effectuate and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order. In addition to the authority to execute and deliver, adopt or amend, as the case may be, the contracts, leases, instruments, releases and other agreements specifically granted in this Confirmation Order, the Debtors and Reorganized Debtors are authorized and empowered, without action of their respective stockholders, boards of directors, members, managers, general partners or other governing body, to take any and all such actions as any of their executive officers, managers or general partners may determine are necessary or appropriate to implement, effectuate and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order. Without limiting any of the foregoing, no action of the stockholders, boards of directors, members, managers, general partners or other governing body of the Debtors or Reorganized Debtors shall be required (a) to enter into, execute and deliver, adopt or amend, as the case may be, any of the contracts, leases, instruments, releases and other agreements or documents and plans to be entered into, executed and delivered, adopted or amended in connection with the Plan and, following the Effective Date, each of such contracts, leases, instruments, releases and other agreements shall be a legal, valid and binding obligation of the applicable Reorganized Debtor and enforceable against such Reorganized Debtor in accordance with its terms; (b) to make any Distributions provided under the Plan, including, without limitation, issuing the New Allied Holdings Common Stock for Distribution in accordance with the terms of the Plan; (c) to consummate the reincorporation of Allied Holdings as a Delaware corporation via merger or otherwise (including any filings, documents or other agreements reasonably necessary to effectuate the reincorporation merger); (d) to change

32

the name of any Reorganized Debtor or its state of incorporation or organization; (e) to convert the amounts outstanding under the Equipment Financing Facility into New Allied Holdings Common Stock; (f) to enter into the Stockholders' Agreement and the Registration Rights Agreement in substantially the form attached as exhibits to the Plan Supplement; (g) to enter into the Management Services Agreement in substantially the form attached as an exhibit to the Plan Supplement; (h) to enter into and affirm the Exit Financing Documents (as defined in the Final DIP Order) and the Second Lien Exit Financing Documents (as defined in the Second Lien Financing Order); or (i) authorize the Reorganized Debtors to engage in any of the activities set forth in this paragraph or otherwise contemplated by the Plan, the Plan Supplement exhibits or this Confirmation Order.

On the Effective Date, all matters provided for under the Plan that would otherwise require the approval of the stockholders, directors, members, managers, general partners or other governing body of the Debtors or any Reorganized Debtor shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law, limited liability law, partnership law or other applicable law of the states in which the Debtors and the Reorganized Debtors are incorporated or organized (giving effect to the reincorporation of Allied Holdings in Delaware) without any further action by the stockholders, directors, members, managers, general partners or other governing body of the Debtors or the Reorganized Debtors.

G.    **Continued Corporate Existence**

On or after the Effective Date, Allied Holdings will be reorganized and reincorporated as a Delaware corporation, and shall operate under its Reorganized Governing Documents and Reorganized By-Laws in substantially the form filed as exhibits to the Plan Supplement. Except as otherwise provided in the Plan, on or after the Effective Date, each of the

33

Reorganized Debtors (other than Reorganized Allied Holdings, which will exist as a new Delaware corporation as described in the previous sentence) shall continue to exist in accordance with the law in the jurisdiction in which it is incorporated or organized and pursuant to its certificate of incorporation and bylaws, operating agreement, partnership agreement or other applicable organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan. Except as otherwise explicitly provided in the Plan or in this Confirmation Order, including, on the Effective Date, all property of each Debtor or Reorganized Debtor (as the case may be) that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Debtor or Reorganized Debtor, or successor thereto, on the Effective Date. As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims and Interests without supervision of the Court, free of any restriction of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or this Confirmation Order. The Reorganized Governing Documents and Reorganized By-Laws are hereby approved in their entirety.

## H.     Cancellation of Claims and Equity Interests

Except with respect to Reinstated Claims and Intercompany Claims, which may be capitalized, satisfied or preserved in the discretion of the Debtors and Reorganized Debtors, and except for purposes of evidencing a right to Distributions under the Plan or otherwise provided hereunder, on the Effective Date, all agreements and other documents evidencing the Claims or rights of any Holder of a Claim against the Debtors, including all notes, guarantees, mortgages and all Interests and any options or warrants to purchase Interests, obligating the Debtors to issue, transfer or sell Interests or any other capital stock of the Debtors, shall be canceled. On the Effective Date, all Old Allied Holdings Common Stock will be cancelled. On the Effective

34

Date, all Old Other Debtors Common Stock shall remain effective and outstanding and be owned and held by Reorganized Allied Holdings or the applicable Reorganized Debtor that held the Old Other Debtors Common Stock as of the Petition Date. Old Allied Holdings Stock Rights will be cancelled unless, after consultation with the Debtors and the Creditors' Committee, Yucaipa determines for business, tax or operational reasons that any such stock rights should remain outstanding.

**I.    Issuance of New Common Stock and Execution of Related Documents**

On or immediately after the Effective Date, in accordance with the Plan, the Reorganized Debtors shall issue, deliver or execute, as the case may be, all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, including, without limitation, the New Common Stock, each of which shall be distributed as provided in the Plan.

**J.    Reorganized Corporate Governance Documents**

On the Effective Date, each Reorganized Debtor shall, if applicable, adopt the Reorganized Governing Documents and Reorganized By-Laws for such Reorganized Debtor. Reorganized Allied Holdings shall (in addition to the adoption of its Reorganized Governing Documents and Reorganized By-Laws) adopt the Stockholders' Agreement, the Registration Rights Agreement and the Management Services Agreement in substantially the forms attached as exhibits to the Plan Supplement. The Reorganized Governing Documents will, among other things, prohibit the issuance of non–voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. The Reorganized Governing Documents and Reorganized By-Laws of Reorganized Allied Holdings, and the Stockholders' Agreement, Registration Rights Agreement and Management Services Agreement, are hereby approved in their entirety

### K.    **Board of Directors and Management**

Pursuant to Section 7.2 of the Plan and consistent with the terms of the Stockholders'
Agreement, the Plan Proponents filed with the Bankruptcy Court the names of individuals who
have been proposed as members of the Initial Board of Reorganized Allied Holdings. Subject to
provisions of the Stockholders' Agreement relating to the composition of the board of directors,
the terms, nomination, election and reelection of members of the Initial Board of Reorganized
Allied Holdings shall be governed by the Reorganized Governing Documents and Reorganized
By-Laws of Reorganized Allied Holdings. The current board of directors for each of the Debtors
shall dissolve as of the Effective Date and such directors shall cease to have further obligations
as directors of any of the Debtors, except if they are designated by the Reorganized Debtors to be
a director on and after the Effective Date and accept such appointment. The Initial Board of each
of Reorganized Allied Holdings and the other Reorganized Debtors shall be authorized to take
action as of the Effective Date without further action or order of the Court. The Debtors
(through their general counsel, Chief Financial Officer or other designated officer) are authorized
and directed to execute an employment agreement with the new CEO of Reorganized Allied
Holdings, which agreement shall be on terms acceptable to Yucaipa and shall be effective
immediately and continue in effect following the Effective Date pursuant to such agreement's
terms and conditions.

### L.    **Effectuating Documents and Further Transactions**

Each of the Debtors or Reorganized Debtors, as appropriate, is authorized to execute,
deliver, file or record such contracts, instruments, releases and other agreements or documents
and take such actions as may be necessary or appropriate to effectuate, implement and further
evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the
Plan.

**M.**    **Exit Financing Facility**

1. Exit Financing Facility Generally; First Lien Financing [9]

The Exit Financing Facility is hereby approved. Upon the Exit Facilities Conversion

Date: (i) the Debtors and the Reorganized Debtors are authorized to execute and deliver an

Affirmation Agreement in form and substance satisfactory to the Agent, pursuant to which the

Reorganized Debtors will assume all of the DIP Obligations, and all other related agreements,

documents, or instruments to be executed or delivered in connection therewith and perform their

obligations thereunder, including, without limitation, the payment or reimbursement of any fees,

expenses, losses, damages, or indemnities; (ii) the Exit Facility Documents shall constitute the

legal, valid and binding obligations of the Reorganized Debtors parties thereto, enforceable in

accordance with their respective terms; (iii) the liens and security interests granted under the

Interim Order and Final DIP Order shall not be altered, amended, or discharged by this

Confirmation Order and shall be, and shall remain, legal, valid, and binding liens on, and

security interests in, all property and assets of the Reorganized Debtors having the priority

granted to them in the Interim Order and Final DIP Order; and (iv) no obligation, payment,

transfer, or grant of security under the Exit Facility Documents, the Interim Order, or the Final

DIP Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or

under any applicable law or subject to any defense, reduction, recoupment, setoff, or

counterclaim. The Debtors and the Reorganized Debtors, as applicable, and the other Persons or

entities granting any liens and security interests to secure the obligations under the Exit Facility

Documents are authorized to make all filings and recordings, and to obtain all governmental

---

[9] Capitalized terms used in this Paragraph M(1) and not otherwise defined herein or in the Plan, as modified or supplemented pursuant to Section LL of this Confirmation Order, shall have the meanings ascribed to them in that certain Final Order Under 11 U.S.C. §§ 105(a), 362, 363, and 364 and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing Debtors to (A) Obtain New Secured Post-Petition Financing to Refinance Existing Post-Petition Financing; (B) Convert New Post-Petition Financing Into Exit Financing; and (C) Pay Related Fees and Expenses, and (II) Granting Related Relief (the "Final DIP Order") [Docket No. 2842].

approvals and consents, necessary to establish and perfect such liens and security interests under the provisions of any applicable federal, state, provincial, or other law (whether domestic or foreign) and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties. Notwithstanding the foregoing, in the event the Exit Facilities Conversion Date occurs and only in such event, the relationship among the Borrowers, the Guarantors, the Agents, the Lenders, and the Secured Parties thereunder shall no longer be governed by the Final DIP Order or the Interim Order, but rather, shall be governed solely by the terms of the Exit Facility Documents and applicable nonbankruptcy law.

2. Second Lien Exit Facility[10]

Upon the Second Lien Exit Facility Conversion Date: (i) the Debtors and the Reorganized Debtors are authorized to execute and deliver an Affirmation Agreement in form and substance satisfactory to the Second Lien Agent, pursuant to which the Reorganized Debtors will assume all of the Second Lien Obligations, and all other related agreements, documents, or instruments to be executed or delivered in connection therewith and perform their obligations thereunder, including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities; (ii) the Second Lien Exit Facility Documents shall constitute the legal, valid and binding obligations of the Reorganized Debtors parties thereto, enforceable in accordance with their respective terms; (iii) the liens and security interests granted under the Second Lien Financing Order shall not be altered, amended, or discharged by this Confirmation

---

[10] Capitalized terms used in this Paragraph M(2) and not otherwise defined herein or in the Plan, as modified or supplemented pursuant to Section LL of this Confirmation Order, shall have the meanings ascribed to them in that certain Interim Order (I) Authorizing Debtors to (A) Restructure Post-Petition Financing Into First and Second Lien Facilities and (B) to Grant Liens and Super-Priority Claims, and (II) Granting Related Relief (the "Second Lien Financing Order")[Docket No. 3058].

Order and shall be, and shall remain, legal, valid, and binding liens on, and security interests in, all property and assets of the Reorganized Debtors having the priority granted to them herein; and (iv) no obligation, payment, transfer, or grant of security under the Second Lien Exit Facility Documents, or the Second Lien Financing Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff, or counterclaim. The Debtors and the Reorganized Debtors, as applicable, and the other persons or entities granting any liens and security interests to secure the obligations under the Second Lien Exit Facility Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such liens and security interests under the provisions of any applicable federal, state, provincial, or other law (whether domestic or foreign), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

**N.**     **Release of Liens**

On the Effective Date, all mortgages, deeds of trust, liens or other security interests against the property of any of the Debtors' estates are fully released and discharged (except to the extent Reinstated under the Plan or granted under the Interim Order, Final DIP Order or Second Lien Financing Order), and all right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.

**O.**     **Provisions Governing Distributions**

The Distribution provisions of Article VIII of the Plan shall be, and hereby are, approved in their entirety.   The Reorganized Debtors or their designees shall make all Distributions required under the Plan.

**P.**    **Consolidation for Voting and Distribution Purposes.**

On and after the Effective Date, each and every Claim filed or to be filed in the Chapter 11 Cases against any of the Debtors shall be deemed filed against the consolidated Debtors and shall be deemed a single consolidated Claim against and an obligation of all of the consolidated Debtors. Such limited consolidation shall not affect (other than for Plan voting and Distribution purposes): (i) the legal and corporate or other organizational structures of the Reorganized Debtors; or (ii) pre- or post-Petition Date liens, guarantees or security interests that are required to be maintained (x) in connection with contracts that were entered into during the Chapter 11 Cases or that have been or will be assumed pursuant to § 365 of the Bankruptcy Code, (y) in connection with the terms of the Exit Financing Facility or the New Common Stock, or (z) pursuant to the terms and conditions contained in the Plan. From and after the Effective Date, each of the Reorganized Debtors will be deemed a separate and distinct entity, properly capitalized, vested with all of the assets of such debtor as they existed prior to the Effective Date and having the liabilities and obligations provided for under the Plan.

**Q.**    **Preservation of Causes of Action**

Except in any contract, instrument, release or other agreement entered into in connection with the Plan or as otherwise specifically provided in the Plan or in a stipulation approved by the Court, pursuant to section 1123(b) of the Bankruptcy Code, each Reorganized Debtor shall retain all claims, rights of action, suits or proceedings arising out of any causes of action, whether known or unknown, contingent or non–contingent, liquidated or unliquidated, in law or in equity, that any Debtor or the Debtors' Estates may hold against any Person, including, without limitation, any Retained Action.

**R.    Procedures for Resolution of Disputed Claims and Disputed Interests**

The claim resolution procedures of Article IX of the Plan shall be, and hereby are, approved in their entirety.

**S.    Release, Injunctive, Exculpation and Related Provisions**

Sections 11.4, 11.5, 11.6, 11.7, 11.9 and 11.10 of the Plan shall be, and hereby are approved in their entirety as set forth therein, except as modified by the express terms of this Order.

**T.    Existing Injunction and Stays Remain in Effect until Effective Date**

The stay imposed by section 362 of the Bankruptcy Code shall remain in full force and effect until the Effective Date.  All injunctions or stays imposed during the Chapter 11 Cases or contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.  Nothing herein shall bar the taking of such other actions as are necessary to effectuate the transactions specifically contemplated by the Plan or by this Confirmation Order.

**U.    Failure to Consummate the Plan**

If the Effective Date does not occur within six months following entry of the Confirmation Order, then the provisions of Section 10.5 of the Plan shall govern.

**V.    Retention of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and sections 157 and 1334 of title 28 of the United States Code, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction, exclusive or otherwise, over all matters arising out of or related to the Chapter 11 Cases and the Plan after the Effective Date, as legally permissible, on the terms set forth in Article XII of the Plan.

**W.**    **Dissolution of Committee**

The terms of Section 13.12 of the Plan shall govern the Creditors' Committee's dissolution and all other related matters.

**X.**    **Payment of Statutory Fees**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on the Effective Date or as soon as practicable thereafter.

**Y.**    **Section 1146 Exemption**

Section 1146 of the Bankruptcy Code shall apply to the transactions contemplated under the Plan. The making, delivery, filing, or recording at any time of any deed, mortgage, leasehold mortgage, deed of trust, leasehold deed of trust, memorandum of lease, lease, assignment, leasehold assignment, security agreement, financing statement, or other instrument of absolute or collateral transfer required by, or deed necessary or desirable by the parties to, the Exit Financing Facility shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, sales or use tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

**Z.** **References to Plan Provisions**

The Plan, along with the Plan Supplement, in each case as modified, is confirmed in its entirety and each of the Plan and the Plan Supplement, in each case as modified, are hereby incorporated into this Order by reference.  The failure specifically to include or to refer to any particular provision of the Plan in this Order shall not diminish or impair the effectiveness of any such provision, it being the intent of the Court that the Plan be confirmed in its entirety as modified herein.  The provisions of the Plan, the Plan Supplement and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each. Notwithstanding the foregoing, in the event of an inconsistency between the Plan and the Plan Supplement, as modified, that cannot be reconciled, then, solely to the extent of such inconsistency, the Plan Supplement will control; provided, however, that in the event of any inconsistencies between the Plan, the Plan Supplement and this Confirmation Order, this Confirmation Order shall control and the provisions of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

**AA.** **Post–Confirmation Notices**

In accordance with Bankruptcy Rules 2002 and 3020(c), within five (5) business days of the date of the Effective Date, the Debtors (or their agents) shall give notice of the entry of this Order and the Effective Date, in substantially the form of the Notice of (A) Entry of Confirmation Order, (B) Effective Date and (C) Administrative Expense Claims Bar Date attached hereto as **Exhibit A** (the "Notice of Confirmation and the Effective Date") by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties having been served with the Confirmation Hearing Notice; provided, however, that no notice or service of any kind shall be required to be mailed or made upon any Person to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable

as addressed," "moved, left no forwarding address" or "forwarding order expired" or similar reason, unless the Debtors have been informed in writing by such Person, or are otherwise aware, of that Person's new address.  To supplement the notice described in the preceding sentence, within fifteen (15) business days of the Effective Date the Debtors shall publish Notice of Confirmation and the Effective Date in the *Wall Street Journal* (national edition), *Atlanta Journal-Constitution*, and *Daily Report*.

Mailing and publication of the Notice of Confirmation and the Effective Date in the time and manner set forth in the preceding paragraph are good and sufficient under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

Except as provided in the Plan and this Order, notice of all subsequent pleadings and motions in these Chapter 11 Cases shall be limited to counsel for the Reorganized Debtors, counsel for the Creditors' Committee (until it is dissolved, Yucaipa, TNATINC, the DIP Lenders and the non–debtor party, if any, specifically impacted by the relief sought by such pleadings or motions, unless otherwise specified in an order by this Court; provided however that all final fee applications described in the following section of the Order shall be provided to counsel for the Creditors' Committee.

## BB.    Final Fee Applications and Fee Application Bar Date

All Professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of sections 322, 327, 328, 330, 331, 363, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Confirmation Date (including, *inter alia*, any compensation requested by any Professional or any other Person other than Yucaipa for making a substantial contribution in the Chapter 11 Cases) shall file and serve on the Reorganized Debtors, Yucaipa, the Creditors' Committee, and any other party entitled to receive

44

a copy of such application pursuant to rule or order of the Bankruptcy Court, an application for final allowance of compensation and reimbursement of expenses on or before sixty (60) days after the Effective Date.

Each application shall comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the local rules for the United States Bankruptcy Court for the Northern District of Georgia, and shall set forth, among other things, in reasonable detail: (i) the name and address of the applicant; (ii) the nature of the Professional fees and expenses for which reimbursement is requested for all periods from the date the particular applicant was retained through the Confirmation Date; (iii) the amount of the Professional fees and expenses requested; (iv) the amounts of Professional fees and expenses previously allowed by the Court, if any; and (v) the amount or amounts of payments made to date, if any, by the Debtors to reduce such allowed amount.

To the extent required by section 1129(a)(4) of the Bankruptcy Code, the Court shall continue to have jurisdiction over, and applications shall be filed for, compensation and reimbursement by a Professional for services rendered, costs or expenses incurred on or after the Confirmation Date in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases.

## CC.   **Substantial Contribution Claim**

Yucaipa is hereby allowed a Claim for substantial contribution under section 503(b) of the Bankruptcy Code as set forth in Section 4.2(a)(iii)(5) of the Plan, without the need for any further application, hearing or approval of this Court or notice to any Person, subject to the right of the Creditors' Committee and the Debtors to obtain copies of supporting invoices as described in this Order. The Creditors Committee shall have the right to review the invoices and expenses of Yucaipa to confirm (a) the accuracy of the calculation of Yucaipa's substantial contribution

45

claim and (b) that such invoices and expenses were associated with or related to these Chapter 11 cases.

## DD.   Non–Material Changes

Section 13.1 of the Plan shall govern post–Confirmation Plan modifications.

## EE.   Authorization to Consummate

The Debtors are authorized to consummate the Plan at any time after the entry of this Order subject to satisfaction or waiver of the conditions precedent to the Effective Date set forth in Section 10.2 of the Plan.  Pursuant to section 1142(b) of the Bankruptcy Code, the Debtors and the Reorganized Debtors and all other necessary parties are authorized and directed to: (i) execute and deliver any instrument, agreement or document; (ii) perform any act that is necessary, desirable or required to effectuate or comply with the terms of and conditions of the Plan and consummation of the Plan and the transactions contemplated therein; and (iii) without limitation, take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments and other agreements or documents created in connection with the Plan. In addition, the Debtors are authorized to enter into and consummate the transactions necessary to draw on the Exit Financing Facility and to convert the amounts outstanding under the Equipment Financing Facility into New Allied Holdings Common Stock.

## FF.   Nonbankruptcy Law

Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Order and the Plan, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

## GG.   Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in

accordance with, the laws of the State of New York without giving effect to the principles of conflict of laws.

**HH.**  **Severability**

Each term and provision of the Plan, as it may have been altered or interpreted by this Bankruptcy Court, is valid and enforceable pursuant to its terms.

**II.**  **Incorporation by Reference**

Findings of fact and conclusions of law made on and as part of the record of the Confirmation Hearing are fully incorporated herein by reference as is fully set forth herein at length.

**JJ.**  **Modified Stay of this Order**

Bankruptcy Rule 3020(e) is not applicable to this Order.  Exception of this Order from the ten (10) day stay imposed under Bankruptcy Rule 3020(e) is warranted because the prompt consummation of the Plan is in the best interest of the Debtors, the Estates, creditors and other parties-in-interest.  Furthermore, the provisions of Federal Rule of Civil Procedure 62(a) and Bankruptcy Rule 7062 shall not apply to this Order.

**KK.**  **Substantial Consummation**

The Plan shall be deemed to be substantially consummated on the first date distributions are made in accordance with the terms of this Plan to holders of any Allowed Claims.

**LL.**  **Miscellaneous**

The Plan is hereby modified as follows:

- The definition of "Cash Out Contribution" will be deleted in its entirety and replaced with the following:

47

"Cash Out Contribution" means a contribution of up to $10 million of cash that Yucaipa is committed to make to effectuate the Cash Option; provided, however, pursuant to Section 3.7(3) of the Plan, (a) up to $2 million of such $10 million may be contributed by the Participating Equity Holders, (b) up to $4 million of such $10 million may be contributed ratably by Other Class 4A Holders, (c) Yucaipa may designate (in Yucaipa's sole discretion) other entities or Persons to contribute some or all of the Cash Out Contribution not funded by the Participating Equity Holders, Other Class 4A Holders or Participating Other Class 4A Holders, and (d) in the event that the total amount of the Cash Out Contribution required to fund the Cash Option is less than $10 million, then amounts contributed by each of the Participating Equity Holders, Other Class 4A Holders and Yucaipa's designees, shall be in the ratio of up to 20%, up to 40%, and at least 40%, respectively, of the total required Cash Out Contribution. The amount of the Cash Out Contribution that may be made by each Other Class 4A Holder is equal to the product of the lesser of (i) the total amount of the Cash Out Contribution all Class 4A Holders are willing to make or (ii) $4,000,000 (or 40% of the total required Cash Out Contribution if such amount is less than $4 million) multiplied by a fraction, the numerator of which is the amount of such Other Class 4A Holder's Qualified Claims, and the denominator of which is the aggregate amount of the Qualified Claims that are held by all Other Class 4A Holders. In the event that the full amount of the Cash Out Contribution available to Other Class 4A Holders is not fully subscribed by the Other Class 4A Holders, each Participating Other Class 4A Holder may contribute additional amounts of the unsubscribed balance (the "Oversubscription") in an amount equal to the product of such unsubscribed balance multiplied by a fraction, the numerator of which is the amount of such Participating Other Class 4A Holder's Qualified Claims, and the denominator of which is the aggregate amount of the Qualified Claims that are held by all Participating Other Class 4A Holders participating in the subscription of the unsubscribed balance.

- The definition of "DIP Loan Facility" will be deleted in its entirety and replaced with the following:

"DIP Loan Facility" means, collectively, that certain (a) first lien debtor-in-possession financing facility and (b) second lien debtor-in-possession financing facility, in each case, entered into pursuant to the DIP Credit Documents.

- The definition of "DIP Credit Documents" will be deleted in its entirety and replaced with the following:

"DIP Credit Documents" means, collectively, (a) that certain Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated on or about May 15, 2007, as amended from time to time, and all documents executed in connection therewith by and among Allied Holdings, Inc. and Allied Systems, LTD (L.P.), as borrowers, certain subsidiaries of Allied Holdings, Inc. and Allied Systems, LTD (L.P.),

as guarantors, Goldman Sachs Credit Partners L.P., acting as lead arranger and syndication agent and The CIT Group/Business Credit, Inc., acting as administrative agent and collateral agent, for themselves and a syndicate of financial institutions and (b) that certain Second Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated on or about May 15, 2007, as amended from time to time, and all documents executed in connection therewith by and among Allied Holdings, Inc. and Allied Systems, LTD (L.P.), as borrowers, certain subsidiaries of Allied Holdings, Inc. and Allied Systems, LTD (L.P.), as guarantors, Goldman Sachs Credit Partners L.P., acting as lead arranger, syndication agent, administrative agent, and collateral agent, for itself and a syndicate of financial institutions.

- The definition of "DIP Liens" will be deleted in its entirety and replaced with the following:

"DIP Liens" means the Liens of the DIP Lenders on the Assets as previously granted pursuant to the Final DIP Order and Second Lien Financing Order, subject to the limitations set forth therein.

- The definition of "Exit Financing Facility" will be deleted in its entirety and replaced with the following:

"Exit Financing Facility" means, collectively, the first lien financing facility and the second lien financing facility, each of which will be created from the conversion of the DIP Loan Facility on the terms and conditions set forth in the DIP Credit Documents and other applicable documents to (a) fund the Debtors' Cash payment obligations under the Plan and (b) provide the Reorganized Debtors' anticipated working capital needs on and after the Effective Date.

- The definition of "Registration Rights Agreement" will be deleted in its entirety and replaced with the following:

"Registration Rights Agreement" means that certain Registration Rights Agreement (in substantially the form filed as an exhibit to the Plan Supplement) to be entered into by and among Reorganized Allied Holdings, Yucaipa and certain holders of New Allied Holdings Common Stock who the Plan Proponents reasonably determine will each receive and beneficially own 5% or more of the New Allied Holdings Common Stock issued pursuant to the Plan.

- The definition of "Stockholders' Agreement" will be deleted in its entirety and replaced with the following:

"Stockholders' Agreement" means the Stockholders' Agreement (in substantially the form filed as an exhibit to the Plan Supplement) to be entered into by and among Reorganized Allied Holdings, Yucaipa and certain holders of New Allied Holdings Common Stock who the Plan Proponents reasonably

determine will each receive and beneficially own more than 5% of the New Allied Holdings Common Stock issued pursuant to the Plan.

• The following definitions will be added in the appropriate alphabetical order:

"DIP Agents" shall mean each of the administrative agents, the syndication agents and collateral agents under the DIP Credit Documents.

"Other Class 4A Holder" shall mean each Holder of Allowed Class 4A Claims, including the beneficial owners of Allowed Class 4A Claims arising from ownership of the Prepetition Notes, as covered by the proof of Claim filed by the Indenture Trustee, irrespective of whether any such beneficial owner of an Allowed Class 4A Claim has filed an individual proof of Claim in respect of its ownership of the Prepetition Notes, other than Yucaipa or its affiliated entities, that is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended, provided that each such Allowed Class 4A Claim is in a fixed and liquidated amount that satisfies each of the following requirements: (i) such Claim is the subject of a timely filed proof of Claim in these Chapter 11 Cases or is listed on the Schedules of Assets and Liabilities of one or more of the Debtors as filed in these Chapter 11 Cases, (ii) such Claim does not purport to be secured or entitled to any administrative or priority treatment and is not scheduled in the Schedules as a secured or priority Claim and (iii) such Claim has not been objected to, is otherwise not disputed and is not scheduled in the Schedules as contingent, unliquidated or disputed.

"Participating Equity Holders" shall mean, collectively, Sopris Capital Advisors, LLC, Aspen Advisors LLC and Armory Advisors LLC.

"Participating Other Class 4A Holder" shall mean an Other Class 4A Holder who (i) timely completes and submits a duly executed Participation Election indicating an intent to participate in the Cash Out Contribution, (ii) is determined by the Debtors to be an Other Class 4A Holder holding a Qualified Claim, and (iii) timely tenders to the Participation Agent the full amount due and payable in respect of its proportionate share of the Cash Out Contribution.

"Qualified Claims" shall mean a Claim in a fixed and liquidated amount that satisfies each of the following requirements: (i) such Claim is the subject of a timely filed proof of Claim in these Chapter 11 Cases or is listed on the Schedules of Assets and Liabilities of one or more of the Debtors as filed in these Chapter 11 Cases, (ii) such Claim does not purport to be secured or entitled to any administrative or priority treatment and is not scheduled in the Schedules as a secured or priority Claim and (iii) such Claim has not been objected to, is otherwise not disputed and is not scheduled in the Schedules as contingent, unliquidated or disputed.

"Ratable Participation" shall mean the total share of an Other Class 4A Holder's participation in the Cash Out Contribution.

"Second Lien Financing Order" shall have the meaning ascribed to it in the Confirmation Order.

- Section 3.7(3) of the Plan will be deleted in its entirety and replaced with the following:

"Treatment: Each Holder of an Allowed Class 4D Claim will receive a Cash distribution equal to the lesser of the following: (a) if the aggregate amount of Allowed Class 4D Claims is equal to or less than $40 million, 25% of such Holder's Allowed Class 4D Claim; and (b) if the aggregate amount of Allowed Class 4D Claims is greater than $40 million, a Pro Rata share of $10 million. In exchange for making the Cash Out Contribution, Yucaipa (and its designees, if any) shall receive the New Allied Holdings Common Stock that each Holder of an Allowed Class 4D Claim would have received if its Allowed Claim were classified in Class 4A, 4B, or 4C (without giving effect to any Voluntary Reduction). On the Effective Date of the Plan, the Participating Equity Holders have the right, but not the obligation, to pay an amount equal to up to twenty (20) percent of the Cash Out Contribution. The Other Class 4A Holders have the right, but not the obligation, to pay an amount equal to up to forty (40) percent of the Cash Out Contribution. Reorganized Allied Holdings will in turn distribute such cash (and rest of the cash for the Cash Out Contribution provided by Yucaipa and its designees, if any, the Other Class 4A Holders, if any, and the Participating Equity Holders, if any) to holders of Allowed Class 4D Claims as soon as practicable after the Effective Date. In exchange, as soon as practicable following the Effective Date, (a) the Participating Equity Holders will receive a Pro Rata share of the New Allied Holdings Common Stock to which Yucaipa would otherwise be entitled under this Section of the Plan based upon the percentage (up to a maximum of twenty (20) percent) of the aggregate Cash Out Contribution paid by the Participating Equity Holders and (b) to the extent each Other Class 4A Holder has submitted a properly completed and duly executed "election participation" and has tendered full payment due in respect thereof, such Other Class 4A Holder will receive a Pro Rata share of New Allied Holdings Common Stock to which Yucaipa would otherwise be entitled under this Section of the Plan based upon the percentage (up to a maximum of forty (40) percent) of the aggregate Cash Out Contribution paid by the Participating Other Class 4A Holders. In the event that the full amount of the Cash Out Contribution available to Other Class 4A Holders is not fully subscribed by the Other Class 4A Holders, each Participating Other Class 4A Holder may contribute additional amounts of the unsubscribed balance (the "Oversubscription") in an amount equal to the product of such unsubscribed balance multiplied by a fraction, the numerator of which is the amount of such Participating Other Class 4A Holder's Qualified Claims, and the denominator of which is the aggregate amount of the Qualified Claims that are held by all Participating Other Class 4A Holders participating in the subscription of the unsubscribed balance."

- Section 3.11(2) of the Plan will be deleted in its entirety and replaced with the following:

"Treatment: The Old Other Debtors Common Stock shall remain effective and outstanding and be owned and held by Reorganized Allied Holdings."

> • Section 4.2(d) of the Plan will be amended by adding the following sentence at the end of Section 4.2(d):

> "As shares of New Common Stock are distributed pursuant to Section 9.5 of this Plan, additional shares of New Common Stock shall be issued to Yucaipa Transport (or its assignees or designees) if necessary to give effect at all times to calculations set forth in the preceding sentence and to maintain the percentage of New Allied Holdings Common Stock allocable to Yucaipa Transport (or its assignees or designees) under the conversion right described herein."

> • Section 7.4 of the Plan will be deleted in its entirety and replaced with the following:

> "Stockholders' Agreement.   Upon the Effective Date, Reorganized Allied Holdings, Yucaipa and certain other stockholders of Reorganized Allied Holdings who shall be the beneficial owners of more than 5% of the issued and outstanding New Allied Holdings Common Stock and are signatories thereto will be bound by the terms of the Stockholders' Agreement.   The Stockholders' Agreement provides for, among other things, (i) nomination rights regarding the board of directors of Reorganized Allied Holdings consistent (for two years) with the board composition described in Section 7.2 of this Plan, (ii) approval rights regarding certain significant transactions involving Reorganized Allied Holdings, (iii) subscription rights in favor of certain qualified stockholders party to the Stockholders' Agreement in connection with certain issuances of securities, (iv) certain additional restrictions on transfer of New Allied Holdings Common Stock and (v) other terms, conditions and restrictions of the type included in stockholders' agreements.  The form of Stockholders' Agreement is set forth in the Plan Supplement.  The entering into and effectuation of the Stockholders' Agreement on the Effective Date is authorized by the Plan without the need for any further action by holders of New Allied Holdings Common Stock, and shall be effective on the date thereof.  The foregoing may be modified by Yucaipa at any time after consultation with the Debtors and the Creditors' Committee. Certain of the terms described above may instead or also be included in the Reorganized Governing Documents or Reorganized By-Laws."

> • Section 7.5 of the Plan will be deleted in its entirety and replaced with the following:

> "Registration Rights Agreement.   On the Effective Date, Reorganized Allied Holdings will be authorized to enter into a Registration Rights Agreement with Yucaipa and other stockholders who are the beneficial owners of more than 5% of the New Allied Holdings Common Stock.  The Registration Rights Agreement is expected to provide (i) certain rights to require Reorganized Allied Holdings to register a public offering, (ii) certain rights to demand that Reorganized Allied Holdings file, prepare and cause to become effective registration statement and (iii) piggyback registration rights.  The form of the Registration Rights Agreement is set forth in the Plan Supplement.   The entering into and effectuation by Reorganized Allied Holdings of the Registration Rights Agreement on the

52

Effective Date, will be authorized by the Plan without the need for any further corporate action and without any further action by holders of Claims or equity interests, and shall be effective on the date thereof.  The foregoing may be modified by Yucaipa at any time after consultation with the Debtors and the Creditors' Committee."

- Section 7.12 of the Plan will be deleted in its entirety and replaced with the following:

"Old Allied Holdings Common Stock, Old Other Debtors Common Stock and Old Allied Holdings Stock Rights.  On the Effective Date, all Old Allied Holdings Common Stock and Old Allied Holdings Stock Rights will be cancelled.  The Old Other Debtors Common Stock shall remain effective and outstanding and be owned and held by Reorganized Allied Holdings."

## MM.  **Final Order**

This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

IT IS SO ORDERED.

Dated:  May _18_, 2007

_C. Ray Mullins_

_____
C. Ray Mullins
UNITED STATES BANKRUPTCY JUDGE


[signatures on following page]

Respectfully submitted,

/s/ Jeffrey W. Kelley

TROUTMAN SANDERS LLP
Ezra H. Cohen
Jeffrey W. Kelley
600 Peachtree St., N.E., Suite 5200
Atlanta, Georgia 30308-2216
Telephone: (404) 885-3009
Facsimile: (404) 692-6799
*Counsel for Debtors and Debtors in Possession*

/s/ Robert A. Klyman

LATHAM & WATKINS LLP
Robert A. Klyman
633 West 5th Street, Suite 4000
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
*Counsel for Yucaipa*

/s/ Frederick Perillo

Previant, Goldberg, Uelmen, Gratz, Miller and
Brueggerman, S.C.
Frederick Perillo
Jill Hartley
1555 North River Center Drive, Suite 202
Milwaukee, Wisconsin 53212
Telephone: (414) 271-4500
Facsimile (414) 271-6308
*Counsel for TNATINC*

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In Re: | Chapter 11 |
| **ALLIED HOLDINGS, INC., *et al.*,** | **Case Nos. 05-12515 through 05-12526 and 05-12528 through 05-12537** |
| Debtors. | |
| | Judge Mullins |

## NOTICE OF (A) ENTRY OF CONFIRMATION ORDER; (B) EFFECTIVE DATE; AND (C) ADMINISTRATIVE EXPENSE CLAIMS BAR DATE

### (A)    NOTICE OF ENTRY OF CONFIRMATION ORDER

PLEASE TAKE NOTICE that the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") entered an order (the "Confirmation Order") on May __, 2007 (the "Confirmation Date"), confirming the *Second Amended Joint Plan Of Reorganization of Allied Holdings, Inc. and Affiliated Debtors Proposed by the Debtors, Yucaipa and the Teamsters National Automobile Transportation Industry Negotiating Committee* (as amended and modified, the "Plan").[11] A copy of the Plan and the Confirmation Order can be obtained by: written request to JPMorgan Trust Company, National Association, c/o Administar Services Group, P.O. Box 56636, Jacksonville, FL 32241-6636; or calling 904-807-3066; or contacting counsel to the Debtors, Troutman Sanders LLP, 5200 Bank of America Plaza, 600 Peachtree Street, N.E., Atlanta, GA 30308, fax no. (404) 885-3900, phone no. (404) 885-2506.

### (B)    NOTICE OF EFFECTIVE DATE OF PLAN

PLEASE TAKE NOTICE THAT on May _____, 2007, the Plan became effective (the "Effective Date").

The Plan, the Plan Supplement and the Confirmation Order shall bind (i) the Debtors, (ii) the Reorganized Debtors, (iii) all Holders of Claims against and Interests in any Debtor, whether or not impaired under the Plan and whether or not, if impaired, such Holders accepted, rejected, or are deemed to have accepted or rejected the Plan, (iv) each Person acquiring property under the Plan, (v) all non–Debtor parties to executory contracts and unexpired leases with any Debtor, (vi) all entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or the Confirmation Order and (vii) each of the foregoing's respective heirs, successors, assigns, trustees, executors or administrators, if any.

### (C)    NOTICE OF ADMINISTRATIVE EXPENSE CLAIMS BAR DATE

PLEASE TAKE FURTHER NOTICE THAT, expect as otherwise provided in the Plan, all requests for payment of Administrative Expense Claims pursuant to section 503 of the

---

[11]    Capitalized terms not defined herein have the meaning given in the Plan.

CH\931720.9

Bankruptcy Code must be filed with the Bankruptcy Court no later than _____,
2007. All such requests must be submitted by motion in a form in accordance with the
Bankruptcy Code, the Bankruptcy Rules and the local rules of the Bankruptcy Court. **If you fail
to file a timely request for allowance of an Administrative Expense Claim, such claim shall
not be Allowed by the Court or paid.**

**(D)   NOTICE OF BAR DATE FOR CLAIMS BASED ON REJECTION OF
EXECUTORY CONTRACTS OR UNEXPIRED LEASES**

PLEASE TAKE FURTHER NOTICE THAT all proofs of Claim arising from the
rejection (if any) of executory contracts or unexpired leases by operation of the Plan or Plan
Supplement must be filed with the Voting Agent within thirty (30) days after the Confirmation
Date. **Any Claims arising from the rejection of an executory contract or unexpired lease
for which proofs of Claim are not timely filed within that time period will be forever
barred from assertion against the Debtors or the Reorganized Debtors, their Estates and
property unless otherwise ordered by the Bankruptcy Court.**

**(E)   FEE APPLICATIONS OF PROFESSIONALS**

Please be advised that any Professional seeking an allowance for compensation or
reimbursement of expenses pursuant to sections 327, 328, 330 or 1103 of the Bankruptcy Code
shall by _____, 2007 file with this Court a final application for professional fees and
expenses.

[remainder of page intentionally left blank]

CH\931720.9

**This Notice is being sent to you by Court Order.**

Dated:  May _____, 2007          Respectfully submitted,

/s/ Jeffrey W. Kelley

TROUTMAN SANDERS LLP
Ezra H. Cohen
Jeffrey W. Kelley
600 Peachtree St., N.E., Suite 5200
Atlanta, Georgia  30308-2216
Telephone:  (404) 885-3009
Facsimile:  (404) 692-6799
*Counsel for Debtors and Debtors in Possession*

/s/ Robert A. Klyman

LATHAM & WATKINS LLP
Robert A. Klyman
633 West 5th Street, Suite 4000
Los Angeles, CA  90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
*Counsel for Yucaipa*

/s/ Frederick Perillo

Previant, Goldberg, Uelmen, Gratz, Miller and
Brueggerman, S.C.
Frederick Perillo
Jill Hartley
1555 North River Center Drive, Suite 202
Milwaukee, Wisconsin  53212
Telephone:  (414) 271-4500
Facsimile (414) 271-6308
*Counsel for TNATINC*

CH\931720.9

# Exhibit 129

# D.I. 2944, Case No. 05-12515

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **ALLIED HOLDINGS, INC.,** *et al.* | **Case Nos. 05-12515 through 05-12526 and 05-12528 through 05-12537 (Jointly Administered)** |
| **Debtors.** | **Judge Mullins** |

### NOTICE OF FILING OF PLAN SUPPLEMENT FOR THE JOINT PLAN OF REORGANIZATION FOR ALLIED HOLDINGS, INC. AND AFFILIATED DEBTORS

Notice is hereby given by Allied Holdings, Inc. and its affiliated debtors[1] (collectively, the "Debtors") of the filing of the attached *Plan Supplement* for the Joint Plan of Reorganization proposed by the Debtors, Yucaipa American Alliance Fund I, LP and Yucaipa Alliance (Parallel) Fund I, LP (collectively, "Yucaipa") and The Teamsters National Automobile Transportation Industry Negotiating Committee ("TNATINC") (the "Plan") as filed on April 5, 2007. Capitalized terms not defined herein shall have the meaning given to them in the Plan.

Respectfully submitted this 24th day of April, 2007.

TROUTMAN SANDERS LLP

_____/s/ Jeffrey W. Kelley_____
Jeffrey W. Kelley
Bank of America Plaza
600 Peachtree Street, N.E. – Suite 5200
Atlanta, Georgia 30308-2216
Telephone:  (404) 885-3000
Facsimile:  (404) 885-3900

Counsel for the Debtors

---

[1] Allied Automotive Group, Inc., Allied Systems, Ltd. (L.P.), Allied Systems (Canada) Company, QAT, Inc., RMX LLC, Transport Support LLC, F.J. Boutell Driveaway LLC, Allied Freight Broker LLC, GACS Incorporated, Commercial Carriers, Inc., Axis Group, Inc., Axis Netherlands, LLC, Axis Areta, LLC, Logistic Technology, LLC, Logistic Systems, LLC, CT Services, Inc., Cordin Transport LLC, Terminal Services LLC, Axis Canada Company, Ace Operations, LLC, and AH Industries Inc.

Case 05-12515-drn    Doc 2944    Filed 04/24/07    Entered 04/24/07 16:25:29    Desc Main
Document    Page 2 of 85

# PLAN SUPPLEMENT

# AMENDED AND RESTATED
## CERTIFICATE OF INCORPORATION
## OF
## [ALLIED HOLDINGS, INC.][1]

FIRST.   The name of the corporation is [Allied Holdings, Inc.]

SECOND.   The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle, 19808.  The name of its registered agent at such address is Corporation Trust Center.

THIRD.   The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

FOURTH.   The Corporation shall have authority to issue one class of Common Stock and one class of Preferred Stock.   The Corporation may issue 100,000,000 shares of Common Stock, $0.01 par value per share (the "Common Stock").   The Corporation may issue 10,000,000 shares of Preferred Stock, $0.01 par value per share (the "Preferred Stock").

The Preferred Stock may be issued from time to time in one or more series.  The board of directors of the Corporation (the "Board of Directors") is hereby authorized to provide by resolution for the issuance of shares of Preferred Stock in one or more series and, by filing a certificate pursuant to the applicable law of the State of Delaware (hereinafter referred to as "Preferred Stock Designation"), setting forth such resolution, to establish by resolution from time to time the number of shares to be included in each such series, and to fix by resolution the designation, powers, preferences and rights of the shares of each such series and the qualifications, limitations and restrictions thereof.   The authority of the Board of Directors with respect to each series shall include, but not be limited to, determination of the following:

(a)      the designation of the series, which may be by distinguishing number, letter or title;

(b)      the number of shares of the series, which number the Board of Directors may thereafter (except where otherwise provided in the Preferred Stock Designation) increase or decrease (but not below the number of shares thereof then outstanding);

(c)      the amounts or rates at which dividends will be payable on, and the preferences, if any, of shares of the series in respect of dividends, and whether such dividends, if any, shall be cumulative or noncumulative;

(d)      dates on which dividends, if any, shall be payable;

---

[1] The name of Reorganized Allied Holdings may be changed to something different than "Allied Holdings, Inc." in connection with the reincorporation in Delaware.

(e)    the redemption rights and price or prices, if any, for shares of the series;

(f)    the terms and amount of any sinking fund, if any, provided for the purchase or redemption of shares of the series;

(g)    the amounts payable on, and the preferences, if any, of shares of the series in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation;

(h)    whether the shares of the series shall be convertible into, or exchangeable, or redeemable for, shares of any other series or any other security of the Corporation or any other corporation, and, if so, the specification of such other series or such other security, the conversion or exchange price or prices or rate or rates, any adjustments thereof, the date or dates on which such shares shall be convertible or exchangeable and all other terms and conditions upon which such conversion or exchange may be made;

(i)    the voting rights, if any, of the holders of shares of the series generally or upon specified events; and

(j)    any other rights, powers and preferences of such shares as are permitted by law.

The Common Stock shall be subject to the express terms of the Preferred Stock and any series thereof.  Except as may otherwise be provided in this Amended and Restated Certificate of Incorporation, in a Preferred Stock Designation or by applicable law, the holders of shares of Common Stock shall be entitled to one vote for each such share upon all questions presented to the stockholders and shall not have cumulative voting rights.

The Corporation shall be entitled to treat the person in whose name any share of its stock is registered as the owner thereof for all purposes and shall not be bound to recognize any equitable or other claim to, or interest in, such share on the part of any other person, whether or not the Corporation shall have notice thereof, except as expressly provided by applicable law.

FIFTH.   Unless and except to the extent that the Bylaws of the Corporation shall so require, the election of directors of the Corporation need not be by written ballot.

SIXTH.   The business and affairs of the Corporation shall be managed by, or under the direction of, the Board of Directors.  The Board of Directors shall have that number of directors from time to time fixed pursuant to a resolution adopted by a majority of the Board of Directors.

SEVENTH.   In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Board of Directors is expressly authorized to make, alter and repeal the Bylaws of the Corporation.

Except as otherwise provided in this Amended and Restated Certificate of Incorporation or the Bylaws of the Corporation, and in addition to any other vote required by law, the affirmative vote of the holders of not less than a majority of the total voting power of the outstanding shares of capital stock of the Corporation entitled to vote (the "Voting Stock"), voting together as a single class, shall be the only vote required in order for stockholders to alter, amend or repeal any provision of the Bylaws of the Corporation.

EIGHTH.   A director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended.   If the General Corporation Law of the State of Delaware is amended after the effective date of this Amended and Restated Certificate of Incorporation to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law of the State of Delaware, as so amended.

Any amendment, modification or repeal of the foregoing paragraph shall not adversely affect any right or protection of a director of the Corporation hereunder with respect to any act or omission occurring prior to the time of such amendment, modification or repeal.

NINTH.   (a)   Certain Acknowledgments.   In recognition and anticipation (i) that the Corporation will not be a wholly owned subsidiary of Yucaipa American Alliance Fund I, LP or Yucaipa American Alliance (Parallel) Fund I, LP (collectively, the "Yucaipa Entities") and that any of the Yucaipa Entities or Affiliated Companies (as defined below) thereof may be controlling or significant stockholders of the Corporation, (ii) that directors, officers and/or employees of any of the Yucaipa Entities or of Affiliated Companies thereof may serve as directors and/or officers of the Corporation, (iii) that any of the Yucaipa Entities and Affiliated Companies thereof may engage (and are expected to continue to engage) in the same, similar or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage, (iv) that any of the Yucaipa Entities and Affiliated Companies thereof may have an interest in the same areas of corporate opportunity as the Corporation and Affiliated Companies thereof, (v) that any of the Yucaipa Entities and Affiliated Companies thereof may engage in material business transactions with the Corporation and Affiliated Companies thereof, and that any of the Yucaipa Entities and/or the Corporation may benefit therefrom, and (vi) that, as a consequence of the foregoing, it is in the best interests of the Corporation that the respective rights and duties of the Corporation and of any of the Yucaipa Entities and Affiliated Companies thereof, and the duties of any directors or officers of the Corporation who are also directors, officers or employees of any of the Yucaipa Entities or of Affiliated Companies thereof, be determined and delineated in respect of any transactions between, or opportunities that may be suitable for both, the Corporation and Affiliated Companies thereof, on the one hand, and any of the Yucaipa Entities and Affiliated Companies thereof, on the other hand, and in recognition of the benefits to be derived by the Corporation through its continual contractual, corporate and business relations with any of the Yucaipa Entities and Affiliated Companies thereof (including possible service of officers and directors of any of the Yucaipa Entities and Affiliated Companies thereof as officers and directors of the

3

Corporation), the provisions of this Article NINTH shall to the fullest extent permitted by law regulate and define the conduct of certain of the business and affairs of the Corporation in relation to any of the Yucaipa Entities and Affiliated Companies thereof and the conduct of certain affairs of the Corporation as they may involve any of the Yucaipa Entities, any Affiliated Companies thereof and its officers and directors, and the power, rights, duties and liabilities of the Corporation and its officers, directors and stockholders in connection therewith. Any person purchasing or otherwise acquiring any shares of capital stock of the Corporation, or any interest therein, shall be deemed to have notice of and to have consented to the provisions of this Article NINTH.

        (b)    <u>Certain Agreements and Transactions Permitted; Certain Fiduciary Duties of Certain Stockholders, Directors and Officers</u>. The Corporation may from time to time enter into and perform, and cause or permit any Affiliated Company of the Corporation to enter into and perform, one or more agreements (or modifications or supplements to pre-existing agreements) with any of the Yucaipa Entities or Affiliated Companies thereof pursuant to which the Corporation or an Affiliated Company thereof, on the one hand, and any Yucaipa Entity or an Affiliated Company thereof, on the other hand, agree to engage in transactions of any kind or nature with each other or with Affiliated Companies thereof and/or agree to compete, or to refrain from competing or to limit or restrict their competition, with each other, including to allocate and to cause their respective directors, officers, stockholders, employees and agents (including any who are directors, officers, stockholders, employees or agents of both) to allocate opportunities between or to refer opportunities to each other. Subject to Section (d) of this Article NINTH, no such agreement, or the performance thereof by the Corporation or any of the Yucaipa Entities, or any Affiliated Company thereof, shall to the fullest extent permitted by law be considered contrary to (i) any fiduciary duty that any of the Yucaipa Entities or any Affiliated Company thereof may owe to the Corporation or any Affiliated Company thereof or to any stockholder or other owner of an equity interest in the Corporation or an Affiliated Company thereof by reason of any of the Yucaipa Entities or any Affiliated Company thereof being a controlling or significant stockholder of the Corporation or of any Affiliated Company or participating in the control of the Corporation or of any Affiliated Company thereof or (ii) any fiduciary duty of any director or officer of the Corporation or of any Affiliated Company thereof who is also a director, officer, employee or agent of any of the Yucaipa Entities or any Affiliated Company thereof to the Corporation or such Affiliated Company, or to any stockholder thereof. Subject to Section (d) of this Article NINTH, to the fullest extent permitted by law, none of the Yucaipa Entities nor any Affiliated Company thereof, as a stockholder of the Corporation or any Affiliated Company thereof, or participant in control of the Corporation or any Affiliated Company thereof, shall have or be under any fiduciary duty to refrain from entering into any agreement or participating in any transaction referred to above and no director, officer, stockholder, employee or agent of the Corporation who is also a director, officer, stockholder, employee or agent of any of the Yucaipa Entities or any Affiliated Company thereof shall have or be under any fiduciary duty to the Corporation or any Affiliated Company thereof, to refrain from acting on behalf of the Corporation or any Affiliated Company thereof or of any of the Yucaipa Entities or any Affiliated Company thereof in respect of any such agreement or transaction or performing any such agreement in accordance with its terms. The Corporation renounces any interest or expectancy of the Corporation or Affiliated Companies thereof in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to the Corporation or its directors, officers, stockholders, employees, agents or

Affiliated Companies, even if the opportunity is one that the Corporation or Affiliated Companies thereof might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so.

           (c)    <u>Similar Activities or Lines of Business</u>.  Except as otherwise agreed in writing between the Corporation and any of the Yucaipa Entities, the Yucaipa Entities and any Affiliated Company thereof shall to the fullest extent permitted by law have no duty to refrain from (i) engaging in the same or similar activities or lines of business as the Corporation and any Affiliated Company thereof and (ii) doing business with any client, customer or vendor of the Corporation or any Affiliated Company thereof, and no Yucaipa Entity nor any officer, director, employee or Affiliated Company thereof (except as provided in subsection (d) below) shall to the fullest extent permitted by law be deemed to have breached its or his or her fiduciary duties, if any, to the Corporation solely by reason of any of the Yucaipa Entities or any Affiliated Company engaging in any such activity.  Neither the Corporation, any Affiliated Company nor any of their respective stockholders shall have any rights in or to any of the activities described in the foregoing sentence or the income or profits derived therefrom.  In the event that any Yucaipa Entity or an Affiliated Company acquires knowledge of a potential transaction or matter which may be a corporate opportunity for any of the Yucaipa Entities, an Affiliated Company thereof and the Corporation or an Affiliated Company thereof, the Yucaipa Entity and its Affiliated Company shall to the fullest extent permitted by law have no duty to communicate or offer such corporate opportunity to the Corporation or any Affiliated Company thereof and shall not to the fullest extent permitted by law be liable to the Corporation or its stockholders for breach of any fiduciary duty as a stockholder of the Corporation by reason of the fact that any of the Yucaipa Entities or any Affiliated Company thereof acquires or seeks such corporate opportunity for itself, directs such corporate opportunity to another person or entity, or otherwise does not communicate information regarding such corporate opportunity to the Corporation or any Affiliated Company thereof.

           (d)    <u>Duties of Directors and Officers of the Corporation</u>.  In the event that a director or officer of the Corporation who is also a director, officer or employee of any Yucaipa Entity or an Affiliated Company acquires knowledge of a potential transaction or matter which may be a corporate opportunity for the Corporation or an Affiliated Company thereof or, any Yucaipa Entity or an Affiliated Company thereof, such director or officer shall to the fullest extent permitted by law have fully satisfied and fulfilled his or her fiduciary duty with respect to such corporate opportunity, and the Corporation to the fullest extent permitted by law waives any claim that such business opportunity constituted a corporate opportunity that should have been presented to the Corporation or any Affiliated Company thereof, if such director or officer acts in a manner consistent with the following policy:  a corporate opportunity offered to any person who is an officer or director of the Corporation, and who is also an officer, director or employee of any of the Yucaipa Entities or an Affiliated Company thereof, shall belong to the Yucaipa Entities or an Affiliated Company thereof, unless such opportunity was expressly offered to such person in writing and solely in his or her capacity as a director or officer of the Corporation.

           (e)    <u>Certain Definitions</u>.  For purposes of this Article NINTH and TENTH, "Affiliated Company" shall mean in respect of the Yucaipa Entities any entity which is controlled by any of the Yucaipa Entities, controls any of the Yucaipa Entities or is under common control with any of the Yucaipa Entities (other than the Corporation and any entity that

is controlled by the Corporation) and in respect of the Corporation shall mean any entity
controlled by the Corporation.  For the purposes of this definition, "control" means the
possession of the power to direct or cause the direction of the management and policies of such
entity through the ownership of voting securities, by contract or otherwise.  For the avoidance of
doubt, for so long as the Yucaipa Entities directly or indirectly own more than fifty percent
(50%) of the capital stock of Performance Logistics Group, Inc., a Delaware corporation, such
corporation shall be considered an Affiliated Company of the Yucaipa Entities for purposes of
this Article NINTH and TENTH.



       TENTH.  (a)  <u>Affiliate Transactions</u>.  Until [_____], 2009,[2] or such earlier date as
provided in Section (c) of this Article TENTH, the vote or consent of at least a Supermajority (as
defined below) of either the Common Stock or the Voting Stock of the Corporation is required in
order to effect the following:

       (1)     a merger or consolidation of the Corporation or a Material
Subsidiary (as defined below) with or into any of the Yucaipa Entities or any of their Affiliated
Companies;

       (2)     the sale, lease, license or other transfer of all or substantially all of
the properties and assets of the Corporation and its subsidiaries (taken as a whole on a
consolidated basis as of the most recently completed fiscal year of the Corporation) or of a
Material Subsidiary and its subsidiaries (taken as a whole on a consolidated basis as of the most
recently completed fiscal year of the Corporation) to one or more of the Yucaipa Entities or one
or more of their Affiliated Companies, whether in one transaction or in a series of transactions;

       (3)     the sale by the Corporation or any subsidiary of the Corporation of
capital stock of the Corporation or such subsidiary or of securities convertible by their terms into
such capital stock, to any of the Yucaipa Entities or any of their Affiliated Companies where the
aggregate consideration paid by the Yucaipa Entities or their Affiliated Companies for such
capital stock or convertible securities in any consecutive one hundred and eighty (180) day
period exceeds twenty-five million dollars ($25,000,000) or, prior to [_____], 2009,[2] exceeds
one hundred million dollars ($100,000,000) in the aggregate; and

       (4)     any amendment to the provisions set forth in this Article TENTH.

       (b)     <u>Certain Definitions</u>.  For purposes of this Article TENTH, a
"Supermajority" of the Common Stock of the Corporation shall mean a percentage equal to (1)
the percentage (as of the record date for any applicable vote or consent) of the Common Stock
owned or held by the Yucaipa Entities together with their Affiliated Companies, <u>plus</u>  (2) seven
percent (7%).  For purposes of this Article TENTH, a "Supermajority" of the Voting Stock of
the Corporation shall mean a percentage equal to (1) if the voting rights (on an as converted basis
or otherwise) of any outstanding Preferred Stock owned or held by the Yucaipa Entities and their
Affiliated Companies is not  materially disproportionate to the voting rights of the Common
Stock, the percentage (as of the record date for any applicable vote or consent) of the Voting
Stock (instead of Common Stock) owned or held by the Yucaipa Entities together with their

---

[2] The two year anniversary of the Effective Date.

Affiliated Companies, plus (2) seven percent (7%).  For purposes of this Article TENTH, "Material Subsidiary" shall mean any subsidiary of the Corporation (i) the assets of which exceed twenty percent (20%) of the total assets of the Corporation and its subsidiaries taken as a whole on a consolidated basis as of the end of the most recently completed fiscal year of the Corporation or (ii) that generated revenues which exceeded twenty percent (20%) of the total revenues of the Corporation and its subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year of the Corporation.  For the avoidance of doubt, for so long as the Corporation directly or indirectly owns more than fifty percent (50%) of the capital stock of Allied Systems (Canada) Company, such entity shall be considered a Material Subsidiary for purpose of this Article TENTH.

           (c)      Termination of Restrictions.  On and after the earlier of [_____][3], 2009 or such date as the Yucaipa Entities and their Affiliated Companies own or hold in the aggregate either (1) seventy-five percent (75%) or more of the Common Stock of the Corporation or (2) if the voting rights (on an as converted basis or otherwise) of any outstanding Preferred Stock owned or held by the Yucaipa Entities and their Affiliated Companies are not materially disproportionate to the per share voting rights of the Common Stock, then seventy-five percent (75%) or more of the Voting Stock of the Corporation, the requirements of Section (a) of  this Article TENTH shall be void and no longer given effect and the vote or consent of a Supermajority of the capital stock of the Corporation (voting together as a single class) shall no longer be required in order to effect any of the actions described in Section (a) of this Article TENTH.

           ELEVENTH.  The Corporation shall not issue any nonvoting equity securities to the extent prohibited by section 1123(a)(6) of title 11 of the United States Code (the "Bankruptcy Code") as in effect on the date of the filing of this Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware; provided, however, that this Article ELEVENTH (i) will have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation, and (iii) in all events may be amended or eliminated in accordance with such applicable law as from time to time may be in effect.

           TWELFTH.  (a)  No Transfers in Violation of This Article TWELFTH.  Any attempted Transfer (as defined below) of Common Stock that is not in compliance with this Article TWELFTH shall be void and shall not be recognized or registered by the Corporation, and the proposed Transferee shall not be treated as the owner of such Common Stock. Notwithstanding the foregoing, to the extent any such Transfer is effected or purported to have been effected and is not in compliance with this Article TWELFTH, the Corporation shall have the option to redeem, out of lawfully available funds therefor, any or all of the Common Stock Transferred (or purported to be Transferred) on such terms and subject to such conditions determined by the Board of Directors in its sole discretion.  Any holder of Common Stock, however acquired, shall be deemed to have notice of and to have consented to the provisions of this Article TWELFTH.

---

[3] The two year anniversary of the Effective Date.

(b) <u>Prohibited Transfers</u>.  No holder of Common Stock shall Transfer any Common Stock to any person or entity, nor shall the Corporation issue, sell or otherwise Transfer any Common Stock to any person or entity, if, at the time of such Transfer, the Corporation has more than 290 holders of record (as such concept is understood for purposes of Section 12(g) of the Securities Exchange Act of 1934, as amended, or any relevant rules promulgated thereunder (the "Exchange Act")), or if the Corporation reasonably determines that such Transfer would, if effected, result in the Corporation having more than 290 holders of record.  The limitations set forth in the immediately preceding sentence shall not prohibit:  (1) a Transfer by a holder of Common Stock to another person or entity that, immediately prior to the Transfer, is a holder of record of Common Stock, (2) a Transfer by a holder of Common Stock to the Corporation, (3) a Transfer by the Corporation to a person or entity that, immediately prior to the Transfer, is a holder or record of Common Stock, (4) a Transfer of all Common Stock owned by the proposed transferor to a single person or entity who is treated as a single record holder under the Exchange Act, or (5) a Transfer so long as after giving effect to such Transfer the Corporation has no more than 290 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act).

(c) <u>Termination of Restrictions</u>.  Section (a) and Section (b) of this Article TWELFTH shall be void and no longer given effect and the restrictions on Transfer therein shall no longer be in effect on and after the earlier of:  (1) such time as the Corporation determines that it has more than 500 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) of Common Stock, (2) only if the Corporation has not filed a Form 15 deregistering the Common Stock under the Exchange Act, _____ __, 2007[4], (3) the listing of the Common Stock on the New York Stock Exchange, NASDAQ or AMEX, (4) the consummation of a sale of capital stock of the Corporation in an underwritten public offering registered under the Securities Act of 1933, as amended, with gross proceeds to the Corporation or the Selling Stockholders of not less than forty million dollars ($40,000,000) or (5) on the fifth business day following the Corporation's receipt of written notice from any of the Yucaipa Entities or Affiliated Companies thereof, that they have determined, in their sole and absolute discretion, that the requirements of Section (a) and Section (b) of this Article TWELFTH shall be void and no longer given effect.  Upon the Corporation's determination that it has greater than 500 holders of record of Common Stock, the Corporation shall notify the record holders of Common Stock of such determination, but the failure of the Corporation to provide such notice shall not be a condition to the termination of the restrictions set forth in Section (a) and (b) of this Article TWELFTH.  Notwithstanding the immediately preceding sentence, if Section (a) and Section (b) of this Article TWELFTH are made void and not effective pursuant to Section (c)(1) of this Article TWELFTH, and the Corporation later determines that it has less than 300 holders of record, then Section (a) and Section (b) of Article TWELFTH may be reinstated and again made effective and binding on all holders of Common Stock if and at such time as the Corporation provides written notice to at least a majority of the holders of record of Common Stock (other than the Yucaipa Entities) that such sections have been reinstated and are again effective.

---

[4] The six-month anniversary of the Effective Date.

(d)  <u>Certain Definitions</u>.  For purposes of this Article TWELFTH, "Transfer" means any transfer, donation, bequest, sale, assignment or other disposal or attempted disposal (including, without limitation, by way of merger, operation of law, pursuant to any domestic relations or other court order, whether with or without consideration and whether voluntarily or involuntarily or by operation of law).  "Transferred" means the accomplishment of a Transfer, and "Transferee" means the recipient of a Transfer.

THIRTEENTH.  The Corporation reserves the right at any time, and from time to time, to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed by law; and all rights, preferences and privileges of whatsoever nature conferred upon stockholders, directors or any other persons whomsoever by and pursuant to this Amended and Restated Certificate of Incorporation in its present form or as hereafter amended are granted subject to the rights reserved in this article.

FOURTEENTH.   The Corporation elects not to be governed by Section 203 of the General Corporation Law of the State of Delaware.

FIFTEENTH.   Other than the voting requirements set forth in Article TENTH of this Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the Voting Stock, voting together as a single class, shall be required to alter, amend or repeal, or to adopt any provision inconsistent with, this Amended and Restated Certificate of Incorporation.

# BYLAWS

## OF

## [ALLIED HOLDINGS, INC.] [1]

---

[1] The name of Reorganized Allied Holdings may be changed to something different than "Allied Holdings, Inc." in connection with the reincorporation in Delaware.

# TABLE OF CONTENTS

ARTICLE I. OFFICES AND RECORDS ................................................................................1

    Section 1.1    Registered Office ...............................................................................1
    Section 1.2    Other Offices .....................................................................................1
    Section 1.3    Books and Records ............................................................................1

ARTICLE II. STOCKHOLDERS ..........................................................................................1

    Section 2.1    Annual Meeting .................................................................................1
    Section 2.2    Special Meeting .................................................................................1
    Section 2.3    Place of Meeting ...............................................................................1
    Section 2.4    Notice of Meeting .............................................................................2
    Section 2.5    Adjournments....................................................................................2
    Section 2.6    Quorum ............................................................................................3
    Section 2.7    Voting and Proxies............................................................................3
    Section 2.8    Notice of Stockholder Business and Nominations..................................4
    Section 2.9    Organization .....................................................................................7
    Section 2.10   Inspectors of Elections, Conduct of Meetings ......................................7
    Section 2.11   Fixing Date of Determination of Stockholders of Record ......................8
    Section 2.12   List of Stockholders Entitled to Vote...................................................9
    Section 2.13   Postponement and Cancellation of Meeting .........................................9

ARTICLE III. BOARD OF DIRECTORS ..............................................................................9

    Section 3.1    General Powers.................................................................................9
    Section 3.2    Number. ..........................................................................................10
    Section 3.3    Organization....................................................................................10
    Section 3.4    Regular Meetings.............................................................................10
    Section 3.5    Special Meetings.............................................................................10
    Section 3.6    Notice.............................................................................................10
    Section 3.7    Quorum. .........................................................................................10
    Section 3.8    Vacancies........................................................................................11
    Section 3.9    Committees......................................................................................11
    Section 3.10   Resignation and Removal. ................................................................11
    Section 3.11   Telephonic Meetings. ......................................................................12
    Section 3.12   Action by Unanimous Consent of Directors.......................................12
    Section 3.13   Reliance upon Records. ....................................................................12
    Section 3.14   Compensation. .................................................................................12

ARTICLE IV. OFFICERS ..................................................................................................12

    Section 4.1    Elected Officers. ..............................................................................12
    Section 4.2    Other Officers. .................................................................................13
    Section 4.3    Resignation and Removal. ................................................................13
    Section 4.4    Vacancies. ......................................................................................13

Section 4.5   Chief Executive Officer. .................................................................................13

Section 4.6   President. ...................................................................................................13

Section 4.7   Vice Presidents and Assistant Vice Presidents ...................................13

Section 4.8   Secretary. ...................................................................................................14

Section 4.9   Treasurer. ...................................................................................................14

Section 4.10  Assistant Officers. .....................................................................................14

Section 4.11  Compensation. ...........................................................................................14

ARTICLE V. CONTRACTS AND PROXIES .........................................................................14

Section 5.1   Contracts. ...................................................................................................14

Section 5.2   Proxies. ......................................................................................................15

ARTICLE VI. INDEMNIFICATION AND INSURANCE ......................................................15

Section 6.1   Indemnification and Insurance. ...............................................................15

ARTICLE VII. STOCK ............................................................................................................17

Section 7.1   Certificates. ...............................................................................................17

Section 7.2   Lost, Stolen or Destroyed Stock Certificates, Issuance of New
Certificates ...............................................................................................17

ARTICLE VIII. INFORMATION RIGHTS .............................................................................17

Section 8.1   Access to Information. ..............................................................................17

ARTICLE IX. MISCELLANEOUS PROVISIONS ..................................................................19

Section 9.1   Fiscal Year. ................................................................................................19

Section 9.2   Dividends. ..................................................................................................19

Section 9.3   Seal. ...........................................................................................................19

Section 9.4   Form of Records. .......................................................................................19

Section 9.5   Manner of Notice. .....................................................................................19

Section 9.6   Waiver of Notice of Meetings of Stockholders, Directors and
Committees. ..............................................................................................19

ARTICLE X. AMENDMENTS .................................................................................................20

BYLAWS
OF
[ALLIED HOLDINGS, INC.]

_____ __, 2007

Incorporated under the General Corporation Law of the State of Delaware.

## ARTICLE I.
## OFFICES AND RECORDS

Section 1.1    Registered Office.  The registered office of [Allied Holdings, Inc.] (the "Corporation") in the State of Delaware shall be located in the City of Wilmington, County of New Castle, and the name and address of its registered agent is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, State of Delaware 19808.

Section 1.2    Other Offices.  The Corporation may have such other offices, either within or without the State of Delaware, as the Board of Directors may from time to time designate or as the business of the Corporation may from time to time require.

Section 1.3    Books and Records.  The books and records of the Corporation may be kept outside the State of Delaware at such place or places as may from time to time be designated by the Board of Directors.

## ARTICLE II.
## STOCKHOLDERS

Section 2.1    Annual Meeting.  If required by applicable law, an annual meeting of stockholders shall be held for the election of directors at such date, time and place, either within or without the State of Delaware, as may be designated by resolution of the Board of Directors from time to time.   Any other proper business may be transacted at the annual meeting.

Section 2.2    Special Meeting.  Special meetings of stockholders for any purpose or purposes may be called at any time by (i) the Chairman, (ii) a majority of the total authorized members of the Board of Directors, or (iii) by holders of not less than a majority of the total voting power of the outstanding shares of capital stock of the Corporation entitled to vote, voting together as a single class, but, other than as set forth in clauses (i), (ii) and (iii), such special meetings may not be called by any other person or persons.  Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 2.3    Place of Meeting.  The Board of Directors may designate the place of meeting for any meeting of the stockholders.   If no designation is made by the Board of Directors, the place of meeting shall be the principal office of the Corporation.   Notwithstanding the foregoing, the Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but shall be held solely by means of remote communication, subject to such guidelines and procedures as the Board of Directors may adopt, as permitted by applicable law.

Section 2.4    Notice of Meeting.  Written or printed notice, stating the place, if any, date and hour of a meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting and the purpose or purposes for which the meeting is called, shall be prepared and delivered by the Corporation not less than ten days nor more than 60 days before the date of the meeting, either personally or by mail, to each stockholder of record entitled to vote at such meeting.   If mailed, such notice shall be deemed to be delivered when deposited in the United States mail with postage thereon prepaid, addressed to the stockholder at such stockholder's address as it appears on the books of the Corporation.

Without limiting the foregoing, any notice to stockholders given by the Corporation pursuant to this Section 2.4 shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given.   Any such consent shall be revocable by the stockholder by written notice to the Corporation and shall also be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary or Assistant Secretary of the Corporation, the transfer agent or other person responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.   Notice given by a form of electronic transmission in accordance with these Bylaws shall be deemed given:  (i) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice, (ii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice, (iii) if by a posting on an electronic network, together with separate notice to the stockholder of such specific posting, upon the later of such posting and the giving of such separate notice, and (iv) if by another form of electronic transmission, when directed to the stockholder.

For purposes of these Bylaws, "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

Section 2.5    Adjournments.  Any meeting of stockholders, annual or special, may be adjourned by the chair of the meeting or by the holders of a majority of the total voting power of the outstanding shares of the Corporation voting together as a single class, from time to time to reconvene at the same or some other time, date and place.  Notice need not be given of any such adjourned meeting if the time, date and place thereof are announced at the meeting at which the adjournment is taken.  If the time, date and place of the adjourned meeting are not announced at the meeting at which the adjournment is taken, then the Secretary of the Corporation shall give written notice of the time, date and place of the adjourned meeting not less than ten days prior to the date of the adjourned meeting.

At an adjourned meeting at which a quorum is present, the stockholders may transact any business which might have been transacted at the original meeting.   Once a share is represented for any purpose at a meeting, it shall be present for quorum purposes for the remainder of the meeting and for any adjournment of that meeting unless a new record date is or must be set for the adjourned meeting.  If the adjournment is for longer than 30 days, or, if after the adjournment

2

a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the adjourned meeting consistent with the new record date.

Section 2.6    Quorum.  Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, at each meeting of stockholders, the presence in person or by proxy of the holders of a majority in voting power of the outstanding shares of stock entitled to vote at the meeting shall be necessary and sufficient to constitute a quorum.  In the absence of a quorum, the stockholders so present may, by a majority in voting power thereof, adjourn the meeting from time to time until a quorum shall attend.  Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation or any subsidiary of the Corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

Section 2.7    Voting and Proxies.

(A)    General.  Except as otherwise provided by or pursuant to the provisions of the Certificate of Incorporation, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share of stock held by such stockholder which has voting power upon the matter in question.  Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date.  Voting at meetings of stockholders need not be by written ballot.  At all meetings of stockholders for the election of directors a plurality of the votes cast shall be sufficient to elect.  All other elections and questions shall, unless otherwise provided by the Certificate of Incorporation, these Bylaws, the rules or regulations of any stock exchange or quotation system applicable to the Corporation, or applicable law or pursuant to any regulation applicable to the Corporation or its securities, be decided by the affirmative vote of the holders of a majority in voting power of the shares of stock of the Corporation, which are present in person or by proxy and entitled to vote thereon.

(B)    Participation and Voting By Means of Remote Communication.  If authorized by the Board of Directors in accordance with these Bylaws and applicable law, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication, (1) participate in a meeting of stockholders and (2) be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication; provided, that (i) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (ii) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the

3

stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

Section 2.8      Notice of Stockholder Business and Nominations.

(A)      Annual Meetings of Stockholders.

(1)      Nominations of persons for election to the Board of Directors and the proposal of business to be considered by the stockholders may be made at an annual meeting of stockholders only (i) pursuant to the Corporation's notice of meeting (or any supplement thereto), (ii) by or at the direction of the Board of Directors, or (iii) by any stockholder of the Corporation who was a stockholder of record of the Corporation on the record date of the meeting and at the time the notice provided for in this Section 2.8 is delivered to the Secretary of the Corporation, who is entitled to vote at the meeting and who complies with the notice procedures set forth in this Section 2.8.

(2)      So long as the Corporation's common stock remains registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act") and the Corporation's obligation to file reports under the Exchange Act has not been suspended, this Section 2.8(A)(2) shall be in effect.  For nominations or other business to be properly brought before an annual meeting by a stockholder pursuant to clause (iii) of paragraph (A)(1) of this Section 2.8, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation and any such proposed business other than the nominations of persons for election to the Board of Directors must constitute a proper matter for stockholder action.  To be timely, a stockholder's notice shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the ninetieth day nor earlier than the close of business on the one hundred twentieth day prior to the first anniversary of the preceding year's annual meeting (provided, however, that in the event that the date of the annual meeting is more than thirty days before or more than seventy days after such anniversary date, notice by the stockholder must be so delivered not earlier than the close of business on the one hundred twentieth day prior to such annual meeting and not later than the close of business on the later of the ninetieth day prior to such annual meeting or the tenth day following the day on which public announcement of the date of such meeting is first made by the Corporation).  For purposes of the first annual meeting of stockholders of the Corporation held after the date when the Corporation's Plan of Reorganization under Chapter 11 of the Bankruptcy Code takes effect, the first anniversary of such annual meeting shall be deemed to be [May 25, 2008].  In no event shall the public announcement of an adjournment or postponement of an annual meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.  Such stockholder's notice shall set forth: (i) as to each person whom the stockholder proposes to nominate for election as a director (a) all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors in an election contest, or is otherwise required, in each case pursuant to and in accordance with Regulation 14A under the Exchange Act and (b) such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected; (ii) as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought

4

before the meeting, the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend the Bylaws of the Corporation, the language of the proposed amendment), the reasons for conducting such business at the meeting and any material interest in such business of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made; and (iii) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (a) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner, (b) the number of shares of capital stock of the Corporation which are owned beneficially and of record by such stockholder and such beneficial owner, (c) a representation that the stockholder is a holder of record of stock of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to propose such business or nomination, and (d) a representation whether the stockholder or the beneficial owner, if any, intends or is part of a group which intends to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal or elect the nominee and/or otherwise to solicit proxies from stockholders in support of such proposal or nomination.  The foregoing notice requirements shall be deemed satisfied by a stockholder if the stockholder has notified the Corporation of his or her intention to present a proposal at an annual meeting in compliance with Rule 14a-8 (or any successor thereof) promulgated under the Exchange Act and such stockholder's proposal has been included in a proxy statement that has been prepared by the Corporation to solicit proxies for such annual meeting.  The Corporation may require any proposed nominee to furnish such other information as it may reasonably require to determine the eligibility of such proposed nominee to serve as a director of the Corporation.

(3)    So long as the Corporation's common stock remains registered under the Exchange Act and the Corporation's obligation to file reports under the Exchange Act is suspended, this Section 2.8(A)(3) shall be in effect.  Notwithstanding anything in the second sentence of paragraph (A)(2) of this Section 2.8 to the contrary, in the event that the number of directors to be elected to the Board of Directors of the Corporation at an annual meeting is increased and there is no public announcement by the Corporation naming the nominees for the additional directorships at least one hundred days prior to the first anniversary of the preceding year's annual meeting, a stockholder's notice required by this Section 2.8 shall also be considered timely, but only with respect to nominees for the additional directorships, if it shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the tenth day following the day on which such public announcement is first made by the Corporation.

(4)    If the Corporation has filed a Form 15 deregistering its common stock under the Exchange Act, and for so long as the Corporation's obligation to file reports under the Exchange Act is suspended, then Sections 2.8(A)(2) and (3) shall not be given effect or be applicable.   If the Corporation later becomes obligated to file reports under the Exchange Act or again registers its common stock under the Exchange Act, then Sections 2.8(A)(2) and (3) shall again be given effect.

(5)     Notwithstanding anything to the contrary set forth in this <u>Section 2.8</u>, the provisions of <u>Section 2.8(A)</u>, <u>(B)</u> and <u>(C)</u> shall not apply to nominations of individuals to serve as the Creditors Committee Director, the Yucaipa Directors or the Executive Director, each as defined in Section 1(a) of the Stockholders Agreement dated as of [_____, __ 2007], as amended from time to time, between the Corporation and the stockholders of the Corporation that are parties thereto (the "<u>Stockholders Agreement</u>").  Nomination of individuals to serve as Creditors Committee Director, the Yucaipa Directors and the Executive Director shall be governed by the procedures set forth in Section 1 of the Stockholders Agreement (but with respect to each such director, only for such time period as the Stockholders Agreement shall provide for nomination rights with respect to each such director).

(B)     <u>Special Meetings of Stockholders</u>.  Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting.  Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting (i) by or at the direction of the Board of Directors or (ii) provided that the Board of Directors has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who is a stockholder of record at the time the notice provided for in this <u>Section 2.8</u> is delivered to the Secretary of the Corporation, who is entitled to vote at the meeting and upon such election and who complies with the notice procedures set forth in this <u>Section 2.8</u>.  In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board of Directors, any such stockholder entitled to vote in such election of directors may nominate a person or persons (as the case may be) for election to such position(s) as specified in the Corporation's notice of meeting, if the stockholder's notice required by paragraph (A)(2) of this <u>Section 2.8</u> shall be delivered to the Secretary at the principal executive offices of the Corporation not earlier than the close of business on the one hundred twentieth day prior to such special meeting and not later than the close of business on the later of the ninetieth day prior to such special meeting or the tenth day following the day on which public announcement of the date of the special meeting and of the nominees proposed by the Board of Directors to be elected at such meeting is first made by the Corporation. In no event shall the public announcement of an adjournment or postponement of a special meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

(C)     <u>General</u>.

(1)     Only such persons who are nominated in accordance with the procedures set forth in this <u>Section 2.8</u> shall be eligible to be elected at an annual or special meeting of stockholders of the Corporation to serve as directors and only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this <u>Section 2.8</u>.  Except as otherwise provided by law, the chairman of the meeting shall have the power and duty (i) to determine whether a nomination or any business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in this <u>Section 2.8</u> and (ii) if any proposed nomination or business was not made or proposed in compliance with this <u>Section 2.8</u>, to declare that such nomination shall be disregarded or that such proposed business shall not be transacted, notwithstanding the foregoing provisions of this <u>Section 2.8</u>, if the stockholder (or a

qualified representative of the stockholder) does not appear at the annual or special meeting of stockholders of the Corporation to present a nomination or business, such nomination shall be disregarded and such proposed business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation.

(2)    For purposes of this <u>Section 2.8</u>, "public announcement" shall include disclosure in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Exchange Act.

(3)    Notwithstanding the foregoing provisions of this <u>Section 2.8</u> and so long as the Corporation's common stock remains registered under the Exchange Act, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this <u>Section 2.8</u>. Nothing in this <u>Section 2.8</u> shall be deemed to affect any rights (i) of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act or (ii) of the holders of any series of Preferred Stock to elect directors pursuant to any applicable provisions of the Certificate of Incorporation.

Section 2.9    <u>Organization</u>.  Meetings of stockholders shall be presided over by the Chairman of the Board, if any, or in his absence by the Vice Chairman of the Board, if any, or in his absence by the Chief Executive Officer, or in his absence by the President, or in his absence by a Vice President, or in the absence of the foregoing persons by a chairman designated by the Board of Directors, or in the absence of such designation by a chairman chosen at the meeting. The Secretary shall act as secretary of the meeting, but in his absence the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 2.10    <u>Inspectors of Elections, Conduct of Meetings</u>.

(A)    <u>Inspectors of Election</u>.  The Corporation may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more inspectors of election, who may be employees of the Corporation, to act at the meeting or any adjournment thereof and to make a written report thereof.  The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  In the event that no inspector so appointed or designated is able to act at a meeting of stockholders, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath to execute faithfully the duties of inspector with strict impartiality and according to the best of his or her ability.

(B)    <u>Duties</u>.  The inspectors shall (i) ascertain the number of shares of stock outstanding and the voting power of each, (ii) determine the number of shares of stock present in person or by proxy at such meeting and the validity of proxies and ballots, (iii) count all votes and ballots, (iv) determine and retain, for a reasonable period, a record of the disposition of any challenges made to any determination by the inspectors, and (v) certify their determination of the number of such shares present in person or by proxy at such meeting and their count of all votes and ballots.  Such certification and report shall specify such other information as may be required by law.  In determining the validity and counting of proxies and ballots cast at any meeting of

stockholders of the Corporation, the inspectors may consider such information as is permitted by applicable law.  The inspectors may appoint or retain other persons or entities to assist them in the performance of their duties.  No person who is a candidate for an office at an election may serve as an inspector at such election.

(C)     Conduct of Meetings.  The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting by the person presiding over the meeting.  The Board of Directors may adopt by resolution such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate.  Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the person presiding over any meeting of stockholders shall have the right and authority to convene and to adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting.  Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the presiding officer of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting, (ii) rules and procedures for maintaining order at the meeting and the safety of those present, (iii) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine, (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof, and (v) limitations on the time allotted to questions or comments by participants.  The presiding officer at any meeting of stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, shall, if the facts warrant, determine and declare to the meeting that a matter or business was not properly brought before the meeting and if such presiding officer should so determine, such person shall so declare to the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered.  Unless and to the extent determined by the Board of Directors or the person presiding over the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

Section 2.11     Fixing Date of Determination of Stockholders of Record.

(A)     Fixing the Record Date.  Except as is otherwise prohibited by law or these Bylaws, in order that the Corporation may determine the stockholders entitled (i) to notice of or to vote at any meeting of stockholders or any adjournment thereof, (ii) to express consent to corporate action in writing without a meeting, (iii) to receive payment of any dividend or other distribution or allotment of any rights, (iv) to exercise any rights in respect of any change, conversion or exchange of stock, or (v) to take, receive or participate in any other action, the Board of Directors may fix a record date, which shall not be earlier than the date upon which the resolution fixing the record date is adopted by the Board of Directors and which (1) in the case of a determination of stockholders entitled to notice of or to vote at any meeting of stockholders or adjournment thereof, shall, unless otherwise required by law, be not more than 60 nor less than 10 days before the date of such meeting; (2) in the case of a determination of stockholders entitled to express consent to corporate action in writing without a meeting, shall not be more than 10 days from the date upon which the resolution fixing the record date is adopted by the Board of Directors and (3) in the case of any other action, shall not be more than 60 days before such action.

8

(B)      If Record Date is Not Fixed.  If no record date is fixed, (i) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, (ii) the record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action of the Board of Directors is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law, or, if prior action by the Board of Directors is required by law, shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action, and (iii) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

(C)      Adjourned Meetings.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting, but the Board of Directors may fix a new record date for the adjourned meeting.

Section 2.12   List of Stockholders Entitled to Vote.  The Secretary shall prepare, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting; or (ii) during ordinary business hours, at the principal place of business of the Corporation.  If the meeting is to be held at a place, the list shall also be produced and kept at the time and place of the meeting during the whole time thereof and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, the list shall also be open to the examination of any stockholder during the whole time thereof on a reasonably accessible electronic network and the information required to access such list shall be provided with the notice of the meeting.  Except as otherwise provided by law, the stock ledger shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list of stockholders or the books of the Corporation, or to vote in person or by proxy at any meeting of stockholders.

Section 2.13   Postponement and Cancellation of Meeting.  Any previously scheduled annual or special meeting of the stockholders may be postponed, and any previously scheduled annual or special meeting of the stockholders called by the Board of Directors may be canceled, by resolution of the Board of Directors upon public notice given prior to the time previously scheduled for such meeting of stockholders.

## ARTICLE III.
## BOARD OF DIRECTORS

Section 3.1   General Powers.  The business and affairs of the Corporation shall be managed by or under the direction of its Board of Directors.  In addition to the powers and authorities expressly conferred upon them by these Bylaws, the Board of Directors may exercise all such powers of the Corporation and do all such lawful acts and things as are not by law or by

the Certificate of Incorporation or by these Bylaws required to be exercised or done by the stockholders.

Section 3.2    Number.  Subject to the rights of the holders of any series of Preferred Stock to elect additional directors under specific circumstances, the number of directors that shall constitute the whole Board of Directors shall be the number from time to time fixed exclusively pursuant to a resolution adopted by a majority of the Board Directors.  A director need not be a stockholder of the Corporation.   Except as otherwise provided by the Certificate of Incorporation, these Bylaws or applicable law, the directors shall be elected at the annual meeting of stockholders, and each director elected shall hold office for a term expiring at the next annual meeting of stockholders and until his or her successor has been duly elected and qualified or until his or her earlier death, resignation, retirement, disqualification or removal from office.

Section 3.3    Organization.  Meetings of the Board of Directors shall be presided over by the Chairman of the Board, if any, or in his absence by the Vice Chairman of the Board, if any, or in his absence by the Chief Executive Officer, or in his absence by the President, or in their absence by a chairman chosen at the meeting.  The Secretary shall act as secretary of the meeting, but in his absence the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 3.4    Regular Meetings.  A regular meeting of the Board of Directors may be held without other notice than this Bylaw immediately after, and at the same place, if any, as, each annual meeting of stockholders.  The Board of Directors may, by resolution, provide the time and place for the holding of additional regular meetings without other notice than such resolution.

Section 3.5    Special Meetings.  Special meetings of the Board of Directors may be called by the Chairman, the Chief Executive Officer, the President or by two or more directors.  The person or persons authorized to call special meetings of the Board of Directors may fix the place and time of the meetings.

Section 3.6    Notice.  Notice of each special meeting of the Board of Directors shall be given by the Secretary.  Notice of each such meeting shall state the date, time and place of the meeting, and shall be delivered to each director either personally or by telegram, fax, telephone or other means of electronic transmission, at least 24 hours before the time at which such meeting is to be held or mailed by first-class mail, postage prepaid, addressed to the director at his residence or usual place of business, at least three days before the day on which such meeting is to be held.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting, except for amendments to these Bylaws as provided under Article X hereof.  A meeting may be held at any time without notice if all of the directors are present or if those not present waive notice of the meeting in writing, either before or after such meeting.

Section 3.7    Quorum.  A number of directors equal to at least a majority of the whole Board shall constitute a quorum for the transaction of business, but if at any meeting of the Board of Directors there shall be less than a quorum present, a majority of the directors present

10

may adjourn the meeting from time to time without further notice.  Except in cases in which the Certificate of Incorporation, these Bylaws or applicable law otherwise provides, the vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

Section 3.8    Vacancies.  Subject to the rights of the holders of any series of Preferred Stock to elect additional directors under specific circumstances, and unless otherwise provided by law or the Certificate of Incorporation, vacancies resulting from death, resignation, retirement, disqualification, removal from office or other cause, and newly created directorships resulting from any increase in the authorized number of directors, may be filled only by the affirmative vote of a majority of the remaining directors, though less than a quorum of the Board of Directors, and each director so chosen shall hold office for a term expiring at the next annual meeting of stockholders and until his or her successor has been duly elected and qualified or until his or her earlier death, resignation or removal from office.  No decrease in the number of authorized directors constituting the whole Board shall shorten the term of any incumbent director.

Section 3.9    Committees.  The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of the committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member.  Any such committee, to the extent permitted by law and to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it.

Unless the Board of Directors otherwise provides, each committee designated by the Board of Directors may make, alter and repeal rules for the conduct of its business. In the absence of such rules, each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to this Article III of these Bylaws.

Section 3.10    Resignation and Removal.  Any director of the Corporation may resign at any time upon notice given in writing or by electronic transmission to the Board of Directors, the Chairman of the Board or the Secretary.  Any such resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, immediately upon its delivery.  Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  Subject to the rights of the holders of any series of Preferred Stock to elect additional directors under specific circumstances, any director, or the entire Board of Directors, may be removed from office at any time, with or without cause, by the affirmative vote of the holders of at least a majority of the voting power of the outstanding shares of stock entitled to vote generally in the election of directors, voting together as a single class.

11

Section 3.11    <u>Telephonic Meetings</u>. Members of the Board of Directors, or any committee of directors designated by the Board of Directors, may participate in a meeting of the Board of Directors or such committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this <u>Section 3.11</u> shall constitute presence in person at such meeting.

Section 3.12    <u>Action by Unanimous Consent of Directors</u>.  Unless otherwise provided in the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing (which may be in counterparts) or by electronic transmission, and the written consent or consents or electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or such committee.  Such filing shall be made in paper form if the minutes of the Corporation are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.13    <u>Reliance upon Records</u>.  Every director, and every member of any committee of the Board of Directors, shall, in the performance of his or her duties, be fully protected in relying in good faith upon the records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors, or by any other person as to matters the director or member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation, including, but not limited to, such records, information, opinions, reports or statements as to the value and amount of the assets, liabilities and/or net profits of the Corporation, or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid, or with which the Corporation's capital stock might properly be purchased or redeemed.

Section 3.14    <u>Compensation</u>.  The Board of Directors shall have the authority to fix the compensation, including fees and reimbursement of expenses, of directors for services to the Corporation in any capacity; <u>provided</u>, that no such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

## ARTICLE IV.
## OFFICERS

Section 4.1    <u>Elected Officers</u>.  Unless otherwise determined by the Board of Directors, the officers of the Corporation shall consist of the Chief Executive Officer, the President, one or more Vice Presidents, the Secretary and the Treasurer.  Any two or more offices may be held by the same person.  Such officers shall be elected from time to time by the Board of Directors to hold office until their respective successors shall have been duly elected and qualified, or until death, resignation or removal, as hereafter provided in these Bylaws.

12

Section 4.2     Other Officers.  The Board of Directors may from time to time elect, or the Chief Executive Officer may appoint, such other officers (including one or more Assistant Vice Presidents, Assistant Secretaries and Assistant Treasurers) and such agents as may be necessary or desirable for the conduct of the business of the Corporation.  Such other officers and agents shall have such duties and shall hold their offices for such terms as shall be provided in these Bylaws or as may be prescribed by the Board of Directors or by the Chief Executive Officer.

Section 4.3     Resignation and Removal.  Any officer or agent of the Corporation may resign at any time by giving a written notice of resignation to the Board of Directors, the Chief Executive Officer, the President or the Secretary.  Any such resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, immediately upon its receipt.  Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  Any officer or agent of the Corporation may be removed, either with or without cause, at any time, by a vote of the majority of the whole Board of Directors, or, except in the case of an officer or agent elected by the Board of Directors, by the Chief Executive Officer.  Such removal shall be without prejudice to the contractual rights, if any, of the person so removed.

Section 4.4     Vacancies.  A vacancy in any office, whether arising from death, resignation, removal or any other cause, may be filled for the unexpired portion of the term of the office, which shall be vacant in the manner prescribed in these Bylaws for the regular election or appointment of such office.

Section 4.5     Chief Executive Officer.  The Chief Executive Officer shall have the general control and management of the business and affairs of the Corporation, under the direction of the Board of Directors.  He or she shall have power: (i) to select and appoint all necessary officers and employees of the Corporation except such officers as under these Bylaws are to be elected by the Board of Directors; (ii) to remove all appointed officers or employees whenever he or she shall deem it necessary, and to make new appointments to fill the vacancies; and (iii) to suspend from office for cause any elected officer, which shall be forthwith declared in writing to the Board of Directors.  The Chief Executive Officer shall have such other authority and shall perform such other duties as may be determined by the Board of Directors.

Section 4.6     President.  The President shall have such authority and perform such duties relative to the business and affairs of the Corporation as may be determined by the Board of Directors or the Chief Executive Officer.  In the absence of both the Chairman and the Chief Executive Officer, the President shall preside at meetings of the stockholders and of the directors.  If the Board of Directors shall not have elected a Chief Executive Officer, the President shall have such authority and shall perform such additional duties as is provided in these Bylaws for the office of Chief Executive Officer.

Section 4.7     Vice Presidents and Assistant Vice Presidents.  Each Vice President and each Assistant Vice President shall have such powers and perform all such duties as from time to time may be determined by the Board of Directors, the Chief Executive Officer, the President or the senior officer to whom such officer reports.

Section 4.8    Secretary.  The Secretary shall record the proceedings of all meetings of the Board of Directors, the committees of the Board of Directors and the stockholders, shall see that all notices are duly given in accordance with the provisions of these Bylaws and as required by law, shall be custodian of the records and the seal of the Corporation and, if necessary or appropriate, affix and attest the seal to all documents to be executed on behalf of the Corporation under its seal, shall see that the books, reports, statements, certificates and other documents and records required by law to be kept and filed are properly kept and filed, and, in general, shall perform all the duties incident to the office of Secretary and such other duties as from time to time may be determined by the Board of Directors, the Chief Executive Officer or the President.

Section 4.9    Treasurer.  The Treasurer shall exercise general supervision over the receipt, custody and disbursement of corporate funds.  The Treasurer shall have such further powers and duties as may be determined from time to time by the Board of Directors, the Chief Executive Officer or the President.

Section 4.10    Assistant Officers.  Any Assistant Secretary or Assistant Treasurer elected or appointed as heretofore provided shall perform the duties and exercise the powers of the Secretary and Treasurer, respectively, in their absence or inability to act, and shall perform such other duties and have such other powers as the Board of Directors, the Chief Executive Officer, the President, the Secretary or the Treasurer (as the case may be) may from time to time prescribe.

Section 4.11    Compensation.  The compensation of the officers of the Corporation for their services as such officers shall be fixed from time to time by the Board of Directors; provided, however, that the Board of Directors may by resolution delegate to the Chief Executive Officer the power to fix compensation of non-elected officers and agents appointed by the Chief Executive Officer.  An officer of the Corporation shall not be prevented from receiving compensation by reason of the fact that such officer is also a director of the Corporation, but any such officer who shall also be a director shall not have any vote in the determination of such officer's compensation.

**ARTICLE V.**
**CONTRACTS AND PROXIES**

Section 5.1    Contracts.  Except as otherwise required by law, the Certificate of Incorporation or these Bylaws, any contracts or other instruments may be executed and delivered in the name and on behalf of the Corporation by such officer or officers (including any assistant officer) of the Corporation as the Board of Directors may from time to time direct.  Such authority may be general or confined to specific instances as the Board of Directors may determine.  The Chief Executive Officer, the President or any Vice President may execute bonds, contracts, deeds, leases and other instruments to be made or executed for or on behalf of the Corporation.  Subject to any restrictions imposed by the Board of Directors, the Chief Executive Officer, the President or any Vice President of the Corporation may delegate contractual power to others under his jurisdiction, it being understood, however, that any such delegation of power shall not relieve such officer of responsibility with respect to the exercise of such delegated power.

14

Section 5.2    <u>Proxies</u>.  Unless otherwise provided by resolution adopted by the Board of Directors, the Chief Executive Officer, the President or any Vice President may from time to time appoint an attorney or attorneys or agent or agents of the Corporation, in the name and on behalf of the Corporation, to cast the votes which the Corporation may be entitled to cast as the holder of stock or other securities or interests in any other corporation or entity, any of whose stock or other securities or interests may be held by the Corporation, at meetings of the holders of the stock or other securities or interests, of such other corporation or entity, or to consent in writing, in the name of the Corporation as such holder, to any action by such other corporation or entity, and may instruct the person or persons so appointed as to the manner of casting such votes or giving such consent, and may execute or cause to be executed in the name and on behalf of the Corporation and under its corporate seal or otherwise, all such written proxies or other instruments as he or she may deem necessary or proper in the premises.

## ARTICLE VI.
## INDEMNIFICATION AND INSURANCE

Section 6.1    <u>Indemnification and Insurance</u>.

(A)    <u>Right to Indemnification</u>.  Each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she or a person of whom he or she is the legal representative is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director or officer of any other corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether the basis of such proceeding is alleged action in an official capacity as a director or officer or in any other capacity while serving as a director or officer shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended, against all expense, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred by such person in connection therewith, and such indemnification shall continue as to a person who has ceased to be a director or officer and shall inure to the benefit of his or her heirs, executors and administrators, <u>provided</u>, however, that except as provided in paragraph (B) of this Article VI with respect to proceedings seeking to enforce rights to indemnification, the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) initiated by such person was authorized in the specific case by the Board of Directors of the Corporation.  The Corporation may, by action of its Board of Directors, provide indemnification and advancement to employees and agents of the Corporation with the same scope and effect as the indemnification and advancement of directors and officers provided for in this Article VI.

(B)    <u>Recovery of Unpaid Indemnification</u>.  If a claim under paragraph (A) of this <u>Section 6.1</u> is not paid in full by the Corporation within 30 days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant also shall be entitled to be paid the expense of prosecuting such claim.  It shall be a

15

defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any is required, has been tendered to the Corporation) that the claimant has not met the standards of conduct which make it permissible under the General Corporation Law of the State of Delaware for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel or stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the General Corporation Law of the State of Delaware, nor an actual determination by the Corporation (including the Board of Directors, independent legal counsel or stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

(C)    Non-Exclusivity of Rights.  The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article VI shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, Bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

(D)    Insurance.  The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the General Corporation Law of the State of Delaware.

(E)    Advancement.  The Corporation shall pay the expenses (including attorneys' fees) incurred by a person described in the first sentence of paragraph (A) of this Article VI (an "Article VI Person") in defending any such proceeding in advance of its final disposition; provided, however, that if the General Corporation Law of the State of Delaware requires, the payment of such expenses incurred by an Article VI Person in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such Article VI Person while a director or officer including, without limitation, service to an employee benefit plan), in advance of the final disposition of a proceeding, shall be made only upon delivery to the Corporation of an undertaking by or on behalf of such Article VI Person to repay all amounts so advanced if it shall ultimately be determined that such Article VI Person is not entitled to be indemnified under this Bylaw or otherwise.

(F)    Amendment or Repeal.  Any amendment or repeal of this Article VI shall not adversely affect any right or protection existing hereunder in respect of any act or omission occurring prior to such amendment or repeal.

(G)    Other Sources.  The Corporation's obligation, if any, to indemnify or to advance expenses to any person who was or is serving at its request as a director or officer of another corporation, partnership, joint venture, trust, enterprise or nonprofit entity shall be reduced by any amount such person may collect as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, enterprise or nonprofit enterprise.

16

### ARTICLE VII.
### STOCK

Section 7.1 <u>Certificates</u>. The shares of the Corporation shall be represented by certificates, provided that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Every holder of stock shall be entitled to have a certificate signed by or in the name of the Corporation by the Chairman or Vice Chairman of the Board of Directors, if any, or the President or a Vice President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary, of the Corporation certifying the number of shares owned by him in the Corporation. Any of or all the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent, or registrar at the date of issue.

Section 7.2 <u>Lost, Stolen or Destroyed Stock Certificates, Issuance of New Certificates</u>. The Corporation may issue a new certificate of stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or his legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

### ARTICLE VIII.
### INFORMATION RIGHTS

Section 8.1 <u>Access to Information.</u>

(A) Subject to the provisions of this Article VIII, in the event that the Corporation files a Form 15 deregistering its common stock under the Exchange Act and is not required to file periodic reports, information and documents with the Securities and Exchange Commission pursuant to the Exchange Act, the Corporation will use commercially reasonable efforts to make available to the holders of its common stock, on a secure website, the following information relating to the Corporation and its subsidiaries:

(1) no later than 120 days after the end of each fiscal year, an audited consolidated balance sheet of the Corporation and its subsidiaries as of the end of such fiscal year and the related audited consolidated statements of income, stockholders' equity and cash flows for the fiscal year then ended, prepared in accordance with the United States generally accepted accounting principals ("<u>GAAP</u>") and certified by a firm of independent public accountants of recognized national standing selected by the Board of Directors; and

17

(2)    no later than 60 days after the end of each fiscal quarter (other than the last quarter of the Corporation's fiscal year), an unaudited consolidated balance sheet of the Corporation and its subsidiaries and the related unaudited consolidated statements of income, stockholders' equity and cash flows as of and for the period then ended, prepared in accordance with GAAP, subject to audit adjustments.

If the subject financial statements, or any portion thereof, cannot be made available within the time periods set forth above without unreasonable effort or expense by the Corporation or for any other reason (including the failure by an accountant to certify or provide a report), then the Corporation will indicate on the secure website the reasons such financial statements cannot be made available and the Corporation will use commercially reasonable efforts to make such financial statements available on the secure website within 15 days following the initially prescribed date.  If the subject financial statements still cannot be made available without unreasonable effort or expense by the Corporation or for any other reason, the Corporation shall not be in violation of this Article VIII so long as the Corporation has used its commercially reasonable efforts to make them available as prescribed in this Section 8.1(A).

(B)    No stockholder shall be provided with access to any information that is made available via a secure website unless and until such stockholder has electronically certified to the host of the website that such stockholder will comply with such customary and reasonable confidentiality provisions as are provided by the host of the website, as prepared by the Corporation (the "Confidentiality Provisions"), and the other restrictions reasonably imposed by the host or the Corporation; provided, that any such stockholder may share the financial information specified in subsection (1) and (2) of Section (A) of  this Article VIII with a prospective transferee of such stockholder's shares of the common stock if such prospective transferee has electronically certified to the independent, third-party host of the secure website that such proposed transferee will comply with the Confidentiality Provisions and the other restrictions reasonably imposed by the host or the Corporation and such prospective transferee is not affiliated with any competitor, customer or supplier or is not an employee of the Corporation that is set forth on the written list of competitors, customers, suppliers and employees of the Corporation which may be furnished by the Corporation to the host of the website from time to time.

(C)    Notwithstanding anything to the contrary in this Article VIII, the Corporation may withhold and shall not be obligated to provide to the holders of its common stock any information that the Board of Directors determines to be competitively sensitive.

(D)    The provisions of and all obligations set forth in this Article VIII shall not be in effect at any time when the Corporation is required to file periodic reports, information and documents with the Securities and Exchange Commission.  Furthermore, the provisions of and all obligations set forth in this Article VIII shall terminate upon the first to occur of (i) the consummation of a "Sale of the Company" (as defined in the Stockholders Agreement) or (ii) the Yucaipa Stockholders (as defined in the Stockholders Agreement) and the Yucaipa Affiliated Companies (as defined in the Stockholders Agreement) owning, holding or possessing in the aggregate of either (x) ninety-five percent (95%) or more of the outstanding common stock of the Corporation or (y) if the voting rights of any outstanding preferred shares of stock of the Corporation owned or held by the Yucaipa Stockholders and the Yucaipa Affiliated Companies

are not materially disproportionate to the voting rights of the common stock of the Corporation, ninety-five percent (95%) or more of the total voting power of the outstanding shares of capital stock of the Corporation.

          (E)      Notwithstanding the foregoing, this Article X may not be amended so as to limit, restrict or reduce the information rights of the stockholders of the Corporation except by either (i) the vote or consent of ninety-five percent (95%) or more of the outstanding common stock or (ii) if the voting rights (on an as converted basis or otherwise) of any outstanding preferred shares of stock of the Corporation owned or held by the Yucaipa Stockholders and the Yucaipa Affiliated Companies are not materially disproportionate to the voting rights of the common stock of the Corporation, ninety-five percent (95%) of the total voting power of the outstanding shares of capital stock of the Corporation shall be required.

## ARTICLE IX.
## MISCELLANEOUS PROVISIONS

      Section 9.1     <u>Fiscal Year</u>.  The fiscal year of the Corporation shall be the calendar year, unless otherwise determined by resolution of the Board of Directors.

      Section 9.2     <u>Dividends</u>.  The Board of Directors may from time to time declare, and the Corporation may pay, dividends on its outstanding shares in the manner and upon the terms and conditions provided by law and the Certificate of Incorporation.

      Section 9.3     <u>Seal</u>.  The corporate seal shall have the name of the Corporation inscribed thereon and shall be in such form as may be approved from time to time by the Board of Directors.

      Section 9.4     <u>Form of Records</u>.  Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be kept on, or by means of, or be in the form of, any information storage device or method; <u>provided</u> that the records so kept can be converted into clearly legible paper form within a reasonable time.

      Section 9.5     <u>Manner of Notice</u>.  Except as otherwise provided herein or permitted by applicable law, notices to directors and stockholders shall be in writing and delivered personally or mailed to the directors or stockholders at their addresses appearing on the books of the Corporation.  Notice to directors may be given by telegram, fax, telephone or other means of electronic transmission.

      Section 9.6     <u>Waiver of Notice of Meetings of Stockholders, Directors and Committees</u>.  Any waiver of notice, given by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at nor the purpose of any regular or special meeting of the stockholders, directors, or members of a committee of directors need be specified in a waiver of notice.

# ARTICLE X.
## AMENDMENTS

In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the Board of Directors of the Corporation is expressly authorized to make, alter and repeal the Bylaws of the Corporation, except as otherwise provided by law and subject to the power of the stockholders of the Corporation to alter or repeal any Bylaw whether adopted by them or otherwise.  The Bylaws may be amended, altered or repealed at any meeting of the Board of Directors or of the stockholders.

Except as otherwise provided in the Certificate of Incorporation or these Bylaws and in addition to any other vote required by law, the affirmative vote of the holders of not less than (i) a majority of the outstanding shares of common stock of the Corporation or (ii) so long as the voting rights of any outstanding preferred shares of stock of the Corporation owned or held by the Yucaipa Stockholders and the Yucaipa Affiliated Companies are not materially disproportionate to the voting rights of the common stock of the Corporation, a majority of the total voting power of the outstanding shares of stock (instead of the outstanding common stock) entitled to vote, voting together as a single class, shall be required in order for stockholders to alter, amend or repeal, or to adopt any provision inconsistent with, these Bylaws.

STOCKHOLDERS AGREEMENT

by and among

[ALLIED HOLDINGS, INC.][1]

and

The Stockholders of [Allied Holdings, Inc.]

Dated as of _____, 2007

---

[1] The name of Reorganized Allied Holdings may be changed to something different than "Allied Holdings, Inc." in connection with the reincorporation in Delaware.

# TABLE OF CONTENTS

1.    Board of Directors..................................................................................................1

2.    Subscription Right. ...............................................................................................3

3.    Legends .................................................................................................................4

4.    Certain Required Approvals. ................................................................................5

5.    Representations and Warranties of Stockholders ................................................6

6.    Restrictions on Transfer; Transfers in Violation of Certificate .........................6

7.    Definitions.............................................................................................................7

8.    Miscellaneous. ....................................................................................................11

Exhibit A — Joinder

## STOCKHOLDERS AGREEMENT

THIS STOCKHOLDERS AGREEMENT (this "<u>Agreement</u>") is made as of _____, 2007, by and among [Allied Holdings, Inc.], a Delaware corporation (the "<u>Company</u>"), Yucaipa American Alliance Fund I, LP, a Delaware limited partnership ("<u>YAAF</u>"), Yucaipa American Alliance (Parallel) Fund I, LP, a Delaware limited partnership ("<u>YAAF Parallel</u>" and, together with YAAF, the "<u>Yucaipa Stockholders</u>"), each of the Stockholders[2] (as defined in <u>Section 7</u>) named on the signature pages hereto and each other Person who otherwise hereafter becomes a party to this Agreement by executing the Joinder attached as <u>Exhibit A</u>. Otherwise undefined capitalized terms used herein are defined in <u>Section 7</u> hereof.

WHEREAS, Allied Holdings, Inc., a Georgia corporation ("<u>Allied Georgia</u>"), filed a plan of reorganization (the "<u>Plan</u>") under Chapter 11 of the United States Code (the "<u>Bankruptcy Code</u>") before the United States Bankruptcy Court for the Northern District of Georgia (the "<u>Bankruptcy Court</u>") to effect a final restructuring of Allied Georgia;

WHEREAS, on [_____], 2007 (the "<u>Effective Date</u>") the Plan became effective;

WHEREAS, on the Effective Date, Allied Georgia merged with and into the Company, with the Company surviving the merger, and shares of Common Stock were issued to the Stockholders pursuant to the Plan; and

WHEREAS, pursuant to the Plan, the Stockholders have named on the signature pages hereto have executed this Agreement to govern certain rights of the Stockholders and to provide certain other rights and obligations among them;

NOW THEREFORE, in consideration of the promises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.      <u>Board of Directors</u>.

(a)      From and after the date hereof and until the provisions of this <u>Section 1</u> cease to be effective in accordance with their terms, each Stockholder shall vote all of his, her or its Shares entitled to vote thereon, and the Company shall take all necessary and desirable actions within its control (including, without limitation, calling special board and stockholder meetings), so that:

---

[2]  The Stockholders that will be signatories to this Agreement will be limited to the beneficial owners of more than 5% of the Company's issued and outstanding Common Stock, determined as of the Effective Date.

(i)      the authorized number of directors on the Company's board of directors (the "<u>Board</u>") shall be established at such number (but not less than five during the two-year period ending on the second anniversary of the Effective Date) as the Board shall determine from time to time;

(ii)      such representatives constituting not less than a majority of the directors on the Board as are designated by the Yucaipa Stockholders from time to time shall be elected to the Board (the "<u>Yucaipa Directors</u>");

(iii)      during the two-year period ending on the second anniversary of the Effective Date, one representative designated by the Creditors Committee and reasonably satisfactory to the Yucaipa Stockholders from time to time shall be elected to the Board (the "<u>Creditors Committee Director</u>");

(iv)      the individual serving as the chief executive officer of the Company from time to time shall be elected to the Board (the "<u>Executive Director</u>");

(v)      the composition of the board of directors of each of the Company's subsidiaries shall be as determined by the Board;

(vi)      the removal from the Board without cause of any Yucaipa Directors shall be only upon the written request of the Yucaipa Stockholders;

(vii)      if the Executive Director ceases to be the chief executive officer of the Company for any reason, such individual shall be removed as a director promptly after such cessation;

(viii)      during the two-year period ending on the second anniversary of the Effective Date, (A) the removal from the Board of the Creditors Committee Director without cause shall be only upon the written request of the Creditors Committee and (B) in the event that any Creditors Committee Director for any reason ceases to serve as a member of the Board during his or her term of office, the resulting vacancy on the Board shall be filled by a representative designated by the Creditors Committee that is reasonably satisfactory to the Yucaipa Stockholders;

(ix)      during the two-year period ending on the second anniversary of the Effective Date, the Board shall not designate any of its authority to an executive committee (or to any committee performing a similar function however designated) unless the membership of such committee includes the Creditors Committee Director; and

(x)      in the event that any representative designated by the Yucaipa Stockholders hereunder for any reason ceases to serve as a member of the Board during his or her term of office, the resulting vacancy on the Board shall be filled by a representative designated by the Yucaipa Stockholders.

The Company shall pay all reasonable out-of-pocket expenses incurred by each director in connection with attending regular and special meetings of the Board and any committee thereof. The Company and the Board may grant board observation rights to the Teamsters National Automobile Transportation Industry Negotiating Committee and other Persons.

(b)     If any party fails to designate a representative to fill a directorship pursuant to the terms of this <u>Section 1</u>, the election of a person to such directorship shall be accomplished in accordance with the Company's bylaws and applicable law.

(c)     The provisions of and all rights under this <u>Section 1</u> will terminate on the first to occur of (i) the consummation of a Qualified Public Offering, (ii) the consummation of a Sale of the Company or (iii) with respect to <u>Section 1(a)(iii)</u>, <u>Section 1(a)(viii)</u> and <u>Section 1(a)(ix)</u> only, the second anniversary of the Effective Date.

2.     <u>Subscription Right</u>.

(a)     If the Company authorizes the issuance or sale of any New Securities to any Person (including a Yucaipa Stockholder) solely for cash consideration  (or for consideration that includes the extension of credit to the Company or any of its subsidiaries if such issuance relates to a debt financing provided by a Yucaipa Stockholder or Yucaipa Affiliated Company), then the Company shall offer to sell to the Yucaipa Stockholders and each Stockholder that qualifies as a Subscribing Other Stockholder at the time of the particular issuance or sale (each, a "<u>Subscription Holder</u>") a portion of such New Securities up to an amount of such New Securities equal to the quotient determined by dividing (1) the number of shares of Common Stock held by such Subscription Holder at such time by (2) the total number of shares of Common Stock held by all Subscription Holders at such time.  Each Subscription Holder shall be entitled to purchase such New Securities on at least as favorable terms to the Subscription Holders as the terms under which such New Securities are to be offered to such Person (including a Yucaipa Stockholder); <u>provided that</u> if such third parties are required to also purchase other securities of the Company, Subscription Holders exercising their rights pursuant to this <u>Section 2</u> shall also be required to purchase the same strip of securities (on the same terms and conditions) that such third parties are required to purchase.  The purchase price payable for the New Securities offered to the Subscription Holders hereunder shall be payable in cash if the New Securities are offered solely for cash consideration.  If the New Securities are offered in connection with a debt financing provided by a Yucaipa Stockholder or a Yucaipa Affiliated Company, then each Subscribing Other Stockholder will be offered the opportunity to participate in such debt financing on terms at least as favorable in the aggregate as those given to such Yucaipa Stockholder or Yucaipa Affiliated Company, including the purchase price for the New Securities.

(b)     In order to exercise its purchase rights hereunder, each Subscription Holder must, within 20 days after receipt of written notice from the Company describing in reasonable detail the New Securities being offered, the purchase price thereof, the payment terms and such holder's percentage allotment, deliver a written notice to the Company describing its election hereunder.  If any Subscription Holder having subscription rights under this <u>Section 2</u> fails to exercise his, her or its subscription rights in full within such 20-day period, the Company shall offer the New Securities that were the were not so subscribed to all Subscription Holders who exercised their subscription rights in full with respect to such New Securities by delivery of

written notice thereto. Each such Subscription Holder will thereafter have an additional 10 days after receipt of such written notice from the Company to accept such offer of New Securities, in whole or in part, by written notice to the Company specifying the maximum number of New Securities which such Subscription Holder has elected to purchase; <u>provided</u>, that, in the event that the aggregate number of New Securities that the Subscription Holders have elected to purchase exceeds that aggregate number of remaining New Securities, such New Securities will be allocated upon the electing Subscription Holders *pro rata* based on the total number of shares of Common Stock held by such electing Subscription Holders at such time.

(c)     Upon the expiration of the offering period described above, the Company shall be entitled to sell such New Securities which Subscription Holders have not elected to purchase during the 90 days following such expiration on terms and conditions no more favorable to the purchasers thereof than those offered to such holders.  Any New Securities offered or sold by the Company after such 90-day period must be reoffered to the Subscription Holders pursuant to the terms of this <u>Section 2</u>.

(d)     Notwithstanding the foregoing, if the Board determines that it should, in the best interests of the Company, issue New Securities which would otherwise be required to be offered to the Subscription Holders pursuant to this <u>Section 2</u> prior to their issuance, the Company may issue such New Securities without first complying with the provisions of this <u>Section 2</u>; <u>provided</u>, <u>however</u>, that within 45 days after such issuance the Company shall offer to each Subscription Holder the opportunity to purchase the number of New Securities that such Subscription Holder would have otherwise been entitled to purchase pursuant to the terms of this <u>Section 2</u>.

(e)     The provisions of and all rights in <u>Section 2</u> above shall terminate upon the first to occur of (i) the listing of the Common Stock on a Nationally Recognized Exchange, (ii) the consummation of a Qualified Public Offering or (iii) the consummation of a Sale of the Company.

3.     <u>Legends</u>.  Each certificate evidencing Shares and each certificate issued in exchange for or upon the transfer of any Shares shall be stamped or otherwise imprinted with a legend in substantially the following form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF _____, 2007, AMONG THE ISSUER AND CERTAIN OF THE ISSUER'S STOCKHOLDERS.  A COPY OF SUCH STOCKHOLDERS AGREEMENT (AS AMENDED, MODIFIED OR SUPPLEMENTED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS THEREOF) IS AVAILABLE AT THE ISSUER'S PRINCIPAL EXECUTIVE OFFICES AND WILL BE FURNISHED WITHOUT CHARGE BY THE ISSUER TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE
ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE
ISSUER'S AMENDED AND RESTATED CERTIFICATE OF
INCORPORATION, WHICH PROVIDES FOR, AMONG
OTHER THINGS, CERTAIN RESTRICTIONS ON THE
TRANSFER OF SUCH SECURITIES AND THE ISSUER'S
OPTION TO REDEEM SUCH SECURITIES IN CONNECTION
WITH A TRANSFER IN VIOLATION OF SUCH
RESTRICTIONS. NO REGISTRATION OR TRANSFER OF
THESE SECURITIES WILL BE MADE ON THE BOOKS OF
THE ISSUER UNLESS AND UNTIL SUCH RESTRICTIONS
HAVE BEEN COMPLIED WITH. A COPY OF SUCH
AMENDED AND RESTATED CERTIFICATE OF
INCORPORATION (AS AMENDED, MODIFIED OR
SUPPLEMENTED FROM TIME TO TIME) IS AVAILABLE AT
THE ISSUER'S PRINCIPAL EXECUTIVE OFFICES AND
WILL BE FURNISHED WITHOUT CHARGE BY THE ISSUER
TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

4.     Certain Required Approvals.

(a)     Until the second anniversary of the Effective Date, the Company shall not, and shall not cause or permit any subsidiary of the Company to, sell or transfer any of its or their properties or assets to, or purchase any property or assets from, or enter into any contract or agreement with, any Yucaipa Stockholder or Yucaipa Affiliated Company (an "Affiliate Transaction"), unless:

(i)     such Affiliate Transaction has been approved by either (1) a majority of the disinterested directors on the Board or (2) all of the directors (including the Creditors Committee Director) then serving on the Board; or

(ii)     such Affiliate Transaction is approved by the vote or consent of holders of either a Supermajority of the Common Stock or a Supermajority of the capital stock of the Company; or

(iii)     the Company has received an opinion as to the fairness to the Company and/or its subsidiary(ies) of such Affiliate Transaction, from a financial point of view, issued by any of FTI Consulting, Inc., Citigroup Global Markets, Inc., Credit Suisse Securities (USA) LLC, Goldman, Sachs & Co., Deutsche Bank Securities Inc. or Valuation Research Corporation (or any of their respective Affiliates) or any other accounting, appraisal or investment banking firm of national standing reasonably acceptable to the Creditors Committee Director; or

(iv)     the Affiliate Transaction involves an issuance of debt or equity securities by the Company or any of its subsidiaries, and each Subscribing Other Stockholder is offered the opportunity to purchase such debt or equity securities on terms no less favorable, in the aggregate, than those offered to the Yucaipa

Stockholders and the Yucaipa Affiliated Companies participating in such Affiliate Transaction and in accordance with the pro rata interest of each Subscribing Other Stockholder in the total number of shares of Common Stock then issued and outstanding; or

(v)    such Affiliate Transaction constitutes a Permitted Transaction.

(b)    The provisions of and all restrictions set forth in <u>Section 4</u> above shall terminate upon the first to occur of (i) the second anniversary of the Effective Date, (ii) the listing of the Common Stock or other equity securities of the Company on a Nationally Recognized Exchange, (iii) the consummation of a Qualified Public Offering, (iv) the consummation of a Sale of the Company or (v) the Yucaipa Stockholders and the Yucaipa Affiliated Companies owning, holding or possessing in the aggregate either (A) seventy-five percent (75%) or more of the outstanding Common Stock or (B) if the voting rights (on an as converted basis or otherwise) of any outstanding Preferred Stock owned, held or possessed by the Yucaipa Stockholders and the Yucaipa Affiliated Companies are not materially disproportionate to the per share voting rights of the Common Stock, seventy-five percent (75%) or more of the voting power of the outstanding shares of capital stock of the Company.

5.    <u>Representations and Warranties of Stockholders</u>.    Each Stockholder represents and warrants, individually and not jointly and severally, to the other parties hereto that (a) such Stockholder has full power and authority to execute, deliver and perform its obligations under this Agreement; (b) this Agreement has been duly and validly authorized, executed and delivered by such Stockholder, and constitutes a valid and binding obligation of such Stockholder, enforceable against such Stockholder in accordance with its terms except to the extent that enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally; (c) such Stockholder is not a party to any agreement which is inconsistent with the rights of any party hereunder or otherwise conflicts with the provisions hereof; and (d) such Stockholder is an "accredited investor" as that term is defined in Rule 501 of Regulation D of the Securities Act.

6.    <u>Restrictions on Transfer; Transfers in Violation of Certificate</u>.    Each Stockholder hereby acknowledges and agrees that the Shares shall be subject to the restrictions on transfer set forth in the Certificate.  Each Stockholder further acknowledges and agrees that (a) any Transfer or attempted Transfer of any Shares in violation of any provision of Certificate shall be null and void and of no force and effect; (b) the Company shall have no obligation to record such Transfer on its books or treat any purported Transferee of such Shares as the owner of such Shares for any purpose; and (c) the Company shall have the option to redeem, out of legally available funds, any Shares Transferred in violation of any provision of the Certificate, on such terms and subject to such conditions as determined by the Board.

7.    <u>Definitions</u>.

"<u>Affiliate</u>" means, as to any specified Person, any other Person which, directly or indirectly, controls, is controlled by, employed by or is under common control with, any of the foregoing.  For the purposes of this definition, "<u>control</u>" means the possession of the power to direct or cause the direction of the management and policies of such Person through the ownership of voting securities, by contract or otherwise.  For purposes of this Agreement, the Company and any Person that is controlled by the Company shall not be considered Affiliates of the Yucaipa Stockholders or any Yucaipa Affiliated Company.

"<u>Certificate</u>" means the Company's Amended and Restated Certificate of Incorporation, as the same may be amended from time to time.

"<u>Common Stock</u>" means the Company's common stock, par value $0.01 per share and any other common equity securities issued by the Company, and any other shares of stock issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or upon conversion of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization).

"<u>Company</u>" means [Allied Holdings, Inc.], a Delaware corporation and any successors thereto.

"<u>Creditors Committee</u>" means (i) the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 case initiated by Allied Georgia's filing on July 31, 2005 of a voluntary petition for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code pursuant to Section 1102 of the Bankruptcy Code as its composition may be changed from time to time by addition, resignation or removal of its members or (ii) in the event that such committee is dissolved, the majority of the members comprising such committee at the time of its dissolution.

"<u>Equipment Financing Facility</u>" means that certain Loan and Security Agreement and Guaranty entered into among Allied Systems, Ltd. (L.P.), as borrower, Allied Georgia and certain of its subsidiaries, as guarantors, and Yucaipa Transportation, LLC, a Delaware limited liability company ("<u>Yucaipa Transport</u>"), as lender, to finance the purchase by Allied Systems of certain equipment from Yucaipa Transport, together with any instruments and agreements entered into in connection therewith.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended from time to time.

"<u>Nationally Recognized Exchange</u>" means any of the following nationally recognized stock exchanges: the New York Stock Exchange, NASDAQ (any market thereof) or AMEX.

"New Securities" shall mean equity securities of the Company or any of its subsidiaries, whether now authorized or not, and rights, options or warrants to purchase any such equity securities, and any securities of any type whatsoever which are, or may become, convertible into such equity securities; provided, however, that the term "New Securities" does not include: (i) securities offered to the public pursuant to a registration statement filed by the Company or any Qualified Public Offering (and, in the case of rights, options or warrants, the securities issued or issuable upon exercise thereof and, if applicable, the Common Stock issued or issuable upon conversion of such securities); (ii) securities issued for the acquisition of another business by the Company by merger, purchase of substantially all the assets of such business or another reorganization resulting in the ownership by the Company of not less than a majority of the voting power of such business (and, in the case of rights, options or warrants, the securities issued or issuable upon exercise thereof and, if applicable, the Common Stock issued or issuable upon the conversion of such securities); (iii) securities issued to directors or employees of or consultants to the Company pursuant to an equity incentive plan, stock option plan, employee stock purchase plan, restricted stock plan or other employee stock plan or agreement or otherwise, in all cases approved by the Board (and, in the case of rights, options or warrants, the securities issued or issuable upon exercise thereof and, if applicable, the Common Stock issued or issuable upon the conversion of such securities); (iv) securities issued to a Person other than a Yucaipa Stockholder or a Yucaipa Affiliated Company in connection with an equipment lease, commercial loan, or research, development or licensing agreement or other similar business transaction, in all cases approved by the Board (and, in the case of rights, options or warrants, the securities issued or issuable upon exercise thereof and, if applicable, the Common Stock issued or issuable upon the conversion of such securities); (v) securities issued as a result of any stock split, stock dividend, reverse stock split, capital reorganization, recapitalization, or reclassification of Common Stock, distributable on a pro rata basis to all holders of Common Stock; (vi) Common Stock issued to any Yucaipa Stockholder or any other Person pursuant to the Plan; or (vii) securities issued upon the conversion of any outstanding indebtedness under the Equipment Financing Facility.

"Other Stockholder" means any Stockholder other than a Yucaipa Stockholder or a Stockholder that is a Yucaipa Affiliated Company.

"Permitted Transaction" means (i) any Affiliate Transaction (including, without limitation, the entrance into, performance under, or any amendment in accordance with the terms of any contract or agreement) specifically disclosed in the Plan or in the related Disclosure Statement or in any supplements to either document and approved by the Creditors Committee (other than the potential sale of Allied Systems (Canada) Company); (ii) the acquisition by the Yucaipa Stockholders or any Yucaipa Affiliated Companies of New Securities pursuant to the exercise of their subscription rights pursuant to Section 2 hereof; (iii) the acquisition of any securities issued as a result of any stock split, stock dividend, reverse stock split, capital reorganization, recapitalization, or reclassification of Common Stock, distributable on a pro rata basis to all holders of Common Stock; (iv) any payments, benefit or awards of securities made or provided pursuant to the terms of any employment agreement, employee benefit plan, officer or director indemnification agreement or any similar arrangement entered into between the Company or any of its subsidiaries and any director, officer, employee, consultant or Board nominee of any Yucaipa Stockholder or Yucaipa Affiliated Company; (v) any Affiliate Transaction to the extent done in the ordinary course of business consistent with the past

practices of Allied Georgia or its subsidiaries; provided that the terms of such transaction are no less favorable in the aggregate to the Company or its relevant subsidiary than those that would have been obtained in a comparable transaction by the Company or such subsidiary with an unrelated Person; (vi) any payments made, actions taken or other Affiliate Transaction in accordance with the terms or contemplated by that certain Monitoring and Management Services Agreement, dated as of the Effective Date, between the Company and Yucaipa American Funds, LLC; (vii) any Affiliate Transaction involving any sharing or common use of real property or facilities with any Yucaipa Affiliated Companies done in the ordinary course of business consistent with the past practices of Allied Georgia or its subsidiaries; provided that the terms of such transaction are no less favorable in the aggregate to the Company or its relevant subsidiary than those that would have been obtained in a comparable transaction by the Company or such subsidiary with an unrelated Person; (viii) any Affiliate Transaction involving the subleasing, assignment or other arrangement with respect to hauling or transporting vehicles or fulfilling other customer requirements with any Yucaipa Affiliated Companies done in the ordinary course of business consistent with the past practices of Allied Georgia or its subsidiaries; provided that the terms of such transaction are no less favorable in the aggregate to the Company or its relevant subsidiary than those that would have been obtained in a comparable transaction by the Company or such subsidiary with an unrelated Person; (ix) any Affiliate Transaction with any Yucaipa Affiliated Company that (1) does not involve a merger, consolidation, sale, lease, license or other transfer of substantially all the properties of, or sale by the Company or any subsidiary of the Company, the sale of issuance of any debt or equity securities of the Company or such subsidiary or any form of debt or equity financing in favor of the Company or such subsidiary and (2) is on terms no less favorable in the aggregate to the Company or its relevant subsidiary than those that would have been obtained in a comparable transaction by the Company or such subsidiary with an unrelated Person; and (x) any Affiliate Transaction with any Yucaipa Stockholder or Yucaipa Affiliated Company that involves consideration to or from the Yucaipa Stockholders or Yucaipa Affiliated Company of less than $10,000,000 and, when taken with all other Affiliate Transactions permitted solely by this clause (x) involves aggregate consideration to or from the Yucaipa Stockholders or Yucaipa Affiliated Companies of less than $25,000,000 in any fiscal year (it being understood that consideration pursuant to any Affiliate Transactions permitted pursuant to any other clause of this definition or approved pursuant to the Certificate or Incorporation or any other provisions of this Agreement, will not be included when calculating the foregoing thresholds in this clause).

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust (including any beneficiary thereof), a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Preferred Stock" means the Company's preferred stock, par value $0.01 per share, including any series thereof as may be designated by the Board from time to time.

"Qualified Public Offering" means a sale of equity securities of the Company in an underwritten public offering registered under the Securities Act, with gross proceeds of not less than $40,000,000, and resulting in the listing of such of the Company's equity securities on a Nationally Recognized Exchange.

"Sale of the Company" means (i) any sale, transfer or issuance or series of sales, transfers or issuances of capital stock of the Company by the Company, the Yucaipa Stockholders or any other Stockholders (including, any merger, consolidation or other transaction or series of related transactions having the same effect) which results in any Person or group of Persons (as the term "group" is used under the Exchange Act), other than the Yucaipa Stockholders or any of their Affiliates, owning capital stock of the Company possessing in the aggregate a majority of the total voting power of the outstanding shares of capital stock of the Company and (ii) any sale or transfer of all or substantially all of the assets of the Company and its subsidiaries in any transaction or series of transactions (other than sales in the ordinary course of business) to any Person or group of Persons (as the term "group" is used under the Exchange Act).

"Securities Act" means the Securities Act of 1933, as amended from time to time.

"Shares" means, at any time, any shares of Common Stock, any other common equity securities issued by the Company, and any other shares of stock issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or upon conversion of such shares or otherwise in connection with a combination of shares, recapitalization, merger, consolidation or other corporate reorganization).

"Stockholders" means the Persons named on the signature pages to this Agreement and any other Person who is a Transferee of Shares, whether from another Stockholder or from the Company, that agrees to be bound by the terms of this Agreement. The term "Stockholder" means any one of the Stockholders and, in the case of a Stockholder who is a natural person, the term "Stockholder" also includes such Stockholder's legal representatives, executors or administrators when the context so requires.

"Subscribing Other Stockholder" means any Person that (i) is an "accredited investor" as that term is defined in Rule 501 of Regulation D of the Securities Act, (ii) either (A) is a Stockholder that, on or after the Effective Date, was, pursuant to the Plan, issued shares of Common Stock representing five percent (5%) or more of the shares of Common Stock issued on the Effective Date or (B) is a Person that was assigned the subscription rights of an Other Stockholder pursuant to Section 8(c) hereof and (iii) as of the date immediately prior to the date of issue or sale of New Securities owns shares of Common Stock representing five percent (5%) or more of the issued and outstanding shares of Common Stock; provided, that any Other Stockholder shall immediately cease to be a "Subscribing Other Stockholder" upon any assignment pursuant to Section 8(c) to the extent that such assignment results in the assigning Other Stockholder beneficially owning shares of Common Stock representing less than five percent (5%) of the issued and outstanding shares of Common Stock.

"Supermajority" of the Common Stock shall mean a percentage equal to the percentage (as of the record date or other applicable date for any vote, consent or approval) of the outstanding Common Stock of the Company that is held or owned by the Yucaipa Stockholders and any Yucaipa Affiliated Company plus seven percent (7%). "Supermajority" of the capital stock shall mean, if the voting rights (on an as converted basis or otherwise) of any outstanding Preferred Stock owned or held by the Yucaipa Entities and their Affiliated Companies are not materially disproportionate to the voting rights of the Common Stock, a

percentage equal to the percentage (as of the record date or other applicable date for any vote, consent or approval) of the voting power of the outstanding capital stock of the Company (voting together as a single class) that is held or owned by the Yucaipa Stockholders and any Yucaipa Affiliated Company plus seven percent (7%).

"Transfer" means any transfer, donation, bequest, sale, assignment, or other disposal or attempted disposal (including by way of merger, operation of law, pursuant to any domestic relations or other court order, whether with or without consideration and whether voluntarily or involuntarily or by operation of law) of all or any portion of a security, any interest or rights in a security, or any rights under this Agreement. "Transferred" means the accomplishment of a Transfer, and "Transferee" means the recipient of a Transfer.

"Yucaipa Affiliated Company" means any entity which is controlled by the Yucaipa Stockholders, controls the Yucaipa Stockholders or is under common control with the Yucaipa Stockholders (other than the Company and any Person that is controlled by the Company). For the purposes of this definition, "control" means the possession of the power to direct or cause the direction of the management and policies of such Person through the ownership of voting securities, by contract or otherwise. For the avoidance of doubt, for so long as the Yucaipa Stockholders own, directly or indirectly, more than fifty percent (50%) of the capital stock of Performance Logistics Group, Inc., a Delaware corporation, such corporation shall be considered a "Yucaipa Affiliated Company."

8.    Miscellaneous.

(a)    Amendment and Waiver.  Except as otherwise provided herein, no modification, amendment or waiver of any provision of this Agreement will be effective against the Company or the holders of Shares unless such modification, amendment or waiver is agreed to, consented to or approved by (i) the Company, (ii) the Yucaipa Stockholders and (iii) the holders of either a Supermajority of the Common Stock or a Supermajority of the capital stock of the Company; provided, however, that no modification, amendment or waiver of the terms of Section 2 of this Agreement will be effective against any Other Stockholder unless such amendment, modification or waiver is approved in writing by such Other Stockholder. Notwithstanding the foregoing, if an amendment or modification of this Agreement is not adverse to the material rights of Other Stockholders under this Agreement, then such amendment or modification will be effective against the Company and the holders of Shares if such amendment or modification is approved in writing by the Company and the Yucaipa Stockholders. The failure of any party to enforce any of the provisions of this Agreement will in no way be construed as a waiver of such provisions and will not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

(b)    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(c)      <u>Successors and Assigns</u>.  This Agreement and all rights and obligations of the Yucaipa Stockholders hereunder may be Transferred by any Yucaipa Stockholder without the consent of any party hereto upon written notice to the Company thereof.  Neither this Agreement nor any of the rights or obligations under this Agreement may be Transferred by any Other Stockholder without the prior written consent of the Company and the Yucaipa Stockholders; <u>provided</u>, <u>however</u>, that in the event that (i) any Other Stockholder proposes to assign its subscription rights under <u>Section 2</u> in connection with the Transfer of (A) all Shares held by such Other Stockholder or (B) a number of Shares equal to not less than five percent (5%) of the number of issued and outstanding shares of Common Stock at such time and (ii) the Transferee of such Shares will acquire beneficial ownership of Shares representing not less than five percent (5%) of the issued and outstanding shares of Common Stock at such time, then such Other Stockholder may assign his, her or its subscription rights under <u>Section 2</u> (and not any other rights hereunder) with the prior written consent of only the Yucaipa Stockholders, which consent the Yucaipa Stockholders shall not unreasonably withhold, delay or condition (but which may be conditioned upon such Transferee executing a joinder to this Agreement (substantially similar the Joinder attached as <u>Exhibit A</u> but solely with respect to the provisions applicable to subscription rights under <u>Section 2</u>) or a separate subscription rights agreement (having substantially the same terms as those set forth in <u>Section 2</u>), in each case, satisfactory to the Yucaipa Stockholders).  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns and any Person that may become a party to this Agreement by executing the Joinder attached as <u>Exhibit A</u>.

(d)      <u>Counterparts</u>.  This Agreement may be executed in separate counterparts each of which will be an original and all of which taken together shall constitute one and the same agreement.

(e)      <u>Remedies</u>.   Any Person having rights under any provision of this Agreement shall be entitled to enforce their rights under this Agreement specifically to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any Stockholder may in its sole discretion apply to any court of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

(f)  <u>Notices</u>.  Any notice provided for in this Agreement must be in writing and must be either personally delivered, sent by first class mail (postage prepaid and return receipt requested), or sent by reputable overnight courier service (charges prepaid) or by facsimile to the Company at the address set forth below and to the Stockholders at their respective addresses indicated in the Company's records, or at such address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.  Notices will be deemed to have been given hereunder when delivered personally, three days after deposit in the U.S. mail, and one day after deposit with a reputable overnight courier service.  Notices given by facsimile will be deemed given when sent and confirmed electronically.  The address of the Company is:

> [Allied Holdings, Inc.]
> 160 Clairemont Avenue, Suite 200
> Decatur, Georgia  30030
> Fax:  [_____]
> Attn:  General Counsel

(g)  <u>Governing Law; Consent to Jurisdiction and Service of Process; Jury Waiver</u>.

(i)  The corporate law of the State of Delaware shall govern all issues and questions concerning the relative rights and obligations of the Company and its stockholders.  All other issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(ii)  Each party hereby (1) irrevocably submits to the exclusive jurisdiction of the federal and state courts located in Wilmington, Delaware for the purpose of any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter hereof, (2) waives to the extent not prohibited by applicable law, and agrees not to assert by way of motion, as a defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such proceeding brought in one of the above-named courts is improper, or that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court and (3) agrees not to commence or maintain any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter hereof or thereof other than before one of the above-named courts nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or

investigation to any court other than one of the above-named courts whether on the grounds of inconvenient forum or otherwise. Each party hereto hereby consents to service of process in any such proceeding in any manner permitted by Delaware law, and agrees that service of process by registered or certified mail, return receipt requested, at its address specified pursuant to Section 8(f) hereof is reasonably calculated to give actual notice.

(iii)    TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT SUCH PARTY WILL NOT ASSERT, ANY RIGHT TO TRIAL BY JURY ON ANY ISSUE IN ANY PROCEEDING, WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE, IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH, RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HEREUNDER, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN TORT OR CONTRACT OR OTHERWISE.

(h)    No Strict Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

(i)    Business Days.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the state in which the Company's chief executive office is located, the time period shall automatically be extended to the business day immediately following such Saturday, Sunday or legal holiday.

(j)    Descriptive Headings; Construction.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement. For all purposes of and under this Agreement, (i) the word "including" shall be deemed to be immediately followed by the words "without limitation"; (ii) words (including defined terms) in the singular shall be deemed to include the plural and vice versa; (iii) words of one gender shall be deemed to include the other gender as the context requires; (iv) "or" is not exclusive; and (v) the terms "hereof," "herein," "hereto," "herewith" and any other words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including the Exhibit hereto) and not to any particular term or provision of this Agreement, unless otherwise specified.

(k)    Entire Agreement.  This Agreement, including the Exhibit hereto, constitutes the entire agreement and understanding among the parties with respect to the matters set forth herein and supersedes all other prior covenants, agreements, undertakings, obligations, promises, arrangements, communications, representations and warranties, whether oral or written, by any party hereto or by any Affiliate or representative of any party hereto with respect to the matters set forth herein.  There are no covenants, agreements, undertakings or obligations with respect to the matters set forth in this Agreement other than those expressly set forth or referred to herein.

(l)    <u>No Agency Relationship</u>.  Nothing contained in this Agreement shall be construed as creating a partnership, agency or joint venture relationship between the Company and any Stockholder, and no party hereto shall become bound by any representation, act or omission by the other party.

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have executed this Stockholders Agreement on the day and year first above written.

**[THE COMPANY]**

By:     _____

Name:   _____

Its:    _____

**[THE YUCAIPA STOCKHOLDERS]**

By:     _____

Name:   _____

Its:    _____

**[OTHER STOCKHOLDERS]**

[_____]

[_____]

[_____]

[_____]

[_____]

**EXHIBIT A**

**STOCKHOLDERS AGREEMENT**

**Joinder**

The undersigned is executing and delivering this Joinder pursuant to the Stockholders Agreement dated _____, 2007 (as the same may hereafter be amended, the "Stockholders Agreement"), among Allied Holdings, Inc., a Delaware corporation (the "Company") and the other persons named as parties therein.

By executing and delivering this Joinder to the Company, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the Stockholders Agreement as a holder of Shares in the same manner as if the undersigned were an original signatory to the Stockholders Agreement, and the undersigned's [_____] shares of Common Stock shall be included as Shares under the Stockholders Agreement.

Accordingly, the undersigned has executed and delivered this Joinder as of the ___ day of _____, _____.


_____

Signature of Stockholder


_____

Print Name of Stockholder

REGISTRATION RIGHTS AGREEMENT


by and among


[ALLIED HOLDINGS, INC.][1]


and


The Stockholders of [Allied Holdings, Inc.]
set forth on the Signature Pages Hereto


Dated as of _____, 2007

---

[1] The name of Reorganized Allied Holdings may be changed to something different than "Allied Holdings, Inc." in connection with the reincorporation in Delaware.

## TABLE OF CONTENTS

1.    Demand Registrations..................................................................................................1

2.    Piggyback Registrations..............................................................................................3

3.    Other Registrations; Registration Rights....................................................................5

4.    Holdback Agreements..................................................................................................5

5.    Registration Procedures ..............................................................................................6

6.    Registration Expenses..................................................................................................9

7.    Indemnification............................................................................................................9

8.    Participation in Underwritten Registrations..............................................................12

9.    Definitions..................................................................................................................13

10.   Company Representations ..........................................................................................14

11.   Miscellaneous............................................................................................................14

# REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT (this "Agreement") is made as of _____, 2007, by and among [Allied Holdings, Inc.], a Delaware corporation (the "Company"), Yucaipa American Alliance Fund I, LP, a Delaware limited partnership ("YAAF"), Yucaipa American Alliance (Parallel) Fund I, LP, a Delaware limited partnership ("YAAF Parallel") and, together with YAAF, the ("Yucaipa Stockholders") and each of the other stockholders of the Company named on the signature pages hereto[2] or who otherwise hereafter becomes a party to this Agreement by executing the Joinder attached as Exhibit A (the "Other Stockholders" and, together with the Yucaipa Stockholders, the "Stockholders"). Otherwise undefined capitalized terms used herein are defined in Section 9 hereof.

WHEREAS, Allied Holdings, Inc., a Georgia corporation ("Allied Georgia"), filed a plan of reorganization (the "Plan") under Chapter 11 of the United States Code before the United States Bankruptcy Court for the Northern District of Georgia to effect a final restructuring of Allied Georgia;

WHEREAS, on [_____], 2007 (the "Effective Date") the Plan became effective;

WHEREAS, on the Effective Date, Allied Georgia merged with and into the Company, with the Company surviving the merger, and shares of Common Stock were issued to the Stockholders pursuant to the Plan; and

WHEREAS, pursuant to the Plan, the Stockholders have executed this Agreement to govern certain rights of the Stockholders and to provide certain other rights and obligations among them;

NOW THEREFORE, in consideration of the promises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

1. Demand Registrations.

(a) Generally. The Stockholders shall be entitled to request registration under the Securities Act of all or any portion of their Registrable Securities on Form S-1 or any similar long-form registration ("Long-Form Registrations") or, if available, on Form S-3 or any similar short-form registration ("Short-Form Registrations"), in each case, in accordance with the provisions set forth in subparagraphs (b) and (c) below. All registrations requested pursuant to this Section 1 are referred to herein as "Demand Registrations." All Long-Form Registrations and, unless otherwise agreed to by the Company, all Short-Form Registrations shall be underwritten registrations. Demand Registrations will be Short-Form Registrations whenever the Company is permitted to use any applicable short form. So long as the Company is subject

---

[2] Other Stockholders will be limited to the beneficial owners of more than 5% of the Company's issued and outstanding Common Stock, determined as of the Effective Date.

to the reporting requirements of the Exchange Act, the Company shall use its reasonable best efforts to make Short-Form Registrations on Form S-3 available for the sale of Registrable Securities. Notwithstanding the foregoing, the Stockholders hereby acknowledge and agree that, as of the Effective Date, the Company is not eligible to register its securities on Form S-3.

(b)     <u>Demand Registrations by the Yucaipa Stockholders</u>.   The Yucaipa Stockholders shall be entitled to request unlimited Demand Registrations at any time.

(c)     <u>Demand Registrations by the Other Stockholders</u>.    At any time during the period (i) commencing upon the earlier to occur of (1) the date that is 180 days following the date of the Company's initial Qualified Public Offering following the Effective Date and (2) the date of the listing of the Common Stock on a Nationally Recognized Exchange and (ii) ending upon the fifth anniversary of the Effective Date (except as otherwise provided in <u>Section 1(f)</u> hereof), the Other Stockholders holding Registrable Securities shall be entitled to request an aggregate of two Demand Registrations; <u>provided</u>, <u>however</u>, that such holders of Other Stockholder Registrable Securities (x) shall be entitled to request Long-Form Registrations only in connection with a registration in which the aggregate offering value of the Other Stockholder Registrable Securities requested to be registered equals at least $40,000,000 and (y) shall be entitled to request Short-Form Registrations only in connection with a registration in which the aggregate offering value of the Other Stockholder Registrable Securities requested to be registered equals at least $20,000,000.  For purposes of this Agreement, a "<u>Qualified Public Offering</u>" is an underwritten public offering  registered with the Securities Act of the Common Stock made by the Company or a Yucaipa Stockholder, with aggregate gross proceeds of not less than $40,000,000. The demand registration rights of all Other Stockholders shall terminate on the fifth anniversary of the Effective Date.

(d)     <u>Requests for Registration</u>.   Each request for a Demand Registration shall specify the approximate number of Yucaipa Registrable Securities or Other Stockholder Registrable Securities, as applicable, requested to be registered and the anticipated per share price range for such offering.  Within 10 days after receipt of any such request, the Company shall give written notice of such requested registration to all holders of Registrable Securities and, subject to <u>Section 1(e)</u> below, will include in such registration, in addition to the Yucaipa Registrable Securities or Other Stockholder Registrable Securities, as applicable, that are requested to be registered pursuant hereto, all Registrable Securities with respect to which the Company has received written requests for inclusion therein within 15 days after the receipt of the Company's notice.

(e)     <u>Priority on Demand Registrations</u>. The Company will not include in any Demand Registration any securities other than Registrable Securities without the prior written consent of the Yucaipa Stockholders.  In connection with any Demand Registration that is an underwritten offering, if (i) the Company has requested to include in such registration any equity securities of the Company (the "<u>Company Equity Securities</u>") to be sold for the account of the Company, (ii) the managing underwriter(s) advise the Company and the Yucaipa Stockholders that in their opinion the inclusion of such Registrable Securities and Company Equity Securities proposed to be included in such offering will not adversely affect the ability of the underwriter(s) to sell such Registrable Securities and such Company Equity Securities in an orderly manner in such offering within a price range acceptable to the Yucaipa Stockholders and the holders of a

majority of the Registrable Securities initially requesting registration, and (iii) the Yucaipa Stockholders consent in writing to the inclusion of such Company Equity Securities in such offering, then the Company may include such Company Equity Securities in such offering. Notwithstanding the foregoing, if a Demand Registration is an underwritten offering and the managing underwriter(s) advise the Company in writing that, in their opinion, the number of Registrable Securities and, if permitted hereunder, other securities requested to be included in such offering, exceeds the number of Registrable Securities and other securities, if any, which can be sold therein without adversely affecting the marketability of the offering, the Company will include in such registration (x) first, the number of Registrable Securities requested to be included in such registration which in the opinion of such underwriter(s) can be sold without adverse effect, pro rata among the respective holders thereof on the basis of the number of Registrable Securities owned by each such holder, (y) second, the Company Equity Securities and (z) third, other securities requested to be included in such Demand Registration, pro rata among the holders of such securities on the basis of the number of such securities owned by each such holder.

(f)  <u>Restrictions on Demand Registrations</u>.  The Company will not be obligated to effect any Demand Registration within six months after the effective date of a previous Long-Form Registration with respect to the Company.  The Company may postpone, for up to six months (from the date of the request), the filing or the effectiveness of a registration statement for a Demand Registration if the Company's board of directors believes that such Demand Registration would reasonably be expected to have an adverse effect on any proposal or plan by the Company or any subsidiary thereof to engage in any acquisition of assets (other than in the ordinary course of business) or any stock purchase, merger, consolidation, tender offer, reorganization, or similar transaction; <u>provided</u>, <u>however</u>, that in such event, the holders of Registrable Securities initially requesting such Demand Registration will be entitled to withdraw such request and, if such request is withdrawn, such Demand Registration shall be treated as if it had never been made in the first instance, and the Company will pay all Registration Expenses in connection with such registration; <u>provided</u>, <u>further</u>, that the duration of the rights of the Other Stockholders to require Demand Registrations pursuant to this <u>Section 1</u> and to participate in Piggyback Registrations pursuant to <u>Section 2</u> hereof shall be extended by the period of any such postponement.  The Company may delay a Demand Registration hereunder only once in any 12-month period.

(g)  <u>Selection of Underwriters</u>.  The holders of a majority of the Registrable Securities initially requesting each Demand Registration hereunder will have the right to select the investment banker(s) and manager(s) to administer the offering under such Demand Registration, subject to the approval of the Yucaipa Stockholders and the Company, which, in each case, will not be unreasonably withheld.

2.  <u>Piggyback Registrations</u>.

(a)  <u>Right to Piggyback</u>.  Whenever the Company proposes to register any of its equity securities under the Securities Act (other than pursuant to (i) a Demand Registration which is addressed in <u>Section 1</u> above rather than in this <u>Section 2</u>, (ii) a registration on Form S-4 or S-8 or any successor or similar forms or (iii) in connection with the Company's initial Qualified Public Offering) and the registration form to be used may be used for the registration

of Registrable Securities (a "Piggyback Registration"), whether for sale for its own account or the account of a Person not a party to this Agreement, the Company will give prompt written notice to all holders of Registrable Securities of its intention to effect such a registration and, subject to Sections 2(c) and 2(d) below, will include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within 15 days after the receipt of the Company's notice. All Piggyback Registration rights of any Other Stockholder shall terminate on the fifth anniversary of the Effective Date (except as otherwise provided in Section 1(f) hereof).

(b)    Priority on Primary Registrations.    If a Piggyback Registration is an underwritten primary registration on behalf of the Company, and the managing underwriter(s) advise the Company in writing (with a copy to each party hereto requesting registration of Registrable Securities) that, in their opinion, the number of securities requested to be included in such registration exceeds the number which can be sold in such offering without adversely affecting the marketability of such offering, the Company will include in such registration (i) first, the securities that the Company proposes to sell, (ii) second, the Registrable Securities requested to be included in such registration, pro rata among the holders thereof on the basis of the number of Registrable Securities owned by each such holder, and (iii) third, other securities requested to be included in such registration pro rata among the holders of such securities on the basis of the number of such other securities owned by each such holder.

(c)    Priority on Secondary Registrations.    If a Piggyback Registration is an underwritten secondary registration on behalf of holders of the Company's securities (it being understood that secondary registrations on behalf of holders of Registrable Securities are addressed in Section 1 above rather than in this Section 2(c)), and the managing underwriter(s) advise the Company in writing that, in their opinion, the number of securities requested to be included in such registration exceeds the number which can be sold in such offering without adversely affecting the marketability of the offering, the Company will include in such registration (i) first, the securities requested to be included therein by the holders requesting such registration, (ii) second, the Registrable Securities requested to be included in such registration, pro rata among the holders of such Registrable Securities on the basis of the number of Registrable Securities owned by each such requesting holder, and (iii) third, other securities requested to be included in such registration pro rata among the holders of such other securities on the basis of the number of such securities owned by each such holder.

(d)    Selection of Underwriters.    If any Piggyback Registration is an underwritten offering, the selection of the investment banker(s) and manager(s) for the offering must be approved by the Yucaipa Stockholders and the holders of a majority of the Registrable Securities included in such Piggyback Registration, in each case, which approval shall not be unreasonably withheld.

(e)    Withdrawal by Company.    If, at any time after giving notice of its intention to register any of its securities as set forth in Section 2(a) and before the effective date of such registration statement filed in connection with such registration, the Company shall determine, for any reason, not to register such securities, the Company may, at its sole discretion, give written notice of such determination to each holder of Registrable Securities and thereupon shall be relieved of its obligation to register any Registrable Securities in connection with such

registration (but not from its obligation to pay the Registration Expenses in connection therewith as provided herein).

       3.      <u>Other Registrations; Registration Rights</u>.

       (a)      If the Company has previously filed a registration statement with respect to Registrable Securities pursuant to <u>Sections 1</u> or <u>2</u>, and if such previous registration has not been withdrawn or abandoned, the Company will not file or cause to be effected any other registration of any of its equity securities or securities convertible into or exchangeable or exercisable for its equity securities under the Securities Act (except on Form S-4 or S-8 or any successor form), whether on its own behalf or at the request of any holder or holders of such securities, until a period of at least six months has elapsed from the effective date of such previous registration.

       (b)      The Company will not grant to any Persons the right to request that the Company register any equity securities of the Company, or any securities convertible into or exchangeable or exercisable for any such securities, without the prior written consent of the Yucaipa Stockholders.

       4.      <u>Holdback Agreements</u>.

       (a)      Unless the managing underwriter in an underwritten public offering of the Company's equity securities otherwise agrees, each holder of Registrable Securities agrees not to offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, enter into a transaction which would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of such securities, whether any such aforementioned transaction is to be settled by delivery of such securities or other securities, in cash or otherwise, or publicly disclose the intention to make any such offer, sale, pledge or disposition, or to enter into any such transaction, swap, hedge or other arrangement, in each case during the 10 days before and the 180-day period beginning on the effective date of any underwritten public offering of the Company's equity securities (including Demand and Piggyback Registrations) (the "<u>Market Standoff Period</u>"), except as part of such underwritten registration if otherwise permitted.  In addition, each holder of Registrable Securities agrees to execute any further letters, agreements and/or other documents requested by the Company or its underwriters which are consistent with the terms of this <u>Section 4(a)</u>.  The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

       (b)      The Company agrees (i) not to effect any public sale or distribution of its equity securities, or any securities convertible into or exchangeable or exercisable for such securities, during the 10 days before and during the 180-day period beginning on the effective date of any underwritten public offering of the Company's equity securities (including Demand and Piggyback Registrations) (except as part of such underwritten registration, pursuant to registrations on Form S-4 or S-8 or any successor form, pursuant to the terms of any employee benefit plan or similar arrangement applicable to the Company's or its subsidiaries' directors, officers or employees, unless the underwriter(s) managing the registered public offering

otherwise agree, and (ii) to use its reasonable best efforts to cause each holder of its Common Stock, or any securities convertible into or exchangeable or exercisable for Common Stock, purchased or otherwise acquired from the Company at any time after the date of this Agreement (other than in a registered public offering) to agree not to effect any public sale or distribution (including sales pursuant to Rule 144) of any such securities during any such period (except as part of such underwritten registration, if otherwise permitted or pursuant to any pre-existing selling plan pursuant to Rule 10b5-1 established or maintained for the benefit of any officer or director of the Company or any of its subsidiaries and over which such individual exercises no discretion), unless the underwriter(s) managing the registered public offering otherwise agree.

     5.   <u>Registration Procedures</u>.  Whenever the holders of Registrable Securities have requested that any Registrable Securities be registered pursuant to this Agreement, the Company will use its reasonable best efforts to effect the registration <u>and</u> the sale of such Registrable Securities in accordance with the intended method of disposition thereof and, pursuant thereto, the Company will as expeditiously as possible:

     (a)   prepare and (within 60 days after the end of the period within which requests for registration may be given to the Company) file with the Securities and Exchange Commission a registration statement with respect to such Registrable Securities and thereafter use its reasonable best efforts to cause such registration statement to become effective as soon as practicable but no later than 120 days after the applicable request date (<u>provided</u> that, before filing a registration statement or prospectus or any amendments or supplements thereto, the Company will furnish to the counsel selected by the holders of a majority of the Registrable Securities covered by such registration statement copies of all such documents proposed to be filed, which documents will be subject to review of such counsel);

     (b)   prepare and file with the Securities and Exchange Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period of either (i) not less than six months (subject to extension pursuant to <u>Section 8(b)</u>) or, if such registration statement relates to an underwritten offering, such longer period as in the opinion of counsel for the underwriters a prospectus is required by law to be delivered in connection with sales of Registrable Securities by an underwriter or dealer, or (ii) such shorter period as will terminate when all of the securities covered by such registration statement during such period have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof set forth in such registration statement (but, in any event, not before the expiration of any longer period required under the Securities Act), and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement until such time as all of such securities have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof set forth in such registration statement;

     (c)   furnish to each seller of Registrable Securities such number of copies of such registration statement, each amendment and supplement thereto, the prospectus included in such registration statement (including each preliminary prospectus), and such other documents as such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(d)     use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any seller reasonably requests and do any and all other acts and things which may be reasonably necessary or advisable to enable such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller (provided that the Company will not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subsection, (ii) subject itself to taxation in any such jurisdiction, or (iii) consent to general service of process in any such jurisdiction);

(e)     promptly notify each seller of such Registrable Securities, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the discovery of the happening of any event as a result of which, the prospectus included in such registration statement contains an untrue statement of a material fact or omits any fact necessary to make the statements therein not misleading in the light of the circumstances under which they were made, and, at the request of any such seller, prepare and furnish to such seller a reasonable number of copies of a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus will not contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein not misleading in the light of the circumstances under which they were made;

(f)     cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by the Company are then listed and, if not so listed, to be quoted on the quotation system on which similar securities issued by the Company are then listed or quoted (or if the securities of the Company are not yet listed or quoted, then on such exchange or quotation system as the Yucaipa Stockholders and the Company determine);

(g)     provide a transfer agent and registrar and a CUSIP number for all such Registrable Securities not later than the effective date of such registration statement;

(h)     enter into such customary agreements (including underwriting agreements in customary form) and take all such other actions as the holders of a majority of the Registrable Securities being sold or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities;

(i)     make available for inspection by any seller of Registrable Securities, any underwriter participating in any disposition pursuant to such registration statement, and any attorney, accountant, or other agent retained by any such seller or underwriter, all financial and other records, pertinent corporate and business documents and properties of the Company, and cause the Company's officers, directors, employees, agents, representatives, and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant, or agent in connection with such registration statement;

(j)      otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the Securities and Exchange Commission, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least 12 months, beginning with the first day of the Company's first full calendar quarter after the effective date of the registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(k)      permit any holder of Registrable Securities which holder, in its sole and exclusive judgment, might be deemed to be an underwriter or a controlling person of the Company to participate in the preparation of such registration or comparable statement and to require the insertion therein of material, furnished to the Company in writing, which in the reasonable judgment of such holder and its counsel should be included;

(l)      in the event of the issuance of any stop order suspending the effectiveness of a registration statement, or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any securities included in such registration statement for sale in any jurisdiction, the Company will use its reasonable best efforts promptly to obtain the withdrawal of such order;

(m)      use its reasonable best efforts to cause such Registrable Securities covered by such registration statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the sellers thereof to consummate the disposition of such Registrable Securities;

(n)      obtain a cold comfort letter from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by cold comfort letters, which letter shall be addressed to the underwriters, and the Company shall use its reasonable best efforts to cause such cold comfort letter to also be addressed to the holders of such Registrable Securities;

(o)      use its reasonable best efforts to cause certificates for the Registrable Securities covered by such registration statement to be delivered by the holders thereof to the underwriters in such denominations and registered in such names as the underwriters may request;

(p)      obtain an opinion from the Company's outside counsel in customary form and covering such matters of the type customarily covered by such opinions, which opinion shall be addressed to the underwriters and the holders of such Registrable Securities; and

(q)      cause the Company's management to participate fully in the sale process, including, without limitation, the preparation of the registration statement and the preparation and presentation of any "road shows," whether domestic or international.

If any such registration or comparable statement refers to any holder by name or otherwise as the holder of any securities of the Company and if such holder, in its sole and exclusive judgment, is or might be deemed to be an underwriter or a controlling person of the Company, such holder shall have the right to require (i) the insertion therein of language, in form and substance satisfactory to such holder and presented to the Company in writing, to the effect

8

that the holding by such holder of such securities is not to be construed as a recommendation by such holder of the investment quality of the Company's securities covered thereby, and that such holding does not imply that such holder shall assist in meeting any future financial requirements of the Company, or (ii) in the event that such reference to such holder by name or otherwise is not required by the Securities Act or any similar federal or state statute then in force, the deletion of the reference to such holder; provided that, with respect to this clause (ii), such holder shall furnish to the Company an opinion of counsel to such effect, which opinion and counsel shall be reasonably satisfactory to the Company.  The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish the Company with such information regarding such seller and the distribution of such securities as the Company may from time to time reasonably request in writing.

6.    Registration Expenses.

(a)    All expenses incident to the Company's performance of or compliance with this Agreement or incurred by the holders of Registrable Securities in effecting any registration pursuant to Sections 1 or 2, including, without limitation, all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, messenger and delivery expenses, the expense of any annual audit or quarterly review, the expenses and fees for listing the securities to be registered on each securities exchange on which similar securities issued by the Company are then listed (or, if none are so listed, on a securities exchange or quotation system), fees and disbursements of custodians, fees and disbursements of counsel for the Company and of a single counsel for the holders of Registrable Securities participating in such registration as a group (selected, in the case of registration pursuant to Section 1, by the holders of a majority of the Registrable Securities who initiate such Demand Registration, and, in the case of a registration pursuant to Section 2, by the holders of a majority of the Registrable Securities participating in such registration), fees and disbursements of all independent certified public accountants, underwriters (excluding discounts and commissions), and other Persons retained by the Company (all such expenses being herein called "Registration Expenses"), will be paid by the Company, whether or not the registration statement to which such Registration Expenses relate becomes effective.

(b)    Except as otherwise set forth in Section 6(a), the fees and disbursements of counsel and other advisors of any holder of Registrable Securities shall be borne by such holder, and each holder of any registration hereunder will pay any underwriting discounts and commissions allocable to the registration of such holder's Registrable Securities so included.

7.    Indemnification.

(a)    The Company agrees to indemnify and hold harmless, to the fullest extent permitted by law, each holder of Registrable Securities, such holder's officers, directors, agents, partners, members, stockholders, employees, Affiliates and each Person who controls such Holder (within the meaning of the Security Act) (each an "Indemnitee" and, collectively, the "Indemnities") against any and all losses, claims, damages, liabilities, joint or several, together with reasonable costs and expenses (including reasonable attorney's fees), to which such indemnified party may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages, or liabilities (or actions or proceedings, whether commenced or

threatened, in respect thereof) arise out of, are based upon, are caused by, or result from (i) any untrue or alleged untrue statement of material fact contained (A) in any registration statement, prospectus, or preliminary prospectus or any amendment thereof or supplement thereto, or (B) in any application or other document or communication (in this <u>Section 7</u> collectively called an "<u>application</u>") executed by or on behalf of the Company or based upon written information furnished by or on behalf of the Company filed in any jurisdiction in order to qualify any securities covered by such registration statement under the "blue sky" or securities laws thereof, or (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, and the Company will reimburse such holder and each Indemnitee for any legal or any other expenses incurred by them in connection with investigating or defending any such loss, claim, liability, action, or proceeding; <u>provided</u>, <u>however</u>, that the Company shall not be liable in any such case to any such Person to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof), or expense arises out of, is based upon, is caused by, or results from an untrue statement or alleged untrue statement, or omission or alleged omission, made in such registration statement, any such prospectus or preliminary prospectus or any amendment or supplement thereto, or in any application, in reliance upon, and in conformity with, written information prepared and furnished to the Company by such Person expressly for use therein or by such Person's failure to deliver, if such Person is required by law to deliver, a copy of the registration statement or prospectus or any amendments or supplements thereto after the Company has furnished such Person with a sufficient number of copies of the same.  In connection with any underwritten offering, the Company will indemnify such underwriters, their officers and directors, and each Person who controls such underwriters (within the meaning of the Securities Act) to the same extent as provided above with respect to the indemnification of the holders of Registrable Securities.

(b)     In connection with any registration statement in which a holder of Registrable Securities is participating, each such holder will furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such registration statement or prospectus and, to the fullest extent permitted by law, will indemnify and hold harmless the other holders of Registrable Securities and the Company, and their respective directors, officers, agents, and employees and each other Person who controls the Company (within the meaning of the Securities Act) against any losses, claims, damages, liabilities, together with reasonable costs and expenses (including reasonable attorney's fees), to which such indemnified party may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages, or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of, are based upon, are caused by, or result from (i) any untrue or alleged untrue statement of material fact contained in the registration statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or in any application, or (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is made in such registration statement, any such prospectus or preliminary prospectus or any amendment or supplement thereto, or in any application, in reliance upon and in conformity with written information prepared and furnished to the Company by such holder expressly for use therein; <u>provided</u>, <u>however</u>, that the obligation to indemnify will be individual, not joint and several, to each holder and will be limited to the net amount of proceeds received by such holder from the sale of Registrable Securities pursuant to such registration statement.

10

(c)      Any Person entitled to indemnification hereunder will (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any Person's right to indemnification hereunder to the extent such failure has not prejudiced the indemnifying party), and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party.  If such defense is assumed, the indemnifying party will not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent will not be unreasonably withheld).  An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim will not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim.

(d)      The indemnifying party shall not, except with the prior written consent of each indemnified party, consent to entry of any judgment or enter into any settlement unless (i) such judgment or settlement requires only the payment of money damages; (ii) such judgment or settlement includes, as an unconditional term thereof, the giving by the claimant or plaintiff to each indemnified party of a release from all liability in respect to such claim or litigation; and (iii) all amounts paid or payable with respect to such judgment or settlement are paid or to be paid by the indemnifying party.

(e)      If the indemnification provided for in this Section 7 is unavailable to, or is insufficient to hold harmless, an indemnified party under the provisions above in respect to any losses, claims, damages, or liabilities referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages, or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the sellers of Registrable Securities and any other sellers participating in the registration statement on the other hand from the sale of Registrable Securities pursuant to the registered offering of securities as to which indemnity is sought, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Company on the one hand and of the sellers of Registrable Securities and any other sellers participating in the registration statement on the other hand in connection with the registration statement on the other in connection with the statement or omissions which resulted in such losses, claims, damages, or liabilities, as well as any other relevant equitable considerations.  The relative benefits received by the Company on the one hand and the sellers of Registrable Securities and any other sellers participating in the registration statement on the other hand shall be deemed to be in the same proportion as the total net proceeds from the offering (before deducting expenses) to the Company bear to the total net proceeds from the offering (before deducting expenses) to the sellers of Registrable Securities and any other sellers participating in the registration statement.  The relative fault of the Company on the one hand and of the sellers of Registrable Securities and any other sellers participating in the registration statement on the other hand shall be determined by reference to, among other things, whether the untrue or alleged omission to state a material fact relates to

11

information supplied by the Company or by the sellers of Registrable Securities or other sellers participating in the registration statement and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(f)     The Company and the sellers of Registrable Securities agree that it would not be just and equitable if contribution pursuant to this <u>Section 7</u> were determined by pro rata allocation (even if the sellers of Registrable Securities were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph.  The amount paid or payable by an indemnified party as a result of the losses, claims, damages, and liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim.  Notwithstanding the provisions of this <u>Section 7</u>, no seller of Registrable Securities shall be required to contribute any amount in excess of the net proceeds received by such seller from the sale of Registrable Securities covered by the registration statement filed pursuant hereto.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(g)     The indemnification and contribution by any such party provided for under this Agreement shall be in addition to any other rights to indemnification or contribution which any indemnified party may have pursuant to law or contract and will remain in full force and effect regardless of any investigation made or omitted by or on behalf of the indemnified party or any officer, director, Affiliate or controlling Person of such indemnified party and will survive the transfer of securities.

8.     <u>Participation in Underwritten Registrations</u>.

(a)     No Person may participate in any registration hereunder which is underwritten unless such Person (i) agrees to sell such Person's securities on the basis provided in any underwriting arrangements approved by the Person or Persons entitled hereunder to approve such arrangements (including, without limitation, pursuant to the terms of any over-allotment or "green shoe" option requested by the managing underwriter(s); <u>provided</u> that no holder of Registrable Securities will be required to sell more than the number of Registrable Securities that such holder has requested the Company to include in any registration), and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements, and other documents reasonably required under the terms of such underwriting arrangements.

(b)     Each Person that is participating in any registration hereunder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in <u>Section 5(e)</u> above, such Person will forthwith discontinue the disposition of its Registrable Securities pursuant to the registration statement until such Person's receipt of the copies of a supplemented or amended prospectus as contemplated by such <u>Section 5(e)</u>.  In the event that the Company shall give any such notice, the applicable time period mentioned in <u>Section 5(b)</u> during which a Registration Statement is to remain effective shall be extended by the number of days during the period from and including the date of the giving of such notice

pursuant to this Section 8 to and including the date when each seller of a Registrable Security covered by such registration statement shall have received the copies of the supplemented or amended prospectus contemplated by <u>Section 5(e)</u>.

        9.    <u>Definitions</u>.

        "<u>Affiliate</u>" means, as to any specified Person, any other Person which, directly or indirectly, controls, is controlled by, employed by or is under common control with, any of the foregoing.  For the purposes of this definition, "<u>control</u>" means the possession of the power to direct or cause the direction of the management and policies of such Person through the ownership of voting securities, by contract or otherwise.

        "<u>Common Stock</u>" means the Company's common stock, par value $0.01 per share.

        "<u>Exchange Act</u>" means the Exchange Act of 1934, as amended, or any similar federal law then in force.

        "<u>Nationally Recognized Exchange</u>" means any of the following nationally recognized stock exchanges:  the New York Stock Exchange, NASDAQ or AMEX.

        "<u>Other Stockholder Registrable Securities</u>" means (i) all shares of Common Stock beneficially owned by the Other Stockholders and (ii) all shares of Common Stock issued or issuable, directly or indirectly, with respect to the securities referred to in clause (i) above upon exercise, conversion, or exchange or by way of stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation, or other reorganization.

        "<u>Person</u>" means an individual, a partnership, a joint venture, an association, a joint stock company, a corporation, a limited liability company, a trust (including any beneficiary thereof), an unincorporated organization, and a governmental entity or any department, agency, or political subdivision thereof.

        "<u>Registrable Securities</u>" means, collectively, the Yucaipa Registrable Securities and the Other Stockholder Registrable Securities.

        "<u>Securities Act</u>" means the Securities Act of 1933, as amended, or any similar federal law then in force.

        "<u>Securities and Exchange Commission</u>" includes any governmental body or agency succeeding to the functions thereof.

        "<u>Stockholders Agreement</u>" means that certain Stockholders Agreement, dated as of the date hereof, among the Company, the Stockholders and the other stockholders of the Company who are parties thereto.

"Transfer" means any transfer, donation, bequest, sale, assignment, or other disposal or attempted disposal (including by way of merger, operation of law, pursuant to any domestic relations or other court order, whether with or without consideration and whether voluntarily or involuntarily or by operation of law) of all or any portion of a security, any interest or rights in a security, or any rights under this Agreement. "Transferred" means the accomplishment of a Transfer, and "Transferee" means the recipient of a Transfer.

"Yucaipa Affiliated Company" means any entity which is controlled by the Yucaipa Stockholders, controls the Yucaipa Stockholders or is under common control with the Yucaipa Stockholders (other than the Company and any entity that is controlled by the Company). For the purposes of this definition, "control" means the possession of the power to direct or cause the direction of the management and policies of such Person through the ownership of voting securities, by contract or otherwise.

"Yucaipa Registrable Securities" means (i) all shares of Common Stock held by the Yucaipa Stockholders or any Yucaipa Affiliated Company and (ii) all shares of Common Stock issued or issuable, directly or indirectly, with respect to the securities referred to in clause (i) above upon exercise, conversion, or exchange or by way of stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation, or other reorganization.

10.    Company Representations. The Company represents and warrants to each holder of Registrable Securities that this Agreement constitutes the legal, valid and binding obligation of the Company, enforceable in accordance with its terms, and the execution, delivery and performance of this Agreement by the Company does not and will not conflict with, violate or cause a breach of any agreement, contract or instrument to which the Company is a party or any judgment, order or decree to which the Company is subject.

11.    Miscellaneous.

(a)    Acknowledgment of the Other Stockholders; Termination of Other Stockholder Rights. Each Other Stockholder acknowledges and agrees that, notwithstanding the registration of the Common Stock under the Exchange Act as of the Effective Date, nothing set forth in this Agreement shall prevent the Company or the Yucaipa Stockholders from (i) filing, or causing to be filed, a Form 15 deregistering the Common Stock under the Exchange Act at any time or (ii) enforcing the restrictions on transfer set forth in the Company's Amended and Restated Certificate of Incorporation, as the same may be amended from time to time. Each Other Stockholder acknowledges and agrees that all of their rights and privileges under this Agreement shall terminate, and the Company shall no longer have any obligation of any kind to any Other Stockholder pursuant to this Agreement, on the first to occur of (i) the consummation of a Sale of the Company (as defined in the Stockholders Agreement) or (ii) the fifth anniversary of the Effective Date (except as otherwise provided in Section 1(f) hereof). The Company and the Yucaipa Stockholders acknowledge and agree that all obligations of the Other Stockholders (including their obligations under Section 4(a) hereof) shall terminate and be of no further force and effect upon the termination of the Other Stockholders' rights and privileges under this Agreement pursuant to the terms of the preceding sentence or otherwise.

14

(b)  <u>Amendment and Waiver</u>.  Except as otherwise provided herein, no modification, amendment, or waiver of any provision of this Agreement will be effective against the Company or the holders of Registrable Securities unless such modification, amendment or waiver is agreed to in writing by (i) the Company, the Yucaipa Stockholders and (iii) the holders of a majority of the outstanding Other Stockholder Registrable Securities.  Notwithstanding the foregoing, if an amendment or modification of this Agreement is not adverse to the material rights of Other Stockholders under this Agreement then such amendment or modification will be effective against the Company and the holders of Other Stockholder Registrable Securities if such amendment or modification is approved in writing by the Company and the Yucaipa Stockholders.  The failure of any party to enforce any of the provisions of this Agreement will in no way be construed as a waiver of such provisions and will not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

(c)  <u>Severability</u>.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be construed and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained herein.

(d)  <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement and understanding among the parties with respect to the matters set forth herein and supersedes all other prior covenants, agreements, undertakings, obligations, promises, arrangements, communications, representations and warranties, whether oral or written, by any party hereto or by any Affiliate or representative of any party hereto with respect to the matters set forth herein. There are no covenants, agreements, undertakings or obligations with respect to the matters set forth in this Agreement other than those expressly set forth or referred to herein.

(e)  <u>Successors and Assigns</u>.  This Agreement and all rights and obligations of the Yucaipa Stockholders hereunder may be Transferred by any Yucaipa Stockholder without the consent of any party hereto upon written notice to the Company thereof.  Neither this Agreement nor any of the rights or obligations under this Agreement may be Transferred by any Other Stockholder without the prior written consent of the Company and the Yucaipa Stockholders; <u>provided</u>, <u>however</u>, that in the event that (i) any Other Stockholder proposes to assign its rights and obligations hereunder in connection with the Transfer of (A) all Other Stockholder Registrable Securities held by such Other Stockholder or (B) a number of Registrable Securities equal to not less than five percent (5%) of the number of issued and outstanding shares of Common Stock at such time and (ii) the Transferee of such Other Stockholder Registrable Securities will acquire beneficial ownership of Registrable Securities representing not less than five percent (5%) of the issued and outstanding shares of Common Stock at such time, then such Other Stockholder may assign his, her or its rights and obligations hereunder with the prior written consent of only the Yucaipa Stockholders, which consent the Yucaipa Stockholders shall not unreasonably withhold, delay or condition (but which may be conditioned upon such Transferee executing a joinder to this Agreement satisfactory to the Yucaipa Stockholders). Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.

(f)    Counterparts.  This Agreement may be executed in separate counterparts each of which will be an original and all of which taken together shall constitute one and the same agreement.

(g)    Remedies.    Any Person having rights under any provision of this Agreement shall be entitled to enforce their rights under this Agreement specifically to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any Stockholder may in its sole discretion apply to any court of competent jurisdiction for specific performance and/or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation of the provisions of this Agreement.

(h)    Notices.  Any notice provided for in this Agreement must be in writing and must be either personally delivered, sent by first class mail (postage prepaid and return receipt requested), or sent by reputable overnight courier service (charges prepaid) or by facsimile to the Company at the address set forth below and to the Stockholders at their respective addresses indicated in the Company's records, or at such address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party. Notices will be deemed to have been given hereunder when delivered personally, three days after deposit in the U.S. mail, and one day after deposit with a reputable overnight courier service. Notices given by facsimile will be deemed given when sent and confirmed electronically.  The address of the Company is:

> [Allied Holdings, Inc.]
> 160 Clairemont Avenue, Suite 200
> Decatur, Georgia  30030
> Fax:  [_____]
> Attn:  General Counsel

(i)    Governing Law.  The corporate law of the State of Delaware shall govern all issues and questions concerning the relative rights and obligations of the Company and its stockholders.  All other issues and questions concerning the construction, validity, enforcement, and interpretation of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

(j)    Consent to Jurisdiction and Service of Process.  Each party hereby (i) irrevocably submits to the exclusive jurisdiction of the federal and state courts located in Wilmington, Delaware for the purpose of any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter hereof, (ii) waives to the extent not prohibited by applicable law, and agrees not to assert by way of motion, as a defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above named courts,

16

that its property is exempt or immune from attachment or execution, that any such proceeding brought in one of the above named courts is improper, or that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court and (iii) agrees not to commence or maintain any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this Agreement or relating to the subject matter hereof or thereof other than before one of the above named courts nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation to any court other than one of the above named courts whether on the grounds of inconvenient forum or otherwise. Each party hereto hereby consents to service of process in any such proceeding in any manner permitted by Delaware law, and agrees that service of process by registered or certified mail, return receipt requested, at its address specified pursuant to Section 11(h) hereof is reasonably calculated to give actual notice.

(k)    Jury Waiver. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT SUCH PARTY WILL NOT ASSERT, ANY RIGHT TO TRIAL BY JURY ON ANY ISSUE IN ANY PROCEEDING, WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE, IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH, RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HEREUNDER, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN TORT OR CONTRACT OR OTHERWISE.

(l)    No Strict Construction. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

(m)    Business Days. If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the state in which the Company's chief executive office is located, the time period shall automatically be extended to the business day immediately following such Saturday, Sunday or legal holiday.

(n)    Descriptive Headings; Construction. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement. For all purposes of and under this Agreement, (i) the word "including" shall be deemed to be immediately followed by the words "without limitation"; (ii) words (including defined terms) in the singular shall be deemed to include the plural and vice versa; (iii) words of one gender shall be deemed to include the other gender as the context requires; (iv) "or" is not exclusive; and (v) the terms "hereof," "herein," "hereto," "herewith" and any other words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular term or provision of this Agreement, unless otherwise specified.

* * * * *

        IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement on the day and year first above written.

**[THE COMPANY]**

By: _____

Name: _____

Its: _____


**[THE YUCAIPA STOCKHOLDERS]**

By: _____

Name: _____

Its: _____


**[THE OTHER STOCKHOLDERS]**

By: _____

Name: _____

Its: _____

## MONITORING AND MANAGEMENT SERVICES AGREEMENT

THIS MONITORING AND MANAGEMENT SERVICES AGREEMENT (this "Agreement") by and between Yucaipa American Funds, LLC, a Delaware limited liability company ("Yucaipa"), and [Allied Holdings, Inc.][1], a Delaware corporation (the "Company"), is made and entered into as of [_____], 2007.

WHEREAS, on July 31, 2005 the Company and certain of its subsidiaries filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and on [_____], 2007 (the "Effective Date") the Company completed its restructuring pursuant to a Plan of Reorganization under which affiliates of Yucaipa were issued common stock representing approximately [__]% of the Company; and

WHEREAS, the Company desires to retain Yucaipa to provide certain monitoring and management services to the Company and Yucaipa is willing to provide such services on the terms set forth below.

NOW, THEREFORE, in consideration of the premises and the mutual covenants of the parties hereto and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned parties agree as follows:

Section 1.      Services.  Subject to the provisions of this Agreement, Yucaipa will perform the following services for the Company to the extent requested by the Board of Directors of the Company:

(a)      general monitoring and management services;

(b)      monitoring of certain financing functions, including assistance with the preparation of financial projections and assistance with compliance with financing agreements;

(c)      identifying and developing growth strategies;

(d)      monitoring labor relations and certain human resource functions, including interfacing and negotiating with various labor unions and assisting with the identification and hiring of executives and directors;

(e)      subject to Section 5, assisting with identification, support, negotiation and analysis of acquisitions or dispositions by the Company or its subsidiaries; and

(f)      subject to Section 5, assisting with support, negotiation and analysis of financing alternatives, including in connection with acquisitions, capital expenditures, refinancing of existing indebtedness and public or private debt or equity issuances.

---

[1] The name of Reorganized Allied Holdings may be changed to something different than "Allied Holdings, Inc." in connection with the reincorporation in Delaware.

The services listed above and in <u>Section 3</u> may, at Yucaipa's election, be performed by Yucaipa, its affiliates and/or such employees, agents and other representatives of Yucaipa and/or its affiliates as Yucaipa deems appropriate in its discretion to the furnishing of the services required.

Section 2.    <u>Annual Fee; Expense Reimbursement</u>.

(a)    <u>Annual Fees</u>.  Commencing on the date of this Agreement, the Company will pay to Yucaipa an aggregate annual fee, in consideration of the services rendered pursuant to <u>Sections 1(a)</u> to <u>(d)</u> above, equal to $1,500,000 (the "<u>Annual Fee</u>"), which fee will be comprised of a management fee equal to $750,000 and an unallocated expense reimbursement of $750,000, which unallocated expense reimbursement will be in addition to the expense reimbursement payable to Yucaipa pursuant to <u>Section 2(b)</u> below.  One-twelfth (1/12th) of the Annual Fee will be payable in advance on the first day of each calendar month; <u>provided</u> that a prorated portion of such fee will be payable in advance on the date of this Agreement for the partial month beginning on the date of this Agreement.  The Annual Fee will be payable by the Company whether or not the Company requests or utilizes Yucaipa to provide the services described in <u>Section 1</u> above.  The Annual Fee will be fully earned when due and payable.

(b)    <u>Reimbursement of Expenses</u>.  In addition to the Annual Fee, the Company will reimburse Yucaipa for all documented out-of-pocket costs, expenses and fees incurred in connection with the performance of its obligations under this Agreement, including, without limitation, travel expenses and costs, fees and expenses paid to legal counsel, accountants, advisers, consultants, subcontractors and other third parties.  The Company will fully reimburse and pay Yucaipa for any such costs, fees and expenses within 10 days after each request for reimbursement by Yucaipa.

Section 3.    <u>Transaction Fees</u>.

(a)    <u>Future Transactions</u>.  The Company hereby grants Yucaipa a right of first refusal to serve as a non-exclusive consultant and advisor in connection with any and each (i) sale, merger, business combination, joint venture or otherwise, whether effected in a single transaction or series of related transactions, in which 25% or more of the equity securities or voting power of the Company or all or a substantial portion of the Company's business or assets (on a consolidated basis) are combined with or transferred to another person or entity (a "<u>Sale Transaction</u>") and (ii) financing transaction (including refinancings and securities offerings) involving greater than $20,000,000 (a "<u>Financing Transaction</u>").  As a consultant or advisor, Yucaipa and/or its affiliates and representatives will provide assistance with identification, support, negotiation and analysis of the relevant transaction, but Yucaipa will not perform any service for which it does not possess the requisite federal or state registrations, licenses or qualifications.  If Yucaipa agrees to serve as consultant or advisor with respect to any such transaction no separate agreement will be required and the Company will (i) pay Yucaipa a cash fee in connection with each such transaction equal to 1.0% of the Gross Transaction Value of such transaction and (ii) reimburse Yucaipa for all documented out-of-pocket costs, expenses and fees incurred in connection with each such transaction.  The fees and expenses referenced in clause (i) above must be paid by the Company concurrently with the closing of each such transaction and the costs, fees and expenses referenced in clause (ii) above shall be paid by the Company to Yucaipa within 10 days after any request for reimbursement by Yucaipa.

      (b)    <u>Gross Transaction Value</u>. With respect to any Sale Transaction, "<u>Gross Transaction Value</u>" means the total amount of cash and the fair market value on the date which is five days prior to the consummation of the transaction (the "<u>Valuation Date</u>") of all other property paid or payable directly or indirectly to the Company, its subsidiaries or any of their respective security holders in connection with a transaction (including (i) amounts paid to holders of any warrants or convertible securities of the Company or its subsidiaries and to holders of any options or stock appreciation rights issued by the Company or its subsidiaries, whether or not vested; (ii) the total amount of indebtedness for borrowed money or similar non-trade liabilities or obligations (including unfunded pension liabilities, guarantees, capitalized leases and the like) of the Company or its subsidiaries repaid, retired, extinguished or assumed in connection with, or which otherwise remains outstanding as of the closing of, a transaction; and (iii) the fair market value of any assets of the Company or its subsidiaries (including working capital items) which are retained by or otherwise distributed to their respective stockholders or affiliates in anticipation of or in connection with a transaction). With respect to any Sale Transaction, when calculating Gross Transaction Value, (1) all shares will be deemed transferred where a transaction is effected by the transfer of shares (A) constituting 25% or more of the then outstanding equity securities of or equity interest in the Company or its subsidiaries or affiliates, or (B) possessing 25% or more of the then outstanding voting power of the outstanding equity securities of or equity interest in the Company or its subsidiaries or affiliates, (2) the value of any securities issuable in connection with a transaction (whether debt or equity) that have an established public market (including any such securities subject to resale restrictions) will be determined on the basis of the last closing price in such market on the Valuation Date; and the value of securities that have no established public market or other property will be the fair market value of such securities or other property on such Valuation Date as determined in good faith and upon mutual agreement of the Company and Yucaipa, and (3) all present value calculations will utilize a discount rate equal to the prime rate published in *The Wall Street Journal* on the Valuation Date (the "<u>Prime Rate</u>"). In the event an agreement for a transaction provides for escrowed or contingent payments or other payments over time, the present value of such payments (discounted at the Prime Rate) shall be based upon projections developed in connection with the proposed transaction, and Yucaipa's fees in respect of such payments shall be calculated based upon such present value and paid at the closing of such transaction. With respect to any transaction that is solely a Financing Transaction, "<u>Gross Transaction Value</u>" means the total amount of indebtedness of the Company or its subsidiaries issued, financed or refinanced or the fair market value (determined consistent with sub-clause (2) above) on the date of issuance of any equity securities issued.

      Section 4.    <u>Term of Agreement</u>. The term of this Agreement will be for five years beginning on _____ __,[2] 2007 and it will automatically be extended by 12 additional calendar months on _____ __,[2] 2008, and every _____ __,[2] thereafter, unless 180 days prior to _____ __,[2] 2008, or 180 days prior to any subsequent _____ __,[2] thereafter, the Company delivers to Yucaipa written notice of its intention not to extend the term of this Agreement.

---

[2] The month and day of the Effective Date.

Section 5.    <u>Termination</u>.

(a)    <u>Termination by the Company</u>.  The Company may elect to terminate this Agreement:

(i)    at any time following a determination of the Board of Directors of the Company to effect such a termination by giving Yucaipa at least 180 days' advance written notice of such termination; or

(ii)    if Yucaipa fails to reasonably perform any material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by it and such failure continues for a period of 60 days after written notice thereof from the Company, which notice must describe the alleged failure with particularity.

(b)    <u>Termination by Yucaipa</u>.  Yucaipa may elect to terminate this Agreement:

(i)    if the Company fails to reasonably perform any material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by it and such failure continues for a period of 60 days after written notice thereof from Yucaipa, which notice must describe the alleged failure with particularity;

(ii)    immediately if the Company fails to pay or reimburse Yucaipa for any amounts due under this Agreement within the time required by this Agreement;

(iii)    at any time upon giving the Company at least 180 days' advance written notice of such termination; or

(iv)    immediately upon the occurrence of any of the following events: (1) any merger, consolidation, business combination, or similar transaction involving the Company, (2) any sale, lease or other disposition directly or indirectly by merger, consolidation, business combination, share exchange, joint venture, or otherwise of assets of the Company or any of its subsidiaries representing 25% or more of the consolidated assets of the Company and its subsidiaries, (3) any issuance, sale, or other disposition of (including by way of merger, consolidation, business combination, share exchange, joint venture, or any similar transaction) securities (or options, rights or warrants to purchase, or securities convertible into or exchangeable for such securities) representing 25% or more of the voting power of the Company or (4) any transaction in which any person acquires "beneficial ownership" (within the meaning of Rule 13d-3(a)(1) under the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>")) or the right to acquire beneficial ownership or any group (within the meaning of Section 13(d)(3) of the Exchange Act) is formed which "beneficially owns" or has the right to acquire "beneficial ownership" of 25% or more of the outstanding voting capital stock of the Company or (5) any combination of the foregoing.

(c)     Payments upon Termination.  In the event of any termination pursuant to Section 5(a)(i), Section 5(b)(i), Section 5(b)(ii) or Section 5(b)(iv), the Company will pay, or cause to be paid, to Yucaipa a cash termination payment equal to the total fees that would have been earned by Yucaipa under Section 2 hereof during the remaining term of this Agreement as if the Agreement had not been terminated.  Any such cash termination payment will be due and payable to Yucaipa, in full, as of the date of such termination.  If the foregoing payments are determined to constitute liquidated damages, such payments shall in all events be deemed reasonable.

(d)     Effect of Termination.  Upon any termination of this Agreement the obligations of the parties hereunder shall also terminate, except (i) the Company will continue to be obligated to make all payments required pursuant to Section 2(b), Section 3, and Section 5(c), (ii) if Yucaipa agrees to serve as a consultant or advisor pursuant to Section 3, and within 12 months of the date of termination of this Agreement the Company enters into or consummates a Sale Transaction or Financing Transaction, then on the date the Company enters into or consummates each such transaction (whichever is earlier) the Company will pay Yucaipa a fee in the amount contemplated by Section 3, and (iii) the provisions of Section 2(b), the payment obligations under Section 3, Section 5, Section 6, Section 7 and Section 8 shall survive any such termination.

Section 6.     Indemnification.

(a)     The Company (the "Indemnifying Party") will indemnify and hold harmless Yucaipa and its affiliates, counsel and other advisors, and the respective partners, equityholders, shareholders, members, directors, officers, fiduciaries, managers, controlling persons, employees and agents of each of the foregoing  (each an Indemnified Party" and collectively, the "Indemnified Parties"), from and against all losses, claims or proceedings including stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards, other liabilities, costs, fees and expenses (collectively, "Losses") (i) related to or arising out of (A) oral or written information provided by the Company, the Company's employees or other agents, which either the Company or any Indemnified Party provides to any persons, or (B) other action or failure to act by the Company, the Company's employees or other agents or any Indemnified Party at the Company's request or with the Company's consent, or (ii) otherwise related to or arising out of any services provided by any Indemnified Party under this Agreement or any transaction or conduct in connection therewith, provided that this clause (ii) shall not apply if it is finally judicially determined by a court of competent jurisdiction that such Losses arose solely out of the gross negligence or bad faith of such Indemnified Party.

(b)     The Company shall further reimburse any Indemnified Party promptly for, or at the Indemnified Party's option advance amounts sufficient to cover, any legal or other fees or expenses as they are incurred (i) in investigating, preparing or pursuing any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration and whether or not any Indemnified Party is a party (an "Action") and (ii) in connection with enforcing such Indemnified Party's rights under this Agreement (including its rights under this Section 6); provided, however, that in the event it is finally judicially determined by a court of competent jurisdiction that the Losses of such

5

Indemnified Party arose solely out of the gross negligence or bad faith of such Indemnified Party, such Indemnified Party will promptly remit to the Company any amounts reimbursed or advanced under this paragraph.

(c)     The Company shall, if requested by Yucaipa, assume the defense of any such Action including the employment of counsel reasonably satisfactory to Yucaipa and will not settle, compromise, consent or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any Indemnified Party is a party thereto) unless it obtains prior written consent of Yucaipa or an express, unconditional release of each Indemnified Party from all liability relating to such Action and any services provided under this Agreement.  Any Indemnified Party shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which this Section 6 relates, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless: (i) the Company has failed promptly to assume the defense and employ counsel or (ii) the named parties to any such Action (including any impleaded parties) include such Indemnified Party and the Company, and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided that the Company shall not in such event be responsible under this Section 6 for the fees and expenses of more than one firm of separate counsel (in addition to local counsel) in connection with any such Action in the same jurisdiction.

(d)     The Company agrees that if any right of any Indemnified Party set forth in the Sections 6(a), (b) or (c) is finally judicially determined to be unavailable (except by reason of the gross negligence or bad faith of such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated herein, then the Company shall contribute to such Losses (i) in such proportion as is appropriate to reflect the relative benefits received by the Company and its stockholders, on the one hand, and such Indemnified Party, on the other hand, in connection with the transactions contemplated hereby, and (ii) if (and only if) the allocation provided in clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company and such Indemnified Party; provided, however, that in no event shall the amount, if any, to be contributed by all Indemnified Parties exceed the amount of the fees actually received by Yucaipa hereunder.

(e)     The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with services rendered or to be rendered by any Indemnified Party pursuant to this Agreement, the transactions contemplated hereby or taken hereunder or any Indemnified Party's actions or inactions in connection with any such services or transactions except for Losses of the Company that are finally judicially determined by a court of competent jurisdiction to have arisen solely out of the gross negligence or bad faith of such Indemnified Party in connection with any such actions, inactions or services.  In no event will any Indemnified Party have any liability for any Losses based on a multiple, any lost profits, any diminution in value or property or equity or any punitive, special, consequential, incidental, exemplary or otherwise not actual damages.

(f)     The rights of the Indemnified Parties hereunder shall be in addition to any other rights that any Indemnified Party may have at common law, by statute or otherwise. Except as otherwise expressly provided for in this <u>Section 6</u>, if any term, provision, covenant or restriction contained in this <u>Section 6</u> or anywhere in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall all remain in full force and effect and shall in no way be affected, impaired or invalidated.  The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Party's services under or in connection with, this Agreement.

Section 7.     <u>Disclaimer; Opportunities</u>.

(a)     <u>Disclaimer</u>.  Yucaipa makes no representations or warranties, express or implied, in respect of the services to be provided pursuant to this Agreement or any registrations, licenses or qualifications.  Yucaipa is providing certain monitoring, management or consulting services and is not undertaking to provide any legal, regulatory, accounting, insurance, tax, investment banking, investment advisory or other similar professional advice and neither Yucaipa, nor its affiliates, will be rendering any opinions.  The Company confirms that it will rely on its own counsel, accountants and other similar experts for legal, regulatory, accounting, insurance, tax, investment banking, investment advisory or other similar professional advice. Yucaipa will not perform any service for which it does not possess the requisite federal or state registrations, licenses or qualifications.  The Company recognizes that Yucaipa is providing services only to the Company and this Agreement is not deemed to be and is not intended to confer rights upon any stockholder or any other person or entity not party to this Agreement against Yucaipa or an Indemnified Party.  Any document, analysis or service provided by Yucaipa under this Agreement will not be quoted, reproduced, summarized or otherwise disclosed, nor will any reference to Yucaipa be made, without Yucaipa's prior written consent.

(b)     <u>Ability to Pursue Opportunities</u>.  Except as Yucaipa may otherwise agree in writing after the date hereof:

(i)     Yucaipa and each of the Indemnified Parties have the right to, and have no duty (contractual, fiduciary or otherwise) not to, directly or indirectly: (A) engage in the same or similar business activities or lines of business as the Company or its subsidiaries and affiliates, or any business that might be in direct or indirect competition with the Company and/or its subsidiaries and affiliates, (B) do business with any client or customer of the Company or its subsidiaries and affiliates, (C) consult, advise, manage, supervise or monitor any company, business or other entity, including any portfolio companies, affiliated investment limited partnerships or limited liability companies affiliated with Yucaipa or any of the Indemnified Parties, or (D) own or purchase any securities or any other interest of or in any company, business or other entity that engages in any of the activities listed in sub-clauses (A), (B) or (C);

7

(ii)       Yucaipa and each of the Indemnified Parties have no duty (contractual or otherwise) to communicate or present any corporate opportunities to the Company or any of its subsidiaries or affiliates or to refrain from any of the actions listed in <u>Section 7(b)(i)</u>; and

(iii)       Neither Yucaipa nor any of the Indemnified Parties will be liable to the Company or any of its subsidiaries or affiliates for breach of any duty (contractual, fiduciary or otherwise) if it (A) participates in any activities described in <u>Section 7(b)(i)</u> or (B) pursues any corporate opportunity for itself, directs any corporate opportunity to another person or entity or does not present such corporate opportunity to the Company, its subsidiaries or affiliates or (C) does any of the foregoing in connection with Performance Logistics Group, Inc. or any of its affiliates.

(c)       <u>Renouncement of Certain Rights</u>.  Without limiting any provision of this <u>Section 7</u>, the Company renounces any interest or expectancy of the Company or its affiliates in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to Yucaipa or any of the Indemnified Parties, even if the opportunity is one that the Company or its subsidiaries or affiliates might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so.

Section 8.    <u>Miscellaneous</u>.

(a)       <u>Information</u>.  The Company will furnish, or arrange to have furnished, to Yucaipa and any person or entity assisting Yucaipa with providing services, such information as Yucaipa believes appropriate to assist Yucaipa and others with providing services pursuant to this Agreement (all such information so furnished being the "<u>Information</u>"), and will update such Information as appropriate.  The Company recognizes and consents to the fact that Yucaipa and others assisting Yucaipa with providing services (i) will use and rely on the accuracy and completeness of the Information supplied or otherwise made available without having any obligation to independently verify the same, (ii) do not assume responsibility for the accuracy or completeness of the Information or such other information, (iii) have no obligation to undertake an independent evaluation, appraisal or physical inspection of any assets or liabilities of the Company or any other person or entity, and (iv) with respect to any financial forecasts (including cost savings and synergies) that may be furnished to or discussed by the Company or any other person or entity, will assume that they have been reasonably prepared and reflect the best then currently available estimates and judgment of the Company's or such other person or entity's management.  Any written information furnished to Yucaipa pursuant to this <u>Section 8(a)</u> that is not publicly available and is specifically marked as "Confidential Information Not For Public Disclosure" by the Company when furnished to Yucaipa, will not be publicly disclosed by Yucaipa during the term of this Agreement without the consent of the Company.

(b)       <u>No Loss of Rights as Stockholder</u>.  The Company acknowledges that affiliates of Yucaipa are owners of equity interests of the Company and that nothing in this Agreement limits, affects or alters the rights or abilities of Yucaipa or its affiliates to take any action in the capacity as an equityholder of the Company.

(c)     Notice.  All notices or other communications hereunder shall be deemed to have been duly given and made if in writing and if served by personal delivery upon the party for whom it is intended, if delivered by registered or certified mail, return receipt requested, or by a national courier service, or if sent by facsimile or by email transmission. Any such notice shall be deemed delivered (i) on the date delivered if by personal delivery, (ii) on the date upon which receipt is signed or delivery is made, if mailed by registered or certified mail, (iii) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed by registered or certified mail, (iv) on the next succeeding business day if sent by national courier service, (v) on the date sent by facsimile if the appropriate facsimile confirmation is received by the sender, or (vi) on the date sent if by email.

|                        |                                         |
|------------------------|-----------------------------------------|
| If to Yucaipa:         | Yucaipa American Funds, LLC             |
|                        | 9130 W. Sunset Boulevard                |
|                        | Los Angeles, California 90069           |
|                        | Email:      [_____]          |
|                        | Attention:  [_____]          |
|                        |                                         |
| If to the Company:     | [Allied Holdings, Inc]                  |
|                        | 160 Clairemont Avenue, Suite 200        |
|                        | Decatur, Georgia  30030                 |
|                        | Email: [_____]               |
|                        | Attn:  General Counsel                  |

with a copy to the General Counsel of the Company at the same address.

(d)     Entire Agreement; Amendments.  This Agreement contains all of the terms and conditions agreed upon by the parties hereto in connection with the subject matter hereof.  This Agreement may not be amended, modified or changed except by written instrument signed by all of the parties hereto.

(e)     Assignment; Successors.  This Agreement shall not be assigned and is not assignable by the Company or Yucaipa without the prior written consent of the other party hereto; provided, however, that Yucaipa may assign, without the prior consent of the Company, its rights and obligations under this Agreement to any partnership or limited liability company controlled by, or under common control with, Yucaipa, and provided further, that Yucaipa may assign the right to receive any payment hereunder to any other person or entity.  Subject to the preceding sentence, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective permitted successors and assigns.

(f)     Governing Law; Jurisdiction; Jury Waiver.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without reference to the choice of law principles thereof.  The Company hereby submits to the exclusive jurisdiction of the Federal and State courts located in the City of New York, New York in connection with any dispute related to this Agreement or any of the matters contemplated hereby.  Notwithstanding the foregoing, to the extent a matter involves the internal affairs of the

9

Company such matter shall be governed by the laws of the jurisdiction of the Company's organization.   EACH OF YUCAIPA AND THE COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS STOCKHOLDERS) WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY DISPUTE RELATED TO THIS AGREEMENT OR ANY OF THE MATTERS CONTEMPLATED HEREBY.

       (g)   <u>Relationship</u>.  Nothing in this Agreement shall constitute or be construed to create a partnership or joint venture between the Company and Yucaipa.  Yucaipa is acting as an independent contractor to provide the services described herein solely to the Company and Yucaipa is not acting as a fiduciary of the Company, any security holders of the Company or any other persons.  No employee of Yucaipa or its affiliates will be deemed employees of the Company or any of its affiliates by reason of this Agreement or the performance of services contemplated hereby.  This Agreement is for the benefit of the Company and Yucaipa and shall not create third-party beneficiary rights, except for <u>Section 6</u> and <u>Section 7</u>.  The Indemnified Parties and the members of the Yucaipa Group are third-party beneficiaries of this <u>Section 6</u> and <u>Section 7</u> of this Agreement with the right to fully enforce those sections as if parties hereto.

       (h)   <u>Construction and Interpretation</u>.  This Agreement shall not be construed for or against either party by reason of the authorship or alleged authorship of any provision hereof or by reason of the status of the respective parties.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against either party.  The captions on sections are provided for purposes of convenience and are not intended to limit, define the scope of or aid in interpretation of any of the provisions hereof.  References to a party or parties shall refer to the Company or Yucaipa, or both, as the context may require.  All pronouns and singular or plural references as used herein shall be deemed to have interchangeably (where the sense of the sentence requires) a masculine, feminine or neutral, and/or singular or plural meaning, as the case may be.  The word "including" whenever used in this Agreement shall be deemed to be immediately followed by the words "without limitation."

       (i)   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

(<i>signature page follows</i>)

 

IN WITNESS WHEREOF, the parties hereto have caused this Monitoring and Management Services Agreement to be duly executed as of the date first above written.

YUCAIPA AMERICAN FUNDS LLC, a Delaware limited liability company

By: _____

    Name:

    Title:

 

[ALLIED HOLDINGS, INC.], a Delaware corporation

By: _____

    Name:

    Title:

# Exhibit 130

# D.I. 1, Case No. 12-650150

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------- x

BDCM OPPORTUNITY FUND II, LP,
BLACK DIAMOND CLO 2005-1 LTD, and
SPECTRUM INVESTMENT PARTNERS,
L.P.,

                  Plaintiff,

             - against -

YUCAIPA AMERICAN ALLIANCE FUND
I, LP, and YUCAIPA AMERICAN
ALLIANCE (PARALLEL) FUND I, LP,

            Defendants.

-------------------------------------------------------- x

Index No. _____

Date purchased: _____

Plaintiffs designate New York
County as the place of trial.

The basis of venue is plaintiff's
principal place of business.

**<u>SUMMONS</u>**

TO THE ABOVE-NAMED DEFENDANTS:

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer or, if the complaint is not served with this summons, to serve a notice of appearance, on Plaintiffs' attorney within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
January 17, 2012

SCHULTE ROTH & ZABEL LLP

By:_____

    Adam C. Harris
    Robert J. Ward
    919 Third Avenue
    New York, New York 10022
    (212) 756-2000

*Attorneys for Plaintiffs BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., and Spectrum Investment Partners, L.P.*

TO:

Yucaipa American Alliance Fund I, LP
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Yucaipa American Alliance (Parallel) Fund I, LP
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------- x

BDCM OPPORTUNITY FUND II, LP,     **:**
BLACK DIAMOND CLO 2005-1 LTD, and  **:**
SPECTRUM INVESTMENT PARTNERS,  **:**
L.P.,     **:**
      **:**
      Plaintiffs,    **:**    Index No.:
      **:**
     - against -    **:**    **COMPLAINT**
      **:**
YUCAIPA AMERICAN ALLIANCE FUND  **:**
I, LP, and YUCAIPA AMERICAN  **:**
ALLIANCE (PARALLEL) FUND I, LP,  **:**
      **:**
     Defendants.    **:**

------------------------------------------------------- x

      Plaintiffs BDCM Opportunity Fund II, LP ("BDCM"), Black Diamond

CLO 2005-1 Ltd. ("Black Diamond CLO"), and Spectrum Investment Partners, L.P.

("Spectrum"), by their attorneys Schulte Roth & Zabel LLP, as and for their Complaint against

Yucaipa American Alliance Fund, I, LP and Yucaipa American Alliance (Parallel) Fund I, LP

(collectively "Yucaipa" or "Yucaipa Defendants"), hereby allege as follows:

## NATURE OF COMPLAINT

      1.    This case arises out of the actions taken by the Yucaipa Defendants (a) to

injure or destroy the rights of Plaintiffs in their capacity as Lenders under that certain Amended

and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit Agreement

and Guaranty Agreement, dated May 15, 2007, between Allied Systems Holdings Inc. and Allied

Systems Ltd. (L.P.), as Borrowers (collectively, "Allied"), the Lenders from time to time party

thereto (including Plaintiffs, "Lenders"), and The CIT Group Business Credit, Inc. ("CIT"), as

Administrative Agent and Collateral Agent (as amended, modified or supplemented from time to

time through and including that certain Amendment No. 3 to Credit Agreement and Consent,

dated as of April 17, 2008, the "Credit Agreement")[1] and (b) in contravention of the provisions of the aforesaid Credit Agreement.

2.      In short, Yucaipa, which is the majority and controlling owner of Allied, the Borrower under the Credit Agreement, has acquired debt obligations owing by Allied under the Credit Agreement (the "Obligations") in violation of the express provisions of the Credit Agreement, in order (i) to undermine and frustrate the rights of the Lenders, including Plaintiffs, vis-à-vis the Borrower, such as the Lenders' right to receive interest and principal payments on the Obligations from Allied or to foreclose on collateral pledged to secure the Obligations, and (ii) to advance Yucaipa's own financial interests as the controlling owner of Allied to the detriment of the Lenders.  As set forth below, Yucaipa caused Allied to default on numerous provisions of the Credit Agreement and other agreements and then interfered with and frustrated the Lenders' ability to exercise their rights as provided in the Credit Agreement.

3.      In August 2009, Yucaipa, which by then already controlled Allied through (i) ownership of the majority of Allied's common and preferred equity, (ii) its appointment of a majority of Allied's Board of Directors, including Derex Walker, its chairman, and other persons affiliated with Yucaipa, and (iii) its control of Allied's management, asserted that it had amassed a majority of the Obligations owing by Allied to the Lenders under the Credit Agreement, despite clear and unequivocal provisions in the Credit Agreement prohibiting Yucaipa from acquiring or owning Term Loan Exposure in excess of defined amounts (essentially the lesser of $50 million in aggregate principal amount or 25% of the aggregate Term Loan Exposure held by all Lenders).  To the extent Yucaipa has in fact amassed Obligations of this magnitude, it has done so in violation of the Credit Agreement and in contravention of the Lenders' rights by

---

[1]      All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Credit Agreement, a true and correct copy of which is annexed hereto as Exhibit A.

causing Allied (its controlled affiliate) to enter into a purported Fourth Amendment to the Credit Agreement without first obtaining the prior consents of the Lenders and CIT, as required under the Credit Agreement.

4.      As is typical of credit agreements of this type, the Credit Agreement, prior to any amendments, contained an absolute prohibition on Yucaipa, as the majority and controlling owner of Allied, from becoming a Lender to Allied.  The purpose of this prohibition was clear: to assure that, as the owner of the Borrower (Allied), Yucaipa could not interfere with the rights of, and decisions being made by, Lenders vis-à-vis the Borrower in their capacity as such, including (without limitation) declaring or waiving defaults, and deciding when (or if) to exercise remedies.  In effect, this prohibition is to prevent a controlling owner of a borrower, such as Allied, from buying enough debt to be able to prevent the lenders from collecting on that debt or otherwise exercising their rights vis-à-vis the borrower.

5.      Pursuant to that certain Amendment No. 3 to Credit Agreement and Consent, dated as of April 17, 2008 (the "Third Amendment"),[2] the Lenders agreed -- at the request of Yucaipa and Allied -- to modify these express restrictions on a narrowly tailored and limited basis.  Under the Third Amendment, Lenders were permitted to sell, transfer or assign Term Loan Exposure to Yucaipa so long as, after giving effect thereto, (a) Yucaipa would own no more than 25% of the Term Loan Exposure of all Lenders, or (b) Yucaipa would acquire no more than $50 million of Term Loan Exposure.  The Third Amendment also expressly provided that if Yucaipa were to acquire any Term Loan Exposure, it (a) would contribute 50% of the Term Loans to Allied as capital (in effect cancelling such Term Loans ) and (b) would not be entitled to vote (and the Obligations held by it would essentially be disregarded) in connection with any matter required to be submitted to the Lenders for consent under the Credit Agreement.

---

[2]      A true and correct copy of the Third Amendment to the Credit Agreement is annexed hereto as <u>Exhibit B</u>.

Yucaipa, both in its capacity as Sponsor and through Allied, was integrally involved in the negotiations that resulted in the Third Amendment and the restrictions on its ability to acquire Term Loan Exposure imposed thereunder.

6.      Yucaipa, however, intentionally violated these negotiated restrictions in order to prevent the Lenders from collecting on the Obligations from the Borrower and exercising their other rights against Borrower.  That is, Yucaipa, working with then Lender ComVest Investment Partners III ("ComVest"), caused Allied, its controlled affiliate, to enter into that certain Amendment No. 4 to Credit Agreement, dated as of August 21, 2009 (the "Purported Fourth Amendment").[3]  ComVest was the largest holder of debt which would enable Yucaipa to own a controlling stake in Allied once Yucaipa purchased ComVest's holdings.  The sole purpose of the Purported Fourth Amendment was to remove all of the restrictions imposed on Yucaipa's ownership of Obligations, as set forth in the initial Credit Agreement and the Third Amendment, as well as all restrictions on voting those Obligations.  After enactment of the Purported Fourth Amendment, ComVest used this amendment to sell its entire stake to Yucaipa.

7.      If effective, the Purported Fourth Amendment would amend the Credit Agreement so that there would be no restrictions whatsoever on Yucaipa becoming a Lender and controlling all decisions of the Lenders relative to the Obligations owed to them by Allied (Yucaipa's controlled affiliate), including undermining and frustrating the rights of the Lenders to be paid on the Obligations in order to financially benefit Yucaipa as the controlling owner of the Borrower, Allied.  This is exactly the situation that the initial Credit Agreement and the Third Amendment were designed to avoid.

8.      By virtue of the Purported Fourth Amendment, Yucaipa not only claims to have no restrictions on its ability to acquire Obligations under the Credit Agreement and vote

---

[3]      A true and correct copy of the Purported Fourth Amendment is annexed hereto as Exhibit C.

those claims, it also asserts that it constitutes Requisite Lenders under the Credit Agreement.

Under the Credit Agreement, Requisite Lenders have broad authority to make certain decisions

affecting the rights of all Lenders, including Plaintiffs.  Those rights include the ability to direct

the Administrative Agent to act (or not act) upon the occurrence and during the continuance of

an Event of Default, to accelerate (or not accelerate) the Obligations when Allied fails to pay

interest or principal when due, and to exercise (or not exercise) remedies to obtain repayment of

the Obligations.  Acting under its alleged status as Requisite Lenders, Yucaipa has prevented the

Administrative Agent from taking any actions on behalf of the Lenders to exercise remedies

against Allied despite the fact that Allied has admittedly been in Default for more than two years,

including not paying millions of dollars of interest on the Obligations during that time.

9.      Yucaipa's actions were undertaken solely to protect its equity investment

in Allied at the expense of Allied's Lenders and to injure or destroy the rights of Allied's

Lenders, including Plaintiffs.

10.     At first, consistent with its obligations to the Lenders as Administrative

Agent, CIT refused to acknowledge the validity of the Purported Fourth Amendment or

Yucaipa's status as alleged Requisite Lenders.  Because of CIT's refusal, on November 13, 2009,

Yucaipa and Allied (Yucaipa's controlled affiliate) commenced an action against CIT in the

Superior Court of Fulton County, Georgia, for, *inter alia*, (a) alleged breach of the Credit

Agreement, (b) a declaration that the Purported Fourth Amendment was effective and binding on

the parties to the Credit Agreement, and (c) a declaration that Yucaipa was the Requisite Lender

under the Credit Agreement (the "Georgia Action").  On December 21, 2009, CIT filed a verified

answer and counterclaims against Yucaipa and Allied seeking a declaration that the Purported

Fourth Amendment was ineffective and not binding, that Yucaipa was not the Requisite Lender

and other relief ("CIT Counterclaim").[4]

11.     Notwithstanding what CIT admitted in its Counterclaim was its

"obligat[ion] to act for the benefit of all the Lenders"(Ex. D, CIT Counterclaim at ¶ 34.),

including Plaintiffs, CIT has now acquiesced in Yucaipa's flagrant breach of the Credit

Agreement.  On December 5, 2011 the parties to the Georgia Action entered into a settlement

agreement (the "Settlement Agreement")[5] whereby CIT agreed, in breach of its duties as

Administrative Agent to the Lenders, among other things, not to "object to, challenge or contest,

either directly or indirectly, the validity of the Fourth Amendment," and acknowledged "that

Yucaipa is the Requisite Lender for all purposes including the exercise of remedies."  (Ex. E,

Settlement Agreement at ¶ 10.)

12.     As consideration for CIT's acquiescence in Yucaipa's breaches and CIT's

abdication of its duties to the Lenders, Yucaipa agreed to senior priority of repayment of certain

Obligations owed to CIT by Allied, provided CIT with an indemnity from claims brought against

CIT by third parties, such as the Lenders, arising from CIT's breaches of duty in entering the

settlement agreement and subsequent actions therewith, dismissed the Georgia Action and

released CIT, as well as other consideration.  (*See id.*, at ¶ 12.).

13.     As a result of the foregoing, Yucaipa not only has control over Allied (the

Borrower) through its majority ownership interest in Allied and control of the Board of

Directors, but it also purports to have control over decisions affecting all Lenders (as the

purported Requisite Lender), including the ability to prevent the Lenders from exercising their

---

[4]      A true and correct copy of the CIT Counterclaim is annexed hereto as Exhibit D.
[5]      A true and correct copy of the Settlement Agreement is annexed hereto as Exhibit E.

rights and remedies against Allied, because it has bought and paid for CIT's acquiescence and cooperation in the Settlement Agreement.

14.    To protect their interests, Plaintiffs seek a declaration that the Purported Fourth Amendment is invalid and that the Yucaipa Defendants are not the Requisite Lenders under the Credit Agreement.

## PARTIES

15.    Plaintiff BDCM is a Delaware limited partnership, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich, CT  06830.

16.    Plaintiff Black Diamond CLO is a Cayman Islands limited liability company, with its principal place of business at One Sound Shore Drive, Suite 200, Greenwich, CT  06830.

17.    Plaintiff Spectrum is a Delaware limited partnership, with its principal place of business at 1250 Broadway, New York, NY  10001.

18.    Upon information and belief, the Yucaipa Defendants are Delaware limited partnerships, having a principal place of business at 9130 West Sunset Boulevard, Los Angeles, California, 90069, and are managed by Yucaipa Alliance Management, LLC and/or Yucaipa American Management, LLC, which are registered to do business in New York.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over the Yucaipa Defendants pursuant to CPLR § 302.  In addition, upon information and belief, the Yucaipa Defendants transact business in New York.  Further, this Court has jurisdiction over the Yucaipa Defendants because, upon information and belief, limited partners of Yucaipa include individuals and organizations domiciled in New York.

20.     Venue is proper pursuant to CPLR § 503 because Spectrum has its principal place of business in New York County.

**FACTUAL ALLEGATIONS**

21.     Allied is a provider of distribution and transportation services to the automotive industry, specializing in the delivery of new vehicles from auto manufacturing plants to auto dealerships.  Allied and several related entities filed for Chapter 11 bankruptcy protection in July 2005.

*Yucaipa Controls Allied's Business*

22.     In May 2007, Allied emerged from bankruptcy pursuant to a plan of reorganization that resulted in Yucaipa becoming the majority and controlling shareholder of Allied.  Upon information and belief, Yucaipa owns more than 70% of the common equity of Allied, and has used (and continues to use) this controlling interest to operate Allied for their own benefit.

23.     In addition to their majority ownership interest in Allied, Yucaipa controls Allied's Board of Directors.  Upon information and belief, pursuant to Allied's 2007 plan of reorganization, Yucaipa appointed four out of the five members of Allied's Board, all of whom were either employees or affiliates of Yucaipa.  Yucaipa's control over the Board has enabled it to control Allied, including the right to appoint and direct the actions of senior management of Allied.  According to CIT, "Yucaipa has continued to appoint senior management of Allied Holdings such that the members of senior management are entirely beholden to Yucaipa."  (Ex. D, CIT Counterclaim at ¶ 9.)

*The Credit Agreement*

24.    To finance its May 2007 emergence from bankruptcy, Allied obtained financing through a $315 credit facility consisting of a $265 million senior secured first priority credit facility ("First Lien Loan"), and a $50 million junior credit facility (the "Second Lien Loan").  Plaintiffs are Lenders under both the First Lien Loan and the Second Lien Loan. Yucaipa is a lender under the Second Lien Loan.

25.    The First Lien Loan is governed by the Credit Agreement.  The $265 million First Lien Loan has three components:  (i) term loans in the aggregate principal amount of $180 million (the "Term Loans"), of which Plaintiffs are Lenders; (ii) a $35 million revolving credit facility from CIT (the "Revolving Loan"); and (iii) a $50 million synthetic letter of credit facility ("LC Facility"), of which Plaintiffs are Lenders.

26.    Plaintiffs are Lenders under the Credit Agreement who own or control, with power to vote, between $40 million and $60 million of the Term Loan and L/C Facility under the First Lien Loan.

27.    The Yucaipa Defendants are defined in the Credit Agreement as the "Sponsor" due to their sponsorship of Allied's 2007 plan of reorganization and subsequent control of Allied after its emergence from Chapter 11.

*Yucaipa Obtains the Right to Become a Lender under the Credit Agreement, with Significant Restrictions on their Rights as Lender*

28.    In addition to its status as majority shareholder of Allied, and its control over Allied's Board of Directors and day-to-day operations, Yucaipa sought to become a Lender under the Credit Agreement.  Section 10.6 of the Credit Agreement, prior to the Third Amendment, permitted Lenders thereunder to sell, assign or transfer all or a portion of their rights and obligations under the Credit Agreement, but only to a party that satisfied the definition

of "Eligible Assignee."  Under the Credit Agreement as originally drafted (and at all times prior

to the effective date of the Third Amendment), the definition of Eligible Assignee expressly

excluded the Sponsor and affiliates of Allied.

29.     As majority shareholder, Yucaipa is an affiliate of Allied, and the Credit

Agreement expressly identifies Yucaipa as Sponsor.  Thus, unless the parties to the Credit

Agreement amended the definition of "Eligible Assignee," Lenders could not sell, assign or

transfer any of their rights or obligations under the Credit Agreement to Yucaipa and,

consequently, Yucaipa could not become a Lender under the Credit Agreement.

30.     Yucaipa and Allied (its controlled affiliate) requested and obtained Lender

consent to the Third Amendment, which amended the Credit Agreement to allow Yucaipa to

become a Lender, but only under strictly limited circumstances and conditions.

31.     That is, in the Third Amendment, to prevent Yucaipa, as the majority and

controlling owner of Allied, from harming the interests of the Lenders and undermining and

interfering with their rights and remedies against Allied, the parties to the Credit Agreement

placed significant restrictions and conditions on any sale or assignment of Term Loans to

Yucaipa (sales or assignments of the L/C facility and Revolver were not permitted at all).

Specifically, Yucaipa's potential status as a Lender was subject to the following restrictions and

conditions, among others, (i) after giving effect to any such sale or assignment, Yucaipa could

not hold or beneficially own more than 25% of the aggregate outstanding principal amount of the

Term Loans, or acquire more than $50 million of the principal amount of the Term Loans; (ii)

Yucaipa had to make capital contributions to Allied of at least 50% of the aggregate principal

amount of Term Loans it acquired; and (iii) Yucaipa would not have any voting rights with

respect to any Term Loans it might acquire (which other Lenders holding Term Loan would

have), including rights to consent to any amendment, modification, termination or waiver of any provision of the Credit Agreement.

32.     As CIT pled in its Counterclaim in the Georgia Action:  "The restrictions and conditions placed on Yucaipa by Amendment No. 3  [the Third Amendment] were intended to ensure that Yucaipa, by virtue of its control of Allied Holdings, could not act in any way, or cause Allied Holdings to act in any way, that would  (i) elevate Yucaipa's interests above the interests of other Lenders or (ii) harm the interests of any other Lender for the benefit of Allied Holdings and/or Yucaipa."  (Ex. D, CIT Counterclaim at ¶ 16.)

33.     The restrictions and conditions were necessary to ensure that Yucaipa, already a majority and controlling shareholder of Allied and a Lender under the Second Lien Loan, did not obtain unfettered control over Allied and injure or destroy the Lenders' rights and interests  by, among other things, becoming Requisite Lenders.  Under the Credit Agreement, Requisite Lender means one or more Lenders that have or hold more than 50% of the sum of the aggregate Term Loans, Revolving Loans and LC Facility.  A Requisite Lender has the authority to make certain key decisions affecting the rights of all Lenders under the Credit Agreement, including Plaintiffs, which includes the right to direct the exercise of remedies such as demanding payment by Allied of any and all amounts due, or commencing foreclosure on the collateral pledged to secure the Obligations.

34.     Pursuant to the Third Amendment, the prohibitions imposed on Yucaipa's ability to acquire and vote Term Loans and other Obligations effectively precluded Yucaipa from ever becoming Requisite Lenders.  Consequently, because Yucaipa had no ability to become the Requisite Lender under the Credit Agreement, they could not as majority and controlling owner of the Borrower, Allied, harm the interests of Plaintiffs and other Lenders, or otherwise interfere

with the Lenders' rights.

*Yucaipa Causes Allied to Default Continuously*

35.    To ensure that Yucaipa was not violating the terms of the Third Amendment, Allied was required to deliver to CIT a monthly report of the amount of Term Loans and Second Lien Term Loans acquired and held by Yucaipa in any particular month, and the price Yucaipa paid for such loans.  However, to conceal its circumventing the restrictions in the Third Amendment, upon information and belief, Yucaipa used its control over Allied to cause Allied to fail to deliver these monthly reports of Yucaipa's holdings, which constituted an Event of Default under the Credit Agreement.

36.    Yucaipa caused Allied to engage in conduct resulting in additional Defaults and Events of Default under the Credit Agreement, including (without limitation) the failure to pay Lenders principal and interest on the Obligations owing under the Credit Agreement and the failure to pay Lenders other Scheduled Payments owing under the Credit Agreement.  Yucaipa caused Allied to fail to make those payments although, at the time these amounts were due, Allied had sufficient cash to comply with its payment obligations under the Credit Agreement.

37.    In fact, since August 2008, Allied, at Yucaipa's direction and control, has been in continuous default under the Credit Agreement.  Specifically, in August 2008, Allied notified the Lenders and CIT that it had failed to comply with the financial covenants set forth in Sections 6.7(a) and 6.7(b) of the Credit Agreement, resulting in Events of Default under section 8.1 of the Credit Agreement as of the fiscal quarter ended June 30, 2008. Later, Allied admitted that, as of August 30, 2008, it also had failed to disclose, as required, Yucaipa's acquisitions of debt for the months of June and July 2008, which also constituted an Event of Default.

38.    Since Allied's first default in August 2008, Allied has, all at Yucaipa's direction and control, continued, on a regular basis, to default on its obligations under the Credit Agreement, resulting in a multitude of Events of Default under, and material breaches of, the Credit Agreement, including and without being exhaustive: (i) failure to comply with the financial covenants in the Credit Agreement for the past several years; (ii) failure to comply with its letter of credit obligations, by not reimbursing a collateral account when beneficiaries have drawn on those letters of credit and thereby squandering security of Lenders; (iii) since December 2008, maintaining excess cash balances in accounts outside of control agreements, thereby securing for itself, without authorization or consent, access to cash that is supposed to be security for the Lenders; (iv) failure to deliver requisite financial statements and other information on a timely basis; and (v) refusal to inform the Lenders of the amount of Term Loans held by Yucaipa.

39.    Allied, at Yucaipa's direction and control, also ceased payment of required principal and interest payments under the Credit Agreement, even though Allied had the requisite cash to make the payments.  By not making principal and interest payments — in combination with the self-help in which Allied has engaged by not reimbursing the collateral account that secures the L/C Facility, attempting to terminate control agreements without providing specified terms for new agreements and by retaining excess cash outside of controlled accounts pledged to the Lenders in contravention of the Credit Documents —Yucaipa effectively usurped the Lenders' rights.

40.    In addition, Yucaipa's efforts to force, through an invalid amendment, extensions of letters of credit that, based on recent practice, would be reimbursed from the

collateral account and termination of control agreements without specified terms for any new control agreements, constitute violations of the Credit Documents.

41.    Allied and Yucaipa acknowledged the aforesaid defaults and recognized that the defaults entitled the Lenders to accelerate the debt.  Accordingly, to forestall such action, Allied and certain of its affiliates entered into a forbearance agreement with CIT and the Lenders on or about September 24, 2008, which was amended on October 23, 2008 (the "Forbearance Agreement").  Pursuant to the Forbearance Agreement, the Lenders agreed to refrain from taking action to enforce their rights under the Credit Agreement until mid-November 2008, so that the parties could engage in discussions about restructuring Allied's debt.

42.    With the lapse of the forbearance period, the continuing Defaults and Events of Default by Allied (including, but not limited to, the failure to pay interest and principal), and the continued deterioration in Allied's business, Yucaipa pursued any means to evade the restrictions on its acquisition of Allied's debt, which were contained in the Third Amendment.  According to the CIT Counterclaim, "Yucaipa wanted to do this to have unfettered control over Allied Holdings and to protect its equity investment which was deeply underwater." (Ex. D, CIT Counterclaim at ¶ 20.)

43.    Since March 2011, Yucaipa has caused Allied not to provide any financial reports, including 2010 audited financials and fleet reports, to the Lenders as required by the Credit Agreement.  Yucaipa intentionally kept the Lenders in the dark about the deterioration in Allied's business as a result of an aggressive business strategy pursued by Allied to force their customers into new contracts.  This strategy backfired and caused the loss of several major customers.

*Yucaipa's Wrongful Attempt to Eliminate Restrictions on their Becoming Lender under the Credit Agreement*

44.    In February 2009, Yucaipa launched a tender offer to purchase from the Lenders, at substantial discounts to par, Allied's Obligations under the Credit Agreement.   The tender offer was conditioned upon acceptance and consent by Lenders constituting Requisite Lenders to a form of the Purported Fourth Amendment that would have eliminated all of the restrictions and conditions imposed upon Yucaipa pursuant to the Third Amendment.   Yucaipa did not receive a sufficient number of acceptances of its offer from the Lenders.  The Yucaipa Defendants' attempt to tie the tender offer to consent from the Lenders to a further amendment of the Credit Agreement clearly demonstrates that Yucaipa understood that Lenders' consent was required to eliminate the existing restrictions.

45.    After the Lenders refused to accept Yucaipa's tender offer, Yucaipa entered into direct discussions with ComVest to purchase the Term Loan and LC Facility Obligations then held by ComVest.  In order to achieve its ends, Yucaipa offered ComVest more consideration than was otherwise necessary to purchase the Allied Obligations owned by ComVest.  In connection therewith, Yucaipa caused Allied to enter into the Purported Fourth Amendment with ComVest (which at the time constituted Requisite Lenders).  The Purported Fourth Amendment committed Allied to various unfair, wasteful provisions, notwithstanding that, at the time of the documentation of the above-described arrangements, Allied was unable to attest either to its solvency or to the absence of any material adverse change in its business and Allied received no valid consideration for its agreement to the Purported Fourth Amendment.

46.    More importantly, the Purported Fourth Amendment, which was executed without the consent of the Lenders or CIT, as the Administrative Agent and a Lender, deletes

every single restriction and condition in the Third Amendment relating to Yucaipa acquiring and voting Allied Obligations and preventing it from interfering with Lenders' rights.

47.     The Purported Fourth Amendment further allows Yucaipa to enter into an Assignment and Assumption Agreement with ComVest, dated August 21, 2009 (the "Assignment"), pursuant to which ComVest assigned its interest in $114.7 million of Term Loans (constituting more than 54% of the aggregate Term Loan Exposure), and $30.4 million of the L/C Facility (constituting more than 60% of the aggregate L/C Exposure), to Yucaipa, well in excess of the express limitations imposed by the Third Amendment.

48.     The Purported Fourth Amendment, together with Yucaipa's control over Allied's business and CIT's acquiescence under the Settlement Agreement, effectively make Yucaipa both Borrower and Lender under the Credit Agreement, undermining and frustrating the rights of all other Lenders under the Credit Agreement.  Accordingly, Lenders have been stripped of all of their rights and ability to take action against Allied in connection with its numerous Defaults and Events of Default under the Credit Agreement.

49.     The Purported Fourth Amendment is not valid because neither requisite consent of all the Lenders nor the consent of the Administrative Agent was obtained, as required under the Credit Agreement (including the Third Amendment).

50.     The Purported Fourth Amendment required the consent of all of the Lenders (not just Requisite Lenders) and CIT, as Administrative Agent.  As CIT alleged in its Counterclaim: "On February 12, 2009, CIT advised Allied Holdings that the proposed [Fourth] [A]mendment[ ] required the consent of the Administrative Agent and the Collateral Agent, or both . . . CIT withheld its consent as Agent and as Lender.  Neither Yucaipa nor Allied ever

disputed that CIT acted well within its rights in refusing to provide its consent."  (Ex. D, CIT Counterclaim at ¶ 22.)

51.     As CIT alleged in its Counterclaim:  "Such consent, however, was necessary."  (Id. at ¶ 29.)

52.     In addition, as CIT pled in its Counterclaim: "Allied's interest payment default on August 1, 2009, and its other prior uncured defaults, made any amendments to the Credit Agreement without consent of all the Lenders and CIT, as Administrative Agent, impossible."  (Id.)

53.     Yucaipa unlawfully caused Allied and ComVest to enter into the Purported Fourth Amendment in violation of the Credit Agreement (including the Third Amendment) to injure or destroy the Lenders' rights and to protect and advance Yucaipa's equity interest in Allied.

54.     As alleged in the CIT Counterclaim, "Yucaipa is engaged in a scheme, in which Allied's board and management are complicit, to take action to protect its own equity investment in Allied Holdings, even at the expense of the other Lenders . . . If deemed effective, among other things, the Purported Fourth Amendment would eliminate the restrictions that had been bargained for in Amendment No. 3 [the Third Amendment] that limited Yucaipa's ownership position and that precluded Yucaipa from interfering with the Lenders' rights, and would eviscerate the amendment provisions in the Credit Documents in contravention of the clearly expressed intent of the parties."  (Id. at ¶¶ 25-27.)

55.     Yucaipa's motives are clear and were detailed in CIT's Counterclaim: "Yucaipa determined that, if it could acquire most of the outstanding Debt, it could prevent the Lenders from exercising their rights under the Credit Documents, control any restructuring

process and thereby protect its equity position at the Lenders' expense." (*Id.* at ¶ 25.)  This is exactly what has happened, as Yucaipa has, by virtue of its claim to constitute Requisite Lenders, prevented the Administrative Agent from acting pursuant to its duties, prevented the Lenders' from exercising their rights and remedies and allowed Allied to operate without consequence despite admittedly being in Default under the Credit Agreement for more than two years (including, without limitation, failing to make interest payments over the past two years).

56.     The purported Assignment of Obligations from ComVest to Yucaipa is ineffective because it was not procured with the necessary consents, and it exceeds the restrictions set forth in the Third Amendment.

57.     Notwithstanding the restrictions placed on Yucaipa obtaining ownership of Allied's Obligations, Yucaipa now purports to be the largest Lender to Allied and has declared itself the Requisite Lender under the Credit Agreement.

58.     Yucaipa has caused Allied to be in breach of its obligations under the Credit Agreement and has prevented the Lenders, including Plaintiffs, from exercising their rights and remedies against Allied.

## AS AND FOR A FIRST CAUSE OF ACTION

59.     A genuine justiciable dispute exists between Plaintiffs and Defendants with respect to the parties' rights and obligations including those set forth in the Credit Agreement and the amendments thereto.

60.     Accordingly, Plaintiffs request a declaration, pursuant to CPLR § 3001, that (i) the Purported Fourth Amendment is null and void, ineffective, and not binding because, inter alia, the required consents of the Lenders and the Administrative Agent were not obtained; and (ii) Yucaipa is not Requisite Lenders under the Credit Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment:

(a)    declaring the Purported Fourth Amendment null and void, ineffective, and not binding;

(b)    declaring that Yucaipa is not Requisite Lenders under the Credit Agreement; and

(c)    granting Plaintiffs such further relief as the court deems proper, together with the costs and disbursements of this action.

Dated: New York, New York
      January 17, 2012

SCHULTE ROTH & ZABEL LLP

By:_____
    Adam C. Harris
    Robert J. Ward

919 Third Avenue
New York, New York  10022
(212) 756-2000

*Attorneys for Plaintiffs BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., and Spectrum Investment Partners, L.P.*

**Exhibit 131**

**D.I. 69, Case No. 12-11564**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**ALLIED SYSTEMS HOLDINGS, INC.,**<br><br>Debtor.<br><br>EIN:  58-0360550 | **Chapter 11**<br><br>**Case No. 12-11564 (CSS)** |
| In re:<br><br>**ALLIED AUTOMOTIVE GROUP, INC.,**<br><br>Debtor.<br><br>EIN:  58-2201081 | **Chapter 11**<br><br>**Case No. 12-_____ (CSS)** |
| In re:<br><br>**ALLIED SYSTEMS, LTD. (L.P.),**<br><br>Debtor.<br><br>EIN:  58-1710028 | **Chapter 11**<br><br>**Case No. 12-11565 (CSS)** |
| In re:<br><br>**AXIS GROUP, INC.,**<br><br>Debtor.<br><br>EIN:  58-2204628 | **Chapter 11**<br><br>**Case No. 12-_____ (CSS)** |
| In re:<br><br>**F.J. BOUTELL DRIVEAWAY LLC,**<br><br>Debtor.<br><br>EIN:  38-0365100 | **Chapter 11**<br><br>**Case No. 12-_____ (CSS)** |

In re:

**ALLIED SYSTEMS (CANADA)
COMPANY,**
                    Debtor.

EIN:  90-0169283

Chapter 11

Case No. 12-_____ (CSS)

---

In re:

**COMMERCIAL CARRIERS, INC.,**

                    Debtor.

EIN:  38-0436930

Chapter 11

Case No. 12-_____ (CSS)

---

In re:

**GACS INCORPORATED,**

                    Debtor.

EIN:  58-1944786

Chapter 11

Case No. 12-_____ (CSS)

---

In re:

**CORDIN TRANSPORT LLC,**

                    Debtor.

EIN:  38-1985795

Chapter 11

Case No. 12-_____ (CSS)

---

In re:

**CT SERVICES, INC.,**

                    Debtor.

EIN:  38-2918187

Chapter 11

Case No. 12-_____ (CSS)

---

In re:

**AXIS CANADA COMPANY,**

                    Debtor.

CBN:  87568828

Chapter 11

Case No. 12-_____ (CSS)

- 2 -

| | |
|---|---|
| In re:<br><br>**TERMINAL SERVICES LLC,**<br><br>            Debtor.<br><br>EIN:  91-0847582 | **Chapter 11**<br><br>**Case No. 12-_____ (CSS)** |
| In re:<br><br>**ALLIED FREIGHT BROKER LLC,**<br><br>            Debtor.<br><br>EIN:  59-2876864 | **Chapter 11**<br><br>**Case No. 12-_____ (CSS)** |
| In re:<br><br>**LOGISTIC TECHNOLOGY, LLC**<br><br>            Debtor.<br><br>EIN:  45-4242057 | **Chapter 11**<br><br>**Case No. 12-_____ (CSS)** |
| In re:<br><br>**LOGISTIC SYSTEMS, LLC**<br><br>            Debtor.<br><br>EIN:  45-4241751 | **Chapter 11**<br><br>**Case No. 12-_____ (CSS)** |
| In re:<br><br>**AXIS ARETA, LLC**<br><br>            Debtor.<br><br>EIN:  45-5215545 | **Chapter 11**<br><br>**Case No. 12-_____ (CSS)** |

| | | |
|---|---|---|
| In re: | | Chapter 11 |
| **TRANSPORT SUPPORT LLC** | | |
| Debtor. | | Case No. 12-_____ (CSS) |
| EIN: 38-2349563 | | |
| In re: | | Chapter 11 |
| **RMX LLC** | | |
| Debtor. | | Case No. 12-_____ (CSS) |
| EIN: 31-0961359 | | |
| In re: | | Chapter 11 |
| **QAT, Inc.** | | |
| Debtor. | | Case No. 12-_____ (CSS) |
| EIN: 59-2876863 | | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER DIRECTING JOINT ADMINISTRATION OF THEIR RELATED CHAPTER 11 CASES

Allied Systems Holdings, Inc. ("**Allied Holdings**") and its U.S. and Canadian subsidiaries (collectively, the "**Debtors**")[1] respectfully submit this Motion for Joint Administration (the "**Motion**"). In support of the Motion, the Debtors respectfully state as follows:

---

[1]     The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

RLF1 6086971v. 1

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this proceeding is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief requested herein are Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## BACKGROUND

3.    On May 17, 2012, involuntary petitions were filed against Allied Holdings and its subsidiary Allied Systems, Ltd. (L.P.) ("**Allied Systems**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in this Bankruptcy Court (the "**Court**"). On June 10, 2012, the remaining Debtors filed voluntary petitions in this Court and, in connection therewith, Allied Holdings and Allied Systems consented to the involuntary petitions filed against them. The "**Petition Date**" of such Debtor is the date that such involuntary petition or voluntary petition was filed by or against such Debtor. The chapter 11 cases commenced thereby are, collectively, the "**Chapter 11 Cases.**"

4.    The Debtors are authorized to operate their businesses as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. As of the date of this Motion, no official committee of unsecured creditors has been appointed by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**").

5.    The Debtors' major line of business, known in the industry as "car haul," is the transport of light vehicles, such as automobiles, sport-utility vehicles and light trucks, from manufacturing plants, ports, auctions, and railway distribution points to automobile dealerships

- 5 -

in the United States and Canada by means of tractor trailers referred to as "**Rigs.**" The Debtors' smaller line of business is logistics, which includes arranging for and managing vehicle distributions services, automobile inspections, auction and yard management services, vehicle tracking, accessorizing, and dealer preparation services for the automobile industry in the United States and Canada, and providing yard management services in Mexico.

6.     Additional information about the Debtors' businesses, the events leading up to the Petition Date, and the facts and circumstances surrounding the Debtors and these Chapter 11 Cases can be found in the Declaration of Scott D. Macaulay in Support of Chapter 11 Petitions and First Day Motions (the "**Macaulay Declaration**"), which is incorporated herein by reference.

## RELIEF REQUESTED

7.     By this Motion, the Debtors seek an order pursuant to Bankruptcy Rule 1015(b) authorizing the joint administration of their Chapter 11 Cases and for consolidation of these cases for procedural purposes only.  The Debtors propose that:  (a) all pleadings relating to any of the Debtors' cases shall bear a joint caption; (b) the Court clerk file and maintain all of these pleadings under the existing docket for Allied Systems Holdings, Inc.; and (c) the Debtors be permitted to combine notices to creditors.

8.     The Debtors request that the Court maintain one file and one docket for all of the jointly administered cases under the case number assigned to Allied Systems Holdings, Inc., and that the Chapter 11 Cases be administered under a consolidated caption, as follows:

| In re: | Chapter 11 |
|---|---|
| **ALLIED SYSTEMS HOLDINGS, INC.,** *et al.,*[1] | **Case No. 12-11564 (CSS)** |
| **Debtors.** | **(Jointly Administered)** |

9.    The Debtors also request that an entry be made on the docket of each of the Chapter 11 Cases, other than that of Allied Systems Holdings, Inc., that is substantially similar to the following:

> An order has been entered in accordance with Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware directing joint administration of the chapter 11 cases of Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (52-1952252); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (98-0212434); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). All further pleadings and other papers shall be filed in, and all further docket entries shall be made in, Case No. 12-11564 (CSS).

**BASIS FOR RELIEF**

10.    Under Bankruptcy Rule 1015(b), the Court may order the joint administration of the estates of a debtor and one or more affiliates:

---

[1]    The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

- 7 -

         (b)   <u>Cases Involving Two or More Related Debtors</u>. If two or more petitions are pending in the same court by or against . . . (4) a debtor and an affiliate, the court may order a joint administration of the estates.

*See* Fed. R. Bankr. P. 1015(b).

11.    The Debtors are "affiliates" as that term is defined in § 101(2) of the Bankruptcy Code.

12.    As explained in the Official Committee Note to Bankruptcy Rule 1015(b), joint administration expedites cases and reduces their overall cost:

> Joint administration as distinguished from consolidation may include combining the estates by using a single docket for the matters occurring in the administration, including the listing of filed claims, the combining of notices to creditors of the different estates, and the joint handling of other purely administrative matters that may aid in expediting the cases and rendering the process less costly.

13.    The Debtors anticipate significant activity during these cases and believe that most hearings and contested matters will apply equally to all of the Debtors' cases. Consequently, joint administration of these cases will promote the economical and efficient administration of the Debtors' estates, unencumbered by the procedural problems otherwise attendant to the administration of separate, albeit related, cases. Additionally, joint administration will avoid the burdensome and costly necessity of duplicating notices to creditors.

14.    In addition, Local Rule 1015-1 provides as follows:

> An order of joint administration may be entered, without notice and an opportunity for hearing, upon the filing of a motion for joint administration pursuant to Fed. R. Bankr. P. 1015, supported by an affidavit, declaration or verification, which establishes that the joint administration of two or more cases pending in this Court under title 11 is warranted and will ease the administrative burden for the Court and the parties. An order of joint administration entered in accordance with this Local Rule may be reconsidered upon motion of any party in interest at any time. An order of joint administration under this Local Rule is for procedural purposes

- 8 -

only and shall not cause a "substantive" consolidation of the respective debtors' estates.

Del. Bankr. L.R. 1015-1.

15.     Joint procedural administration of the Debtors' cases will also benefit creditors and other parties in interest, because non-Debtor parties who file or respond to motions affecting multiple Debtors need not prepare and file multiple sets of substantially identical papers.

16.     Joint procedural administration of the Debtors' cases will not adversely affect the rights of the Debtors' respective creditors, since each creditor may still file its claim against the particular estate which it alleges owes it money.  In fact, the creditors and the Debtors' estates will benefit by the reduction of costs resulting from joint administration.

17.     Joint administration will relieve the Court of rendering numerous duplicative orders and maintaining numerous duplicative files.    Furthermore, supervision of the administrative aspects of these Chapter 11 Cases by the U.S. Trustee will be simplified.  Indeed, the reduction of costs and duplicative efforts afforded by joint administration of these cases will benefit the creditors, the Debtors' estates, and all interested parties.

18.     Finally, the entry of joint administration orders in multiple related cases such as these is common and non-controversial in this district.  *See, e.g., In re AFA Investment Inc.*, Case No. 12-11127 (MFW) (Bankr. D. Del. Apr. 3, 2012); *In re CyberDefender Corp.*, Case No. 12-10633 (BLS) (Bankr. D. Del. Feb. 24, 2012); *In re AES Eastern Energy, L.P.*, Case No. 11-14138 (KJC) (Bankr. D. Del. Jan. 4, 2012); *In re SP Newsprint Holdings LLC*, Case No. 11-13649 (CSS) (Bankr. D. Del. Nov. 17, 2011); *In re Blitz U.S.A., Inc.*, Case No. 11-13603 (Bankr. D. Del. Nov. 10, 2011); *In re Chef Solutions Holdings, LLC*, Case No. 11-13139 (KG) (Bankr. D. Del. Oct. 5, 2011).

- 9 -

**NOTICE**

19.     Notice of this Motion has been provided via facsimile, overnight delivery service, electronic transmission or same-day messenger service to: (i) the U.S. Trustee; (ii) counsel for the agent for the Debtors' proposed debtor-in-possession lenders; (iii) counsel for The CIT Group/Business Credit, Inc., as resigning administrative agent and collateral agent under the Debtors' first lien credit agreement, counsel for BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Adviser L.L.C. and Spectrum Investment Partners LP and each other lender under the Debtors' first lien credit agreement; (iv) counsel for The Bank of New York Mellon, in its capacity as administrative agent and collateral agent under the Debtors' second lien credit agreement; (v) the Debtors' twenty (20) largest unsecured creditors listed in the Debtors' consolidated list of creditors (excluding insiders); (vi) Bank of America, Fidelity National Bank, J.P. Morgan Chase Bank and Bank of Nova Scotia, which are the banks with which the Debtors maintain their primary banking relationships; and (vii) all other persons requesting notices.  As this Motion is seeking "first day" relief, within two (2) business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).  In light of the expedited nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

- 10 -

## CONCLUSION

**WHEREFORE** the Debtors respectfully request entry of an order granting the relief requested herein, and granting the Debtors such other and further relief as may be just. A form of Order is attached as **Exhibit A** hereto.

Dated: June 10, 2012
        Wilmington, Delaware

                                        _____
                                        Mark D. Collins (No. 2981)
                                        Christopher M. Samis (No. 4909)
                                        Marisa A. Terranova (No. 5396)
                                        RICHARDS, LAYTON & FINGER, P.A.
                                        One Rodney Square
                                        920 North King Street
                                        Wilmington, Delaware 19801
                                        Telephone No.: (302) 651-7700
                                        Facsimile No.: (302) 651-7701
                                        Email: collins@rlf.com
                                               samis@rlf.com
                                               terranova@rlf.com

                                        -and-

                                        Jeffrey W. Kelley (GA Bar No. 412296)
                                        Ezra H. Cohen (GA Bar No. 173800)
                                        Carolyn P. Richter (GA Bar No. 574097)
                                        Matthew R. Brooks (GA Bar No. 378018)
                                        Benjamin R. Carlsen (GA Bar No. 940614)
                                        TROUTMAN SANDERS LLP
                                        Bank of America Plaza
                                        600 Peachtree Street, Suite 5200
                                        Atlanta, Georgia 30308-2216
                                        Telephone No.: (404) 885-3000
                                        Facsimile No.: (404) 885-3900
                                        Email: jeffrey.kelley@troutmansanders.com
                                               ezra.cohen@troutmansanders.com
                                               carolyn.richter@troutmansanders.com
                                               matthew.brooks@troutmansanders.com
                                               benjamin.carlsen@troutmansanders.com

                                        *Proposed Counsel for the Debtors*

- 11 -

EXHIBIT A

**Proposed Order Directing Joint Administration**
**of the Debtors' Related Chapter 11 Cases**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**ALLIED SYSTEMS HOLDINGS, INC.,**<br><br>Debtor.<br><br>EIN: 58-0360550 | **Chapter 11**<br><br>**Case No. 12-11564 (CSS)** |
| In re:<br><br>**ALLIED AUTOMOTIVE GROUP, INC.,**<br><br>Debtor.<br><br>EIN: 58-2201081 | **Chapter 11**<br><br>**Case No. 12-_____ (CSS)** |
| In re:<br><br>**ALLIED SYSTEMS, LTD. (L.P.),**<br><br>Debtor.<br><br>EIN: 58-1710028 | **Chapter 11**<br><br>**Case No. 12-11565 (CSS)** |
| In re:<br><br>**AXIS GROUP, INC.,**<br><br>Debtor.<br><br>EIN: 58-2204628 | **Chapter 11**<br><br>**Case No. 12-_____ (CSS)** |
| In re:<br><br>**F.J. BOUTELL DRIVEAWAY LLC,**<br><br>Debtor.<br><br>EIN: 38-0365100 | **Chapter 11**<br><br>**Case No. 12-_____ (CSS)** |

| | |
|---|---|
| In re: | Chapter 11 |
| **ALLIED SYSTEMS (CANADA) COMPANY,** | Case No. 12-_____ (CSS) |
| Debtor. | |
| EIN: 90-0169283 | |
| In re: | Chapter 11 |
| **COMMERCIAL CARRIERS, INC.,** | Case No. 12-_____ (CSS) |
| Debtor. | |
| EIN: 38-0436930 | |
| In re: | Chapter 11 |
| **GACS INCORPORATED,** | Case No. 12-_____ (CSS) |
| Debtor. | |
| EIN: 58-1944786 | |
| In re: | Chapter 11 |
| **CORDIN TRANSPORT LLC,** | Case No. 12-_____ (CSS) |
| Debtor. | |
| EIN: 38-1985795 | |
| In re: | Chapter 11 |
| **CT SERVICES, INC.,** | Case No. 12-_____ (CSS) |
| Debtor. | |
| EIN: 38-2918187 | |
| In re: | Chapter 11 |
| **AXIS CANADA COMPANY,** | Case No. 12-_____ (CSS) |
| Debtor. | |
| CBN: 87568828 | |

- 2 -

| | |
|---|---|
| In re: | Chapter 11 |
| TERMINAL SERVICES LLC, | Case No. 12-_____ (CSS) |
| Debtor. | |
| EIN: 91-0847582 | |
| In re: | Chapter 11 |
| ALLIED FREIGHT BROKER LLC, | Case No. 12-_____ (CSS) |
| Debtor. | |
| EIN: 59-2876864 | |
| In re: | Chapter 11 |
| LOGISTIC TECHNOLOGY, LLC | Case No. 12-_____ (CSS) |
| Debtor. | |
| EIN: 45-4242057 | |
| In re: | Chapter 11 |
| LOGISTIC SYSTEMS, LLC | Case No. 12-_____ (CSS) |
| Debtor. | |
| EIN: 45-4241751 | |
| In re: | Chapter 11 |
| AXIS ARETA, LLC | Case No. 12-_____ (CSS) |
| Debtor. | |
| EIN: 45-5215545 | |

- 3 -

In re:

**TRANSPORT SUPPORT LLC**

            **Debtor.**

EIN: 38-2349563

In re:

**RMX LLC**

            **Debtor.**

EIN: 31-0961359

In re:

**QAT, Inc.**

            **Debtor.**

EIN: 59-2876863

|

**Chapter 11**

**Case No. 12-_____ (CSS)**

 

**Chapter 11**

**Case No. 12-_____ (CSS)**

 

**Chapter 11**

**Case No. 12-_____ (CSS)**

---

## ORDER DIRECTING JOINT ADMINISTRATION
## OF THE DEBTORS' RELATED CHAPTER 11 CASES

This matter is before the Court[1] on the motion of Allied Systems Holdings, Inc. ("**Allied Holdings**") and its U.S. and Canadian subsidiaries (collectively, the "**Debtors**"),[2] debtors and debtors-in-possession herein for joint administration of these bankruptcy cases pursuant to Federal Rule of Bankruptcy Procedure 1015 (the "**Motion**").

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[2]    The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

The Court has considered the Motion, the Declaration of Scott D. Macaulay in Support of Chapter 11 Petitions and First Day Motions, and the matters reflected in the record of the hearing held on the Motion. It appears that the Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334; that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); that the Debtors have provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances and that no further notice is necessary; and that the relief sought in the motion is in the best interests of the Debtors, their estates, and their creditors; and that good and sufficient cause exists for such relief.

Accordingly, it is hereby **ORDERED** as follows:

1.      The Motion is **GRANTED**.

2.      The above-captioned cases are consolidated for procedural purposes only and shall be jointly administered under Case No. 12-11564 (CSS), in accordance with the provisions of Federal Rule of Bankruptcy Procedure 1015(b).

3.      The joint caption of these cases shall read as follows:

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **ALLIED SYSTEMS HOLDINGS, INC.,** *et al.,*[1] | **Case No. 12-11564 (CSS)** |
| **Debtors.** | **(Jointly Administered)** |

4.      All pleadings and papers filed in these cases, with the exception of proofs of claim and proofs of interest, shall be captioned as in the preceding paragraph.

---

[1]      The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

- 5 -

5.     All docket entries in these cases shall be made in the case of Allied Systems

Holdings, Inc., Case No.12-11564 (CSS). An entry shall be made on the docket of each of the

Debtors' cases, other than that of Allied Systems Holdings, Inc., that is substantially similar to

the following:

> An order has been entered in accordance with Rule 1015(b) of the
> Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the
> Local Rules of Bankruptcy Practice and Procedure of the United
> States Bankruptcy Court for the District of Delaware directing
> joint administration of the chapter 11 cases of Allied Systems
> Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-
> 2201081); Allied Freight Broker LLC (59-2876864); Allied
> Systems (Canada) Company (52-1952252); Allied Systems, Ltd.
> (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada
> Company (98-0212434); Axis Group, Inc. (58-2204628);
> Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-
> 2918187); Cordin Transport LLC (38-1985795); F.J. Boutell
> Driveaway LLC (38-0365100); GACS Incorporated (58-1944786);
> Logistic Systems, LLC (45-4241751); Logistic Technology, LLC
> (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359);
> Transport Support LLC (38-2349563); and Terminal Services LLC
> (91-0847582). All further pleadings and other papers shall be filed
> in, and all further docket entries shall be made in, Case No. 12-
> 11564 (CSS).

6.     One consolidated service list shall be maintained by the Debtors and kept by the

Clerk of the United States Bankruptcy Court for the District of Delaware.

7.     Nothing contained in the Motion or this Order shall be deemed or construed as

directing or otherwise affecting a substantive consolidation of the Debtors' Chapter 11 Cases or

permitting the Debtors to file consolidated monthly operating reports.

8.     The terms and conditions of this Order shall be immediately effective and

enforceable upon its entry.

9.     The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order in accordance with the Motion.

10.    This Court shall retain jurisdiction to interpret and enforce this Order.

Dated: June ___, 2012
       Wilmington, Delaware

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE