# Exhibit 144

| From: | Michael Riggs <mriggs@jackcooper.com> |
|---|---|
| Sent: | Sunday, December 18, 2011 8:49 PM |
| To: | jschaffer@spectrumgp.com; Rich Ehrlich |
| Cc: | Theo Ciuptiu; Bob Griffin; Rudy Bijleveld; 'Kirk Ferguson' |
| Subject: | Yucaipa/JC  Term Sheet - CONFIDENTIAL |
| Attachments: | image001.gif; Yucaipa Term Sheet (JCT Dec 15 2011) (2).doc |

| Importance: | High |
|---|---|

Jeff and Rich:

We do NOT yet have a deal with Yucaipa. However they have agreed to continue discussions if I can "find a way to get all of the necessary consents to buy their debt". They are willing to "assist in some ways with diligence and HSR filings to facilitate a debt sale/trade", but Yucaipa is NOT willing to agree to a "full due diligence". They are simply not interested in exploring a typical M&A type transaction, by signing a term sheet with a number of diligence outs in the deal. Yucaipa has agreed to let us see certain contract terms in their primary contract with Ford, so we can build up our own set of projections (like we did in 2009 with Jack Cooper). They also understand the need for HSR work being done. And Ira was clear they do want to do a deal with me. He not only agreed to carry a significant part of the purchase price ($50 million) in Jack Cooper par-passu high yield bonds, he even agreed to withhold payment of that $50 million until AFTER Allied actually files for the 363 transaction. That is putting their money where their mouth is. A copy of the latest unsigned version of our proposal to Yucaipa is attached.

So the next logical step is to see if we can agree to a bridge loan with you. Without a bridge loan this deal is dead. Ira is aware that I will be trying to work out that bridge loan with your two companies. So if you still want to meet on Tuesday in New York, despite the fact that we will not yet have any term sheet signed with Yucaipa, then I will still meet with you at 11AM eastern at Black Diamond's office on this Tuesday. Let me know. Perhaps you guys can help me develop a full game plan to get to the finish line … along with providing the bridge financing.

Theo will be sending you a revised bridge loan proposal by noon tomorrow. I want you to be prepared for what we believe it will take to get bondholder consents, so here are some of the high level changes we will need from you which differ from our last LOI with you:

1. Your total bridge loan might have to go from $100 million to $120 million, so we can also take out CIT for $20 million in cash. I hope to find out about CIT tomorrow. Right now I am not sure where it stands.

2. Your 85 cent cash payment must be changed and now be into the same pari-passu form bonds as Yucaipa and our current bond holders, but at par. We will put no cash down on this bridge loan.

3. The remedy for default on your bridge loan will need to change. The only default remedy we can have in the new agreement with you is that the bridge loan will convert into our bonds -- instead of the principal coming immediately due.

4. You must be willing to give a binding commitment prior to the 363 filing because Yucaipa wants "no outs" when they sign the debt purchase agreement with them.

5. The terms of the bridge loan should now be 6% interest-only for one year, and then if not taken out at the end of the year, the principal will convert to $1**10** million of our bonds.

1

Confidential



BDCM0000207

Theo will send you the revised bridge LOI tomorrow. I will be in New York any way tomorrow night. Let me know after you read it if you still wish to meet on Tuesday. Thanks.

Respectfully,

T. Mike Riggs
Chairman
Jack Cooper Holdings Corp.



*Always striving to be the best...*
Cell  262-496-5440
Email   mriggs@jackcooper.com
Website  www.jackcooper.com

---

**From:** Theo Ciupitu
**Sent:** Thursday, December 15, 2011 1:59 PM
**To:** Ira Tochner; Derex Walker
**Cc:** Michael Riggs
**Subject:** Yucaipa/JC - revised Term Sheet
**Importance:** High

Regards,

Theo A. Ciupitu
Executive Vice President and General Counsel
Jack Cooper Holdings Corp.
Jack Cooper Transport Company, Inc.
tciupitu@jackcooper.com
404-350-7934 (office)
404-308-7803 (cell)

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed in this communication (or in any attachment).

CONFIDENTIALITY NOTICE: This electronic mail transmission has been sent by a lawyer. It may contain information that is confidential, privileged, proprietary, or otherwise legally exempt from disclosure. If you are not the intended recipient, you are hereby notified that you are not authorized to read, print, retain, copy, or disseminate this message, any part of it, or any attachments. If you have received this message in error, please delete this message and any attachments from your system without reading the content and notify the sender immediately of the inadvertent transmission. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Thank you for your cooperation.

Confidential

BDCM0000208

CONFIDENTIAL DRAFT –
Jack Cooper Comments on 12/15/2011

### For Discussion Purposes Only

## TERM SHEET FOR ACQUIRING FIRST AND SECOND LIEN SECURED DEBT CLAIMS WITH RESPECT TO ALLIED SYSTEMS HOLDINGS, INC. AND CONSUMMATING 363 SALE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

This term sheet (this "**Term Sheet**") outlines the parties nonbinding present intentions with respect to certain material terms of the following proposed transactions (the "**Proposed Transactions**"): (a) the purchase by Jack Cooper Transport Company, Inc. ("**Jack Cooper**") through a designated affiliate ("**JCT Affiliate**") of certain first and second lien secured debt claims (the "**Purchased Debt**") against Allied Systems Holdings, Inc. and its subsidiaries and other affiliates (collectively, "**Allied**") (the "**Debt Purchase Transaction**"); and (b) the purchase of substantially all of the assets and the assumption of designated liabilities of Allied through a sale under Section 363 of Title 11 of the United States Code (the "**Bankruptcy Code**") pursuant to a credit bid of the first lien secured debt claims against Allied (the "**363 Sale**"). The terms and conditions summarized herein are provided for discussion purposes only, and are not enforceable or binding on any parties hereto, and do not contain all of the contemplated terms and conditions of the Proposed Transactions. In addition, the Term Sheet constitutes confidential settlement negotiations under Federal Rule of Evidence 408 (and comparable state law) and cannot be used in any proceeding for any purpose. The consummation of the Proposed Transactions shall be subject to, among other things, the negotiation and execution of definitive agreements that are mutually acceptable to Jack Cooper, Yucaipa (as hereinafter defined), and Allied and the satisfaction of customary and specific conditions precedent.

### Debt Purchase Transaction Specific Terms

| | |
|---|---|
| **Seller:** | The Yucaipa Companies, LLC, Yucaipa American Alliance Fund I, LP, Yucaipa American Alliance (Parallel) Fund I, LP, and all other funds managed by or related to the foregoing entities and their general partners (collectively, "**Yucaipa**"). |
| **Buyer:** | JCT Affiliate |
| **Purchased Debt:** | 1. All claims held by Seller at closing under that certain Amended and Restated First Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007, by and among, <u>inter alia</u>, Allied Systems Holdings, Inc. (f/k/a Allied Holdings, Inc.) and Allied Systems, Ltd. (L.P.) (collectively, the "**Allied Borrowers**"), certain subsidiaries of Allied Borrowers as guarantors (the "**Allied Guarantors**"), the Lenders party thereto from time to time, and The CIT Group/Business Credit, Inc. ("**CIT**"), as administrative and collateral agent (as amended and modified, the "**First Lien Credit Agreement**"). |

BDCM0000209

2. All claims held by Seller at closing under that certain Second Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007, by and among, inter alia, the Allied Borrowers, the Allied Guarantors, and Goldman Sachs Credit Partners, L.P., as sole lead arranger, sole book runner, and sole lead administrative agent (as amended and modified, the "**Second Lien Credit Agreement**"; and, together with the First Lien Credit Agreement, the "**Credit Agreements**").

**Amount of Purchased Debt:**

1. First Lien Credit Agreement term loans – approximately [$114,700,000] of principal, plus all accrued and unpaid interest, fees, charges, and expenses.

2. First Lien Credit Agreement synthetic letter of credit usage loans – approximately [$20,100,000] of principal, plus all accrued and unpaid interest, fees, charges, and expenses.

3. Second Lien Credit Agreement term loans – approximately [$20,000,000] of principal, plus all accrued and unpaid interest, fees, charges, and expenses.

**Purchased Debt Purchase Price:**

1. First Lien Credit Agreement claims – $150 million for good and valuable consideration paid.

2. Second Lien Credit Agreement claims - $1.00 for good and valuable consideration paid.

**Form of Purchase:**

Direct assignment by Seller to Buyer.

**Documentation:**

Mutually acceptable to Buyer and Seller, but to be based on "distressed trade" form documents published by The Loan Syndications and Trading Association, as amended or modified to accommodate the Debt Purchase Transaction.

[Note To Yucaipa: Forms can be found on the LSTA website.]

**Closing Date:**

TBD

**Assignment Fee under the Credit Agreements:**

Would be shared equally between Buyer and Seller, unless waived by CIT.

**Payment of Purchased Debt Purchase Price:**

1. $100 million of Purchased Debt Purchase Price paid in cash at closing.

2 -

Confidential

2. $50 million balance of Purchased Debt Purchase Price to be paid in form of notes issued as part of a "tack-on" financing under Jack Cooper's 12 ¾% Senior Secured Notes Due 2015; provided, however, such notes would only be issued and delivered if and upon Allied's filing of its bankruptcy cases in the Bankruptcy Court in connection with the 363 Sale.

*[Note to Yucaipa: Jack Cooper would provide material documents related to its corporate bonds upon Yucaipa signing a mutually acceptable confidentiality agreement and Jack Cooper completing its due diligence described in item 1 of the immediately succeeding paragraph.]*

**Conditions Precedent to Signing Definitive Agreements for Debt Purchase Transaction:**

1. Allied and/or Yucaipa to provide to Jack Cooper the following due diligence items (after Jack Cooper enters into a mutually acceptable confidentiality agreement):

(a) Full and complete copies of all documents relating to the Credit Agreements (collectively, the "**Loan Documents**") including, but not limited to, those documents set forth on **Schedule 1** attached hereto.

(b) Corporate structure charts and summary of shareholders and their ownership.

(c) Summary of certain material terms (to be agreed) of Ford contract, including, without limitation, revenue provisions, bankruptcy provisions, and evidence of the contract being a "no cut" contract.

(d) Access to a third-party due diligence consulting firm to allow such firm to confirm (after such third-party consulting firm has entered into a mutually acceptable confidentiality agreement) sustainable annual EBITDA in excess of $40 million.

(e) The most current appraisals and/or listings regarding the rigs and real estate owned by Allied to allow Jack Cooper to confirm: (i) numbers and locations of such rigs and real estate; (ii) the age of such rigs and general condition of such real estate; (iii) that Allied has clear title to such rigs and real estate; and (iv) that such rigs and real estate are not encumbered by claims (such as financing liens, operating or capital lease claims, and mortgages), other than collateral interests granted pursuant to the Credit Agreements.

3 -

BDCM0000211

(f) The lease agreements regarding the rigs and real estate leased by Allied to allow Jack Cooper to confirm the lease terms of such rigs and real estate.

2. Jack Cooper completing its review and due diligence of the items listed in item 1 above within twenty (20) days of receipt thereof from Allied and/or Yucaipa.

3. As of the Closing Date, Allied shall have the following:

(a) average cash book balance of not less than $4,000,000 over a 10 day period prior to closing;

(b) average accounts receivable, net of contras, of not less than $9,000,000 over a ten day period prior to closing; and

(c) [owned rigs of not less than 2,500, and all such rigs (i) shall be in good operating condition and in a state of good maintenance and repair, ordinary wear and tear accepted, and (ii) shall conform to all laws applicable thereto.]

[NOTE TO JCT; REMAINS SUBJECT TO ALLIED REVIEW/CONFIRMATION]

**Conditions Precedent to Closing Debt Purchase Transaction:**

1. The Loan Documents being amended, as necessary, to provide that Buyer may acquire claims under the Loan Documents as an "Eligible Assignee" and become the "Requisite Lender" with all rights associated therewith, including, but not limited to, the right to vote its acquired claims and to direct that actions be undertaken as may be allowed pursuant to the Loan Documents.

[Note To Yucaipa: Our understanding is that Eligible Assignee is defined as follows under the First Lien Credit Agreement: "*Eligible Assignee means (i) any Lender, any Affiliate of any Lender and any Related Fund [], and (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans; provided, neither Borrowers nor any of their Subsidiaries shall be an Eligible Assignee.*" [Emphasis added.] Jack Cooper is not in the business of extending credit or buying loans (contract construction rules would suggest an Eligible Assignee would have to be in the business of extending credit or buying loans because of the preceding examples of commercial

4 -

Confidential

bank, investment fund, etc.]

2. All commitments to make advances or issue new letters of credit under the First Lien Credit Agreement would be terminated.

[NOTE TO JCT:  ALLIED TO CONFIRM IF DONE.]

3. Proof of Yucaipa, Allied, and CIT delivering evidence of releases of certain claims against each other in that certain lawsuit styled as *Allied Systems Holdings, Inc., Yucaipa American Alliance Fund I., LP and Yucaipa American Alliance (Parallel) Fund I, LP vs. The CIT Group/Business Credit, Inc., In the Superior Court of Fulton County, Georgia, Case No. 2009CF177574 (J. Goger).*

4. As of the Closing Date:  (a) the total outstanding principal amount under the First Lien Credit Agreement would not exceed $[265,000,000] less the amount of any commitments that have been terminated before the Closing Date; (b) the total outstanding principal amount under the Second Lien Credit Agreement would not exceed $[30,000,000]; and (iii) Yucaipa would hold a majority of the voting shares of Allied and would have the power to elect the majority of the members of the Board of Directors of Allied.

5. Allied to provide to Jack Cooper's third-party consulting firm the following due diligence items (after such third-party consulting firm has entered into a mutually acceptable confidentiality agreement): (a) estimated current run-rate revenues and terminal contribution margins by terminal based on current customer contracts; (b) detail on all major current traffic lanes, including, without limitation, load factor, average trip distance, destinations, annual unit volume and mileage for each origin to destination, and size/type and number of units delivered at each destination; and (c) copies of all Appendices to the Ford customer contract showing fixed and variable rates for each origin to destination delivery.

6. Jack Cooper to obtain the consent of its lenders and investors to consummate the Proposed Transactions.

7. All necessary consents and approvals from governmental and regulatory bodies, if any, have been obtained.

8. The Administrative Agent under the First Lien Credit

5 -

BDCM0000213

Agreement is not contesting that the Seller represents Requisite Lenders and Buyer will be an Eligible Assignee and will represent Requisite Lenders under the First Lien Credit Agreement.

9.  Settlement and dismissal with prejudice of all claims and counterclaims in that certain lawsuit styled as *Allied Systems Holdings, Inc. v. T. Michael Riggs, IEP Carhaul LLC, Jack Cooper Transport Company, Inc., and Active Carhaul Acquisition, Inc. v. The Yucaipa Companies, LLC and Mark J. Gendregske*; in the Superior Court of Cobb County, Georgia, Civil Action File No. CV-09-1-10536-48.

10.  Yucaipa (in its capacity as equity holder) and Allied would enter into one or more cooperation and support agreements with respect to the Allied bankruptcy filings and the 363 Sale as further described below (the "**Cooperation Agreements**").

**Restriction on Purchasing Jack Cooper Bonds**:   Yucaipa would agree to not purchase any notes under Jack Cooper's 12 ¾% Senior Secured Notes Due 2015 for two (2) years after the closing, unless they trade below a certain threshold to be agreed.

**Restrictive Covenants**:   Yucaipa would agree to a three (3)-year restrictive covenant covering the provision of car haul delivery, brokerage, and related services (to be agreed) in the United States, Canada, and Mexico providing for (a) non-competition, (b) non-solicitation of customers, vendors, and senior employees, and (c) mutual confidentiality and mutual non-disparagement restrictions – in each case subject to customary exceptions to be agreed upon.

**Consent to Acquisition**:   In its capacity as a holder of notes under Jack Cooper's 12 ¾% Senior Secured Notes Due 2015, Yucaipa would agree, through December 31, 2012, to vote its notes in favor of any acquisition of Allied whether pursuant to a Section 363 Sale or otherwise.

[Note To Yucaipa: To Be Discussed.]

### 363 Sale Specific Terms

**Structure of 363 Sale**:   Buyer anticipates purchasing substantially all of the assets of Allied, free and clear of all liens, claims, and other encumbrances, pursuant to a sale under Section 363 of the Bankruptcy Code (the "**Bankruptcy Process**"). In addition, Buyer would expect to have Allied assume and assign certain customer contracts, supply agreements, leases, license

6 -

BDCM0000214

agreements, and other executory contracts, which executory contracts would be designated by Buyer in its sole and absolute discretion. Except as specifically agreed upon and designated by Buyer in the Cooperation Agreements that would be executed by Yucaipa, Allied, and Buyer, Buyer would not assume or otherwise be responsible for any indebtedness, trade payables, or other liabilities or obligations of Allied or its bankruptcy estate whatsoever, contingent or otherwise.

**363 Sale Purchase Price:**    Credit bid of all claims against Allied under the First Lien Credit Agreement.

**Signing and Closing 363 Sale:**    The Cooperation Agreements among Yucaipa, Allied, and Buyer would be signed simultaneous with the closing of the Debt Purchase Transaction.

The Bankruptcy Process would be expected to take no longer than ninety (90) days, subject to any delays occasioned by the Bankruptcy Court's calendar.

**Bankruptcy Filings:**    Within thirty (30) days of the closing date of the Debt Purchase Transaction, Allied would file its bankruptcy cases in the Bankruptcy Court. Allied would file, on the same date as the date of the bankruptcy filings, a motion and form of order, both in form and substance acceptable to Buyer in its sole and absolute discretion, seeking approval of the 363 Sale, a customary break-up fee, and certain other bid protections, including, but not limited to, a minimum overbid and minimum bidding increments, acceptable to Buyer in its sole and absolute discretion (collectively, the "**Bid Protections**"), pursuant to Section 363 of the Bankruptcy Code. Pursuant to the Cooperation Agreements, Allied and Yucaipa would use their best efforts to promptly obtain approval by the Bankruptcy Court of the Bid Protections and the 363 Sale.

**Conditions Precedent to Closing 363 Sale:**

1. Negotiation and execution of the Cooperation Agreements with and by Yucaipa and Allied, which agreements would include, among other things, the terms described in the "Bankruptcy Filings" paragraph above and mutually acceptable "milestones" to implement the Bankruptcy Process.

2. The entry of a final non-appealable order of the Bankruptcy Court approving the 363 Sale in a form acceptable to Buyer in its sole and absolute discretion and to be attached to the Cooperation Agreements.

7 -

Confidential

BDCM0000215

## General Terms

**Transaction Costs**:

Each party shall be responsible for its own individual costs and expenses, specifically including costs and expenses of legal counsel and other advisors, to negotiate, document, and implement the Proposed Transactions.

**Nonbinding Provisions:**

Each party acknowledges and agrees that the provisions of this Term Sheet do not create or constitute any legally binding obligations among the parties. The parties do not intend to be bound by the provisions of this Term Sheet, and no party shall have any liability to the other parties hereto with respect to the terms of this Term Sheet. No party may reasonably rely on any promises inconsistent with this paragraph.

\*\*\*\*\*

8 -

Confidential

## Schedule 1

### *List of Loan Documents*

1.  First Lien Credit Agreement Documents (all as amended and restated, including all amendments and restatements thereto)

    Credit Agreement
    Pledge and Security Agreement
    Intellectual Property Security Agreements
    Notes
    Mortgages
    Guaranties
    Intercreditor Agreements
    Canadian Pledge and Security Agreement
    Affirmation Agreement
    Any and all waiver letters or agreements
    Any and all forbearance agreements
    Evidence of the right of Requisite Lenders to accelerate the obligations under the First Lien Credit Agreement


2.  Second Lien Credit Agreement Documents (all as amended and restated, including all amendments and restatements thereto)

    Credit Agreement
    Pledge and Security Agreement
    Intellectual Property Security Agreements
    Notes
    Mortgages
    Guaranties
    Intercreditor Agreements
    Canadian Pledge and Security Agreement
    Affirmation Agreement
    Any and all waiver letters or agreements
    Any and all forbearance agreements

\*\*\*\*\*

9 -

Confidential

BDCM0000217