# Exhibit 145

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
------------------------------------------------------------------------X
BDCM OPPORTUNITY FUND II, LP, :
BLACK DIAMOND CLO 2005-1 LTD : Hon. Charles E. Ramos
SPECTRUM INVESTMENT PARTNERS, :
L.P., : Motion Seq. No. 3
  :
              Plaintiffs, : Index No. 650150/2012
  :
        -against- : AFFIDAVIT OF
  : DEREX WALKER
YUCAIPA AMERICAN ALLIANCE FUND : IN OPPOSITION TO
I, LP, and YUCAIPA AMERICAN : PLAINTIFFS'
ALLIANCE (PARALLEL) FUND I, LP : MOTION FOR
  : SUMMARY JUDGMENT
             Defendants. :
------------------------------------------------------------------------X

STATE OF CALIFORNIA      )
                                      ) ss.
COUNTY OF LOS ANGELES  )

       DEREX WALKER, being duly sworn, deposes and states as follows:

       1.    I am of legal age and majority, under no disabilities, and am competent to testify as to the facts contained herein. I submit this affidavit in opposition to Plaintiffs' Motion for Summary Judgment.

       2.    The facts contained in the affidavit are within my personal knowledge and are known or believed by me to be true and correct.

       3.    I am a transaction partner with YEC, Inc., a company affiliated with Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (collectively, "Yucaipa").

       4.    Yucaipa is the largest shareholder of Allied Systems Holdings, Inc. ("Allied"), a position it has held since Allied emerged from bankruptcy and Plaintiffs simultaneously acquired their original positions in Allied's debt in May 2007. Yucaipa is also a lender in Allied's $315

1

million credit facility, which is comprised of a $265 million senior secured first priority credit facility (the "First Lien Facility" or "Senior Credit Facility") and a $50 million junior credit facility. Although Yucaipa has investment positions in Allied and has the right to appoint a majority of Allied's board of directors—which right is expressly recognized in the Credit Agreement pursuant to which the Plaintiffs are Lenders, Yucaipa does not "control" Allied or its senior management, contrary to allegations made by Plaintiffs in the above-styled action. Allied's board of directors includes two independent directors, including Allied's CEO, who are not affiliated with Yucaipa.

5. The First Lien Facility is governed by the Credit Agreement. Upon information and belief, plaintiffs BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD (together, "Black Diamond"), and Spectrum Investment Partners, L.P. ("Spectrum," together with Black Diamond, "Plaintiffs") have been parties to the Credit Agreement since the syndication of the loan. I am personally aware that Plaintiffs had no input whatsoever in the Credit Agreement's negotiation.

**Yucaipa's Experience with Black Diamond**

6. Black Diamond has a reputation as a lender for being unduly aggressive, irrational, and difficult to work with. Upon information and belief, several private equity firms have blacklisted Black Diamond and will not do business with them.

7. My first experience with Black Diamond was in connection with my service as Chairman of the Board of Directors for Performance Transportation Systems, Inc. ("PTS"), an Allied competitor that provided distribution and transportation services to the automotive industry. Yucaipa owned the majority of PTS's equity but did not own any of its debt, and Black Diamond owned the majority of PTS's first-lien debt and served as its Requisite Lender. In

2007, when PTS was struggling financially, Black Diamond, in its capacity as Requisite Lender, demanded that PTS's Board of Directors unilaterally terminate PTS's collective bargaining agreement with the International Brotherhood of Teamsters (the "Teamsters") in a desperate attempt to cut wages for more than fifteen-hundred (1,500) drivers and mechanics by at least 15% and thereby increase Black Diamond's return on its investment in PTS. The Board advised Black Diamond that its maneuver would backfire and cause almost seventeen-hundred (1,700) PTS employees to lose their jobs, but Black Diamond insisted on its requirement that PTS's Board carry out its plan. Steve Deckoff, managing principal of Black Diamond, advised PTS that he was betting that PTS's employees would be so nervous about keeping their jobs in a difficult economy that they would break ranks with Teamster leadership and side with Black Diamond in its attempt to lower wages. Predictably, after Black Diamond's plan was implemented against the recommendation of PTS's Board, the Teamsters immediately went on strike and PTS was forced into liquidation. As a consequence, almost seventeen-hundred (1,700) PTS employees lost their jobs. Mr. Deckoff later admitted during a meeting with me on August 18, 2009, that he believed Black Diamond made a mistake in its handling of PTS.

**The Third Amendment to Allied's First Lien Credit Facility**

8. In early 2008, a number of Lenders were concerned about the state of the automotive industry and were looking for strategies to exit their positions in the Allied debt. Some of these Lenders expressed interest in potentially selling their debt positions to Yucaipa but recognized that doing so would potentially constitute a default under the Credit Agreement without an amendment to the terms of the Credit Agreement. To facilitate such potential sales, the Lenders held discussions with Allied about potentially amending the Credit Agreement to allow Yucaipa to be an "Eligible Assignee" under that document's terms. On April 17, 2008, the

3

Lenders' Administrative and Collateral Agent under the Credit Agreement, The CIT Group/Business Credit, Inc. ("CIT"), coordinated passage of Amendment No. 3 To Credit Agreement and Consent (the "Third Amendment"). The Third Amendment was validly enacted with Requisite Lender consent, which essentially constituted consent from the Lenders holding the majority of Allied's outstanding first-lien debt, and permitted Yucaipa to acquire Allied debt without potentially causing a default. Yucaipa was not a party to the Third Amendment and neither requested nor received consent to the Third Amendment.

9. Plaintiffs have never asserted to Yucaipa or Allied that the Third Amendment or any portions thereof are ineffective or required unanimous Lender consent to be effective.

10. Yucaipa did not make any purchases of Allied's first lien debt while the Third Amendment was in effect, prior to the enactment of the Fourth Amendment.

**Yucaipa's Negotiations with Lenders, Including Plaintiffs, Concerning First-Lien Debt**

11. In December 2008, with the automotive industry continuing to decline, Lenders holding a majority of Allied's first-lien debt sought to exit their positions in Allied's first-lien debt by selling them to Yucaipa pursuant to the Third Amendment. Yucaipa made clear to the Lenders that it would buy the Lenders' positions only if certain Third Amendment terms related to Yucaipa's potential acquisitions were amended and Yucaipa could serve as the Requisite Lender on its own.

12. Yucaipa informed Plaintiffs of, and Plaintiffs were aware of, Yucaipa's conditions for acquiring first-lien debt prior to ComVest's acquisition of its Requisite Lender stake in Allied's first-lien debt in February 2009 because Yucaipa had delivered to Plaintiffs a copy of a proposal including the terms of Allied's proposed fourth amendment to the Credit Agreement as part of a proposed tender offer for Allied's first lien debt as described more fully in Paragraph 14

4

of this affidavit. Despite this knowledge, Plaintiffs remained silent and never asserted in any way that Yucaipa could not be Requisite Lender under the terms of that proposed fourth amendment to the Credit Agreement.

13. As negotiations between Yucaipa and potential selling Lenders progressed, a Lender told me that Lenders holding a majority of Allied's first-lien debt excluded both Plaintiffs from some of their discussions because of Plaintiffs' reputation for being difficult and obstructionist.

14. In response to the Lenders' stated desire to sell Yucaipa their debt, Yucaipa submitted a written tender offer to all Lenders, including Plaintiffs, on February 4, 2009 (the "Tender Offer"). The Tender Offer package included Allied's proposed fourth amendment to the Credit Agreement (the "Proposed Fourth Amendment") that would have amended the Third Amendment's terms to eliminate any limits on the amount of Term Loans and LC Deposits Yucaipa could purchase, permitted Yucaipa to acquire a majority of Allied's first-lien debt, and permitted Yucaipa to become the Requisite Lender, among other changes. A true and correct copy of the February 4, 2009 email, attaching the Tender Offer materials and the Proposed Fourth Amendment (the "February 4 Email") is attached hereto as Exhibit A. The February 4 Email shows that the Tender Offer documents, including the Proposed Fourth Amendment, were sent to Richard Ehrlich of Black Diamond and Jeffrey Schaffer and Jeff Buller of Spectrum, among others. Although some of the Proposed Fourth Amendment's terms varied from the Fourth Amendment that ComVest enacted on August 21, 2009, the two documents' definitions of "Term Loan Exposure" were identical.

15. On February 11, 2009, Yucaipa offered to extend the deadline for responses to the Tender Offer in an email that was sent to all Lenders, including Richard Ehrlich of Black

Diamond and Jeffrey Schaffer and Jeff Buller of Spectrum, among others.  A true and correct copy of the February 11, 2009 email and accompanying letter from Yucaipa is attached hereto as Exhibit B.

16. Plaintiffs did not take any steps to demonstrate opposition to any aspect of Yucaipa's Tender Offer or the Proposed Fourth Amendment.  Plaintiffs never informed Yucaipa that the changes in the Proposed Fourth Amendment would violate the letter or the spirit of the Credit Agreement, and never stated that such changes could be made only with their consent.

17. At approximately the same time in February 2009, ComVest Investment Partners III, L.P. ("ComVest") acquired the majority of Allied's first-lien debt, including a majority of both the First Lien Term Loans and LC Commitments from Allied's then-existing Lenders.  Shortly thereafter, Yucaipa entered into direct negotiations with ComVest to acquire its Requisite Lender position.  These negotiations played out over several months and involved different proposals, but every one of them contemplated ComVest enacting certain amendments to the Third Amendment's terms, Yucaipa acquiring ComVest's majority position in Allied's first-lien debt, and Yucaipa becoming the Requisite Lender.

18. During the time Yucaipa and ComVest were negotiating over Yucaipa's purchase of Allied's first-lien debt held by ComVest, Richard Ehrlich of Black Diamond called me several times to inquire about the status of the negotiations.  Yucaipa told Mr. Ehrlich, and he was fully aware throughout the summer of 2009, that Yucaipa intended to acquire ComVest's majority position in Allied's first-lien debt and become the Requisite Lender.  Black Diamond not only understood Yucaipa's intentions and did not object, but went further, proposing to join with Yucaipa in transactions to gain total control of Allied's assets, to the detriment of all of Allied's other Lenders.  At one point, Black Diamond sought to sell its debt position to ComVest while

6

Black Diamond knew ComVest was seeking to sell all of its holdings to Yucaipa, including the debt ComVest might acquire from Black Diamond. During other calls with Mr. Ehrlich and during an August 18, 2009 in-person meeting I had with Mr. Deckoff of Black Diamond and another Yucaipa representative, Black Diamond proposed a transaction whereby Black Diamond and Yucaipa would put Allied into bankruptcy and seek to purchase its assets at a low-ball price. Under Black Diamond's plan, Black Diamond and Yucaipa would jointly make a new loan to Allied to fund Allied's bankruptcy, which would be structured as bankruptcy debtor-in-possession financing. Black Diamond assumed that Allied would be unable to repay that loan, and therefore Black Diamond could foreclose on Allied's assets without providing any recovery to the rest of Allied's lenders. Black Diamond advised me that it was willing to write off its investment in the first-lien debt in the bankruptcy because it held so little debt and had only paid $0.15 on the dollar for that debt. It further advised that its plan would provide a larger profit to Yucaipa than buying ComVest's position in Allied's first-lien debt would provide. During my calls with Mr. Ehrlich and during my meeting with Mr. Deckoff, Black Diamond never took any steps to demonstrate opposition to any aspect of Yucaipa's plan to become Requisite Lender.

**Fourth Amendment**

19.     On August 21, 2009, ComVest, as Requisite Lender, and Allied executed the Fourth Amendment. Allied appointed an independent committee of board members to review and vote on the Fourth Amendment, and the law firm of Troutman Sanders issued an opinion letter to CIT, as Lenders' Agent, and the Lenders regarding the validity of the Fourth Amendment. Allied's independent committee voted to approve the Fourth Amendment. ComVest and Yucaipa executed the Assignment and Assumption Agreement after the Fourth Amendment was enacted.

20. Yucaipa relied on the validity of the Third Amendment's passage by less than unanimous consent, in subsequently relying upon Allied's obtaining passage of the Fourth Amendment by less than unanimous consent. That same reliance on the validity of both the Third and Fourth Amendments led Yucaipa to purchase over $140 million in Allied's first-lien debt.

21. In the days leading up to the Fourth Amendment's enactment and the Assignment and Assumption Agreement, principals from Black Diamond, including Richard Ehrlich, had multiple discussions with Yucaipa concerning Yucaipa's plan to acquire ComVest's majority position. In particular, I met with Steve Deckoff of Black Diamond and another Yucaipa representative in person in Los Angeles on or about August 18, 2009 to discuss potential transactions involving Yucaipa and Black Diamond. An email regarding this meeting makes it clear that Mr. Deckoff's sole purpose in traveling to Los Angeles was to meet with Yucaipa about Allied. During this meeting, the parties discussed Yucaipa's proposed transaction to acquire ComVest's majority debt position, and Yucaipa informed Mr. Deckoff that Yucaipa was close to completing that transaction. Yucaipa and Black Diamond further discussed Yucaipa's acquisition of ComVest's position, among other topics, during an August 19, 2009 conference call involving Mr. Ehrlich, Stephanie Bond, an associate of Yucaipa, Robert Klyman, Esq. and Glen Collyer, Esq. of Latham & Watkins LLP (Yucaipa's counsel), and myself. (True and correct copies of an August 11-15, 2009 email string between Black Diamond and Yucaipa regarding the August 18, 2009 meeting and an August 19, 2009 email string between Black Diamond and Yucaipa regarding the August 19, 2009 conference call are attached hereto as Exhibit C.) During these communications, Black Diamond never objected in any way to Yucaipa's proposed acquisition, never expressed that it would not consent to Yucaipa becoming Requisite Lender, and never stated a belief that unanimous Lender consent was required for

Yucaipa to acquire ComVest's position. To the contrary, Black Diamond acquiesced to Yucaipa's proposed plan.

22. The following day, August 20, 2009, Mr. Ehrlich of Black Diamond followed up on our discussions via email, asking me "What did you decide?" regarding "Allied." I understood him to be asking if Yucaipa had decided to pursue Black Diamond's proposed transaction or to acquire ComVest's majority position in Allied's debt. I responded: "Haven't yet." (A true and correct copy of our Aug. 20, 2009 email string is attached hereto as Exhibit D.)

23. On August 22, 2009, I followed up with Mr. Ehrlich via email to inform him that Yucaipa "did in fact take an assignment of the ComVest debt." Black Diamond did not object or express in any way that Yucaipa's acquisition was improper; instead, Mr. Ehrlich responded, "OK. Let me know a good time [to talk]." (A true and correct copy of our August 22-24, 2009 email string is attached hereto as Exhibit E.) Black Diamond did not state any objection to Yucaipa that unanimous Lender consent was required for Yucaipa to acquire ComVest's position and never questioned Yucaipa's Requisite Lender status to me, even after the Fourth Amendment was passed and Yucaipa acquired ComVest's majority position – permitting Yucaipa to become Requisite Lender.

24. I also contacted Jeff Schaffer of Spectrum on August 22, 2009, to inform him that Yucaipa had taken an assignment of ComVest's first-lien loans. Mr. Schaffer responded to my email on September 8, 2009, stating "I am back in the office this week. Please call me at your convenience so we can discuss next steps. Thanks, Jeff." I also offered to meet in person with Mr. Schaffer later in September 2009, but he was not available. (A true and correct copy of my email exchange with Mr. Schaffer is attached hereto as Exhibit F.) Even though I attempted to open a line of communication with Mr. Schaffer, he never objected in any way to Yucaipa's

9

acquisition, never expressed that the Fourth Amendment was invalid or that unanimous Lender consent was required for Yucaipa to acquire ComVest's position, and never questioned Yucaipa's Requisite Lender status to me before his and Black Diamond's counsel sent a letter to CIT on September 18, 2009, as discussed further below.

25.  I also contacted CIT on or about August 22, 2009, to inform them that Yucaipa had taken an assignment of ComVest's first-lien loans. I had a series of phone calls with CIT representatives over the weeks that followed concerning Yucaipa's requests as Requisite Lender for CIT as Administrative Agent to resolve certain outstanding administrative issues. During those multiple calls, CIT never objected in any way to Yucaipa's acquisition, never expressed that the Fourth Amendment was invalid or that CIT's or all Lenders' consent was required for Yucaipa to acquire ComVest's position, and never questioned Yucaipa's Requisite Lender status.

**The Georgia Litigation**

26.  Approximately one month after Yucaipa acquired ComVest's majority position without objection from Plaintiffs, Plaintiffs changed course and, by letter dated September 18, 2009, instructed CIT, as Lenders' Agent, to challenge the validity of the Fourth Amendment. Soon thereafter, based on CIT's intransigence in response to Plaintiffs' request, Allied and Yucaipa were forced to file suit in Georgia against CIT in its representative capacity.

27.  I understood that CIT served as Plaintiffs' agent in the Georgia litigation, and that CIT was litigating on its own behalf and on behalf of all the Lenders, including Plaintiffs, throughout the Georgia litigation. CIT asserted in its Counterclaim that it filed suit to resolve the "competing and contrary claims" between Plaintiffs and Yucaipa, and to resolve its "uncertainty and insecurity regarding its rights and actions" as Agent. (Grant Aff., Exh. K, ¶¶ 35 and 41; see also id., ¶¶ 34-42.) To illustrate those "competing and contrary claims," CIT attached a letter

from Plaintiffs to its Counterclaim and explained that Plaintiffs "specifically instructed [CIT] not to recognize the directions Yucaipa provided" as Requisite Lender.  (Id. ¶ 34; id., Exh. J.)  I understood that CIT brought its claim for a declaratory judgment that the Fourth Amendment was not valid and that Yucaipa was not the Requisite Lender in its representative capacity on Plaintiffs' and other Lenders' behalf.  (See id., Exh. K, ¶ 35 (CIT brought the declaratory judgment claim "to fulfill its role as Administrative Agent in good faith, and to protect itself, as Administrative Agent, from competing and contrary claims from various Lenders") and id., ¶ 42 (CIT sought the declaration to establish that it had "not breached its obligations as Administrative Agent and Collateral Agent under the Credit Agreement").)

28.     Plaintiffs have also repeatedly admitted in this litigation that CIT served as their agent in the Georgia litigation.  (See, e.g., Grant Aff., Exh. L, ¶ 12; id., Exh. M at 2:13-15.)

29.     While their agent was challenging the validity of Yucaipa's Requisite Lender status, Plaintiffs were busy behind the scenes attempting to negotiate a deal with Yucaipa to sell Allied.  In March through May, 2011, Black Diamond attempted to broker a transaction whereby Allied would be sold as a whole or as part of an asset sale to a third party.  Black Diamond proposed to finance this acquisition. Over the course of approximately three months, Mr. Ehrlich sent me numerous proposals regarding this potential transaction, all of which relied on Yucaipa's ability to vote the majority of Allied's debt and exercise its Requisite Lender powers.  During these discussions, Plaintiffs never suggested they had any objection to or issue with Yucaipa being Requisite Lender or the Fourth Amendment's validity.  Indeed, Plaintiffs' plan recognized and depended on Yucaipa's Requisite Lender status to fulfill their own business objectives.

30.     Plaintiffs also participated in the Georgia litigation.  Both Black Diamond and Spectrum produced documents in response to subpoenas issued in the Georgia litigation; Mr.

11

Ehrlich was deposed as Black Diamond's Rule 30(b)(6) designee on May 4, 2011; and Spectrum was scheduled for a Rule 30(b)(6) deposition on May 18, 2011, but that deposition was postponed based on settlement discussions between Yucaipa and CIT, who Yucaipa understood to still be acting as Plaintiffs' agent. Black Diamond and Spectrum were both represented in the Georgia litigation by the same counsel who represent them in the above-styled case.

31.     Plaintiffs were fully aware that settlement negotiations were ongoing between Yucaipa, Allied and CIT from approximately May 2011 until December 2011. In fact, Mr. Ehrlich called me repeatedly for updates on the status of the discussions during those months. I understood Mr. Ehrlich's calls were to gauge Yucaipa's settlement posture. I understood he also was talking with his agent, CIT, throughout the settlement process. During Mr. Ehrlich's calls to me, he never complained about CIT's handling of the Georgia Action, never expressed that a settlement of the Georgia Action would not resolve the claims CIT brought in its representative capacity, never said that his or other Lenders' consent would be required to finalize the settlement, and never suggested that Yucaipa could not be Requisite Lender.

32.     During the time the Georgia litigation was pending, including during the six months when the parties were negotiating a settlement, Plaintiffs never informed Yucaipa that they had terminated their agency relationship with CIT. Similarly, CIT never suggested to Yucaipa that its agency relationship with Plaintiffs had terminated or that they were displeased with CIT's handling of the Georgia Action.

33.     On December 5, 2011, CIT, Yucaipa and Allied executed a Settlement Agreement to settle the Georgia litigation, and the parties filed Dismissals with Prejudice of all of their claims two days later. Upon information and belief, Plaintiffs became aware of the Settlement Agreement on December 5, 2011, when CIT posted it to an IntraLinks website that is available to

12

all of Allied's Lenders. Yucaipa intended for CIT to execute the Settlement Agreement and the Dismissals with Prejudice in both its representative capacity and in its individual capacity as a Lender, and Yucaipa understood that CIT did, in fact, act in both capacities in executing both documents. Yucaipa intended for several provisions of the Settlement Agreement to apply to CIT in its representative capacity. For example, Paragraph 10 of the Settlement Agreement clearly contemplated CIT acting in its representative capacity, as it states "CIT acknowledges that it recorded Yucaipa's first lien loans … on the Register (as defined in the Credit Agreement) and expressly recognizes the validity and enforceability of the Fourth Amendment." The Credit Agreement requires the Administrative Agent to record each loan on the Register. (Ehrlich Aff., Exh. 1, § 10.6(b).) Yucaipa intended that many other Settlement Agreement provisions would apply to CIT in its representative capacity. (See, e.g., Grant Aff., Exh. I, ¶ 13 (concerning circumstances under which CIT may resign as Administrative Agent and Collateral Agent and CIT's agreement not to exercise any remedies as Administrative Agent and Collateral Agent before it resigns without Yucaipa's written consent as Requisite Lender); id., ¶ 7 ("CIT in its capacity as agent or otherwise agrees to support any Restructuring [of Allied] to which Yucaipa consents" under certain enumerated conditions); id., ¶ 11 (concerning CIT's resolution of administrative issues in its representative capacity as Administrative and Collateral Agent); id., ¶ 14 (concerning CIT's "consent rights over the appointment of a replacement Administrative Agent and Collateral Agent").

34.     Paragraph 2 of the Settlement Agreement required CIT, Yucaipa and Allied to "dismiss their respective claims in the Action with prejudice upon the execution of this Agreement." (Id., ¶ 2). Yucaipa intended and understood that this Paragraph required CIT's dismissal, with prejudice, of all its claims including the entire declaratory judgment claim CIT

13

brought in its representative capacity. Accordingly, CIT "dismiss[ed] with prejudice the Verified Answer and Counterclaims and all claims it asserted in its Verified Answer and Counterclaims." (Grant Aff., Exh. F (emphasis added)). Yucaipa intended and understood that CIT's dismissal resolved with finality the declaratory judgment claim it brought in its representative capacity.

35. Plaintiffs learned about the Settlement Agreement on December 5, 2011, two days before CIT, Yucaipa and Allied filed their Dismissals with Prejudice. (Grant Aff., Exh. C at 11). Between December 5 and December 7, 2011, Plaintiffs did not inform or suggest in any way to Yucaipa or Allied that they objected to the settlement or the dismissal, or that they believed CIT entered the settlement and dismissal solely in its individual capacity. Allied and Yucaipa were in direct contact with CIT between December 5 and 7, 2011 and CIT did not inform Allied or Yucaipa that Black Diamond or Spectrum stated any objection regarding the settlement to CIT during that period.

36. Paragraph 1(d) of the Settlement Agreement states that the parties to the Settlement Agreement do not release any claims "belonging to any person or entity other than the Parties to this Agreement." I understood and intended that the sole and exclusive purposes of this language were to (a) preserve claims that third parties might have unrelated to the validity of either the Fourth Amendment or Yucaipa's status as Requisite Lender; (b) ensure that Allied was not inadvertently being released from its obligations under the Credit Documents, including, without limitation, its obligation to repay the loans at maturity; and (c) preserve claims that Allied's Lenders may have against CIT for any liability it might have as a result of its actions or inactions as Administrative or Collateral Agent, including without limitation its initial failure as Collateral Agent to properly perfect the Lenders' security interests in certain of the Allied collateral. The language was never intended to preserve claims that Lenders or their

14

representatives might have against Yucaipa with respect to the validity of the Fourth Amendment or its status as Requisite Lender, as those claims were brought in the counterclaim and settled by CIT in the Settlement Agreement in its representative capacity as agent for Allied's first lien Lenders and thereafter dismissed with prejudice by CIT in its representative capacity as agent for Allied's first lien Lenders under the Credit Agreement. Nor was the language in Paragraph 1(d) intended to somehow limit the scope of CIT's dismissal with prejudice or otherwise limit CIT's capacity to enter the Settlement Agreement and the Dismissals with Prejudice in its representative capacity. Yucaipa understood and intended that CIT's dismissal with prejudice of all of its claims in the Georgia litigation, including those it brought in its representative capacity regarding the validity of the Fourth Amendment and Yucaipa's Requisite Lender status, would thereby be resolved with finality and that no other Lender could assert those claims in the future.

37. Yucaipa has not affirmatively exercised any of its powers as Requisite Lender. This is consistent with prior Requisite Lenders' course of conduct. After Allied stated to the Lenders in August 2008 that Events of Default had occurred under the Credit Agreement, and even after Allied ceased making scheduled interest payments in May 2009 and ceased making scheduled amortization payments in July 2009, the Lenders never acted to enforce Lenders' remedies against Allied up to and including August 21, 2009, when Yucaipa first acquired its first-lien debt. During this year-long period, Allied did not expect the then-Requisite Lenders to enforce their remedies, as Allied operated without the protection of a forbearance agreement for all but two months of this time. Additionally, any Lender could have filed an involuntary bankruptcy proceeding against Allied at any time after August of 2008, but no Lender chose to do so until Plaintiffs filed their involuntary proceeding on May 17, 2012.

This 25th day of September, 2012.

_____
DEREX WALKER

Sworn to and subscribed before me
this 25th day of September, 2012.

_____
Notary Public

My commission expires: 1/13/2016

L. A. JOHNSON
Commission # 1963979
Notary Public - California
Los Angeles County
My Comm. Expires Jan 13, 2016

16