# Exhibit 146

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

CASE NO: 502009CA042921XXXXMB
CIVIL DIVISION: AI (Sasser)

T. MICHAEL RIGGS, INNOVATIVE
EQUITY PARTNERS, LLC and JACK
COOPER TRANSPORT COMPANY, INC.

Plaintiffs,
v.

COMVEST INVESTMENT PARTNERS III,
L.P., and COMVEST III PARTNERS, LLC,

Defendants,
_____/



13 MAR 25 AM 10:56 FILED
SHARON R. BOCK, CLERK
PALM BEACH COUNTY, FL
CIRCUIT PROBATE

## NOTICE OF FILING DEPOSITION

COMES NOW, Plaintiffs, T. MICHAEL RIGGS, INNOVATIVE EQUITY PARTNERS, LLC and JACK COOPER TRANSPORT COMPANY, INC. and hereby files the attached deposition transcript of Robert Priddy taken on February 27, 2013 in support of their Motion for Summary Judgment.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by electronic mail and regular US mail this 2\_\_ day of March, 2013 to: Robert W. Wilkins, Esq., JONES, FOSTER, ET AL., 505 S. Flagler Drive, Suite 1100, West Palm Beach, FL 33401 rwilkins@jonesfoster.com, mkieta@jonesfoster.com, sstubbs@jonesfoster.com, joconnor@jonesfoster.com, mmacfarlane@jonesfoster.com and Russell A. Williams, Esq. and Michael Sullivan, Esq., WOMBLE, CARLYLE, ET AL., Atlantic Station, 271 17th Street, NW, Suite 2400 Atlanta, GA 30363-1017 RWilliams@wcsr.com, MSullivan@wcsr.com.

BELL & MELAMED, LLC
Attorneys for Plaintiffs, *T. MICHAEL RIGGS, INNOVATIVE EQUITY PARTNER, LLC. and JACK COOPER TRANSPORT COMPANY, INC.*
4901 NW 17th Way, Suite 302
Ft. Lauderdale, FL 33309
T: 954-489-2331; F: 954-489-2332

JEFFREY M. BELL
Florida Bar No.: 374539
jbell@bellmelamedlaw.com

Δ π EXHIBIT 17
Deponent Comvest
Date 2/14 Rpt DDB
WWW.DEPOBOOK.COM

Miles E. Hoisington, Esq.
BBO #545814
9 Overhill Road
Providence, RI 02906
meh@hoisingtonlaw.com

Original Transcript

# In the Matter Of:

## RIGGS VS. COMVEST INVESTMENT

502009CA04921XXXX MB

## ROBERT PRIDDY

*February 27, 2013*



800.211.DEPO (3376)
EsquireSolutions.com

Page 1

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE No.502009CA04921XXXX MB
CIVIL DIVISION AI (Sasser)

T. MICHAEL RIGGS, INNOVATIVE
EQUITY PARTNERS, LLC and JACK
COOPER TRANSPORT COMPANY, INC.,

        Plaintiffs,
-vs-

COMVEST INVESTMENT PARTNERS III,
L.P., and COMVEST III PARTNERS, LLC.,

        Defendants.

---

DEPOSITION OF ROBERT PRIDDY

Wednesday, February 27th, 2013
9:43 - 3:25 p.m.

505 S. Flagler Drive, Suite 1100

West Palm Beach, Florida 33401

Reported By:
Teresa Whalen, RPR, FPR
Notary Public, State of Florida
West Palm Beach Office   Job #352512

Page 2

1   APPEARANCES:

2   Co-Counsel on behalf of the Plaintiffs

3       JEFFREY M. BELL, ESQUIRE
        BELL & MELAMED, LLC
4       4901 NW 17th Way, Suite 302
        Fort Lauderdale, Florida 33309
5       Phone: 954.489.2331

6

7   Co-Counsel on behalf of the Plaintiffs:

8       MILES E. HOISINGTON, ESQUIRE
        LAW OFFICE OF MILES E. HOISINGTON
9       442-L Horseneck Road
        Westport, Mass. 02790
10      Phone: 508.636.7363

11

12  General Counsel on behalf of the Plaintiffs:

13      THEO A. CIUPITU, ESQUIRE
        Jack Cooper Transport Holdings Corp.
14      630 W. Kennesaw Due West Road
        Kennesaw, Georgia 30152
15      Phone: 404.350.7934

16

17  On behalf of the Defendants:

18      ROBERT R. WILKINS, ESQUIRE
        JONES, FOSTER, JOHNSTON & STUBBS, P.A
19      505 South Flagler Drive, Suite 1100
        West Palm Beach, Florida 33401
20      Phone: 561.659.3000

21

22

23

24

25

Page 3

```
                       I N D E X


WITNESS:          DIRECT    CROSS   REDIRECT   RECROSS

ROBERT PRIDDY

BY MR. BELL:        4



                    E X H I B I T S



NUMBER                  DESCRIPTION              PAGE


DEPOSITION EX. 81      E-MAIL - 1/16/09           33
DEPOSITION EX. 82      E-MAIL STRING - 8/7/09    146
```

Page 86

1  memory is not...
2       But I don't think they had a real deal, they
3  were just sort of trying to get a lay of the land and,
4  you know, Burkle would like to work with you, blah,
5  blah, blah. But you know, I said we work with anybody,
6  all we want is money.
7       Q.  Right.
8       A.  And we've got the hammer and we're going to
9  bring it down on his head. So there was a lot of
10 posturing back and forth.
11      Q.  It seemed like the discussions kind of
12 switched back and forth between whether you might,
13 Comvest might partner with Burkle and Yucaipa to run
14 Allied, or that you would sell, Comvest would sell the
15 debt?
16      A.  Well, once we got engaged with Burkle, we then
17 had to question, because Burkle wanted nothing to do
18 with Riggs, he and Riggs had had some I guess run-ins,
19 it's long before I ever got involved; but he didn't like
20 Riggs and didn't want anything to do with him.
21      So, you know, the idea of putting them
22 together and having Riggs run them made a lot of sense
23 to us. Burkle would have none of that because he didn't
24 like Riggs, didn't hold Riggs in high esteem, shall we
25 say.

Page 87

1    He also said that the unions would never do
2    business with Riggs, you know. I also met one of the
3    union bosses to try and gauge whether we could find some
4    accommodation with the unions or not.
5        Q.   What did the union person say?
6        A.   First off, he was rather friendly. I mean, I
7    long ago learned union bosses are never your friend.
8    Okay? They may be friendly but they're never your
9    friend. But he was pretty friendly in the first call,
10   then after that it was like he wouldn't return my calls.
11   I found out later that Burkle had told him don't talk to
12   them. So that did show me that Burkle had some labor
13   clout. Not that I didn't know that, but he certainly
14   proved it to me with that go around.
15       Q.   And did that ultimately have any influence
16   with respect to Comvest's position with what it did in
17   August?
18       A.   The only -- it didn't have any direct
19   influence, other than it made me more concerned about
20   whether Burkle could really carry through on his threat
21   that if we wiped him out he would make sure that we
22   couldn't run the company, that he would have labor
23   unrest such that there would never be a company there to
24   run.
25       Q.   Did you or anyone from Comvest to your

Page 88

knowledge keep Riggs informed of what was going on with the discussions with Yucaipa?

A. Well, certainly when we were first off, we were strategizing with Riggs as to how to play Yucaipa, but once we engaged with Yucaipa and started looking at whether we should be going to put Yucaipa in bankruptcy and combine it with Allied -- Active -- or whether we should work with Burkle and have Allied be the -- and Allied had its own management team, a fellow named Gendreski (phonetic) or something like that, who I met with in Atlanta one time. He was a solid management guy, you know.

And so Burkle was saying, you know, look, let's partner together and we'll run Allied and we will control this industry, and I have the union. He had a preferential labor contract with the unions, which is what allowed him to be profitable while everybody else was falling by the wayside. And he said the contract is up for renewal, and in fact I can improve upon that in the next contract.

Well, in fact, the opposite happened, the union buddies weren't his buddies when it all came down, and his wage rates went up significantly. That's why, one of the reasons why he...

Q. A lot of hot air?

Page 96

1  thing we want to do is get pregnant in this business if
2  we aren't going have a real play to make, you know.  So
3  we ended up not engaging with Cooper and not getting
4  serious with him.  We did some due diligence, we spent
5  time and effort with them, but...
6      Q.   Comvest decided to walk away from that
7  potential?
8      A.   Correct.
9      Q.   And the reason again once more as to why
10 Comvest decided to walk away from it --
11     MR. WILKINS:  Object to the form.
12 BY MR. BELL:
13     Q.   -- what do you remember?
14     A.   There may have been a lot of reasons, but
15 basically it was a small play, and ultimately we didn't
16 want to be stuck holding just Cooper, because we had to
17 have the bigger piece put together of the puzzle.
18     Q.   And acquisition of Cooper wasn't part of why
19 you entered into the deal with Riggs in any way, was it?
20     A.   Correct.  Riggs didn't come to us and say
21 let's go buy Cooper and bring it with Active.
22     Q.   Right.  The topic of Cooper came up after the
23 fact?
24     A.   Yeah, yeah.  It was sort of noise in the deal,
25 if you will.  You've got to follow all your different

Page 97

1   leads, you never know where these things are going to
2   end up.
3       Q.   Riggs did though, bring the idea to you, to
4   Comvest, correct?
5       A.   I don't know whether it was Riggs, but somehow
6   we got in touch with Cooper, Mark did, and Mark
7   certainly spent time with Cooper.
8       Q.   Take a look at what's been marked as Exhibit
9   No. 20. This is couple of e-mails dated February 25th,
10  2009, there's one from you to Mark Hughes, and then
11  February 26th, 2009 from Mr. Hughes to you. Is that
12  correct?
13      A.   Yes.
14      Q.   Okay. In the first one from you to
15  Mark Hughes, you indicate why is Comvest waiting for
16  Burkle to allow you to visit with Allied management. Is
17  that right?
18      A.   Correct.
19      Q.   And you sound like you didn't feel like, we
20  didn't have to wait for Burkle for anything, right?
21      A.   Well, that was my thinking. Little did I know
22  that later on, because we did meet with -- not at this
23  time, but subsequently we did meet with the management
24  of Allied, and he was a pretty straightforward fellow.
25  But as we tried to get more involved with him, it was

Page 98

1  clear that Burkle had told him do not talk with Comvest
2  at all, and we never got any more replies from Allied
3  management.
4      This was ways down the road from this e-mail,
5  but Burkle controlled this deal in his mind, and he
6  wanted to make sure everybody understood that he was the
7  control guy.
8      Q.   Okay.  I had something else to ask you about
9  that one, but I wanted you to look at this exhibit
10 first.  This is No. 12, it's from Mike Riggs to
11 Mark Hughes dated February 25th, 2009.  This was the
12 same day that you wrote Priddy -- that you wrote Hughes,
13 and Hughes wrote you back on the 26th.  And Riggs is
14 telling Mark Hughes:
15      Just FYI, I now have Cooper financials, they
16      are grim.  And then he says down at the next
17      paragraph, I have been called into Cooper by the
18      owner and asked if I can personally give them a
19      plan to save them, so please keep this information
20      above confidential.
21      So it is your understanding that Riggs is
22 floating this idea by Mark Hughes that maybe we want to
23 take a look at Cooper?
24      A.   It certainly looks like that.
25      Q.   And then in the exhibit, the other one,

Page 99

1  Exhibit 20, is where Hughes is writing you and saying by
2  the way, the number two player in the industry, Cooper,
3  is on the verge of bankruptcy, it's a 200-million-plus
4  business with a very young fleet.
5       And so it looks like Hughes was now floating
6  this idea by you; would that be a fair assessment?
7       A.   Yeah.
8       Q.   But it was Riggs, it appears, who brought the
9  idea to Mark Hughes and then Mark brought it to you?
10      A.   I certainly don't doubt that.
11      Q.   Let me show you what's been marked Exhibit 43.
12 And this appears to be an e-mail dated March 6, 2009
13 from Mark Hughes to Robert Priddy; correct?
14      A.   Uh-huh.
15      Q.   Yes?
16      A.   Yes.
17      Q.   Hughes is going to Kansas City to meet with
18 the Cooper people is what the e-mail indicates.
19      A.   Yes.
20      Q.   And Hughes also says:
21           Incidentally, the president of Cooper told me
22           last night that, quote, they would rather watch
23           Cooper burn in flames than sell it to Yucaipa, end
24           quote.
25           Do you recall hearing that before?