**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ASHINC CORPORATION, *et al.*, | Case No. 12-11564 (CSS) |
| Debtors. | (Jointly Administered) |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET. AL., AS SUCCESSOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASHINC CORPORATION, AND ITS AFFILIATED DEBTORS, <br><br> Plaintiff, <br><br> BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., and SPECTRUM INVESTMENT PARTNERS, L.P., <br><br> Intervenors, <br><br> v. <br><br> YUCAIPA AMERICAN ALLIANCE FUND I, L.P., and YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., <br><br> Defendants. | Adv. Proc. No. 13-50530 (CSS) |

CATHERINE E. YOUNGMAN, LITIGATION
TRUSTEE FOR ASHINC CORPORATION, ET
AL., AS SUCCESSOR TO BDCM
OPPORTUNITY FUND II, LP, BLACK
DIAMOND CLO 2005-1 LTD., SPECTRUM
INVESTMENT PARTNERS, L.P., BLACK
DIAMOND COMMERCIAL FINANCE, L.L.C.,
as co-administrative agent, and SPECTRUM
COMMERCIAL FINANCE LLC, as co-
administrative agent,

               Plaintiff,

       v.

YUCAIPA AMERICAN ALLIANCE FUND I,
L.P., and YUCAIPA AMERICAN ALLIANCE
(PARALLEL) FUND I, L.P.,

             Defendants.

Adv. Proc. No. 14-50971 (CSS)

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendants Yucaipa American Alliance Fund I, L.P., and Yucaipa American Alliance

(Parallel) Fund I, L.P., (collectively "Yucaipa"), through their undersigned counsel, hereby

submit their Proposed Findings of Fact and Conclusions of Law following trial in the above-

captioned adversary proceedings.[1]

---

[1] Yucaipa does not consent to the entry of final orders or judgments by the Court to the extent that it is later
determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with
Article III of the United States Constitution.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

**PROPOSED FINDINGS OF FACT** ............................................................................... 7

I.      THE PARTIES ......................................................................................................... 7

    A.      The Debtors ................................................................................................... 7

    B.      Yucaipa. ........................................................................................................ 7

    C.      Black Diamond and Spectrum ("BD/S"). ................................................... 9

    D.      The Trustee. .................................................................................................. 9

II.     PROCEDURAL HISTORY ..................................................................................... 10

III.    ALLIED'S 2005 BANKRUPTCY AND YUCAIPA SPONSORSHIP OF THE
    EXIT PLAN. ............................................................................................................ 13

IV.     ALLIED'S FIRST AND SECOND LIEN CREDIT AGREEMENTS ........................ 14

V.      THE ALLIED BOARD'S CONSTITUTION AND INDEPENDENCE. ..................... 15

VI.     YUCAIPA TRIES TO HELP ALLIED THROUGH THE GREAT RECESSION. ....... 19

VII.    ALLIED DEFAULTS; LENDERS, INCLUDING BD/S, DO NOT EXERCISE
    REMEDIES. ............................................................................................................ 21

VIII.   WITH BLACK DIAMOND'S SUPPORT, YUCAIPA CONTINUES ITS
    EFFORTS TO REHABILITATE ALLIED. ............................................................... 22

IX.     BD/S APPROVE OF YUCAIPA'S ACTIONS AS REQUISITE LENDER. ............... 25

X.      YUCAIPA AND BD/S SEPARATELY NEGOTIATE WITH JCT FOR THE
    SALE OF ALLIED DEBT UNTIL BD/S ENDS THE NEGOTIATIONS AND
    FORCES ALLIED INTO BANKRUPTCY. ............................................................... 26

    A.      BD/S and JCT Initiate Discussions for JCT To Purchase Allied's First
        Lien Debt in Spring 2011 ............................................................................. 29

    B.      JCT Initiates Direct Negotiations With Yucaipa in December 2011 and
        Negotiates With Yucaipa and BD/S On Separate Tracks Until May 2012. ....... 33

i

XI.    BD/S FORCES ALLIED INTO AN INVOLUNTARY BANKRUPTCY PROCEEDING WITH ONLY A FEW DAYS' NOTICE. ............................ 42

XII.    YUCAIPA ATTEMPTS TO SALVAGE THE JCT NEGOTIATIONS. ....................... 48

XIII.    JCT BUYS ALLIED'S ASSETS IN DECEMBER 2013. ............................................. 49

XIV.    OVERVIEW OF TRUSTEE'S DAMAGES CLAIMS THROUGH THE EXPERT TESTIMONY OF JEFFREY RISIUS. ............................................. 50

    A.    Damages to Allied's Estate ..................................................... 52

        1.    Implied Enterprise Value From the December 19 Term Sheet ............... 52

        2.    Estimated Expenses ..................................................... 55

        3.    Assumed Benefit to Allied's Estate ........................................ 57

        4.    The December 19 Term Sheet Was Preliminary and Highly Conditional. ............................................................. 59

        5.    The December 19 Term Sheet Was Not Binding or Acceptable to Black Diamond. ....................................................... 62

        6.    The December 19 Term Sheet Was Superseded by Subsequent Term Sheets That Contemplated Lower Values. .................................. 63

        7.    Value of the Proposed JCT Note Consideration. .................................. 67

        8.    Losses Attributable to Allied's Bankruptcy ........................................ 69

        9.    Market Prices of Allied's First Lien Debt ............................................ 69

        10.    Mr. Risius Calculated Damages as of December 19, 2011 ...................... 70

    B.    Lender Damages ...................................................... 70

XV.    EXPERT TESTIMONY OF DANIEL R. FISCHEL REGARDING DAMAGES. ......... 72


**PROPOSED CONCLUSIONS OF LAW** ...................................................... 79

I.    JURISDICTION AND VENUE .................................................... 79

II.    LEGAL STANDARDS GOVERNING THE TRUSTEE'S CLAIMS ............................ 79

ii

A.      The Trustee Failed to Meet Her Burden On Damages In Connection With Estate Claim 7 and Lender Claim 3. ................................................................... 79

B.      Breach of Fiduciary Duty (Estate Claim 7). ....................................................... 91

    1.      Yucaipa's Fiduciary Duties To Allied Were Not Implicated In The Context Of The 2011-2012 JCT Negotiations. ........................................ 91

    2.      Even If Yucaipa's Fiduciary Duties To Allied Were Implicated In Connection With The JCT Negotiations, Yucaipa Did Not Breach Any Duty. ................................................................................................. 94

    3.      The Trustee Failed To Prove That Yucaipa Caused The JCT Negotiations To Fail. ............................................................................ 110

C.      The Trustee Has Not Established Liability Under BD/S's Breach of the Implied Covenant of Good Faith and Fair Dealing Claim (Lender Claim 3) .... 119

    1.      The Trustee Did Not Establish Liability Based On Yucaipa's Alleged Interference With The JCT Negotiations. ................................ 120

    2.      The Trustee Did Not Establish Liability Based On Allegations That Yucaipa Caused or Allowed Allied To Breach The FLCA. ........... 125

    3.      The Trustee Failed To Prove That Yucaipa Deprived The Lenders of The Benefits of The FLCA Through Any Conduct It Undertook As Requisite Lender. ............................................................................ 128

D.      Equitable Subordination Claim (Estate Claim 1; Lender Claim 1) ................... 130

CONCLUSION .................................................................................................................... 136

2137110.25
DOCS_LA:343415.1 96991/001

# TABLE OF AUTHORITIES

**Page**

## CASES

*1357 Tarrytown Road Auto, LLC v. Granite Properties, LLC*
142 A.D.3d 976 (2016) ................................................................. 120, 129

*Aronson v. Lewis*
473 A.2d 805 (Del. 1984) ......................................................................... 94

*Beach to Bay Real Est. Ctr. LLC v. Beach to Bay Realtors Inc.*
2017 WL 2928033, at *5 (Del. Ch. July 10, 2017) .................................... 91

*Brehm v. Eisner*
746 A.2d 244 (Del. 2000) ......................................................................... 94

*Broder v. Cablevision Systems Corp.*
418 F.3d 187 (2d Cir. 2005) .................................................................... 121

*Brushton-Moira Cent. School Dist. v. Fred H. Thomas Associates, P.C.*
91 N.Y.2d 256 (1998) .............................................................................. 127

*Cap. Sec. Sys. W.L.L. v. L-3 Commc'ns Sec. & Detection Sys., Inc.*
2018 WL 4666072, at *7 (S.D.N.Y. Sept. 28, 2018) ............................. 119, 121, 128

*Cede & Co. v. Technicolor, Inc.*
634 A.2d 345 (Del. 1993) ......................................................................... 94

*Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*
151 B.R. 327 (Bankr. D. Del. 1993) ........................................................ 133

*Cline v. Grelock*
2010 WL 761142, at *2, n. 11 (Del. Ch. Mar. 2, 2010) ............................. 81

*CSH Theatres, L.L.C. v. Nederlander of San Francisco Associates*
2018 WL 3646817, at *30 (Del. Ch. July 31, 2018) ........................... 2, 82, 110

*eCommerce Indus., Inc. v. MWA Intel., Inc.*
2013 WL 5621678, at *50 (Del. Ch. Sept. 30, 2013) ................................. 81

*Encite LLC v. Soni*
2011 WL 5920896, at *25 (Del. Ch. Nov. 28, 2011) ......................... 81, 82, 96

*Farmer v. Potteiger*
2012 WL 5398626, at *6 (M.D. Pa. Sept. 28, 2012) ................................ 124

iv

*Glick v. KF Pecksland LLC*
   2017 WL 5514360, at *19 (Del. Ch. Nov. 17, 2017) ..................................................... 81, 110

*In re 11 E. 36th LLC*, No. 13-11506 (RG)
   2014 WL 2903660, at *4 (Bankr. S.D.N.Y. June 26, 2014)................................................. 119

*In re Ashinc Corp.*
   629 B.R. 154 (Bankr. D. Del. 2021) ..................................................................................... 96

*In re Biogen '755 Pat. Litig.*
   2018 WL 3613162, at *2 (D.N.J. July 26, 2018)................................................................. 117

*In re Chelsea Therapeutics Int'l Ltd. Stockholders Litig.*
   2016 WL 3044721 at *1 (Del. Ch. May 20, 2016) .............................................................. 108

*In re Dollar Store Thrifty S'holder Litig.*
   14 A.3d 573 (Del. Ch. 2010)............................................................................................... 108

*In re Hechinger Inv. Co. of Delaware*
   280 B.R. 90 (D. Del. 2002).................................................................................................. 101

*In re Hechinger Investment Co. of Del.*
   327 B.R. 537 (D. Del. 2005).................................................................................................. 83

*In re HH Liquidation, LLC*
   590 B.R. 211 (Bankr. D. Del. 2018) ................................................................................ 81, 95

*In re Orchard Enters., Inc. S'holder Litig.*
   88 A.3d 1213 (Del. 2012) .................................................................................................... 108

*In re Prince*
   85 F.3d 314 (7th Cir.1996) .................................................................................................... 83

*In re Radnor Holdings Corp.*
   353 B.R. 820 (Bankr. D. Del. 2006) ..................................................................................... 81

*In re S & D Foods, Inc.*
   110 B.R. 34 (Bankr. D. Col. 1990) ..................................................................................... 135

*In re Tower Air, Inc.*
   416 F.3d 229 (3d Cir. 2005).................................................................................................. 95

*In re Tremont Sec. Law, State Law, & Ins. Litig.*
   No. 08–11117, 2013 WL 5393885, at *8 (S.D.N.Y. Sept. 26, 2013).................................... 119

*In re W. T. Grant Co.*
   4 B.R. 53 (Bankr. S.D.N.Y. 1980)....................................................................................... 135

2137110.25
DOCS_LA:343415.1 96991/001

*In re Walt Disney Co. Derivative Litig.*
  907 A.2d 693 (Del. Ch. 2005), aff'd, 906 A.2d 27 (Del. 2006) ................................ 94

*In re Winstar Communications, Inc.*
  554 F.3d 382 (3d Cir. 2009) ................................................................................... 133

*Jedwab v. MGM Grand Hotels, Inc.*
  509 A.2d 584 (Del. Ch. 1986) ........................................................................... 92, 93

*Kenford Co. v. Erie County*
  67 N.Y.S.2d 257 (1986) ......................................................................................... 126

*Knox v. Lion/Hendrix Cayman Ltd. (In re John Varvatos Enters.)*
  2021 U.S. Dist. LEXIS 171924, at *8 (D. Del. Sep. 10, 2021) ............................ 134

*Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*
  2014 WL 5192179, at *13 (Del. Ch. Oct. 10, 2014) ............................................... 81

*Lola Roberts Beauty Salon, Inc. v. Leading Ins. Group Ins. Co., Ltd.*
  160 A.D.3d 824 (2018) ........................................................................................... 126

*Macrophage Therapeutics, Inc. v. Goldberg*
  2021 WL 2582967, at *19 (Del. Ch. June 23, 2021) ............................................... 82

*Marine Midland Bank, N.A. v. Yoruk*
  242 A.D.2d 932 (N.Y. 1997) ................................................................................... 121

*Medek v. Medek*
  2009 WL 2005365, at *12 (Del. Ch. July 1, 2009) ................................................. 81

*Mendel v. Carroll*
  651 A.2d 297 (Del. Ch. 1994) ........................................................................... 92, 93

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*
  392 F.3d 520 (2d Cir. 2004) ................................................................................... 120

*Odyssey Partners, L.P. v. Fleming Cos.*
  735 A.2d 386 (Del. Ch. 1999) ................................................................. 4, 91, 93, 102

*OptimisCorp v. Waite*
  2015 WL 5147038, at *82 (Del. Ch. Aug. 26, 2015),
  aff'd, 137 A.3d 970 (Del. 2016) .............................................................................. 81

*Peloro v. United States*
  488 F.3d 163 (3d Cir. 2007) ................................................................................... 123

*Peltz v. Hatten*
   279 B.R. 710 (D. Del. 2002) ................................................................. 83

*Quadrant Structured Prod. Co. v. Vertin*
   102 A.3d 155 (Del. Ch. 2014) ................................................... 101, 108, 109

*Ravenswood Inv. Co., L.P. v. Est. of Winmill*
   2018 WL 1410860, at *23 (Del. Ch. Mar. 21, 2018) ................................... 81

*Ryan v. Tad's Enters., Inc.*
   709 A.2d 682 (Del. Ch. 1996), aff'd, 693 A.2d 1082 (Del. 1997) ........................... 95

*Shandler v. DLJ Merch. Banking, Inc.*
   2010 WL 2929654, at *16 (Del. Ch. July 26, 2010) ............................................. 109

*Shmueli v. Whitestar Dev. Corp.*
   148 A.D.3d 1814 (2017) ...................................................................... 128

*Siga Techs., Inc. v. PharmAthene, Inc.*
   132 A.D.3d 1108 (Del. 2015) ................................................................ 82

*Silvester v. Time Warner, Inc.*
   763 N.Y.S. 2d 912, aff'd, 14 A.D.3d 430 (2005) ................................... 121

*Solomon v. Pathe Commc'ns Corp.*
   1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), aff'd, 672 A.2d 35 (Del. 1996) ................ 91

*Thorpe by Castleman v. CERBCO, Inc.*
   676 A.2d 436 (Del. 1996) ................................................... 96, 110, 118

*United States v. Reynolds*
   715 F.2d 99 (3d Cir. 1983) ................................................... 97, 117

*VFB LLC v. Campbell Soup Co.*
   482 F.3d 624 (3d Cir. 2007) ................................................................ 83

*Walsh v. Quinn*
   359 Fed. Appx. 273 (3d Cir. 2009) ........................................... 123, 125

*Wayne L Ryan Revocable Trust v. Ryan*
   957 N.W.2d 481 (Neb. 2021) ................................................................ 90

*Yucaipa Am. Alliance Fund I, L.P. v. Ehrlich*
   204 F. Supp. 3d 765 (D. Del. 2016) ...................................................... 123

## STATUTES

11 U.S.C. § 363 .................................................................................................... 1

11 U.S.C. § 510(c) ............................................................................................. 130

11 U.S.C. § 510(c)(1) ........................................................................................ 130

28 U.S.C. § 1334 ................................................................................................. 79

28 U.S.C. § 1408 ................................................................................................. 79

28 U.S.C. § 1409 ................................................................................................. 79

28 U.S.C. § 157(c)(1) ........................................................................................... 1

## RULES

Fed. R. Bankr. P. 8007(e) ................................................................................... 95

Fed. R. Bankr. P. 9033 ........................................................................................ 11

Fed. R. Evid. 801(c) .................................................................................... 97, 118

Fed. R. of Evid. 702 ............................................................................................ 91

2137110.25
DOCS_LA:343415.1 96991/001

**INTRODUCTION**[1]

1.      Having reviewed the evidence and arguments in this case, the Court finds that the

Trustee's claims are premised on speculation and inferences that are unsupported by the weight

of the evidence and, in some instances, directly contradict it.  At trial, the Trustee asserted the

following three claims against Yucaipa: (1) breach of fiduciary duty (Estate Claim 7); (2) breach

of the implied covenant of good faith and fair dealing (Lender Claim 3); and equitable

subordination of Yucaipa's claims (Estate Claim 1, Lender Claim 1).  As the basis for each of

her claims, the Trustee alleges that, Yucaipa "squandered" a potential deal directly between

Allied and its competitor, Jack Cooper Transportation ("JCT"), whereby JCT would have paid

$244 million for Allied in 2011, as opposed to the $135 million JCT paid for some of Allied's

assets at a 2013 bankruptcy auction ("JCT 363 Sale").  The evidence at trial reflects a different

reality.

2.      During the December 2011 through May 2012 negotiations underlying the

Trustee's claims, JCT was negotiating with Allied's *lenders* for the purchase of Allied *debt* so

that it could purchase Allied's assets through a credit bid in a sale under 11 U.S.C. § 363 ("363

Sale").  JCT was not pursuing a deal directly with Allied.  Although the Trustee argued that this

structure—*i.e.*, a debt purchase followed by a 363 Sale, as opposed to a direct deal with Allied—

was adopted at the behest of Yucaipa, the Trustee presented no evidence at all, let alone a

preponderance of evidence, in support of this theory.  Instead, every witness directly involved in

the negotiations testified that this was *JCT's* strategy.  Indeed, the sole basis for the Trustee's

damages calculation, as articulated by her expert, Jeffery Risius, is a term sheet sent by JCT to

---

[1] Pursuant to 28 U.S.C. § 157(c)(1), this constitutes the Court's proposed findings of fact and conclusions of law.

1

Black Diamond on December 19, 2011 for the purchase of its *debt* (the "<u>December 19 Term Sheet</u>"). Based on this term sheet, Mr. Risius purports to extrapolate a $244 million enterprise value for Allied that he claims, without any corroborating evidence, JCT would have paid for Allied's assets in December 2011. This is so even though the December 19 Term Sheet was non-binding, preceded any due diligence, and was "not acceptable" to Black Diamond. That is, the Trustee's damages calculation is premised on a proposed deal that indisputably would not have closed and which reflects an entirely different deal than the one Yucaipa supposedly "squandered." The Court cannot award damages based on Mr. Risius' speculative calculation. In any event, the record is devoid of any evidence that Yucaipa interfered with any potential transaction with JCT and establishes instead that Yucaipa acted in good faith in the course of those negotiations. Based on the evidence at trial, any potential deal being negotiated at the time with JCT was frustrated not by Yucaipa, but by BD/S' unilateral decision to force Allied into bankruptcy in the midst of those negotiations.

3.     Mark Twain is widely credited with the famous quote: "Never let the truth get in the way of a good story." While this philosophy may make for good stories, it does not make for good justice. The Court cannot ignore the evidence at trial, which reveals a truth inconsistent with the Trustee's narrative. As the plaintiff in this case, the Trustee bears the burden of proof. She has failed to meet that burden and cannot recover on any of her claims for the following reasons, set forth in more detail below.

4.     ***Regardless of whether the Trustee has established a basis for liability against Yucaipa (she has not), the Trustee cannot recover anything more than nominal damages because she has failed to articulate a responsible estimate of damages.*** *See CSH Theatres, L.L.C. v. Nederlander of San Francisco Associates*, 2018 WL 3646817, at *30 (Del. Ch. July 31,

2

2018).  The Trustee's damages expert, Mr. Risius, calculated damages for each of the Trustee's

claims by assuming that Allied would have received approximately $240 million in cash

proceeds, after expenses, pursuant to the terms allegedly outlined in the preliminary and non-

binding December 19 Term Sheet.  Mr. Risius compares this amount to the net proceeds received

by Allied's lenders in the JCT 363 Sale in order to arrive at a damages figure of $158,596,000

for the Estate and $72,176,000 for the Lenders.  The Court concludes that Mr. Risius's

calculation of damages is materially flawed and wholly speculative for, at least, the following

reasons.

5.      _First_, Mr. Risius bases his opinion on the unreasonable assumption that the deal

reflected in the December 19 Term Sheet would have been consummated even though the

December 19 Term Sheet was preliminary, subject to numerous conditions that were never

satisfied, was superseded by multiple subsequent term sheets, and was unacceptable to BD/S.

_Second_, Mr. Risius's conclusion that JCT would have paid $244 million (_i.e._, the entire face

amount of Allied's first lien debt) for Allied in a 363 Sale is unreasonable and bears no relation

to the actual market trading prices of Allied's debt.  Mr. Risius admitted that he did not perform

a valuation of Allied, and instead relied on the December 19 Term Sheet for this determination.

The December 19 Term Sheet did not include an offer by JCT to pay $244 million for Allied—or

its debt for that matter.  And although Mr. Risius claimed that he was relying on other term

sheets together with the December 19 Term Sheet, there is not one term sheet or any

combination of term sheets in evidence that reflect a willingness by JCT to pay $244 million for

Allied or its first lien debt.  _Third_, Mr. Risius's conclusion that the Allied Estate would have

benefited at all had the December 19 Term Sheet been consummated is premised on the

unsubstantiated, and unrealistic, assumption that, after buying all of Allied's first lien debt, JCT

3

would have credit bid the full amount of that debt at a 363 Sale, thereby eliminating Allied's

indebtedness in that amount.  Mr. Risius further inflates the purported benefit to Allied's estate

by discounting his damages calculation only by the net proceeds that the *lenders* received from

the JCT 363 Sale rather than by the full amount that went to the *estate*.  *Fourth*, because a

majority of the consideration that JCT proposed to provide in the December 19 Term Sheet

would have gone directly to Yucaipa, Mr. Risius's analysis leads to the unreasonable conclusion

that Yucaipa is primarily liable for damages caused to itself.  *Fifth*, Mr. Risius failed to properly

discount his calculations by, among other things, a realistic amount of expenses and losses that

Allied would predictably incur from the bankruptcy case that JCT was requiring as part of any

deal.  *Sixth*, Mr. Risius calculated damages and interest as of December 19, 2011, as if all the

transactions contemplated in the December 19 Term Sheet would have been consummated on

that date.  In light of these, and other flaws in Mr. Risius's damages calculation, the Trustee

cannot recover damages in this case even if she were able to establish liability on the part of

Yucaipa under any of the claims asserted at trial.  In any event, the Trustee has not established

such liability.

      6.       ***Yucaipa is not liable for breach of fiduciary duty for at least three reasons***.

*First*, Yucaipa could not violate any fiduciary duties as a majority shareholder in connection with

the sale of *debt* to JCT because Yucaipa was negotiating in its capacity as a *lender* and it had no

obligation to sell its debt at any price.  *See Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d

386, 415 (Del. Ch. 1999) (controlling shareholder is not acting in a fiduciary capacity when

acting as a creditor).  *Second*, any fiduciary duty would have been owed by Yucaipa to *Allied*,

not to BD/S.  No evidence supports a claim that Yucaipa's negotiations with JCT breached any

duty to Allied.  The Trustee's theory that Yucaipa prevented a transaction directly between

4

Allied and JCT contradicts the evidence.  JCT insisted on purchasing debt from BD/S, CIT, and Yucaipa in late 2011 through May 2012.  Similarly, the Trustee's contention that Yucaipa prevented a transaction between JCT and Allied's lenders by demanding to be paid a premium on its debt is belied by the evidence.  Initially, JCT engaged the lenders in separate negotiations and Yucaipa was not aware of what JCT was proposing to the other lenders, so it could not have demanded a premium relative to these other lenders.  Further, Yucaipa was not situated similarly to the other lenders: among other things, JCT was demanding that Yucaipa also sell its second lien loans and use its equity control to cause Allied to file for bankruptcy and sell its assets to JCT.  Nevertheless, although Yucaipa owed no duty to Allied's other lenders, Yucaipa conditioned the sale of its debt to JCT on BD/S and CIT agreeing with JCT for the sale of their debt to JCT, thereby ensuring that only a deal acceptable to those other lenders would proceed.  *Third*, BD/S cannot recover based on the failed JCT negotiations because *BD/S themselves* caused this failure when they abruptly filed an involuntary bankruptcy petition against Allied.  The contention that BD/S was forced to end the negotiations because Yucaipa refused to agree to share the proceeds of any debt sale ratably with the other lenders is not supported by the evidence and appears to be a mere pretext designed to manufacture liability for Yucaipa where none otherwise exists.

7.        ***Yucaipa is not liable for breach of the implied covenant of good faith and fair dealing***.  The Trustee's claim for breach of the implied covenant of good faith and fair dealing (Lender Claim 3) is based on the same alleged interference with the JCT negotiations and fails for several reasons, including that no contract restricted Yucaipa's right to negotiate the sale of its debt to JCT.  The Trustee's other purported basis for that claim—namely, that Yucaipa caused Allied to breach the First Lien Credit Agreement ("FLCA")—fails because, among other things,

Yucaipa did not cause those breaches; Allied was in default of its covenants under the credit agreement since 2008, more than a year before Yucaipa ever claimed Requisite Lender status, and was never able to make the missed principal and interest payments regardless of any conduct by Yucaipa. Moreover, no lender, including BD/S, ever asked Yucaipa to exercise lender remedies after it became Requisite Lender. Instead, the evidence shows that BD/S were happy to receive the benefits of Yucaipa's actions as Requisite Lender and communicated their support. Moreover, damages is an essential element of this claim, and the Trustee does not allege and cannot establish any damages arising from this alleged breach.

8.      ***Subordination in any amount is not appropriate in this case***. The Trustee cannot recover on a theory of equitable subordination for several reasons, including that (a) the Trustee cannot prove that Yucaipa engaged in inequitable conduct in connection with the JCT negotiations or otherwise, (b) Yucaipa caused no harm to Allied or its creditors, and (c) subordination would be duplicative of damages sought (and in some cases awarded) against Yucaipa on the Trustee's other claims. Moreover, equitable subordination is an equitable remedy, and it would be entirely inequitable and punitive to subordinate Yucaipa's claims where any alleged harm was BD/S' own doing, and where BD/S has already been awarded multiple times the amount of their claims against Allied. Indeed, BD/S have already turned an investment of approximately $25.4 million to acquire Allied debt into approximately $154 million based, in large part, on the Court's prior summary judgment award in favor of the Trustee.

9.      For the foregoing reasons, the Court enters judgment in favor of Yucaipa and against the Trustee on Estate Claim 1, Lender Claim 1. The Court recommends entry of judgment in favor of Yucaipa and against the Trustee on Estate Claim 7 and Lender Claim 3.

2137110.25
DOCS_LA:343415.1 96991/001

**PROPOSED FINDINGS OF FACT**

I.   **THE PARTIES**

A.   **The Debtors.**

10.   ASHINC Corp. (formerly known as Allied Systems Holdings, Inc.) and related Debtors ("Allied" or the "Company") was a unionized automobile and truck hauling company that provided transportation services to automobile manufacturers in the United States.  (Stip. Fact ¶ 1; Ex. 586).

B.   **Yucaipa.**

11.   The Yucaipa Companies is a private equity firm founded by Ronald Burkle ("Burkle").  The specific defendants in these cases, Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (hereinafter, "Yucaipa"), are funds managed by Yucaipa American Alliance Fund I, LLC.

12.   Burkle, as the founder of the firm, oversees Yucaipa's investments and drives the big picture goals of the company.  [3/2/2022 p.m. Trial Tr. at 22:20-23:8] [Tochner Cross[2]].  Ira Tochner ("Tochner") is a senior partner at The Yucaipa Companies.  He has served on fifteen to twenty corporate boards in the time that he has worked at The Yucaipa Companies, including serving on the Allied Board of Directors (the "Board" or "Allied Board") during the time periods relevant to this case.  [3/2/2022 p.m. Trial Tr. at 21:3-7] [Tochner Cross]; [3/2/2022 a.m. Trial Tr. at 87:2-10] [Tochner Adverse Direct].  Tochner has never before this case been sued for

---

[2]   At trial, Yucaipa's counsel conducted its examinations of Tochner and Burkle immediately after the Trustee's adverse direct examinations of those witnesses.  As a result, the transcript refers to Yucaipa's examination of Tochner and Burkle as "cross-examination," when in fact those portions of the transcript contain both Yucaipa's direct and cross-examination.  For the purpose of these findings, the Court has labeled citations to the Trustee's examination of Tochner and Burkle as "Adverse Direct" and Yucaipa's examination of Tochner and Burkle as "Cross."

violating his fiduciary duties, and has never been threatened with such a lawsuit. [3/2/2022 p.m. Trial Tr. at 21:8-19] [Tochner Cross]. Similarly, Tochner testified that in his 30-year career at Yucaipa, he does not believe any Yucaipa representative serving as a board member of a portfolio company has ever been sued for violating fiduciary duties. [3/2/2022 p.m. Trial Tr. at 22:15-19] [Tochner Cross].

13.     Yucaipa is not in the business of lending. [3/2/2022 p.m. Trial Tr. at 19:14-23] [Tochner Cross]. Nor does Yucaipa ever invest in companies with the intention of liquidating them or taking them into bankruptcy. [3/3/2022 Trial Tr. at 55:15-20] [Burkle Cross]. Rather, for over 35 years, Yucaipa's business philosophy has been focused on rehabilitating and growing businesses to make them profitable. *See* [3/2/2022 p.m. Trial Tr. at 23:9-18] [Tochner Cross]. Yucaipa often uses its unique relationship with labor unions to help the businesses in which it invests. [3/3/2022 Trial Tr. at 59:12-18] [Burkle Cross]. Yucaipa's business philosophy is driven by its reputation of being a good partner, even in bad times. [3/2/2022 p.m. Trial Tr. at 23:19-25:2] [Tochner Cross].

14.     Yucaipa's investment strategy with respect to Allied included using Yucaipa's unique relationship with Allied's labor union to improve the company's union agreements, obtain certain wage concessions to increase Allied's liquidity, and obtain more favorable rates from Allied's customers (referred to in the industry as original equipment manufacturers ("OEMs")). [3/2/2022 p.m. Trial Tr. at 27:11-24] [Tochner Cross].

15.     The limited partners of the Yucaipa funds at issue are public and union pension funds. [3/2/2022 p.m. Trial Tr. at 26:11-13] [Tochner Cross].

2137110.25
DOCS_LA:343415.1 96991/001

C.    **Black Diamond and Spectrum ("BD/S").**

16.    BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD (collectively,

"Black Diamond") and Spectrum Investment Partners, L.P. ("Spectrum") (Black Diamond and

Spectrum, collectively, "BD/S") are investment firms that, among other things, regularly invest

in distressed debt. *See, e.g.*, [3/1/2022 p.m. Trial Tr. at 9:19-24] [Deckoff Cross]; *see also*

[3/2/2022 a.m. Trial Tr. at 41:16-23] [Harris Cross].  Black Diamond was founded and is run by

Stephen Deckoff ("Deckoff"), and Spectrum was founded and is run by Jeffrey Schaffer

("Schaffer").  [3/1/2022 a.m. Trial Tr. at 68:18-23] [Deckoff Direct]; (Dep. Tr. Schaffer at 44:25-

46:8).

17.    BD/S acquired a total of $10 million of Allied's $265 million first lien debt

facility upon Allied's exit from bankruptcy in 2007. *See* (Exs. 416, 481).  In 2011 and 2012,

BD/S purchased additional debt at a significant discount and increased their combined holdings

of Allied first lien debt to over $56 million. *See* (Exs. 417, 481).  These purchases were made

well after Allied defaulted under the FLCA, after the entry into the Fourth Amendment to the

FLCA ("Fourth Amendment"), after Yucaipa assumed the role of Requisite Lender, and, in some

cases, after the breakdown of the JCT negotiations at issue in this case.  [3/1/2022 p.m. Trial Tr.

at 30:19-31:4] [Deckoff Cross]; [3/1/2022 p.m. Trial Tr. at 31:22-25] [Deckoff Cross]; [3/1/2022

p.m. Trial Tr. at 32:23-33:20] [Deckoff Cross] ("Q. . . . So you're still buying debt, Black

Diamond is, after you put Allied in bankruptcy, true? A. Yes.").

D.    **The Trustee.**

18.    Plaintiff Catherine E. Youngman has acted as the Litigation Trustee ("Trustee")

under the terms of the Debtors' Chapter 11 Plan of Reorganization Proposed by the Debtors, the

Committee, and the First Lien Agents (the "Plan") (DX P) since December 2016.  (13-50530,

D.I. 994-1 ¶ 1).

9

19.     Under the Plan, the Trustee was selected by the Litigation Oversight Committee ("LOC"), which is comprised of three members.  Two of the three members of the LOC were selected by BD/S.  (13-50530, D.I. 994-1 ¶¶ 2-3).

20.     The Trustee must consult with, and obtain approval of, the LOC with respect to all material decisions regarding the prosecution of the "Litigation Claims" (as defined in the Plan), including (without limitation) the litigation strategy with respect thereto, and the filing and prosecution of any dispositive or other substantive motions or pleadings.  (13-50530, D.I. 994-1 ¶ 4).

21.     The Trustee's prosecution of the Litigation Claims is funded by affiliates of BD/S, who are the only Investors (as defined in the Plan), pursuant to the Investment Funding Agreement (DX O, Schedule 1.1) ("Funding Agreement").  (13-50530, D.I. 994-1 ¶¶ 7-8).  BD/S have committed to invest up to $15 million to fund the Trustee's prosecution of the Litigation Claims, all of which is to be fully reimbursed before excess recoveries are distributed in accordance with a waterfall provision set forth in the Plan.  (13-50530, D.I. 994-1 ¶¶ 9-11).

## II.     PROCEDURAL HISTORY.

22.     The Official Committee of Unsecured Creditors filed the case, bearing the Adv. No. 13-50530 on February 1, 2013, and filed an Amended Complaint on March 14, 2013 (the "Estate Claims").  (Stip. Fact ¶ 63; PX WW).  On November 19, 2014, BD/S filed the case bearing Adv. No. 14-50971 (the "Lender Claims").  (Stip. Fact ¶ 63; Ex. 207).

23.     Under the Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization dated December 3, 2015,[3] and Litigation Trust Agreement dated December 20,

---

[3]     12-11564, D.I. 3360-1 (Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee, and the First Lien Agents (the "Amended Plan").  *See also* 12-11564, D.I. 3383

2016 (Ex. 385), the Estate Claims and the Lender Claims are jointly prosecuted by the Trustee.[4] (Stip. Fact ¶ 64).

24.    Further procedural history is set forth in the parties' joint submission on July 25, 2019 (the "Joint Procedural History"),[5] which is incorporated herein.  (Stip. Fact ¶ 65).

25.    Subsequent to submission of the Joint Procedural History, the parties concluded fact and expert discovery, and each filed cross-motions seeking partial summary judgment. (Stip. Fact ¶ 66).

26.    On May 4, 2021, this Court issued an Opinion (the "Opinion") and Order granting in part and denying in part each party's motion for summary judgment and directing the parties to submit a Proposed Judgment reflecting the Court's rulings.[6]  (Stip. Fact ¶ 67).

27.    On May 18, 2021, Yucaipa filed an Objection to Proposed Findings of Fact and Conclusions of Law Pursuant to FRBP 9033 (the "Yucaipa Rule 9033 Objections")[7] and an Objection to Entry of Judgment and Additional Questions to the Proposed Form of Judgment and Additional Objections to the Proposed Form of Judgment Submitted by the Litigation Trustee; Request for Stay in the Alternative ("Entry of Judgment Objection").[8]  (Stip. Fact ¶ 68).  The

---

(Findings of Fact, Conclusions of Law, and Order Confirming the Plan) (the "Confirmation Order").  The Amended Plan became effective on December 20, 2016.  *See* 12-11564, D.I. 3744 (Notice of Effective Date).

[4]    Amended Plan § 5.13.  The Confirmation Order appointed the Trustee and Plan Administrator in these cases. *See* Confirmation Order ¶¶2 0, 22.  Thereafter, the Trustee was substituted as plaintiff in both above-captioned adversary actions.  *See* 13-50530, D.I. 415; 14-50971, D.I. 214.

[5]    *See* 13-50530, D.I. 599; 14-50971, D.I. 365.

[6]    13-50530, D.I. 825, 826; 14-50971, D.I. 563, 564.

[7]    13-50530, D.I. 828; 14-50971, D.I. 566.

[8]    13-50530, D.I. 830; 14-50971, D.I. 568.

Trustee objected to the Yucaipa Rule 9033 Objections and the Entry of Judgment Objection.[9]
(Stip. Fact ¶ 68).

28.    This Court entered Judgment, on June 23, 2021, awarding the Trustee damages in
the amount of $132,431,957 (inclusive of pre-judgment interest), plus post-judgment interest on
Estate Claim 5 (Breach of Contract), and Estate Claims 10, 11, and 13 (Fraudulent Transfers and
Disallowance of Claims) (the "Judgment").  (Stip. Fact ¶ 69).

29.    Yucaipa appealed the Judgment and moved for a stay of proceedings pursuant to
Bankruptcy Rule 8007(e) (the "Stay of Proceedings Motion").[10]  The Court denied the Stay of
Proceedings Motion.[11]  (Stip. Fact ¶ 70).

30.    On October 4, 2021, Yucaipa moved for withdrawal of the reference with respect
to the above-referenced Adversary Proceedings ("Motion to Withdraw").[12]  (Stip. Fact ¶ 71).
The Motion to Withdraw has been transmitted to the District Court and remains pending.[13]  (Stip.
Fact ¶ 71).

31.    On March 1-4, 7, and 17, 2022, trial proceedings took place before this Court on
the Trustee's remaining claims:  Breach of Fiduciary Duty (Estate Claim 7), Breach of the
Implied Covenant of Good Faith and Fair Dealing (Lender Claim 3), and Equitable
Subordination (Estate Claim 1; Lender Claim 1).

---

[9]      13-50530, D.I. 836, 14-50971, D.I. 574.

[10]     13-50530, D.I. 891; 14-50971, D.I. 626.

[11]     13-50530, D.I. 907; 14-50971, D.I. 642.

[12]     14-50971, D.I. 625.

[13]     Civil Action Nos. 1:21-cv-01649 and 1:21-cv-01650.

32.     The Trustee seeks to recover certain amounts on these claims to be distributed under a Litigation Proceeds Waterfall set forth in the Amended Plan.[14]  (Stip. Fact ¶ 72).

## III.    ALLIED'S 2005 BANKRUPTCY AND YUCAIPA SPONSORSHIP OF THE EXIT PLAN.

33.     On July 31, 2005, Allied filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia (the "2005 Bankruptcy").  (Stip. Fact ¶ 2; Ex. 586).

34.     On May 3, 2006, Yucaipa purchased the majority of Allied's debt for $81.6 million.  (Stip. Fact ¶ 3; Ex. 587).  Burkle testified that Jimmy Hoffa Jr., the head of the International Brotherhood of Teamsters ("Teamsters"), asked Yucaipa to buy Allied—a unionized company—because Yucaipa has a history, and has specialized in, working with complicated union issues. [3/3/2022 Trial Tr. at 12:15-25] [Burkle Adverse Direct].  He further testified that Yucaipa was specifically brought in on Allied because Allied's customers came from a special alliance between the automakers, the Teamsters, and the United Auto Workers and it was believed that Yucaipa's history working with unions could help Allied become profitable.  [3/3/2022 Trial Tr. at 17:19-18:1] [Burkle Adverse Direct].

35.     Yucaipa later financed Allied's purchase of used rigs and contributed to the payment of claims tendered by unsecured creditors who opted for cash in lieu of equity.  (Stip. Fact ¶ 4; Ex. 587).

36.     Allied emerged from the 2005 Bankruptcy in May 2007 under a Joint Plan of Reorganization sponsored by the Company, Yucaipa, and the Teamsters (the "Joint Plan").

---

[14]     *See* Amended Plan §§ 5.111(b), 5.14.

13

(Stip. Fact ¶ 5; Ex. 398).  The Georgia bankruptcy court approved the Joint Plan.  (Stip. Fact ¶ 5).

37.    Under the Joint Plan, Yucaipa converted its debt into approximately 67% of Allied's new equity, and Yucaipa was granted certain governance rights in the Company under the Joint Plan, including the right to appoint three members to the Allied Board.  (Stip. Fact ¶ 6; Ex. 398 at §7.2; Ex. 587); [3/2/2022 p.m. Trial Tr. at 26:20-27:10; 29:4-9] [Tochner Cross]. BD/S purchased all of its Allied debt after confirmation of this Joint Plan, and with the knowledge and understanding of the rights Yucaipa held vis-a-vis Allied and the Board.  *See* (Exs. 416, 417, 481); *see also* (Dep. Tr. Schaffer at 519:23-520:4) (testifying that Spectrum bought debt in Allied with the understanding that Yucaipa had the right to appoint directors under the Joint Plan).

38.    Allied's Amended Certificate of Incorporation ("COI") is dated May 29, 2007. (Stip. Fact ¶ 7; DX OO*).[15]  The COI states, among other things:  "A director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director . . . ."  (DX OO* at 10).

## IV.    ALLIED'S FIRST AND SECOND LIEN CREDIT AGREEMENTS.

39.    To finance its exit from the 2005 Bankruptcy, Allied entered into a two-tiered financing structure with various lenders (the "Lenders") comprising $265 million in first lien debt, governed by the FLCA, and $50 million in second lien debt, governed by a Second Lien Credit Agreement ("SLCA").  (Stip. Fact ¶ 10).

---

[15]    Exhibits marked with an asterisk are being introduced by Yucaipa pursuant to the parties' Stipulation Concerning the Authenticity and Admission of Documents and Disclosure of Settlement Information Under Seal at Trial, dated February 11, 2022 (the "Stipulation").  (13-50530, D.I. 936).  The Stipulation permits Yucaipa to introduce into evidence such exhibits without the need for authentication, as they were produced by the non-offering Party.

14

40.     The first lien facility included three types of debt: (1) $180 million in term loans ("Term Loans"), (2) a $35 million revolving credit facility from the CIT Group/Business Credit, Inc. ("CIT" or the "Agent"), and (3) $50 million in letter of credit commitments ("LC Commitments").  (Stip. Fact ¶ 11).  The FLCA and SLCA were secured by a pledge of Allied assets, and both contained fixed interest rates.  (Stip. Fact ¶ 11).

41.     As initially executed, the FLCA barred Yucaipa from being an "Eligible Assignee."  [Stip. Fact ¶ 12].  The SLCA contained a similar provision.  (Stip. Fact ¶ 12).

## V.     THE ALLIED BOARD'S CONSTITUTION AND INDEPENDENCE.

42.     From June 2007 through December 2013, Yucaipa-affiliated directors held three of the five director positions on Allied's Board.  (Stip. Fact ¶ 8).  The two Yucaipa-affiliated Board members who testified at trial—Derex Walker ("Walker") by deposition and Tochner as a live witness—testified that, when acting as Board members they operated independently of their roles as Yucaipa partners, and that they neither asked for nor needed Burkle's approval for decisions they made as Board members.  *See* [3/2/2022 a.m. Trial Tr. at 104:16-105:3] [Tochner Adverse Direct]; [3/2/2022 p.m. Trial Tr. at 16:15-17:6] [Tochner Adverse Direct]; (Dep. Tr. Walker at 280:1-4, 280:6-7, 280:17-23, 281:22-282:2) (testifying that Burkle's sign-off was not relevant to his thinking as a director of Allied and that he did not look to Burkle for his approval in carrying out his duties as a director).

43.     The Trustee did not present evidence sufficient to support a finding to the contrary.  The evidence shows that Burkle's involvement was limited to advising Allied regarding its relationship with the unions and OEMs and helping Allied manage those relationships through Burkle's unique connections and reputation among those parties.  *See* [3/3/2022 Trial Tr. at 31:25-33:15] [Burkle Adverse Direct]; [3/2/2022 p.m. Trial Tr. at

15

15:15-16:3; 16:11-17:6] [Tochner Adverse Direct] (testifying that he would seek Burkle's

opinion on certain topics pertaining to Allied, but Burkle was not a Board member, did not have

a say in Board decisions, and certainly did not have the final say).  The evidence further

established that Burkle provided these services free of charge to Allied.  *See* [3/3/2022 Trial Tr.

at 55:18-60:7] [Burkle Cross]; (Dep. Tr. Walker at 625:8-16; 625:18-20).

44.    Mark Gendregske ("Gendregske") served as Allied's Chief Executive Officer and

a director on Allied's Board from June 2007 through the sale of Allied's assets in December

2013 in the JCT 363 Sale.  (Stip. Fact ¶ 9).  Gendregske was recruited for the position of CEO by

an independent recruiting firm, was one of several candidates interviewed, and was approved for

the position by the Teamsters.  *See* (Dep. Tr. Gendregske at 71:8-11; 71:16-19); (Dep. Tr.

Gendregske at 111:18-22; 112:1-4) (testifying that the Teamsters approved his hiring); (Dep. Tr.

Walker at 243:15-244:9) (testifying that there were several candidates who were interviewed for

the CEO position); (Dep. Tr. Walker at 247:3-7) (testifying that when he interviewed

Gendregske it was the first time he met him).  In Gendregske's view, he was hired for the

position by the Teamsters, not Yucaipa.  (Dep. Tr. Gendregske at 111:18-22; 112:1-4).

45.    Brian Cullen ("Cullen") served on the Allied Board from spring 2007 through the

end of 2013.  (Dep. Tr. Cullen at 30:14-17).  In March 2008, Cullen and Gendregske were

selected as members of a special committee of the Board determined to be independent from

Yucaipa.  (Ex. 284 at 2, 5-7).

46.    Although the Trustee accused the Board, and in particular Gendregske, of serving

"at Yucaipa's pleasure" and alleged that Yucaipa prevented the Board from pursuing

restructuring transactions that would eliminate Yucaipa's controlling position at Allied, these

allegations were not substantiated by the evidence at trial.  Gendregske testified that he, not

16

Yucaipa, controlled the decisions at Allied, and the Trustee offered no contrary testimony from any witness involved in Allied's governance.  (Dep. Tr. Gendregske at 270:7-9, 270:11-16) ("Q. What about concerns about Yucaipa micromanaging management, was that a concern held by others to your knowledge? A. No. I mean, I ran the company. I ran the company. I never had Yucaipa over my back telling me, Hey, you need to put these trucks here. You need to go after this customer. You need to do that. I don't ever remember that happening with me. I ran the company."); *see also* (Dep. Tr. Cullen at 44:2-5, 44:7-10) (testifying that it was not his understanding that Gendregske served at Yucaipa's pleasure).  Burkle testified that it is contrary to his business philosophy to interfere with a portfolio company's management.  *See* [3/3/2022 Trial Tr. at 29:7-31:21] [Burkle Adverse Direct] (testifying that Allied's CEO did not have to run things by him for approval; "you can't have a great CEO if you are second-guessing them" (30:3-5); and "good people don't come to work for you if you're going to tell them what to do" (31:7-8)).

47.    Gendregske testified that he constantly searched for strategic combinations and restructurings to help Allied's financial situation.  (Dep. Tr. Gendregske at 208:10-209:10); (Dep. Tr. Gendregske 212:4-212:6, 212:10-213:12, 213:21-214:8).  Allied's general counsel, John Blount, was also involved in numerous conversations concerning potential business combinations of Allied with JCT over the years.  (Dep. Tr. Blount at 12:3-10).

48.    Walker, a former Yucaipa partner and the Chairman of the Allied Board at all times relevant to this matter, and Gendregske spoke often about potential M&A transactions for Allied during their time serving together on the Allied Board.  (Walker Dep. Tr. at 714:19-715:4).

17

49.     Tochner recalled that the Board considered all possibilities in assessing restructuring options for Allied.  [3/2/2022 p.m. Trial Tr. at 35:18-36:8] [Tochner Cross].  He explained that during his time on the Board, "[w]e probably talked to three or four other big firms to either merge with or sell. So any of the opportunities or alternatives that were available to us, we, of course, looked at."  [3/2/2022 p.m. Trial Tr. at 35:18-36:2] [Tochner Cross].  Among those possibilities, Tochner recalled that Allied engaged in discussions with a potential buyer to sell Axis, a subsidiary of Allied, in May 2011.  *See* (DX MM); [3/2/2022 p.m. Trial Tr. at 37:14-25] [Tochner Cross].  Tochner also recalled that the Board considered a transaction with United Roads around the same period of time.  *See* (DX RR); [3/2/2022 p.m. Trial Tr. at 38:1-11] [Tochner Cross].

50.     With respect to JCT specifically, the evidence shows that the Allied Board engaged in ongoing efforts to reach a deal to restructure Allied with JCT at various points in time.  (Dep. Tr. Walker at 668:19-669:11).  Gendregske testified that he explored potential deals with JCT from the time that Michael Riggs ("Riggs"), JCT's Chief Executive Officer, first bought JCT in 2009 and that he had numerous meetings with Riggs to discuss the concept.  (Dep. Tr. Gendregske at 210:4-210:19; 214:12-216:3).  At times, Riggs was not interested in Allied and Gendregske would try to sell *him* on the idea.  (Dep. Tr. Gendregske at 217:5-21).

51.     Although the Trustee alleges that Yucaipa prevented direct restructuring discussions between JCT and Allied, the evidence does not support such an inference.  The Trustee points to a July 2010 Letter of Intent from JCT to purchase Allied (the "2010 LOI") as evidence that Yucaipa interfered in Allied's negotiations with JCT.  However, the Board together with its advisors considered the 2010 LOI and let it lapse.  *See* (Ex. 105); (PX Q); [3/2/2022 p.m. Trial Tr. at 44:11-21] [Tochner Cross]; [3/3/2022 Trial Tr. at 77:1-78:21] [Burkle Cross]

18

(testifying that he did not tell Allied's Board to reject the proposal, does not believe he had any interactions with Allied's Board about the proposal, and that the Allied Board would have received advice from multiple advisors in making the decision not to accept or further negotiate the deal). The Board determined that the offer was economically unreasonable and suspected that it was a tactic to affect the settlement of ongoing litigation between Allied and Riggs. *See* (PX Q); [3/2/2022 p.m. Trial Tr. at 44:11-21] [Tochner Cross]; *see also* (Dep. Tr. Gendregske at 306:22-307:19) (explaining his belief that the purpose of the 2010 JCT proposal was to obtain Allied's confidential information in order to do it harm in the marketplace). Burkle testified that the proposal was also not credible because it purported to be sent at the request of the Teamsters, who disliked Riggs. [3/3/2022 Trial Tr. at 77:1-78:14] [Burkle Cross]. The proposal also failed to specify how JCT would pay for Allied, and would allow Riggs to propose price increases to Allied's customers before a transaction was ever consummated. [3/3/2022 Trial Tr. at 77:1-78:14] [Burkle Cross].

52.     The evidence at trial also demonstrated that the Allied Board was kept informed and, when appropriate, became involved in the negotiations between its lenders and JCT in late 2011-2012. (Dep. Tr. Walker at 672:19-22, 672:24-673:17, 673:21-25, 674:3-6, 674:8-10, 674:12-13, 674:16-675:3); (Dep. Tr. Walker at 688:10-12, 688:17-689:10; 694:7-9, 694:11-18, 694:20-22) (testifying that Gendregske and Cullen participated in a meeting and discussions in March 2012 to finalize the sale of Yucaipa's Allied debt to JCT.)

## VI.     **YUCAIPA TRIES TO HELP ALLIED THROUGH THE GREAT RECESSION.**

53.     By December 2007, the Great Recession had begun, which significantly impacted the automotive industry. As a result, car hauling businesses like Allied were struggling. [3/1/2022 p.m. Trial Tr. at 19:24-20:1; 20:7-18] [Deckoff Cross]. One such company (and

19

Allied competitor), Performance Transportation Services ("PTS"), went into bankruptcy and was liquidated. Prior to PTS' bankruptcy and liquidation, Yucaipa and Black Diamond were both investors in PTS and Black Diamond was a lender. Shortly before the bankruptcy, Black Diamond became requisite lender. As a result of PTS' bankruptcy and liquidation, PTS lost nearly all of its value. [3/1/2022 p.m. Trial Tr. at 20:16-24; 21:18-21] [Deckoff Cross]; *see also* [3/3/2022 Trial Tr. at 16:17-23] [Burkle Adverse Direct] (testifying that he wanted to remind Deckoff about PTS' liquidation and how it was "a complete wipe out"); [3/3/2022 Trial Tr. at 52:6-8] [Burkle Adverse Direct] (testifying that Black Diamond recovered less than 10 cents on the dollar on its $76 million position in PTS); [3/3/2022 Trial Tr. at 52:23-53:4] [Burkle Adverse Direct]; (Dep. Tr. Riggs at 64:8-21, 64:23-65:7) (testifying that Black Diamond was not someone he wanted in a capital structure because it put PTS into liquidation, while calling PTS' liquidation "the legendary worst-case scenario from a customer standpoint").

54.     In mid-2008, hoping to avoid a similar fate for Allied and its stakeholders, Yucaipa agreed to invest additional funds in Allied by buying Allied debt and converting it into equity. [3/3/2022 Trial Tr. at 15:13-17] [Burkle Adverse Direct]; [3/3/2022 Trial Tr. at 66:7-14] [Burkle Cross]. To that end, Allied and its lenders entered into a Third Amendment to the FLCA and a Third Amendment to the SLCA ("Third Amendment") in April 2008. (Stip. Fact ¶ 14; Exs. 136, 343).

55.     Pursuant to the Third Amendment, Yucaipa purchased $40 million of second lien debt in May 2008, and voluntarily converted $20 million of that debt into equity in Allied in order to de-leverage Allied and avoid a going concern qualification from Allied's auditors. *See* (Stip. Fact ¶ 15); *see also* (Dep. Tr. Walker 159:11-16); (Ex. 136); (Ex. 343); (Ex. 615); [3/3/2022 Trial Tr. at 15:13-17] [Burkle Adverse Direct]; [3/3/2022 Trial Tr. at 66:7-14] [Burkle

Cross].  Yucaipa believed its purchase of Allied debt under the Third Amendment and subsequent $20 million contribution would enable Allied to survive through the poor economic conditions of the Great Recession.  [3/3/2022 Trial Tr. at 66:4-17] [Burkle Cross].  As Burkle testified at trial, Yucaipa's belief at the time was that if it could carry Allied through the economic downturn, automobile sales would recover, and Allied would become profitable for the benefit of all its stakeholders. [3/3/2022 Trial Tr. at 15:13-17] [Burkle Adverse Direct]; [3/3/2022 Trial Tr. at 66:7-14] [Burkle Cross].

## VII.  ALLIED DEFAULTS; LENDERS, INCLUDING BD/S, DO NOT EXERCISE REMEDIES.

56.     In the midst of the Great Recession, and despite Yucaipa's $20 million investment pursuant to the Third Amendment, Allied continued to struggle financially.  On August 15, 2008, Allied notified its first lien lenders that it was in default under the FLCA.  (Stip. Fact ¶ 16, Ex. 149).

57.     The first lien lenders chose not to exercise remedies, and instead entered into a forbearance agreement, which was later renewed and extended.  (Exs. 152, 158).  After the forbearance period expired in November 2008, the lenders, including BD/S, chose not to exercise remedies against Allied.  *See* (Exs. 152, 158); *see also* (Dep. Tr. Cullen at 184:18-185:5).  There is no evidence in the record that any lender, including BD/S, ever instructed the Agent or asked the Requisite Lender/s to exercise remedies at any time prior to the involuntary bankruptcy petition filed by BD/S on May 17, 2012.  *See* [3/1/2022 p.m. Trial Tr. at 194:2-10] [Deckoff Cross] (testifying that he does not know whether any first lien lender, including BD/S ever asked the Requisite Lender or Yucaipa to exercise remedies after the forbearance period ended); (Dep. Tr. Schaffer at 238:18-20, 238:22-239:6); *see also* (Ex. 150); (Dep. Tr. Schaffer at 165:14-16;

165:19-22; 167:23-168:14; 169:11-16) (testifying that he does not believe the lenders exercised

remedies as of September 2008).

58.    To the contrary, in December 2008, a group of lenders (including BD/S) directed

CIT not to exercise remedies after CIT attempted unilaterally to "sweep" Allied's cash deposits.

(Ex. 199); (Dep. Tr. Schaffer at 235:22-236:7; 236:13-15) ("It appears we are asking them not to

accelerate or purport to accelerate any obligation under the credit agreement –"); (Dep. Tr.

Schaffer at 237:14-18).

59.    Allied remained in default under the FLCA through consummation of the JCT

363 Sale in late December 2013.  (Stip. Fact ¶ 16).

## VIII.    WITH BLACK DIAMOND'S SUPPORT, YUCAIPA CONTINUES ITS EFFORTS TO REHABILITATE ALLIED.

60.    On or about February 19, 2009, ComVest Investment Partners ("ComVest")

acquired approximately 54% of the Company's first lien debt and became the Requisite Lender

under the FLCA.  (Stip. Fact ¶ 17; Ex. 46*).  ComVest's acquisition of Requisite Lender status

caused Allied's customers to question Allied's continued viability and Yucaipa became

concerned about the growing potential that Allied would be liquidated in bankruptcy, depleting

all value for its stakeholders.  (Dep. Tr. Davies at 40:7-41:4); (Dep. Tr. Cullen at 324:7-22,

324:24-325:18, 325:21-22).

61.    In mid-2009, Yucaipa was considering taking over ComVest's position and

implementing a plan to rehabilitate Allied.  Before Yucaipa proceeded with its plans, Burkle

insisted on obtaining Black Diamond's approval.  [3/3/2022 Trial Tr. at 66:18-67:15] [Burkle

Cross] ("I would not have made the investment if I didn't believe that Steve [Deckoff] was going

to support us."). On August 18, 2009, Burkle and Walker of Yucaipa met with Deckoff in the Yucaipa offices. Deckoff and Burkle both testified about this meeting at trial.

62.     Burkle testified that during this meeting he had a conversation with Deckoff to let him know what Yucaipa was planning to do. [3/3/2022 Trial Tr. at 66:18-21] [Burkle Cross]. He explained to Deckoff that ComVest was threatening to push Allied into bankruptcy and causing its customers to doubt the viability of the Company going forward. *See* [3/3/2022 Trial Tr. at 14:15-15:5] [Burkle Adverse Direct]. Knowing Deckoff experienced a similar problem when PTS went into bankruptcy and lost all of its value, Burkle wanted to stress to Deckoff that this was a similar situation and propose a solution to avoid the same outcome. *See* [3/3/2022 Trial Tr. at 13:15-14:8] [Burkle Adverse Direct]. To solve the problem, he proposed to Deckoff that Yucaipa would buy ComVest out so they could keep Allied alive through the recession, convince its customers that it was viable going forward, and negotiate with customers and the unions to put Allied in the best position to weather the storm of the Great Recession while the economy recovered. *See* [3/3/2022 Trial Tr. at 12:1-18:6] [Burkle Adverse Direct].

63.     Burkle explained that the whole purpose of the meeting was to get Deckoff's approval and to know Yucaipa and Black Diamond were moving forward as partners. Burkle further explained that he knew Deckoff had a reputation for being aggressive with Black Diamond's investments and he wanted to ensure that Yucaipa would not spend tens of millions of dollars to solve one problem only to create a new problem with Black Diamond. [3/3/2022 Trial Tr. at 74:2-17] [Burkle Cross]. Burkle was clear in his testimony that Yucaipa would not have bought the debt had Deckoff suggested in any way that he did not support it. [3/3/2022 Trial Tr. at 74:14-25] [Burkle Cross]. Burkle also testified, in no uncertain terms, that Deckoff voiced his support for the plan that Burkle proposed. [3/3/2022 Trial Tr. at 67:16-18] [Burkle

23

Cross] ("Q.  And did he tell you he was going to support you?  A.  He told me over and over and over he was going to support us.").

64.    Deckoff, on the other hand, testified generally that he met with Burkle at this time because he was concerned about the viability of the Company given its ongoing defaults and the deals that it had in place with the labor union and the customers.  *See* [3/1/2022 p.m. Trial Tr. at 67:14-68:1] [Deckoff Cross].  He remembered that Burkle proposed a strategy to resolve Allied's issues and that he thought the strategy was logical.  [3/1/2022 p.m. Trial Tr. at 65:21-66:4] [Deckoff Cross].  When asked whether Burkle's strategy involved purchasing ComVest's Requisite Lender position, Deckoff did not deny that the conversation took place.  [3/1/2022 p.m. Trial Tr. at 67:9-68:12] [Burkle Cross].  Instead, he testified that he did not remember discussing the ComVest debt in that meeting and did not remember whether he knew during that meeting that Yucaipa planned to buy the ComVest debt.  [3/1/2022 p.m. Trial Tr. at 67:9-68:12] [Deckoff Cross].  The Court finds Burkle's specific recollection more reliable than Deckoff's lack thereof.

65.    Unaware of any objection by any first lien lenders, Yucaipa purchased ComVest's $145.1 million (principal face amount) of first lien Allied debt for approximately $43 million (the "Yucaipa-ComVest Transaction").  (Stip. Fact ¶ 18).  A Fourth Amendment to the FLCA was entered into on the same day.  (Stip. Fact ¶ 18; Exs. 408, 26, 25).  The Court previously held the Fourth Amendment was invalid *ab initio*, which resulted in Yucaipa being in breach of the Third Amendment because "[b]y August 31, 2009, Allied should have received $57.4 million in cash or $57.4 million of debt it owed to Yucaipa should have been extinguished."  (13-50530, D.I. 825 at 30).  Damages arising out of this breach have already been awarded in full by this Court in its June 23, 2021 Judgment.  (Stip. Fact ¶ 69).

24

## IX.    BD/S APPROVE OF YUCAIPA'S ACTIONS AS REQUISITE LENDER.

66.    Although in this case BD/S claim that they were damaged by conduct undertaken by Yucaipa after it assumed the role of Requisite Lender, the evidence at trial was to the contrary.  For example, in December 2011, Yucaipa (acting as Requisite Lender) instructed CIT to release $16,928,474.40 in LC Commitments, which resulted in each first lien lender receiving their pro rata share of these released funds.  *See* (Ex. 198 at 15 (§ 16)); *see also* (Dep. Tr. Aliberto at 608:8-609:14).  For BD/S specifically, this resulted in a payment of $4.8 million.  *See* (Exs. 416, 417, 481) (providing the amount of BD/S' debt holdings at the time to calculate its pro rata recovery).

67.    Evidence at trial also established that BD/S viewed Yucaipa's conduct while it was acting as Requisite Lender as beneficial to the lenders.  For example, in a December 2009 audit memo, Spectrum stated: "it is Spectrum's belief that the Sponsor [i.e. Yucaipa] is operating in good faith to add value to the company."  (Ex. 249 at 2).  And, again, in May 2010 Spectrum stated, in an internal valuation memo: "[i]t is our belief that Yucaipa will be able to extract value from the first lien in order to protect this investment and we will benefit from that."  (Ex. 251 at 6).

68.    Black Diamond similarly expressed its approval of Yucaipa's actions.  Burkle testified that after the Yucaipa-ComVest Transaction in August 2009, "[e]very time [Deckoff and I] talked, he thanked me.  Every time we talked, he made positive comments.  And on I think at least two occasions he wrote me an email."  [3/3/2022 Trial Tr. at 75:1-6] [Burkle Cross].  In 2011, after Deckoff met with Burkle to discuss Yucaipa's strategy for Allied, Deckoff emailed Burkle: "[o]n Allied, the strategy you outlined seemed right and you have our support.  If there is anything we can do to help let me know."  (Ex. 656).  In his email, he also followed up on

25

certain bank or casino deals that he and Burkle discussed working on together, indicating that he was interested in doing more business with Yucaipa.  *See* (Ex. 656); *see also* [3/1/2022 p.m. Trial Tr. at 89:14-25] [Deckoff Cross].

69.    BD/S also continued to increase their Allied debt holdings after Yucaipa became Requisite Lender.  Through June 2012, BD/S purchased debt at discounted prices and increased their combined holdings of Allied first lien debt to over $56 million.  *See* (Exs. 417, 481).

## X.    YUCAIPA AND BD/S SEPARATELY NEGOTIATE WITH JCT FOR THE SALE OF ALLIED DEBT UNTIL BD/S ENDS THE NEGOTIATIONS AND FORCES ALLIED INTO BANKRUPTCY.

70.    Although the Trustee's claims at trial center on the events surrounding the 2011-2012 negotiations with JCT, the Trustee chose not to present any testimony—whether live or by deposition—of the witnesses directly and most involved in these negotiations on behalf of Black Diamond and Spectrum.  At trial Deckoff testified that Rich Ehrlich ("Ehrlich"), a former Black Diamond analyst, was the person primarily responsible for overseeing Black Diamond's investment in Allied and was the person at Black Diamond who was primarily responsible for speaking to Riggs about a potential deal with JCT.  [3/1/2022 p.m. Trial Tr. at 16:25-18:24] [Deckoff Cross].  He further testified that Ehrlich would have been more knowledgeable about the day-to-day negotiations with JCT.  [3/1/2022 p.m. Trial Tr. at 143:14-17] [Deckoff Cross] ("Q. . . . Mr. Ehrlich would have been more knowledgeable than you about the day-to-day negotiations with JCT, true? A.  Yes."); [3/1/2022 p.m. Trial Tr. at 18:18-24] [Deckoff Cross] ("Q. Mr. Ehrlich was the person for Black Diamond who was primarily speaking to Mr. Riggs about a potential deal with JCT, correct? A.  Yes."); *see also* [3/1/2022 p.m. Trial Tr. at 106:18-

26

107:6] [Deckoff Cross] ("A. Rich's job was supposed to keep me in the loop on all the transactions that he worked on. Q. Including Allied. A Yes.").

71.     Nevertheless, the Trustee chose not to offer testimony from Ehrlich either as a live witness or through his deposition, which was taken in this case. The Trustee also chose not to offer testimony from Schaffer, who was also heavily involved in the negotiations, and whose deposition was also taken. In fact, the Trustee chose not to introduce testimony of any witness affiliated with Spectrum during the trial, including Jefferey Buller, the Spectrum analyst working with Schaffer on the JCT negotiations. (Dep. Tr. Schaffer at 46:7-20). Instead, the Trustee chose to offer only testimony from Deckoff and Adam Harris ("Harris"), BD/S' bankruptcy counsel.

72.     The JCT negotiations began in early 2011, when Black Diamond and JCT began discussing a plan for JCT to acquire Allied's first lien debt from Black Diamond. *See* [3/1/2022 p.m. Trial Tr. at 112:1-21] [Deckoff Cross]. Those discussions led to JCT engaging each of Yucaipa, BD/S and CIT in separate on-again, off-again negotiations from late 2011 through early 2012, regarding JCT's potential acquisition of each lender's Allied debt. *See, e.g.*, [3/2/2022 p.m. Trial Tr. at 46:6-10] [Tochner Cross]. At trial, Burkle and Tochner each testified that it was JCT that insisted on negotiating with each lender separately, and that Yucaipa would have preferred to negotiate together with the other lenders. Indeed, both Burkle and Tochner testified that it was always their assumption that once Yucaipa was able to negotiate the terms of a deal with JCT, Yucaipa would sit down with all of the selling lenders and "that [Yucaipa] would not do a deal unless everybody holds hands and agrees to it." [3/2/2022 a.m. Trial Tr. at 94:8-11] [Tochner Adverse Direct]; *see also* [3/2/2022 p.m. Trial Tr. at 63:23-64:6] [Tochner Cross].

27

73.     These separate negotiation tracks resulted in Yucaipa having no visibility into the terms being negotiated between JCT and the other selling lenders.  *See* [3/3/2022 Trial Tr. at 23:2-24:10] [Burkle Cross] (testifying that Black Diamond's separate conversations with JCT made negotiations difficult and Yucaipa was left to negotiate the best deal it could with JCT and then reconcile with Black Diamond); [3/3/2022 Trial Tr. at 85:2-4, 85:11-19] [Burkle Cross] (same); *see also* [3/2/2022 a.m. Trial Tr. at 91:19-92:19] [Tochner Adverse Direct] ("I had absolutely no idea, especially in the beginning, of the level of conversations that were going on separately with Black Diamond and Riggs. . . . I had no idea ever that that was going on until much much much later. . . .").

74.     Yucaipa never knew the prices that JCT was offering to BD/S and CIT for their Allied debt.  *See* [3/2/2022 a.m. Trial Tr. at 91:19-93:2] [Tochner Adverse Direct]; [3/3/2022 Trial Tr. at 85:2-4, 85:11-19] [Burkle Cross]; *see also* [3/3/2022 Trial Tr. at 24:1-2] [Burkle Adverse Direct].  At trial, both Burkle and Tochner testified that it was never their understanding, nor were they ever told, that an increase in the consideration paid by JCT for Yucaipa-held debt would result in a decrease of the consideration paid for debt held by the other selling lenders.  *See, e.g.*, [3/2/2022 a.m. Trial Tr. at 93:3-13] [Tochner Adverse Direct] (testifying that he didn't think it was the case that Yucaipa negotiating a higher price made BD/S' price go down).  Thus, when Yucaipa was negotiating the price of its debt, it was doing so in a vacuum and could not have been seeking a premium on its debt as compared to other lenders.  The Trustee provided no evidence to the contrary.  And, as discussed in Conclusions of Law Section II.B.2.c. below, no evidence was presented at trial that any reduction in the consideration offered by JCT to BD/S resulted from an increase in consideration promised to Yucaipa, as the Trustee has argued in this case.

28

75.    According to the testimony of Riggs, BD/S, unlike Yucaipa, had full visibility into the terms being negotiated with Yucaipa.  (Dep. Tr. Riggs at 257:4-8, 257:10-14) ("I believe they were doing the financing so they would have to know what I was doing with Yucaipa.  It was nothing hidden from them as far as I know because they were actually the financing source."); *see also* (Exs. 99, 664).

76.    The JCT negotiations involved the exchange of numerous non-binding term sheets between JCT and each of the selling lenders, separately.  *See* (Exs. 116, 117, 118, 90, 119, 122, 86, 259, 123); (PX PPP, PX LLL).  All term sheets exchanged between JCT and BD/S contained contingencies and conditions that were never satisfied, and there was never consensus between these parties about key terms.  *See* (Exs. 116, 117, 118, 90, 119, 122, 86, 259, 123); (PX PPP, PX LLL).  Ultimately, BD/S ended the JCT negotiations by pushing Allied into involuntary bankruptcy on May 17, 2012 (the "Petition Date").  (PX II); (Ex. 88) (May 17, 2012 email from Ehrlich to Ciupitu stating "Theo, Got your email. At this time, BD and Spectrum have decided not to continue with negotiations."). The relevant events during the JCT negotiations, as adduced at trial, are set forth below.

A.    **BD/S and JCT Initiate Discussions for JCT To Purchase Allied's First Lien Debt in Spring 2011.**

77.    In spring 2011, JCT and Black Diamond began discussing a plan for JCT to acquire Allied's first lien debt from Black Diamond.  Deckoff testified that Black Diamond led the negotiations during this time period.  [3/1/2022 p.m. Trial Tr. at 112:1-21] [Deckoff Cross]. In fact, Black Diamond instructed Yucaipa not to speak directly to JCT and that it would keep Yucaipa informed on the negotiations.  (Dep. Tr. Walker at 665:5-8) ("We weren't really having

29

discussions with Jack Cooper or Mike Riggs. We were having discussions with Black Diamond which instructed us only to talk to them.").

78.    Throughout the late 2011 to spring 2012 negotiations, JCT made clear that it wanted to structure the transaction so that JCT would purchase all of Allied's first lien debt, and only then buy Allied's assets in a pre-negotiated bankruptcy through a 363 Sale under Chapter 11 of the Bankruptcy Code.  (Dep. Tr. Ciupitu at 39:18-40:15); (Dep. Tr. Riggs at 80:25-81:6) ("Q. So is it fair to say that at least as of . . . around December 2011, Jack Cooper's plan was to acquire Allied debt held by the lenders and credit bid the debt in a 363 sale? A. That appears to be the strategy.  And I - - it does sound familiar.").

79.    Although Deckoff testified that the negotiations in spring 2011 were for "a straight M&A deal through a 363 sale," [3/1/2022 p.m. Trial Tr. at 105:18-22] [Deckoff Cross], the documentary evidence at trial was to the contrary.  The evidence indicates that BD/S attempted to convert the structure proposed by JCT into a transaction for the purchase of Allied assets, but JCT insisted on buying debt first.[16]  On April 8, 2011, Ehrlich sent Riggs an "Allied Systems Holdings, Inc. Restructuring Term Sheet" (the "April 8 Term Sheet"), in which Black Diamond proposed that JCT purchase Allied's equity.  *See* (Ex. 80).  In response, on April 9, 2011, Riggs sent a mark-up of the April 8 Term Sheet for the purchase of Allied's debt, stating that the April 8 Term Sheet did not reflect the contemplated deal, which "was supposed to be simply getting your debt paid out at par." (Ex. 457*).  Eventually the negotiations proceeded in accordance with JCT's preference as a debt purchase followed by a 363 Sale.

---

[16]    This was not the first time Riggs pursued the approach of buying Allied's debt.  Riggs testified that in 2009 he worked with ComVest in order to buy Allied's debt.  *See* (Dep. Tr. Riggs at 40:24-41:3; 41:14-25).  Riggs testified that, while one alternative use for the debt was to buy Allied out of bankruptcy, the primary alternative was to "flip" Allied's debt by selling it to Yucaipa for a profit.  *See* (Dep. Tr. Riggs at 37:3-20; 37:22-25; 38:1-4; 40:24-41:3; 41:14-25).

80.    On June 9, 2011, Riggs sent Ehrlich an email attaching a revised deal for the purchase of Allied debt, explaining that BD/S' proposal contained several "non-starters," including, among other things, BD/S' refusal to confirm that JCT would be Requisite Lender. (Ex. 83). Riggs put the deal on hold, explaining, "[w]e are so far apart on the items below that I need to take a breather and think about the overall deal." (Ex. 83 at 1).

81.    On June 14, 2011, Ehrlich sent JCT an email with revised deal terms conditioning the deal on Black Diamond's purchase of all of Yucaipa's debt prior to selling to JCT. *See* (Ex. 82* at 1). Ehrlich told Riggs, "[l]et me know by email if these terms work for you and we will start negotiations with Yucaipa. I understand that the term sheet will not be binding, but I do want to ensure that we are on the same page before talking to Yucaipa." (Ex. 82* at 2).

82.    During this period, Yucaipa was learning about the negotiations from Black Diamond. On June 16, 2011, Walker forwarded to Burkle a "Jack Cooper/Black Diamond Proposal for Acquiring Allied Debt," which was conveyed to him by Ehrlich. (Ex. 536); (Dep. Tr. Walker at 667:1-9) ("this is taking information relayed to us by Black Diamond in a series of proposals they had made to us and translating it into what it means to Yucaipa."). The proposal presented two options, both of which were for the purchase of Yucaipa's Allied debt. The first option proposed that Black Diamond would purchase $145 million of Yucaipa's Allied first lien debt for 50 cents on the dollar in cash. The second option proposed that JCT would purchase Yucaipa's debt for about 84 cents on the dollar for a combination of cash and secured notes issued by JCT ("JCT Notes"). (Ex. 536). Burkle testified that he was confused by the proposal because "it's from Riggs apparently telling us to sell our debt to Black Diamond, not to Riggs." [3/3/2022 Trial Tr. at 83:16-21] [Burkle Cross].

31

83.     On June 18, 2011, Black Diamond discussed internally that Yucaipa was working with Black Diamond to get a deal done with Riggs and was open minded about the form of consideration.  (Ex. 661).  Ehrlich explained to Deckoff that Yucaipa "like[s] our structure, but want[s] additional consideration," noting that Walker told him "foranything [*sic*] over the 84% we are looking for, they did not need cash.  They were open to the form of consideration."  (Ex. 661 at 4).  Ehrlich further explained to Deckoff: "[t]hey like our deal, and are open minded about consideration above our deal."  (Ex. 661 at 2).

84.     At trial, Deckoff testified that during this period in the spring of 2011, Yucaipa was "encouraging" BD/S' negotiations with JCT.  [3/1/2022 p.m. Trial Tr. at 113:8-14] [Deckoff Cross].

85.     On June 21, 2011, at 2:56 p.m. EST, Deckoff sent an email to Burkle.  (Stip. Fact ¶ 31; Ex. 662).  In his email, Deckoff encouraged Burkle to pursue the proposed deal Black Diamond had unilaterally negotiated with JCT, *see* (Ex. 536), because Black Diamond believed "there [was] a reasonable chance of maybe getting some [*sic*] done with Riggs at a value we think is extremely high[.]"  (Ex. 662).  In an effort to engage in the negotiations, Yucaipa conveyed a counter to JCT.  [3/3/2022 Trial Tr. at 84:3-6] [Burkle Cross].

86.     Hours later, at 6:24 p.m., Deckoff sent another email to Burkle.  (Stip. Fact ¶ 32; Ex. 663).  Deckoff's email forwarded an email from Riggs in which Riggs explained that Yucaipa countered with a higher price and that JCT was not prepared to raise its price. (Ex. 663 at 1-2).  Riggs therefore explained that he "consider[ed] the Allied debt purchase deal now as 'dead'."  (Ex. 663 at 1-2).  In his email to Burkle, Deckoff accused Burkle of blowing up the deal.  (Ex. 663 at 1).

32

87.     At trial, Burkle explained that, rather than simply accept the first proposal Yucaipa saw, it wanted to negotiate.  [3/3/2022 Trial Tr. at 84:7-22] [Burkle Cross] ("I don't know what we asked, but most of the time when somebody makes you an offer on something you counter at a higher price.").

88.     Despite Riggs' comment that the deal was dead, and despite Deckoff's accusation that Burkle blew it up, negotiations continued, and subsequent term sheets included materially higher proposals from JCT to BD/S and Yucaipa.  [3/3/2022 Trial Tr. at 84:23-85:1] [Burkle Cross]; [3/2/2022 a.m. Trial Tr. at 83:24-84:6] [Harris Cross].  BD/S rejected those proposals, however, and subsequently refused to engage in negotiations.  *See* (PX JJ); [3/2/2022 p.m. Trial Tr. at 75:1-22; 78:2-10] [Tochner Cross] ("Q.  What ultimately happened with Yucaipa's efforts to salvage the JCT deal . . . post bankruptcy? A.  My memory is Black Diamond and Spectrum would not do the deal. Q.  And you know that because they told you? A.  They told me that.").

## B.     JCT Initiates Direct Negotiations With Yucaipa in December 2011 and Negotiates With Yucaipa and BD/S On Separate Tracks Until May 2012.

89.     In December 2011, Riggs reached out to Yucaipa directly to negotiate a purchase of Yucaipa's Allied debt.  *See* (Dep. Tr. Walker at 679:8-11; 679:13-14; 680:2-4; 680:6-16) (testifying Riggs approached Yucaipa and said he had been in discussions with BD/S and CIT).  Around this time, Tochner took a leading role in negotiating with JCT on behalf of Yucaipa.  *See* [3/2/2022 p.m. Trial Tr. at 40:15-20] [Tochner Cross].  At trial, Burkle testified that Deckoff complained to Burkle that Walker, who was previously the main point of contact for the negotiations, was negotiating too aggressively in Deckoff's view.  [3/3/2022 Trial Tr. at 27:11-23] [Burkle Adverse Direct].  In addition to assuring Deckoff that Yucaipa would treat Black Diamond's debt "exactly like our debt," Burkle also placed Tochner in charge of the negotiations

33

in an effort to appease Deckoff.  *See* [3/3/2022 Trial Tr. at 76:6-16] [Burkle Cross]; [3/3/2022 Trial Tr. at 27:15-23] [Burkle Adverse Direct]; *see also* [3/2/2022 p.m. Trial Tr. at 40:15-20] [Tochner Cross].

90.    When Riggs approached Yucaipa at this time, through Tochner, he expressed that JCT wanted to acquire Yucaipa's debt.  [3/2/2022 p.m. Trial Tr. at 40:15-25] [Tochner Cross] ("Q.  You were involved in the negotiations with JCT on behalf of Yucaipa?  A.  Yes.  Q.  And when did you become fully involved in the negotiations with JCT?  A.  About December 2011. Q.  And what specifically did you understand JCT was looking to buy?  A.  They were looking to buy our debt.  Q.  And how do you know that?  A.  Because they told me that.  Mike Riggs told me that.").  Tochner testified that, in the course of the negotiations, Riggs made it clear to him that JCT was looking to buy Yucaipa's Allied debt first, rather than purchase Allied's assets directly.  [3/2/2022 p.m. Trial Tr. at 40:21-25] [Tochner Cross]; *see also* (Dep. Tr. Walker at 681:2-4, 681:9-15, 681:16-18) (testifying that JCT "had a very strong view as to how the transaction would be structured.").

91.    On December 9, 2011, Riggs sent Tochner a "Term Sheet for Acquiring First and Second Lien Secured Debt Claims With Respect to Allied Systems Holding, Inc. And Consummating 363 Sale Under Chapter 11 of the Bankruptcy Code" (the "December 9 Term Sheet") (Ex. 116).  The December 9 Term Sheet proposed that JCT would purchase all of Yucaipa's first and second lien debt for a combination of cash and new JCT bonds having an aggregate face value of $150 million.  (Ex. 116 at 4-5).  The terms sheet was subject to various conditions precedent, including, among other conditions, full diligence by JCT concerning Allied's financial condition.  (Ex. 116).

34

92.    On December 13, 2011, Walker sent Riggs a mark-up of the December 9 Term Sheet.  (Stip. Fact ¶ 34; Ex. 117).  In its markup, Yucaipa proposed a purchase price for its debt in a combination of cash and new debt having a face value of $160 million, which was approximately equal to the principal amount of Yucaipa's first lien debt, plus accrued interest at that point in time.  (Ex. 117 at 3) ($134,800,000 of principal + $25.4 million accrued interest = $160,200,000); [3/2/2022 a.m. Trial Tr. at 108:19-109:4] [Tochner Adverse Direct] ("I remember the concept and the concept we went back with was par plus interest.").  At trial, no evidence was presented that such a counter proposal caused JCT to decrease the amount of consideration offered to BD/S for its debt or that Yucaipa had an understanding that its counter would cause such a reduction.

93.    On December 15, 2011, JCT sent Yucaipa a revised term sheet (the "12/15/11 Revised Term Sheet").  (Stip. Fact ¶ 35; Ex. 118).  The 12/15/11 Revised Term Sheet was subsequently forwarded to BD/S on December 18, 2011.  (Stip. Fact ¶ 35; Exs. 99, 664).

94.    In his email forwarding the 12/15/11 Revised Term Sheet to BD/S, Riggs explained that Yucaipa was "clear they want to do a deal" and "not only agreed to carry a significant part of the purchase price ($50 million) in Jack Cooper par-passu [*sic*] high yield bonds, [but] even agreed to withhold payment of that $50 million until AFTER Allied actually files for the 363 transaction. That is putting their money where their mouth is."  (Ex. 664 at 1). Tochner testified that these were significant concessions for Yucaipa because Yucaipa valued JCT Notes at a discount and Yucaipa would be assuming a significant risk by agreeing to transfer its debt to JCT before receiving any of the cash consideration.  [3/2/2022 p.m. Trial Tr. at 56:15-57:12, 59:21-60:10] [Tochner Cross].  Ehrlich shared Riggs' email with Deckoff, stating, "According to Riggs, Yucaipa is willing to work with us to get a deal done."  (Ex. 664 at 1).

35

95.     On December 19, 2011, JCT sent BD/S the December 19 Term Sheet for discussion purposes.  (Stip. Fact ¶ 36; PX Y, PX Z, and Ex. 90).  The December 19 Term Sheet contemplated Black Diamond financing a significant portion of JCT's purchase of the Allied first lien debt.  (Ex. 90 at 2).  The proposal included a purchase price of $150 million for claims held by Yucaipa.  (Ex. 90 at 3).  BD/S were offered 100% of par, with the entire purchase price to be paid in JCT Notes upon Allied filing for bankruptcy and consummating a 363 Sale.  (Ex. 90 at 3).

96.     The December 19 Term Sheet was, by its own express terms, "For Discussion Purposes Only," "nonbinding," and "not enforceable or binding on any parties hereto."  (Ex. 90 at 2).  The proposal in the December 19 Term Sheet was subject to numerous conditions precedent, including the execution of a confidentiality agreement between JCT and BD/S, a non-compete agreement between JCT and BD/S, BD/S' review of JCT's financials, and, most significantly, any conditions precedent to which JCT would ultimately agree in its separate negotiations with Yucaipa.  (Ex. 90 at 4-5).  The proposals that JCT and Yucaipa were trading at the time included a laundry list of conditions precedent, including, among other things, extensive due diligence by JCT, approval by JCT's lenders, resolution of disputes among Allied's lenders (including a recognition that Yucaipa was the Requisite Lender under the FLCA), and confirmation by JCT that Allied had a sustainable annual EBITDA of $40 million.  (Ex. 90); *see also* (Ex. 118 at 4-7).

97.     At trial, Deckoff testified that Black Diamond would not have agreed to the December 19 Term Sheet.  [3/1/2022 a.m. Trial Tr. at 78:5-24] [Deckoff Direct] (testifying that "this transaction wasn't acceptable to us . . . .").  Deckoff testified that Black Diamond was unwilling to go forward with any deal that was not ratable.  [3/1/2022 p.m. Trial Tr. at 137:10-

36

13] [Deckoff Cross].  But no evidence was presented at trial that Deckoff, or any person on

behalf of BD/S, conveyed this concern to JCT or to Yucaipa or made any effort to counter this

proposal with a transaction that would result in identical treatment for Yucaipa and BD/S.

Notwithstanding the fact that the December 19 Term Sheet was unacceptable to Black Diamond,

this proposal forms the sole basis for the Trustee's damages calculations.  [3/4/2022 a.m. Trial

Tr. at 42:20-43:3] [Risius Cross].

98.     The terms of the December 19 Term Sheet are inconsistent with both

contemporaneous and subsequent term sheets.  For instance, in another communication between

JCT and BD/S on the same day (December 19, 2011), JCT proposed different terms than those

presented in the December 19 Term Sheet, including, among other things, a different price for

BD/S' debt.  (PX Y at 4) (noting a discounted price for first lien BD/S debt, in contrast to the

price of 100% of par reflected in the December 19 Term Sheet).

99.     The evidence presented at trial suggests that, after receiving the December 19

2011 Term Sheet, BD/S had lost their appetite to pursue a transaction with JCT and were, instead

pursuing the filing of an involuntary bankruptcy petition against Allied.  In fact, BD/S had been

preparing a strategy to commence an involuntary proceeding for Allied as early as October 2009,

when Ehrlich and Schaffer discussed finding attorneys with that specific expertise.  (Dep. Tr.

Schaffer at 353:13-15, 353:19-354:14 (testifying that in October 2009 BD/S was looking for

attorneys "who had experience filing and threatening involuntaries."); 353:24-355:9, 355:11-15);

(Ex. 248).[17]

_____

[17] The evidence suggests that BD/S' plan to force Allied into bankruptcy to maximize their recovery may have come
about as early as August 2009, before Yucaipa purchased any first lien Allied debt.  In August 2009 Schaffer
discussed the possibility of subordinating Yucaipa's debt with Riggs—who at the time was looking to buy Allied's
debt.  (Ex. 79); (Dep. Tr. Schaffer at 339:23-340:5; 340:6-12); (Dep. Tr. Riggs at 61:10-62:12, 62:14-63:20).

100.    On January 17, 2012, as BD/S and Yucaipa continued to separately negotiate for the sale of their debt to JCT, BD/S filed a lawsuit in New York State Court seeking a declaration that the Fourth Amendment was invalid, and that Yucaipa was not the Requisite Lender (the "NY Action").  (Stip. Fact ¶ 37, PX AA).  The NY Action ran directly counter to the condition that JCT was requiring in proposals that Yucaipa be recognized as the Requisite Lender.

101.    Indeed, by early 2012, BD/S appear to have elected to pursue commencing an involuntary bankruptcy petition for Allied.  On the same day BD/S sued Yucaipa in New York State Court, Ehrlich and Schaffer were discussing their desire to "file ASAP."  (Ex. 468 at 1).  But Schaffer suggested that the parties continue to negotiate for a time, not for the purpose of consummating a deal, but rather in order to obtain financial information from JCT before forcing Allied into bankruptcy.  (Ex. 468 at 1) (Schaffer stating: "I know we have to just press the button at some point, but perhaps get the nda done and get cooper financials first").

102.    On February 9, 2012, Riggs refused to provide JCT's financials to BD/S; rather, he informed BD/S that he had to "walk away from the deal."  (Ex. 92 at 1).  In response, Schaffer said, "thought you already did frankly weeks ago."  (Ex. 92 at 1).

103.    Yucaipa was unaware of the issues plaguing JCT's negotiations with BD/S and the prices that JCT was offering to BD/S.  At trial, Tochner testified that Riggs informed him that he was "confident [he] can then cut a deal with everybody else" and that he "had a deal" with BD/S.  [3/2/2022 a.m. Trial Tr. at 93:20-94:4, 114:23-115:2, 115:6-12] [Tochner Adverse Direct].  Between January and March 2012, JCT and Yucaipa continued to exchange term sheets concerning JCT's purchase of Allied's debt and the subsequent purchase of Allied's assets in a pre-negotiated bankruptcy.  *See* (Stip. Fact ¶¶ 38-43); (PX PPP) (February 14, 2012 term sheet); (PX LLL) (February 21, 2012 term sheet); (Ex. 119) (February 28, 2012 term sheet); (Ex. 122)

(March 8, 2012 term sheet).  On March 7, 2012, Tochner and Walker met with Riggs in Atlanta, Georgia.  (Stip. Fact ¶ 42); (PX CC, PX DD); (Ex 121).  Gendregske participated in the meeting, which was intended to negotiate a final term sheet between Yucaipa and JCT.  (Dep. Tr. Walker at 688:10-12, 688:17-689:10; 694:7-9, 694:11-18, 694:20-22).

104.    On March 8, 2012, JCT sent Walker and Tochner a final term sheet ("Final Term Sheet").  (Stip. Fact ¶ 43; Ex. 122).  The total consideration to be paid by JCT to Yucaipa under the Final Term Sheet had a face value of $155 million, with $75 million in JCT Notes and $80 million in cash.  (Ex. 122 at 7); [3/2/2022 p.m. Trial Tr. at 53:7-15] [Tochner Cross].  The Final Term Sheet also contemplated that Yucaipa would transfer its debt holdings to JCT before Yucaipa received the cash portion of the consideration, the payment of which was conditioned upon a subsequent chapter 11 proceeding for Allied in which JCT would be the successful bidder for Allied's assets.  (Ex. 122 at 7); [3/2/2022 p.m. Trial Tr. at 56:12-20] [Tochner Cross].

105.    Although the Trustee argued at trial that the $155 million in consideration represented a premium on Yucaipa's debt, the Final Term Sheet does not reflect such a premium.  The Final Term Sheet contemplated that Yucaipa would assign to JCT $186 million in claims for outstanding principal and accrued interest.  (Ex. 122 at 6); [3/2/2022 p.m. Trial Tr. at 53:19-23] [Tochner Cross].  In other words, the consideration Yucaipa agreed to accept from JCT for its Allied debt, had the deal been finalized, would have amounted to, at most, about 80% of the face value of the claims purchased ($155 million for $186 million of debt), assuming Yucaipa valued the JCT Notes at face value, which Tochner testified at trial it did not.  [3/2/2022 p.m. Trial Tr. at 54:17-55:3] [Tochner Cross].

106.    At trial, no evidence was presented that Yucaipa ever demanded that it receive more consideration than other lenders.  To the contrary, both Tochner and Burkle testified that

39

they were unaware of the price being negotiated by JCT with the other lenders and that Yucaipa's negotiation tactic was to negotiate the best price vis-à-vis the buyer—JCT.  [3/2/2022 a.m. Trial Tr. at 113:24-114:3; 114:9-12] [Tochner Adverse Direct]; [3/3/2022 Trial Tr. at 23:18-24:2] [Burkle Adverse Direct].  Moreover, both Burkle and Tochner testified that they expected that before any final agreements were signed, there would need to be a conversation among the selling lenders to ensure all parties were satisfied with the deal.  [3/2/2022 a.m. Trial Tr. at 114:14-115:2;115:6-12] [Tochner Adverse Direct]; [3/3/2022 Trial Tr. at 23:18-24:10] [Burkle Adverse Direct].

107.    Yucaipa not only understood that such a conversation would happen, Yucaipa insisted on the condition of lender approval prior to entering into a final agreement with JCT.  At Yucaipa's insistence, the Final Term Sheet included a condition precedent to Yucaipa and JCT executing definitive agreements that JCT simultaneously enter into definitive agreements with CIT, and BD/S to purchase all of their Allied debt.  (Ex. 122 at 9 ¶ 6); [3/3/2022 Trial Tr. at 87:9-19] [Burkle Cross] ("Q. . . . did you understand that it was important that each of [the senior lien holders] have a deal at the same time Yucaipa had a deal? A.  We required it."); [3/3/2022 Trial Tr. at 87:24-88:14] [Burkle Cross]; [3/2/2022 p.m. Trial Tr. at 66:7-15] [Tochner Cross]; *see also* [3/2/2022 p.m. Trial Tr. at 47:16-19] [Tochner Cross] (testifying that Yucaipa's deal with Riggs was contingent on JCT also reaching a deal that was acceptable to BD/S and CIT).

108.    While Yucaipa was able to negotiate a final term sheet with JCT, the negotiations between JCT and BD/S remained at an impasse.  On March 8, 2012, JCT sent BD/S a "Term Sheet for Acquiring First and Second Lien Secured Debt Claims With Respect to Allied Systems Holdings, Inc. And Consummating 363 Sale Under Chapter 11 of the Bankruptcy Code."  (Stip. Fact ¶ 44, Ex. 86).  This term sheet included terms to which BD/S refused to agree, including, for

example, retroactive affirmation of the Fourth Amendment for JCT's benefit and entry into a

non-compete agreement with JCT.  (Ex. 86).

109.    On March 18, 2012, Riggs wrote to BD/S: "[w]e seem too far apart to make this

work."  (Ex. 87 at 1).  But Riggs continued his efforts to reach a deal with BD/S.  On April 12,

2012, JCT sent BD/S a revised "Term Sheet for Acquiring first and Second Lien Secured Debt

Claims With Respect to Allied Systems Holdings, Inc. And Consummating 363 Sale Under

Chapter 11 of the Bankruptcy Code."  (Stip. Fact ¶ 45, Ex. 259).  In responding to a counter

proposal from BD/S, Ciupitu wrote: "Although we appreciate your counterproposal, we are not

able to accept your proposed structure."  (Ex. 259 at 1).  The revised proposal from JCT

continued to insist on a non-compete and retroactive affirmation of the Fourth Amendment prior

to JCT's purchase of the Allied debt.  (Ex. 259 at 6, 8).

110.    In response, Schaffer wrote:

> Theo, Without commenting on the price or other smaller points, we
> have already discussed that we will not drop our lawsuits or the 4th
> amendment etc under any circumstances until/unless the deal is
> done (ie: not at the First Closing Date). We also cannot agree to the
> restrictive covenants (other than non disparage and
> confidentiality).

(Ex. 127 at 2).

111.    Later in the same email chain, Schaffer doubled down on Spectrum's position that

it "will not agree to a 'non-compete' of any kind with our investments."  (Ex. 127 at 1).  At trial,

the Trustee offered no evidence aside from Deckoff's self-serving speculation that Spectrum

would have agreed to these terms too had the term sheets reflected ratable treatment.  *See, e.g.*

[3/1/2022 p.m. Trial Tr. at 145:6-8] [Deckoff Cross] (testifying with respect to Schaffer's

position on a non-compete, "maybe I would have been able to convince Jeff [Schaffer]

otherwise.").

41

112.    On May 10, 2012, JCT sent BD/S a revised "Term Sheet for Acquiring first and Second Lien Secured Debt Claims With Respect to Allied Systems Holdings, Inc. And Consummating 363 Sale Under Chapter 11 of the Bankruptcy Code."  (Stip. Fact ¶ 46, Ex. 123). The May 10, 2012 term sheet included a reduced proposed price for BD/S' debt.  Although the Trustee argued at trial that the reduction in price was caused by Yucaipa's demand for a specific price, the evidence is clear that it was not.  JCT expressly tied the reduction in price to BD/S' refusal to affirm the Fourth Amendment and dismiss its lawsuit against Yucaipa before JCT purchased Allied debt, stating, "[p]lease note that we have reduced the purchase price to 70% because of your demand for the 4th amendment affirmation and Yucaipa settlement not be released until the Second Closing. If you agree to have those items released at the First Closing, then we could agree to a 75% purchase price."  (Ex. 123 at 1).  As a further obstacle to the negotiations, BD/S refused to disclose to JCT the amount of their debt holdings that JCT was offering to purchase.  (Ex. 123 at 3-5).  Schaffer admitted at his deposition that this may have been a negotiating tactic.  (Dep. Tr. Schaffer at 83:18-84:17).

## XI.    BD/S FORCES ALLIED INTO AN INVOLUNTARY BANKRUPTCY PROCEEDING WITH ONLY A FEW DAYS' NOTICE.

113.    On the evening of May 14, 2012, BD/S representatives and counsel had a call with Yucaipa representatives and counsel.  (Stip. Fact ¶ 48); *see also* (PX KKK*).  During the call, BD/S demanded that Yucaipa commit to equal and ratable treatment in any transaction involving Allied's first lien debt.  [3/2/2022 p.m. Trial Tr. at 43:23-44:1] [Harris Cross].  This was the first time that BD/S asked Yucaipa to enter into an agreement for equal and ratable treatment among the lenders in any sale of Allied debt.  *See* [3/2/2022 p.m. Trial Tr. at 44:2-45:2] [Harris Cross] (testifying that he is not aware of any other discussions between BD/S and

42

Yucaipa on the subject).  By May, BD/S had known for approximately six months that the price

Yucaipa was seeking for its debt in its private negotiations with JCT was higher than what JCT

was proposing to pay BD/S.  *See, e.g.*, (Exs. 664; 90); [3/1/2022 p.m. Trial Tr. at 130:2-5]

[Deckoff Cross] ("Q.  Had you agreed on December 19, 2011, had you agreed that you would

provide bridge financing?  A.  We hadn't agreed to this deal because we weren't treated equally

and ratably in this deal.").  BD/S' eleventh-hour demand for Yucaipa to contractually commit to

ratable treatment on a short deadline, after knowing for months that JCT was offering Yucaipa a

higher price for its debt, casts doubt on how genuine BD/S' concerns over ratable treatment

were.  The parties agreed to continue their discussions about ratable treatment on a follow-up call

the next day.  [3/2/2022 a.m. Trial Tr. at 46:8-11] [Harris Cross].

114.    On May 15, 2012, BD/S' counsel wrote to Yucaipa, demanding that Yucaipa "be

prepared to advise whether [it] is prepared to . . . (b) confirm that Yucaipa will contractually

commit to assure that Black Diamond and Spectrum will receive equal and ratable treatment with

Yucaipa in any transaction affecting the First Lien debt (with JCT or anyone else)."  (Ex. 713 at

1).

115.    Tochner testified that Yucaipa was willing to agree to BD/S' demand at this time.

[3/2/2022 p.m. Trial Tr. at 65:12-25] [Tochner Cross].  He understood that his "marching orders"

from Burkle with respect to the other Lenders "were to always be fair with the other lenders."

[3/2/2022 p.m. Trial Tr. at 66:1-15] [Tochner Cross].  Burkle testified that he had always made

clear to Deckoff that it was Yucaipa's intention to treat Black Diamond equally.  [3/3/2022 Trial

Tr. at 18:24-19:9] [Burkle Adverse Direct] (testifying that as early as their August 18, 2009

meeting, Burkle told Deckoff that "we will treat your debt the same way we treat our debt . . . . I

said your debt will be treated exactly like our debt.").  Burkle also testified that Tochner was

aware of his prior discussions and agreement with Deckoff, which is why Yucaipa's Final Term Sheet required a deal that would be acceptable to all other selling Lenders.  [3/3/2022 Trial Tr. at 87:22-88:18] [Burkle Cross]; (Ex. 122 at 9).

116.    Yucaipa representatives and counsel and BD/S representatives and counsel spoke again around noon on May 15, 2012.  (Stip. Fact ¶ 50, Ex. 472).  On the call, when Yucaipa was asked to contractually commit to assure equal and ratable treatment for BD/S, Yucaipa was amenable and requested that BD/S' counsel draft an agreement for its review.  *See* [3/2/2022 a.m. Trial Tr. at 53:8-20] [Harris Cross].  Based on the parties' apparent meeting of the minds, BD/S' counsel proceeded to prepare a full draft agreement for Yucaipa's review.

117.    On May 16, 2012, at 6:26 p.m. EST, BD/S' counsel circulated a draft letter agreement "in furtherance of our discussions from yesterday…" noting that the "draft has not been approved by either Black Diamond or Spectrum . . . ." ("May 16 Letter Agreement").  (Stip. Fact ¶ 51, Exs. 265, 351); *see also* [3/1/2022 p.m. Trial Tr. at 176:17-177:13] [Deckoff Cross] (testifying that he does not recall whether BD/S had approved the May 16 Letter Agreement). Among other things, the May 16 Letter Agreement required that all first lien lenders receive equal and ratable consideration in any debt deal with JCT or any other party.  (Ex. 265 at 5 (§ 4)).  The fact that BD/S' counsel circulated the May 16 Letter Agreement "in furtherance of" the parties' prior discussions indicates, at the least, that BD/S understood that Yucaipa had expressed a willingness to enter into such an agreement.  *See* [3/2/2022 p.m. Trial Tr. at 71:23-72:2] [Tochner Cross].

118.    To facilitate negotiations, the parties, including Allied, had agreed to a standstill, whereby no party would put Allied into bankruptcy until 5 p.m. on May 17, 2012.  *See* (PX OOO*).  Walker forwarded the May 16 Letter Agreement to Allied's general counsel, John

Blount, and Hazen Dempster, Allied's outside counsel from Troutman Sanders, and indicated

that he was in the process of reviewing it.  (Ex. 351) (Walker email stating: "Please see below.

We're reviewing now.").

119.    On May 17, 2012, at 11:50 a.m., BD/S' counsel emailed Yucaipa representatives

and its counsel.  (Stip. Fact ¶ 52, PX HH*).  In that email, BD/S' counsel threatened to file an

involuntary petition against Allied if Yucaipa did not provide comments on the May 16 Letter

Agreement by 12 p.m. that day.  (PX HH*).  The parties subsequently agreed to extend the

deadline to 5:00 pm that day.  (PX HH*).

120.    In an apparent effort to accelerate resolution of the ratable treatment issue,

Yucaipa advised BD/S that Burkle would connect with Deckoff directly to discuss.  (Ex. 475).

At 1:09 p.m. Ehrlich updated Schaffer that "Derex said that Ron wanted to talk to Steve and that

he will likely try to connect with Steve before 5 p.m."  (DX L); *see also* (PX GG*) (Ehrlich

forwarding to Deckoff a message from Walker stating, "Ron is reaching out to Steve Deckoff.

We'll be in touch re: the lock-up after they've connected."); (Ex. 477) (Ehrlich to Deckoff:

"Spoke to Derex.  He said that Ron should have called in the last few minutes or will be calling

shortly."); (PX GG*).  Deckoff testified that he understood that Burkle wanted to get in touch

with him to discuss the deal further.  [3/1/2022 p.m. Trial Tr. at 180:13-20] [Deckoff Cross].

121.    At 5:17 p.m. on May 17, 2012, Ehrlich emailed Ciuptiu of JCT.  (Stip. Fact ¶ 53,

Ex. 88).  In the email, BD/S called off the negotiations with JCT.  (Ex. 88).  At trial Deckoff

testified that BD/S called off the negotiations because they had already authorized the filing of

an involuntary bankruptcy petition against Allied.  [3/1/2022 p.m. Trial Tr. at 183:5-17]

[Deckoff Cross].

45

122.     BD/S filed the involuntary bankruptcy petition for Allied at 5:45 p.m. on the

Petition Date (the "Involuntary Petition"). (Stip. Fact ¶ 54, PX II, DX B).  When asked at his

deposition why BD/S decided to file the Involuntary Petition against Allied, Deckoff refused to

answer on the basis of attorney-client privilege.

123.     At trial, the Trustee offered no evidence that Yucaipa or Allied had

communicated to BD/S any intention to put Allied into bankruptcy.  Burkle and Tochner both

testified that they believed bankruptcy would be harmful for Allied, and that Yucaipa never

threatened and did not intend to put Allied into bankruptcy.  [3/2/2022 p.m. Trial Tr. at 67:5-13]

[Tochner Cross]; [3/3/2022 Trial Tr. at 73:5-74:1] [Burkle Cross].  As set forth in more detail in

Conclusions of Law Section II.B.3 below, the Court finds that the Trustee has failed to meet her

burden of establishing that BD/S' filing of the Involuntary Petition was caused by any alleged

wrongful conduct by Yucaipa.

124.     Following the commencement of the involuntary proceedings, Allied consented to

the bankruptcy and Allied and certain affiliates filed voluntary Chapter 11 Petitions (the

"Bankruptcy").  (Stip. Fact ¶ 55).

125.     Tochner testified that he never expected BD/S to push Allied into bankruptcy, and

that, once they did, the bankruptcy created "chaos" for Allied and required "a lot of damage

control."  [3/2/2022 p.m. Trial Tr. at 79:6-10; 80:4-10] [Tochner Cross].  He further testified that

the Bankruptcy case would and did upset relationships with the OEMs, which were crucial to

Allied's business.  [3/2/2022 p.m. Trial Tr. at 67:5-16] [Tochner Cross].  Burkle testified that he

was "shocked" that BD/S filed the Involuntary Petition.  [3/3/2022 Trial Tr. at 89:11-23] [Burkle

Cross].  He explained that Yucaipa did not want Allied to go into bankruptcy without a plan

because it would destroy the value of the company.  [3/3/2022 Trial Tr. at 73:5-74:1] [Burkle

46

Cross]; *see also* [3/3/2022 Trial Tr. at 62:22-24 [Burkle Cross] ("I don't think I even needed to educate him [Deckoff] how much money he lost on PTS by destroying the company. But he turned around and did the same thing with this company.")

126.    BD/S' decision to call off negotiations and file the Involuntary Petition caught Yucaipa by surprise because Yucaipa understood that the parties were on the verge of reaching an agreement. *See* [3/3/2022 Trial Tr. at 86:1-14] [Burkle Cross]. As Burkle testified, "I don't know why they walked away from the deal the way they did. Who says in 24 hours or 72 hours we're going to throw you into bankruptcy, when you have a deal that you worked really hard to get for years." [3/3/2022 Trial Tr. at 86:21-24] [Burkle direct].

127.    At trial, Burkle testified that he tried to call Deckoff to affirm his commitment to ratable treatment but received no response. [3/3/2022 Dep. Tr. at 61:3-12] [Burkle Cross]. Burkle's testimony is corroborated by an email from Burkle to Deckoff shortly after the Involuntary Petition was filed, in which Burkle states: "I've called a couple times and missed you. We worked our ass off to create value. . . You clearly have been talking and discussing options with. [*sic*] Riggs for some time which was your call, but the action you've taken without picking up the phone is just wrong. . . I worked hard to increase everyones [*sic*] value. I'm disappointed by your actions." (DX TTT). Burkle testified that had Deckoff truly wanted to get a hold of him on May 17, he could have because "he has my phone number and we call each other direct." [3/3/2022 Trial Tr. at 62:4-62:24] [Burkle Cross]; *see also* [3/3/2022 Trial Tr. at 89:11-90:4] [Burkle Cross (testifying that he was shocked BD/S filed the Involuntary Petition and could not comprehend why Deckoff waited all day for his call because, "[t]o this day we call each other all the time. And he has my cell number. He has my home number. He has every number I have. And he testified he sat around all day hoping I would call."). The Court finds

that it is more likely than not that, by this time, BD/S had decided to file an involuntary petition against Allied regardless of any feedback from Yucaipa on the May 16 Letter Agreement, and that this would not have changed had Burkle been able to reach Deckoff and confirm Yucaipa's agreement to ratable treatment prior to the 5 p.m. deadline on May 17, 2012.

128.    Despite BD/S knowing of Allied's continuous defaults and inability to pay off its debt, and despite Black Diamond's knowledge that Allied's debt could lose all value in bankruptcy (as was the case with PTS), shortly after filing the Involuntary Petition, on June 5, 2012, BD/S purchased another $2.5 million of Allied's first lien debt.  (Exs. 417, 481).

## XII.    <u>YUCAIPA ATTEMPTS TO SALVAGE THE JCT NEGOTIATIONS.</u>

129.    After the Involuntary Petition was filed, Yucaipa continued to explore potential deals with JCT to preserve Allied's value.  As part of those discussions, on June 6, 2012, Riggs sent Allied's Board a proposal to acquire Allied's assets, in which each of Allied's lenders would receive the same option to be compensated in one of two ways specified in the term sheet.  *See* (PX JJ); [3/2/2022 p.m. Trial Tr. at 73:12-23] [Tochner Cross].  The terms of the proposed transaction provided that all lenders would be treated equally with respect to their Allied debt. *See* (PX JJ); [3/2/2022 p.m. Trial Tr. at 75:1-7] [Tochner Cross]; *see also* [3/2/2022 a.m. Trial Tr. at 35:6-7] [Harris Cross] (testifying that the proposal in PX JJ "would have resulted in ratable treatment if this had been accepted.").  The proposal offered terms even more attractive to the lenders than the offer made in June 2011, which Deckoff blamed Burkle and Yucaipa for squandering.  (*Compare* PX JJ *with* Ex. 536).  In connection with the discussions that led to this term sheet, Tochner testified that Yucaipa was "[a]bsolutely" committed that if they were going to be paid for its first lien debt, the same price would be paid to all lenders.  [3/2/2022 p.m. Trial Tr. at 77:22-78:1] [Tochner Cross].  But, instead of engaging in efforts to salvage a deal, BD/S

48

told Tochner that they would not do the deal.  [3/2/2022 p.m. Trial Tr. at 78:2-14] [Tochner Cross].

### XIII.  JCT BUYS ALLIED'S ASSETS IN DECEMBER 2013.

130.    As discussed in greater detail below in Findings of Fact Section XIV.A.6, in August 2012, the Allied Board also negotiated directly with JCT, resulting in a proposal by JCT to acquire Allied's assets.  *See* (Ex. 641*).  Allied's financial advisers ultimately found the proposal unacceptable and the Board rejected it upon that advice.  *See* (Ex. 641*).  Allied's negotiations with JCT did not result in any agreement for the sale of Allied.  *See, e.g.*, (Dep. Tr. Gendregske at 310:8-10); *see also* [3/4/2022 a.m. Trial Tr. at 44:16-19] [Risius Cross].

131.    In September 2013, an auction for Allied's assets was held.  (PX XX; PX YY). JCT ultimately submitted the high bid to buy most of Allied's assets for $135 million.  (Stip. Fact ¶ 60, Ex. 129).  The Court approved JCT's bid.  (Stip. Fact ¶ 60; DX Z, DX BB).

132.    Excluded from JCT's bid, at BD/S' demand, were certain real estate assets of the Debtor with an appraised value of approximately $21 million.  As Harris testified at trial, during the 363 auction process, BD/S "got [JCT ]to agree to exclude from their bid certain things we didn't think were material to their go-forward operation.  Those assets then became available for the lenders to acquire through a new – a new vehicle and monetized for their benefit alone." [3/2/2022 a.m. Trial Tr. at 74:13-19] [Harris Cross].  BD/S purchased those assets through a $5 million credit bid.  *See* (Dep. Tr. Schaffer at 509:15-21, 510:7-14); (DX AA, DX CC); [3/2/2022 a.m. Trial Tr. at 75:19-21] [Harris Cross].

133.    On November 30, 2013, the Court entered the Order Under 11 U.S.C. §§ 105(a) And 365 And Fed. Bankr. P. 2002, 6004 and 6006 Authorizing And Approving:  (1) Sale of Assets Free And Clear Of Liens, Claims, Encumbrances, And Other Interests; And (II)

49

Assumption And Assignment Of Unexpired Lease To An Acquisition Entity Formed By Prepetition First Lien Agents, pursuant to which the Court approved a sale of certain of Allied's assets on the terms set forth in the Order.  (Stip. Fact ¶ 61, DX AA).

134.    The JCT 363 Sale closed on December 27, 2013.  (Stip. Fact ¶ 61).  Pursuant to the Court's order dated September 17, 2013, Yucaipa's pro rata share of the JCT proceeds has been placed in an escrow account.  (DX Z at 20-21).

## XIV.    OVERVIEW OF TRUSTEE'S DAMAGES CLAIMS THROUGH THE EXPERT TESTIMONY OF JEFFREY RISIUS.

135.    The Trustee retained Jeffrey Risius, a managing director with Stout, Risius, Ross, as her damages expert.  Mr. Risius testified as a live witness before the Court on March 4, 2022. The Trustee offered no other testimony from any fact or expert witness at trial to carry her burden of proof on the issue of damages.

136.    Although Mr. Risius testified at length about his valuation experience, Mr. Risius did not perform an independent enterprise valuation of Allied in this case.  [3/4/2022 a.m. Trial Tr. at 8:5-11:10] [Risius Direct]; [3/4/2022 a.m. Trial Tr. at 40:5-22; 42:3-8 (video played for impeachment)] [Risius Cross].  Instead, as discussed below, Mr. Risius calculated damages arising from the failed JCT transaction by "implying" an enterprise value for Allied based upon a preliminary and non-binding term sheet sent by JCT to Black Diamond on December 19, 2011 (the "December 19 Term Sheet").  [3/4/2022 a.m. Trial Tr. at 21:10-22:7] [Risius Direct]; [3/4/2022 a.m. Trial Tr. at 43:16-44:3; *see also* 105:19–23] [Risius Cross].  In short, Mr. Risius concluded that Allied's value was approximately equal to the face amount of its outstanding first lien debt.  [3/4/2022 a.m. Trial Tr. at 78:15-18] [Risius Cross].  He reached this conclusion by assuming that JCT would have, pursuant to the terms of the December 19 Term Sheet: (i)

50

purchased all of Allied's first lien debt, from all holders of that debt, (ii) paid "par" for all of Allied's first lien debt (with the exception of CIT, as to which JCT proposed to pay less than par, and Yucaipa, as to which JCT proposed to pay more than par), and (iii) subsequently credit bid the full amount of the first lien debt to acquire Allied's assets in a "pre-negotiated" bankruptcy case that would have cost Allied no more than $5 million in chapter 11 restructuring expenses to implement. [3/4/2022 a.m. Trial Tr. at 58:10-12] [Risius Cross]. This assumption is in direct conflict with Deckoff's testimony at trial that the December 19 Term Sheet was not acceptable to Black Diamond and that Black Diamond would not have proceeded with this transaction. *See* [3/1/2022 a.m. Trial Tr. at 78:5-24] [Deckoff Direct] (testifying that "this transaction wasn't acceptable to us . . . ."); *see also* [3/1/2022 p.m. Trial Tr. at 130:2-5] [Deckoff Cross] ("Had you agreed on December 19, 2011, had you agreed that you would provide bridge financing? A We hadn't agreed to this deal because we weren't treated equally and ratably in this deal.").

137.    The Trustee's claims for damages at trial were based solely upon the failed JCT transaction, as calculated by Mr. Risius under the proposed December 19 Term Sheet. [3/4/2022 a.m. Trial Tr. at 21:10-22:7] [Risius Direct]; [3/4/2022 a.m. Trial Tr. at 43:16-44:3] [Risius Cross]. At a high level, Mr. Risius concluded that Allied's Estate suffered damages of approximately $158.6 million, before interest, arising from the Trustee's claim for breach of fiduciary duty in connection with the failed pre-bankruptcy JCT transaction. [3/4/2022 a.m. Trial Tr. at 14:9-16] [Risius Direct]. Separately, Mr. Risius concluded that the non-Yucaipa first lien lenders suffered damages of over $72 million, arising from the Trustee's claim for breach of the implied covenant of good faith and fair dealing, again in connection with the failed pre-bankruptcy JCT transaction. [3/4/2022 a.m. Trial Tr. at 37:6-14] [Risius Direct]. The difference between the two figures (approximately $86 million) represents "losses" that were effectively

51

sustained by Yucaipa, itself, from the failure of the hypothetical transaction with JCT under the December 19 Term Sheet. [3/4/2022 a.m. Trial Tr. at 37:21–38:3] [Risius Direct]. In other words, a majority of Mr. Risius's concluded damages to Allied's Estate is derived from amounts that would have been payable directly to Yucaipa, the Defendant, in the hypothetical JCT transaction. [3/4/2022 a.m. Trial Tr. at 49:2-10] [Risius Cross].

138.    For the reasons set forth below, the Court finds that Mr. Risius' calculation of damages is flawed and unreliable and based upon unreasonable assumptions. As a result, the Court further finds that the Trustee has failed to meet her burden with respect to the amount of damages she seeks to recover, and, thus, may not recover any such damages regardless of whether she has established a basis for liability, which as set forth in Conclusions of Law Section II.A, the Court finds she has not done.

A.    **Damages to Allied's Estate**

1.    **Implied Enterprise Value From the December 19 Term Sheet**

139.    Mr. Risius calculated damages to Allied's Estate by first implying an enterprise value for Allied from the December 19 Term Sheet. [3/4/2022 a.m. Trial Tr. at 43:16-44:3; *see also* 105:19–23] [Risius Cross] ("THE COURT: But you're actually calculating enterprise value based on the numbers in the December term sheet, right? . . . THE WITNESS: I think that's accurate."). Although the December 19 Term Sheet constituted an offer to purchase claims held only by Black Diamond, it contained a short description of JCT's intent to negotiate separate agreements with each of Spectrum, CIT, and Yucaipa, to purchase claims held by each of those parties against Allied. (Ex. 90 at 3). ("Buyer will purchase the following claims under the Credit Agreements from Black Diamond, Yucaipa, CIT and Spectrum, provided that Buyer will negotiate separate term sheets and definitive agreements with each seller of such claims"). JCT

52

also proposed in the December 19 Term Sheet to borrow $120 million from Black Diamond to finance the cash portion of the proposed consideration.  (Ex. 90).  Taken together, JCT proposed to finance the entire purchase price consideration described in the December 19 Term Sheet. [3/4/2022 p.m. Trial Tr. at 92:6-21] [Fischel Direct].

140.    The December 19 Term Sheet stated that JCT intended to "purchase the following claims under the Credit Agreements from Black Diamond, Yucaipa, CIT and Spectrum": (1) first lien term loans having a principal balance of approximately $150 million, (2) first lien revolving loans having a principal balance of approximately $35 million, and (3) first lien letters of credit having a principal balance of approximately $30 million.  (Ex. 90.)  Thus, JCT stated in its offer to Black Diamond that it would propose to purchase first lien claims having an aggregate principal balance of approximately $215 million from four lenders; i.e., Black Diamond, Yucaipa, CIT and Spectrum.  The term sheet said nothing about JCT's interest in purchasing any additional first lien debt or about purchasing debt held by any other first lien lenders.  [3/4/2022 a.m. Trial Tr. at 91:16-19] [Risius Cross].

141.    Nevertheless, Mr. Risius concluded that JCT was actually proposing in December 2011: (i) to purchase all $244 million in outstanding first lien claims against Allied from all holders of that debt, including multiple holders with which JCT never negotiated, and (ii) to pay the full face amount of all first lien debt held by any such other lenders.  [3/4/2022 a.m. Trial Tr. at 65:16-66:4; 89:1-5; 91:20-92:5] [Risius Cross].  The December 19 Term Sheet provided that JCT's offer to Black Diamond was subject to the negotiation of "separate term sheets and definitive agreements" with each of Black Diamond, Yucaipa, CIT and Spectrum; it made no reference to any agreement to be negotiated with any other holder of claims against Allied.  *See* (Ex. 90).  Hence, by assuming that JCT would have purchased any claims in excess of the $215

53

million identified in the December 19 Term Sheet, Mr. Risius added approximately $29 million

to Allied's value, as "implied" by that term sheet.

142.    Mr. Risius attempted to defend his conclusion that JCT would have paid par for

all first lien loans held by other lenders by citing "subsequent term sheets which had purchase

language in it for the residual lenders." [3/4/2022 a.m. Trial Tr. at 24:2-10] [Risius Direct].

However, his alleged reliance on one subsequent term sheet for this purpose cannot be squared

with his decision to ignore JCT's proposals to pay lenders other than Yucaipa far less than par in

other subsequent term sheets. Mr. Risius testified that he relied on the December 19 Term Sheet,

even though that term sheet did not include an offer to any "residual" lenders, because it would

not be credible to "cherry pick" favorable terms from different term sheets that JCT provided

during the course of the negotiations. [3/4/2022 a.m. Trial Tr. at 21:10-22:7] [Risius Direct];

[3/4/2022 a.m. Trial Tr. at 147:15-148:4] [Risius Cross]. Nevertheless, that is what Mr. Risius

has done here. Further, the March 8, 2012 term sheet sent to Yucaipa, which is the only term

sheet that mentions the purchase of claims held by other lenders, stated that JCT would purchase

claims held by other lenders at a price "up to par plus accrued and unpaid interest." (Ex. 122 at

14) (emphasis added). That term sheet did not constitute an offer to any lender other than

Yucaipa, however, and it provided no assurance that JCT would, in fact, purchase any claims

held by any such lenders at par, as Mr. Risius assumed.

143.    According to Mr. Risius, JCT would only have agreed to purchase Allied's first

lien debt upon the simultaneous agreement by all parties on the terms of a pre-negotiated chapter

11 bankruptcy case for Allied, which would conclude within 90 days, and in which Allied's

assets would be sold to JCT pursuant to 11 U.S.C. § 363 in exchange for a credit bid by JCT of

the full principal amount of all of Allied's first lien debt. [3/4/2022 a.m. Trial Tr. at 42:9-16]

[Risius Cross].  Mr. Risius acknowledged on Cross-examination, however, that JCT had not, in fact, negotiated any such terms of a potential credit bid with any party as of December 19, 2011 and that no such agreement was ever reached between any of the parties.  [3/4/2022 a.m. Trial Tr. at 44:16-19] [Risius Cross].  Hence, notwithstanding Mr. Risius's assumption to the contrary, JCT might have been expected to credit bid far less than the full principal amount of all of Allied's first lien debt in the context of any bankruptcy sale of Allied's assets, which would have translated to substantially less value for Allied's Estate than Mr. Risius assumed, and potentially less value than Allied's Estate actually realized in 2013.

## 2. Estimated Expenses

144.    After arriving at an implied value of over $244 million for Allied, Mr. Risius reduced that figure by $5 million, which he testified was an "extremely conservative" estimate of the expenses associated with a pre-negotiated bankruptcy process lasting 90 days.  [3/4/2022 a.m. Trial Tr. at 31:21-32:5; 44:4-6; 66:5-8; 95:21-96:21] [Risius Cross].  Mr. Risius based the $5 million estimate of expenses entirely on his own "experience" and on the opinions of certain of his co-workers, to which he described the circumstances of the case "generically."  [3/4/2022 a.m. Trial Tr. at 31:21-32:5] [Risius Direct].

145.    No evidence was presented by the Trustee to support Mr. Risius's assumption that a pre-negotiated bankruptcy of any sort – let alone one that could be concluded within 90 days – was plausible for Allied, a complex operating business that had billions of dollars of debt in addition to that held by the first lien lenders.  Notably, Allied was the subject of a chapter 11 bankruptcy case that was commenced in 2012, in which it took more than three and a half years to confirm a plan, and in which Allied's assets were actually sold to JCT in 2013 (the "363

55

<u>Sale</u>") in a Court-supervised process that was not approved until 16 months after Allied's petition date. (Stip. Fact ¶¶ 60, 62, 64).

146.    In estimating the expenses associated with a hypothetical Allied bankruptcy case at $5 million, Mr. Risius ignored evidence of expenses that Allied's Estate actually incurred in Allied's real-life chapter 11 case. [3/4/2022 p.m. Trial Tr. at 104:25-105:20] [Fischel Direct]. Mr. Risius acknowledged that Allied's Estate paid from the proceeds of the 363 Sale approximately $79 million to satisfy obligations of the Estate that had been incurred through the date of the 363 Sale, including over $29 million to pay off a DIP loan, nearly $9 million to fund an expense reserve, $12.5 million to fund winddown reserves, and over $28 million to pay prepetition expenses. [3/4/2022 a.m. Trial Tr. at 93:21-94:13] [Risius Cross]. Mr. Risius did not account for these actual expenses – which alone total approximately half the amount of his concluded damages to the Estate – when arriving at his $5 million estimate of expenses. [3/4/2022 a.m. Trial Tr. at 97:1-5] [Risius Cross]. His estimate of expenses also did not include those that would have been incurred in connection with negotiating and documenting term sheets between JCT and each of the selling lenders, final debt sale agreements, prepetition agreements concerning the terms of an Allied bankruptcy filing, asset sale agreements, and the like. [3/4/2022 a.m. Trial Tr. at 94:25-95:20] [Risius Cross]. Mr. Risius failed to identify any expenses actually incurred in the Allied bankruptcy which would not have been incurred in the hypothetical 90 day sale process he considered, thereby rendering his damage calculations entirely speculative. The Court finds that Mr. Risius's estimate of $5 million in expenses to be unreasonably aggressive, rather than conservative, because it had the effect of substantially increasing the Trustee's damages claims. [3/4/2022 p.m. Trial Tr. at 105:23-106:6] [Fischel Direct].

### 3.    Assumed Benefit to Allied's Estate

147.    According to Mr. Risius, "Allied's estate would have received net proceeds in the amount of $239 million and change" in a hypothetical transaction with JCT. [3/4/2022 a.m. Trial Tr. at 46:4-7] [Risius Cross].  When pressed, however, Mr. Risius acknowledged that, had the transactions described in the December 19 Term Sheet been consummated, Allied would not have received any cash "proceeds"; rather, Allied's Estate would have benefited only if JCT would be the successful bidder at a hypothetical auction of Allied's assets at which JCT would have credit bid the entirety of the purchased debt. [3/4/2022 a.m. Trial Tr. at 47:3-12] [Risius Cross].  By contrast, in reality, Allied's Estate received approximately $135 million in cash proceeds in the 363 Sale, as well as additional consideration from the sale of certain other assets. [3/4/2022 a.m. Trial Tr. at 32:10-33:22] [Risius Direct].

148.    Mr. Risius further acknowledged that any cash proceeds in the December 19 Term Sheet transaction would have been paid directly to the selling lenders with which JCT was negotiating individual debt purchase transactions.  [3/4/2022 a.m. Trial Tr. at 47:13-48:2; 75:4-11] [Risius Cross] ("The cash was going to go to the holders of the first lien debt as part of all of these term sheets.").  Indeed, $150 million – over 60% of the total consideration that JCT was allegedly proposing to pay in the transaction – would have gone directly to Yucaipa under the term sheet forming the basis for Mr. Risius's opinion.  [3/4/2022 a.m. Trial Tr. at 49:2–10; 88:1–6; 88:12–19] [Risius Cross].

149.    Mr. Risius ultimately concluded that Allied's Estate suffered damages in the amount of approximately $158.6 million, before interest, by reducing the $239.2 million "net proceeds" figure by $80.616 million, which he found was the amount actually recovered by Allied's first lien lenders in Allied's bankruptcy case.  [3/4/2022 a.m. Trial Tr. at 49:25-50:10; 67:2-6] [Risius Cross].  In other words, Mr. Risius calculated damages to Allied's Estate by

reference to the amount that Allied's first lien lenders received in Allied's bankruptcy case, rather than by what Allied' Estate actually received directly.

150.    This distinction is significant.  The Court approved a sale of substantially all of Allied's assets to JCT in 2013 for $135 million.  (Stip. Fact ¶ 60).  As discussed above, Allied used most of the sale proceeds to satisfy obligations of the Estate, including amounts owed on a debtor-in-possession loan, certain prepetition expenses, and wind-down expenses.  Mr. Risius did not reduce his damages figure by those amounts.  Rather, he assumed that if proceeds of the 363 Sale did not go to Allied's first lien lenders, Allied's Estate did not benefit from those proceeds.  [3/4/2022 a.m. Trial Tr. at 83:16-19] [Risius Cross] ("I'm looking at this defining the estate as all of the stakeholders, the first lien debt holders, and so forth, so that didn't enter into that calculation because the estate is the lender.").  However, as the Court observed at trial, Allied's Estate consisted of a much broader array of creditors, which Mr. Risius failed to consider in his analysis.  [3/4/2022 a.m. Trial Tr. at 83:21-84:2] [Risius Cross] ("THE COURT: Well, there are other claims, right? There are admin claims, secured claims, unsecured claims, DIP claims.  THE WITNESS: Fair.  THE COURT: The company couldn't [sic] gone into even a 90-day bankruptcy without a DIP, right?  THE WITNESS: Right. Right.").

151.    In calculating damages, Mr. Risius further assumed that JCT would credit bid the full amount of Allied's first lien debt in exchange for Allied's assets, which would have eliminated all first lien claims against Allied's Estate.  [3/4/2022 a.m. Trial Tr. at 84:14-20] [Risius Cross] ("THE COURT: . . .  You just assumed they credit bid the whole amount.  THE WITNESS: Yes.").  However, the December 19 Term Sheet did not require JCT to credit bid any debt in exchange for Allied's assets.  (Ex. 90); *see also* [3/4/2022 a.m. Trial Tr. at 87:19-24] [Risius Cross] ("Q . . . Can you please point the Court to the requirement in the December 19,

58

2011 Term Sheet that JCT had to credit bid any amount at a 363 sale? . . . A I don't recall that being in there.").  Moreover, when JCT attempted to negotiate definitive documents with Allied and Yucaipa in April 2012, the parties included a rather typical provision in a draft asset purchase agreement that would have permitted JCT to bid "up to" the amount of the purchased debt.  (DX X at 117).

152.    As the Court observed at trial, it was unreasonable for Mr. Risius to assume that Allied's Estate suffered any damages under the circumstances:

> "THE COURT: So I'm just trying to figure out.  You talk about implied enterprise value to the estate based on purchase prices of secured debt. But if the purchase price of the secured debt includes a premium, say a control premium, and when you actually go to bankruptcy, you don't bid the entire $200-and-something million, say you bet [sic] a 100 million, isn't a fair estimate of enterprise value based on a credit bid, the actual amount of the credit bid than what someone necessarily paid for the debt that they used for the credit bid? And we don't know what that amount would have been, right?
>
> THE WITNESS: Right."

[3/4/2022 a.m. Trial Tr. at 84:3-13] [Risius Cross].

153.    Had Mr. Risius's presumed hypothetical series of transactions been consummated, and JCT had not credit bid the full amount of the purchased debt, JCT would have continued to hold claims against Allied's Estate, in place of Allied's existing first lien lenders.  [3/4/2022 p.m. Trial Tr. at 86:11-87:1] [Fischel Direct].  In that event, the Estate might well have been left worse off than it was following the 363 Sale.  Any determination to the contrary would be purely speculative.

**4.    The December 19 Term Sheet Was Preliminary and Highly Conditional.**

154.    The December 19 Term Sheet was conditioned upon numerous events that did not occur as of December 2011, and in many cases could never have occurred.  For example, the December 19 Term Sheet required Black Diamond to extend financing to JCT, but the parties

59

had not agreed to terms in December 2011 and never agreed to such terms.  [3/4/2022 a.m. Trial

Tr. at 120:18–121:1] [Risius Cross].  While the Trustee argued at trial that this condition was

removed by JCT in subsequent term sheets, Mr. Risius' analysis was based on the December 19

Term Sheet, not such subsequent term sheets.  [3/4/2022 a.m. Trial Tr. at 43:16-44:3; *see also*

105:19-23] [Risius Cross].  Importantly, even though there is no dispute that JCT needed

financing to consummate the hypothetical transaction, no evidence was presented at trial that

JCT had obtained a financing commitment from any other source.  [3/1/2022 p.m. Trial Tr. at

132:13-25] [Deckoff Cross] (testifying that JCT needed financing for the transaction proposed by

the December 19 Term Sheet).  JCT was also requiring, in order for the parties to conduct

diligence, that BD/S enter into confidentiality agreements with JCT.  (Ex. 90).  But no such

confidentiality agreements, or "NDAs" had been signed between JCT and BD/S as of January

2012.  *See* (Ex. 468); *see also* [3/1/2022 p.m. Trial Tr. at 135:3-24] [Deckoff Cross] (testifying

that he did not know whether Black Diamond and JCT had entered into a confidentiality

agreement to enable required diligence at the time of the December 19 Term Sheet); *see also*

[3/1/2022 p.m. Trial Tr. at 142:20-24] [Deckoff Cross].  JCT was also requiring as part of an

agreement with BD/S, that BD/S enter into a three-year non-compete agreement.  (Ex. 90).  This,

among other things in the December 19 Term Sheet, was unacceptable to Spectrum.  *See, e.g.*,

(Ex. 127 at 1) (April 2012 Schaffer email to JCT stating that "we will not agree to a 'non-

compete' of any kind with our investments.").  JCT's agreement to purchase Black Diamond's

debt was also conditioned on the "negotiat[ion of] separate term sheets and definitive documents

with each" of Yucaipa, Black Diamond, CIT, and Spectrum.  (Ex. 90); *see also* [3/4/2022 a.m.

Trial Tr. at 140:10–141:4] [Risius Cross].  But no such definitive agreements had been finalized

between JCT and any lender in December 2011 or at any time thereafter.  [3/4/2022 a.m. Trial Tr. at 123:23–124:10] [Risius Cross].

155.    In addition, the December 19 Term Sheet was conditioned upon the satisfaction of all conditions to which JCT would ultimately agree with Yucaipa, none of which had been agreed as of December 19, 2011.  (Ex. 90); *see also* [3/4/2022 a.m. Trial Tr. at 124:22–125:10] [Risius Cross] ("This was non-binding, and so it wasn't agreed to.  So it was -- it was a whole list of things had to happen -- had to happen before you have a definitive agreement.").  The conditions that JCT was demanding at the time in its separate negotiations with Yucaipa included, among other things: (i) JCT conducting diligence and confirming that Allied had "sustainable annual EBITDA in excess of $40 million"; (ii) releases of claims between JCT, Allied, Yucaipa, and other lenders; (iii) JCT obtaining the consent of its existing lenders to consummate the transactions; (iv) JCT obtaining governmental and regulatory consents; (v) an agreement among the lenders and the first lien agent that Yucaipa represents the Requisite Lender, which was then being hotly disputed; and (vi) the dismissal of certain litigation.  (Ex. 118.)  None of these conditions had been satisfied at the time, but Mr. Risius did not discount his opinion of damages as a result.  [3/4/2022 a.m. Trial Tr. at 140:7-9] [Risius Cross]; *see also* [3/1/2022 p.m. Trial Tr. at 135:3-24; 137:1-9] [Deckoff Cross] (testifying that he did not know whether Black Diamond and JCT had entered into a confidentiality agreement to enable required diligence at the time of the December 19 Term Sheet); [3/1/2022 p.m. Trial Tr. at 145:12-16] [Deckoff Cross] (testifying that Black Diamond and JCT had not executed an NDA as of January 2012); [3/1/2022 p.m. Trial Tr. at 145:12-16] [Deckoff Cross] (testifying that no non-compete had been signed at the time of the December 19 Term Sheet).  Rather, he simply assumed that "a

61

deal was able to be had with JCT," regardless of the conditions demanded by JCT, which were never met. [3/4/2022 a.m. Trial Tr. at 125:11–126:1] [Risius Cross].

156.     Although it was a condition to any transaction, JCT had not performed any diligence on Allied at the time that it sent the December 19 Term Sheet to Black Diamond and JCT was not aware of Allied's financial condition at the time. [3/4/2022 a.m. Trial Tr. at 136:10–15] [Risius Cross] ("Q. Isn't it true, sir, that there was no due diligence done by the time the December 2011 Term Sheets, one to Yucaipa, one to Black Diamond/Spectrum, there was no due diligence done by then, and the due diligence that occurred occurred [sic] well after that time? Isn't that true? A. Yes."). In fact, JCT had not conducted any due diligence on Allied until after the Petition Date. [3/2/2022 p.m. Trial Tr. at 83:23-83:15] [Tochner Cross] (testifying that JCT had not done due diligence in connection with any pre-bankruptcy proposals); [3/1/2022 p.m. Trial Tr. at 140:22-141:3] [Deckoff Cross].

**5.     The December 19 Term Sheet Was Not Binding or Acceptable to Black Diamond.**

157.     By its terms, the December 19 Term Sheet was not a final term sheet and was not binding on any party. (Ex. 90) ("The terms and conditions summarized herein are provided for discussion purposes only, and are nonenforceable or binding on any parties hereto"); [3/4/2022 a.m. Trial Tr. at 54:12-21] [Risius Cross] (stating that the December 19 Term Sheet "clearly wasn't" final and that there were a number of term sheets thereafter); [3/4/2022 a.m. Trial Tr. at 122:8-10] [Risius Cross] ("Q. There is[n't] one thing in Exhibit 90 that's binding. Isn't that true? A. Correct."). No party, including Black Diamond, ever agreed to the terms of the December 19 Term Sheet. [3/4/2022 a.m. Trial Tr. at 74:2–9] [Risius Cross]. Indeed, Mr. Deckoff testified that the December 19 Term Sheet was not acceptable to Black Diamond. [3/1/2022 a.m. Trial

Tr. at 78:19-24] [Deckoff Direct].  As a result, no transaction could have been consummated on the terms outlined in the December 19 Term Sheet relied upon by Mr. Risius in support of his damage calculations because Black Diamond – the only party to which that term sheet was addressed – did not agree to its terms.

158.    Moreover, any deal with JCT was predicated on JCT reaching agreements with multiple other parties through separate negotiations.  (Ex. 90.)  As Mr. Risius testified: "A deal never happened with any of the parties because -- and a deal wouldn't have happened with any of the parties because JCT was only going to do it if they got everybody on the same page and had a deal that happened because they weren't interested in Black Diamond's debt, Yucaipa's debt, CIT's debt or Spectrum's debt on a standalone basis."  [3/4/2022 a.m. Trial Tr. at 74:2–9] [Risius Cross].

6.    **The December 19 Term Sheet Was Superseded by Subsequent Term Sheets That Contemplated Lower Values.**

159.    As discussed above, Mr. Risius calculated damages on the basis of the December 19 Term Sheet.  Mr. Risius's reliance on that term sheet was arbitrary, however, as JCT and Black Diamond did not reach agreement on the terms of the December 19 Term Sheet, and those parties continued to negotiate on and off until May 2012.  [3/4/2022 a.m. Trial Tr. at 54:12-15] [Risius Cross] ("Q. . . . did you see any evidence that the December 19, 2011, term sheet was a final term sheet?  A. Oh, it clearly wasn't.  There was a number of term sheets thereafter. . . ");  *see also* [3/1/2022 p.m. Trial Tr. at 148:12-14] [Deckoff Cross] (December 19 Term Sheet was superseded by later term sheets).  During that period, JCT sent multiple term sheets to BD/S in which JCT proposed to pay materially less to BD/S than it proposed to pay in the December 19 Term Sheet.  *See, e.g.*, (Ex. 123) (May 2012 BD/S Term Sheet); (Ex. 471*) (proposing to pay

63

BD/S as little as 60% of par); [3/4/2022 a.m. Trial Tr. at 58:1-9] [Risius Cross] (acknowledging that JCT proposed to pay less in the May 2012 term sheet). Nevertheless, Mr. Risius ignored these later term sheets in favor of the December 19 Term Sheet, from which he could imply a higher value for Allied. [3/4/2022 a.m. Trial Tr. at 58:1-13] [Risius Cross].

160. As noted above, JCT sent a term sheet to Yucaipa on or about December 15, 2011, which conditioned any transaction with Yucaipa on diligence that would confirm that Allied had "sustainable annual EBITDA in excess of $40 million." (Ex. 118). Allied actually had negative EBITDA in 2011 of over $29 million. [3/4/2022 a.m. Trial Tr. at 128:1-16] [Risius Cross]. Moreover, no evidence was produced to suggest that Allied could have sustainable annual EBITDA in excess of $40 million in the future. *Cf.* [3/4/2022 a.m. Trial Tr. at 96:15-17] [Risius Cross] ("THE COURT: Now, the company – in 2011 and 2012, the company had negative EBITDA; correct? THE WITNESS:·Reported, yes."). Thus, JCT appears to have believed in December 2011 – before it had the opportunity to conduct diligence – that Allied was a profitable company when, in fact, it was not.

161. As JCT began to receive information about Allied's true financial condition, it lowered its offers dramatically. An email chain dated August 17, 2012 indicates that, after Allied's investment banker provided certain financial information about Allied to JCT and its professionals in August 2012, Mr. Riggs expressed shock and concern:

> "Based on 2012 year-to-date financial results, Allied is running $17 million lower (annualized) EBITDA than we projected based on our snapshot of 2011. So earnings are going the wrong way. Even more troubling, the attached CIM we received from Rothchild makes no sense. The projected Allied capex is almost as large as the forecasted EBITDA over the next four years. See page 59. . . . If these capex figures are accurate, then are all your 1,200-part [*sic*] trucks junk? In addition, there is no demonstrable way Allied can ever achieve the EBITDA level that they forecast."

> ". . . . Even if they miraculously did hit their EBITDA projections, which is highly doubtful, it is almost a negative cash flow projection for the next four

64

years. Maybe I am missing something, but given its overall tone, I assume the CIM was supposed to be a 'selling document' from Rothchild. Instead it almost appears you're trying to scare me off. This poor performance and unbelievable set of projections is making it much more difficult for Barclay's to get committed financing."

[3/4/2022 a.m. Trial Tr. at [132:22-134:8] [Risius Cross] (quoting Ex. 97).

162.    However, Mr. Risius understood that, even by August 2012, JCT still had only a limited window into Allied's true financial condition.  [3/4/2022 a.m. Trial Tr. at 135:24-136:9] [Risius Cross] (". . . . due diligence means something to me.  As I read this e-mail, I read this as they were very early on in the process.  So I'm not sure due diligence had really been conducted because he just received the confidential information memorandum.  That would be that, you know, JCT's due diligence hadn't begun, that they were just relying on the sales document at that point.").

163.    On August 23, 2012, just days after sending this email, JCT submitted a bid directly to Allied's board to acquire Allied's assets, which Mr. Risius valued at $40 million in cash plus $80 million in second lien term loans, non-voting common stock, and an "assumed liability amount."  [3/4/2022 a.m. Trial Tr. at 135:13-19] [Risius Cross].  Although this proposal described a much simpler asset sale transaction from JCT's perspective than the multi-step transaction described in the December 19 Term Sheet, it was still at a lower price and with materially less valuable consideration.  Mr. Risius refused to admit that JCT would likely have been willing to pay more for Allied if it had been a highly profitable company, as contemplated by the December 19 Term Sheet, than an unprofitable company, which JCT discovered to be the case in August 2012.  [3/4/2022 a.m. Trial Tr. at 128:17-21] [Risius Cross].

164.    Allied's board of directors and its advisors rejected JCT's August 2012 proposal as unacceptable because they did not believe that it was a real commitment.  (Ex. 641*).  That proposal was conditioned on, among other things, JCT renegotiating the terms of Allied's

65

contracts with third parties.  (Ex. 641* at 3) (describing the proposal as "a re-trade with a lot of open items subject to further re-trade" and that "[t]he most glaring issue with the proposal, according to Mr. Antinelli, was the fact that it was contingent on the renegotiation of the Company's contract with Ford, resulting in at least $20 million in additional annual revenue, with the negotiations to be handled by JCT.").  The Board minutes[18] indicate:

> Mr. Antinelli opined that this provision represented an obvious opportunity for JCT to continue renegotiating the proposal, and concluded that the Company obviously could not stand by while its largest competitor renegotiated the Company's contract with its largest customer. . . Mr. Gendregske stated that pursuing the JCT deal as structured would be a terrible strategy. He said that JCT would have more leverage to get what it wanted from Ford after the deal was done, and that going to Ford in advance would likely kill the Company.  Mr. Antinelli expressed his complete agreement. He then stated that Barclays was not likely to come up with a  better financing structure than anchor and arrange. He then noted the current proposal, when compared to the prior proposal, represented $15 million less cash, $75 million less paper, elimination of the $20 million non-compete payment, and elimination of the $6.5 million payment obligations to management. . ."

(Ex. 641* at 2-3).

165.    Additionally, Allied's Board and advisors were of the opinion that JCT may not be able to obtain financing for a purchase of Allied at $200 million and expressed doubt as to whether JCT could obtain the necessary bondholder consent for such a transaction because the bondholders felt that at $200 million JCT was overpaying for Allied.  (Ex. 641* at 2).  Even after conducting an extensive marketing campaign, Allied yielded no significant interest from other potential purchasers.  (Ex. 641* at 12) (summarizing the marketing process and noting that Rothschild had contacted 91 parties and 16 NDAs had been executed with potential buyers).

---

[18] Allied's Board minutes are admissible party admissions when offered by Yucaipa because they are party admissions, as the Trustee has stepped into the shoes of the Company and is an adverse party.

166.    Having failed to reach agreement with JCT, Allied sought approval from the Court in May 2013 to sell its assets in the 363 Sale.  (D.I. 1175).  Although Allied solicited interest in the sale from 91 potentially interested parties, JCT and BD/S, through a credit bid, were the only parties to express a firm interest in acquiring Allied's assets.  *See* (Ex. 641*); [3/2/2022 p.m. Trial Tr. at 88:3-16] [Tochner Cross].  Ultimately, JCT submitted a winning bid of $135 million in cash for substantially all of Allied's assets, after increasing its bid as a result of competing credit bids submitted by BD/S.  (Stip. Fact ¶ 60).  Mr. Risius did not discount his damages calculations to reflect these subsequent developments to the December 19 Term Sheet.

### 7.    Value of the Proposed JCT Note Consideration.

167.    By its terms, JCT proposed in the December 19 Term Sheet to provide 100% of the consideration payable to BD/S, and a majority of the total consideration payable to all selling lenders, in the form of new notes to be issued by JCT (the JCT Notes).  (Ex. 90.)  Mr. Risius valued those JCT Notes at par in calculating damages to Allied's Estate.  [3/4/2022 a.m. Trial Tr. at 102:12-19] [Risius Cross].  Mr. Risius assumed the debt consideration proposed to be tendered by JCT in the transaction would trade at par, simply because JCT's existing debt had traded around par prior to December 2011.  [3/4/2022 a.m. Trial Tr. at 104:6-13] [Risius Cross].  This analysis proved too simplistic to be reliable.  Mr. Risius did not perform a credit analysis with respect to JCT and did not consider the implications to JCT or its creditors of JCT's incurrence of over $200 million in new debt to finance the proposed transaction.  [3/4/2022 a.m. Trial Tr. at 104:14-23] [Risius Cross].  In December 2011, when JCT's notes had traded at par, JCT had approximately $155 million in debt outstanding.  (PX Y).  Had JCT financed this transaction as proposed in the December 19 Term Sheet, it would have far more than doubled its debt load.

67

168.    Mr. Risius testified that he never looked at JCT's financial statements, never did any credit analysis with respect to JCT, and never considered whether JCT could even service the debt that would be incurred in the proposed transaction.  [3/4/2022 a.m. Trial Tr. at 109:5-13] [Risius Cross].  Mr. Risius also did not discount the value of the debt that JCT was offering, even though he was aware that JCT was in default on its outstanding notes while it was negotiating with Allied's lenders (though it had failed to disclose that default in the context of its negotiations with Allied's lenders).  [3/4/2022 a.m. Trial Tr. at 109:14-22] [Risius Cross].

169.    In addition, the December 19 Term Sheet proposed to provide the selling lenders with the debt consideration only "if and upon" the filing of a bankruptcy case for Allied and the subsequent sale of Allied's assets to JCT in a 363 sale.  (Ex. 90.)  Although the debt consideration was made conditional upon a later sale of Allied's assets to JCT (which was not guaranteed), and would be payable, if at all, only at some undetermined time after December 19, 2011, Mr. Risius did not discount the value of that consideration to reflect its conditionality or the delay in payment when calculating damages.  [3/4/2022 a.m. Trial Tr. at 99:19-100:9; 101:1-4] [Risius Cross].

170.    By contrast, JCT's own offers implied a significant discount in the value of JCT's debt.  Throughout the negotiations, JCT consistently offered to pay Allied's lenders less in cash than it would in new debt.  *See, e.g.*, (Ex. 471*) (email dated March 8, 2012 summarizing two alternatives proposed by JCT to BD/S, as "1) We can receive 70% of par - of which, 50% would be paid in Modified Jack Cooper bonds at First Close and 50% in Modified Jack Cooper bonds at Second Close. 2) We can receive 60% of par - of which, 25% would be paid in Modified Jack Cooper bonds at First Close and 75% in cash at Second Close."); (Ex. 96) (attaching term sheet dated June 26, 2012 from JCT to Allied offering first lien lenders the option to receive either (i)

68

57% of principal amount in cash or (ii) 85% of principal in new JCT notes, plus warrants). Thus, JCT—which certainly was in a better position than Mr. Risius to value its own debt—consistently discounted the value of its proposed debt consideration in its offers, while Mr. Risius made no attempt to discount that consideration in calculating damages.

### 8.    Losses Attributable to Allied's Bankruptcy.

171.    Mr. Risius testified that Allied likely lost significant operational value as a result of being placed into an involuntary bankruptcy proceeding by BD/S in May 2012. [3/4/2022 a.m. Trial Tr. at 120:6-17] [Risius Cross]. He further testified that the transactions described in the December 19 Term Sheet were also conditioned upon Allied being placed into bankruptcy. [3/4/2022 a.m. Trial Tr. at 50:11-22] [Risius Cross]. In addition, Mr. Risius testified that bankruptcy would likely have been value-destructive for Allied. [3/4/2022 a.m. Trial Tr. at 120:6-14] [Risius Cross] (". . . . it certainly doesn't help a company in the automotive industry to be in bankruptcy, particularly to be – you have issues with suppliers, customers. It puts pressure on the business, for sure."). Yet, Mr. Risius did not discount the Estate's damages for losses that could have been expected to be suffered by Allied in the bankruptcy case that JCT was requiring for Allied under the December 19 Term Sheet. *See* [3/4/2022 a.m. Trial Tr. at 17:2-14] [Risius Direct].

### 9.    Market Prices of Allied's First Lien Debt.

172.    Mr. Risius implied from the December 19 Term Sheet that JCT was willing to pay over $244 million to purchase all of Allied's first lien debt in December 2011. [3/4/2022 a.m. Trial Tr. at 43:16-44:3] [Risius Cross]. That amount is almost exactly equal to the aggregate principal amount of Allied's first lien debt that was outstanding at the time; *i.e.*, Mr. Risius's implied enterprise value for Allied was approximately equal to 100% of the principal amount of

69

Allied's first lien debt. [3/4/2022 a.m. Trial Tr. at 78:15-18] [Risius Cross]. Notably, however, that same debt was trading for 5 to 8 cents of par dollar value at the time. [3/4/2022 p.m. Trial Tr. at 101:20-103:3] [Fischel Direct]; (Ex. 805 at Ex. 3A & 3B); [3/4/2022 a.m. Trial Tr. at 79:7-9] [Risius Cross]. Mr. Risius ignored the actual market trading prices of the debt when calculating damages that were premised upon Allied's value. [3/4/2022 a.m. Trial Tr. at 104:24-105:10] [Risius Cross]; *Cf.* [3/4/2022 a.m. Trial Tr. at 104:24-105:2 ("THE COURT: Well, you do think you're smarter than the market because you didn't value the first lien debt at its market price of 10 cents. You valued the first lien debt at face value.").

**10.    Mr. Risius Calculated Damages as of December 19, 2011.**

173.    Mr. Risius calculated damages as of December 19, 2011, even though there was no agreement, even in principle, between any of the parties as of that date, and the transactions described in the December 19 Term Sheet could not have closed on that date. [3/4/2022 a.m. Trial Tr. at 101:8-17] [Risius Cross]. As Mr. Risius testified: "[T]his was a term sheet that was sent, that was delivered on December 19th. It was not, you know, a deal's not going to happen like magic, and close on that date. A deal -- we don't even have an agreement that actually was signed in the "but-for" world, right. And even if there were, there would have been a process, a period of time, 90 days, to get through this 363 sale process pre-negotiated." [3/4/2022 a.m. Trial Tr. at 101:8-17] [Risius Cross]. Nevertheless, Mr. Risius calculated prejudgment interest as accruing beginning on December 19, 2011. [3/4/2022 a.m. Trial Tr. at 101:10-17] [Risius Cross].

**B.    Lender Damages**

174.    Mr. Risius separately determined that the Trustee should be awarded, in the alternative, damages of over $72 million before interest, on account of the Lender claim for

70

breach of the implied covenant.  [3/4/2022 a.m. Trial Tr. at 37:6-14] [Risius Direct].  Mr. Risius

concluded that the damages suffered by the non-Yucaipa first lien lenders should be measured by

the difference between (a) what those lenders would have received upon a ratable distribution of

the same $239.2 million that he assumed JCT was prepared to pay under the December 19 Term

Sheet, after $5 million in hypothetical expenses, and (b) what those lenders actually recovered in

Allied's bankruptcy case.  [3/4/2022 a.m. Trial Tr. at 142:14–143:4] [Risius Cross].  The only

difference between Mr. Risius's calculation of damages to the lenders and the Estate is that the

former excludes amounts attributed to Yucaipa's share of the proposed purchase consideration

equal to approximately $86 million.  [3/4/2022 a.m. Trial Tr. at 37:15-38:3] [Risius Direct].

175.    At trial, however, Mr. Risius acknowledged that the December 19 Term Sheet did

not propose ratable treatment for the lenders.  For example, JCT had proposed to pay CIT $20

million in exchange for over $35 million in claims.  (Ex. 90); *see also* [3/4/2022 a.m. Trial Tr. at

143:18-22] [Risius Cross].  By calculating damages assuming a ratable distribution among the

non-Yucaipa lenders, Mr. Risius ignored the discount in JCT's offer to CIT, which inflated his

damages to the lenders by approximately $15 million.  [3/4/2022 a.m. Trial Tr. at 143:23-144:7]

[Risius Cross].

176.    Mr. Risius also testified that he was aware that the Trustee had already recovered

substantial amounts through a settlement of certain claims asserted in this litigation, and that he

was also aware of the Court's prior Judgment awarding the Trustee over $130 million in

damages.  [3/4/2022 a.m. Trial Tr. at 52:17-25] [Risius Cross].  Mr. Risius testified that the

lender damages claim at issue was "interdependent" with the breach of contract claims that were

the subject of the Court's prior decision.  [3/4/2022 a.m. Trial Tr. at 51:21-52:16] [Risius Cross].

However, he did not update his damages calculations at trial to reflect the awards and recoveries previously obtained by the Trustee.  [3/4/2022 a.m. Trial Tr. at 53:1–5] [Risius Cross].

## XV.    **EXPERT TESTIMONY OF DANIEL R. FISCHEL REGARDING DAMAGES.**

177.    Yucaipa offered the expert testimony of Daniel R. Fischel on the issue of damages and to rebut the expert testimony of the Trustee's damages expert, Jeffrey Risius.  [3/4/2022 p.m. Trial Tr. at 73:12-108:3] [Fischel Direct].

178.    Professor Fischel is the President of Compass Lexecon, an economics consulting firm, and the Lee and Brena Freeman Professor of Law and Business Emeritus at the University of Chicago Law School.  Professor Fischel was formerly dean of that institution and a professor at Chicago's Graduate School of Business.  He has been extensively published in legal and economics journals and has testified in multiple proceedings in federal and state courts across the country, including this Court and the Delaware Chancery Court.  Professor Fischel has been qualified as an expert and testified on valuation, finance, and damages issues on many prior occasions.  [3/4/2022 p.m. Trial Tr. at 73:12-75:15] [Fischel Direct]; (Ex. 805 at Appendix A).

179.    With no objection from the Trustee, the Court qualified Professor Fischel to testify as Yucaipa's damages expert in this case.  [Professor Fischel delivered an original expert report dated September 27, 2019 (Ex. 805) and a rebuttal expert report dated November 12, 2019 (Ex. 806).  Professor Fischel testified as a live witness before the Court on March 4, 2022.

180.    Professor Fischel rendered two primary expert opinions in his reports and live testimony: (a) it is unreasonable for Mr. Risius to rely on the December 19 Term Sheet and (b) Mr. Risius's estimates of damages are fundamentally flawed.  [3/4/2022 p.m. Trial Tr. at 76:9-78:5] [Fischel Direct].

2137110.25
DOCS_LA:343415.1 96991/001

181.    Mr. Risius relies on the December 19 Term Sheet for a proposed transaction between JCT and BD/S in assessing damages against Yucaipa.  [3/4/2022 p.m. Trial Tr. at 78:7-13; Ex. 90] [Fischel Direct].  Professor Fischel testified that the December 19 Term Sheet is subject to various conditions precedent to executing definitive documents and closing, including conditions precedent to be separately agreed to with Yucaipa.  [3/4/2022 p.m. Trial Tr. at 78:21-79:14] [Fischel Direct]; (Ex. 118).  The 12/15/11 Revised Term Sheet for a proposed transaction between JCT and Yucaipa had various conditions precedent, including access to a third-party due diligence consulting firm to allow such firm to confirm that Allied had sustainable annual EBITDA in excess of $40 million.  [3/4/2022 p.m. Trial Tr. at 79:15-21] [Fischel Direct]; (Ex. 118).  Professor Fischel analyzed Allied's actual EBITDA performance during the period of 2011 through mid-2012.  [3/4/2022 p.m. Trial Tr. at 79:22-24] [Fischel Direct].  He testified that Allied's actual EBITDA for the annual period ending December 31, 2011 was negative $29.280 million and for the six months ending June 30, 2012 was negative $4.707 million.  [3/4/2022 p.m. Trial Tr. at 80:7-12] [Fischel Direct].  Professor Fischel opined that it is improper for Mr. Risius to base his damages calculations on the December 19 Term Sheet without taking into account the failure of Allied to satisfy the EBITDA condition in the 12/15/11 Revised Term Sheet.  [3/4/2022 p.m. Trial Tr. at 80:13-81:5] [Fischel Direct].  Although such EBITDA condition was ultimately deleted in subsequent term sheets between JCT and Yucaipa, as Professor Fischel acknowledged on Cross examination, he emphasized that JCT retained due diligence conditions, among other conditions, in its later term sheets with Yucaipa, including in what has been designated as the Final Term Sheet between JCT and Yucaipa dated March 8, 2012.  [3/4/2022 p.m. Trial Tr. at 139:17-141:3] [Fischel Redirect]; (Ex. 122).

73

182.    Professor Fischel further testified that the 12/15/11 Revised Term Sheet with Yucaipa required JCT to obtain the consent of its third party lenders and investors to consummate the proposed transactions, which did not occur prior to the Petition Date.  [3/4/2022 p.m. Trial Tr. at 81:6-82:16] [Fischel Direct]; (Dep. Tr. Ciuputu at 141:2-141:11) (testifying that he does not recall JCT seeking bondholder consents for the Allied acquisition at any time prior to May 17, 2012); *see also* (Dep. Tr. Riggs at 110:25-111:4).  Professor Fischel opined that there was no basis for Mr. Risius to assume that such consent from non-parties to the negotiations would be obtained and no evidence that such consent was obtained prior to the Petition Date, which further renders Mr. Risius' conclusions as unreasonable and unreliable.  [3/4/2022 p.m. Trial Tr. at 81:6-82:16] [Fischel Direct].  At trial the Trustee pointed to the fact that JCT eventually did obtain its lenders' consent when it purchased Allied for $135 million in bankruptcy.  This fact is unhelpful to the Trustee's damages theory because it establishes only that JCT's lenders were willing to consent to JCT's purchase of Allied assets for a price of $135 million.  It does not establish, one way or the other, whether the lenders would have consented to an earlier transaction for a much higher price and the issuance of approximately $250 million of JCT Notes as contemplated by the December 19 Term Sheet. *See* (Dep. Tr. Ciuputu at 141:2-11) (testifying that JCT never sought bondholder consent prior to the Petition Date); *see also* (Ex. 95) (Riggs, in a June 25, 2012 email, stating: "we are only just starting to get some feedback from our lenders . . . .  However, I do not yet have adequate support to represent to you that I will get consent as the term sheet stands today.  So I did not want you representing that it is 'approved' by our lenders yet to [BD/S]".)

183.    With respect to Mr. Risius' calculation of estate damages, Professor Fischel testified that Mr. Risius calculated damages to Allied's estate of $158.596 million based on the

total amount of Allied's outstanding first lien debt payable under the December 19 Term Sheet

($244.212 million), after deductions for $5 million of projected bankruptcy expenses and

$80.616 million of actual net proceeds available to the First Lien Lenders from the 363 Sale to

JCT and other recoveries.  [3/4/2022 p.m. Trial Tr. at 84:17-85:18] [Fischel Direct].  Professor

Fischel concluded that Mr. Risius' estate damages calculation was fundamentally flawed because

the December 19 Term Sheet contemplated payment by JCT to the First Lien Lenders as part of

a debt sale and not to Allied.  [3/4/2022 p.m. Trial Tr. at 86:11-87:1] [Fischel Direct].  As noted

by Professor Fischel, the estate was not involved in this transaction between JCT and the first

lien lenders at all, so Allied could not have suffered any damages.  [3/4/2022 p.m. Trial Tr. at

86:25-87:1] [Fischel Direct].

184.    With respect to Mr. Risius' calculation of lender damages, Professor Fischel

testified that Mr. Risius calculated damages to the non-Yucaipa first lien lenders of $72.2 million

based on the total amount of Allied's outstanding non-Yucaipa first lien debt, minus $34.9

million of actual net proceeds available to such non-Yucaipa first lien lenders from the 363 Sale

to JCT and other recoveries.  [3/4/2022 p.m. Trial Tr. at 90:12-91:10] [Fischel Direct].  Professor

Fischel noted that the only difference between Mr. Risius' calculations of estate damages and

lender damages is that the lender damages calculation does not include Yucaipa's projected

recovery of $86.4 million on account of its own share of the first lien debt under the December

19 Term Sheet.  [3/4/2022 p.m. Trial Tr. at 90:15-25] [Fischel Direct].

185.    Professor Fischel concluded that Mr. Risius' damages calculations were

fundamentally flawed because there is no basis for Mr. Risius' assumptions that: (a) the JCT

Notes to be issued under the December 19 Term Sheet would have been worth par value at the

time of issuance, (b) the first lien lenders would have received face value for the JCT notes after

75

issuance, and (c) the first lien lenders would have been able to sell their JCT notes for face value at issuance. [3/4/2022 p.m. Trial Tr. at 91:15-92:5] [Fischel Direct].

186.    Professor Fischel testified that JCT proposed to fund its obligations under the December 19 Term Sheet entirely through the incurrence of debt from the issuance of new JCT Notes and new financing from Black Diamond, which, based upon Mr. Risius's assumptions, would have added approximately $250 million in risky debt to JCT's balance sheet. [3/4/2022 p.m. Trial Tr. at 92:6-21] [Fischel Direct]. Professor Fischel noted that Mr. Risius had not conducted any analysis of whether JCT could have issued additional debt at this level, yet Mr. Risius assumed that the new JCT Notes would be valued at par. [3/4/2022 p.m. Trial Tr. at 92:22-94:15] [Fischel Direct]. Professor Fischel's analysis reflected that the yield to maturity on JCT's existing notes at the time was similar to CCC-rated bonds, which are characterized as currently vulnerable to nonpayment, without taking into account any additional debt that would have been issued by JCT through the December 19 Term Sheet. [3/4/2022 p.m. Trial Tr. at 94:17-95:25] [Fischel Direct]; (Ex. 806 at Ex. 1B). Referencing JCT's publicly filed financials and Mr. Risius' trial testimony, Professor Fischel estimated that JCT had approximately $150 million of outstanding notes as liabilities on its balance sheet at the time of the December 19 Term Sheet, which would have been increased to $400 million had the contemplated transactions under the December 19 Term Sheet closed, based upon Mr. Risius's assumptions. [3/4/2022 p.m. Trial Tr. at 96:16-97:16] [Fischel Direct]. Professor Fischel opined that there is no basis for Mr. Risius to conclude that the new JCT Notes would be valued at par given the amount of additional debt and associated risk that would be added to JCT's balance sheet through the proposed transactions under the December 19 Term Sheet. [3/4/2022 p.m. Trial Tr. at 98:3-99:4] [Fischel Direct].

76

187.    In challenging Mr. Risius' calculations, Professor Fischel also evaluated the market trading prices of Allied's first lien debt during the period 2011 through 2012.  [3/4/2022 p.m. Trial Tr. at 101:16-18] [Fischel Direct]; (Ex. 805 at Ex. 3A & 3B).  He testified that Black Diamond and Spectrum purchased an aggregate of $13.5 million and $6.0 million of Allied's first lien debt, respectively, at either 5.1% or 8.0% of par value during this time period. [3/4/2022 p.m. Trial Tr. at 101:20-103:3] [Fischel Direct]; (Ex. 805 at Ex. 3A & 3B).  Professor Fischel noted that Mr. Risius ignored this actual market trading data in his damages calculations. [3/4/2022 p.m. Trial Tr. at 103:4-7] [Fischel Direct].  Professor Fischel concluded that Mr. Risius' damages calculations were unreliable because he assumed that JCT would be willing to pay 100% for Allied's first lien debt when that same debt was trading at a small fraction of par at the time.  [3/4/2022 p.m. Trial Tr. at 103:8-22] [Fischel Direct].

188.    As further support, Professor Fischel pointed to valuations conducted by Black Diamond and Spectrum during the period 2008 to 2012 that reflected estimates of Allied's enterprise value at amounts substantially below the $244 million of outstanding first lien debt as of the December 19 Term Sheet.  [3/4/2022 p.m. Trial Tr. at 104:3-23] [Fischel Direct]; (Ex. 805 at Ex. 4A & 4B).  On Cross examination, Professor Fischel also referenced proposed term sheets from JCT to Black Diamond and Spectrum subsequent to the December 19 Term Sheet pursuant to which JCT offered to pay as little as 70% of par on account of Black Diamond's and Spectrum's first lien debt, and even those reduced offers were subject to various conditions. [3/4/2022 p.m. Trial Tr. at 130:17-131:8] [Fischel Cross].

189.    With respect to Mr. Risius' calculation of estate damages, Professor Fischel criticized Mr. Risius for providing no basis for limiting his deduction for projected bankruptcy expenses to $5 million under the December 19 Term Sheet when the actual incurred expenses in

Allied's Bankruptcy totaled $79.05 million.  [3/4/2022 p.m. Trial Tr. at 104:25-105:20] [Fischel Direct].  Although Mr. Risius suggested that his deduction of $5 million against his estate damages calculation was conservative, Professor Fischel testified that this assumption was actually aggressive because it increased Mr. Risius' assessment of damages by keeping the amount of deductible expenses low.  [3/4/2022 p.m. Trial Tr. at 105:23-106:6] [Fischel Direct].

190.    With respect to Mr. Risius' calculation of lender damages, Professor Fischel identified Mr. Risius' arbitrary assumption that CIT would have received $34.4 million on account of the full outstanding amount of its first lien debt under the December 19 Term Sheet, whereas JCT actually proposed to pay a discounted amount of only $20 million to CIT under the December 19 Term Sheet.  [3/4/2022 p.m. Trial Tr. at 106:14-107:11] [Fischel Direct]; (Ex. 90 at 4).

191.    Finally, Professor Fischel challenged Mr. Risius' assumption that JCT would have paid par value under the December 19 Term Sheet to miscellaneous other first lien lenders who Mr. Risius assumed collectively held $17.725 million of first lien debt at the time, notwithstanding the fact that the December 19 Term Sheet did not include any provision to this effect.  [3/4/2022 p.m. Trial Tr. at 107:13-23] [Fischel Direct]; *see also* (Ex. 90).  Professor Fischel also characterized this assumption by Mr. Risius as aggressive.  [3/4/2022 p.m. Trial Tr. at 107:24-108:1] [Fischel Direct].

192.    In sum, the Court finds the testimony and expert reports of Professor Fischel to be persuasive and credible in identifying unsupported and unreliable assumptions and conclusions in Mr. Risius' damages opinions.  The Court agrees with Professor Fischel's opinions that: (a) it was unreasonable for Mr. Risius to rely on the December 19 Term Sheet and (b) Mr. Risius'

estimates of damages are fundamentally flawed.  Mr. Risius' opinions do not provide a reliable basis for assessment of damages against Yucaipa.

## PROPOSED CONCLUSIONS OF LAW

### I.    JURISDICTION AND VENUE

193.    This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1334.

194.    Venue is proper in this District, pursuant to 28 U.S.C. §§ 1408 and 1409.

### II.    LEGAL STANDARDS GOVERNING THE TRUSTEE'S CLAIMS.

195.    The Trustee's claims at trial are derived from her allegation that Yucaipa caused damage to Allied's estate and lenders by interfering with the 2011-2012 JCT negotiations.  For the reasons set forth below, the Court finds in favor of Yucaipa and against the Trustee on Estate Claim 7 (Breach of Fiduciary Duty) and Lender Claim 3 (Breach of the Implied Covenant of Good Faith and Fair Dealing) and recommends that judgment be entered in favor of Yucaipa and against the Trustee on those claims and further finds in favor of Yucaipa and against the Trustee on Estate Claim 1/Lender Claim 1 (Equitable Subordination) and directs that Judgment be entered in favor of Yucaipa on those claims, all on the following bases.

### A.    The Trustee Failed to Meet Her Burden On Damages In Connection With Estate Claim 7 and Lender Claim 3.

196.    The Trustee has failed to meet her burden of establishing a reasonable basis for her claimed damages, rather than mere conjecture and speculation, and is, therefore, not entitled to an award of any damages in connection with her claims for breach of fiduciary duty (Estate Claim 7) and breach of the covenant of good faith and fair dealing (Lender Claim 3).

197.    For the reasons discussed below, the Court concludes that that the Trustee has not met her burden in establishing damages because Mr. Risius's calculation of damages is materially flawed and wholly speculative.  In short, Mr. Risius's reliance on the December 19 Term Sheet for purposes of calculating damages was not reasonable because that term sheet was preliminary, non-binding, highly conditional, and superseded by multiple later term sheets in which JCT proposed to pay materially less.  Mr. Risius's concluded damages are based on the value of Allied's first lien debt, yet his conclusions bear no relation to the actual market trading prices of that debt.  Further, Mr. Risius's conclusion that Allied's Estate would have benefited from a hypothetical transaction with JCT in an amount equal to the full face amount of Allied's outstanding first lien debt – an amount that JCT did not offer to pay in the December 19  Term Sheet – was premised upon the unrealistic assumption that JCT would have credit bid the full amount of that debt in a hypothetical future bankruptcy sale, the assumed outcome of which would look nothing like the actual 363 Sale consummated in Allied's chapter 11 case. Additionally, no evidence was produced to support Mr. Risius's conclusion that Allied would have incurred just $5 million in expenses in that hypothetical bankruptcy case (its actual restructuring expenses were nearly 16 times that amount), and his decision to not discount damages to the Estate by the full amount of cash the Estate received in the JCT 363 Sale or by losses that the Estate would suffer in the bankruptcy case being required by JCT was baseless. Because a majority of the consideration that JCT proposed to provide in the December 19 Term Sheet would have gone directly to Yucaipa, Mr. Risius's analysis leads to the bizarre conclusion that Yucaipa is primarily liable for damages caused to itself.  Moreover, no evidence supports Mr. Risius's conclusion that the debt consideration that JCT would have provided to Allied's lenders in the hypothetical transaction was worth the same as cash; indeed, the evidence was to

80

the contrary.  Mr. Risius's separate calculation of damages to the lenders suffers from many of these flaws, as well as others.

198.    The Trustee bears the burden of proving damages for an alleged breach of fiduciary duties by a preponderance of the evidence. *Glick v. KF Pecksland LLC*, 2017 WL 5514360, at *19 (Del. Ch. Nov. 17, 2017); *see also In re HH Liquidation, LLC*, 590 B.R. 211, 273 (Bankr. D. Del. 2018).  Even where a defendant has been found to have breached its fiduciary duties, the plaintiff is required to provide a reasonable basis for assessing damages before any damages can be awarded.  *Cline v. Grelock*, 2010 WL 761142, at *2, n. 11 (Del. Ch. Mar. 2, 2010); *see also In re Radnor Holdings Corp.*, 353 B.R. 820, 848–49 (Bankr. D. Del. 2006) (notwithstanding plaintiff's prevailing on the issue of breach of fiduciary duties, the court declined to award damages because plaintiff failed to prove "a recognizable measure and amount of damages"); *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *13 (Del. Ch. Oct. 10, 2014); *Medek v. Medek*, 2009 WL 2005365, at *12 (Del. Ch. July 1, 2009) (holding plaintiff failed to provide a reliable basis for an award of damages); *see also Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *23 (Del. Ch. Mar. 21, 2018).

199.    Courts will refuse to award damages that are "based on mere speculation or conjecture." *Encite LLC v. Soni*, 2011 WL 5920896, at *25 (Del. Ch. Nov. 28, 2011). Speculative damages entitle a plaintiff to no relief.  *OptimisCorp v. Waite*, 2015 WL 5147038, at *82 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016); *see also Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *23 (Del. Ch. Mar. 21, 2018) (stock sale price speculative); *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *50 (Del. Ch. Sept. 30, 2013) (damages for lost revenue speculative); *Cline v. Grelock*, 2010 WL 761142, at *2

81

(Del. Ch. Mar. 2, 2010) (denying damages as speculative despite finding breach of fiduciary duties occurred).  A "Court cannot create what does not exist in the evidentiary record, and cannot reach beyond that record when it finds the evidence lacking.  Equity is not a license to make stuff up. If a plaintiff seeks more than nominal damages, proof must replace hypothetical estimates." *CSH Theatres, L.L.C. v. Nederlander of San Francisco Associates*, 2018 WL 3646817, at *30 (Del. Ch. July 31, 2018) (internal citations omitted).[19]

200.     Additionally, the Trustee is required to prove a causal link between its claimed damages and any breach of fiduciary duty; otherwise, it is limited to recovering only nominal damages.  *See Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2582967, at *19 (Del. Ch. June 23, 2021).

201.     The Trustee has not satisfied this burden.  The Court finds the opinions and conclusions of Mr. Risius to be based upon unsupportable and arbitrary assumptions, rendering his opinions and conclusions wholly unreliable and not credible.  Mr. Risius's reliance on the December 19 Term Sheet for purposes of calculating damages was not appropriate for reasons including that the December 19 Term Sheet: (i) was not a final term sheet; (ii) was not binding on JCT or any other party, let alone all of the relevant parties; (iii) reflected an offer only to Black Diamond, which was unacceptable to Black Diamond; (iv) contained numerous conditions precedent, many of which were never (and some of which could never be) satisfied; (v) was sent without the benefit of required diligence and prior to JCT's receipt of information reflecting

---

[19]     While courts have held that uncertainty in the amount of damages may be resolved against the wrongdoer once there is a finding of wrongdoing, this rule applies only where the uncertainty is caused by the wrongdoing.  *See Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1132 (Del. 2015) (finding lower court correctly refused to apply "wrongdoer rule" where defendant's breach was not a cause of the uncertainty).  Any uncertainty in the amount of damages here was not caused by Yucaipa.  In any event, there is a difference between damages being uncertain in amount and damages being based on speculation; courts will not award the latter.  *See, e.g.*, *Encite LLC v. Soni,* 2011 WL 5920896, at *25 (Del. Ch. Nov. 28, 2011). Here, the Trustee's damages are purely speculative.

82

Allied's true financial condition; and (vi) was superseded by multiple later term sheets in which JCT proposed to pay substantially less.

202.     Moreover, Mr. Risius estimated damages arising from a proposed purchase of Allied's first lien debt in a manner that is completely detached from the market trading prices of that debt or the actual enterprise value of Allied.  Mr. Risius concluded that JCT would have paid approximately 100% of the face value of debt that was trading at between 5 cents and 8 cents on the dollar during the relevant period.  Objective evidence from the public debt market is a more reliable measure of value than the subjective estimates of an expert witnesses.  *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 632-33 (3d Cir. 2007) ("[I]f the bondholders thought VFI solvent, they wouldn't have sold their debt so cheaply. . . . we do not think that the district court erred in choosing to rely on the objective evidence from the public equity and debt markets. . . . Absent some reason to distrust it, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'") (quoting *In re Prince*, 85 F.3d 314, 320 (7th Cir.1996)); *see also In re Hechinger Investment Co. of Del.*, 327 B.R. 537, 548 (D. Del. 2005) ("because valuation is, to a great extent, a subjective exercise dependent upon the input of both facts and assumptions, the court will give deference to 'prevailing marketplace values', rather than to values created with the benefit of hindsight for the purpose of litigation.") (*quoting Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002) ("in determining whether a value is objectively 'reasonable' the court gives significant deference to marketplace values.")).  It is simply not credible to imply an enterprise value for Allied equal to the full, outstanding principal amount of its first lien debt, when that same debt was being purchased at the time (including by BD/S) for well under 10% of its face value.  Mr. Risius also admitted that he never actually performed an enterprise valuation of Allied that took into account Allied's financial performance

83

and future prospects.  [3/4/2022 a.m. Trial Tr. at 42:3-8 (video played for impeachment)] [Risius Cross].

203.    Mr. Risius's analysis is plagued by other major flaws.  For example, he concluded that Allied's Estate would have received all but $5 million of over $244 million in "proceeds" from the transactions described in the December 19 Term Sheet.  But Allied would have received no cash and no "proceeds" even if JCT had successfully negotiated private agreements to purchase debt from each of Allied's lenders.  The only benefit that Allied's Estate might have received in those transactions would have been through a conditional credit bid of certain of the purchased debt, which would have come to fruition only if Allied later entered bankruptcy and obtained Court approval to sell its assets to JCT in exchange for a credit bid.  However, the parties had not agreed in December 2011 on the terms of a bankruptcy case for Allied or on a consensual sale of Allied's assets to JCT.

204.    Mr. Risius's conclusion is based on the unrealistic assumption that, even though it was not bound to do so, JCT would have credit bid the full amount of Allied's first lien debt in exchange for Allied's assets.  The December 19 Term Sheet contains no such requirement.  *See* (Ex. 90).  And no such requirement was included in an asset purchase agreement that Allied attempted to negotiate with JCT in April 2012, prior to the filing of the Involuntary Petition.  In all likelihood, JCT would have credit bid only as much of the debt as necessary to acquire the assets at auction.  Given that JCT submitted a high bid of $135 million for those assets in 2013, following an auction in which JCT's only competition was from BD/S and the same lenders (aside from Yucaipa) whose claims JCT would have purchased, there is little reason to believe that JCT would have submitted a higher bid in a hypothetical auction that Mr. Risius assumes was contemplated by the December 19 Term Sheet.  In that event, the "implied" value for Allied

84

would be no more than $135 million (i.e., the same amount that Allied's Estate actually received in cash in the JCT 363 Sale).  The Estate would have suffered no damages and JCT would remain the holder of substantial deficiency claims against Allied's Estate following the sale.

205.    Furthermore, had Allied's Estate received only a credit bid as consideration in exchange for Allied's assets, the Estate might well have been rendered administratively insolvent.  Without any cash proceeds, the Estate probably would not have been able to satisfy the obligations – including a DIP loan and winddown reserves – that were satisfied with the cash proceeds obtained in the 363 Sale.  Mr. Risius appears not to have considered these implications.

206.    Mr. Risius's calculation of damages is also flawed because it is premised on the problematic assumption that JCT would have paid par for all of Allied's first lien debt.  JCT specifically identified $215 million in debt held by four lenders in the December 19 Term Sheet as being subject to a potential purchase, following the negotiation of separate agreements with each of those four lenders.  By assuming that JCT would have paid par for the balance of Allied's first lien debt, Mr. Risius inflated his damages to the Estate by over $29 million.

207.    The Court also takes issue with Mr. Risius's assumption that damages to the Estate should be reduced by just $5 million in estimated expenses.  The Trustee presented no evidence that $5 million was a reasonable estimate of expenses that would be incurred by Allied in a hypothetical bankruptcy case and it was unreasonable for Mr. Risius to ignore the actual expenses incurred by Allied in its actual, as opposed to hypothetical, bankruptcy case.  While Mr. Risius attempted to justify the lower figure by assuming that any consensual bankruptcy case for Allied would have been resolved in 90 days, the Trustee presented no evidence that Allied could have concluded a chapter 11 case within 90 days, even under the best of circumstances. Having presided over Allied's real-world chapter 11 case, this Court does not believe it is

85

realistic to assume that Allied could have completed a bankruptcy case in such a short period of time or to have done so without incurring significantly less in expenses than it incurred in its actual case.

208.     Similarly, it was wrong for Mr. Risius to reduce his damages to Allied's Estate by amounts recovered only by Allied's first lien lenders.  Mr. Risius appears to have presumed that the first lien lenders were the only creditors represented by the Estate.  [3/4/2022 a.m. Trial Tr. at 83:16-84:2] [Risius Cross] (THE WITNESS: ". . . the estate is the lender. . . .  THE COURT: Well, there are other claims; right? There are admin claims, secured claims, unsecured claims, DIP claims.  THE WITNESS: Fair.  THE COURT: The company couldn't [sic] gone into even a 90-day bankruptcy without a DIP; right?  THE WITNESS: Right. Right.").  In reality, Allied's Estate benefited in the full amount of the proceeds received in the 363 Sale to JCT.  Although the Estate used a substantial portion of those proceeds to satisfy obligations of the Estate – which reduced the amount available to Allied's first lien lenders – the Estate still benefitted from every penny of the proceeds received.  Any calculation of damages to the Estate should have assumed that the Estate benefited from the $135 million in cash that JCT paid in the 363 Sale, not the $80 million that was distributed to the first lien lenders.

209.     Assumptions such as the one above—that the Estate only benefited to the extent of any recovery by Allied's first lien lenders—reflect a fundamental misunderstanding of bankruptcy, which led to flaws in Mr. Risius's conclusions.  Indeed, Mr. Risius admitted at trial that he has only limited bankruptcy experience.  [3/4/2022 a.m. Trial Tr. at 96:8-14] [Risius Cross] ("THE COURT: And you have experience in Chapter 11 cases? THE WITNESS: In matters – as a transaction advisory. I'm not an investment banker, so my context in bankruptcy is

86

typically in situations like this or in dealing with a client of - - from a valuation perspective

outside of - - outside of court. But not as a banker.").

210.    Furthermore, Mr. Risius's analysis fails to account for the fact that the majority of

the consideration that JCT was proposing to provide in the December 19 Term Sheet would have

gone directly to Yucaipa, as the holder of a majority of Allied's first lien debt.  By calculating

damages using the "implied" value derived from the December 19 Term Sheet, Mr. Risius

effectively concludes that Yucaipa is liable primarily for damages caused to itself.  That result is

nonsensical and untenable.

211.    It was also improper for Mr. Risius to assume that the notes that JCT proposed to

provide to Allied's lenders in exchange for the majority of their debt were worth 100% of their

face value.  As discussed above, Mr. Risius did not consider how the incurrence of such a

substantial amount of new debt – well over twice the amount of JCT's outstanding debt at the

time – would impact JCT or its creditworthiness, especially considering that JCT was already in

default on its existing notes at the time.  JCT made several offers to Allied and its lenders in

which JCT proposed to provide the sellers significantly more in debt than it would provide in

cash.  *See, e.g.*, (Ex. 471*) (Email dated March 8, 2012 summarizing two alternatives proposed

by JCT to BD/S, as: "1) We can receive 70% of par - of which, 50% would be paid in Modified

Jack Cooper bonds at First Close and 50% in Modified Jack Cooper bonds at Second Close. 2)

We can receive 60% of par - of which, 25% would be paid in Modified Jack Cooper bonds at

First Close and 75% in cash at Second Close."); (Ex. 96) (attaching term sheet dated June 26,

2012 from JCT to Allied offering first lien lenders the option to receive either (i) 57% of

principal amount in cash or (ii) 85% of principal in new JCT notes, plus warrants).  These offers

imply a significant discount in the value of the JCT debt.  Notwithstanding this clear indication

87

that JCT valued its own debt at less than par during the relevant time period, Mr. Risius assumed no discount at all.  Mr. Risius also did not discount his damages calculation to reflect the conditional and delayed nature of the debt consideration proposed to be provided to sellers under the December 19 Term Sheet.  A damages assessment that assumes 100% of par value for the JCT Notes offered as consideration for Allied's first lien debt is, therefore, unreasonable.

212.    Importantly, Mr. Risius's entire analysis is flawed because it is strategically based on a single, preliminary term sheet, sent prior to JCT having done any diligence, and which was subject to numerous unsatisfied conditions and superseded by later proposals.  As discussed above, any deal with JCT, including specifically the December 19 Term Sheet, was subject to due diligence, JCT lender consents, multiple ancillary agreements (e.g., a non-disclosure and non-compete agreements), and JCT's negotiation of final agreements with all other lenders, among other various conditions precedent.  None of these conditions were satisfied at the time of the December 19 Term Sheet or any time before the Petition date.  And the evidence at trial did not form a reasonable basis for Mr. Risius to assume that these conditions would be satisfied.

213.    Moreover, as discussed above, JCT reduced its offers to BD/S following the December 19 Term Sheet.  JCT further reduced its offers to purchase Allied's assets directly postpetition, after it was provided with information concerning Allied's true financial condition.  Mr. Risius admitted that the December 19 Term Sheet was superseded by multiple later term sheets and that it preceded any due diligence by JCT, yet he chose to calculate damages as if the higher amount that JCT proposed in the conditional December 19 Term Sheet, at the outset of the negotiations, without any material information about Allied's financial condition, represented a binding agreement among all parties.  [3/4/2022 a.m. Trial Tr. at 54:12-16] [Risius Cross] (stating that the December 19 Term Sheet "clearly wasn't" final and that "[t]here was a number

88

of term sheets thereafter.").  In light of these facts, Mr. Risius's reliance on the December 19

Term Sheet in calculating damages is simply not credible.

214.    Mr. Risius's assessment of damages also fails to account for any losses due to the

bankruptcy case that JCT was requiring for Allied.  Mr. Risius testified that (i) JCT would not

have consummated any transaction without Allied filing for bankruptcy, and (ii) Allied suffered

significant operational losses following the commencement of its involuntary bankruptcy case.

Yet, he did not discount his damages to the Estate to reflect anticipated losses to Allied from

such a filing.  Any damages to the Estate would have been reduced by such losses.  Moreover,

the significant losses that Allied incurred as a result of being placed into bankruptcy

involuntarily by BD/S cannot form the basis for a damages claim against Yucaipa.  Mr. Risius's

damages calculations should have been reduced by those losses.

215.    Mr. Risius also calculated damages as of December 19, 2011, and began

calculating prejudgment interest as of that date.  As described above, there was no agreement

between JCT and any lender as of December 19, 2011; the December 19 Term Sheet certainly

was not enforceable as of that date.  And, even if the December 19 Term Sheet had been

enforceable as of that date, the transactions described in that term sheet would not have been

consummated on December 19, 2011.  It was, therefore, improper to calculate damages and

interest as of December 19, 2011.

216.    Turning to the separate calculation of damages to the non-Yucaipa first lien

lenders, the Court concludes that Mr. Risius's calculation of damages suffers from most of the

same flaws as those summarized above.  Like his calculation of damages to the Estate, Mr.

Risius premises his analysis of damage to the lenders upon the same flawed $244.2 million

implied value of Allied derived from the December 19 Term Sheet, the same understated

assumed expenses of $5 million, and the same unsupported assumption that JCT would purchase at par $29 million in claims that are not identified in the December 19 Term Sheet. Similarly, he ignores that JCT reduced its offers to the lenders over time, and he fails to discount the value of the JCT debt that was proposed to be issued to the lenders due to the risky, conditional, and delayed nature of that consideration.

217.    In addition, Mr. Risius calculated damages to the lenders by assuming that CIT would have received a recovery nearly equal to the face amount of its debt in a hypothetical transaction based upon the December 19 Term Sheet, which ignores the $15 million discount that JCT proposed to provide to CIT in that very term sheet.

218.    Mr. Risius also acknowledged that he did not update his lender damage calculations to reflect prior recoveries and awards obtained for the lenders' benefit. As a result, the Court cannot determine to what extent the lenders' claims have already been satisfied or would be satisfied from those prior recoveries and awards.

219.    In sum, the Court concludes that Mr. Risius's calculations of damages to each of the Estate and the non-Yucaipa first lien lenders are materially flawed and unreliable.[20] Damages premised upon the December 19 Term Sheet are speculative, at best, and are not evidence of actual harm. Even if the Trustee had been able to prove the merits of the claims at trial – which, for the reasons discussed below, she has not – she has failed to prove any damages arising from the JCT negotiations.

---

[20]    The Court notes that the Nebraska Supreme Court recently concluded, on a *de novo* review, that the valuation testimony offered by Mr. Risius in that case was "inherently unreliable," that "Risius' explanations for his projections were 'misleading and not credible,'" that he had "'double-counted' the same risks to justify his projections," and that he had applied an "arbitrary" methodology, which reflected a "downward bias" and that "render[ed] his conclusion unreliable." *Wayne L Ryan Revocable Trust v. Ryan*, 957 N.W.2d 481, 496 (Neb. 2021).

B.    **Breach of Fiduciary Duty (Estate Claim 7).**[21]

1.    **Yucaipa's Fiduciary Duties To Allied Were Not Implicated In The Context Of The 2011-2012 JCT Negotiations.**

220.    The Trustee argued that Yucaipa breached a fiduciary duty owed to Allied and its stakeholders by interfering with the 2011-2012 JCT negotiations. The Trustee therefore has the burden of establishing the existence of a fiduciary duty owed by Yucaipa in the context of the 2011-2012 JCT negotiations. *See, e.g.*, *Beach to Bay Real Est. Ctr. LLC v. Beach to Bay Realtors Inc.*, 2017 WL 2928033, at *5 (Del. Ch. July 10, 2017), as revised (July 11, 2017).

221.    When a controlling shareholder is both a fiduciary and a creditor, the stockholder is not restricted by its fiduciary duties from exercising its rights as a creditor. *See Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 415 (Del. Ch. 1999); *see also Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996). The controlling shareholder's fiduciary duties do not limit its rights as a lender to negotiate the price at which it is willing to sell its debt to a third party. *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 415 (Del. Ch. 1999) (where controlling shareholder exercises rights in its capacity as a creditor, "the law will not impress upon them special limitations that pertain to the conduct of fiduciaries."). Nor do the controlling shareholder's fiduciary duties require it to

---

[21]    At trial, the Trustee called Jonathan R. Macey, a Law Professor, as an expert witness to testify regarding issues of corporate governance and corporate control in the context of a controlling shareholder's actions affecting the Debtor's estate. Before trial, Yucaipa filed a Motion *In Limine* To Exclude The Reports And Testimony of Jonathan R. Macey (the "Macey Motion"), arguing that Professor Macey's opinions are wholly legal conclusions that are unhelpful to the Court and inadmissible under Federal Rule of Evidence 702, applied to this case by Federal Rule of Bankruptcy Procedure 9017. *See* (13-50530, D.I. 932; 14-50971, D.I. 667). On February 25, 2022, the Court denied the Macey Motion without prejudice, explaining that it would consider Professor Macey's testimony in the context of the entire case and would thereafter decide whether Professor Macey's testimony is impermissible upon Yucaipa's renewed motion. (13-50530, D.I. 962 at ¶ 2). At trial, Yucaipa renewed the Macey Motion. The Court heard oral arguments and took the issue under submission. [3/4/2022 p.m. Trial Tr. at 65:25-71:13]. Having considered Professor Macey's testimony in full and in the context of the entire case, the Court hereby orders that the Macey Motion is GRANTED and that Professor Macey's testimony and expert reports are inadmissible. Thus, Professor Macey's testimony and expert reports were not considered in the Court's analysis.

sell its debt at all, or at any particular price. *See Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986); *Mendel v. Carroll*, 651 A.2d 297, 306 (Del. Ch. 1994) (controlling stockholders' fiduciary duties do not "require[] them to sell their interest").

222.    The evidence at trial established that at the time of the relevant negotiations—beginning in mid-2011 and continuing until the Petition Date, JCT was conditioning any transaction involving Allied on the purchase of Allied's first lien debt from its largest holders. *See, e.g.*, (Dep. Tr. Ciupitu at 37:10-38:25) (testifying as to JCT's strategy to acquire Allied in 2011-2012 and noting, "We looked at the sellers, because our understanding at the time was Allied was in default on debt documents, Allied didn't have any --didn't have much equity value, so the sellers were the first lien lenders, which were Yucaipa, Black Diamond, Spectrum, and CIT.")  Indeed, every term sheet that JCT sent between December 2011 through the Involuntary Petition describes an offer to purchase debt held by either Yucaipa, BD/S, or CIT. *See* (Exs. 86, 90, 116, 117, 118, 119, 122, 123,259); (PX LLL, PX PPP).

223.    While the Trustee made much of the fact that JCT's ultimate goal was to own Allied, JCT insisted on buying Allied's debt from BD/S, Yucaipa, and CIT first.  In fact, when Black Diamond suggested at the outset of the negotiations in April 2011 that JCT buy Allied's equity, Riggs vehemently rejected the concept, explaining he "was crystal clear that in no case would [he] let the Allied debt become an anchor that could sink the entire Jack Cooper enterprise," and "the deal was supposed to be simply getting your debt paid out at par."  (Ex. 457* at 1).

224.    JCT's decision to structure any deal as a debt purchase meant that Yucaipa was negotiating with JCT in its capacity as a ***lender***.  Yucaipa's fiduciary duties as a majority shareholder, therefore, did not place special limits on Yucaipa's ability to negotiate under these

92

circumstances. *See Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 415 (Del. Ch. 1999) (controlling shareholder is not acting in a fiduciary capacity when acting as a creditor).

225.    In response, the Trustee argues that Yucaipa was acting in its capacity as a majority shareholder—*i.e.*, a fiduciary—because, as part of the transaction, it was also aiding in the negotiation of a cooperation agreement with respect to Allied, whereby Allied would consent to a pre-negotiated bankruptcy and 363 sale with JCT as the buyer. *See, e.g.*, [3/1/2022 a.m. Trial Tr. at 20:4-10] [Trustee's Opening].  The Trustee's argument is misguided.  The Trustee has alleged a breach of duty arising from Yucaipa's conduct in negotiating a certain price for its debt *as a lender*.  There is no allegation or evidence that Yucaipa violated a duty in connection with any terms of a cooperation agreement, the terms of which were not addressed at trial.

226.    The Court finds that because Yucaipa's conduct during the course of the JCT negotiations related to "its status as a secured creditor" of Allied and "did not derive from any fiduciary relationship, the law will not impress upon [Yucaipa] special limitations that pertain to the conduct of fiduciaries." *Odyssey Partners, L.P. v. Fleming Companies, Inc.*, 735 A.2d 386, 415 (Del. Ch. 1999).  Yucaipa's fiduciary duties did not dictate how it could negotiate with respect to the sale of its Allied debt.  Yucaipa owed no duty to Allied to sell its debt at all or at any price.  *See Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986); *Mendel v. Carroll*, 651 A.2d 297, 306 (Del. Ch. 1994) (controlling stockholders' fiduciary duties do not "require[] them to sell their interest").  Accordingly, the Court finds in Yucaipa's favor on Estate Claim 7.

227.    Because the Court finds that Yucaipa's fiduciary duties are not implicated in this case, the Court need not rule on whether the underlying conduct would violate such duties.  Nevertheless, the Court analyzes the issue as an alternative basis for a judgment and finds that,

for the additional reasons set forth in Conclusions of Law Section II.B.2 below, Yucaipa's

conduct does not constitute a breach of any fiduciary duty to Allied.

## 2. Even If Yucaipa's Fiduciary Duties To Allied Were Implicated In Connection With The JCT Negotiations, Yucaipa Did Not Breach Any Duty.

### a. The business judgment rule is the applicable standard.

228.    Generally, the decisions of fiduciaries of Delaware corporations are reviewed

under the deferential business judgment standard, which "presume[s] that in making a business

decision the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473

A.2d 805, 812 (Del. 1984).  The business judgment rule "operates to preclude a court from

imposing itself unreasonably on the business and affairs of a corporation." *Cede & Co. v.

Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993).  "[A] decision made by a loyal and informed

board will not be overturned by the courts unless it cannot be 'attributed to any rational business

purpose.'" *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993).  To the extent

Yucaipa's fiduciary duties are implicated in this case, Yucaipa's conduct is evaluated under the

business judgment rule.

229.    The Trustee bears the burden of rebutting the presumptions of the business

judgment standard by a preponderance of the evidence.  *In re Walt Disney Co. Derivative Litig.*,

907 A.2d 693, 748 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).  In order to shift the burden,

the Trustee is required to prove that "directors are interested or lack independence relative to the

decision, [did] not act in good faith, act[ed] in a manner that cannot be attributed to a rational

business purpose or reach[ed] their decision by a grossly negligent process that includes the

failure to consider all material facts reasonably available." *Brehm v. Eisner*, 746 A.2d 244, 264

94

n. 66 (Del. 2000).  The Trustee faces "an uphill battle to carry this burden of proof."  *In re HH Liquidation, LLC*, 590 B.R. 211, 272 (Bankr. D. Del. 2018); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near Herculean task.").

230.    The Trustee argues that the entire fairness standard should apply in this case because Yucaipa was found to have acted in bad faith in connection with the Fourth Amendment. [3/1/2022 a.m. Trial Tr. at 12:5-9, 12:19-21] [Trustee Opening].  Under the entire fairness standard, the directors and/or controlling stockholders must show that the challenged transaction was entirely fair to the minority stockholders in terms of both price and process.  *Encite v. Soni*, 2011 WL 5920896, at *20 (Del. Ch. Nov. 28, 2011) (citation omitted).  Whether a transaction meets this standard is determined as of the time of the board's decision.  *See Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 690 n.10 (Del. Ch. 1996), *aff'd*, 693 A.2d 1082 (Del. 1997).

231.    The Court disagrees that the entire fairness standard applies here.  As the Trustee herself argued, and as the Court has already held in connection with Yucaipa's Motion for Stay of Proceedings Pursuant to Bankruptcy Rule 8007(e), (13-50530, D.I. 891; 14-50971, D.I. 626), the Trustee's claim for breach of fiduciary duty is separate from her claims concerning the Fourth Amendment, which were decided on summary judgment, and is not premised on overlapping factual issues.[22]  (13-50530, D.I. 907 at 10) ("the Trustee seeks different measures of damages arising out of different conduct on each of these claims.").  The Court's finding that Yucaipa acted in bad faith in connection with the Fourth Amendment affects only how it would evaluate a breach of fiduciary duty claim based on Yucaipa's conduct surrounding the Fourth

---

[22] The only exception is that the Court has reserved the issue of the specific amount, if any, of subordination relating to the Fourth Amendment.  (13-50530, D.I. 907 at 9).  For the reasons stated in Conclusions of Law Section D, the Court finds that the Trustee is not entitled to an additional remedy given the June 23, 2021 Judgment.

2137110.25
DOCS_LA:343415.1 96991/001

Amendment.  It does not shift the burden with respect to claims concerning conduct in the course of other transactions like the JCT negotiations.

232.    Moreover, even if the Trustee were able to rely on the Court's unrelated finding of bad faith to rebut the business judgment rule presumption, the entire fairness standard is still inappropriate in this case.  Because this standard focuses on price, (*see Encite v. Soni*, 2011 WL 5920896, at *20 (Del. Ch. Nov. 28, 2011), it is inapplicable under the facts of this case where that essential element of the inquiry is missing.  The fiduciary—*i.e.*, Yucaipa—was neither paying nor receiving a price for Allied.  Rather it was negotiating with a third party for the sale of Yucaipa's debt.  Critically, no price was ever agreed-upon, so the Court is unable to make a determination whether any price was fair.  *See Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 442-43 (Del. 1996) (noting that "the Chancellor's finding of entire fairness [was] enigmatic" where "no price was ever received and the procedure [is alleged to be] a breach of loyalty.").  If the business judgment standard were not applied (it is), the appropriate test would be usurpation of a corporate opportunity.  But the Trustee has already conceded, and it is the law of the case, that the JCT negotiations during the relevant 2011-2012 timeframe did not involve a corporate opportunity.  *In re Ashinc Corp.*, 629 B.R. 154, 211 (Bankr. D. Del. 2021) ("As the parties agree that the 'doctrine of corporate opportunity' is not an issue in this litigation, the Court will not discuss it further.").

233.    Accordingly, the Court finds that the business judgment standard is the applicable standard in this case.  The Trustee therefore bears the burden of rebutting the presumption.  The Court finds that the Trustee has not satisfied that burden for the following reasons.

   **b.**          ***Yucaipa did not prevent any hypothetical deal directly between Allied and JCT.***

96

234.     As an initial matter, some mental gymnastics are necessary to understand how the Trustee seeks to transform an argument that Yucaipa acted unfairly in negotiating for the sale of its debt to a third party into a claim for breach of a fiduciary duty to the borrower—Allied. Perhaps for this reason, Yucaipa's purported interference with the JCT negotiations is not asserted in the Estate complaint as a basis for its breach of fiduciary duty claim, or at all.  *See* (PX WW).

235.     Recognizing this defect to the Estate's claim the Trustee argued at trial that Yucaipa used its control of Allied's Board to prevent Allied from negotiating directly with JCT to sell Allied's assets.  *See, e.g.*, [3/1/2022 p.m. Trial Tr. at 126:3-13] [Deckoff Cross].  The Trustee offered testimony from Deckoff that Yucaipa "morph[ed] the deal from what should have been just a straight M & A deal into a purchase of their debt at a premium . . . ."  [3/1/2022 p.m. Trial Tr. at 126:3-13] [Deckoff Cross].  This argument was not supported by the evidence at trial.  As an initial matter, Deckoff was not directly involved in the JCT negotiations and the Trustee chose not to introduce testimony from the BD/S representatives who were directly involved.  *See* [3/1/2022 p.m. Trial Tr. at 18:18-24] [Deckoff Cross]; [3/1/2022 p.m. Trial Tr. at 143:14-17].  Deckoff's testimony that Yucaipa "morphed" the deal from a direct transaction with Allied into a transaction involving a debt purchase appears to be, at best, mere speculation.  To the extent it has any basis at all, this testimony could only be based on inadmissible hearsay in the form of updates that Deckoff received from Ehrlich.  *See, e.g.*, *United States v. Reynolds*, 715 F.2d 99, 101 (3d Cir. 1983) ("Rule 801(c) defines hearsay as 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'") (quoting Fed. R. Evid. 801(c)).

236.    Indeed, the documents and testimony from the witnesses who were directly involved in the negotiations controvert Deckoff's speculation.  A review of the term sheets exchanged among the parties during the course of the JCT negotiations establishes that when JCT was negotiating with Yucaipa in December 2011, JCT was focused on buying Allied's *debt* from Allied's lenders, not on buying Allied's equity or assets directly.  *See* (Ex. 116) (12/9/11 Term Sheet between Yucaipa and JCT); (Ex. 117) (12/12/11 Term Sheet between Yucaipa and JCT); (Ex. 118) (12/15/11 term Sheet between Yucaipa and JCT); (PX PPP) (2/14/12 Term Sheet between Yucaipa and JCT); (PX LLL) (2/20/12 Term Sheet between Yucaipa and JCT); (Ex. 119) (2/28/12 Term Sheet between Yucaipa and JCT); (Ex. 122) (3/8/12 Final Term Sheet between Yucaipa and JCT).

237.    The evidence shows that, in December 2011, JCT approached Yucaipa to negotiate a purchase of its Allied debt, not equity.  [3/2/2022 p.m. Trial Tr. at 40:15-25] [Tochner Cross] ("Q.  You were involved in the negotiations with JCT on behalf of Yucaipa?  A. Yes.  Q.  And when did you become fully involved in the negotiations with JCT?  A.  About December 2011.  Q.  And what specifically did you understand JCT was looking to buy?  A. They were looking to buy our debt.  Q.  And how do you know that?  A.  Because they told me that.  Mike Riggs told me that.").  This finding is consistent with the testimony of Riggs and Ciupitu, who both testified that JCT was looking to purchase Allied debt and then pursue a 363 sale. *See, e.g.*, (Dep. Tr. Riggs at 80:25-81:6); (Dep. Tr. Ciupitu at 37:10-38:25).

238.    At no point during the December 2011 through May 2012 negotiations did anyone at JCT tell Yucaipa that JCT would be willing to convert the proposals being presented to Yucaipa for the purchase of Allied's debt into a transaction for the purchase of Allied's assets.

[3/2/2022 p.m. Trial Tr. at 47:20-24] [Tochner Cross]; *see also* [3/2/2022 p.m. Trial Tr. at 41:9-21] [Tochner Cross].

239.    Additionally, the Trustee offered no credible evidence at trial that Yucaipa interfered with the management of Allied, nor that it could or did exercise control of the company to prevent Allied from engaging in negotiations with third parties. *See, e.g.*, [3/3/2022 Trial Tr. at 29:7-31:21] [Burkle Adverse Direct] (testifying that "the Allied CEO didn't have to run things by me for approval"); (Dep. Tr. Cullen at 44:2-5, 44:7-10) (testifying that it was not his understanding that Gendregske served at Yucaipa's pleasure); (Dep. Tr. Gendregske at 270:7-9, 270:11-16) ("I ran the company. I ran the company. I never had Yucaipa over my back telling me, Hey you need to put these trucks here. You need to go after this customer. You need to do that. I don't ever remember that happening with me. I ran the company.").

240.    The Trustee's efforts to prove that Burkle controlled the company at trial fell flat. The evidence at trial showed that Burkle's involvement was limited to matters involving labor relations because of Burkle's unique ties to Allied's labor union. *See* [3/3/2022 Trial Tr. at 31:25-33:15] [Burkle Adverse Direct] (testifying about his role for Allied "as the person who coordinated all the union efforts for this for no pay and for no title or anything . . . .").

241.    Burkle specifically testified that he did not exercise control over Allied's management and that it was not in his interest or practice to interfere with the management of Yucaipa's portfolio companies in general. *See* [3/3/2022 Trial Tr. at 29:7-31:21] [Burkle Adverse Direct] (testifying that Allied's CEO did not have to run things by him for approval; "you can't have a great CEO if you're second guessing them." (30:9-4-5); "good people don't come to work for you if you're going to tell them what to do." (31:7-8)).

99

242.     In any event, the evidence showed that Yucaipa did not prevent the Allied Board from considering any potential sale to JCT or other potential buyers.  To the contrary, based on the evidence presented at trial, the Allied Board, including the Yucaipa-appointees, considered various restructuring transactions to sell Allied's assets to other companies, including JCT throughout the time Yucaipa was Allied's majority shareholder.  *See, e.g.*, [3/2/2022 p.m. Trial Tr. at 35:14-36:8] [Tochner Cross] (testifying that the Board considered various opportunities to restructure Allied between 2009 and 2011); (Dep. Tr. Gendregske at 208:10-209:10) (testifying that he constantly searched for strategic combinations to help Allied's financial situation); (Dep. Tr. Gendregske at 212:4-212:6, 212:10-213:12, 213:21-214:8) (discussing potential transactions he explored for Allied with other companies, including a near-deal with United Roads); (Dep. Tr. Walker at 714:11-20; 714:22-715:4) (Walker and Gendregske spoke often about potential M&A transactions for Allied during their time on the Allied Board together).  With respect to JCT specifically, the Allied Board engaged in ongoing efforts to reach a deal with JCT at various points in time.  *See* (Dep. Tr. Walker at 668:19-669:11); (Dep. Tr. Gendregske at 210:4-210:19; 214:12-216:3) (describing prior discussions with Riggs to combine Allied with JCT, dating back to the time Riggs bought JCT); (Dep. Tr. Gendregske at 217:5-21) (testifying that sometimes Riggs was not interested and Gendregske had to sell *him* on the idea); (Dep. Tr. Blount at 12:3-10) (Allied's general counsel, John Blount, testifying that he had numerous conversations about potential combinations of Allied and JCT over the years).

243.     Finally, the underlying premise that Allied was not involved in the 2011-2012 negotiations with JCT is belied by the evidence.  The Board was aware of, and kept apprised of, discussions with JCT.  (Dep. Tr. Walker at 672:19-22, 672:24-673:17, 673:21-25, 674:3-6, 674:8-10, 674:12-13, 674:16-675:3).  Gendregske and Cullen were also included in the meeting

100

and discussions in March 2012 when Yucaipa negotiated the Final Term Sheet with JCT.  (Dep.

Tr. Walker at 688:10-12, 688:17-689:10; 694:7-9, 694:11-18, 694:20-22).

244.    Even after BD/S forced Allied into bankruptcy, the Allied Board, primarily

through its independent financial advisors, negotiated directly with JCT.  *See* (Ex. 641*);

[3/2/2022 p.m. Trial Tr. at 88:3-9] [Tochner Cross] (testifying that prior to the August 2012

proposal from JCT to acquire Allied, Allied had done substantial marketing to try to get the best

price, including having financial advisor Rothschild contact nearly a hundred potential buyers).

245.    The Court finds that Yucaipa did not interfere with any direct negotiations

between Allied and JCT.  The evidence is clear that the buyer (JCT) was interested in purchasing

Allied's debt before acquiring its assets and the Allied Board was free to, and did in fact,

negotiate directly with JCT, both before and after the period during which JCT chose to negotiate

directly with Allied's lenders.

### c.    *Yucaipa did not demand an "unfair premium" above par.*

246.    The Trustee also argued that Yucaipa breached a fiduciary duty by demanding

that JCT pay a premium on its debt as compared to what JCT would pay other lenders.  That

argument is not supported by the law or evidence, and therefore cannot overcome the business

judgment rule presumption nor demonstrate that Yucaipa acted in a manner that would violate

the entire fairness standard were it applicable here (it is not).

247.    Initially, this argument is premised on the incorrect argument that Yucaipa owed a

fiduciary duty to Allied's **creditors**.  *See, e.g.*, *Quadrant Structured Prod. Co. v. Vertin*, 102

A.3d 155, 176 (Del. Ch. 2014) (directors of insolvent corporation do not owe fiduciary duties to

creditors) (emphasis added); *see also In re Hechinger Inv. Co. of Delaware*, 280 B.R. 90, 94 (D.

Del. 2002) (stating, "no Delaware court has expressly extended [the duty directors of a

101

corporation may owe to creditors when the corporation is insolvent] to controlling or majority shareholders.").  Yucaipa owed no duty to BD/S to secure a deal with JCT for BD/S' benefit.  As a result, no such duty could have been breached.  Further, as the authorities cited in Conclusions of Law Section II.B.1 above make clear, Yucaipa was free to negotiate the price at which it was willing to sell its debt to JCT, just as BD/S were free to negotiate for themselves.  *Odyssey Partners, L.P. v. Fleming Companies, Inc.*, 735 A.2d 386, 415 (Del. Ch. 1999).  But Yucaipa chose to work with BD/S to try to close a deal with JCT on terms acceptable to *all* parties.

248.    The Trustee failed to produce any evidence at trial to show that the price Yucaipa sought from JCT for Yucaipa's debt amounted to an unfair premium.  Rather, the evidence adduced at trial shows that in negotiating with JCT for the sale of its debt, Yucaipa asked to be paid the face value of its first lien debt plus accrued interest.  *See* (Ex. 117 at 3); [3/2/2022 a.m. Trial Tr. at 108:19-109:4] [Tochner Adverse Direct] (testifying that the concept was that Yucaipa was offered par for its debt and countered with par plus interest); *see also* [3/2/2022 p.m. Trial Tr. at 55:24 – 56:5] [Tochner Cross] ("Q.  With respect to the first lien, were you agreeing to get a premium in connection with that?  A.  I believe we were getting, as you we [*sic*] said earlier, par plus interest. So that to me means we were not getting a premium . . . ."); (Dep. Tr. Gendregske at 316:16-19; 316:20-317:3; 317:5-14) (testifying that Riggs told him it was not true Yucaipa was being advantaged in any way).

249.    The evidence at trial further demonstrated that Yucaipa was negotiating to assign to JCT claims in an amount significantly greater than the price offered by JCT.  The Final Term Sheet reflects a price of $155 million ($75 million in JCT notes, $80 million in cash) to be tendered in exchange for claims against Allied totaling approximately $186 million.  *See* (Ex. 122); [3/2/2022 p.m. Trial Tr. at 53:2-54:2; 54:17-23] [Tochner Cross].  Even assuming that the

JCT Notes should be valued at face value—a fact that was not established at trial (*see* Findings of Fact Section XIV.A.7)—$155 million for $186 million of debt (including accrued interest), does not represent a premium above par.  In fact, it represents a discount to about 80% of par.

250.     The Trustee's argument that Yucaipa used the Requisite Lender status to demand that it be paid more than other lenders is also not supported by the evidence.  There is no such demand in the record.  In fact, Riggs testified that he does not know how the negotiations may have been different if Yucaipa was not acting as the Requisite Lender.  (Dep. Tr. Riggs at 263:2-10; 263:12-14; 263:16-17).  He further testified that it "wasn't his perception" that Yucaipa was entitled to a higher price than the other lenders because of Yucaipa's ownership of a controlling interest in Allied's debt.  (Dep. Tr. Riggs at 238:23-239:1; 239:3-5); *see also* (Dep. Tr. Gendregske at 316:16-18; 316:20-317:3; 317:5-14).

251.     Critically, the evidence at trial established that each lender was negotiating with JCT separately.  *See, e.g.*, [3/3/2022 Trial Tr. at 23:18-24:5] [Burkle Adverse Direct]; [3/3/2022 Trial Tr. at 85:2-4, 85:11-19] [Burkle Cross]; [3/3/2022 Trial Tr. at 85:24-86:1] [Burkle Cross]; [3/2/2022 p.m. Trial Tr. at 46:6-13] [Tochner Cross].  Given the disjointed nature of the negotiations, Yucaipa had no insight into what JCT was offering BD/S or how Yucaipa's deal with JCT compared to that of BD/S.  [3/1/2022 p.m. Trial Tr. at 116:23-117:2] [Deckoff Cross]. Yucaipa was, therefore, left to negotiate the best price that it could for its debt and assumed that BD/S would do the same.  *See* [3/2/2022 a.m. Trial Tr. at 113:24-114:3, 114:9-22, 114:24-115:2; 115:6-12] [Tochner Adverse Direct]; [3/3/2022 Trial Tr. at 85:2-4, 85:11-22] [Burkle Cross].

252.     The Trustee provided no evidence to support her assumption that an increase in the price Yucaipa negotiated for its debt would result in a decrease in the offers from JCT to the other selling lenders.  Yucaipa's representatives testified that they had no reason to believe this

to be the case. *See* [3/3/2022 Trial Tr. at 23:14-24:2] [Burkle Adverse Direct] ("So when you

have separate conversations, you both ask for what you hope you can get and then you can sit in

the room afterwards and say, how are we going to reconcile this?  But the idea that one side

would say, I don't really want to ask for a dollar because that might mean there might be less for

Steve, or that Steve was [sic] sit in the room and say, I don't really want to ask for a dollar

because that might mean there's less for Ron.  We're negotiating against Riggs . . . We allowed

Black Diamond to negotiate separately.  But when they negotiate separately, we don't know

what they're asking for and they don't know what we're asking for."); [3/2/2022 a.m. Trial Tr. at

93:14-94:11] [Tochner Adverse Direct] (testifying that Yucaipa didn't know that its negotiations

with JCT would impact the other lenders and therefore sought to negotiate the best price for its

debt).

253.    In the end, the Trustee offered no evidence to establish that the $5 million

increase between the $150 million in consideration allocated to Yucaipa in the December 19

Term Sheet (*i.e.*, the hypothetical transaction upon which the Trustee bases her damages

calculation) and the $155 million in consideration allocated to Yucaipa in the Final Term Sheet

caused any decrease in the price JCT offered for BD/S' debt.  The only evidence at trial

concerning the reason for JCT's reduction of its proposals to BD/S demonstrates that the price

was reduced as a result of BD/S' refusal to agree to certain terms demanded by JCT.  *See, e.g.*,

(Ex. 123 at 1) ("Please note that we have reduced the purchase price to 70% because of your

demand for the 4th amendment affirmation and Yucaipa settlement not be released until the

Second Closing.  If you agree to have those items released at the First Closing, then we could

agree to a 75% purchase price.").  Moreover, the alleged "increase" of $5 million in

consideration allocated to Yucaipa was accompanied by a change in the nature of the underlying

consideration; Yucaipa had agreed to accept considerably more JCT Notes, in lieu of cash, and those JCT Notes were not worth the same as cash.  *See* [3/2/2022 p.m. Trial Tr. at 59:3-60:3] [Tochner Cross]; [3/2/2022 p.m. Trial Tr. at 54:24-55:3] [Tochner Cross].

254.    In any event, the evidence at trial established that Yucaipa was willing to agree to share the proceeds of a JCT transaction ratably.  At the time BD/S ended the JCT negotiations and forced Allied into bankruptcy, Yucaipa had agreed to consider and was in the process of reviewing and negotiating the May 16 Letter Agreement for ratable treatment, which BD/S had provided to it less than 24 hours earlier.  *See* (Ex. 265) (Harris email attaching draft May 16 Letter Agreement on May 16, 2012 at 6:26 p.m.); (Ex. 351) (Walker forwarding May 16 Letter Agreement internally at Allied stating "We're reviewing now."); (Ex. 88) (Ehrlich email to Ciuputu on May 17, 2012 at 5:17 p.m. informing JCT that BD/S "have decided not to continue with negotiations."); (PX II) (Notice of Bankruptcy Case Filing "entered on 5/17/2012 at 5:45 PM EDT…"); (DX II) (Involuntary Petition).

255.    The Trustee presented no evidence at trial that Yucaipa ever refused to agree to ratable treatment.  [3/2/2022 a.m. Trial Tr. at 53:8-20] [Harris Cross]; [3/2/2022 a.m. Trial Tr. at 97:15-24] [Tochner Adverse Direct] (Tochner testifying that nobody said "no" to the idea of ratable treatment following a May 14, 2012 discussion).

256.    To the contrary, Burkle and Tochner both testified that Yucaipa was willing to agree to ratable treatment and Burkle testified that he had expressed Yucaipa's willingness to agree to ratable treatment to Deckoff at various times after Yucaipa purchased Allied's first lien debt in August 2009.  [3/2/2022 a.m. Trial Tr. at 94:8-95:23] [Tochner Adverse Direct] (testifying that Burkle's marching orders were "that we have to be fair and there was always going to be a conversation at the end where Steve was – would have the final say.") ; [3/2/2022

105

a.m. Trial Tr. at 118:3-8] [Tochner Adverse Direct] (Yucaipa was "[a] hundred percent"

prepared to agree to ratable treatment among the lenders)]; [3/3/2022 Trial Tr. at 18:24-19:9]

[Burkle Adverse Direct] ("Q.  My question was, when did the pari passu conversation take

place? A.  I'm sorry. On the very first meeting, I explained all the things I just told you to

Deckoff, and I told him, we will treat your debt the same way we treat our debt.  We're not

buying debt to have any kind of advantage over anybody.  We're not buying debt to change the

terms of the debt. We're not buying debt to advantage ourselves in any way, and you will have –

I don't believe I used the term pari passu because it's not what normally what I would say. But I

said your debt will be treated exactly like our debt.").

257.    Tochner further testified, in response to a question from the Court, that Yucaipa

would agree to ratable treatment even if that meant a reduction in Yucaipa's payment from JCT,

in part because there was no scenario in which a JCT transaction would come to fruition without

BD/S' support.  [3/2/2022 p.m. Trial Tr. at 72:4-17] [Tochner Cross].

258.    Yucaipa's willingness to agree to ratable treatment is implicit in its Final Term

Sheet with JCT.  Because Yucaipa was unaware of the terms being negotiated between JCT and

the other selling lenders, it expressly conditioned the sale of its debt to JCT on BD/S and CIT

agreeing to the overall deal with JCT, and it required JCT to purchase the debt of each of the

remaining lenders to ensure that no lender was left behind or unsatisfied.  *See* (Ex. 122 at 9);

[3/2/2022 a.m. Trial Tr. at 93:14-94:17] [Tochner Adverse Direct] (testifying that due to the

nature of the negotiations, Yucaipa put a clause in its final term sheet with JCT "that we will not

do a deal unless everybody holds hands and agrees to it."); [3/2/2022 p.m. Trial Tr. at 66:7-16]

[Tochner Cross] (testifying that Black Diamond, Spectrum, and CIT needed to enter into a deal

in order for Yucaipa to enter into one with JCT, and that those were his "marching orders");

106

[3/3/2022 Trial Tr. at 87:15-88:18] [Burkle Cross] (testifying that Yucaipa insisted on including a clause in its Final Term Sheet with JCT that required all lenders to agree to the overall deal.). This provision necessarily implies an agreement by Yucaipa to ratable treatment because that is what Deckoff claimed would be necessary for Black Diamond to accept any deal.

259.    In Yucaipa's view, this provision addressed BD/S' May 14, 2012 demand for ratable treatment because, as Tochner testified, "there was going to be no deal unless Black Diamond and Spectrum agreed to it."  [3/2/2022 a.m. Trial Tr. at 96:18-20, 97:5-8] [Tochner Adverse Direct] (testifying that adding language to term sheet calling for equal and ratable treatment with Yucaipa "didn't need to be said" and that "[t]here was going to be no deal unless Black Diamond and Spectrum agreed to it.").  Tochner testified that in his discussions with BD/S during the 72-hour time period between BD/S' demand for ratable treatment and the filing of the Involuntary Petition, Yucaipa conveyed its understanding to BD/S that this provision already addressed their demand for ratable treatment.  [3/2/2022 a.m. Trial Tr. at 95:11-23] [Tochner Adverse Direct] (testifying that he spoke to Ehrlich and Harris and directed them to the specific term in the Final Term Sheet).  In response, the Trustee argued at trial that this provision could have been waived by the parties, but provided no evidence to support that either Yucaipa or JCT would be willing or able to unilaterally waive a clause that they intentionally negotiated to include in their deal.

260.    Yucaipa's willingness to agree to ratable treatment is further demonstrated by its conduct post-petition.  Yucaipa continued to negotiate with JCT after BD/S filed the Involuntary Petition in an effort to salvage a deal with JCT.  [3/2/2022 p.m. Trial Tr. at 73:24-74:7] [Tochner Cross] ("My basic understanding is that a deal still could have been done.  Whether we were in bankruptcy or not, we still could have accomplished the same thing, so it made sense to try to get

107

a deal done just as we had pre-bankruptcy."). Those efforts resulted in a proposal submitted in June 2012, which provided the same rights to all lenders—in fact, the proposal was more favorable than the deal Deckoff accused Burkle of "squandering" in June 2011. *See* (PX JJ); (Ex. 536); [3/2/2022 p.m. Trial Tr. at 75:1-7, 76:20-23; 77:22-78:1] [Tochner Cross].

### d.    *Yucaipa's conduct satisfies the business judgment standard.*

261.    For the foregoing reasons, the Court finds that the Trustee has not met her burden of rebutting the business judgment rule presumption.[23]  Unless one of the presumptions of the business judgment standard are rebutted by the Trustee, the Court's analysis need only consider "whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) (citing *In re Dollar Store Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010)).  Bad faith and a breach of duty may only be inferred where "a decision lacks any rational conceivable basis." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) (citing *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1213, 1239 (Del. 2012)).

262.    There is no dispute that Yucaipa participated in the JCT negotiations.  Indeed Yucaipa and JCT entered the Final Term Sheet.  (Ex. 122).  While the Trustee argues that Yucaipa should have caused Allied to negotiate directly with JCT, Yucaipa's duty of loyalty allowed it "wide latitude to take action and embrace risk for the benefit of the corporation." *In re Chelsea Therapeutics Int'l Ltd. Stockholders Litig.*, 2016 WL 3044721 at *1 (Del. Ch. May 20, 2016).  Negotiating for the sale of Yucaipa's Allied debt was "one logical approach to

---

[23] For the same reasons, the Court also rules in the alternative that, were the Court to apply the entire fairness standard, Yucaipa's conduct in connection with the JCT negotiations at issue satisfies the entire fairness standard.

advancing" a sale of Allied's assets to JCT—which the Trustee alleges was Allied's objective at the time.  *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014).  In fact, as explained in Conclusions of Law Section II.B.1 above and based on, among other things, correspondence between the parties, the relevant term sheets, and the testimony of Riggs, Ciuputu, Walker, and Tochner, a debt-sale transaction was the *only* way to reach a deal with JCT because that is what JCT was requiring at the time.  *See, e.g.*, (Dep. Tr. Riggs at 80:25-81:6); (Dep. Tr. Riggs at 221:7-11); (Dep. Tr. Riggs at 235:13-21); (Dep. Tr. Ciuputu at 68:9-69:4); (Dep. Tr. Walker at 679:8-11, 679:13-14, 680:1-4, 680:6-16, 681:2-4, 681:9-14, 681:16-18); [3/2/2022 p.m. Trial Tr. at 40:21-25] [Tochner Cross].

263.    The evidence at trial demonstrates that Yucaipa, even in BD/S' view engaged in the negotiations in good faith and made considerable concessions in an effort to generate a deal with JCT.  *See* (Ex. 122 at 7) (agreeing to accept nearly half of its consideration in JCT debt as opposed to cash); (Ex. 664) (Riggs informing BD/S that Yucaipa "is putting their money where their mouth is."); (Ex. 661) at 2 (Ehrlich email stating that Yucaipa "like[s] our deal, and are open minded about consideration above our deal."); [3/2/2022 p.m. Trial Tr. at 54:24-55:3, 56:15-20 [Tochner Cross] (testifying that Yucaipa valued JCT Notes as less valuable than cash but agreed to accept them as consideration, and that Yucaipa assumed risk of transferring its debt to JCT before receiving any cash).

264.    Based on the forgoing reasons, the Court finds that Yucaipa did not violate the fiduciary duty of loyalty to Allied under the business judgment rule standard.[24]

_____

[24] To the extent the Trustee is asserting a breach of the duty of care, Yucaipa is exculpated under the terms of Allied's Certificate of Incorporation.  *See Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *16 (Del. Ch. July 26, 2010) ("a controlling stockholder cannot be held liable for a breach of the duty of care when the directors are exculpated.").  (DX OO at 10 (§ 8)).

265.     Because the Trustee has failed to establish a breach of any fiduciary duty, the Court finds in favor of Yucaipa and against the Trustee on Estate Claim 7, and recommends that judgment be entered in favor of Yucaipa and against the Trustee on that claim.

**3.     The Trustee Failed To Prove That Yucaipa Caused The JCT Negotiations To Fail.**

266.     Because the Court finds that the Trustee has failed to establish a breach of Yucaipa's fiduciary duty to Allied, the Court need not determine whether the Trustee has established the other elements of her claim, including the element of causation.  *See Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996) (transactional damages found inappropriate where a failure to consummate a transaction was not proximately caused by breach of fiduciary duty).  Moreover, as explained in Conclusions of Law Section II.A above, even if the failure of the JCT negotiations was caused by Yucaipa, the Trustee has failed to prove the amount of damages through a responsible estimate and, therefore, could not recover anything beyond nominal damages even if she were able to prevail on Estate Claim 7.  *See CSH Theatres, L.L.C. v. Nederlander of San Francisco Associates*, 2018 WL 3646817, at *30 (Del. Ch. July 31, 2018) ("[] Court 'cannot create what does not exist in the evidentiary record, and cannot reach beyond that record when it finds the evidence lacking. Equity is not a license to make stuff up.' If a plaintiff seeks more than nominal damages, proof must replace 'hypothetical estimates.'").

267.     Nevertheless, the Court undertakes the analysis of the element of causation and finds that the Trustee has failed to establish that any conduct by Yucaipa caused the JCT negotiations to fail.  It is the Trustee's burden to prove causation.  *See Glick v. KF Pecksland LLC*, 2017 WL 5514360, at *19 (Del. Ch. Nov. 17, 2017) (Plaintiff is required to prove, by a preponderance of evidence, that it suffered damages as a result of a breach of fiduciary duty).

110

*a.*                    ***BD/S, not Yucaipa, caused the JCT negotiations to fail.***

268.     The Trustee cannot meet her burden to establish causation because it was BD/S

that chose to end the JCT negotiations.  At trial, both of the Trustee's witnesses, Deckoff and

Harris, admitted that BD/S ended the prepetition negotiations with JCT on May 17, 2012 because

they decided to force Allied into bankruptcy rather than continue negotiations with JCT.  *See*

(DX B); (Ex. 88); [3/1/2022 a.m. Trial Tr. at 94:23-95:9] [Deckoff Adverse Direct] (testifying

that Black Diamond decided not to continue with negotiations because it was proceeding with an

involuntary bankruptcy petition); [3/1/2022 p.m. Trial Tr. at 183:5-10] [Deckoff Cross]

(testifying again that Black Diamond called off negotiations because the involuntary bankruptcy

petition had been authorized); [3/2/2022 a.m. Trial Tr. at 67:16-22] [Harris Cross].

269.     The Trustee's argument that it was Yucaipa's purported refusal to agree to ratable

treatment that ended the negotiations is belied by the testimony of her own witnesses and ignores

the overwhelming evidence at trial that Yucaipa never refused to agree to ratable treatment.  *See*

Conclusions of Law Section II.B.2.c.

270.     Based on the evidence at trial, BD/S' eleventh-hour demand that Yucaipa enter

into a written agreement for ratable treatment appears to be a mere pretext.  According to

Deckoff's testimony, BD/S had concerns over ratable treatment since at least the December 19

Term Sheet.  *See* [3/1/2022 p.m. Trial Tr. at 130:2-5, 137:1-6] [Deckoff Cross].  Yet, there is no

evidence in the record that BD/S ever raised a concern over ratable treatment with JCT (or

Yucaipa) in the course of the parties' year-long negotiations.  Riggs testified that BD/S always

knew where JCT's negotiations with Yucaipa stood but that he did not recall BD/S ever telling

him around March 2012 that BD/S should be treated equally with respect to what Yucaipa was

being offered.  (Dep. Tr. Riggs at 257:4-14; 257:23-258:16).

271.    In the context of negotiations that spanned at least one year, BD/S gave Yucaipa approximately 72 hours to approve a 13-page written agreement (not yet approved by BD/S) providing for ratable treatment in any transaction involving Allied debt. *See* (Ex. 265) (Harris email attaching draft May 16 Letter Agreement on May 16, 2012 at 6:26 p.m.); (Ex. 475) (Walker notifying Ehrlich that Burkle will be calling Deckoff); (Ex. 88) (Ehrlich email to Ciuputu on May 17, 2012 at 5:17 p.m. informing JCT that BD/S "have decided not to continue with negotiations."); (PX II) (Notice of Bankruptcy Case Filing "entered on 5/17/2012 at 5:45 PM EDT…"); (DX II) (Involuntary Petition); [3/1/2022 p.m. Trial Tr. at 179:10-14 [Deckoff Cross] (testifying that his counsel set the 5:00 pm deadline).

272.    At the time BD/S filed the Involuntary Petition, BD/S were aware that Yucaipa had agreed to consider the written May 16 Letter Agreement, and that Burkle would be reaching out to discuss the matter with Deckoff directly. *See, e.g.*, (Ex. 477) (Ehrlich telling Deckoff that Burkle was going to reach out to him); (Ex. 475) (Walker notifying Ehrlich that Burkle will be calling Deckoff). Deckoff testified that he understood that Burkle wanted to get in touch with him to discuss the deal further. [3/1/2022 p.m. Trial Tr. at 180:13-20] [Deckoff Cross]. There is no evidence that Deckoff made any attempt to reach Burkle to discuss this issue even though Burkle testified that Deckoff "has my cell number. He has my home number. He has every number I have . . . ," [3/3/2022 Trial Tr. at 90:1-3] [Burkle Cross], and that the two regularly communicated directly. *See* [3/3/2022 Trial Tr. at 62:4-18] [Burkle Cross]. Deckoff confirmed that Burkle was generally available to him and easy to reach. *See* [3/1/2022 p.m. Trial Tr. at 92:1-4] [Deckoff Cross]; [3/1/2022 p.m. Trial Tr. at 78:19-21] [Deckoff Cross].

273.    Nevertheless, Deckoff testified that he simply waited for Burkle's call, and when it did not arrive by the 5 p.m. deadline that BD/S had unilaterally and arbitrarily imposed on

112

Yucaipa, BD/S filed the Involuntary Petition.  [3/1/2022 p.m. Trial Tr.at 181:5-15] [Deckoff

Cross] (testifying that he waited in his office all day for Burkle's call but that it never came).

Burkle testified that he in fact tried to reach Deckoff, but that his calls went unanswered.

[3/3/2022 Trial Tr. at 60:25-62:18, 63:24-64:7] [Burkle Cross]; (DX TTT).  Regardless, it defies

logic that Deckoff would make no effort to confirm Yucaipa's agreement to ratable treatment

with Burkle when it was purportedly the one hurdle to consummating a deal that BD/S wanted

with JCT.

274.    The conclusion that BD/S' termination of the JCT negotiations had nothing to do

with Yucaipa's alleged refusal to agree to ratable treatment becomes inescapable when one

considers that BD/S rejected a post-petition proposal from JCT in June 2012 that reflected not

only equal treatment but also a deal for an even greater price than the one Deckoff accused

Burkle of squandering in 2011.  *See* (Exs. 536, 663), (PX JJ ) (JCT's June 2012 Proposal

offering all Allied senior debt holders the option of selling debt for 85 cents in the form of JCT

Notes); [3/2/2022 p.m. Trial Tr. at 78:2-10] [Tochner Adverse Direct] ("Q.  What ultimately

happened with Yucaipa's efforts to salvage the JCT deal - - JCT Deal - - post-bankruptcy?  A.

My memory is Black Diamond and Spectrum would not do the deal.  Q.  And you know that

because they told you?  A.  They told me that.  Q.  And they told you this in the course of you

trying to negotiate to salvage the JCT deal?  A.  Yes.").

275.    The Court finds that it was BD/S' strategic decision to place Allied in bankruptcy

rather than continue negotiations with JCT that caused the failure of the negotiations.  That

failure was not caused by Yucaipa.  The evidence shows that BD/S was planning on forcing

Allied into bankruptcy long before the issue of ratable treatment in the context of the JCT

negotiations was raised.  *See* (Ex. 79) (discussing "equitable subordination angle" in August

2009), (Ex. 248) (discussing retaining counsel to file/threaten involuntary bankruptcy in October 2009); (Dep. Tr. Schaffer at 353:19-354:14, 354:25-355:9, 355:11-15) (testifying that in October 2009, BD/S were trying to find lawyers who had experience filing and threatening involuntary bankruptcy in relation to Allied, which was something BD/S was interested in doing); (Ex. 468) (Schaffer in a January 17, 2012 email to Ehrlich: "I know we have to just press the button at some point, but perhaps get the nda done and get cooper financials first?").

276.    Additionally, the evidence presented at trial demonstrates that BD/S chose to abandon negotiations with JCT in favor of bankruptcy because BD/S and JCT had reached an impasse in their negotiations with respect to terms aside from price.  These issues included, among other things: disagreement between BD/S and JCT about the terms of a non-disclosure agreement, (*see* (Exs. 256, 468); [3/1/2022 p.m. Trial Tr. at 143:18-20] [Deckoff Cross]);  BD/S' refusal to agree to a standard non-compete ((Ex. 127); [3/1/2022 p.m. Trial Tr. at 145:12-16] [Deckoff Cross]); BD/S' refusal to affirm the Fourth Amendment before the deal closed as *JCT* was requiring (Ex. 127); JCT's refusal to provide certain diligence to BD/S, (*see* (Exs. 83, 92)); and BD/S' refusal to disclose the amount of debt it was purportedly selling to JCT.  (Ex. 123); (Dep. Tr. Schaffer at 464:13-465:4, 465:6-7, 465:9-466:1, 466:3) (testifying that he would have withheld his debt holdings for various reasons, including not wanting the buyer "to know whether you're a large or smallholder [*sic*].").

277.    At trial, the Trustee's witness, Deckoff, attempted to explain away these non-price issues by speculating that they could have been overcome had the deal been equal and ratable. *See, e.g.*, [3/1/2022 p.m. Trial Tr.  at144:7-9] [Deckoff Cross] ("Q.  But BD/S was not willing to agree to a non-compete, true?  A.  Incorrect.  If we had gotten equal and ratable treatment, we would have been willing to agree to a non compete.").  But there is no evidence, other than

114

Deckoff's self-serving testimony, to support that assertion. To the contrary, the evidence

demonstrates that a non-compete, for example, was unacceptable to Spectrum. (Ex. 127)

(Schaffer stating, "We will not agree to a non-compete of any kind with our investments.");

[3/1/2022 p.m. Trial Tr. at 145:6-9] [Deckoff Cross] ("Q. But your partner, Spectrum, wasn't

okay [with agreeing to a non-compete], isn't that true? A. That's what it appears in this email

but maybe I would have been able to convince Jeff [Schaffer] otherwise."). The Trustee chose

not to include Schaffer as a witness in her case, so Deckoff's speculation could not be tested and

cannot be relied upon.

278.    In light of such issues, by May 2012, JCT had reduced the price it was willing to

pay for BD/S' debt to 70% of par, and BD/S found itself at an impasse with JCT. *See* (Ex. 123).

As Schaffer testified, "Theo [Ciupitu] and Mike [Riggs] were just constantly sending us term

sheets that were ***nowhere near deals that we were willing to do***." (Dep. Tr. Schaffer at 452:3-

12) (emphasis added).

279.    The Court finds that by forcing Allied into bankruptcy, BD/S not only caused the

failure of the JCT negotiations, but also substantially and adversely impacted Allied's value to

any potential buyer.

280.    In addition, the Court was presented with substantial evidence of the impact of an

involuntary bankruptcy on Allied. Tochner testified that from his perspective as an Allied Board

member, putting Allied into bankruptcy "was chaos," and resulted in "a lot of damage control"

by the Board and loss of customers over time. [3/2/2022 p.m. Trial Tr. at 80:4-13] [Tochner

Cross]; *see also* [3/2/2022 p.m. Trial Tr.at 67:5-13] [Tochner Cross] (putting Allied into

bankruptcy "would have been a terrible thing for the company . . . so everything that we've

always done -- me personally -- is to avoid bankruptcy."); [3/2/2022 p.m. Trial Tr. at 74:8-12]

115

[Tochner Cross] (filing of the Involuntary Petition presented a big hurdle to salvaging any debt

deal with JCT).  Burkle testified that Allied lost customers as a result of the involuntary

bankruptcy.  [3/3/2022 Trial Tr. at 14:7-12] [Burkle Adverse Direct].  BD/S' bankruptcy

counsel, Harris, agreed in his testimony that putting a company into bankruptcy can be a major

disruption to its business and can cause it to lose customers.  [3/2/2022 a.m. Trial Tr. at 45:11-

16] [Harris Cross].

281.    Allied's other lenders and customers also testified to the adverse effects they

expected bankruptcy to have on Allied and their investment in it.  *See, e.g.*, (Dep. Tr. New at

100:19-101:10, 101:12-13); (Dep. Tr. Davies at 22:25-23:2, 23:9-23, 24:6-13) (testifying that

bankruptcy is disruptive); 40:7-41:4 (same); 53:19-22, 54:1 (same); (Dep. Tr. Balakrishnan at

44:2-10, 44:14-45:8) (testifying that Avenue Capital Group, LLC did not want another

bankruptcy for Allied because it's bad for the fund); (Dep. Tr. Balakrishnan at 50:17-21, 50:23-

51:2, 51:7-22) (testifying that bankruptcy is bad because it takes away the focus away from

running the business).  Because BD/S caused Allied's 2012 bankruptcy, Yucaipa cannot be held

liable for any losses suffered by Allied as a result, including the loss of any potential pre-petition

JCT deal or any loss to Allied's value.

### b.    *Yucaipa Did Not "Squander" A Deal In Spring 2011.*

282.    As if recognizing the contradiction in arguing that Yucaipa caused the JCT

negotiations in 2012 to fail when it was BD/S that ended the negotiations, the Trustee presented

testimony from Deckoff that Yucaipa squandered a deal in the spring of 2011 for a price of 84

cents on the dollar for first lien lenders.  As described above, this is a deviation from the

Trustee's original damages theory, which relies entirely on the December 19 Term Sheet and

calculates damages based on the unreasonable assumption that a deal under those terms would

have materialized. *See* (Conclusions of Law Section II.A). The prevailing inference from the glaring omission of witnesses in the Trustee's case (like Ehrlich and Schaffer, each of whom was more involved in and more knowledgeable about the JCT negotiations than Deckoff) is that testimony by these omitted witnesses (either live or at deposition) would be inconsistent with the new narrative presented by the Trustee for the first time at trial. *In re Biogen '755 Pat. Litig.*, 2018 WL 3613162, at *2 (D.N.J. July 26, 2018) ("When a party knows of witnesses on a material issue and they are within his control to produce, if the party chooses to not call the witnesses, the fact finder may draw me [*sic*] inference that the testimony would have been unfavorable.") (citation and internal quotations omitted).

283.    In any event, the Trustee failed to support this new theory with admissible evidence. For one thing, there is no term sheet reflecting this proposal. The only evidence of such a proposal is an email from Walker to Burkle, conveying a proposal communicated to Walker by Black Diamond's Ehrlich, whereby Yucaipa could either sell its debt (i) to Black Diamond for 50 cents on the dollar in cash or (ii) to JCT for 84 cents on the dollar, with a majority of the consideration to be paid in JCT Notes. (Ex. 536); (Dep. Tr. Walker at 662:5-6; 662:19-663:5; 663:22-664:1; 664:9-665:8) (testifying about the terms proposed by Ex. 536 and noting that "the options laid out here were informed by the discussions with Black Diamond. We weren't really having discussions with Jack Cooper or Riggs. We were having discussions with Black Diamond which instructed us only to talk to them.").[25] This constitutes inadmissible hearsay because the proposal was conveyed to Walker by Ehrlich, and Ehrlich's statement that this was the proposal is offered for its truth. *See, e.g.*, *United States v. Reynolds*, 715 F.2d 99,

---

[25] Although Deckoff testified several times that this was an "M&A" deal, this proposal in June 2011 was clearly for for the sale of Yucaipa's Allied *debt*. *See* [3/1/2022 a.m. Trial Tr. at 93:1-21] [Deckoff Direct]; (Ex. 663).

101 (3d Cir. 1983) ("Rule 801(c) defines hearsay as 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'") (quoting Fed. R. Evid. 801(c)).

284.    Similarly, Deckoff's testimony that Yucaipa squandered the deal when it countered with a higher price is based on inadmissible hearsay in the form of an email from Riggs stating that the deal was dead.  *See* (Ex. 663); *see also* [3/1/2022 p.m. Trial Tr. at 125:4-13; 126:3-13] [Deckoff Cross].  Regardless, the Trustee cannot establish that Yucaipa caused this supposed deal not to occur because the Trustee failed to proffer any evidence that this June 2011 transaction was one that would have been consummated but for Yucaipa's conduct, or at all. Importantly, the evidence is clear that negotiations continued after this exchange and that JCT initially *increased* its offers to Yucaipa and BD/S in those negotiations.  In fact, JCT proposed to purchase lenders' first lien debt on terms even more attractive than those reflected in Ex. 536 again in June 2012, but BD/S refused to engage in the negotiations.  [3/2/2022 p.m. Trial Tr. at 78:2-10] [Tochner Cross] (testifying that BD/S refused to negotiate with JCT to salvage a deal post-bankruptcy).  As a result, the Trustee cannot establish that Yucaipa "squandered" this proposal.[26]

285.    In light of all the foregoing evidence, the Court finds that Yucaipa was not the proximate cause of any purported loss related to the JCT negotiations.  *See Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 444 (Del. 1996).  On this additional, independent ground, the Court recommends that a judgment be entered in favor of Yucaipa and against the Trustee on Estate Claim 7.

---

[26] The Trustee also offers no damages calculation based on this proposal. In any event, as set forth in Findings of Fact Section XIV.A.6 above, JCT eventually reduced the amount of its proposal significantly after its advisors had an opportunity to analyze Allied's financials.

**C.** **The Trustee Has Not Established Liability Under BD/S's Breach of the Implied Covenant of Good Faith and Fair Dealing Claim (Lender Claim 3)**

286.    The Trustee asserts Lender Claim 3 in the alternative to Estate Claim 7.  Because the Court finds in favor of Yucaipa on Estate Claim 7, the Court considers the merits of Lender Claim 3.  The Trustee alleges, on behalf of the Lenders, that Yucaipa breached the implied covenant of good faith and fair dealing (the "Covenant") by (1) interfering with the JCT negotiations; and (2) using its Requisite Lender status to allow Allied to breach the FLCA.  The Trustee failed to prove either theory at trial.[27]

287.    Under New York law, the elements of a claim for the breach of the Covenant are: "(1) [the] defendant must owe plaintiff a duty to act in good faith and conduct fair dealing; (2) [the] defendant must breach that duty by acting in bad faith or failing to conduct fair dealing; and (3) the breach of duty must proximately cause plaintiff's damages." *In re 11 E. 36th LLC*, No. 13-11506 (RG), 2014 WL 2903660, at *4 (Bankr. S.D.N.Y. June 26, 2014) (quoting *In re Tremont Sec. Law, State Law, & Ins. Litig.*, No. 08–11117, 2013 WL 5393885, at *8 (S.D.N.Y. Sept. 26, 2013)).

288.    It is the Trustee's burden to establish by a preponderance of the evidence all of the elements of her claim.  *See Cap. Sec. Sys. W.L.L. v. L-3 Commc'ns Sec. & Detection Sys., Inc.*, 2018 WL 4666072, at *7 (S.D.N.Y. Sept. 28, 2018); *see also Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (Plaintiff's burden to establish by a preponderance of evidence the existence of a breach).  The Trustee did not do so.

---

[27] This claim was expressly alleged in the alternative to Lender Claim 2.  (Ex. 207).  As the Trustee already prevailed on Lender Claim 2, it cannot also prevail on this claim.

119

1.      **The Trustee Did Not Establish Liability Based On Yucaipa's Alleged Interference With The JCT Negotiations.**

289.    Allegations that Yucaipa interfered with the JCT negotiations do not give rise to liability against Yucaipa under a theory of breach of the Covenant for many of the same reasons set forth above in Conclusions of Law Section II.B.  Specifically the Trustee cannot establish any of the alleged wrongful conduct by Yucaipa, as the evidence presented at trial does not support a finding that Yucaipa demanded a premium or prevented a hypothetical deal directly between Allied and JCT.  Additionally, for the same reasons the Trustee cannot prove causation in connection with Estate Claim 7, she cannot prove causation in connection with Lender Claim 3. And, regardless of any alleged wrongful conduct by Yucaipa in connection with the JCT negotiations, the Trustee cannot establish the resulting damages with sufficient certainty.  *See* (Conclusions of Law Section II.A).

290.    The Court further finds that Yucaipa is not liable for breach of the Covenant based on Yucaipa's alleged interference with the JCT negotiations for the following two additional reasons:

a.      ***The Trustee failed to prove that the FLCA limits Yucaipa's rights as a lender to set a price for its debt.***

291.    To the extent the Trustee's Covenant claim is premised on Yucaipa demanding a premium for its debt in the JCT negotiations, the claim also fails because the FLCA does not expressly or impliedly limit any lender's right to retain or assign its debt to an Eligible Assignee at any price.  *See, e.g.*, *1357 Tarrytown Road Auto, LLC v. Granite Properties, LLC*, 142 A.D.3d 976, 977 (2016) ("no obligation may be implied that would be inconsistent with other terms of the contractual relationship."); *Silvester v. Time Warner, Inc.*, 763 N.Y.S. 2d 912, 918, *aff'd*, 14

120

A.D.3d 430 (2005) ("[S]uch covenant does not impose any obligation upon a party to the contract beyond what the explicit terms of the contract provide.").

292.    The FLCA provides that each lender, including Yucaipa, has the right to "sell, assign, or transfer . . . its rights and obligations" without requiring such sale, assignment, or transfer to be for any particular price, let alone on a *pro rata* basis.  (Ex. 133* at 169 (§ 10.6 (c)). Consequently, the price Yucaipa sought for its debt cannot be a breach of the Covenant because the imposition of a limitation on the price a lender may demand for its debt is contrary to the rights afforded to the lenders under the FLCA.  *See, e.g.*, *Marine Midland Bank, N.A. v. Yoruk*, 242 A.D.2d 932, 933 (N.Y. 1997) ("an obligation may not be implied that would be inconsistent with other terms of the contractual relationship.") (cleaned up); *Cap. Sec. Sys. W.L.L. v. L-3 Commc'ns Sec. & Detection Sys., Inc.*, 2018 WL 4666072, at *10 (S.D.N.Y. Sept. 28, 2018), quoting *Broder v. Cablevision Systems Corp.*, 418 F.3d 187, 198–99 (2d Cir. 2005) ("Where it applies, the implied covenant can only impose an obligation consistent with other mutually agreed upon terms in the contract.").

293.    The Trustee did not present *any* evidence at trial to even suggest that the FLCA expressly or impliedly limited Yucaipa's right to sell its debt at a price of its choosing.  On this additional basis, the Court finds no breach of the Covenant based on Yucaipa's alleged demand for a premium.

       ***b.***       ***The Trustee, standing in the shoes of BD/S, is collaterally estopped by the RICO decision.***

294.    On February 14, 2022, Yucaipa filed in these adversary proceedings a Motion *In Limine* To Exclude Argument, Evidence, and Testimony That the JCT Deal Was Sufficiently Certain To Support An Award of Damages (the "JCT Motion").  (13-50530, D.I. 940-42; 14-

50971, D.I. 676-678).  On February 25, 2022, the Court denied the JCT Motion.  (13-50530, D.I.

962).  Although the JCT Motion may not have been appropriate as a motion *in limine*, the

evidence adduced at trial confirms that the Trustee, while standing in the shoes of BD/S, is

barred from relitigating whether the JCT deal was sufficiently certain to support a claim for

damages.

295.    As explained in Conclusions of Law Section II.A. above, the Trustee's damages

claim is dependent on the assumption that JCT's offer to purchase the claims of certain of

Allied's first lien lenders, including Yucaipa and BD/S, was sufficiently certain to form the basis

for her calculation of damages.  Specifically, the Trustee alleges that Yucaipa, while acting as

Requisite Lender, "scuttle[d] a transaction with [JCT] that would have provided full payment on

the First Lien Debt to the First Lien Lenders."  (12-11564, D.I. 2703 ¶ 13).

296.    As a direct consequence of the JCT deal failing, the Trustee, on behalf of BD/S,

claims to be damaged in an amount equal to the difference between the assumed net proceeds

from JCT's December 19 Term Sheet that would have gone to the first lien lenders and the actual

net proceeds received by those lenders in Allied's Bankruptcy case.  [3/4/2022 a.m. Trial Tr. at

142:22-143:4] [Risius Cross].  Indeed, the Trustee's expert on damages, Risius, testified at trial

that, but for Yucaipa's actions, a transaction with JCT would have been consummated prior to

Allied's involuntary bankruptcy, and the first lien lenders would have been better off.  [3/4/2022

a.m. Trial Tr. at 125:23-126:1] [Risius Cross].

297.    However, the certainty of the JCT deal has already been litigated by the parties

and that deal was adjudicated to have been speculative and conditional by the Delaware District

Court  (the "RICO Action").  *Yucaipa Am. Alliance Fund I, L.P. v. Ehrlich*, 204 F. Supp. 3d 765

(D. Del. 2016).  (PX GGG).  In that action, filed in 2015, Yucaipa filed a complaint in the

122

District Court against BD/S asserting, among other claims, a RICO cause of action.  (PX CCC ¶¶ 151-201).  Yucaipa alleged that it was BD/S' wrongful conduct that interfered with Yucaipa's sale of its debt holdings to JCT, preventing the closure of the deal, and costing Yucaipa millions of dollars.  (PX CCC ¶ 200).  BD/S moved to dismiss the RICO Action, arguing that the complaint failed to state a claim.  (PX GGG at 2).

298.    The Delaware District Court agreed with BD/S' arguments and issued an opinion dismissing Yucaipa's RICO complaint (the "2016 Dismissal Ruling"), ruling that the JCT deal was, as a matter of law, "speculative" and "subject to multiple closing conditions including funding contingencies."  (PX GGG at 16).  The District Court further ruled that Yucaipa "could not satisfy proximate cause in light of the numerous conditions and contingencies attendant to the JCT Deal."  (PX GGG at 17).

299.    Collateral estoppel or issue preclusion applies when "1) the issue sought to be precluded is the same as that involved in the prior action; 2) that issue was actually litigated; 3) it was determined by a final and valid judgment; and 4) the determination was essential to the prior judgment."  *Walsh v. Quinn*, 359 Fed. Appx. 273, 275 (3d Cir. 2009) (quoting *Peloro v. United States*, 488 F.3d 163, 175-75 (3d Cir. 2007)).  Here the doctrine applies and bars the Trustee from relitigating that the JCT deal was uncertain because all four elements of the test are met.

300.    *First*, the Trustee argued at trial and introduced testimony from her damages expert seeking to prove that, but for Yucaipa's actions, the JCT deal would have been consummated prior to Allied's bankruptcy.  [3/4/2022 a.m. Trial Tr. at 125:23-126:1] [Risius Cross].  The Trustee's counsel even went so far as to refer to Yucaipa's complaint in the RICO Action at trial as a reference point for the amount of damages that the Trustee claims to have incurred as a result of the failed JCT deal.  [3/1/2022 a.m. Trial Tr. at 27:7-12] [Trustee

123

Opening]. However, in the Delaware District Court RICO Action, in moving to dismiss Yucaipa's complaint, BD/S argued that the JCT deal was dependent on several contingencies, making it uncertain. *See* (PX GGG at 16-17). This is the same issue.

301. *Second*, the JCT deal's certainty was "actually litigated" in the Delaware District Court on BD/S' Rule 12(b) motion against Yucaipa's RICO complaint. An issue is "actually litigated" if it is argued before a prior court and ruled upon. *See, e.g.*, *Farmer v. Potteiger*, 2012 WL 5398626, at \*6 (M.D. Pa. Sept. 28, 2012). In *Farmer,* on a motion to dismiss, the court reviewed the allegations of a prior lawsuit and arguments in the parties' papers on a motion to dismiss that prior lawsuit, and compared them to that of the new underlying matter between the same parties. *Farmer v. Potteiger*, 2012 WL 5398626, at \*6 (M.D. Pa. Sept. 28, 2012). The parties' contentions as set forth in their briefing in the prior case and the issues raised in the new case were substantially similar enough for the court to determine that the issues had been "fully litigated, and adjudicated, in the earlier case." *Farmer v. Potteiger*, 2012 WL 5398626, at \*6 (M.D. Pa. Sept. 28, 2012). The court applied collateral estoppel to preclude re-litigation of the same issues. *Farmer v. Potteiger*, 2012 WL 5398626, at \*6 (M.D. Pa. Sept. 28, 2012).

302. The same is true here. BD/S expressly argued in its 12(b)(6) Motion papers against Yucaipa's RICO complaint that the JCT deal's uncertainty and conditionality precluded an award of damages and the District Court adopted BD/S' position in its ruling. As a result, the parties, including the Trustee as successor to BD/S, have "actually litigated" the issue of whether the JCT deal was sufficiently certain to support a claim for damages, and the District Court had adjudicated that it was not. (PX GGG at 16).

124

303.     *Third*, it is indisputable that the 2016 Dismissal Ruling was a final judgment on the merits in a prior suit, as a grant of a motion to dismiss is a final judgment on the merits.  *See, e.g.*, *Walsh v. Quinn*, 359 Fed. Appx. 273, 275 (3d Cir. 2009).

304.     *Fourth*, the District Court's ruling that the JCT deal was uncertain and "subject to multiple closing contingencies including funding contingencies" was necessary to the court's decision to dismiss the RICO complaint.  The court was assessing whether the loss of the JCT deal was sufficiently "concrete" or certain enough to support standing, proximate cause, and damages.  (PX GGG at 16-17).  Yucaipa alleged that it had lost profits from the failure to close the JCT deal, but the court found that the deal was, as a matter of law, insufficiently certain because Yucaipa's "losses arising from a failure to close the JCT deal, if any, are not clear and definite."  (PX GGG at 16).

305.     Because all four requirements of collateral estoppel are satisfied here, the Trustee cannot now relitigate the fact that the JCT deal was too uncertain and contingent to form the basis of a claim for damages.  She must live with the ruling of the prior case, in which the court held there was "no plausible basis for asserting" that the JCT deal would close.  (PX GGG at 17).

306.     Accordingly, this Court finds that the Trustee is barred from recovering damages, at least on behalf of BD/S, based on the previously litigated and adjudicated argument that the JCT deal was sufficiently certain to support an award for damages.

**2.     The Trustee Did Not Establish Liability Based On Allegations That Yucaipa Caused or Allowed Allied To Breach the FLCA.**

307.     At trial, the Trustee also failed to establish the second purported basis for her breach of the Covenant claim, namely, that Yucaipa caused or allowed Allied to breach the FLCA when it was acting as the Requisite Lender.  The Trustee failed to satisfy her burden of

proving that any conduct by Yucaipa caused Allied's alleged breach of the FLCA.  *See Lola Roberts Beauty Salon, Inc. v. Leading Ins. Group Ins. Co., Ltd.*, 160 A.D.3d 824, 825 (2018) ("Proximate cause is an essential element of a breach of contract action.").  The Trustee must show her damages are "directly traceable to the breach [and] not remote or the result of other intervening causes." *Kenford Co. v. Erie County*, 67 N.Y.S.2d 257, 261 (1986).  At trial, the Trustee failed to make this showing, as Allied's breaches of the FLCA began a year ***before*** Yucaipa assumed the role of Requisite Lender.  (Ex. 149).

308.    By the time Yucaipa purchased a majority of Allied's first lien debt on August 21, 2009, (Stip. Fact ¶ 18), Allied had already been in default for over a year.  (Stip. Fact ¶ 16, Ex. 149); (Dep. Tr. Walker at 430:14-430:16).  It cannot be that Allied's default was caused by Yucaipa's actions as a lender, when in fact, Allied was in default before Yucaipa purchased the first lien debt at issue.  And, of course, prior to its purchase of such first lien debt, Yucaipa was not a party to the FLCA and, therefore, could not have breached it.

309.    Additionally, the Trustee did not set forth any evidence, let alone establish by a preponderance of the evidence, that Allied would not have breached the FLCA but for some conduct by Yucaipa.  There is no evidence in the record that Allied would have been able to make principal or interest payments at any time while Yucaipa was acting as Requisite Lender, but for some conduct by Yucaipa.  Rather, testimony adduced at trial showed that Allied was facing an unprecedented downturn in the economy as a result of the Great Recession which greatly harmed its business, and, consequently, its financial position.  *See, e.g.*, (Stip. Fact ¶ 16); (Dep. Tr. Gendregske at 120:1-2; 120:5-17) (describing the impact of the Great Recession on the automotive sector); (Dep. Tr. Macaulay at 132:4-13; 132:17-18; 132:23-24; 133:2-9; 133:21-24; 133:3) (Allied's Chief Financial Officer, testifying that Allied stopped making interest and

126

principal payments under the FLCA in August 2009 because on August 1, 2009, Allied did not

have the ability to pay those amounts); (Dep. Tr. Macaulay at 227:3-5; 227:7; 227:12-18)

(testifying that after execution of the Fourth Amendment, "[t]he company still was not able to

service its debt and was still in default on the loan agreement . . . .").

310.    Moreover, the evidence at trial does not support a finding that but for Yucaipa

assuming the role of Requisite Lender, Allied's first lien lenders would have exercised remedies

against Allied and would have been in a better position as a result.  *See, e.g.*, *Brushton-Moira*

*Cent. School Dist. v. Fred H. Thomas Associates, P.C.*, 91 N.Y.2d 256, 261 (1998) (Contract

damages "are intended to return the parties to the point at which the breach arose and to place the

nonbreaching party in as good a position as it would have been had the contract been

performed.").  Although Allied was in default since August 2008 (Stip. Fact ¶ 16), the first lien

lenders chose not to exercise remedies or to direct CIT, the Agent under the FLCA, to exercise

remedies at any point prior to August 21, 2009—the date of the Fourth Amendment and

Yucaipa's purchase of ComVest's Allied debt.  (Ex. 216) (August 20, 2008 Notice of

Reservation of Rights), (Ex. 150) (September 2008 Reservation of Rights Letter); (Dep. Tr.

Schaffer at 163:10-20, 163:22-164:2, 165:14-16, 167:23-168:14, 169:11-16, 202:17-19, 202:21-

203:7) (no remedies exercised any time between 2008 and involuntary in 2012), (Dep. Tr.

Schaffer at 235:7-11, 235:22-236:7, 236:13-15, 237:14-18, 237:20-21, 237:23-238:1); (Dep. Tr.

Aliberto at 611:8-611:13, 611:17-611:20; 611:23-612:13); (Dep. Tr. Dempster at 156:24-157:18)

(Choice not to exercise remedies by lenders because "they evidently viewed the company as a

going concern as being more valuable than it would be in bankruptcy.").

311.    Instead, the lenders, including BD/S, executed and extended forbearance

agreements which prohibited the exercise of remedies,  (Ex. 152) (Forbearance Agreement); (Ex.

158) (Amendment to Forbearance Agreement), and even directed CIT to refrain from exercising remedies against Allied.  (Ex. 199) (Requisite Lender Direction Letter to CIT); (Dep. Tr. Aliberto at 611:23, 611:25-612:8, 612:10-13) (lenders chose not to exercise remedies and objected to CIT sweeping cash); (Dep. Tr. Schaffer at 235:22-236:7, 236:13-236:15) (Allied lenders, including Spectrum, told CIT not to cash sweep); (Dep. Tr. Schaffer at 237:23-238:1, 238:18-238:20, 238:22-239:6) (CIT's exercise of remedies was not in lenders' interest).

312.    Finally, the Trustee cannot prevail on a claim for breach of the Covenant based on Yucaipa allegedly allowing Allied to breach the FLCA because she did not articulate, let alone prove, any resulting damages.  Under New York Law, the Trustee bears the burden of proving, by a preponderance of the evidence, that the Lenders were damaged, and that their damage was proximately caused by Yucaipa's conduct.  *See Cap. Sec. Sys. W.L.L. v. L-3 Commc'ns Sec. & Detection Sys., Inc.*, 2018 WL 4666072, at \*7 (S.D.N.Y. Sept. 28, 2018) (noting the plaintiff "has the burden of proving each element" of its claim for breach of the implied covenant of good faith and fair dealing).  As explained in Conclusions of Law Section II.A above, the only damages sought by the Trustee in this case are those attributable to the failed JCT transaction. [3/4/2022 a.m. Trial Tr. at 40:9-17] [Risius Cross].  The Trustee, therefore, cannot prevail on a claim based on any other alleged, but unproven, conduct.  *See Shmueli v. Whitestar Dev. Corp.*, 148 A.D.3d 1814 (2017) (affirming entry of directed verdict for defendant where plaintiff "failed at trial to present nonspeculative evidence of his alleged damages.").

**3.      The Trustee Failed To Prove That Yucaipa Deprived The Lenders of The Benefits of The FLCA Through Any Conduct It Undertook As Requisite Lender.**

128

313.     The Trustee has not met her burden to prove that Yucaipa deprived the lenders of the benefits of the FLCA.  *See 1357 Tarrytown Road Auto, LLC v. Granite Properties, LLC*, 142 A.D.3d 976, 977 (2016) (covenant of good faith and fair dealing obligates party to contract not to take action that would deprive another party of benefits under the agreement).  Instead, the evidence at trial showed that BD/S believed that Yucaipa's conduct as Requisite Lender benefitted them, and they accepted those benefits.

314.     BD/S each signaled their support and approval of Yucaipa's actions while it was operating as the Requisite Lender.  For example, internal memoranda created by Spectrum stated that "As of 12/31/09, it is Spectrum's belief that the Sponsor [i.e., Yucaipa] is operating in good faith to add value to the company."  (Ex. 249 at 2); *see also* (Ex. 251 at 6) (Spectrum Valuation Memo stating: "It is our belief that Yucaipa will be able to extract value from the first lien in order to protect this investment and we will benefit from that.").

315.     Deckoff also expressed Black Diamond's support for Yucaipa's strategy to improve Allied's operations and union relationships in an email to Burkle in February 2011, stating, "On Allied, the strategy you outlined seemed right and you have our support."  (Ex. 656); *see also* [3/3/2022 Trial Tr. at 75:1-6] [Burkle Cross] (testifying that Deckoff thanked him and made positive comments every time they talked after the August 21, 2009 Yucaipa-ComVest Transaction.).

316.     BD/S further benefitted from Yucaipa's actions as Requisite Lender when they received pro rata portions of the $16.9 million in Letter of Credit commitments released pursuant to Yucaipa's instructions as Requisite Lender.  *See* (Aliberto Dep. Tr. at 608:8-609:14); [3/1/2022 p.m. Trial Tr. at 98:16-18] [Deckoff Cross].

129

317.     For all of the foregoing reasons, the Court finds in favor of Yucaipa and against the Trustee on Lender Claim 3 and recommends the entry of a judgment in favor of Yucaipa on Lender Claim 3.

**D.    Equitable Subordination Claim (Estate Claim 1; Lender Claim 1)**

318.     Pursuant to Estate Claim 1 and Lender Claim 1, the Trustee seeks to equitably subordinate Yucaipa's claims against Allied's Estate.  The Trustee did not present any evidence at trial specifically in support of these claims.  Rather, the Trustee appears to take the position that Yucaipa's claims should be subordinated for the same reasons that Yucaipa should be found liable for damages; *i.e.*, Yucaipa exercised its control over Allied in a manner that derailed a transaction with JCT, to the detriment of Allied and the lenders.

319.  Section 510(c)(1) provides:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> (1)     under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2)     order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

320.     As the Court explained in its Summary Judgment Opinion ("SJO"), the Trustee bears the burden of persuasion in showing that "(i) there was inequitable conduct; (ii) the inequitable conduct resulted in: (a) injury to the debtor or creditors or (b) created an unfair advantage for the claimant; and (iii) equitable subordination is consistent with the Bankruptcy Code."  SJO, at 101.  The Court finds the Trustee has not met this burden.

130

321.     For the reasons discussed above, Yucaipa's conduct in connection with the JCT

negotiations was not inequitable.  Specifically, there is no evidence that Yucaipa prevented the

Allied Board from negotiating directly with JCT, no evidence that Yucaipa demanded a premium

on its debt as compared to the other lenders, and no evidence that Yucaipa squandered a deal that

would have paid all of the lenders in full for their debt to seek a bigger payout for itself.  Rather,

the evidence proved that Yucaipa negotiated in good faith and sought to reach a deal with JCT

that would accrue to the benefit of all parties.  *See* Conclusions of Law Sections II.B.2-3.

322.     Moreover, the Trustee failed to demonstrate that Yucaipa's conduct in connection

with the JCT negotiations either (a) resulted in injury to Allied or its creditors or (b) created an

unfair advantage for Yucaipa.  As discussed above in Conclusions of Law Section II.A, the

Trustee failed to demonstrate that Yucaipa caused any damage whatsoever to Allied or its

creditors in the course of the JCT negotiations.  Rather, to the extent Allied and its creditors were

harmed, such harm resulted from BD/S' decision to file the Involuntary Petition and to withdraw

from further negotiations with Yucaipa and JCT thereafter.  *See* Conclusions of Law Section

II.B.3.  Nor did the Trustee demonstrate that Yucaipa created an unfair advantage for itself in the

JCT negotiations.  As described above, the evidence is clear that Black Diamond led the

negotiations before Yucaipa was ever approached by JCT to negotiate for the sale of its debt.  At

that point, JCT led separate negotiations with BD/S and Yucaipa concerning the sale of their

debt.  BD/S was aware of Yucaipa's discussions with JCT, but Yucaipa had no insight into

BD/S' negotiations with JCT.  Yucaipa was therefore left to negotiate the best price that it could

for its debt and sought to obtain payment for the principal amount of its first lien debt plus

accrued interest, though it agreed to accept a lesser amount.  Yucaipa committed to BD/S that it

would treat their debt equally to its own in any transaction and even included a term in its Final

131

Term Sheet to ensure that happened.  The Court finds that all of the forgoing dispels the notion that Yucaipa sought to obtain an unfair advantage for itself in the JCT negotiations.

323.    In its Summary Judgment Opinion ("SJO"), the Court granted the Trustee's motion for summary judgment with respect to the equitable subordination claims, in part, upon finding that Yucaipa had engaged in inequitable conduct in connection with the Fourth Amendment, in breaching the Third Amendment (*i.e.,* the subject of Trustee's breach of contract claims), and in causing Allied to pay certain fees while it was insolvent (*i.e.*, the subject of Trustee's fraudulent transfer claims).  SJO, at 108-09.  The Court reserved for trial, however, the extent to which Yucaipa's claims should be subordinated.  SJO, at 109.

324.    In addition to the above, in its SJO, the Court reserved for trial whether Yucaipa's claims should be subordinated if Yucaipa caused Allied to commit events of default under the FLCA.  SJO, at 109.  As discussed above, in paragraphs 307 through 312, inclusive, the Trustee did not present any such evidence nor proof of harm to any creditors.

325.    Having considered the evidence presented at trial, the Court concludes that Yucaipa's claims should not be equitably subordinated in any amount.  The Trustee has pursued three distinct categories of damages in this litigation: First, the Trustee claimed damages from Yucaipa's alleged breach of the FLCA in the amount of the Capital Contribution not made upon Yucaipa's purchase of Allied's first lien debt in 2009, plus interest.  The full amount sought by the Trustee for this alleged injury was awarded in the June 23, 2021 Judgment.  Judgment, at par. 1. Second, the Trustee claimed damages arising from Allied making certain transfers that the Court determined to be avoidable, in the amount of the transfers, plus interest.  The full amount sought by the Trustee for this alleged injury was also awarded in the June 23, 2021 Judgment.  Judgment, at par. 2.  Third, the Trustee sought damages at trial related to Yucaipa's alleged

132

interference with the JCT negotiations.  For the reasons discussed above, no damages will be awarded in connection with the JCT negotiations because the Trustee failed to demonstrate (i) that Yucaipa was liable on any theory for its conduct in connection with the JCT negotiations and (ii) that Allied or the lenders suffered any harm as a result of Yucaipa's conduct in connection with the JCT negotiations.

326.    The Trustee has not alleged any other harm.  Since all of the alleged harm that the Court has determined to be compensable has already been remedied in full pursuant to the Judgment, subordination would not remedy any additional harm.[28]  "A claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." *In re Winstar Communications, Inc.*, 554 F.3d 382, 413 (3d Cir. 2009).  Thus, where the defendant is held liable for money damages, the Trustee cannot also obtain a remedy of subordination to rectify the same harm. *See, e.g.*, *Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*, 151 B.R. 327, 332 (Bankr. D. Del. 1993) ("a debtor may not obtain both equitable subordination and an award of money damages which would compensate it for the damages resulting from the same conduct.  On the contrary, equitable subordination is a remedy available only when damages cannot be reasonably ascertained.") (citations omitted).

327.    Moreover, the Trustee has already recovered a substantial amount under a confidential settlement agreement reached with certain defendants to settle claims asserted in this litigation, which the Court has reviewed in camera.  Yet, the Trustee failed to update her claimed

---

[28]    Although the Trustee alleges that the Judgment has not yet been satisfied, the Trustee is actively pursuing its recovery, including by filing cases against dozens of defendants in multiple courts throughout the country.  Moreover, equitable subordination is not a mechanism for collecting on an existing judgment.  The Trustee has not pointed to any legal authority to support the award of an *additional* judgment to assist in its collection efforts with respect to an existing judgment.

damages to reflect the amounts recovered or to explain how the receipt of the settlement proceeds impact her remaining claims. Subordination may not be imposed as a remedy where, as here, damages are available and where the relief would be punitive. *See, e.g.*, *Knox v. Lion/Hendrix Cayman Ltd. (In re John Varvatos Enters.)*, 2021 U.S. Dist. LEXIS 171924, at *8 (D. Del. Sep. 10, 2021).

328.    In addition, equitable subordination is rooted in equity and equity would not be served by imposing the remedy in this case. First, the Court has already issued a Judgment that is intended to compensate the Trustee fully for all harm suffered. Second, BD/S are the only meaningful beneficiaries of any awards in this litigation, including the Judgment, in which the Court awarded the Trustee approximately $132 million, as well as the Settlement Agreement, which resulted in the Trustee's receipt of additional amounts known to the Court through its in camera review of the confidential settlement agreement filed in this case under seal.

329.    As of the Petition Date, BD/S together held claims against Allied's Estate in the approximate amount of $56 million. BD/S purchased nearly all of those claims at a steep discount and with full knowledge of the allegations that underlie the Trustee's claims. Following their receipt of distributions from the Estate, BD/S now hold approximately $42.9 million in claims against the Estate. Based upon the awards and settlements to date, BD/S stand to recover approximately twice the amount of their claims against the Estate and approximately five times the amount paid for those claims. Awarding equitable subordination under these circumstances would grant BD/S an undeserved windfall.

330.    Moreover, Yucaipa produced evidence that BD/S had been strategizing to move to equitably subordinate Yucaipa's claims since at least August 2009, and that BD/S purchased nearly all of their claims against Allied for years after at pennies on the dollar, including

134

postpetition.  (Ex. 417) (Black Diamond Trade Sheet); (Ex. 481) (Spectrum Allied Trade Sheet).

Equitable subordination is not appropriate under these circumstances.  *See, e.g.*, *In re S & D*

*Foods, Inc.*, 110 B.R. 34, 37 (Bankr. D. Col. 1990) ("Equity does not aid those who purchase

their claims after the alleged misconduct of other creditors and after the intervention of

bankruptcy and at distressed prices."); *see also In re W. T. Grant Co.*, 4 B.R. 53, 78 (Bankr.

S.D.N.Y. 1980) (same).[29]

331.    In sum, the Court concludes that it would be inequitable to subordinate Yucaipa's

claims.

## CONCLUSION

For the reasons stated in this Court's findings of fact and conclusions of law, judgment is

entered in favor of Yucaipa with respect to Estate Claim 1 and Lender Claim 1.  The Court

recommends entry of a judgment in favor of Yucaipa on Estate Claim 7 and Lender Claim 3.

---

[29]    There is no meaningful distinction between the Estate and Lender equitable subordination claims in this regard.  BD/S is the primary beneficiary of all of the claims in their capacity as "Investors" that bought into the litigation postpetition and with knowledge of all of the allegations in the complaints.

Dated:  April 21, 2022                      PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Fax: (302) 652-4400
Email: ljones@pszjlaw.com
          dbertenthal@pszjlaw.com
          pkeane@pszjlaw.com

-and-

GLASER WEIL FINK HOWARD AVCHEN &
SHAPIRO LLP
Patricia L. Glaser (*admitted pro hac vice*)
Gali Grant (*admitted pro hac vice*)
Matthew P. Bernstein (*admitted pro hac vice*)
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
Telephone: (310) 553-3000
Fax: (310) 556-2920
Email: pglaser@glaserweil.com
          ggrant@glaserweil.com
          mbernstein@glaserweil.com

*Counsel for Yucaipa*

136