# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ASHINC Corporation, *et al.*, | Case No. 12-11564 (CSS) |
| Debtors. | (Jointly Administered) |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET AL., AS SUCCESSOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASHINC CORPORATION, AND ITS AFFILIATED DEBTORS, | Adv. Pro. No. 13-50530 (CSS) |
| Plaintiff, | |
| BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., and SPECTRUM INVESTMENT PARTNERS, L.P., | |
| Intervenors, | |
| v. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., and YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., | |
| Defendants. | |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET AL., AS SUCCESSOR TO BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as co-administrative agent, and SPECTRUM COMMERCIAL FINANCE LLC, as co-administrative agent, | Adv. Pro. No. 14-50971 (CSS) |
| Plaintiff, | |
| v. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., and YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., | |
| Defendants. | |

"How did you go bankrupt?" Bill asked.

"Two ways," Mike said. "Gradually and then suddenly."

Ernest Hemingway, *The Sun Also Rises*

At 5:45 pm on May 17, 2012, BD/S filed an involuntary Chapter 11 petition against Allied.[1]  It was a sudden culmination of two years of negotiations surrounding Allied's insolvency.

Allied, which was a unionized hauler for the major automobile manufacturers, had been in default of its 1st and 2nd lien secured debt since 2008, i.e., for 4 years.  The 2008 financial crisis, which was particularly hard on the automotive business, took newly reorganized Allied to EBITDA in excess of negative $29 million in 2011.  But, Allied had an eager suitor in a competitor, Jack Cooper Transport or JCT, and by 2011-2012 the automotive business had begun to emerge from the financial crisis.

Allied's capital structure was dominated by Yucaipa, which had funded Allied's exit from a previous bankruptcy.  Yucaipa owned a majority of the 1st lien secured debt (where it was improperly serving as requisite lender), 2nd lien secured debt, and the equity.  Yucaipa also controlled the board.  Black Diamond and Spectrum (collectively, "BD/S") were large minority holders of Allied's secured debt.  It is law of the case in this litigation that, at all relevant times, Yucaipa owed fiduciary duties to Allied's creditors, including BD/S.

By no later than May 2011, Allied's board became aware that JCT desired to acquire the assets of Allied.  Rather than engaging in negotiations with JCT, the board

---

[1]  The above-captioned debtor is referred to herein as "Allied" or the "Company."

deferred to Yucaipa, acting in its capacity as the dominant lender.  That was a breach of fiduciary duty by the board and, thus, Yucaipa.  The rest of this unfortunate story may have been avoided if the board had simply fulfilled its clear fiduciary obligation to engage in negotiations with JCT on behalf of the company.

Nonetheless, Yucaipa began negotiations with JCT over an integrated, two-step transaction in which JCT would purchase Yucaipa's debt and then credit bid that debt for Allied's assets in a 363 sale in Allied's pre-negotiated Chapter 11.  Perhaps seeing an opportunity to divide and conquer, JCT also engaged in parallel negotiations with BD/S over the purchase of its debt for the same purpose.  While Yucaipa and BD/S were aware of each other's negotiations with JCT they were mostly unaware of the details, including the price offered for each other's debt.

What followed from 2011 through mid-2012 were negotiations among JCT on the one hand and Yucaipa and BD/S (acting separately) on the other hand.  These negotiations took the form of exchanged term sheets and never proceeded to a form agreement let alone definitive documentation.  Indeed, no term sheet was ever agreed upon.  Concurrently, Yucaipa's principal, Ron Burkle, and Black Diamond's principal, Steve Deckoff, engaged in discussions regarding, among other things, Allied, through two in-person meetings and occasional phone calls.

While prices varied between term sheets, the Yucaipa negotiations generally involved JCT paying approximately 110% to 115% of par for Yucaipa's 1st lien debt and

$1 for the 2nd lien debt.  There were several other deal points.  Two important ones

were: (1) varying conditions based on Allied's financial condition that reflected JCT,

which had not performed due diligence, was not fully aware of Allied's poor financial

condition; and (2) a condition that required BD/S and CIT to consent to the Yucaipa

deal.  Similarly, the prices in the BD/S term sheets varied from 100% of par to 60-70%

of par with the prices dropping as negotiations progressed and the price Yucaipa

demanded for its own secured debt increased - the negotiations were inextricably

linked as any increase in Yucaipa consideration led to a concomitant drop in

consideration to BD/S.  The JCT offers to Yucaipa and BD/S, which were subject to

numerous conditions, implied an enterprise value of Allied of approximately $250

million.

Alarmed with the discrepancy between prices, although not aware of the precise

figures, in early 2012, BD/S changed tactics and began to put pressure on Yucaipa and

Allied to ensure receipt of equal and ratable treatment with Yucaipa for the purchase of

debt by JCT.  For example, BD/S sued Yucaipa in New York state court, asserting that

Yucaipa was improperly serving as Allied's requisite lender for the first lien secured

debt, and BD/S's lawyer sent two letters "reminding" the Allied board of its fiduciary

duties.  This culminated in a telephone conference on May 14th between representatives

of Yucaipa and BD/S, which was the first time the parties had discussed the JCT

acquisition other than in two high-level dinner meetings between Messrs. Burkle and Deckoff.

At that telephone conference, BD/S proposed to Yucaipa that all secured lenders receive equal and ratable treatment for the purchase of their debt.  Yucaipa neither agreed nor disagreed to such treatment at the meeting.  A subsequent telephone conference was held on May 15th, which ended with the parties' agreement that BD/S's lawyer would draft a legal document incorporating BD/S's demand.  The parties also agreed that neither would put Allied into bankruptcy prior to May 17th at 12 noon Eastern time.

That draft legal document was prepared by BD/S's lawyer and it was sent to Yucaipa via email on May 16th with a demand that comments be received by the expiration of the bankruptcy standstill agreement on May 17th at 12 noon.  That day the parties agreed to extend the standstill and response deadline to 5:00 p.m.  Yucaipa's representative stated that Mr. Burkle would call Mr. Deckoff by that time.  No substantive response one way or the other was made to BD/S's draft legal document. Although Mr. Burkle testified that he called, it was unclear whether he meant that he did so prior to 5:00 p.m.  Mr. Deckoff, who had Mr. Burkle's private number, which he had called previously, did not call Mr. Burkle, and testified that Mr. Burkle did not call him.  No telephone records were submitted by either side.

In any event, BD/S filed an involuntary Chapter 11 petition against Allied on May 17th at 5:45 p.m.  Litigation ensued among the parties, inside and outside bankruptcy, which ultimately culminated in this trial in 2022.  In late 2013, JCT purchased Allied's assets for $135 million.

In this trial, the litigation trustee of Allied's estate has asserted that Yucaipa's conduct in 2011-2012 constituted a breach of fiduciary duty that harmed Allied and its creditors and resulted in damages of $158.6 million constituting the difference between the consideration set forth in a December 2011 term sheet and the ultimate purchase price JCT paid for Allied's assets in 2013.[2]  The Court will find as follows:

1.      At all relevant times, Yucaipa and the Allied board owed fiduciary duties to Allied's creditors, including BD/S.

2.      When the Yucaipa controlled board was informed in May 2011 that JCT wanted to buy Allied's assets and neglected to engage in negotiations but deferred to Yucaipa the board and, thus, Yucaipa breached their fiduciary duties.  Moreover, Yucaipa breached its fiduciary duties in its negotiations with JCT because it was seeking a higher price for its debt than that offered to BD/S.

3.      Plaintiff has failed to prove damages because their damages case is unreasonable, arbitrary, and flawed for a number of reasons, including, without

---

[2] There are other claims discussed below that are not addressed in this introduction.

6

limitation, the use of the December 2011 term sheet, which was highly contingent and was clearly used by plaintiffs' expert solely to maximize damages, and the unreasonable assumption of only $5 million in bankruptcy fees to consummate a pre-negotiated sale in bankruptcy.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[3]

On May 4, 2021, the Court issued a detailed 117-page Opinion on the parties' cross-motions for summary judgment [*See* Adv. Pro. 13-50530, D.I. 825 (the "Summary Judgment Opinion")] in the above-captioned Adversary Proceedings [the "Adversary Proceedings" are Adv. Pro. 13-50530 (the "Estate Action") and Adv. Pro. 14-50971 (the "Lender Action"].[4]  To the extent necessary, the findings will reference *only* docket numbers in Adv. Pro. 13-50530, unless otherwise indicated, against Defendants Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P.

---

[3]  The findings of fact and conclusions of law set forth herein constitute the findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.  To the extent that findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law.  To the extent that any conclusions of law are determined to be findings of fact, they are adopted, and shall be deemed, findings of fact.

[4]  The "Estate Action" (Adv. Pro. 13-50530) was filed by the Official Committee of Unsecured Creditors (the "Committee") and the "Lender Action" (Adv. Pro. 14-50971) was filed by BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd. (collectively, "Black Diamond"), and Spectrum Investment Partners, L.P. ("Spectrum," and together with Black Diamond, "BD/S").  Under the Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization dated December 3, 2015 (12-11564, D.I. 3360-1), and a Litigation Trust Agreement dated December 20, 2016, the Estate Claims and Lender Claims are now jointly prosecuted by the Trustee (defined herein).  Amended Plain § 5.13.  The Confirmation Order appointed Ms. Catherine E. Youngman as the Litigation Trustee (the "Trustee" for the "Trust") and Plan Administrator in these cases. *See* 12-11564, D.I. 3383 at ¶¶ 20, 22; *see also* Order Substituting Plaintiffs and Amending Captions in Above-Referenced Adversary Proceedings to Reflect Litigation Trustee as Plaintiff (Adv. Pro. 13-50530, D.I. 415; Adv. Pro. 14-050971, D.I. 214).

(together, "Yucaipa"). The Court subsequently entered Judgment in favor of the Trustee on several claims on June 23, 2021, [13-50530, D.I. 841 (the "Judgment")] leaving three remaining claims for trial. The remaining claims are: (1) Equitable Subordination (Estate Claim 1/Lender Claim 1), (2) Breach of Fiduciary Duty (Estate Claim 7), and, in the alternative to Breach of Fiduciary Duty, (3) Breach of the Implied Covenant of Good Faith and Fair Dealing (Lender Claim 3) (collectively, the "Remaining Claims").

The Court conducted a trial on the Remaining Claims over seven days from March 1 through 8, and March 17, 2022 (the "Trial"). During the course of the Trial, the Court received into evidence testimony from seven witnesses appearing live in Court, four witnesses by deposition designations submitted with video also played in Court, deposition designations from nine additional witnesses submitted by Yucaipa for consideration, and stipulations, filed in lieu of live testimony, for two witnesses. The Court also received 426 documents designated as exhibits by the Parties as well as the Parties' stipulations and objections with respect to those exhibits, and objections to deposition designations offered.

The Court, having reviewed the record, and after due deliberation, enters the following findings of fact and conclusions of law with respect to the Trustee's Remaining Claims and Yucaipa's Answers and surviving affirmative defenses in connection therewith.

**FINDINGS OF FACT**

**A. Allied's 2005 Bankruptcy, Yucaipa's Sponsorship of Allied's Exit Plan, and Yucaipa's Selection of the Company's CEO and the Appointment of Allied's Board**

1.      Allied was a unionized automobile and truck hauler engaged in the transport of vehicles in North America.  [Stip. Fact ¶ 1.]

2.      On July 31, 2005, Allied filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia (the "2005 Bankruptcy"). [Stip. Fact ¶ 2.]

3.      On or about May 3, 2006, Yucaipa purchased the majority of Allied's debt for $81.6 million and later financed Allied's purchase of used rigs and contributed to the payment of claims tendered by unsecured creditors who opted for cash in lieu of equity. [Stip. Fact ¶¶ 3-4.]

4.      On March 5, 2007, in anticipation of sponsoring Allied's emergence from the 2005 Bankruptcy, Yucaipa retained an executive search firm to assist in identifying a new CEO for the Company. [Ex. 393 at 2-6 (Heidrick & Struggles engagement letter to Derex Walker dated February 2, 2007 and countersigned on March 5, 2007.]  Derex Walker and Ira Tochner — both Partners of Yucaipa at the time and later two initial members of Allied's new Board of Directors (the "Board") — met and interviewed candidates to be Allied's CEO in advance of the Company's emergence. [Dep. Tr. (Riggs) 148:15-149:2, 153:18-154-7 (Riggs testified that he interviewed with Messrs.

Walker and Tochner in spring 2007 for the CEO position at Allied, and he understood at the time that Yucaipa was the controlling shareholder and that he would ultimately be answering to Yucaipa, in that capacity, if he became Allied's CEO.]

5. The position of Allied's CEO was initially offered to Mike Riggs, who at the time was the CEO of an automotive logistics company called JHT Holdings, Inc ("JHT"). [*See* Dep. Tr. (Walker Vol. I) 156:4-22.]  Derex Walker is no longer a Partner with Yucaipa. [3/3/22 a.m. Trial Tr. 53:21-54:5 (Burkle Adverse Direct).]  However, Mr. Walker was a Yucaipa Partner when deposed in May 2019 and was also produced as Yucaipa's Rule 30(b)(6) representative.  His deposition testimony is therefore admissible for any purpose pursuant to Fed. R. Civ. P. 32(a)(3), made applicable by Bankruptcy Rule 7032.  Mr. Riggs declined, and the position went to Mark Gendregske.  Mr. Gendregske served as Allied's CEO and as a director on Allied's Board from June 2007 through the Company's sale in December 2013 (the "JCT 363 Sale").  [Stip. Fact ¶ 9.] [*See also* Dep. Tr. (Walker Vol. I) at 156:4-22.]

6. Allied emerged from the 2005 Bankruptcy in late May 2007 under a Joint Plan of Reorganization sponsored by Allied, Yucaipa, and the International Brotherhood of Teamsters (the "Joint Plan").  [Stip. Fact ¶ 5.]

7. Under the Joint Plan, Yucaipa's old debt was converted into approximately 67% of Allied's new equity, and Yucaipa was granted governance rights in the reorganized Company.  [Stip. Fact ¶ 6.]

8.    Among Yucaipa's governance rights was its ability to appoint three members of Allied's five-member Board.  Yucaipa also had the right to select the Company's CEO, who would serve as the fourth member of the Board, which selection had to be "reasonably acceptable to the [Teamsters] and the Creditors' Committee." The fifth member, selected by the Creditors' Committee, had to be "reasonably acceptable" to Yucaipa. [Ex. 398 (Joint Plan) at § 7.2.  *See also* Ex. 587 (Yucaipa memorandum providing that Yucaipa "appointed four of the five directors on the board, consisting of three [Yucaipa] representatives and the CEO."); Dep. Tr. (Walker Vol. I) 148:18-25, 148:17-23) (authenticating same).]

9.    From June 2007 through the JCT 363 Sale in late 2013, the Board at all times included three Yucaipa-affiliated directors, Mark Gendregske (the Company's CEO), and Brian Cullen (an outside director).  [Stip. Fact ¶¶ 8-9; *see also* Dep. Tr. (Cullen) at 30:14-17.]   During the relevant period for Trial, the Yucaipa-affiliated directors of Allied were: (1) Derex Walker (Chairman of the Board), (2) Ira Tochner, and (3) Jeff Pelletier.  [*See* PX Q at 1 (Minutes of Meeting of Board dated July 29, 2010); Ex. 573 at 1 (Minutes of Meeting of the Board dated March 8, 2011); Ex. 688 at 1 (Minutes of Special Meeting of the Board dated October 5, 2012)).]

## B.  Allied's Credit Agreements and the Third Amendments Thereto

10.    To finance its exit from the 2005 Bankruptcy, Allied entered into a two-tiered financing structure with various lenders (the "Lenders") comprising $265 million

in first lien debt (the "First Lien Debt" held by the "First Lien Lenders"), governed by the FLCA, and $50 million in second lien debt, governed by a Second Lien Credit Agreement ("SLCA"). [Stip. Fact ¶ 10.]

11.     The FLCA included three types of debt: (1) $180 million in term loans ("Term Loans"), (2) a $35 million revolving credit facility from the CIT Group/Business Credit, Inc. ("CIT"), and (3) $50 million in letter of credit commitments ("LC Commitments"). The FLCA and SLCA were secured by a pledge of substantially all of Allied's assets, and both contained fixed interest rates. The Georgia bankruptcy court approved Allied's entry into both the FLCA and SLCA. [Stip. Fact ¶ 11.]

12.     As initially executed, the FLCA barred Yucaipa from being an "Eligible Assignee," meaning that a holder of First Lien Debt could not sell, assign, or transfer any portion of its debt, rights or obligations to Yucaipa. The SLCA contained a similar provision. [Stip. Fact ¶ 12.]

13.     The FLCA also provided for a "Requisite Lender" entitled to direct the First Lien Agent to take certain actions and exercise particular remedies (or refrain from doing so) on behalf of all Lenders. Under the FLCA, the Requisite Lender was one or more Lenders holding more than 50% of the Term Loans and LC Commitments. [Stip. Fact ¶ 13; Ex. 133 (FLCA) at § 1.1, p. 47.] A consortium of Lenders was the Requisite Lender immediately following entry of the FLCA.

14.     In April 2008, a Third Amendment to the FLCA was entered.  [Stip. Fact ¶ 14.]

15.     The Third Amendment to the FLCA permitted Yucaipa to acquire a limited amount of Term Loans as a "Restricted Sponsor Affiliate," but placed restrictions on any Term Loans Yucaipa purchased. [*See* Ex. 27 (Third Amendment) at § 2.7(c); *see also* Summary Judgment Opinion at p. 12-13 (summarizing restrictions); Summary Judgment Opinion at p. 25-46 (holding that Yucaipa breached the Third Amendment to the FLCA by disregarding restrictions on, among other things, its requirement to make a substantial capital contribution to Allied).]

16.     The parties similarly amended the SLCA.  However, the Third Amendment to the SLCA did not restrict the amount of Second Lien debt Yucaipa could acquire or require Yucaipa to make a capital contribution to Allied in connection with any acquisition of Second Lien debt. [*See* Ex. 343 (Third Amendment to SLCA).]

17.     In the second quarter of 2008, Yucaipa purchased $40 million of the $50 million of Second Lien debt at a discount to par — $0.66 cents on the dollar — and exercised its option to convert $20 million of those holdings into preferred stock in Allied while holding onto the remainder, increasing Yucaipa's equity stake in Allied to slightly over 71%.  [Stip. Fact ¶15; *see also* Dep. Tr. (Walker Vol. I) 159:11-160:4; Ex. 615 (Yucaipa trade blotter); Ex. 587 (March 2010 Yucaipa Memorandum) at 2.]

### C. Allied Defaults Under FLCA and ComVest Becomes Requisite Lender

18.    On August 15, 2008, Allied notified its First Lien Lenders that it was in default.  Allied remained in default under the FLCA through consummation of the JCT 363 Sale in late 2013.  [Stip. Fact ¶ 16; *see* Ex. 537 (Email from Stephanie Bond to Derex Walker Re: pres dated September 11, 2011) at 4 ("Allied has been in default of the Obligations since August 2008 and is currently operating without a forbearance agreement from the bank group."); Ex. 532 (Email from Derex Walker to Patti Kelley attaching Allied-BD_Update_Internal100222_Final.ppt dated February 22, 2010) at 3 ("Allied has been in default of its credit agreement since August 2008 and has not made interest payments since May 2009.").]

19.    On or about February 19, 2009, ComVest Investment Partners ("ComVest") acquired approximately 54% of the Allied's First Lien debt and became the Requisite Lender.  [Stip. Fact ¶ 17.]

20.    On or about August 4, 2009, Allied missed its first quarterly interest payment due to Lenders under the FLCA. [*See* Ex. 299 (Minutes of Meeting of Board dated August 3, 2009) at 2 ("Mr. Walker made a motion that the Company forego the quarterly interest payment due August 4, 2009.  Mr. Tochner seconded the motion, and it carried unanimously.").]

21.    On August 21, 2009, Yucaipa and ComVest entered a Loan Purchase Agreement pursuant to which Yucaipa purchased ComVest's $145.1 million (principal

face amount) of First Lien debt for approximately $43 million.  [Stip. Fact ¶ 18; Ex 24 (the "LPA")].

22.    Allied was not a party to the LPA, but the agreement required the Company to: (i) reimburse ComVest $1.85 million for its associated legal fees and expenses, (ii) reimburse Yucaipa $831,325.83 for its legal fees and expenses, and (iii) agree to the later-voided Fourth Amendment to the FLCA [Ex. 26, the "Fourth Amendment."]  The Fourth Amendment did not purport to cure any of Allied's Events of Default or reset any financial covenants, as contemplated in earlier iterations of the amendment. [*See* Summary Judgment Opinion at p. 17.]

23.    In connection with the LPA, ComVest was ultimately paid all accrued interest on account of its prior First Lien debt holdings by Yucaipa.  No other First Lien Lender was paid interest owed on account of their holdings after May 2009. [Dep. Tr. (Walker Vol. II) 571:12-15, 20-25 (Q: "[I]s it your recollection that ComVest was paid its interest payments for the period of time that it held Allied's first lien debt?" A: "Yes, that was the case." Q: "Do you know if any other lenders were paid their interest payments on or after August 2009, setting aside ComVest?" A: "I – Allied didn't make any interest payments after August 4th – or starting on August 4th, Allied stopped making interest payments.").]

**D. Yucaipa Assumes Requisite Lender Status In Bad Faith And Sues CIT**

24.    In September 2009 — contemporaneous with developing a "Contingency Plan" focused on the "Validity of Amendment No. 4" [Ex. 525 (Email from Stephanie Bond (of Yucaipa) to Derex Walker Re: Restructuring Plan dated August 23, 2009) at 2] — Yucaipa announced to its investors that:

> [The ComVest] transaction makes us 'requisite lender' for purposes of any amendments or consents to the Company's first lien credit facility.  Our ownership of the first lien debt is not subject to any of the customary restrictions or limitations normally associated with a sponsor's acquisition of its bank debt.
>
> Our purchase of the first lien debt is also notable because it puts us in the position of controlling every tranche of the Company's capital structure.  In addition to holding 56% of the first lien debt, we also hold 67% of the second lien debt as well as 71% of the fully-diluted equity. [Ex. 529 (Memorandum to Limited Partners from Yucaipa dated September 11, 2009) at 3].

25.    On November 13, 2009, Yucaipa and Allied sued CIT in Georgia state court seeking, among other things, a declaratory judgment holding that the Fourth Amendment was valid, and that Yucaipa was Requisite Lender under the FLCA (the "CIT Litigation").  [Stip. Fact ¶ 19; Ex. 630 (Verified Complaint).]

26.    On December 21, 2009, CIT filed counterclaims in the CIT Litigation on behalf of itself and First Lien Lenders seeking, among other things, declaratory judgment that: (i) the Fourth Amendment was ineffective, (ii) the Third Amendment to the FLCA remains in full force and effect, and (iii) Yucaipa cannot be "Requisite

Lenders" under the FLCA.  CIT also sought specific performance of Yucaipa's capital contribution requirement in the Third Amendment.  [Stip. Fact ¶ 20; Ex. 193 (CIT Verified Answer and counterclaims) at 18-38.]

27.    Two years later, on December 5, 2011, CIT settled the CIT Litigation solely on its own behalf, but expressly not on behalf of any of Allied's other Lenders.  This settlement did not resolve the validity of the Fourth Amendment.  [Stip. Fact ¶ 21; Ex. 198 (Settlement Agreement and Mutual Limited Releases dated December 5, 2011).]

28.    No longer having their interests represented by CIT in a representative capacity, BD/S — both Lenders who collectively were owed approximately $61 million under the FLCA and SLCA [*See* DX QQ at 1 (total First Lien debt outstanding pre-distributions); *see also* Ex. 481 ($5 million second lien debt held by Spectrum)] — filed a lawsuit in New York State Court on January 17, 2012, against Yucaipa (the "NY Action").  [Stip. Fact ¶ 37.]

29.    The NY Action sought a declaration that the Fourth Amendment was invalid, and that Yucaipa was not the Requisite Lender. [*See generally* PX AA (Summons and Complaint in NY Action).]

30.    On March 9, 2013, the New York State Supreme Court ruled in favor of BD/S, issuing a written opinion to "amplif[y]" an earlier oral ruling issued on November 19, 2012.  In this published opinion, Justice Charles E. Ramos concluded, among other things, that: (i) Yucaipa caused Allied to enter into the Fourth

17

Amendment, which was "flatly prohibited under the Credit Agreement;" (ii) the Fourth Amendment "is not, and never was, effective;" and (iii) "Yucaipa [was] not the Requisite Lender."  [Stip. Fact ¶56. *See BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, No. 650150/2012, 2013 WL 1290394, at *5-6 (N.Y. Sup. Ct. Mar. 8, 2013) (Ex. 843), *aff'd*, 978 N.Y.S.2d 10 (App. Div. 2013), *leave to appeal denied*, 8 N.E.3d 849 (N.Y. 2014).]

31.    Yucaipa appealed Justice Ramos' decision, and the New York appellate court issued an opinion on December 17, 2013, affirming the trial court's dispositive holdings.  [*BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, 978 N.Y.S.2d 10 (App. Div. 2013) (affirming in all material respects).]  The New York Court of Appeals thereafter denied Yucaipa's petition for further review on April 3, 2014.  [Stip. Fact ¶ 57. *BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, 8 N.E.3d 849 (N.Y. 2014).]

**E.  JCT's Desire to Acquire Allied**

32.    The evidence adduced at Trial was clear that Mike Riggs — both before and after acquiring JCT in spring 2009 — held a strong desire to acquire Allied.

33.    Among other things, Mr. Riggs testified that it was a "dream" of his to combine the entities, and that in the course of a five year "quest" he made several overtures and proposals. [Dep. Tr. (Riggs) 97:17-98:5 (Combining Allied and JCT "was really kind of the dream" and "I really wanted it to work whatever it took."), 79:8-11 ("[F]or me it was always about acquiring Allied, however we did that."), 161:18-162:13

(describing five-year quest), 178:21-179:11 (testifying that he wanted to combine JCT and Allied notwithstanding rumors of a bankruptcy because he was confident in his turnaround capabilities and thought there were a lot of synergies between JCT and Allied).]

34.     Mr. Deckoff, the founder and a principal of BD/S, testified that he had met with Mr. Riggs on multiple occasions and observed that "[h]e was highly motivated" and "there was no doubt he wanted to buy [Allied]." [3/1/22 a.m. Trial Tr. 83:1-7 (Deckoff Direct).]

35.     Jeffrey Schaffer, a founder and principal of Spectrum, similarly testified about Mr. Riggs' "desire to buy Allied" and interactions he had with Mr. Riggs as a "debt holder [of Allied] and as a friend." [Dep. Tr. (Schaffer Vol. II) 402:4-11.]   Mr. Schaffer testified that he told Mr. Riggs to "[m]ake a bid for the [C]ompany" and "Mike being the type of person that he is, won't ever stop and won't ever stop finding different angles, different ways to try to buy something[.]"   [Dep. Tr. (Schaffer Vol. II) 402:11-19.]  Mr. Schaffer further testified that "there never was a[n] inkling in my mind that [Riggs'] goal was not to buy the company."   [Dep. Tr. (Schaffer Vol. II) 426:24-427:4.]

36.     Yucaipa's 30(b)(6) witness (Derex Walker) also admitted that "Riggs was certainly interested in trying to put together a transaction at various points in time" to acquire Allied, which was supported by testimony by Ira Tochner, a Senior Partner at

Yucaipa, and Ron Burkle, the Founder and Managing Principal of Yucaipa [Dep. Tr. (Walker Vol. II) 668:19-669:11; *see also* 3/2/22 a.m. Trial Tr. 88:5-8 (Tochner Adverse Direct) ("Mike Riggs had been interested in doing a deal since I think maybe 2008."); 3/3/22 a.m. Trial Tr. 25:25-26:1 (Burkle Adverse Direct) ("There were so many things with Riggs, I don't remember when the first one was.  But it was quite early."); 3/3/22 a.m. Trial Tr. 76:19-25 (Burkle Friendly Cross) (Q: "Did Jack Cooper ever offer to buy assets in Allied instead of debt?" A: "I believe he did. . . . There were – he threw everything he could against the wall along the way so I think there were asset deals as well.").]

37.    JCT made various proposals (solicited and unsolicited) to acquire Allied (or Yucaipa's stake in Allied), however, the proposals never proceeded past the term sheet phase and there was never an agreement, even in principle, on any of the term sheets.

38.    As discussed more fully below — in connection with JCT's additional efforts to acquire Allied in 2011-2012 — there was never an independent process free from Yucaipa's domination and control of the Company.  Rather, the evidence adduced at Trial reveals that Mr. Riggs was dealing exclusively with Yucaipa — never an independent committee (or "restructuring committee") or Company advisors — and his perception was that Yucaipa controlled Allied's entire capital structure.  In Mr. Riggs' words, "[if] you think [Yucaipa] own[s] control of the common stock, you think they

own control of the senior debt, who else would you work it with?" [*See, e.g.*, Dep. Tr. (Riggs) 237:25-238:8; 175:9-176:21 (testifying that he had no knowledge of or meetings with a Special Committee: "I'm sorry, I may be confused. Unless that special committee is Derex and Ron, and I didn't know they were a special committee, then I'd say the same answer, no, I don't think I ever met with that special committee.").] Only *after* BD/S filed the involuntary bankruptcy on May 17, 2012 (the "Bankruptcy") did Allied hire outside advisors in connection with a restructuring. Even then, the evidence reflects that Mike Riggs continued to negotiate directly with Yucaipa despite Yucaipa being aware that BD/S was alleging it suffered from debilitating conflicts of interest.

39. The only substantive evidence of Board-level consideration of any of Riggs/JCT offers and overtures over the years — including during late 2011/early 2012 "JCT Negotiations" addressed below — was minutes of a Board meeting on July 29, 2010, where the 7/20/10 LOI was addressed. Notably, at this meeting "Mr. Walker stated that he found the offer flawed on several levels: first, a release of all claims [against Riggs] as a condition to negotiations is clearly unacceptable. Second, as the Company's largest lender, Mr. Walker stated that Yucaipa would never accept such an offer and rather believes that the Company is worth very significantly more on [sic] liquidation." [PX Q (7/29/10 Board Minutes) at 2.] It was only after Mr. Walker's statements that a supposed "thorough discussion of the Letter of Intent was undertaken, after which Mr. Walker made a motion to allow the Letter of Intent to lapse

without any response from the Company[,]" which unanimously carried. [PX Q (7/29/10 Board Minutes) at 2.]

**F. Yucaipa's Self-Interested Dealings With JCT in Spring 2011**

40.     In a March 6, 2011 email, Mark Gendregske (Allied's CEO ) told Messrs. Walker and Tochner that "[b]ankruptcy is inevitable," while seeking approval of an incentive compensation structure for management that was "bankruptcy proof." [Ex. 632 (email from Mark Gendregske to Derex Walker and Ira Tochner dated March 6, 2011) ("Bankruptcy is inevitable, so incentive comp structure [for management] must be bankruptcy proof.").]

41.     On March 8, 2011, Mr. Gendregske apprised the full Board that Allied "no longer had a future absent new customer terms," and the CFO added that "the Company was forecast to run out of cash in 2012." [Ex. 573 (Minutes of Meeting of the Board dated March 8, 2011).]

42.     Mr. Deckoff testified that around this time Allied "had been in payment default … for a few years," and Lenders "weren't getting any financial statements on the company." [3/1/22 a.m. Trial Tr. 70:25-71:4 (Deckoff Direct).]   Mr. Deckoff's testimony was undisputed and is supported by a May 29, 2011, internal Yucaipa email — from Derex Walker to Ira Tochner — discussing whether Allied should issue financial reporting for March and April 2011 to Lenders.  Mr. Walker writes that these reports "show a dramatic decline in cash, down $8MM in April" and notes

22

management's concern "that issuing the reports will lead certain lenders like BD/S to think the end is near and make it harder to cut a deal.  Not issuing the report is simply another breach (one of many) under the credit agreement." [Ex. 636 (Email from Derex Walker to Ira Tochner dated May 29, 2011).]

43.    On May 9, 2011, following some preliminary discussions with BD/S about a potential transaction to acquire Allied, Mike Riggs sent another Letter of Intent to purchase substantially all the assets of Allied to Derex Walker and BD/S (the "May 2011 LOI").  [Stip. Fact ¶ 26; Ex. 107.]

44.    The May 2011 LOI was addressed to Derex Walker as Chairman of Allied's Board (at the Company's address), as well as to Mr. Walker in his capacity as a Yucaipa Partner (at Yucaipa's address).  Messrs. Deckoff and Ehrlich (of BD/S) were also recipients of the May 2011 LOI.  [Ex. 107 (Email from Mike Riggs to Rich Ehrlich and Derex Walker attaching Allied 363 Letter of Intent from TM Riggs 5-9-11.doc dated May 9, 2011).]

45.    The May 2011 LOI provided that JCT was "was interested in acquiring substantially all the assets of [Allied] . . . through a [a sale under Section 363 of Title 11 of the United States Code (a "Section 363 Sale")]," which would require Allied, Yucaipa and BD/S (collectively defined as the "Seller Parties" therein) to execute "a mutually acceptable definitive asset purchase agreement" and submission of bid procedures. [Ex. 107 at p 3.]

46.     Initially, the "Total Consideration" contemplated in the May 2011 LOI was (a) $175 million "payable in cash at closing," (b) an additional amount to be "mutually agreed upon between [JCT] and CIT," and (c) the "assumption of certain designated liabilities deemed critical to the operations of Allied as determined by [JCT] in its sole and absolute discretion." [Ex. 107 at p. 3 § 2.]

47.     The May 2011 LOI further contemplated the Seller Parties would enter "Definitive Documents as soon as practicable" and for the Parties' "respective Board of Directors . . . or other similar governance bodies necessary to approve Definitive Documents" and take "all corporate actions necessary" to consummate the transaction. [Ex. 107 at p. 3 §§ 3, 4.]

48.     The May 2011 LOI anticipated that it would take JCT "no longer than forty-five (45) days from the date of execution of th[e] LOI to obtain a financing commitment," and further that "the Bankruptcy Process would commence shortly thereafter and be expected to take no longer than ninety (90) days." [Ex. 107 at p. 4 § 3.]

49.     On May 17, 2011, Ira Tochner (a Yucaipa Partner and Board member at the time) wrote Messrs. Walker and Gendregske that "Bilbao [a banker for JCT] called and said Riggs desperately wants to do a deal.  Doesn't want Axis.  I didn't respond, except to say Riggs knows the deal (which I assume he knows that it's par or nothing)."  [Stip. Fact ¶ 27; Ex. 410 (Email from Ira Tochner to Derex Walker and Mark Gendregske dated May 17, 2011).]

50.    The undisputed evidence reflects that JCT's initial offer in the May 2011 LOI increased to approximately $0.84 on the dollar — approximately a $225 million implied valuation of Allied — by June 21, 2011.  [*See* Stip. Fact. ¶ 32; Ex. 663 at 1 (Email from Steve Deckoff to Ron Burkle dated June 21, 2011) ("The deal we had with Riggs worked out to 84 cents on the dollar.  About a 225mm enterprise valuation. . . . It may not be what you wished for when you made the investment, but it's a surprisingly high value given the situation."); *see also* 3/1/22 a.m. Trial Tr. 74:19-76:1 (Deckoff Direct) (testifying regarding same); 3/1/22 p.m. Trial Tr. 113:2-4 (Deckoff Cross) ("We ultimately got [JCT] to 84 cents on the dollar and then Yucaipa scuttled it by wanting I think 110 cents on the dollar."); 3/1/22 p.m. Trial Tr. 114:15-115:12 (Deckoff Cross) (testifying that Yucaipa was insisting on 110 cents on the dollar); 3/1/22 p.m. Trial Tr. 122:21-22 (Deckoff Cross) ("I believe the deal was there to do at 84 and it fell apart because Yucaipa insisted on 110.").]  This presumptively final offer — made before JCT declared the deal dead after Yucaipa demanded a "crazy high price" — is reflected in Yucaipa's contemporaneous internal correspondence and was not refuted at Trial.  [Ex. 536 (Email from Derex Walker attaching "Allied Proposal" dated June 16, 2011) at 2 (presenting an option 2 to "[a]ssign $135MM in Allied first lien loans held by Yucaipa to Jack Cooper for cash and a note at a rate of $0.837 on the dollar or $113MM" and "be entitled to receive $10MM in excess LC deposits outside of the loan assignment to Jack Cooper, bringing the total distribution to Yucaipa to $123MM.").]  Mr. Walker's email is

consistent with Mr. Deckoff's statement that this deal with JCT was "[a]bout a 225mm enterprise valuation."  [Stip. Fact. ¶ 32; Ex. 663 at 1 (Email from Steve Deckoff to Ron Burkle dated June 21, 2011).]

51.    Mr. Deckoff sent Mr. Burkle an email on June 21, 2011, after receiving word that this potential JCT transaction might be dead, because he "thought this was a good resolution" given that "[t]he company had been [insolvent] for quite a few years. The company wasn't performing well . . . [a]nd [he] thought 84 cents for all the lenders was a good recovery."  Despite asking Mr. Burkle to call him and explain if he was "missing something," however, Mr. Deckoff received no response.  [3/1/22 a.m. Trial Tr. 76:2-14 (Deckoff Direct); 3/1/22 a.m. Trial Tr. 93:18-24 (Deckoff Direct) ("[H]e never responded to my email" and "I don't believe I spoke to him again after that until, maybe when we were – the company had the 363 Sale in Bankruptcy."); 3/2/2022 Trial Tr. 179:23-180:4 (Deckoff Cross).]

52.    No evidence was introduced reflecting that Yucaipa took any steps to ensure a fair process (or any process at all) for the *Company* to consider JCT's interest expressed in the May 2011 LOI, and subsequent discussions through June 2011, free from Yucaipa's domination and control of Allied. [At Trial, Mr. Tochner had no recollection what he "did or what [he] didn't do" with respect to being told by JCT's banker that "Riggs desperately wants to do a deal" in May 2011.  (3/2/22 a.m. Trial Tr. 89:23-90:7 (Tochner Direct) (testifying about Ex. 410)).]    Relatedly, there was no

evidence presented that JCT's interest in acquiring substantially all of Allied's assets was ever discussed at the Board level. Brian Cullen, Allied's only outside Board member, testified he had no recollection of entertaining any proposals at the time. [Dep. Tr. (Cullen) 230:15-23.] Further, JCT had no familiarity with the name Brian Cullen at any point in time. [*See* Dep. Tr. (Ciupitu) 159:3-11.]

53.    Yucaipa's 30(b)(6) deponent (Derex Walker) testified that any Section 363 Sale — as contemplated in the May 2011 LOI and subsequent offers during the JCT Negotiations — is "not something Yucaipa could do on its own" because "filing a bankruptcy and commencing a 363 sale is a company decision. It's not a Lender decision." Accordingly, Mr. Walker testified that a Section 363 Sale "has nothing to do with Yucaipa" and was a Board decision. [*See* Dep. Tr. (Walker Vol. II) 609:3-610:5.]

**G. The Initial Stages of the JCT Negotiations**

54.    In late 2011, Yucaipa and JCT began discussing a prospective deal for JCT to simultaneously acquire First Lien debt holdings from Yucaipa and other Lenders to facilitate a pre-negotiated Section 363 Sale. [*See* Ex. 115 (Emails between Mike Riggs and Ira Tochner from December 6-7, 2011) (referring to a potential "package deal" for the First Lien debt holdings).]

55.    On December 9, 2011, Mike Riggs sent Ira Tochner a "Term Sheet for Acquiring First and Second Lien Secured Debt Claims With Respect to Allied System

Holdings, Inc. And Consummating 363 Sale Under Chapter 11 of the Bankruptcy Code"
(the "December 9 Term Sheet").  [Stip. Fact ¶ 33; Ex. 116.]

56.    The December 9 Term Sheet contemplated a purchase of Yucaipa's First
Lien debt holdings for face value ("100% principal claims transferred") and Second Lien
Debt holdings for $1.00 [Ex. 116 at 4 ("Purchase Debt Purchase Price")] as a first step to
JCT "purchasing substantially all of the assets of Allied, free and clear of all liens, claims
and other encumbrances" pursuant to a Section 363 Sale by "[c]redit bid[ing] all claims
against Allied under the First Lien Credit Agreement." [Ex. 116 at 8 ("Structure of 363
Sale" and "363 Sale Purchase Price").]

57.    At this time, Allied had been in default under the FLCA for over three
years and no Lenders — other than ComVest — had been paid any principal or interest
for over two years.  [Dep. Tr. (Walker Vol. II) 571:12-15, 20-25.]  The Obligations under
the FLCA were also set to mature in May 2012.  [Ex. 537 (Email from Stephanie Bond to
Derex Walker Re: pres dated September 11, 2011) at 4 ("The First Lien Obligations
mature in May 2012, whereas the Second Lien Obligations mature in November 2012").]

58.    On December 13, 2011, Derex Walker sent Mr. Riggs a mark-up of the
December 9 Term Sheet (the "December 13 Counterproposal").  [Stip. Fact ¶ 34; Ex. 117
(Email from Derex Walker to Mike Riggs, copying Ira Tochner, Re: Allied dated
December 13, 2011).]  Mr. Walker's mark-up reflected Yucaipa's First Lien holdings
totaled $134.8 million, consisting of $114.7 million of Term Loans and $20.1 million of

LC Commitments.  The December 13 Counterproposal sought "100% of principal claims transferred plus all accrued interest (approx. $25.4 million as of the end of November)" and any additional interest accrued through closing. [*See* Ex. 117 at 2-3 ("Amount of Purchased Debt," "Purchased Debt Purchase Price," and "Payment of Purchased Debt Purchase Price") (emphasis removed).]

59.    Thus, as of December 13, 2011, Yucaipa was seeking at least $160.2 million on account of its $134.8 million face amount of First Lien debt held — *i.e.*, approximately $1.19 for each dollar of its First Lien debt.

60.    There was no evidence adduced at Trial that following receipt of the December 9 Term Sheet, and prior to Yucaipa making a counterproposal four days later, Mr. Walker (or others at Yucaipa) took any steps to apprise the other Board members of JCT's interest in acquiring Allied's assets through a pre-negotiated Section 363 Sale.  Nor was there any evidence of Yucaipa taking any measures to ensure the fairness of the process from the perspective of the estate by, for example, setting up an independent committee or hiring outside advisors to engage with JCT to maximize the value for all stakeholders.

61.    Among Yucaipa's principal defenses to the Trustee's breach of fiduciary duty claim is that during the JCT Negotiations, "JCT was interested in buying Allied's debt, not its assets." [*See* 3/1/22 a.m. Trial Tr. 35:14-15 (Yucaipa Opening Statement).] Thus, Yucaipa claims it was free to negotiate with JCT solely as a Lender without regard

to fiduciary duties owed to Allied.  The contention that JCT was not interested in buying Allied's assets, however, is belied by the terms of the December 9 Term Sheet and those that followed.  The evidence adduced at Trial reflecting that JCT's objective was to own Allied, not debt, included:

    i.    Theo Ciupitu — JCT's General Counsel responsible for managing JCT's legal dealings [Dep. Tr. (Ciupitu) 21:21-22:11] — testified that "in 2011 and 2012," JCT's "goal was not to acquire any debt.  The goal was to acquire Allied." [Dep. Tr. (Ciupitu) 37:15-16.]

    ii.    Mr. Riggs testified that "the whole idea for [JCT] was the acquisition of [Allied] . . . whether we call it a purchase of the debt or an M&A deal or a transaction, the end game was to buy the debt and own the company and combine the entities, same as it has always been. [*See* Dep. Tr. (Riggs) 234:8-235:6.]

    iii.    Mr. Riggs further testified: "I was not in the debt investing business, I was in the business of running companies, so this whole thing was to try to get a package together." [Dep. Tr. (Riggs) 236:3-6.]

62.    The Court finds that, for all practical purposes, JCT's efforts to purchase Yucaipa's and other's debt during the JCT Negotiations were a means to acquire

Allied's assets and rejects Yucaipa's contention that this was a "simple" debt trade enabling Yucaipa to somehow evade fiduciary responsibility to the Company.

**H. The Disparity of Offers During the JCT Negotiations and BD/S's Attempts to Have Fiduciary Duties Honored and Achieve a Fair Price and Fair Process**

63.    On December 15, 2011, JCT sent Ira Tochner and Derex Walker a revised Term Sheet countering Yucaipa's December 13 Counterproposal (the "12/15/11 Revised Term Sheet"). [Stip. Fact ¶ 35; Ex. 118.] JCT's 12/15/11 Revised Term Sheet reduced the "Purchased Debt Purchase Price" for First Lien holdings from the approximately $160.2 million, set forth in Yucaipa's December 13 Counterproposal, to $150 million consisting of: (1) $100 million cash, and (2) $50 million paid in "notes issued as part of a 'tack-on' financing under Jack Cooper' 12 ¾% Senior Secured Notes Due 2015" ("JCT Notes"). [Ex. 118 (Email from Theo Ciupitu to Ira Tochner and Derex Walker Re: Yucaipa/JC – revised Term Sheet dated December 15, 2011) at 3-4.]

64.    On December 18, 2011, JCT's 12/15/11 Revised Term Sheet was forwarded to representatives of BD/S. [Stip. Fact ¶ 35; Ex. 99.]

65.    On December 19, 2011, in anticipation of a meeting scheduled the next day at BD/S's offices in Greenwich, Connecticut, Mike Riggs sent Rich Ehrlich of BD/S and Jeffrey Schaffer attachments entitled "Allied Acquisition – Summary of Financial Impact Dec 19, 2011.pptx" and "JCT and Allied Combined.xlsx." [Stip. Fact ¶ 36; *see* PX Y (Email from Rich Ehrlich to Les Meier and Steve Deckoff forwarding Email from Mike

Riggs FW: Jack Cooper Information – CONFIDENTIAL EMAIL #1 dated December 19, 2011).] Mr. Rigg's attachments reflect, among other things, that JCT envisioned:

      i.    Giving Yucaipa a premium for its First Lien debt while discounting other Lenders, and a "total acquisition costs with fees" of $253 million. [PX Y at 13 (reflecting $5 million "premium" for Yucaipa and discounts for others, and a "total acquisition costs with fees" of $253 million).]

      ii.    Projected pro forma EBITDA results of a combined JCT and Allied "after Synergies" of: (1) $115 million "expected case," (2) $174 million "best case," and (3) $58 million "Worst Case Armageddon Scenario." [PX Y at 14 (Pro forma results).]

66.    On December 19, 2011, Theo Ciupitu of JCT also sent Rich Ehrlich and Jeffrey Schaffer a Term Sheet for a prospective purchase of Yucaipa, BD/S and CIT's debt holdings which contemplated bridge financing from BD/S.  [Stip. Fact ¶ 36; Ex. 90 (the "12/19/11 Term Sheet").]

67.    On December 20, 2011, JCT met at BD/S's offices in Connecticut to discuss JCT's proposals and its goal of acquiring Allied [*See* 3/1/22 a.m. Trial Tr. 81:4-82:12 (Deckoff Direct) ("[M]y recollection is, [JCT] walked through, you know, the terms of it with us.  And then, you know, in doing that deal, they wanted us to take back debt. And then, they also wanted us to provide them financing.   So they were walking

through with us, you know, some numbers in terms of financial performance and what they projected that the combined companies would do.  I – my recollection is the purpose of it was to try to get us comfortable with making them the bridge loan.").] Participants at this meeting included Steve Deckoff and Rich Ehrlich, from Black Diamond, Jeffrey Schaffer, from Spectrum, and Mike Riggs, Theo Ciupitu and Kirk Ferguson from JCT [Dep. Tr. (Ciupitu) 61:10-62:6, 62:16-24.]

68.    Mr. Deckoff testified that JCT's proposal, presented on December 20, 2011, was not acceptable to BD/S because the terms were not equal and ratable and contemplated Yucaipa receiving a premium. This disparate treatment was unacceptable to Mr. Deckoff [3/1/22 a.m. Trial Tr. 80:25-81:5 (Deckoff Direct).]

69.    Mr. Deckoff further testified that if JCT's proposals over the course of the JCT Negotiations been equal and ratable with Yucaipa, he was prepared to support a transaction including by accepting certain conditions precedent within BD/S's control. [*See generally* 3/1/22 a.m. Trial Tr. 86-87 (Deckoff Direct).]

70.    Mr. Burkle admitted during the course of the proceedings that any JCT transaction *should* have been equal and ratable. [*See* 3/3/22 a.m. Trial Tr. 24:11-15 (Burkle Adverse Direct) (testifying that after Mr. Deckoff complained about not being treated *pari passu* he told him "he should be"); *see also* 3/3/22 a.m. Trial Tr. 22:11-23:24 (Burkle Adverse Direct) (testifying that the conversation with Mr. Deckoff regarding him being unhappy with Derex Walker and not being treated *pari passu* occurred during

a lunch at a restaurant called Gemma in January 2011: "I told him, you're going to get treated just like I do.  And I didn't mean just on the debt.  I mean on information, on everything.").]  Notwithstanding Mr. Burkle's admission of what fairness dictated (*pari passu*), there was no evidence that Yucaipa ever agreed to commit to equal and ratable treatment or deviate from the premium price it had negotiated with JCT.

**I.  CIT's Agreement in Principle With JCT**

71.    On February 10, 2012, CIT agreed in principle to JCT purchasing its $35 million First Lien debt holdings and to facilitate JCT's credit bidding for substantially all of Allied's assets in a Section 363 Sale (the "JCT/CIT Agreement").  [Ex. 62 (Aliberto) (Email from Michael Aliberto to Michael Riggs Re: Term Sheet dated February 10, 2012).]  The JCT/CIT Agreement contemplated CIT's First Lien debt to be purchased for "the greater of (x) US $20 million, or (y) an amount that would yield a recovery to CIT that is not less than the highest recovery obtained by any other lender under the Credit Agreement . . . Such consideration [to] be paid in cash upon execution and delivery of the Documentation." [*See* Ex. 62 (Aliberto) at 1-3 ("Purchased Debt," "Amount of Purchased Debt," and "Purchased Debt Purchase Price").]    CIT's corporate representative testified that the deal was "a floor of $20 million, and if any other lender could negotiate a better price, CIT was essentially going to get a most-favored nations provision" [Dep. Tr. (Aliberto) 504:18-24.]

**J.   Schulte's Letters to Board and Yucaipa's Continued Demand for a Premium**

72.     On February 10, 2012, the same day CIT was reaching an agreement in principle with JCT, it was reported to Mr. Deckoff that JCT was nearing a deal with both Yucaipa and CIT, and that JCT no longer needed any bridge financing from BD/S. [Ex. 469 (Email from Richard Ehrlich to Steve Deckoff Re: Riggs dated February 10, 2012); *see also* 3/1/22 a.m. Trial Tr. 84:3-23 (Deckoff Direct).]  Mr. Deckoff testified that this was concerning because he knew the contemplated transaction with Yucaipa included a premium on its First Lien debt: "[s]o I was concerned that they were going to . . . go ahead and do this, buy Yucaipa's debt, then they would have . . . control of the debt.  And then, ultimately, we wouldn't be treated fairly." [3/1/22 a.m. Trial Tr. 84:16-23 (Deckoff Direct).]  In light of these concerns, Mr. Deckoff directed Adam Harris — BD/S's lawyer at Schulte Roth & Zabel at this time — to write Allied's Board and remind it of its fiduciary duties and the need to maximize value for all stakeholders. [ 3/1/22 a.m. Trial Tr. 84:17-85:11 (Deckoff Direct).]

73.     On February 15, 2012, Adam Harris wrote to Allied's Board (the "2/15/12 Letter").  [Ex. 349 (Letter to Allied's Board of Directors from Adam Harris dated February 15, 2012).]  Mr. Harris testified that the purpose of the 2/15/12 Letter was to "put the Board on notice that the manner in which they were conducting themselves at the time, in our view, was in violation of their fiduciary obligations given the financial circumstances of the company and the company's existing events of default, including

payment defaults that had been extended for several years." [3/2/22 a.m. Trial Tr. 9:9-15 (Harris Direct).]

74.    Mr. Harris's 2/15/12 Letter stated his understanding that Yucaipa: (1) "own[ed] more than 70% of the common equity of Allied," (2) "control[led] the Board of Directors and management," and (3) had "caused the Board of Directors and management to intentionally cause Defaults and Events of Default to occur and continue under the Credit Agreements, including the failure to pay interest and principal on the Obligations to the Lenders when due." [3/2/22 a.m. Trial Tr. 9:9-15 (Harris Direct).]

75.    Mr. Harris concluded his 2/15/11 Letter stating:

> We are prepared to engage the Board of Directors immediately in a discussion regarding an appropriate restructuring and/or recapitalization of the Borrowers and Subsidiary Guarantors to preserve and protect the Company's assets, and to maximize the value available for all interested parties.  As you are well aware, the Maturity Date of the Obligations under the First Lien Credit Agreement is May, 2012, and based upon the information available to us (including the recently revised 2012 projections) we do not believe the Borrowers or Subsidiary Guarantors will be in a position to pay the Obligations that become due on that date (resulting in a cross default under the Second Lien Credit Agreement).  Thus, we believe a restructuring and/or recapitalization is inevitable.  If the Borrowers choose not to engage in this constructive and value preserving dialogue, our clients will take such actions as they deem necessary or appropriate to end the status quo and move forward towards a prompt resolution. . . . We look forward to hearing from you promptly. [3/2/22 a.m. Trial Tr. 9:9-15 (Harris Direct).]

76.    It is undisputed that the 2/15/12 Letter was received.  [Dep. Tr. (Walker Vol. II) 692:4-11; *see also* 13-50530, D.I. 700-10 (Dep. Tr. (Tochner) 285:18-286:25 (testifying that he received the 2/15/11 Letter but had no recollection of the Board or any special committee of the Board meeting and discussing the letter).]  Yet, Mr. Harris testified that he received no response to BD/S's request to discuss a restructuring and/or recapitalization to "maximize the value available for all interested parties." [3/2/22 a.m. Trial Tr. 14:19-15:7 (Harris Direct) ("No.  The Board never took us up on this invitation for negotiations.").]

77.    On February 21, 2012, Derex Walker sent a marked-up term sheet back to JCT (the "February 21 Term Sheet") which, among other things, modified the "Purchased Debt Purchase Price" for Yucaipa's First Lien debt from $145 million to $155 million.  [Stip. Fact ¶ 39; PX LLL at 5 (Email from Derex Walker to Mike Riggs and others Re: Yucaipa/Jack Cooper – Revised Term Sheet dated February 21, 2012) ("Purchased Debt Purchase Price").]

78.    On February 28, 2012, JCT provided comments to Yucaipa's February 21 Term Sheet.  JCT amended the "Purchased Debt Purchase Price" for Yucaipa's First Lien debt from $155 million to $150 million.  [Stip. Fact ¶ 40; Ex. 119 at 4 (Email from Theo Ciuputu to Derex Walker and Ira Tochner Re: Yucaipa/Jack Cooper – revised Term Sheet (February 28, 2012) dated February 28,2012) ("Purchased Debt Purchase Price").]

79.     On March 5, 2012, Ira Tochner inadvertently sent an email to Mike Riggs making certain observations on JCT's most recent markup of the Term Sheet to Yucaipa. In the email, Mr. Tochner states that Yucaipa should "stay tight on demanding $155 [million] and a cash breakup fee." [Stip. Fact ¶Dep. Ex. 638; 13-50530, D.I. 700-10 (Dep. Tr. (Tochner) 279:4-281:3) (testifying that he inadvertently sent Ex. 638 to Mike Riggs stating that Yucaipa should "stay tight on demanding 155 [million].").]   Mike Riggs agreed to "to give in on the $155 [million]" following a discussion with Mr. Tochner later that day. [*See* PX CC at 3 (Email from Mike Riggs to Theo Ciuputu Re: $155 dated March 5, 2012).]

80.     On March 7, 2012, Ira Tochner and Derex Walker met with Mike Riggs in Atlanta, Georgia, in an effort to negotiate final deal points with JCT.  [Stip. Fact ¶ 42; *see* PX CC at 1 (Email from Ira Tochner to Mike Riggs dated March 6, 2012) ("We reviewed the term sheet and some issues still require some discussion.  Ron would like us to get in a room tomorrow and either sign a deal or move on. . . . So if its ok with you, we'll hop on a plane with the intention of meeting tomorrow."), *see also* Ex 121 (Email between Derex Walker, Ira Tochner and Mike Riggs including a list of deal points to discuss dated March 6, 2012); *see also* PX DD (Email from Ira Tochner to Mike Riggs Re: Meeting Time dated March 6, 2012).]

81.     On March 8, 2012, JCT sent Derex Walker and Ira Tochner a Term Sheet captioned "Confidential Term Sheet-Final Version 03/08/2012" (the "JCT/Yucaipa

Final Term Sheet"). [Ex. 122 at 1 (Email from Theo Ciupitu to Derex Walker and Ira Tochner dated March 8, 2012) ("Thank you, Derex. This Term Sheet is final.").] The price for Yucaipa's First Lien debt in the JCT/Yucaipa Final Term Sheet was $155 million, with $80 million paid in cash and $75 million in JCT Notes. [Stip. Fact ¶ 43; Ex. 122 at 6-7 ("Purchased Debt Purchase Price" and "Payment of Purchase Debt Purchase Price").]

82.    Later in the day on March 8, 2012, JCT separately sent BD/S a new Term Sheet presenting two alternate payment options (the "3/8/12 BD/S Term Sheet"). Under the 3/8/12 BD/S Term Sheet, BD/S would receive either: (a) 70% of the principal amount of all FLCA claims if they accepted 50% of consideration paid on a "First Closing Date" in JCT Notes, and the balance in JCT Notes on a later date, or (b) 60% of the principal amount of all FLCA claims if they accepted 25% of consideration paid on a "First Closing Date" in JCT Notes, and the balance in cash on a later date. [Ex. 86 at 3-4 ("Purchased Debt Purchase Price," "Closing Dates," "Payment of Purchased Debt Purchase Price – Payment Option 1," and "Payment of Purchased Debt Purchase Price – Payment Option 2").]

83.    Mr. Deckoff testified that the 3/8/12 BD/S Term Sheet was unacceptable because JCT "lowered the price to us and I believe they simultaneously increased the price to Yucaipa. So value [wa]s getting transferred from us to Yucaipa." [3/1/22 a.m. Trial Tr. 86:20-87:2 (Deckoff Direct).] Mr. Deckoff, however, testfied that he was

prepared to agree to a JCT transaction if it had been on equal and ratable terms. [3/1/22 a.m. Trial Tr. 87:3-23 (Deckoff Direct).]

84.    Mr. Ciupitu's testimony confirms Mr. Deckoff's understanding that value was, in fact, getting transferred from other Lenders to Yucaipa as the JCT Negotiations progressed: "[JCT] looked at this as an M&A deal.  We equated requisite lender position similar to a control[] premium.  So . . . it made sense for us to placate [Yucaipa] and give them a premium."    [Dep. Tr. (Ciupitu) 69:14-21; Dep. Tr. (Ciupitu) 70:1-7 ("Substantively for [JCT], it was an M&A deal.  It was a means to an end.  Structurally and technically . . . a two-step transaction with a debt trade, but from our perspective in 2011, 2012, the substance was an M&A deal.").]

85.    Mr. Ciupitu further testified that any transaction to acquire the Company hinged on Yucaipa's participation given its purported status as Requisite Lender: "[t]he underlying transaction from Jack Cooper's perspective was to acquire Allied. . . . [N]ot having Yucaipa who held either the requisite lender position at the time and/or a large portion of the debt didn't make sense to proceed with the BD/S transaction without Yucaipa." [Dep. Tr. (Ciupitu) 75:16-22.]

86.    Responding to whether JCT would be willing to pay a premium if Yucaipa "in fact, was not a requisite lender," Mr. Ciupitu testified that he did not believe it would have.  [Dep. Tr. (Ciupitu) 175:12-21.]

**K.  Yucaipa Thwarts BD/S's Efforts to Get a Fair Process and Equal Treatment**

87.    After receiving the 3/8/12 BD/S Term Sheet, BD/S instructed Adam Harris of Schulte to send another letter to Allied's Board "encouraging them to negotiate with Jack Cooper to get the best deal for everybody on an equal and ratable basis." [3/1/22 p.m. Trial Tr. 119:23-120:12 (Deckoff Cross).]

88.    On March 22, 2012, Adam Harris sent a second letter to the Board (the "3/22/12 Letter"). [Ex. 350 (Letter from Adam Harris to The Board of Directors dated March 22, 2012).]

89.    The 3/22/12 Letter reminded the Board members that — whether in connection with a JCT transaction or any other restructuring — they were "required by the fiduciary duties they owe to Allied's creditors to establish a process to maximize the value of the sale of [Allied's] assets for all creditor." [Ex. 350 at 2 (Letter from Adam Harris to The Board of Directors dated March 22, 2012).]

90.    The 3/22/12 Letter continued that BD/S was "prepared to engage the Board of Directors immediately in a discussion to facilitate a transaction with JCT, or any other appropriate buyer, or on the terms of an appropriate restructuring[,]" and sought "immediate assurances from the Board of Directors that they will only pursue a transaction or restructuring that provides equal treatment to all creditors" and concluded that BD/S "look[ed] forward to hearing [back] promptly." [Ex. 350 at 2-3 (Letter from Adam Harris to The Board of Directors dated Mach 22, 2012).]

91.     On March 30, 2012, Allied's General Counsel, John Blount, sent a response stating that the Board "has not breached any fiduciary duties and has acted, and continues to act, in the best interests of Allied's stakeholders." [Ex. 639 (Letter from John Blount to Adam Harris dated March 30, 2012).]

92.     Mr. Tochner testified that he had no recollection of any Board or Special Committee meeting to address the 3/22/12 Letter. [13-50530, D.I. 700-11 (Dep. Tr. (Tochner) 287:3-23) (testifying that he received the 3/22/12 Letter but had no recollection of any Board or Special Committee meeting held to address it).]

93.     On May 10, 2012, JCT sent BD/S a revised Term Sheet to acquire their Allied debt holdings and consummate a Section 363 Sale (the "5/10/12 Term Sheet"). The 5/10/12 Term Sheet offered a "Purchased Debt Purchase Price" for FLCA claims of 70% of the principal amount of claims held, with 50% paid in JCT Notes at a "First Closing," and the balance paid in JCT Notes at a "Second Closing." [Ex. 123 at 9-10 (Email from Theo Ciupitu to Jeffrey Schaffer Re: Revised Term Sheet with Black Diamond and Spectrum dated May 10, 2012) ("Purchased Debt Purchase Price" and "Payment of Purchased Debt Purchase Price.").] The 5/10/12 Term Sheet again contemplated JCT's purchase of "substantially all of the assets of Allied, free and clear of all liens, claims, and other encumbrances, pursuant to a [Section 363 Sale]," and Allied's support and cooperation in connection therewith. The 5/10/12 Term Sheet further provided that the "363 Sale Purchase Price" was to be a "Credit bid of all lender

claims against Allied under the First Lien Credit Agreement."  [Ex. 123 at 14 ("Structure of 363 Sale" and "Signing and Closing 363 Sale").]

94.    At Trial, Mr. Tochner emphasized a provision in the JCT/Yucaipa Final Term Sheet contemplating that JCT, Yucaipa and Allied would sign "Definitive Agreements" simultaneously with definitive agreements also being entered among JCT, CIT, and BD/S. [*See* Ex. 122 at 5 (definition of "Definitive Agreements"), 9 (definition of "Other Seller Definitive Agreements")]. According to Mr. Tochner, this provision protected BD/S by requiring that "everybody holds hands and agrees" to any deal with JCT at the end of the day. [*See* 3/2/22 a.m. Trial Tr. 94:8-11 (Tochner Adverse Direct).] The provision, however, does not address establishing a fair process for Allied to maximize value to all stakeholders or ensure ratable treatment for Lenders [Mr. Harris also correctly observed that BD/S "weren't third-party beneficiaries" to this provision, so "it wasn't a binding agreement" and "[Yucaipa] could have chosen to enforce or not enforce it . . . in their own discretion." (3/2/22 a.m. Trial Tr. 61:16-62:4 (Harris Cross)).] Additionally, there was no evidence presented by Yucaipa reflecting that the JCT/Yucaipa Final Term Sheet, or the contents of this provision, were ever sent to BD/S.

95.    Rather, the evidence reflects that Yucaipa simply proceeded towards finalizing definitive documentation with JCT by, among other things, having its lawyers negotiate a Cooperation Agreement between Allied, Yucaipa, and JCT supporting a

Section 363 Sale. [*See* Ex. 804 (Email from Lee Craig of Paul Hastings (JCT's counsel) to Derex Walker, Ira Tochner and Yucaipa's counsel at Latham & Watkins dated May 11, 2012) ("Attached please find revised drafts of the Debt Purchase Agreement, Cooperation Agreement and Note Purchase Agreement (each with redlines to the prior drafts distributed).").] Yucaipa did this without implementing any protections to address BD/S's concerns articulated in Mr. Harris's letters, such as using an independent restructuring committee or third-party advisors for Allied.  Mr. Riggs testified that his understanding was that he only ever needed to work with Yucaipa: "[I] was under the presumption that [Yucaipa] owned control of the debt and they owned control of the common stock . . . So there's no reason to work with anybody but [Yucaipa]." [Dep. Tr. (Riggs) 237:7-15; Dep. Tr. (Riggs) 254:12-17 (testifying that he had no recollection of ever meeting with any representatives of Yucaipa or Allied other than Ron Burkle, Derex Walker, and Ira Tochner during the JCT Negotiations).]

**L.  Yucaipa Never Agreed to Equal and Ratable Treatment**

96.    After receiving no substantive response to either the February 15 or March 22, 2012, letters to the Board, BD/S sought assurances directly from Yucaipa that it would agree to equal and ratable treatment to facilitate a transaction with JCT (or any other restructuring).  These discussions occurred between May 14 through May 17, 2012.

97.     Yucaipa contends that it agreed to equal and ratable treatment during these discussions. [13-50530, D.I. 958 (Yucaipa's Trial Brief) at 10 ("Yucaipa agreed to ratable treatment in an effort to reach a global deal with JCT") (citing Exs. 351, 472); *see also* 3/1/22 a.m. Trial Tr. 40:6-7 (Yucaipa Opening) ("Yucaipa had agreed to share in the debt purchase price ratably"); 3/1/22 a.m. Trial Tr. 45:2-5 (Yucaipa Opening) ("May 15, 2012, Yucaipa reiterates its agreement to contractually commit that BD/S receives equal and ratable treatment with Yucaipa and any transaction affecting the first lien debt."); 3/1/22 a.m. Trial Tr. 50:13-14 (Yucaipa Opening) ("Yucaipa did agree and the evidence will establish that."); 13-50530, D.I. 958 at 3 (Yucaipa's Trial Brief) ("Yucaipa agreed to re-negotiate its deal with JCT to satisfy BD/S's demand for 'ratable treatment' among the lenders.").] The evidence adduced at Trial does not support this contention.

98.     On May 14, 2012, Adam Harris of Schulte circulated a dial-in for a 9:45 p.m. EST call between representatives of BD/S and Yucaipa. [Ex. 713 at 2 (Email from Adam Harris to Rich Ehrlich, Derex Walker, and Doug Teitelbaum Re: Dial in for 9:45 pm call) ("Derex—Please arrange to have counsel on the phone.  Thanks.").] On that call for Yucaipa were Derex Walker and Doug Teitelbaum (also of Yucaipa), Yucaipa's outside counsel, Rich Ehrlich of BD/S, and Adam Harris and his colleague Victoria Lepore. [3/2/22 a.m. Trial Tr. 18:18-23 (Harris Direct).]

99.     Mr. Harris testified that the May 14 call "was to facilitate a discussion about getting equal and ratable treatment and allocation of [JCT] consideration as

between Yucaipa, Black Diamond, and Spectrum[.]" [3/2/22 a.m. Trial Tr. 19:3-12 (Harris Direct).] During the call, Yucaipa acknowledged that it had, in fact, negotiated for a greater percentage return on its First Lien debt than what was being offered to BD/S, but it would not commit to equal and ratable treatment going forward in principle or otherwise.  [3/2/22 a.m. Trial Tr. 19:14-23 (Harris Direct).]

100.    On May 15, 2012, Mr. Harris sent dial-in details to Yucaipa and its representatives for a call "at noon, with a tentative follow up for 2."  Mr. Harris's email states:

> As a follow up to last night's discussion, please be prepared to advise whether Yucaipa is prepared to (a) compromise on the purchase price it had previously required from JCT in order to facilitate a transaction in which Yucaipa, Black Diamond and Spectrum would each receive equal and ratable treatment on account of their First Lien debt, and (b) confirm that Yucaipa will contractually commit to assure that Black Diamond and Spectrum will receive equal and ratable treatment with Yucaipa in any transaction affecting the First Lien debt (with JCT or anyone else). [Ex. 713 at 1 (Email from Adam Harris to Douglas Teitelbaum and others Re: My schedule dated May 15, 2012).]

101.    Another call between the parties occurred mid-day EST on May 15, 2012. Mr. Harris testified that during the course of these discussions Yucaipa did not agree to commit to equal and ratable treatment, in principle or otherwise. [3/2/22 a.m. Trial Tr. 21:21-22:3 (Harris Direct).]  Yucaipa did not present any evidence to the contrary. [Mr. Tochner testified that he was not a participant on these calls and could not say affirmatively that Yucaipa agreed to commit to equal and ratable treatment.  [*See*

3/2/22 p.m. Trial Tr. 94:3-95:5 (Tochner Adverse Redirect); *see also* 3/2/22 p.m. Trial Tr. 68:21-23 (Tochner Friendly Cross) ("I can't recall being on these calls.  I can't – I can't picture it.  I just don't remember being on those calls.").]  Mr. Burkle also testified that he was not a participant on these calls.  [*See* 3/3/22 a.m. Trial Tr. 28:8-17 (Burkle Adverse Direct).]

102.    Following the call on May 15, 2012, Mr. Harris was asked by his clients to prepare an agreement for Yucaipa's consideration which memorialized BD/S's request for equal and ratable treatment of any transaction affecting Lenders.  Mr. Harris drafted and circulated such an agreement on May 16, 2012. (the "May 16 Draft Letter Agreement").  [Ex. 265 at 3-15 (May 16 Draft Letter Agreement); *see also* 3/2/22 a.m. Trial Tr. 22:4-17 (Harris Direct).]

103.    Mr. Harris's cover email attaching the May 16 Draft Letter Agreement asked for comments from Yucaipa "by no later than 11 am NY time" on May 17, 2012, given a "12 noon expiration of the Yucaipa and Allied agreements regarding the commencement of any voluntary chapter 11 cases." [Ex. 265 at 1 (Email from Adam Harris to Ira Tochner and others Re: Allied dated May 16, 2012).]  This "standstill" agreement was reached at the outset of the May 14 to 17, 2012, discussions to address BD/S's concern that Yucaipa would not cause Allied to preemptively commence a bankruptcy in Atlanta while discussions between the parties were underway. [3/2/22

a.m. Trial Tr. 22:18-23:23-9 (Harris Direct) (the deadline "was agreed to by the parties as part of an overall conversation.").]

104.    On May 17, 2012, at 12:50 a.m. EST, Derex Walker wrote Rich Ehrlich that "Ron [Burkle] is reaching out to Steve Deckoff" and that they would "be in touch re: the lock-up after they've connected." [3/2/22 a.m. Trial Tr. 22:18-23:23-9 (Harris Direct) (the deadline "was agreed to by the parties as part of an overall conversation.").] However, by 11:00 a.m. EST time on May 17, 2012, Mr. Deckoff had not heard from Mr. Burkle, nor had Yucaipa provided any comments to the May 16 Draft Letter Agreement. At 11:50 a.m. EST, Mr. Harris's colleague (Victoria Lepore) wrote Yucaipa representatives and their counsel:

> We have not received any comments from you on the draft agreement we distributed last night.  Nor have we received any written indication that Yucaipa and Allied have agreed to extend the representations previously given regarding the commencement of voluntary chapter 11 cases.  Further, despite representations that principals to Yucaipa would be reaching out to principals of BD/S, no such communication has been made.  As a result, unless we receive extension agreements from each of Yucaipa and Allied by 12 noon today, the clients have authorized us to file the involuntary petitions.
>
> This information has already been conveyed to Kasowitz and BD/S has tried to reach Derex Walker by telephone as well.
>
> We look forward to your response. [DX L at 3 (Email from Victoria Lepore to Ira Tochner and others Re: Allied dated May 17, 2012).]

105.    Around 12 p.m. EST on May 17, 2012, Yucaipa and Allied each agreed to extend the standstill agreement — that they would not cause the Company to file for bankruptcy — until 5:00 p.m. EST that day. [PX NNN at 1 (Email from Adam Grant to Adam Harris dated May 17, 2012 at 12:04 p.m.) ("This will confirm our agreement to extend the agreement below to 5 PM today, NY Time."); PX OOO (Email from John Blount to Derex Walker and others dated May 17, 2012 at 12:05 p.m. EST) ("Agreed on behalf of Allied").]   Derex Walker also provided further assurances that Mr. Burkle would be reaching out to Mr. Deckoff. [*See* DX L at 2 (Email from Rich Ehrlich to Jeffrey Schaffer Re: Allied dated May 17, 2012 at 1:09 PM) ("Derex said that Ron knows to call Steve…"); Ex. 477 (Email from Rich Ehrlich to Steve Deckoff Re: Burkle at 3:49 p.m.) ("Spoke to Derex.  He said that Ron should have called in the last few minutes or will be calling shortly.").]

106.    Mr. Deckoff testified that he was aware that Mr. Burkle was supposed to call before 5:00 p.m. on May 17, 2012, and that he was in the office "waiting for this phone call and the phone call shockingly never came." [3/1/22 p.m. Trial Tr. 181:5-10 (Deckoff Cross); *see also* 3/1/22 p.m. Trial Tr. 181:13-15 (Deckoff Cross) (explaining that "Mr. Burkle knows my cell phone number, and Mr. Burkle also knows my office number, and Mr. Burkle has left messages with my secretary before.").]   Mr. Deckoff did not call Mr. Burkle.  [3/3/2022 Trial Tr. at 62:4-62:24] [Burkle Cross] (testifying that "he has my phone number and we call each other direct."); *see also* [3/3/2022 Trial Tr. at

89:11-90:4] [Burkle Cross] (testifying that he was shocked BD/S filed the Involuntary Petition and could not comprehend why Deckoff waited all day for his call because, "[t]o this day we call each other all the time. And he has my cell number. He has my home number. He has every number I have. And he testified he sat around all day hoping I would call.").]

107.    Yucaipa did not provide any comments on the May 16 Draft Letter Agreement either before the 5:00 p.m. deadline or thereafter. [3/2/22 a.m. Trial Tr. 24:10-14 (Harris Direct) ("Not prior to 5:00 p.m. Not ever.").]  Per Ms. Lepore's email earlier that day, BD/S therefore filed an involuntary bankruptcy petition for Allied at 5:45 p.m. on May 17, 2012. [DX B (Notice of Bankruptcy Case Filing).]

108.    Allied subsequently consented to the Bankruptcy and Allied and certain affiliates filed voluntary Chapter 11 Petitions.

## M. JCT's Eventual Purchase of Substantially All of Allied's Assets in Late 2013

109.    Following commencement of the Bankruptcy, JCT remained interested in acquiring Allied. [3/2/22 a.m. Trial Tr. 27:9-28:12 (Harris Direct); Ex. 128 at 10 (Email from Jesse Austin (JCT's counsel) to Adam Harris Re: Allied dated May 17, 2012) ("My client still wants to buy the company.").]

110.    In September 2013 — after it was judicially determined that Yucaipa caused Allied to enter into the Fourth Amendment, which was "flatly prohibited" under the Credit Agreement and therefore was not the Requisite Lender — an auction

for Allied's assets was held under 11 U.S.C. § 363. [Stip. Fact ¶60; PX XX (Transcript of Auction dated September 11, 2013); PX YY (Transcript of Auction dated September 12, 2013).]

111. At this auction, JCT submitted a bid to buy substantially all of Allied's assets for $135 million, which the Court approved. [Stip. Fact. ¶ 61; *see* 12-11564, D.I. 1837 (Sale Order dated September 17, 2013); DX Z (copy of same).] BD/S as confirmed Requisite Lenders placed a successful credit bid for $5 million for certain real estate assets on behalf of the First Lien Lenders. [*See* 12-11564, D.I. 1868) (Order Authorizing and Approving Sale of Assets dated September 30, 2013).]

112. The JCT 363 Sale closed on December 27, 2013. [Stip. Fact. ¶ 62; *see* 12-11564, D.I. 2127 (Report of Sale of Debtors' Assets dated December 31, 2013); DX BB (copy of same).]

**N. Damages**

113. The Trustee retained Jeffrey Risius, a managing director with Stout, Risius, Ross, as her damages expert. Mr. Risius testified as a live witness before the Court on March 4, 2022. The Trustee offered no other testimony from any other expert witness at trial to carry her burden of proof on the issue of damages.

114. Although Mr. Risius testified at length about his valuation experience Mr. Risius did not perform an independent enterprise valuation of Allied in this case. [3/4/2022 a.m. Trial Tr. at 8:5-11:10 (Risius Direct); 3/4/2022 a.m. Trial Tr. at 40:5-22;

42:3-8 (video played for impeachment)] (Risius Cross).]  Instead, as discussed below,

Mr. Risius calculated damages arising from the failed JCT transaction by implying an

enterprise value for Allied based upon a preliminary and non-binding term sheet sent

by JCT to BD/S on December 19, 2011 (the "December 19 Term Sheet").  [3/4/2022 a.m.

Trial Tr. At 21:10-22:7 (Risius Direct); 3/4/2022 a.m. Trial Tr. at 43:16-44:3; *see also*

105:19–23 (Risius Cross).]  In short, Mr. Risius concluded that Allied's value was

approximately equal to the face amount of its outstanding First Lien Debt. [3/4/2022

a.m. Trial Tr. at 78:15-18 (Risius Cross).]  He reached this conclusion by assuming that

JCT would have, pursuant to the terms of the December 19 Term Sheet: (i) purchased all

of Allied's First Lien Debt, from all holders of that debt, (ii) paid "par" for all of Allied's

First Lien Debt (with the exception of CIT, as to which JCT proposed to pay less than

par, and Yucaipa, as to which JCT proposed to pay more than par), and (iii)

subsequently credit bid the full amount of the First Lien Debt to acquire Allied's assets

in a "pre-negotiated" bankruptcy case that would have cost Allied no more than $5

million in chapter 11 restructuring expenses to implement.  [3/4/2022 a.m. Trial Tr. at

58:10-12 (Risius Cross).]  This assumption is in direct conflict with Deckoff's testimony

at trial that the December 19 Term Sheet was not acceptable to BD/S and that BD/S

would not have proceeded with this transaction.  [*See* 3/1/2022 a.m. Trial Tr. at 78:5

(Deckoff Direct) (testifying that "this transaction wasn't acceptable to us . . . ."); *see also*

3/1/2022 p.m. Trial Tr. at 130:2-5 (Deckoff Cross) ("Had you agreed on December 19,

2011, had you agreed that you would provide bridge financing? We hadn't agreed to this deal because we weren't treated equally and ratably in this deal.").]

115.    The Trustee's claims for damages at trial were based solely upon the failed JCT transaction, as calculated by Mr. Risius under the proposed December 19 Term Sheet. [3/4/2022 a.m. Trial Tr. at 21:10-22:7 (Risius Direct); 3/4/2022 a.m. Trial Tr. at 43:16-44:3 (Risius Cross).]    At a high level, Mr. Risius concluded that Allied's estate suffered damages of approximately $158.6 million, before interest, arising from the Trustee's claim for breach of fiduciary duty in connection with the failed pre-bankruptcy JCT transaction.    [3/4/2022 a.m. Trial Tr. at 14:9-16 (Risius Direct).] Separately, Mr. Risius concluded that the non-Yucaipa first lien lenders suffered damages of over $72 million, arising from the Trustee's claim for breach of the implied covenant of good faith and fair dealing, again in connection with the failed pre-bankruptcy JCT transaction.    [3/4/2022 a.m. Trial Tr. at 37:6-14 (Risius Direct).]    The difference between the two figures (approximately $86 million) represents losses that were effectively sustained by Yucaipa, itself, from the failure of the hypothetical transaction with JCT under the December 19 Term Sheet.    [3/4/2022 a.m. Trial Tr. at 37:21–38:3 (Risius Direct).]    In other words, a majority of Mr. Risius's concluded damages to Allied's estate is derived from amounts that would have been payable directly to Yucaipa, the Defendant, in the hypothetical JCT transaction.    [3/4/2022 a.m. Trial Tr. at 49:2-10 (Risius Cross).]

**O. Damages to Allied's Estate**

### 1. Implied Enterprise Value From the December 19 Term Sheet

116.    Mr. Risius calculated damages to Allied's estate by first implying an enterprise value for Allied from the December 19 Term Sheet.  [3/4/2022 a.m. Trial Tr. at 43:16-44:3; *see also* 105:19–23 (Risius Cross) ("THE COURT: But you're actually calculating enterprise value based on the numbers in the December term sheet, right? . . .  THE WITNESS: I think that's accurate.").]  Although the December 19 Term Sheet constituted an offer to purchase claims held only by BD/S, it contained a short description of JCT's intent to negotiate separate agreements with each of Spectrum, CIT, and Yucaipa, to purchase claims held by each of those parties against Allied.  [Ex. 90 at 3 ("Buyer will purchase the following claims under the Credit Agreements from Black Diamond, Yucaipa, CIT, and Spectrum provided that Buyer will negotiate separate term sheets and definitive agreements with each seller of such claims").]  JCT also proposed in the December 19 Term Sheet to borrow $120 million from BD/S to finance the cash portion of the proposed consideration.  [Ex. 90.]  Taken together, JCT proposed to finance the entire purchase price consideration described in the December 19 Term Sheet.  [3/4/2022 p.m. Trial Tr. at 92:6-21 (Fischel Direct).]

117.    The December 19 Term Sheet stated that JCT intended to "purchase the following claims under the Credit Agreements from Black Diamond, Yucaipa, CIT and Spectrum:" (1) first lien term loans having a principal balance of approximately $150 million, (2) first lien revolving loans having a principal balance of approximately $35

million, and (3) first lien letters of credit having a principal balance of approximately $30 million. [Ex. 90.] Thus, JCT stated in its offer to BD/S that it would propose to purchase first lien claims having an aggregate principal balance of approximately $215 million from four lenders; i.e., Black Diamond, Yucaipa, CIT and Spectrum. The term sheet said nothing about JCT's interest in purchasing any additional First Lien Debt or about purchasing debt held by any other first lien lenders. [3/4/2022 a.m. Trial Tr. at 91:16-19 (Risius Cross).]

118.    Nevertheless, Mr. Risius concluded that JCT was actually proposing in December 2011: (i) to purchase all $244 million in outstanding first lien claims against Allied from all holders of that debt, including multiple holders with which JCT never negotiated, and (ii) to pay the full face amount of all First Lien Debt held by any such other lenders. [3/4/2022 a.m. Trial Tr. at 65:16-66:4; 89:1-5; 91:20-92:5 (Risius Cross).] The December 19 Term Sheet provided that JCT's offer to BD/S was subject to the negotiation of "separate term sheets and definitive agreements" with each of Black Diamond, Yucaipa, CIT and Spectrum; it made no reference to any agreement to be negotiated with any other holder of claims against Allied. [*See* Ex. 90.] Hence, by assuming that JCT would have purchased any claims in excess of the $215 million identified in the December 19 Term Sheet, Mr. Risius added approximately $29 million to Allied's value, as implied by that term sheet.

119.    Mr. Risius defended his conclusion that JCT would have paid par for all first lien loans held by other lenders by citing "subsequent term sheets which had purchase language in it for the residual lenders."  [3/4/2022 a.m. Trial Tr. at 24:2-10 (Risius Direct).]  However, his alleged reliance on one subsequent term sheet for this purpose cannot be squared with his decision to ignore JCT's proposals to pay lenders other than Yucaipa far less than par in other subsequent term sheets.  Mr. Risius testified that he relied on the December 19 Term Sheet, even though that term sheet did not include an offer to any residual lenders, because it would not be credible to cherry pick favorable terms from different term sheets that JCT provided during the course of the negotiations.  [3/4/2022 a.m. Trial Tr. at 21:10-22:7 (Risius Direct); 3/4/2022 a.m. Trial Tr. at 147:15-148:4 (Risius Cross).]  Nevertheless, that is what Mr. Risius has done here.  Further, the March 8, 2012 term sheet sent to Yucaipa, which is the only term sheet that mentions the purchase of claims held by other lenders, stated that JCT would purchase claims held by other lenders at a price "up to par plus accrued and unpaid interest."  [Ex. 122 at 14.]  That term sheet did not constitute an offer to any lender other than Yucaipa, however, and it provided no assurance that JCT would, in fact, purchase any claims held by any such lenders at par, as Mr. Risius assumed.

120.    According to Mr. Risius, JCT would only have agreed to purchase Allied's First Lien Debt upon the simultaneous agreement by all parties on the terms of a pre-negotiated chapter 11 bankruptcy case for Allied, which would conclude within 90

days, and in which Allied's assets would be sold to JCT pursuant to 11 U.S.C. § 363 in exchange for a credit bid by JCT of the full principal amount of all of Allied's First Lien Debt.  [3/4/2022 a.m. Trial Tr. at 42:9-16 (Risius Cross).]  Mr. Risius acknowledged on cross-examination, however, that JCT had not, in fact, negotiated any such terms of a potential credit bid with any party as of December 19, 2011 and that no such agreement was ever reached between any of the parties.  [3/4/2022 a.m. Trial Tr. at 44:16-19 (Risius Cross).]  Hence, notwithstanding Mr. Risius's assumption to the contrary, JCT might have been expected to credit bid far less than the full principal amount of all of Allied's First Lien Debt in the context of any bankruptcy sale of Allied's assets, which would have translated to substantially less value for Allied's estate than Mr. Risius assumed, and potentially less value than Allied's estate actually realized in 2013.

### 2.  Estimated Expenses

121.    After arriving at an implied value of over $244 million for Allied, Mr. Risius reduced that figure by $5 million, which he testified was an "extremely conservative" estimate of the expenses associated with a pre-negotiated bankruptcy process lasting 90 days.  [3/4/2022 a.m. Trial Tr. at 31:21-32:5; 44:4-6; 66:5-8; 95:21-96:21 (Risius Cross).]  Mr. Risius based the $5 million estimate of expenses entirely on his own experience and on the opinions of certain of his co-workers, to which he described the circumstances of the case generically.  [3/4/2022 a.m. Trial Tr. at 31:21-32:5 (Risius Direct).]

122.    No evidence was presented by the Trustee to support Mr. Risius's assumption that a pre-negotiated bankruptcy of any sort – let alone one that could be concluded within 90 days – was plausible for Allied, a complex operating business that had billions of dollars of debt in addition to that held by the first lien lenders.  Notably, Allied was the subject of a chapter 11 bankruptcy case that was commenced in 2012, in which it took more than three and a half years to confirm a plan, and in which Allied's assets were actually sold to JCT in 2013 (the "363 Sale") in a Court-supervised process that was not approved until 16 months after Allied's petition date.  [Stip. Fact ¶¶ 60, 62, 64.]

123.    In estimating the expenses associated with a hypothetical Allied bankruptcy case at $5 million, Mr. Risius ignored evidence of expenses that Allied's estate actually incurred in Allied's real-life chapter 11 case.  [3/4/2022 p.m. Trial Tr. at 104:25-105:20 (Fischel Direct).]  Mr. Risius acknowledged that Allied's estate paid from the proceeds of the 363 Sale approximately $79 million to satisfy obligations of the estate that had been incurred through the date of the 363 Sale, including over $29 million to pay off a DIP loan, nearly $9 million to fund an expense reserve, $12.5 million to fund winddown reserves, and over $28 million to pay prepetition expenses. [3/4/2022 a.m. Trial Tr. at 93:21-94:13 (Risius Cross).]  Mr. Risius did not account for these actual expenses – which alone total approximately half the amount of his concluded damages to the estate – when arriving at his $5 million estimate of expenses.

[3/4/2022 a.m. Trial Tr. at 97:1-5 (Risius Cross).] His estimate of expenses also did not include those that would have been incurred in connection with negotiating and documenting term sheets between JCT and each of the selling lenders, final debt sale agreements, prepetition agreements concerning the terms of an Allied bankruptcy filing, asset sale agreements, and the like. [3/4/2022 a.m. Trial Tr. at 94:25-95:20 (Risius Cross).] Mr. Risius failed to identify any expenses actually incurred in the Allied bankruptcy which would not have been incurred in the hypothetical 90 day sale process he considered.

### 3.  Assumed Benefit to Allied's Estate

124.    According to Mr. Risius, "Allied's estate would have received net proceeds in the amount of $239 million and change" in a hypothetical transaction with JCT.  [3/4/2022 a.m. Trial Tr. at 46:4-7 (Risius Cross).]  When pressed, however, Mr. Risius acknowledged that, had the transactions described in the December 19 Term Sheet been consummated, Allied would not have received any cash "proceeds"; rather, Allied's estate would have benefited only if JCT would be the successful bidder at a hypothetical auction of Allied's assets at which JCT would have credit bid the entirety of the purchased debt.  [3/4/2022 a.m. Trial Tr. at 47:3-12 (Risius Cross).]  By contrast, in reality, Allied's estate received approximately $135 million in cash proceeds in the 363 Sale, as well as additional consideration from the sale of certain other assets. [3/4/2022 a.m. Trial Tr. at 32:10-33:22 (Risius Direct).]

125.    Mr. Risius further acknowledged that any cash proceeds in the December 19 Term Sheet transaction would have been paid directly to the selling lenders with which JCT was negotiating individual debt purchase transactions.  [3/4/2022 a.m. Trial Tr. at 47:13-48:2; 75:4-11 (Risius Cross) ("The cash was going to go to the holders of the first lien debt as part of all of these term sheets.").]  Indeed, $150 million – over 60% of the total consideration that JCT was allegedly proposing to pay in the transaction – would have gone directly to Yucaipa under the term sheet forming the basis for Mr. Risius's opinion.  [3/4/2022 a.m. Trial Tr. at 49:2–10; 88:1–6; 88:12–19 (Risius Cross).]

126.    Mr. Risius ultimately concluded that Allied's estate suffered damages in the amount of approximately $158.6 million, before interest, by reducing the $239.2 million "net proceeds" figure by $80.616 million, which he found was the amount actually recovered by Allied's first lien lenders in Allied's bankruptcy case.  [3/4/2022 a.m. Trial Tr. at 49:25-50:10; 67:2-6 (Risius Cross).]  In other words, Mr. Risius calculated damages to Allied's estate by reference to the amount that Allied's first lien lenders received in Allied's bankruptcy case, rather than by what Allied' estate actually received directly.

127.    This distinction is significant.  The Court approved a sale of substantially all of Allied's assets to JCT in 2013 for $135 million.  [Stip. Fact ¶ 60.]  As discussed above, Allied used most of the sale proceeds to satisfy obligations of the estate, including amounts owed on a debtor-in-possession loan, certain prepetition expenses,

and wind-down expenses.  Mr. Risius did not reduce his damages figure by those amounts.  Rather, he assumed that if proceeds of the 363 Sale did not go to Allied's first lien lenders, Allied's estate did not benefit from those proceeds.  [3/4/2022 a.m. Trial Tr. at 83:16-19 (Risius Cross) ("I'm looking at this defining the estate as all of the stakeholders, the first lien debt holders, and so forth, so that didn't enter into that calculation because the estate is the lender.").]  However, as the Court observed at trial, Allied's estate consisted of a much broader array of creditors, which Mr. Risius failed to consider in his analysis.  [3/4/2022 a.m. Trial Tr. at 83:21-84:2 (Risius Cross) ("THE COURT: Well, there are other claims, right? There are admin claims, secured claims, unsecured claims, DIP claims.  THE WITNESS: Fair.  THE COURT: The company couldn't [sic] gone into even a 90-day bankruptcy without a DIP, right?  THE WITNESS: Right. Right.").]

128.    In calculating damages, Mr. Risius further assumed that JCT would credit bid the full amount of Allied's First Lien Debt in exchange for Allied's assets, which would have eliminated all first lien claims against Allied's estate.  [3/4/2022 a.m. Trial Tr. at 84:14-20 (Risius Cross) ("THE COURT: . . .  You just assumed they credit bid the whole amount.  THE WITNESS: Yes.").]  However, the December 19 Term Sheet did not require JCT to credit bid any debt in exchange for Allied's assets.  [Ex. 90; *see also* 3/4/2022 a.m. Trial Tr. at 87:19-24 (Risius Cross) ("Q . . . Can you please point the Court to the requirement in the December 19, 2011 Term Sheet that JCT had to credit bid any

amount at a 363 sale? . . . A I don't recall that being in there.").] Moreover, when JCT

attempted to negotiate definitive documents with Allied and Yucaipa in April 2012, the

parties included a rather typical provision in a draft asset purchase agreement that

would have permitted JCT to bid "up to" the amount of the purchased debt. [DX X at

117.]

129.    As the Court observed at trial, it was unreasonable for Mr. Risius to

assume that Allied's estate suffered any damages under the circumstances:

> "THE COURT: So I'm just trying to figure out. You talk
> about implied enterprise value to the estate based on
> purchase prices of secured debt. But if the purchase price of
> the secured debt includes a premium, say a control
> premium, and when you actually go to bankruptcy, you
> don't bid the entire $200-and-something million, say you bet
> [sic] a 100 million, isn't a fair estimate of enterprise value
> based on a credit bid, the actual amount of the credit bid
> than what someone necessarily paid for the debt that they
> used for the credit bid? And we don't know what that
> amount would have been, right?
>
> THE WITNESS: Right." [3/4/2022 a.m. Trial Tr. at 84:3-13
> (Risius Cross).]

130.    Had Mr. Risius's presumed hypothetical series of transactions been

consummated, and JCT had not credit bid the full amount of the purchased debt, JCT

would have continued to hold claims against Allied's estate, in place of Allied's existing

first lien lenders. [3/4/2022 p.m. Trial Tr. at 86:11-87:1 (Fischel Direct).] In that event,

the estate might well have been left worse off than it was following the 363 Sale. Any

determination to the contrary would be purely speculative.

### 4. The December 19 Term Sheet Was Preliminary and Highly Conditional.

131. The December 19 Term Sheet was conditioned upon numerous events that did not occur as of December 2011, and in many cases could never have occurred. For example, the December 19 Term Sheet required BD/S to extend financing to JCT, but the parties had not agreed to terms in December 2011 and never agreed to such terms. [3/4/2022 a.m. Trial Tr. at 120:18–121:1 (Risius Cross).] While the Trustee argued at trial that this condition was removed by JCT in subsequent term sheets, Mr. Risius's analysis was based on the December 19 Term Sheet, not such subsequent term sheets. [3/4/2022 a.m. Trial Tr. at 43:16-44:3; *see also* 105:19-23 (Risius Cross).] Importantly, even though there is no dispute that JCT needed financing to consummate the hypothetical transaction, no evidence was presented at trial that JCT had obtained a financing commitment from any other source. [3/1/2022 p.m. Trial Tr. at 132:13-25 (Deckoff Cross) (testifying that JCT needed financing for the transaction proposed by the December 19 Term Sheet).] JCT was also requiring, in order for the parties to conduct diligence, that BD/S enter into confidentiality agreements with JCT. [Ex. 90.] But no such confidentiality agreements, or "NDAs" had been signed between JCT and BD/S as of January 2012. [*See* Ex. 468; *see also* 3/1/2022 p.m. Trial Tr. at 135:3-24 (Deckoff Cross) (testifying that he did not know whether BD/S and JCT had entered into a confidentiality agreement to enable required diligence at the time of the December 19 Term Sheet); *see also* 3/1/2022 p.m. Trial Tr. at 142:20-24 (Deckoff Cross).] JCT was also requiring as part of an agreement with BD/S, that BD/S enter into a three-

year non-compete agreement.  [Ex. 90.]  This, among other things in the December 19

Term Sheet, was unacceptable to Spectrum.  [*See, e.g.*, Ex. 127 at 1 (April 2012 Schaffer

email to JCT stating that "we will not agree to a 'non-compete' of any kind with our

investments.").]  JCT's agreement to purchase BD/S's debt was also conditioned on the

"negotiat[ion of] separate term sheets and definitive documents with each" of Yucaipa,

Black Diamond, CIT, and Spectrum.  [Ex. 90; *see also* 3/4/2022 a.m. Trial Tr. at 140:10–

141:4 (Risius Cross).]  But no such definitive agreements had been finalized between

JCT and any lender in December 2011 or at any time thereafter.  [3/4/2022 a.m. Trial Tr.

at 123:23–124:10 (Risius Cross).]

132.    In addition, the December 19 Term Sheet was conditioned upon the

satisfaction of all conditions to which JCT would ultimately agree with Yucaipa, none of

which had been agreed as of December 19, 2011.  [Ex. 90; *see also* 3/4/2022 a.m. Trial Tr.

at 124:22–125:10 (Risius Cross) ("This was non-binding, and so it wasn't agreed to.  So it

was -- it was a whole list of things had to happen -- had to happen before you have a

definitive agreement.").]  The conditions that JCT was demanding at the time in its

separate negotiations with Yucaipa included, among other things: (i) JCT conducting

diligence and confirming that Allied had "sustainable annual EBITDA in excess of $40

million"; (ii) releases of claims between JCT, Allied, Yucaipa, and other lenders; (iii) JCT

obtaining the consent of its existing lenders to consummate the transactions; (iv) JCT

obtaining governmental and regulatory consents; (v) an agreement among the lenders

and the first lien agent that Yucaipa represents the Requisite Lender, which was then being hotly disputed; and (vi) the dismissal of certain litigation.  [Ex. 118.]  None of these conditions had been satisfied at the time, but Mr. Risius did not discount his opinion of damages as a result.  [3/4/2022 a.m. Trial Tr. at 140:7-9 (Risius Cross); *see also* 3/1/2022 p.m. Trial Tr. at 135:3-24; 137:1-9 (Deckoff Cross) (testifying that he did not know whether BD/S and JCT had entered into a confidentiality agreement to enable required diligence at the time of the December 19 Term Sheet); 3/1/2022 p.m. Trial Tr. at 145:12-16 (Deckoff Cross) (testifying that BD/S and JCT had not executed an NDA as of January 2012); 3/1/2022 p.m. Trial Tr. at 145:12-16 (Deckoff Cross) (testifying that no non-compete had been signed at the time of the December 19 Term Sheet).]  Rather, he simply assumed that "a deal was able to be had with JCT," regardless of the conditions demanded by JCT, which were never met.  [3/4/2022 a.m. Trial Tr. at 125:11–126:1 (Risius Cross).]

133.    Although it was a condition to any transaction, JCT had not performed any diligence on Allied at the time that it sent the December 19 Term Sheet to BD/S and JCT was not aware of Allied's financial condition at the time.  [3/4/2022 a.m. Trial Tr. at 136:10–15 (Risius Cross) ("Q. Isn't it true, sir, that there was no due diligence done by the time the December 2011 Term Sheets, one to Yucaipa, one to Black Diamond/Spectrum, there was no due diligence done by then, and the due diligence that occurred occurred [sic] well after that time? Isn't that true? A. Yes.").]  In fact, JCT

had not conducted any due diligence on Allied until after the Petition Date. [3/2/2022 p.m. Trial Tr. at 83:23-83:15 (Tochner Cross) (testifying that JCT had not done due diligence in connection with any pre-bankruptcy proposals); 3/1/2022 p.m. Trial Tr. at 140:22-141:3 (Deckoff Cross).]

### 5. The December 19 Term Sheet Was Not Binding or Acceptable to Black Diamond

134.    By its terms, the December 19 Term Sheet was not a final term sheet and was not binding on any party.  [Ex. 90 ("The terms and conditions summarized herein are provided for discussion purposes only, and are nonenforceable or binding on any parties hereto"); 3/4/2022 a.m. Trial Tr. at 54:12-21 (Risius Cross) (stating that the December 19 Term Sheet "clearly wasn't" final and that there were a number of term sheets thereafter); 3/4/2022 a.m. Trial Tr. at 122:8-10 (Risius Cross) ("Q. There is[n't] one thing in Exhibit 90 that's binding. Isn't that true? A. Correct.").]   No party, including BD/S, ever agreed to the terms of the December 19 Term Sheet.  [3/4/2022 a.m. Trial Tr. at 74:2–9 (Risius Cross).]  Indeed, Mr. Deckoff testified that the December 19 Term Sheet was not acceptable to BD/S.  [3/1/2022 a.m. Trial Tr. at 78:19-24 (Deckoff Direct).]  As a result, no transaction could have been consummated on the terms outlined in the December 19 Term Sheet relied upon by Mr. Risius in support of his damage calculations because BD/S – the only party to which that term sheet was addressed – did not agree to its terms.

135.    Moreover, any deal with JCT was predicated on JCT reaching agreements with multiple other parties through separate negotiations.  [Ex. 90.]  As Mr. Risius testified: "A deal never happened with any of the parties because -- and a deal wouldn't have happened with any of the parties because JCT was only going to do it if they got everybody on the same page and had a deal that happened because they weren't interested in Black Diamond's debt, Yucaipa's debt, CIT's debt or Spectrum's debt on a standalone basis."  [3/4/2022 a.m. Trial Tr. at 74:2–9 (Risius Cross).]

### 6.    The December 19 Term Sheet Was Superseded by Subsequent Term Sheets That Contemplated Lower Values.

136.    As discussed above, Mr. Risius calculated damages on the basis of the December 19 Term Sheet.  However, JCT and BD/S did not reach agreement on the terms of the December 19 Term Sheet, and those parties continued to negotiate on and off until May 2012.  [3/4/2022 a.m. Trial Tr. at 54:12-15 (Risius Cross) ("Q. . . . did you see any evidence that the December 19, 2011, term sheet was a final term sheet?  A. Oh, it clearly wasn't.  There was a number of term sheets thereafter. . . "); *see also* 3/1/2022 p.m. Trial Tr. at 148:12-14 (Deckoff Cross) (December 19 Term Sheet was superseded by later term sheets).]  During that period, JCT sent multiple term sheets to BD/S in which JCT proposed to pay materially less to BD/S than it proposed to pay in the December 19 Term Sheet.  [*See, e.g.*, Ex. 123 (May 2012 BD/S Term Sheet); Ex. 471 (proposing to pay BD/S as little as 60% of par); 3/4/2022 a.m. Trial Tr. at 58:1-9 (Risius Cross) (acknowledging that JCT proposed to pay less in the May 2012 term sheet).]

Nevertheless, Mr. Risius ignored these later term sheets in favor of the December 19

Term Sheet, from which he could imply a higher value for Allied.  [3/4/2022 a.m. Trial

Tr. at 58:1-13 (Risius Cross).]

137.    As noted above, JCT sent a term sheet to Yucaipa on or about December

15, 2011, which conditioned any transaction with Yucaipa on diligence that would

confirm that Allied had "sustainable annual EBITDA in excess of $40 million."  [Ex.

118.]  Allied actually had negative EBITDA in 2011 of over $29 million.  [3/4/2022 a.m.

Trial Tr. at 128:1-16 (Risius Cross).]  Moreover, no evidence was produced to suggest

that Allied could have sustainable annual EBITDA in excess of $40 million in the future.

[*Cf.* 3/4/2022 a.m. Trial Tr. at 96:15-17 (Risius Cross) ("THE COURT: Now, the

company – in 2011 and 2012, the company had negative EBITDA; correct?   THE

WITNESS: Reported, yes.").]  Thus, JCT appears to have believed in December 2011 –

before it had the opportunity to conduct diligence – that Allied was a profitable

company when, in fact, it was not.

138.    As JCT began to receive information about Allied's true financial

condition, it lowered its offers dramatically.  An email chain dated August 17, 2012

indicates that, after Allied's investment banker provided certain financial information

about Allied to JCT and its professionals in August 2012, Mr. Riggs expressed shock

and concern:

> "Based on 2012 year-to-date financial results, Allied is
> running $17 million lower (annualized) EBITDA than we

projected based on our snapshot of 2011. So earnings are going the wrong way. Even more troubling, the attached CIM we received from Rothchild makes no sense.   The projected Allied capex is almost as large as the forecasted EBITDA over the next four years. See page 59. . . . If these capex figures are accurate, then are all your 1,200-part [*sic*] trucks junk? In addition, there is no demonstrable way Allied can ever achieve the EBITDA level that they forecast."

". . . . Even if they miraculously did hit their EBITDA projections, which is highly doubtful, it is almost a negative cash flow projection for the next four years. Maybe I am missing something, but given its overall tone, I assume the CIM was supposed to be a 'selling document' from Rothchild. Instead it almost appears you're trying to scare me off.   This poor performance and unbelievable set of projections is making it much more difficult for Barclay's to get committed financing." [3/4/2022 a.m. Trial Tr. at 132:22-134:8 (Risius Cross) (quoting Ex. 97).]

139.   However, Mr. Risius understood that, even by August 2012, JCT still had only a limited window into Allied's true financial condition.  [3/4/2022 a.m. Trial Tr. at 135:24-136:9 (Risius Cross) (". . . . due diligence means something to me.  As I read this e-mail, I read this as they were very early on in the process.  So I'm not sure due diligence had really been conducted because he just received the confidential information memorandum.  That would be that, you know, JCT's due diligence hadn't begun, that they were just relying on the sales document at that point.").]

140.   On August 23, 2012, just days after sending this email, JCT submitted a bid directly to Allied's board to acquire Allied's assets, which Mr. Risius valued at $40 million in cash plus $80 million in second lien term loans, non-voting common stock, and an "assumed liability amount."  [3/4/2022 a.m. Trial Tr. at 135:13-19 (Risius

69

Cross).]  Although this proposal described a much simpler asset sale transaction from JCT's perspective than the multi-step transaction described in the December 19 Term Sheet, it was still at a lower price and with materially less valuable consideration.  Mr. Risius refused to admit that JCT would likely have been willing to pay more for Allied if it had been a highly profitable company, as contemplated by the December 19 Term Sheet, than an unprofitable company, which JCT discovered to be the case in August 2012.  [3/4/2022 a.m. Trial Tr. at 128:17-21 (Risius Cross).]

141.    Allied's board of directors and its advisors rejected JCT's August 2012 proposal as unacceptable because they did not believe that it was a real commitment. [Ex. 641.]  That proposal was conditioned on, among other things, JCT renegotiating the terms of Allied's contracts with third parties.  [Ex. 641 at 3 (describing the proposal as "a re-trade with a lot of open items subject to further re-trade" and that "[t]he most glaring issue with the proposal, according to Mr. Antinelli, was the fact that it was contingent on the renegotiation of the Company's contract with Ford, resulting in at least $20 million in additional annual revenue, with the negotiations to be handled by JCT.").]  The Board minutes indicate:

> Mr. Antinelli opined that this provision represented an obvious opportunity for JCT to continue renegotiating the proposal, and concluded that the Company obviously could not stand by while its largest competitor renegotiated the Company's contract with its largest customer. . . Mr. Gendregske stated that pursuing the JCT deal as structured would be a terrible strategy. He said that JCT would have more leverage to get what it wanted from Ford after the deal

was done, and that going to Ford in advance would likely
kill the Company.  Mr. Antinelli expressed his complete
agreement. He then stated that Barclays was not likely to
come up with a better financing structure than anchor and
arrange. He then noted the current proposal, when
compared to the prior proposal, represented $15 million less
cash, $75 million less paper, elimination of the $20 million
non-compete payment, and elimination of the $6.5 million
payment obligations to management. . ." [Ex. 641 at 2-3.]

142.    Additionally, Allied's Board and advisors were of the opinion that JCT

may not be able to obtain financing for a purchase of Allied at $200 million and

expressed doubt as to whether JCT could obtain the necessary bondholder consent for

such a transaction because the bondholders felt that at $200 million JCT was overpaying

for Allied.  [Ex. 641 at 2.]  Even after conducting an extensive marketing campaign,

Allied yielded no significant interest from other potential purchasers.  [Ex. 641 at 12

(summarizing the marketing process and noting that Rothschild had contacted 91

parties and 16 NDAs had been executed with potential buyers).]

143.    Having failed to reach agreement with JCT, Allied sought approval from

the Court in May 2013 to sell its assets in the 363 Sale.  [D.I. 1175.]  Although Allied

solicited interest in the sale from 91 potentially interested parties, JCT and BD/S,

through a credit bid, were the only parties to express a firm interest in acquiring

Allied's assets.  [*See* Ex. 641; 3/2/2022 p.m. Trial Tr. at 88:3-16 (Tochner Cross).]

Ultimately, JCT submitted a winning bid of $135 million in cash for substantially all of

Allied's assets, after increasing its bid as a result of competing credit bids submitted by

BD/S. [Stip. Fact ¶ 60.] Mr. Risius did not discount his damages calculations to reflect these subsequent developments to the December 19 Term Sheet.

### 7. Value of the Proposed JCT Note Consideration.

144. By its terms, JCT proposed in the December 19 Term Sheet to provide 100% of the consideration payable to BD/S, and a majority of the total consideration payable to all selling lenders, in the form of new notes to be issued by JCT (the "JCT Notes"). [Ex. 90.] Mr. Risius valued those JCT Notes at par in calculating damages to Allied's estate. [3/4/2022 a.m. Trial Tr. at 102:12-19 (Risius Cross).] Mr. Risius assumed the debt consideration proposed to be tendered by JCT in the transaction would trade at par, simply because JCT's existing debt had traded around par prior to December 2011. [3/4/2022 a.m. Trial Tr. at 104:6-13 (Risius Cross).] Mr. Risius did not perform a credit analysis with respect to JCT and did not consider the implications to JCT or its creditors of JCT's incurrence of over $200 million in new debt to finance the proposed transaction. [3/4/2022 a.m. Trial Tr. at 104:14-23 (Risius Cross).] In December 2011, when JCT's notes had traded at par, JCT had approximately $155 million in debt outstanding. [PX Y.] Had JCT financed this transaction as proposed in the December 19 Term Sheet, it would have far more than doubled its debt load.

145. Mr. Risius testified that he never looked at JCT's financial statements, never did any credit analysis with respect to JCT, and never considered whether JCT could even service the debt that would be incurred in the proposed transaction.

[3/4/2022 a.m. Trial Tr. at 109:5-13 (Risius Cross).]  Mr. Risius also did not discount the value of the debt that JCT was offering, even though he was aware that JCT was in default on its outstanding notes while it was negotiating with Allied's lenders (though it had failed to disclose that default in the context of its negotiations with Allied's lenders).  [3/4/2022 a.m. Trial Tr. at 109:14-22 (Risius Cross).]

146.    In addition, the December 19 Term Sheet proposed to provide the selling lenders with the debt consideration only "if and upon" the filing of a bankruptcy case for Allied and the subsequent sale of Allied's assets to JCT in a 363 sale.  [Ex. 90.] Although the debt consideration was made conditional upon a later sale of Allied's assets to JCT (which was not guaranteed), and would be payable, if at all, only at some undetermined time after December 19, 2011, Mr. Risius did not discount the value of that consideration to reflect its conditionality or the delay in payment when calculating damages.  [3/4/2022 a.m. Trial Tr. at 99:19-100:9; 101:1-4 (Risius Cross).]

147.    By contrast, JCT's own offers implied a significant discount in the value of JCT's debt.  Throughout the negotiations, JCT consistently offered to pay Allied's lenders less in cash than it would in new debt.  [*See, e.g.*, Ex. 471 (email dated March 8, 2012 summarizing two alternatives proposed by JCT to BD/S, as "1) We can receive 70% of par - of which, 50% would be paid in Modified Jack Cooper bonds at First Close and 50% in Modified Jack Cooper bonds at Second Close. 2) We can receive 60% of par - of which, 25% would be paid in Modified Jack Cooper bonds at First Close and 75% in

cash at Second Close."); Ex. 96 (attaching term sheet dated June 26, 2012 from JCT to Allied offering first lien lenders the option to receive either (i) 57% of principal amount in cash or (ii) 85% of principal in new JCT notes, plus warrants).]  Thus, JCT—which certainly was in a better position than Mr. Risius to value its own debt—consistently discounted the value of its proposed debt consideration in its offers, while Mr. Risius made no attempt to discount that consideration in calculating damages.

### 8.    Losses Attributable to Allied's Bankruptcy.

148.    Mr. Risius testified that Allied likely lost significant operational value as a result of being placed into an involuntary bankruptcy proceeding by BD/S in May 2012. [3/4/2022 a.m. Trial Tr. at 120:6-17 (Risius Cross).]   He further testified that the transactions described in the December 19 Term Sheet were also conditioned upon Allied being placed into bankruptcy.   [3/4/2022 a.m. Trial Tr. at 50:11-22 (Risius Cross).]  In addition, Mr. Risius testified that bankruptcy would likely have been value-destructive for Allied.   [3/4/2022 a.m. Trial Tr. at 120:6-14 (Risius Cross) (". . . . it certainly doesn't help a company in the automotive industry to be in bankruptcy, particularly to be – you have issues with suppliers, customers.  It puts pressure on the business, for sure.").]  Yet, Mr. Risius did not discount the estate's damages for losses that could have been expected to be suffered by Allied in the bankruptcy case that JCT was requiring for Allied under the December 19 Term Sheet.  [*See* 3/4/2022 a.m. Trial Tr. at 17:2-14 (Risius Direct).]

### 9.  Market Prices of Allied's First Lien Debt.

149.    Mr. Risius implied from the December 19 Term Sheet that JCT was willing to pay over $244 million to purchase all of Allied's First Lien Debt in December 2011. [3/4/2022 a.m. Trial Tr. at 43:16-44:3 (Risius Cross).]  That amount is almost exactly equal to the aggregate principal amount of Allied's First Lien Debt that was outstanding at the time; *i.e.*, Mr. Risius's implied enterprise value for Allied was approximately equal to 100% of the principal amount of Allied's First Lien Debt.  [3/4/2022 a.m. Trial Tr. at 78:15-18 (Risius Cross).]  Notably, however, that same debt was trading for 5 to 8 cents of par dollar value at the time.  [3/4/2022 p.m. Trial Tr. at 101:20-103:3 (Fischel Direct); Ex. 805 at Ex. 3A & 3B; 3/4/2022 a.m. Trial Tr. at 79:7-9 (Risius Cross).]  Mr. Risius ignored the actual market trading prices of the debt when calculating damages that were premised upon Allied's value.  [3/4/2022 a.m. Trial Tr. at 104:24-105:10 (Risius Cross); *Cf.* 3/4/2022 a.m. Trial Tr. at 104:24-105:2 ("THE COURT: Well, you do think you're smarter than the market because you didn't value the first lien debt at its market price of 10 cents.  You valued the first lien debt at face value.").]

### 10.  Mr. Risius Calculated Damages as of December 19, 2011.

150.    Mr. Risius calculated damages as of December 19, 2011, even though there was no agreement, even in principle, between any of the parties as of that date, and the transactions described in the December 19 Term Sheet could not have closed on that date.  [3/4/2022 a.m. Trial Tr. at 101:8-17 (Risius Cross).]  As Mr. Risius testified: "[T]his was a term sheet that was sent, that was delivered on December 19th. It was not,

you know, a deal's not going to happen like magic, and close on that date. A deal -- we don't even have an agreement that actually was signed in the "but-for" world, right. And even if there were, there would have been a process, a period of time, 90 days, to get through this 363 sale process pre-negotiated." [3/4/2022 a.m. Trial Tr. at 101:8-17 (Risius Cross).] Nevertheless, Mr. Risius calculated prejudgment interest as accruing beginning on December 19, 2011. [3/4/2022 a.m. Trial Tr. at 101:10-17 (Risius Cross).]

### 11. Lender Damages

151. Mr. Risius separately determined that the Trustee should be awarded, in the alternative, damages of over $72 million before interest, on account of the Lender claim for breach of the implied covenant. [3/4/2022 a.m. Trial Tr. at 37:6-14 (Risius Direct).] Mr. Risius concluded that the damages suffered by the non-Yucaipa first lien lenders should be measured by the difference between (a) what those lenders would have received upon a ratable distribution of the same $239.2 million that he assumed JCT was prepared to pay under the December 19 Term Sheet, after $5 million in hypothetical expenses, and (b) what those lenders actually recovered in Allied's bankruptcy case. [3/4/2022 a.m. Trial Tr. at 142:14–143:4 (Risius Cross).] The only difference between Mr. Risius's calculation of damages to the lenders and the estate is that the former excludes amounts attributed to Yucaipa's share of the proposed purchase consideration equal to approximately $86 million. [3/4/2022 a.m. Trial Tr. at 37:15-38:3 (Risius Direct).]

152.    At trial, however, Mr. Risius acknowledged that the December 19 Term Sheet did not propose ratable treatment for the lenders.    For example, JCT had proposed to pay CIT $20 million in exchange for over $35 million in claims.  [Ex. 90; *see also* 3/4/2022 a.m. Trial Tr. at 143:18-22 (Risius Cross).]    By calculating damages assuming a ratable distribution among the non-Yucaipa lenders, Mr. Risius ignored the discount in JCT's offer to CIT, which increased his damages to the lenders by approximately $15 million.  [3/4/2022 a.m. Trial Tr. at 143:23-144:7 (Risius Cross).]

**12. Expert Testimony Of Daniel R. Fischel Regarding Damages.**

153.    Yucaipa offered the expert testimony of Daniel R. Fischel on the issue of damages and to rebut the expert testimony of the Trustee's damages expert, Jeffrey Risius.  [3/4/2022 p.m. Trial Tr. at 73:12-108:3 (Fischel Direct).] Professor Fischel is the President of Compass Lexecon, an economics consulting firm, and the Lee and Brena Freeman Professor of Law and Business Emeritus at the University of Chicago Law School.    Professor Fischel was formerly dean of that institution and a professor at Chicago's Graduate School of Business.  He has been extensively published in legal and economics journals and has testified in multiple proceedings in federal and state courts across the country, including this Court and the Delaware Chancery Court.  Professor Fischel has been qualified as an expert and testified on valuation, finance, and damages issues on many prior occasions.  [3/4/2022 p.m. Trial Tr. at 73:12-75:15 (Fischel Direct); Ex. 805 at Appendix A.]

154.    With no objection from the Trustee, the Court qualified Professor Fischel to testify as Yucaipa's damages expert in this case.  (Professor Fischel delivered an original expert report dated September 27, 2019 [Ex. 805] and a rebuttal expert report dated November 12, 2019 [Ex. 806]).  Professor Fischel testified as a live witness before the Court on March 4, 2022.

155.    Professor Fischel rendered two primary expert opinions in his reports and live testimony: (a) it is unreasonable for Mr. Risius to rely on the December 19 Term Sheet and (b) Mr. Risius's estimates of damages are fundamentally flawed.  [3/4/2022 p.m. Trial Tr. at 76:9-78:5 (Fischel Direct).]

156.    Mr. Risius relies on the December 19 Term Sheet for a proposed transaction between JCT and BD/S in assessing damages against Yucaipa.  [3/4/2022 p.m. Trial Tr. at 78:7-13 (Fischel Direct); Ex. 90.]  Professor Fischel testified that the December 19 Term Sheet is subject to various conditions precedent to executing definitive documents and closing, including conditions precedent to be separately agreed to with Yucaipa.  [3/4/2022 p.m. Trial Tr. at 78:21-79:14 (Fischel Direct); Ex. 118.] The 12/15/11 Revised Term Sheet for a proposed transaction between JCT and Yucaipa had various conditions precedent, including access to a third-party due diligence consulting firm to allow such firm to confirm that Allied had sustainable annual EBITDA in excess of $40 million.  [3/4/2022 p.m. Trial Tr. at 79:15-21 (Fischel Direct); Ex. 118.]  Professor Fischel analyzed Allied's actual EBITDA performance during the

period of 2011 through mid-2012.  [3/4/2022 p.m. Trial Tr. at 79:22-24 (Fischel Direct).]

He testified that Allied's actual EBITDA for the annual period ending December 31,

2011 was negative $29.280 million and for the six months ending June 30, 2012 was

negative $4.707 million.  [3/4/2022 p.m. Trial Tr. at 80:7-12 (Fischel Direct).]  Professor

Fischel opined that it is improper for Mr. Risius to base his damages calculations on the

December 19 Term Sheet without taking into account the failure of Allied to satisfy the

EBITDA condition in the 12/15/11 Revised Term Sheet.  [3/4/2022 p.m. Trial Tr. at

80:13-81:5 (Fischel Direct).]  Although such EBITDA condition was ultimately deleted in

subsequent term sheets between JCT and Yucaipa, as Professor Fischel acknowledged

on cross examination, he emphasized that JCT retained due diligence conditions, among

other conditions, in its later term sheets with Yucaipa, including in what has been

designated as the Final Term Sheet between JCT and Yucaipa dated March 8, 2012.

[3/4/2022 p.m. Trial Tr. at 139:17-141:3 (Fischel Redirect); Ex. 122.]

157.    Professor Fischel further testified that the 12/15/11 Revised Term Sheet

with Yucaipa required JCT to obtain the consent of its third party lenders and investors

to consummate the proposed transactions, which did not occur prior to the Petition

Date.  [3/4/2022 p.m. Trial Tr. at 81:6-82:16 (Fischel Direct); Dep. Tr. Ciupitu at 141:2-

141:11 (testifying that he does not recall JCT seeking bondholder consents for the Allied

acquisition at any time prior to May 17, 2012); *see also* Dep. Tr. Riggs at 110:25-111:4.]

Professor Fischel opined that there was no basis for Mr. Risius to assume that such

consent from non-parties to the negotiations would be obtained and no evidence that such consent was obtained prior to the Petition Date, which further renders Mr. Risius's conclusions as unreasonable and unreliable.   [3/4/2022 p.m. Trial Tr. at 81:6-82:16 (Fischel Direct).]  At trial the Trustee pointed to the fact that JCT eventually did obtain its lenders' consent when it purchased Allied for $135 million in bankruptcy.  This fact is unhelpful to the Trustee's damages theory because it establishes only that JCT's lenders were willing to consent to JCT's purchase of Allied assets for a price of $135 million.  It does not establish, one way or the other, whether the lenders would have consented to an earlier transaction for a much higher price and the issuance of approximately $250 million of JCT Notes as contemplated by the December 19 Term Sheet. [*See* Dep. Tr. Ciupitu at 141:2-11 (testifying that JCT never sought bondholder consent prior to the Petition Date); *see also* Ex. 95 (Riggs, in a June 25, 2012 email, stating: "we are only just starting to get some feedback from our lenders . . . .  However, I do not yet have adequate support to represent to you that I will get consent as the term sheet stands today.  So I did not want you representing that it is 'approved' by our lenders yet to [BD/S]".).]

158.   With respect to Mr. Risius's calculation of estate damages, Professor Fischel testified that Mr. Risius calculated damages to Allied's estate of $158.596 million based on the total amount of Allied's outstanding First Lien Debt payable under the December 19 Term Sheet ($244.212 million), after deductions for $5 million of projected

bankruptcy expenses and $80.616 million of actual net proceeds available to the First Lien Lenders from the 363 Sale to JCT and other recoveries.  [3/4/2022 p.m. Trial Tr. at 84:17-85:18 (Fischel Direct).]    Professor Fischel concluded that Mr. Risiuss' estate damages calculation was fundamentally flawed because the December 19 Term Sheet contemplated payment by JCT to the First Lien Lenders as part of a debt sale and not to Allied.  [3/4/2022 p.m. Trial Tr. at 86:11-87:1 (Fischel Direct).]  As noted by Professor Fischel, the estate was not involved in this transaction between JCT and the first lien lenders at all, so Allied could not have suffered any damages.  [3/4/2022 p.m. Trial Tr. at 86:25-87:1 (Fischel Direct).]

159.    With respect to Mr. Risius's calculation of lender damages, Professor Fischel testified that Mr. Risius calculated damages to the non-Yucaipa first lien lenders of $72.2 million based on the total amount of Allied's outstanding non-Yucaipa First Lien Debt, minus $34.9 million of actual net proceeds available to such non-Yucaipa first lien lenders from the 363 Sale to JCT and other recoveries.  [3/4/2022 p.m. Trial Tr. at 90:12-91:10 (Fischel Direct).]  Professor Fischel noted that the only difference between Mr. Risius's calculations of estate damages and lender damages is that the lender damages calculation does not include Yucaipa's projected recovery of $86.4 million on account of its own share of the First Lien Debt under the December 19 Term Sheet. [3/4/2022 p.m. Trial Tr. at 90:15-25 (Fischel Direct).]

160.    Professor Fischel concluded that Mr. Risius's damages calculations were fundamentally flawed because there is no basis for Mr. Risius's assumptions that: (a) the JCT Notes to be issued under the December 19 Term Sheet would have been worth par value at the time of issuance, (b) the first lien lenders would have received face value for the JCT notes after issuance, and (c) the first lien lenders would have been able to sell their JCT notes for face value at issuance.  [3/4/2022 p.m. Trial Tr. at 91:15-92:5 (Fischel Direct).]

161.    Professor Fischel testified that JCT proposed to fund its obligations under the December 19 Term Sheet entirely through the incurrence of debt from the issuance of new JCT Notes and new financing from BD/S, which, based upon Mr. Risius's assumptions, would have added approximately $250 million in risky debt to JCT's balance sheet.  [3/4/2022 p.m. Trial Tr. at 92:6-21 (Fischel Direct).]  Professor Fischel noted that Mr. Risius had not conducted any analysis of whether JCT could have issued additional debt at this level, yet Mr. Risius assumed that the new JCT Notes would be valued at par.  [3/4/2022 p.m. Trial Tr. at 92:22-94:15 (Fischel Direct).]  Professor Fischel's analysis reflected that the yield to maturity on JCT's existing notes at the time was similar to CCC-rated bonds, which are characterized as currently vulnerable to nonpayment, without taking into account any additional debt that would have been issued by JCT through the December 19 Term Sheet.  [3/4/2022 p.m. Trial Tr. at 94:17-95:25 (Fischel Direct); Ex. 806 at Ex. 1B.]  Referencing JCT's publicly filed financials and

Mr. Risius's trial testimony, Professor Fischel estimated that JCT had approximately $150 million of outstanding notes as liabilities on its balance sheet at the time of the December 19 Term Sheet, which would have been increased to $400 million had the contemplated transactions under the December 19 Term Sheet closed, based upon Mr. Risius's assumptions. [3/4/2022 p.m. Trial Tr. at 96:16-97:16 (Fischel Direct).] Professor Fischel opined that there is no basis for Mr. Risius to conclude that the new JCT Notes would be valued at par given the amount of additional debt and associated risk that would be added to JCT's balance sheet through the proposed transactions under the December 19 Term Sheet. [3/4/2022 p.m. Trial Tr. at 98:3-99:4 (Fischel Direct).]

162.    In challenging Mr. Risius's calculations, Professor Fischel also evaluated the market trading prices of Allied's First Lien Debt during the period 2011 through 2012. [3/4/2022 p.m. Trial Tr. at 101:16-18 (Fischel Direct); Ex. 805 at Ex. 3A & 3B.] He testified that Black Diamond and Spectrum purchased an aggregate of $13.5 million and $6.0 million of Allied's First Lien Debt, respectively, at either 5.1% or 8.0% of par value during this time period. [3/4/2022 p.m. Trial Tr. at 101:20-103:3 (Fischel Direct); Ex. 805 at Ex. 3A & 3B.] Professor Fischel noted that Mr. Risius ignored this actual market trading data in his damages calculations. [3/4/2022 p.m. Trial Tr. at 103:4-7 (Fischel Direct).] Professor Fischel concluded that Mr. Risius's damages calculations were unreliable because he assumed that JCT would be willing to pay 100% for Allied's First

Lien Debt when that same debt was trading at a small fraction of par at the time. [3/4/2022 p.m. Trial Tr. at 103:8-22 (Fischel Direct).]

163.    As further support, Professor Fischel pointed to valuations conducted by BD/S during the period 2008 to 2012 that reflected estimates of Allied's enterprise value at amounts substantially below the $244 million of outstanding First Lien Debt as of the December 19 Term Sheet.  [3/4/2022 p.m. Trial Tr. at 104:3-23 (Fischel Direct); Ex. 805 at Ex. 4A & 4B.]  On cross examination, Professor Fischel also referenced proposed term sheets from JCT to BD/S subsequent to the December 19 Term Sheet pursuant to which JCT offered to pay as little as 70% of par on account of BD/S's First Lien Debt, and even those reduced offers were subject to various conditions.  [3/4/2022 p.m. Trial Tr. at 130:17-131:8 (Fischel Cross).]

164.    With respect to Mr. Risius's calculation of estate damages, Professor Fischel criticized Mr. Risius for providing no basis for limiting his deduction for projected bankruptcy expenses to $5 million under the December 19 Term Sheet when the actual incurred expenses in Allied's Bankruptcy totaled $79.05 million.  [3/4/2022 p.m. Trial Tr. at 104:25-105:20 (Fischel Direct).]  Although Mr. Risius suggested that his deduction of $5 million against his estate damages calculation was conservative, Professor Fischel testified that this assumption was actually aggressive because it increased Mr. Risius's assessment of damages by keeping the amount of deductible expenses low.  [3/4/2022 p.m. Trial Tr. at 105:23-106:6 (Fischel Direct).]

165.    With respect to Mr. Risius's calculation of lender damages, Professor Fischel identified Mr. Risius's arbitrary assumption that CIT would have received $34.4 million on account of the full outstanding amount of its First Lien Debt under the December 19 Term Sheet, whereas JCT actually proposed to pay a discounted amount of only $20 million to CIT under the December 19 Term Sheet.  [3/4/2022 p.m. Trial Tr. at 106:14-107:11 (Fischel Direct); Ex. 90 at 4.]

166.    Finally, Professor Fischel challenged Mr. Risius's assumption that JCT would have paid par value under the December 19 Term Sheet to miscellaneous other first lien lenders who Mr. Risius assumed collectively held $17.725 million of First Lien Debt at the time, notwithstanding the fact that the December 19 Term Sheet did not include any provision to this effect.  [3/4/2022 p.m. Trial Tr. at 107:13-23 (Fischel Direct); *see also* Ex. 90.]  Professor Fischel also characterized this assumption by Mr. Risius as aggressive.  [3/4/2022 p.m. Trial Tr. at 107:24-108:1 (Fischel Direct).]

## CONCLUSIONS OF LAW

Having set forth the Court's Findings of Fact, the Court now transitions into explaining its Conclusions of Law.

### A.  Yucaipa Breached its Fiduciary Duty

167.    "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[5]  The

---

[5] *In re NSC Wholesale Holdings LLC*, 637 B.R. 71, 85 (Bankr. D. Del. 2022) (Sontchi, J.).

Trustee has established that Yucaipa controlled Allied and its Board, purported to fully control Allied's equity and debt, and that it abused its position of control by failing to act with the utmost loyalty and fairness required.

### 1. Yucaipa Indisputably Owed Fiduciary Duties to Allied for the Benefit of All Residual Claimants, Including Creditors

168.     It is undisputed that Yucaipa owed a fiduciary duty to Allied.[6]  It is also undisputed that Allied was insolvent from early 2008 forward.[7]

169.     Under longstanding principles of Delaware law, when a corporation becomes insolvent, its fiduciaries owe duties "to the corporation for the benefit of all of its residual claimants, a category which now includes creditors."[8]  Thus, Yucaipa owed fiduciary duties to Allied for the benefit of all its residual claimants, including Allied's secured and unsecured creditors, at all relevant times.

### 2. Yucaipa's Self-Dealing

170.     "[T]he premise of controlling stockholder fiduciary responsibility is to hold the controller liable for actions it[] causes using its control of the company's board

---

[6]  Summary Judgment Opinion at p. 75 n.209 (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994) ("[A] shareholder owes a fiduciary duty … if it owns a majority interest in or exercises control over the business affairs of the corporation.")).

[7]  *See id.* at p. 51 n.130 ("Yucaipa's expert concedes that Allied was insolvent by early 2008.") (citing, *inter alia*, Ex. 805 (Fischel Report) ¶19)).

[8]  1 R. FRANKLIN BALOTTI ET AL., DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 4.16[E][4] (4th ed. Supp. 2022). *See also, e.g., In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 863 (Bankr. D. Del. 2018) ("[W]hen the Debtor reached insolvency, Broad Street [the Debtor's sole member and fiduciary] would then be obligated to exercise its control and influence over the Debtor for the benefit of the Debtor's creditors.").

….”[9]   In a scenario where "a controlling shareholder does not set the terms of a transaction unilaterally, use confidential corporate information in the negotiation process, or otherwise use his power to impede or impair the effectiveness of a negotiation, he has not used his power to impair the normal and primary protection that the law affords the corporation and its shareholders: the judgment of its independent board of directors."[10]   On the other hand, a controller that "intentionally subvert[s]" a board of directors from exercising its independent business judgment breaches its fiduciary duty.[11]  This case falls into the latter category.

171.    The evidence adduced at Trial demonstrates that Yucaipa exploited its control over Allied to demand a premium price for First Lien debt throughout the JCT Negotiations.  At all relevant times, Allied was insolvent and under the direct control of

---

[9] *Shandler v. DLJ Merch. Banking, Inc.*, No. C.A. 4797-VCS, 2010 WL 2929654, at *16 (Del. Ch. July 26, 2010); *see also In re CNX Gas Corp. S'holders Litig.*, C.A. No. 5377-VCL, 2010 WL 2291842, at *15 (Del.Ch. May 25, 2010) ("[D]irector primacy remains the centerpiece of Delaware law, even when a controlling stockholder is present.").

[10] *Cinerama, Inc. v. Technicolor, Inc.*, No. Civ. A. No. 8358, 1991 WL 111134, at *20 (Del. Ch. June 24, 1991), *aff'd in part, rev'd in part on other grounds sub nom. Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994), and *abrogated by Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994).

[11] *See Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1062 (Del. Ch.) (ultimate controlling stockholder and chairman of the board who "intentionally subverted" an independent process created to sell company assets breached his fiduciary duty to the company), *judgment entered*, No. 183-N, 2004 WL 5322715 (Del. Ch. Mar. 4, 2004), and *aff'd*, 872 A.2d 559 (Del. 2005); *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 387 (Del. Ch. 2004) ("The reality is that controlling stockholders have no inalienable right to usurp the authority of boards of directors that they elect. … Like other stockholders, a controlling stockholder must live with the informed (i.e., sufficiently careful) and good faith (i.e., loyal) business decisions of the directors unless the DGCL requires a vote. That is a central premise of our law, which vests most managerial power over the corporation in the board, and not in the stockholders.").

Yucaipa.  Yucaipa dominated every aspect of Allied's capital structure and business.  It was Allied's controlling shareholder, held a majority of its First and Second Lien debt, illegitimately claimed the status of Requisite Lender through its bad faith acquisition of First Lien debt, and it hand-picked Allied's CEO.  When JCT — a committed suitor that had been pursuing Allied for years — offered to purchase Allied's assets in a Section 363 Sale in late 2011, Yucaipa should have used its control to initiate a process to lock in a lucrative transaction on equal terms for Allied's Lenders.[12]

172.    Rather than exploiting JCT's interest to benefit Allied and its stakeholders, Yucaipa exploited Allied in an effort to extract a premium for itself to the detriment of the other First Lien Lenders.

173.    Allied's cooperation was integral to every iteration proposed during the JCT Negotiations.  Every Term Sheet required Allied's cooperation in a Section 363 Sale which, as discussed above, Yucaipa's 30(b)(6) witness admitted required Company approval.

174.    Nevertheless, the evidence demonstrates that Yucaipa — under the false pretext that it was "in the position of controlling every tranche of the Company's capital structure" — never meaningfully sought Allied's input with respect to a Section 363

---

[12]  This is not to say that late 2011 was the *first* time that JCT's interest in acquiring Allied implicated Yucaipa's fiduciary duty to Allied.  In fact, only months before, JCT had written Mr. Walker in his capacity as Allied's Chairman with an offer to acquire Allied's assets.  [*See* Ex. 107 (Email from Mike Riggs to Rich Ehrlich and Derex Walker Re : Allied 363 Letter of Intent from TM Riggs 5-9-11.doc dated May 9, 2011).]

Sale.[13]  Confronted with the unfairness of this process, the Yucaipa representatives in control of Allied's Board did nothing.  By removing Allied from this process, Yucaipa ensured that there would be no deal for Allied's assets unless JCT agreed to Yucaipa's terms, which included its demand for a premium price for its First Lien debt.[14]

175.    In this respect, the Court agrees with Professor Macey's opinion that Yucaipa wielded its control over Allied as bargaining power that reflected "inappropriate favoritism" to Yucaipa as the controlling shareholder.[15]  [3/4/22 p.m. Trial Tr. at 14:13-15:10 (Macey Direct).]  Under Delaware law, this is the "essence" of a breach of the duty of loyalty.[16]

---

[13]  The evidence adduced at Trial reflects that Mr. Walker was primarily responsible for Yucaipa's strategy with respect to its Allied investment, including the JCT Negotiations.  Mr. Walker's conduct is imputed to Yucaipa.  *See, e.g., Hollinger Int'l, Inc.*, 844 A.2d at 1062 (controlling shareholder "is, regrettably, not an innocent bystander to [its principal]'s breaches of fiduciary duty" as the principal "felt free to and did act for [controlling shareholder] — as in function both its principal and agent — in a manner that was obviously inconsistent with the duties [that principal] owed [to the subsidiary].").

[14]  Riggs' testimony on this point is revealing: "If you think they own control of the common stock, you think they own control of the senior debt, who else would you work it with." *See* (Riggs (Dep. Tr.) 237:25-238:8 (emphasis added)).

[15]  The Defendants' filed a Motion to Exclude the Reports and Testimony of Jonathan R. Macey (Adv. Pro. 13-50530, Docket No. 931; Adv. Pro. 14-50971, Docket No. 666) (the "Motion *In Limine*"); which the Court denied without prejudice. Adv. Pro. 13-50530, Docket No. 962; Adv. Pro. 14-50971, Docket No. 698.  The Defendants renewed the Motion *In Limine* during the Trial. [*See* 3/4/2022 p.m. Trial Tr. at 66:2-71:13.] Concurrently herewith, the Court is issuing an order denying the renewed Motion *In Liminie*.

[16]  *Steiner v. Meyerson*, Civ. A. No. 13139, 1995 WL 441999, at *2 (Del. Ch. July 19, 1995) ("The essence of a duty of loyalty claim is the assertion that a corporate officer or director has misused power over corporate property or processes in order to benefit himself rather than advance corporate purposes."); *see also In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755, 760 n. 487 (Del. Ch. 2005) (The duty of loyalty requires "true faithfulness and devotion" to the interests of the corporation, particularly in cases involving "an imperial … controlling shareholder with a supine or passive board."), *aff'd*, 906 A.2d 27 (Del. 2006).

176.    Fair and ratable treatment for creditors in the JCT Negotiations was the cardinal principle urged in multiple communications from BD/S to Yucaipa — in numerous letters, emails, and phone calls throughout the JCT Negotiations.  Mr. Burkle also admitted that Allied's creditors were "entitled to *pari passu*" treatment in the JCT Negotiations, that *pari passu* treatment for all creditors is "what [he] would have done," and what he instructed his team to do.[17]  Nevertheless, the evidence adduced at Trial demonstrates that Yucaipa never agreed to equal and ratable treatment.[18]

177.    Because Yucaipa exploited Allied in an effort to receive a premium price for its First Lien debt to the detriment of other First Lien Lenders, at a time when Allied was insolvent and Yucaipa owed fiduciary duties to Allied's creditors, Yuacipa breached its fiduciary duty of loyalty.

**B.  Yucaipa's Defenses To The Breach of Fiduciary Duty Claim Are Unavailing**

178.    Yucaipa does not dispute that it failed to facilitate an independent, value-maximizing process for the sale of Allied's assets in the course of the JCT Negotiations.  Rather, Yucaipa's principal defense to the Trustee's breach of fiduciary duty claim at Trial was that its fiduciary duty was not implicated in the context of the

---

[17]  13-50530, D.I. 700-11 (Burkle (Dep. Tr.) 173:8-175:20).

[18]  Yucaipa's sole evidence in support of its assertion that it offered fair, equal, and ratable treatment to BD/S prior to the Bankruptcy is a May 16, 2012 email from BD/S's counsel to Yucaipa and its counsel circulating the May 16 Draft Letter Agreement.  However, the Court agrees with Mr. Harris, who testified that "[t]here's nothing in this document that suggests [Yucaipa] agreed" to equal and ratable treatment. The Court also finds Mr. Harris's testimony that Yucaipa never agreed to equal ratable treatment to be credible. [*See* 3/2/22 a.m. Trial Tr. 25:24-26:3 (Harris Direct).]

JCT Negotiations because "JCT was interested in buying Allied debt, not its assets." [*See* 3/1/22 a.m. Trial Tr. 35:14-15 (Yucaipa Opening).]  Thus, Yucaipa claims, it was free to negotiate with JCT wearing its Lender hat without regard to fiduciary duties owed as a controlling shareholder.  To this end, Yucaipa relies heavily on *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386 (Del. Ch. 1999), and similar holdings.  As discussed below, Yucaipa was not entitled to disregard its fiduciary duties.  Even putting aside that Yucaipa acquired its debt illegitimately and in bad faith, JCT was never proposing a "simple" debt deal.  It wanted to acquire Allied.  For this reason, and others addressed below, *Odyssey Partners* is readily distinguishable.

179.    Yucaipa also suggests that its actions should be subject to a deferential business judgment standard.  That cannot be.  Its self-dealing and position as a controlling shareholder implicate the entire fairness standard whereby Yucaipa must demonstrate its actions were entirely fair to the Company and its residual claimants.[19] Yucaipa did not carry this heavy burden at Trial.

---

[19]  *See, e.g., Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1242 (Del. 2012) ("Delaware has long adhered to the principle that the controlling shareholders have the burden of proving an interested transaction was entirely fair."); *see also Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (holding that the business judgment standard of review governs squeeze-out mergers between a controlling stockholder and its subsidiary only where the merger is "conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of minority stockholders."); *see also IRA Trust FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964 (Del. Ch. Dec. 11, 2017) *as revised* (Jan. 26, 2018) (observing that *M & F Worldwide Corp.* ("MFW") applied in the context of squeeze-out mergers but reasoning that there is "no principled basis on which to conclude that the dual protections in the *MFW* framework should apply to squeeze-out mergers but not to other forms of controller transactions," because the *MFW* framework "replicates an arm's-length bargaining process in negotiating … a transaction.").

180.    Finally, Yucaipa's arguments that the Trustee has failed to establish causation in this case are unavailing.  Under Delaware law, Yucaipa, as the wrongdoer, bore the burden of establishing there was no likelihood of a JCT transaction and the causation requirements are loosened.[20]   Again, Yucaipa did not carry this burden at Trial.

### 1.    The JCT Term Sheets Were Not Debt Transactions

181.    Yucaipa's assertion that JCT was not interested in buying Allied's assets is belied by the terms of the December 9 Term Sheet and those that followed.   As discussed, each of the JCT Term Sheets makes clear that the objective of the transaction was for JCT to "purchas[e] substantially all of the assets of Allied, free and clear of all liens, claims and other encumbrances" pursuant to a Section 363 Sale by "[c]redit bid[d]ing all claims against Allied under the First Lien Credit Agreement."

182.    Further, every Term Sheet considered during the JCT Negotiations required Allied's cooperation in a Section 363 Sale which, Yucaipa admits required Company approval.

---

[20]  *See, e.g., Bomarko, Inc. v. Int'l Telecharge, Inc.,* 794 A.2d 1161, 1181 (Del. Ch. 1999), *as revised* (Nov. 16, 1999) (some likelihood of a deal is sufficient basis of damages once a breach of fiduciary duty is established), *aff'd,* 766 A.2d 437 (Del. 2000); *Hampshire Grp., Ltd. v. Kuttner,* C.A. No. 3607-VCS, 2010 WL 2739995, at *50 (Del. Ch. July 12, 2010) (a duty of loyalty breach "loosen[s] the stringent requirements of causation and damages.").

183.    Messrs. Ciuputu and Riggs each testified that, contrary to Yucaipa's contentions, they did not view the proposed transaction as a "debt acquisition."  On the contrary, JCT's "goal was not to acquire any debt.  The goal was to acquire Allied."

184.    Accordingly, the Court rejects Yucaipa's contention that JCT was simply interested in acquiring Allied's debt, and not its assets.  Its fiduciary duties to Allied and its stakeholders were undoubtedly implicated in the JCT Negotiations.

### 2.  *Odyssey Partners* **Is Inapposite**

185.    Yucaipa relies heavily on *Odyssey Partners* to argue that it was not restricted from protecting its rights as a creditor by virtue of being Allied's controlling shareholder. However, *Odyssey Partners* illustrates why Yucaipa indisputably owed a fiduciary duty to Allied and its stakeholders in the course of the JCT Negotiations.

186.    The plaintiffs in *Odyssey Partners* alleged that a majority shareholder breached its fiduciary duty by (i) hindering the company's search for capital; (ii) acquiring the company's first lien credit facility; and (iii) initiating foreclosure proceedings on the first lien credit facility and acquiring the remainder of the company's equity in a credit bid.[21] The Chancery Court held that there was no breach, as (i) the majority shareholder did not "control" the board, and therefore was not responsible for the board's inability to secure capital; (ii) there was no evidence "that [the majority shareholder] used its position as [the company's] largest stockholder" to

---

[21] *Odyssey Partners, L.P.*, 735 A.2d at 415-16.

acquire the company's first lien facility; and (iii) in initiating foreclosure proceedings, the majority shareholder exercised its statutory rights as a creditor, which did not invoke its fiduciary duty.[22]

187.    In this case, unlike *Odyssey Partners*, Yucaipa was not simply Allied's majority shareholder: it dominated and controlled Allied.  Further, as this Court previously held, Yucaipa, acting in bad faith, used its control over Allied to acquire its First Lien debt and purported Requisite Lender status.[23]  Thus, unlike the majority shareholder in *Odyssey Partners*, Yucaipa's rights as a creditor "derive[d] from the circumstances or conditions giving rise to [its] fiduciary obligation in the first instance."[24]  Having acquired its Requisite Lender status in bad faith, Yucaipa was prohibited from using that status to subsequently leverage a premium price on that same, unlawfully acquired, debt to the detriment of Allied's legitimate creditors.

188.    Even assuming Yucaipa legitimately acquired its Requisite Lender status (it did not), "Delaware law does not countenance a director's misuse of his fiduciary position for his benefit as a creditor."[25]  In *Odyssey Partners*, there was no misuse by the majority shareholder because the foreclosure sale that it initiated was a "statutory

---

[22] *Id.* at 411-12, 415.

[23] Summary Judgment Opinion at p. 102.

[24] *Odyssey Partners, L.P.*, 735 A.2d at 415.

[25] *Cox v. Crawford-Emery*, No. C.A. 3202-VCN, 2007 WL 4327775, at *4 n.26 (Del. Ch. Nov. 30, 2007).

process" that "did not require [the company] directors' approval."[26]   Here, in stark

contrast, every iteration of the Term Sheets in the JCT Negotiations required the Allied

Board's cooperation and approval.   For the reasons discussed above, Yucaipa misused

its control over the Board by preventing it from initiating a value-maximizing

transaction for the benefit of all of Allied's stakeholders.[27] For these reasons, *Odyssey*

*Partners* is distinguishable from the matter at hand and does not move the Court to

conclude that Yucaipa's fiduciary duties were not implicated in the JCT Negotiations.

### 3. The Entire Fairness Standard — Not Business Judgment Rule — Applies

189.    Yucaipa also contends that if the Court determines a fiduciary duty was

owed to Allied in the context of the JCT Negotiations, its conduct is entitled to review

under the deferential business judgment standard.   However, "if the Court finds facts

evidencing disloyalty by the defendant, the business judgment rule is rebutted, and the

Court reviews the transaction to determine whether, despite the disloyal act, the

transaction is nevertheless entirely fair to the Company's shareholders."[28]   "[A]n entire

fairness standard of review is appropriate where the controlling stockholder has

---

[26] *Odyssey Partners, L.P.*, 735 A.2d at 414.

[27]  Yucaipa's misconduct distinguishes this case from *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584 (Del. Ch. 1986) on the same grounds.  *See id.* at 598 (The law "does not, absent a showing of culpability, require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority shareholders") (emphasis added).

[28]   *Bomarko, Inc.*, 794 A.2d at 1178; *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995). ("Where … the presumption of the business judgment rule has been rebutted, the [fiduciary's] action is examined under the entire fairness standard.").

actually used its power over the corporation 'to impair the normal and primary protection the law affords the corporation and its stockholders; the judgment of its independent board of directors.'"[29]  This applies regardless of whether a transaction is ultimately consummated.[30]  Because the Court has determined that Yucaipa engaged in self-dealing by exploiting its control over Allied during the JCT Negotiations, the entire fairness standard of review applies to this transaction.[31]

190.    The record demonstrates that Yucaipa's conduct during the JCT Negotiations was not entirely fair to the Company and its residual claimants.[32]  This demanding standard requires objective fairness, independent of Yucaipa's subjective

---

[29]  *Odyssey Partners, L.P.*, 735 A.2d at 412 (quoting 1 RODMAN WARD, JR. ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 151.6, at GCL-V-38 (4th ed.1999)).  In *Odyssey Partners*, the Chancery Court held that the majority shareholder's acquisition of the company's first lien credit facility was entitled to the presumption of the business judgment rule because there was "no evidence or suggestion in the record that the [company's] board of directors had any occasion to become involved in" negotiating the terms of the acquisition.  In contrast, here, the Board had every reason to be involved in the JCT Negotiations given that it required its assistance and contemplated the sale of Allied's Assets in a Section 363 Sale which Yucaipa's 30(b)(6) witness admits was "a company decision . . not a Lender decision."

[30]  *See, e.g., Gantler v. Stephens*, 965 A.2d 695, 708 n.33 (Del. 2009) ("[O]ur decisions have applied the entire fairness standard in a non-transaction context.") (citing *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993) (applying the fair dealing prong of entire fairness)).

[31]  Yucaipa's demand for a premium at the expense of Allied's legitimate Lenders places this transaction squarely within the purview of the entire fairness standard.  *See, e.g., Berteau v. Glazek*, C.A. No. 2020-0873-PAF, 2021 WL 2711678, at *12 (Del. Ch. June 30, 2021) ("[T]he entire fairness framework governs any transaction between a controller and the controlled corporation in which the controller receives a non-ratable benefit" relative to other stakeholders, or where the controller "compete[s] with the minority stockholders for the transaction consideration.") (citing *In re EZCORP Inc. Consulting Agreement Derivative Litig.*, C.A. No, 9962-VCL, 2016 WL 301245, at *11 (Del. Ch. Jan. 25, 2016) and *Salladay v. Lev*, C.A. No. 2019-0048-SG, 2020 WL 954032, at *8 (Del. Ch. Feb. 27, 2020)).  Opposing summary judgment, Yucaipa submitted an Expert Opinion of William B. Chandler III.  (13-50530, D.I. 767-1, Ex. 33).  Notably, Chancellor Chandler (Ret.) assumed that the entire fairness standard applied to the allegations at issue.  Yucaipa ultimately did not call Mr. Chandler at Trial.

[32]  *See, e.g., Ams. Mining Corp.*, 51 A.3d at 1242.

belief.[33]  Here, Yucaipa understood what was required.  Yucaipa's principal Ron Burkle admitted that Allied's creditors were "entitled to *pari passu*" treatment in the JCT Negotiations, that *pari passu* treatment for all creditors is "what [he] would have done," and what he instructed his team to do.  However, as the evidence adduced at Trial demonstrates, Yucaipa never agreed to this price.

191.    There was also no fair dealing.  "The fair dealing inquiry looks for steps designed to ensure fairness to the minority."[34]  The evidence presented at Trial demonstrates that Yucaipa and the Yucaipa-controlled Board failed to take any steps to ensure that the non-Yucaipa lenders were treated fairly during the JCT Negotiations. This remained true even after they were confronted with the unfairness of the manner in which the JCT Negotiations were proceeding.  There were numerous mechanisms that Yucaipa and the Board could have employed to create a fair process, including (i) creating a special committee (or "restructuring committee") composed of independents to evaluate the potential transaction and the possibility of alternative transactions, (ii) retaining an investment bank to pursue the potential transaction, or (iii) requiring minority Lender approval for any transaction with JCT.[35]  Yucaipa fails

---

[33]  *See, e.g.*, *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1144-45 (Del. Ch. 2006).

[34]  *In re Cellular Tel. P'ship Litig.*, C.A. No. 6885-VCL, 2022 WL 698112, at *22 (Del. Ch. Mar. 9, 2022).

[35]  For the reasons discussed above, the Court rejects Yucaipa's contention that there was a provision in the JCT/Yucaipa Final Term Sheet that protected BD/S by requiring that "everybody holds hands and agrees" to any deal with JCT at the end of the day — as well as its assertion that the existence of such a provision was sufficient to satisfy Yucaipa's fiduciary duty to Allied.

the fair dealing prong of entire fairness by failing to take any of these measures during the JCT Negotiations.[36]

### 4.  Causation Was Sufficiently Established

192.    Yucaipa's contention that BD/S cannot establish causation is unavailing. Yucaipa argued that it had agreed to equal and ratable treatment prior to the Bankruptcy, but that BD/S decided "that it could make more money by forcing Allied into bankruptcy."[37]  However, it was Yucaipa's intransigence, not the Bankruptcy, that ended the JCT Negotiations.[38]  Moreover, even if BD/S's decision to force Allied into Bankruptcy contributed to the JCT Negotiations coming to an end, Yucaipa's refusal to agree to ratable treatment was the leading cause.

193.    This argument fails for two additional reasons. First, in arguing that BD/S filed the Bankruptcy "understanding that it could make more money by forcing Allied into bankruptcy,"[39] Yucaipa is advancing a theory that this Court has rejected several

---

[36] *See, e.g.*, *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 758 (Del. Ch. 1986) (controlling shareholder breached its fiduciary duty because, *inter alia*, "no independent agency, either board committee, special counsel or investment banker, provided an independent basis to conclude" that transaction involving controlling shareholder was fair to the company).

[37] 13-50530, D.I. 958 (Yucaipa's Trial Brief) at p. 16.

[38] If BD/S were somehow mistaken in their belief that Yucaipa had not agreed to equal and ratable treatment before the Bankruptcy (and there is no evidence that it was), it stands to reason that Yucaipa would have endeavored to correct BD/S's misunderstanding after they filed the Bankruptcy.  There is no evidence that Yucaipa or its counsel reached out to inform BD/S that it was prepared to re-negotiate its deal with JCT to accommodate equal and ratable treatment.

[39] 13-50530, D.I. 958 (Yucaipa's Trial Brief) at p. 16.

times as "not plausible."[40]    This holding is the law of the case.[41]    None of the

"exceptional circumstances" warranting reconsideration are present here.

194.    Second, BD/S was entitled to invoke this Court's jurisdiction in response

to Yucaipa's breach.    "When the directors, or the majority stockholders, exercise a

power that the general corporation law confers upon them, 'it is competent for any one

[sic] who conceives himself aggrieved thereby to invoke the processes of a court of

equity for protection against its oppressive exercise.'"[42]    Yucaipa failed to act in

response to BD/S imploring for a fair process to be established.    Thus, it was

appropriate for BD/S to ask this Court to oversee a process that they could not obtain

from Allied's fiduciaries.[43]

---

[40]    *See* 14-50971, D.I. 82 at p. 64 ("Yucaipa's argument depends on every one of the following unpredictable events occurring in a manner favorable to Black Diamond and Spectrum: (i) invalidating the Fourth Amendment through litigation; (ii) obtaining judicial declaration that Black Diamond and Spectrum are the Requisite Lenders; (iii) acquiring Allied's assets through a credit bid on behalf of all Lenders (including Yucaipa, subject to the equitable subordination claims); (iv) prevailing in their equitable subordination claims against Yucaipa and obtaining a substantial recovery; and (v) hoping that the Allied assets they acquired would increase in value to the point where the asset value plus any recovery realized from the equitable subordination litigation exceeded a par plus accrued interest recovery years after JCT had offered them a 100% recovery. Yucaipa's reliance on this sequence of events is not plausible.").

[41]    *See In re Vaso Active Pharms., Inc.*, 500 B.R. 384, 399 (Bankr. D. Del. 2013) ("In the interests of finality and judicial economy, the law of the case doctrine precludes relitigation of issues in which parties have already had a full and fair opportunity to litigate" in the absence of "extraordinary circumstances, such as situations in which new evidence is available, a supervening law has been announced, or an earlier decision was clearly erroneous and would create manifest injustice.") (citing *In re Cont'l Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002)), *aff'd*, 537 B.R. 182 (D. Del. 2015).

[42]    *Adams v. Clearance Corp.*, 121 A.2d 302, 306 (Del. 1956) (quoting *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 491 (Del Ch. 1923)).

[43]    *See In re SemCrude, L.P.*, 428 B.R. 590, 594 (D. Del. 2010) ("[T]he primary goal of the Bankruptcy Code [is] to ensure equal and fair treatment among similarly situated creditors.").

195.    Thus, for the foregoing reasons, the Court finds that the Trustee has sufficiently established causation between Yucaipa's inequitable conduct and the JCT Negotiation's failure.

## C.  The Trustee Has Not Proven Damages

196.    Notwithstanding the preceding discussion, and irrespective of the Trustee successfully meeting her burden of proving Yucaipa's breach of fiduciary duty, the Trustee has failed to meet her burden of establishing a reasonable basis for her claimed damages. Rather, the Court finds the Trustee's damages arguments to be mere conjecture and speculation. Therefore, the Trustee is not entitled to an award of any damages in connection with her claims for breach of fiduciary duty (Estate Claim 7).

197.    For the reasons discussed below, the Court concludes that that the Trustee has not met her burden in establishing damages because Mr. Risius's calculation of damages is materially flawed and wholly speculative.  Mr. Risius's reliance on the December 19 Term Sheet for purposes of calculating damages was not reasonable because that term sheet was preliminary, non-binding, highly conditional, and superseded by multiple later term sheets in which JCT proposed to pay materially less. Mr. Risius's concluded damages are based on the value of Allied's First Lien debt, yet his conclusions bear no relation to the actual market trading prices of that debt.

198.    Further, Mr. Risius's conclusion that Allied's estate would have benefited from a hypothetical transaction with JCT in an amount equal to the full face amount of

Allied's outstanding First Lien debt – an amount that JCT did not offer to pay in the December 19 Term Sheet – was premised upon the unrealistic assumption that JCT would have credit bid the full amount of that debt in a hypothetical future bankruptcy sale, the assumed outcome of which would look nothing like the actual 363 Sale consummated in Allied's Chapter 11.

199.    Additionally, no evidence was produced to support Mr. Risius's conclusion that Allied would have incurred just $5 million in expenses in that hypothetical bankruptcy case (its actual restructuring expenses were nearly sixteen times that amount), and his decision to not discount damages to the estate by the full amount of cash the estate received in the JCT 363 Sale or by losses that the estate would suffer in the bankruptcy case being required by JCT was baseless.

200.    Also, because a majority of the consideration that JCT proposed to provide in the December 19 Term Sheet would have gone directly to Yucaipa, Mr. Risius's analysis leads to the strange conclusion that Yucaipa is primarily liable for damages caused to itself.  Moreover, no evidence supports Mr. Risius's conclusion that the debt consideration that JCT would have provided to Allied's Lenders in the hypothetical transaction was worth the same as cash; indeed, the evidence was to the contrary.  Mr. Risius's separate calculation of damages to the Lenders suffers from many of these flaws, as well as others.

201.    The Trustee bears the burden of proving damages for an alleged breach of fiduciary duties by a preponderance of the evidence.[44]  Even where a defendant has been found to have breached its fiduciary duties, the plaintiff is required to provide "a reasonable basis for assessing damages" before any damages can be awarded.[45]

202.    Courts will refuse to award damages that are "based on mere speculation or conjecture."[46]  Speculative damages entitle a plaintiff to no relief.[47]  A "Court cannot create what does not exist in the evidentiary record, and cannot reach beyond that record when it finds the evidence lacking.  If a plaintiff seeks more than nominal damages, proof must replace hypothetical estimates.[48]

203.    While courts have held that uncertainty in the amount of damages may be resolved against the wrongdoer once there is a finding of wrongdoing, this rule applies

---

[44]  *See Glick v. KF Pecksland LLC*, C.A. No. 12624-CB, 2017 WL 5514360, at *19 (Del. Ch. Nov. 17, 2017); *see also In re HH Liquidation, LLC*, 590 B.R. 211, 273 (Bankr. D. Del. 2018).

[45]  *Cline v. Grelock*, C.A. No. 4046-VCN, 2010 WL 761142, at *2, n.11 (Del. Ch. Mar. 2, 2010); *see also In re Radnor Holdings Corp.*, 353 B.R. 820, 848–49 (Bankr. D. Del. 2006) (notwithstanding plaintiff's prevailing on the issue of breach of fiduciary duties, the court declined to award damages because plaintiff failed to prove "a recognizable measure and amount of damages"); *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *13 (Del. Ch. Oct. 10, 2014); *Medek v. Medek*, Civ. A. 2559-VCP, 2009 WL 2005365, at *12 (Del. Ch. July 1, 2009) (holding plaintiff failed to provide a reliable basis for an award of damages); *see also Ravenswood Inv. Co., L.P. v. Est. of Winmill*, C.A. No. 3730-VCS, 2018 WL 1410860, at *23 (Del. Ch. Mar. 21, 2018).

[46]  *Encite LLC v. Soni*, Civ. A. No. 2476-VCG, 2011 WL 5920896, at *25 (Del. Ch. Nov. 28, 2011).

[47]  *OptimisCorp v. Waite*, Civ. A. 8773-VCP, 2015 WL 5147038, at *82 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016); *see also Ravenswood Inv. Co., L.P.*, 2018 WL 1410860, at *23 (stock sale price speculative); *eCommerce Indus., Inc. v. MWA Intel., Inc.*, C.A. No. 7471-VCP, 2013 WL 5621678, at *50 (Del. Ch. Sept. 30, 2013) (damages for lost revenue speculative); *Cline*, 2010 WL 761142, at *2 (denying damages as speculative despite finding breach of fiduciary duties occurred).

[48]  *CSH Theatres, L.L.C. v. Nederlander of San Francisco Associates*, C.A. No. 9380-VCMR, 2018 WL 3646817, at *30 (Del. Ch. July 31, 2018) (internal citations omitted).

only where the uncertainty is caused by the wrongdoing.[49]  Any uncertainty in the amount of damages here was not caused by Yucaipa.  In any event, there is a difference between damages being uncertain in amount and damages being based on speculation; courts will not award the latter.[50]  Here, the Trustee's damages are purely speculative.

204.    The Trustee has not satisfied her burden.  The Court finds the opinions and conclusions of Mr. Risius, discussed above, to be based upon unsupportable and arbitrary assumptions, rendering his opinions and conclusions unreliable and not credible.   Mr. Risius's reliance on the December 19 Term Sheet for purposes of calculating damages was not appropriate for reasons including that the December 19 Term Sheet: (i) was not a final term sheet; (ii) was not binding on JCT or any other party, let alone all of the relevant parties; (iii) reflected an offer only to Black Diamond, which was unacceptable to Black Diamond; (iv) contained numerous conditions precedent, many of which were never satisfied; (v) was sent without the benefit of required diligence and prior to JCT's receipt of information reflecting Allied's true financial condition; and (vi) was superseded by multiple later term sheets in which JCT proposed to pay substantially less.

---

[49] *See Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1132 (Del. 2015) (finding lower court correctly refused to apply "wrongdoer rule" where defendant's breach was not a cause of the uncertainty).

[50] *See, e.g., Encite LLC*, 2011 WL 5920896, at *25.

205.    Moreover, Mr. Risius estimated damages arising from a proposed purchase of Allied's First Lien debt in a manner that is detached from the market trading prices of that debt or the actual enterprise value of Allied.  In doing so, Mr. Risius concluded that JCT would have paid approximately 100% of the face value of debt that was trading at between 5 cents and 8 cents on the dollar during the relevant period.

206.    Objective evidence from the public debt market is a more reliable measure of value than the subjective estimates of an expert witnesses.[51]  It is simply not credible to imply an enterprise value for Allied equal to the full, outstanding principal amount of its First Lien debt, when that same debt was being purchased at the time (including by BD/S) for well under 10% of its face value.  Mr. Risius also admitted that he never actually performed an enterprise valuation of Allied that took into account Allied's financial performance and future prospects.  [3/4/2022 a.m. Trial Tr. at 42:3-8 (video played for impeachment) (Risius Cross).]

---

[51]  *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 632-33 (3d Cir. 2007) ("[I]f the bondholders thought VFI solvent, they wouldn't have sold their debt so cheaply. . . . We do not think that the district court erred in choosing to rely on the objective evidence from the public equity and debt markets. . . . Absent some reason to distrust it, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'") (quoting *In re Prince*, 85 F.3d 314, 320 (7th Cir.1996)); *see also In re Hechinger Investment Co. of Del.*, 327 B.R. 537, 548 (D. Del. 2005) ("because valuation is, to a great extent, a subjective exercise dependent upon the input of both facts and assumptions, the court will give deference to 'prevailing marketplace values', rather than to values created with the benefit of hindsight for the purpose of litigation.") (*quoting Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002) ("in determining whether a value is objectively 'reasonable' the court gives significant deference to marketplace values.")).

207.    Mr. Risius's analysis is plagued by other major flaws.  For example, he concluded that Allied's estate would have received all but $5 million of over $244 million in "proceeds" from the transactions described in the December 19 Term Sheet.  But Allied would have received no cash and no "proceeds" even if JCT had successfully negotiated private agreements to purchase debt from each of Allied's Lenders.  The only benefit that Allied's estate might have received in those transactions would have been through a conditional credit bid of certain of the purchased debt, which would have come to fruition only if Allied later entered bankruptcy and obtained court approval to sell its assets to JCT in exchange for a credit bid.  However, the parties had not agreed in December 2011 on the terms of a bankruptcy case for Allied or on a consensual sale of Allied's assets to JCT.

208.    Mr. Risius's conclusion is based on the assumption that, even though it was not bound to do so, JCT would have credit bid the full amount of Allied's First Lien debt in exchange for Allied's assets.  The December 19 Term Sheet contains no such requirement.  [*See* Ex. 90.]  And no such requirement was included in an asset purchase agreement that Allied attempted to negotiate with JCT in April 2012, prior to the filing of the Involuntary Petition.  It is possible that instead of credit bidding the full amount of Allied's First Lien debt, JCT would have credit bid only as much of the debt as necessary to acquire the assets at auction.  Given that JCT submitted a high bid of $135 million for those assets in 2013, following an auction in which JCT's only competition

was from BD/S and the same lenders (aside from Yucaipa) whose claims JCT would have purchased, there is little reason to believe that JCT would have submitted a higher bid in a hypothetical auction that Mr. Risius assumes was contemplated by the December 19 Term Sheet. In that event, the "implied" value for Allied would be no more than $135 million (i.e., the same amount that Allied's estate actually received in cash in the JCT 363 Sale). The estate would have suffered no damages and JCT would remain the holder of substantial deficiency claims against Allied's estate following the sale.

209.    Furthermore, had Allied's estate received only a credit bid as consideration in exchange for Allied's assets, the estate might well have been rendered administratively insolvent. Without any cash proceeds, the estate probably would not have been able to satisfy the obligations – including a DIP loan and winddown reserves – that were satisfied with the cash proceeds obtained in the 363 Sale. Mr. Risius appears not to have considered these implications.

210.    Mr. Risius's calculation of damages is also flawed because it is premised on the problematic assumption that JCT would have paid par for all of Allied's First Lien debt. JCT specifically identified $215 million in debt held by four lenders in the December 19 Term Sheet as being subject to a potential purchase, following the negotiation of separate agreements with each of those four lenders. By assuming that

JCT would have paid par for the balance of Allied's First Lien debt, Mr. Risius inflated his damages to the estate by over $29 million.

211.    The Court also rejects Mr. Risius's assumption that damages to the estate should be reduced by just $5 million in estimated expenses.  The Trustee presented no evidence that $5 million was a reasonable estimate of expenses that would be incurred by Allied in a hypothetical bankruptcy case and it was unreasonable for Mr. Risius to ignore the actual expenses incurred by Allied in its actual, as opposed to hypothetical, bankruptcy case.  While Mr. Risius attempted to justify the lower figure by assuming that any consensual bankruptcy case for Allied would have been resolved in 90 days, the Trustee presented no evidence that Allied could have concluded a Chapter 11 case within 90 days.  Having presided over Allied's real-world Chapter 11 case, this Court does not believe it is realistic to assume that Allied could have completed a bankruptcy case in such a short period of time or to have done so without incurring significantly less in expenses than it incurred in its actual case.

212.    Similarly, it was wrong for Mr. Risius to reduce his damages to Allied's estate by amounts recovered only by Allied's First Lien Lenders.  Mr. Risius appears to have presumed that the First Lien Lenders were the only creditors represented by the estate.  [3/4/2022 a.m. Trial Tr. at 83:16-84:2 (Risius Cross) (THE WITNESS: ". . . the estate is the lender. . . .  THE COURT: Well, there are other claims; right? There are admin claims, secured claims, unsecured claims, DIP claims.  THE WITNESS: Fair.

THE COURT: The company couldn't [*sic*] gone into even a 90-day bankruptcy without a DIP; right?  THE WITNESS: Right. Right.").]  In reality, Allied's estate benefited in the full amount of the proceeds received in the 363 Sale to JCT.  Although the estate used a substantial portion of those proceeds to satisfy obligations of the estate – which reduced the amount available to Allied's First Lien Lenders – the estate still benefitted from all of the proceeds received.  Any calculation of damages to the estate should have assumed that the estate benefited from the $135 million in cash that JCT paid in the 363 Sale, not the $80 million that was distributed to the First Lien Lenders.

213.    Assumptions such as the one above—that the estate only benefited to the extent of any recovery by Allied's First Lien Lenders—reflect a misunderstanding of the bankruptcy process, which led to flaws in Mr. Risius's conclusions.  Indeed, Mr. Risius admitted at Trial that he has only limited bankruptcy experience.  [3/4/2022 a.m. Trial Tr. at 96:8-14 (Risius Cross) ("THE COURT: And you have experience in Chapter 11 cases? THE WITNESS: In matters – as a transaction advisory. I'm not an investment banker, so my context in bankruptcy is typically in situations like this or in dealing with a client of - - from a valuation perspective outside of - - outside of court. But not as a banker.").]

214.    Furthermore, Mr. Risius's analysis fails to account for the fact that the majority of the consideration that JCT was proposing to provide in the December 19 Term Sheet would have gone directly to Yucaipa, as the holder of a majority of Allied's

First Lien debt.  By calculating damages using the "implied" value derived from the December 19 Term Sheet, Mr. Risius effectively concludes that Yucaipa is liable primarily for damages caused to itself.  That result is untenable.

215.    It was also improper for Mr. Risius to assume that the notes JCT proposed to provide to Allied's Lenders in exchange for the majority of their debt were worth 100% of their face value.  As discussed above, Mr. Risius did not consider how the incurrence of such a substantial amount of new debt – well over twice the amount of JCT's outstanding debt at the time – would impact JCT or its creditworthiness, especially considering that JCT was already in default on its existing notes at the time. JCT made several offers to Allied and its Lenders in which JCT proposed to provide the sellers significantly more in debt than it would provide in cash.  [*See, e.g.*, Ex. 471 (Email dated March 8, 2012 summarizing two alternatives proposed by JCT to BD/S, as: "1) We can receive 70% of par - of which, 50% would be paid in Modified Jack Cooper bonds at First Close and 50% in Modified Jack Cooper bonds at Second Close. 2) We can receive 60% of par - of which, 25% would be paid in Modified Jack Cooper bonds at First Close and 75% in cash at Second Close."); Ex. 96 (attaching term sheet dated June 26, 2012 from JCT to Allied offering first lien lenders the option to receive either (i) 57% of principal amount in cash or (ii) 85% of principal in new JCT notes, plus warrants).] These offers imply a significant discount in the value of the JCT debt.  Notwithstanding this clear indication that JCT valued its own debt at less than par during the relevant

time period, Mr. Risius assumed no discount at all.  Mr. Risius also did not discount his damages calculation to reflect the conditional and delayed nature of the debt consideration proposed to be provided to sellers under the December 19 Term Sheet.  A damages assessment that assumes 100% of par value for the JCT Notes offered as consideration for Allied's First Lien debt is, therefore, unreasonable.

216.    Importantly, Mr. Risius's entire analysis is flawed because it is strategically based on a single, preliminary term sheet, sent prior to JCT having done any diligence, and which was subject to numerous unsatisfied conditions and superseded by later proposals.  As discussed above, any deal with JCT, including specifically the December 19 Term Sheet, was subject to due diligence, JCT lender consents, multiple ancillary agreements (e.g., a non-disclosure and non-compete agreements), and JCT's negotiation of final agreements with all other lenders, among other various conditions precedent.  None of these conditions were satisfied at the time of the December 19 Term Sheet or any time before the Petition Date.  And the evidence at Trial did not form a reasonable basis for Mr. Risius to assume that these conditions would be satisfied.

217.    Moreover, as discussed above, JCT reduced its offers to BD/S following the December 19 Term Sheet.  JCT further reduced its offers to purchase Allied's assets directly postpetition, after it was provided with information concerning Allied's true financial condition.   Mr. Risius admitted that the December 19 Term Sheet was

superseded by multiple later term sheets and that it preceded any due diligence by JCT; yet he chose to calculate damages as if the higher amount that JCT proposed in the conditional December 19 Term Sheet, at the outset of the negotiations, without any material information about Allied's financial condition, represented a binding agreement among all parties.  [3/4/2022 a.m. Trial Tr. at 54:12-16 (Risius Cross) (stating that the December 19 Term Sheet "clearly wasn't" final and that "[t]here was a number of term sheets thereafter.").]   In light of these facts, Mr. Risius's reliance on the December 19 Term Sheet in calculating damages is simply not credible.

218.    Mr. Risius's assessment of damages also fails to account for any losses due to the bankruptcy case that JCT was requiring for Allied.  Mr. Risius testified that (i) JCT would not have consummated any transaction without Allied filing for bankruptcy, and (ii) Allied suffered significant operational losses following the commencement of its involuntary bankruptcy case.  Yet, he did not discount his damages to the estate to reflect anticipated losses to Allied from such a filing.  Any damages to the estate would have been reduced by such losses.  Moreover, the losses, whatever they may be, that Allied incurred as a result of being placed into bankruptcy involuntarily by BD/S should have been accounted for in Mr. Risius's damages calculation.  Mr. Risius's damages calculations should have been reduced by these losses.

219.    Mr. Risius also calculated damages as of December 19, 2011, and began calculating prejudgment interest as of that date.  As described above, there was no

agreement between JCT and any lender as of December 19, 2011; the December 19 Term Sheet certainly was not enforceable as of that date. And, even if the December 19 Term Sheet had been enforceable as of that date, the transactions described in that term sheet would not have been consummated on December 19, 2011. It was, therefore, improper to calculate damages and interest as of December 19, 2011.

220.    Turning to the separate calculation of damages to the non-Yucaipa first lien lenders, the Court concludes that Mr. Risius's calculation of damages suffers from most of the same flaws as those summarized above. Like his calculation of damages to the estate, Mr. Risius premises his analysis of damage to the non-Yucaipa first lien lenders upon the same flawed $244.2 million implied value of Allied derived from the December 19 Term Sheet, the same understated assumed expenses of $5 million, and the same unsupported assumption that JCT would purchase at par $29 million in claims that are not identified in the December 19 Term Sheet. Similarly, he ignores that JCT reduced its offers to the Lenders over time, and he fails to discount the value of the JCT debt that was proposed to be issued to the Lenders due to the risky, conditional, and delayed nature of that consideration.

221.    In addition, Mr. Risius calculated damages to the non-Yucaipa first lien lenders by assuming that CIT would have received a recovery nearly equal to the face amount of its debt in a hypothetical transaction based upon the December 19 Term

Sheet, which ignores the $15 million discount that JCT proposed to provide to CIT in that very term sheet.

222.     Mr. Risius also acknowledged that he did not update his lender damage calculations to reflect prior recoveries and awards obtained for the Lenders' benefit.  As a result, the Court cannot determine to what extent the Lenders' claims have already been satisfied or would be satisfied from those prior recoveries and awards.

223.     In sum, the Court concludes that Mr. Risius's calculations of damages to each of the estate and the non-Yucaipa first lien lenders are materially flawed and unreliable.  Damages premised upon the December 19 Term Sheet are speculative, at best, and are not evidence of actual harm.  Even though the Trustee has proven the merits of the claims at Trial, she has failed to prove any damages arising from the JCT Negotiations. For that reason, the Court is unable to award any damages in favor of the Trustee.[52]

### D.  The Implied Covenant of Good Faith and Fair Dealing

224.     The Trustee asserts Lender Claim 3 in the alternative to Estate Claim 7. The Trustee alleges, on behalf of the Lenders, that Yucaipa breached the implied covenant of good faith and fair dealing (the "Covenant") by (1) interfering with the JCT

---

[52] *See In re Radnor Holdings Corp.*, 353 B.R. at 848-49 (irrespective of plaintiff's ability to prevail on the issue of breach of fiduciary duties, the court declined to award damages because plaintiff failed to prove a "recognizable measure and amount of damages.").

negotiations; and (2) using its Requisite Lender status to allow Allied to breach the FLCA.[53]

225.    Under New York Law,[54] the Trustee bears the burden of proving, by a preponderance of the evidence, that the Lenders were damaged, and that their damage was proximately caused by Yucaipa's conduct.[55]

226.    Because the Court has concluded above that Yucaipa breached its fiduciary duty (Estate Claim 7), but with no reasonable estimate of damages resulting therefrom, there is no need to reach the Trustee's alternative claim for breach of the implied covenant of good faith and fair dealing (Lender Claim 3).  Even if Yucaipa did breach the Covenant, the Trustee still faces the same problems with respect to damages.

227.    As explained above, the only damages sought by the Trustee in this case are those attributable to the failed JCT transaction.  [3/4/2022 a.m. Trial Tr. at 40:9-17 (Risius Cross).]  Because the Trustee has failed to meet her burden of establishing a reasonable basis for the claimed damages, the Court will not award any damages in connection with either Estate Claim 7 or Lender Claim 3.

---

[53] This claim was expressly alleged in the alternative to Lender Claim 2.  [Ex. 207.]  As the Trustee already prevailed on Lender Claim 2, it cannot also prevail on this claim.

[54]    *See* Summary Judgment Opinion at p. 12 n.16 (holding that the FLCA and its amendments are governed by New York law).

[55]    .  *See Cap. Sec. Sys. W.L.L. v. L-3 Commc'ns Sec. & Detection Sys., Inc.*, 16-CV-3687(PKC), 2018 WL 4666072, at *7 (S.D.N.Y. Sept. 28, 2018) (noting the plaintiff "has the burden of proving each element" of its claim for breach of the implied covenant of good faith and fair dealing).

### E. Equitable Subordination

228.    Pursuant to Estate Claim 1 and Lender Claim 1, the Trustee seeks to equitably subordinate Yucaipa's claims against Allied's estate.  The Trustee did not present any evidence at trial specifically in support of these claims.  Rather, the Trustee appears to take the position that Yucaipa's claims should be subordinated for the same reasons that Yucaipa should be found liable for damages; *i.e.*, Yucaipa exercised its control over Allied in a manner that derailed a transaction with JCT, to the detriment of Allied and the lenders.

229.    Section 510(c)(1) provides:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may —
>
> (1)    under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2)    order that any lien securing such a subordinated claim be transferred to the estate.[56]

230.    As the Court explained in its Summary Judgment Opinion, the Trustee bears the burden of persuasion in showing that "(i) there was inequitable conduct; (ii) the inequitable conduct resulted in: (a) injury to the debtor or creditors or (b) created an

---

[56]  11 U.S.C. § 510(c).

unfair advantage for the claimant; and (iii) equitable subordination is consistent with the Bankruptcy Code."[57]  The Court finds the Trustee has not met this burden.

231.    Specifically, the Trustee failed to demonstrate that Yucaipa's conduct in connection with the JCT Negotiations resulted in injury to Allied or its creditors or that equitable subordination is appropriate in this case.  As discussed, the Trustee failed to demonstrate that Yucaipa caused any damage to Allied or its creditors in the course of the JCT Negotiations.

232.    In its Summary Judgment Opinion, the Court granted the Trustee's motion for summary judgment with respect to the equitable subordination claims, in part, upon finding that Yucaipa had engaged in inequitable conduct in connection with the Fourth Amendment, in breaching the Third Amendment (*i.e.*, the subject of Trustee's breach of contract claims), and in causing Allied to pay certain fees while it was insolvent (*i.e.*, the subject of Trustee's fraudulent transfer claims).[58]  The Court reserved for trial, however, the extent to which Yucaipa's claims should be subordinated.[59]

233.    In addition to the above, in its Summary Judgment Opinion, the Court reserved for trial whether Yucaipa's claims should be subordinated if Yucaipa caused

---

[57]  Summary Judgment Opinion at p. 101.

[58]  *Id*. at p. 108-09.

[59]  *Id*. at p. 109.

Allied to commit events of default under the FLCA.[60]  The Trustee did not present any such evidence nor proof of harm to any creditors.

234.    Having considered the evidence presented at Trial, the Court concludes that Yucaipa's claims should not be equitably subordinated in any amount.  The Trustee has pursued three distinct categories of damages in this litigation.  First, the Trustee claimed damages from Yucaipa's alleged breach of the FLCA in the amount of the Capital Contribution not made upon Yucaipa's purchase of Allied's First Lien Debt in 2009, plus interest.  The full amount sought by the Trustee for this alleged injury was awarded in the June 23, 2021 Judgment.[61]  Second, the Trustee claimed damages arising from Allied making certain transfers that the Court determined to be avoidable, in the amount of the transfers, plus interest.  The full amount sought by the Trustee for this alleged injury was also awarded in the June 23, 2021 Judgment.[62]  Third, the Trustee sought damages at Trial related to Yucaipa's alleged interference with the JCT Negotiations.  For the reasons discussed above, no damages will be awarded in connection with the JCT Negotiations because the Trustee failed to carry her burden of proving that Allied or the Lenders suffered damages as a result of Yucaipa's conduct in connection with the JCT Negotiations.

---

[60] *Id.*

[61] Judgment ¶ 1.

[62] *Id.* ¶ 2.

235.    The Trustee has not alleged any other harm.  Since all of the alleged harm that the Court has determined to be compensable has already been remedied in full pursuant to the Judgment, subordination would not remedy any additional harm.[63]  "A claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct."[64]  Thus, where the defendant is held liable for money damages, the Trustee cannot also obtain a remedy of subordination to rectify the same harm.[65]

236.    Moreover, the Trustee has already recovered a substantial amount under a confidential settlement agreement reached with certain defendants to settle claims asserted in this litigation, which the Court has reviewed *in camera*.  Yet, the Trustee failed to update her claimed damages to reflect the amounts recovered or to explain how the receipt of the settlement proceeds impact her remaining claims.  Subordination may not be imposed as a remedy where, as here, damages are available.[66]

---

[63]  Although the Trustee alleges that the Judgment has not yet been satisfied, the Trustee is actively pursuing her recovery, including, by filing cases against dozens of defendants in multiple courts throughout the country.  Moreover, equitable subordination is not a mechanism for collecting on an existing judgment.  The Trustee has not pointed to any legal authority to support the award of an *additional* judgment to assist in its collection efforts with respect to an existing judgment.

[64]  *In re Winstar Communications, Inc.*, 554 F.3d 382, 413 (3d Cir. 2009).

[65]  *See, e.g., Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*, 151 B.R. 327, 332 (Bankr. D. Del. 1993 ("a debtor may not obtain both equitable subordination and an award of money damages which would compensate it for the damages resulting from the same conduct.  On the contrary, equitable subordination is a remedy available only when damages cannot be reasonably ascertained.") (citations omitted).

[66]  *See, e.g., Knox v. Lion/Hendrix Cayman Ltd. (In re John Varvatos Enters., Inc.)*, Case No. 20-11043 (MFW), 2021 WL 4133656 at *8 (D. Del. Sep. 10, 2021).

237.    In addition, equitable subordination is rooted in equity and equity would not be served by imposing the remedy in this case.  First, the Court has already issued a Judgment that is intended to compensate the Trustee fully for all harm suffered.[67] Second, BD/S are the only meaningful beneficiaries of any awards in this litigation, including the Judgment, in which the Court awarded the Trustee approximately $132 million, as well as the Settlement Agreement, which resulted in the Trustee's receipt of additional amounts known to the Court through its *in camera* review of the confidential settlement agreement filed in this case under seal.

238.    As of the Petition Date, BD/S together held claims against Allied's estate in the approximate amount of $56 million.  BD/S purchased nearly all of those claims at a steep discount and with knowledge of the allegations that underlie the Trustee's claims.   Following their receipt of distributions from the estate, BD/S now hold approximately $42.9 million in claims against the estate.  Based upon the awards and settlements to date, BD/S stand to recover approximately twice the amount of their claims against the estate and approximately five times the amount paid for those claims. Awarding equitable subordination under these circumstances would grant BD/S an undeserved windfall.[68]

---

[67] Adv. Pro. 13-50530, D.I. 841; Adv. Pro. 14-50971, D.I. 579.

[68] The Court is cognizant that BD/S is entitled to the payment of the face amount of its debt regardless of the price at which it was obtained.  Indeed, the purchase price is generally irrelevant, and the Court is rarely aware of it.   However, the purchase price is highly relevant in considering whether to provide equitable relief in this instance.

239.    Moreover, Yucaipa produced evidence that BD/S had been strategizing to move to equitably subordinate Yucaipa's claims since at least August 2009, and that BD/S purchased nearly all of their claims against Allied for years after at pennies on the dollar, including postpetition.  [Ex. 417 (Black Diamond Trade Sheet); Ex. 481 (Spectrum Allied Trade Sheet).]    Equitable subordination is not appropriate under these circumstances because "[e]quity does not aid those who purchase their claims after the alleged misconduct of other creditors and after the intervention of bankruptcy and at distressed prices."[69]

240.    In sum, the Court concludes that it would be inequitable to subordinate Yucaipa's claims.[70]

## CONCLUSION

As set forth above, the Court finds the breaches alleged by the plaintiffs in the Remaining Claims of (i) Breach of Fiduciary Duty (Estate Claim 7), and, in the alternative to Breach of Fiduciary Duty, (ii) Breach of the Implied Covenant of Good Faith and Fair Dealing (Lender Claim 3).  However, the Court finds that the plaintiffs cannot prove any damages as a result of those breaches.  The Court further finds that

---

[69]  *See, e.g.*, *In re S & D Foods, Inc.*, 110 B.R. 34, 37 (Bankr. D. Col. 1990); *see also In re W. T. Grant Co.*, 4 B.R. 53, 78 (Bankr. S.D.N.Y. 1980) (same).

[70]  There is no meaningful distinction between the Estate's and Lender's equitable subordination claims in this regard.  BD/S is the primary beneficiary of all of the claims in their capacity as "Investors" that bought into the litigation postpetition and with knowledge of all of the allegations in the complaints.

the claims for Equitable Subordination (Estate Claim 1/Lender Claim 1) are inappropriate under these facts and circumstances.

Thus, the Court will enter Judgment on behalf of the Defendants on the Remaining Claims.

By the Court:

_____
Christopher S. Sontchi
United States Bankruptcy Judge

Date: May 2, 2022